UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

IME WATCHDOG, INC.,

**Case No.:**

Plaintiff,

-against-

SAFA ABULRAHIM GELARDI, VITO GELARDI,
And IME COMPANIONS LLC,

**DECLARATION OF
DANIELLA LEVI, ESQ. IN
SUPPORT OF PLAINTIFF'S
MOTION FOR A TEMPORARY
RESTRAINING ORDER,
PRELIMINARY INJUNCTION, &
PERMANENT INJUNCTION**

Defendants.
-----------------------------------------------------------------X

Daniella Levi, Esq. declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.      I am the sole shareholder and Chief Operating Officer ("COO") of IME WatchDog, Inc. ("IME WatchDog"), the Plaintiff in this case.  As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents I maintain at the IME WatchDog office as well as those provided to me by one Carlos Roa ("Roa").

2.      The above-entitled case is brought for the purpose of obtaining a temporary restraining order and a preliminary injunction enjoining the Defendants IME Companions LLC, Safa Abdulrahim Gelardi, and Vito Gelardi (collectively the "Defendants") from continuing to unlawfully utilize IME WatchDog's trade secrets and confidential and proprietary information.

3.      I am an attorney licensed to practice law in the State of New York since June 26, 2002.  Since July 2002, I have owned and operated a personal injury law firm duly incorporated under the laws of the State of New York named Daniella Levi & Associates, P.C.

1

4.      Throughout my first decade of practice in the personal injury field, I was often frustrated by insurance carriers' use of what they called independent medical examinations ("IME") to prevail in cases.

5.      In fact, I considered those to be insurance medical exams, conducted by doctors hired by the insurance companies and therefore, they were everything but independent.

6.      My injured clients had to attend those IMEs and would report to me thereafter that the so-called examination generally lasted for only a few minutes.

7.      Those short exams generally produced voluminous reports detailing how either my clients' injuries were  not causally related to the accident, or that they completely healed.

8.      The insurance carriers used those IME reports in support of motions for summary judgment or at the time of trial.

9.      Since the IME exam is an integral part of the litigation and an adversarial event, I always felt that it was important that clients not attend them unaccompanied.

10.      However, the reality was that on an industry-wide basis, it was almost always the case that clients attended IMEs alone, for a couple of reasons.

11.      First, it was too expensive and disruptive to law practices to have a paralegal and/or attorney out of the office for, sometimes, hours at a time.

12.      Second, there was a risk that, if an attorney who attended the IME with his or her client had to testify at trial about what truly transpired, any such attorney would be disqualified on the basis of being a fact witness pursuant to Rule 3.7 of the New York Rules of Professional Conduct.

13.      I therefore saw a real need for a service that could fulfill this very important function at an economically feasible price point.

2

14.     After much thoughtful deliberation, in or about May 2011, I decided to pull the trigger on my idea and launch IME WatchDog, Inc.

15.     The business idea was to provide "watch dogs" to personal injury law firms that would accompany their clients to the IMEs and report back about what did and did not occur during those IMEs.

16.     I came up with the concept, developed forms of reports for the "watch dogs" or observers to complete relating to the different types of IMEs (i.e., orthopedic, neurological, chiropractic, and other modalities), established price lists, established recruitment and training procedures for the watch dogs, and started the IME observer ("watch dog") business from scratch.

17.     I built a customer database through my long-lasting relationships and friendships with other personal injury attorneys who I frequently interacted with in court, through memberships in different legal organization such as New York State Trial Lawyers Association, American Association for Justice, various bar associations and related services.

18.     It took years for me to build these relationships and for IME WatchDog to grow as a business and achieve its success and reputation.

19.     The documents and checklists I created that are used by IME WatchDog's IME observers are confidential and proprietary, and took great costs and efforts to create.

20.     These documents and checklists are crucial to assist an IME observer to properly report on what happens at an IME such that IME WatchDog's customers may use the reports to represent their clients in.

21.     In its infancy, IME WatchDog came under attack by the insurance industry who tried in various ways to keep the "watch dogs" out of the exam room.

3

22.    Among other things, insurance carries included language in their IME notices specifically prohibiting the use of IME WatchDog, cancelling IME appointments if a personal injury plaintiff was accompanied by a watch dog, filed motions to exclude watch dogs from the exam room, and sought to preclude watch dogs from being able to testify at trial or preparing affidavits in opposition to motions by the insurance carriers.

23.    I went through painstaking efforts, time, and money in the form of legal fees to fight the insurers to make it the law of the land in the Appellate Divisions of the State of New York that "watch dogs" and observers are permitted to accompany plaintiffs to IMEs.

