UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IME WATCHDOG, INC., | |
|                Plaintiffs, | Civil Action No.: 1:22-cv-1032 |
| -against – | |
| SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC, | AFFIDAVIT OF SAFA GELARDI |
|                Defendants. | |

I, Safa Gelardi, of full age, hereby deposes and says:

1. My name is Safa Gelardi. I reside at 148 Clay Pit Road, Staten Island, New York 10309 with my husband and three children. My children are ages 18, 7 and 3.

2. I am the owner of a company called IME Companions ("Companions") along with my husband, Vito. I submit this affidavit to prevent the Court from closing my business before this case has even started, which would be devastating to my family as Companions is our only source of income.

3. Daniella Levi, Esq. and Carlos Roa have accused me of breaking the law so, under the advice of my attorneys, I must assert my constitutional right against self-incrimination with respect to my interactions with Adam Rosenblatt after my partners and I started Companions.

4. However, I want to set the record straight as to how I started Companions, how I learned the IME observer business, and how I grew the vast majority of my business fairly through hard work, dedication and persistence. By offering this testimony, I do not intend waive my Fifth Amendment right against self-incrimination.

5. I also want to tell the Court that there are many IME observer businesses in New York, and we all have similar pricing, websites, forms, processes and systems. We compete against

1

each other for the same pool of clients. Much of the "confidential information" which IME Watchdogs ("Watchdogs") accuses me of stealing is publicly available or available on Watchdog's website.

6. I believe that after the Court hears the full story, it will understand why closing my business while this case is pending would be not only be a catastrophe for my family but unjust and unfair.

7. I recognize that Watchdogs is requesting access to Companion's computer systems and paper files. I am not opposed to providing this information. However, on the advice of my attorney, I would like some safeguards in place such as a confidentiality order and my counsel's participation in setting the search parameters and processes to ensure that Companions' proprietary and confidential information is protected. I respectfully ask the Court not to enjoin me to give Watchdogs completely unfettered access to Companion's information before the discovery process has started.

8. I also recognize that Watchdogs is requesting that I not communicate with Adam Rosenblatt. I have not communicated with Adam Rosenblatt since I was served with this lawsuit and I agree not to communicate with him during the pendency of this case.

**How I Started IME Companions**

9. My background is in the banking industry. I worked at Sterling Bank for 17 years. I started there as a teller and worked my way up to District Manager, where I oversaw 16 bank branches. I did not get to this position by being lazy or taking shortcuts.

10. The focus of my career was on entrepreneurs and business clients and helping them develop and grow their businesses. Over the years, I had the opportunity to collaborate and network

2

with dozens of entrepreneurs and business clients, from start-up internet companies to established businesses, including many law firms and litigation funding companies.

11. In or around 2016, while I was working at the bank, I was approached by a business client of mine, Ronald Rosenblatt, with an idea for a new business. The idea was to provide a service to people with potential medical malpractice claims by having their records reviewed by an expert in medical malpractice before seeing a lawyer.

12. I am an entrepreneur at heart, and I have always wanted to be my own boss, set my own hours, work from home, and support my family with a small business of my own.

13. Ronald Rosenblatt asked me to start the company with him. I jumped at the chance. We started a company called Medmal USA LLC d/b/a malpracticescreening.com (and its sister company, casescreening.com) in January 2017. Business Entity Information, attached hereto as Exhibit A.

14. We developed the business websites and began to do business. After a few months, however, it became apparent that Ronald Rosenblatt had medical issues which made him an unreliable partner. That business gradually became dormant.

15. I only mention Ronald Rosenblatt because he is how I met his son, Adam Rosenblatt.

16. In or around 2017, Ronald asked me to help his son Adam start an IME business multiple times. I explained that it would be difficult to make time for Adam. I had my hands full with family life, work life, and building Med Mal USA. Ronald pleaded with me. He told me that his son works for an attorney named Daniella Levi and that she is ruthless and treats people badly. Ronald told me that he worked with Ms. Levi as a consultant on medical malpractice claims. Ronald told me that he came up with the idea of an IME observer business, not Ms. Levi. Ronald

said that the only reason his son works there is that he asked Ms. Levi to hire his son because she stole his idea. I said I would help him, but I was not looking into another business and intended to put my efforts was focused into malpracticescreening.com.

