UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

                             Plaintiff,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS LLC,

                             Defendants.
---------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

                    Third-Party Plaintiffs,

        -against-

CARLOS ROA and DANIELLA LEVI,

                    Third-Party Defendants.
---------------------------------------------------------------X

**Case No.: 1:22-cv-1032 (PKC) (JRC)**

 

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW
<u>IN FURTHER SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION</u>**

**MILMAN LABUDA LAW GROUP PLLC**

Jamie S. Felsen, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
jamiefelsen@mllaborlaw.com
emanuel@mllaborlaw.com

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................1

II.   FACTUAL BACKGROUND ..................................................................................4

III.  ARGUMENT ...........................................................................................................13

      A.  Plaintiff Has Established the Existence of Irreparable Harm ........................14

      B.  IME WatchDog Is Likely to Succeed On The Merits Of Its Claims ..............21

      C.  The Balance of Hardships Tips Considerably In IME WatchDog's Favor ..........................................................................................................22

      D.  Granting an Injunction Would Not Harm the Public Interest ........................22

IV.   CONCLUSION .......................................................................................................24

## TABLE OF AUTHORITIES

Arminius Schleifmittel GmbH v. Design Indus., Inc.,
    2007 WL 534573, 2007 U.S. Dist. LEXIS 10847 (M.D.N.C. Feb. 15, 2007)........... 15, 16

Benihana, Inc. v. Benihana of Tokyo, LLC,
    784 F.3d 887 (2d Cir. 2015) ................................................................................. 23

Champion Salt, LLC v. Arthofer,
    4:21-CV-00755-JAR, 2021 WL 4059727 (E.D. Mo. Sept. 7, 2021)............................... 22

Crown IT Servs. v. Koval-Olsen,
    11 A.D.3d 263 (1st Dept. 2004)............................................................................. 18

Ericmany Ltd. v. Agu,
    2016 WL 8711361 (E.D.N.Y. June 3, 2016) ................................................................ 18

Flip Flop Shops Franchise Co., LLC v Neb,
    CV 16-7259-JFW (EX), 2016 WL 9275403 (C.D. Cal. Dec. 5, 2016) ........................... 21

Garvin GuyButler Corp. v Cowen & Co.,
    155 Misc. 2d 39 (Sup. Ct. N.Y. Cty. 1992) ............................................................. 17

Geraci v. Probst,
    61 A.D.3d 717 (2d Dept. 2009) ............................................................................. 19

Geraci v. Probst,
    15 N.Y.3d 336 (2010) ........................................................................................... 19

Gluco Perfect, LLC v. Perfect Gluco Products, Inc.,
    No. 14-CIV.-1678 (KAM) (RER), 2014 WL 4966102 (E.D.N.Y. Oct. 3, 2014)............. 17

Golden Krust Patties, Inc. v. Bullock,
    957 F. Supp. 2d 186 (E.D.N.Y. 2013) ..................................................................... 17

Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.,
    No. 1:18-CV-08333-ALC, 2019 WL 10960397 (S.D.N.Y. June 20, 2019).................... 17

Matter of Elefterakis,
    238 A.D.2d 7 (2d Dept. 1997) ......................................................................... 6 n. 3

Mister Softee, Inc. v. Diaz,
    2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020)................................................ 15

Mohammed v. Reno,
    309 F.3d 95 (2d Cir.2002)...................................................................................... 13

N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,
    883 F.3d 32 (2d Cir. 2018)...................................................................... 13

NextG Networks of New York, Inc. v. City of New York,
    2004 WL 2884308 (S.D.N.Y. Dec. 10, 2004) .................................................. 14

Panorama Consulting Sols., LLC v. Armitage,
    2017 WL 11547493 (D. Colo. June 9, 2017).................................................. 14

Plaza Motors of Brooklyn, Inc. v. Bogdasarov,
    2021 U.S. Dist. LEXIS 230156 (E.D.N.Y. Dec. 1, 2021) ............................... 18

QBE Americas, Inc. v. Allen,
    No. 22-CIV.-756 (JSR), 2022 WL 889838 (S.D.N.Y. Mar. 25, 2022).......... 18, 19, 20, 22

Really Good Stuff, LLC v. BAP Investors, L.C.,
    813 F. App'x 39 (2d Cir. 2020) ..................................................................... 18

Regeneron Pharms., Inc. v. U.S. Dep't of Health & Human Servs.,
    510 F. Supp. 3d 29 (S.D.N.Y. 2020) ............................................................. 18

Register.com, Inc. v. Verio, Inc.,
    356 F.3d 393 (2d Cir. 2004) ......................................................................... 18

Salinger v. Colting,
    607 F.3d 68 (2d Cir. 2010)............................................................................ 15

Schein v. Cook,
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) ........................................................ 23

Scherer Design Group, LLC v. Schwartz,
    2018 U.S. Dist. LEXIS 125644 (D.N.J. July 26, 2018).................................... 17

SEC v. Citigroup Global Markets, Inc.,
    673 F.3d 158 (2d Cir. 2012)......................................................................... 22

Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC,
    468 Fed. Appx. 43 (2d Cir. 2012).................................................................. 15

WHIC LLC v. NextGen Laboratories, Inc.,
    341 F. Supp. 3d 1147 (D. Haw. 2018) ............................................... 19, 20, 22

Winifred Warren, Inc., v. Turner's Gowns,
    285 N.Y. 62 (1941) ...................................................................................... 17

Winter v. Nat. Hus. Def Council, Inc.,
    555 U.S. 7 (2008)......................................................................................... 13

ii

**PRELIMINARY STATEMENT**

Following an illuminating hearing on April 4, 2022, this Court found that Plaintiff IME WatchDog, Inc. ("Plaintiff" or "IME WatchDog") has demonstrated likelihood of success on the merits of its claims against Defendants Safa Abdulrahim Gelardi ("Safa"), Vito Gelardi ("Vito"), and IME Companions LLC ("Companions" or the "Corporate Defendant") (Safa, Vito, and Companions collectively hereinafter the "Defendants"), finding "what clearly and convincingly appears to be wrongfully obtained trade secrets" by Defendants.  The Court also found the remaining elements of an injunction met and issued an injunction enjoining Defendants from franchising Companions as well as from any ongoing or future communications by Defendants with Plaintiff's employees and agents.

