1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------x
                                          22-CV-1032(PKC)
3    IME WATCHDOG, INC.
                                          United States Courthouse
4              Plaintiff,                 Brooklyn, New York

5              -against-                  April 4, 2022
                                          2:00 p.m.
6

7    SAFA ABDULRAHIM GELARDI, ET AL.,

8              Defendants.
     --------------------------------x

9

10        TRANSCRIPT OF CIVIL CAUSE FOR PRELIMINARY INJUNCTION
               BEFORE THE HONORABLE PAMELA K. CHEN
10                 UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES

13   Attorney for Plaintiff:   MILMAN LABUDA LAW GROUP PLLC
                               3000 Marcus Avenue, Suite 3W8
14                             Lake Success, New York 11042
                               BY:  EMANUEL KATAEV, ESQ.
15                                  JAMIE S. FELSEN, ESQ.

16

17   Attorney for Defendant:   KOUTSOUDAKIS & IAKOVOU LAW GROUP PLLC
                               40 Wall Street, 49th Floor
17                             New York, New York 10005
18                             BY:  STEVEN SIEGLER, ESQ.

19

20   Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
                               Phone:  (718)804-2777
21                             Fax:    (718)804-2795
                               Email:  Georgetteb25@gmail.com
22

23

     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25

PROCEEDINGS

1          (In open court.)

2          THE COURTROOM DEPUTY:  All rise.  Civil cause for a

3    preliminary injunction hearing.  Docket 22-CV-1032.  IME

4    WatchDog, Inc. versus Gelardi, et al.

5          Will the parties please state their appearances for

6    the record starting with the plaintiff.

7          MR. KATAEV:  Good afternoon, your Honor, Emanuel

8    Kataev of Milman Labuda Law Group PLLC for the plaintiff IME

9    WatchDog, Inc.

10          MR. FELSEN:  Good afternoon, your Honor, Jamie

11   Felsen from Milman Labuda Law Group for the plaintiff.

12          THE COURT:  Good afternoon to both of you, and then

13   I think you have a party representative here with you.

14          MR. FELSEN:  Daniella Levi one of the defendants is

15   with us, your Honor.

16          THE COURT:  All right.  Good afternoon to you as

17   well.

18          Then for -- sorry, defendant, but also counterclaim

19   plaintiff, go ahead.

20          MR. SIEGLER:  Good afternoon, your Honor.  This is

21   Steven Siegler, KI Legal on behalf of the defendant IME

22   Companions and Ms. Gelardi.  With me here today is my law

23   clerk/associate waiting admission, Madeline Perez.  My client

24   is here seated at the table as well and she has family members

25   and co-workers in the gallery today.

PROCEEDINGS

1          THE COURT:  All right.  Your client's name is.

2          MR. SIEGLER:  Safa, S-A-F-A.  Gelardi,

3    G-E-L-A-R-D-I.

4          THE COURT:  Good afternoon to all of you.

5          So as the parties are aware, we're here for a

6    hearing on perhaps what can be best characterized as dueling

7    motions for some kind of preliminary relief.

8          What I'd like to do today, and I want to use our

9    time very efficiently, is I will have the parties give me very

10   brief opening statements just to describe what you think

11   you're going to prove today through the witnesses, but do try

12   to keep it to about five minutes so we can get directly to the

13   witnesses.

14         I also understand that each side essentially wants

15   to rely on the same witnesses, am I correct about that,

16   Mr. Kataev?

17         MR. KATAEV:  Your Honor, we have four witnesses and

18   we're intending on calling the defendants as direct witnesses

19   in our case in chief.

20         THE COURT:  Then Mr. Siegler, I understand you

21   didn't provide an exhibit list -- I mean, a witness list, but

22   is it correct that you're relying on some of the same

23   witnesses?

24         MR. SIEGLER:  Correct, your Honor.  We supplied our

25   witness list to the plaintiff, but I didn't submit it to the

PROCEEDINGS

1    Court, I apologize.

2            THE COURT:  Okay.  So I think what would make the

3    most sense, but you'll tell me if this doesn't work, is that

4    while the witness is up there I suggest you just ask all of

5    your questions.  So let's say we start with a witness that the

6    plaintiff calls, you can cross examine that person, even if

7    that person is also on your list and if, Mr. Siegler, at some

8    point you want to ask direct questions relating to your

9    motion, you can do that.  I just think we should have all the

10   questions asked of the witness while he or she is up there to

11   avoid having them called and then recalled.

12           MR. SIEGLER:  Your Honor, before we go into the

13   openings, and in the spirit of getting this thing done

14   efficiently, I had a proposal that if we stipulate for the

15   purposes of today that there is a likelihood of success, a

16   probability of success and not stipulate to irreparable harm

17   inequities, it is going to shorten this thing by a very -- you

18   know, it's going to shorten this thing considerably.

19           THE COURT:  You're saying as to the plaintiff's

20   motion you would stipulate to the probability of success --

21           MR. SIEGLER:  I'm saying --

22           THE COURT:  -- or likelihood of success, I'm sorry.

23           MR. SIEGLER:  I'm saying if we do that and your

24   Honor doesn't --

25           THE COURT:  If I don't have to hear the facts about

PROCEEDINGS

1   the alleged --

2           MR. SIEGLER:  Correct.

3           THE COURT:  -- theft of trade secrets.

4           MR. SIEGLER:  Correct.  If we're going to get into

5   that testimony anyway, then obviously I wouldn't stipulate to

6   that but --

7           THE COURT:  Can I say this, I think it's a little

8   difficult because you still want to discuss irreparable harm

9   and it seems to me I need to know what allegedly was taken and

10  the impact, but I certainly think that if everyone agrees that

11  certain information was misappropriated in some way, then I

12  think we can skip to the issue of does that amount to

13  irreparable harm.  That's what you're getting at, Mr. Siegler?

14          MR. SIEGLER:  Well, I don't want to stipulate to

15  that, your Honor, I just want to stipulate that there is a

16  likelihood of success for today.  I will make a proffer that

17  my client's not going to testify about any of this stuff

18  because she's going to plead the Fifth.  She's been accused of

19  a crime and therefore she has a right not to incriminate

20  herself.  So any of her useful testimony on that subject

21  you're not going to hear it anyway.

22          What you'll hear from Mr. Gelardi is what's in her

23  affidavit, which is how the business started and all that

24  other stuff.  But when it comes to her dealings with

25  Mr. Rosenblatt, she's not going to testify to that.

PROCEEDINGS

1          THE COURT:  All right.  But you understand, and I'm

2     sure you do, that since this is a civil proceeding, her

3     invocation of the Fifth though could give rise to a negative

4     inference as to certain facts and so it does matter at least

5     for the record and to me what facts exactly she's taking the

6     Fifth as to.  I can't say whether or not it's going to

7     relate -- sorry, be relevant to my ultimate determination at

8     this point, but certainly she holds certain information that

9     seems to me to be central to both parties' motions.  But going

10     back to your original suggestion, I'm not sure it is a

11     workable one, even though I appreciate your effort to try to

12     streamline this.

13          Let me just hear from Mr. Kataev really quickly

14     about this notion of stipulating to likelihood of success and

15     then just addressing irreparable harm.

16          MR. KATAEV:  I think the stipulation would be great

17     for any post-hearing briefing on the subject, but as far as

18     the hearing goes, I think there's a totality of the

19     circumstances element here and the Court needs to know all the

20     facts.  Maybe we could short circuit some of those facts, but

21     I can't agree not to get into any of those facts based on a

22     stipulation.  We'd like the Court to see all the evidence that

23     we've obtained and we'd like to the Court see that there's

24     more evidence to be obtained and that goes to the heart of our

25     relief here, the relief we're requesting.

PROCEEDINGS

1          THE COURT:  Let's do this, I'd like to just get

2    started and perhaps I'm sort of operating a bit in the blind

3    here in terms of what makes the most sense or what's the most

4    efficient, because I'm not quite sure which facts are going to

5    be relevant at this point or which we can skip over and just

6    have stipulated to.

7          Mr. Felsen, what did you want to say?

8          MR. FELSEN:  Your Honor, I just wanted to make sure,

9    before we get started, I wanted to make sure that there is no

10   nonparty witnesses in the courtroom.

11         THE COURT:  Yes, I can do that.  So the lawyers

12   know, are there witnesses sitting here who are not going to be

13   called first for example.

14         MR. KATAEV:  From the plaintiffs side, no, your

15   Honor.

16         THE COURT:  Mr. Siegler?

17         MR. SIEGLER:  Nobody that we're calling today.

18   Mr. Vito Gelardi is a defendant --

19         THE COURT:  Yes.

20         MR. SIEGLER:  -- I don't plan on calling him.  They,

21   I think the plaintiffs have named him and subpoenaed him, so

22   he's here today.

23         THE COURT:  Okay.  Sitting here.

24         MR. SIEGLER:  He's in the gallery.

25         THE COURT:  Yes, sir.  But no one is calling him or

PROCEEDINGS

1    you're going to call him at some point.

2              MR. SIEGLER:  We're not going to call him, I don't

3    know if plaintiff is going to call him.

4              MR. KATAEV:  Plaintiff intends to call him as a

5    witness, Your Honor.

6              THE COURT:  All right.  So we'll excuse Mr. Gelardi.

7    Did you say -- well, he is a party though, he has a right

8    actually to be here, he is a defendant.

9              MR. KATAEV:  We have no problem with him being

10   present.

11             THE COURT:  Do you want him to sit at your table?

12             MR. SIEGLER:  We have children here today, I prefer

13   he stays with the children.

14             THE COURT:  Okay.  So Mr. Gelardi, you can obviously

15   remain seated in the audience area if you prefer, but

16   obviously as a party you have a right to sit near your counsel

17   if you'd like to communicate with him confidentially during

18   the proceeding, but I leave that up to you.  But you're not

19   going to be excused now under the rule on witnesses because

20   you are a defendant.

21             So I think we've cleared the audience area of any

22   other witnesses who are nonparties and we'll start with you,

23   Mr. Kataev, give me your opening.

24             MR. KATAEV:  Thank you, your Honor.

25             THE COURT:  You can remain seated just use the

PROCEEDINGS

1   microphone because right now it's very difficult for everyone

2   to be heard.

3          MR. KATAEV:  May it please the Court.  The essence

4   of the American economic system is free enterprise and fair

5   competition.  American courts have understood and recognized

6   that importance and need of fair competition between --

7          THE COURT:  Mr. Kataev, go a little slower.

8   Remember we have a court reporter.

9          MR. KATAEV:  Understood.  Thank you.

10          THE COURT:  Yes.

11          So American courts have understood and recognized

12   that --

13          MR. KATAEV:  The importance and need of fair

14   competition between competing businesses, and as a result

15   developed a body of law around unfair competition to protect

16   American businesses.

17          A business owner must compete fairly within the

18   bounds of the law.  A business owner must not misappropriate

19   trade secrets of a competitor.  A business owner must not

20   bribe a fiduciary of a competitor to gain an unfair advantage

21   or to poach clients.  If a business owner breaks these rules,

22   they must be stopped and are responsible for all of the harms

23   and losses that result.

24          We're going to provide facts in evidence of the

25   following chain of events today.  In or about 2016, defendant

PROCEEDINGS

1    Safa Gelardi was a banker working in a bank where she met a

2    patron of the bank, a doctor, who had lost his medical license

3    named Ronald Rosenblatt.  The defendant, Safa Gelardi, in

4    violation of her employer's banking rules, started a medical

5    malpractice screening business in January of 2017 with

6    Mr. Rosenblatt, despite the fact she's not a doctor and has

7    zero experience in the legal medical malpractice field.

8           Through her relationship with Mr. Ronald Rosenblatt,

9    Ms. Gelardi learned about Ronald's son, Adam Rosenblatt.  Safa

10   learned, during the course of this relationship, that Adam was

11   employed by a company called IME WatchDog since about 2011.

12   IME WatchDog is a business that was started at home by a

13   personal injury attorney named Daniella Levi.  Ms. Gelardi

14   learned that Adam, in his capacity as president of IME

15   WatchDog has access to all of the business's financial and

16   proprietary information, but was only a salaried employee with

17   no membership interest or shareholder stake.

18          Based on what she heard from Ron, Ms. Gelardi became

19   very interested in IME WatchDog as a business.  She thought it

20   was a great idea and became interested in starting a competing

21   business, however, Ms. Gelardi is not an attorney.  She's not

22   a paralegal, she has no legal experience whatsoever and up

23   until she met Mr. Adam Rosenblatt --

24          THE COURT:  Slower.  Yes.  Okay.

25          MR. KATAEV:  -- she did not know what an independent

PROCEEDINGS

1  medical examination was.  She had never, prior to that time,

2  read an IME report.  So what did she do?

3        Safa directed and asked Ronald Rosenblatt to arrange

4  a meeting with his son Adam so that she can speak to him.  As

5  soon as she met Adam, she identified him as an easy target to

6  manipulate and take advantage of.  She engaged in the campaign

7  of bribery and blackmail with him, a lot of the carrot and the

8  stick.  Ms. Gelardi told Mr. Rosenblatt that they should start

9  their own business.  She knew that she could not do it alone

10 and that he had all the knowledge, and so she needed him to

11 assist her in her endeavor.  Adam was the perfect target.

12       Using Ronald Rosenblatt, she set up a meeting with

13 Adam and over time convinced him to bring over trade secrets

14 and proprietary information so they can start this business

15 together.

16       During their initial meetings in or about 2017, she

17 promised him a 70 percent equity stake and to match his salary

18 as well as a lump sum payment of $5,000 in cash.

19 Mr. Rosenblatt was interested in having a stake in his own

20 business and so he cooperated with her and provided her this

21 information.  However, as soon as he provided her this

22 information, the deal quickly changed.  All of a sudden it

23 became a 40 percent stake and the salary would have to be

24 reduced substantially until such time as they grew.  Adam

25 Rosenblatt felt taken advantage of and he immediately said he

PROCEEDINGS

1    didn't want to have any more dealings with her, but

2    Ms. Gelardi won in the process.  Not only did she get the

3    business plan as well as sample reports that the IME observers

4    used, she basically received the complete road map as to how

5    to run this business and operate it.

6           With that, Safa Gelardi landed on a gold mine.  She

7    now had access to hundreds of personal injury law firms who

8    she knows actually uses these IME observer services.  We

9    respectfully submit that not all personal injury law firms do.

10   There is no way to obtain such a list.  While it is true that

11   the lists of personal injury law firms are public information,

12   there is no list of personal injury law firms that utilize IME

13   observer services.

14          Once Ms. Gelardi realized she had everything she

15   needed to start the IME observer company, a competitor without

16   Adam Rosenblatt, she decided to walk back her offer.  Instead,

17   Ms. Gelardi then took her business idea and all the secrets

18   that she stole and she met with a suspended attorney named

19   Greg Elefterakis, E-L-E-F-T-E-R-A-K-I-S.  Mr. Elefterakis runs

20   a funding company for personal injury cases because he is no

21   longer licensed to practice law.  They went into business

22   together.

23          Safa wanted to hit the ground running and she wanted

24   IME WatchDog's biggest client.  With access to the customer

25   list that she had with the corresponding amount of money that

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1    each customer spent with IME WatchDog, she knew exactly who to

2    target first and once she obtained that client she was ready

3    and able to -- ready, willing and able to continue running her

4    business as a going concern.  However, things didn't go so

5    smoothly for Safa Gelardi.  And so when that happened she

6    decided to call on Adam Rosenblatt again.  This time she told

7    Adam, if you don't help me, I'm going to tell Daniella Levi

8    exactly what you did.  Adam, fearful of being reported to

9    Daniella Levi, immediately complied.  And as a reward for his

10   compliance, Ms. Gelardi paid him money, which he accepted.

11          One of the things that Safa and Adam did together

12   that caused irreparable harm to my client is Safa directed

13   Adam to sabotage accounts, provide reports late, don't send a

14   watch dog on the date and time confirmed.  Do other things

15   that are against the client's wishes and when they get upset,

16   let me know and I will contact them and offer them a better

17   price.  Their plan worked; a lot of clients left and by our

18   estimate there is over two and a half million dollars in

19   damages.

20          Based on the bribery that ensued and the fact that

21   Safa was always able to get Adam to cooperate by reminding him

22   that he will definitely get fired and probably be criminally

23   prosecuted if he doesn't cooperate, she was able to run this

24   scheme for years and years unbeknownst to anybody.

25          In April of 2018, Safa decided she wanted to build a

PROCEEDINGS

1  website but the name www.imecompanion.com was already taken.

2  As fate would have it, Daniella Levi anticipated that there

3  would be competitors and she decided that because she wanted

4  to expand the business into a national platform, she would

5  want to have multiple names.  She bought the imecompanion.com

6  name in or about 2011, six-years before Safa ever came up with

7  the competing name.

8       Safa was upset that the name was taken and she

9  called Adam and said if you don't release that name to me, I'm

10 going to tell Daniella what you did.  Adam caused the domain

11 name to be released and Adam received $2,500 for doing so.

12 This was another thing that caused the plaintiff irreparable

13 harm.  The plaintiff was prevented from moving forward on a

14 national platform into franchising her business because of the

15 fact that the domain name she purchased in order do so, one of

16 them was stolen by the defendants.

17      Now that Safa was doing well, after a little over

18 year in her business, she decided that she knew how to run IME

19 Companions all on her own.  She entered into an agreement to

20 buy out her partners but as soon as she realized she had no

21 idea what she was doing, she yet again contacted Adam

22 Rosenblatt consistently asking him for help with every little

23 detail of the IME observer business.  What do you do if the

24 doctor is being difficult about having a watch dog, what if a

25 motion is filed against the personal injury law firm to

PROCEEDINGS

1    prevent the watch dog from coming in.  These are all battles

2    that the plaintiff had gone through already and had available

3    at her disposal.  She called Adam, asked Adam for the

4    information under threat of reporting him, and Adam complied

5    and provided it to her.  She got all of the hard earned

6    efforts of my client through bribery and threats and

7    extortion.  She has to be stopped.

8            THE COURT:  Mr. Kataev, remember, I want to hear the

9    witnesses, so could you wrap up your opening.  I obviously

10   appreciate the detail to some extent, but we do need to hear

11   from the witnesses and have a limited amount of time.

12           MR. KATAEV:  Yes, your Honor, I'll cut to the chase.

13   We respectfully submit at the conclusion of this hearing that

14   there will be undeniable evidence that plaintiff has been

15   irreparably harmed.  The case law in the Second Circuit says

16   that if you --

17           THE COURT:  Again, don't worry about the case law.

18   You can, if you want to, you can brief some of that later, but

19   I just want to get an idea of who is going to be up here and

20   what you anticipate they'll say.  Kind of like an opening in a

21   trial.

22           MR. KATAEV:  Understood.  We intend to call first

23   the defendants to hear from them directly on the questions.

24   After that we will be calling an individual named Steven

25   Rombom, a 40-year experienced, world-renowned private

PROCEEDINGS

1    investigator who was hired by our law firm to conduct an

2    investigation into this matter.  Mr. Rombom was instrumental

3    in obtaining the evidence that we have in this case, including

4    many admissions against by the defendants themselves which we

5    intend to play for the Court to hear.  Mr. Rosenblatt -- I'm

6    sorry, withdrawn.  Mr. Rombom was also instrumental in

7    obtaining the cooperation of Mr. Rosenblatt, and you will hear

8    testimony from him today about how he was able to do so.

9            After Mr. Rosenblatt testifies, we will place

10   Mr. Carlos Roa on the stand.  Carlos Roa is a former employee

11   of IME Companions and he was the precipice upon which the

12   plaintiff discovered that this has been going on.  Carlos Roa

13   will explain to the Court what the defendants did, why he was

14   complicit in what they did, and why he chose to stop doing

15   what they were doing.

16           We will also present to the Court the witness Adam

17   Rosenblatt himself.  He will explain how he was manipulated,

18   what was done in order to secure his cooperation by Safa and

19   Vito Gelardi, and how he was confronted about what he had been

20   doing by the private investigator.

21           And finally, your Honor, you will hear from Daniella

22   Levi herself.  She will explain to you the painstaking efforts

23   that she took to build her business from the ground up.  A

24   brand new business that no one had ever thought of before.

25   How it was effectively stolen by the defendants.  I believe

PROCEEDINGS

1    that with that evidence we will be able to prove that

2    irreparable harm has been established.

3           THE COURT:  So, Mr. Siegler, I'm going to ask you to

4    be brief as well given the list we have here of witnesses.

5    But what's going to be the defense's response, if any, to the

6    allegation of about, essentially, getting through some

7    improper means, you can call it trade secret or you can call

8    it at least sensitive commercial business information, from

9    plaintiff.

10          MR. SIEGLER:  You're not going to hear her testify

11   on that, Ms. Gelardi.  She's going to plead the Fifth

12   Amendment on that because she's been threatened with criminal

13   charges.

14          Thank you, your Honor.  As far as an opening, I

15   didn't prepare a long speech.  I think your Honor can hear

16   that this is total overkill.  It is based on a theory, a

17   supposition that all this stuff happened.  Ms. Levi, with all

18   respect, has no idea how Ms. Gelardi started this business.

19   How she started it with Mr. Elefterakis with pluck, with

20   initiative, with hard work, with knocking on doors when she's

21   six months pregnant, by going to PI firms door to door in

22   Manhattan begging for work.  And how Mr. Elefterakis, her

23   business partner, set her up with very good accounts, guys who

24   were his golf partners, you know, they went to school together

25   or whatever it was.  This business was built fairly.  The vast

PROCEEDINGS

1   majority, I'm not saying all, I'm saying the vast, vast

2   majority of this business was built on hard work,

3   perseverance, and Ms. Gelardi's spirit and determination.

4            THE COURT:  Let me stop you for one second.  I just

5   want to make sure that you and your client, since she's

6   sitting in front of me, your clients, understand though that

7   if they take the Fifth in this civil case regarding the

8   specific allegations, which we've gotten a summary of and

9   which the plaintiffs -- plaintiff claims she's going to prove

10  or it's going to prove at this hearing about these meetings

11  with Adam Rosenblatt and the request for information that at a

12  minimum can be deemed proprietary, if they take the Fifth in

13  the face of that, I can take a negative inference.  In other

14  words, I can infer that those are true, and you can argue to

15  me that they built the business honestly, but you understand

16  that the allegations and perhaps the facts, if I accept the

17  testimony, will bear this out --

18            MR. SIEGLER:  Your Honor --

19            THE COURT:  -- suggest otherwise.

20            MR. SIEGLER:  Correct.  I want to clarify that

21  Ms. Gelardi will speak freely about all of her interactions

22  with Mr. Rosenblatt prior to the business being formed,

23  including a transfer of business information, which was

24  Mr. Rosenblatt's idea.  He was trying to solicit business.  He

25  hated Ms. Levi, he still hates Ms. Levi I'm sure because she's

PROCEEDINGS

1   forcing him to come to this thing and lie and she had an

2   investigator basically threaten him, which we have on tape.

3        But prior to the company being formed, you'll

4   hear -- you'll hear from our client that Adam Rosenblatt came

5   to her multiple times trying to steal his employer's business

6   and she turned him down. He sent her some information, she

7   didn't pay for it, she didn't want it. He sent it to her.

8   And by the way, he sent it to multiple other of Ms. Levis'

9   competitors.

10       THE COURT: Let me ask you a question, there are a

11  few things that are hard to reconcile in terms of being black

12  or white. The idea, for example -- or the argument that there

13  was a domain name, IME Companions, that belonged to Ms. Levi

14  or her company but that Mr. Rosenblatt released at the time

15  that Ms. Gelardi wanted to start her business --

16       MR. SIEGLER: We can talk about that, your Honor.

17       THE COURT: -- but how can that be legitimate. You

18  could try to lay the blame at Mr. Rosenblatt's feet, but is

19  there any dispute that that domain name belonged to plaintiff

20  before it was released to defendant?

21       MR. SIEGLER: Yes. It was purchased by

22  Mr. Rosenblatt because he was upset -- sorry, Adam Rosenblatt,

23  because he was upset. It's our client's company name minus an

24  "S." So he knew we were IME Companions, and you'll hear, the

25  evidence will show, Safa got a call from a law firm, they were

PROCEEDINGS

1  typing in the wrong -- they were leaving off the "S" and the

2  client was going to WatchDog's and the client was asking

3  Ms. Gelardi what's going on, I keep trying to book an

4  appointment with you, but it keeps going to WatchDog.  That's

5  when we found out about this other domain.  It's called cyber

6  squatting.  There was no legitimate business purpose for her

7  to open a website -- I don't believe it was Ms. Levi, I

8  believe it was Mr. Rosenblatt.  Safa did talk to him about

9  that, she may have threatened him, but she didn't pay, there

10 was no money in that.  She may have said, look, release my

11 domain, and I believe he did very shortly.  There was no money

12 exchanged for that.

13          THE COURT:  What did she threaten him with when you

14 say threaten.

15          MR. SIEGLER:  I think the evidence will show she

16 threatened with him going to Ms. Levi and exposing that he

17 sent her basically her business model back in 2017 for free

18 without any strings attached.  He also sent it to many other

19 companies.

20          THE COURT:  Okay.  So go ahead, I interrupted you.

21          MR. SIEGLER:  Well, I was talking about how

22 Ms. Gelardi started this business.  She started it with three

23 other people, one was an attorney -- a former attorney who had

24 a successful lawsuit funding company.

25          THE COURT:  Lawsuit funding, yes.

PROCEEDINGS

1        MR. SIEGLER:  Lawsuit funding.  She built the

2   business through hard work, your Honor is going to hear about

3   that.

4        And your Honor is also going to hear that these two

5   companies are not the only companies in this space.  There are

6   many, many businesses who do exactly what WatchDog does.  She

7   does not have the monopoly on this business and she

8   publishes -- I say she, Ms. Levi all respect, her company

9   publishes a list of clients, it publishes its IME report

10  template, it publishes its prices, and all of these companies,

11  Guards, Sharks --

12        THE COURT:  Sharks.

13        MR. SIEGLER:  -- WatchDogs, Sharks with a K,

14  Smartdogs, there's ZR Per Diem is getting into it.  There is a

15  PI -- you know, an investigator company that's into it.  Yeah,

16  and there's nurses who have a similar company.

17        THE COURT:  So let me stop you here and ask you just

18  very briefly again, what do you anticipate eliciting about

19  your defamation claim that's the basis of your motion.

20        MR. SIEGLER:  Honestly, your Honor, you have our

21  affidavit --

22        THE COURT:  Mask.  Sorry.

23        MR. SIEGLER:  Thank you.

24        You have our affidavit.  You have Mr. Roa on tape

25  doing these things.  What you're going to hear is that he was

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1   acting in the scope of his employment.  He was acting as an

2   agent of IME WatchDog.  He was there at their behest.  And we

3   think the evidence will show, perhaps not today but through

4   discovery, that IME Watchdog is vicariously liable for his

5   conduct.  He was acting as their employee.  He was there that

6   day as an observer --

7           THE COURT:  Hang on, you said vicariously liable.

8           MR. SIEGLER:  Correct.

9           THE COURT:  Go ahead.

10          MR. SIEGLER:  And I'm not here to prove that to you

11  today, I think there is a likelihood of success on it,

12  certainly as to Mr. Roa, and the discovery will show through

13  emails, texts, phone calls, we're going to get Ms. Levi's

14  phone, we're going to get Mr. Roa's phone and we're going to

15  talk about how or if he was directed to go there and, if not,

16  he's still acting within the scope of his employment.

17          THE COURT:  So I have the gist of what you're going

18  to argue in defense, which is that while it may be true that

19  Adam Rosenblatt presented all this information to your client,

20  he did so on his own and in fact your client didn't want to

21  use it or didn't take it.  That's the gist of it; is that

22  right?

23          MR. SIEGLER:  That's correct, your Honor.

24          THE COURT:  All right.  So let's have Mr. Kataev or

25  Mr. Felsen call your first witness because I can see we have a

S. GELARDI - DIRECT - MR. KATAEV

1  lengthy list here.

2          MR. KATAEV:  Your Honor, the plaintiff calls Safa

3  Gelardi.

4          THE COURT:  Ms. Gelardi, if you approach the witness

5  stand, remain standing for a moment so we can swear you in.

6          Come up on here, sorry to my left.

7          MR. KATAEV:  Your Honor, permission to use the

8  podium.

9          THE COURT:  Yes, you may, but you're going to have

10 to put a microphone on it.  Let's see if it works

11 logistically.

12          Let's have the witness sworn in.

13          (Witness sworn.)

14 **SAFA GELARDI,** called as a witness, having been first duly

15 sworn/affirmed, was examined and testified as follows:

16          THE WITNESS:  I do.

17          THE COURTROOM DEPUTY:  Please state and spell your

18 name for the record.

19          THE COURT:  That will probably work for you,

20 Mr. Kataev, it will probably project enough.

21          MR. KATAEV:  Thank you, your Honor.

22          THE COURTROOM DEPUTY:  May the witness please state

23 and spell her name for the record.

24          THE WITNESS:  Safa Gelardi.  S-A-F-A G-E-L-A-R-D-I.

25          THE COURT:  You can move that microphone if you need

S. GELARDI - DIRECT - MR. KATAEV

1   to, Ms. Gelardi, keep it close to your mouth though so

2   everyone can hear you.

3            Go ahead, you may inquire.

4            MR. KATAEV:  Your Honor, just to confirm, I'm going

5   to move to treat this witness as hostile under 611(c)(2) of

6   the Federal Rules of Evidence.

7            THE COURT:  You may.

8   DIRECT EXAMINATION

9   BY MR. KATAEV:

10  Q    Ms. Gelardi, good afternoon, my name is Emanuel Kataev.

11  I represent IME WatchDog.  I'm going to be asking you a series

12  of questions and ask that each of your questions be answered

13  with a yes or no.

14           Do you understand?

15  A    Yes.

16  Q    Your attorney will be able to ask you any other questions

17  that you want to answer to explain the yeses or nos.

18           MR. SIEGLER:  I object to that instruction, your

19  Honor, not every question is a yes or no question.

20           THE COURT:  Let's see.  Ask the question.

21  Q    Ms. Gelardi, you met Ronald Rosenblatt in or about 2016

22  through your employment at Sterling Bank, correct?

23  A    Yes.

24  Q    In fact, Ronald Rosenblatt was a customer of Sterling

25  Bank, correct?

S. GELARDI – DIRECT – MR. KATAEV

1   A    Yes.

2   Q    And you averred in your affidavit you worked for Sterling

3   Bank for 17 years, correct?

4   A    Yes, but I believe that's incorrect.

5   Q    You worked for Sterling Bank for 17 continuous years,

6   correct?

7   A    No.

8   Q    And you were at one point the vice president of Sterling

9   Bank, correct?

10  A    Yes.

11  Q    And as a vice president of Sterling Bank, you were aware

12  that it was against Sterling Bank's policy to go into business

13  and/or invest with bank customers, correct?

14  A    No.

15  Q    Doing so would constitute a conflict of interest with the

16  bank, correct?

17  A    No.

18  Q    You ignored the bank's policy and negotiated and entered

19  into a business partnership with Ronald Rosenblatt, a customer

20  of Sterling Bank, correct?

21  A    Yes.

22          MR. SIEGLER:  Objection, compound.

23          THE COURT:  Hold on, hold on.  Break that down.

24          MR. KATAEV:  I'll withdraw the question, your Honor.

25          THE COURT:  All right.

S. GELARDI – DIRECT – MR. KATAEV

1    BY MR. KATAEV:

2    Q    During the time you negotiated the terms of your business

3    partnership with Ronald Rosenblatt, you engaged in numerous

4    communications with him, correct?

5    A    Correct.

6    Q    You had telephone calls with him, correct?

7    A    Yes.

8    Q    You exchanged emails with him, correct?

9    A    Ronald Rosenblatt?

10   Q    Correct.

11   A    I'm not sure.

12   Q    You exchanged text messages with him, correct?

13   A    Yes.

14   Q    And you also had meetings with Ronald Rosenblatt,

15   correct?

16   A    Yes.

17           THE COURT:  Go a little slower.  Again, every time

18   you read you go too fast.

19   Q    Some of the meetings that you had held with Ronald

20   Rosenblatt were held at the offices of Bruce Povman,

21   P-O-V-M-A-N, an attorney, correct?

22   A    Yes.

23   Q    And --

24           THE COURT:  Mr. Kataev, you don't need to bend down,

25   you're projecting quite fine as it is.

S. GELARDI – DIRECT – MR. KATAEV

1        MR. KATAEV:  Thank you, your Honor.

2   Q    In or about January 17th of 2017, you in fact formed a

3   business with Ronald Rosenblatt called Medmal USA LLC,

4   correct?

5   A    Yes.

6   Q    And you did business as malpracticescreening.com,

7   correct?

8   A    Yes.

9   Q    That business is still in existence, correct?

10  A    Yes.

11  Q    And you continued to perform work for that business,

12  correct?

13  A    No.

14  Q    And the premise of that business is giving advice to

15  people with potential medical malpractice injuries as to

16  whether they have a claim, correct?

17  A    No.

18  Q    During your meetings with Ron Rosenblatt you learned that

19  before he met you he offered the same business idea as Medmal

20  USA LLC to Daniella Levi and she turned it down, correct?

21  A    No.

22  Q    During your meetings with Ronald Rosenblatt leading up to

23  the formation of Medmal USA LLC, you learned from Ronald

24  Rosenblatt more details about Mrs. Levi; isn't that true?

25  A    No.

S. GELARDI - DIRECT - MR. KATAEV

1    Q    And at some point from Ronald Rosenblatt you learned

2    about Daniella Levi's business IME WatchDog, Inc., correct?

3    A    Can you repeat that one more time.

4    Q    During the course of the time that you met with Ronald

5    Rosenblatt you learned about Daniella Levi's business called

6    IME WatchDog, Inc., correct?

7    A    Yes.

8         THE COURT:  Mr. Kataev, I don't want to tell you how

9    to do your examination, but I would tell you I don't -- I

10   can't take away a lot from when she says "no" and you don't

11   follow up with her, in other words, where she disagrees with

12   you.  I'm not sure if you're assuming I'm going to agree with

13   your question versus her answer and you're not doing any

14   follow up.

15        I mean -- you don't have to bend down you can just

16   stand up.

17        MR. KATAEV:  It's preliminary information, your

18   Honor, it doesn't go to the heart so I'm just moving it along.

19        THE COURT:  Okay.

20   BY MR. KATAEV:

21   Q    When you learned about IME WatchDog, Inc., this business

22   piqued your interest, correct?

23   A    No.

24   Q    Prior to hearing from Ronald Rosenblatt about --

25   withdrawn.  Prior to learning about IME WatchDog, you had no

S. GELARDI – DIRECT – MR. KATAEV

1  idea what the acronym IME stood for, correct?

2  A    Yes.

3  Q    You're not an attorney, correct?

4  A    Yes.

5  Q    You're not a paralegal, right?

6  A    Correct.

7  Q    You've never worked in an attorney's office; isn't that

8  true?

9  A    True.  Yes.

10  Q    And you never worked in a medical office either, right?

11  A    Yes.

12  Q    And you never attended an IME, right?

13          THE COURT:  When, at that time?

14  Q    Prior to meeting with Ronald Rosenblatt.

15  A    Correct.

16  Q    In fact, you've never had any connection whatsoever to

17  the personal injury field, correct?

18  A    Correct.

19  Q    Your sole experience at the time that you first met

20  Ronald Rosenblatt was solely in the banking industry, correct?

21  A    Yes.

22  Q    So despite not even knowing what an IME was, you liked

23  what you heard from Ronald Rosenblatt and you decided you

24  wanted to get into this business, right?

25          MR. SIEGLER:  Objection --

S. GELARDI – DIRECT – MR. KATAEV

1    A    No.

2              MR. SIEGLER:  -- leading.

3              THE COURT:  He's allowed to lead.  But again, slow

4    it down.  And she said no, was the response.  Overruled.

5    BY MR. KATAEV:

6    Q    But you nonetheless opened up IME Companions, correct?

7    A    Correct.

8    Q    You also learned from Ronald Rosenblatt that his son,

9    Adam, was the president of IME WatchDog, right?

10   A    Correct.

11   Q    You sought from Ronald an introduction to Adam, correct?

12   A    No.

13   Q    And you conditioned continuing a partnership with Ronald

14   Rosenblatt on him setting up a meeting between you and Adam,

15   correct?

16   A    No.

17   Q    There was a point in time where you eventually met Adam

18   Rosenblatt, correct?

19   A    Yes.

20   Q    And in meeting him you learned about him and what

21   motivated him, correct?

22   A    No.

23   Q    You learned about the fact that he was just an employee

24   at the company and had no interest in it, correct?

25             THE COURT:  Sorry, can you repeat that.

S. GELARDI - DIRECT - MR. KATAEV

1  Q   You learned about the fact that Adam was just an employee

2  of IME WatchDog, Inc. and had no interest in the company

3  itself, correct?

4          THE COURT:  I'm sorry, didn't you just say he's the

5  president.

6          MR. KATAEV:  That's right.  You can be an officer,

7  your Honor, and not have any shareholder interest.

8          THE COURT:  So the question is what was your

9  understanding about Adam Rosenblatt's interest in IME WatchDog

10 at the time you first met him?

11         THE WITNESS:  I didn't even know, I didn't even ask.

12         THE COURT:  I'm sorry to interrupt you, Mr. Kataev,

13 but I'm curious, you say you did meet --

14         THE WITNESS:  I did.

15         THE COURT:  -- Adam Rosenblatt --

16         THE WITNESS:  Yes.

17         THE COURT:  -- at some point.

18         How did that meeting come about?

19         THE WITNESS:  It was just an introduction.  His dad

20 brought him to the bank to introduce me.  His dad was begging

21 me to help him.

22         THE COURT:  Help who, Adam?

23         THE WITNESS:  Correct.

24         THE COURT:  Do what?

25         THE WITNESS:  Start his own business.

S. GELARDI - DIRECT - MR. KATAEV

1    THE COURT:  So your testimony is that the father

2    initiated you meeting with Adam --

3        THE WITNESS:  Correct.

4        THE COURT:  -- so that you could help Adam start a

5    business?

6        THE WITNESS:  That is correct.

7        THE COURT:  All right.  Go ahead.

8    BY MR. KATAEV:

9    Q    And as part of getting Adam to join you in a business

10   venture to perform a competing IME observer business, you told

11   him that he could be an owner of this business, correct?

12       MR. SIEGLER:  Objection.  Compound.

13       THE COURT:  Sustained.  Sustained.  That has a lot

14   of parts to it, so why don't you start -- just break that down

15   into one question.

16   Q    When you met Adam, you learned that he had no ownership

17   interest in IME WatchDog, Inc., correct?

18   A    When I first met him, no, I did not.

19   Q    Eventually, through the course of your discussions with

20   him --

21   A    Correct.

22   Q    -- you learned that, correct?

23       And in discussing with him the prospect of opening a

24   competing business, you told him that you would be willing to

25   give him an ownership interest in a competing business that

S. GELARDI - DIRECT - MR. KATAEV

1   you wanted to own?

2   A    No.

3   Q    You offered him a 70 percent membership -- shareholder

4   interest in a competing business; isn't that true?

5   A    Wrong.

6   Q    You were aware at the time you were speaking with Adam

7   that he was the president and employee of IME WatchDog,

8   correct?

9   A    Correct.

10  Q    And you understood that he had a fiduciary duty to IME

11  WatchDog, correct?

12  A    What does that mean?

13          THE COURT:  Do you not understand the question?

14          THE WITNESS:  Yes, I don't understand it.  Repeat it

15  please.

16          MR. KATAEV:  I'll withdraw it.

17          THE COURT:  Well, do you know what a fiduciary duty

18  is?

19          THE WITNESS:  I believe it's like an officer of the

20  company.

21          THE COURT:  Right.  And so did you believe that Adam

22  Rosenblatt had some kind of officer responsibility --

23          THE WITNESS:  No, I didn't.

24          THE COURT:  -- or duty to IME WatchDog at the time

25  you met him?

S. GELARDI - DIRECT - MR. KATAEV

1          THE WITNESS:  I did not.

2          THE COURT:  You did not believe that?

3          THE WITNESS:  I did not know that or -- I just

4     didn't know that.

5          THE COURT:  Did you believe that?

6          THE WITNESS:  We never spoke about fiduciary duties.

7     I never asked the question.

8          THE COURT:  Okay.  Go ahead -- well, let me ask it

9     this way.

10         Did you believe Adam Rosenblatt had some duty of

11    loyalty --

12         THE WITNESS:  I did not.

13         THE COURT:  -- to his company?

14         THE WITNESS:  No, I did not.

15         THE COURT:  You did not believe that?

16         THE WITNESS:  I honestly thought he was just an

17    employee.

18         THE COURT:  Go ahead, Mr. Kataev.

19    BY MR. KATAEV:

20    Q    In your current business, IME Companions, do any of your

21    employees have a duty of loyalty to you?

22    A    I would assume so.

23    Q    And you assumed just the same that Adam had a duty of

24    loyalty to his employer, IME WatchDog, correct?

25    A    Correct.

S. GELARDI - DIRECT - MR. KATAEV

1     THE COURT:  All right.  Go ahead.

2   Q    Now, eventually there came a point in time when you and

3   Adam discussed opening a competing business, right?

4   A    No.

5   Q    At some point you talked with Adam about financing the

6   opening of the business, correct?

7   A    Wrong, no.

8   Q    You constantly reminded Adam that he had no ownership

9   interest in IME WatchDog, correct?

10  A    I don't recall.

11  Q    There came a point in time when you asked Adam to provide

12  you with information about IME WatchDog, correct?

13  A    No.

14  Q    When Adam provided you with information about IME

15  WatchDog, you gave him $5,000 in cash as a good faith gesture,

16  correct?

17  A    Absolutely untrue, without a shadow of a doubt.  Total

18  fabrication.

19  Q    You met with Adam with your husband Vito, correct, in

20  April of 2017?

21  A    Correct.

22  Q    And Adam told you all about the business, correct?

23  A    No.

24  Q    Adam gave you a Sales by Customer Summary for 2016 in or

25  about April of '17, correct?

S. GELARDI - DIRECT - MR. KATAEV

1   A    No.

2   Q    Adam provided you with contact information for each of

3   the clients on the Sales by Customer Summary, correct?

4            THE COURT:  You've got to go slower, Mr. Kataev,

5   really --

6            MR. KATAEV:  I'll slow down.

7            THE COURT:  -- partly because I'm having trouble

8   focusing on your question when you go so fast and I'm sure the

9   court reporter is having some difficulty keeping up with you.

10           So the question is, did you provide contact

11  information -- or were you provided with contact information

12  by Adam Rosenblatt for each of the clients.  That's the

13  question, right?

14  Q    For each of the customers listed in the Sales by Customer

15  Summary for 2016.

16  A    No.

17           THE COURT:  Whose customer summary, the plaintiff?

18           MR. KATAEV:  IME WatchDog's, yes.

19           THE COURT:  Again, just go slower.

20           MR. KATAEV:  I will, your Honor.

21  Q    You told Adam that if you were going to open a business

22  together that he would have to make some sacrifices, correct?

23  A    No.

24  Q    You and Adam eventually did not open any business

25  together; is that right?

S. GELARDI – DIRECT – MR. KATAEV

1    A      Yes.

2    Q      And that happened in 2017, correct?

3    A      What happened in 2017?

4    Q      Your decision not to open up a business with Adam?

5    A      Yes.

6    Q      And you thereafter opened up the business anyway,

7    correct?

8    A      Correct.

9    Q      You also asked Adam to arrange a meeting between

10   yourself, Adam, and two of the IME WatchDog's best watch dogs,

11   correct?

12   A      Wrong.

13   Q      You, in fact, met with Adam, Jamal and Gabby from IME

14   WatchDog, correct?

15   A      Yes.

16   Q      And you met in a restaurant in Forest Hills, correct?

17   A      Correct.

18   Q      And you asked questions from Adam, Jamal and Gabby about

19   the inner workings of IME WatchDog, correct?

20   A      No.

21          THE COURT:  What was the purpose of the meeting?

22          THE WITNESS:  You know what?  I'm going to tell you,

23   your Honor.  We went there to talk to Adam because they were

24   hounding and they begged to sit with us, they begged to talk

25   to us.  We went to talk to him.  We said, okay, fine, we'll

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

S. GELARDI - DIRECT - MR. KATAEV

1   hear him out, my husband and I, and he brings a crew of people

2   that we're --

3            MR. GELARDI:  Eight people.

4            THE WITNESS:  It was like eight people --

5            THE COURT:  Who is saying that?

6            THE WITNESS:  That's my husband.

7            THE COURT:  Okay, please, Mr. Gelardi, do not speak

8   from the audience area.  This is not a free-for-all, folks.

9            THE WITNESS:  Your Honor, he brung a group of

10  people, they ordered food, they were drinking and drinking.

11  We never got a word in.  We had -- we felt so taken advantage

12  of and we just left.

13           THE COURT:  All right.  Go ahead, next question.

14  BY MR. KATAEV:

15  Q    You thereafter opened up a competing business with Greg

16  Elefterakis, correct?

17  A    Correct.

18  Q    And Greg Elefterakis is a suspended attorney, correct?

19  A    I do not have any knowledge of that.

20  Q    He doesn't practice law anymore, correct?

21  A    I don't think so.

22  Q    In setting up a competing business with Mr. Elefterakis,

23  you presented him with this idea, correct?

24  A    With -- I presented Mr. Elefterakis?

25  Q    With the idea to do an IME --

S. GELARDI – DIRECT – MR. KATAEV

1  A    Yes --

2  Q    -- observer business?

3  A    -- correct.

4  Q    And Mr. Elefterakis then got his nephew, Nick

5  Elefterakis, involved, correct?

6  A    I believe it was Nick Liakas and Nick Elefterakis,

7  correct, both nephews.

8  Q    Both of those individuals are attorneys, correct?

9  A    Correct.

10  Q    And you went into business together with Mr. Elefterakis,

11  and the two Nicks, correct?

12  A    Correct.

13  Q    You were a 50 percent owner then, correct?

14  A    Correct.

15  Q    While Mr. Elefterakis owned 25 percent, correct?

16  A    Correct.

17  Q    While the other two Nicks owned the remaining 25 percent

18  equally between themselves?

19  A    No, that is wrong.  The Nicks did not own anything.  It

20  was Gregory Elefterakis and two of his employees, Roman Pollak

21  and Anthony Brida from his office.  He gave two of his

22  employees 12 and a half percent each from his 50 percent

23  stake.

24       THE COURT:  All right, next question.

25  Q    After you formed this business you contacted Adam again,

S. GELARDI - DIRECT - MR. KATAEV

1    correct?

2    A    I don't recall -- I don't think we spoke for a very long

3    time after I formed the business.

4    Q    When you formed the business -- prior to forming the

5    business with Mr. Elefterakis, what information did you

6    present to him?

7    A    I presented him with two invoices, your Honor.

8             THE COURT:  Okay.

9    Q    Two IME WatchDog invoices, correct?

10   A    Correct.

11   Q    That's information that you obtained from my client,

12   correct?

13   A    That is correct.

14   Q    Through Adam, correct?

15   A    Yes.

16   Q    After you opened up your business you ended up obtaining

17   Subin & Associates as a client, correct?

18   A    Yes.

19   Q    And by chance, that happened to be the highest volume of

20   sales in the 2016 Sales by Customer Summary list, correct?

21   A    Correct.

22            MR. SIEGLER:  Objection.  There is no foundation for

23   that.  His client can't testify to that.

24   A    I don't even know that.

25            THE COURT:  Hold on one second.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

S. GELARDI - DIRECT - MR. KATAEV

1      MR. KATAEV:  From her memory, your Honor.

2      THE COURT:  Hang on one second.  I see what you're

3  saying.  Sustained.

4      I guess why don't you establish how -- although she

5  did say correct.  Why don't you establish how she knows it to

6  be the highest volume of plaintiff's company.

7  Q   And you knew that it was highest grossing -- highest

8  sales because you saw the list that Adam provided you,

9  correct?

10 A   Correct.

11     THE COURT:  So, overruled.  Go ahead.

12 Q   You then began contacting Adam and asking him --

13     THE COURT:  You have to go slower, Mr. Kataev.  I

14 cannot tell you enough times.  You're reading your questions

15 so fast the court reporter cannot record them.  And quite

16 frankly, I could barely understand them.  So you have to go

17 slower.

18     MR. KATAEV:  Okay.

19     THE COURT:  You should keep your voice up, listen

20 carefully to the question --

21     THE WITNESS:  Okay.

22     THE COURT:  -- and if someone objects just stop for

23 a moment --

24     THE WITNESS:  Okay.

25     THE COURT:  -- so I can rule on the objection.

S. GELARDI – DIRECT – MR. KATAEV

1          THE WITNESS:  Okay.

2          THE COURT:  Again, Mr. Kataev, I'm going to

3   interrupt you to slow you down.

4          MR. KATAEV:  Okay.

5   Q    Ms. Gelardi, after you obtained the Subin account, you

6   started contacting Adam and asking him to sabotage customer

7   accounts of IME WatchDog, correct?

8          THE COURT:  Hold on.  The what account, the Subin?

9          MR. KATAEV:  Subin & Associates, yes.  That's a law

10   firm, your Honor.

11          THE COURT:  S-U-B-I-N?

12          MR. KATAEV:  Correct.

13          THE COURT:  Okay.  After you obtained the Subin

14   account...

15   Q    You instructed Adam to sabotage the customer accounts of

16   IME WatchDog?

17   A    Absolutely untrue.

18   Q    It's your testimony today that you did not threaten him

19   that if he didn't comply with your request you will reveal

20   what he did to Daniella Levi?

21   A    Absolutely untrue.

22   Q    You didn't threaten him that he will be finished if you

23   do that?

24   A    Absolutely -- I never -- your Honor, I threatened him

25   once and that was to release my domain.  I never threatened

S. GELARDI – DIRECT – MR. KATAEV

1  him after that.  They bought my domain after I started my

2  company.  I said, Adam, did you buy my domain?  And he said,

3  ha, ha, ha, that was clever, right?  And it went straight to

4  IME WatchDog.  I said, if you don't release my domain, I'm

5  going to go straight to your boss and show her what you sent

6  me.

7          THE COURT:  Mr. Kataev.

8  Q    And you threatened Adam that he will be fired, correct?

9  A    Or what?

10          THE COURT:  When?  Are we going back now to this

11  whole thing about sabotaging IME WatchDog's business?

12  Q    After you obtained the Subin --

13  A    After I obtained Subin Associates, I never threatened

14  Adam.  I threatened him once, as I explained to the judge,

15  when.  And that was when I found out when he took my domain.

16  Q    In seeking to get customers for your business, IME

17  Companions, you routinely defamed and disparaged Mrs. Levi,

18  correct?

19  A    Absolutely not.

20  Q    You told customers, personal injury lawyers, that IME

21  WatchDog is owned by a personal injury attorney, correct?

22  A    Correct -- actually I don't recall ever bringing up

23  Mrs. Levi in anything.

24  Q    You told customers that you wanted to obtain, that

25  because IME WatchDog was owned by a personal injury attorney,

S. GELARDI – DIRECT – MR. KATAEV

1  they were not safe and that their clients could be taken away

2  by her, correct?

3  A     No.

4  Q     Okay.

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GELARDI – DIRECT – KATAEV

1          THE COURT:  I'm sorry what do you mean by, they were

2     not safe?

3          THE WITNESS:  I don't understand.

4          THE COURT:  You said, didn't you tell customers that

5     they were not safe because Ms. Levi is a personal injury

6     attorney.

7          What does that mean, not safe?

8          MR. KATAEV:  Your Honor, I'll present it with the

9     evidence that we're going to present to the witness.

10          THE COURT:  Okay.  But how did you answer that

11     question.

12          Did you ever say anything about Ms. Levi being --

13          THE WITNESS:  I did not.

14          THE COURT:  Hang on.  A personal injury attorney to

15     any of your customers or any potential customers?

16          THE WITNESS:  Not that I recall.  Not that I recall,

17     Your Honor.

18          THE COURT:  Go ahead, Mr. Kataev.

19     DIRECT EXAMINATION (Continued)

20     BY MR. KATAEV:

21     Q    In order to get customers for IME Companions, you

22     utilized the 2016 list to pick off those customers from IME

23     WatchDog, correct?

24     A    No.

25          THE COURT:  I'm sorry to interrupt you, but can you

GELARDI - DIRECT - KATAEV

1    explain to me how it is you got this 2016 list?

2            THE WITNESS:  Your Honor, when the doctor brought

3    his son, I didn't even ask to meet with him.  He kept bugging

4    me -- he brought his son and his son said to me, please,

5    please, please, you don't understand, you got to help me.

6            THE COURT:  Hang on.  The doctor is Ron Rosenblatt?

7            THE WITNESS:  Right.  Ronald Rosenblatt.

8            When he brought his son -- and they're both the same

9    personality, very needy, very wanty -- I said I will try, I'll

10   do my best, but I know nothing about the business.  He took it

11   upon himself to send me whatever it is he sent --

12           THE COURT:  Who is he?

13           THE WITNESS:  Adam Rosenblatt.

14           THE COURT:  So he sent you the 2016 list of IME

15   WatchDog's customers?

16           THE WITNESS:  He sent a lot of stuff, Your Honor.

17           THE COURT:  But you received that --

18           THE WITNESS:  But that was in -- correct.

19           THE COURT:  Okay.  When?

20           THE WITNESS:  I would say on or about -- was it

21   April of 2017, around then.  Maybe March.

22           THE COURT:  And what did you do with that

23   information?

24           THE WITNESS:  I didn't open it for months, Your

25   Honor.

GELARDI - DIRECT - KATAEV

1       THE COURT:  Did you ever use it, though, to solicit

2   customers?

3       THE WITNESS:  I did not.

4       THE COURT:  So it's your testimony you never used

5   the information --

6       THE WITNESS:  I never used that list.

7       THE COURT:  Again, you're interrupting.

8       THE WITNESS:  I'm sorry.

9       THE COURT:  Are you saying that you never used the

10  information that Adam Rosenblatt sent you to build your

11  business?

12      THE WITNESS:  I did not, Your Honor.

13      THE COURT:  You hesitated.  Why?

14      THE WITNESS:  Because I used -- what I took to Greg

15  Elefterakis was the invoice.  That's why I hesitated.

16      THE COURT:  And why did you do that?

17      THE WITNESS:  Because he sent me the invoice and I'm

18  wondering if that is what you mean by, did you use the

19  information that Adam Rosenblatt sent you.

20      THE COURT:  No, I'm sorry.  He was Adam Rosenblatt

21  sent you the invoice?

22      THE WITNESS:  Correct.

23      THE COURT:  And why did you use that?

24      THE WITNESS:  I used it because it had the same name

25  and I wanted to ask him if he recognized this firm.  And it

GELARDI - DIRECT - KATAEV

1   turned out to be his nephew's firm.

2          THE COURT:  When you say you had the same name, what

3   do you mean?

4          THE WITNESS:  So the invoice that Adam sent me was

5   from a firm called Elefterakis, Elefterakis and Panek.

6          THE COURT:  Panek?

7          THE WITNESS:  Panek.  My partner's name was Gregory

8   Elefterakis.  So he was my client, as well, at the bank,

9   Gregory Elefterakis.  I took the invoice to him to ask him if

10   he knew of this firm.

11          THE COURT:  You keep saying him.

12          Who did you take --

13          THE WITNESS:  To Gregory.  To gregory Elefterakis.

14          THE COURT:  Okay.  And that's how you used the

15   invoice to confirm whether or not Mr. Elefterakis --

16          THE WITNESS:  Elefterakis.

17          THE COURT:  Your future business partner was a --

18          THE WITNESS:  Correct.

19          THE COURT:  -- customer of IME WatchDog?

20          THE WITNESS:  No, ma'am.  No, Your Honor.  Gregory

21   Elefterakis has nothing to do with Watchdog.

22          THE COURT:  The invoice listed as a customer of IME

23   WatchDog a Elefterakis -- sorry, I'm mispronouncing it -- an

24   e-company, is that when you're saying?

25          THE WITNESS:  It's a law firm.  It's a law firm that

GELARDI - DIRECT - KATAEV

1    utilized IME WatchDog.

2          THE COURT:  Right.  So you wanted to confirm with

3    the person who became your future business partner that that

4    was not his law firm?

5          THE WITNESS:  I knew he didn't have a law firm, Your

6    Honor.  I was taking the invoices to ask if he knew of this

7    law firm, and if he did, I wanted to pitch him the idea of an

8    IME business to do together.

9          THE COURT:  So you did use that invoice --

10          THE WITNESS:  I did use the invoice Your Honor.

11          THE COURT:  -- IME Watchdog, to potential take one

12    of IME WatchDog's customers from them?

13          THE WITNESS:  No, not to take a customer.  I used

14    the invoice as a -- because he had the same name is.  So I

15    wanted to know, hey, first do you know this firm.  Yes, these

16    are my nephews' firm.  Well, they use a service, IME WatchDog,

17    and I previously pitched him a prior idea --

18          THE COURT:  Who've the he, again?

19          THE WITNESS:  I'm sorry.  Mr. Elefterakis.

20    Mr. Gregory Elefterakis.  I previously pitched him a different

21    business idea and he turned it down.  So the second meeting I

22    had with him was with this invoice that I thought, you know, I

23    wanted him to know that, you know, if -- because of the same

24    name, that's the only reason it caught my attention.

25          THE COURT:  But it seems to me you're missing the

GELARDI - DIRECT - KATAEV

1   fundamental point which is, isn't it true that you went to

2   Gregory to see -- first to see if he knew them, correct?

3            THE WITNESS:  Correct.

4            THE COURT:  When he said he did know them, did you

5   not then say, can we get that law firm, your nephew's law firm

6   to be one of IME Companions clients, right?

7            THE WITNESS:  If Gregory agreed to start the

8   business, then yes, we would have gone that path.  That

9   initial meeting was just to see if he wanted to start a

10   business.

11            THE COURT:  Again, but you still wanted to get from

12   IME Watchdog, one of their customers for your new business

13   venture using --

14            THE WITNESS:  Correct, Your Honor.

15            THE COURT:  Okay.  The invoice and using Gregory?

16            THE WITNESS:  Correct.

17            THE COURT:  Okay.  Go ahead.

18   Q    After you opened IME Companions LLC you, routinely

19   contacted Adam multiple times a day with --

20            THE COURT:  Go slowly, please.

21   Q    After you opened IME Companions, you routinely called and

22   texted Adam multiple times a day with questions on how to

23   handle the day-to-day issues that popped up in such a

24   business, correct?

25   A    No.

GELARDI - DIRECT - KATAEV

1    Q    It's not true that you asked Adam to provide you with

2    sample reports for IME observers to use?

3    A    I did ask him for one, report.

4    Q    It's not true that you also asked him for sample motions

5    to use when insurance carriers tried to prevent the IME

6    observers from coming into the IME?

7    A    No.

8    Q    And when Adam provided you the report that you just

9    referenced, you paid him for that, correct?

10   A    No.

11             THE COURT:  What was the report?

12             THE WITNESS:  It was a doctor's report.  It was a

13   report from a Watchdog that observed a particular doctor.

14             THE COURT:  And why did you ask him for that?

15             THE WITNESS:  I asked him for that report because

16   the doctor was very difficult and he gave us a very difficult

17   time.  We also observed with that doctor.  I just wanted to

18   find out if it was something that he normally does, and it was

19   just for quality control.

20             THE COURT:  But it was a IME WatchDog report?

21             THE WITNESS:  Yes.  It was an IME WatchDog report,

22   Your Honor, and we were already in business.  It was strictly

23   just a quality control my own companion to see -- you know, I

24   wanted to quality control.

25             THE COURT:  To help your business?

GELARDI – DIRECT – KATAEV

1          THE WITNESS:  Well, not really.  It wasn't to help

2    my business.

3          THE COURT:  But quality control is to help your

4    business, is it not?

5          THE WITNESS:  No, your Honor.  It was more to

6    actually find out if my companion was doing the right thing.

7    And if the doctor is this difficult with everyone.  It wasn't

8    going to help anything.

9          THE COURT:  All right.  Go ahead.

10   Q    The reports that IME Companions makes after an IME are

11   private and confidential, correct?

12         MR. SIEGLER:  Objection.  Sorry, objection.

13         THE COURT:  Overruled.

14         MR. KATAEV:  You can answer.

15         THE WITNESS:  What was the question?

16   Q    The reports that IME Companions makes after an IME

17   observer observes an IME are private and confidential,

18   correct?

19   A    Yes.

20   Q    They contain medical information of personal injury

21   plaintiffs, correct?

22   A    No.  No, medical information.

23   Q    So they're therefore confidential because you use them in

24   the course of your business, correct?

25   A    I think they're confidential because they're the

GELARDI - DIRECT - KATAEV

1   attorney's client and -- there's no medical information in the

2   IME report.

3   Q    And when you received this report from Adam, you copied

4   it, correct?

5   A    No.

6   Q    When you received this report from Adam, you obtained

7   something that's confidential, correct?

8   A    Yes.  I guess.

9   Q    At some point in 2019, you started paying Adam through

10  Zelle, correct?

11  A    I plead the Fifth.

12       MR. KATAEV:  Your Honor, I'm going to hand up what's

13  been previously marked as Plaintiff's Exhibit 1 to the witness

14  for identification.

15       THE COURT:  Yes.  Go ahead.

16       MR. KATAEV:  (Handing).

17  Q    Ms. Gelardi, this is an e-mail that you received from

18  Adam Rosenblatt, correct?

19  A    Looks that way, yes.

20  Q    And you received that e-mail on March 14th, 2019,

21  correct?

22  A    Correct.

23  Q    And that was two years after you had already opened your

24  business, correct?

25  A    Correct.

GELARDI – DIRECT – KATAEV

1  Q    And it was long after any discussions you had with Adam

2  about opening a competing business were over, correct?

3  A    Correct.

4  Q    And in this e-mail, there's an attachment labeled Emilio

5  Gonzalez, Dr. Adam Bender, July 19, 2016, correct?

6  A    Yes.

7  Q    And attached to the e-mail on the second page is an IME

8  WatchDog report, correct?

9  A    Correct.

10  Q    And it says on top, confidential attorney work-product,

11  correct?

12  A    Correct.

13        MR. KATAEV:  Can you go to the fourth page please,

14  of the exhibit.  I'm sorry, fifth page.

15  Q    It says at the top, the first bullet point, the IME

16  physician asked the examinee to describe his current symptoms,

17  correct?

18  A    I don't see that.

19  Q    We're on the fifth page.  It says Page 4 of 22 at the

20  bottom.

21        THE COURT:  It says Page 4 of 22?

22        MR. KATAEV:  On the bottom, but it's the fifth page

23  of the Exhibit, Your Honor.

24        THE COURT:  Why don't we go to with the numbering on

25  the bottom --

GELARDI – DIRECT – KATAEV

1  Q   Page 4 of 22, please?

2  A   Okay.

3  Q   The first bullet point says, the IME physician asked the

4  examinee to describe his current symptoms.

5         That's what's written there, correct?

6  A   Correct.

7  Q   And this therefore describes medical conditions, correct?

8  A   No.  It describes an injury from an accident.

9         MR. KATAEV:  Your Honor, I offer this e-mail into

10  evidence as Plaintiff's 1.

11        THE COURT:  Yes.  Any objection?

12        Any objection?

13        MR. SIEGLER:  Thank you, Your Honor.  No.

14        THE COURT:  Okay.  Exhibit 1, Plaintiff's Exhibit 1

15  is admitted.

16        (Plaintiff's Exhibit 1, was received in evidence.)

17        MR. KATAEV:  I'd like to present to the witness what

18  has been marked as Plaintiff's Exhibit 2.

19        Permission to approach, Your Honor?

20        THE COURT:  All right.

21        MR. KATAEV:  (Handing).

22  Q   This is yet another e-mail that you received from Adam,

23  correct?

24  A   Yes.

25  Q   And it's dated Monday October 14, 2019, correct?

GELARDI - DIRECT - KATAEV

1    A    Correct.

2    Q    And you received this e-mail, correct?

3    A    Yes.

4    Q    And this e-mail similarly has a report attached to it for

5    Dr. Yong, Y-O-N-G, Kim, correct?

6    A    Correct.

7              MR. KATAEV:  Your Honor, I offer this into evidence

8    as Plaintiff's Exhibit 2.

9              THE COURT:  Any objection?

10             MR. SIEGLER:  No objection, Your Honor.

11             But if the exhibit contains medical information as

12   plaintiff says, maybe it should be held confidential or

13   sealed.

14             THE COURT:  Well, that's fine.  These can remain

15   sealed.  So far they're not part of the public docket.  So

16   Exhibit 2 will be admitted, but obviously can remain under

17   seal.

18             MR. KATAEV:  Your Honor, we could submit redacted

19   exhibits to the Court if it comes time to file them publicly.

20             I'd like to present what has been marked as

21   Plaintiff's Exhibit 3 to the witness.

22             Permission to approach, Your Honor?

23             THE COURT:  Yes.  Go ahead.

24   Q    Ms. Gelardi this is the sales by customers summary that

25   you received from Adam at a meeting that you had with him,

GELARDI – DIRECT – KATAEV

1   correct?

2   A    No.

3   Q    Your testimony today is that you did not receive this

4   from Adam?

5            MR. SIEGLER:  Objection.

6            That's not what she said.

7            THE COURT:  Sustained.  Why don't you –– you said

8   two things.  Did you receive this and at a meeting with Adam.

9   So why don't you break it down to did you receive this

10  document ––

11           THE WITNESS:  No, ma'am.

12           THE COURT:  –– from Adam Rosenblatt?

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.  And when did you receive it?

15           THE WITNESS:  This was sent –– this was part of the

16  stuff sent to my e-mail.

17           THE COURT:  All right.  And when?

18           THE WITNESS:  I would say April 2017.

19           THE COURT:  So your testimony is not that you met

20  with him and got this, but you received this from him via

21  e-mail; is that right?

22           THE WITNESS:  That is correct.

23           THE COURT:  Okay.  Go ahead, Mr. Kataev.

24           MR. KATAEV:  Just one second, Your Honor.

25           Your Honor, may I offer this into evidence as

GELARDI - DIRECT - KATAEV

1    Plaintiff's Exhibit 3?

2              THE COURT:  You may.  Any objection?

3              MR. SIEGLER:  Well, Your Honor, there's been no --

4    no objection.

5              THE COURT:  Admitted, Exhibit 3.

6              Go ahead.

7              (Plaintiff's Exhibit 3, was received in evidence.)

8              MR. KATAEV:  I'd like to present to the witness what

9    has been marked as Plaintiff's Exhibit 4.

10             THE COURT:  Yes.  Go ahead.

11             MR. KATAEV:  (Handing).

12   Q    This is yet another e-mail that you received from Adam,

13   correct?

14   A    Yes.

15   Q    And you received it on August 21st of 2019, correct?

16   A    I plead the Fifth.

17   Q    This e-mail contains a list of law firm names and e-mail

18   addresses within each law firm, correct?

19   A    I plead the Fifth.

20             MR. FELSEN:  Your Honor, the witness is looking at

21   her attorney and communicating and making gestures.  I'd ask

22   that you direct him to stop.

23             THE COURT:  All right.  I didn't notice that.  But

24   obviously, you should not get signals, if you are, from your

25   attorney.  Same to you Mr. Siegler, don't communicate with

GELARDI - DIRECT - KATAEV

1   your client via any silent means, okay.

2          MR. SIEGLER:  Your Honor, can I address that?  That

3   is absolute scandalous allegation that I would be coaching my

4   witness from the stand --

5          THE COURT:  I did not see it.  I'm not verifying it.

6          Everyone, this goes out saying, you cannot coach

7   your witness from your position while they're on the stand,

8   okay.  So I'm not saying you did it.  Everyone should just not

9   do that.  Perhaps, there was some misunderstanding about what

10  was going on.

11         And I'll say this, witnesses often look at their

12  attorneys, as it happens.  So I'm not impugning Mr. Siegler's

13  behavior in any way.  So let's go back to Exhibit 4.

14         She's taken the Fifth.  What do you want to do?

15         MR. KATAEV:  Your Honor, I'd like first to offer it

16  into evidence, as she's testified that that she received it.

17         THE COURT:  Actually, she took the Fifth as to that

18  question.  I don't know if she said she received it and then

19  you asked her the date or asked it together, but she took the

20  Fifth, I know, as to the date.

21         MR. KATAEV:  Your Honor, I ask that an adverse

22  inference be entered that she did receive it based on her

23  taking the Fifth, and I offer it into evidence any way.

24         THE COURT:  Right.  Based on the document itself, I

25  have no reason to believe she did not.

GELARDI – DIRECT – KATAEV

1          Any objection to the admission, Mr. Siegler?

2          MR. SIEGLER:  Yes.  We've heard no testimony about

3     it and, I believe this is the wrong witness to admit this

4     document.  There's been no testimony whether she received it

5     or not.

6          THE COURT:  I'm going to overrule that objection and

7     I'll note that it says from Adam Rosenblatt to Safa Gelardi,

8     the same, Gmail address as the other e-mails.  Let me double

9     check that.  Yes.  As to which the witness has already

10    admitted to receiving e-mails at.  So I'm going to allow

11    Exhibit 4 in to evidence.  Based on the adverse inference, as

12    well.

13         Go ahead Mr. Kataev.

14         (Plaintiff's Exhibit 4, was received in evidence.)

15    Q    The reason Adam sent you this list is because it

16    contained the decision-maker as to whether to purchase IME

17    observer services from each of these list of law firm,

18    correct?

19    A    Can you just rephrase that so I can understand it.

20    Q    Sure.  The reason why Adam sent you this was because it

21    contained the contact information of the person within each

22    law firm who makes decisions about whether to purchase IME

23    observer services, correct?

24    A    What is this?  What are you implying?

25    Q    I'm referring to Plaintiff's Exhibit 4 which has been

AVERY N. ARMSTRONG, RPR
OFFICIAL COURT REPORTER

GELARDI - DIRECT - KATAEV

1    admitted into evidence.  It's the list of law firm names with

2    an e-mail next to them?

3    A    I plead the Fifth.

4    Q    This is one of many e-mails that you received from Adam

5    with such information, correct?

6    A    What such information?

7    Q    Contact information of an individual within the law firm

8    that's listed?

9    A    I'm not sure.

10         MR. KATAEV:  Your Honor, I'd like to offer into

11   evidence what has been marked as Plaintiff's Exhibit 5.

12         THE COURT:  Yes.  Go ahead.

13         MR. KATAEV:  (Handing).

14   Q    Ms. Gelardi, at some point in 2019, you asked Adam

15   Rosenblatt to open a Zelle account, correct?

16   A    No.

17   Q    And it's true that you made payments to Adam through

18   Zelle, correct?

19   A    I plead the Fifth.

20   Q    Referring to the first page of the exhibit, on

21   August 1st, 2019, you paid Adam Rosenblatt $300 from your

22   personal account, correct?

23   A    I plead the Fifth.

24   Q    Referring to the second page, on October 8th, 2019, you

25   paid Adam $100, correct?

GELARDI - DIRECT - KATAEV

1   A    I plead the Fifth.

2   Q    Referring to the third page, on November 11, 2019, you

3   paid Adam $100 from your business account, correct?

4   A    I plead the Fifth.

5   Q    Referring to the fourth page, on March 5, 2020, you paid

6   Adam $230 from your business account named IME Companions LLC,

7   correct?

8   A    I plead the Fifth.

9        THE COURT:  Mr. Kataev, please don't go through

10  every single one of these, okay.  So I'm going to ask you,

11  Ms. Gelardi, to page through what appears to be about 25 pages

12  in Exhibit 5.

13       Are you taking the Fifth as to each of the payments

14  that are reflected in Exhibit 5 that appear to be from you to

15  Mr. Rosenblatt?

16       THE WITNESS:  Yes, Your Honor.

17       THE COURT:  Okay.  If you want to ask anything more

18  about any of those pages, fine, but we don't need to march

19  through every single one of them.

20       MR. KATAEV:  Thank you, Your Honor.  I'll just note

21  that there was 27 pages of separate payments.

22       THE COURT:  All right.  And Exhibit 5 is admitted

23  into evidence.

24       MR. KATAEV:  Thank you, Your Honor.

25       (Plaintiff's Exhibit 5, was received in evidence.)

GELARDI - DIRECT - KATAEV

1      MR. KATAEV:  I'd like to offer -- present to the

2  witness an exhibit previously marked as Plaintiff's Exhibit 6.

3      THE COURT:  All right.  Do you have a notebook?

4  Maybe just put them all in a notebook and just give her the

5  notebook.

6      MR. KATAEV:  That's fine, Your Honor.  I can do

7  that.

8      THE COURT:  That way you don't have to keep walking

9  up to her with each one.  That way you can refer her to the

10  tab and she can just flip through it.

11      MR. KATAEV:  Your Honor, it's about the only

12  exercise I get.

13      THE COURT:  Sorry about that.  I appreciate that.

14      MR. KATAEV:  Let the record reflect that the exhibit

15  binder has been placed in front of the witness.

16      THE COURT:  Now turn to Exhibit 6, Ms. Gelardi.

17  Q    Ms. Gelardi, this is a screenshot of a text message

18  exchange between yourself and Carlos Roa, correct?

19  A    I don't know.

20  Q    It says your name at the top in the middle, correct?

21  A    I see my first name.

22  Q    And on the right side, are messages that Carlos sent you,

23  correct?

24  A    I don't know.

25  Q    And on the left side is information that you provided to

GELARDI – DIRECT – KATAEV

1   Carlos, correct?

2   A     Again, I don't know.

3   Q     Rosenberg and Gluck is a customer of IME Companions,

4   correct?

5   A     No, they are not.

6   Q     Napoli is a law firm that is a customer of IME

7   Companions, correct?

8   A     No, they are not.

9   Q     Hecht is a law firm that was a customer of IME

10  Companions, correct?

11  A     No, they are not.

12              THE COURT:  For the court reporter, it's H-E-C-H-T,

13  Hecht.

14              MR. KATAEV:  Thank you, Your Honor.

15  Q     Is there any reason you have to believe that these are

16  not your text messages with Carlos Roa?

17  A     I'm just -- I just don't see -- I don't see any other

18  information.

19  Q     Now, at the bottom left of this text message exchange is

20  a screenshot, correct?

21              It says new assignment?

22  A     Yes.

23  Q     You sent that screenshot to Carlos, correct?

24  A     I'm not sure.

25  Q     If you go to the second page of the exhibit, you'll see

GELARDI - DIRECT - KATAEV

1    the full screen of the screenshot?

2              MR. KATAEV:  I'll represent to the Court that that's

3    what it is.

4    Q    This is a picture of an e-mail that Adam Rosenblatt

5    received, correct?

6    A    I don't know.

7    Q    Adam Rosenblatt sent you this screenshot, correct?

8    A    Again, I do not know.  I'm not sure.

9              MR. KATAEV:  Your Honor, I offer it into evidence,

10   subject to connection.

11             THE COURT:  I'm not going to allow this in yet

12   because she hasn't testified that she knows who sent this or

13   who the text exchange is with.

14             Obviously, I note that -- well, let me ask you this:

15   Ms. Gelardi, is there any reason for you to believe that SG

16   and Safa in this exhibit doesn't exit that this text was at

17   least with you on one end?

18             THE WITNESS:  Your Honor, honestly, you can put a

19   name on any number.

20             THE COURT:  You don't recall this exchange at all?

21             THE WITNESS:  I do not recall this exchange.

22             THE COURT:  All right.  I'm not going to allow it in

23   now until you can authenticate it with someone who actually

24   can testify as to who it was sent between and when.

25             MR. KATAEV:  Okay.  I'd like to offer --

GELARDI - DIRECT - KATAEV

1    A    I'm sorry, which texts do you assume are mine?

2    Q    On the left side.

3    A    Yeah, I do not recall.

4            MR. KATAEV:  That's fine, Your Honor.  We'll do it

5    through another witness.

6    Q    Please turn to exhibit tab number seven.

7            MR. KATAEV:  I'd like to present to the witness what

8    has been previously marked as Plaintiff's Exhibit 7.

9            THE COURT:  Seven, go ahead.

10           MR. KATAEV:  I apologize, Your Honor.  I meant

11   Exhibit 8.

12           THE COURT:  Okay.

13   Q    This is an e-mail chain between IME Companions and an

14   individual named Alexander Cherny, correct?

15           MR. SIEGLER:  I'm sorry, is counsel testifying?

16           THE COURT:  Well, he is.  But why don't we ask first

17   if this witness has ever seen this.

18           Have you seen this before?

19           THE WITNESS:  Yes, Your Honor, I have.

20           THE COURT:  All right.  What is it?

21           THE WITNESS:  This is an e-mail that I sent to Alex

22   Cherny.  He was my client.

23           THE COURT:  How do you spell Cherny?

24           THE WITNESS:  C-H-E-R-N-Y.

25           THE COURT:  Okay.  Go ahead, Mr. Kataev.

GELARDI - DIRECT - KATAEV

1    Q    You emphasize in the first paragraph of your e-mail that

2    we are not a law firm, correct?

3    A    Correct.

4    Q    In the second paragraph, second sentence, you stated IME

5    WatchDog does have the reputation of stealing clients because

6    the owner who is an attorney provides kickbacks to her

7    Watchdogs, correct?

8    A    Is that what it says?  I can't read it.  I'm sorry.  I

9    can't see.

10   Q    I'll represent to you that that's what it says.

11   A    Okay.

12   Q    You stated this in an e-mail to Mr. Cherny, correct?

13   A    If that's what it says, yes.

14   Q    You also said that those clients can easily -- can be

15   easily traced back to Daniella Levi, correct?

16   A    Correct.

17   Q    In this e-mail, you disparaged Mrs. Levi and said to

18   Mr. Cherny that she stole Watchdog clients, correct?

19   A    No.

20            MR. SIEGLER:  Objection.  Compound.

21            THE COURT:  She said no.  Let's move on.

22            Overruled.

23            MR. KATAEV:  Your Honor, I offer this exhibit into

24   evidence.  The witness testified that she sent this e-mail.

25            THE COURT:  Any objection?

GELARDI – DIRECT – KATAEV

1          MR. SIEGLER:  No objection.

2          THE COURT:  All right.  8 is admitted.

3          (Plaintiff's Exhibit 8, was received in evidence.)

4          MR. KATAEV:  I'd like to offer -- I'm sorry, I'd

5  like to present to the witness, a exhibit previously marked as

6  Plaintiff's 9.

7          THE COURT:  All right.

8  Q    Ms. Gelardi, this is a text message exchange between

9  yourself and Mr. Carlos Roa, correct?

10  A    Correct.

11  Q    And in this text message exchange, you sent him a

12  screenshot of his declaration and said to him, so you turn on

13  me to work for Watchdog, like she will ever trust you after

14  when you did to me; is that right?

15          THE COURT:  Hang on.  So you turn on me to work for

16  Watchdog, comma, like she will ever trust you after what you

17  did to me.  I just want to make sure that gets reported

18  accurately.

19          Okay.  Go ahead.

20  A    Correct.

21  Q    And you said to him, good luck, you're a disgrace,

22  correct?

23  A    Yes.

24  Q    And this is the same day and time -- withdrawn.

25          This is the same day that you were served with

GELARDI − DIRECT − KATAEV

1   papers in connection with this lawsuit, correct?

2   A    Correct.

3   Q    And you were angry at Carlos Roa for reporting to

4   Daniella Levi what you were doing, correct?

5   A    No.

6            MR. KATAEV:  Your Honor, I offer this exhibit into

7   evidence as Plaintiff's 9.

8            THE COURT:  All right.  9 is admitted.

9            Go ahead.

10           (Plaintiff's Exhibit 9, was received in evidence.)

11           THE COURT:  I do have one question.

12           When you said, like she will ever trust you after

13   what you did to me, what did you mean?

14           THE WITNESS:  I mean, he betrayed me, he lied, what

15   makes you think if you betray and lie, that the next person

16   will believe you or trust you.

17           THE COURT:  What did he lie about, in your mind?

18           THE WITNESS:  I think everything.  I have no idea

19   what he lied about.  I know that this whole thing is because

20   of his lies.

21           THE COURT:  But you don't know specifically what he

22   told her that was so −−

23           THE WITNESS:  No, your Honor.

24           THE COURT:  At all.  Okay.  Go ahead.

25   Q    You also started the process of franchising IME

GELARDI – DIRECT – KATAEV

1  Companions LLC, correct?

2  A    Correct.

3  Q    And you also filed for -- withdrawn.

4        You also filed to obtain a trademark for IME

5  Companions, correct?

6  A    Correct.

7        MR. KATAEV:  I'd like the witness to be represented

8  with what has been marked as Plaintiff's Exhibit 13.

9  Q    Ms. Gelardi, this is a printout from the United States

10  Patent and Trademark Offices website concerning a trademark

11  tiled IME Companions, correct?

12  A    Yes.

13  Q    And you obtained this trademark, correct?

14  A    Yes.

15  Q    You recently obtained it on October 21th of 2021,

16  correct?

17  A    Yes.

18  Q    It states in this document that IME Companions offers

19  consulting services concerning legal matters in the medical

20  field, correct?

21  A    Yes.  It does say that.

22  Q    But you're not an attorney, correct?

23  A    Correct.

24  Q    And therefore, you cannot offer any consulting services

25  concerning any legal matter, correct?

GELARDI – DIRECT – KATAEV

1          MR. SIEGLER:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  Answer the question?

4          THE COURT:  Yes, you can.

5          THE WITNESS:  What's the question?

6          MR. KATAEV:  Can I have it read back, please?

7          THE COURT:  The question was, and therefore, you

8    cannot offer any consulting services concerning any legal

9    matter, correct?

10          THE WITNESS:  Yes.  I'm assuming I'm not qualified

11   to give legal advice, correct.

12   Q    And you're also not a doctor, correct?

13   A    Correct.

14   Q    And you cannot offer any consulting in the medical field

15   either, correct?

16   A    I cannot provide advice on medical, correct.

17   Q    After consulting services concerning legal matters in the

18   medical field, it says, legal consultation services, correct?

19   A    Where does it say that?

20   Q    Following that line --

21          THE COURT:  On Page 1 next to goods and services.

22   A    Oh, I see.  Yeah.  So it says, yes.

23   Q    And you can't offer these services either, correct?

24          MR. SIEGLER:  I'm sorry, is he speaking to the

25   witness personally or to the business?

GELARDI – DIRECT – KATAEV

 1          THE COURT:  Well, I think to the business is a fair

 2    clarification.

 3          Can your business, IME Companions, provide legal

 4    consultation services?

 5    A    I believe so.  Can we not be, like, a service where we

 6    offer law firms to out-- an outsourcing service of departments

 7    of their firms?

 8          THE COURT:  This is not a question for you to ask

 9    us.  The question is does your company --

10          THE WITNESS:  Yeah.

11          THE COURT:  -- provide such services or in your

12    mind, do they have the ability to provide those services?

13          THE WITNESS:  To my knowledge, yes.  Certain

14    services, yes.

15    Q    IME Companions does not have any attorneys that it

16    employees, correct?

17    A    Correct.

18    Q    And it doesn't have any medical professionals that it

19    employees, correct?

20    A    Correct.

21    Q    And therefore, you have no qualification whatsoever to

22    provide any of these services that we just talked about,

23    correct?

24    A    No.  I think we can provide legal services, we just

25    cannot give legal advice.

GELARDI - DIRECT - KATAEV

1    THE COURT:  How do you construe legal services?

2    THE WITNESS:  Legal services is an advocate that we

3    send on these defense ordered medical exams.

4    Isn't that a legal service, Your Honor?

5    THE COURT:  Again, it's not for you to ask me the

6    question.  The question is what did you mean when you wrote

7    legal or you or whatever filled this out for your company.

8    What was meant when it said legal consultation

9    services?

10    THE WITNESS:  So Your Honor, I did not fill this

11    out.  But what I'm understanding is a legal service could be

12    an IME companion.  That's what I construe as a legal service.

13    THE COURT:  All right.  Go ahead.

14   Q    Without Adam's help, you would not know the specific

15   personal at each personal injury law firm responsible for

16   hiring IME observers, correct?

17   A    No.  That is not correct.

18   Q    Without Adam, you would not know how to service the

19   customers for whom you provided observers, correct?

20   A    That is not correct.

21   Q    Without Adam, you would not know how to bill customers

22   for whom you provide observers, correct?

23   A    That is not correct.

24   Q    Without Adam, you would not know what to charge

25   customers, correct?

GELARDI – DIRECT – KATAEV

1    A     That is not correct.

2    Q     Without Adam, you would not know how to create reports

3    for customers, correct?

4    A     That is not correct.

5    Q     But you concede that Adam sent you two reports that we

6    sent you today in exhibits, correct?

7    A     Correct.

8    Q     Without Adam, you would not know how to recruit

9    observers, correct?

10   A     Wrong.

11   Q     Without Adam, you would not know how to train observers,

12   correct?

13   A     Wrong.

14   Q     Without bribing and threatening Adam, you would not know

15   how to pay observers, correct?

16   A     Absolutely incorrect.

17   Q     Without bribing and threatening Adam, you would not know

18   how to deal with legal issues regarding the observers,

19   correct?

20   A     I don't even understand the line of question.  I'm just

21   going to say it's not correct.

22   Q     You derived a significant financial --

23            THE COURT:  Repeat the question.

24            MR. KATAEV:  I'll read it over.

25   Q     You derived a significant financial benefit from the IME

GELARDI – DIRECT – KATAEV

1  Watchdog information you obtained from Adam through bribery,

2  threats, and coercion, correct?

3  A    No.

4  Q    IME Companions has gross revenues of over $1 million,

5  correct?

6  A    No.

7  Q    IME Companions has over $750,000 in gross revenues,

8  correct?

9  A    No.

10 Q    After you were served with this lawsuit, you instructed

11 Adam to destroy all the incriminating evidence he has,

12 correct?

13 A    Absolutely incorrect.

14 Q    You and Mr. Vito Gelardi have other sources of income

15 from which you derive income, correct?

16 A    No.  We have some rental properties, but very little

17 income, Your Honor, from anything other than IME Companions.

18 Q    But isn't it true that you bragged to people at IME

19 Companions that one rental property covers your mortgage for

20 that property and your home?

21 A    No.

22 Q    You have a rental property located in Lake Harmony,

23 Pennsylvania, correct?

24 A    Correct.

25 Q    You charge $358 per night for a stay at that Lake Harmony

GELARDI – CROSS – SIEGLER

1    location, correct?

2    A     Correct.

3    Q     You also own a rental property in Brooklyn, right?

4    A     No, I do not.

5    Q     You and your husband also flip homes for a profit,

6    correct?

7    A     No, we do not.

8    Q     Would you agree with me, that justice dictates that if a

9    thief is caught that they should be forced --

10            THE COURT:  Sustained.  Sustained.

11            MR. KATAEV:  Your Honor, I may be done, if I could

12   have a minute.

13            THE COURT:  Yes.

14            (Pause in the proceedings.)

15            MR. KATAEV:  Your Honor, subject to recross, quote,

16   unquote, I have no further questions.

17            THE COURT:  All right.  So your witness,

18   Mr. Siegler, if you want to ask anything.

19            MR. SIEGLER:  Yes, Your Honor.  We have to ask some

20   questions touched on by Mr. Kataev, but then we're going to

21   ask about the injunction relief.

22   CROSS-EXAMINATION

23   Q     Ms. Gelardi, can you tell the Court about your family?

24            MR. KATAEV:  Objection.

25            Relevance.

GELARDI - CROSS - SIEGLER

1    THE COURT:  I'll give you some leeway.

2         Go ahead.

3  Q    How many children do you have?

4  A    We have -- my husband and I have two children, and we

5  care for four others, Your Honor.

6  Q    When you say you care for four others, can you --

7  A    We have four other children that we take care of.

8  They're grown men now.  We've cared for them their whole

9  lives.

10         THE COURT:  I'm sorry, why do you take care of four

11  grown men?

12         THE WITNESS:  Well, we took care of them since were

13  children.  They're grown now.

14         THE COURT:  But do you take care of them now?

15         THE WITNESS:  We still -- we help them.  They're

16  getting married.  They're part of family.  Yes, we still care

17  for them.

18         THE COURT:  Okay.  Go ahead.

19  Q    Did legally adopt these children?

20  A    No.

21         MR. KATAEV:  Objection, Your Honor.

22         This has nothing to do with the claims here.

23         THE COURT:  I think you're going to argue something

24  about financial wherewithal.

25         MR. SIEGLER:  No.  It goes exactly irreparable -- it

GELARDI - CROSS - SIEGLER

1   goes to balance of the equities --

2           THE COURT:  Right.  Go ahead.  I'll give you a

3   little bit of leeway, but unless you're going to tell me some

4   specifics about dollar amount, I'm not sure what this gets

5   you.

6   Q    How many employees does Companions have at the present

7   time?

8   A    We have over 20 people working for us, Your Honor.

9   Q    And Mr. Kataev spoke about household income.

10          Can you estimate for the Court how much of your

11  income you get from Companions versus rentals and other

12  things?

13  A    IME Companions is roughly 85 percent of our main source

14  of income.

15  Q    What happens to your family if the business is shutdown

16  today?

17          MR. FELSEN:  Objection, Your Honor.

18          THE COURT:  Overruled.

19          MR. SIEGLER:  You can answer.

20          THE WITNESS:  I can answer?

21  A    We would be totally devastated.  We'd have to sell our

22  home.  We'd have to sell our car.  We'd have to take our

23  children out of school.  We would have -- I have 20 people,

24  single mothers, some of which are in this -- that work for us

25  that rely on us as a sole income.  We work around peoples'

GELARDI – CROSS – SIEGLER

1   schedules.  We have over 20 companions that I would say more

2   than half of them do this full time, Your Honor.

3   Q    Ms. Gelardi, earlier in your testimony, you testified

4   that there was a mistake in your affidavit with respect to

5   Sterling.  I think your affidavit said 17 years.

6           Can you tell the Court about that?

7   A    I have been in the financial industry, Your Honor, for 17

8   years, working for the banks.  I have been with Sterling close

9   to four.  I would say three and a half to four years.

10  Q    What were your job responsibilities at Sterling?

11  A    I ran multiple branches.  I was a district manager and

12  ran multiple branches.

13  Q    How many employees reported to you?

14  A    Thirty to 40, Your Honor.

15          MR. KATAEV:  Relevance, Your Honor.

16          THE COURT:  Overruled.  For what it's worth.

17          Go ahead, ask your next question.

18  Q    Would you -- what was the focus of your work at Sterling?

19  A    Business development.

20  Q    And did you bring in new business?

21          It was part of your job to bring in new business --

22  A    Yes, sir.

23  Q    Were you successful in that endeavor?

24  A    Very successful.

25  Q    Can you estimate for the Court how many dollars you

GELARDI – CROSS – SIEGLER

1    brought in per year?

2    A    I would say I grew each branch from 15 to $20 million

3    each year.

4             (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. GELARDI – CROSS – MR. SIEGLER

1    CROSS-EXAMINATION(Continued.)

2    BY MR. SIEGLER:

3    Q    We had some testimony about Ronald Rosenblatt, do you

4    recall that?

5    A    Yes.

6    Q    What was -- how -- was he a business client or something

7    else?

8    A    He was a personal client.

9    Q    Of the bank or some other --

10   A    Of the bank, yes.

11   Q    He came to you with a business idea, correct?

12   A    Yes, that is correct.

13   Q    Were you attracted to the idea of starting your own

14   business?

15   A    Yes.

16   Q    Why is that?

17   A    I wanted to have a family, I wanted to raise my children

18   myself.  I wanted to be my own boss.  I wanted to -- I wanted

19   to do what I do for the banks for myself.  I wanted to run my

20   own business.

21   Q    What was the business model of malpracticescreening.com,

22   were you going to do medical advice?

23   A    I was not going to do medical advice.  I was running the

24   platform and the business idea.  Ronald Rosenblatt had brought

25   in other doctors and himself, but mostly other doctors to

S. GELARDI - CROSS - MR. SIEGLER

1   screen those reports -- to screen those screenings.

2   Q    Can you just tell the Judge what the business idea was, I

3   don't think we have a clear idea.

4   A    The business idea, your Honor, I think is great.  It's --

5   most people that get injured in a malpractice case, their only

6   means is to go to an attorney to find out if they are a victim

7   of malpractice.  Ronald Rosenblatt said we should bring this

8   to the public where before you go to your attorney, you can

9   get it screened by a medical professional who can determine

10  for you whether or not to waste your time and go to a --

11  whether you have a potential case or not.

12          THE COURT:  Would that be for a fee?

13          THE WITNESS:  Yes, your Honor.

14          THE COURT:  All right.

15  BY MR. SIEGLER:

16  Q    Did -- whatever happened to that business?

17  A    The doctor and the people that he brought forward to

18  screen the cases -- well, it was him at first and he just

19  seemed very unreliable and he had -- he had issues that we

20  couldn't -- I had no one to screen the cases, so it went

21  dormant, your Honor.

22  Q    And is it currently still in existence or is it

23  dormant --

24  A    It is.  It's live -- it is still in existence it's just

25  not being worked.

S. GELARDI - CROSS - MR. SIEGLER

1  Q    Just let me finish my question.

2  A    I'm sorry.

3  Q    Did Ronald Rosenblatt introduce you to his son?

4  A    Yes.

5  Q    And why did he introduce you, to the best of your

6  knowledge?

7  A    He wanted -- he wanted his son, according to Ronald

8  Rosenblatt, to take his idea and do a business for himself

9  with it.

10 Q    What was his idea?  What do you mean?

11 A    Ronald Rosenblatt claims he invented IME WatchDog.  He

12 came up with the idea.

13 Q    Did he mention how his son came to work for IME WatchDog?

14 A    He mentioned to me that he was working with Daniella

15 Levi, Ronald Rosenblatt, in screening malpractice cases and he

16 pitched her both ideas and she took IME WatchDog and -- and

17 took it from him and made it into what it is today.  And he

18 said, well, you know, according to Ronald Rosenblatt, he said

19 well, you stole my idea, will you at least hire my son.

20         MR. KATAEV:  Objection.  Hearsay.

21         THE COURT:  This is from Mr. Rosenblatt to you, is

22 that what you're saying?

23         THE WITNESS:  Correct, your Honor.

24         THE COURT:  All right.  Sustained.

25         MR. SIEGLER:  I ask the Court to consider it for

S. GELARDI - CROSS - MR. SIEGLER

1   what it's worth in the scope of this hearing.

2            THE COURT:  Well, I'm not going to consider it for

3   its truth, which is that Mr. Rosenblatt -- he's already.

4            MR. SIEGLER:  Well --

5            THE COURT:  Hang on a second.  He already stated he

6   invented the idea and that in and of itself that she's

7   reporting it to me is hearsay, but in terms of affecting or

8   influencing what she did next, I'll consider that.

9   BY MR. SIEGLER:

10  Q    Did Ronald Rosenblatt introduce you to Adam?  I'm sorry

11  if I asked that before.

12  A    Yes, he did.

13  Q    Did there come a time when you and Adam spoke just the

14  two of you about this business --

15           MR. KATAEV:  Objection.

16  Q    -- or was it always with your father?

17           MR. KATAEV:  Objection.  Leading.

18           THE COURT:  Overruled.

19  A    Ask again please.

20  Q    I'm sorry.  Was there a time that you met just with Adam

21  or was it always with your father or something else?

22           THE COURT:  His father.

23  A    His father.  Yes, there was a time when I met with only

24  Adam.

25           THE COURT:  To talk about starting this business?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

S. GELARDI - CROSS - MR. SIEGLER

1          THE WITNESS:  Correct.

2     Q    Did Adam ever express why he wanted to start his own

3     business?

4          MR. KATAEV:  Objection.  Hearsay.

5          THE COURT:  Sustained.

6     Q    Did you form an opinion about Adam through your various

7     conversations with him prior to the formation of the company

8     Companions?

9          MR. KATAEV:  Objection.  Calls for opinion

10    testimony.

11         THE COURT:  Overruled.

12         THE WITNESS:  Yes, your Honor, I did.

13         THE COURT:  What was --

14    Q    What was your opinion of Adam?  I'm sorry.

15         THE COURT:  No, you go ahead, I'm sorry.

16    Q    What was your opinion of Adam?

17    A    My opinion was he was untrustworthy, he was unethical.

18    He was just really ruthless in wanting to take his boss down

19    and it's just not someone I wanted to go into business with.

20    Q    Did you know who Daniella Levi was at that point?

21    A    No, I did not.

22    Q    Did you have any interest in taking her down or any kind

23    of --

24    A    Absolutely not.

25    Q    You testified that Adam sent you an email that you looked

S. GELARDI - CROSS - MR. SIEGLER

1   at it several months later; is that correct?

2   A    That is correct.

3   Q    Why didn't you immediately open it -- or I'm sorry open

4   the attachments?

5   A    Sir, I was very busy.  I had a baby, a family, a very

6   demanding job and I'm trying to build a business with Ronald

7   Rosenblatt.  I didn't have the time at the moment to invest in

8   helping Adam.

9   Q    Do you specifically recall -- sorry, withdrawn.

10          Did you ask -- I'm sorry, did you offer to pay Adam

11   for the documents he sent you?

12   A    Absolutely not.

13          MR. KATAEV:  Objection.  Leading.

14          MR. SIEGLER:  There's nothing leading about that.

15          THE COURT:  Overruled.

16   A    I did not pay for any of the documents he sent, your

17   Honor.

18   Q    Did you ask him to send them?

19   A    No, I did not.

20   Q    To your knowledge, did he send those documents to other

21   people?

22   A    Yes.

23   Q    Did you give Adam any reward or benefit of any kind for

24   the documents that he sent to you in 2017?

25   A    No.

S. GELARDI – CROSS – MR. SIEGLER

1    Q    After you looked at the documents, did you rush to open a

2    business right away?

3    A    No.

4    Q    Who is Greg Elefterakis?

5    A    Greg Elefterakis, your Honor, was a client of mine as

6    well.

7    Q    Did he have a business?

8    A    He does, he had multiple.

9    Q    Did he have a business called Case Cash?

10   A    Yes.

11   Q    Did you seek a meeting with Mr. Elefterakis in 2017?

12             MR. KATAEV:  Objection.  Leading.

13   A    Yes.

14             THE COURT:  Overruled.  Did you seek a meeting with

15   him?

16             THE WITNESS:  Yes.

17             THE COURT:  Go ahead.

18   Q    Why did you want to meet with Mr. Elefterakis?

19   A    Mr. Elefterakis was an influential man.  He owned Case

20   Cash Company.  He was very successful, and he had a list of, I

21   would say, potential clients that I wanted to work with him

22   with.

23   Q    Did you approach him with the IME Companions idea or a

24   different idea?

25   A    I approached him with both.

S. GELARDI - CROSS - MR. SIEGLER

1   Q    What was the first -- I'm sorry.  What was the order in

2   which you approached him?

3   A    I approached him first with malpracticescreening.com,

4   your Honor, I thought it was a great idea.  He did not find it

5   a great idea, he was not interested.  I was disappointed.  And

6   months later I asked for a second meeting with him and he saw

7   me again and that's when I took the invoice and I'm, like,

8   hey, what about this?  That's when I pitched him IME

9   Companions.

10          THE COURT:  I'm sorry, you said you wanted -- you

11  were interested in potential clients of his, who?

12          THE WITNESS:  Your Honor, Mr. Elefterakis funded

13  cases for personal injury attorneys.

14          THE COURT:  I see, okay, those are the clients you

15  were interested in --

16          THE WITNESS:  Correct.

17          THE COURT:  -- of his?

18          THE WITNESS:  Correct.

19          THE COURT:  All right.

20  BY MR. SIEGLER:

21  Q    So tell us about the second meeting.

22  A    The second meeting I pitched IME Companions.  He heard me

23  out, he called his nephew while I was sitting there still

24  talking, he made a phone call, he asked his nephew, hey, have

25  you ever heard of this service?

S. GELARDI - CROSS - MR. SIEGLER

1          MR. KATAEV:  Objection.  Hearsay.

2     A    I was there --

3          THE COURT:  Hang on a second.  Overruled.

4          I'm only going to consider it to explain what

5     happened next.

6          THE WITNESS:  Yes.

7          THE COURT:  I don't think it's being offered for its

8     truth yet.  Go ahead.

9     A    He called his nephews, he spoke to his nephew first Nick

10    Liakas before Elefterakis.  He called Nick, he asked him, have

11    you ever heard of this business, what do you do -- what do

12    they do.  And then he said to Nick, okay, you know what?  I

13    think I'm going to start my own IME business.  That's what he

14    said to his nephew.

15         THE COURT:  IME, go ahead.

16    Q    Did Greg have an idea in his head at that meeting how you

17    guys would split up the work?

18         MR. KATAEV:  Objection.  Calls for the mind of

19    another witness.

20         MR. SIEGLER:  Calls for what?

21         MR. KATAEV:  Calls for the mind -- the mind state of

22    another witness.

23         THE COURT:  Overruled.

24    A    What was the question, sir?

25    Q    Did Greg tell you how he wanted the division of labor?

S. GELARDI - CROSS - MR. SIEGLER

1    A    Yes, he did.

2    Q    What did he tell you?

3    A    So it was going to be where I would -- he was going to

4    make phone calls, get me meetings.  He hired -- well, he

5    didn't hire, he brought in two other people, Roman Pollak and

6    Anthony Brida.  He said, you guys are going to do the office

7    work for her, I'm going to set up the meeting.  You're going

8    to go on every single meeting, you're going to close.  That's

9    how we started getting our clients.

10          THE COURT:  When was this?

11          THE WITNESS:  This was, I would say, late 2017, your

12   Honor.

13          THE COURT:  All right, go ahead.

14          MR. SIEGLER:  I'm going to approach the witness with

15   a -- she may have it already, it's the formation documents for

16   the company.

17          I'm not sure if you have it up there.

18          THE COURT:  Did you give her a binder of your

19   exhibits?  I don't think it's in the plaintiff's exhibits.

20          MR. KATAEV:  It's not, your Honor.

21          MR. SIEGLER:  It might not be.  Let me show her my

22   copy.

23          (Witness reviewing document.)

24   Q    Let me know when you're done reviewing.

25   A    I'm done.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

S. GELARDI - CROSS - MR. SIEGLER

1   Q    Do you recognize those documents?

2   A    Yes.

3   Q    Can you tell the Court what they are.

4   A    This is the corporation documents for IME Companions.

5            THE COURT:  I'm sorry, what document is it, is it

6   marked as an exhibit?

7            MR. SIEGLER:  Yes, it's an exhibit to Ms. Gelardi's

8   affidavit, the February 25 affidavit.  It's Exhibit B to her

9   affidavit.

10            THE COURT:  You're talking about the pleadings.  Go

11  ahead.

12  Q    Can you just read for the judge what they are.

13  A    This is a tax ID, your Honor.  Tax identification number

14  that we acquired.  Greg Elefterakis was the one who acquired

15  all of the business documentation.

16  Q    Are there Articles of Incorporation?

17  A    There is a filing receipt and there's Articles of

18  Incorporation, yes.

19  Q    Is there a date on the filing?

20  A    The filing receipt is dated October 17th, 2017.

21  Q    To the best of your recollection, is that the date that

22  the company was formed?

23  A    Yes, to the best of my recollection.

24            MR. SIEGLER:  I move to enter that exhibit into

25  evidence.

S. GELARDI – CROSS – MR. SIEGLER

1          THE COURT:  Any objection?

2          MR. KATAEV:  No, your Honor.

3          THE COURT:  It's not marked as an exhibit, but it is

4   Exhibit B to Defendants' memo of law in opposition which was

5   docketed as 29.  The copy of the exhibit that I'm looking at

6   has the ECF heading of 26-2.

7          MR. SIEGLER:  Thank you, your Honor.

8          (Defense Exhibit B, was received in evidence.)

9   Q    So who came up with the name for the company?

10  A    Greg did.

11  Q    Did Greg tell you his thinking about why to name it

12  Companions?

13         THE COURT:  Sustained.

14  Q    Who were the firm's first clients?

15  A    Nick Elefterakis, Elefterakis & Panek, and Liakas Law.

16  Two of Greg Elefterakis' nephews.

17         THE COURT:  How do you spell Liakas.

18         THE WITNESS:  L-I-A-K-A-S.

19         THE COURT:  Go ahead.

20  BY MR. SIEGLER:

21  Q    How did you learn the -- first of all, you already

22  testified you didn't know what IME even was before this,

23  correct?

24  A    That's correct.

25  Q    How did you learn this business?

S. GELARDI - CROSS - MR. SIEGLER

1    A    You know, Nick Elefterakis, Nick Liakas, Greg Elefterakis

2    and other clients as well prepped me.  In the beginning it was

3    just the nephews.  They taught me everything.  They sent me

4    case law, they said what they wanted the advocates to do at

5    the exams, what to block, what questions not to block, how to

6    present ourselves, what they wanted us to wear even as far as

7    professional business attire.  So we were coached by the

8    attorneys on how to use the service, on how they wanted to --

9    how they wanted the service to benefit them.

10             THE COURT:  Let me ask a question.  Did those law

11   firms work with IME WatchDog?

12             THE WITNESS:  I believe so, your Honor.

13             THE COURT:  All right.  Go ahead.

14   BY MR. SIEGLER:

15   Q    I was going to ask you, did either Greg or Nick or Nick

16   introduce you to new clients?

17   A    They did.

18   Q    Which ones?

19   A    So Greg Elefterakis introduced me to a gentleman named

20   Greg Ciccione which was a senior partner at Subin Associates,

21   your Honor.

22             THE COURT:  Okay, hold on.  C-I-C-C-O-N-E.

23             THE WITNESS:  C-I-C-C-I-O-N-E.

24             THE COURT:  Subin we already have, S-U-B-I-N.

25             THE WITNESS:  Correct.

S. GELARDI - CROSS - MR. SIEGLER

1        THE COURT:  All right.

2    A    He introduced me to Greg Ciccione, he requested a meeting

3    with the senior partners.  I was told to go and close the

4    deal.  I showed up with Mr. Roman Pollak, also came with me

5    another partner of mine, and Mr. Greg Elefterakis was on

6    speakerphone at this meeting with Mr. Herb Subin and Greg

7    Ciccione.

8    Q    How did the meeting go?

9    A    The meeting went excellent.  We -- they decided to work

10   with us immediately.  Greg did mention at the meeting --

11        MR. KATAEV:  Objection.  Hearsay.

12        THE COURT:  Overruled.  Let me hear it first.

13   A    Greg mentioned at the meeting they were very happy that a

14   new service showed up, they were very happy that a competitor

15   is around --

16        THE COURT:  Sustained, sustained.

17   A    -- Greg had mentioned.

18        THE COURT:  Sustained, sustained.  Move on.

19   BY MR. SIEGLER:

20   Q    Did they introduce you to any other clients?

21   A    Yes.

22   Q    Can you name a few.

23   A    I can name a few.  John Zaremba was a school mate of Nick

24   and Nick.  We got introduced to Mr. Alex Cherny, he was a very

25   good friend of Greg Elefterakis.  We were introduced to

S. GELARDI - CROSS - MR. SIEGLER

1    Khavinson, he was also a good friend --

2              (Court reporter asks for clarification.)

3              THE COURT:  Can you spell that.

4              MR. KATAEV:  It's K-H-A-V --

5              THE WITNESS:  K-H-A-V-I-N-S-O-N.

6              MR. KATAEV:  K-H --

7              THE COURT:  K-H.

8    A    We were introduced to so many.  We were introduced to

9    Kenneth Halperin from Wingate, Rosati, Shapiro & Halperin.  We

10   were introduced to -- he would just schedule meetings and

11   meetings would just fill my calendar.

12             THE COURT:  Who is the "he."

13             THE WITNESS:  Mr. Gregory Elefterakis, your Honor.

14             THE COURT:  Next question.

15   BY MR. SIEGLER:

16   Q    At some point did you quit your job at Sterling?

17   A    I did.

18   Q    Were you fired from Sterling?

19   A    No, I was not.

20             THE COURT:  When did you quit?

21             THE WITNESS:  December of 2017, your Honor.

22             THE COURT:  So about two months after starting your

23   own company?

24             THE WITNESS:  That is correct.

25   Q    What were your job duties when you started?

S. GELARDI - CROSS - MR. SIEGLER

1    A    When I started IME Companions I was the observer, the

2    editor, the bookkeeper, the accountant, the salesperson, the

3    marketing.  I did everything.

4            THE COURT:  When you say the observer, did you go

5    to --

6            THE WITNESS:  Yes --

7            THE COURT:  -- the medical --

8            THE WITNESS:  -- I was the first companion, your

9    Honor.

10           THE COURT:  All right.

11   BY MR. SIEGLER:

12   Q    In addition to getting referrals from your business

13   partners, how else did you win business?

14   A    We gave better pricing.  We went to CLE meetings.  We

15   sponsored so many events.  We sponsored the Jewish Lawyers

16   Guild.  We sponsored multiple CLE events where we would show

17   up with tables and marketing, we mailed marketing material.

18           We would set up a 20 block radius, I would put a zip

19   code in, your Honor, of personal injury attorneys in a 20

20   block radius and I would literally go door to door, leave my

21   material, sit in offices for hours and not be seen.  In the

22   heat, in the cold we went from office to office -- myself, I

23   went from office to office to office in order to get the

24   clients that I now have.

25   Q    Did you eventually buy out your partners?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

S. GELARDI - CROSS - MR. SIEGLER

1    A    I did.

2    Q    Who is Carlos Roa?

3            THE COURT:  Sorry, when did you buy out your

4    partners?

5            THE WITNESS:  I don't recall.  Not too long after,

6    maybe a year after.  I'm not sure, your Honor.

7            THE COURT:  How much did you pay to buy them out?

8            THE WITNESS:  I paid a little over a hundred

9    thousand dollars, your Honor.

10            THE COURT:  Go ahead.

11            MR. SIEGLER:  Your Honor, I have the purchase

12    agreement if I can show the witness if your Honor --

13            THE COURT:  No, that's fine.  I mean, is there any

14    reason to show it?  She said about a hundred thousand dollars.

15            MR. SIEGLER:  That's accurate.

16            THE COURT:  Let me ask one question though before

17    you get too far.

18            In January 2019 or thereabout, what were the

19    company's revenues, if you know.

20            THE WITNESS:  I'm not even sure.  January of 2019.

21    I think I brought it with me.

22            THE COURT:  So it would be a little over year after

23    you started.

24            THE WITNESS:  Well --

25            THE COURT:  Hang on.  So around the time you bought

S. GELARDI – CROSS – MR. SIEGLER

1    out your partners, what was the revenue?

2             THE WITNESS:  The revenue, I'm going to guesstimate,

3    your Honor, maybe 10 to 12,000 a month.

4             THE COURT:  All right.  Go ahead.

5    BY MR. SIEGLER:

6    Q    Who is Carlos Roa?

7    A    Someone that I hired to be a companion.

8    Q    And how do you know Mr. Roa or how were you acquainted

9    with Mr. Roa first?

10   A    I was introduced to Mr. Roa by my husband Vito Gelardi.

11   Vito has known Carlos since he was a teenager in high school

12   and we were actually looking to hire more companions and we

13   needed Spanish-speaking companions, your Honor, so he was

14   going through his contact book and he called Carlos.

15   Q    You said Carlos came to be an employee of Companions?

16   A    Correct.

17   Q    What was his first position?

18   A    His first position was a companion.

19   Q    And when did he begin working for Companions?

20   A    I would say around, I'm going to say maybe 2019, around

21   then.

22   Q    To your knowledge, did he tell you he had any previous

23   experience?

24   A    No, he did not.  He did not have any previous experience.

25   Q    Between 2017 and 2019, the beginning of 2019, did you

S. GELARDI - CROSS - MR. SIEGLER

1   ever look at the materials that had been sent to you in 2017?

2   A    No.

3   Q    Did you consult those materials in order to form a

4   business plan?

5   A    No, your Honor.

6   Q    Did you consult that material to figure out clients, your

7   competitor's clients, who they were?

8   A    No.  We had so many other means, your Honor.  We didn't

9   even look at the list.

10           Mr. Elefterakis had his -- had close contacts.  It

11   was no longer cold calling.  He would just set up meetings and

12   we would just go in and close.

13   Q    How did you know what your competitor's prices were?

14   A    I looked up online on her website, your Honor.

15   Q    Did you look at your other competitors as well?

16   A    No, not at the time.

17   Q    Not at that time, okay.

18           Over time -- let me ask you, the stuff that Adam

19   sent you, did you print it?

20   A    No.

21   Q    Where did you keep it?  Was it kept in a special place?

22   A    It stayed in my email.  I printed -- I don't believe I

23   printed any of it.  I might have printed the Sales by Customer

24   list.

25   Q    What about the invoices?

S. GELARDI - CROSS - MR. SIEGLER

1   A    And the invoices.

2   Q    Over time did you see what Carlos' strengths were?

3   A    Carlos Roa, yes, I did.

4   Q    What were his strengths?

5   A    Your Honor, Carlos has the gift of gab.  Carlos seems to

6   be an excellent salesperson.  He really knows how to talk

7   about things that he knows nothing about.  He makes it seem

8   like he knows everything about whatever it is you're talking

9   about.  I thought his strength would be good in sales.

10  Q    Did you move him into more of a sales position?

11  A    I did.

12  Q    How much did you pay him?

13  A    Carlos?

14  Q    Yes.

15  A    I paid him $800.

16  Q    That was weekly or monthly?

17  A    Weekly.  And then I gave him residuals for every account

18  that -- so for every account that he acquired, he received a

19  residual for each IME that law firm booked.

20  Q    What was his residual, how was it calculated?

21  A    It was calculated per IME.  Each account that he acquired

22  per IME he was getting $20 per IME.

23  Q    For all clients that he brought in?

24  A    For all clients that he brought in, correct, for each IME

25  that client booked, your Honor.

S. GELARDI – CROSS – MR. SIEGLER

1   Q    So let's talk about marketing.  What kind of marketing

2   did you do?  You talked about conventions and things, in

3   person, what else did you do?

4   A    First, I created my own marketing material, but then I

5   wanted a more professional look so I hired a marketing

6   company.  They helped me create my material and then I hired

7   this company to do ongoing social media marketing, email

8   marketing.  We have been really hardcore in marketing since

9   2020, if not 2019 actually, I'm not a hundred percent sure

10  when but it's around that time.

11  Q    Did you engage any companies to provide names of

12  potential clients?

13          MR. KATAEV:  Objection.  Leading.

14  A    Your Honor --

15          THE COURT:  Hang on, hang on.  Overruled.

16  A    Your Honor, I hired a company called ZoomInfo.  ZoomInfo,

17  what they do is a lead-generating company.  So basically I can

18  put personal injury attorneys in the field and I can put the

19  area that I want, Westchester, New York City, Florida, it

20  doesn't matter it will give you 99 percent accurate contact

21  information for these attorneys.  And I think I built a list

22  over 10,000 contacts from ZoomInfo.

23  Q    We touched on this earlier, are there other companies

24  that provide IME observers in New York?

25  A    Yes.  Plenty.

S. GELARDI - CROSS - MR. SIEGLER

1  Q    Is one of those companies Satellite Investigations?

2  A    Yes.

3           MR. KATAEV:  Objection.  Relevance.

4           THE COURT:  Sustained in terms of leading, but --

5           MR. SIEGLER:  Sorry, your Honor, why don't we just

6  ask.

7  Q    Do you know the name of the company?

8  A    I know there is IME Guards.  I know that there's IME

9  Sharks.  I know that there's Smartdog Solutions.  There's ZR

10 Per Diem.  There is a group of nurses upstate that also do

11 IMEs, they have an IME business, but they are a group of

12 nurses.  There is also a group of nurses in New Jersey that

13 also own an IME business and I know this because I asked when

14 I go out to meet new clients, they tell me who they are using

15 and who they are not.

16          THE COURT:  Next question.

17 Q    Are you -- I'm sorry.  To the best of your knowledge, do

18 these companies all compete for personal injury firm clients?

19 A    Yes.

20 Q    Do these companies all have basically the same prices?

21 A    Yes.

22 Q    Do they all provide similar services as WatchDog's and

23 Companions?

24 A    Yes.  The --

25          THE COURT:  Sustained.  I assume that calls for some

S. GELARDI - CROSS - MR. SIEGLER

1    hearsay, but I mean I don't know how she would know that

2    unless someone tells her that because she's not -- how do you

3    know all this?

4            THE WITNESS:  It's on the website, your Honor.  They

5    all explain what we do, what our benefit is, why you should

6    hire us.  We also have videos.

7            THE COURT:  So based on the websites --

8            THE WITNESS:  Correct.

9            THE COURT:  -- you say they provide the same

10   services as your company.

11           THE WITNESS:  Yes, your Honor.

12           THE COURT:  All right.  Go ahead.

13   BY MR. SIEGLER:

14   Q    As far as WatchDog, do they publish any material on the

15   website?

16   A    Yes.

17   Q    What do they publish on their website?

18   A    They publish -- your Honor, a report is published on

19   their website.  There is a video.

20           THE COURT:  When you say a report, you're talking

21   about one of the examination reports.

22           THE WITNESS:  Correct, your Honor.

23           THE COURT:  With any redactions?

24           THE WITNESS:  I believe there was redactions,

25   correct.  The client's name would be redacted I believe.

S. GELARDI - CROSS - MR. SIEGLER

1          THE COURT:  Is there pricing information on their

2     website?

3          THE WITNESS:  Yes, ma'am -- yes, your Honor.

4          THE COURT:  Okay.

5     BY MR. SIEGLER:

6     Q    What else do they put on their website?

7     A    They have reviews.  They have a list of their own

8     clients.  How much they charge.  How much they charge for out

9     of state, I believe.  They have a video explaining to you

10    exactly what they do on the website.

11    Q    Do the IME companies you mentioned -- well, let me ask

12    you this way.  Does your company Companions have an exclusive

13    contract with any of our clients?

14    A    No.

15    Q    To the best of your knowledge, being in the industry, do

16    other watch dog companies or IME observer companies have --

17         THE COURT:  Sustained.

18    Q    -- exclusive contracts --

19         THE COURT:  Sustained.

20    Q    Have you ever -- has your company ever been called by a

21    client saying, in essence, I tried someone else but they're

22    not free, do you have something --

23         MR. FELSEN:  Judge --

24         THE COURT:  Sustained.

25    Q    Are there companies that use your company and other

S. GELARDI - CROSS - MR. SIEGLER

1    companies?

2    A    Yes.

3    Q    Do your clients have a choice of which company to use for

4    the IME observer?

5          THE COURT:  Sustained.  We don't need to go through

6    this, I get the point.

7    Q    Okay.  Let's talk about this Cherny email.  It was marked

8    previously, I don't know the number.

9          MR. KATAEV:  It's four.

10         MR. SIEGLER:  It was Plaintiff's Exhibit 4.  Just

11   let me know when you have it in front of you.

12         MR. KATAEV:  Counselor, I apologize, I have it as

13   eight.

14         THE COURTROOM DEPUTY:  And from plaintiff's table

15   that was?

16         THE WITNESS:  It's on eight, okay.  Yes, I have it

17   in front of me now.

18   Q    What were the circumstances that led you to writing this

19   email?

20   A    Your Honor, my -- my company -- Alex Cherny was upset and

21   he stated that one of companions --

22         MR. KATAEV:  Objection.

23         THE COURT:  Hang on.

24   A    One of my companions had told his client that if he's not

25   happy with his attorney, that they know a better attorney that

S. GELARDI - CROSS - MR. SIEGLER

1    they can refer him to.  And I was very upset at that

2    accusation, extremely upset.  So I wrote this email to explain

3    to him we are not attorneys, we don't take attorney -- clients

4    from one attorney to another, it makes no difference, but I do

5    know that, according to Herb Subin at the Subin Associates

6    meeting I had with them, that it has happened with WatchDog

7    and, you know, so I'm telling him, you know, please find out

8    which client it is and find out if it was me or WatchDog.  But

9    we don't have that reputation.

10            MR. FELSEN:  Your Honor, move to strike based on

11    hearsay.

12            THE COURT:  Overruled.  She's quoting what was said

13    to explain why she wrote this email, but quite honestly I

14    don't understand the explanation.

15            So tell me again, one of your companions said

16    that --

17            THE WITNESS:  One of my companions was accused, your

18    Honor.  One of my -- we don't know who the companion was.

19            THE COURT:  Okay.

20            THE WITNESS:  So Alex Cherny is basically -- he

21    basically accused me -- my companion of telling his client --

22            THE COURT:  So Alex Cherny is an attorney.

23            THE WITNESS:  Correct.

24            THE COURT:  And he says that your companion told

25    Mr. Cherny's client...

S. GELARDI - CROSS - MR. SIEGLER

1       THE WITNESS:  Client, that if you're not happy with

2  your attorney that they know a better attorney, that he can --

3  that they can refer him to.

4       THE COURT:  All right.

5       THE WITNESS:  And that's not something that we had

6  the reputation for or would do and it made no sense for us to

7  ever do such a thing.

8       THE COURT:  All right.

9  BY MR. SIEGLER:

10 Q    Did you continue -- had you lost business to Mr. -- had

11 you lost business with Mr. Cherny's firm prior to this email?

12 A    Prior -- yes, that was, yes.  They stopped using us for a

13 little bit and I called to inquire why and that's when I was

14 told why.  And I had to send this email in defense of my

15 company and myself and my reputation.

16 Q    Did they subsequently restart doing business with

17 Companion?

18 A    Yes.

19      THE COURT:  Can you explain, though, why is it this

20 is being forwarded, I think, from --

21      THE WITNESS:  I think --

22      THE COURT:  -- your company to Mr. Roa?  You see the

23 top of it, it says from IME Companions to Carlos Roa, one of

24 your workers.

25      THE WITNESS:  That is correct, your Honor.  I sent

S. GELARDI - CROSS - MR. SIEGLER

1    this to Carlos.  Carlos worked for me at the time.

2              THE COURT:  Why did you send it to him?

3              THE WITNESS:  I mean, he was a smart guy.  You know,

4    I wanted him to -- actually I sent it to him to just make him

5    aware.  He was working with me that, look at the accusation

6    and look at the email reply.

7              THE COURT:  Let me digress for one second.  At the

8    time that you bought out your partners in 2019 --

9              THE WITNESS:  Correct.

10             THE COURT:  -- January 2019, how many workers did

11   IME Companions have?

12             THE WITNESS:  In 2019, I would say maybe seven to

13   10.

14             THE COURT:  How many of them were companions?

15             THE WITNESS:  All of them.

16             THE COURT:  And who was running the business then?

17             THE WITNESS:  I was.

18             THE COURT:  Go ahead, Mr. Siegler.

19   BY MR. SIEGLER:

20   Q    Ms. Gelardi, let's turn to the incident with Mr. Roa or

21   the alleged incident with Mr. Roa recently.

22             Does IME Companions have contracts, written

23   contracts with its observers?

24   A    We do with some, yes.

25   Q    Did IME Companions have relationships with its observers?

S. GELARDI - CROSS - MR. SIEGLER

1      MR. KATAEV:  Objection.  Relevance.

2      THE COURT:  Hang on a second.  Let me hear more

3  about this.  Go ahead.  Overruled.

4  A    What do you mean by relationships?

5  Q    Well, there's a -- Companions works with observers,

6  correct?

7  A    Correct.

8  Q    And let's start, what's the nature of their relationship

9  with observers, are they employees or something else?

10  A    They're independent contractors.

11  Q    And does Companions' business need observers?

12  A    Yes, without observers we have no business.

13      THE COURT:  I'm sorry, what incident with Mr. Roa

14  are you referring to the fact --

15      MR. SIEGLER:  Referring to our preliminary

16  injunction.

17      THE COURT:  All right, go ahead.

18  Q    Does Mr. Roa know who your observers are?

19  A    Yes.

20  Q    Does he know their names?

21  A    Yes.

22  Q    I'm sorry.  And Mr. Roa, where does he work?

23  A    He now works for WatchDog.

24      THE COURT:  When did he leave your company?

25      THE WITNESS:  The day I fired him on March 1st when

S. GELARDI - CROSS - MR. SIEGLER

1    I got served.

2                THE COURT:  Of this year?

3                THE WITNESS:  Of this year.

4    Q    When you were served did you learn that he went to

5    Ms. Levi or Levi, I'm sorry, in January of 2022?

6    A    Yes.  I learned that from the complaint, sir.

7    Q    And he continued to work for you until March?

8    A    Yes.

9                THE COURT:  When you say went to, you mean started

10   working for WatchDog.

11               MR. SIEGLER:  That's exactly what I mean.

12   Q    How do you know Mr. Roa is currently an employee of

13   WatchDog's?

14               THE COURT:  I feel a hearsay objection coming on.

15   A    We see him at -- my companions see him with WatchDog

16   clients at IMEs, your Honor.

17               THE COURT:  Sustained as to the hearsay.  Let's go

18   on.  We're going to hear from Mr. Roa directly I gather.

19               MR. SHALIT:  May I be heard briefly.  I represent

20   Mr. Roa as a witness here with respect to the third-party

21   complaint.

22               THE COURT:  You represent Mr. Roa with respect to

23   the third-party complaint, yes.

24               MR. SHALIT:  He hasn't been served in this action.

25   I'm objecting to --

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

S. GELARDI - CROSS - MR. SIEGLER

1          THE COURT:  He's objecting to this line of

2   questioning about him?

3          MR. SHALIT:  About Mr. Roa and with respect to their

4   preliminary injunction request.

5          THE COURT:  Why don't you come forward and state

6   your name for the record, maybe use the microphone over there

7   for a second.  Go ahead, yes.

8          MR. SHALIT:  For the record, my name is Leo Shalit.

9   I represent Mr. Carlos Roa with respect to the third-party

10  complaint.

11          Your Honor, it's my understanding that the

12  third-party complaint and the summons with the counterclaims

13  has not been served on my client yet.  There's an affidavit of

14  attempted service that was filed in the record.  And I believe

15  that their preliminary injunction request with respect to my

16  client, all these questions are premature, given the fact he

17  is not even a party to these proceedings right now.

18          THE COURT:  Well, that may be so.  I mean, I'd hoped

19  to achieve some efficiency by having the defendants' motion

20  dealt with here because there is now an allegation against

21  Ms. Levi as having directed Mr. Roa, but if you haven't served

22  Mr. Roa yet --

23          MR. SIEGLER:  We have his papers right here to

24  personally serve him today.

25          THE COURT:  Well, that's fine, but obviously

S. GELARDI - CROSS - MR. SIEGLER

1  Mister -- what was your name again.

2          MR. SHALIT:  Mr. Shalit, your Honor.  I've asked my

3  client whether I can accept service and I'm not able to accept

4  service at this time.  I requested they comply with the law

5  and serve him however they want.

6          THE COURT:  Let's do this, partly because I think

7  the time it's already taking almost a couple of hours to go

8  through the direct of this witness.  So let's do this, I'm not

9  going to address the factual allegations relating to

10 defendants' defamation claim.  The complaint should be served

11 on Mr. Roa before we have a hearing, if we're going to have

12 one.  It may be that I'm willing to rely on affidavits at that

13 point, because I will have heard from many of the same

14 witnesses.  So in terms of assessing the credibility in some

15 general way, I will have the opportunity to do that.

16          But this doesn't mean we won't have a hearing, but I

17 see that this is not going to really work.  Mr. Roa should

18 have a chance to be here, given that he is a defendant in this

19 counterclaim.  I hadn't realized he hadn't been served yet.

20 So Mr. -- I'm sorry, I keep forgetting your name.

21          MR. SHALIT:  Shalit.

22          THE COURT:  Mr. Shalit, sir, have a seat.  Let's not

23 get into the allegations relating to Mr. Roa's alleged, I

24 guess, collusion with Ms. Levi to defame defendants' company,

25 but I suspect Mr. Roa's name is going to come up as part of

S. GELARDI - CROSS - MR. SIEGLER

1   the allegations that plaintiff has made against the defendant

2   and I thought he was -- is he not testifying?

3        MR. KATAEV:  Yes, your Honor, he has been

4   subpoenaed.

5        THE COURT:  He's the third witness, right?

6        MR. SIEGLER:  I'm sorry, can I be heard, Mr. Shalit,

7   please.

8        This is a preliminary injunction hearing, your

9   Honor, where we feel like there is a very strong likelihood of

10  success.  We are suffering immediate harm because he's out

11  there --

12       THE COURT:  But you haven't served him, so how can

13  he -- until he's served I'm not going to have a hearing to

14  determine that he's liable in some way.

15       Why haven't you served him?

16       MR. SIEGLER:  We attempted service and he evaded.

17  We went to his house, we knocked on the door and he wouldn't

18  open the door.  I'm sure he's out in the hallway trying to

19  evade right now.

20       MR. SHALIT:  I just object to that characterization,

21  your Honor.

22       MR. SIEGLER:  We served him today.

23       THE COURT:  I saw the characterization by the

24  process server.  So --

25       MR. SIEGLER:  He has been served as of five minutes

S. GELARDI - CROSS - MR. SIEGLER

1    ago.

2              THE COURT:  But still that's not enough time in

3    which to have the hearing relating to the claims against him.

4              So while I had wanted to be efficient about this, I

5    had forgotten, because I had seen that service process

6    affidavit about him -- or maybe it was your letter, I can't

7    remember, but at any rate, I don't think the claim against him

8    ought to be the subject of this hearing right now, but he is a

9    witness testifying in the case against the defendants.

10             I suspect though on cross there may be questions

11   asked of him, Mr. Shalit, that relate to what he has been

12   doing as a means of impugning his credibility or showing his

13   bias.

14             MR. SHALIT:  Yes, your Honor, that's my

15   understanding as well and that's why I'm here to represent my

16   client independently of the parties that are here today.

17             THE COURT:  All right.  Why don't you have a seat.

18   Let's try to move forward with this witness.  Let's not get

19   into the alleged defamation in this examination of this

20   witness, so just move forward, Mr. Siegler, and focus on the

21   claim against the defendants for now.

22             MR. SIEGLER:  I have no further questions at this

23   time.

24             (Continued on the next page.)

25

GELARDI – REDIRECT – KATAEV

1        THE COURT:  Okay.  Redirect or if you want to call

2   it hostile direct.  It does seem to be kind of hostile.

3   REDIRECT EXAMINATION

4   BY MR. KATAEV:

5   Q    If the Court shuts down the IME Companions business, you

6   will be forced to go out and make a real living, correct, Ms.

7   Gelardi?

8        THE COURT:  Sustained.

9   Q    If the Court grants the relief requested by the

10  plaintiff, you could go on and work for a bank again, correct?

11  A    I don't want to.

12  Q    The observers that you hire at IME Companions are

13  independent contractors; correct, they're not employees?

14  A    Correct.

15  Q    And Ronald Rosenblatt has no medical license, to your

16  knowledge, correct?

17  A    Correct.

18  Q    And he had no medical license at the time that he came to

19  you about Med Mal USA LLC, correct?

20  A    Correct.

21       THE COURT:  I'm sorry, was he a doctor at the time?

22       THE WITNESS:  Your Honor, he was a doctor that was

23  consulting on med mal cases for attorneys, but he wasn't

24  allowed to practice medicine.

25  Q    The reason why you opened up IME Companions was because

GELARDI – REDIRECT – KATAEV

1   you wanted to own your own business, correct?

2   A    Correct.

3   Q    And you testified that Adam hates Daniella Levi, correct?

4   A    Yes.

5   Q    But Adam is still an employee of IME WatchDog, correct?

6   A    To my knowledge, yes.

7   Q    And to your knowledge, Adam did not leave to go work for

8   anybody else, correct?

9   A    Correct.

10  Q    And to your knowledge, Adam did not go and open up his

11  own competing business, correct?

12  A    Correct.

13  Q    And you ultimately went and opened up a competing

14  business, correct?

15  A    Yes.

16  Q    Now, you stated in your affidavit that Med Mal USA LLC

17  was dormant; is that right?

18  A    Yes.

19  Q    But at the same time, you also testified that you were

20  busy with Med Mal LLC; isn't that true?

21  A    No.  You have the facts screwed up.  I was busy with Med

22  Mal when Adam wanted to -- wanted us to help him start IME --

23  his own IME business.

24  Q    You just can't tell this Court when which was which,

25  correct?

GELARDI - REDIRECT - KATAEV

1  A      It was all on or around, Your Honor, 2016 to 2017.  It

2  was all in that time.

3  Q      You stated in your declaration in opposition to the

4  instant motion that Ronald Rosenblatt had medical issues which

5  made him an unreliable partner, correct?

6  A      Correct.

7  Q      And you said that that happened after only a few months,

8  correct?

9  A      Yes, Your Honor.

10  Q      So was that only from 2016 to 2017, a span of a year, or

11  was that a few months, as you said in your affidavit?  Which

12  one is it?

13  A      It was a few months.

14  Q      Now, you testified that you started this business with

15  Mr. Elefterakis, correct?

16  A      Yes.

17  Q      But you concede that Elefterakis was a client or a

18  customer of IME WatchDog, correct?

19  A      You've got the Elefterakis' mixed up.

20  Q      Well, the Elefterakis' -- withdrawn.

21          The Elefterakis firm was a customer of WatchDog,

22  correct?

23  A      There was an Elefterakis firm, correct.  But that's not

24  who I started the business with, Your Honor.

25          THE COURT:  But was the firm a WatchDog customer at

GELARDI - REDIRECT - KATAEV

1   the time you started your business with the uncle?

2            THE WITNESS:  Say it again.  I'm sorry.

3            THE COURT:  You started your --

4            THE WITNESS:  I started with the uncle, yes.  I

5   started the business with the uncle and the Elefterakis,

6   Elefterakis, and Panek firm were WatchDog customers, correct.

7            THE COURT:  Right.  But then you got them to be

8   customers of your company with their uncle?

9            THE WITNESS:  Correct.

10  Q    And it's your testimony that this law firm trained you on

11  how to be an IME observer?

12  A    They gave me many, many pointers, and that wasn't the

13  only firm.  Many firms did.

14  Q    So it's your testimony today that customers of IME

15  WatchDog who received services from IME WatchDog left IME

16  WatchDog to teach you how to do a competing business; is that

17  your testimony today?

18  A    No.  They didn't teach me.  They gave me pointers on what

19  they didn't like about WatchDog and how they wanted the

20  service to be better.

21  Q    The only way you were able to get the Elefterakis law

22  firm as a customer of Companion's from WatchDog was by having

23  Adam sabotage that account, correct?

24  A    Absolutely not.

25            THE COURT:  Mr. Kataev, I assume it's because their

GELARDI - REDIRECT - KATAEV

1   uncle was working with her.  I think maybe you're missing the

2   obvious point here.

3                THE WITNESS:  Yes.

4   Q    And you were able to get the Subin and Associates account

5   by asking Adam to sabotage that account, correct?

6   A    Absolutely incorrect.

7   Q    And you were able to get customers from WatchDog by

8   offering better pricing, correct?

9   A    Yes.

10  Q    And the reason why you were able to give better pricing

11  was because you knew the pricing that WatchDog gave, correct?

12  A    Yes.

13  Q    And you reason why you know that is because Adam gave you

14  that information?

15  A    No.  It's on the website.

16  Q    Is it your testimony today that every customer paid the

17  same price based on what was written on the website?

18                THE COURT:  Everything customer of whom?

19                MR. KATAEV:  Of IME WatchDog.

20  A    I don't -- I'm going to --

21                THE COURT:  How would she know that?

22                THE WITNESS:  How would I know that?

23  Q    When you had IME Companions -- withdrawn.

24                In your company IME Companions LLC, not all of your

25  customers paid the same price, correct?

GELARDI - REDIRECT - KATAEV

1   A    Yes.

2   Q    In fact, some paid full price sometimes and others don't,

3   right?

4   A    Yes.

5   Q    And that's why it was important when Adam sent you

6   e-mails and he told you, all paid full price, correct?

7   A    No.

8   Q    I'd like for you to look at Exhibit 4 which has been

9   admitted into evidence.

10           On the bottom left of this e-mail, Adam tells you

11   all of these customers paid full price, correct?

12   A    That's what it says on the e-mail.

13   Q    And that was important because it helped you undercut the

14   pricing, correct?

15   A    No.

16   Q    Carlos Roa worked for you as a 1099 independent

17   contractor, correct?

18   A    He also was an employee.

19   Q    And he worked -- he worked every week from anywhere from

20   60 to 80 hours, correct?

21   A    No.

22   Q    Why is it, to your knowledge, that Carlos Roa went to IME

23   WatchDog?

24           THE COURT:  Sustained.

25   Q    You testified that you did cold calls and went door to

GELARDI – REDIRECT – KATAEV

1    door, correct?

2    A    Right.

3    Q    But you also testified that you got customers from Greg

4    Elefterakis?

5    A    Correct.

6    Q    So which one is it --

7    A    It's both.  It's everything.

8    Q    You testified that you obtained reports from IME

9    WatchDog's website; do you remember that?

10   A    Yes.  I recall looking at a report on the website.

11   Q    And you did that early on when you first opened IME

12   Companions in 2017, correct?

13   A    Yes.

14   Q    But you also had to ask Adam for additional reports in

15   2019, right?

16   A    I explained that to the judge.

17   Q    And the reason for that is because there are different

18   types of reports, right?

19   A    I explained why I requested that report.

20        MR. KATAEV:  Your Honor, if you could give me one

21   minute.  I believe I'm done.

22        THE COURT:  Okay.

23        (Pause in the proceedings.)

24        MR. KATAEV:  No further questions, Your Honor.

25        THE COURT:  Any redirect?

GELARDI - REDIRECT - KATAEV

1           MR. SIEGLER:  No, your Honor.  Thank you.

2           THE COURT:  All right.  I want to ask some

3    questions.

4           THE WITNESS:  Sure.

5           THE COURT:  I am concerned, Mr. Siegler, with your

6    client's invocation of the Fifth because she invoked when

7    asked the question, did you pay -- and there was a series of

8    similar questions -- did you pay Adam Rosenblatt via Zelle and

9    did you pay Adam Rosenblatt in 2019.  But then on or during

10   your examination, you asked if she paid Adam Rosenblatt for

11   documents, and she emphatically said no.

12          So my concern is that there the a selective

13   invocation of the Fifth which obviously she can do.  But the

14   record is unclear exactly what she is saying or what she's

15   invoking as to.  So I want to ask a few questions as follow up

16   so I can decide what to infer negatively from her invocation,

17   since ordinarily, I would assume that she was saying that she

18   didn't pay for any of the documents she received from

19   Mr. Rosenblatt relating to WatchDog.

20          Are you invoking your right against

21   self-incrimination, Ms. Gelardi, as to paying Mr. Rosenblatt

22   to receive information about IME WatchDog?

23          THE WITNESS:  Your Honor, those payments have

24   nothing to do with any documents he ever sent me.

25          THE COURT:  That's not my question.

GELARDI - REDIRECT - KATAEV

1          My question is did you pay him in 2019 for

2     information to help your business?

3          Are you invoking the Fifth?

4          THE WITNESS:  I plead the Fifth.

5          THE COURT:  And did you pay him for information that

6     you believed he got from working at IME WatchDog in 2019?

7          THE WITNESS:  Yes, I plead the Fifth.

8          THE COURT:  You're taking the Fifth as to that.

9          And are you taking the Fifth as to using the

10    information that you got from Mr. Rosenblatt in 2019 in

11    exchange for these payments to further your own business?

12         Did you use that information to further your own

13    business?

14         Are you taking the Fifth as to that?

15         THE WITNESS:  I plead the Fifth.

16         THE COURT:  All right.

17         MR. SIEGLER:  If I may, Your Honor.

18         THE COURT:  Yes, you can ask.  You can say anything

19    you want.

20         MR. SIEGLER:  Thank you, Your Honor.  We have a fine

21    line, here, correct.  When I asked the question about whether

22    she paid, I was referring solely to the documents that she

23    received in 2017.  And I wanted to draw a bright line between

24    before the company started and after.

25         THE COURT:  Yes.  I understood that.  That's why I

GELARDI - REDIRECT - KATAEV

1    wanted to ask the follow up, because the invocation before

2    that was much more general.  But I understand what you're

3    saying in terms of timing, but I want to make sure it's clear

4    on the record that the invocation has to do with getting

5    information from Mr. Rosenblatt that related to IME WatchDog

6    and also furthered her own business.

7              One last question in this vein, with regard to the

8    information that you paid Mr. Rosenblatt for in 2019, did you

9    believe that it was confidential business information of IME

10   WatchDog in --

11             THE WITNESS:  No, I plead the Fifth.

12             THE COURT:  You're pleading the Fifth as to that?

13             THE WITNESS:  Your Honor, I would like to say, no, I

14   do not believe it was confidential information.

15             THE COURT:  All right.  Was it business information

16   relating to WatchDog that you could have gotten on your own?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  So -- but you paid Mr. Rosenblatt for

19   this information?  Can you explain why?

20             THE WITNESS:  I would love to.

21             THE COURT:  But you're taking the Fifth?

22             THE WITNESS:  Per my attorney advice, I will plead

23   the Fifth.  Honestly, I would love to explain it.

24             THE COURT:  And when you paid Mr. Rosenblatt, was it

25   pursuant to some agreement with Mr. Rosenblatt that he would

GELARDI – REDIRECT – KATAEV

1    give you this information in exchange for money?

2                THE WITNESS:  No, Your Honor.

3                THE COURT:  But you paid him?

4                THE WITNESS:  Yes.

5                THE COURT:  Do you want to ask any follow up,

6    Mr. Kataev?  You know, the invocation troubles me because it's

7    obviously -- it deserves a negative inference in this context.

8    There's no question.  It's a little unclear to me exactly what

9    the import, though, of the negative inference is because so

10   far, she's denied paying him or even soliciting the documents

11   that she received before she formed her company.

12               THE WITNESS:  That's correct.

13               THE COURT:  But that doesn't mean she didn't -- and

14   I'm going to use the vernacular -- steal information,

15   thereafter, from WatchDog by paying Mr. Rosenblatt, that is

16   from 2019.  If you have a theory as to what it is she's

17   invoking the Fifth as to, it would behoove you to ask more

18   specific questions.  I'm just taking stabs in the dark.

19               MR. KATAEV:  Your Honor, we believe it'll be fleshed

20   out with other witnesses and we don't need any further

21   testimony from her.

22               THE COURT:  Okay.  And you don't want her to more

23   specifically take the Fifth as to anything?

24               MR. KATAEV:  No.  I believe it's sufficient.

25               THE COURT:  All right.  It's your case.  You may

PROCEEDING

1    step down.  Thank you very much.

2              (The witness steps down.)

3              THE COURT:  Now, folks, it's already 4:35.  We're

4    not moving very quickly.

5              Are you calling Mr. Vito Gelardi too?

6              MR. KATAEV:  Your Honor, in the interest of

7    efficiency, we'd like to call Steven Rombom as a witness.  We

8    believe that we will be able to finish his testimony today.

9              MR. SIEGLER:  Your Honor, I object to this

10   testimony.  There was no affidavit provided by this witness,

11   so this is a witness by surprise.  I don't know what he's

12   going to say.  I have no clue, and I had no opportunity to

13   prepare a cross examination.  The other witnesses all

14   testified by affidavits.  This is quite unfair.

15             I raise an objection.

16             MR. KATAEV:  Your Honor, we were required to provide

17   witness lists and we did.  If he wanted to find out what his

18   testimony was, he could have reached out to ask for a

19   deposition or a proffer.  He didn't.

20             THE COURT:  Do you ever any kind of witness

21   statement for him, something under Rule 35 or 3500 or

22   something that you can -- some kind of witness statement?

23             MR. KATAEV:  No, your Honor.  But I would say that

24   we should finish his direct before it's time to leave for

25   today, and that would give him an opportunity to prepare for

PROCEEDING

1    cross.

2          THE COURT:  I would like to hear his testimony.

3    I'll see whether or not if it's of such a nature that I should

4    exclude it or strike it.

5          I want to make one other observation before we go

6    on.  I erred, I believe, when I let Ms. Gelardi testify as to

7    her opinion about Mr. Roa's credibility or character for

8    truthfulness.  Under Rule 608, that kind of evidence should

9    come in by way of reputation evidence.  In other words, what

10   is someone's reputation in the community for truthfulness.

11   She actually just testified as to her own feeling about

12   Mr. Roa's trustworthiness and truthfulness.  So I'm going to

13   disregard that testimony.

14         The other part of the rule is that that evidence

15   shouldn't come in until the witness -- and here it would be

16   Mr. Roa -- that his character, rather, is challenged, his

17   character for truthfulness is challenged.  That hasn't

18   happened yet.  But obviously, we're taking things a bit out of

19   order.

20         In any event, I don't think it satisfies the rule,

21   and I think I made a mistake by allowing Ms. Gelardi simply to

22   testify as to her own view.  So I'm going to disregard that.

23         Okay.  So let's call Mr. Rombom.

24         MR. KATAEV:  Steven Rombom.

25         (The witness takes the stand.)

ROMBOM – DIRECT – FELSEN

1          THE COURTROOM DEPUTY:  Please remain standing and

2    raise your right hand.

3          (The witness was sworn and/or affirmed in by the

4    courtroom deputy.)

5          THE WITNESS:  I affirm.

6          THE COURTROOM DEPUTY:  Thank you.  Have a seat.

7          Please state and spell your name, for the record.

8          THE WITNESS:  My name is Steven Rombom, R-O-M-B-O-M.

9    Also spelled R-A-M-B-A-M.

10         THE COURT:  Okay.  You may inquire.

11   **STEVEN ROMBOM**, called as a witness, having been first duly

12   sworn/affirmed, was examined and testified as follows:

13   DIRECT EXAMINATION

14   BY MR. FELSEN:

15   Q    Good afternoon, Mr. Rombom.

16         What is your occupation?

17   A    I'm a licensed private investigator and security services

18   provider in the State of New York, licensed by the State of

19   New York, and in other jurisdictions.

20   Q    And what are your qualifications as a private

21   investigator?

22   A    I've been a licensed private investigator for going on 40

23   years.  I specialize in sophisticated financial frauds and in

24   financial crimes, including the alleged event being discussed

25   today.

ROMBOM – DIRECT – FELSEN

1          MR. SIEGLER:  Your Honor, I'm going to object again.

2          This seems to be expert witness.  We've already

3   heard about his qualifications.

4          THE COURT:  I'm going to overrule.  Let me hear what

5   he has to say.  And because this is just a hearing before me,

6   I'd prefer just to hear it and we can address the

7   permissibility of it or potential prejudice afterward.

8          Go ahead.

9   Q    Mr. Rombom, are you familiar with a company called IME

10  WatchDog Incorporated?

11  A    Yes, I am.

12  Q    And how are you familiar with that company?

13  A    Towards the end of February of this year, I was retained

14  by the law firm of Milman Labuda, Milman M-I-L-M-A-M Labuda,

15  L-A-B-U-D-A, to conduct an investigation into an alleged theft

16  of intellectual property, alleged commercial bribery, and

17  related matters.

18  Q    And did you, in fact, engage in an investigation?

19  A    I did.  I was briefed on the situation, I was informed

20  that IME WatchDog believed that one of their competitors had

21  subverted an employee, a senior employee, and that that senior

22  employee was turning over confidential records, misdirecting

23  potential clients and existing clients, and I was asked to

24  conduct an investigation to determine if that was, in fact,

25  true.

ROMBOM - DIRECT - FELSEN

1    Q     And can you explain what your investigation entailed?

2    A     I will say that it was a remarkably short investigation.

3    Almost immediately we were able to determine that Mr. Adam

4    Rosenblatt, a senior employee of IME WatchDog's was

5    potentially involved in misdirecting clients, turning over --

6    I'm summarizing, but turning over confidential records, and in

7    return for which, he was receiving payments primarily via the

8    Zelle service, Z-E-L-L-E, from a competitor of IME WatchDog's

9    known as IME Companions.  I requested permission to -- of your

10   firm, Milman Labuda, I requested permission to conduct an

11   unscheduled interview of Mr. Rosenblatt, you agreed.  On

12   March 1st, I interviewed Mr. Rosenblatt.  It was an

13   admission-seeking interview.  During the interview, he did

14   confess.  He confessed in great detail throughout the

15   afternoon of that day.

16         Following his confession, he made a controlled call

17   to IME Companions.  A controlled call is a call where one of

18   co -- alleged co-conspirators will call the other alleged

19   co-conspirators and try to get them to discuss the conspiracy

20   and discuss the components of the conspiracy in detail.  He

21   did make that call, recorded by him with our assistance.  He

22   spoke with Safa Gelardi.  He spoke with Vito Gelardi.  They

23   went into great detail about the activities about the

24   payments.  In that first call, Safa Gelardi told him, don't

25   worry about it, I see you're nervous, it'll never be found

ROMBOM - DIRECT - FELSEN

1    out --

2             MR. SIEGLER:  Your Honor, I object to this

3    testimony.  He's basically -- we have the audio of this

4    meeting.  He's recalling it and he's recalling it incorrectly

5    which I know I can take care of on cross.  Why don't they just

6    play the tape.

7             THE COURT:  All right.  I am going to sustain the

8    objection to him being the investigator recount what's on the

9    tape.  I can just listen to the tape.

10            Let's just move on.

11            MR. FELSEN:  Your Honor, may we play the tape?

12            THE COURT:  Yes, you can play the tape.  I'd like to

13   hear that.

14            No disrespect, Mr. Rombom.  I just think it'll be

15   quicker this way, and perhaps it'll be less cross.

16            THE WITNESS:  Yes, Your Honor.

17            MR. KATAEV:  Your Honor, I have it connected to the

18   court's system.  I'm going to press play, but I'm not sure if

19   it's going to work.

20            THE COURT:  Okay.  And has this been marked as an

21   exhibit?

22            MR. KATAEV:  This is marked previously as

23   Plaintiff's Exhibit 18A.

24            THE COURT:  Okay.  18A is admitted.

25            (Plaintiff's Exhibit 18A, was received in evidence.)

ROMBOM - DIRECT - FELSEN

1          MR. KATAEV:  I'm pressing play now.

2          THE COURT:  I'm sorry, what date was this on,

3    March 1, 2022?

4          THE WITNESS:  (Nonverbal gesture).

5          MR. KATAEV:  Correct.

6          THE COURT:  Okay.  Go ahead.

7          (Audio recording played.)

8          MR. KATAEV:  I don't hear anything, Your Honor.

9          (Audio recording stopped.)

10         THE COURT:  Why don't you put the microphone next

11   to -- use one of the microphones and just put it next to it.

12         MR. KATAEV:  Thank you.

13         (Audio recording played.)

14         MR. KATAEV:  Let the record reflect that's the end

15   of recording number one.

16   Q    Mr. Rombom, were there additional recordings?

17   A    There were.  I requested of Adam Rosenblatt, following

18   this very useful call that he should standby and be ready to

19   receive a second call that was apparently going to be coming

20   from Vito Gelardi.  Vito Gelardi did call him.  Adam did

21   record the call.  A small portion of the call was lost, one

22   side of it.  But the vast majority of the call was, in fact,

23   recorded.  It was essentially more of the same, instructing

24   Adam --

25         MR. SIEGLER:  Objection.

ROMBOM - DIRECT - FELSEN

1          THE COURT:  Sustained as to the investigator

2   describing what happened.  Although, was that part of it, the

3   lost part that you're about to describe?

4          THE WITNESS:  No.

5          THE COURT:  So let's hear the next recording.

6          MR. FELSEN:  Before we play the second, I just have

7   some follow up on the first tape recording.

8   Q    Were you present for that entire call that we just

9   listened to?

10  A    I was present for that entire call and all the other

11  calls.

12  Q    And did you observe the call being initiated and

13  terminated?

14  A    Yes, I did.

15  Q    And did -- what we just heard, is that a fair and

16  accurate depiction of what you heard during the call?

17  A    That is, in fact, the call.  Correct.

18         MR. FELSEN:  I offer the first recording into

19  evidence, Your Honor.

20         THE COURT:  Yeah.  It was already admitted.

21         Go ahead.

22         MR. FELSEN:  Thank you.  And I will play the second

23  recording.

24         MR. SIEGLER:  I'm sorry, Your Honor if I could

25  actually use the bathroom.

ROMBOM - DIRECT - FELSEN

1           THE COURT:  Yes.  Go right ahead.  It's five

2   o'clock.  Everyone take five minutes. come back and be ready

3   to go in five minutes.  My apologies.

4           (A short break was taken.)

5           THE COURT:  So let's go back on the record, Fida.

6           I'll remind the witness you're still under oath,

7   sir.

8           Mr. Felsen how much longer do you expect?

9           MR. FELSEN:  We're going to play the last two

10  recordings, and then we'll be done.

11          THE COURT:  So expedite this, let me ask the witness

12  very quickly, Mr. Rombom, the two additional recordings that

13  we're about to listen to were made using the same protocols

14  you previously described?

15          THE WITNESS:  Yes the problem is the third call, we

16  only got one side of the conversation in an audible format.

17  The other was lower volume, and it still needs to be enhanced.

18  And it's actually a pretty critical call because Vito Gelardi

19  called and instructed --

20          MR. SIEGLER:  Wait.  Hold on.

21          THE COURT:  Hold on.  Hold on one second.  Let's

22  wait.

23          So what you're saying is the third call, the problem

24  is you can hear Mr. Rosenblatt clearly, who's with you, but

25  you can't hear what Mr. Vito Gelardi was saying on the other

ROMBOM - DIRECT - FELSEN

1   end?

2           THE WITNESS:  Precisely.

3           THE COURT:  Okay.  What I want to do, though, is go

4   ahead and admit those two other recordings based on

5   Mr. Rombom's testimony about how they were made.  I don't have

6   any reason to doubt that they are conversations of the

7   individuals they purport to be of.  So let's go ahead and

8   listen to those.

9           I just want to let the parties know that at the

10  conclusion of this, because we're going to end at 5:30, I'll

11  explain to you how I want to proceed in this matter.  But I'm

12  hoping that we'll be done with Mr. Rombom's testimony,

13  including his cross, by then.

14          MR. FELSEN:  Your Honor, before we play the tape, I

15  just want to point something out to the Court.  There's

16  somebody in the first row that while the tape recordings have

17  been played has been making staring eye contact and

18  threatening eye contact with my client.

19          THE COURT:  Okay.  Is that person there now?

20          MS. LEVI:  No.  She's not here.  She was wearing a

21  white coat.

22          MR. FELSEN:  She's not here now.  I'm just bringing

23  it to the Court's attention.

24          THE COURT:  So if you see the person again, you'll

25  let me know and I'll make my own observation.  I didn't see

ROMBOM – DIRECT – FELSEN

1  that person nor did I see any unusual activity going on.

2       MR. SIEGLER:  I think she's referring to

3  Ms. Gelardi's 16-year old daughter, possibly.

4       THE COURT:  All right.  Well, let's go forward.

5       I didn't observe anything and I have no basis to

6  find, one way or the other, whether this is happening.  But

7  I'll note if someone comes back and matches that description

8  and I'll pay attention.  Okay.

9       Let's go on with the next two recordings.

10       MR. KATAEV:  Playing recording two.

11       THE COURT:  Marked as --

12       (Audio recording played.)

13       THE COURT:  Let's start it again and tell me what

14  it's marked as exhibit-wise.

15       MR. KATAEV:  Playing recording two which is marked

16  as Plaintiff's Exhibit 18B.

17       THE COURT:  All right.  And it's been admitted.

18       (Plaintiff's Exhibit 18B, was received in evidence.)

19       THE COURT:  Okay.  Hang on one second.  Turn it off

20  again.  I can barely hear that.

21       (Audio recording stopped.)

22       THE COURT:  Let me ask you, Mr. Rombom, when was

23  this second recording made?

24       THE WITNESS:  They're all made on March 1st.

25       THE COURT:  Okay.  And what time, do you know, is

ROMBOM - DIRECT - FELSEN

1    the second one?

2            THE WITNESS:  Not precisely without referring to my

3    file, no.

4            THE COURT:  Well, what was the amount of time in

5    between them; do you recall?

6            THE WITNESS:  Between the first and the second call

7    I'd say approximately 20 minutes, and between the second and

8    the third call, about an hour.

9            THE COURT:  Okay.  So hopefully we can put it right

10   over the speaker.

11           (Audio recording played.)

12           THE COURT:  Mr. Kataev, can we do this, I can see

13   that this is a very long recording.

14           (Audio recording stopped.)

15           MR. KATAEV:  There's about 10 minutes left, Your

16   Honor.

17           THE COURT:  I can barely hear what the other person

18   is saying.  But let me ask you, Mr. Rombom, who's on the

19   conversation that we just listened to?

20           THE WITNESS:  It's Adam Rosenblatt and Vito Gelardi.

21           THE COURT:  Okay.  I would like a copy of that, of

22   all three recordings, just on a flash drive or something,

23   because I can barely hear it, and this is on the a good use of

24   evidence time because I can barely hear what Mr. Gelardi is

25   saying.

ROMBOM - DIRECT - FELSEN

1          So let's finish up the examination of the witness

2     and let Mr. Siegler cross with the limited time that we have.

3          MR. KATAEV:  Can we provide a Drop Box link with the

4     audio recordings.

5          THE COURT:  I think that works.  I can access a Drop

6     Box, I believe.

7          MR. KATAEV:  I'll just take an e-mail address.

8          THE COURTROOM DEPUTY:  A USB would be better.

9          MR. KATAEV:  Okay.  We'll get a --

10         THE COURT:  Yeah, if you could put it on a USB that

11    would be better.

12         Yes.  Go ahead.

13         MR. FELSEN:  Your Honor, so long as these three

14    recordings are being admitted into evidence, I'm going to --

15         THE COURT:  Yes, they're all be admitted.

16         What was the third one, 18C?

17         MR. KATAEV:  18C is about six minutes, Your Honor,

18    and I think we'll be able it hear it well.

19         THE COURT:  Right.  I just want to make sure we have

20    on the record, 18A, B, and C are the three recordings that

21    were between Mr. Rosenblatt and one or both of the defendants.

22         MR. KATAEV:  Correct, Your Honor.

23         MR. FELSEN:  I'm sorry, I'm mistaken.  Just a couple

24    of questions, and then I'll be finished.

25         THE COURT:  Okay.

ROMBOM – DIRECT – FELSEN

1   Q    Mr. Rombom, when Adam Rosenblatt essentially confessed to

2   you --

3              THE COURTROOM DEPUTY:  I'm sorry, could you use the

4   microphone?

5              THE COURT:  Yes.  Let's put the microphone back.

6   Q    When Adam Rosenblatt confessed to you during this

7   meeting, did you believe what he was telling you?

8              THE COURT:  Sustained.  Sustained.

9              THE WITNESS:  Yes, I did.

10             THE COURT:  Sustained.  Don't answer that question.

11             THE WITNESS:  I'm sorry, I didn't hear you, Your

12   Honor.

13             THE COURT:  For the same reason I'm not going to

14   credit the defendant's view of Mr. Rosenblatt's truthfulness.

15   Q    Did you come to learn how Adam Rosenblatt was turned

16   against his own employer?

17   A    Yes, I did.  In the second part of my interview of

18   Mr. Rosenblatt, I asked him what motived him to turn against

19   his employer, he had the most senior --

20             MR. SIEGLER:  Objection.

21             This is hearsay.

22             THE COURT:  Sustained.  Sustained.

23             This is all hearsay.

24             MR. FELSEN:  I don't have anything further.

25             THE COURT:  All right.  Thank you.

ROMBOM – CROSS – SIEGLER

1   Cross-examination?

2           MR. SIEGLER:  Thank you, Your Honor.

3           I'd actually like to play some of the tape as well.

4   But since Your Honor can't hear it, let me just ask the

5   witness.

6   CROSS-EXAMINATION

7   BY MR. SIEGLER:

8   Q    On the second tape, sir, do you realize that you are

9   recorded speaking to Adam Rosenblatt?

10  A    I wasn't aware of that, but that's possible.  Sure.

11  Q    All right.  If you go to minute 10, 30 seconds, I hear

12  two voices.

13          THE COURT:  Can someone play that, because I'd like

14  to hear that from myself.  I'm not going to accept the

15  lawyers' or witness' characterization.

16          Mr. Rombom, while that's being cued up, can you

17  explain to me why in that second call there was what appears

18  to be rustling against the microphone going on?

19          THE WITNESS:  Probably cloth rubbed up against it or

20  something.  I'm not really sure why.

21          THE COURT:  Did you observe that?

22          In other words, what was the setup?  Because it

23  strikes me as counterproductive to have a call that's being

24  recorded with so much interference.

25          You were physically present when the call was being

ROMBOM – CROSS – SIEGLER

1   made and recorded, right?

2            THE WITNESS:  Yes, I was.

3            THE COURT:  So you don't know if the rustling sound

4   was coming -- let me rephrase that.

5            Did you ever see Mr. Rosenblatt, when you were

6   observing him making the call, brush against whatever the

7   recording device microphone was?

8            THE WITNESS:  So the first phone call was done, the

9   one that's in very good shape was done through a technical

10  means where you send it out to another recording device and

11  it's recorded.  The second one, when we did that, it failed,

12  and what you're listening thorough is the backup recording

13  that was literally a recorded on the spot.

14           THE COURT:  I see.

15           THE WITNESS:  So it could have been I rubbed up

16  against it, Mr. Rosenblatt rubbed up against it.  I'm not

17  really sure.

18           The third call same, problem.  But Mr. Vito Gelardi

19  insisted that Adam take the -- Adam Rosenblatt take the call

20  off speaker so --

21           THE COURT:  Can you remove the child from the

22  courtroom who's crying, please.

23           Go ahead.

24           THE WITNESS:  So Mr. Gelardi's part of the third

25  call is a little subdued.  I could hear the whole

ROMBOM – CROSS – SIEGLER

1  conversation, but the recorder did not pick it up well enough

2  to play in the courtroom.  We were in the process of enhancing

3  that.

4          THE COURT:  Okay.  All right.  So minute -- what was

5  it again?

6          MR. SIEGLER:  Minute 10, 30 seconds.

7          MR. KATAEV:  Of Plaintiff's Exhibit 18B playing now.

8  Forgive me, Your Honor.

9              (Audio recording played.)

10             (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROMBOM – CROSS – SIEGLER

1          (Audiotape played.)

2          MR. SIEGLER:  (Continuing.) Can you stop and play

3   that back and there was a third voice on the tape.

4          (Audiotape stopped.)

5          THE COURT:  Can you tell us what minute you're at

6   now.

7          MR. KATAEV:  I just put it back to 13:03, I believe

8   it was at 13:20, I'm not sure.

9          THE COURT:  All right.

10         MR. KATAEV:  Playing from 13:03, Exhibit 18B.

11         (Audiotape played.)

12         MR. KATAEV:  That's the end of the recording from

13   18B.

14         (Audio recording stopped.)

15   CROSS-EXAMINATION(Continued.)

16   BY MR. SIEGLER:

17   Q    Mr. Rombom, you're telling -- you were or weren't on the

18   tape for this, that the recording was still taping.

19   A    No, I wasn't, but I don't see a problem with it.

20   Q    Who is the third person in the room?

21   A    A gentleman by the name of Albert Belcher, who is also a

22   licensed private investigator in the State of New York, he was

23   working with me.

24   Q    So describe the setup, were you in an office, were you --

25   A    We were in Mr. Adam Rosenblatt's office.  He was sitting

ROMBOM - CROSS - SIEGLER

1  behind his desk, we were in the guest chairs.

2  Q    What size office is it?

3  A    Standard size office.

4  Q    Ten by ten, eight by eight, six by six?

5  A    Not six by six or eight by eight.  A sizable office.  I

6  want to say probably 10 feet by 15 feet.

7  Q    And where were you sitting and where was Mr. Rosenblatt

8  sitting?

9  A    Mr. Rosenblatt was behind his desk, I was in the guest

10  chair.

11  Q    Where was Mr. Belcher?

12  A    Sitting next to me.

13  Q    Were you and Mr. Belcher present the entire time through

14  all the recordings?

15  A    I was present during the entire time, I can't recall if

16  Mr. Belcher was.

17  Q    What time -- and Mr. Rosenblatt's office was where?

18  A    Inside the offices of IME WatchDog.

19  Q    Thank you.

20       What time did you arrive at IME WatchDog's that day?

21  A    I would have to check my notes.

22  Q    Was it in the morning, late afternoon?

23  A    Not late afternoon, but afternoon.

24  Q    What did you say to Mr. Rosenblatt when you entered his

25  office?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ROMBOM - CROSS - SIEGLER

1    A    I said, I'm Steven Rombom, I'm a private investigator.

2    This is my colleague.  We'd like to interview you about some

3    problems that may be occurring at IME WatchDog.

4    Q    You said this was an unannounced visit?

5    A    Yes, it was.  Correct.

6    Q    And what did you say to him and what did he say to you,

7    if I was a fly on the wall?

8    A    I described to him the situation.  I was told -- I told

9    him that we had conducted a preliminary investigation which

10   appeared to indicate he was diverting clients from IME

11   WatchDog to IME Guardians, Safa Gelardi and Vito Gelardi.

12   Initially he denied it, but rather quickly after we showed him

13   evidence that we had, excuse me, after we showed him evidence

14   that we had, including a significant number of wires sent to

15   him by the Gelardis via Zelle, he slowly, but surely, began to

16   reveal more and more details of his interactions with the

17   Gelardis and his diversions of clients, his helping them build

18   their business, helping them refine their business, developing

19   forms for them.  Helping train their so-called watch dogs, I

20   believe is the term, the independent medical examiners that go

21   with the law firm's clients.  It was a rather lengthy

22   interview by the time we got done.

23   Q    You say initially he denied it; is that correct?

24   A    He didn't deny it completely, he minimized it.

25   Q    What did he say to minimize it?

ROMBOM - CROSS - SIEGLER

1    A     He said well, gee, these are clients that were going to

2    leave us anyway or -- which he quickly came up off.  He -- you

3    know, he later admitted that these were in fact clients that

4    were still giving some business to IME WatchDogs.  He also

5    said, well, you know, it wasn't that hard.  I would tell them

6    we couldn't service them here at IME WatchDogs and I would

7    refer them to someone else.  He made it sound like it was a

8    minimal thing, and then when we got into a discussion about

9    how much money he was being paid by the Gelardis, how he was

10   essentially moving clients wholesale over to the Gelardis in

11   return for this money, that he realized what he did and he got

12   a little emotional about it and he started saying, I don't

13   know why I did it.  They tricked me.  They told me they would

14   help my father.  Apparently his father had some issue and,

15   finally, without any prompting whatsoever he confessed to

16   everything.

17   Q     Was he crying at one point?

18   A     Yes, he was.

19   Q     Was --

20   A     Not -- excuse me.  Let me rephrase that.  He was not

21   weeping, there were no tears, but he was -- he was weepy.

22   Q     He was visibly upset?

23   A     Wouldn't you be?

24   Q     I absolutely would be if two investigators walked into my

25   office unannounced and started grilling me with this kind of

ROMBOM - CROSS - SIEGLER

1   stuff.

2   A    Well --

3           MR. KATAEV:  Objection.

4   A    -- just to be clear, just to be clear we were not

5   grilling him.  I was speaking to him in the exact same tone of

6   voice I'm speaking to you.  I didn't threaten him.  In fact,

7   on two occasions he said, are you going to arrest me?  I said,

8   I'm a private investigator, I'm working for Daniella Levi.  I

9   don't have the power of arrest.

10  Q    Were you -- how were you referred to the Labuda firm?

11  A    I'm sorry?

12          MR. KATAEV:  Objection.  Relevance.

13  Q    Were you referred to the Labuda firm --

14          THE COURT:  Overruled.

15  Q    -- by Ms. Levi?

16  A    I'm not following the question, I'm sorry.

17  Q    How did you get to the Labuda law firm?

18  A    The Labuda law firm retained me --

19  Q    Okay.

20  A    -- on behalf of their client.

21  Q    Did you have any prior dealings with Ms. Levi or IME

22  WatchDog?

23  A    No, I literally had never met her before that day.

24  Q    After he confessed, he then made a tape, what did you say

25  to get him to agree to make this recording to call his,

ROMBOM - CROSS - SIEGLER

1    quote/unquote, co-conspirator without their knowledge and

2    record it, how did that occur?

3    A    First of all, I asked him if he regretted what he had

4    done and he said yes, very much so.  I said, are you willing

5    to assist us in undoing the damage that you've done, and he

6    said, how could I do that.  And I told him, look, the first

7    thing that we need to do is we need to get evidence that what

8    you're telling us is in fact the truth.  You know, you told us

9    one thing in the beginning of the conversation, you told us

10   another thing as it moved forward.

11          Now -- now that you have shown us payments that we

12   didn't have, now that you've detailed specific clients that

13   you moved over from IME WatchDogs to IME Guardians, I believe

14   they're called, I'd like you to -- I'd like you to make a

15   controlled call to the Gelardis and discuss with them the

16   actual things that you've done in the past with them.  That

17   you've diverted clients to them, that you've given them

18   information, that you've made them a lot of money that would

19   have otherwise have been made by your employer.  And he said,

20   just like they do on TV?  I said, precisely like they do on

21   TV, and he agreed to do that.  We set up the first phone call

22   for him.  It went well --

23   Q    I'll back up a second, I'm not there yet.

24   A    Okay.

25   Q    He was still employed by IME WatchDog at that time?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ROMBOM – CROSS – SIEGLER

1   A    I believe he's still employed to this date.

2   Q    Is he still employed as the president of the company?

3   A    I don't know.  I believe he's employed there.

4   Q    The guy who was allegedly selling information to a

5   competitor, giving away all this info, do you know why he's

6   still employed there?  Does it make sense to you?

7            MR. KATAEV:  Objection.

8            THE COURT:  Sustained.  Sustained.  You don't have

9   to answer that.

10           THE WITNESS:  Yes, your Honor.

11  Q    What was your colleague doing during these conversations

12  with Mr. Rosenblatt?

13  A    We work occasionally as a team.  He was asking relevant

14  questions if he felt I missed anything when we were

15  interviewing Mr. Rosenblatt.  Primarily he was assisting in

16  taking notes.  We would switch off in taking notes.

17  Q    Do you have still have a copy of those notes?

18  A    Not with me.

19           MR. KATAEV:  Objection.  Those would be privileged.

20           THE COURT:  Overruled.

21           MR. SIEGLER:  I would ask that we subpoena those for

22  the next time, if there is a next time, or I can get them in

23  discovery.

24           THE COURT:  You can certainly get the notes, and

25  they should be provided if you're putting forth the witness

ROMBOM - CROSS - SIEGLER

1    so --

2    A    I'm actually not sure I have them.  I should but I'm not

3    sure.

4    Q    What does that mean?

5    A    It means that I completed my investigation for Milman

6    Labuda, I handed off Mr. Rosenblatt to Milman Labuda and they

7    picked up the ball and the documentation of his testimony and

8    the continuing interviews of him were conducted by the

9    attorneys at Milman Labuda, not by me.  My job -- my job was

10   to do an admission-seeking interview.

11   Q    Did you make notes of that interview?

12   A    Yes, I did.

13   Q    Did you make them on a computer or handwriting?

14   A    Handwriting.

15   Q    And what have you done with those notes?

16   A    They should still be in the file, but I haven't looked at

17   the file since the beginning of March.

18   Q    So I'm going to ask you to produce the contents of that

19   file.

20          THE COURT:  Well, you can ask the lawyers.

21          MR. SIEGLER:  I ask the lawyers to produce the

22   contents of that file.

23   Q    Did you believe everything that Adam told you after you

24   presented him with evidence of wrongdoing?

25          THE COURT:  Sustained.  On both sides.  Neither is

ROMBOM – REDIRECT – MR. FELSEN

1    allowed to ask him what he thinks --

2              MR. SIEGLER:  I'm sorry to go off the rails here,

3    your Honor.  I have no further questions.

4              THE COURT:  Anything else from plaintiff's counsel.

5              MR. FELSEN:  Just a couple of follow-up questions.

6    REDIRECT EXAMINATION

7    BY MR. FELSEN:

8    Q    Was Mr. Rosenblatt a willing participant throughout your

9    investigation?

10   A    Yes, he was.

11             THE COURT:  As far as you could tell.

12             MR. FELSEN:  No further questions.

13             THE COURT:  The question is inherently subjective,

14   but did he ever voice any objection to you about participating

15   in the investigation?

16             THE WITNESS:  Thank you for allowing me to add this.

17             Not only did he not voice any objections, but as the

18   interview went forward he started suggesting things and

19   volunteering things that I didn't have enough information to

20   ask him at that point 'cause it was the beginning of the

21   investigation.  He was an extremely willing participant,

22   extremely cooperative and he made it clear that he was

23   extremely apologetic, he wanted to undo what he had done.

24             THE COURT:  All right.  Thank you very much.

25             MR. SIEGLER:  One follow-up question.

ROMBOM – RECROSS – MR. SIEGLER

1    THE COURT:  Yes, please go ahead.

2  RECROSS EXAMINATION

3  BY MR. SIEGLER:

4  Q    Did you record your controlled -- did you record your

5  interview with the witness, Mr. Rosenblatt?

6  A    Yes, I did and it's been deleted.

7    THE COURT:  Are we talking an audio recording?

8    THE WITNESS:  Yes.

9  Q    Can you explain yourself, sir, you deleted what?

10 A    Yes, I did.  I did record the interview and it was

11 deleted.

12 Q    Why did you delete it, that's evidence in a case.

13   THE COURT:  Well, the question is why did you delete

14 it.

15   THE WITNESS:  I deleted it because that's our

16 standard operating procedure.  Once we close the case we speak

17 to the attorneys, if the attorneys have already obtained the

18 exact same evidence that we obtained -- and by the way, no, we

19 did not record the entire interview.

20 BY MR. SIEGLER:

21 Q    Did you give a recording to the law firm, the Milman law

22 firm?

23 A    I gave them exactly what you've heard, that's the extent

24 of what I gave the Milman law firm.

25 Q    So you didn't give the audio of your interview with

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ROMBOM – RECROSS – MR. SIEGLER

1  Mr. Rosenblatt prior to the phone calls?

2  A    Partial interview, correct.

3  Q    Is that your standard operating procedure to delete --

4  A    It is if I'm --

5  Q    -- what could be evidence in a case?

6  A    It is no longer evidence in the case because they

7  obtained much more detailed evidence and I am no longer on the

8  case.  My file is closed.

9  Q    Is it possible that --

10       MR. SIEGLER:  We're going to address that at a

11  different time.  No further questions.

12       THE COURT:  Thank you.  You may step down,

13  Mr. Rombom.

14       THE WITNESS:  Thank you, your Honor.

15       THE COURT:  It's 5:30 everyone, we're going to

16  conclude the hearing now.  It's been about three and a half

17  hours roughly that we've been here today.

18       I'm actually prepared to make a finding that the

19  defendants did take -- the evidence establishes certainly by a

20  preponderance that the defendants did take confidential

21  information through Mr. Adam Rosenblatt about IME WatchDog's

22  business in order to further their own business, namely, IME

23  Companions.  And I think as defense counsel alluded to at the

24  beginning, there is a likelihood of success here that has been

25  established.

PROCEEDINGS

1          I also want to note, not that I think this is much

2     of an issue, but although I've policed the admission of

3     hearsay because this is a preliminary injunction hearing, I am

4     actually allowed to consider hearsay evidence, and I'll just

5     cite a couple of cases for that proposition.  *Mullins versus*

6     *City of New York*, M-U-L-L-I-N-S, 626 F.3d 47, Second Circuit

7     case from 2010.  And also Zeneca, Inc., the company,

8     Z-E-N-E-C-A versus Eli Lilly Corporation, cited at Westlaw

9     1 -- sorry, reported at Westlaw 1999, Westlaw 509471, which is

10    a Southern District of New York case from 1999, and it cites

11    other cases.

12         So even to the extent that some hearsay has been

13    admitted, and I'll note actually that most of it came through

14    the questioning of the defense attorney just now of the

15    investigator about what Mr. Rosenblatt told him, I can

16    consider that.  But, quite frankly, I don't think I need to

17    consider it nor do I need to see the notes from

18    Mr. Rosenblatt, I'm sorry Mr. Rombom to determine that the

19    defendant did take confidential information and knowingly did

20    so in exchange for money.  There's no challenge to Exhibit

21    Number 5, which has 27 pages worth of Zelle payments.  Then I

22    just heard a recording where it is clear to me the defendants,

23    Mr. and Mrs. Gelardi, are acknowledging that they have this

24    ongoing relationship or had it with Mr. Rosenblatt where they

25    were willing to pay him money to get information and then

PROCEEDINGS

1   provide him safe haven by bringing him over to their company

2   and possibly paying him $2500 in that moment because

3   Mr. Rosenblatt expressed financial desperation.

4        I don't find, and I don't think I have quite enough

5   evidence, but I don't need it, to find that the defendants

6   paid for information before 2019, though I have some

7   reasonable doubts I think that that didn't occur before or

8   have some reason to believe it occurred before because if the

9   defendants were willing to pay money for it starting from

10  2019, it seems logical they would have done so from the

11  beginning.

12       On the other hand, they got the information it

13  appears unsolicited.  I actually think that's a credible part

14  of Ms. Gelardi's testimony.  I do not credit other parts of

15  your testimony though, Ms. Gelardi.  I don't believe for a

16  moment that you thought that the information Rosenblatt was

17  sharing with you, even if it was volunteered in the beginning,

18  was anything other than confidential.  You had to know from

19  your days in business and in the banking industry that there's

20  confidential, proprietary information that a business is not

21  allowed to share, or that an employee of a business is not

22  allowed to share with a competitor and that there is a

23  fiduciary duty.  If you're in the banking industry you well

24  know that.  So I didn't credit that testimony and I believe

25  that you and your husband knew full well you were essentially

PROCEEDINGS

1   stealing this information or buying it from Mr. Rosenblatt at

2   least as of 2019.  That happens to coincide with when you

3   bought the business from your initial investors, which is why

4   I asked you about how many observers you had at that time and

5   how big your revenue was and just doing some quick math, 10 to

6   12,000 a month in revenue is really not enough to even pay

7   these seven or eight observers and yourself a salary.  Now,

8   perhaps there is some other financial arrangement or maybe

9   they got some money on the side for doing these investigations

10  or observations, but nonetheless it makes sense to me that you

11  started paying for this information to grow your business just

12  as you said in the phone call with Mr. Rosenblatt, that in

13  fact it sounds like your business took off from 2019, which

14  coincided with when you are getting all this information from

15  Mr. Rosenblatt.  And I just heard from the investigator and I

16  have considered it, that Mr. Rosenblatt admitted that he gave

17  all sorts of information to try to help you and your husband

18  grow your competing business.

19          I don't need to resolve this fight over the domain,

20  I don't think it's relevant particularly because there is

21  certainly a likelihood of success on the merits.  So then the

22  question remains irreparable harm and the scope of the

23  injunction, if any.

24          Now I'll make a couple of observations, but I want

25  the parties to address this further.  First of all, I think

PROCEEDINGS

1   that the injunction, the thing requested is overly broad.  I

2   don't think, although this is a preliminary thought in my

3   mind, that IME Companions can be shut down entirely.  The

4   plaintiff's counsel admitted that they are able to quantify at

5   least an amount of damages at this point, substantial as they

6   may be, and if those damages can be paid, then obviously

7   preliminary relief in the form of an injunction is

8   inappropriate.

9            On the other hand, if the plaintiff can show that

10   there's some significant risk of damage to reputation or of

11   plaintiff's business, it's really more relevant whether

12   plaintiff is losing so much money that they may go out of

13   business quite frankly than what will happen to defendants'

14   business, then there might be a showing of irreparable harm.

15   You all know the law, so I want you to brief this further and

16   give me some actual evidence as to why it is or is not

17   irreparable harm given that I have found that these secrets,

18   trade secrets, client information, other protocols have been

19   taken improperly.

20            In that vein as well what I think is also true is

21   that the defendant should not be allowed to franchise based on

22   any information they obtained unlawfully or at least

23   against -- or improperly I should say.  That's pretty clear in

24   the case law, that that would create a serious risk of

25   irreparable harm to the plaintiff.

PROCEEDINGS

1       And I guess the third suggestion I make is that it

2   would be helpful to me if I knew if plaintiff can actually

3   trace those clients that they've lost to IME Companions,

4   because it seems to me if Mr. Rosenblatt is cooperating with

5   plaintiff, he ought to be able to provide such a list.

6       Now I think you may have done something similar to

7   that already, and I see, Mr. Kataev, you have something in

8   your hand.

9       MR. KATAEV:  Yes, your Honor, I'm waiting for you to

10  finish so I can address your points.

11      THE COURT:  That's fine.  So I am willing to

12  consider crafting some kind of injunction relief that perhaps

13  doesn't go quite as far as the plaintiff has requested.  I

14  don't think it's necessarily appropriate to put IME Companions

15  out of business, but it is appropriate not to let them

16  franchise, if what they're franchising off of is essentially

17  stolen information.  And, again, the question is what is the

18  irreparable harm to plaintiff.  What will happen to its

19  business, not so much what will happen to IME Companions.

20      MR. KATAEV:  Thank you, your Honor.  I just want to

21  clarify something before I begin.  You said three suggestions.

22  The first was briefing on irreparable harm.  I believe the

23  third was how we can trace the, quote/unquote, damages.  What

24  was the second?

25          THE COURT:  I don't know the order.  Franchising is

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1    not --

2              MR. KATAEV:  Understood.

3              MR. SIEGLER:  I'm not sure we're arguing right now.

4              THE COURT:  No, this isn't meant to be argument

5    but --

6              MR. KATAEV:  These are some thoughts, your Honor, on

7    what you said.

8              THE COURT:  Right.  I don't actually want your

9    thoughts orally, I would prefer both sides write on this.  I

10   think you may have already submitted something suggesting

11   which clients you believe may have been stolen from IME

12   WatchDog by IME Companions and, again, I think you have the

13   better information on that to some extent.

14             MR. KATAEV:  Your Honor, I would still like to be

15   heard briefly.  We prepared a pocket brief we would like to

16   give to the Court today on irreparable harm.

17             With respect to tracing, we believe that the Court

18   has the authority to order a forensic analysis.  There is even

19   a possibility of ordering a neutral forensic analysis so that

20   the forensic analyst can provide that information directly to

21   the Court who can then provide it to the parties.  We would

22   ask that we be allowed to do a forensic analysis ourselves

23   with someone we hire at our cost, but if the Court finds that

24   it prefers a neutral forensic analysis, then we would ask that

25   the defendants be required to pay that cost.

PROCEEDINGS

1          With that said, I would like to provide a copy of

2     this pocket brief subject to further briefing to both the

3     defendants and to the Court and --

4          THE COURT:  That's fine, I'll receive that and

5     obviously give a copy to Mr. Siegler.

6          Have the parties discussed at all the possibility of

7     a forensic examination?  Since it seemed to me Mr. Siegler was

8     prepared at the beginning of this to focus on the irreparable

9     harm issue.

10         MR. SIEGLER:  We've had some initial discussions

11    towards settlement.  The last word that I heard was, let's

12    wait and see what happens on Monday, which is today.  We may

13    restart those discussions; we may not.

14         THE COURT:  I urge you to do that though because,

15    Mr. Siegler, I'm sure you're a very realistic, experienced

16    attorney but I don't see how you could --

17         MR. SIEGLER:  It's a matter of how much, your Honor.

18         THE COURT:  Yes, I understand that.  I understand.

19         MR. SIEGLER:  There is a price on this, it is money,

20    it's not anything else.  If there is a sum, you know, I think

21    maybe an accounting is appropriate, not as an injunction but

22    as the normal discovery process with the normal safeguards in

23    place.  They want to run through our records, disclosing our

24    trade secrets without any confidentiality order, without any

25    kind of, you know, it's a rampant -- it's running rampant

PROCEEDINGS

1    through their records, I don't think that's called for.

2          What you have here is $6,000 of payments.  I mean,

3    this is not the crime of century.  It's an important crime, I

4    get it -- not say crime, it's an important allegation and it

5    was wrong, if what they say is true.  And I conceded that at

6    the beginning, your Honor.  I said there is probably a

7    likelihood of success to some extent.

8          But that said, I appreciate what you said about not

9    close the business, my client appreciates it, her employees

10   appreciate it.  But we're talking about a forensic analysis, I

11   think we do it in the subject -- in the context of normal

12   discovery and not something we have to rush to do, you know,

13   on a moment's notice.

14         THE COURT:  Well, the only disagreement I have with

15   you on that is that the plaintiff's position, and I don't know

16   how fully supported it is or how well it's supported I should

17   say, is that time is of the essence.  In other words, for

18   every day we delay some kind of resolution, the plaintiff's

19   losing not only revenue, but perhaps reputation and standing

20   in this market.  That's part of their argument.  So time is an

21   issue.

22         What I want to do is, and what I'm inclined to do

23   is, issue at least a limited injunction on any franchising by

24   defendants until the irreparable harm issue can be explored

25   further by the parties either, or by briefing, or some kind of

PROCEEDINGS

1    settlement can be reached between the parties about perhaps

2    some kind of damages --

3              MR. SIEGLER:  Your Honor --

4              THE COURT:  -- or rectification of the situation.

5    But I think, for me, the franchising is a pretty clear

6    demarcation that that should not happen and that injunction

7    I'm very likely to issue.

8              MR. SIEGLER:  We're also agreeing, your Honor, not

9    to contact Mr. Rosenblatt, so whatever leak was occurring it's

10   now stopped up, it's been stopped up since March.  We have no

11   intention of getting back in touch with this gentleman, so

12   that's one of the reliefs that they requested.  We're totally

13   consenting to that, we're not going to contact Mr. Rosenblatt.

14             MR. KATAEV:  Your Honor, two points to address.  The

15   last argument was a red herring, respectfully.  This cow has

16   been milked for everything it's worth and there's nothing

17   further to be gained from Mr. Rosenblatt.  They have the

18   information in hand and we'll brief the subject over

19   irreparable harm.

20             Second, with respect to time being of the essence,

21   it's a travesty that this Court did not hear the third

22   recording because Mr. Rosenblatt can be heard repeating what

23   Mr. Gelardi said, destroy everything, delete everything, do

24   you want me to take everything.  There's very big risks of

25   spoliation here.  We need a forensic analysis immediately,

PROCEEDINGS

1   whether it's neutral ordered by the court or otherwise the

2   plaintiff will do it.

3           MR. SIEGLER:  Your Honor, this is the tape that you

4   can't hear Mr. Gelardi speak.  It's a recording of one person

5   speaking, so counsel may have inside information that I don't,

6   but to me he just misrepresented something to the Court.  It's

7   a one-sided conversation only and it is of zero, zero

8   evidential value until someone enhances it, which they haven't

9   yet.

10          THE COURT:  I assume what Mr. Kataev is recounting

11  is Mr. Rosenblatt saying whatever he said, do you want me to

12  destroy it.

13          MR. KATAEV:  That's correct, your Honor.

14          THE COURT:  I'll listen to the tape and see if I can

15  discern anything or if at least it seems credible as opposed

16  to him gilding the lily, which I doubt he would do since he

17  thinks it's being recorded, but again I think what we should

18  focus on is, I have made a finding, I did find improper

19  conduct.  There is a likelihood of success based on just what

20  I've heard, I don't need to hear from any other witnesses.

21          The recordings, quite frankly, the negative

22  inferences I made about the payments and the clear payment

23  records themselves via Zelle tell the story.  It's enhanced to

24  some extent by Mr. Rombom's description of what Mr. Rosenblatt

25  said during the interview, which was elicited by you,

PROCEEDINGS

1  Mr. Siegler.  So I think all of that, you know, fully supports

2  a finding of likelihood of success.

3        I think we need to deal expeditiously with the

4  question of irreparable harm.  If the parties can get together

5  and agree on some forensic evaluation, I would prefer that,

6  but I will at a minimum issue an injunction to prevent any

7  kind of franchising by defendants.  And then also any

8  communication with any employees, current or former of IME

9  WatchDog, or perhaps I should just make it as to

10 Mr. Rosenblatt.  I don't think there are any others.

11       MR. KATAEV:  And any agents, your Honor.

12       We have one additional point when you're ready.

13       THE COURT:  Go ahead.

14       MR. KATAEV:  The additional point is that there has

15 been evidence presented to the Court about disparaging and

16 defaming IME WatchDog.  We would like an injunction to that

17 effect that there will be no statements made by the defendants

18 about the plaintiff IME WatchDog, Inc. or the third-party

19 defendant, Mrs. Daniella Levi.

20       THE COURT:  Well --

21       MR. SIEGLER:  This is --

22       THE COURT:  -- I didn't hear any evidence on that.

23 But, quite honestly, I would -- I am directing both parties

24 not to make statements about the other parties that can be

25 misconstrued as defaming, because there is a pending complaint

PROCEEDINGS

1    or claim for defamation.  Which is the other thing I wanted to

2    address, which is that obviously is on a different timeline

3    slightly, but I think it's worthwhile trying to resolve it, if

4    the parties can, some kind of agreement about that.  In other

5    words, dropping those claims if in fact you folks could come

6    to some resolution about this action, and then both sides

7    agreeing not to speak ill of each other or try to speak badly

8    to potential clients about each other for some period of time,

9    if not indefinitely.  I think that would make sense.  But I do

10   want you folks to talk to each other.

11          I will then review this pocket brief.  Mr. Siegler,

12   though you should have an opportunity to respond to it and

13   then why don't we just have then the plaintiff reply as a form

14   of giving you another chance to supplement your pocket brief.

15          MR. SIEGLER:  You mean defendants?

16          THE COURT:  I actually meant plaintiffs.  So in

17   other words, defendants can respond to the pocket brief or put

18   in anything you want to about the irreparable harm injury,

19   then I'll have plaintiff's reply to that.  I say reply because

20   I already have a pocket brief from them, but they can put in

21   whatever they want to about irreparable harm, including

22   responding to the opposition of the defendants.

23          I'm trying to shorten this process so we can move it

24   along.  Yes, Mr. Shalit.

25          MR. SHALIT:  Yes, your Honor.

PROCEEDINGS

1         THE COURT:  So we can hear you better.

2         MR. SHALIT:  I'm sorry to interrupt.  I just have a

3    question.  I'm not clear.  I saw on the docket that there is

4    an order I believe by April 12th for the parties to submit

5    additional summations.  My understanding is that that is going

6    to be handled with this reply brief schedule that you're

7    imposing right now.  I want to make sure it doesn't apply to

8    my client.

9         THE COURT:  Yes.  We have to figure out how to deal

10   with your client.  Did he just get served in the hallway

11   today?

12        MR. SHALIT:  He got served in the hallway.  I had a

13   brief conversation with the opposing counsel about potentially

14   working this out and I'm going to try to do my best to work it

15   out with him so we can nip all these issues in the bud.

16        THE COURT:  Yes, I prefer if we can wrap them all up

17   together and minimize the amount of briefing.  So Mr. Siegler,

18   maybe you and Mr. Shalit can decide how you want to approach

19   the defendants' claims against the plaintiffs as well as

20   Mr. Roa.

21        MR. SIEGLER:  We'll do, your Honor.

22        THE COURT:  Let me know because I think we set a

23   schedule for briefing of that motion, did we not?

24        MR. KATAEV:  That's correct, your Honor.

25        THE COURT:  If you want to stay that until you have

PROCEEDINGS

1    a chance to talk, that's fine with me.

2              MR. SHALIT:  Is that okay with defense?

3              MR. SIEGLER:  No objection.  I think it can be

4    resolved --

5              THE COURT:  Okay, so let's --

6              MR. SIEGLER:  Not the lawsuit but just this

7    preliminary injunction.

8              MR. SHALIT:  Right.

9              THE COURT:  Right.

10             MR. SHALIT:  I also believe that it could be

11   resolved, your Honor.

12             THE COURT:  Okay.  So let's stay the motion of the

13   defendants for now for a preliminary injunction.  I'll allow

14   the attorneys to speak to each other and see if you can come

15   up with some global resolution.  But in the meantime, I do

16   need the briefing on the irreparable injury.

17             Let's figure out how much time do you want,

18   Mr. Siegler, to respond to this pocket brief and just put in

19   whatever you want about irreparable harm, because the request

20   I think foremost is perhaps for a forensic examination.

21             MR. SIEGLER:  I need a nap after this hearing, your

22   Honor, it's not going to be today or tomorrow.

23             THE COURT:  Oh, no, understood, of course.

24             MR. SIEGLER:  End of the week?

25             THE COURT:  Oh, absolutely, that's fine.  That's

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1  good, Friday is good.  Then a week for you folks?

2              MR. KATAEV:  That's more than sufficient, your

3  Honor.

4              There is one last point we'd like to raise, your

5  Honor.

6              THE COURT:  Yes, sure.

7              MR. KATAEV:  We're entitled to attorney's fees under

8  the Defend Trade Secrets Act and we'd like to ask for the fees

9  on this motion.

10              THE COURT:  So why don't you put that in -- make a

11  separate motion on that, if you will, and obviously do what

12  you need to do to itemize.  I'll give Mr. Siegler two weeks to

13  respond to that.

14              MR. KATAEV:  We can brief that out further so we can

15  focus on the immediate issue.  I'll work that out with

16  opposing counsel, I'll submit a letter.

17              THE COURT:  If you would that would be helpful.

18  Yes.

19              MR. FELSEN:  Your Honor, one final point.

20              Your Honor, based on your finding today we'd ask

21  that you further extend the injunction to preclude the

22  defendant from servicing any of the plaintiff's customers and

23  using any of their confidential information.

24              MR. SIEGLER:  Your Honor --

25              THE COURT:  Well --

PROCEEDINGS

1          MR. SIEGLER:  -- we don't know which customers those

2    are.

3          THE COURT:  That I can't do that now.  We have a

4    small window of time in which I want to hear some briefing

5    about the irreparable harm.  I cannot say that that would

6    necessarily be a part of an injunction, I don't know, because

7    if it's compensable as damages, then every dollar they earn

8    from these allegedly stolen customers can be recompensed,

9    right, so --

10         MR. FELSEN:  But, your Honor, why should they be

11   entitled to continue doing this.  You already found what

12   they've done is unlawful.

13         THE COURT:  Right, but it may not be irreparable

14   harm, and I'd like to hear more, because I don't know which

15   customers, other than based on what you say they allegedly

16   took, and I also don't know if just the taking of those

17   customers is sufficient to show irreparable harm.  I mean, you

18   equate the mere taking of customers as stealing revenue with

19   irreparable harm, but the case law isn't quite as broad in

20   that regard.  So I just want some more briefing, this will be

21   just another couple of weeks.

22         So I'm not going to put that as part of the

23   injunction just yet, but that's what the argument is about.

24   You need to tell me which clients, the magnitude of the loss,

25   and why it actually meets the standard of irreparable harm.

PROCEEDINGS

1          MR. KATAEV:  Understood, your Honor.

2          THE COURT:  I think you know you have to focus more

3    about the long-term effects on plaintiff's business.  All

4    right.

5          I think we have it this Friday, what date, Fida.

6          MR. SIEGLER:  April 8th, is it.

7          MR. KATAEV:  Yes.

8          THE COURTROOM DEPUTY:  April 8th.

9          THE COURT:  April 8th for the defendants' response

10   to the pocket brief as well as its briefing on the irreparable

11   harm issue and then 22nd -- no, the 15th rather.

12         MR. SIEGLER:  Fifteen.

13         THE COURT:  The 15th will be the date for the

14   plaintiff's reply and supplemental briefing on irreparable

15   harm.

16         Again, I urge all the parties to talk to each other

17   see if you can come up with some settlement on this and I

18   would wrap into that attorney fees if you're going to make

19   that request as part of the bargaining process.

20         MR. KATAEV:  Understood.

21         MR. SIEGLER:  Your Honor, if they are going to be

22   alleging new facts in their supplemental brief from the 15th,

23   I would like to reply with more facts as well.  We haven't

24   gone through the clients one by one, I personally didn't do

25   that today since they're all a matter of money, but if they're

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1   going to allege and point out to your Honor exactly which

2   clients we took, exactly when and exactly how they're being

3   harmed, then I think I should have a chance to respond to

4   that.

5          MR. KATAEV:  Your Honor, on that point it's a fair

6   point but it goes beyond the irreparable harm issue.  So I

7   think what we should is we should keep the current schedule,

8   we do intend on submitting what's called our reply

9   declaration, an exhibit that we have in the binder which

10  they've had, it's Exhibit Number 11.  It's a listing of all

11  our customers and figuring that for monetary damages, but

12  again the issue before the Court is irreparable harm, the

13  nonmonetary damages.  So to the extent that that needs to be

14  addressed separately, we're fine with working something out

15  with defendants.

16         THE COURT:  Looking at Exhibit 11, which I don't

17  think was admitted or discussed, right?

18         MR. KATAEV:  It was not, your Honor.

19         THE COURT:  So this is a list of all IME WatchDog's

20  current customers or clients?

21         MR. KATAEV:  No, your Honor, this is just a

22  sampling.

23         THE COURT:  Okay.

24         MR. KATAEV:  It's a sampling that I believe was

25  primarily taken from the affidavit of Carlos Roa.  There is a

PROCEEDINGS

1   list of 20 law firms in that declaration and I believe that

2   this sampling shows how much business my client did up until

3   the point they stopped working with my client and then moved

4   on to IME Companions.  It's not the full extent, it's not the

5   full breadth, but we intend to use it in a reply declaration,

6   quote/unquote, reply declaration by Mrs. Levi on April 15th.

7              MR. SIEGLER:  Well --

8              THE COURT:  Right.  The problem is one of procedure

9   here.  So Mr. Siegler should have a chance to respond.  I'm

10  wondering if we should invert the order of briefing.  Perhaps

11  it would be better to have plaintiff supplement --

12             MR. KATAEV:  Sure.

13             THE COURT:  -- on the issue of irreparable harm what

14  you've already submitted, so you do that on --

15             MR. KATAEV:  The 8th.

16             THE COURT:  -- Friday, which is the 8th and then

17  Mr. Siegler you'll have until the 15th to respond to that.

18             MR. SIEGLER:  Thank you, your Honor.

19             THE COURT:  If you want to submit a reply that's up

20  to you, but I'm not going to set a deadline for that, I'm

21  talking to the plaintiff's counsel.

22             MR. KATAEV:  Thank you, your Honor.

23             THE COURT:  I think that makes more sense.  Okay.

24  So that concludes today's proceeding.  I thank everyone for

25  the presentation and preparation.

PROCEEDINGS

1          The recordings is the only thing I still need, I

2    would like to just hear them.

3          MR. KATAEV:  It will be FedEx'd with a flash drive.

4          THE COURT:  That would be perfect.  Thank you so

5    much.

6          MR. KATAEV:  We'll be asking for a next day

7    transcript.

8          THE COURT:  Okay.  You know, the parties if they get

9    to together they can split the cost.

10         MR. KATAEV:  I'm amenable to that.

11         MR. SIEGLER:  Yes, I think we should do something

12   like that.

13         THE COURT:  Thank you everyone.

14         Have a good evening.

15         (Matter concluded.)

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2    WITNESS                                        PAGE

3    SAFA GELARDI

4    DIRECT EXAMINATION     BY MR. KATAEV              23

5    CROSS-EXAMINATION      BY MR. SIEGLER             76

6    REDIRECT EXAMINATION   BY MR. KATAEV             115

7

8    STEVEN ROMBOM

9    DIRECT EXAMINATION     BY MR. FELSEN             128

10   CROSS-EXAMINATION      BY MR. SIEGLER            140

11   REDIRECT EXAMINATION   BY MR. FELSEN             151

12   RECROSS EXAMINATION    BY MR. SIEGLER            152

13                        E X H I B I T S

14
     PLAINTIFF              PAGE
15   1                       55

16   3                       58

17   4                       60

18   5                       62

19   8                       68

20   9                       69

21   18A                    131

22   18B                    136

23   DEFENSE

24   B                       92

25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

**MR. FELSEN: [21]** 2/10 2/14 7/8
58/20 78/17 104/23 106/10 131/11
133/6 133/18 133/22 134/9 135/14
135/22 138/13 138/23 139/24 151/5
151/12 168/19 169/10
**MR. KATAEV: [152]** 2/7 3/17 6/16
7/14 8/4 8/9 8/24 9/3 9/9 9/13 10/25
15/12 15/22 23/2 23/7 23/21 24/4 25/24
27/1 28/17 31/16 33/16 36/6 36/18 39/20
41/1 41/18 42/4 42/9 42/12 45/8 52/14
53/12 53/16 54/13 54/22 55/9 55/17
55/21 56/7 56/18 57/24 58/8 58/11
59/15 59/21 61/10 61/13 62/20 62/24
63/1 63/6 63/11 63/14 64/14 65/2 65/9
65/25 66/4 66/7 66/10 67/23 68/4 69/6
70/7 71/6 74/24 76/11 76/15 76/24
77/21 79/15 83/20 84/15 84/17 85/4
85/9 86/13 87/12 89/1 89/18 89/21
90/20 92/2 94/11 95/4 95/6 101/13
102/3 105/9 105/12 105/22 109/1 113/3
119/19 121/20 121/24 125/19 125/24
126/6 126/16 126/23 127/24 131/17
131/22 132/1 132/5 132/8 132/12
132/14 136/10 136/15 137/15 138/3
138/7 138/9 138/17 138/22 142/7 143/7
143/10 143/12 147/3 147/12 149/7
149/19 158/9 158/20 159/2 159/6
159/14 162/14 163/13 164/11 164/14
166/24 168/2 168/7 168/14 170/1 170/7
170/20 171/5 171/18 171/21 171/24
172/12 172/15 172/22 173/3 173/6
173/10
**MR. SHALIT: [14]** 110/19 110/24
111/3 111/8 112/2 112/21 113/20
114/14 165/25 166/2 166/12 167/2
167/8 167/10
**MR. SIEGLER: [111]** 2/20 3/2 3/24
4/12 4/21 4/23 5/2 5/4 5/14 7/17 7/20
7/24 8/2 8/12 17/10 18/18 18/20 19/16
19/21 20/15 20/21 21/1 21/13 21/20
21/23 22/8 22/10 22/23 24/18 25/22
29/25 30/2 32/12 40/22 52/12 55/13
56/10 57/5 58/3 59/2 60/2 66/15 67/20
68/1 71/1 71/24 76/19 77/25 78/19
83/25 84/4 86/14 89/20 90/14 90/21
91/7 91/24 92/7 97/11 97/15 102/5
105/10 109/15 110/11 111/23 113/6
113/16 113/22 113/25 114/22 122/1
123/17 123/26 129/1 131/2
132/25 133/24 134/20 136/2 139/20
140/2 142/6 143/2 149/21 150/21 151/2
151/25 153/10 159/3 160/10 160/17
160/19 162/3 162/8 163/3 164/21
165/15 166/21 167/3 167/6 167/21
167/24 168/24 169/1 170/6 170/12
170/21 172/7 172/18 173/11
**MS. LEVI: [1]** 135/20
**THE COURT: [471]** 2/12 2/16 3/1 3/4
3/20 4/2 4/19 4/22 4/25 5/3 5/7 6/1 7/1
7/11 7/16 7/19 7/23 7/25 8/3 8/6 8/11 8/14
8/25 9/7 9/10 10/24 15/8 15/17 17/3
18/4 18/19 19/10 19/17 20/13 20/20
20/25 21/12 21/17 21/22 22/7 22/9

22/17 22/24 23/4 23/9 23/19 23/25 24/7
24/20 25/23 25/25 26/17 26/24 28/8
28/19 29/13 30/3 30/25 31/4 31/8 31/12
31/15 31/17 31/22 31/24 32/1 32/4 32/7
32/13 33/13 33/17 33/21 33/24 34/2
34/5 34/8 34/13 34/15 34/18 35/1 36/4
36/7 36/17 36/19 37/21 38/5 38/7 38/13
39/24 40/8 40/25 41/2 41/11 41/13
41/19 41/22 41/25 42/2 42/8 42/11
42/13 43/7 43/10 44/6 45/4 45/10 45/14
45/18 45/25 46/6 46/12 46/14 46/17
46/19 46/22 47/1 47/4 47/7 47/9 47/13
47/16 47/20 47/23 48/2 48/6 48/11
48/14 48/17 48/19 48/22 49/2 49/9
49/11 49/18 49/25 50/4 50/11 50/15
50/17 50/20 51/11 51/14 51/20 51/25
52/3 52/9 52/13 53/15 54/21 54/24
55/11 55/14 55/20 56/9 56/14 56/23
57/7 57/12 57/14 57/17 57/19 57/23
58/2 58/5 58/10 58/23 59/5 59/17 59/24
60/6 61/12 62/9 62/17 62/22 63/3 63/8
63/13 63/16 64/12 65/11 65/20 65/22
66/9 66/12 66/16 66/20 66/23 66/25
67/21 67/25 68/2 68/7 68/15 69/8 69/11
69/17 69/21 69/24 71/2 71/4 71/7 71/21
72/1 72/8 72/11 73/1 73/5 73/13 74/23
76/10 76/13 76/17 77/1 77/10 77/14
77/18 77/23 78/2 78/18 79/16 82/12
82/14 83/21 83/24 84/2 84/5 84/18
84/22 84/25 85/5 85/11 85/13 85/15
86/15 87/14 87/17 88/10 88/14 88/17
88/19 89/3 89/7 89/15 89/23 90/10
90/13 90/18 91/5 91/10 92/1 92/3 92/13
92/17 92/19 93/10 93/13 93/22 93/24
94/1 94/12 94/16 94/18 95/3 95/7 95/12
95/14 95/20 95/22 96/4 96/7 96/10 97/3
97/7 97/10 97/13 97/16 97/22 97/25
98/4 101/15 102/4 102/16 102/25 103/7
103/9 103/12 103/20 103/23 104/1
104/4 104/17 104/19 104/24 105/5
105/23 106/12 106/19 106/22 106/24
107/4 107/8 107/19 107/22 108/2 108/7
108/10 108/14 108/16 108/18 109/2
109/13 109/17 109/24 110/2 110/9
110/14 110/17 110/22 111/1 111/5
111/18 111/25 112/6 112/22 113/5
113/12 113/23 114/2 114/17 114/25
115/8 115/21 117/25 118/3 118/7
118/25 119/18 119/21 120/24 121/22
121/25 122/2 122/5 122/25 123/5 123/8
123/16 123/18 123/25 124/12 124/15
124/18 124/21 124/24 125/3 125/5
125/13 125/22 125/25 126/3 126/20
127/2 128/10 129/4 131/7 131/12
131/20 131/24 132/2 132/6 132/10
133/1 133/5 133/20 134/1 134/5 134/11
134/21 135/3 135/19 135/24 136/4
136/11 136/13 136/17 136/19 136/22
136/25 137/4 137/9 137/12 137/17
137/21 138/5 138/10 138/15 138/19
138/25 139/5 139/8 139/10 139/13
139/22 139/25 140/13 140/21 141/3
141/14 141/21 142/4 143/5 143/9
147/14 149/8 149/20 149/24 150/20
150/25 151/4 151/11 151/13 151/24

152/1 152/7 152/13 153/12 153/15
158/11 158/25 159/4 159/8 160/4
160/14 160/18 161/14 162/4 163/10
163/14 164/13 164/20 164/22 165/16
166/1 166/9 166/16 166/22 166/25
167/5 167/9 167/12 167/23 167/25
168/6 168/10 168/17 168/25 169/3
169/13 170/2 170/9 170/13 171/16
171/19 171/23 172/8 172/13 172/16
172/19 172/23 173/4 173/8 173/13
**THE COURTROOM DEPUTY: [9]** 2/2
23/17 23/22 125/14 128/1 128/6 138/8
139/3 170/8
**THE WITNESS: [177]** 23/16 23/24
31/11 31/14 31/16 31/19 31/23 31/25
32/3 32/6 33/14 33/19 33/23 34/1 34/3
34/6 34/12 34/14 34/16 37/22 38/4 38/6
38/9 41/21 41/24 42/1 45/3 45/13 45/16
46/2 46/7 46/13 46/16 46/18 46/20
46/24 47/3 47/6 47/8 47/12 47/14 47/17
47/22 47/24 48/4 48/7 48/13 48/16
48/18 48/20 48/25 49/5 49/10 49/13
49/19 50/3 50/7 50/14 50/16 51/12
51/15 51/21 52/1 52/5 52/15 57/11
57/13 57/15 57/18 57/22 62/16 65/18
65/21 66/19 66/21 66/24 69/14 69/18
69/23 71/3 71/5 71/10 72/10 72/13 73/2
73/10 77/12 77/15 78/20 82/13 83/23
85/1 85/12 87/16 88/12 88/16 88/18
89/6 90/11 92/18 93/12 93/23 93/25
95/5 95/13 95/21 95/24 96/6 96/8 97/5
97/8 97/20 97/24 98/2 103/4 103/8
103/11 103/22 103/24 104/3 105/16
106/17 106/20 106/23 107/1 107/5
107/21 107/25 108/3 108/9 108/12
108/15 108/17 109/25 110/3 115/22
118/2 118/4 118/9 119/3 119/22 122/4
122/23 123/4 123/7 123/15 124/11
124/13 124/17 124/20 124/22 125/2
125/4 125/12 128/5 128/8 131/16 132/4
133/4 134/15 135/2 136/24 137/2 137/6
137/20 139/9 139/11 140/19 141/2
141/8 141/15 141/24 149/10 151/16
152/8 152/15 153/14

$
**$1 [1]** 75/4
**$1 million [1]** 75/4
**$100 [2]** 61/25 62/3
**$2,500 [1]** 14/11
**$20 [2]** 80/2 100/22
**$20 million [1]** 80/2
**$230 [1]** 62/6
**$2500 [1]** 155/2
**$300 [1]** 61/21
**$358 [1]** 75/25
**$5,000 [2]** 11/18 35/15
**$6,000 [1]** 161/2
**$750,000 [1]** 75/7
**$800 [1]** 100/15

,

'17 [1]** 35/25

**-**

**-against [1]** 1/5

**1**

**10 [6]** 98/3 108/13 137/15 140/11 142/6 156/5
**10 feet [1]** 144/6
**10,000 [1]** 101/22
**10005 [1]** 1/17
**1032 [2]** 1/2 2/3
**1099 [1]** 120/16
**11 [3]** 62/2 171/10 171/16
**11042 [1]** 1/14
**12 [1]** 39/22
**12,000 [2]** 98/3 156/6
**12th [1]** 166/4
**13 [1]** 70/8
**13:03 [2]** 143/7 143/10
**13:20 [1]** 143/8
**14 [1]** 55/25
**14th [1]** 53/20
**15 [1]** 80/2
**15 feet [1]** 144/6
**15th [5]** 170/11 170/13 170/22 172/6 172/17
**16-year [1]** 136/3
**17 [4]** 25/3 25/5 79/5 79/7
**17th [2]** 27/2 91/20
**18A [4]** 131/23 131/24 131/25 138/20
**18B [5]** 136/16 136/18 142/7 143/10 143/13
**18C [2]** 138/16 138/17
**19 [1]** 54/5
**1999 [2]** 154/9 154/10
**1st [4]** 61/21 109/25 130/12 136/24

**2**

**20 [7]** 78/8 78/23 79/1 96/18 96/19 137/7 172/1
**2010 [1]** 154/7
**2011 [2]** 10/11 14/6
**2016 [11]** 9/25 24/21 35/24 36/15 40/20 45/22 46/1 46/14 54/5 117/1 117/10
**2017 [20]** 10/5 11/16 20/17 27/2 35/20 37/2 37/3 46/21 57/18 86/24 87/11 90/11 91/20 95/21 98/25 99/1 117/1 117/10 121/12 123/23
**2018 [1]** 13/25
**2019 [28]** 53/9 53/20 55/25 58/15 61/14 61/21 61/24 62/2 97/18 97/20 98/20 98/25 98/25 101/9 108/8 108/10 108/12 121/15 122/9 123/1 123/6 123/10 124/8 125/16 155/5 155/10 156/2 156/13
**2020 [2]** 62/5 101/9
**2021 [1]** 70/15
**2022 [3]** 1/5 110/5 132/3
**21st [1]** 58/15
**21th [1]** 70/15
**22 [3]** 54/19 54/21 55/1
**22-CV-1032 [2]** 1/2 2/3
**22nd [1]** 170/11
**25 [2]** 62/11 91/8
**25 percent [2]** 39/15 39/17

**26-2 [1]** 92/6
**27 [2]** 62/21 154/21
**2777 [1]** 1/20
**2795 [1]** 1/21
**29 [1]** 92/5
**2:00 [1]** 1/5

**3**

**30 [2]** 140/11 142/6
**3000 [1]** 1/13
**35 [1]** 126/21
**3500 [1]** 126/21
**3W8 [1]** 1/13

**4**

**40 [3]** 1/17 79/14 128/22
**40 percent [1]** 11/23
**40-year [1]** 15/25
**47 [1]** 154/6
**49th [1]** 1/17
**4:35 [1]** 126/3

**5**

**50 percent [2]** 39/13 39/22
**509471 [1]** 154/9
**5:30 [2]** 135/10 153/15

**6**

**60 [1]** 120/20
**608 [1]** 127/8
**611 [1]** 24/5
**626 [1]** 154/6

**7**

**70 percent [2]** 11/17 33/3
**718 [2]** 1/20 1/21

**8**

**80 [1]** 120/20
**804-2777 [1]** 1/20
**804-2795 [1]** 1/21
**85 percent [1]** 78/13
**8th [6]** 61/24 170/6 170/8 170/9 172/15 172/16

**9**

**92 [1]** 174/24
**99 percent [1]** 101/20

**A**

**ABDULRAHIM [1]** 1/6
**ability [1]** 72/12
**able [17]** 13/3 13/3 13/21 13/23 16/8 17/1 24/16 112/3 118/21 119/4 119/7 119/10 126/8 130/3 138/18 157/4 158/5
**absolute [1]** 59/3
**absolutely [13]** 35/17 42/17 42/21 42/24 43/19 74/16 75/13 85/24 86/12 118/24 119/6 146/24 167/25
**accept [4]** 18/16 112/3 112/3 140/14
**accepted [1]** 13/10
**access [4]** 10/15 12/7 12/24 138/5
**accident [1]** 55/8
**according [3]** 83/7 83/18 106/5
**account [13]** 42/5 42/8 42/14 61/15

**61/22 62/3 62/6 100/17 100/18 100/21 118/23 119/4 119/5
**accountant [1]** 96/2
**accounting [1]** 160/21
**accounts [4]** 13/13 17/23 42/7 42/15
**accurate [3]** 97/15 101/20 133/16
**accurately [1]** 68/18
**accusation [2]** 106/2 108/5
**accused [3]** 5/18 106/17 106/21
**achieve [1]** 111/19
**acknowledging [1]** 154/23
**acquainted [1]** 98/8
**acquired [4]** 91/14 91/14 100/18 100/21
**acronym [1]** 29/1
**Act [1]** 168/8
**acting [4]** 22/1 22/1 22/5 22/16
**action [2]** 110/24 165/6
**activities [1]** 130/23
**activity [1]** 136/1
**actual [2]** 148/16 157/16
**Adam [156]** 10/9 10/10 10/14 10/23 11/4 11/5 11/11 11/13 11/24 12/16 13/6 13/7 13/8 13/11 13/13 13/21 14/9 14/10 14/11 14/21 15/3 15/3 15/4 16/16 18/11 19/4 19/22 22/19 30/9 30/11 30/14 30/17 31/1 31/9 31/15 31/22 32/2 32/4 32/9 32/16 33/6 33/21 34/10 34/23 35/3 35/5 35/8 35/11 35/14 35/19 35/22 35/24 36/2 36/12 36/21 36/24 37/4 37/9 37/10 37/13 37/18 37/23 39/25 40/14 41/8 41/12 42/6 42/15 43/2 43/8 43/14 46/13 47/10 47/19 47/20 48/4 50/19 50/22 51/1 51/8 53/3 53/6 53/9 53/18 54/1 54/5 55/22 56/25 57/4 57/8 57/12 58/12 60/7 60/15 60/20 61/4 61/14 61/17 61/21 61/25 62/3 62/6 65/4 65/7 73/18 73/21 73/24 74/2 74/5 74/8 74/11 74/14 74/17 75/1 75/11 84/10 84/13 84/20 84/24 85/2 85/6 85/14 85/16 85/25 86/8 86/10 86/23 99/18 116/3 116/5 116/7 116/10 116/22 118/23 119/5 119/13 120/5 120/10 121/14 122/8 122/9 122/10 130/3 132/17 132/20 132/24 137/20 139/1 139/6 139/15 140/9 141/19 141/19 143/25 150/23 153/21
**Adam's [1]** 73/14
**add [1]** 151/16
**addition [1]** 96/12
**additional [6]** 121/14 132/16 134/12 164/12 164/14 166/5
**address [10]** 59/2 60/8 112/9 129/6 138/7 153/10 156/25 158/10 162/14 165/2
**addressed [1]** 171/14
**addresses [1]** 58/18
**addressing [1]** 6/15
**admission [5]** 2/23 60/1 130/13 150/10 154/2
**admission-seeking [2]** 130/13 150/10
**admissions [1]** 16/4
**admit [2]** 60/3 135/4
**admitted [19]** 55/15 56/16 58/5 60/10 61/1 62/22 68/2 69/8 120/9 131/24

**A**

**admitted... [9]**  133/20 136/17 138/14 138/15 146/3 154/13 156/16 157/4 171/17
**adopt [1]**  77/19
**advantage [4]**  9/20 11/6 11/25 38/11
**adverse [2]**  59/21 60/11
**advice [7]**  27/14 71/11 71/16 72/25 81/22 81/23 124/22
**advocate [1]**  73/2
**advocates [1]**  93/4
**affecting [1]**  84/7
**affidavit [15]**  5/23 21/21 21/24 25/2 79/4 79/5 91/8 91/8 91/9 111/13 114/6 116/16 117/11 126/10 171/25
**affidavits [2]**  112/12 126/14
**affirm [1]**  128/5
**affirmed [3]**  23/15 128/3 128/12
**after [35]**  14/17 15/24 16/9 39/25 40/3 40/16 42/5 42/13 43/1 43/1 43/12 43/13 50/18 50/21 52/10 52/16 53/23 54/1 68/13 68/16 69/12 71/17 75/10 87/1 95/22 97/5 97/6 97/22 117/7 123/24 145/12 145/13 147/24 150/23 167/21
**afternoon [12]**  2/7 2/10 2/12 2/16 2/20 3/4 24/10 128/15 130/15 144/22 144/23 144/23
**afterward [1]**  129/7
**against [21]**  1/5 13/15 14/25 16/4 25/12 111/20 113/1 114/3 114/7 114/9 114/21 122/20 139/16 139/18 140/18 140/19 141/6 141/16 141/16 157/23 166/19
**agent [1]**  22/2
**agents [1]**  164/11
**ago [1]**  114/1
**agree [5]**  6/21 28/12 76/8 147/25 164/5
**agreed [3]**  50/7 130/11 148/21
**agreeing [2]**  162/8 165/7
**agreement [4]**  14/19 97/12 124/25 165/4
**agrees [1]**  5/10
**ahead [55]**  2/19 20/20 22/9 24/3 32/7 34/8 34/18 35/1 38/13 41/11 45/18 50/17 52/9 53/15 56/23 57/23 58/6 58/10 60/13 61/12 66/9 66/25 68/19 69/9 69/24 73/13 77/2 77/18 78/2 79/17 85/15 87/17 89/8 89/15 90/13 91/11 92/19 93/13 97/10 98/4 103/12 108/18 109/3 109/17 111/7 129/8 132/6 133/21 134/1 135/4 135/7 138/12 141/23 152/1 164/13
**aided [1]**  1/24
**al [2]**  1/6 2/4
**Albert [1]**  143/21
**Alex [5]**  66/21 94/24 105/20 106/20 106/22
**Alexander [1]**  66/14
**allegation [4]**  17/6 59/3 111/20 161/4
**allegations [5]**  18/8 18/16 112/9 112/23 113/1
**allege [1]**  171/1
**alleged [9]**  5/1 108/21 112/23 114/19 128/24 129/15 129/16 130/18 130/18

**allegedly [4]**  5/9 149/4 169/8 169/15
**alleging [1]**  170/22
**allow [4]**  60/10 65/11 65/22 167/13
**allowed [8]**  30/3 115/24 151/1 154/4 155/21 155/22 157/21 159/22
**allowing [2]**  127/21 151/16
**alluded [1]**  153/23
**almost [2]**  112/7 130/3
**alone [1]**  11/9
**always [3]**  13/21 84/16 84/21
**am [8]**  3/15 122/5 129/11 131/7 153/7 154/3 158/11 164/23
**amenable [1]**  173/10
**Amendment [1]**  17/12
**American [4]**  9/4 9/5 9/11 9/16
**amount [7]**  5/12 12/25 15/11 78/4 137/4 157/5 166/17
**analysis [6]**  159/18 159/19 159/22 159/24 161/10 162/25
**analyst [1]**  159/20
**angry [1]**  69/3
**another [12]**  14/12 55/22 58/12 66/5 89/19 89/22 94/5 106/4 141/10 148/10 165/14 169/21
**answer [9]**  24/17 28/13 45/10 52/14 71/3 78/19 78/20 139/10 149/9
**answered [1]**  24/12
**Anthony [2]**  39/21 90/6
**anticipate [2]**  15/20 21/18
**anticipated [1]**  14/2
**anymore [1]**  38/20
**anyway [4]**  5/5 5/21 37/6 146/2
**apologetic [1]**  151/23
**apologies [1]**  134/3
**apologize [3]**  4/1 66/10 105/12
**apparently [2]**  132/19 146/14
**appear [1]**  62/14
**appearances [2]**  1/12 2/5
**appeared [1]**  12/5
**appears [3]**  62/11 140/17 155/13
**apply [1]**  166/7
**appointment [1]**  20/4
**appreciate [5]**  6/11 15/10 63/13 161/8 161/10
**appreciates [1]**  161/9
**approach [6]**  23/4 55/19 56/22 87/23 90/14 166/18
**approached [3]**  87/25 88/2 88/3
**appropriate [3]**  158/14 158/15 160/21
**approximately [1]**  137/7
**April [11]**  1/5 13/25 35/20 35/25 46/21 57/18 166/4 170/6 170/8 170/9 172/6
**April 12th [1]**  166/4
**April 15th [1]**  172/6
**April 2017 [1]**  57/18
**April 8th [3]**  170/6 170/8 170/9
**April of [1]**  35/25
**area [4]**  8/15 8/21 38/8 101/19
**argue [3]**  18/14 22/18 77/23
**arguing [1]**  159/3
**argument [5]**  19/12 159/4 161/20 162/15 169/23
**around [9]**  9/15 46/21 78/25 94/15 97/25 98/20 98/20 101/10 117/1
**arrange [2]**  11/3 37/9

**arrangement [1]**  156/8
**arrest [2]**  147/7 147/9
**arrive [1]**  144/20
**Articles [2]**  91/16 91/17
**as a [1]**  49/14
**assessing [1]**  112/14
**assignment [1]**  64/21
**assist [2]**  11/11 148/5
**assistance [1]**  130/21
**assisting [1]**  149/15
**associate [1]**  2/23
**Associates [6]**  40/17 42/9 43/13 93/20 106/5 119/4
**assume [6]**  34/22 66/1 102/25 118/25 122/17 163/10
**assumed [1]**  34/23
**assuming [2]**  28/12 71/10
**attached [3]**  20/18 54/7 56/4
**attachment [1]**  54/4
**attachments [1]**  86/4
**attempted [2]**  111/14 113/16
**attended [1]**  29/12
**attention [3]**  49/24 135/23 136/8
**attire [1]**  93/7
**attorney [33]**  1/13 1/16 10/13 10/21 12/18 20/23 20/23 24/16 26/21 29/3 38/18 43/21 43/25 45/6 45/14 54/10 58/21 58/25 67/6 70/22 82/6 82/8 105/25 105/25 106/3 106/4 106/22 107/2 107/2 124/22 154/14 160/16 170/18
**attorney's [3]**  29/7 53/1 168/7
**attorneys [14]**  39/8 59/12 72/15 88/13 93/8 96/19 101/18 101/21 106/3 115/23 150/9 152/17 152/17 167/14
**attracted [1]**  81/13
**audible [1]**  134/16
**audience [3]**  8/15 8/21 38/8
**audio [13]**  131/3 132/7 132/9 132/13 136/12 136/21 137/11 137/14 138/4 142/9 143/14 152/7 152/25
**Audiotape [3]**  143/1 143/4 143/11
**August [2]**  58/15 61/21
**August 1st [1]**  61/21
**August 21st [1]**  58/15
**authenticate [1]**  65/23
**authority [1]**  159/18
**available [1]**  15/2
**Avenue [1]**  1/13
**averred [1]**  25/2
**avoid [1]**  4/11
**aware [5]**  3/5 25/11 33/6 108/5 140/10
**away [4]**  28/10 44/1 87/2 149/5

**B**

**baby [1]**  86/5
**back [15]**  6/10 12/16 20/17 43/10 59/13 67/15 71/6 134/2 134/5 136/7 139/5 143/3 143/7 148/23 162/11
**backup [1]**  141/12
**badly [1]**  165/7
**balance [1]**  78/1
**ball [1]**  150/7
**bank [16]**  10/1 10/2 24/22 24/25 25/3 25/5 25/9 25/11 25/13 25/16 25/20

**B**

**bank...** [5] 31/20 48/8 81/9 81/10 115/10
**bank's** [2] 25/12 25/18
**banker** [1] 10/1
**banking** [4] 10/4 29/20 155/19 155/23
**banks** [2] 79/8 81/19
**barely** [5] 41/16 136/20 137/17 137/23 137/24
**bargaining** [1] 170/19
**based** [15] 6/21 10/18 13/20 17/16 59/22 59/24 60/11 103/7 106/10 119/17 135/4 157/21 163/19 168/20 169/15
**basically** [8] 12/4 19/2 20/17 101/17 102/20 106/20 106/21 131/3
**basis** [2] 21/19 136/5
**bathroom** [1] 133/25
**battles** [1] 15/1
**bear** [1] 18/17
**became** [4] 10/18 10/20 11/23 49/3
**began** [2] 41/12 145/15
**begged** [2] 37/24 37/24
**begging** [2] 17/22 31/20
**begin** [2] 98/19 158/21
**beginning** [10] 93/2 98/25 148/9 150/17 151/20 153/24 155/11 155/17 160/8 161/6
**behalf** [2] 2/21 147/20
**behavior** [1] 59/13
**behest** [1] 22/2
**behind** [2] 144/1 144/9
**behoove** [1] 125/17
**Belcher** [4] 143/21 144/11 144/13 144/16
**belonged** [2] 19/13 19/19
**bend** [2] 26/24 28/15
**Bender** [1] 54/5
**benefit** [4] 74/25 86/23 93/9 103/5
**best** [9] 3/6 37/10 46/10 83/5 91/21 91/23 102/17 104/15 166/14
**betray** [1] 69/15
**betrayed** [1] 69/14
**better** [12] 13/16 96/14 105/25 107/2 118/20 119/8 119/10 138/8 138/11 159/13 166/1 172/11
**Betts** [1] 1/20
**between** [16] 9/6 9/14 30/14 37/9 39/18 63/18 65/24 66/13 68/8 98/25 123/23 137/5 137/6 137/7 138/21 162/1
**bias** [1] 114/13
**big** [2] 156/5 162/24
**biggest** [1] 12/24
**bill** [1] 73/21
**binder** [3] 63/15 90/18 171/9
**bit** [4] 7/2 78/3 107/13 127/18
**black** [1] 19/11
**blackmail** [1] 11/7
**blame** [1] 19/18
**blind** [1] 7/2
**block** [4] 93/5 93/5 96/18 96/20
**body** [1] 9/15
**book** [2] 20/3 98/14
**booked** [2] 100/19 100/25
**bookkeeper** [1] 96/2

**boss** [3] 43/5 81/18 85/18
**bottom** [5] 54/20 54/22 54/25 64/19 120/10
**bought** [5] 14/5 43/1 97/25 108/8 156/3
**bounds** [1] 9/18
**Box** [2] 138/3 138/6
**bragged** [1] 75/18
**branch** [1] 80/2
**branches** [2] 79/11 79/12
**brand** [1] 16/24
**breadth** [1] 172/5
**break** [4] 25/23 32/14 57/9 134/4
**breaks** [1] 9/21
**bribe** [1] 9/20
**bribery** [5] 11/7 13/20 15/6 75/1 129/16
**bribing** [2] 74/14 74/17
**Brida** [2] 39/21 90/6
**brief** [17] 3/10 15/18 17/4 157/15 159/15 160/2 162/18 165/11 165/14 165/17 165/20 166/6 166/13 167/18 168/14 170/10 170/22
**briefed** [1] 129/19
**briefing** [12] 6/17 158/22 160/2 161/25 166/17 166/23 167/16 169/4 169/20 170/10 170/14 172/10
**briefly** [3] 21/18 110/19 159/15
**bright** [1] 123/23
**bring** [4] 11/13 79/20 79/21 82/7
**bringing** [3] 43/22 135/22 155/1
**brings** [1] 38/1
**broad** [2] 157/1 169/19
**Brooklyn** [1] 1/4 76/3
**brought** [11] 31/20 46/2 46/4 46/8 80/1 81/24 82/17 90/5 97/21 100/23 100/24
**Bruce** [1] 26/20
**brung** [1] 38/9
**brush** [1] 141/6
**bud** [1] 166/15
**bugging** [1] 46/3
**build** [5] 13/25 16/23 47/10 86/6 145/17
**built** [5] 17/25 18/2 18/15 21/1 101/21
**bullet** [2] 54/15 55/3
**business** [175] 5/23 9/17 9/18 9/19 9/21 10/5 10/12 10/19 10/21 11/9 11/14 11/20 12/3 12/5 12/17 12/21 13/4 14/4 14/14 14/18 14/18 14/23 16/23 16/24 17/17 17/18 17/23 17/25 18/2 18/15 18/22 18/23 18/24 19/5 19/15 20/6 20/17 20/22 21/2 21/7 25/12 25/19 26/2 27/3 27/6 27/9 27/11 27/14 27/19 28/2 28/5 28/21 29/24 31/25 32/5 32/9 32/10 32/11 32/24 32/25 33/4 34/20 35/3 35/6 35/22 36/21 36/24 37/4 37/6 38/1 38/22 39/2 39/10 39/25 40/3 40/4 40/5 40/16 43/11 43/16 46/10 47/11 48/17 49/3 49/8 49/21 50/10 50/12 50/24 51/22 51/25 52/2 52/4 52/4 52/4 54/2 62/3 62/6 71/25 72/1 72/3 78/15 79/19 79/20 79/21 81/6 81/11 81/14 81/20 81/21 81/24 82/2 82/4 82/16 83/8 84/14 84/25 85/3 85/19 86/6 87/2 87/7 87/9

89/11 89/13 91/15 92/25 93/7 96/12 96/13 99/4 102/11 102/13 107/10 107/11 107/16 108/16 109/11 109/12 115/5 116/1 116/11 116/14 116/23 117/14 117/24 118/1 118/5 118/16 123/2 123/11 123/13 124/6 124/9 124/15 145/18 145/18 146/4 153/22 153/22 155/19 155/20 155/21 156/3 156/11 156/13 156/18 157/11 157/13 157/14 158/15 158/19 161/9 170/3 172/2
**business's** [1] 10/15
**businesses** [3] 9/14 9/16 21/6
**busy** [3] 86/5 116/20 116/21
**buy** [5] 14/20 43/2 96/25 97/3 97/7
**buying** [1] 156/1

**C**

**C-H-E-R-N-Y** [1] 66/24
**C-I-C-C-I-O-N-E** [1] 93/23
**C-I-C-C-O-N-E** [1] 93/22
**calculated** [2] 100/20 100/21
**calendar** [1] 95/11
**call** [48] 8/1 8/2 8/3 8/4 13/6 15/22 17/7 17/7 19/25 22/25 88/24 115/1 126/7 127/23 130/16 130/17 130/17 130/18 130/21 130/24 132/18 132/19 132/20 132/21 132/21 132/22 133/8 133/10 133/12 133/16 133/17 134/15 134/18 134/23 137/6 137/8 140/17 140/23 140/25 141/6 141/8 141/18 141/19 141/25 147/25 148/15 148/21 156/12
**called** [26] 4/11 7/13 10/11 14/9 15/3 20/5 23/14 27/3 28/5 48/5 50/21 87/9 88/23 89/9 89/10 98/14 101/16 104/20 107/13 128/11 129/9 134/19 145/19 148/14 161/1 171/8
**calling** [7] 3/18 7/17 7/20 7/25 15/24 99/11 126/5
**calls** [13] 4/6 22/13 23/2 26/6 85/9 89/18 89/20 89/21 90/4 102/25 120/25 133/11 153/1
**campaign** [1] 11/6
**cannot** [9] 41/14 41/15 59/6 70/24 71/8 71/14 71/16 72/25 169/5
**capacity** [1] 10/14
**car** [1] 78/22
**care** [8] 77/5 77/6 77/7 77/10 77/12 77/14 77/16 131/5
**cared** [1] 77/8
**carefully** [1] 41/20
**Carlos** [26] 16/10 16/10 16/12 63/18 63/22 64/1 64/16 64/23 68/9 69/3 97/2 98/6 98/11 98/14 98/15 100/3 100/5 100/5 100/13 107/23 108/1 108/1 111/9 120/16 120/22 171/25
**Carlos'** [1] 100/2
**carriers** [1] 51/5
**carrot** [1] 11/7
**case** [21] 3/19 15/15 15/17 16/3 18/7 82/5 82/11 87/9 87/19 93/4 114/9 125/25 152/12 152/16 153/5 153/6 153/8 154/7 154/10 157/24 169/19
**cases** [8] 12/20 82/18 82/20 83/15

# C

**cases...** [4]  88/13 115/23 154/5 154/11
**cash** [4]  11/18 35/15 87/9 87/20
**caught** [2]  49/24 76/9
**caught that** [1]  76/9
**cause** [2]  1/9 2/2
**caused** [3]  13/12 14/10 14/12
**CCR** [1]  1/20
**central** [1]  6/9
**century** [1]  161/3
**certain** [4]  5/11 6/4 6/8 72/13
**certainly** [6]  5/10 6/8 22/12 149/24 153/19 156/21
**chain** [2]  9/25 66/13
**chair** [1]  144/10
**chairs** [1]  144/1
**challenge** [1]  154/20
**challenged** [2]  127/16 127/17
**chance** [6]  40/19 112/18 165/14 167/1 171/3 172/9
**changed** [1]  11/22
**character** [3]  127/7 127/16 127/17
**characterization** [3]  113/20 113/23 140/15
**characterized** [1]  3/6
**charge** [4]  73/24 75/25 104/8 104/8
**charges** [1]  17/13
**chase** [1]  15/12
**check** [2]  60/9 144/21
**CHEN** [1]  1/10
**Cherny** [10]  66/14 66/22 66/23 67/12 67/18 94/24 105/7 105/20 106/20 106/22
**Cherny's** [2]  106/25 107/11
**chief** [1]  3/19
**child** [1]  141/21
**children** [9]  8/12 8/13 77/3 77/4 77/7 77/13 77/19 78/23 81/17
**choice** [1]  105/3
**chose** [1]  16/14
**Ciccione** [3]  93/20 94/2 94/7
**circuit** [3]  6/20 15/15 154/6
**circumstances** [2]  6/19 105/18
**cite** [1]  154/5
**cited** [1]  154/8
**cites** [1]  154/10
**City** [2]  101/19 154/6
**civil** [4]  1/9 2/2 6/2 18/7
**claim** [6]  21/19 27/16 112/10 114/7 114/21 165/1
**claims** [6]  18/9 77/22 83/11 114/3 165/5 166/19
**clarification** [2]  72/2 95/2
**clarify** [2]  18/20 158/21
**CLE** [2]  96/14 96/16
**clear** [10]  82/3 124/3 147/4 147/4 151/22 154/22 157/23 162/5 163/22 166/3
**cleared** [1]  8/21
**clearly** [1]  134/24
**clerk** [1]  2/23
**clerk/associate** [1]  2/23
**clever** [1]  43/3
**client** [41]  2/23 12/24 13/2 13/12 15/6

18/5 19/4 20/2 20/2 22/19 22/20 40/11 40/17 40/23 48/8 53/1 59/1 66/22 81/6 81/8 87/5 100/25 104/21 105/24 106/8 106/21 106/25 107/1 111/13 111/16 112/3 114/16 117/17 135/18 147/20 157/18 161/9 166/8 166/10 172/2 172/3
**client's** [6]  3/1 5/17 13/15 19/23 103/25 122/6
**clients** [50]  9/21 13/17 18/6 21/9 36/3 36/12 44/1 50/6 67/5 67/14 67/18 87/21 88/11 88/14 90/9 92/14 93/2 93/16 94/20 96/24 99/6 99/7 100/23 100/24 101/12 102/14 102/18 104/8 104/13 105/3 106/3 110/16 129/23 129/23 130/5 145/10 145/17 145/21 146/1 146/3 146/10 148/12 148/17 158/3 159/11 165/8 169/24 170/24 171/2 171/20
**close** [8]  24/1 79/8 90/8 94/3 99/10 99/12 152/16 161/9
**closed** [1]  153/8
**cloth** [1]  140/19
**clue** [1]  126/12
**co** [5]  2/25 130/18 130/18 130/19 148/1
**co-conspirator** [1]  148/1
**co-conspirators** [2]  130/18 130/19
**co-workers** [1]  2/25
**coach** [1]  59/6
**coached** [1]  93/7
**coaching** [1]  59/3
**coat** [1]  135/21
**code** [1]  96/19
**coercion** [1]  75/2
**coincide** [1]  156/2
**coincided** [1]  156/14
**cold** [3]  96/22 99/11 120/25
**colleague** [2]  145/2 149/11
**collusion** [1]  112/24
**coming** [5]  15/1 51/6 110/14 132/19 141/4
**comma** [1]  68/16
**commercial** [1]  17/8 129/16
**communicate** [2]  8/17 58/25
**communicating** [1]  58/21
**communication** [1]  164/8
**communications** [1]  26/4
**community** [1]  127/10
**companies** [14]  20/19 21/5 21/5 21/10 101/11 101/23 102/1 102/18 102/20 104/11 104/16 104/16 104/25 105/1
**companion** [10]  51/23 52/6 73/12 96/8 98/7 98/18 106/18 106/21 106/24 107/17
**Companion's** [1]  118/22
**companions** [72]  2/22 14/19 16/11 19/13 19/24 30/6 34/20 43/17 45/21 50/6 50/18 50/21 52/10 52/16 62/6 64/3 64/7 64/10 66/13 70/1 70/5 70/11 70/18 72/3 72/15 75/4 75/7 75/17 75/19 78/6 78/11 78/13 79/1 85/8 87/23 88/9 88/22 91/4 92/12 96/1 98/12 98/13 98/15 98/19 102/23 104/12 105/21 105/24 106/15 106/17 107/23 108/11 108/14 108/22 108/25 109/5 110/15 115/5

115/12 115/25 119/23 119/24 121/12 130/9 130/17 153/23 157/3 158/3 158/14 158/19 159/12 172/4
**Companions -- withdrawn** [1]  119/23
**Companions'** [1]  109/11
**company** [49]  10/11 12/15 12/20 19/3 19/14 19/23 20/24 21/8 21/15 21/16 30/24 31/2 33/20 34/13 41/6 43/2 48/24 72/9 73/7 85/7 87/20 90/16 91/22 92/9 95/23 101/6 101/7 101/16 101/17 102/7 103/10 104/12 104/20 104/25 105/3 105/20 107/15 107/22 109/24 112/24 118/8 119/24 123/24 125/11 129/9 129/12 149/2 154/7 155/21
**company's** [1]  97/19
**compensable** [1]  169/7
**compete** [2]  9/17 102/18
**competing** [15]  9/14 10/20 14/7 32/10 32/24 32/25 33/4 35/3 38/15 38/22 54/2 116/11 116/13 118/16 156/18
**competition** [4]  9/5 9/6 9/14 9/15
**competitor** [7]  9/19 9/20 12/15 94/14 130/8 149/5 155/22
**competitor's** [2]  99/7 99/13
**competitors** [4]  14/3 19/9 99/15 129/20
**complaint** [7]  110/6 110/21 110/23 111/10 111/12 112/10 164/25
**complete** [1]  12/4
**completed** [1]  150/5
**completely** [1]  145/24
**compliance** [1]  13/10
**complicit** [1]  16/14
**complied** [2]  13/9 15/4
**comply** [2]  42/19 112/4
**components** [1]  130/20
**compound** [3]  25/22 32/12 67/20
**computer** [2]  1/24 150/13
**computer-aided** [1]  1/24
**concede** [2]  74/5 117/17
**conceded** [1]  161/5
**concern** [2]  13/4 122/12
**concerned** [1]  122/5
**concerning** [5]  70/10 70/19 70/25 71/8 71/17
**conclude** [1]  153/16
**concluded** [1]  173/15
**concludes** [1]  172/24
**conclusion** [2]  15/13 135/10
**conditioned** [1]  30/13
**conditions** [1]  55/7
**conduct** [6]  16/1 22/5 129/15 129/24 130/10 163/19
**conducted** [2]  145/9 150/8
**confess** [1]  130/14
**confessed** [5]  130/14 139/1 139/6 146/15 147/24
**confession** [1]  130/16
**confidential** [16]  52/11 52/17 52/23 52/25 53/7 54/10 56/12 124/9 124/14 129/22 130/6 153/20 154/19 155/18 155/20 168/23
**confidentiality** [1]  160/24
**confidentially** [1]  8/17
**confirm** [3]  24/4 48/15 49/2

**C**

**confirmed** [1]  13/14
**conflict** [1]  25/15
**confronted** [1]  16/19
**connected** [1]  131/17
**connection** [3]  29/16 65/10 69/1
**consenting** [1]  162/13
**consider** [8]  83/25 84/2 84/8 89/4
 154/4 154/16 154/17 158/12
**considerably** [1]  4/18
**considered** [1]  156/16
**consistently** [1]  14/22
**conspiracy** [2]  130/19 130/20
**conspirator** [1]  148/1
**conspirators** [2]  130/18 130/19
**constantly** [1]  35/8
**constitute** [1]  25/15
**construe** [2]  73/1 73/12
**consult** [2]  99/3 99/6
**consultation** [3]  71/18 72/4 73/8
**consulting** [6]  70/19 70/24 71/8 71/14
 71/17 115/23
**contact** [12]  13/16 36/2 36/10 36/11
 60/21 61/7 98/14 101/20 135/17 135/18
 162/9 162/13
**contacted** [3]  14/21 39/25 50/19
**contacting** [2]  41/12 42/6
**contacts** [2]  99/10 101/22
**contain** [1]  52/20
**contained** [2]  60/16 60/21
**contains** [2]  56/11 58/17
**contents** [2]  150/18 150/22
**context** [2]  125/7 161/11
**continue** [3]  13/3 107/10 169/11
**continued** [9]  27/11 44/5 45/19 80/4
 81/1 110/7 114/24 142/10 143/15
**continuing** [3]  30/13 143/2 150/8
**continuous** [1]  25/5
**contract** [1]  104/13
**contractor** [1]  120/17
**contractors** [2]  109/10 115/13
**contracts** [3]  104/18 108/22 108/23
**control** [4]  51/19 51/23 51/24 52/3
**controlled** [4]  130/16 130/17 148/15
 152/4
**conventions** [1]  101/2
**conversation** [6]  134/16 137/19 142/1
 148/9 163/7 166/13
**conversations** [3]  85/7 135/6 149/11
**convinced** [1]  11/13
**cooperate** [2]  13/21 13/23
**cooperated** [1]  11/20
**cooperating** [1]  158/4
**cooperation** [2]  16/7 16/18
**cooperative** [1]  151/22
**copied** [1]  53/3
**copy** [6]  90/22 92/5 137/21 149/17
 160/1 160/5
**corporation** [2]  91/4 154/8
**correct** [316]  3/15 3/22 3/24 5/2 5/4
 18/20 22/8 22/23 24/22 24/25 25/3 25/6
 25/9 25/13 25/16 25/20 26/4 26/5 26/6
 26/8 26/10 26/12 26/15 26/21 27/4 27/7
 27/9 27/12 27/16 27/20 28/2 28/6 28/22

29/1 29/3 29/6 29/15 29/17 29/18 29/20
 30/6 30/7 30/10 30/11 30/15 30/18
 30/21 30/24 31/3 31/23 32/3 32/6 32/11
 32/17 32/21 32/22 33/8 33/9 33/11
 34/24 34/25 35/6 35/9 35/12 35/16
 35/19 35/21 35/22 35/25 36/3 36/22
 37/2 37/7 37/8 37/11 37/14 37/16 37/17
 37/19 38/16 38/17 38/18 38/20 38/23
 39/3 39/5 39/7 39/8 39/9 39/11 39/12
 39/13 39/14 39/15 39/16 40/1 40/9
 40/10 40/12 40/13 40/14 40/17 40/20
 40/21 41/5 41/9 41/10 42/7 42/12 43/8
 43/18 43/21 43/22 44/2 45/23 46/18
 47/22 48/18 50/2 50/3 50/14 50/16
 50/24 51/9 52/11 52/18 52/21 52/24
 53/4 53/7 53/10 53/18 53/21 53/22
 53/24 53/25 54/2 54/3 54/5 54/8 54/9
 54/11 54/12 54/17 55/5 55/6 55/7 55/23
 55/25 56/1 56/2 56/5 56/6 57/1 57/22
 58/13 58/15 58/18 60/18 60/23 61/5
 61/15 61/18 61/22 61/25 62/3 62/7
 63/18 63/20 63/23 64/1 64/4 64/7 64/10
 64/20 64/23 65/5 65/7 66/14 67/2 67/3
 67/7 67/12 67/15 67/16 67/18 68/9
 68/10 68/20 68/22 69/1 69/2 69/4 70/1
 70/2 70/5 70/6 70/11 70/13 70/16 70/20
 70/22 70/23 70/25 71/9 71/11 71/12
 71/13 71/15 71/16 71/18 71/23 72/16
 72/17 72/19 72/20 72/23 73/16 73/17
 73/19 73/20 73/22 73/23 73/25 74/1
 74/3 74/4 74/6 74/7 74/9 74/12 74/15
 74/19 74/21 75/2 75/5 75/8 75/12 75/15
 75/23 75/24 76/1 76/2 76/6 81/1 81/12
 83/23 85/1 86/1 86/2 88/16 88/18 92/23
 92/24 93/25 95/24 98/16 100/24 103/8
 103/22 103/25 106/23 107/25 108/9
 109/6 109/7 115/6 115/10 115/13
 115/14 115/16 115/17 115/19 115/20
 116/1 116/2 116/3 116/5 116/8 116/9
 116/11 116/12 116/14 116/25 117/5
 117/6 117/8 117/15 117/18 117/22
 117/23 118/6 118/9 118/23 119/5 119/8
 119/11 119/25 120/6 120/11 120/14
 120/17 120/20 121/1 121/5 121/12
 123/21 125/12 132/5 137/23 138/22
 145/5 145/23 153/2 163/13 166/24
**corresponding** [1]  12/25
**cost** [3]  159/23 159/25 173/9
**counsel** [9]  8/16 66/15 151/4 153/23
 157/4 163/5 166/13 168/16 172/21
**Counselor** [1]  105/12
**counterclaim** [2]  2/18 112/19
**counterclaims** [1]  111/12
**counterproductive** [1]  140/23
**couple** [6]  112/7 138/23 151/5 154/5
 156/24 169/21
**course** [5]  10/10 28/4 32/19 52/24
 167/23
**court** [38]  1/1 1/20 2/1 4/1 6/19 6/22
 6/23 9/3 9/8 16/5 16/13 16/16 36/9
 41/15 56/19 64/12 65/2 76/23 78/10
 79/6 79/25 83/25 91/3 95/2 115/5 115/9
 116/24 135/15 156/19 159/17 159/21
 159/23 160/3 162/21 163/1 163/6
 164/15 171/12

**court's** [2]  131/18 135/23
**Courthouse** [1]  1/3
**courtroom** [4]  7/10 128/4 141/22
 142/2
**courts** [2]  9/5 9/11
**covers** [1]  75/19
**cow** [1]  162/15
**crafting** [1]  158/12
**create** [3]  74/2 101/6 157/24
**created** [1]  101/4
**credibility** [3]  112/14 114/12 127/7
**credible** [2]  155/13 163/15
**credit** [3]  139/14 155/14 155/24
**crew** [1]  38/1
**crime** [4]  5/19 161/3 161/3 161/4
**crimes** [1]  128/24
**criminal** [1]  17/12
**criminally** [1]  13/22
**critical** [1]  134/18
**cross** [13]  4/6 76/22 80/5 114/10
 126/13 127/1 131/5 131/15 135/13
 138/2 140/1 140/6 143/15
**CROSS-EXAMINATION** [5]  76/22 80/5
 140/1 140/6 143/15
**crying** [2]  141/22 146/17
**cued** [1]  140/16
**curious** [1]  31/13
**current** [6]  34/20 54/16 55/4 164/8
 171/7 171/20
**currently** [2]  82/22 110/12
**customer** [24]  12/24 13/1 24/24 25/19
 35/24 36/3 36/14 36/17 40/20 42/6
 42/15 48/19 48/22 49/13 64/3 64/6 64/9
 99/23 117/18 117/21 117/25 118/22
 119/16 119/18
**customers** [34]  25/13 36/14 43/16
 43/20 43/24 45/4 45/15 45/15 45/21
 45/22 46/15 47/2 49/12 50/12 56/24
 73/19 73/21 73/25 74/3 118/6 118/8
 118/14 119/7 119/25 120/11 121/3
 168/22 169/1 169/8 169/15 169/17
 169/18 171/11 171/20
**cut** [1]  15/12
**CV** [2]  1/2 2/3
**cyber** [1]  20/5

**D**

**dad** [2]  31/19 31/20
**damage** [2]  148/5 157/10
**damages** [8]  13/19 157/5 157/6 158/23
 162/2 169/7 171/11 171/13
**Daniella** [18]  2/14 10/13 13/7 13/9
 14/2 14/10 16/21 27/20 28/2 28/5 42/20
 67/15 69/4 83/14 85/20 116/3 147/8
 164/19
**dark** [1]  125/18
**date** [9]  13/14 59/19 59/20 91/19 91/21
 132/2 149/1 170/5 170/13
**dated** [2]  55/25 91/20
**daughter** [1]  136/3
**day** [13]  22/6 50/19 50/22 50/23 50/23
 68/24 68/25 109/25 130/15 144/20
 147/23 161/18 173/6
**days** [1]  155/19
**deadline** [1]  172/20

## D

**deal [5]** 11/22 74/18 94/4 164/3 166/9
**dealings [3]** 5/24 12/1 147/21
**dealt [1]** 111/20
**December [1]** 95/21
**decide [2]** 122/16 166/18
**decided [7]** 12/16 13/6 13/25 14/3 14/18 29/23 94/9
**decision [2]** 37/4 60/16
**decision-maker [1]** 60/16
**decisions [1]** 60/22
**declaration [6]** 68/12 117/3 171/9 172/1 172/5 172/6
**deemed [1]** 18/12
**defamation [4]** 21/19 112/10 114/19 165/1
**defame [1]** 112/24
**defamed [1]** 43/17
**defaming [2]** 164/16 164/25
**Defend [1]** 168/8
**defendant [15]** 1/16 2/18 2/21 7/18 8/8 8/20 9/25 10/3 19/20 112/18 113/1 154/19 157/21 164/19 168/22
**defendant's [1]** 139/14
**defendants [26]** 1/7 2/14 3/18 14/16 15/23 16/4 16/13 16/25 114/9 114/21 138/21 153/19 153/20 154/22 155/5 155/9 159/25 160/3 161/24 164/7 164/17 165/15 165/17 165/22 167/13 171/15
**defendants' [7]** 92/4 111/19 112/10 112/24 157/13 166/19 170/9
**defense [8]** 22/18 73/3 92/8 107/14 153/23 154/14 167/2 174/23
**defense's [1]** 17/5
**definitely [1]** 13/22
**delay [1]** 161/18
**delete [1]** 152/12 152/13 153/3 162/23
**deleted [4]** 152/6 152/9 152/11 152/15
**demanding [1]** 86/6
**demarcation [1]** 162/6
**denied [3]** 125/10 145/12 145/23
**deny [1]** 145/24
**departments [1]** 72/6
**depiction [1]** 133/16
**deposition [1]** 126/19
**deputy [1]** 128/4
**derive [1]** 75/15
**derived [2]** 74/22 74/25
**describe [5]** 3/10 54/16 55/4 133/3 143/24
**described [2]** 134/14 145/8
**describes [2]** 55/7 55/8
**describing [1]** 133/2
**description [2]** 136/7 163/24
**deserves [1]** 125/7
**desk [2]** 144/1 144/9
**desperation [1]** 155/3
**despite [2]** 10/6 29/22
**destroy [3]** 75/11 162/23 163/12
**detail [5]** 14/23 15/10 130/14 130/20 130/23
**detailed [2]** 148/12 153/7
**details [2]** 27/24 145/16

**determination [2]** 6/7 18/3
**determine [5]** 82/9 113/14 129/24 130/3 154/18
**devastated [1]** 78/21
**developed [1]** 9/15
**developing [1]** 145/18
**development [1]** 79/19
**device [2]** 141/7 141/10
**dictates [1]** 76/8
**Diem [2]** 21/14 102/10
**difference [1]** 106/4
**different [5]** 49/20 87/24 121/17 153/11 165/2
**difficult [6]** 5/8 9/1 14/24 51/16 51/16 52/7
**difficulty [1]** 36/9
**digress [1]** 108/7
**direct [9]** 3/18 4/8 24/8 45/19 58/22 112/8 115/2 126/24 128/13
**directed [4]** 11/3 13/12 22/15 111/21
**directing [1]** 164/23
**directly [4]** 3/12 15/23 110/18 159/20
**disagreement [1]** 161/14
**disagrees [1]** 28/11
**disappointed [1]** 88/5
**discern [1]** 163/15
**disclosing [1]** 160/23
**discovered [1]** 16/12
**discovery [5]** 22/4 22/12 149/23 160/22 161/12
**discuss [4]** 5/8 130/19 130/20 148/15
**discussed [4]** 35/3 128/24 160/6 171/17
**discussing [1]** 32/23
**discussion [1]** 146/8
**discussions [4]** 32/19 54/1 160/10 160/13
**disgrace [1]** 68/21
**disparaged [2]** 43/17 67/17
**disparaging [1]** 164/15
**disposal [1]** 15/3
**dispute [1]** 19/19
**disregard [2]** 127/13 127/22
**disrespect [1]** 131/14
**district [5]** 1/1 1/1 1/10 79/11 154/10
**diversions [1]** 145/17
**diverted [1]** 148/17
**diverting [1]** 145/10
**division [1]** 89/25
**docket [3]** 2/3 56/15 166/3
**docketed [1]** 92/5
**doctor [13]** 10/2 10/6 14/24 46/2 46/6 51/13 51/16 51/17 52/7 71/12 82/17 115/21 115/22
**doctor's [1]** 51/12
**doctors [2]** 81/25 81/25
**document [6]** 57/10 59/24 60/4 70/18 90/23 91/5
**documentation [2]** 91/15 150/7
**documents [13]** 86/11 86/16 86/20 86/24 87/1 90/15 91/1 91/4 122/11 122/18 122/24 123/22 125/10
**dog [4]** 13/14 14/24 15/1 104/16
**dogs [2]** 37/10 145/19
**dollar [2]** 78/4 169/7

**dollars [4]** 13/18 79/25 97/9 97/14
**domain [12]** 14/10 14/15 19/13 19/19 20/5 20/11 42/25 43/1 43/2 43/4 43/15 156/19
**done [19]** 4/13 16/18 76/11 90/24 90/25 121/21 134/10 135/12 141/8 141/9 145/22 148/4 148/5 148/16 150/15 151/23 155/10 158/6 169/12
**door [8]** 17/21 17/21 96/20 96/20 113/17 113/18 120/25 121/1
**doors [1]** 17/20
**dormant [3]** 82/21 82/23 116/17
**double [1]** 60/8
**doubt [3]** 35/17 135/6 163/16
**doubts [1]** 155/7
**down [18]** 19/6 25/23 26/24 27/20 28/15 30/4 32/14 36/6 42/3 49/21 57/9 85/18 85/22 115/5 126/1 126/2 153/12 157/3
**Dr [1]** 54/5
**Dr. [1]** 56/5
**Dr. Yong [1]** 56/5
**draw [1]** 123/23
**drinking [2]** 38/10 38/10
**drive [2]** 137/22 173/3
**Drop [2]** 138/3 138/5
**dropping [1]** 165/5
**dueling [1]** 3/6
**duly [2]** 23/14 128/11
**during [14]** 8/17 10/10 11/16 26/2 27/18 27/22 28/4 122/9 130/13 133/16 139/6 144/15 149/11 163/25
**duties [2]** 34/6 95/25
**duty [7]** 33/10 33/17 33/24 34/10 34/21 34/23 155/23

## E

**e-company [1]** 48/24
**E-L-E-F-T-E-R-A-K-I-S [1]** 12/19
**e-mail [24]** 53/17 53/20 54/4 54/7 55/9 55/22 56/2 56/4 57/16 57/21 58/12 58/17 58/17 61/2 65/4 66/13 66/21 67/1 67/12 67/17 67/24 120/10 120/12 138/7
**e-mails [4]** 60/8 60/10 61/4 120/6
**early [1]** 121/11
**earn [1]** 169/7
**earned [1]** 15/5
**easily [2]** 67/14 67/15
**EASTERN [1]** 1/1
**easy [1]** 11/5
**ECF [1]** 92/6
**economic [1]** 9/4
**editor [1]** 96/2
**effect [1]** 164/17
**effectively [1]** 16/25
**effects [1]** 170/3
**efficiency [2]** 111/19 126/7
**efficient [2]** 7/4 114/4
**efficiently [2]** 3/9 4/14
**effort [1]** 6/11
**efforts [2]** 15/6 16/22
**eight [9]** 38/3 38/4 105/13 105/16 144/4 144/4 144/5 144/5 156/7
**either [5]** 29/10 71/15 71/23 93/15 161/25

## E

**Elefterakis [52]** 12/19 12/19 17/19 17/22 38/16 38/18 38/22 38/24 39/4 39/5 39/6 39/10 39/15 39/20 40/5 47/15 48/5 48/5 48/8 48/9 48/13 48/15 48/16 48/21 48/23 49/19 49/20 87/4 87/5 87/11 87/18 87/19 88/12 89/10 91/14 92/15 92/15 93/1 93/1 93/19 94/5 94/25 95/13 99/10 117/15 117/17 117/21 117/23 118/5 118/6 118/21 121/4
**Elefterakis' [3]** 92/16 117/19 117/20
**Elefterakis' -- withdrawn [1]** 117/20
**element [1]** 6/19
**Eli [1]** 154/8
**elicited [1]** 163/25
**eliciting [1]** 21/18
**email [11]** 1/21 85/25 99/22 101/7 105/7 105/19 106/2 106/13 107/11 107/14 108/6
**emails [2]** 22/13 26/8
**EMANUEL [3]** 1/14 2/7 24/10
**Emilio [1]** 54/4
**emotional [1]** 146/12
**emphasize [1]** 67/1
**emphatically [1]** 122/11
**employed [6]** 10/11 148/25 149/1 149/2 149/3 149/6
**employee [16]** 10/16 16/10 22/5 30/23 31/1 33/7 34/17 98/15 110/12 116/5 120/18 129/21 129/21 129/22 130/4 155/21
**employees [11]** 34/21 39/20 39/22 72/16 72/19 78/6 79/13 109/9 115/13 161/9 164/8
**employer [4]** 34/24 139/16 139/19 148/19
**employer's [2]** 10/4 19/5
**employment [3]** 22/1 22/16 24/22
**end [7]** 65/17 129/13 132/14 135/1 135/10 143/12 167/24
**endeavor [2]** 11/11 79/23
**ended [1]** 40/16
**engage [2]** 101/11 129/18
**engaged [2]** 11/6 26/3
**enhanced [2]** 134/17 163/23
**enhances [1]** 163/8
**enhancing [1]** 142/2
**enough [7]** 23/20 41/14 114/2 142/1 151/19 155/4 156/6
**ensued [1]** 13/20
**entailed [1]** 130/1
**enter [1]** 91/24
**entered [4]** 14/19 25/18 59/22 144/24
**enterprise [1]** 9/4
**entire [5]** 133/8 133/10 144/13 144/15 152/19
**entirely [1]** 157/3
**entitled [2]** 168/7 169/11
**equally [1]** 39/18
**equate [1]** 169/18
**equities [1]** 78/1
**equity [1]** 11/17
**erred [1]** 127/6
**ESQ [3]** 1/14 1/15 1/18

**essence [4]** 9/3 104/21 161/7 162/20
**essentially [7]** 3/14 17/6 132/23 139/1 146/10 155/25 158/16
**establish [2]** 41/4 41/5
**established [2]** 17/2 153/25
**establishes [1]** 153/19
**estimate [3]** 13/18 78/10 79/25
**et [2]** 1/6 2/4
**evade [1]** 113/19
**evaded [1]** 113/16
**evaluation [1]** 164/5
**evening [1]** 173/14
**event [2]** 127/20 128/24
**events [3]** 9/25 96/15 96/16
**eventually [5]** 30/17 32/19 35/2 36/24 96/25
**everything [13]** 12/14 69/18 93/3 96/3 100/8 119/18 121/7 146/16 150/23 162/16 162/23 162/23 162/24
**evidence [56]** 6/22 6/24 9/24 15/14 16/3 17/1 19/25 20/15 22/3 24/6 45/9 55/10 55/16 56/7 57/25 58/7 59/16 59/23 60/11 60/14 61/1 61/11 62/23 62/25 65/9 67/24 68/3 69/7 69/10 75/11 91/25 92/8 120/9 127/8 127/9 127/14 131/25 133/19 136/18 137/24 138/14 145/13 145/13 148/7 150/24 152/12 152/18 153/5 153/6 153/7 153/19 154/4 155/5 157/16 164/15 164/22
**evidential [1]** 163/8
**exact [2]** 147/5 152/18
**exactly [13]** 6/5 13/1 13/8 21/6 77/25 104/10 110/11 122/14 125/8 152/23 171/1 171/2 171/2
**examination [20]** 11/1 24/8 28/9 45/19 76/22 80/5 103/21 114/19 115/3 122/10 126/13 128/13 138/1 140/1 140/6 143/15 151/6 152/2 160/7 167/20
**examine [1]** 4/6
**examined [2]** 23/15 128/12
**examinee [2]** 54/16 55/4
**examiners [1]** 145/20
**example [2]** 7/13 19/12
**exams [2]** 73/3 93/5
**excellent [2]** 94/9 100/6
**exchange [10]** 63/18 64/19 65/13 65/20 65/21 68/8 68/11 123/11 125/1 154/20
**exchanged [3]** 20/12 26/8 26/12
**exclude [1]** 127/4
**exclusive [2]** 104/12 104/18
**excuse [3]** 8/6 145/13 146/20
**excused [1]** 8/19
**exercise [1]** 63/12
**exhibit [63]** 3/21 53/13 54/14 54/23 55/14 55/14 55/16 55/18 56/8 56/11 56/16 56/21 58/5 58/7 58/9 59/13 60/11 60/14 60/25 61/11 61/20 62/12 62/14 62/22 62/25 63/2 63/2 63/14 63/16 64/25 65/16 66/6 66/8 66/11 67/23 68/3 68/5 69/6 69/10 70/8 91/6 91/7 91/8 91/24 92/3 92/4 92/5 92/8 105/10 120/8 131/21 131/23 131/25 136/14 136/16 136/18 142/7 143/10 154/20 171/9 171/10 171/16

## F

**F.3d [1]** 154/6
**fabrication [1]** 35/18
**face [1]** 18/13
**fact [22]** 10/6 13/20 14/15 22/20 24/24 27/2 29/16 30/23 31/1 37/13 109/14 111/16 120/2 129/18 129/24 132/22 133/17 146/3 147/6 148/8 156/13 165/5
**facts [12]** 4/25 6/4 6/5 6/20 6/20 6/21 7/4 9/24 18/16 116/21 170/22 170/23
**factual [1]** 112/9
**failed [1]** 141/11
**fair [6]** 9/4 9/6 9/13 72/1 133/15 171/5
**fairly [2]** 9/17 17/25
**faith [1]** 35/15
**familiar [2]** 129/9 129/12
**family [6]** 2/24 76/23 77/16 78/15 81/17 86/5
**far [9]** 6/17 17/14 56/15 93/6 97/17 103/14 125/10 151/11 158/13
**fast [3]** 26/18 36/8 41/15
**fate [1]** 14/2

**Exhibit 1 [3]** 53/13 55/14 55/14
**Exhibit 11 [1]** 171/16
**Exhibit 13 [1]** 70/8
**Exhibit 18A [1]** 131/23
**Exhibit 18B [3]** 136/16 142/7 143/10
**Exhibit 2 [2]** 55/18 56/8
**Exhibit 3 [2]** 56/21 58/1
**Exhibit 4 [3]** 58/9 60/25 105/10
**Exhibit 5 [1]** 61/11
**Exhibit 6 [2]** 63/2 63/16
**Exhibit 7 [1]** 66/8
**exhibit-wise [1]** 136/14
**exhibits [4]** 56/19 74/6 90/19 90/19
**existence [3]** 27/9 82/22 82/24
**existing [1]** 129/23
**exit [1]** 65/16
**expand [1]** 14/4
**expect [1]** 134/8
**expedite [1]** 134/11
**expeditiously [1]** 164/3
**experience [5]** 10/7 10/22 29/19 98/23 98/24
**experienced [2]** 15/25 160/15
**expert [1]** 129/2
**explain [16]** 16/13 16/17 16/22 24/17 46/1 89/4 103/5 106/2 106/13 107/19 124/19 124/23 130/1 135/11 140/17 152/9
**explained [3]** 43/14 121/16 121/19
**explaining [1]** 104/9
**explanation [1]** 106/14
**explored [1]** 161/24
**exposing [1]** 20/16
**express [1]** 85/2
**expressed [1]** 155/3
**extend [1]** 168/21
**extent [8]** 15/10 152/23 154/12 159/13 161/7 163/24 171/13 172/4
**extortion [1]** 15/7
**extremely [4]** 106/2 151/21 151/22 151/23
**eye [2]** 135/17 135/18

**9**

## F

**father [7]** 32/1 84/16 84/21 84/22 84/23 146/14 146/14
**Fax [1]** 1/21
**FCRR [1]** 1/20
**fearful [1]** 13/8
**February [2]** 91/8 129/13
**February 25 [1]** 91/8
**Federal [1]** 24/6
**FedEx'd [1]** 173/3
**fee [1]** 82/12
**feel [2]** 110/14 113/9
**feeling [1]** 127/11
**fees [3]** 168/7 168/8 170/18
**feet [3]** 19/18 144/6 144/6
**FELSEN [7]** 1/15 2/11 7/7 22/25 134/8 174/9 174/11
**felt [3]** 11/25 38/11 149/14
**few [7]** 19/11 94/22 94/23 117/7 117/11 117/13 122/15
**Fida [2]** 134/5 170/5
**fiduciary [5]** 9/20 33/10 33/17 34/6 155/23
**field [6]** 10/7 29/17 70/20 71/14 71/18 101/18
**Fifteen [1]** 170/12
**fifth [38]** 5/18 6/3 6/6 17/11 18/7 18/12 53/11 54/14 54/19 54/22 58/16 58/19 59/14 59/17 59/20 59/23 61/3 61/19 61/23 62/1 62/4 62/8 62/13 122/6 122/13 123/3 123/4 123/7 123/8 123/9 123/14 123/15 124/11 124/12 124/21 124/23 125/17 125/23
**fight [1]** 156/19
**figure [3]** 99/6 166/9 167/17
**figuring [1]** 171/11
**file [7]** 56/19 137/3 150/16 150/17 150/19 150/22 153/8
**filed [4]** 14/25 70/3 70/4 111/14
**filing [3]** 91/17 91/19 91/20
**fill [2]** 73/10 95/11
**filled [1]** 73/7
**final [1]** 168/19
**finally [2]** 16/21 146/15
**financial [9]** 10/15 74/22 74/25 77/24 79/7 128/23 128/24 155/3 156/8
**financing [1]** 35/5
**find [11]** 51/18 52/6 82/6 88/4 106/7 106/8 126/17 136/6 155/4 155/5 163/18
**finding [4]** 153/18 163/18 164/2 168/20
**fine [14]** 26/25 37/25 56/14 62/18 63/6 66/4 97/13 111/25 123/20 158/11 160/4 167/1 167/25 171/14
**finish [5]** 83/1 126/8 126/24 138/1 158/10
**finished [2]** 42/22 138/24
**fired [1]** 13/22 43/8 95/18 109/25
**firm [46]** 14/25 16/1 19/25 42/10 47/25 48/1 48/5 48/10 48/25 48/25 49/4 49/5 49/7 49/15 49/16 50/5 50/5 58/17 58/18 60/17 60/22 61/1 61/7 64/6 64/9 67/2 73/15 100/19 102/18 107/11 117/21 117/23 117/25 118/6 118/10 118/13

118/22 129/14 130/10 147/10 147/13 147/17 147/18 152/21 152/22 152/24
**firm's [2]** 92/14 145/21
**firms [10]** 12/7 12/9 12/11 12/12 17/21 72/6 72/7 93/11 118/13 172/1
**first [42]** 7/13 13/2 15/22 22/25 23/14 29/19 31/10 32/18 49/15 50/2 54/15 55/3 59/15 61/20 63/21 66/16 67/1 82/18 88/1 88/3 89/9 92/4 92/21 94/12 96/8 98/9 98/17 98/18 101/4 121/11 128/11 130/24 133/7 133/18 135/16 137/6 141/8 148/3 148/6 148/21 156/25 158/22
**five [5]** 3/12 113/25 134/1 134/2 134/3
**flash [2]** 137/22 173/3
**fleshed [1]** 125/19
**flip [2]** 63/10 76/5
**Floor [1]** 1/17
**Florida [1]** 101/19
**fly [1]** 145/7
**focus [6]** 79/18 114/20 160/8 163/18 168/15 170/2
**focusing [1]** 36/8
**folks [5]** 38/8 126/3 165/5 165/10 168/1
**follow [8]** 28/11 28/14 122/15 124/1 125/5 133/7 151/5 151/25
**follow-up [2]** 151/5 151/25
**following [7]** 9/25 71/20 80/4 130/16 132/17 142/10 147/16
**follows [2]** 23/15 128/12
**food [1]** 38/10
**forced [2]** 76/9 115/6
**forcing [1]** 19/1
**foremost [1]** 167/20
**forensic [10]** 159/18 159/19 159/20 159/22 159/24 160/7 161/10 162/25 164/5 167/20
**Forest [1]** 37/16
**forgetting [1]** 112/20
**Forgive [1]** 142/8
**forgotten [1]** 114/5
**form [4]** 85/6 99/3 157/7 165/13
**format [1]** 134/16
**formation [3]** 27/23 85/7 90/15
**formed [8]** 18/22 19/3 27/2 39/25 40/3 40/4 91/22 125/11
**former [3]** 16/10 20/23 164/8
**forming [1]** 40/4
**forms [1]** 145/19
**forth [1]** 149/25
**forward [8]** 14/13 82/17 111/5 114/18 114/20 136/4 148/10 151/18
**forwarded [1]** 107/20
**found [7]** 20/5 43/15 130/25 157/17 169/11
**foundation [1]** 40/22
**four [8]** 3/17 77/5 77/6 77/7 77/10 79/9 79/9 105/9
**fourth [2]** 54/13 62/5
**franchise [1]** 157/21 158/16
**franchising [7]** 14/14 69/25 158/16 158/25 161/23 162/5 164/7
**frankly [4]** 41/16 154/16 157/13 163/21

**frauds [1]** 128/23
**free [4]** 9/4 20/17 38/8 104/22
**freely [1]** 18/21
**Friday [3]** 168/1 170/5 172/16
**friend [2]** 94/25 95/1
**front [4]** 18/6 63/15 105/11 105/17
**full [8]** 65/1 79/2 120/2 120/6 120/11 155/25 172/4 172/5
**fully [2]** 161/16 164/1
**fundamental [1]** 50/1
**funded [1]** 88/12
**funding [4]** 12/20 20/24 20/25 21/1
**further [18]** 76/16 114/22 121/24 123/11 123/12 125/20 139/24 151/3 151/12 153/11 153/22 156/25 157/15 160/2 161/25 162/17 168/14 168/21
**furthered [1]** 124/6
**future [2]** 48/17 49/3

## G

**G-E-L-A-R-D-I [2]** 3/3 23/24
**gab [1]** 100/5
**Gabby [2]** 37/13 37/18
**gain [1]** 9/20
**gained [1]** 162/17
**gallery [2]** 2/25 7/24
**gather [1]** 110/18
**gave [13]** 35/15 35/24 39/21 51/16 96/14 100/17 118/12 118/18 119/11 119/13 152/23 152/24 156/16
**gee [1]** 146/1
**GELARDI [74]** 1/6 2/4 2/22 3/2 5/22 7/18 8/6 8/14 10/1 10/3 10/9 10/13 10/18 10/21 11/8 12/2 12/6 12/14 12/17 13/5 13/10 16/19 17/11 17/18 18/21 19/15 20/3 20/22 23/3 23/4 23/14 23/24 24/1 24/10 24/21 38/3 38/7 42/5 53/17 56/24 60/7 61/14 62/11 63/16 63/17 65/15 68/8 70/9 75/14 76/23 79/3 98/10 108/20 115/7 122/21 126/5 127/6 127/21 130/22 130/22 130/24 132/20 132/20 134/18 134/25 137/20 137/24 141/18 145/11 145/11 154/23 155/15 162/23 163/4
**Gelardi's [5]** 18/3 91/7 136/3 141/24 155/14
**Gelardis [5]** 145/15 145/17 146/9 146/10 148/15
**general [2]** 112/15 124/2
**generating [1]** 101/17
**gentleman [3]** 93/19 143/21 162/11
**Georgette [1]** 1/20
**Georgetteb25 [1]** 1/21
**gesture [2]** 35/15 132/4
**gestures [1]** 58/21
**gift [1]** 100/5
**gilding [1]** 163/16
**gist [2]** 22/17 22/21
**given [5]** 17/4 111/16 112/18 148/17 157/17
**global [1]** 167/15
**Gluck [1]** 64/3
**Gmail [1]** 60/8
**gmail.com [1]** 1/21
**goes [6]** 6/18 6/24 59/6 77/25 78/1

## G

**goes... [1]** 171/6
**gold [1]** 12/6
**golf [1]** 17/24
**Gonzalez [1]** 54/5
**good [19]** 2/7 2/10 2/12 2/16 2/20 3/4 17/23 24/10 35/15 68/21 94/25 95/1 100/9 128/15 137/23 141/9 168/1 168/1 173/14
**goods [1]** 71/21
**grants [1]** 115/9
**great [7]** 6/16 10/20 82/4 88/4 88/5 130/14 130/23
**Greg [24]** 12/19 38/15 38/18 47/14 87/4 87/5 89/16 89/25 91/14 92/10 92/11 92/16 93/1 93/15 93/19 93/20 94/2 94/5 94/6 94/10 94/13 94/17 94/25 121/3
**gregory [11]** 39/20 48/7 48/9 48/13 48/13 48/20 49/20 50/2 50/7 50/15 95/13
**grew [2]** 11/24 80/2
**grilling [2]** 146/25 147/5
**gross [2]** 75/4 75/7
**grossing [1]** 41/7
**ground [2]** 12/23 16/23
**group [8]** 1/13 1/16 2/8 2/11 38/9 102/10 102/11 102/12
**grow [2]** 156/11 156/18
**grown [3]** 77/8 77/11 77/13
**Guardians [2]** 145/11 148/13
**Guards [2]** 21/11 102/8
**guess [4]** 41/4 53/8 112/24 158/1
**guesstimate [1]** 98/2
**guest [2]** 144/1 144/9
**Guild [1]** 96/16
**guy [2]** 108/3 149/4
**guys [3]** 17/23 89/17 90/6

## H

**H-E-C-H-T [1]** 64/12
**ha [3]** 43/3 43/3 43/3
**hadn't [2]** 112/19 112/19
**half [5]** 13/18 39/22 79/2 79/9 153/16
**half percent [1]** 39/22
**hallway [1]** 113/18 166/10 166/12
**Halperin [2]** 95/9 95/9
**hand [6]** 53/12 128/2 155/12 157/9 158/8 162/18
**handed [1]** 150/6
**Handing [4]** 53/16 55/21 58/11 61/13
**handle [1]** 50/23
**handled [1]** 166/6
**handwriting [2]** 150/13 150/14
**hang [13]** 22/7 41/2 45/14 46/6 68/15 84/5 89/3 97/25 101/15 101/15 105/23 109/2 136/19
**happen [4]** 157/13 158/18 158/19 162/6
**happened [11]** 13/5 17/17 37/2 37/3 40/19 82/16 89/5 106/6 117/7 127/18 133/2
**happening [1]** 136/6
**happens [4]** 59/12 78/15 156/2 160/12

**happy [4]** 94/13 94/14 105/25 107/1
**hard [6]** 15/5 17/20 18/2 19/11 21/2 146/5
**hardcore [1]** 101/8
**harm [32]** 4/16 5/8 5/13 6/15 13/12 14/13 17/2 113/10 156/22 157/14 157/17 157/25 158/18 158/22 159/16 160/9 161/24 162/19 164/4 165/18 165/21 167/19 169/5 169/14 169/17 169/19 169/25 170/11 170/15 171/6 171/12 172/13
**harmed [2]** 15/15 171/3
**Harmony [2]** 75/22 75/25
**harms [1]** 9/22
**hated [1]** 18/25
**hates [2]** 18/25 116/3
**haven [1]** 155/1
**having [10]** 4/11 11/19 14/24 23/14 36/7 36/9 111/19 111/21 118/22 128/11
**head [1]** 89/16
**heading [1]** 92/6
**hear [49]** 4/25 5/21 5/22 6/13 15/8 15/10 15/23 16/5 16/7 16/21 17/10 17/15 19/14 19/4 19/24 21/2 21/4 21/25 24/2 38/1 94/12 109/2 110/18 127/2 129/4 129/6 131/13 132/8 133/5 134/24 134/25 136/20 137/17 137/23 137/24 138/18 139/11 140/4 140/11 140/14 141/25 162/21 163/4 163/20 164/22 166/1 169/4 169/14 173/2
**heard [20]** 9/2 10/18 29/23 60/2 88/22 88/25 89/11 110/19 112/13 113/6 129/3 133/15 133/16 152/23 154/22 156/15 159/15 160/11 162/22 163/20
**hearing [18]** 2/3 3/6 6/17 6/18 15/13 18/10 28/24 84/1 112/11 112/16 113/8 113/13 114/3 114/8 129/5 153/16 154/3 167/21
**hearsay [14]** 83/20 84/7 85/4 89/1 94/11 103/1 106/11 110/14 110/17 139/21 139/23 154/3 154/4 154/12
**heart [2]** 6/24 28/18
**heat [1]** 96/22
**Hecht [2]** 64/9 64/13
**held [3]** 26/19 26/20 56/12
**help [16]** 13/7 14/22 31/21 31/22 32/4 46/5 51/25 52/1 52/3 52/8 73/14 77/15 116/22 123/2 146/14 156/17
**helped [2]** 101/6 120/13
**helpful [2]** 122/3 168/17
**helping [4]** 86/8 145/17 145/18 145/19
**Herb [2]** 94/6 106/5
**herring [1]** 162/15
**herself [2]** 5/20 16/22
**hesitated [2]** 47/13 47/15
**hey [3]** 49/15 88/8 88/24
**high [1]** 98/11
**highest [4]** 40/19 41/6 41/7 41/7
**Hills [1]** 37/16
**himself [2]** 16/17 46/11 81/25 83/8
**hire [6]** 83/19 90/5 98/12 103/6 115/12 159/23
**hired [6]** 16/1 90/4 98/7 101/5 101/6 101/16
**hiring [1]** 73/16

**hit [1]** 12/23
**hold [8]** 25/23 25/23 40/25 42/8 93/22 134/20 134/21 134/21
**holds [1]** 6/8
**home [3]** 10/12 75/20 78/22
**homes [1]** 76/5
**honestly [7]** 18/15 21/20 34/16 65/18 106/13 124/23 164/23
**Honor [215]** 2/7 2/10 2/15 2/20 3/17 3/24 4/12 4/24 5/15 7/8 7/15 8/5 8/24 15/12 16/21 17/14 17/15 18/18 19/16 21/2 21/4 21/20 22/23 23/2 23/7 23/21 24/4 24/19 25/24 27/1 28/18 31/7 36/20 37/23 38/9 40/7 41/1 42/10 42/24 45/8 45/17 46/2 46/16 46/25 47/12 48/20 49/6 49/10 50/14 51/22 52/5 53/12 54/23 55/9 55/13 55/19 56/7 56/10 56/18 56/22 57/24 57/25 58/3 58/20 59/2 59/15 59/21 61/10 62/16 62/20 62/24 63/6 63/11 64/14 65/9 65/18 66/4 66/10 66/19 67/23 69/6 69/23 73/4 73/10 75/17 76/11 76/15 76/19 77/5 77/21 78/8 78/17 79/2 79/7 79/14 79/15 80/4 82/13 82/21 83/23 85/12 86/17 87/5 88/4 88/12 90/12 90/20 91/13 92/2 92/7 93/12 93/21 95/13 95/21 96/9 96/19 97/6 97/9 97/11 97/12 98/3 98/13 99/5 99/8 99/14 100/5 100/25 101/14 101/16 102/5 103/4 103/11 103/18 103/22 104/3 105/20 106/10 106/18 107/25 110/16 111/11 112/2 113/3 113/9 113/21 114/14 115/22 117/1 117/9 117/24 121/20 121/24 122/1 122/23 123/17 123/20 124/13 124/17 125/2 125/19 126/6 126/9 126/16 126/23 129/1 131/2 131/11 131/16 131/17 132/8 133/19 133/24 135/14 137/16 138/13 138/17 138/22 139/12 140/2 140/4 142/8 149/10 151/3 153/14 158/9 158/20 159/6 159/14 160/17 161/6 162/3 162/8 162/14 163/3 163/13 164/11 165/25 166/21 166/24 167/11 167/22 168/3 168/5 168/19 168/20 168/24 169/10 170/1 170/21 171/1 171/5 171/18 171/21 172/18 172/22
**HONORABLE [1]** 1/10
**hoped [1]** 111/18
**hopefully [1]** 137/9
**hoping [1]** 135/12
**hostile [3]** 24/5 115/2 115/2
**hounding [1]** 37/24
**hour [1]** 137/8
**hours [4]** 96/21 112/7 120/20 153/17
**house [1]** 113/17
**household [1]** 78/9
**hundred [3]** 97/8 97/14 101/9
**hundred percent [1]** 101/9
**hundreds [1]** 12/7
**husband [8]** 35/19 38/1 38/6 76/5 77/4 98/10 155/25 156/17

## I

**IAKOVOU [1]** 1/16
**ID [1]** 91/13
**idea [31]** 10/20 12/17 14/21 15/19

**I**

**idea... [27]**  17/18 18/24 19/12 27/19 29/1 38/23 38/25 49/7 49/17 49/21 69/18 81/11 81/13 81/24 82/2 82/3 82/4 83/8 83/10 83/12 83/19 84/6 87/23 87/24 88/4 88/5 89/16

**ideas [1]**  83/16

**identification [2]**  53/14 91/13

**identified [1]**  11/5

**ignored [1]**  25/18

**IME [188]**  1/3 2/3 2/8 2/21 10/11 10/12 10/14 10/19 11/2 12/3 12/8 12/12 12/15 12/24 13/1 14/18 14/23 16/11 19/13 19/24 21/9 22/2 22/4 24/11 28/2 28/6 28/21 28/25 29/1 29/12 29/22 30/6 30/9 31/2 31/9 32/10 32/17 33/7 33/10 33/24 34/20 34/24 35/9 35/12 35/14 36/18 37/10 37/13 37/19 38/25 40/9 42/7 42/16 43/4 43/11 43/16 43/20 43/25 45/21 45/22 46/14 48/19 48/22 49/1 49/8 49/11 49/12 49/16 50/6 50/12 50/18 50/21 51/2 51/5 51/6 51/20 51/21 52/10 52/10 52/16 52/16 52/17 53/2 54/7 54/15 55/3 60/16 60/22 62/6 64/3 64/6 64/9 66/13 67/4 69/25 70/4 70/11 70/18 72/3 72/15 73/12 73/16 74/25 75/4 75/7 75/17 75/18 78/13 83/11 83/13 83/16 87/23 88/8 88/22 89/13 89/15 91/4 92/22 93/11 96/1 100/19 100/21 100/22 100/22 100/24 101/24 102/8 102/8 102/11 102/13 104/11 104/16 105/4 107/23 108/11 108/22 108/25 115/5 115/12 115/25 116/5 116/22 116/23 117/18 118/11 118/14 118/15 118/15 119/19 119/23 119/24 120/22 121/8 121/11 122/22 123/6 124/5 124/9 129/9 129/20 130/4 130/8 130/9 130/17 144/18 144/20 145/3 145/10 145/11 146/4 146/6 147/21 148/13 148/13 148/25 153/21 153/22 157/3 158/3 158/14 158/19 159/11 159/12 164/8 164/16 164/18 171/19 172/4

**imecompanion.com [1]**  14/5

**IMEs [2]**  102/11 110/16

**immediate [2]**  113/10 168/15

**immediately [6]**  11/25 13/9 86/3 94/10 130/3 162/25

**impact [1]**  5/10

**implying [1]**  60/24

**import [1]**  125/9

**importance [2]**  9/6 9/13

**important [4]**  120/5 120/13 161/3 161/4

**imposing [1]**  166/7

**improper [2]**  17/7 163/18

**improperly [2]**  157/19 157/23

**impugning [2]**  59/12 114/12

**in [328]**  2/1 2/25 3/19 3/19 4/13 5/11 5/22 7/2 7/3 7/10 7/24 8/15 9/24 9/25 10/1 10/3 10/5 10/7 10/14 10/19 10/20 11/6 11/11 11/16 11/18 11/19 11/19 12/2 13/18 13/25 14/6 14/15 14/18 15/1 15/15 15/20 16/3 16/3 16/6 16/14 16/18

17/21 18/6 18/7 18/12 18/13 19/11 20/1 20/10 20/17 21/5 22/1 22/18 22/20 23/5 23/12 24/21 24/24 25/2 26/3 27/2 27/2 27/9 28/11 29/7 29/10 29/16 29/20 30/17 30/20 30/24 31/2 31/9 32/9 32/17 32/23 32/25 33/4 34/20 35/2 35/9 35/11 35/15 35/19 35/24 36/14 37/2 37/3 37/13 37/16 37/16 38/11 38/22 40/20 43/16 43/23 45/21 46/18 50/23 51/22 52/23 53/1 53/9 54/4 55/16 58/7 59/13 60/11 60/14 61/14 62/12 62/14 62/25 63/4 63/15 63/20 65/11 65/16 65/22 67/1 67/4 67/12 67/17 68/3 68/11 69/1 69/10 69/17 70/18 70/19 71/14 71/17 72/11 74/6 75/7 75/22 76/3 76/14 78/24 79/3 79/4 79/7 79/20 79/21 79/23 80/1 81/25 82/5 82/22 82/24 83/15 84/1 84/6 84/7 85/18 85/22 86/7 86/24 87/11 88/1 88/11 88/15 89/16 90/5 90/19 92/4 92/8 93/2 96/12 96/19 96/19 96/21 96/21 96/22 96/23 97/18 98/11 99/1 99/3 99/12 99/21 99/22 100/9 100/23 100/24 101/2 101/8 101/18 101/24 102/4 102/12 104/15 104/21 105/11 105/17 107/14 108/8 108/12 110/5 110/24 111/14 112/14 112/14 112/18 113/14 113/18 114/2 114/9 114/19 116/16 117/2 117/3 117/3 117/11 119/24 120/2 121/12 121/14 121/23 122/9 123/1 123/6 123/10 123/10 123/23 124/3 124/7 124/8 124/10 125/1 125/7 125/18 126/6 127/9 127/9 127/10 127/15 127/20 128/3 128/18 128/19 128/23 128/23 129/18 129/19 129/24 130/5 130/6 130/14 130/20 130/24 131/25 132/22 133/17 134/3 134/16 135/11 135/16 136/18 137/4 139/17 140/17 140/22 141/9 142/2 142/2 143/20 143/22 143/24 143/25 144/1 144/9 144/22 146/3 146/10 147/5 147/6 148/5 148/8 148/9 148/16 149/15 149/16 149/22 150/16 151/15 152/12 153/5 153/6 153/22 154/20 155/2 155/17 155/19 155/19 155/23 156/6 156/12 156/12 157/2 157/7 157/20 157/23 158/7 160/22 161/11 161/11 161/17 161/20 162/11 162/18 165/4 165/5 165/16 165/18 165/20 166/10 166/12 166/15 167/15 167/18 168/10 169/4 169/19 170/22 171/9 172/1 172/5

**inappropriate [1]**  157/8

**INC [10]**  1/3 2/4 2/9 28/2 28/6 28/21 31/2 32/17 154/7 164/18

**incident [3]**  108/20 108/21 109/13

**inclined [1]**  161/22

**including [6]**  16/3 18/23 128/24 135/13 145/14 165/21

**income [7]**  75/14 75/15 75/17 78/9 78/11 78/14 78/25

**Incorporated [1]**  129/10

**Incorporation [2]**  91/16 91/16

**incorrect [4]**  25/4 74/16 75/13 119/6

**incorrectly [1]**  131/4

**incriminate [1]**  5/19

**incriminating [1]**  75/11

**incrimination [1]**  122/21

**indefinitely [1]**  165/9

**independent [5]**  10/25 109/10 115/13 120/16 145/20

**independently [1]**  114/16

**indicate [1]**  145/10

**individual [3]**  15/24 61/7 66/14

**individuals [2]**  39/8 135/7

**industry [5]**  29/20 79/7 104/15 155/19 155/23

**inequities [1]**  4/17

**infer [2]**  18/14 122/16

**inference [6]**  6/4 18/13 59/22 60/11 125/7 125/9

**inferences [1]**  163/22

**influencing [1]**  84/8

**influential [1]**  87/19

**info [1]**  149/5

**information [74]**  5/11 6/8 10/16 11/14 11/21 11/22 12/11 15/4 17/8 18/11 18/23 19/6 22/19 28/17 35/12 35/14 36/2 36/11 36/11 40/5 40/11 46/23 47/5 47/10 47/19 52/20 52/22 53/1 56/11 60/21 61/5 61/6 61/7 63/25 64/18 75/1 101/21 104/1 119/14 122/22 123/2 123/5 123/10 123/12 124/5 124/8 124/9 124/14 124/15 124/19 125/1 125/14 148/18 149/4 151/19 153/21 154/19 154/25 155/6 155/12 155/16 155/20 156/1 156/11 156/14 156/17 157/18 157/22 158/17 159/13 159/20 162/18 163/5 168/23

**informed [1]**  129/19

**inherently [1]**  151/13

**initial [4]**  11/16 50/9 156/3 160/10

**initially [2]**  145/12 145/23

**initiated [2]**  32/2 133/12

**initiative [1]**  17/20

**injunction [22]**  1/9 2/3 76/21 109/16 111/4 111/15 113/8 154/3 156/23 157/1 157/7 158/12 160/21 161/23 162/6 164/6 164/16 167/7 167/13 168/21 169/6 169/23

**injured [1]**  82/5

**injuries [1]**  27/15

**injury [22]**  10/13 12/7 12/9 12/11 12/12 12/20 14/25 29/17 43/20 43/21 43/25 45/5 45/14 52/20 55/8 73/15 88/13 96/19 101/18 102/18 165/18 167/16

**inner [1]**  37/19

**inquire [3]**  24/3 107/13 128/10

**inside [2]**  144/18 163/5

**insisted [1]**  141/19

**instant [1]**  117/4

**Instead [1]**  12/16

**instructed [3]**  42/15 75/10 134/19

**instructing [1]**  132/23

**instruction [1]**  24/18

**instrumental [1]**  16/2 16/6

**insurance [1]**  51/5

**intellectual [1]**  129/16

**intend [4]**  15/22 16/5 171/8 172/5

**intending [1]**  3/18

**intends [1]**  8/4

**I**

**intention [1]** 162/11
**interactions [2]** 18/21 145/16
**interest [13]** 10/17 25/15 28/22 30/24 31/2 31/7 31/9 32/17 32/25 33/4 35/9 85/22 126/6
**interested [6]** 10/19 10/20 11/19 88/5 88/11 88/15
**interference [1]** 140/24
**interrupt [4]** 31/12 42/3 45/25 166/2
**interrupted [1]** 20/20
**interrupting [1]** 47/7
**interview [15]** 130/11 130/13 130/13 139/17 145/2 145/22 150/10 150/11 151/18 152/5 152/10 152/19 152/25 153/2 163/25
**interviewed [1]** 130/12
**interviewing [1]** 149/15
**interviews [1]** 150/8
**introduce [6]** 31/20 83/3 83/5 84/10 93/16 94/20
**introduced [8]** 93/19 94/2 94/24 94/25 95/8 95/8 95/10 98/10
**introduction [2]** 30/11 31/19
**invented [2]** 83/11 84/6
**invert [1]** 172/10
**invest [2]** 25/13 86/7
**investigation [11]** 16/2 129/15 129/18 129/24 130/1 130/2 145/9 150/5 151/9 151/15 151/21
**investigations [2]** 102/1 156/9
**investigator [14]** 16/1 16/20 19/2 21/15 128/17 128/21 128/22 131/8 133/1 143/22 145/1 147/8 154/15 156/15
**investigators [1]** 146/24
**investors [1]** 156/3
**invocation [7]** 6/3 122/6 122/13 122/16 124/1 124/4 125/6
**invoice [13]** 47/15 47/17 47/21 48/4 48/9 48/15 48/22 49/9 49/10 49/14 49/22 50/15 88/7
**invoices [5]** 40/7 40/9 49/6 99/25 100/1
**invoked [1]** 122/6
**invoking [4]** 122/15 122/20 123/3 125/17
**involved [2]** 39/5 130/5
**irreparable [33]** 4/16 5/8 5/13 6/15 13/12 14/12 17/2 77/25 156/22 157/14 157/17 157/25 158/18 158/22 159/16 160/8 161/24 162/19 164/4 165/18 165/21 167/16 167/19 169/5 169/13 169/17 169/19 169/25 170/10 170/14 171/6 171/12 172/13
**irreparably [1]** 15/15
**isn't [9]** 27/24 29/7 33/4 50/1 73/4 75/18 116/20 159/4 169/19
**issue [14]** 5/12 146/14 154/2 160/9 161/21 161/23 161/24 162/7 164/6 168/15 170/11 171/6 171/12 172/13
**issues [5]** 50/23 74/18 82/19 117/4 166/15
**it'll [4]** 125/19 130/25 131/14 131/15

**itemize [1]** 168/12
**itself [3]** 31/3 59/24 84/6

**J**

**Jamal [2]** 37/13 37/18
**JAMIE [2]** 1/15 2/10
**January [6]** 10/5 27/2 97/18 97/20 108/10 110/5
**January 17th [1]** 27/2
**January 2019 [2]** 97/18 108/10
**Jersey [1]** 102/12
**Jewish [1]** 96/15
**job [7]** 79/10 79/21 86/6 95/16 95/25 150/9 150/9
**John [1]** 94/23
**join [1]** 32/9
**judge [6]** 1/10 43/14 82/2 91/12 104/23 121/16
**July [1]** 54/5
**July 19 [1]** 54/5
**jurisdictions [1]** 128/19
**justice [1]** 76/8

**K**

**K-H [2]** 95/6 95/7
**K-H-A-V-I-N-S-O-N [1]** 95/5
**KATAEV [33]** 1/14 2/8 3/16 6/13 8/23 9/7 15/8 22/24 23/20 24/10 26/24 28/8 31/12 34/18 36/4 41/13 42/2 43/7 45/18 57/23 60/13 62/9 66/25 76/20 78/9 115/4 118/25 125/6 137/12 158/7 169/10 174/4 174/6
**keep [9]** 3/12 20/3 24/1 41/19 48/11 63/8 99/21 112/20 171/7
**keeping [1]** 36/9
**keeps [1]** 20/4
**Kenneth [1]** 95/9
**kept [2]** 46/3 99/21
**Khavinson [1]** 95/1
**KI [1]** 2/21
**kickbacks [1]** 67/6
**Kim [1]** 56/5
**kind [18]** 3/7 15/20 33/22 85/22 86/23 101/1 115/2 126/20 126/22 127/8 146/25 158/12 160/25 161/18 161/25 162/2 164/7 165/4
**knew [12]** 11/9 13/1 14/18 19/24 41/7 48/10 49/5 49/6 50/2 119/11 155/25 158/2
**knocked [1]** 113/17
**knocking [1]** 17/20
**know [102]** 4/18 5/9 6/19 7/12 8/3 10/25 13/16 17/24 21/15 31/11 33/17 34/3 34/4 37/22 40/24 46/10 49/15 49/15 49/22 49/23 49/23 50/4 51/23 59/18 59/20 63/19 63/24 64/2 65/6 65/8 69/19 69/21 73/14 73/18 73/21 73/24 74/2 74/8 74/11 74/14 74/17 83/18 85/20 89/12 90/24 92/22 93/1 97/19 98/8 99/13 102/7 102/8 102/8 102/19 102/13 103/1 103/1 103/3 105/8 105/11 105/25 106/5 106/7 106/7 106/18 107/2 108/3 109/18 109/20 110/12 119/13 119/21 119/22 125/6 126/11 131/5 135/9 135/25 136/25 141/3 146/3 146/5

146/13 148/8 149/3 149/5 155/18 155/24 157/15 158/25 160/20 160/25 161/12 161/15 164/1 166/22 169/1 169/6 169/14 169/16 170/2 173/8
**knowing [1]** 29/22
**knowingly [1]** 154/19
**knowledge [14]** 11/10 38/19 72/13 83/6 86/20 98/22 102/17 104/15 115/16 116/6 116/7 116/10 120/22 148/1
**known [2]** 98/11 130/9
**knows [6]** 12/8 41/5 65/12 100/6 100/7 100/8
**KOUTSOUDAKIS [1]** 1/16

**L**

**L-A-B-U-D-A [1]** 129/15
**labeled [1]** 54/4
**labor [1]** 89/25
**LABUDA [13]** 1/13 2/8 2/11 129/14 129/14 130/10 147/10 147/13 147/17 147/18 150/6 150/6 150/9
**Lake [3]** 1/14 75/22 75/25
**landed [1]** 12/6
**last [5]** 124/7 134/9 160/11 162/15 168/4
**late [4]** 13/13 90/11 144/22 144/23
**later [4]** 15/18 86/1 88/6 146/3
**law [56]** 1/13 1/16 2/8 2/11 2/22 9/15 9/18 12/7 12/9 12/11 12/12 12/21 14/25 15/15 15/17 16/1 19/25 38/20 42/9 48/25 48/25 49/4 49/5 49/7 50/5 50/5 58/17 58/18 60/17 60/22 61/1 61/7 64/6 64/9 67/2 72/6 73/15 92/4 92/15 93/4 93/10 100/19 112/4 118/10 118/21 129/14 145/21 147/17 147/18 152/21 152/21 152/24 157/15 157/24 169/19 172/1
**lawsuit [6]** 20/24 20/25 21/1 69/1 75/10 167/6
**lawyers [5]** 7/11 43/20 96/15 150/20 150/21
**lawyers' [1]** 140/15
**lay [1]** 19/18
**lead [2]** 30/3 101/17
**lead-generating [1]** 101/17
**leading [8]** 27/22 30/2 84/17 86/13 86/14 87/12 101/13 102/4
**leak [1]** 162/9
**learn [4]** 92/21 92/25 110/4 139/15
**learned [15]** 10/9 10/10 10/14 27/18 27/23 28/1 28/5 28/21 30/8 30/20 30/23 31/1 32/16 32/22 110/6
**learning [1]** 28/25
**least [9]** 6/4 17/8 65/17 83/19 156/2 157/5 157/22 161/23 163/15
**leave [6]** 8/18 96/20 109/24 116/7 126/24 146/2
**leaving [1]** 20/1
**led [1]** 105/18
**leeway [2]** 77/1 78/3
**left [9]** 13/17 23/6 38/12 63/25 64/19 66/2 118/15 120/10 137/15
**legal [20]** 2/21 10/7 10/22 70/19 70/25 71/8 71/11 71/17 71/18 72/3 72/24 72/25 73/1 73/2 73/4 73/7 73/8 73/11

**L**

**legal... [2]** 73/12 74/18
**legally [1]** 77/19
**legitimate [2]** 19/17 20/6
**lengthy [2]** 23/1 145/21
**Leo [1]** 111/8
**less [1]** 131/15
**letter [2]** 114/6 168/16
**Levi [35]** 2/14 10/13 13/7 13/9 14/2
16/22 17/17 18/25 18/25 19/13 20/7
20/16 21/8 27/20 27/24 42/20 43/17
43/23 45/5 45/12 67/15 67/17 69/4
83/15 85/20 110/5 110/5 111/21 112/24
116/3 147/8 147/15 147/21 164/19
172/6
**Levi's [3]** 22/13 28/2 28/5
**Levis' [1]** 19/8
**liable [3]** 22/4 22/7 113/14
**Liakas [5]** 39/6 89/10 92/15 92/17 93/1
**license [3]** 10/2 115/15 115/18
**licensed [5]** 12/21 128/17 128/18
128/22 143/22
**lie [3]** 19/1 69/15 69/17
**lied [2]** 69/14 69/19
**lies [1]** 69/20
**likelihood [11]** 4/15 4/22 5/16 6/14
22/11 113/9 153/24 156/21 161/7
163/19 164/2
**likely [1]** 162/7
**Lilly [1]** 154/8
**lily [1]** 163/16
**limited [3]** 15/11 138/2 161/23
**line [5]** 71/20 74/20 111/1 123/21
123/23
**link [1]** 138/3
**list [28]** 3/21 3/21 3/25 4/7 12/10 12/12
12/25 17/4 21/9 23/1 40/20 41/8 45/22
46/1 46/14 47/6 58/17 60/15 60/17 61/1
87/20 99/9 99/24 101/21 104/7 158/5
171/19 172/1
**listed [1]** 36/14 48/22 61/8
**listen [5]** 41/19 131/9 134/13 135/8
163/14
**listened [2]** 133/9 137/19
**listening [1]** 141/12
**listing [1]** 171/10
**lists [2]** 12/11 126/17
**literally [3]** 96/20 141/13 147/23
**little [13]** 5/7 9/7 14/17 14/22 26/17
75/16 78/3 97/8 97/22 107/13 125/8
141/25 146/12
**live [1]** 82/24
**lives [1]** 77/9
**living [1]** 115/6
**LLC [10]** 27/3 27/20 27/23 50/18 62/6
70/1 115/19 116/16 116/20 119/24
**located [1]** 75/22
**location [1]** 76/1
**logical [1]** 155/10
**logistically [1]** 23/11
**long [7]** 17/15 40/2 54/1 97/5 137/13
138/13 170/3
**long-term [1]** 170/3
**longer [5]** 12/21 99/11 134/8 153/6
153/7
**look [10]** 20/10 59/11 99/1 99/9 99/15
101/5 108/5 108/6 120/8 148/6
**looked [4]** 85/25 87/1 99/14 150/16
**looking [5]** 58/20 92/5 98/12 121/10
171/16
**Looks [1]** 53/19
**losing [2]** 157/12 161/19
**loss [1]** 169/24
**losses [1]** 9/23
**lost [6]** 10/2 107/10 107/11 132/21
133/3 158/3
**lot [6]** 11/7 13/17 28/10 32/13 46/16
148/18
**love [2]** 124/20 124/23
**lower [1]** 134/17
**loyalty [3]** 34/11 34/21 34/24
**luck [1]** 68/21
**lump [1]** 11/18

**M**

**M-U-L-L-I-N-S [1]** 154/6
**ma'am [1]** 48/20 57/11 104/3
**Madeline [1]** 2/23
**magnitude [1]** 169/24
**mail [24]** 53/17 53/20 54/4 54/7 55/9
55/22 56/2 56/4 57/16 57/21 58/12
58/17 58/17 61/2 65/4 66/13 66/21 67/1
67/12 67/17 67/24 120/10 120/12 138/7
**mailed [1]** 96/17
**mails [4]** 60/8 60/10 61/4 120/6
**main [1]** 78/13
**majority [3]** 18/1 18/2 132/22
**maker [1]** 60/16
**mal [5]** 115/19 115/23 116/16 116/20
116/22
**malpractice [6]** 10/5 10/7 27/15 82/5
82/7 83/15
**malpracticescreening.com [3]** 27/6
81/21 88/3
**man [1]** 87/19
**manager [1]** 79/11
**Manhattan [1]** 17/22
**manipulate [1]** 11/6
**manipulated [1]** 16/17
**many [19]** 16/4 20/18 21/6 21/6 61/4
77/3 78/6 79/13 79/25 95/8 96/15 99/8
108/10 108/14 112/13 118/12 118/12
118/13 156/4
**map [1]** 12/4
**march [11]** 46/21 53/20 62/5 62/18
109/25 110/7 130/12 132/3 136/24
150/17 162/10
**March 1 [1]** 132/3
**March 14th [1]** 53/20
**March 1st [3]** 109/25 130/12 136/24
**March 5 [1]** 62/5
**Marcus [1]** 1/13
**marked [17]** 53/13 55/18 56/20 58/9
61/11 63/2 66/8 68/5 70/8 91/6 92/3
105/7 131/20 131/22 136/11 136/14
136/15
**market [1]** 161/20
**marketing [10]** 96/3 96/17 96/17 101/1
101/1 101/4 101/5 101/7 101/8 101/8
**married [1]** 77/16
**Mask [1]** 21/22
**match [1]** 11/17
**matches [1]** 136/7
**mate [1]** 94/23
**material [4]** 96/17 96/21 99/6 101/4
101/6 103/14
**materials [2]** 99/1 99/3
**math [1]** 156/5
**matter [9]** 6/4 16/2 70/25 71/9 101/20
135/11 160/17 170/25 173/15
**matters [3]** 70/19 71/17 129/17
**maybe [14]** 6/20 46/21 56/12 63/4 97/6
98/3 98/20 108/12 111/6 114/6 119/1
156/8 160/21 166/18
**mean [24]** 3/21 28/15 33/12 45/1 45/7
47/18 48/3 69/13 69/14 73/6 83/10
97/13 103/1 108/3 109/4 110/9 110/11
111/18 112/16 125/13 150/4 161/2
165/15 169/17
**means [7]** 17/7 59/1 82/6 99/8 114/12
141/10 150/5
**meant [4]** 66/10 73/8 159/4 165/16
**meantime [1]** 158/17
**mechanical [1]** 1/23
**med [5]** 115/19 115/23 116/16 116/20
116/21
**media [1]** 101/7
**medical [25]** 10/2 10/4 10/7 11/1 27/15
29/10 52/20 52/22 53/1 55/7 56/11
70/19 71/14 71/16 71/18 72/18 73/3
81/22 81/23 82/9 96/7 115/15 115/18
117/4 145/20
**medicine [1]** 115/24
**Medmal [3]** 27/3 27/19 27/23
**meet [4]** 31/13 46/3 87/18 102/14
**meeting [30]** 11/4 11/12 29/14 30/14
30/20 31/18 32/2 37/9 37/21 49/21 50/9
56/25 57/8 87/11 87/14 88/6 88/21
88/22 89/16 90/7 90/8 94/2 94/6 94/8
94/9 94/10 94/13 106/6 131/4 139/7
**meetings [11]** 11/16 18/10 26/14
26/19 27/18 27/22 90/4 95/10 95/11
96/14 99/11
**meets [1]** 169/25
**members [1]** 2/24
**membership [2]** 10/17 33/3
**memo [1]** 92/4
**memory [1]** 41/1
**men [2]** 77/8 77/11
**mention [1]** 83/13 94/10
**mentioned [4]** 83/14 94/13 94/17
104/11
**mere [1]** 169/18
**merits [1]** 156/21
**message [4]** 63/17 64/19 68/8 68/11
**messages [3]** 26/12 63/22 64/16
**met [20]** 10/1 10/23 11/5 12/18 24/21
27/19 28/4 29/19 30/17 31/10 32/16
32/18 33/25 35/19 37/13 37/16 57/19
84/20 84/23 147/23
**microphone [9]** 9/1 23/10 23/25 111/6
132/10 139/4 139/5 140/18 141/7
**microphones [1]** 132/11
**middle [1]** 63/20

**M**

**might [3]**  90/21 99/23 157/14
**milked [1]**  162/16
**million [3]**  13/18 75/4 80/2
**MILMAN [11]**  1/13 2/8 2/11 129/14
129/14 130/10 150/5 150/6 150/9
152/21 152/24
**mind [6]**  69/17 72/12 89/18 89/21
89/21 157/3
**mine [4]**  12/6 66/1 87/5 94/5
**minimal [1]**  146/8
**minimize [2]**  145/25 166/17
**minimized [1]**  145/24
**minimum [2]**  18/12 164/6
**minus [1]**  19/23
**minute [6]**  76/12 121/21 140/11 142/4
142/6 143/5
**minutes [7]**  3/12 113/25 134/2 134/3
137/7 137/15 138/17
**misappropriate [1]**  9/18
**misappropriated [1]**  5/11
**misconstrued [1]**  50/6
**misdirecting [2]**  129/22 130/5
**mispronouncing [1]**  48/23
**misrepresented [1]**  163/6
**missed [1]**  149/14
**missing [2]**  49/25 119/1
**mistake [2]**  79/4 127/21
**mistaken [1]**  138/23
**Mister [1]**  112/1
**misunderstanding [1]**  59/9
**mixed [1]**  117/19
**model [2]**  20/17 81/21
**moment [5]**  23/5 41/23 86/7 155/2
155/16
**moment's [1]**  161/13
**Monday [2]**  55/25 160/12
**monetary [1]**  171/11
**money [15]**  12/25 13/10 20/10 20/11
125/1 146/9 146/11 148/18 154/20
154/25 155/9 156/9 157/12 160/19
170/25
**monopoly [1]**  21/7
**month [2]**  98/3 156/6
**monthly [1]**  100/16
**months [8]**  17/21 46/24 86/1 88/6
95/22 117/7 117/11 117/13
**more [25]**  6/24 12/1 27/24 28/3 52/5
62/17 79/1 98/12 100/10 101/5 109/2
124/2 125/17 125/22 132/23 145/16
145/16 153/7 157/11 168/2 169/14
169/20 170/2 170/23 172/23
**morning [1]**  144/22
**mortgage [1]**  75/19
**most [6]**  4/3 7/3 7/3 82/5 139/19
154/13
**mostly [1]**  81/25
**mothers [1]**  78/24
**motion [10]**  4/9 4/20 14/25 21/19
111/19 117/4 166/23 167/12 168/9
168/11
**motions [3]**  3/7 6/9 51/4
**motivated [1]**  30/21
**motived [1]**  139/18

**mouth [1]**  24/1
**move [11]**  23/25 24/5 67/21 91/24
94/18 100/10 106/10 114/18 114/20
131/10 165/23
**moved [3]**  148/10 148/13 172/3
**moving [4]**  14/13 28/18 126/4 146/10
**Mr. Adam [4]**  10/23 130/3 143/25
153/21
**Mr. Alex [1]**  94/24
**Mr. and [1]**  154/23
**Mr. Belcher [3]**  144/11 144/13 144/16
**Mr. Carlos [3]**  16/10 68/9 111/9
**Mr. Cherny [2]**  67/12 67/18
**Mr. Cherny's [2]**  106/25 107/11
**Mr. Elefterakis [17]**  12/19 17/19 17/22
38/22 38/24 39/4 39/10 39/15 40/5
48/15 49/19 87/11 87/18 87/19 88/12
99/10 117/15
**Mr. Felsen [3]**  7/7 22/25 134/8
**Mr. Gelardi [7]**  5/22 8/6 8/14 38/7
137/24 162/23 163/4
**Mr. Gelardi's [1]**  141/24
**Mr. Greg [1]**  94/5
**Mr. Gregory [2]**  49/20 95/13
**Mr. Herb [1]**  94/6
**Mr. Kataev [26]**  3/16 6/13 9/7 15/8
22/24 23/20 26/24 28/8 31/12 34/18
36/4 41/13 42/2 43/7 45/18 57/23 60/13
62/9 66/25 76/20 78/9 118/25 125/6
137/12 158/7 163/10
**Mr. Roa [22]**  21/24 22/12 98/8 98/9
98/10 107/22 108/20 108/21 109/13
109/18 109/22 110/12 110/18 110/20
110/22 111/3 111/21 111/22 112/11
112/17 127/16 166/20
**Mr. Roa's [5]**  22/14 112/23 112/25
127/7 127/12
**Mr. Roman [1]**  94/4
**Mr. Rombom [13]**  16/2 16/6 127/23
128/15 129/9 132/16 134/12 136/22
139/1 140/16 143/17 153/13 154/18
**Mr. Rombom's [3]**  135/5 135/12
163/24
**Mr. Ronald [1]**  10/8
**Mr. Rosenblatt [55]**  5/25 10/6 11/8
11/19 16/5 16/7 16/9 18/22 19/14 19/22
20/8 62/15 83/21 84/3 122/19 122/21
123/10 124/5 124/8 124/18 124/24
124/25 125/15 130/11 130/12 134/24
138/21 139/18 141/5 141/16 144/7
144/9 144/24 149/12 149/15 150/6
151/8 152/5 153/1 154/15 154/18
154/24 155/3 156/1 156/12 156/15
156/16 158/4 162/9 162/13 162/17
162/22 163/11 163/24 164/10
**Mr. Rosenblatt's [4]**  18/24 19/18
139/14 144/17
**Mr. Shalit [6]**  112/2 112/22 113/6
114/11 165/24 166/18
**Mr. Siegler [22]**  3/20 4/7 5/13 7/16
17/3 58/25 60/1 76/18 108/18 114/20
122/5 138/2 160/5 160/7 160/15 164/1
165/11 166/17 167/18 168/12 172/9
172/17
**Mr. Siegler's [1]**  59/12

**Mr. Vito [5]**  7/18 75/14 126/5 134/25
141/18
**Mrs. [7]**  27/24 43/17 43/23 67/17
154/23 164/19 172/6
**Mrs. Daniella [1]**  164/19
**Mrs. Gelardi [1]**  154/23
**Mrs. Levi [5]**  27/24 43/17 43/23 67/17
172/6
**Ms. Gelardi [36]**  2/22 10/9 10/13 10/18
10/21 11/8 12/2 12/14 12/17 13/10
17/11 17/18 18/21 19/15 20/3 20/22
23/4 24/1 24/10 24/21 42/5 53/17 56/24
61/14 62/11 63/17 65/15 68/8 70/9
76/23 79/3 108/20 122/21 127/6 127/21
155/15
**Ms. Gelardi's [4]**  18/3 91/7 136/3
155/14
**Ms. Levi [14]**  17/17 18/25 18/25 19/13
20/7 20/16 21/8 45/5 45/12 110/5
111/21 112/24 147/15 147/21
**Ms. Levi's [1]**  22/13
**Ms. Levis' [1]**  19/8
**much [20]**  78/10 97/7 100/12 104/8
104/8 124/2 126/1 134/8 140/24 146/9
148/4 151/24 153/7 154/1 157/12
158/19 160/17 167/17 172/2 173/5
**Mullins [1]**  154/5
**multiple [9]**  14/5 19/5 19/8 50/19
50/22 79/11 79/12 87/8 96/16
**must [4]**  9/17 9/18 9/19 9/22
**myself [5]**  81/18 81/19 96/22 107/15
140/14

**N**

**name [36]**  3/1 14/1 14/6 14/7 14/8 14/9
14/11 14/15 19/13 19/19 19/23 23/18
23/23 24/10 47/24 48/2 48/7 49/14
49/24 63/20 63/21 65/19 92/9 92/11
94/22 94/23 102/7 103/25 111/6 111/8
112/1 112/20 112/25 128/7 128/8
143/21
**named [8]**  7/21 10/3 10/13 12/18
15/24 62/6 66/14 93/19
**namely [1]**  153/22
**names [5]**  14/5 58/17 61/1 101/11
109/20
**nap [1]**  167/21
**Napoli [1]**  64/6
**national [2]**  14/4 14/14
**nature [2]**  109/8 127/3
**near [1]**  8/16
**necessarily [2]**  158/14 169/6
**need [24]**  5/9 9/6 9/13 15/10 23/25
26/24 62/18 105/5 109/11 125/20 148/7
148/7 154/16 154/17 155/5 156/19
162/25 163/20 164/3 167/16 167/21
168/12 169/24 173/1
**needed [3]**  11/10 12/15 98/13
**needs [3]**  6/19 134/17 171/13
**needy [1]**  46/9
**negative [5]**  6/3 18/13 125/7 125/9
163/21
**negatively [1]**  122/16
**negotiated [2]**  25/18 26/2
**Neither [1]**  150/25

**N**

**nephew [5]** 39/4 88/23 88/24 89/9 89/14
**nephew's [2]** 48/1 50/5
**nephews [4]** 39/7 89/9 92/16 93/3
**nephews' [1]** 49/16
**nervous [1]** 130/25
**neutral [3]** 159/19 159/24 163/1
**never [16]** 11/1 29/7 29/10 29/12 29/16 34/6 34/7 38/11 42/24 42/25 43/13 47/4 47/6 47/9 130/25 147/23
**new [22]** 1/1 1/4 1/14 1/17 1/17 16/24 50/12 64/21 79/20 79/21 93/16 94/14 101/19 101/24 102/12 102/14 128/18 128/19 143/22 154/6 154/10 170/22
**next [20]** 38/13 39/24 44/5 61/2 69/15 71/21 79/17 84/8 89/5 95/14 102/16 114/24 132/10 132/11 133/5 136/9 144/12 149/22 149/22 173/6
**Nick [13]** 39/4 39/6 39/6 89/9 89/10 89/12 92/15 93/1 93/1 93/15 93/15 94/23 94/24
**Nicks [3]** 39/11 39/17 39/19
**night [1]** 75/25
**nip [1]** 166/15
**Nobody [1]** 7/17
**nonetheless [2]** 30/6 156/10
**nonmonetary [1]** 171/13
**nonparties [1]** 8/22
**nonparty [1]** 7/10
**Nonverbal [1]** 132/4
**nor [2]** 136/1 154/17
**normal [3]** 160/22 160/22 161/11
**normally [1]** 51/18
**nos [1]** 24/17
**note [6]** 60/7 62/20 65/14 136/7 154/1 154/13
**notebook [3]** 63/3 63/4 63/5
**notes [8]** 144/21 149/16 149/16 149/17 149/24 150/11 150/15 154/17
**nothing [7]** 46/10 48/21 77/22 86/14 100/7 122/24 162/16
**notice [2]** 58/23 161/13
**notion [1]** 6/14
**November [1]** 62/2
**November 11 [1]** 62/2
**number [8]** 65/19 66/6 91/13 105/8 132/15 145/14 154/21 171/10
**Number 5 [1]** 154/21
**numbering [1]** 54/24
**numerous [1]** 26/3
**nurses [4]** 21/16 102/10 102/12 102/12

**O**

**o'clock [1]** 134/2
**oath [1]** 134/6
**object [5]** 24/18 113/20 126/9 129/1 131/2
**objecting [2]** 110/25 111/1
**objection [49]** 25/22 29/25 32/12 40/22 41/25 52/12 52/12 55/11 55/12 56/9 56/10 57/5 58/2 58/4 60/1 60/6 67/20 67/25 68/1 71/1 76/24 77/21

78/17 83/20 84/15 84/17 85/4 85/9 86/13 87/12 89/1 89/18 92/1 94/11 101/13 102/3 105/22 109/1 110/14 126/15 131/8 132/25 139/20 147/3 147/12 149/7 149/19 151/14 167/3
**objections [1]** 151/17
**objects [1]** 41/22
**observation [2]** 127/5 135/25
**observations [2]** 156/10 156/24
**observe [3]** 133/12 136/5 140/21
**observed [2]** 51/13 51/17
**observer [15]** 12/8 12/13 12/15 14/23 22/6 32/10 39/2 52/17 60/17 60/23 96/1 96/4 104/16 105/4 118/11
**observers [21]** 12/3 51/2 51/6 73/16 73/19 73/22 74/9 74/11 74/15 74/18 101/24 108/23 108/25 109/5 109/9 109/11 109/12 109/18 115/12 156/4 156/7
**observes [1]** 52/17
**observing [1]** 141/6
**obtain [3]** 12/10 43/24 70/4
**obtained [17]** 6/23 6/24 13/2 40/11 42/5 42/13 43/12 43/13 53/6 70/13 70/15 75/1 121/8 152/17 152/18 153/7 157/22
**obtaining [3]** 16/3 16/7 40/16
**obvious [1]** 119/2
**obviously [15]** 5/5 8/14 8/16 15/9 56/16 58/24 65/14 111/25 122/13 125/7 127/18 157/6 160/5 165/2 168/11
**occasionally [1]** 149/13
**occasions [1]** 147/7
**occupation [1]** 128/16
**occur [2]** 148/2 155/7
**occurred [1]** 155/8
**occurring [2]** 145/3 162/9
**October [4]** 55/25 61/24 70/15 91/20
**October 14 [1]** 55/25
**October 17th [1]** 91/20
**October 21th [1]** 70/15
**October 8th [1]** 61/24
**offer [21]** 12/16 13/16 55/9 56/7 57/25 59/15 59/23 61/10 63/1 65/9 65/25 67/23 68/4 69/6 70/24 71/8 71/14 71/23 72/6 86/10 133/18
**offered [3]** 27/19 33/3 89/7
**offering [1]** 119/8
**offers [1]** 70/18
**office [17]** 29/7 29/10 39/21 90/6 96/22 96/22 96/23 96/23 96/23 143/24 143/25 144/2 144/3 144/5 144/17 144/25 146/25
**officer [3]** 31/6 33/19 33/22
**offices [4]** 26/20 70/10 96/21 144/18
**often [1]** 59/11
**Oh [3]** 71/22 167/23 167/25
**old [1]** 136/3
**once [5]** 12/14 13/2 42/25 43/14 152/16
**one-sided [1]** 163/7
**ones [1]** 93/18
**ongoing [2]** 101/7 154/24
**online [1]** 99/14
**open [12]** 2/1 20/7 36/21 36/24 37/4

46/24 61/15 86/3 86/3 87/1 113/18 116/10
**opened [10]** 30/6 37/6 38/15 40/16 50/18 50/21 53/23 115/25 116/13 121/11
**opening [9]** 3/10 8/23 15/9 15/20 17/14 32/23 35/3 35/6 54/2
**openings [1]** 4/13
**operate [1]** 12/5
**operating [3]** 7/2 152/16 153/3
**opinion [6]** 85/6 85/9 85/14 85/16 85/17 127/7
**opportunity [4]** 112/15 126/12 126/25 165/12
**opposed [1]** 163/15
**opposing [2]** 166/13 168/16
**opposition [3]** 92/4 117/3 165/22
**orally [1]** 159/9
**order [13]** 14/15 16/18 45/21 88/1 96/23 99/3 127/19 153/22 158/25 159/18 160/24 166/4 172/10
**ordered [2]** 38/10 73/3 163/1
**ordering [1]** 159/19
**ordinarily [1]** 122/17
**original [1]** 6/10
**otherwise [3]** 18/19 148/19 163/1
**ought [2]** 114/8 158/5
**ourselves [2]** 93/6 159/22
**outsourcing [1]** 72/6
**overkill [1]** 17/16
**overly [1]** 157/1
**overrule [2]** 60/6 129/4
**overruled [19]** 30/4 41/11 52/13 67/22 71/2 78/18 79/16 84/18 85/11 86/15 87/14 89/3 89/23 94/12 101/15 106/12 109/3 147/14 149/20
**own [31]** 11/9 11/19 14/19 22/20 31/25 33/1 39/19 51/23 76/3 81/13 81/18 81/20 85/2 89/13 95/23 101/4 102/13 104/7 116/1 116/1 116/11 116/23 123/11 123/12 124/6 124/16 127/11 127/22 135/25 139/16 153/22
**owned [5]** 39/15 39/17 43/21 43/25 87/19
**owner [7]** 9/17 9/18 9/19 9/21 32/11 39/13 67/6
**ownership [3]** 32/16 32/25 35/8

**P**

**p.m [1]** 1/5
**page [21]** 44/5 54/7 54/13 54/14 54/19 54/19 54/21 54/22 55/1 61/20 61/24 62/2 62/5 62/11 64/25 71/21 80/4 114/24 142/10 174/2 174/14
**pages [4]** 62/11 62/18 62/21 154/21
**paid [22]** 13/10 51/9 61/21 61/25 62/3 62/5 97/8 100/15 119/16 119/25 120/2 120/6 120/11 122/10 123/22 124/8 124/18 124/24 125/3 146/9 155/6 157/6
**painstaking [1]** 16/22
**PAMELA [1]** 1/10
**Panek [5]** 48/5 48/6 48/7 92/15 118/6
**papers [2]** 69/1 111/23
**paragraph [2]** 67/1 67/4
**paralegal [2]** 10/22 29/5

**P**

part [16]  32/9 56/15 57/15 77/16 79/21 112/25 127/14 133/2 133/3 139/17 141/24 155/13 161/20 169/6 169/22 170/19
Partial [1]  153/2
participant [2]  151/8 151/21
participating [1]  151/14
particular [1]  51/13
particularly [1]  156/20
parties [17]  2/5 3/5 3/9 114/16 135/9 156/25 159/21 160/6 161/25 162/1 164/4 164/23 164/24 165/4 166/4 170/16 173/8
parties' [1]  6/9
partly [2]  36/7 112/6
partner [6]  17/23 48/17 49/3 93/20 94/5 117/5
partner's [1]  48/7
partners [8]  14/20 17/24 94/3 96/13 96/25 97/4 98/1 108/8
partnership [3]  25/19 26/3 30/13
parts [2]  32/14 155/14
party [9]  2/13 8/7 8/16 110/20 110/23 111/9 111/12 111/17 164/18
past [1]  148/16
Patent [1]  70/10
path [1]  50/8
patron [1]  10/2
Pause [2]  76/14 121/23
pay [18]  19/7 20/9 74/15 86/10 86/16 97/7 100/12 122/7 122/8 122/9 122/18 123/1 123/5 136/8 154/25 155/9 156/6 159/25
paying [6]  53/9 122/21 125/10 125/15 155/2 156/11
payment [2]  11/18 163/22
payments [11]  61/17 62/13 62/21 122/23 123/11 130/7 130/24 148/11 154/21 161/2 163/22
pending [1]  164/25
Pennsylvania [1]  75/23
people [13]  20/23 27/15 38/1 38/3 38/4 38/10 75/18 78/8 78/23 82/5 82/7 86/21 90/5
peoples' [1]  78/25
per [8]  21/14 75/25 80/1 100/21 100/22 100/22 102/10 124/22
percent [11]  11/17 11/23 33/3 39/13 39/15 39/17 39/22 39/22 78/13 101/9 101/20
Perez [1]  2/23
perfect [2]  11/11 173/4
perform [2]  27/11 32/10
perhaps [13]  3/6 7/2 18/16 22/3 59/9 131/15 156/8 158/12 161/19 162/1 164/9 167/20 172/10
period [1]  165/8
permissibility [1]  129/7
permission [5]  23/7 55/19 56/22 130/9 130/10
perseverance [1]  18/3
person [12]  4/6 4/7 49/3 60/21 69/15 101/3 135/19 135/24 136/1 137/17

personal [22]  10/13 12/7 12/9 12/11 12/12 12/20 14/25 29/17 43/20 43/21 43/25 45/5 45/14 52/20 61/22 73/15 73/15 81/8 88/13 96/19 101/18 102/18
personality [1]  46/9
personally [3]  71/25 111/24 170/24
phone [10]  1/20 22/13 22/14 22/14 88/24 90/4 141/8 148/21 153/1 156/12
physically [1]  140/25
physician [2]  54/16 55/3
PI [2]  17/21 21/15
pick [2]  45/22 142/1
picked [1]  150/7
picture [1]  65/4
piqued [1]  28/22
pitch [1]  49/7
pitched [5]  49/17 49/20 83/16 88/8 88/22
PKC [1]  1/2
place [3]  16/9 99/21 160/23
placed [1]  63/15
plaintiff [35]  1/4 1/13 2/6 2/8 2/11 2/19 3/25 4/6 8/3 8/4 14/12 14/13 15/2 15/14 16/12 17/9 18/9 19/19 23/2 36/17 56/12 113/1 115/10 157/9 157/12 157/25 158/2 158/5 158/13 158/18 163/2 164/18 165/13 172/11 174/14
plaintiff's [41]  4/19 41/6 53/13 55/10 55/14 55/16 55/18 56/8 56/21 58/1 58/7 58/9 60/14 60/25 61/11 62/25 63/2 66/8 68/3 68/6 69/7 69/10 70/8 90/19 105/10 105/14 131/23 131/25 136/16 136/18 142/7 151/4 157/4 157/11 161/15 161/18 165/19 168/22 170/3 170/14 172/21
plaintiffs [6]  7/14 7/21 18/9 52/21 165/16 166/19
plan [4]  7/20 12/3 13/17 99/4
platform [3]  14/4 14/14 81/24
play [14]  16/5 131/6 131/11 131/12 131/18 132/1 133/6 133/22 134/9 135/14 140/3 140/13 142/2 143/2
played [8]  132/7 132/13 135/17 136/12 137/11 142/9 143/1 143/11
playing [4]  136/10 136/15 142/7 143/10
plead [16]  5/18 17/11 53/11 58/16 58/19 61/3 61/19 61/23 62/1 62/4 62/8 123/4 123/7 123/15 124/11 124/22
pleading [1]  124/12
pleadings [1]  91/10
Plenty [1]  101/25
PLLC [3]  1/13 1/16 2/8
pluck [1]  17/19
poach [1]  9/21
pocket [8]  159/15 160/2 165/11 165/14 165/17 165/20 167/18 170/10
podium [1]  23/8
point [33]  4/8 6/8 7/5 8/1 25/8 28/1 30/17 31/17 35/2 35/5 35/11 50/1 53/9 54/15 55/3 61/14 85/20 95/16 105/6 112/13 119/2 135/15 146/17 151/20 157/5 164/12 164/14 168/4 168/19 171/1 171/5 171/6 172/3

pointers [2]  118/12 118/18
points [2]  158/10 162/14
policed [1]  154/2
policy [2]  25/12 25/18
Pollak [3]  39/20 90/5 94/4
popped [1]  50/23
portion [1]  132/21
position [5]  59/7 98/17 98/18 100/10 161/15
possibility [2]  159/19 160/6
possible [2]  140/10 153/9
possibly [2]  136/3 155/2
post [1]  6/17
post-hearing [1]  6/17
potential [10]  27/15 45/15 49/11 82/11 87/21 88/11 101/12 129/7 129/23 165/8
potentially [2]  130/5 166/13
Povman [1]  26/20
power [1]  147/9
practice [3]  12/21 38/20 115/24
precipice [1]  16/11
precisely [3]  135/2 137/2 148/20
preclude [1]  168/21
prefer [6]  8/12 8/15 129/6 159/9 164/5 166/16
prefers [1]  159/24
pregnant [1]  17/21
prejudice [1]  129/7
preliminary [14]  1/9 2/3 3/7 28/17 109/15 111/4 111/15 113/8 145/9 154/3 157/2 157/7 167/7 167/13
premature [1]  111/16
premise [1]  27/14
preparation [1]  172/25
prepare [3]  17/15 126/13 126/25
prepared [3]  153/18 159/15 160/8
preponderance [1]  153/20
prepped [1]  93/2
present [8]  8/10 16/16 40/6 45/8 45/9 55/17 56/20 58/8 63/1 66/7 68/5 78/6 93/6 133/8 133/10 140/25 144/13 144/15
presentation [1]  172/25
presented [6]  22/19 38/23 38/24 40/7 150/24 164/15
president [7]  10/14 25/8 25/11 30/9 31/5 33/7 149/2
press [1]  131/18
pressing [1]  132/1
pretty [3]  134/18 157/23 162/5
prevent [3]  15/1 51/5 164/6
prevented [1]  14/13
previous [2]  98/22 98/24
previously [9]  49/17 49/20 53/13 63/2 66/8 68/5 105/8 131/22 134/14
price [7]  13/17 119/17 119/25 120/2 120/6 120/11 160/19
prices [3]  21/10 99/13 102/20
pricing [6]  96/14 104/1 119/8 119/10 119/11 120/14
primarily [1]  130/7 149/15 171/25
print [1]  99/19
printed [1]  99/22 99/23 99/23
printout [1]  70/9
prior [13]  11/1 18/22 19/3 28/24 28/25

**P**

**prior... [8]** 29/14 40/4 49/17 85/7 107/11 107/12 147/21 153/1
**private [10]** 15/25 16/20 52/11 52/17 128/17 128/20 128/22 143/22 145/1 147/8
**privileged [1]** 149/19
**probability [2]** 4/16 4/20
**problem [6]** 8/9 134/15 134/23 141/18 143/19 172/8
**problems [1]** 145/3
**procedure [3]** 152/16 153/3 172/8
**proceed [1]** 135/11
**proceeding [3]** 6/2 8/18 172/24
**proceedings [4]** 1/23 76/14 111/17 121/23
**process [8]** 12/2 69/25 113/24 114/5 142/2 160/22 165/23 170/19
**produce [2]** 150/18 150/21
**produced [1]** 1/24
**product [1]** 54/10
**professional [3]** 82/9 93/7 101/5
**professionals [1]** 72/18
**proffer [2]** 5/16 126/19
**profit [1]** 76/5
**project [1]** 23/20
**projecting [1]** 26/25
**promised [1]** 11/17
**prompting [1]** 146/15
**properties [1]** 75/16
**property [5]** 75/19 75/20 75/22 76/3 129/16
**proposal [1]** 4/14
**proposition [1]** 154/5
**proprietary [4]** 10/16 11/14 18/12 155/20
**prosecuted [1]** 13/23
**prospect [1]** 32/23
**protect [1]** 9/15
**protocols [2]** 134/13 157/18
**prove [5]** 3/11 17/1 18/9 18/10 22/10
**provide [24]** 3/21 9/24 13/13 35/11 36/10 51/1 71/16 72/3 72/17 72/12 72/22 72/24 73/22 101/11 101/24 102/22 103/9 126/16 138/3 155/1 158/5 159/20 159/21 160/1
**provided [12]** 11/20 11/21 15/5 35/14 36/2 36/11 41/8 51/8 63/25 73/19 126/10 149/25
**provider [1]** 128/18
**provides [1]** 67/6
**public [3]** 12/11 56/15 82/8
**publicly [1]** 56/19
**publish [3]** 103/14 103/17 103/18
**published [1]** 103/18
**publishes [4]** 21/8 21/9 21/9 21/10
**purchase [3]** 60/16 60/22 97/1
**purchased [2]** 14/15 19/21
**purport [1]** 135/7
**purpose [2]** 20/6 37/21
**purposes [1]** 4/15
**pursuant [1]** 124/25
**put [19]** 23/10 63/4 65/18 96/18 101/18 101/18 104/6 132/10 132/11
137/9 138/10 139/5 143/7 158/14 165/17 165/20 167/18 168/10 169/22
**putting [1]** 149/25

**Q**

**qualification [1]** 72/21
**qualifications [2]** 128/20 129/3
**qualified [1]** 71/10
**quality [4]** 51/19 51/23 51/24 52/3
**quantify [1]** 157/4
**question [51]** 19/10 24/19 24/19 24/20 25/24 28/13 31/8 32/15 33/13 34/7 36/8 36/10 36/13 38/13 39/24 41/20 45/11 52/15 59/18 69/11 71/3 71/5 71/7 72/8 72/9 73/6 73/6 74/20 74/23 79/17 83/1 89/24 93/10 95/14 97/16 102/16 122/7 122/25 123/1 123/21 124/7 125/8 139/10 147/16 151/13 151/25 152/13 156/22 158/17 164/4 166/3
**questioning [2]** 111/2 154/14
**questions [27]** 4/5 4/8 4/10 15/23 24/12 24/12 24/16 37/18 41/14 50/22 76/16 76/20 93/5 111/16 114/10 114/22 121/24 122/3 122/8 122/15 125/18 138/24 149/14 151/3 151/5 151/12 153/11
**quick [1]** 156/5
**quicker [1]** 131/15
**quickly [6]** 6/13 11/22 126/4 134/12 145/12 146/2
**quit [2]** 95/16 95/20
**quite [12]** 7/4 26/25 41/15 106/13 126/14 154/16 155/4 157/13 158/13 163/21 164/23 169/19
**quote [4]** 76/15 148/1 158/23 172/6
**quote/unquote [3]** 148/1 158/23 172/6
**quoting [1]** 106/12

**R**

**R-O-M-B-O-M [1]** 128/8
**radius [2]** 96/18 96/20
**rails [1]** 151/2
**raise [4]** 81/17 126/15 128/2 168/4
**rampant [2]** 160/25 160/25
**ran [2]** 79/11 79/12
**rate [1]** 114/7
**rather [4]** 127/16 145/12 145/21 170/11
**reached [2]** 126/18 162/1
**read [6]** 11/2 26/18 67/8 71/6 74/24 91/12
**reading [1]** 41/14
**ready [5]** 13/2 13/3 132/18 134/2 164/12
**real [1]** 115/6
**realistic [1]** 160/15
**realize [1]** 140/8
**realized [4]** 12/14 14/20 112/19 146/11
**really [11]** 6/13 36/5 52/1 85/18 100/6 101/8 112/17 140/20 141/17 156/6 157/11
**reason [14]** 49/24 59/25 60/15 60/20 64/15 65/15 97/14 115/25 119/10 119/13 121/17 135/6 139/13 155/8
**reasonable [1]** 155/7

**recall [14]** 35/10 40/2 43/22 45/16 45/16 65/20 65/21 66/3 81/4 86/9 97/5 121/10 137/5 144/15
**recalled [1]** 4/11
**recalling [2]** 131/4 131/4
**receipt [1]** 91/17 91/20
**receive [8]** 57/3 57/8 57/9 57/14 59/22 122/22 132/19 160/4
**received [32]** 12/4 14/11 46/17 53/3 53/6 53/17 53/20 55/16 55/22 56/2 56/25 57/20 58/7 58/12 58/15 59/9 59/18 60/4 60/14 61/4 62/25 65/5 68/3 69/10 92/8 100/18 118/15 122/18 123/23 125/11 131/25 136/18
**received that [1]** 46/17
**receiving [2]** 60/10 130/7
**recently [2]** 70/15 108/21
**recognize [1]** 91/1
**recognized [3]** 9/5 9/11 47/25
**recollection [2]** 91/21 91/23
**recompensed [1]** 169/8
**reconcile [1]** 19/11
**record [21]** 2/6 6/5 23/18 23/23 41/15 63/14 111/6 111/8 111/14 122/14 124/4 128/7 132/14 132/21 134/5 138/20 148/2 152/4 152/4 152/10 152/19
**recorded [9]** 1/23 130/21 132/23 140/9 140/24 141/1 141/11 141/13 163/17
**recorder [1]** 142/1
**recording [29]** 132/7 132/9 132/13 132/15 133/5 133/7 133/18 133/23 136/10 136/12 136/15 136/21 136/23 137/11 137/13 137/14 141/7 141/10 141/12 142/9 143/12 143/14 143/18 147/25 152/7 152/21 154/22 162/22 163/4
**recordings [13]** 132/16 134/10 134/12 135/4 135/16 136/9 137/22 138/4 138/14 138/20 144/14 163/21 173/1
**records [5]** 129/22 130/6 160/23 161/1 163/23
**recount [1]** 131/8
**recounting [1]** 163/10
**recross [2]** 76/15 152/2
**recruit [1]** 74/8
**rectification [1]** 162/4
**red [1]** 162/15
**redacted [2]** 56/18 103/25
**redactions [2]** 103/23 103/24
**redirect [4]** 115/1 115/3 121/25 151/6
**reduced [1]** 11/24
**refer [4]** 63/9 106/1 107/3 146/7
**referenced [1]** 51/9
**referrals [1]** 96/12
**referred [2]** 147/10 147/13
**referring [10]** 60/25 61/20 61/24 62/2 62/5 109/14 109/15 123/22 136/2 137/2
**refine [1]** 145/18
**reflect [2]** 63/14 132/14
**reflected [1]** 62/14
**regard [2]** 124/7 169/20
**regarding [2]** 18/7 74/18
**regretted [1]** 148/3
**relate [2]** 6/7 114/11
**related [2]** 124/5 129/17

**R**

**relating [6]** 4/8 112/9 112/23 114/3 122/19 124/16
**relationship [4]** 10/8 10/10 109/8 154/24
**relationships [2]** 108/25 109/4
**release [4]** 14/9 20/10 42/25 43/4
**released [3]** 14/11 19/14 19/20
**Relevance [5]** 76/25 79/15 102/3 109/1 147/12
**relevant [5]** 6/7 7/5 149/13 156/20 157/11
**relief [7]** 3/7 6/25 6/25 76/21 115/9 157/7 158/12
**reliefs [1]** 162/12
**rely [3]** 3/15 78/25 112/12
**relying [1]** 3/22
**remain [6]** 8/15 8/25 23/5 56/14 56/16 128/1
**remaining [1]** 39/17
**remains [1]** 156/22
**remarkably [1]** 130/2
**remember [4]** 9/8 15/8 114/7 121/9
**remind [1]** 134/6
**reminded [1]** 35/8
**reminding [1]** 13/21
**remove [1]** 141/21
**renowned [1]** 15/25
**rental [4]** 75/16 75/19 75/22 76/3
**rentals [1]** 78/11
**repeat [4]** 28/3 30/25 33/14 74/23
**repeating [1]** 162/22
**rephrase [3]** 60/19 141/4 146/20
**reply [11]** 108/6 165/13 165/19 165/19 166/6 170/14 170/23 171/8 172/5 172/6 172/19
**report [19]** 11/2 21/9 51/3 51/8 51/11 51/12 51/13 51/15 51/20 51/21 53/2 53/3 53/6 54/8 56/4 103/18 103/20 121/10 121/19
**reported [4]** 13/8 68/17 79/13 154/9
**reporter [6]** 1/20 9/8 36/9 41/15 64/12 95/2
**reporting [3]** 15/4 69/3 84/7
**reports [12]** 12/3 13/13 51/2 52/10 52/16 74/2 74/5 82/1 103/21 121/8 121/14 121/18
**represent [7]** 24/1 65/2 67/10 110/19 110/22 111/9 114/15
**representative [1]** 2/13
**represented [1]** 70/7
**reputation [8]** 67/5 106/9 107/6 107/15 127/9 127/10 157/10 161/19
**request [6]** 18/11 42/19 111/4 111/15 167/19 170/19
**requested [10]** 94/2 112/4 115/9 121/19 130/9 130/10 132/17 157/1 158/13 162/12
**requesting [1]** 6/25
**required [2]** 126/16 159/25
**residual [2]** 100/19 100/20
**residuals [1]** 100/17
**resolution [3]** 161/18 165/6 167/15
**resolve [2]** 156/19 165/3

**resolved [2]** 167/4 167/11
**respect [10]** 17/18 21/8 79/4 110/20 110/22 111/3 111/9 111/15 159/17 162/20
**respectfully [3]** 12/9 15/13 162/15
**respond [7]** 165/12 165/17 167/18 168/13 171/3 172/9 172/17
**responding [1]** 165/22
**response [3]** 17/5 30/4 170/9
**responsibilities [1]** 79/10
**responsibility [1]** 33/22
**responsible [2]** 9/22 73/15
**restart [2]** 107/16 160/13
**restaurant [1]** 37/16
**result [2]** 9/14 9/23
**retained [2]** 129/13 147/18
**return [2]** 137/2 146/11
**reveal [2]** 42/19 145/16
**revenue [6]** 98/1 98/2 156/5 156/6 161/19 169/18
**revenues [3]** 75/4 75/7 97/19
**review [1]** 165/11
**reviewing [2]** 90/23 90/24
**reviews [1]** 104/7
**reward [2]** 13/9 86/23
**right [102]** 2/16 3/1 5/19 6/1 8/6 8/7 8/16 9/1 22/22 22/24 25/25 29/5 29/10 29/12 29/24 30/9 31/6 32/7 33/21 35/1 35/3 36/13 36/25 38/13 39/24 43/3 46/7 49/2 50/6 52/6 52/9 55/20 57/17 57/21 58/23 59/24 62/22 63/3 63/22 65/22 66/20 68/2 68/7 68/14 69/8 73/13 76/3 76/17 78/2 82/14 83/24 87/2 88/19 90/13 93/13 94/1 96/10 98/4 103/12 107/4 107/8 109/17 111/17 111/23 113/5 113/19 114/8 114/17 116/17 118/7 120/3 121/2 121/15 121/18 122/2 122/20 123/16 124/15 125/25 128/2 131/7 134/1 136/4 136/17 137/9 138/19 139/25 140/11 141/1 142/4 143/9 151/24 159/3 159/8 166/7 167/8 167/9 169/9 169/13 170/4 171/17 172/8
**rise [2]** 2/2 6/3
**risk [2]** 157/10 157/24
**risks [1]** 162/24
**Roa [37]** 16/10 16/10 16/12 21/24 22/12 63/18 64/16 68/9 69/3 97/2 98/6 98/8 98/9 98/10 100/3 107/22 107/23 108/20 108/21 109/13 109/18 109/22 110/12 110/18 110/20 110/22 111/3 111/9 111/21 111/22 112/11 112/17 120/16 120/22 127/16 166/20 171/25
**Roa's [5]** 22/14 112/23 112/25 127/7 127/12
**road [1]** 12/4
**Roman [3]** 39/20 90/5 94/4
**Rombom [21]** 15/25 16/2 16/6 126/7 127/23 127/24 128/8 128/11 128/15 129/9 131/14 132/16 134/12 136/22 137/18 139/1 140/16 143/17 145/1 153/13 154/18
**Rombom's [3]** 135/5 135/12 163/24
**Ron [3]** 10/18 27/18 46/6
**Ronald [36]** 10/3 10/8 11/3 11/12 24/21 24/24 25/19 26/3 26/9 26/14

26/19 27/3 27/22 27/23 28/1 28/4 28/24 29/14 29/20 29/23 30/8 30/11 30/13 46/7 81/3 81/24 82/7 83/3 83/7 83/11 83/15 83/18 84/10 86/6 115/15 117/4
**Ronald's [1]** 10/9
**room [1]** 143/20
**Rosati [1]** 95/9
**Rosenberg [1]** 64/3
**Rosenblatt [132]** 5/25 10/3 10/6 10/8 10/9 10/23 11/3 11/8 11/12 11/19 11/25 12/16 13/6 14/22 16/5 16/7 16/9 16/17 18/11 18/22 19/4 19/14 19/22 19/22 20/8 22/19 24/21 24/24 25/19 26/3 26/9 26/14 26/20 27/3 27/18 27/22 27/22 27/24 28/1 28/5 28/24 29/14 29/20 29/23 30/8 30/14 30/18 31/15 33/22 34/10 36/12 46/6 46/7 46/13 47/10 47/19 47/20 53/18 57/12 60/7 61/15 61/21 62/15 65/4 65/7 81/3 81/24 82/7 83/3 83/8 83/11 83/15 83/18 83/21 84/3 84/10 86/7 115/15 117/4 122/8 122/9 122/10 122/19 122/21 123/10 124/5 124/8 124/18 124/24 124/25 125/15 130/4 130/11 130/12 132/17 134/24 137/20 138/21 139/1 139/6 139/15 139/18 140/9 141/5 141/16 141/19 144/7 144/9 144/24 149/12 149/15 150/6 151/8 152/5 153/1 153/21 154/15 154/18 154/21 155/3 155/16 156/1 156/12 156/15 156/16 158/4 162/9 162/13 162/17 162/22 163/11 163/24 164/10
**Rosenblatt's [6]** 18/24 19/18 31/9 139/14 143/25 144/17
**roughly [2]** 78/13 153/17
**routinely [3]** 43/17 50/18 50/21
**row [1]** 135/16
**RPR [1]** 1/20
**rubbed [3]** 140/19 141/15 141/16
**rule [6]** 8/19 41/25 126/21 127/8 127/14 127/20
**rules [3]** 9/21 10/4 24/6
**run [5]** 12/5 13/23 14/18 81/19 160/23
**running [5]** 12/23 13/3 81/23 108/16 160/25
**runs [1]** 12/19
**rush [2]** 87/1 161/12
**rustling [2]** 140/18 141/3
**ruthless [1]** 85/18

**S**

**S-A-F-A [2]** 3/2 23/24
**S-U-B-I-N [2]** 42/11 93/24
**sabotage [5]** 13/13 42/6 42/15 118/23 119/5
**sabotaging [1]** 43/11
**sacrifices [1]** 36/22
**SAFA [27]** 1/6 3/2 10/1 10/3 10/9 11/3 12/6 12/23 13/5 13/11 13/12 13/21 13/25 14/6 14/8 14/17 16/18 19/25 20/8 23/2 23/14 23/24 60/7 65/16 130/22 130/24 145/11
**safe [5]** 44/1 45/2 45/5 45/7 155/1
**safeguards [1]** 160/22
**salaried [1]** 10/16
**salary [3]** 11/17 11/23 156/7

**S**

**sales [10]** 35/24 36/3 36/14 40/20 40/20 41/8 56/24 99/23 100/9 100/10
**salesperson [2]** 96/2 100/6
**sample [3]** 12/3 51/2 51/4
**sampling [3]** 171/22 171/24 172/2
**Satellite [1]** 102/1
**satisfies [1]** 127/20
**saying [23]** 4/19 4/21 4/23 18/1 18/1 38/5 41/3 47/9 48/11 48/24 59/6 59/8 83/22 104/21 122/14 122/17 124/3 134/23 134/25 137/18 137/25 146/12 163/11
**says [19]** 15/15 28/10 54/10 54/15 54/19 54/21 55/3 56/12 60/7 63/20 64/21 67/8 67/10 67/13 71/18 71/22 106/24 107/23 120/12
**scandalous [1]** 59/3
**schedule [4]** 95/10 166/6 166/23 171/7
**schedules [1]** 79/1
**scheme [1]** 13/24
**school [4]** 17/24 78/23 94/23 98/11
**scope [4]** 22/1 22/16 84/1 156/22
**screen [5]** 65/1 82/1 82/1 82/18 82/20
**screened [1]** 82/9
**screening [2]** 10/5 83/15
**screenings [1]** 82/1
**screenshot [6]** 63/17 64/20 64/23 65/1 65/7 68/12
**screwed [1]** 116/21
**seal [1]** 56/17
**sealed [2]** 56/13 56/15
**seat [3]** 112/22 114/17 128/6
**seated [3]** 2/24 8/15 8/25
**second [36]** 15/15 18/4 40/25 41/2 49/21 54/7 57/24 61/24 64/25 67/4 67/4 84/5 88/6 88/21 88/22 89/3 108/7 109/2 111/7 132/19 133/6 133/22 134/21 136/19 136/23 137/1 137/6 137/7 139/17 140/8 140/17 141/11 148/23 154/6 158/24 162/20
**seconds [2]** 140/11 142/6
**secret [1]** 17/7
**secrets [8]** 5/3 9/19 11/13 12/17 157/17 157/18 160/24 168/8
**secure [1]** 16/18
**security [1]** 128/17
**see [40]** 6/22 6/23 22/25 23/10 24/20 41/2 50/2 50/2 50/9 51/23 54/18 59/5 63/21 64/17 64/17 64/25 67/9 71/22 88/14 100/2 107/22 110/15 110/15 112/17 127/3 130/25 135/24 135/25 136/1 137/12 141/5 141/14 143/19 154/17 158/7 160/12 160/16 163/14 167/14 170/17
**seek [2]** 87/11 87/14
**seeking [3]** 43/16 130/13 150/10
**seem [2]** 100/7 115/2
**selective [1]** 122/12
**self [1]** 122/21
**self-incrimination [1]** 122/21
**sell [2]** 78/21 78/22
**selling [1]** 149/4

**send [8]** 13/13 46/11 73/3 86/18 86/20 107/14 108/2 141/10
**senior [6]** 93/20 94/3 129/21 129/21 130/4 139/19
**sense [7]** 4/3 7/3 107/6 149/6 156/10 165/9 172/23
**sensitive [1]** 17/8
**sent [40]** 19/6 19/7 19/8 20/17 20/18 43/5 46/11 46/14 46/14 47/10 47/17 47/19 47/21 48/4 57/15 57/16 60/15 60/20 63/22 64/23 65/7 65/12 65/24 66/21 67/24 68/11 74/5 74/6 85/25 86/11 86/16 86/24 93/3 99/1 99/19 107/25 108/4 120/5 122/24 145/14
**sentence [1]** 67/4
**separate [2]** 62/21 168/11
**separately [1]** 171/14
**series [2]** 24/11 122/7
**serious [1]** 157/24
**serve [2]** 111/24 112/5
**served [16]** 68/25 75/10 110/1 110/4 110/24 111/13 111/21 112/10 112/19 113/12 113/13 113/15 113/22 113/25 166/10 166/12
**server [1]** 113/24
**service [19]** 49/16 72/5 72/6 73/4 73/11 73/12 73/18 88/25 93/8 93/9 94/14 111/14 112/3 112/4 113/16 114/5 118/20 130/8 146/6
**services [24]** 12/8 12/13 60/17 60/23 70/19 70/24 71/8 71/17 71/18 71/21 71/23 72/4 72/11 72/12 72/14 72/22 72/24 73/1 73/2 73/9 102/22 103/10 118/15 128/17
**servicing [1]** 168/22
**set [8]** 11/12 17/23 90/7 96/18 99/11 148/21 166/22 172/20
**setting [2]** 30/14 38/22
**settlement [3]** 160/11 162/1 170/17
**setup [2]** 140/22 143/24
**seven [4]** 66/6 66/9 108/12 156/7
**several [1]** 86/1
**SG [1]** 65/15
**shadow [1]** 35/17
**Shalit [8]** 111/8 112/2 112/21 112/22 113/6 114/11 165/24 166/18
**shape [1]** 141/9
**Shapiro [1]** 95/9
**share [2]** 155/21 155/22
**shareholder [3]** 10/17 31/7 33/3
**sharing [1]** 155/17
**Sharks [4]** 21/11 21/12 21/13 102/9
**short [3]** 6/20 130/2 134/4
**shorten [3]** 4/17 4/18 165/23
**shortly [1]** 20/11
**shouldn't [1]** 127/15
**show [11]** 19/25 20/15 22/3 22/12 43/5 90/21 96/16 97/12 97/14 157/9 169/17
**showed [4]** 94/4 94/14 145/12 145/13
**showing [2]** 14/12 157/14
**shown [1]** 148/11
**shows [1]** 172/2
**shut [1]** 157/3
**shutdown [1]** 78/15
**shuts [1]** 115/5

**side [8]** 3/14 7/14 63/22 63/25 66/2 132/22 134/16 156/9
**sided [1]** 163/7
**sides [3]** 150/25 159/9 165/6
**SIEGLER [28]** 1/18 2/21 3/20 4/7 5/13 7/16 17/3 58/25 60/1 76/18 108/18 114/20 122/5 138/2 140/7 160/5 160/7 160/15 164/1 165/11 166/17 167/18 168/12 172/9 172/17 174/5 174/10 174/12
**Siegler's [1]** 59/12
**signals [1]** 58/24
**significant [4]** 74/2 74/25 145/14 157/10
**silent [1]** 59/1
**similar [4]** 21/16 102/22 122/8 158/6
**similarly [1]** 56/4
**simply [1]** 127/21
**single [4]** 62/10 62/19 78/24 90/8
**sit [4]** 8/11 8/16 37/24 96/21
**sitting [8]** 7/12 7/23 18/6 88/23 143/25 144/7 144/8 144/12
**situation [3]** 129/19 145/8 162/4
**six [7]** 14/6 17/21 138/17 144/4 144/4 144/5 144/5
**six-years [1]** 14/6
**sizable [1]** 144/5
**size [2]** 144/2 144/3
**skip [2]** 5/12 7/5
**slightly [1]** 165/3
**slow [3]** 30/3 36/6 42/3
**slower [7]** 9/7 10/24 26/17 36/4 36/19 41/13 41/17
**slowly [2]** 50/20 145/15
**small [2]** 132/21 169/4
**smart [1]** 108/3
**Smartdog [1]** 102/9
**Smartdogs [1]** 21/14
**smoothly [1]** 13/5
**so-called [1]** 145/19
**social [1]** 101/7
**sole [2]** 29/19 78/25
**solely [2]** 29/20 123/22
**solicit [2]** 18/24 47/1
**soliciting [1]** 125/10
**Solutions [1]** 102/9
**sometimes [1]** 120/2
**son [11]** 10/9 11/4 30/8 46/3 46/4 46/4 46/8 83/3 83/7 83/13 83/19
**soon [3]** 11/5 11/21 14/20
**sophisticated [1]** 128/23
**sorry [57]** 2/18 4/22 6/7 16/6 19/22 21/22 23/6 30/25 31/4 31/12 45/1 45/25 47/8 47/20 48/23 49/19 52/12 54/14 63/13 66/1 66/15 67/8 68/4 71/24 77/10 83/2 84/10 84/20 85/14 85/15 86/3 86/9 87/18 88/1 88/10 91/5 97/3 102/5 102/17 109/13 109/22 110/5 112/20 113/6 115/21 118/2 132/2 133/24 138/23 139/3 139/11 147/11 147/16 151/2 154/9 154/18 166/2
**sort [1]** 7/2
**sorts [1]** 156/17
**sought [1]** 30/11
**sound [2]** 141/3 146/7

**S**

**sounds [1]** 156/13
**source [1]** 78/13
**sources [1]** 75/14
**Southern [1]** 154/10
**space [1]** 21/5
**span [1]** 117/10
**Spanish [1]** 98/13
**Spanish-speaking [1]** 98/13
**speak [8]** 11/4 18/21 38/7 152/16
163/4 165/7 165/7 167/14
**speaker [2]** 137/10 141/20
**speakerphone [1]** 94/6
**speaking [7]** 33/6 71/24 98/13 140/9
147/5 147/6 163/5
**special [1]** 99/21
**specialize [1]** 128/23
**specific [4]** 18/8 73/14 125/18 148/12
**specifically [3]** 69/21 86/9 125/23
**specifics [1]** 78/4
**speech [1]** 17/15
**spell [6]** 23/17 23/23 66/23 92/17 95/3
128/7
**spelled [1]** 128/9
**spent [1]** 13/1
**spirit [2]** 4/13 18/3
**split [2]** 89/17 173/9
**spoke [7]** 34/6 40/2 78/9 84/13 89/9
130/22 130/22
**spoliation [1]** 162/25
**sponsored [3]** 96/15 96/15 96/16
**spot [1]** 141/13
**squatting [1]** 20/6
**stabs [1]** 125/18
**stake [5]** 10/17 11/17 11/19 11/23
39/23
**stand [6]** 16/10 23/5 28/16 59/4 59/7
127/25
**standard [4]** 144/3 152/16 153/3
169/25
**standby [1]** 132/18
**standing [3]** 23/5 128/1 161/19
**staring [1]** 135/17
**start [16]** 4/5 8/22 11/8 11/14 12/15
19/15 31/25 32/4 32/14 50/7 50/9 85/2
89/13 109/8 116/22 136/13
**started [29]** 5/23 7/2 7/9 10/4 10/12
17/18 17/19 20/22 20/22 42/6 43/1 53/9
69/25 90/9 95/25 96/1 97/23 110/9
117/14 117/24 118/1 118/3 118/4 118/5
123/24 146/12 146/25 151/18 156/11
**starting [6]** 2/6 10/20 81/13 84/25
95/22 155/9
**state [10]** 2/5 23/17 23/22 89/21 104/9
111/5 128/7 128/18 143/22 143/22
**stated [6]** 67/4 67/12 84/5 105/21
116/16 117/3
**statement [2]** 126/21 126/22
**statements [3]** 3/10 164/17 164/24
**states [5]** 1/1 1/3 1/10 70/9 70/18
**stay [3]** 75/25 166/25 167/12
**stayed [1]** 99/22
**stays [1]** 8/13
**steal [2]** 19/5 125/14

**stealing [3]** 67/5 156/1 169/18
**stenography [1]** 1/23
**step [2]** 126/1 153/12
**steps [1]** 126/2
**Sterling [14]** 24/22 24/24 25/2 25/5
25/8 25/11 25/12 25/20 79/5 79/8 79/10
79/18 95/16 95/18
**STEVEN [8]** 1/18 2/21 15/24 126/7
127/24 128/8 128/11 145/1
**stick [1]** 11/8
**still [24]** 5/8 18/25 22/16 27/9 50/11
77/15 77/16 82/22 82/24 88/23 114/2
116/5 134/6 134/17 143/18 146/4
148/25 149/1 149/2 149/6 149/17
150/16 159/14 173/1
**stipulate [6]** 4/14 4/16 4/20 5/5 5/14
5/15
**stipulated [1]** 7/6
**stipulating [1]** 6/14
**stipulation [2]** 6/16 6/22
**stole [3]** 12/18 67/18 83/19
**stolen [5]** 14/16 16/25 158/17 159/11
169/8
**stood [1]** 29/1
**stop [6]** 16/14 18/4 21/17 41/22 58/22
143/2
**stopped [11]** 9/22 15/7 107/12 132/9
136/21 137/14 143/4 143/14 162/10
162/10 172/3
**story [1]** 163/23
**straight [2]** 43/3 43/5
**streamline [1]** 6/12
**Street [1]** 1/17
**strength [1]** 100/9
**strengths [2]** 100/2 100/4
**strictly [1]** 51/22
**strike [2]** 106/10 127/4
**strikes [1]** 140/23
**strings [1]** 20/18
**strong [1]** 113/9
**stuff [7]** 5/17 5/24 17/17 46/16 57/16
99/18 147/1
**subdued [1]** 141/25
**Subin [13]** 40/17 42/5 42/8 42/9 42/13
42/12 42/13 93/20 93/24 94/6 106/5
106/5 119/4
**subject [8]** 5/20 6/17 65/10 76/15
114/8 160/2 161/11 162/18
**subjective [1]** 151/13
**submit [7]** 3/25 12/9 15/13 56/18
166/4 168/16 172/19
**submitted [2]** 159/10 172/14
**submitting [1]** 171/8
**subpoena [1]** 149/21
**subpoenaed [2]** 7/21 113/4
**subsequently [1]** 107/16
**substantial [1]** 157/5
**substantially [1]** 11/24
**subverted [1]** 129/21
**success [14]** 1/14 4/15 4/16 4/20 4/22
5/16 6/14 22/11 113/10 153/24 156/21
161/7 163/19 164/2
**successful [4]** 20/24 79/23 79/24
87/20
**sudden [1]** 11/22

**suffering [1]** 113/10
**sufficient [3]** 125/24 168/2 169/17
**suggest [2]** 4/4 18/19
**suggesting [2]** 151/18 159/10
**suggestion [2]** 6/10 158/1
**suggestions [1]** 158/21
**Suite [1]** 1/13
**sum [2]** 11/18 160/20
**summarizing [1]** 130/6
**summary [7]** 18/8 35/24 36/3 36/15
36/17 40/20 56/24
**summations [1]** 166/5
**summons [1]** 111/12
**supplement [2]** 165/14 172/11
**supplemental [2]** 170/14 170/22
**supplied [1]** 3/24
**supported [2]** 161/16 161/16
**supports [1]** 164/1
**supposition [1]** 17/17
**surely [1]** 145/15
**surprise [1]** 126/11
**suspect [2]** 112/25 114/10
**suspended [2]** 12/18 38/18
**sustain [1]** 131/7
**sustained [31]** 32/13 32/13 41/3 57/7
76/10 76/10 83/24 85/5 92/13 94/16
94/16 94/18 94/18 102/4 102/25 104/17
104/19 104/24 105/5 110/17 115/8
120/24 133/1 139/8 139/8 139/10
139/22 139/22 149/8 149/8 150/25
**swear [1]** 23/5
**switch [1]** 149/16
**sworn [5]** 23/12 23/13 23/15 128/3
128/12
**sworn/affirmed [2]** 23/15 128/12
**symptoms [2]** 54/16 55/4
**system [2]** 9/4 131/18

**T**

**tab [2]** 63/10 66/6
**table [3]** 2/24 8/11 105/14
**tables [1]** 96/17
**tape [17]** 19/2 21/24 131/6 131/9 131/9
131/11 131/12 133/7 135/14 135/16
140/3 140/8 143/3 143/18 147/24 163/3
163/14
**taping [1]** 143/18
**target [3]** 11/5 11/11 13/2
**taught [1]** 93/3
**tax [2]** 91/13 91/13
**teach [2]** 118/16 118/18
**team [1]** 149/13
**tears [1]** 146/21
**technical [1]** 141/9
**teenager [1]** 98/11
**telephone [1]** 26/6
**template [1]** 21/10
**ten [2]** 144/4 144/4
**term [2]** 145/20 170/3
**terminated [1]** 133/13
**terms [7]** 7/3 19/11 26/2 84/7 102/4
112/14 124/3
**testified [16]** 23/15 59/16 65/12 67/24
79/3 85/25 92/22 116/3 116/19 117/14
120/25 121/3 121/8 126/14 127/11

**T**

**testified... [1]** 128/12
**testifies [1]** 16/9
**testify [7]** 5/17 5/25 17/10 40/23 65/24 127/6 127/22
**testifying [3]** 66/15 113/2 114/9
**testimony [31]** 5/5 5/20 16/8 18/17 32/1 42/18 47/4 57/3 57/19 60/2 60/4 79/3 81/3 85/10 118/10 118/14 118/17 119/16 125/21 126/8 126/10 126/18 127/2 127/13 131/3 135/5 135/12 150/7 155/14 155/15 155/24
**text [8]** 26/12 63/17 64/16 64/19 65/13 65/16 68/8 68/11
**texted [1]** 50/22
**texts [2]** 22/13 66/1
**theft [2]** 5/3 129/15
**themselves [3]** 16/4 39/18 163/23
**theory [2]** 17/16 125/16
**thereabout [1]** 97/18
**thereafter [3]** 37/6 38/15 125/15
**therefore [6]** 5/19 52/23 55/7 70/24 71/7 72/21
**they've [3]** 158/3 169/12 171/10
**thief [1]** 76/9
**thinking [1]** 92/11
**thinks [2]** 151/1 163/17
**third [18]** 62/2 110/20 110/23 111/9 111/12 113/5 134/15 134/23 137/8 138/16 141/18 141/24 143/3 143/20 158/1 158/23 162/21 164/18
**third-party [5]** 110/20 110/23 111/9 111/12 164/18
**Thirty [1]** 79/14
**thorough [1]** 141/12
**though [15]** 6/3 6/11 8/7 18/6 24/1 47/1 97/16 107/19 114/10 125/9 135/3 155/6 155/15 160/14 165/12
**thought [9]** 10/19 16/24 34/16 49/22 88/4 100/9 113/2 155/16 157/2
**thoughts [2]** 159/6 159/9
**thousand [2]** 97/9 97/14
**threat [1]** 15/4
**threaten [6]** 2/9 20/13 20/14 42/18 42/22 147/6
**threatened [8]** 17/12 20/9 20/16 42/24 42/25 43/8 43/13 43/14
**threatening [3]** 74/14 74/17 135/18
**threats [2]** 15/6 75/2
**three [7]** 20/22 79/9 137/22 138/13 138/20 153/16 158/21
**through [30]** 3/11 10/8 15/2 15/6 17/6 21/2 22/3 22/12 24/22 32/19 40/14 53/9 61/17 62/9 62/11 62/19 63/10 66/5 75/1 85/6 98/14 105/5 112/8 141/9 144/13 153/21 154/13 160/23 161/1 170/24
**throughout [2]** 130/14 151/8
**tiled [1]** 70/11
**time [69]** 3/9 11/1 11/13 11/24 13/6 13/14 15/11 19/14 26/2 26/17 28/3 28/4 29/13 29/19 30/17 31/10 33/6 33/24 35/2 35/11 40/3 51/17 56/19 68/24 78/7 79/2 82/10 84/13 84/20 84/23 86/7 97/25 99/16 99/17 99/18 100/2 101/10

108/1 108/8 112/4 112/7 114/2 114/23 115/18 115/21 116/19 117/2 118/1 126/24 136/25 137/4 137/24 138/2 144/13 144/15 144/17 144/20 145/22 148/25 149/22 149/22 153/11 156/4 161/17 161/20 162/20 165/8 167/17 169/4
**time -- withdrawn [1]** 68/24
**timeline [1]** 165/2
**times [4]** 19/5 41/14 50/19 50/22
**timing [1]** 124/3
**today [34]** 2/22 2/25 3/8 3/11 4/15 5/16 7/17 7/22 8/12 9/25 16/8 22/3 22/11 42/18 57/3 74/6 78/16 83/17 111/24 113/22 114/16 118/14 118/17 119/16 126/8 126/25 128/25 153/17 159/16 160/12 166/11 167/22 168/20 170/25
**today's [1]** 172/24
**together [12]** 11/15 12/22 13/11 17/24 36/22 36/25 39/10 49/8 59/19 164/4 166/17 173/9
**told [23]** 11/8 13/6 32/10 32/24 35/22 36/21 43/20 43/24 69/22 94/3 105/24 106/24 107/14 120/6 130/24 145/8 145/8 146/13 148/6 148/8 148/9 150/23 154/15
**tomorrow [1]** 167/22
**tone [1]** 147/5
**took [15]** 12/17 16/23 43/15 46/10 47/14 48/9 59/17 59/19 77/12 83/16 83/17 88/7 156/13 169/16 171/2
**top [4]** 54/10 54/15 63/20 107/23
**total [2]** 17/16 35/17
**totality [1]** 6/18
**totally [2]** 78/21 162/12
**touch [1]** 162/11
**touched [2]** 76/20 101/23
**towards [2]** 129/13 160/11
**trace [2]** 158/3 158/23
**traced [1]** 67/15
**tracing [1]** 159/17
**trade [7]** 5/3 9/19 11/13 17/7 157/18 160/24 168/8
**trademark [4]** 70/4 70/10 70/10 70/13
**train [2]** 74/11 145/19
**trained [1]** 118/10
**transcript [3]** 1/9 1/23 173/7
**transcription [1]** 1/24
**transfer [1]** 18/23
**travesty [1]** 162/21
**treat [1]** 24/5
**trial [1]** 15/21
**tricked [1]** 146/13
**tried [2]** 51/5 104/21
**trouble [1]** 36/7
**troubles [1]** 125/6
**true [16]** 12/10 18/14 22/18 27/24 29/8 29/9 33/4 50/1 51/1 51/4 61/17 75/18 116/20 129/25 157/20 161/5
**trust [4]** 68/13 68/16 69/12 69/16
**trustworthiness [1]** 127/12
**truth [3]** 84/3 89/8 148/8
**truthfulness [5]** 127/8 127/10 127/12 127/17 139/14

**try [9]** 3/11 6/11 19/18 46/9 114/18 130/19 156/17 165/7 166/14
**trying [7]** 18/24 19/5 20/3 86/6 113/18 165/3 165/23
**turn [7]** 63/16 66/6 68/12 68/15 108/20 136/19 139/18
**turned [5]** 19/6 27/20 48/1 49/21 139/15
**turning [3]** 129/22 130/5 130/6
**TV [2]** 148/20 148/21
**types [1]** 121/18
**typing [1]** 20/1

**U**

**ultimate [1]** 6/7
**ultimately [1]** 116/13
**unannounced [2]** 145/4 146/25
**unbeknownst [1]** 13/24
**uncle [5]** 118/1 118/4 118/5 118/8 119/1
**unclear [2]** 122/14 125/8
**undeniable [1]** 15/14
**under [8]** 8/19 15/4 24/5 56/16 126/21 127/8 134/6 168/7
**undercut [1]** 120/13
**understood [10]** 9/5 9/9 9/11 15/22 33/10 123/25 159/2 167/23 170/1 170/20
**undo [1]** 151/23
**undoing [1]** 148/5
**unethical [1]** 85/17
**unfair [3]** 9/15 9/20 126/14
**UNITED [4]** 1/1 1/3 1/10 70/9
**unlawful [1]** 169/12
**unlawfully [1]** 157/22
**unless [2]** 78/3 103/2
**unquote [4]** 76/16 148/1 158/23 172/6
**unreliable [2]** 82/19 117/5
**unscheduled [1]** 130/11
**unsolicited [1]** 155/13
**untrue [3]** 35/17 42/17 42/21
**untrustworthy [1]** 85/17
**unusual [1]** 136/1
**up [69]** 4/4 4/10 8/18 10/22 11/12 14/6 15/9 15/19 16/23 17/23 23/6 27/22 28/11 28/14 28/16 30/6 30/14 36/9 37/4 37/6 38/15 38/22 40/16 40/16 41/19 43/22 50/23 53/12 63/9 83/12 89/17 90/7 90/17 92/9 94/4 94/14 96/17 96/18 99/11 99/14 112/25 115/25 116/10 116/13 116/21 117/19 122/15 124/1 125/5 133/7 138/1 140/16 140/19 141/15 141/16 142/1 146/2 148/21 148/23 150/7 151/5 151/25 162/10 162/10 166/16 167/15 170/17 172/2 172/19
**upon [2]** 16/11 46/11
**upset [8]** 13/15 14/8 19/22 19/23 105/20 106/1 106/2 146/22
**upstate [1]** 102/10
**urge [2]** 160/14 170/16
**us [22]** 2/15 37/24 37/25 51/16 72/9 78/8 78/24 78/25 88/21 93/6 94/10 103/6 107/6 107/12 116/22 143/5 146/2 148/5 148/8 148/8 149/9 148/11

**U**

**USA [5]** 27/3 27/20 27/23 115/19 116/16
**USB [2]** 138/3 138/10
**useful [2]** 5/20 132/18
**uses [1]** 12/8
**utilize [1]** 12/12
**utilized [2]** 45/22 49/1

**V**

**value [1]** 163/8
**various [1]** 85/6
**vast [4]** 17/25 18/1 18/1 132/22
**vein [2]** 124/7 157/20
**venture [2]** 32/10 50/13
**verifying [1]** 59/5
**vernacular [1]** 125/14
**versus [5]** 2/4 28/13 78/11 154/5 154/8
**via [6]** 57/20 59/1 122/8 130/7 145/15 163/23
**vicariously [2]** 22/4 22/7
**vice [2]** 25/8 25/11
**victim [1]** 82/6
**video [2]** 103/19 104/9
**videos [1]** 103/6
**view [2]** 127/22 139/14
**violation [1]** 10/4
**visibly [1]** 146/22
**visit [1]** 145/4
**Vito [15]** 7/18 16/19 35/19 75/14 98/10 98/11 126/5 130/22 132/20 132/20 134/18 134/25 137/20 141/18 145/11
**voice [5]** 41/19 143/3 147/6 151/14 151/17
**voices [1]** 140/12
**volume [3]** 40/19 41/6 134/17
**volunteered [1]** 155/17
**volunteering [1]** 151/19

**W**

**wait [3]** 134/20 134/22 160/12
**waiting [2]** 2/23 158/9
**walk [1]** 12/16
**walked [1]** 146/24
**walking [1]** 63/8
**wall [2]** 1/17 145/7
**wants [1]** 3/14
**wanty [1]** 46/9
**waste [1]** 82/10
**watch [6]** 13/14 14/24 15/1 37/10 104/16 145/19
**WATCHDOG [95]** 1/3 2/4 2/9 10/11 10/12 10/15 10/19 13/1 20/4 21/6 22/2 22/4 24/11 28/2 28/6 28/21 28/25 30/9 31/2 31/9 32/17 33/7 33/11 33/24 34/24 35/9 35/12 35/15 37/14 37/19 40/9 42/7 42/16 43/4 43/21 43/25 45/23 48/19 48/21 48/23 49/1 49/11 49/16 51/12 51/13 51/20 51/21 54/8 67/5 67/18 68/13 68/16 75/1 83/11 83/13 83/16 93/11 103/14 106/6 106/8 109/23 110/10 110/15 116/5 117/18 117/21 117/25 118/6 118/15 118/15 118/16 118/19 118/22 119/7 119/11 119/19 120/23 122/19 122/22 123/6 124/5

124/10 124/16 125/15 129/10 129/20 144/18 145/3 145/11 147/22 148/25 159/12 164/9 164/16 164/18
**WatchDog's [15]** 12/24 20/2 36/18 37/10 43/11 46/15 49/12 102/22 110/13 121/9 130/4 130/8 144/20 153/21 171/19
**WatchDogs [5]** 21/13 67/7 146/4 146/6 148/13
**wear [1]** 93/6
**wearing [1]** 135/20
**website [15]** 14/1 20/7 70/10 99/14 103/4 103/15 103/17 103/19 104/2 104/6 104/10 119/15 119/17 121/9 121/10
**websites [1]** 103/7
**week [3]** 120/19 167/24 168/1
**weekly [2]** 100/16 100/17
**weeks [2]** 168/12 169/21
**weeping [1]** 146/21
**weepy [1]** 146/21
**Westchester [1]** 101/19
**Westlaw [3]** 154/8 154/9 154/9
**whatsoever [4]** 10/22 29/16 72/21 146/15
**wherewithal [1]** 77/24
**white [2]** 19/12 135/21
**Who've [1]** 49/18
**whole [4]** 43/11 69/19 77/8 141/25
**wholesale [1]** 146/10
**why [55]** 16/13 16/14 32/14 41/4 41/5 47/13 47/15 47/16 47/23 51/14 54/24 57/7 57/9 60/20 66/16 77/10 81/16 83/5 85/2 86/3 87/18 92/11 102/5 103/5 106/13 107/13 107/14 107/19 108/2 111/5 113/15 114/15 114/17 115/25 119/10 119/13 120/5 120/22 121/19 123/25 124/19 131/5 132/10 140/17 140/20 146/13 149/5 152/12 152/13 156/3 157/16 165/13 168/10 169/10 169/25
**willing [9]** 13/3 32/24 112/12 148/4 151/8 151/21 154/25 155/9 158/11
**win [1]** 96/13
**window [1]** 169/4
**Wingate [1]** 95/9
**wires [1]** 145/14
**wise [1]** 136/14
**wishes [1]** 13/15
**withdraw [2]** 25/24 33/16
**withdrawn [7]** 16/6 28/25 68/24 70/3 86/9 117/20 119/23
**within [5]** 9/17 22/16 58/18 60/21 61/7
**without [18]** 12/15 20/18 35/17 73/14 73/18 73/21 73/24 74/2 74/8 74/11 74/14 74/17 109/12 137/2 146/15 148/1 160/24 160/24
**witness [64]** 3/21 3/25 4/4 4/5 4/10 8/5 16/16 22/25 23/4 23/12 23/13 23/14 23/22 24/5 45/9 53/13 55/17 56/21 58/8 58/20 59/4 59/7 60/3 60/9 63/2 63/15 66/5 66/7 66/17 67/24 68/5 70/7 72/5 76/17 89/19 89/22 90/14 90/23 97/12 110/20 112/8 113/5 114/9 114/18 114/20 126/2 126/7 126/10 126/11

126/17 126/20 126/22 127/15 127/25 128/3 128/11 129/2 134/6 134/11 138/1 140/5 149/25 152/5 174/2
**witness' [1]** 140/15
**witnesses [18]** 3/11 3/13 3/15 3/17 3/18 3/23 7/10 7/12 8/19 8/22 15/9 15/11 17/4 59/11 112/14 125/20 126/13 163/20
**won [1]** 12/2
**won't [1]** 112/16
**wondering [2]** 47/18 172/10
**word [2]** 38/11 160/11
**words [7]** 18/14 28/11 127/9 140/22 161/17 165/5 165/17
**work [28]** 4/3 17/20 17/22 18/2 21/2 23/19 27/11 54/10 68/13 68/15 78/24 78/25 79/18 83/13 87/21 89/17 90/7 93/11 94/9 109/22 110/7 112/17 115/10 116/7 131/19 149/13 166/14 168/15
**work-product [1]** 54/10
**workable [1]** 6/11
**worked [10]** 13/17 25/2 25/5 29/7 29/10 82/25 108/1 120/16 120/19 120/19
**workers [3]** 2/25 107/24 108/10
**working [14]** 10/1 78/8 79/8 83/14 98/19 108/5 110/10 119/1 123/6 143/23 147/8 166/14 171/14 172/3
**workings [1]** 37/19
**works [4]** 23/10 109/5 109/23 138/5
**world [1]** 15/25
**world-renowned [1]** 15/25
**worry [2]** 15/17 130/25
**worth [4]** 79/16 84/1 154/21 162/16
**worthwhile [1]** 165/3
**wouldn't [3]** 5/5 113/17 146/23
**wrap [3]** 15/9 166/16 170/18
**write [1]** 159/9
**writing [1]** 105/18
**written [3]** 55/5 108/22 119/17
**wrong [9]** 20/1 33/5 35/7 37/12 39/19 60/3 74/10 74/13 161/5
**wrongdoing [1]** 150/24
**wrote [3]** 73/6 106/2 106/13
**www.imecompanion.com [1]** 14/1

**Y**

**Y-O-N-G [1]** 56/5
**year [11]** 14/18 15/25 80/1 80/3 97/6 97/22 110/2 110/3 117/10 129/13 136/3
**years [10]** 13/24 13/24 14/6 25/3 25/5 23/9 79/5 79/8 79/9 128/23
**yeses [2]** 24/17
**Yong [1]** 56/5
**YORK [12]** 1/1 1/4 1/14 1/17 1/17 101/19 102/24 128/18 128/19 143/22 154/6 154/10
**yourself [5]** 37/10 63/18 68/9 152/9 156/7

**Z**

**Z-E-L-L-E [1]** 130/8
**Z-E-N-E-C-A [1]** 154/8
**Zaremba [1]** 94/23
**Zelle [8]** 53/10 61/15 61/18 122/8

## Z

**Zelle... [4]**  130/8 145/15 154/21 163/23
**Zeneca [1]**  154/7
**zero [3]**  10/7 163/7 163/7
**zip [1]**  96/18
**ZoomInfo [3]**  101/16 101/16 101/22
**ZR [2]**  21/14 102/9