UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IME WATCHDOG, INC.,

                            Plaintiff,

          -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS LLC,

                         Defendants.
-----------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

                      Third-Party Plaintiffs,

          -against-

CARLOS ROA and DANIELLA LEVI,

                    Third-Party Defendants.
-----------------------------------------------------------------X

**Case No.: 1:22-cv-1032 (PKC) (JRC)**

## PLAINTIFF'S SUPPLEMENTAL REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

**MILMAN LABUDA LAW GROUP PLLC**

Jamie S. Felsen, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
jamiefelsen@mllaborlaw.com
emanuel@mllaborlaw.com

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................6

I.      PLAINTIFF IS ENTITLED TO ITS DISCOVERY-RELATED RELIEF;
        DEFENDANTS HAVE ABANDONED SAME..............................................6

II.     DEFENDANTS' RECITIATION OF THE FEBRUARY 28 & APRIL 5, 2022
        ORDERS IS INACCURATE .........................................................................6

III.    PLAINTIFF PROVIDED THE COURT WITH EACH ITEM REQUESTED
        TO WARRANT THE RELIEF SOUGHT .....................................................7

IV.    DEFENDANTS HAVE FAILED TO DISTINGUISH ANY PART OF
        THEIR BUSINESS AS LEGITIMATE .......................................................12

V.     WERE IT MADE, PLAINTIFF WOULD PREVAIL ON A MOTION FOR
        RECONSIDERATION...............................................................................13

VI.    THIS COURT'S FEBRUARY 28 AND APRIL 5, 2022 ORDERS ARE NOT
        LAW-OF-THE-CASE ...............................................................................15

VII.  THIS COURT'S FEBRUARY 28 AND APRIL 5, 2022 ORDERS ARE NOT
        "JUDGMENTS" ........................................................................................17

VIII. DEFENDANTS' SPECIFIC ARGUMENTS REGARDING IRREPARABLE
        HARM ARE UNAVAILING .....................................................................17

IX.    THIS COURT SHOULD GIVE GREAT WEIGHT TO THE PERSUASIVE
        AUTHORITY PRESENTED BY PLAINTIFF .............................................23

CONCLUSION .......................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

Arminius Schleifmittel GmbH v. Design Indus., Inc.,
    2007 WL 534573, 2007 U.S. Dist. LEXIS 10847 (M.D.N.C. Feb. 15, 2007).................. 24

Arista Records, LLC v. Tkach,
    122 F. Supp. 3d 32 (S.D.N.Y. 2015)................................................................................ 6

Arizona v. California,
    460 U.S. 605 (1983)........................................................................................................ 15

Broidy Capital Mgt. LLC v. Benomar,
    944 F.3d 436 (2d Cir. 2019)........................................................................................... 24

Buckley v. Rogerson,
    133 F.3d 1125 (8th Cir. 1998) ....................................................................................... 23

Charles W. v. Maul,
    214 F.3d 350 (2d Cir. 2000)........................................................................................... 23

Coleman v. New York City Tr. Auth.,
    37 N.Y.2d 137 (1975) .................................................................................................... 20

DiLaura v. Power Auth.,
    982 F.2d 73 (2d Cir. 1992)............................................................................................. 15

Faiveley Transp. Mahmo AB v. Wabtec Corp.,
    559 F.3d 110 (2d Cir. 2009)............................................................................................. 7

In re PCH Assocs.,
    949 F.2d 585 (2d Cir.1991)............................................................................................ 15

Intl. Profit Assoc., Inc. v Paisola,
    461 F. Supp. 2d 672 (N.D. Ill. 2006) ............................................................................ 10

Jenkins v. XpresSpa Group, Inc.,
    No. 19-CIV.-1774 (VEC), 2020 WL 7261138 (S.D.N.Y. Dec. 10, 2020) ...................... 16

JobDiva, Inc. v. Monster Worldwide, Inc.,
    No. 13-CIV.-8229 (KBF), 2014 WL 5034674 (S.D.N.Y. Oct. 3, 2014) ......................... 19

Johnson v. Holder,
    564 F.3d 95 (2d Cir. 2009)............................................................................................. 16

Joseph S. v. Hogan,
    No. 06-CIV.-1042, 2011 WL 2848330 (E.D.N.Y. 2011) ................................................. 20

Kairam v. W. Side GI, LLC,
    793 Fed. Appx. 23 (2d Cir. 2019)...................................................................... 24

Lee v. City Brewing Corp.,
    279 N.Y. 380 (1939) ........................................................................................ 20

Liberty Power Corp., LLC v. Katz,
    No. 10-CIV.-1938 (NGG) (CLP), 2011 WL 256216 (E.D.N.Y. Jan. 26, 2011)17, 17 n. 4, 18

Loew v. Kolb,
    No. 03-CIV.-5064 (RCC), 2003 WL 22077454 (S.D.N.Y. 2003)...................... 6

Markovits v. Venture Info Capital, Inc.,
    129 F.Supp.2d 647 (S.D.N.Y.2001)................................................... 18, 18 n. 5

Mason v. Amtrust Fin. Services, Inc.,
    848 Fed. Appx. 447 (2d Cir. 2021)................................................... 24, 24 n. 8

Mendez-Caton v. Caribbean Fam. Health Ctr.,
    340 F.R.D. 60 (E.D.N.Y. 2022) ...................................................................... 13

Munoz v. United States,
    No. 07-CIV.-2080 (ILG), 2008 WL 2942861 (E.D.N.Y. July 28, 2008) ......... 18

NLRB v. Coca–Cola Bottling Co.,
    55 F.3d 74 (2d Cir. 1995)............................................................................... 15

QBE Americas, Inc. v. Allen,
    No. 22-CIV.-756 (JSR), 2022 WL 889838 (S.D.N.Y. Mar. 25, 2022)...................... 10, 24

Sloley v. VanBramer,
    945 F.3d 30 (2d Cir. 2019).............................................................................. 23

TCPIP Holding Co. v. Haar Commc'ns Inc.,
    No. 99-CIV.-1825 (RCC), 2004 WL 1620950 (S.D.N.Y. 2004)....................... 6

Tolliver v. Jordan,
    No. 19-CIV.-11823 (PMH), 2021 WL 2741728 (S.D.N.Y. July 1, 2021) ....... 17

Tribble v. Gardner,
    860 F.2d 321 (9th Cir. 1988) .......................................................................... 23

Turret Labs USA, Inc. v. CargoSprint, LLC,
    No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022).................................... 24

United States v. Donziger,
    No. 11-CIV.-691 (LAK), 2020 WL 6364652 (S.D.N.Y. Oct. 28, 2020)......................... 20

United States v. Orena,
    145 F.3d 551 (2d Cir. 1998)........................................................................ 19

United States v. Persico,
    CR-92-0351 (CPS), 1997 WL 867788 (E.D.N.Y. Mar. 13, 1997) ................................... 19

United States v. Robinson,
    560 F.2d 507 (2d Cir. 1977)........................................................................ 20

