UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IME WATCHDOG, INC.,

                Plaintiff,

       - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, and IME COMPANIONS LLC,

                Defendants.

------------------------------------------------------------x
SAFA GELARDI AND IME COMPANIONS
LLC,

                Third-Party Plaintiffs,

       - against -

CARLOS ROA AND DANIELLA LEVI,

                Third-Party
                Defendants.

------------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") commenced this action on
February 25, 2022, against IME Companions LLC ("Companions") and Safa Abdulrahim Gelardi
and Vito Gelardi ("Individual Defendants") (collectively, "Defendants"), alleging
misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary
and injunctive relief.  Before the Court is Plaintiff's motion for a preliminary injunction.  After
holding a show-cause hearing on April 4, 2022, the Court granted Plaintiff's motion in part and
preliminarily enjoined Defendants from franchising Companions and having any ongoing or future
communications with Plaintiff's employees and agents.  The Court reserved ruling on the
remainder of Plaintiff's request for a preliminary injunction and requested the submission of

supplemental briefing on the issue of irreparable harm.  For the reasons stated herein, the Court grants in part and denies in part the remainder of Plaintiff's motion and issues a separate order setting forth the requirements of the preliminary injunction.

## BACKGROUND

### I.    Findings of Fact

Pursuant to Federal Rule of Civil Procedure 52(a)(2), the Court makes the following findings of fact in support of its partial grant of a preliminary injunction against Defendants.  The Court also incorporates by reference its February 28, 2022 and April 5, 2022 Docket Orders ruling on Plaintiff's motion for a temporary restraining order and partially ruling on the preliminary injunction motion.  (*See* 2/28/2022 Docket Order; 4/5/2022 Docket Order.)

Watchdog and Companions are competitors in the area of personal injury cases.  When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination (what the parties refer to as an "IME") of the plaintiff to evaluate his or her alleged injuries.  (*See* Declaration of Daniella Levi ("Levi Decl."), Dkt. 8, ¶¶ 4–8.)  Companies like Watchdog and Companions provide a third-party service to plaintiffs undergoing an IME, by sending an associate with the plaintiff to the medical examination to observe, take notes, and help the plaintiff fill out forms.  The associate then produces a report that the plaintiff's counsel can potentially use in the plaintiff's personal injury case in court.  (*Id.* ¶¶ 15–16, 27–28.)

Watchdog is a New York corporation (*see* Complaint ("Compl."), Dkt. 1, ¶ 4) established in May 2011 by Daniella Levi, a third-party defendant in this action (*see* Levi Decl., ¶¶ 1, 14.) Levi, who is a personal injury attorney, developed "forms of reports" and checklists for Watchdog's associates "to complete" after "different types" of medical examinations; "established price lists" and "recruitment and training procedures"; and "built a customer database" for Watchdog.  (*Id.* ¶¶ 3, 16–18.)  Through years of practice and operation, Watchdog developed

information regarding its customers' preferences, "such as how soon each customer wants its report, and whether the [associate] should have a conference with the customer in advance of the" medical examination.[1]  (*Id.* ¶ 30.)

In 2011, Levi hired Adam Rosenblatt as an administrative assistant, and later promoted him to a Watchdog associate/observer.  In 2016, Rosenblatt was again promoted, this time to president of Watchdog.  (*Id.* ¶¶ 31–32.)  As president, Rosenblatt holds the "top executive" position at Watchdog, along with Levi as the chief operating officer, and has access to the company's "entire database, including the identity of all of its customers and clients, their contact information, their preferences, their pricing and all of the financial details" of the company.  (*Id.*)  Watchdog's "sensitive documents" and data are password-protected, such that only Levi and Rosenblatt have access to them.  (*Id.* ¶¶ 34–35.)

