UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

IME WATCHDOG, INC.,

                              Plaintiff,

             -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS,
NICHOLAS LIAKIS, and IME COMPANIONS LLC,

                            Defendants.
-----------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

                  Third-Party Plaintiffs,

             -against-

CARLOS ROA,

                  Third-Party Defendant.
-----------------------------------------------------------------X
CARLOS ROA,

                Third-Party Counter-Claimant,

             -against-

SAFA ABUDLRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS, LLC,

                Third-Party Counter-Defendants.
-----------------------------------------------------------------X

**Case No.: 1:22-cv-1032 (PKC) (JRC)**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW CAUSE FOR CONTEMPT, FOR AN ORDER OF ATTACHMENT PURSUANT TO RULE 64 OF THE FEDERAL RULES OF CIVIL PROCEDURE & ARTICLE 62 OF THE NEW YORK CIVIL PRACTICE LAW & RULES, AND IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION DIRECTING DEFENDANTS TO CEASE OPERATING IME COMPANIONS LLC AND ANY OTHER ENTITIES THAT <u>COMPETE WITH PLAINTIFF</u>**

**MILMAN LABUDA LAW GROUP PLLC**
Jamie S. Felsen, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)

ii

## TABLE OF CONTENTS

FACTS ................................................................................................................. 1

ARGUMENT ..................................................................................................... 11

    **A.**    **Companions Must Be Shut Down and Defendants Must be Barred from Operating an IME Business, Being Employed or Involved in an IME Business in any Regard** .................................................................... 11

    **B.**    **Defendants are in contempt of the Injunction** .............................. 13

    **C.**    **Defendants Should be Sanctioned for Contempt of Court** ........... 15

    **D.**    **Plaintiff Should Be Awarded Attorneys' Fees, and Costs** ........... 17

    **E.**    **The Court Should Prohibit Defendants from Selling Any Real Property, Including the Defendants' Florida House which is Currently in Contract** 18

**CONCLUSION** ................................................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

2Die4Kourt v. Hillair Cap. Mgmt., LLC,
    692 Fed. Appx. 366 (9th Cir. 2017)..................................................................... 12

Allstate Ins. Co. v. TMR Medibill, Inc.,
    2000 U.S. Dist. LEXIS 23142 (E.D.N.Y. Jul. 13, 2000).................................... 19

Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.,
    534 Fed. Appx. 633 (9th Cir. 2013)..................................................................... 12

Arminius Schleifmittel GmbH v. Design Indus., Inc.,
    No. 1:06-cv-644, 2007 WL 534573 (M.D.N.C. Feb. 15, 2007) ......................... 12

Bank Leumi Tr. Co. v. Istim, Inc.,
    892 F. Supp. 478 (S.D.N.Y. 1995) ..................................................................... 19

Bray v. Leverage Grp.,
    2008 U.S. Dist. LEXIS 92383 (E.D.N.Y. Nov. 4, 2008)................................... 21

Capital Ventures Int'l v. Republic of Argentina,
    443 F.3d 214 (2d Cir. 2006).................................................................................. 18

Cargill, Inc. v. Sabine Trading & Shipping Co., Inc.,
    756 F.2d 224 (2d Cir. 1985)................................................................................. 18

CBS Broad. Inc. v. FilmOn.com, Inc.,
    814 F.3d 91 (2d Cir. 2016)........................................................................... 13, 17

Citigroup Inc. v. Sayeg,
    No. 21-CIV.-10413 (JPC), 2022 WL 596073 (S.D.N.Y. Feb. 24, 2022) ......................... 17

Coley v. Vannguard Urban Improvement Ass'n,
    2016 U.S. Dist. LEXIS 172378 (E.D.N.Y. Dec. 13, 2016) ............................. 20

DLJ Mortg. Capital, Inc. v. Kontogiannis,
    594 F. Supp. 2d 308 (E.D.N.Y. 2009) ............................................................... 20

Escamilla v. SMS Holdings Corp.,
    CIV. 09-2120 ADM/JSM, 2011 WL 5025254 (D. Minn. Oct. 21, 2011) ......................... 16

JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.,
    306 F. Supp. 2d 482 (S.D.N.Y. 2004)................................................................. 20

King v. Allied Vision, Ltd.,
    65 F.3d 1051 (2d Cir. 1995)................................................................................. 13

Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.,
    No. 1:18-CV-8333 (ALC), 2019 WL 10960397 (S.D.N.Y. Jun. 20, 2019) ..................... 12

Medina v. Buther,
    No. 15-CIV.-1955 (LAP), 2019 WL 581270 (S.D.N.Y. Feb. 13, 2019)… ......... 13, 14, 15

Multifeeder Tech., Inc. v. British Confectionery Co. Ltd.,
    CIV. 09-1090 JRT/TNL, 2012 WL 4135848 (D. Minn. Sept. 18, 2012) ........................ 16

N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.,
    2008 U.S. Dist. LEXIS 40517 (S.D.N.Y. May 14, 2008).................................................. 20

Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.,
    369 F.3d 645 (2d Cir. 2004)................................................................................... 13, 15, 17

Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,
    No. 99-CIV.-10175 (KMW), 2021 WL 3418475 (S.D.N.Y. Aug. 5, 2021) ........ 15, 17, 18

Powell v. Ward,
    487 F. Supp. 917 (S.D.N.Y. 1980) ................................................................................... 14

Prabir v. Bukhara Indian Cuisine, Inc.,
    2018 U.S. Dist. LEXIS 94563 (S.D.N.Y. May 17, 2018)................................................. 20

Telenor Mobile Commc'ns AS v. Storm LLC,
    587 F. Supp. 2d 594, 621 (S.D.N.Y. 2008)................................................................. 15, 16

Telenor Mobile Commc'ns AS v. Storm LLC,
    351 Fed. Appx. 467 (2d Cir. 2009)............................................................................. 15, 16