24.    This included, *inter alia*, suing Baker, McEvoy, Morrissey & Moskovits, P.C. ("Baker McEvoy") to enjoin it from refusing to move forward with IMEs with a "watch dog" or observer present, and prevailing in obtaining a temporary restraining Order, and subsequently successfully litigated its case through appeal against Baker McEvoy.

25.    The Hon. James E. D'Auguste, J.S.C. succinctly summarized IME WatchDog's legal battle in a 2016 decision as follows:

> The [conditions, *inter alia* , that no non-attorney may be present, placed] in Baker McEvoy's IME demand have become such a widespread problem that the law firm has been barred from serving IME notices containing conditions that purport to exclude a non-attorney representative present at the examination—exactly what has been protested in the instant case—in a plenary action. See IME Watchdog, Inc. v. Baker, McEvoy, Morrissey & Moskovitz, P.C., Index No.: 21822/2016E, NYLJ 1202756064297 (Sup.Ct., Bronx County Apr. 19, 2016) (granting IME Watchdog, Inc. **a temporary restraining order and preliminary injunction against Baker McEvoy**).
>
> On appeal, the Appellate Division, First Department, which had originally stayed the enforcement of an injunction, **vacated the stay and permitted the injunction to go into effect**. See IME Watchdog, Inc. v. Baker, McEvoy, Morrissey & Moskovitz, P.C., 2016 WL 4133495 (1st Dept. Aug. 4, 2016).

4

> Thus, Baker McEvoy is also prohibited under this separate order from the Appellate Division from the exact conduct that is the subject of the instant motion practice. Although the Appellate Division decision in IME Watchdog was issued in August, Baker McEvoy never communicated with this Court that it is not permitted to interfere with a non-attorney's presence at a physical examination.

See Steinbok v. City of New York, 53 Misc. 3d 1205(A) (Sup. Ct. N.Y. Cty. 2016) (emphasis added).  Thereafter, in Henderson v. Ross, the Second Department held that a plaintiff is entitled to be examined at his or her IME in the presence of his or her attorney or other legal representative, if necessary, so long as the attorney or other legal representative does not interfere with the conduct of the examination.  See 147 A.D.3d 915 (1st Dept. 2017).

26.     In Martinez v. Pinard, the First Department similarly held as much.  See 160 A.D.3d 440 (1st Dept. 2018); see also Santana v. Johnson, 154 A.D.3d 452 (1st Dept. 2017).

27.     As explained by the First Department in Markel v. Pure Power Boot Camp, Inc., "IME observers or 'watchdogs' are typically hired by plaintiff's lawyers to assist their clients in filling out forms at the examining doctor's office. More importantly, according to plaintiff, the presence of an IME observer deters examining doctors hired by defendants from inquiring about matters beyond the scope of the particular action[,] keeps the IME process honest[,] and to serve as the attorney's 'eyes and ears' [to observe] what occurred during the IME, and then [report] that information back to plaintiff's attorney."  See 171 A.D.3d 28, 30-32 (1st Dept. 2019).

28.     In Markel, the First Department held that an IME observer's notes constitute materials prepared for trial, bringing them within the conditional or qualified privilege protections of New York Civil Practice Law & Rules ("CPLR") § 3101(d)(2), which materials may be obtained only upon a showing that the requesting party has a substantial need for them in the preparation of its case and that, without undue hardship, the requesting party is unable to obtain the substantial equivalent by other means.  See Markel, 171 A.D.3d at 31.

29.     After costly legal battles to successfully fight for its right to exist, I, on behalf of IME WatchDog, have spent over a decade marketing IME WatchDog's services and cultivating relationships with its customers, many of whom have been customers of IME WatchDog from its inception.

30.     IME WatchDog's carefully curated customer preferences – such as how soon each customer wants its report, and whether the IME observer should have a conference with the customer in advance of the IME, among many others – and customer relations are vital to its business; possession of that decades-long developed information provides IME WatchDog a unique competitive advantage in the IME observer industry.

31.     Since 2011, IME WatchDog employed Adam Rosenblatt ("Rosenblatt") initially as an administrative assistant and then as a watch dog himself.  In or about 2016, Rosenblatt became President of IME WatchDog – the top executive of IME WatchDog besides me.

32.     As President, Rosenblatt has had access to IME WatchDog's entire database, including the identity of all of its customers and clients, their contact information, their preferences, their pricing and all of the financial details of IME WatchDog.

33.     IME WatchDog took reasonable measures to keep this information secret, including restricting access of its database that contains this information only to myself and Rosenblatt.