17. Sometime later, Ronald brought Adam to the bank and introduced him to me in person. To the best of my recollection, it was just an introduction, and we did not talk business.

18. In or around April 2017, Ronald Rosenblatt and Adam contacted me again about Adam's potential business. To the best of my recollection, Adam stated that he was the president of a company called IME Watchdogs and that he hated his boss. Adam spoke of Ms. Levi very poorly, calling her a "bitch" and a "cheap Israeli Jew" who does nothing for the business except take money every month. Adam accused Ms. Levi of evading taxes on her Watchdog income using a fake account called "Zara." Adam stated words to the effect of, "she stole my Dad's idea and I want to take it back from her."

19. I told them I needed more details about this business and how it works; however, my gut instinct instantly told me that this is someone I can never trust. His unethical and unscrupulous behavior and his passion to destroy his boss's business was a turn-off.

20. Sometime thereafter, Adam emailed me with some material attached. To the best of my memory, I did not open the attachments for several months, nor communicate with Adam in the interim.

21. In either July or August 2017, Adam contacted me again and pleaded with me to start this business with him.

22. I re-read his email from April and opened the attachments. From the best of my recollection, some of the documents included business information of the company Adam worked

for, Watchdogs. One of the documents which I remember seeing was the "Sales by Customer Summary" document attached to Ms. Levi's sealed declaration as Exhibit C.

23. I did not ask Adam to send me those documents, I did not offer him money for those documents, and I did not otherwise provide any money or benefit to Adam for those documents.

24. I thought that the idea was interesting. However, I did not want to go into business with Adam because my instincts told me not to.

25. Around the same time, I had reached out for one of my contacts, Roman Pollak, who worked for a client of mine, Greg Elefterakis, Esq. Greg was a successful personal injury attorney in Brooklyn for 20 years before started his own lawsuit funding company, Case Cash Funding.

26. I wanted a meeting with Mr. Elefterakis to discuss my malpractice screening business.

27. Greg agreed to meet with me, and I asked him if he would invest in my malpractice screening business. He turned me down. I was very disappointed.

28. In or around September 2017, I reached out for Roman Pollak again and asked for another meeting with Mr. Elefterakis. I planned on discussing the IME observer business which I had heard about from Adam.

29. Mr. Elefterakis agreed to meet with me. After I described the business to him, he said he was interested in the idea.

30. He contacted his nephews, Nick Liakas, Esq. and Nick Elefterakis, Esq. who both have successful plaintiff's personal injury law firms in Manhattan (Liakas Law and Elefterakis

Elefterakis & Panek, respectively). He asked if they had used or would use an IME observer business. When they said yes, Greg Elefterakis said he was on board.

31. Greg told me the business model was he had the connections, he would get me the appointments, and I had to close the deals. This was perfect for me.

32. Mr. Elefterakis provided start-up capital and brought in two more partners, Roman Pollak and Anthony Brida. I provided start-up capital in a matching amount.

33. We opened IME Companions on or about November 17, 2017. See Application for EIN number, receipt for filing Articles of Incorporation, and Articles of Incorporation, attached collectively hereto as Exhibit B.

**How I Grew IME Companions**

34. Our first clients were Greg's nephews' firms, Liakas Law and Elefterakis Elefterakis & Panek.

35. Greg and his nephews (the two Nicks), were instrumental in helping the business grow.

36. They were fully familiar with the IME process. They taught me about it and why attorneys would pay to have people observe IMEs on their behalf. They critiqued my reports and told me what they want their IME observer reports to look like, in order to be helpful to them in court. They critiqued my Companions and gave me pointers on how the Companions should advocate, what questions to block and what questions not to block.

37. They introduced me to the Zaremba Brown law firm. Nick Liakas, Nick Elefterakis and John Zaremba all when to the same school. Zaremba Brown later became my client. Soon after, Greg got us a meeting with another good friend of his, Alex Cherny from Cherny &

Podolsky. Greg accompanied me to Alex's office. They seemed to be good friends, and very soon after Alex became a client. Alex is now unfortunately deceased.