The question that remains before the Court, and for which the Court requested further briefing, is whether Plaintiff will be irreparably harmed warranting the issuance of a preliminary injunction enjoining Defendants from "operating the parts of IME Companions LLC that were built on Defendants' wrongful appropriation of Plaintiff's trade secrets."

First and foremost, Plaintiff respectfully submits that there is no way to slice and dice Defendants' operations – which was created and built *solely* on the illegal misappropriation of Plaintiff's confidential information and trade secrets obtained through routine acts of bribery and extortion – such that Defendants may continue to operate some "parts" of their business while being enjoined from operating other "parts."  Safa conceded at the hearing that she has no background in the law nor in medicine, that she is not an attorney or paralegal, nor has she otherwise ever worked in the legal or personal injury field, and – crucially – that she never knew what an independent medical examination ("IME") was until she met Adam Rosenblatt ("Rosenblatt"), the President of Plaintiff.

Indeed, as adduced at the hearing, Safa's business started when she misappropriated and brought confidential IME WatchDog invoices[1] to non-party Gregory Elefterakis ("Elefterakis"), with whom she opened Companions, and used the information she obtained from Rosenblatt to steal IME WatchDog's customers. Companions would not have started but for Safa's illegal acts. Because Companions was born in crime, the only appropriate remedy is to completely shut down the business Defendants designed to unfairly compete against Plaintiff since its inception by obtaining and utilizing indisputably confidential information Defendants stole. Bearing this perspective, Plaintiff has unquestionably established irreparable harm solely based on the evidence adduced at the hearing, let alone the additional evidence submitted herewith, which only bolsters Plaintiff's entitlement to relief. It would be entirely inappropriate to permit Defendants to, in any way, continue to relish the fruits of the poisonous tree.

Specifically, Safa testified that she utilized the IME WatchDog invoices she illegally obtained to open a competing business and take customers away from IME WatchDog. Safa then repeatedly bribed and/or extorted Rosenblatt in order to build up her business. Safa denied using the other materials, but this Court properly found that her testimony was incredible, as she conceded she acted for the purpose of securing the Elefterakis law firm (which was a customer of IME WatchDog) as the first customer of Companions with the information she held in her possession. It is obvious, therefore, that Defendants acted in similar fashion with respect to every customer listed on the 2016 Sales by Customer Summary (the "Summary").[2]

---

[1] As set forth in the Supplemental Declaration of Adam Rosenblatt ("Rosenblatt Decl."), Safa paid Adam $5,000.00 in cash for these and other confidential materials.

[2] While Safa incredulously (based on the rest of her testimony) denied opening an email Rosenblatt sent her with the Summary for months, even crediting this testimony, the fact remains – albeit implicitly – that Safa ultimately opened the email and logic dictates that she thereafter utilized it to gain an unfair and inappropriate competitive advantage against IME WatchDog.

Moreover, the evidence adduced at the hearing and submitted herewith clearly shows that, in addition to stealing IME Watchdog's confidential information to open its business in order to solicit and steal IME WatchDog's customers, Defendants frequently sent correspondence to IME WatchDog's customers disparaging and defaming Plaintiff by stating that Daniella Levi, Esq. ("Mrs. Levi") would steal personal injury clients from Plaintiff's own customers and that this risk was not present with Defendants' competing business as Safa and her husband, unlike Mrs. Levi, are not personal injury attorneys.

These scurrilous statements, which constitute defamation *per se*, not only injured and continue to injure the reputation and good will of IME WatchDog, but separately impugned the integrity and ravaged the reputation of Mrs. Levi, herself, as an attorney with her own personal injury law firm. As set forth in Mrs. Levi's declaration in support, she has also been irreparably harmed because the value of each customer lost due to Defendants' illegal conduct is incalculable and there is no telling how much business each customer would have continued to give IME WatchDog, especially because Defendants undercut Plaintiff's pricing.

Based on the foregoing alone, Plaintiff respectfully submits that there can be no question as to the existence of irreparable harm for more than one reason. Defendants' entire business was created and maintained through bribery and theft. Moreover, there is no way to value the loss of good will, nor can Plaintiff easily calculate lost revenue from customers it lost.

Finally, the evidence adduced at the hearing clearly eliminates the prospect of any prejudice to Defendants in shutting Companions down. While Safa may not want to, she is more than capable of obtaining a job in the banking industry based on her extensive seventeen (17) year history in banking. Moreover, Defendants own many properties which they rent for the purpose of passive income and engage in home flipping which is another source of income.

3

As such, Defendants will not be left destitute in the wake of this Court's appropriate entry of an injunction enjoining Defendants from operating IME Companions LLC because it was built on Defendants' misappropriation of Plaintiff's trade secrets.  In any event, any harm to Defendants would be self-inflicted, as they have nobody but themselves to blame for their conduct.  A thief that is caught is never permitted to keep the stolen goods nor the spoils, regardless of their financial situation.

Defendants' entire business was created and maintained through criminal chicanery.  It must, therefore, be shut down.  Any result other than prohibiting Defendants from operating Companions or any other business in the IME industry will condone the theft of an entire business, and lead to the absolutely abhorrent notion that crime does pay.

Accordingly, Plaintiff has established the existence of irreparable harm warranting Defendants' business being shut down.

## FACTUAL BACKGROUND

A hearing was conducted in this case on April 4, 2020.  See Hearing Transcript ("Tr."), annexed as **Exhibit "A"** to the Declaration of Emanuel Kataev, Esq. ("Kataev Decl.").

Safa met with Ronald Rosenblatt ("Ronald"), who was a customer of Sterling Bank, in or about 2016 through her employment at Sterling Bank, where she served as Vice President.  See Tr. at 24:21-25:1, 25:8-10.

Ignoring Sterling Bank's policies against doing business or investing with its customers, Safa entered into a business partnership with Ronald, and their business remains in existence to this day, though Safa denies that she continues to perform work there.  Tr. at 25:18-27:13.  During the course of Safa's meetings with Ronald, she learned about IME WatchDog.  Tr. at 28:1-7.

Prior to that time, Safa had no knowledge of the personal injury industry and, in fact, had no idea what IME stood for. <u>Tr.</u> at 28:24-29:18. She conceded that she is not an attorney, paralegal, and never worked in an attorneys' office or medical office nor did she have any connection to the personal injury field. <u>Id.</u> Her sole experience at the time was in the banking industry. <u>Tr.</u> at 29:19-21. Notwithstanding the foregoing, Safa opened up IME Companions. <u>Tr.</u> at 30:6-7. Safa learned from Ronald that Rosenblatt is the President of IME WatchDog. <u>Tr.</u> at 30:8-10. Safa met with Adam, purportedly because Ronald begged her to help Rosenblatt start his own business, but she later conceded that she met with Adam to start a competing business. <u>Tr.</u> at 30:17-32:7, 84:10-85:1.