Van Alen v. Dominick & Dominick,
    560 F.2d 547 (2d Cir. 1977)........................................................................ 20

Virgin Atlantic Airways, Ltd. v. National Mediation Bd.,
    949 F.2d 585 (2d Cir.1991)........................................................................ 15

Virgin Atlantic Airways, Ltd. v. National Mediation Bd.,
    506 U.S. 820 (1992) ................................................................................ 15

WHIC LLC v. NextGen Laboratories, Inc.,
    341 F. Supp. 3d 1147 (D. Haw. 2018) ............................................................. 24

Zirvi v. Flatley,
    838 Fed. Appx. 582 (2d Cir. 2020) ................................................................ 24

Zirvi v. Flatley,
    142 S. Ct. 311 (2021) ............................................................................... 24

**Rules**

Fed. R. Civ. P. 12 .................................................................................. 16, 24

Fed. R. Civ. P. 59 .................................................................................... 17

Fed. R. Evid. 403 .................................................................................... 20

**PRELIMINARY STATEMENT**

After hearing from just two of the six witnesses Plaintiff IME WatchDog, Inc. ("Plaintiff") called at the April 4, 2022 show cause hearing, this Court found that:

**(i)** "Plaintiff has demonstrated likelihood of success on the merits of its claims against Defendants;"

**(ii)** "Plaintiff has met the remaining prongs of the preliminary injunction test with respect to Defendants' planned franchising of Defendant IME Companions LLC and any ongoing or future communications by Defendants with Plaintiff's employees and agents" as "Defendants' planned franchising will cause irreparable harm to Plaintiff because it poses an imminent risk of dissemination of Plaintiff's trade secrets that would not be compensable by money damages" and because "Plaintiff has demonstrated irreparable harm with respect to any continued or imminent future risk of loss of its trade secrets to Defendants through its employees and agents;"

**(iii)** "Plaintiff has demonstrated sufficient hardship given that Defendants' 'actions, if not enjoined will likely result in irreparable harm to the Plaintiff' and 'Plaintiff is likely to succeed as to the merits of its case;'"

**(iv)** "Defendants cannot 'demonstrate any hardship based upon [their] inability to rely on [trade secrets they have], more likely than not, obtained fraudulently;'" and

**(v)** "the public interest will be served by an injunction prohibiting Defendants from further communicating with Plaintiff's employees and agents and from franchising what clearly and convincingly appears to be wrongfully obtained trade secrets."

Contrary to Defendants' argument, this Court did not *deny* Plaintiff's request to preliminarily enjoin Defendants from continuing to operate their business, not even once.

The Court merely sought further briefing on the subject.  And rightfully so, as even without hearing from the remaining four (4) witnesses Plaintiff was prepared to call, the Court was prepared to make a finding that the evidence establishes, certainly by a preponderance that the defendants did take confidential information through Mr. Adam Rosenblatt ("Rosenblatt") about IME WatchDog's business in order to further their own business.  The Court found that Defendants did take confidential information and knowingly did so in exchange for money as there was no challenge to twenty-seven pages worth of Zelle payments and a recording of a call between Rosenblatt and the Defendants made it clear to the Court that Defendants acknowledged that they had an ongoing relationship with Rosenblatt where they were willing to pay him money to get information and then provide him safe haven by bringing Rosenblatt over to their company and possibly paying him $2,500.00 in that moment because Rosenblatt expressed financial desperation.

With respect to Plaintiff's request to preliminarily enjoin Defendants from operating IME Companions LLC which was built by Defendants' wrongful appropriation of Plaintiff's trade secrets, the Court set a schedule for the parties' supplemental briefs on the issue of irreparable harm supporting that aspect of the requested injunction.  The Court did not deny Plaintiff's requested relief to shut down Defendants' competing business which was concededly born in crime, as Defendant Safa Gelardi ("Safa") testified she brought IME WatchDog invoices – by its very essence, confidential information – to Greg Elefterakis ("Elefterakis") and opened a business together with him.  Nor did the Court deny Plaintiff's request to preliminarily enjoin Defendants from operating their business on February 28, 2022.  In that Order, while the Court denied Plaintiff's request for a temporary restraining Order, pending a hearing, the Court was and remains prepared to enter a preliminary injunction.

As such, Defendants' arguments are unavailing to the extent that they posit a decision has been made on the merits of Plaintiff's requested relief to preliminary enjoin Defendants from operating their business – unabashedly and indisputably born in crime – such that Plaintiff's motion should somehow be construed as one for reconsideration or to alter or amend a judgment.  In that regard, Defendants' characterization of the prior Orders is unsupported, nonsensical, and only detracts from this Court's thoughtful analysis and the great care taken by this Court to weigh the evidence presented in an effort to properly decide Plaintiff's entitlement to the relief sought.

To that end, it is worthwhile to revisit Plaintiff's requested relief in its motion papers. Plaintiff sought:

**(i)** to enjoin Defendants from using in any manner whatsoever its trade secrets and confidential & proprietary information;

**(ii)** to direct Defendants to return all of its originals and copies of documents, records, and information – electronic and otherwise – that contain its trade secrets and confidential & proprietary information;

**(iii)** to direct Defendants to make all electronic accounts in their custody and control and on which they stored information regarding Plaintiff's trade secrets and confidential & proprietary information available and accessible to Plaintiff – including providing relevant passwords – to permit Plaintiff inspection to ensure its trade secrets and confidential & proprietary information is secure;

**(iv)** to enjoin Defendants from continuing to operate their business until Plaintiff recovers its trade secrets and confidential & proprietary information; and

**(v)** to enjoin Defendants from contacting Rosenblatt and/or any of Plaintiff's customers.

3

Defendants have agreed to not contact Rosenblatt, and this Court has already enjoined them from contacting any other employees and agents of Plaintiff. However, Plaintiff still seeks to enjoin Defendants from contacting Plaintiff's customers.

Moreover, and crucially, Plaintiff seeks a forensic analysis of Defendants' electronic devices and the turning over of all its documents. Defendants have not opposed this relief, and because the extent of the harm done by them to Plaintiff remains unknown, it is crucial that this Court permit Plaintiff to conduct discovery on an expedited basis as requested in their Order to show cause. The reason why this is crucial is because Plaintiff is in no position to provide this Court with a complete set of evidence concerning the extent of its damages; it has no clue!

As to irreparable harm, Plaintiff has established the existence of same for two (2) independent reasons, wherein the existence of either provides a solid basis for this Court to grant the relief sought. First, based on the evidence that customers have been diverted, it is difficult to establish with any mathematical precision the amount of business that a diverted customer would have continued to give Plaintiff. Second, based on the evidence that Plaintiff has been disparaged and defamed by Defendants in their communications to customers on Plaintiff's list that the owner of Plaintiff steals personal injury clients for her own law firm, there is a loss of goodwill and reputation which is incalculable; that genie can never be put back into the bottle. Irreparable harm exists for these two separate reasons, and no amount of deflection by Defendants can distract the Court from these indisputable facts.