Companions is a New York limited liability company (Compl., Dkt. 1, ¶ 5) established in November 2017 by Defendants Safa Gelardi and Vito Gelardi, a married couple.  (*See* Declaration of Safa Gelardi ("Gelardi Decl."), Dkt. 26, ¶¶ 2, 33.)  Prior to launching Companions, Safa Gelardi had no experience in the personal injury field generally or with independent medical examinations specifically—rather, she worked at a bank in various positions, including as vice president.  (*See* April 4, 2022 Hearing Transcript ("Tr.") 24:21–25:10, 29:16–30:7.)  However, after meetings with Rosenblatt and his father in early 2017, Safa Gelardi learned about Watchdog's business, reviewed proprietary documents Rosenblatt shared with her, and decided to open Companions.  (*See* Gelardi Decl., ¶¶ 16–18, 20–22, 28, 33; Tr. 35:19–21, 84:10–85:1, 155:12–14.)

---

[1] Defendants in personal injury actions have resisted the presence of Watchdog's third-party associates at medical examinations.  The issue was litigated in New York state courts, which have held that plaintiffs are entitled to have a nonlegal third-party observer at the examination. *See, e.g., Gonzalez v. Red Hook Container Terminal, LLC*, 128 N.Y.S.3d 897, 898 (App. Div. 2020).

Rosenblatt shared many of Watchdog's highly detailed and proprietary documents with Defendants over time, including, but not limited to, Watchdog's: (1) invoices; (2) customer lists and sales reports; (3) a quarterly report; (4) a memorandum containing profit and loss analyses and the breakdown of medical examinations by the doctors' specialties; (5) tables recording how much (and whether) customers paid, what they paid for (*i.e.*, associate's travel time), whether they received discounts, the time spent in the examination, and the doctors' specialties; and (6) payroll information that reflects profits made by each associate for Watchdog.[2]  (Dkt. 45-3, at ECF 93–193.)

Safa Gelardi used two Watchdog invoices that Rosenblatt provided to pitch the idea of Companions to an investor—Gregory Elefterakis—who had previously declined to fund a different idea Safa Gelardi pitched to him.  This time, Elefterakis agreed to provide start-up capital for Companions and brought in two more business partners, Roman Pollak and Anthony Bridda.  (*See* Gelardi Decl., Dkt. 26, ¶¶ 31–32.)  Elefterakis also introduced Safa Gelardi to the clients to whom these two invoices were issued, which happened to be his nephews' firms, and whom Safa Gelardi poached from Watchdog as her first clients.  (Tr. 50:11–16 ("THE COURT: Again, but you still wanted to get from IME Watchdog, one of their customers for your new business venture using -- THE WITNESS: Correct, Your Honor. THE COURT: Okay. The invoice and using Gregory

---

[2] The Court notes that Defendants' production of these materials, which Defendants were required to produce pursuant to the Court's March 30, 2022 Docket Order, appears to have been incomplete and includes the production of materials without any context or explanation.  For example, Defendants produced a single sheet of paper that includes Levi's personal information (*e.g.*, her age, date of birth, home address, phone numbers, her husband's name, his age, and his line of business), and four separate links to what appear to be dockets and articles, presumably linked to Levi in some manner.  (*Id.* at ECF 195.)  However, there is no explanation of who created this document, when, and for what purpose, or the source of the information contained in it.  Nor do Defendants explain why they produced this document without any contextual information.

[Elefterakis]? THE WITNESS: Correct."); Dkt. 45-3, ECF 2–3, 99–100; Gelardi Decl., Dkt. 26, ¶¶ 34–35.)

Using Watchdog's misappropriated invoices and a 2016 customer sales summary report, along with some help from her newly found business partners,[3] Safa Gelardi got Companions off the ground in November 2017.[4]  (Tr. 40:4–18.)  Safa Gelardi also used Watchdog's website and Rosenblatt's knowledge about Watchdog's business to set up Companions' website.  (*See* Dkt. 45-3, ECF 80–81 ("[W]e need a website . . . with a significant amount of content to be taken from IME Watchdog.").)  Having learned from Rosenblatt that Watchdog's website would benefit from certain improvements, and again having no personal knowledge of the industry, Safa Gelardi made very specific requests for her own company's website—copying Rosenblatt's words almost *verbatim*.  (*See, e.g., id.* at ECF 81 (Safa Gelardi writing in an email that, "Many of [Watchdog's] current clients are baffled by the format and just email [Rosenblatt]. . . . Clients should be able to log on and book an [associate] . . . Many clients will not want to take these steps and I should be

---

[3] Safa Gelardi bought out her partners in August 2018.  (Gelardi Decl., Dkt. 26, ¶ 45.)