Weitzman v. Stein, 98 F.3d 717, 719, 710 (2d Cir. 1996)................................................ 15, 17, 18

**Statutes**

New York Civil Practive Law & Rules ("CPLR") § 6201 ................................................. 18, 19

CPLR § 6212.................................................................................................................... 18

Fed. R. Civ. P. 64 ............................................................................................................. 18

**FACTS**

On May 13, 2022, this Court issued a limited Preliminary Injunction prohibiting, *inter alia*, Defendants from contacting Plaintiff's employees, agents, and/or customers.  Although the Court found that Plaintiff demonstrated a high likelihood of success on the merits of its claims against Defendants, because the case was still at the early stage of litigation, before discovery and a forensic analysis, the Court was reluctant to make a finding that IME Companions LLC ("Companions") was built *entirely* on misappropriated information and customers poached through commercial bribery and sabotage and, therefore, it did not issue Plaintiff's requested Order to shut down defendants' business *pendete lite*.  See ECF Docket Entry 66.[1]

However, the Court left open the possibility that Plaintiff could renew its request after conducting discovery and astutely ordered a forensic analysis. Id. Some discovery and forensic analysis has been conducted and it unequivocally demonstrates egregious conduct by Defendants warranting that Defendants must be shut down. The overwhelming evidence establishes that Companions was born out of and built *entirely* through Defendants' theft of IME Watchdog's confidential and proprietary information.

Indeed, the forensic analysis, Plaintiff's investigative efforts, and Safa Abdulrahman Gelardi's ("Safa") deposition testimony overwhelmingly, unequivocally and without a shadow of a doubt establishes that Safa – who by her own admission did not know what an IME was before she met Adam Rosenblatt ("Rosenblatt"), the executive of Plaintiff that she bribed – started and built IME Companions LLC ("Companions") entirely with the misappropriated information and trade secrets unlawfully obtained from Rosenblatt by commercial bribery.

---

[1] On June 8, 2022, this Court entered an Amended Preliminary Injunction (collectively hereinafter with the original Preliminary Injunction the "Injunction") due to Defendants' slanderous campaign designed to solicit funds in aid of their indefensible conduct.  See ECF Docket Entry 80.

The misappropriated information and trade secrets includes, but is not limited to, financial statements, sales by customer lists, customer lists, contact information, pricing information, sample reports, sample bills, website and marketing content and training materials.

The forensic discovery has also uncovered a five (5) year-long arrangement between Safa and Rosenblatt to siphon away customers from IME Watchdog.  At times, this was achieved by directing Rosenblatt to sabotage customer relationships (in exchange for money) and then having Safa call those customers to steal them away from IME Watchdog. Other times, after sabotaging customer relationships by purposely turning down IME assignments, at Defendants' direction, Rosenblatt would actually give those customers Safa's number so that they could book with her, instead.

The text message exchanges between Safa and Rosenblatt are mind-numbing.  <u>See</u> Declaration of Emanuel Kataev, Esq. ("<u>Kataev</u> <u>Decl.</u>") at ¶ 7, Exhibit ("<u>Ex.</u>") B (containing relevant portions of text messages between Safa and Rosenblatt between August 16, 2019 and March 2,  2022[2] at 3: ("Fuck it up and be rude…Ima pay u good;" at 85: "Ignore them fuck up a few times and when they switch I will pay you big;" at 89: "Whatever will get me accounts do it. Let's keep it clean;" at 70: "Raise their prices…;" at 4: "I was hoping they fire u guys;" at 144: "You have to turn down their next ime;" at 146: "Ok so the next one you turn down please;" at 50: "What did u do to fuck this one up so I can make the sale;" at 86: "Yes baby. Make that money;" at 89: "This is a way for you to make extra money and for me to grow my business please keep it clean;" at 6: "Who did u fight with this week;" at 33: "Anyone u had a problem with that I could go after").

---

[2] To the extent it is determined that earlier text messages from April 2017 through August 2019 were deleted, Plaintiff seeks an adverse inference that Safa and Rosenblatt worked in the same manner from the beginning, in addition to all other relief available for any such spoliation.

Safa would even go so far as telling Adam to send watchdogs home when she knows the worst thing a watchdog can do to lose a customer is fail to timely arrive for a scheduled IME. Id. at 199 ("Hey Adam. can you send the watchdog home;" at 217: "Can you send the WD home from Bendo office please;" at 224: "Tell his ass to go home").

At the April 4, 2022 show cause hearing (the "Hearing"), this Court noted that the damages in this case are – to a large extent – calculable based on the evidence it heard so far. However, the forensic evidence has revealed that it will be impossible to calculate the damage Defendants' extended campaign of thievery and sabotage has done (and continues to do) to Plaintiff.

The mountain of lies told by Safa are so prolific that Plaintiff was forced to prepare numerous Excel spreadsheets and exhibits to keep track of them; it is as if every time Safa's lips move, another lie comes out.  For example, at the Hearing, Safa proclaimed that she did not open the emails Rosenblatt sent her until months after she received them[3] and that she met Gregory Elefterakis ("Elefterakis") – a suspended attorney who runs a litigation funding company, whose name appeared on two (2) IME WatchDog invoices obtained from Rosenblatt which Safa provided Elefterakis to inquire about the IME observer business.  See ECF Docket Entry 46-1 at 40:4-15.

However, in direct contravention of Safa's testimony, both at the Hearing and during her deposition held on February 2 and 3 last month, the forensic examination of Safa's emails reveals that Rosenblatt e-mailed her confidential financial records on in late April 2017.  See Kataev Decl. at ¶ 8, Ex. C at 1-121.  Within days, Safa forwarded that e-mail and other e-mails from Rosenblatt containing IME WatchDog's 2016 customer list, as well as an Excel spreadsheet identifying all of IME WatchDog's clients with their contact information.  Id.  at 8, 34, 40, 136-137, 141-47.