34.     For example, Rosenblatt and I added password protection to sensitive documents, and thus were the only ones who could access sensitive documents.

35.     Further, all computers at IME WatchDog are connected to a Microsoft Windows Domain; in order to log in to any desktop computer at IME WatchDog, one would need a valid username and password to access any information on any such computer.

6

36.     As such, only Rosenblatt and I would be able to access our own computers, which contain sensitive data, and others working at IME WatchDog were not permitted nor able to do so.

37.     Finally, IME WatchDog is protected from outside attacks by the implementation of: (i) a firewall called Sonicwall TZ 400, with a security suite subscription and all security features enabled; (ii) antivirus software on each and every computer; and (iii) updates performed by an outside IT company for the IME WatchDog file server and virtual file server.

38.     IME WatchDog's entire database, including the identity of all of its customers, their contact information, their preferences, and their pricing derives independent economic value from not being generally known to, and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

39.     This information is related to services used in and intended for use in interstate or foreign commerce because IME WatchDog has its observers travel out of the State of New York to the States of New Jersey and Pennsylvania in the regular course of its business.

40.     Rosenblatt was in a position of trust and was required, as President of IME WatchDog, to provide his utmost duty of loyalty to his employer, IME WatchDog.

41.     On or about January 28, 2022, I received a text message from an unknown number asking to meet with me to discuss the decline in sales of IME WatchDog.

42.     I met this individual with my son on February 2, 2022, and he identified himself as Carlos Roa, an employee of Defendants.

43.     During our meeting, I was presented with compelling documentary evidence[1] by Roa.

---

[1] Because this evidence contains the trade secrets stolen by the Defendants, Plaintiff will file a separate motion to seal and provide this Court with the unredacted documents under seal.

44.     This evidence establishes that Rosenblatt has been selling information related to IME WatchDog's customers, their contact information, their preferences, their pricing and related financial information of IME WatchDog to the Defendants since in or about June or July of 2016.

45.     These acts are in violation of Rosenblatt's fiduciary duty, and Defendants' actions constitute, among other things, theft of trade secrets and unfair competition.

46.     Defendants know that the trade secrets they obtained from Rosenblatt – including customer lists, financial information, and details about customers – were acquired by improper means.

47.     In fact, Defendants bribed Rosenblatt with money in order to acquire IME WatchDog's trade secrets (through Zelle payments, cash payments, and wire transfers).

48.     The unauthorized disclosure by Rosenblatt of IME WatchDog's confidential information to Defendants provided critical information to Defendants, a competitor that would have no other way to obtain such information and Defendants used the confidential information as "roadmap" and "step by step manual" to establish their operations.

49.     Plaintiff's confidential information gave Defendants the ability to duplicate operational, service, and development techniques that IME WatchDog has spent a decade, establishing and which Defendants would have no other way of obtaining.

50.     No permission was given to Rosenblatt to sell customer lists, financial information, and details about IME WatchDog's customers to anyone nor was any permission given to Defendants to have access to any of this information.

51.     It is obvious from Defendants' brazen tactics to bribe Rosenblatt in exchange for the fruits of IME Watchdog's business that Defendants have been and are still actively engaged in a scheme to plunder and destroy the company I built for over ten years.

8

52.     During our meeting, Roa also informed me that the Defendants are in the process of creating a franchise from my business idea and all of the confidential information I created that they stole.

53.     Based on the evidence presented to me by Roa, I am certain that discovery will uncover a significant number of customers being solicited by Defendants using confidential information inappropriately and illegally acquired by the Defendants.

54.     In fact, based on the evidence submitted in my declaration under seal, I attach documentary evidence of actual customers stolen or attempted to be stolen by Defendants from IME WatchDog.

55.     Immediate injunctive relief is necessary to prevent Defendants and Rosenblatt from destroying the customer relationships and goodwill that IME WatchDog has spent over a decade building, from stealing IME Watchdog's customers which they obtained solely by using IME Watchdog's trade secrets and confidential information, from franchising a business which they stole from IME Watchdog, and causing further imminent and irreparable financial harm to IME WatchDog.

56.     In addition to securing the return of its misappropriated information to it by Defendants and enjoining Defendants from engaging in any further illegal activity, it is essential that IME WatchDog be permitted to forensically examine the Defendants' email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact nature and extent of Defendants' unlawful bribery scheme to steal IME WatchDog's customers.

57.     I also request this relief urgently because I cannot fire Rosenblatt until I obtain same; if I fire Rosenblatt, I believe Defendants will be put on notice, resulting in additional harm.

58.     I respectfully request that this Court grant the relief requested herein.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 25, 2022.

Daniella Levi, Esq.

10