38. I resigned from Sterling Bank and devoted my full time to Companions.

39. When I started the business, I was the only employee. I did everything from customer service to sales, marketing, editing IME reports, sending IME reports to the attorneys in a timely fashion, bookkeeping, booking appointments, answering phones and emails, attending IMEs as an observer, training other observers, billing, payroll, and countless other tasks. I learned the entire business from doing it.

40. Gradually with Greg's help, the bookings from attorneys started to come in. Greg introduced me to his network and sent me to close and sometimes came along with me to the meetings to close the deal. Greg gave me a desk in his Manhattan office. We worked on calling his clients every chance we got and booked the calendar for sales appointments around IME observation appointments. I met with many of Greg's contacts including Kenneth Halperin from Wingate. Greg Elefterakis accompanied me to this particular appointment. Mr. Halperin met with us and stated he had nothing bad to say about Watchdogs but as a friendly favor to Greg he would use us as well. He stated he would split the business. I gained referrals to other attorneys by being responsive, accommodating, and by providing good service and good reports at a good price.

41. In addition to Greg's network, I was making cold calls, making appointments to visit the firms in person and getting face to face appointments with relevant partners, senior paralegals, and operations people.

42. Eventually, my hard work, long hours, and total commitment to the business started to pay off. Companions started to grow.

43. In January 2018, I won the Subin Associates account. Greg orchestrated a meeting for me to meet Herb Subin, Greg Ciccione (senior partners), and CFO Arnie Baum. Greg Ciccione and Greg Elefterakis were very good friends and golf partners. Greg did not come with me to the meeting but he was on speakerphone.

44. I hired a company to create a website so that potential clients could book appointments online. It went live in or around August 2018.

45. In August 2018, I was able to buy out my partners' shares for $115,000. A true copy of the Purchase Agreement is attached hereto as Exhibit C.

46. In early 2019, I hired Carlos Roa to be an IME observer. My husband knew Carlos and his family since Carlos was 16. We invited Carlos and his family to our home multiple times. We've met his mother, grandfather and grandmother. I have cooked for Carlos and his family many times and we all ate together like family. I trusted him and treated him well.

47. Carlos had no previous experience working in the IME observer industry.

48. Over time, I realized that Carlos' strength was salesmanship, and he eventually became my "right hand man."

49. I began a marketing blitz with Carlos's help.

50. I purchased tables and booths at Continuing Legal Education ("CLE") presentations, New York State Trial Lawyers Association ("NYSTLA") events, and other law-related events, frequently on nights and weekends, to introduce Companions and its services. We met a lot of attorneys this way. I would also get a list of the attendees and their contact information from NYSTLA, who we would contact repeatedly and ask for their business.

51. I entered into an agreement with an internet marking company, which provided me a spreadsheet of over 3,000 law firms in the New York area with contact information for the

8

relevant contact, including their direct phone number, email address, LinkedIn profile, and business address. Carlos and I cold-called and cold-emailed these law firms continually looking for new business.

52. I entered into an agreement with another internet marketing company, which provided lead generation, email and text message marketing, call tracking, reputation monitoring and other services. We used all those features and more.

53. We called, emailed and visited dozens of potential clients we had met either through NYSTLA and CLE events or through referrals from other attorneys.

54. I started paying Carlos a residual for each IME he booked through his sales efforts. He was incentivized to win as much business as possible, and his efforts bore fruit.

55. I recall one occasion where we were at a NYSTLA event, and we were giving away bottles of whiskey to attorneys who signed up with us. One attorney stopped by to chat but did not sign up. Carlos literally chased this man into an elevator to beg for his business and give him the bottle of whiskey. This attorney agreed to use our services.

56. In August 2019, we won the Zemsky & Salomon account from Watchdog and another competitor, IME Guards, due to their poor service.

57. Since 2019, we have continued to grow Companions through hard work, dedication, total commitment, and providing superior service than our competitors. The vast majority of our success is due to fair competition.

**IME Observer Businesses in New York**

58. Daniella Levi's claim that I took all her business away is ridiculous.

59. There are many competing entities in the IME observer industry in New York.

60.     Satellite Investigations Corporation ("Satellite") is an active New York entity that was incorporated in 2005. Satellite provides IME observation services. They have advertised this service from at least October 2017. Business Entity Information and Satellite Investigations website (accessed online on March 24, 2022 at https://satellitepi.com/ime-appointments/) and Satellite Investigations website as of October 9, 2017, captured by Internet Wayback Machine at https://web.archive.org/web/20171009120108/http://satellitepi.com/ime-appointments/), attached collectively hereto as Exhibit D.