Rosenblatt met with Defendants in 2017 and discussed opening a competing business together. <u>See</u> <u>Rosenblatt</u> <u>Decl.</u> at ¶¶ 15-25. Safa asked Rosenblatt to provide confidential information in a show of good faith that Rosenblatt was serious about leaving to form a competing business, and discussed giving him a seventy percent (70%) stake in their new venture with a matching salary as to what he was earning working at Plaintiff. <u>Id.</u> at ¶¶ 26-29. After he did so, Safa walked back the offer to forty percent (40%) and half the salary. <u>Id.</u> at ¶¶ 30-42.

Safa then routinely bribed and extorted Rosenblatt for confidential information and to sabotage IME WatchDog accounts so that she can poach its customers. <u>Id.</u> at ¶¶ 43-80. This conduct occurred for years, and Rosenblatt received well over $20,000.00 for doing it. <u>Id.</u>; <u>see</u> <u>also</u> <u>Id.</u> at ¶ 93.

Safa learned through meeting with Rosenblatt that he had no ownership stake in IME WatchDog. <u>Tr.</u> at 32:9-22. Safa knew that Rosenblatt had a duty of loyalty to IME WatchDog, just like she felt her employees had a duty of loyalty to her at Companions. <u>Tr.</u> at 33:6-34:25. Safa and Vito met with Rosenblatt again in April 2017. <u>Tr.</u> at 35:19-21.

At that meeting, Rosenblatt provided Safa the Summary.  <u>See</u> <u>Rosenblatt</u> <u>Decl.</u> at ¶¶ 27-28.  Safa also met with Rosenblatt again with two IME WatchDog observers after that in a restaurant in Forest Hills with eight unidentified people and the meeting did not go well.  <u>Tr.</u> at 37:13-38:12.  However, Safa ultimately decided not to go into business with Rosenblatt and opened IME Companions.  <u>Tr.</u> at 36:24-37:8.  Safa opened IME Companions with non-party Elefterakis, a suspended attorney.[3]  <u>Tr.</u> at 38:15-21.  Safa presented the idea of the business to Elefterakis utilizing confidential documents she obtained from Rosenblatt, who then got two related attorneys involved.  <u>Tr.</u> at 38:22-39:16.  Safa subsequently formed IME Companions with a fifty-percent (50%) ownership stake, while Elefterakis had a twenty-five percent (25%) ownership stake, and two individuals – Roman Pollak and Anthony Brida – each had a twelve-and-a-half percent (12.5%) ownership stake.  <u>Tr.</u> at 38:21-40:15.  They formed Companions on October 17, 2017.  <u>Tr.</u> at 91:1-92:8.

After opening IME Companions, Safa obtained Subin & Associates ("Subin") as a customer, which happened to be the highest volume client of IME WatchDog.  <u>Tr.</u> at 40:16-41:11.  Safa quit her job at Sterling Bank in December 2017, two (2) months after she opened Companions.  <u>Tr.</u> at 95:16-24.  Defendants obtained Subin as a customer by directing Rosenblatt to sabotage the Plaintiff's account with them, including by mis-calendaring IME's so they would be missed by Plaintiff's observers, failing to turn in reports in a timely fashion, and by telling Subin Plaintiff could not provide coverage even when it was available.  <u>See</u> <u>Rosenblatt</u> <u>Decl.</u> at ¶¶ 48-56.

Though Safa denied bringing up Mrs. Levi "in anything," she conceded that she told customers that Mrs. Levi steals personal injury clients by and through IME WatchDog.  <u>Tr.</u> at 43:20-45:17, 66:10-68:3; <u>see</u> <u>also</u> <u>Ex.</u> 8.

---

[3] <u>See</u> <u>Matter of Elefterakis</u>, 238 A.D.2d 7 (2d Dept. 1997).

Similarly, although Safa denied receiving the 2016 Sales by Customer Summary ("Summary") from Adam, she later told the Court herself that Rosenblatt provided her with same and, incredulously, that she never used the Summary. Compare Tr. at 35:24-36:1 with Tr. at 46:14-47:19. Instead, Safa admitted to the Court that she utilized IME WatchDog invoices that she received from Rosenblatt to have Elefterakis open IME Companions with her; she also conceded that she did so to take a law firm owned by relatives of Elefterakis as her first customer from IME WatchDog. Tr. at 47:9-50:16.

Safa also admitted that she asked Rosenblatt for reports to use, despite the fact she conceded that each report is confidential for a variety of reasons (medical information and privileged legal information). Tr. at 51:1-56:21. Safa also conceded that she requested and obtained these reports in 2019, well after she first opened her business in 2017. Id. This demonstrates that Safa utilized IME WatchDog's confidential information throughout the life of IME Companions.

Safa invoked her Fifth Amendment privilege against self-incrimination when asked questions about whether Rosenblatt sent her an email containing contact information for customers of IME WatchDog. Tr. at 58:8-61:12. The Court made a finding of a negative inference and determined that Safa received the email based on the documentary evidence of same. Id.

Similarly, Safa exercised her Fifth Amendment privilege against self-incrimination when asked questions about whether she paid Rosenblatt via Zelle. Tr. at 61:10-62:25. The Court should therefore make an adverse inference that Safa paid Rosenblatt for confidential information as the Zelle documents and Rosenblatt's declaration reflect. Id. Safa sent emails to personal injury firms telling them that IME Companions is not a law firm, and suggesting or outright stating Mrs. Levi uses IME WatchDog to steal clients of personal injury firms for her own firm. Tr. at 66:10-68:3.

7

Safa trademarked IME Companions LLC as a company that offers consulting services concerning legal matters in the medical field and consulting in the medical field, but she concedes that she is not qualified to do either of those things, and admits that Companions did not hire attorneys or medical professionals in order to enable Companions to do so. Tr. at 70:7-73:13. Safa incredulously testified that she convinced the law firm owned by relatives of Elefterakis to cease utilizing IME WatchDog so that they can train Safa on how to run the same business. Tr. at 92:25-93:13, 118:10-20. Safa hired Carlos Roa ("Roa") as an IME observer in 2019. Tr. at 98:6-24.