Setting aside the foregoing, Plaintiff did comply with this Court's April 5, 2022 Order. Plaintiff did provide a list of customers it is aware of that were lost due to alleged unfair competition. Plaintiff did establish that Defendants disseminated its confidential information. And Plaintiff also established the long-term, extensive financial damage caused by same.

Moreover, as set forth below, even if this Court does deem that Plaintiff's supplemental papers constitute a motion for reconsideration (which it should not), Plaintiff readily meets the standard for this Court to grant same. Since Plaintiff's filing of the complaint on February 25, 2022, oodles and oodles of evidence has poured in cementing the relief Plaintiff seeks.

First, an investigation by a private investigator on March 1, 2022 revealed that Rosenblatt was bribed and extorted into providing confidential information in exchange for promises of a majority equity stake in a competing business, then by threats of revealing his disloyalty and paying him compensation. Rosenblatt was bribed from the beginning, with cash, and was only paid by Zelle after Safa had a baby and was unable to meet him in person.

Second, on April 4, 2022, for the first time, Defendants handed over the documents they were required to turn over by subpoena which show that they were in possession of: (i) email correspondence between Rosenblatt and Safa; (ii) IME WatchDog invoices; (iii) a state-by-state guide for personal injury; (iv) emails with contact information for customers; (v) emails with COVID-related legal developments related to IMEs; (vi) emails containing marketing materials; (vii) reports containing total number of customers and total number of IMEs observed by year; (viii) IME WatchDog's customer lists; and (ix) IME WatchDog's financial reports and metrics.

Third, after the April 4, 2022 hearing, more evidence came to light of Defendants' criminal acts of commercial bribery and unfair competition as detailed in the supplemental reply declarations of Daniella Levi, Esq. ("Mrs. Levi"), Rosenblatt, and Carlos Roa ("Roa").

As such, even through the lens of a motion for a reconsideration, Plaintiff prevails. Accordingly, it has established irreparable harm, warranting Defendants' business being shut down and the remaining relief sought for expedited and forensic discovery.

## ARGUMENT

**I.     Plaintiff is entitled to its discovery-related relief; Defendants have abandoned same.**

In their opposition, Defendants singularly focus on the purported lack of irreparable harm to keep the doors open to the enterprise they built solely by engaging in criminal acts of extortion and bribery.  In doing so, Defendants completely failed to oppose Plaintiff's request for expedited discovery and a forensic analysis of all electronic devices.[1]  Thus, as an initial matter, Defendants have waived any defense to Plaintiff's requested relief concerning discovery.  See, e.g., Arista Records, LLC v. Tkach, 122 F. Supp. 3d 32, 38–39 (S.D.N.Y. 2015) (finding that when a party fails to oppose specific arguments, then the party waives those issues); see also TCPIP Holding Co. v. Haar Commc'ns Inc., No. 99-CIV.-1825 (RCC), 2004 WL 1620950, *4 (S.D.N.Y. 2004) (defendant's failure to respond to motion was sufficient basis to grant motion by default); Loew v. Kolb, No. 03-CIV.-5064 (RCC), 2003 WL 22077454, *1 (S.D.N.Y. 2003) (same).

**II.    Defendants' recitation of the February 28 & April 5, 2022 Orders is inaccurate.**

Defendants characterize this Court's February 28, 2022 Order as a denial of Plaintiff's requested relief to enjoin Defendants from operating their business.  See ECF Docket Entry 52 at 4.  However, the Court did not deny the relief requested by Plaintiff with prejudice.  Indeed, this Court specifically held that "Plaintiff's … motion for *a temporary restraining order* is denied because Plaintiff has not carried its *burden at this stage*."  See Text Only Order dated February 28, 2022.  The Court then set a hearing to enable Plaintiff to meet its burden.  Id.

---

[1] Defendants opposed Plaintiff's request for expedited discovery and a forensic analysis in their original opposition papers, solely on the grounds that Plaintiff has not established a likelihood of success on the merits and that there exists no irreparable harm.  See ECF Docket Entry 29 at 1 and 7.  Because each of these elements have been established, Plaintiff is entitled to the discovery-related relief requested.  Defendants have also asked Rosenblatt to delete and destroy everything on the heels of being served.  See Plaintiff's Exhibit 18C.  As such, the relief is warranted due to the risk of spoliation of evidence.

6

As a result, the Court effectively reserved decision on the relief requested by Plaintiff until the hearing. Defendants' characterization of the Court's April 5, 2022 Order is similarly misguided. After hearing from just two (2) of the six (6) witnesses, the Court found that all elements necessary for a preliminary injunction had been met to enjoin Defendants from franchising their business and from engaging in any contact with Plaintiff's employees and agents. See Text Only Order dated April 5, 2022. With respect to Plaintiff's request to enjoin Defendants from operating their business, the Court found that Plaintiff has demonstrated a likelihood of success on the merits of is claims against Defendants, and set a briefing schedule to permit Plaintiff to brief the issue of irreparable harm supporting that aspect of the requested injunction. Id. As such, Defendants' meretricious arguments fail, as there was no outright denial of Plaintiff's requested relief; the Court sought additional information to make an informed decision.

## III.    Plaintiff Provided the Court with Each Item Requested to Warrant the Relief Sought

In both the February 28, 2022 and April 5, 2022 Orders, this Court specifically held that the "loss of trade secrets and client relationships does not establish irreparable harm absent a showing that there is an imminent risk of dissemination of trade secrets and that plaintiff's injuries are not compensable through an award of damages." See Text Only Order dated February 28, 2022 (citing Faiveley Transp. Mahmo AB v. Wabtec Corp., 559 F.3d 110, 118-19 (2d Cir. 2009)); see also Text Only Order dated April 5, 2022 (citing Faiveley, 559 F.3d at 118-19 ("We have previously observed that 'the loss of trade secrets cannot be measured in money damages' where that secret, once lost, is 'lost forever.' … Where a misappropriator seeks only to use those secrets-without further dissemination or irreparable impairment of value-in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury" (citations and internal quotation marks omitted)).

7

Here, Plaintiff has easily demonstrated both the imminent risk of dissemination of trade secrets and that plaintiff's injuries are not compensable through an award of damages in numerous ways, none of which Defendants bothered to address in their opposition.

a.   There exists evidence to merit a finding of imminent risk of dissemination of secrets

As an initial matter, the hearing established that Defendants' business was born through the dissemination of trade secrets.  Safa testified that she took IME WatchDog invoices obtained through Rosenblatt in 2017 and pitched the business idea she learned of through Ronald Rosenblatt and Adam Rosenblatt to him.  See Declaration of Emanuel Kataev, Esq. ("Kataev Decl.") at ¶ 3, Exhibit ("Ex." or "Exs.") A (hereinafter "Tr.") 25:18-27:13, 28:1-7, 28:24-29:21, 30:8-10, 30:17-32:7, 32:9-22, 36:24-37:8, 37:13-38:12, 38:15-40:15, 84:10-85:1, 91:1-92:8.