[4] Safa Gelardi gave conflicting testimony at the April 4, 2022, show-cause hearing regarding her knowledge of Watchdog's 2016 customer sales summary report.  (*Compare* 35:24–36:1 ("Q Adam [Rosenblatt] gave you a Sales by Customer Summary for 2016 in or about April of '17, correct? A No.") *and* 36:2–16 ("Q [Adam provided you with contact information for] each of the customers listed in the Sales by Customer Summary for 2016. A No."), *with* 40:16–41:10 ("Q After you opened up your business you ended up obtaining Subin & Associates as a client, correct? A Yes. . . . Q And you knew that it was highest grossing – highest sales because you saw the list that Adam provided you, correct? A Correct.") *and* 56:24–57:18 ("THE COURT: . . . did you receive [the 2016 customer sales summary report] . . . from Adam Rosenblatt? THE WITNESS: Yes. THE COURT: Okay. And when did you receive it? THE WITNESS: This was sent – this was part of the stuff sent to my e-mail. THE COURT: All right. And when? THE WITNESS: I would say April 2017.").  The Court finds that Safa Gelardi did receive Watchdog's 2016 customer sales summary report from Rosenblatt in April 2017 and used it to start Companions in November 2017.

able to enter the information in manually.")[5]  Significantly, Safa Gelardi planned to franchise Watchdog's stolen trade secrets as early as September 20, 2017, when she was setting up Companions.  (*Id.* ("We cannot really franchise and tell people to use Google calendar.").)

After starting Companions, Safa Gelardi continued to use misappropriated information to poach clients from Watchdog and grow Companions.  Sometime in 2019, Safa Gelardi asked Rosenblatt for a copy of one of Watchdog's medical examination reports (*see* Dkt. 15-1, at ECF 1–24; Dkt. 45-3, at ECF 58–79)—which are extremely detailed—in order to compare it with the performance of her own associates and advance her business.[6]  In March 2019, Rosenblatt emailed a 2016 Watchdog report to Safa Gelardi, with the subject line "sample report."  (Dkt. 15-1, at ECF 1.)  In October 2019, Rosenblatt emailed a 2019 Watchdog report to Safa Gelardi, with the subject line "New Template."  (Dkt. 15-2, at ECF 1.)  The top of each report's first page has a clear designation that the report is confidential attorney work product.[7]  Other emails between Rosenblatt and Safa Gelardi show that on August 21, 2019, Rosenblatt sent a list of six of Watchdog's clients and their email addresses to Safa Gelardi, with a note that "all paid full price," and that seven days later, Safa Gelardi forwarded this information to Carlos Roa at "croa@imecompanions.com."[8]  (Dkt. 45-3, at ECF 92.)

---

[5] Whether or not Safa Gelardi sought this information from Rosenblatt, or paid for it, is irrelevant.  What matters is that she used this information—which she knew she obtained wrongfully—to set up her own competing business, Companions.

[6] While Safa Gelardi denied that having a copy of Watchdog's report helped Companions (*see* Tr. 51:11–52:9), the Court does not credit that testimony.

[7] Records show that Safa Gelardi forwarded both emails (*see* Dkt. 15-1, at ECF 1; Dkt. 15-2, at ECF 1), presumably to Carlos Roa, a Companions employee at the time, as with another email with Watchdog's customers discussed here.

[8] In light of all the evidence before it, the Court finds that the email address "croa@imecompanions.com" is Carlos Roa's Companions email address.