---

[3] In what will be a nauseating and unnerving pattern, this is demonstrably a lie, as Safa forwarded Rosenblatt's emails within days of her receipt of them to numerous individuals for advice.  See Kataev Decl. at ¶ 8, Ex. C at 8, 34, 40, 136-137, 141-47..

On May 1, 2017, Rosenblatt sent Safa an e-mail informing her what she needed to buy to get the business started.  Id. at 118.  On May 3, 2017, Rosenblatt e-mailed Safa attaching documents to show what an invoice should look like.  Id.  at 119-21.

That same day, Rosenblatt sent an e-mail to a website developer, Lumina, with copy to Safa regarding what the "IME Guard Dog" website should look like.  Id. at 122.  The next day, Safa's accountants formed IME GuardDog Inc,[4] which Plaintiff submits is evidence that Defendants immediately acted upon the confidential information and trade secrets they misappropriated. Id. at 123-25.

During May and June 2017, Safa, Rosenblatt, and Lumina communicated extensively regarding cost for building the IME GuardDog website.  Id.  at 126-34.  On August 19, 2017, Safa sent an e-mail to another website developer regarding building the IME GuardDog website.  Id.  at 135.  On September 20, 2017, Safa sent an e-mail to the original website developer instructing them that *a significant amount of content should taken from Plaintiff's website*. Id. at 138.

On September 24, 2017, Safa e-mailed Defendant Roman Pollak ("Pollak"), an employee of Elefterakis whom Safa testified she went through to reach Elefterakis, to request a meeting.  Id. at 139-40.   On September 29, 2017, Safa e-mailed Pollak IME WatchDog' confidential and sensitive financial records concerning its revenue; the same records Rosenblatt had previously sent to Safa. Id. at 141-47.  On October 3, 2017, after Pollak analyzed the financial records, he asked Safa extensive questions about them.  Id.  at 148.  Two days later, Pollak e-mailed Lumina, with copy to Safa, regarding the website for their competing venture and once again reiterated that *ninety percent (90%) of the website should be copied from Plaintiff's website*. Id. at 149-50 ¶ 5.

---

[4] The forensic evidence reveals that Defendants' competing business had several proposed names before they settled on IME Companions LLC.

On June 10, 2018, Safa stated to Elefterakis in an e-mail "[w]e came to you for a partnership *with a list of attorneys who currently use the service* in hopes of your share of the company would be sales and faster growth … when i showed [Defendant Pollak] the invoice *and the list* that I had on a well thought out complete business and was ready to move forward with other partnerships, but then decided to move forward with you as business decision *because you guaranteed the attorneys that we now have*." Id. at 151.

Companions was thereafter formed entirely with Plaintiff's confidential information on October 27, 2017.  In fact, using the list, financial information  and all of the other confidential and proprietary information Rosenblatt provided Safa in exchange for money, Safa created her own list of "top revenue" customers organized by customers who provided Plaintiff with the most revenue so she and Elefterakis could target them.  See Kataev Decl. at ¶ 8, Ex. C at 136-37 ("Attorney List Over 10,000 in Revenue").  These initial customers were picked off one-by-one.

Indeed, Safa testified that Companion's first ten (10) customers had been Plaintiff's customers.  See Kataev Decl. at ¶ 10, Ex. E at 300:19-301:6.   The forensic discovery shows that an astonishing ninety percent (90%) of Companions' current clients were Plaintiff's clients (which Safa conceded at her deposition  is certainly "possible")!  See Id. at 302:13-20.

It bears emphasis that Defendants, while initially paying Rosenblatt in cash, started to consistently pay Rosenblatt via Zelle or QuickPay in 2019.  During the Hearing, Safa exercised her Fifth Amendment right against self-incrimination when asked about these payments.  However, during her deposition, Safa provided an explanation, which was yet another lie; she claimed that when she needed last minute interpreters for no-fault IMEs, she would call Rosenblatt, who would send a WatchDog, for which she would Zelle Rosenblatt to pay the Watchdogs.  See Kataev Decl. at ¶ 9, Ex. D at 239:4-241:24.

5

The truth, however, is revealed in Safa's extensive text messages with Rosenblatt.  To meet her goal of creating a business entirely through the theft of Plaintiff's customers, she brazenly requested of, demanded from, and cajoled Rosenblatt to sabotage or, in her words, "fuck up" Plaintiff's relationship with its clients so that she can swarm in like a vulture to steal each customer.[5]  See Kataev Decl. at ¶ 8, Ex. B at 81-82 ("Safa: When am I going to get Parker Waichman [("Parker")]. Name your price I got you;" Rosenblatt: "They pay 95;" Safa: "I will give you half in advance and half after they start booking");  and 85-86 ("Safa: Ignore them fuck up a few times and when they switch I will pay you big;" Rosenblatt: "Sounds good Will have some more immediate clients for you tomorrow;" Safa: "Yes baby.  Make that money"); and 126 ("Safa: Raise the price on Parker So I could get them I'll give you 1000;" Rosenblatt: "Ok will try").

The Zelle payments are  directly and easily tied to these text messages.  Audaciously, Safa routinely sought to convince Rosenblatt to leave his position with Plaintiff and routinely bashed and denigrated Plaintiff's principal Daniella Levi, Esq. ("Mrs. Levi"), calling her a bitch  and once stating to Rosenblatt that he should "forget that hoe."  See Kataev Decl. at ¶ 8, Ex. C at 172, 174.