61.     IME Observers of WNY, LLC ("Observers") is an active New York entity that was incorporated in June 2013. According to its website, Observers "works with attorneys to get quality reporting of medical exams." Observers "will attend the independent medical exams for your clients. We help injured patients feel at ease." Business Entity Information and Observers website (accessed online on March 9, 2022, at https://www.imeobserverswny.com/index.php), attached collectively hereto as Exhibit E.

62.     IME Guards LLC ("Guards") is an active New York entity that was incorporated in February 2018. According to its website, Guards "make[s] sure your Insurance Medical Exam is handled properly." Guards "ensure[s] that plaintiff attorneys have an independent record of what transpired [at the IME] in the event that the IME physician's report is inaccurate." Guards charges $179 for the first hour, plus $45 for each additional half hour. Business Entity Information and IME Guards website (accessed online on March 9, 2022, at https://www.imeguards.com), attached collectively hereto as Exhibit F.

63.     Adam Rosenblatt told me that he met with sent Plaintiff's business information to a company called Law Cash in an attempt to get them to start an IME observer business with him.

Soon after, Law Cash started Guards and hired a former Watchdogs observer, Jamal Aaron, to help run it.

64. Smartdog IME Solutions, LLC ("Smartdog") is an active New York entity that was incorporated in October 2018. Business Entity Information, attached hereto as Exhibit G. I do not have much information on Smartdog.

65. IME Sharks Inc. ("Sharks") is an active New York entity that was incorporated in February 2019. According to its website, Sharks was founded by Chrissy Grigoropoulos, an attorney. Sharks provides the same services as Watchdogs, Smartdog, Guards, and Companions. Sharks charges $155.00 for the initial hour, plus $40 for each additional half hour. Business Entity Information and IME Sharks website (accessed online on March 9, 2022, at www.imesharks.com/home/our-benefits/ and www.imesharks.com/home/appointments), attached collectively hereto as Exhibit H.

66. ZR Per Diem is an active New York entity that was incorporated in 2017. ZR Per Diem has offered IME coverage since at least October 2020. Business Entity Information and ZR Per Diem website (accessed online on March 25, 2022 via the Internet Wayback Machine at https://web.archive.org/web/20201028200928/https://www.zrperdiem.com/ime-coverage), attached collectively hereto as Exhibit I.

67. As the Court can see, Watchdogs has a number of competitors besides Companions.

68. The Court should also know that Watchdogs has maintained a website since 2011 that has, at various times, listed its prices, its services, its IME report template, a description of the IME observer process, its associations and memberships, and a list of its clients. Watchdogs' website still contains this information. IME Watchdogs website, video (accessed online on March 9, 2022, at https://imewatchdog.com/), attached hereto as Exhibit J; IME Watchdogs Sample

Report from 2017, accessed via the Internet Wayback Machine on March 11, 2022 at https://web.archive.org/web/20111111220603/http://www.imewatchdog.com/files/SampleIME.pdf, attached hereto as Exhibit K.

69. Further, Watchdogs, Companions, Satellite, Observers, Guards, Sharks, Smartdogs, and ZR Per Diem all have the same access to the names, phone numbers and email addresses of the same pool of clients. Any personal injury attorney in New York and beyond is a potential customer.

70. There are many factors going into whether a law firm chooses a particular IME observer business on a given day, such as whether the business has an IME observer available on a particular day, at a particular physician's office, at a particular time. Law firms may engage, and often do engage, IME observers from multiple IME observer businesses to obtain the coverage they need. There have been many times when a client of one of my competitors has called Companions because they did not have an observer available, and vice versa.

**Conclusion**

71. I thank the Court for its time and attention in reading this Affidavit. I sincerely hope that Your Honor will not shut down my business before this case even starts or give Watchdogs unfettered access to Companions' confidential information without some safeguards in place.

72. I agree that I will not communicate with Adam Rosenblatt for any reason while this case is going on.

[Certification on next page]

I certify under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
March 28, 2022

_____
Safa A. Gelardi