Safa invoked the Fifth Amendment when asked whether: (i) she paid Rosenblatt in 2019 for information to help her business; (ii) she paid him for information that she believed he got from working at IME WatchDog in 2019; (iii) she used the information she got from Rosenblatt in 2019 in exchange for the payments to further her own business; and (iv) she believed the information she paid Rosenblatt for in 2019 was confidential. Tr. at 123:1-125:24. Safa conceded at the hearing that she and Vito own some rental properties from which they derive income. Tr. at 75:14-76:2. Safa conceded that she could go back to working for a bank if her business is shut down, and that the only reason she would not is because she does not want to. Tr. at 115:9-11.

Steven Rombom is a highly qualified licensed private investigator in the State of New York. Tr. at 128:16-25. He was hired by Plaintiff's counsel to conduct an investigation into an alleged theft of intellectual property, commercial bribery, and related matters surrounding IME WatchDog and IME Companions. Tr. at 129:9-25. Mr. Rombom determined that Rosenblatt was misdirecting customers and turning over confidential records in exchange for payments based on evidence presented to him and requested permission to conduct an unscheduled interview of Rosenblatt to seek admissions, which was granted, and during which Rosenblatt confessed in great detail as to his wrongdoing. Tr. at 130:1-15.

8

During their meeting, Mr. Rombom told Rosenblatt that he had conducted a preliminary investigation which appeared to indicate he was diverting clients from IME WatchDog to IME Companions, Safa and Vito. Tr. at 145:6-22.  Initially he denied it, but rather quickly after the private investigator showed him evidence that he had, including a significant number of wires sent to him by the Gelardis via Zelle, he slowly, but surely, began to reveal more and more details of his interactions with the Gelardis and his diversions of clients, his helping them build their business, helping them refine their business, developing forms for them, helping train their so-called watch dogs, the independent medical examiners that go with the law firm's clients. Id.

Following Rosenblatt's confessions, he agreed to and did make controlled calls to the Defendants. Tr. at 130:1-22, 147:23-148:22.  Safa and Vito made numerous admissions against interest during three (3) separate phone calls. Tr. at 131:11-138:22, 140:8-143:14, Exs. 18A, 18B, and 18C.  Specifically, it was obvious they had an ongoing relationship, they discussed paying money for obtaining customers, and Defendants told Rosenblatt that Mrs. Levi would never find out or discover anything they are doing. Id.  Further, upon being served with process, Rosenblatt was told in no uncertain terms by Vito to delete and destroy everything, and to take everything from the office with him. Id.  Mr. Rombom was present for the entirety of each call, observed each call being initiated and terminated, and testified that each recording was a fair and accurate depiction of what was hear during the call. Tr. at 133:6-135:13.  Throughout the interview, Rosenblatt was a willing participant. Tr. at 151:8-24.

Following the hearing, the Court made a finding that the evidence establishes certainly by a preponderance that the defendants did take confidential information through Mr. Adam Rosenblatt about IME WatchDog's business in order to further their own business, namely, IME Companions, and that there is a likelihood of success that has been established. Tr. at 153:15-25.

The Court noted that Defendants took confidential information from Rosenblatt in exchange for money because, among other things, there was no challenge to the evidence of payments (Ex. 5), which has twenty-seven (27) pages worth of Zelle payments and the recording heard during the hearing made it clear that Defendants acknowledge that they have an ongoing relationship with Rosenblatt where they are willing to pay him money to get information and then provide him safe haven by bringing him over to their company and possibly pay him $2,500.00 in that moment because of Rosenblatt's expressed financial desperation.  Tr. at 154:1-155:3.

The Court found that it is logical that Defendants paid Rosenblatt for confidential information since 2017 because there is strong evidence that Defendants paid Rosenblatt for confidential information in 2019.  Tr. at 155:4-11.

The Court found that Safa was not a credible witness because she lied about the confidential nature of the documents she received from Rosenblatt.  Tr. at 155:12-156:18.  Safa stated that she earned approximately $132,000.00 per year and had seven to eight IME observers in 2019, which is not enough to pay the seven to eight observers, Safa, and Vito a salary.  Id.  The Court found that Defendants paid for information in 2019 to grow her business.  Id.

The Court requested further briefing on the existence of irreparable harm given the finding that trade secrets, client information, and other protocols have been taken improperly.  Tr. at 156:19-157:19.

The Court entered a preliminary injunction enjoining Defendants from franchising.  Tr. at 157:20-25.

The Court also entered a preliminary injunction enjoining Defendants from any future or ongoing communications with Plaintiff's employees and/or agents.  Tr. at 164:3-12.

10

Throughout her first decade of practice in the personal injury field since 2002 prior to forming IME WatchDog, Mrs. Levi had personally reviewed thousands of IME reports. <u>See</u> Supplemental Declaration of Daniella Levi ("<u>Levi</u> <u>Decl.</u>") ¶ 4. She is therefore uniquely qualified and experienced in the personal injury field to create and operate the IME observer business. <u>Id.</u> at ¶ 5. Crucially, in forming the business, she taught Rosenblatt and other IME observers about commonly used instruments by IME doctors, including how and what they are used for, e.g., goniometer used to test range of motion, such as flexion and extension by measuring the angle of each; a reflex hammer to test deep tendon reflexes; a Wartenberg pinwheel used to test neurological nerve reaction; as well as commonly used tests performed by IME doctors , e.g., a Spurling Test used to test and assess neck injuries, Straight Leg Testing used to test and asses lower back injuries, Lachman test or anterior Drawer Test used to test for an ACL tear, and a McMurray used to test and assess meniscal damage. <u>Id.</u> at ¶ 7. Someone without a personal injury background can't know this. <u>Id.</u>

Because of Defendants' illegal conduct in bribing and extorting a key employee into funneling clients to them, IME WatchDog was denied the corporate opportunity to serve as the IME observers for 3M Combat Arms Earplug Class action by US Veterans, and with respect to Douglas & London's needs to cover fifty to one hundred IMEs a month nationwide. <u>Id.</u> at ¶¶ 17-27; <u>see</u> <u>also</u> <u>Rosenblatt</u> <u>Decl.</u> ¶¶ 81-88, Ex. A.

Further, Defendants routinely disparaged and defamed both Plaintiff and Mrs. Levi, personally, causing incalculable damage to both. <u>Id.</u> at ¶¶ 28-29, 33-34; <u>see</u> <u>also</u> <u>Rosenblatt</u> <u>Decl.</u> ¶¶ 89-92, Ex. B.