Further, the hearing also established that an imminent risk of the dissemination of trade secrets existed due to Defendants' plans to trademark and franchise Plaintiff's business idea.  See Text Only Order dated April 5, 2022 ("Defendants' planned franchising will cause irreparable harm to Plaintiff because it poses an imminent risk of dissemination of Plaintiff's trade secrets that would not be compensable by money damages").

Plaintiff has similarly demonstrated that the imminent risk of the dissemination of trade secrets exists every single day that Defendants operate.

In the supplemental declarations, Mrs. Levi states and Rosenblatt acknowledges that she taught him everything about the business, including, but not limited to, (i) drafting and editing reports; (ii) how to recruit and train observers; (iii) how to schedule observers for IMEs; (iv) how to invoice and collect payment from customers; (v) how to ascertain customer preferences; (vi) how to establish pricing structures for different law firms; and (vii) how to market to law firms to obtain customers.  See Levi Supp. Decl. ¶¶ 6-7; see also Rosenblatt Supp. Decl. ¶¶ 4-6.

Similarly, Rosenblatt declared that Safa received the IME WatchDog handbook for observers among other confidential documents in exchange for, initially, a seventy percent (70%) equity stake in a competing business with a matching salary and, subsequently, an unsolicited cash payment of $5,000.00.  See Rosenblatt Supp. Decl. ¶¶ 27, 31-35.  Every single time Defendants onboard a new observer, Plaintiff's trade secrets are disseminated.

In addition, the evidence adduced at the hearing establishes that Defendants routinely plagiarized IME WatchDog's reports, which Defendants passed off as their own, despite Safa's concession at the hearing that these reports are confidential.  See Tr. at 52:10-19, 52:23-53:2, 53:6-8, 53:17-55:8, 55:17-56:6.  This information and countless other reports have been and are at continued risk of being disseminated to thousands of law firms as Defendants' marketing scheme.

Accordingly, there exist imminent risks of the dissemination of trade secrets.

b.  Plaintiff has established its damages are not compensable through an award of damages

Moreover, a plethora of evidence exists to establish that Plaintiff's damages are not compensable merely through an award of money damages.

First, as Roa declares, he directly witnessed Safa direct Adam to purpose sabotage Plaintiff's accounts so that she can call Plaintiff's customers and steal them for the Defendants' benefit.  See Roa Supp. Decl. ¶ 6.  Once enough acts of sabotage were committed – including missing appointments, submitting reports late, refusing appointments, sending the wrong observer when a specific observer was requested – Rosenblatt would inform Safa which client was sabotaged and Safa then sought to secure each such customer.  Id. at ¶¶ 7-8.  This is supported by the documents Defendants themselves provided pursuant to Plaintiff's subpoena.  See Levi Supp. Decl. ¶ 14, Ex. A at 85 (December 28, 2021 email from Rosenblatt to Safa with the names, email addresses, and phone numbers of seven (7) customers) and 92 (same, with six (6) customers).

Because sufficient evidence exists that Plaintiff's relationships with its customers were sabotaged, it is "very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor."  See QBE Americas, Inc. v. Allen, No. 22-CIV.-756 (JSR), 2022 WL 889838, at *15 (S.D.N.Y. Mar. 25, 2022).

Second, the evidence establishes Defendants routinely defamed Plaintiff and Mrs. Levi. At the hearing, Safa admitted that she told customers that Mrs. Levi steals personal injury clients by and through IME WatchDog.  See Tr. at 43:20-45:17, 66:10-68:3, Ex. 8; see also Levi Supp. Decl. ¶¶ 28-29, 33-34; Rosenblatt Supp. Decl. ¶¶ 89-92, Ex. B.  She was forced to, because the evidence existed right there in black and white.  See Ex. 8 ("IME Watchdog does have the reputation of stealing clients because the owner who is an attorney provides kickbacks to her watchdogs.  Those clients can easily be traced back to Daniella Levy." [*sic*]).  These disparaging statements caused disproportionate detriment to Plaintiff, none of which is readily ascertainable because it is unknown how many customers were deceived and duped by Defendants into leaving Plaintiff to work with Safa, who transcends Roa's purported "gift of gab" as a master charlatan who faked her way into the IME observer business through bribery, extortion, and confidence games with Plaintiff's customer.  Courts have found false statements less damaging than these to warrant a finding of irreparable harm. See Intl. Profit Assoc., Inc. v Paisola, 461 F. Supp. 2d 672, 679-80 (N.D. Ill. 2006) ("I find that … defendants may be enjoined [from making their] false representation that IPA offered to settle with Paisola, and that as part of this settlement IPA agreed to pay Paisola and to allow Paisola to participate in the management of the company. I do find that IPA has no adequate legal remedy as to this demonstrated defamation, and that the damages of this defamation, including reputational losses and potential confusion by its customers and employees, are incalculable such that IPA has no adequate legal remedy").

Certainly, then, Defendants' scurrilous statements and false fabrications of Mrs. Levi's engaging in kickbacks to steal personal injury clients from Plaintiff's customers merits a similar finding of the existence of irreparable harm.

Third, in light of the foregoing, Defendants' argument that Plaintiff failed to comply with the Court's instructions – i.e., to: (i) identify those clients that they have lost to Defendants; (ii) show that Plaintiff is losing so much money that they may go out of business, i.e., the magnitude of Plaintiff's loss; and (iii) why the foregoing meets the standard of harm, with the focus on the long-term effects on Plaintiff's business – is unavailing, especially because Plaintiff has provided the Court with each of these items despite not yet receiving the expedited discovery schedule and Order requiring a forensic analysis of Defendants' electronic devices.

With respect to the first instruction, Plaintiff has identified numerous clients they have lost to Defendants.  See Declaration of Carlos Roa dated February 17, 2022, ECF Docket Entry 9, at ¶ 20 (identifying twenty (20) clients of Plaintiff Roa secured for Defendants utilizing confidential information improperly obtained from Rosenblatt); see also Declaration of Daniella Levi dated February 25, 2022, filed under seal, ECF Docket Entry 15, at ¶ 33, Ex. H; Roa Supp. Decl. ¶¶ 15-18, Ex. A.  Plaintiff does not know all of the customers it has lost to Defendants; that is why Plaintiff has sought expedited discovery and a forensic analysis of Defendants' electronic devices to ascertain same.  Notwithstanding, there can be no dispute that Plaintiff identified customers that they have lost to Defendants.

Similarly, with respect to the second instruction, Plaintiff has repeatedly shown the magnitude of the loss it has suffered and continues to suffer.  See Docket Entry 15 (under seal) at ¶ 31 ("Based on the customers I lost due to Defendants' actions, I estimate that I lost more than $1,000,000.00 in revenue when factoring in how many IMEs each customer I lost typically

contracted with IME WatchDog to perform prior to their departure"); see also Levi Supp. Decl. ¶¶ 36 ("In calculating the lost revenue from the 2016 customer list Safa bribed Adam for (a list larger than the earlier list of customers), the total exceeds $2,000,000.00") and 39 ("Further, the lost revenue from the loss of the corporate opportunity … is likely in excess of $100,000.00").