Safa Gelardi and Rosenblatt continued to exchange emails with Watchdog's proprietary information through 2021. (*Id.* at ECF 85–90). Thus, the Individual Defendants took "confidential information through" Rosenblatt about Watchdog's "business in order to further their own business, namely," Companions, and did so "in exchange for money" beginning in at least 2019.[9] (Tr. 153:20–23, 154:16–20, 155:12–156:2; Dkts. 15-5, 15-6, 15-7.)  Although fully aware that the information shared by Rosenblatt was proprietary and confidential, the Individual Defendants had an "ongoing relationship" with Rosenblatt in which they paid him to "get information."  (Tr. 154:21–156:2.)  The Individual Defendants even assured Rosenblatt that Levi would not find out about the scheme because she did not have access to his bank accounts and could not subpoena him. (*See* Plaintiff's Supplemental Anticipated Witness and Exhibit List ("Pl. List"), Exhibit 18A, audio tape: Recording of a Call Between Adam Rosenblatt, Safa Gelardi, and Vito Gelardi (on file with the Court).)  When Rosenblatt expressed fear about being found out, the Individual Defendants promised to hire Rosenblatt as a Companions employee and to give him a salary advance.  (*Id.*)

In addition to using Watchdog's proprietary information to grow Companions into one of Watchdog's competitors (Tr. 156:2–18),  Defendants attempted to recruit Watchdog's clients and other potential clients by making disparaging remarks about Watchdog and Levi.  In a March 2019 email to a Watchdog client, Safa Gelardi stated (in an apparent reference to Levi's background as

---

[9] Safa Gelardi invoked her Fifth Amendment right against self-incrimination in response to questions regarding paying Rosenblatt for Watchdog's confidential and proprietary information after creating Companions in November 2017, and using it to further Companions' business. (*See* 53:9–11, 58:15–19. 60:15–62:16, 122:5–125:4.)  As the Court advised Defendants at the show-cause hearing, the Court draws a negative inference from this invocation and concludes that Defendants did pay Rosenblatt in exchange for information and documents from Watchdog, beginning at least in 2019. (*See* Tr. 6:1–9, 18:4–19); *see Baxter v. Palmigiano*, 425 U.S. 308, 318–20 (1976); *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983).

an attorney): "keep in mind WE ARE NOT ATTORNEYS, we are not owned by attorneys, so your clients are safe. We are there to add value not to take away." (Pl. List, Exhibit 17, at 2.)  In another email sent to a potential client, Safa Gelardi wrote: "IME Watchdog is owned by a law firm and attorney Daniella Lev[i]." (Dkt. 56-7, at ECF 1.)  Similar statements permeate emails addressed to potential clients sent by Roa on behalf of Companions: "We are independently owned, not owned by another law firm." (Dkt. 51-1, at ECF 2; Dkt 51-3, at ECF 2; Dkt 51-4, at ECF 2). A different iteration of this email went farther and added: "therefore your clients are safe with us during their IMEs."  (Dkt. 51-5, at ECF 2.)   The inference that Defendants wanted potential customers to draw from these statements is not hard to decipher: Levi, Watchdog's owner and a personal injury attorney, used the medical examinations her company observed to poach personal injury plaintiffs from Watchdog's clients and would do the same to the potential clients Companions was wooing, but that Companions would not.[10]

As a result of Defendants' actions, Plaintiff lost many clients and business opportunities, including its largest account—the law firm of Subin & Associates, which was one of the accounts for which Rosenblatt shared proprietary information with Safa Gelardi in 2017.[11]

---

[10] Defendants also sent thinly veiled, disparaging marketing emails to potential customers. (*See* Dkt. 45-7.)  One such email includes an image of an aggressive dog behind what appears to be a cage, with a message that reads, "You Can Keep the Dog in a Cage and Send a Companion on your next IME!"  (*Id.* at ECF 2–3.)