These text messages also confirm that Safa further perjured herself at her deposition when she testified that Rosenblatt hounded her and approached her about making money on the side, and that she merely acquiesced to his demands.  A small sampling of the forensic evidence undeniably establishes that it was *Safa* who repeatedly harassed and begged Rosenblatt to lead the way in developing Safa's competing business by demanding confidential information and trade secrets, for help with various issues attendant to running an IME observer business, to handle her marketing and sales campaigns, together with requests and demands to sabotage Plaintiff's relationships with its customers for Defendants' benefit and for Rosenblatt to sell her clients.

---

[5] This is a mere sampling of the thousands of text messages establishing Defendants' scheme.

See Kataev Decl. at ¶ 8, Ex. C at 1, 5, 6, 40, 47-48 ("I want a big account we'll pay 1,000;" "Help me get Shkolnik.;" "Give me a referral;" "Who did u fight with this week;" "Make some money on the side.  Help me out.  Give Me the bastards u don't want to deal with.;" "Nice.  You need to spread the love.  I'll give you 300 bucks for an account now").

More egregiously, the text messages between Safa and Rosenblatt establish Defendants' pattern and practice of sabotage against the Plaintiff, whereby Defendants routinely: (i) used the information Rosenblatt provided to undercut Plaintiff's prices; (ii) convinced customers to switch to Companions by capitalizing on the sabotage Safa directed Adam to engage in; (iii) disparaged and defamed Plaintiff and Mrs. Levi by stating that personal-injury-plaintiffs were not safe and implying that Mrs. Levi would steal them from her own law-firm-customers.

Numerous additional reasons warrant the immediate complete shut-down of Companions. Defendants have consistently, repeatedly, willfully and contumaciously with impunity violated this Court's Preliminary Injunction Order prohibiting them from having any contact with Plaintiff's employees, agents, and/or customers and making defamatory and disparaging comments about Plaintiff.  This warrants contempt and Plaintiff respectfully requests a hearing.

The most egregious example is that on March 6, 2023, hundreds of Plaintiff's law-firm-customers and also defense firms that its founder, Daniella Levi, Esq. ("Mrs. Levi"), litigates against in her personal injury practice anonymously received via regular mail and e-mail what many principals of these law-firm-customers of Plaintiff have themselves described as libelous or slanderous materials concerning Mrs. Levi and Carlos Roa ("Roa") (an employee of IME WatchDog who was associated with Companions prior to this litigation and blew the whistle on Defendants' illegal conduct).  See Declaration of Daniella Levi ("Levi Decl.") at ¶¶ 4, 7-8; see also Declaration of Carlos Roa ("Roa Decl.") at ¶ 6, Exs. A & B.

While the e-mails and letters were all sent anonymously, there is not a shadow of a doubt that they were sent by Defendants.    Indeed, the first sentence of the e-mail sent states "CRIMINAL AND PEDOPHILE CALL COMPETITORS DISHONEST, WHAT A JOKE!!!" Id.  The mailings and e-mails refer to Mrs. Levi as a money launderer for a cartel and to Roa as a pedophile, and state that "birds of a feather flock together."  Id.  The bottom of the first page of the material states "defense firms will now gear up with this information. This will allow them to question the credibility of her Watch Dogs, employees and her company. Signed, Whistle Blower."  Defendants' sign off only establishes their retaliatory intent, as they mock Roa for blowing the whistle on their illegal conduct and calling Plaintiff ("competitors") dishonest.

This publication violates the Injunction in two (2) independent ways: (i) Defendants contacted Plaintiff's customers; and (ii) Defendants defamed and disparaged Plaintiff.  This libelous distribution into the universe will undoubtedly cause incalculable loss due to harmed reputation. This is not the first, but certainly the most egregious and heinous, act that Defendants have committed, and arguably constitutes criminal conduct in the form of harassment.  See New York Penal Law § 240.26(3).

Further, and equally egregious, Safa hired a private investigator, Stephan "Steve" Stanulis ("Stanulis") and ordered him to place a GPS device on Roa's vehicle to illegally track his whereabouts for reasons one can only imagine were not intended to bestow good things upon him. During her deposition, Safa again lied and stated that, although she hired the private investigator, she denied instructing him to install any GPS device and denied any knowledge of it.  See Kataev Decl. at ¶ 9, Ex. D at 23:20-24:21.  However, an affidavit with exhibits received from the private investigator Safa hired establish that Safa instructed him to install the tracker and even separately paid for it. See Roa Decl. at ¶ 25, Ex. E.

In addition, text messages Safa sent to Stanulis evince an even more sinister intent:

> hey Steve, it seems that the tracker has been found. How would he find it the same day. This is not fair. *The whole thing will not work now* because he is skeptical and he knows … Hey Steve, he did find the tracker, it is at a police station.

See Roa Decl. ¶ 6, Exs. A and B (emphasis added).  Roa is now, understandably, scared out of his mind and constantly looking over his shoulder.  In addition, Defendants have contacted other Plaintiffs' watchdogs in violation of the Injunction.  Most notably, one Rebecca Roth (hereinafter "Roth") – a "watchdog" for Plaintiff – was accosted by agents of Companions with questions concerning Plaintiff and was solicited to work for Companions in Florida, establishing two separate willful breach of the Injunction which prohibits Defendants from communicating with Plaintiff's employees/agents and franchising Plaintiff's business concept.  See Roa Decl. ¶¶ 36-42, Ex. F.

Because there is no question Defendants' business was started and built entirely on the confidential trade secrets it stole from Plaintiff, this Court must put a stop to Defendants' conduct once and for all by prohibiting Defendants from operating their business *pendente lite* to guard against additional violations, all of which have caused Plaintiff only further irreparable harm.

 The testimony this Court relied on in declining to shut down Defendants' competing business was a farce and has now been disproven, and this Court should now shut Companions down not only based on the overwhelming evidence establishing that Safa's entire business was derived from Plaintiff's confidential information, but also because of the egregious violations of the Injunction *and* Safa's unabated perjury.