Rosenblatt was hired by Mrs. Levi in May 2011 to serve as a personal assistant to her at her law firm. <u>See</u> <u>Rosenblatt</u> <u>Decl.</u> at ¶ 2.

When Plaintiff was formed, Rosenblatt served as an observer and worked his way up to President in or about 2016. Id. at ¶¶ 3-12. At all times relevant, Rosenblatt had a fiduciary duty and duty of loyalty to Plaintiff. Id. at ¶¶ 9-10. Rosenblatt was taught by Mrs. Levi and other attorneys everything involved in running an IME observer business. Id. at ¶¶ 5-6. Rosenblatt had access to innumerable confidential, proprietary, and sensitive information of Plaintiff which was protected from disclosure. Id. at ¶¶ 12-14.

On March 1, 2022, Rosenblatt was confronted by private investigators who showed him all the evidence of his wrongdoing, to which he confessed, and the private investigators secured his cooperation against the Defendants. Id. at ¶¶ 94-100. During the calls, the Gelardis told Rosenblatt not to worry, were prepared to offer him safe haven, and said there is no way Mrs. Levi would find out. Id. After Defendants were served with the lawsuit in this case, Rosenblatt was told to delete and destroy everything. Id. Defendants took advantage of Rosenblatt. See, generally, Id.; see also, generally, Declaration of Carlos Roa ("Roa Decl.").

Roa was employed by Defendants since 2019. See Roa Decl. ¶ 1. Safa bragged to Roa how she was able to get Rosenblatt to sell all of Plaintiff's proprietary information so that she could start a competing business. Id. at ¶ 4. Roa directly witnessed how Safa instructed Rosenblatt to purposely sabotage IME WatchDog accounts so that she can steal these customers. Id. at ¶¶ 6-8. Moreover, Safa directed Roa to engage in all sorts of fraudulent conduct. Id. at ¶ 9.

While working for Defendants, Roa spent ten percent (10%) of his time seeking business legitimately and ninety percent (90%) of his time utilizing the confidential trade secrets Defendants bribed Rosenblatt for. Id. at ¶¶ 12-25. It was a lot easier for Roa to get clients using the latter. Id. While Roa understood what Defendants were doing (and what he was doing at their direction) was wrong morally, he only later learned through some research that it was illegal. Id. at ¶¶ 26-27.

12

After doing some soul searching and having a discussion with his mother, he decided to do what was right and inform Daniella Levi about this.  Id. at ¶¶ 28-29.  Roa cooperated with private investigators Mrs. Levi's counsel hired and provided evidence of Defendants' wrongdoing.  Id. at ¶¶ 29-30.

Roa was terminated by Defendants after receiving the complaint in this case, together with his declaration in support, and subsequently informed Mrs. Levi, who hired him to work for Plaintiff.  Id. at ¶¶ 31-32.

Based on the foregoing evidence adduced at the hearing and submitted herewith, Plaintiff respectfully requests the issuance of a preliminary injunction enjoining Defendants from operating their business.

Justice requires it.

## ARGUMENT

"A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018).  Additionally, injunctions are typically warranted only where the balance of equities tips in the moving party's favor and where an injunction is in the public interest. See Winter v. Nat. Hus. Def Council, Inc., 555 U.S. 7, 20 (2008).

Crucially, the stronger the showing that the movant makes as to its likelihood of success on the merits, the less compelling the need to demonstrate irreparable harm. See, e.g., Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir.2002) ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff[ ] will suffer absent the stay").

As this Court has already found that Plaintiff has demonstrated likelihood of success on the merits due to the great weight of evidence it has produced – communications between Defendants and a key employee of Plaintiff, as well as audio recordings containing admissions against interest by both individual Defendants – coupled with the Defendants' election to invoke their Fifth Amendment privilege against self-incrimination, which allows for a negative inference, the need for Plaintiff to demonstrate irreparable harm is significantly diminished.  In considering whether irreparable harm exists, the court should consider whether "providing plaintiff with monetary relief will simply not remedy the loss of competitive advantage plaintiff may lose from the alleged misappropriation of its confidential information." See Panorama Consulting Sols., LLC v. Armitage, 2017 WL 11547493, at *1 (D. Colo. June 9, 2017); see also NextG Networks of New York, Inc. v. City of New York, 2004 WL 2884308 (S.D.N.Y. Dec. 10, 2004).

For the reasons set forth below, IME WatchDog has satisfied these requirements, in addition to those required for relief under the DTSA, and the Court should grant a Preliminary Injunction to prevent Defendants from operating their business which was created and maintained solely through the use of IME WatchDog's trade secrets and proprietary & confidential information.  The Court should also direct Defendants to return to Plaintiff all confidential information and trade secrets they illegally obtained from Plaintiff and destroy all electronic information belonging to Plaintiff that is in their possession.

### A.  **Plaintiff Has Established the Existence of Irreparable Harm**

The Court has already concluded that Plaintiff has established irreparable harm with regard to Defendants' planned franchising and any ongoing or future communications by Defendants with Plaintiff's employees and agents.  The Court should likewise conclude that Plaintiff has established irreparable harm if Defendants are permitted to continue operating.

To satisfy the irreparable injury requirement, a party must demonstrate that absent preliminary relief, it will suffer "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." See Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC, 468 Fed. Appx. 43, 45 (2d Cir. 2012).

Moreover, a loss that is difficult to replace or to measure is generally irreparable. See Mister Softee, Inc. v. Diaz, 2020 U.S. Dist. LEXIS 118979 (E.D.N.Y. July 2, 2020) (irreparable injury established where the plaintiffs alleged that, as a result of defendant's infringement, business will be diverted, and the goodwill associated with the plaintiff's trademarks will be taken from their control) (citing Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010)).

Where, as here, a defendant pays for confidential information and invokes the Fifth Amendment related to the underlying facts, courts have shut down businesses. See Arminius Schleifmittel GmbH v. Design Indus., Inc., 2007 WL 534573, 2007 U.S. Dist. LEXIS 10847 (M.D.N.C. Feb. 15, 2007).