With millions of dollars at stake, there is no question of the magnitude of Plaintiff's loss based on these estimated numbers alone, setting aside the fact of the incalculable loss related to Plaintiff's loss of goodwill and standing due to Defendants' defamatory statements and the loss of Plaintiff's relationships with its customers due to Defendants' instigating random acts of sabotage by Rosenblatt. Notably, just because Defendants sabotaged an account of Plaintiff does not necessarily mean that Plaintiff's customer switched to Defendants' competing business. As such, it is completely incapable of calculation the exact loss suffered by Plaintiff due to Defendants' unlawful conduct.

As such, Plaintiff has readily established why the foregoing meets the standard of irreparable harm. The long-term effect on Plaintiff's business is that it has been stymied from its natural growth due to the Defendants' dastardly acts of destruction.

## IV. Defendants Have Failed to Distinguish Any Part of Their Business as Legitimate

While Defendants have focused on this Court's instructions concerning Plaintiff's request to preliminarily enjoin Defendants from operating *the parts* of IME Companions LLC that were built on Defendants' wrongful appropriation of Plaintiff's trade secrets by calling attention to Plaintiff's statements that there's "no way to slice and dice Defendants' operations,"[2] Defendants have curiously failed to explain what "part," if any, of their business is legitimate such that they should remain open.

---

[2] See ECF Docket Entry 52 at 1 n. 4, 6 (twice), and 8 n. 16.

Naturally, this is because Defendants cannot identify any part of their business which runs legitimately; all of it constitutes fruit of the poisonous tree.  It bears emphasis, in that regard, that Safa readily conceded that she has no legal or medical background and, crucially, did not even know what an IME was until she met Rosenblatt.  Because Defendants failed to identify any part of their business which runs legitimately and without the use of Plaintiff's confidential information and trade secrets, i.e., its invoices, IME WatchDog handbook for observers, its many varied reports (which reports Safa conceded she received twice in 2019 from Rosenblatt), and customer lists, Defendants must be enjoined from operating any part of their business.

## V.     Were it Made, Plaintiff Would Prevail on a Motion for Reconsideration

While Plaintiff respectfully submits that its supplemental brief does not constitute a motion for reconsideration for the reasons set forth in Point II, *supra*, were one made, Plaintiff would prevail on same.  As aptly noted by Defendants, a motion for reconsideration may only be granted where the moving party "shows that the court overlooked controlling law or facts that, had they been considered, would have altered the disposition[3] of the underlying motion." See <u>Mendez-Caton v. Caribbean Fam. Health Ctr.</u>, 340 F.R.D. 60, 74 (E.D.N.Y. 2022).

Here, there exist numerous facts that, had they been considered, would have altered this Court's decision on Plaintiff's motion for a temporary restraining Order and preliminary injunction.

First, following the filing of the instant motion on February 25, 2022, the Plaintiff conducted – by and through counsel – an investigation utilizing a private investigator who was able to secure admissions from both Rosenblatt and each of the individual defendants themselves. <u>See</u> <u>Exs.</u> 18A, 18B, and 18C.  The statements made by Defendants are damning.

---

[3] Plaintiff respectfully reiterates that the instant motion for a preliminary injunction has not been disposed of, as this Court has requested supplemental briefing in order to enter a final disposition.

Second, on April 4, 2022, Defendants complied with the subpoena by providing nearly 200 pages of documents that should never have been in their possession.  See Levi Supp. Decl. at ¶ 14, Ex. A.  These documents consisted of: (i) email correspondence between Rosenblatt and Safa; (ii) IME WatchDog invoices; (iii)  a state-by-state guide for personal injury suits; (iv) emails with contact information for Plaintiff's customers; (v) emails with COVID-related legal developments related to IMEs; (vi) emails containing Plaintiff's marketing materials; (vii) reports containing Plaintiff's total number of customers and total number of IMEs observed by year; (viii) Plaintiff's customer lists; and (ix) Plaintiff's financial reports and metrics.  **None of these documents should have ever been in Defendants' hands.**

Third, the supplemental declarations filed under seal on April 8, 2022 provide further information about lost corporate opportunities for Plaintiff and how Defendants managed to steal and swindle the same.  All of this constitutes facts that, had the same been considered, would have altered the Court's decision on both the temporary restraining Order and the instant motion for a preliminary injunction, which remains *sub judice*.

Defendants' argument that the moving party may not adduce new facts, issues, or arguments not previously presented to a court on a motion for reconsideration bolsters Plaintiff's position on precisely why Plaintiff's supplemental brief cannot be deemed to constitute a motion for reconsideration. Here, this Court made its findings after only two of the six witnesses testified, and– as such – Plaintiff was well within its rights to provide additional evidence for the Court's consideration.

Indeed, Plaintiff did not have a full and fair opportunity to present all of its evidence in support of its motion, given that there existed four (4) additional witnesses and many exhibits which were not admitted into evidence.

14

As such, the instant case is distinguishable from any case where courts have held they cannot reconsider based on "new" evidence.  In each of those cases, the parties had a full and fair opportunity to present all of their evidence prior to receiving a decision.

In addition, Plaintiff is constantly finding new evidence of Defendants' wrongdoing, which only supports Plaintiff's request for expedited discovery and a forensic examination, each of which Defendants failed to oppose.  See Point I, *supra*.

Accordingly, this Court should be permitted to review the supplemental declarations submitted on April 8, 2022 and the supplemental reply declarations submitted herewith.  To the extent that Defendants seek an opportunity to address any of this proffered evidence, Plaintiff welcomes another day of hearing to do so.

## VI.    This Court's February 28 and April 5, 2022 Orders Are Not Law-of-the-Case

Defendants argue that this Court's February 28, 2022 and April 5, 2022 Orders constitute "law of the case" for the proposition that Defendants should not be enjoined from continuing to operate their business, despite the fact this Court never expressly denied Plaintiff's requested relief which remains *sub judice*.  The law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  See DiLaura v. Power Auth., 982 F.2d 73, 76 (2d Cir. 1992) (quoting In re PCH Assocs., 949 F.2d 585, 592 (2d Cir.1991)); see also NLRB v. Coca–Cola Bottling Co., 55 F.3d 74, 77-78 (2d Cir. 1995). The doctrine is "admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." See Virgin Atlantic Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.), cert. denied, 506 U.S. 820 (1992); see also Arizona v. California, 460 U.S. 605, 618 (1983) (law of case doctrine "does not limit the tribunal's power").

15

"The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." See Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks and citation omitted). Cogent and compelling reasons include "an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Id. at 99-100 (citation omitted).