[11] That some of Plaintiff's then-existing customers may have been "unhappy" with Plaintiff's service and chose to switch to Defendants (*see* Dkts. 27, 28), and that Defendants "met" some of the poached clients through events and introductions (see Defs' Supp. Resp., Dkt. 55, at 1–3), is not material where, as here, Defendants' business likely would not have existed in the shape and form it does without Rosenblatt sharing improperly obtained proprietary information regarding Watchdog's business with Defendants.  In any event, the fact that customers may have had their own reasons for moving to Companions and were unaware of Defendants' improper business practices does not prove that Defendants did not use Watchdog's proprietary information—it simply shows that Defendants took steps to recruit certain clients in a targeted manner after learning about them through Rosenblatt.

8

## II.    Procedural History

On February 28, 2022, the Court denied Plaintiff's motion for a temporary restraining order, finding that Plaintiff had not established irreparable harm.  (*See* 2/28/2022 Docket Order.) The Court held a show cause hearing on Plaintiff's motion for preliminary injunction on April 4, 2022, where it found that Plaintiff had demonstrated likelihood of success on the merits of its claims against Defendants.  (*See* 4/5/2022 Docket Order).  The Court thus granted Plaintiff's motion in part and preliminarily enjoined Defendants from (1) franchising Companions and (2) having any ongoing or future communications with Plaintiff's employees and agents.  (*Id.*)  The Court reserved ruling on the remainder of Plaintiff's requests for preliminary relief and requested the parties to submit supplemental evidence and briefing on the issue of irreparable harm.  (*See* Tr. 153:12–172:25.)  Supplemental briefing was completed on April 21, 2022.  (*See* Dkts. 44, 45, 46, 51, 52, 55, 56.)

Plaintiff seeks a preliminary injunction enjoining "Defendants from operating their business," and "direct[ing] Defendants to return . . . all confidential information and trade secrets" and "destroy all electronic information belonging to Plaintiff that is in their possession." (Plaintiff's Supplemental Brief ("Pl. Supp. Br."), Dkt. 44, at 14.)  Plaintiff also seeks access to "all electronic accounts" in Defendants' custody or control "on which they stored information regarding" Watchdog, including "providing relevant passwords."  (*Id.* at 25).  Lastly, Plaintiff seeks to enjoin Defendants "from contacting . . . any of [Watchdog's] clients."  (Proposed Order to Show Cause, Dkt. 6, at 3–4.)

## DISCUSSION

## I.    Legal Standard

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Natural Res. Defense Council,*

*Inc.*, 555 U.S. 7, 24 (2008)).  "A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits . . .; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Khan v. Addy's BBQ LLC*, 419 F. Supp. 3d 538, 552 (E.D.N.Y. 2019) (quoting *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015)); *see also Winter*, 555 U.S. at 20; *Salinger v. Colting*, 607 F.3d 68, 75 (2d Cir. 2010).  "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, . . . but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citations omitted); *see also Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A preliminary injunction is an equitable remedy and an act of discretion by the court.").

"Courts refer to preliminary injunctions as [either] prohibitory or mandatory." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).  While a "[p]rohibitory injunction[ ] maintain[s] the status quo pending resolution of the case[,] [a] mandatory injunction[ ] alter[s] it." *Id.* at 36–37 (citation omitted).  The status quo in the context of a preliminary injunction is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (*per curiam*) (internal quotation and citation omitted).  A party moving for a mandatory injunction, or an injunction that "will provide the movant with substantially all the relief sought and relief that cannot be undone even if the defendant prevails at a trial on the merits" must satisfy a heightened legal standard and both: "(1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal quotation and footnotes omitted).