This Memorandum of Law is therefore respectfully submitted by Plaintiff in support of its Order to show cause for contempt and renewed motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure and the Defend Trade Secrets Act ("DTSA").

An injunction should be issued against Defendants to shut down Companions and preclude Safa from being involved in any manner in any business (directly or indirectly) that competes with Plaintiff because forensic discovery has shown that Safa's business was *entirely* built on Plaintiff's trade secrets and confidential information.

Safa must be shut down from working in the IME observer business because her entire business was formed through the "fruits of the poisonous tree" (i.e., through the misappropriation of Plaintiff's confidential information and trade secrets) and there is no way to permit Safa to remain engaged in this industry based on all of the confidential information and trade secrets that she has used exclusively to build her business.  Without the Court's immediate intervention, the irreparable harm to IME WatchDog will continue unabated and without remedy.

In support, Plaintiff respectfully submits that the terms of the Injunction at issue are clear and unambiguous, and there is no doubt that Defendants have violated same.

Plaintiff also seeks prejudgment attachment of Defendants' real property pursuant to Rule 64 in order to prevent them from diverting assets in an effort to render themselves judgment-proof.  Indeed, on the verge of having their business shut down by the Court as the forensic examiner produced a plethora of evidence establishing Defendants' entire business was started and built through the theft of Plaintiff's confidential information obtained through bribery of Plaintiff's key employee, Defendants are in the process of selling their real estate holdings,[6] most likely for the purpose of liquidating and hiding their assets knowing that a money judgment against them is a virtual certainty.

---

[6] Defendants own properties at: (i) 148 Clay Pit Road, Staten Island, NY; (ii) 322 88th Street, Brooklyn, NY; (iii) 19 Summit Drive, Mount Pocono, PA; (iv) 1523 North Hollywood Street, Philadelphia, PA; (v) 9 Woods End, Lake Harmony, PA; (vi) 1475 Moon Valley Drive, Champions Gate, FL; and (vii) 5265 Milford Road, East Stroudsburg, PA.  See Kataev Decl. at ¶ 9, Ex. D at 66:12-79:7.

Plaintiff therefore also seeks pre-judgment attachment to prevent Defendants from selling their real estate in an effort to avoid paying a highly anticipated inevitable judgment entered against them.

Plaintiff has brought this emergency motion at this time because public records establish the individual Defendants have entered into a contract to sell a nine (9) bedroom luxurious home they own in Champions Gate, Florida with which they supplement their income through vacation rentals.  Since Defendants use these properties to supplement their income, it can readily be inferred that the property is being sold for an improper purpose.  Plaintiff also seeks, as outlined below, an appropriate Order of protection and an additional forensic examination at Defendants' cost.[7]

Finally, Plaintiff seeks a hearing concerning its contempt application.

## ARGUMENT

### A.  Companions Must Be Shut Down and Defendants Must be Barred from Operating an IME Business, Being Employed or Involved in an IME Business in any Regard

Plaintiff respectfully incorporates by reference the arguments submitted in its supplemental memorandum of law in further support of its motion for a preliminary injunction enjoining Defendants from, *inter alia*, operating their business.  See ECF Docket Entry 55.

As is readily apparent from the overwhelming weight of the forensic evidence, Defendants entirely relied on Rosenblatt to build their business to the detriment of Plaintiff by bribing Rosenblatt for customer information, encouraging him to turn away work or outright engage in disputes with customers, and requesting, demanding, and cajoling Rosenblatt to provide other confidential and proprietary trade secrets of IME WatchDog.

---

[7] For a complete recitation of the facts, reference is respectfully made to the sworn declarations of Daniella Levi, Esq., Carlos Roa, and Emanuel Kataev, Esq., in support.

Defendants' business was thus not only created and built entirely through the use of Plaintiff's trade secrets, *Defendants' business was sustained by it.* Under these circumstances, courts have shut down defendant-competitors who have engaged in such unlawful conduct. See 2Die4Kourt v. Hillair Cap. Mgmt., LLC, 692 Fed. Appx. 366, 369 (9th Cir. 2017) (affirming grant of preliminary injunction to trademark owner even though defendant argued that an injunction would force it to shut down its business, terminate its employees, and default on its obligations to creditors and distributors); see also Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co., 534 Fed. Appx. 633, 636 (9th Cir. 2013) ("That the present injunction will allegedly drive Sis-Joyce out of business does not weigh in Sis-Joyce's favor where it appears that Sis-Joyce's entire business model is premised on its infringing use of the Arëna mark"); Arminius Schleifmittel GmbH v. Design Indus., Inc., No. 1:06-cv-644, 2007 WL 534573 (M.D.N.C. Feb. 15, 2007) (holding that certain defendants are to be "officially closed until the final resolution of this case, without any operations continuing at their facilities" where plaintiff established that defendants succeeded in their business by misappropriating plaintiff's library of individualized customer specifications); Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd., 1:18-CV-08333-ALC, 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) (diversion of customers is irreparable and incalculable, thereby warranting an immediate and permanent stop through injunctive relief).

As in each of these cases, Defendants must be shut down because the evidence establishes Defendants' business was created and sustained entirely through the theft of Plaintiff's confidential information and other illegal wrongful acts. Moreover, based on Defendants' egregious violations of the Injunction by sending libelous materials to Plaintiff's customers and practically the entire personal injury bar in the State of New York, the failure to provide the injunctive relief requested is only virtually guaranteed to encourage Defendants to continue their campaign of terror.

Plaintiff has already suffered a tremendous loss of good will and had its reputation severely harmed by Defendants' conduct.  Accordingly, this Court should grant the relief requested.

**B.  <u>Defendants are in contempt of the Injunction</u>**

Defendants must be punished for their routine and egregious violations of the Injunction.