In Schleifmittel, the defendants began competing with the plaintiff by producing duplicates of plaintiff's rubber base elements and sanding caps as replacements for plaintiff's tool bodies, and plaintiff alleged that defendants illegitimately succeeded in this endeavor by misappropriating plaintiff's library of individualized customer specifications. See Id., 2007 WL 534573 at *1. The defendants there invoked their Fifth Amendment privilege against self-incrimination such that the plaintiff's allegations had not been responded to nor in any way were denied. Id. at *6. As a result, the Court in Schleifmittel entered a preliminary injunction requiring certain defendants there to be "officially closed until the final resolution of this case, without any operations continuing at their facilities." Id. at *8.

This Court should similarly hold here.  Just like in <u>Schleifmittel</u>, the Defendants began competing with IME WatchDog by imitating its services through stolen IME reports, invoices, and other confidential information, all of which were illegally misappropriated through bribery and extortion.  When called to this Court to explain themselves, Defendants invoked their Fifth Amendment privilege against self-incrimination such that they could not respond to Plaintiff's allegations.  <u>See</u> <u>Tr.</u> at 155:12-156:18 (finding Safa was not credible because she lied about the confidential nature of the documents she received from Rosenblatt).

Accordingly, this Court should similarly shut down Defendants' operations until the final resolution of this case, without any operations continuing whatsoever.  This result is required and Defendants are not prejudiced because they have other means of income.

Although Defendants may argue they have some customers that were never customers of Plaintiff, this argument misses the mark.  Indeed, but for the theft of Plaintiff's entire business, including its watchdog handbook that contains the entire playbook of Plaintiff's operation, along with the theft of Plaintiff's thousands of IME reports, pricing information, information about Plaintiff's watchdogs that enabled Defendants to recruit them, Safa, who has no legal or medical experience, would have been unable to obtain any customers – even those that never did business with Plaintiff.  Thus, even Defendants' customers who were never customers of Plaintiff were obtained solely through the fruits of the poisonous tree.

Similarly, Defendants would never have been able to operate this business had they not stolen the IME WatchDog handbook by bribing Rosenblatt.  As set forth in Mrs. Levi's declaration, she personally and painstakingly trained Rosenblatt and other IME observers on all the ins and outs of this business such that they could attend IMEs and properly do their work.  Without Plaintiff's handbook, Defendants would be at a complete loss as to how to train observers.

"[T]he diversion of a company's customers [including one of its most significant clients] may also constitute irreparable harm." See Scherer Design Group, LLC v. Schwartz, 2018 U.S. Dist. LEXIS 125644 * 23 (D.N.J. July 26, 2018); see also Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd., 1:18-CV-08333-ALC, 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) (diversion of customers is irreparable and incalculable, thereby warranting an immediate and permanent stop through injunctive relief); Gluco Perfect, LLC v. Perfect Gluco Products, Inc., No. 14-CIV.-1678 (KAM) (RER), 2014 WL 4966102, at *16 (E.D.N.Y. Oct. 3, 2014) (same, entering preliminary injunction as a result); Garvin GuyButler Corp. v. Cowen & Co., 155 Misc. 2d 39, 45 (Sup. Ct. N.Y. Cty. 1992) ("The prohibition of defendants to utilize confidential and proprietary information … pending the disposition of this case will not prejudice defendants but rather shall maintain the *status quo*").

Indeed, proof of attempts to solicit returning customers by itself is sufficient to establish irreparable harm.  See Golden Krust Patties, Inc. v. Bullock, 957 F. Supp. 2d 186, 195 (E.D.N.Y. 2013).[4]

On this subject, the Court of Appeals has long ago held:

> [I]f the relief herein prayed for had not been granted, [plaintiffs] would have continued to be damaged by the diversion of its customers and trade and would have continued to suffer great and irreparable loss, in name and reputation.

See Winifred Warren, Inc. v. Turner's Gowns, 285 N.Y. 62, 66 (1941).  The evidence submitted at the early stage of this case, prior to the joinder of issue and without the benefit of discovery, overwhelmingly establishes that Defendants routinely and consistently diverted Plaintiff's customers.  Plaintiff can only imagine what lies ahead upon conducting a forensic analysis.  The element of irreparable harm has thus undoubtedly been met.

---

[4] See Levi Decl. at ¶¶ 17-36, Ex. B; see also Rosenblatt Decl. at ¶¶ 81-89, Ex. A.

Moreover, as Judge Matsumoto recently explained in <u>Plaza Motors of Brooklyn, Inc. v.</u>

<u>Bogdasarov</u>, 2021 U.S. Dist. LEXIS 230156 (E.D.N.Y. Dec. 1, 2021):

> [t]he loss of reputation and goodwill constitutes irreparable harm." <u>See</u>
> <u>Really Good Stuff, LLC v. BAP Investors, L.C.</u>, 813 F. App'x 39, 44 (2d
> Cir. 2020) (citing <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 404 (2d
> Cir. 2004)). "Furthermore, loss of business opportunities and relationships
> with clients who could produce an indeterminate amount of business over
> years to come are ... hard to measure in dollars and are properly considered
> irreparable harm." <u>See</u> <u>Ericmany Ltd. v. Agu</u>, 2016 WL 8711361, at *3
> (E.D.N.Y. June 3, 2016) (quotations and citation omitted); <u>see</u> <u>also</u>, <u>e.g.</u>,
> <u>Regeneron Pharms., Inc. v. U.S. Dep't of Health & Human Servs.</u>, 510 F.
> Supp. 3d 29, 40 (S.D.N.Y. 2020) ("Courts have determined that a loss of
> existing business and a decline in the opportunity for new business may
> qualify as irreparable harm").

Here, as undeniably established at the hearing, Plaintiff has shown both a loss of reputation

and goodwill as well as the loss of business and future business opportunities and relationships

with customers who could produce an indeterminate amount of business over years to come.

Indeed, Defendants diverted Plaintiff's largest customer, Subin & Associates, as well as at least

eight (8) other customers[5] Rosenblatt can recall, all through bribery and theft of Plaintiff's

confidential information.  The foregoing irrefutably constitutes irreparable harm.  Judge Rakoff

most recently dealt with this issue in <u>QBE Americas, Inc. v. Allen</u>, No. 22-CIV.-756 (JSR), 2022

WL 889838, at *15 (S.D.N.Y. Mar. 25, 2022).  There, the court held:

> QBE argues that will suffer irreparable harm if a rival insurer is able
> to set up a competing aviation insurance division using its former
> employees *and its trade secrets*, passing off QBE's financial results
> as its own. The Court agrees. *Even if QBE could reliably measure*
> *and obtain damages for poached customers at the end of this*
> *litigation*, it would be **very difficult to precisely quantify the harm**
> **caused by having its trade secrets misappropriated and used to**
> **jump-start a new competitor.**

<u>Id.</u> at *15 (citing <u>Crown IT Servs. v. Koval-Olsen</u>, 11 A.D.3d 263, 266 (1st Dept. 2004)).