As an initial matter, as set forth *supra*, the law of the case doctrine does not apply because this court has not yet ruled on whether Defendants are to be enjoined from operating their business. See, e.g., Jenkins v. XpresSpa Group, Inc., No. 19-CIV.-1774 (VEC), 2020 WL 7261138, at *4 (S.D.N.Y. Dec. 10, 2020) ("Defendant is mistaken in its belief that the Court decided as a matter of law that the contract is ambiguous with respect to the language concerning "applicable sales targets." In stating that it would "[r]ead[ ] any ambiguity in plaintiffs' favor," the Court was not decreeing that the contract is ambiguous but was instead invoking the well-known standard for deciding a Rule 12(c) motion. … That the Court did not explicitly state that the language "applicable sales targets" was ambiguous indicates that the Court did not intend to make a decision regarding the contract's ambiguity *vel non*. Taken in conjunction with the Court's other statements at the January 3 hearing, it is abundantly clear that the Court has not yet ruled on whether the contract is ambiguous for purposes of the parties' summary judgment motions. *See, e.g.*, Hearing Tr. at 14 ("What we're going to try is your contention that the contract is ambiguous."); *id.* at 15 ("[Defendant's] best argument is [that] the agreement is ambiguous, and, therefore, you're going to put on evidence of what the parties intended. If you can't do that, you're not going to prevail"). Thus, just like in Jenkins, since there has been no ruling on whether Defendants should be enjoined from operating their business born in crime, the law of the case doctrine cannot be invoked.

16

However, assuming *arguendo* that it has somehow been invoked (which it has not), cogent and compelling reasons exist – by way of the availability of new evidence, discussed *supra* in Point V – to militate against the law of the case doctrine.

## VII.    This Court's February 28 and April 5, 2022 Orders Are Not "Judgments"

Defendants' reliance on Rule 59 of the Federal Rules of Civil Procedure (hereinafter "Rules" or "Rule") – that Plaintiff's supplemental brief constitutes a motion to alter or amend a judgment under Rule 59(e) is similarly misguided.  See Tolliver v. Jordan, No. 19-CIV.-11823 (PMH), 2021 WL 2741728, at *9 (S.D.N.Y. July 1, 2021) ("As no judgment has been entered in the case, and the February 26, 2021 Order denying Plaintiff's application for a preliminary injunction is interlocutory and not a final order, the motion cannot be one under Rule 59(e) …") (quoting Fed. R. Civ. P. 59(e) ("A motion to alter or amend a *judgment* must be filed no later than 28 days after the entry of the *judgment*") (emphasis added)).

In any event, even if Rule 59 did apply, no decision has yet been made on Plaintiff's requested relief to enjoin Defendants from operating their business as argued *supra*.

## VIII.    Defendants' Specific Arguments Regarding Irreparable Harm Are Unavailing

Defendants argue that Plaintiff failed to demonstrate irreparable harm by relying on Judge Garaufis' decision in Liberty Power Corp., LLC v. Katz,[4] arguing that Plaintiff's witnesses are not credible, and that Plaintiff's list of customers is speculative.  Each of these arguments fail.

With respect to Defendants' reliance on Katz, it is misplaced, and – as set forth below – is easily distinguished from the facts of this case.  This is demonstrated by a simple review of the court's holding in Katz.

There, Judge Garaufis reasoned:

---

[4] See No. 10-CIV.-1938 (NGG) (CLP), 2011 WL 256216 (E.D.N.Y. Jan. 26, 2011).

> Unlike the movants in <u>Markovits</u>,[5] [Plaintiff] has not argued that it is entitled to preclude Defendants from competing with it at all, just that Defendants should not be permitted to use its trade secrets to do so. According to Plaintiff, Defendants stole trade secret information only with respect to a finite-albeit large-number of customers. (See … Decl. … (stating that Defendants acquired trade secrets information with respect to approximately 4,630 current and former LPC customers, 2,845 of which were active customers at the time Plaintiff filed the action, and 2,365 of which were LPC customers as of October 15, 2010).) Thus the difficulty of calculating the harm of Defendants' competition with Plaintiff in the market generally is simply not a concern that is present in this case. The harm Plaintiff has alleged in this case is the possibility that Defendants will use its trade secrets to undercut its contracts with a defined subset of its current and former customers and move them to competing electricity suppliers. Even if the court finds that Plaintiff has shown that there is an actual and imminent risk that Defendants will use Plaintiff's trade secrets to do this, the harm that would result is measureable [*sic*] and compensable through an award of damages after trial. Indeed, Plaintiff has calculated the potential renewal value of the contracts between it and the customers about whom Defendants obtained Plaintiff's proprietary information. … At trial, Plaintiff would be able to offer evidence establishing how many customers it lost due to Defendants' misappropriation of its trade secrets, and could recover damages to compensate it for this harm.

See <u>Katz</u>, at *7. Unlike in <u>Katz</u>, the Plaintiff here is unable to precisely determine how many customers it lost due to Defendants' actions. Indeed, as set forth herein, more and more evidence pours in slowly but surely to show the true extent of Defendants' conduct and the damage they have done. Moreover, there is no telling how much damage was done by Defendants' defamatory statements and acts of sabotage, none of which is present in <u>Katz</u>.

With respect to Defendants' attacks on the credibility of Rosenblatt and Roa, these are equally unavailing. As an initial matter, credibility determinations can only be made at a hearing. See <u>Munoz v. United States</u>, No. 07-CIV.-2080 (ILG), 2008 WL 2942861, at *11 (E.D.N.Y. July 28, 2008) ("While these claims are certainly inconsistent with the allegations made by the

---

[5] See <u>Markovits v. Venture Info Capital, Inc.</u>, 129 F.Supp.2d 647, 661 (S.D.N.Y.2001).

petitioner and the individuals who submitted declarations on his behalf, they cannot resolve the dispute without a hearing at which credibility determinations can be made"); JobDiva, Inc. v. Monster Worldwide, Inc., No. 13-CIV.-8229 (KBF), 2014 WL 5034674, at *2 (S.D.N.Y. Oct. 3, 2014) ("it is impossible to ignore that when witnesses are examined and then cross-examined before the Court …, the Court does and must assess the demeanor and weigh the credibility of those witnesses"); see also United States v. Persico, CR-92-0351 (CPS), 1997 WL 867788, at *19 (E.D.N.Y. Mar. 13, 1997), aff'd in part, rev'd in part sub nom. United States v. Orena, 145 F.3d 551 (2d Cir. 1998) ("A hearing allows for a searching inquiry into the particulars …, as the court undertakes to sort through the conflicting claims, and permits factual determinations to be made by the … judge. A hearing also provides the … judge with an opportunity to observe the demeanor and assess the credibility of various witnesses. Most often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist").