10

The Court finds that Plaintiff is seeking a status quo injunction that would restore and preserve the parties' situation as it existed immediately prior to the events that precipitated the dispute and applies the general standard for preliminary injunctions, as opposed to the heightened legal standard.[12]  The Court reiterates its finding, made at the close of the show-cause hearing, that Plaintiff has established a likelihood of success, and focuses its analysis on irreparable harm, as well as the balance of hardships and the public interest.[13]

## II.    Plaintiff Has Established Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered."  *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 221 (E.D.N.Y. 2013) (alterations omitted) (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)).  "[T]o show irreparable harm, the moving party must establish that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation."  *Int'l Home Care Servs. of New York, LLC v. People's United Bank, Nat'l Ass'n*, No. 20-CV-3358 (PKC) (SJB), 2020 WL

---

[12] However, the Court notes that, in light of the overwhelming evidence of irreparable harm and clear likelihood of success, Plaintiff has met the heightened, mandatory injunction standard as well.

[13] Defendants argue that Plaintiff's supplemental brief is a "stealth motion for reconsideration" of the Court's April 5, 2022 Docket Order because Plaintiff "ignored the narrow scope of" the Court's supplemental briefing inquiry.  (*See* Defendants' Supplemental Response ("Defs' Supp. Resp."), Dkt. 52, at 1; *see also id.* at 5, 7–10.)  Defendants are incorrect.  The Court only made a final determination with respect to preventing Defendants from franchising and communicating with Plaintiff's employees and agents.  (*See* 4/5/2022 Docket Order.)  The Court specifically reserved ruling on the remainder of Plaintiff's requests for preliminary relief, noting that "the question remains [whether there is] irreparable harm and [what] the scope of the injunction [should be], if any."  (Tr. 156:21–23.)  Moreover, the Court qualified its observations regarding irreparable harm and the scope of the injunction as preliminary, and thus asked for supplemental evidence and briefing from the parties.  (Tr. 157:2–158:19.)

5752187, at \*4 (E.D.N.Y. Sept. 24, 2020) (internal quotation marks omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). The moving party must also demonstrate that irreparable harm is "actual and imminent, not remote or speculative." *Allstate Ins. Co.*, 929 F. Supp. 2d at 221 (alterations omitted and internal quotation marks omitted).

"[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *Rex Med. L.P. v. Angiotech Pharm. (US) Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). Good will is defined as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976 (RJH), 2011 WL 497978, at \*6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012) (summary order); *see also Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562 (ERK) (RML), 2008 WL 207843, at \*5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 F. App'x. 885 (2d Cir. 2008) (summary order). "[G]ood will constitutes the intangible qualities of a business that attract customers . . ." *Id.* "[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Singas*, 2011 WL 497978, at \*6 (internal quotation and citation omitted).

Here, as discussed in detail in the Court's factual findings, Plaintiff has demonstrated that Defendants established their business partly by (1) misappropriating information they obtained from Rosenblatt, Plaintiff's president, in 2017, (2) poaching and diverting clients from Plaintiff, and (3) disparaging Watchdog and its owner, Daniella Levi, to Watchdog's clients. It is undisputed

that before Safa Gelardi started Companions, she had no background in law, medicine, personal injury lawsuits, or independent medical examinations.  Instead, she improperly obtained and used Plaintiff's proprietary information to jump-start Companions and continued, over the next several years, to use the misappropriated trade secrets to grow Companions into a competing business that diverted Watchdog's longtime customers, as well as potential new business for Plaintiff.  While the Court credits Safa Gelardi's testimony that she also received help in setting up Companions from her former business partner Elefterakis, who helped recruit his nephews' law firms away from Watchdog as Companions' first clients, there is no doubt that Companions' existence and growth is based in part on Watchdog's misappropriated trade secrets, customers, and business opportunities.

When Defendants engaged in this conduct, they were well aware that Rosenblatt was violating his duties to Watchdog by divulging this information to Defendants, even cavalierly reassuring Rosenblatt that Levi would not find out about this breach of duty.[14]  Defendants went as far as paying Rosenblatt for this information, in regular installments, and offering him employment with Companions, in the event Levi discovered the scheme and fired him.