"A party who violates an injunction entered by the district court faces the threat of both civil and criminal contempt." <u>See</u> <u>Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.</u>, 369 F.3d 645, 657 (2d Cir. 2004). "A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." <u>See</u> <u>CBS Broad. Inc. v. FilmOn.com, Inc.</u>, 814 F.3d 91, 98 (2d Cir. 2016) (<u>citing</u> <u>Paramedics</u>, 369 F.3d at 655).

There is no requirement that the party acts willfully to be held in civil contempt. <u>See</u> <u>Medina v. Buther</u>, No. 15-CIV.-1955 (LAP), 2019 WL 581270, at *25 (S.D.N.Y. Feb. 13, 2019) (<u>citing</u> <u>Paramedics</u>, 369 F.3d at 655).  *First*, the Injunction is clear and unambiguous. An order is clear and unambiguous when it "leaves no uncertainty in the minds of those to whom it is addressed" and allows them to ascertain from the order precisely what acts are required. <u>See</u> <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1058 (2d Cir. 1995); <u>see also</u> <u>Medina</u>, 2019 WL 581270, at *25.

The Injunction is clear about not having contact with Plaintiff's employees, agents, and/or customers as well as the specific prohibition against making any statements to third parties, oral or written, regarding this case, that can be construed as misleading and any statements about each other that can be construed as defamatory and/or disparaging (not necessarily defamatory) statements.

13

Defendants had an opportunity for nine (9) months to clarify the meaning of the Injunction and did not do so. The Injunction precisely describes the prohibited conduct and Defendants' failure to seek clarification indicated that they understood clearly their obligations thereunder.

*Second*, it is clear that Defendants have violated the orders. Defendants have, for example, accosted Roth and harassed and terrified Roa by placing a GPS device on his vehicle. Defendants have also anonymously contacted customers of Plaintiff, which they are prohibited from doing, and provided the customers (and non-customers) with libelous materials concerning both Mrs. Levi and Roa, which they are prohibited from doing.  No question exists that they have violated the orders.

*Third*, Defendants have not attempted to comply with the orders in a reasonable manner. A party is "'not reasonably diligent' when he or she ignores the order or takes only superficial actions that "'strain both the language and intent of the order.'" See Medina, 2019 WL 581270, at *25; see also Powell v. Ward, 487 F. Supp. 917, 933-34 (S.D.N.Y. 1980).

With respect to the Injunction, Defendants have not only failed to be reasonably diligent when ignoring this Court's Orders, but they have deliberately violated it under the mistaken confidence that they will deny sending the letters and emails because they were submitted anonymously.  However, there can be no doubt that the letters and e-mails were sent by Defendants.  The first sentence of the e-mail makes this clear.  It states: "CRIMINAL AND PEDOPHILE CALL COMPETITORS DISHONEST, WHAT A JOKE!!!"  See Roa Decl. at ¶ 6, Exs. A & B (emphasis added).

The reference to Ms. Levi and Mr. Roa calling "competitors" (Defendants) dishonest and the circumstances under which these mailings and e-mails were circulated point to only one conclusion: Defendants sent them or directed them to be sent.

In any event, another forensic imaging by the Forensic Examiner of Defendants' electronic devices is now warranted and should be ordered to be conducted at Defendants' sole expense.

Accordingly, Defendants are in contempt of the Injunction.

**C.   Defendants Should be Sanctioned for Contempt of Court**

Civil contempt sanctions are imposed for two purposes: "secur[ing] future compliance with court orders" and "compensat[ing] the party that has been wronged." See Paramedics, 369 F.3d at 657.  This Court is vested with wide discretion in fashioning a remedy to encourage future compliance. See Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996); Medina, 2019 WL 581270, at *26; see also Telenor Mobile Commc'ns AS v. Storm LLC, 587 F. Supp. 2d 594, 621 (S.D.N.Y. 2008), aff'd, 351 Fed. Appx. 467 (2d Cir. 2009) (imposing a daily fine of $100,000, doubling every 30 days, and noting that "[i]n creating an appropriate remedy, the Court should consider (1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him.") (internal quotations and citations omitted); Patsy's Brand, Inc. v. I.O.B. Realty, Inc., No. 99-CIV.-10175 (KMW), 2021 WL 3418475, at *16 (S.D.N.Y. Aug. 5, 2021) ("A coercive fine must be substantial enough to make it more economical for a contemnor to comply than not to comply").

Although no such showing is required for sanctions to be issued in a contempt application, it is worthy to note that Plaintiff faces irreparable harm and has already suffered incalculable harm if Defendants continue to not comply with the Injunction because reputation is everything among law-firm-customers and the conduct complained of here is equivalent to the use of nuclear weaponry by the Defendants.

15

Accordingly, with respect to the Injunction, the Court should enter an order requiring Defendants to pay a fine of $10,000.00 for each letter and e-mail sent with the fine increasing by $20,000.00 each day until Defendants retract their letters and e-mails as set forth below.  These amounts are reasonably tailored to ensure compliance.

In addition, Defendants should be directed to send a letter and e-mail to each attorney to whom they sent the materials contained in Exhibits A & B to Roa's Declaration stating that they retract the defamatory statements they made about Ms. Levi and Roa and that they sent same as retribution for a lawsuit filed by Ms. Levi's company where Roa also works and that Defendants have been held in contempt of Court and punished by the Court for distributing same.