---

[5] This includes – but is not limited to – Chopra & Nocerino, Hill Moin, Silberstein Awad & Miklos,
Alan Ripka, Ginarte Gallardo, Brian Levy & Associates, Bergman Bergman, and Khavinson.

This Court has expressed reluctance about the existence of irreparable harm merely because some form of damages is identifiable.  Plaintiff respectfully submits that Judge Rakoff dealt with this issue recently, and as set forth in QBE Americas, Inc., the mere ability to calculate some form of damages does not render the harm suffered by a plaintiff as reparable; the two forms of damages are not mutually exclusive.

Moreover, after Defendants illegally obtained information that enabled them to get their foot in the door with Plaintiff's customers, in order to convince those customers to leave Plaintiff and go to Defendants, Defendants defamed and disparaged Plaintiff and Mrs. Levi as "unsafe" for its customers by virtue of Mrs. Levi's role as a personal injury attorney herself who would purportedly steal the personal injury plaintiffs attending the IMEs as clients for her own firm.  Such acts constitute defamation *per se*.  See Geraci v. Probst, 61 A.D.3d 717, 718 (2d Dept. 2009) aff'd as modified and remanded, 15 N.Y.3d 336 (2010) (holding that a false statement constitutes defamation *per se* when it tends to injure another in his or her trade, business, or profession) Therefore, Plaintiff has established the existence of irreparable harm for this reason alone.  Indeed, based on the evidence adduced at the hearing and submitted herewith, there are likely countless personal injury law firms who have been led to believe that Mrs. Levi is capable of and has taken personal injury clients away from its own customers based on Defendants' repeated marketing efforts to that effect.  As such, Plaintiff is also irreparably prejudiced by the loss of good will and reputation it has suffered.  This is supported by a case that is strikingly on point with the facts here. In WHIC LLC v. NextGen Laboratories, Inc., defendants used misappropriated information of the plaintiff's business to contact the plaintiff's clients to recruit them by, among other things, lying to them about the plaintiff's viability.[6] See 341 F. Supp. 3d 1147, 1165 (D. Haw. 2018).

---

[6] This is similar to Defendants' lies about Mrs. Levi's stealing clients of Plaintiff's customers.

The defendants in <u>WHIC LLC</u> also falsely told clients and collectors various stories, including that Aloha Toxicology lost its certification, the owners were shutting down the laboratory, and that Aloha Toxicology was bought out by Ohana/NextGen.  <u>Id.</u>  Based on these defamatory statements, the Court granted a preliminary injunction.

In doing so, the court in <u>WHIC LLC</u> held:

> Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief. <u>Winter</u>, 555 U.S. at 20 …. It has lost at least six clients (at least some of which are large accounts) to [defendants] because of [their] misappropriation, and all of [defendants'] clients are former clients of Plaintiff. … [Defendants] falsely told clients and collectors various stories, …. At best, clients and collectors are confused as to whether [Plaintiff] is still an independent, functioning business; at worst, clients think that the laboratory lost its accreditation and cannot be trusted to (and is not allowed to) provide accurate test results. Plaintiff thus lost and will continue to lose goodwill in the eyes of customers and collectors.

<u>See</u> <u>Id.</u>

This case is no different.  Just like in <u>WHIC LLC,</u> IME Watchdog has been irreparably damaged due to Defendants' false statements that Plaintiff's owners steal personal injury clients from its customers.

Moreover, for each customer Plaintiff lost due to Defendants' conduct, there is no telling how much business each respective customer would have done with Plaintiff had Defendants not unlawfully engaged in the conduct complained of herein.

As such, revenue from these clients who could produce an indeterminate amount of business over years to come is difficult to measure in dollars and Defendants' interference with them is properly considered irreparable harm.  <u>See</u> <u>QBE Americas, Inc.</u>, *supra*.  This is further supported by the fact that Defendants admittedly undercut Plaintiff's pricing for IME observer services because Defendants knew exactly how much Plaintiff charged each customer.

In addition, failing to provide the relief sought will embolden Defendants and others to engage in similar conduct, establishing irreparable harm.  See Flip Flop Shops Franchise Co., LLC v. Neb, CV 16-7259-JFW (EX), 2016 WL 9275403, at *9 (C.D. Cal. Dec. 5, 2016) ("Plaintiffs have also presented evidence of potential injury to their entire business model. Specifically, Curin testified that his franchisees are a close-knit community, and that they are keeping a close eye on what happens in this case. As the court in Quizno's held, if this Court does not uphold the Non–Competition Covenant, it is reasonable to conclude that other Flip Flop Shops franchisees will be emboldened to follow in Defendants' footsteps, which would jeopardize Plaintiffs' entire business model. Under those circumstances, it is virtually impossible to quantify the damages that would be caused in this case if an injunction is not issued, and, therefore, Plaintiffs have amply demonstrated that they will suffer irreparable injury in the absence of a preliminary injunction").

Likewise, here, Defendants' entire business was created, grown, and maintained through bribery and theft from Plaintiff.  Absent a preliminary injunction, individuals will be incentivized to open a competing business using misappropriated trade secrets and will do so with impunity if they merely have to pay money damages for doing so.  In other words, others would be emboldened to act in a similar fashion.

Based on the foregoing, IME WatchDog has established that it will suffer irreparable injury in the absence of the closure of Defendants' business or a prohibition on Defendants' servicing any of Plaintiff's current or former clients.

**B.**  **IME WatchDog Is Likely to Succeed On The Merits Of Its Claims.**

This Court has already found that Plaintiff has established a likelihood of success on the merits of its claims against Defendants.  See Tr. at 153:15-25, 157:20-25, 164:3-12.

As such, this weighty factor militates in favor of granting the relief requested.

**C.** **The Balance of Hardships Tips Considerably In IME WatchDog's Favor.**

Safa testified that she supervised dozens of employees during her almost two-decade tenure as a bank executive.  Safa can easily return to making an honest living at a bank instead of operating Companions which was created, built, and operated solely through bribery and theft.