To the extent that this Court can make credibility determinations as to Roa and Rosenblatt based on their declarations without a hearing, each admit to wrongdoing at the direction of Safa and/or Vito Gelardi.  It hardly makes sense that either would impugn their own integrity to achieve any goal on behalf of Plaintiff to their own detriment unless they were each telling the truth. Moreover, Mrs. Levi declared that she was unaware of any of the foregoing conduct until Roa voluntarily came to her and told her.  Mrs. Levi then independently verified this information by accessing Rosenblatt's computer after he left.   A private investigator was then hired and independently confirmed Plaintiff's allegations in this complaint *after* Plaintiff had filed its complaint.  Contrary to Defendants' arguments, a careful review of the recording in Exhibit 18B readily demonstrates that Mr. Rombom specifically told Rosenblatt that he is not a police officer and does not have the power of arrest.  Rosenblatt's remorse is further *indicia* of truthfulness.

Further, the authorities cited by Defendants related to bias applies more to jury trials rather than bench trials where the Court is the finder of fact.  See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: *unfair prejudice, confusing the issues, misleading the jury*, undue delay, wasting time, or needlessly presenting cumulative evidence") (emphasis added).  Similarly, the authorities relied upon by Defendants concerning bias involve jury trials.  See Lee v. City Brewing Corp., 279 N.Y. 380, 383 (1939) ("The jury rendered a verdict for the plaintiff …"); see also Coleman v. New York City Tr. Auth., 37 N.Y.2d 137, 144 (1975) ("The jury was charged: …"); United States v. Robinson, 560 F.2d 507, 509 (2d Cir. 1977) ("After trial before a jury … appellant Cecil Robinson was convicted of bank robbery …").

Instead, as this Court appropriately noted during the hearing, the Second Circuit favors admitting evidence at bench trials, and all doubts as to admissibility are resolved in favor of doing so.  See United States v. Donziger, No. 11-CIV.-691 (LAK), 2020 WL 6364652, at *2 (S.D.N.Y. Oct. 28, 2020) ("When the Court is the trier of fact, concerns about permitting evidence of questionable reliability … are far less pressing.  The case law perhaps reflects this principle most clearly in decisions regarding the use of potentially unreliable expert evidence in bench trials. In that context, courts have concluded that the proper course is to err on the side of admitting the evidence") (quoting Joseph S. v. Hogan, No. 06-CIV.-1042, 2011 WL 2848330, at *3 (E.D.N.Y. 2011) (explaining that "without the risk of poisoning the jury with misleading expert testimony of limited probative value, the Court can take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology") (citation omitted); see also Van Alen v. Dominick & Dominick, 560 F.2d 547, 552 (2d Cir. 1977) ("the more prudent course in a bench trial [is] to admit into evidence doubtfully admissible records, and testimony based on them").

In addition, Defendants repetitive theme of Rosenblatt hating Mrs. Levi is nonsensical. The evidence adduced at the hearing establishes that Rosenblatt remains employed at IME WatchDog by Mrs. Levi. See Tr. at 116:3-12,[6] 148:23-149:3.  It defies logic that Rosenblatt would remain employed by Mrs. Levi if he hated or detested her, as the evidence adduced at the hearing establishes that there are numerous competing IME observer companies out there (setting aside the fact that Rosenblatt is free to work outside of the industry if he wanted to).  More importantly, even if he did hate her, it does not change the fact that Safa accepted confidential information from Rosenblatt in exchange for money.[7]  See Id. at 123:1-15, 124:7-125:18, 154:16-155:3.

Similarly, to the extent Roa is found incredible, he is the *sine qua non* to Plaintiff's discovery of Defendants' conduct.  Of great import, his revelation to Mrs. Levi was independently verified by her, and confirmed by an independently hired private investigator.  Defendants' bitter attacks against Roa and claims of breach of duty of loyalty are belied by Defendants' engagement in illegal conduct; indeed, the bank robbers cannot sue the getaway driver when he turns state's evidence against them to protect himself against prosecution.

---

[6] Q And you testified that Adam hates Daniella Levi, correct? **A Yes.** Q But Adam is still an employee of IME WatchDog, correct? **A To my knowledge, yes.** Q And to your knowledge, Adam did not leave to go work for anybody else, correct? **A Correct.** Q And to your knowledge, Adam did not go and open up his own competing business, correct? **A Correct.**

[7] Plaintiff's theory as to why Safa pled the Fifth when it came to questions concerning the 2019 Zelle payments but denied making any payments in 2017 when she started her business is because the Zelle payments constitute irrefutable documentary evidence of payment while the cash payments Rosenblatt declared he received from Safa can be controverted through denials without the risk of being caught perjuring herself.  As such, Defendants deny wherever they can and plead the Fifth where they cannot.  Either way, their denials are meritless.  See Tr. at 155:4-11 ("I don't find, and I don't think I have quite enough evidence, but I don't need it, to find that the defendants paid for information before 2019, though I have some reasonable doubts I think that that didn't occur before or have some reason to believe it occurred before *because if the defendants were willing to pay money for it starting from 2019, it seems logical they would have done so from the beginning*") (emphasis added).

Again, Plaintiff welcomes a hearing at which both Roa's and Rosenblatt's credibility may be appropriately assessed.

With respect to the list submitted by Plaintiff, Defendants argue that it is wildly inaccurate because two (2) customers submitted virtually identical paragraph-long affidavits with cryptic and conclusory information and Defendants laughably deny that the remaining customers listed are theirs without so much as providing any customer list, evidence which is inarguably discoverable in this case.

Defendants argue with self-serving statements that Subin & Associates was "fairly won" while Rosenblatt declares that Safa demanded he sabotage the relationship with them so she could poach them by threatening to inform Mrs. Levi that he disclosed confidential information and sought to open a competing business.  See Rosenblatt Supp. Decl. ¶¶ 49-56.

This Court has already found none of the Defendants' statements credible, save for one. See Tr. at 155:12-155:18 ("On the other hand, they got the information it appears unsolicited. I actually think that's a credible part of Ms. Gelardi's testimony. *I do not credit other parts of your testimony though*, Ms. Gelardi. *I don't believe for a moment that you thought that the information Rosenblatt was sharing with you, even if it was volunteered in the beginning, was anything other than confidential*. You had to know from your days in business and in the banking industry that there's confidential, proprietary information that a business is not allowed to share, or that an employee of a business is not allowed to share with a competitor and that there is a fiduciary duty. If you're in the banking industry you well know that. *So I didn't credit that testimony and I believe that you and your husband knew full well you were essentially stealing this information or buying it from Mr. Rosenblatt at least as of 2019*. That happens to coincide with when you bought the business from your initial investors, which is why I asked you about how many observers you had

22

at that time and how big your revenue was and just doing some quick math, 10 to 12,000 a month

in revenue is really not enough to even pay these seven or eight observers and yourself a salary.

Now, perhaps there is some other financial arrangement or maybe they got some money on the

side for doing these investigations or observations, but *nonetheless it makes sense to me that you*

*started paying for this information to grow your business just as you said in the phone call with*

*Mr. Rosenblatt, that in fact it sounds like your business took off from 2019, which coincided with*

*when you are getting all this information from Mr. Rosenblatt.* And I just heard from the

investigator … that Mr. Rosenblatt admitted that he gave all sorts of information to try to help you

and your husband grow your competing business") (emphasis added).