Based on this evidence, it is clear that, without an injunction, Plaintiff will continue to suffer substantial harm to its goodwill and reputation, and that Defendants will continue to divert clients from Plaintiff.  *See QBE Am., Inc. v. Allen*, Nos. 22-CV-756, 22-CV-757 (JSR), 2022 WL

---

[14] The Court notes that in their allegations against Roa, Defendants allege that Roa "breached his duty of loyalty to Companions when he went to Watchdog with damaging information in January 2022." (Defs' Supp. Resp., Dkt. 52, at 2; Dkt. 25, ¶¶ 1, 36–41.)  This statement further confirms that Defendants well understand an employee's duty of loyalty to its employer and regard such loyalty as important, and yet took no issue with taking information about Watchdog from Rosenblatt for years, to Watchdog's detriment and their own benefit.  The Court also notes that glaringly lacking from this statement is any pronunciation that the information Roa shared with Watchdog is incorrect—Defendants simply complain that it is "damaging."

889838, at *15 (S.D.N.Y. Mar. 15, 2022) ("Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor."); *see also Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x. 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal quotation marks excluded).)   Thus, Plaintiff has met its burden of demonstrating that, absent a preliminary injunction, it will suffer imminent irreparable harm.[15]

## III.    The Balance of Hardships and Public Interest Tip In Plaintiff's Favor

The Court finds that the balance of hardships decidedly tips in Plaintiff's favor.   As the Court previously found and now reiterates, "Plaintiff has demonstrated sufficient hardship given that Defendants' 'actions, if not enjoined will likely result in irreparable harm to the Plaintiff' and 'Plaintiff is likely to succeed as to the merits of its case.'"   (4/5/2022 Docket Order (quoting *Home It, Inc. v. Wen*, No. 19-CV-7070 (MKB) (VMS), 2020 WL 353098, at *6 (E.D.N.Y. Jan. 21, 2020)).   "At the same time, Defendants cannot 'demonstrate any hardship based upon [their]

---

[15] Defendants argue that the cases cited by Plaintiff, some of which the Court relies on here, are inapplicable because they dealt with trademark issues and non-compete clauses.   (*See* Defs' Supp. Resp., Dkt. 52, at 18.)   However, loss of goodwill and injury to reputation are not narrowly confined to trademark and non-compete cases and, in any event, while the circumstances of trade secret loss and customer misappropriation in such cases may not be factually identical to the issues presented here, the legal analysis from those cases regarding the imposition of preliminary injunctive relief is relevant and applicable here.

inability to rely on [trade secrets they have], more likely than not, obtained fraudulently.'"[16]  (*Id.* (citing *Pearson Educ., Inc. v. Labos*, 19-CV-487 (CM), 2019 WL 1949820, at *6 (S.D.N.Y. Apr. 23, 2019) ("[I]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." (internal quotation marks omitted)).)

The Court also finds that the public interest will be served by an injunction prohibiting Defendants from further using "what clearly and convincingly appears to be wrongfully obtained trade secrets" to poach clients from Plaintiff.  (4/5/2022 Docket Order.)  It goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest.

## IV.    No Bond Is Required

Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party."  *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond, *see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-

---

[16] The Court has considered Defendant Safa Gelardi's testimony that the money she receives from Companions is the primary source of income for the Individual Defendants, but notes that Safa Gelardi could return to her banking career if necessary.  (Tr. 115:9-11 ("Q If the Court grants the relief requested by the plaintiff, you could go on and work for a bank again, correct? A I don't want to.").)  In any event, as discussed below, this testimony is not material because the Court denies Plaintiff's request to completely shut down Companions.

movant, *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted).  If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction."  *Corning, Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (*per curiam*).

Here, Defendants have not requested a security bond and Plaintiff similarly has not raised the issue.  Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case.  The Court has already concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants, if any, thus would be minimal. *Golden Krust*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm.").  This is especially true in light of the Court's denial, as discussed below, of Plaintiff's request to shut down Companions entirely for the duration of this litigation.  Accordingly, the Court finds that no bond is required here.