Moreover, because discovery is necessary to ascertain the nature and extent of Defendants' egregious bad faith conduct, this Court should require Defendants to submit to another imaging of their electronic devices at their sole cost so as to permit the Forensic Examiner to obtain all relevant data concerning same.  See Escamilla v. SMS Holdings Corp., CIV. 09-2120 ADM/JSM, 2011 WL 5025254, at *5 (D. Minn. Oct. 21, 2011) (ordering the defendant to bear the costs of forensic examination, as defendant destroyed the contents of his computer, as when a party has been prejudiced due to the conduct of the other party, and that party bears the cost of additional discovery in the form of forensic services, it is appropriate that the costs are borne by the bad actor); see also Multifeeder Tech., Inc. v. British Confectionery Co. Ltd., CIV. 09-1090 JRT/TNL, 2012 WL 4135848 (D. Minn. Sept. 18, 2012) (granting plaintiff a $600,000 sanction, of which approximately $490,000 was for ESI analysis costs and remainder for attorneys' fees and costs in pursing the motion).  The requested sanctions constitute an appropriate remedy to ensure probable compliance with the Court's orders. See Telenor, 587 F Supp. 2d at 621 ("an initial contempt sanction of $100,000 per day, doubling to $200,000 per day thirty days

thereafter, and to $400,000 per day thirty days after that, and continuing to double every thirty days until compliance is achieved, is an appropriate remedy to ensure probable compliance with this Court's orders"); see also Citigroup Inc. v. Sayeg, No. 21-CIV.-10413 (JPC), 2022 WL 596073 (S.D.N.Y. Feb. 24, 2022) (ordering sanctions starting at $5,000 per day from March 4, 2022 to March 13, 2022; $10,000 per day from March 14, 2022 to March 23, 2022; and $15,000 per day from March 24, 2022 to April 2, 2022); CBS Broad. Inc., 814 F.3d at 101-04 (affirming sanctions of $10,000 per day).

Accordingly, this Court should enter an appropriate Order of sanctions consistent with the foregoing.

### D. Plaintiff Should Be Awarded Attorneys' Fees, and Costs

This Court should award Plaintiff its attorneys' fees and costs incurred in bringing the instant application. See Weitzman, 98 F.3d at 719 (the decision to award fees on a contempt motion rests in the court's equitable discretion).

Although "the Second Circuit has not decided whether a finding of willfulness or bad faith is required before a court may order attorneys' fees as a sanction for violating a court order," such a finding strongly supports granting attorney's fees and costs." See Patsy's Brand, 2021 WL 3418475, at *17. "A willful contempt is one where the contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." Id. Defendants had notice of this Court's orders. They did not appeal either order or seek to have them modified or stayed.  They have not taken reasonable steps to comply with the Injunction. As set forth above, unless Defendants comply with the Court's orders, Plaintiff will continue to suffer the barrage and bombardment of reputation-damaging letters and e-mails and have its agents accosted by the Defendants with impunity.

17

Accordingly, Plaintiff should be awarded its reasonable fees and costs incurred in bringing this motion and seeking to enforce the Court's orders. See Patsy's Brand, 2021 WL 3418475, at *17 (awarding attorneys' fees where the contemnor "had notice of the Injunction; failed to seek to modify it before [acting in violation of the Injunction]; and did not make a good faith effort to comply with the Injunction"); see also Weitzman, 98 F.3d at 720 (holding it was error to deny attorneys' fees where none of the proceedings "would have been necessary if [the contemnor] had respected the [court's] order").

### E.   The Court Should Prohibit Defendants from Selling Any Real Property, Including the Defendants' Florida House which is Currently in Contract

Attachment is available in a federal court "under the circumstances and in the manner provided by the law of the state in which the district court is held." Fed. Civ. Proc. 64; see also Cargill, Inc. v. Sabine Trading & Shipping Co., Inc., 756 F.2d 224, 227 (2d Cir. 1985).

New York Law gives state and federal courts the right to attach property prior to entry of a judgment. See New York Civil Practice Law & Rules ("CPLR") § 6201. Attachment is proper if the plaintiff seeks, and would be entitled to, a money judgment when:

> the defendant, with intent to defraud his creditors *or frustrate the enforcement of a judgment that might be rendered in plaintiffs favor*, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts[.]

Id. "A plaintiff seeking an order of attachment must show 'that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in [CPLR §] 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.'"[8] Capital Ventures Int'l v. Republic of Argentina, 443 F.3d 214 (2d Cir. 2006) (quoting CPLR § 6212(a)).

---

[8] There are no counterclaims against Plaintiff.

1.      **A Claim for a Money Judgment and Likelihood of Success on the Merits Exists**

There can be no dispute that Plaintiff states a claim for a money judgment, and the Court has already concluded that Plaintiff will probably succeed on its claims.  See ECF Docket Entries 66, 80, and Text Only Order on Motion for Preliminary Injunction dated April 5, 2022.

As discussed *supra*, since the Court concluded Plaintiff is likely to succeed on its claims, substantial additional evidence exists to further support that conclusion.  Moreover, Plaintiff seeks millions of dollars in damages.  See Levi Decl. ¶ 9.

2.      **Grounds for Attachment Exist**

To establish a ground for attachment per CPLR § 6201, Plaintiff must prove two elements; that defendant: (1) either is about to or has assigned, disposed of, encumbered, or secreted property, or removed it from the state; and (2) has acted or will act with the intent to defraud his or her creditors or to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor.  See Allstate Ins. Co. v. TMR Medibill, Inc., 2000 U.S. Dist. LEXIS 23142 (E.D.N.Y. Jul. 13, 2000); Bank Leumi Tr. Co. v. Istim, Inc., 892 F. Supp. 478, 482 (S.D.N.Y. 1995).

"It is not always practicable to establish by proof the existence of a fraudulent intent ... even when in reality it exists. Direct proof of the fact can rarely be obtained, and when it is established it must ordinarily be inferred from the circumstances."  Bank Leumi Tr. Co. 892 F. Supp. at 483.   The circumstances here warrant a finding that Defendants are selling assets to defraud Plaintiff and to frustrate the enforcement of a judgment that will be rendered in Plaintiff's favor.  This is because, as further set forth below and based on Safa's testimony, Defendants rely on the property they are selling for twenty percent (20%) of their income, and have instead chosen to place it on the market and aggressively reduce the price to entice a buyer to make an offer.