Other courts have considered the defendants' ability to earn income elsewhere in deciding this issue.  See Champion Salt, LLC v. Arthofer, 4:21-CV-00755-JAR, 2021 WL 4059727, at *12 (E.D. Mo. Sept. 7, 2021) ("The Court also recognizes that Defendants engage in other businesses which are not related to salt sales and treatment and accordingly will not be prohibited under the preliminary injunction. Defendants may also offer services outside the Territory covered by the Services Agreement and to Legacy Customers (with some limitations). The Court disagrees with Defendants' assertion that a preliminary injunction would completely shut down their business. Therefore, Defendants have additional opportunities to earn income during the course of this litigation").

Notwithstanding the foregoing, Defendants put themselves in this position.  They created Companions entirely through the theft of another business through bribery.  They cannot be rewarded by crying poverty or playing violins concerning their family or the individuals they have hired.

On the other hand, IME WatchDog will continue to suffer prejudice and incalculable damages for the loss of its customers.  See QBE Americas, Inc. v. Allen, *supra*.

**D.** **Granting an Injunction Would Not Harm the Public Interest.**

Before ordering injunctive relief, the Court should also "ensure that the injunction does not cause harm to the public interest."  See SEC v. Citigroup Global Markets, Inc., 673 F.3d 158, 163 n.1 (2d Cir. 2012).

The relief sought would not cause injury to the public.

The protection of IME WatchDog's confidential information does not, and will not, stifle market competition, cause any signification dislocation in the market, or seriously impinge on the availability of IME observers.  The general public remains free to utilize the services of IME observers from IME WatchDog and several other competitors.

The public interest is best served in this instance by the enforcement of the law and the cessation of Defendants from perpetrating a fraud on the consumer public and potentially inflicting physical and/or financial harm; after all, if they are capable of stealing from IME WatchDog, what would stop them from inflicting damage upon anyone else, including their own customers.  See Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 897 (2d Cir. 2015).  Thus, like the remaining factors, this factor favors injunctive relief in favor of IME WatchDog.

In addition, the public interest will be best served by closing down Companions which was created, built, and operated solely through bribery and theft.  Permitting Defendants to continue to operate would set an example to the public that one can steal from another and keep all that was stolen.  See WHIC LLC, 341 F. Supp. 3d at 1166 ("it is in the public interest to issue this injunction (under terms set forth below). See, e.g., Schein v. Cook, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) ("Public interest is also served by enabling the protection of trade secrets").  As such, granting the injunction would not harm the public interest.

## **CONCLUSION**

IME WatchDog has demonstrated a likelihood of success on the merits of its claims against Defendants and that without an award of injunctive relief under Rule 65 and the DTSA, it would suffer immediate and  irreparable harm.

IME WatchDog has no adequate remedy at law and is therefore entitled to a preliminary injunction closing down Defendants' business and returning all of Plaintiff's confidential information and never using it.

23

For these reasons and the reasons set forth herein, IME WatchDog respectfully requests that this Court grant its Order to Show Cause for Preliminary Injunction and issue further relief as is just and proper.

As requested in Plaintiff's initial motion for a preliminary injunction, it is respectfully submitted that this Court should enter an Order:

(a) preliminarily enjoining Defendants and any persons or entities acting in concert with or on behalf of defendant, from using in any manner whatsoever IME WatchDog, Inc.'s trade secret and confidential and proprietary information (including, without limitation, IME WatchDog, Inc.'s customer database, including the identity and contact information of IME WatchDog, Inc.'s customers, or any other information regarding IME WatchDog, Inc.'s customers, clients, transactions, financial information, or other matters involving IME WatchDog, Inc.;

(b) directing Defendants to return to IME WatchDog, Inc. all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain IME WatchDog, Inc.'s trade secrets and confidential and proprietary information (including, without limitation, IME WatchDog, Inc.'s customer database, including the identity and contact information of IME WatchDog, Inc.'s customers, and for each customer of IME WatchDog, Inc., the services offered and payments received from IME WatchDog, Inc's customers, and/or other matters involving IME WatchDog, Inc. and which Defendants obtained or accessed, including without limitation information regarding IME WatchDog, Inc.'s customers, clients, transactions, financial information, or other information involving IME WatchDog, Inc.;

(c) directing Defendants to make all electronic accounts that are in their custody or control and on which they stored information regarding IME WatchDog, Inc.'s trade secrets and confidential or proprietary information available and accessible to IME WatchDog, Inc. (including providing relevant passwords) to inspect to ensure IME WatchDog, Inc.'s trade secrets and confidential and proprietary information is secure and has not been improperly copied or distributed;

(d) preliminarily enjoining Defendants from continuing to operate their business until such time that IME WatchDog Inc. recovers its confidential and proprietary information from Defendants;

(e) preliminarily enjoining Defendants from contacting Adam Rosenblatt and/or any IME WatchDog, Inc. clients and/or IME Watchdog, individuals currently performing services for IME Watchdog, Inc.; and

(f) preliminarily enjoining Defendants from operating their business

Dated: Lake Success, New York
      April 8, 2022

              Respectfully submitted,

              **MILMAN LABUDA LAW GROUP PLLC**

              _____/s_____
              Jamie S. Felsen, Esq.
              Emanuel Kataev, Esq.
              3000 Marcus Avenue, Suite 3W8
              Lake Success, NY 11042-1073
              (516) 328-8899 (office)
              (516) 328-0082 (facsimile)
              jamiefelsen@mllaborlaw.com
              emanuel@mllaborlaw.com

              *Attorneys for Plaintiff*
              *Counterclaim-Defendant*
              *IME WatchDog, Inc.*
              *and Third-Party Defendant*
              *Daniella Levi*

**VIA ECF**

Katsoudakis & Iakovou Law Group, PLLC
Attn: Steven Siegler, Esq.
40 Wall Street, 49th Floor
New York, NY 10005-1300
(212) 404-8644 (telephone)
(212) 404-8609 (direct dial)
(332) 777-1884 (facsimile)
steven@kilegal.com

*Attorneys for Defendants*
*Counter-Claim Plaintiffs*
*Third-Party Plaintiffs*
*Safa Abdulrahim Gelardi*
*Vito Gelardi, and*
*IME Companions LLC*

**VIA ECF**

Leo Shalit, P.C.
Attn: Leo Shalit, Esq.
45 Glen Cove Road
Greenvale, NY 11548
(833) SHALIT-1 (office)
(646) 957-0009 (direct)
(833) 742-5481 (facsimile)
leo@shalit-law.com

*Attorneys for*
*Third-Party Defendant*
*Carlos Roa*

26