Accordingly, even if this Court were to weigh the credibility of Roa and Rosenblatt based

on their declarations, Defendants have no credibility whatsoever.  As such, Plaintiff's witnesses

should be considered credible.

## IX.    This Court Should Give Great Weight to the Persuasive Authority Presented by Plaintiff

Defendants argue that this Court cannot rely on non-binding authorities submitted which

are directly on point with the facts set forth here.

As an initial matter, where there is a dearth of authority, decisions of other federal lower

courts, are relevant and often persuasive" authority on issues to be decided. See Sloley v.

VanBramer, 945 F.3d 30 (2d Cir. 2019) (citing Charles W. v. Maul, 214 F.3d 350, 357 (2d Cir.

2000)); see also Buckley v. Rogerson, 133 F.3d 1125, 1129 (8th Cir. 1998) ("In the absence of

binding precedent, a court should look to all available decisional law, including decisions of state

courts, other circuits and district courts") (internal quotation marks omitted)); Tribble v. Gardner,

860 F.2d 321, 324 (9th Cir. 1988) (similar).  Here, there exist no decisions from the Supreme Court

of the United States dealing with the Defend Trade Secrets Act of 2016, a relatively new law.

And there are only five (5) decisions from the Second Circuit on the new law, none of which apply here. See Turret Labs USA, Inc. v. CargoSprint, LLC, No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022) (affirming dismissal of complaint with DTSA claims); Mason v. Amtrust Fin. Services, Inc., 848 Fed. Appx. 447 (2d Cir. 2021) (affirming dismissal of DTSA claims and denial of preliminary injunction due to lack[8] of likelihood of success on the merits); Zirvi v. Flatley, 838 Fed. Appx. 582 (2d Cir. 2020), cert. denied, 142 S. Ct. 311 (2021) (affirming dismissal of DTSA claims on statute of limitations grounds); Kairam v. W. Side GI, LLC, 793 Fed. Appx. 23 (2d Cir. 2019) (affirming dismissal of DTSA claim pursuant to Rule 12(b)(6) but granting leave to amend); and Broidy Capital Mgt. LLC v. Benomar, 944 F.3d 436 (2d Cir. 2019) (affirming dismissal due to lack of subject matter jurisdiction arising under diplomatic immunity).

Accordingly, in the absence of binding precedent, Plaintiff respectfully requests that this Court afford great weight to the decisions in WHIC LLC v. NextGen Laboratories, Inc. and Arminius Schleifmittel GmbH v. Design Industries, each of which are directly on point because: (i) like the Defendants here, the defendants in WHIC LLC spread vicious lies about the plaintiff to divert customers; and (ii) like the Defendants here, the defendants in Arminius Schleifmittel pled the Fifth when faced with evidence of their wrongdoing under the DTSA such that the court was to make an adverse inference against them in shutting their business down.

Moreover, Plaintiff respectfully submits that QBE Americas, Inc v. Allen is directly on point for the proposition that the loss of customer relationships creates irreparable harm because it would be (and is) difficult to determine how much business Plaintiff lost due to Defendants' conduct. That the parties in those cases previously had an employment relationship is meaningless.

---

[8] The Court in this case has already found that Plaintiff has established a likelihood of success on the merits, which Defendants conceded at the hearing in an effort to prevent the Court from hearing and admitting the damning evidence against them. As such, Mason is inapposite.

Finally, the trademark cases Defendants seek to distinguish are also on point.  Like the confidential information Plaintiff possessed, trademarks constitute proprietary information entitled to protection, and this Court already found that Plaintiff's information was confidential such that it was entitled to protection from disclosure.  See Tr. at 52:10-19, 53:6-8, 54:1-12, 129:12-25, 130:1-20, 153:15-25, 154:12-155:3, 155:12-156:18.

## CONCLUSION

As requested in Plaintiff's initial motion for a preliminary injunction, it is respectfully submitted that this Court should enter an Order:

(a) preliminarily enjoining Defendants and any persons or entities acting in concert with or on behalf of defendant, from using in any manner whatsoever IME WatchDog, Inc.'s trade secret and confidential and proprietary information (including, without limitation, IME WatchDog, Inc.'s customer database, including the identity and contact information of IME WatchDog, Inc.'s customers, or any other information regarding IME WatchDog, Inc.'s customers, clients, transactions, financial information, or other matters involving IME WatchDog, Inc.;

(b) directing Defendants to return to IME WatchDog, Inc. all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets and confidential and proprietary information (including, without limitation, Plaintiff's customer database, including the identity and contact information of Plaintiff's customers, and for each customer of IME WatchDog, Inc., the services offered and payments received from IME WatchDog, Inc's customers, and/or other matters involving IME WatchDog, Inc. and which Defendants obtained or accessed, including without limitation information regarding IME WatchDog, Inc.'s customers, clients, transactions, financial information, or other information involving IME WatchDog, Inc.;

(c) directing Defendants to make all electronic accounts that are in their custody or control and on which they stored information regarding IME WatchDog, Inc.'s trade secrets and confidential or proprietary information available and accessible to IME WatchDog, Inc. (including providing relevant passwords) to inspect to ensure IME WatchDog, Inc.'s trade secrets and confidential and proprietary information is secure and has not been improperly copied or distributed;

(d) preliminarily enjoining Defendants from continuing to operate their business until such time that IME WatchDog Inc. recovers its confidential and proprietary information from Defendants;

(e) preliminarily enjoining Defendants from contacting Adam Rosenblatt and/or any IME WatchDog, Inc. clients and/or IME Watchdog, individuals currently performing services for IME Watchdog, Inc.; and

(f) preliminarily enjoining Defendants from operating their business

Dated: Lake Success, New York
April 21, 2022

Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

_____/s_____
Jamie S. Felsen, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
jamiefelsen@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*
*Counterclaim-Defendant*
*IME WatchDog, Inc.*
*and Third-Party Defendant*
*Daniella Levi*

26

**VIA ECF**
Katsoudakis & Iakovou Law Group, PLLC
Attn: Steven Siegler, Esq.
40 Wall Street, 49th Floor
New York, NY 10005-1300
(212) 404-8644 (telephone)
(212) 404-8609 (direct dial)
(332) 777-1884 (facsimile)
steven@kilegal.com

*Attorneys for Defendants*
*Counter-Claim Plaintiffs*
*Third-Party Plaintiffs*
*Safa Abdulrahim Gelardi*
*Vito Gelardi, and*
*IME Companions LLC*

**VIA ECF**
Leo Shalit, P.C.
Attn: Leo Shalit, Esq.
45 Glen Cove Road
Greenvale, NY 11548
(833) SHALIT-1 (office)
(646) 957-0009 (direct)
(833) 742-5481 (facsimile)
leo@shalit-law.com

*Attorneys for*
*Third-Party Defendant*
*Carlos Roa*