## V.      The Preliminary Injunction Plaintiff Seeks Is Overbroad

Plaintiff requests a broad preliminary injunction that not only would prevent Defendants from continuing to use Plaintiff's trade secrets and require them to turn over all improperly collected information back to Plaintiff but would also effectively shutter Companions for the remainder of this litigation.  (*See* Dkt. 6, at 3–4.)  Plaintiff's request for preliminary relief is overly broad.  While it is undisputed that Plaintiff did, in fact, lose trade secrets and customers to Defendants, at this stage of the proceeding, before discovery or forensic analysis has been

conducted, the Court cannot make a finding that Companions is built entirely on misappropriated information and poached clients.  For similar reasons, the Court declines to order Defendants to grant Plaintiff unlimited access to all of their electronic accounts, including the sharing of passwords.[17]  "In all cases, the relief should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'"  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)).  The Court therefore denies Plaintiff's request to shut down Companions during the pendency of this litigation.

The Court grants the following preliminary injunctive relief to Plaintiff:

    a.  Defendants are preliminarily enjoined from using in any manner whatsoever Plaintiff's trade secrets and confidential and proprietary information.

    b.  Defendants are directed to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets and confidential and proprietary information.

    c.  Defendants are preliminarily enjoined from contacting Plaintiff's current clients, employees, and agents.

    d.  Defendants are preliminarily enjoined from franchising Companions.

    e.  Defendants are preliminarily enjoined from destroying documents, whether in hard copy and/or computerized and/or other electronic media format, that are presently in Defendants' personal or corporate possession relating to Companions, Watchdog, and or any other matter relevant to this case.[18]

---

[17] However, as ordered below, Defendants must permit unfettered access to these records and electronic accounts to the independent forensic analyst.

[18] The Court recognizes that this non-destruction requirement is a standard requirement for all ongoing litigation, *see Warren v. City of New York Dep't of Correctional Med. Staff*, No. 17-CV-1125 (PKC) (LB), 2021 WL 1163105, at *14 (E.D.N.Y. Mar. 26, 2021) ("FRCP 37(b)(2) allows a district court to impose sanctions when a party spoliates evidence in violation of a court order, but even without a discovery order, a district court may impose sanctions for spoliation under its inherent power to manage the litigation."), but the Court specifically reiterates this requirement in light of its concerns about Defendants' candor and conduct thus far in this matter.

f.  Within fourteen (14) days of this Memorandum and Order, the parties are directed to meet and confer regarding the retention of an independent forensic analyst who will conduct an analysis of all of Defendants' records and electronic accounts. Defendants will provide complete and unrestricted access to their records and electronic accounts to the forensic analyst.  The parties will share equally the cost of the forensic analysis.  The parties shall file a joint report within thirty (30) days of this Memorandum and Order regarding the status of the forensic analysis, and every sixty (60) days thereafter.  The forensic analyst's final findings shall be filed with the Court promptly upon the completion of the analysis.

Because "an injunction that prohibits the use or disclosure of trade secrets or confidential information must also specifically describe the nature of the secrets or confidential information to be protected," *see ExpertConnect, LLC v. Parmar*, 773 F. App'x. 651, 653 (2d Cir. 2019) (summary order), the Court attaches a separate order to this Memorandum and Opinion that sets forth the terms of the preliminary injunction with specificity, as required by Rule 65(d).  *See Capstone Logistics Holdings, Inc. v. Navarete*, 838 F. App'x. 588, 590 (2d Cir. 2020) (summary order) ("[W]e conclude that the form of the permanent injunction entered by the District Court fails to satisfy the specificity requirements of Rule 65(d) because it is 'not possible to ascertain from the four corners of the order precisely what acts are forbidden' without resorting to extrinsic documents." (quoting *Corning*, 365 F.3d at 158)).

## CONCLUSION

For the reasons stated herein, the Court grants in part and denies in part Plaintiff's request for a preliminary injunction.  The Court attaches the preliminary injunction order, which sets forth the specific terms of the injunction, to this Memorandum and Order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 13, 2022
       Brooklyn, New York

18