19

Courts have inferred fraud where, as here, a defendant sells property shortly after the commencement of litigation.  See Prabir v. Bukhara Indian Cuisine, Inc., 2018 U.S. Dist. LEXIS 94563 (S.D.N.Y. May 17, 2018) (defendants putting the restaurant up for sale just one month after the commencement of plaintiffs' lawsuit supports inference of fraudulent intent); see also Coley v. Vannguard Urban Improvement Ass'n, 2016 U.S. Dist. LEXIS 172378 at *9 (E.D.N.Y. Dec. 13, 2016) (defendant's sale of property three weeks after being served supports inference of fraudulent intent); DLJ Mortg. Capital, Inc. v. Kontogiannis, 594 F. Supp. 2d 308, 325 (E.D.N.Y. 2009) (defendants' sale of properties within three months of plaintiff's filing suit supports inference of fraudulent intent); N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc., 2008 U.S. Dist. LEXIS 40517, *7 (S.D.N.Y. May 14, 2008) (inference of fraudulent intent shown where defendants offered a property for sale "shortly before or after the commencement of [the] action").

Courts have also found fraudulent intent based on the sale of property while a plaintiff's motion for a preliminary injunction was pending.  See Coley v. Vannguard Urban Improvement Ass'n, 2016 U.S. Dist. LEXIS 172378 (E.D.N.Y. Dec. 13, 2016) (citing JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., 306 F. Supp. 2d 482 (S.D.N.Y. 2004)).

Here, the Defendants put their luxurious Florida vacation home on the market on September 14, 2022, merely three (3) months after the Court entered a preliminary injunction against them on June 8, 2022 wherein the Court concluded that Plaintiff was likely to succeed on its claims against Defendants.  See https://www.zillow.com/homedetails/1475-Moon-Valley-Dr-Champions-Gate-FL-33896/122987470_zpid/ (last accessed March 8, 2023).

After purchasing the property for $684,500.00 in December 2021, Defendants first sought to sell it for $975,000.00 on September 14, 2022.  Id.

They then repeatedly decreased the price as follows:

(i) by $75,100.00 to $899,900.00 on January 5, 2023;

(ii) by $74,900.00 to $825,000.00 on January 23, 2023; and

(iii) by $25,100.00 to $799,900.00 on February 17, 2023.

Id.  The property was listed as "pending sale" as of February 26, 2023.  Id.

Moreover, based on Safa's testimony that 20% of the Gelardi's income is derived by their income from rental properties, Kataev Decl. at ¶ 9, Ex. D at 59:8-11, there is no logical reason for them to sell this property other than to avoid the eventual large judgment Plaintiff is destined to obtain.

Additionally, because, as discussed *supra*, Companions was created and built entirely through the theft of Plaintiff's confidential information, the Florida property that Defendants are in contract to sell which they purchased in 2021 (after they made millions of dollars from their thievery from Plaintiff) was purchased using the money they stole from Plaintiff which is another basis for an order of attachment.  See Bray v. Leverage Grp., 2008 U.S. Dist. LEXIS 92383, *16-17 (E.D.N.Y. Nov. 4, 2008) (granting motion to attach defendants' assets purchased using, in all likelihood, plaintiff's money).

 Plaintiff will be irreparably harmed if Defendants sell their real property because it would impede Plaintiff's ability to collect the forthcoming large judgment against Defendants.

This is especially the case as Defendants' Florida property is one of, if not the most, valuable asset they own.

Accordingly, Plaintiff seeks an order precluding the sale of the Florida property and any other properties owned by the Defendants, or, in the alternative, an order requiring that all proceeds from the sale of the Florida real property and any other real property be held in escrow pending final disposition of this case.

21

## **CONCLUSION**

IME WatchDog has demonstrated a likelihood of success on the merits of its claims against Defendants and that without an award of injunctive relief, it would suffer immediate and irreparable harm. IME WatchDog has no adequate remedy at law and is therefore entitled to a preliminary injunction prohibiting Defendants from continuing to operate their business.

For these reasons and the reasons set forth herein, IME WatchDog respectfully requests that this Court grant its renewed motion for a preliminary injunction, Order to Show Cause for contempt and sanctions, for prejudgment attachment, and issue such other and further relief as is just, equitable, and proper.

Dated: Lake Success, New York
      March 10, 2023             Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

_____/s_____
Jamie S. Felsen, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
jamiefelsen@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff*
*IME WatchDog, Inc.*

22

**VIA ECF**
Warner & Scheuerman
<u>Attn</u>: Jonathan D. Warner, Esq.
6 West 18th Street, 10th Floor
New York, NY 10011-4602
(212) 924-7111 (telephone)
(646) 692-0166 (direct dial)
(212) 924-6111 (facsimile)
jdwarner@wslaw.nyc

*Attorneys for Defendants*
*Third-Party Plaintiffs*
*Third-Party Counterclaim Defendants*
*Safa Abdulrahim Gelardi*
*Vito Gelardi, and*
*IME Companions LLC*

**VIA ECF**
Leo Shalit, P.C.
<u>Attn</u>: Leo Shalit, Esq.
45 Glen Cove Road
Greenvale, NY 11548
(833) SHALIT-1 (office)
(646) 957-0009 (direct)
(833) 742-5481 (facsimile)
leo@shalit-law.com

*Attorneys for*
*Third-Party Defendant*
*Third-Party Counterclaimant*
*Carlos Roa*

**VIA ECF**
United States District Court
Eastern District of New York
Attn: Hon. James R. Cho, U.S.M.J.
225 Cadman Plaza East
Courtroom 11D South
Brooklyn, NY 11201-1804