1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     ------------------------------x
3                                        22-CV-1032(PKC)
     IME WATCHDOG, INC.,
4                                        United States Courthouse
              Plaintiff,                 Brooklyn, New York
5
              - versus -                 March 27, 2023
6                                        2:00 p.m.
     SAFA ABDULRAHIM GELARDI, et al.,
7
              Defendants.
8
     ------------------------------x
9
       TRANSCRIPT OF CIVIL CAUSE FOR PRELIMINARY INJUNCTION HEARING
10               BEFORE THE HONORABLE PAMELA K. CHEN
                   UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES

13   Attorney for Plaintiff:   MILMAN LABUDA LAW GROUP PLLC
                               3000 Marcus Avenue
14                             Suite 3W8
                               Lake Success, New York 11042
15                             BY:  EMANUEL KATAEV, ESQ.
                                    JAMIE SCOTT FELSEN, ESQ.
16

17   Attorney for Defendant:   WARNER & SCHEUERMAN
     IME Companions LLC        6 West 18th Street
18                             10th Floor
                               New York, New York 10011
19                             BY:  JONATHON D. WARNER, ESQ.
                                    - and -
20                             THE LAW OFFICE OF HARLEY D. BREITE
                               331 Straight Street
21                             Paterson, New Jersey 07501
                               BY:  HARLEY D. BREITE, ESQ.
22
     Attorney for Defendant:   MELANIE WIENER
23   Anthony Bridda            1 MetroTech Center
                               Suite 1701
24                             Brooklyn, New York 11201
                               BY:  MELANIE I. WIENER, ESQ.
25

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

2

```
 1   APPEARANCES (CONTINUED)

 2   Attorney for Defendant:   LEO SHALIT, PC
     Carlos Roa                565 Plandome Road - #9
 3                             Manhasset, New York 11030
                               BY:  LEO SHALIT, ESQ.
 4


 5
     Also Present:             DANIELLA LEVI
 6                             ELI LEVI
                               SAFA GELARDI
 7                             VITO GELARDI

 8
     Court Reporter:           LINDA D. DANELCZYK, RPR, CSR, CCR
 9                             Phone:  718-613-2330
                               Fax:    718-804-2712
10                             Email:  LindaDan226@gmail.com

11

12
     Proceedings recorded by mechanical stenography.  Transcript
13   produced by computer-aided transcription.

14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS                                    3

1              (In open court.)

2              THE COURTROOM DEPUTY:  All rise.

3              THE COURT:  Have a seat everyone.

4              THE COURTROOM DEPUTY:  Civil cause for a preliminary

5    injunction hearing, Docket 22-CV-1032, IME Watchdog, Inc.

6    versus Gelardi, et al.

7              Will the parties please state their appearances for

8    the record, starting with plaintiff.

9              MR. KATAEV:  Good afternoon, everyone.  Emanuel

10   Kataev of Milman Labuda Law Group, PLLC for the plaintiff.

11             MR. LEVI:  Good afternoon, Your Honor.  Eli Levi,

12   officer of IME Watchdog.

13             MR. FELSEN:  Good afternoon, Your Honor.  Jamie

14   Felsen from Milman Labuda Law Group, counsel for the

15   plaintiff.

16             MS. LEVI:  Good afternoon, Your Honor.  Daniella

17   Levi from IME Watchdog.

18             MR. ROA:  Good afternoon, Your Honor, Carlos Roa.

19   I'm a third-party defendant.

20             MR. SHALIT:  Good afternoon, Your Honor.  Leo

21   Shalit, counsel for Carlos Roa, as a third-party defendant.

22             THE COURT:  Good afternoon to all of you.

23             And then on the defense side.

24             MR. WARNER:  Good afternoon, Your Honor.  Jonathan

25   Warner of Warner & Scheuerman for the defendants.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    4

1            THE COURT:  Good afternoon.

2            MR. BREITE:  Good afternoon, Your Honor.  Harley

3    Breite, cocounsel on behalf of the defendants.

4            THE COURT:  And then we have the two defendants,

5    correct?

6            MS. GELARDI:  Correct, good afternoon.  Safa

7    Gelardi.

8            MR. GELARDI:  Good afternoon, Your Honor.  Vito

9    Gelardi.

10           THE COURT:  Okay.  All right.  And I understand,

11   Mr. Warner, you're going to file a notice of appearance; is

12   that right?

13           MR. WARNER:  Mr. Breite.

14           THE COURT:  Oh, I'm sorry, Mr. Breite.

15           Mr. Breite, you need to file a notice of appearance,

16   correct?

17           MR. BREITE:  Yes, I was -- I thought I did,

18   actually.  I have a hard copy of it here, but I will ensure

19   that it was properly filed.  I thought I did so last week, but

20   I'm already working on it.

21           THE COURT:  Okay.

22           All right, so we're here for a hearing that arose

23   out of the plaintiff's motion for contempt and also for

24   renewing their motion for a preliminary injunction.

25           Let me outline for everyone, just so we'll be

1   efficient here, about the issues that I need to resolve via

2   this hearing.

3           And let me start off by saying that I don't need to

4   hear live witnesses on all of these issues, because there have

5   been substantial written filings, including a lot of exhibits,

6   and I have a pretty good idea of what most of the facts appear

7   to be, at least on paper.

8           And so the issues that I see as being raised and

9   needing resolution are:  First, the motion of plaintiffs to

10  hold defendants in contempt of my amended preliminary

11  injunction, which is Docket Number 80, issued back on June 8,

12  2022.  And so we'll just refer to that as "the injunction".

13          And the basis for that contempt motion are the

14  alleged witness tampering and intimidation of Mr. Roa, an

15  employee of plaintiffs, stemming from the use -- and it seems

16  undisputed -- the use of a GPS tracking device on Mr. Roa's

17  vehicle by defendants, via a private investigator.

18          Then there's a second basis which has to do with

19  contacting plaintiff's employees' agents and customers, and

20  with respect to the customers, it has to do with alleged

21  mailings by the defendants disparaging Ms. Levi and Mr. Roa

22  with what, I assume, are completely false accusations of -- of

23  pedophilia as to Mr. Roa, and being involved in some kind of

24  drug cartel by Ms. Levi.

25          And then, a separate bases, in terms of contacting

PROCEEDINGS                                                      6

1    the plaintiff's employees at some of these IME appointments or

2    events.

3                "IME" is going to be used a lot, independent medical

4    examination, I think it is; is that right?

5                MR. KATAEV:  Correct.

6                THE COURT:  Okay.  And then, I would say there's a

7    new basis which came up during the briefing of this motion,

8    which is -- because I had issued a TRO in response to the

9    initial filing, it seems to me that there's now a question of

10   whether the defendants are in contempt of my TRO, which was

11   issued on March 10, 2023, via the creation of a new company

12   to, basically, end-run my order that the defendants not -- or

13   cease operating their business during the pendency of the TRO

14   and up until this hearing.

15               And that is evidenced, in part, by this encounter

16   between Mr. Beibin, who apparently is a long-time employee of

17   the defendants, by one of plaintiff's employees.  And

18   Mr. Beibin's statement that he was at an IME appointment, not

19   working for defendants but working for some company called

20   Client Exam Services, which purportedly is owned and operated

21   by someone named Fari, F-A-R-I, Gutierrez.

22               But when one looks to see what Client Exam Services

23   is, it is apparently a company created on March 16, 2023, the

24   precise day that the plaintiff's employee ran into Mr. Beibin,

25   and doesn't seem to have any owner, according to the

PROCEEDINGS                                        7

1   database -- or the registration, I should say, other than a

2   website that is used by individuals to incorporate or run

3   their businesses, and so where it says, owner of this company,

4   Client Exam Services, it lists -- I forget what it's called

5   now, legal-something-or-other website.

6           MR. KATAEV:  Legal Zoom, Your Honor.

7           THE COURT:  Legal Zoom, that's right, dot com, which

8   as I said before is just a generic website to help or assist

9   people in creating corporate identities.

10          It is, on its face, highly suspicious, and that's

11  why I want to probe that today as well, because if there's

12  evidence that the defendants had anything to do with creating

13  this new company, within the last two weeks, and sending

14  Mr. Beibin, one of their employees, or at least one their main

15  examiners out, under this new company name, I would view that

16  as a clear violation of my Temporary Restraining Order.

17          Then, the other issues that are raised by the

18  original motion is a request to preliminarily enjoin

19  defendants from continuing to operate their business, either

20  on the basis that it's a sanction for the contempt of the

21  first injunction or based on evidence -- I would say and/or

22  based on evidence that defendants started IME Companions

23  almost exclusively based on plaintiff's confidential customer

24  list and other confidential information.

25          It is reported in the papers, and I think backed up

PROCEEDINGS                    8

1   by the forensic examination that has occurred since I last saw

2   the parties, that 90 percent of IME Companion's customers come

3   from the plaintiff's customer lists, and that 98 percent of

4   their total revenue are from plaintiff's former customers.

5           So on that basis, the plaintiff is seeking to enjoin

6   IME Companions from continuing their business because it's all

7   based, allegedly, on stolen information and stolen trade

8   secrets.

9           Then there's another request to impose a daily fine

10  of $10,000 on the plaintiff for every day of violating the

11  original injunction, and also a request to preclude the sale

12  of a property in Florida as an effort to thwart collection and

13  as a fraudulent sale, and that would be under New York State

14  law.

15          And then there are a few other aspects of the

16  plaintiff's motion which I intend to resolve.  One is

17  directing defendants to -- not to contact, directly or

18  indirectly, any of plaintiff's employees, principals or

19  agents, attorneys fees being awarded to plaintiffs because of

20  the application that had to be filed, and then defendants

21  submitting to another forensic examination at their sole cost

22  to determine the nature and extent of the contumacious

23  conduct, including another forensic accounting.

24          So those are all the issues that I will -- that I

25  intend to try to resolve today.  But like I said, I don't

PROCEEDINGS                                                    9

1    think it's necessary for there to be an extended presentation

2    of witnesses, because I think that much of the documents are

3    relevant and, perhaps, sufficient for me to decide these

4    issues.

5              But I will hear argument first from the plaintiff

6    and then from the defense on these various points.  You don't

7    have to address all of them but just address the ones you

8    think are most important.  And if you think there is testimony

9    that I need to hear, then let me know.

10             You can remain seated so you can use the microphone.

11             MR. KATAEV:  Thank you, Your Honor.

12             THE COURT:  Just speak slowly and loudly into the

13    microphone.

14             MR. KATAEV:  Your Honor, the defendants make no

15    attempt to address the mountain of evidence against them

16    regarding the theft of plaintiff's business.  Instead, they

17    argue that nothing they did relates to the theft of trade

18    secrets, which is a mute point because this Court already

19    found the likelihood of success on the merits on all our

20    claims, or at least to defend the trade secrets act claim, and

21    also this Court found that irreparable harm was established.

22             These issues cannot be re-litigated.  The only

23    relief this Court did not previously provide to the plaintiff

24    was to shut the defendant's business down.  The Court

25    explicitly left that open at plaintiff's request to confirm

1     that, to revisit this after discovery.  The defendants have

2     not submitted any evidence, and completely ignore the evidence

3     that we submit, that is against them.

4              The discovery establishes that the defendants'

5     business was started by Safa who had no experience in anything

6     but banking, admittedly did not --

7              (Court reporter interrupts for clarification.)

8              MR. KATAEV:  Anything but banking.  Admittedly did

9     not know what an IME was before she met Adam Rosenblatt, the

10    key employee of the plaintiff.

11             THE COURT:  Well, let me say you this to just to

12    save you some time.

13             I agree with you that it is, in effect, the law of

14    the case.  My prior finding about the defendants having stolen

15    trade secrets and built their business, to some extent but I

16    didn't know how much, on the trade secrets taken from

17    plaintiffs.

18             So the question now is, it appears that the forensic

19    examination has established definitively, in a way, because

20    we're talking about electronic data, or metadata, I assume,

21    that 90 percent of the customers that IME Companion has, are

22    former plaintiff's customers, correct?

23             MR. KATAEV:  That's exactly, right, Your Honor.

24             What we've done is we've obtained from the

25    defendants a 2018, '19, '20, and, I believe, the entire year

PROCEEDINGS                                              11

1   of '21 with a partial 2022, and we've compared that with our

2   customer lists, and we totaled up -- let me just pull up that

3   exhibit.  We have a total of $2,625,649 in sales by

4   Companions.  And we submit that the evidence shows that of

5   that $2.6, $2,579,574 is revenue that came from plaintiff's

6   prior customers.  Out of the entire span of 2018 to part of

7   2022, only $46,075 came from what we quoted as independent

8   sales, at least, you know, from our customers.

9           And so when you do the math, it's approximately 98.2

10  or 98.3 percent leaving about 1.7 or 1.8 percent.

11          The forensic evidence shows that, contrary to what

12  Safa testified, she received an email from Adam on or about

13  April 27th, 2017.

14          THE COURT:  Adam Rosenblatt.

15          MR. KATAEV:  That's correct.

16          THE COURT:  Just remember, the court reporter

17  doesn't know who you're speaking about.  But, yes, Adam

18  Rosenblatt, a former employee of the plaintiffs.

19          MR. KATAEV:  Adam Rosenblatt emailed sensitive

20  financial documentation about IME Watchdog to the defendant,

21  Safa Gelardi and that contrary to what she testified, she

22  immediately acted upon this information.  She forwarded it to

23  her accountant for advice.  She forwarded it to another

24  individual for advice.  And within days, on or about May 4th,

25  she formed the corporation IME Guarddog, Inc.

PROCEEDINGS                                                12

1          Now, that corporation lists the incorporator as Adam

2    Rosenblatt, but we submit that the evidence will show that

3    Adam Rosenblatt had nothing to do with that, that it was, in

4    fact, Safa Gelardi who did that.

5          Moreover, there's an extended email campaign between

6    Safa and an individual named Roman Pollak, who's here today to

7    testify by subpoena, and Anthony Bridda, and as well as

8    Gregory Elefterakis all of whom are part of a litigation

9    funding company called Case Cash.

10          Greg Elefterakis is the head of that company.  And

11   Roman Pollak and Anthony Bridda are his employees that work

12   for him.  And they together entered into a business

13   arrangement with Safa Gelardi, knowing full well that this

14   information was taken.

15          There is an exhibit that we intend to present from

16   the forensic evidence that shows Roman Pollak speaking about

17   this with Safa and analyzing the financial documents of IME

18   Watchdog and asking questions about it.  So that evidence is

19   intended to show that they knew full well what they were doing

20   by getting into business with her.

21          They did not, for example, contact Ms. Levi and

22   inform her, hey, there's someone who has your financial

23   sensitive info.

24          THE COURT:  So tell me again, so there is actual

25   evidence of --

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    13

1          And I'm going to spell this for the court reporter,

2     Mr. Gregory Elefterakis, E-L-E-F-T-E-R-A-K-I-S.

3               MR. KATAEV:  Correct.

4               THE COURT:  Okay.

5               -- who, I'll just note, isn't able to appear today.

6     He's a defendant as well.  But we were informed he was in

7     Florida and we allowed him not to appear.  Quite honestly, I

8     thought his only -- the only issue related to him was his

9     pending motion to dismiss.

10          But I guess I want to ask you if you intend to amend

11    your complaint, because I don't think at the time you filed it

12    you knew this information about Gregory Elefterakis'

13    involvement in setting up the IME Companions based on what he

14    knew to be allegedly stolen trade secrets; is that right?

15              MR. KATAEV:  No, Your Honor.  We did amend the

16    complaint and he is a defendant party.

17              THE COURT:  Based on this information?

18              MR. KATAEV:  Correct.

19              THE COURT:  Okay.  My apologies.

20          So you have evidence showing that Ms. Gelardi was

21    talking to Mr. Elefterakis and specifically saying, this is

22    how we got this information?

23              MR. KATAEV:  It's not exactly that cut and dry, Your

24    Honor.

25              The evidence is that Roman Pollak received

PROCEEDINGS                                              14

1   plaintiff's confidential information and analyzed it.

2   Mr. Elefterakis is not on that email.  However, in a June 2018

3   email, later on, towards the end of their working relationship

4   together, Safa emailed them asking for a meeting to discuss

5   parting ways.

6              In that email, she references the fact that she came

7   to him, Gregory Elefterakis, with a list of attorneys who

8   currently use the service.  And then she later references,

9   within the same email --

10             THE COURT:  Hang on.  Currently used Watchdog

11   Service?

12             MR. KATAEV:  Correct.

13             THE COURT:  Okay, that's what I was looking for, is

14   that there is some connection made between Watchdog and this

15   list.

16             MR. KATAEV:  That's exactly --

17             THE COURT:  Okay.

18             MR. KATAEV:  Now, Watchdog is not specifically

19   referenced in there, but we respectfully submit that there's

20   enough circumstantial evidence to make that inference that the

21   list that she's referring to is, in fact, Watchdog's list.

22             THE COURT:  Well, that's what I'm trying to get at.

23   The list itself, this written document or electronic document,

24   doesn't say Watchdog's clients, correct?

25             MR. KATAEV:  In that email there are no attachments.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1    She just references a list.

2            THE COURT:  Okay.  And then, you're saying in the

3    oral conversation there's some reference to Watchdog being the

4    source of the list?  That's what I'm trying to get at.

5            MR. KATAEV:  We don't have any evidence of any oral

6    conversation.  We do know that they had met, but we don't have

7    any specific evidence about any oral conversation.

8            THE COURT:  Okay.

9            MR. KATAEV:  That's what we're calling them as

10   witnesses for so we can hear from them about what they

11   discussed.

12           THE COURT:  Okay.  Well, let me say this.  I mean,

13   it was clear to me from the last hearing that Ms. Gelardi and

14   Mr. Gelardi bribed the former employee of Watchdog to get

15   customer lists.  That was clearly established through an audio

16   tape I heard --

17           MR. KATAEV:  Correct.

18           THE COURT:  -- and recording and other evidence.

19           But what I'm trying to focus on now is that since

20   then you've done forensic examinations of various computers or

21   personal devices of people working at Watchdog -- sorry,

22   Companions, and what you have discovered, you're saying, is

23   some evidence of a conversation between Mr. Elefterakis,

24   Mr. Pollak and Ms. Gelardi in which they are discussing the

25   stolen customer list.

PROCEEDINGS                                                    16

1          MR. KATAEV:  Correct.

2          THE COURT:  But I guess I'm trying to get at what

3    exactly was said versus what you are arguing is a reasonable

4    inference.

5          MR. KATAEV:  There are numerous emails where the

6    defendant, Safa Gelardi, forwards to Roman Pollak, for

7    example, copies of invoices that Watchdog used, copies of

8    reports that Watchdog used, financial information of Watchdog.

9          THE COURT:  Okay.

10         MR. KATAEV:  There are no such emails with respect

11   to Mr. Elefterakis, however, she did testify at the deposition

12   that she went through Roman Pollak to reach Gregory

13   Elefterakis.

14         THE COURT:  Okay.  All right.  Go ahead.

15         MR. KATAEV:  The bottom line is that all the

16   evidence that we have shows that from the very beginning

17   through the filing of the instant complaint, Safa Gelardi

18   routinely relied on Adam Rosenblatt to run her business.

19         We have evidence in 2022, a text message exchange,

20   in which she asked:  Adam, what do I say to this attorney

21   about how do you sell this service?  She consistently relied

22   on him for everything, and frequently there were things that

23   she asked for that she previously asked for, meaning that she

24   was just too lazy to go back to what Adam sent her before and

25   just asked him to send it again.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

1          It was -- the 254 pages of text messages are just a

2     sampling of the thousands of pages of text messages that we

3     have.  And we tried our best to cull it, but all of the

4     evidence was so compelling that we had to use all of those 254

5     pages.

6          In addition, Your Honor, this isn't just a financial

7     issue about losing customers, we suffered irreparable harm

8     because Safa routinely directed Adam to sabotage plaintiff's

9     relationships with its customers.  And Adam would then give

10    Safa the phone number of the exact contact needed to make the

11    switch.

12         It's one thing to call the law firm and ask for the

13    head of the law firm, which is very difficult to get the head

14    of law firm on the phone, as you can imagine, these attorneys

15    run very busy firms and they don't want to be constantly

16    contacted by vendors.  So her life was made easier by Adam.

17         Another thing that we respectfully submit

18    constitutes a trade secret is the fact that, although the

19    price is listed on the websites, every customer makes its own

20    financial arrangement with IME Watchdog.  And she had that

21    inside information, text message after text message:  Did

22    these guys pay full price?  These guys full price, correct?

23    What's the deal with these guys?

24         She would also specifically ask, why is it -- what

25    is it that they're upset about?  And she used that

1    information, which is not publicly available, in order to

2    obtain the customer and steal it away from the plaintiff.

3    These are all confirmed by the text messages submitted to the

4    Court.

5            In addition, we submit that contempt and an

6    injunction that we request the renewed motion for injunction

7    is necessary because there's evidence that Safa routinely

8    perjured herself at the last hearing.  She did so because she

9    did not expect this Court to grant the forensic examination

10   and was hoping that that could be averted by her testimony.

11           Almost all of her testimony has been established to

12   be a lie by the forensic evidence that we received.  The most

13   glaring example is she claimed she did not open Adam's email

14   from April 2017 for months, yet she formed IME Guarddog within

15   a week and she forwarded all that information to her

16   accountant and others that she sought advice from.

17           Ms. Gelardi pled the Fifth regarding the Zelle

18   payments that she sent to Adam, which is indisputable, and she

19   denied giving Adam Rosenblatt any cash.  The text messages

20   show that there was cash received.

21           I also want to note, I don't think we have evidence

22   on this point, but I want to point out that the text messages

23   we did recover were from what's called the iCloud account from

24   the forensic examiner.  In other words, those text messages

25   were not recovered from the phone.  What we would submit,

PROCEEDINGS                                    19

1    following the hearing, that exists as evidence of an intent to

2    delete or destroy evidence.  As the Court heard from the third

3    recording played at the April 4th, 2023 --

4                  (Court reporter interrupts for clarification.)

5                  MR. KATAEV:  As the Court heard on the third

6    recording that the plaintiff played at the April 4th, 2022,

7    show-cause hearing where it was heard and Adam asking:  Delete

8    everything?  What do you mean delete everything?  What do you

9    want me to take with you?  Or words along those lines.

10                 Safa also testified that it was Adam who constantly

11   contacted her and quote/unquote hounded her in order to run

12   away from Daniella Levi because he hated her.

13                 This evidence -- the forensic evidence also belies

14   that testimony because it's clear that Safa is the one

15   constantly contacting him.

16                 We're prepared to show -- we're prepared to show at

17   this hearing, through cross-examination of Ms. Gelardi, that

18   Ms. Gelardi made her own list of the -- of the top customers

19   who have over $10,000 in revenue.  I believe we submitted that

20   as an exhibit with the motion papers.

21                 As this Court knows and from the cases we cited from

22   the Second Circuit and the Southern District and Eastern

23   District from the TICOR title, T-I-C-O-R, case Mercer Health

24   and Ecolab, it's very difficult to calculate damages that

25   would successfully address the loss of a relationship with a

PROCEEDINGS                                    20

1   client.

2            THE COURT:  Let me stop you, Mr. Kataev, and focus

3   you, because there are a lot of issues you could address.

4   This is not one that I need more discussion of.

5            What I am more interested in from you, at least, and

6   then, of course, I'm going to turn to the defense and find out

7   what response, if any, they have to what does appear to me to

8   be a mountain of evidence about theft of trade secrets and

9   perjured testimony from before.

10           The contempt part of it I'm struggling with a bit

11   more, because the definition of contact might not, it seems to

12   me, encompass placing a GPS device on Mr. Roa's car.  As

13   terrible as I think that is, and menacing as I think that is,

14   under the circumstances.  Because imagine a situation where

15   the defense simply hire the investigator to surveil Mr. Roa by

16   following him around but never reaching out to him or

17   contacting him at all but just monitoring his movements

18   physically.  Technically, I don't think that's contact.

19           And, perhaps, it's my fault for not writing it more

20   explicitly, because I really did not contemplate something

21   like this would happen in this civil matter.  But I don't

22   think it -- because, remember, the standard is pretty

23   demanding about contempt, right?  The language has to be clear

24   and unambiguous in terms of encompassing the contumacious

25   conduct, and I think, as much as it pains me to say this, that

PROCEEDINGS                                        21

1    I think the defendants might have found a loophole of some

2    sort to engage in what is potentially criminal conduct, for

3    sure, but doesn't necessarily run afoul of my no-contact

4    injunction.

5            Now, let me just say this, because I want to head

6    off a lot of unnecessary argument.  It is clear to me that the

7    right result here is to -- regardless if I find contempt or

8    not, is to -- I don't know if the word is broaden or -- but

9    amend the injunction to effectively -- and this will be the

10   effect, I think, shutdown the defendant's business.  Because I

11   think the right remedy is that they do not get to use the

12   stolen information.

13           And if that's 90 percent of their clients, then

14   that's what will happen.  And if that's 98 percent of their

15   business, they're going to have to find business elsewhere.

16   But that seems to me the right result now that I know what the

17   true facts are, now that the forensic examination has revealed

18   the extent to which the defendant's stole or built their

19   business on stolen information.

20           And, moreover, and I'll await your answers on this,

21   the defendant's conduct, in particular Ms. Gelardi's conduct,

22   since -- during the entire pendency of this proceeding, has

23   been galling, quite frankly.

24           I find that she lied to me during the hearing, as

25   now just one of the facts that she clearly lied about based on

1    the forensic evidence, which does not lie, is that she did

2    open the information -- the email from Mr. Rosenblatt

3    immediately and used it to great effect to open her business,

4    to build her business.  Everything that the business is built

5    on came from, it appears the information that she stole from

6    IME Watchdog through Mr. -- or with Mr. Rosenblatt's

7    complicity and through his efforts.

8              And I heard the tape before about where

9    Mr. Rosenblatt -- or in which Mr. Rosenblatt sought a safe

10   haven and demanded that they hire him and pay him money so

11   that he could escape some -- his current situation, basically,

12   being a mole within another company.

13             So, to me, the conclusion is inescapable that the

14   injunction has to be quite strict and that -- to the extent

15   that the defense is going to claim that it -- you know, in the

16   balance of hardships that it's unfair to the defendant, my

17   response is it's not, if the defendant has brought upon

18   themselves the extent of this restriction, and that is exactly

19   the situation we're in here.

20             So, to me, there's really no reason to belabor this

21   issue about is there irreparable harm to the plaintiff.  I

22   found it before, based on what I knew then.  I think it's all

23   the more proved up now, with everything that's resulted from

24   the forensic examination.  And the question is, what's a

25   proper injunction while this case proceeds?  And now it's

PROCEEDINGS                                              23

1    clear to me that it should be to prevent the defendants from

2    using the customers or having contact with or continuing their

3    business with this stolen information or that was begun with

4    stolen information.

5            More the issue for me, quite frankly, is the

6    contempt issue, which I don't, quite honestly, think has been

7    proved, at least on the original allegations.  Because, like I

8    said, Ms. Gelardi has very cleverly figured out a way, I

9    think, to get around the no-contact provision but in a way

10   that I find truly troubling.  And I understand why Mr. Roa

11   feels threatened or menaced, and he's obviously taken it up

12   with the local law enforcement authorities, as I think is

13   appropriate.  That kind of conduct is simply outrageous in

14   this context, and there's no reason for it.

15           I understand that the defendants think that they

16   should do it to find out if Mr. Roa is spreading defamatory

17   statements about their business.  But when there was an

18   injunction that said no contact, at a minimum, the defendants

19   should have ensured that that did not violate that.

20           And so I'm not finding that it violated my order,

21   but it does suggest to me a level of willfulness or

22   deviousness that makes me very concerned about the enforcement

23   of this injunction and whether the defendants will follow any

24   rule that I lay down.

25           This is even more reinforced by what has happened of

PROCEEDINGS                                    24

1   late, and I want to focus on this.  I want to know from the

2   defendants, so I'm going to shift for a moment:  What is the

3   connection, if any, between the defendants and this purported

4   new company?  What's it called?  Client Services or Client

5   Exam Services?

6               MR. WARNER:  Correct, Your Honor, Client Exam

7   Services.

8               THE COURT:  What's the connection between the

9   defendants and that, if any?

10              MR. WARNER:  None.

11              THE COURT:  And so they don't know who this Fari

12  Gutierrez person is?

13              MR. WARNER:  No, they know who he is, but there's no

14  connection.

15              They're not being paid.  They're not operating the

16  business.  They have nothing to do with Client Exam Services.

17  You shut them down, Judge, on the 10th, and they have not

18  operated the business since that time.

19              THE COURT:  And they don't have any idea of how this

20  company got created coincidentally on March 16 to allow one of

21  their most productive examiners to work for this new company?

22              MR. WARNER:  Fari Gutierrez started it.  They told

23  him that they'd been shut down.  They can't do it.

24              THE COURT:  Who is "they," the defendants?

25              MR. WARNER:  Ms. Gelardi.  We can put her on the

PROCEEDINGS                                    25

1    stand, Your Honor, that she called Fari and said, I have been

2    shut down.  I cannot operate the business.  It's yours, if you

3    want it.

4              THE COURT:  And then how did Mr. Beibin end up with

5    Fari?

6              MR. WARNER:  I believe that Safa also told him that

7    she could not retain him any longer, that Fari may be taking

8    over the business, some of the business may be going to one of

9    the others, he'd have to contact the other IME observer

10   companies.

11             There are numbers of them, Judge, hers is not the

12   only one.

13             THE COURT:  Okay.  She is not permitted to convey

14   her business to anyone else.

15             MR. WARNER:  She's not conveying it, Judge.  She's

16   not getting paid --

17             THE COURT:  She can't share any of the information

18   she got to start her business.

19             MR. WARNER:  She's not sharing anything, Judge.

20   She's not involved in operating the business.

21             THE COURT:  All right.  I'm --

22             MR. WARNER:  Think of it like this, Your Honor --

23             THE COURT:  No, you said it, why don't we have her

24   take the stand.  I would like -- actually like to hear from

25   her.

PROCEEDINGS                                                    26

1              MR. WARNER:  Then, I would like to say to Your

2     Honor, think of it like this:  You're an attorney in a firm,

3     or in a small firm, and you've just been suspended or

4     disbarred.  What do you do with respect to your clients?  You

5     call up Mr. Kataev and say, I've been disbarred.

6              THE COURT:  No.  Here's the difference.  You don't

7     do that when it's clear that the import of this action is that

8     her business, Ms. Gelardi's business, is built on stolen

9     information.  I've already made that finding from before.

10             So the reaction shouldn't be, oh, I will tell

11    someone else what I stole from someone about who they could go

12    to and it's all there as if they want to start a business of

13    their own.  You don't do that.

14             MR. WARNER:  She didn't convey any information,

15    Judge, other than that she's been shut down.

16             THE COURT:  You just said she called Fari Gutierrez

17    and said -- and F-A-R-I is Fari -- it's all yours.

18             What's all yours?

19             MR. WARNER:  Any of the outstanding --

20             THE COURT:  Clients.

21             MR. WARNER:  Well, not just clients, but their

22    outstanding assignments and other things that the clients are

23    relying on.

24             THE COURT:  No, I'm taking -- but I'm using your

25    words.  You said what do you do if you're a lawyer and you're

PROCEEDINGS                                              27

1    shut down.  You want to take care of your clients, right?  So

2    you try to find them someone else who might service their

3    needs, correct?

4                 MR. WARNER:  Oh, yes.

5                 THE COURT:  That's what you're saying she did.

6                 My point is, she wasn't in a position to do that,

7    given this proceeding in which she's alleged to have stolen

8    the client list and, therefore, was not entitled to use them

9    in any way.

10                Now, you're going to say to me, she wasn't using

11   them, she was letting someone else us them.

12                MR. WARNER:  That's exactly, right, Judge.

13                THE COURT:  Okay.

14                MR. KATAEV:  She was not operating the business.

15   And she was not using them.  She's not being paid, and other

16   than --

17                THE COURT:  So what's her interest in having those

18   clients get services from someone else?

19                Why would she do this?

20                MR. KATAEV:  To not have plaintiff do it, Your

21   Honor.

22                MR. WARNER:  Pardon me?

23                THE COURT:  Well, that's a different -- I understand

24   why she wouldn't want to have the plaintiff do it because

25   she's being sued by them.

1          MR. WARNER:  The clients are not harmed.

2          THE COURT:  This is a good faith, sort of,

3     protection of her clients?

4          MR. WARNER:  Yes, Judge, exactly so.

5          A woman built this -- I know you think she stole

6     this business, Judge, but -- and I'm not going to be able to

7     make a dent on that impression with you, but the fact of the

8     matter is --

9          THE COURT:  Well, why don't you address the

10    evidence, then?  Doesn't the evidence prove she stole the

11    business?

12         MR. WARNER:  No, Judge, I don't believe it does.

13         THE COURT:  Then tell me why not.

14         MR. WARNER:  Here's why, Judge.

15         This is not secret information.

16         THE COURT:  No, no, stop, stop, stop.  One moment.

17    One second.

18         I understand that argument to be made that there's

19    public information out there, but don't ignore what are the

20    actual transmissions between your client and Mr. Rosenblatt

21    where she clearly was stealing their information.

22         Whether it was also available in the public is not

23    the issue.  She took it from Mr. Rosenblatt, who gave it to

24    her out of the servers or computer databases of the

25    plaintiffs.  She did it to start her business.  She also did

1    it to find out how much business they were doing so she could

2    target the most lucrative parts of the business.  That's not

3    public.

4           And you could argue until you're blue in the face

5    that, yes, one could look up lawyers, one could look up car

6    accident cases, one could do all that, but that's not what she

7    did.  At least solo.  She clearly -- and this is what I want

8    you to address -- she clearly took information via

9    Mr. Rosenblatt and started her business.

10          Are you denying that?

11          MR. WARNER:  No, Judge.  Mr. Rosenblatt sent her a

12   customer list and -- with the, I believe, gross revenue

13   figures for 2016 on that list.

14          THE COURT:  Okay.  There's forensic evidence.  Am I

15   wrong that there actually are communications where she's

16   saying to Mr. Rosenblatt, send me this, or sabotage this?  I

17   read something in the papers where it says, go and get them,

18   baby, or something to that effect, where he's basically trying

19   to delay things, or the services aren't as good from Watchdog

20   or do other things to sabotage those clients of Watchdog.

21          Is that not in evidence?

22          MR. WARNER:  There are text exchanges, Judge, that

23   indicate what you are saying.  But that was well after the

24   business was set up and started.  Well after.

25          THE COURT:  I'm not sure that matters.  I mean, I

PROCEEDINGS                                        30

1    don't -- one, is, is it not true that she opened the email

2    from Adam Rosenblatt with customer lists soon after she got it

3    and then sent it to her accountants?

4              MR. WARNER:  I believe that's what she testified to.

5              THE COURT:  And you're aware -- no, no, she didn't

6    testify to that.  That's the problem.  She testified to me

7    that she didn't open it, but that's what the forensic evidence

8    shows.

9              So why should I trust a single thing you're telling

10   me, because, quite frankly, this record is rife with

11   misstatements, I would say lies, quite frankly, some under

12   oath by your client to me, and I think to the plaintiff, that

13   have been disproved by forensic evidence.

14             I don't understand why you're resisting or how you

15   can in good faith resist what is an obvious conclusion that

16   your client did steal those trade secrets.  She paid for them.

17   I heard the tape myself.  I saw -- I mean, I've seen the

18   evidence, and it's been presented in voluminous documents now

19   that there was this constant exchange of information and

20   communication between Ms. Gelardi and Mr. Rosenblatt to begin

21   the business.

22             MR. WARNER:  I believe that -- Your Honor, that

23   you're incorrect on that.  Simply incorrect.

24             There was not a constant exchange of information

25   when the business was begun.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                                31

1              Mr. Rosenblatt sent the customer list with the

2     general revenue provisions on it to Ms. Gelardi.  There's no

3     dispute as to that.

4              THE COURT:  Even the questionnaires, as well,

5     though, right?  The forms that they use --

6              MR. WARNER:  They are on the website, Judge.  And

7     they could have been obtained by the attorneys without any

8     difficulty at all.  This is not a trade secret.  There's no

9     effort to protect it.  There's no -- there's no -- there's

10    nothing secret about it.

11             THE COURT:  Okay.  How about the information about

12    who they earned the most money from, who were the most

13    lucrative clients?

14             MR. WARNER:  Judge, I --

15             THE COURT:  Is there evidence showing that

16    Mr. Rosenblatt provided that to her?

17             MR. WARNER:  Yes, he did.  Not that Ms. Gelardi

18    bought it or paid for it, but that he did send it.  He sent a

19    list with the -- I think a -- I can't remember the exact

20    count, maybe it was 15 or 20 of the customers and their

21    grosses from 2016.

22             THE COURT:  Okay.  And there is not evidence showing

23    that she somehow used that to triangulate in some way and

24    figure out who they should focus on, meaning IME Companions

25    when they started their business?

PROCEEDINGS                                    32

1          MR. WARNER:  I don't feel that the evidence -- that

2   any evidence that shows how they focused on it is of any

3   validity, Judge.

4          This is something that all you need to do is watch

5   daytime TV and you will find out exactly who the biggest

6   personal injury firms in New York are.  And all you need to do

7   is sit and watch daytime TV and you'll see the firms.  One,

8   two, three, four, five, six advertised.

9          THE COURT:  So let me ask you a question.  What

10  evidence is there that that's how the Gelardis started this

11  business?  That they went out -- how did they get this client

12  list?

13         MR. WARNER:  The evidence, I believe, shows that

14  Mr. Elefterakis was very well aware of the top personal injury

15  firms, because he's in the cash provision business, and he

16  knew all these firms intimately, and that was how Ms. Gelardi

17  got to the firms through introductions by Mr. Elefterakis, not

18  through -- not through the Rosenblatt listing, but because

19  Mr. Elefterakis knew who the firms were with the biggest

20  practices.

21         THE COURT:  And let me ask you -- actually, let me

22  ask you a question.  Is there an affidavit from Mr. Gregory

23  Elefterakis?  That's who we're talking about, not the other

24  Elefterakises, right?  There's no affidavit from him.

25         MR. WARNER:  No, there's no affidavit from Gregory.

1   He's -- he's someone, Judge, who's available by Zoom, that --

2   remember, Your Honor said he could testify remotely.

3             THE COURT:  Yes.  And will he testify that he was

4   the one who came up with the customer list?

5             MR. WARNER:  The customer list?  No, he won't say he

6   came up with the customer list.

7             THE COURT:  No, the client list, whatever you want

8   to call it, the list that was used to build this business.

9             Will he say that?

10            MR. WARNER:  I don't know what he'll say, Judge,

11  I've never spoken with him.  I didn't think at this time after

12  he was subpoenaed, I should go speak to him and be accused of

13  witness tampering.

14            But I'm quite sure -- but I'm quite sure, that given

15  who Mr. Elefterakis was and his involvement in the PI

16  business, that he knew exactly who to call.  In fact, I

17  personally have been in the personal injury business for many

18  years, and if you ask me who to call I would just say, gee,

19  take a look, Judge, at Super Lawyers, and you'll know exactly

20  who to call.

21            THE COURT:  And is there any correlation between

22  that list and the clients that you're -- that were pursued by

23  Companions?

24            MR. WARNER:  In terms of the top level firms, yes.

25  I mean, it's not a one-to-one, but they -- but she also

PROCEEDINGS                                    34

1    pursued other firms.

2             THE COURTROOM DEPUTY:  Mr. Warner, could you please

3    move the microphone --

4             MR. WARNER:  -- I'm sorry.  She also --

5             THE COURTROOM DEPUTY:  You can pick it up and move

6    it closer so you don't have to stretch.

7             MR. WARNER:  I'm sorry.  I apologize.

8             She also pursued other firms, as well as just the

9    top firms.  She would go and make presentations at CLE -- what

10   do they call it -- presentations.

11            THE COURT:  Seminar.

12            MR. WARNER:  Seminar, yes.  Thank you, Your Honor.

13            And other similar things.  This is not a secret,

14   Judge, who these personal injury firms are.

15            THE COURT:  Here's what we're going to do.  I'd like

16   to hear from Mr. Elefterakis.

17            Fida, can you get him on the phone?

18            THE COURTROOM DEPUTY:  Yes.

19            THE COURT:  We told him to be available by phone.

20            I'd like to hear what he has to say about how this

21   business got started.

22            THE COURTROOM DEPUTY:  I need a phone number for

23   him, sir.

24            MR. KATAEV:  Mr. Genovesi is in the back.  That's

25   his counsel, and he can help us with that information.

PROCEEDINGS                                      35

1           MR. GENOVESI:  Anthony Genovesi.  Good afternoon,

2     Your Honor.

3           THE COURT:  Good afternoon.  Come forward,

4     Mr. Genovesi.

5           THE COURTROOM DEPUTY:  I'm sorry.  First, the

6     spelling of your last name.

7           THE COURT:  G-E-N-O-V-E-S-I, I assume.  Genovesi.

8           MR. GENOVESI:  G-E-N-O-V-E-S-I.

9           THE COURTROOM DEPUTY:  Oh, you need to slow down.

10    G-E-N --

11          MR. GENOVESI:  G-E-N-O-V-E-S-I.

12          THE COURTROOM DEPUTY:  Okay, do you want to come

13    forward so you don't have to yell out the number throughout

14    the whole courtroom?

15          MR. GENOVESI:  No, that's fine.

16          THE COURTROOM DEPUTY:  All right.  Number.

17          MR. GENOVESI:  I don't know what number.  I mean, I

18    can give -- I have his cell phone number.  I didn't know if

19    this was going to be -- I thought it was going to be a video.

20          THE COURT:  No.

21          THE COURTROOM DEPUTY:  No.

22          MR. GENOVESI:  Okay.  Could I just text him to tell

23    him to call the Court?

24          THE COURTROOM DEPUTY:  Yes.

25          MR. KATAEV:  If Your Honor would like, I do have

1    argument on the points of contempt on Client Exam Services.

2                THE COURT:  Okay.  Why don't we hold off for a

3    second.

4                The one thing I wonder is if I should hear from

5    Ms. Gelardi first.  But let me hear first from

6    Mr. Elefterakis.

7                Let me just say this to you, Mr. Kataev, while we

8    have this break in the action.

9                I don't think the allegations about Mr. Elefterakis

10   that you mentioned are in the amended complaint.

11               MR. KATAEV:  I'll pull it up, Your Honor.

12               THE COURT:  Yes.

13               MR. GENOVESI:  Judge --

14               THE COURT:  Hang on a second.

15               The reason I mention it this because you know

16   there's a pending motion to dismiss from him.

17               Go ahead.

18               MR. GENOVESI:  That's correct.  And that's from my

19   firm, Judge.

20               THE COURT:  Yes.

21               MR. GENOVESI:  We take issue, just for the record,

22   with the representations and the exchange that Mr. Kataev had

23   with Your Honor, and the conclusions which seem to, very

24   quickly, slide into wrongfulness, and I submit there is no --

25               THE COURT:  Your position is that his conversations

1   with Ms. Pollak and Ms. Gelardi didn't make clear to him that

2   the client list came from IME Watchdog?

3          MR. GENOVESI:  Right.  I mean, on this point, and

4   you'll hear from Mr. Elefterakis, I mean, I have to agree with

5   defense counsel.

6          I mean, if Gregory Elefterakis was presumably

7   contacted by Ms. Gelardi because these are his relationships

8   with people that he deals with every day.  So I don't know

9   what -- you know, the plaintiff's client list or that

10  profit -- I mean, he went to his clients, that's what --

11  that's, presumably, his involvement in this, and his value

12  to -- that's it.  And I think that, you know, whatever

13  questions Your Honor has for him, or the Court has for him, I

14  will bear that out.

15         So I have a phone number, cell phone (917)674-0384.

16         THE COURTROOM DEPUTY:  Off the record.

17         (Discussion was had off the record.)

18         THE COURT:  Why don't both of you have a seat here

19  at counsel table.

20         MR. KATAEV:  On that docket entry, Your Honor,

21  that's 114 for the first amended complaint.

22         THE COURT:  And you're saying that that does contain

23  these allegations about Mr. Elefterakis?

24         MR. KATAEV:  That's correct.  And I can point out

25  the specific paragraph number shortly.

PROCEEDINGS                                      38

1          THE COURT:  We're going to get Mr. Elefterakis on

2    the phone, and I am going put him under oath.  We'll let him

3    know that you're both here.

4          (Pause in the proceedings.)

5          THE COURT:  Did you say your name was Wiener; is

6    that right?

7          MS. WIENER:  Yes, Your Honor.

8          THE COURTROOM DEPUTY:  Hello, Mr. Elefterakis.

9          MR. ELEFTERAKIS:  Yes, speaking.

10         THE COURTROOM DEPUTY:  This is the court's deputy.

11   I'm calling from the courtroom.

12         We are have Judge Chen present, along with the

13   parties, and your attorneys.

14         (Pause in the proceedings.)

15         THE COURT:  So, Mr. Elefterakis, I want to make sure

16   you can here me.  This is Judge Chen.

17         MR. ELEFTERAKIS:  I can.

18         THE COURT:  Okay.  So I don't know if you're

19   driving, but if you are, I'd like you to stop.

20         MR. ELEFTERAKIS:  I'm pulling over right now.

21         THE COURT:  Okay.  Let's give you a minute to do

22   that.

23         MR. ELEFTERAKIS:  Yes.  Okay, I am now parked.

24         THE COURT:  Okay.  So, Mr. Elefterakis, let me

25   explain to you what's happening.

1          First of all, your lawyers Ms. Wiener and

2    Mr. Genovesi are here, so, obviously, if they think that I'm

3    asking you anything that's inappropriate, I'm sure they'll

4    object.

5          But some factual issues have arisen, and it's my

6    understanding, from counsel for the other defendants,

7    Mr. Warner and Mr. Breite are the lawyers, that you might have

8    certain information that I think is relevant.  So I want to

9    put you under oath and ask you some questions.  Okay?

10          MR. ELEFTERAKIS:  Okay, yes.

11          THE COURT:  All right.  So if you'll raise your

12    right hand where you are so you can be sworn in.

13          THE WITNESS:  Yes.

14

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

ELEFTERAKIS - DIRECT - THE COURT          40

1          (Witness takes the witness stand.)

2    **GREGORY ELEFTERAKIS**, called as a witness, having been first

3    duly sworn/affirmed, was examined and testified as follows:

4          THE WITNESS:  I do.

5          THE COURTROOM DEPUTY:  Please state and spell your

6    name for the record.

7          THE WITNESS:  It's Gregory Elefterakis.  First name

8    G-R-E-G-O-R-Y.  Last name E, as in Edward, L, as in Larry, E

9    as in Edward, F as in Frank, T, as in Thomas, E, as in Edward,

10   R, as in round, A, as in apple, K, as in kid, I, as in indigo,

11   S, as in Sam.

12   EXAMINATION

13   BY THE COURT:

14   Q    All right.  Thank you very much, Mr. Elefterakis.  And my

15   apologies for, in a sense, waylaying you while you're driving.

16          So, the first question I want to ask you, and what

17   will happen is I will allow plaintiff's counsel to ask some

18   other follow-up questions, as well as defense counsel or

19   Mr. Elefterakis' counsel as well.

20          Were you involved in the establishment of IME

21   Companions as a company?

22   A    I was.

23   Q    All right.  And what was your role in that?

24   A    My role, basically, was to sign some (audio interference)

25   immediately whether or not it would be a -- that would be

ELEFTERAKIS - DIRECT - THE COURT                    41

1    profitable, whether or not I can (audio interference).

2            THE COURTROOM DEPUTY:  I'm sorry.  Could you please

3    speak slowly and repeat your answer, but slowly?

4            MR. ELEFTERAKIS:  Yes.

5            My goal was, basically, to evaluate initially

6    whether or not it was a business that I felt would be

7    profitable given the current clientele that I have.

8            I was given (audio interference) business.  I had

9    nothing to do -- once we established the business, I didn't

10   have anything to do with the day-to-day operations of the

11   business.

12   Q    Now, did you come up with the idea to establish the

13   business or were you approached about doing that?

14   A    No, I was approached, initially, about the prospect of

15   opening up this company myself.

16   Q    All right.  And when, roughly, did that happen?

17   A    I can't really tell you with any specificity what the day

18   was.

19   Q    And how do you know Ms. Gelardi?

20   A    I'm sorry, I didn't hear that.

21   Q    How did you know Ms. Gelardi at that time?

22   A    Again, I'm not --

23           THE COURTROOM DEPUTY:  How did you know Ms. Safa

24   Gelardi at that time?

25           THE WITNESS:  She to me -- Your Honor, working

ELEFTERAKIS - DIRECT - THE COURT                42

1   (audio interference).

2   Q    And what does Roman do or what was he doing then?

3   A    Roman was my chief financial officer in the company that

4   I owned, Case --

5   Q    Case what?

6   A    Roman was my chief financial officer in the company

7   called Case Cash Funding (indiscernible) in that --

8            THE COURT:  Case Cash Funding, okay.

9   Q    Okay.  And did you meet with Roman, who I understand his

10  last name is Pollak, and Ms. Safa Gelardi to discuss the

11  establishment of the business?

12  A    I did.

13  Q    And at the time, did you discuss how it is that you would

14  start the business, in terms of clients or, you know, getting

15  the business going?

16  A    We did.

17  Q    And what was that discussion?

18  A    Well, I basically heard for the first time the concept of

19  what the business was about.  And, basically, I really -- the

20  whole decision was based on my doing some due diligence and

21  calling some clients that I dealt with in my current business

22  to find out (indiscernible) if they knew about the product, if

23  they used the product.  I could give them product charge

24  (indiscernible) the same -- would they use me, and that was

25  the basis -- diligence that they would --

ELEFTERAKIS - DIRECT - THE COURT                43

1   Q    And what exactly is that business that you have now, Case

2   Cash Funds?

3   A    Yeah, it's not --

4         THE COURTROOM DEPUTY:  I'm sorry, could you repeat

5   that whole answer slowly.

6         THE WITNESS:  I'm sorry, yes.  It's a non-recourse

7   settlement funding business.

8   Q    And what does that mean?

9         MR. ELEFTERAKIS:  (Indiscernible) involved in

10  personal lawsuit, and they need money prior to the case

11  resolving.  I'll make a decision to advance them money, if I

12  think it's a viable case.  If the case is successful at the

13  end, I get paid back; and if not, then there's no personal

14  obligation on the client.  That's the goal.

15  Q    Okay.  And in terms of finding clients, did you actually

16  then look up or provide names of potential clients for this

17  new business, Companions?

18  A    Yeah, I -- (indiscernible).

19        THE COURTROOM DEPUTY:  I'm sorry.  Could you please

20  repeat the answer one more time.

21  Q    The way you went about it was?

22  A    I approached the clients that deal with me that I deal

23  with in my current business, Cash Funding business, I ask them

24  whether or not they would be willing to give me names in this

25  new venture and similar quality.  And once I got the

1   appropriate answer, I decided it was a business I wanted to go

2   into.

3   Q    And how many clients did you recall approaching or how

4   many clients did you approach that you remember?

5   A    Originally, it was within, probably, ten clients to get a

6   good sampling of what the response would be and, basically,

7   all affirmatives, and that's when I knew I could rely on

8   enough people, enough attorneys to form a business.

9   Q    And these clients were all attorneys; is that right?

10  A    Yes, this particular required attorneys to provide me

11  work (indiscernible).

12  Q    And did you, at any point, approach any other clients

13  besides these ten?

14  A    No.

15  Q    And so this was at the beginning before Companions

16  started; is that right?

17  A    Yes, correct.

18  Q    Okay.  And when you say you were going to charge them

19  similar rates, what did you mean?

20  A    Well, I mean, I think we had some discussions initially

21  about what charge.  I think I had one (indiscernible)

22  attorneys that were already using the product charge, pay or

23  (indiscernible) and ask if I charge them similar for, you

24  know, with (indiscernible) and they respond, yes.

25  Q    And when you say "similar product," what product are you

1    talking about?

2    A    Well, the IME company that provides their (indiscernible)

3    to appear at independent medical exams.

4    Q    And those clients you approached, do they say which

5    companies IME services they were using?

6    A    No, these are attorneys in the current business, most

7    their own personal friends or relatives, people I would rely

8    on to say affirmatively, yes or no, oh, yeah, sure.  Then

9    really follow up with friends in my current business.  I,

10   personally (indiscernible) the ten firms I knew I could rely

11   on to provide (indiscernible).

12   Q    Okay.  And at any point did you sit down with Ms. Gelardi

13   and/or Mr. Pollak and talk about the clients that you had

14   found?

15   A    Yes.  I basically remember information to Roman to say

16   that I've this client (indiscernible).

17        Roman to tell Safa can go -- you can present her

18   case with all the details about her business and because

19   they're already on board.

20   Q    Okay.  And did either Roman or Safa ever sit down with

21   you and say, here's a list of clients that we found?

22   A    No.

23   Q    So no discussion ever about here's a bigger list than

24   your ten of potential IME Companion clients?

25   A    Well, while -- I'm sorry (indiscernible).

ELEFTERAKIS - CROSS - MR. KATAEV                46

1          THE COURT:  Sorry.  Go ahead.

2    A    There were times when I was approached, more Roman than

3    Safa.  But Roman would tell me or ask me a question like, do

4    you know this attorney?  Do you have an arrangement with this

5    attorney?  And if I did, yes, I'd make a phone call.  If I

6    said, no, that would be the end.

7          THE COURT:  All right.

8          Mr. Kataev, do you want to ask any follow up?  And

9    just keep your voice up.

10         So plaintiff's counsel might ask you a few questions

11   now.

12         THE WITNESS:  Sure.  Thank you.

13   CROSS-EXAMINATION

14   BY MR. KATAEV:

15   Q    Mr. Elefterakis, you testified that you are or were an

16   owner of Case Cash Funding, correct?

17   A    Correct.

18   Q    And that company caters to personal injury law firms,

19   correct?

20   A    That's correct.

21   Q    And those personal injury law firms send you prospective

22   plaintiffs who need non-recourse loans, correct?

23   A    Correct.

24   Q    And Roman Pollak is your CFO at that company, correct?

25   A    Correct.

ELEFTERAKIS - CROSS - MR. KATAEV                47

1    Q    And you trust Roman to carry out these duties for you in

2    that business and otherwise, correct?

3    A    Yes.  He's my -- yes.  Yes.

4    Q    And Roman carries out duties and functions for you

5    related to Case Cash Funding and other ventures, correct?

6    A    One of the (indiscernible) you referred to.

7    Q    Any other business ventures?

8    A    I don't know of any other business ventures I can think

9    of.

10   Q    It's fair to say that the reason you learned about the

11   IME Observer business is through Roman who learned it through

12   Safa, correct?

13   A    No, I learned it directly.

14              THE COURT:  Hang on, there's an objection.

15              THE COURTROOM DEPUTY:  One second.  One moment,

16   please.  One moment.

17              THE COURT:  Okay.  You're objecting to that

18   question?

19              MR. GENOVESI:  Yes, because it calls for him to

20   testify about someone else's state of mind and --

21              MR. KATAEV:  I'll rephrase.

22              THE COURT:  Fair enough.  Well, unless he said to

23   you, I got this from Safa, but go ahead.

24   BY MR. KATAEV:

25   Q    To your knowledge, you learned about the IME Observer

ELEFTERAKIS - CROSS - MR. KATAEV                48

1   business through Roman, who learned about it through Safa,

2   correct?

3           THE COURT:  Same objection.

4           Here's the question.

5           So did -- when you spoke to Roman about the IME

6   Companion business, did he ever mention Safa's involvement?

7           MR. ELEFTERAKIS:  No.  Roman (indiscernible) I

8   learned of the business from Safa about the business.  But he

9   didn't know -- he didn't talk (indiscernible).

10          THE COURT:  I'm sorry, what did you say?  He did not

11  what about the details?

12          THE COURTROOM DEPUTY:  Details about the business.

13          MR. ELEFTERAKIS:  Roman never told me about the

14  details.  He said that Safa wanted to speak to me about a

15  business I might want to get into.

16          THE COURT:  Okay.  All right.

17  BY MR. KATAEV:

18  Q    And Roman and Safa -- Roman and/or Safa previously

19  approached you about a medical malpractice screening business,

20  correct?

21  A    About what?

22  Q    A medical malpractice screening business.

23  A    I don't recall that at all.

24  Q    Do you recall rejecting a prior business idea of Safa's?

25  A    No.

ELEFTERAKIS - CROSS - MR. KATAEV                49

1   Q    Safa would send Roman emails about this perspective

2   business, correct?

3              MR. GENOVESI:  Objection.

4              THE COURT:  Hang on.  If you know.  If you know.

5              In other words, did you ever get forwarded an email

6   from Safa to Roman and then it got forwarded to you?

7              MR. ELEFTERAKIS:  I don't recall that.

8              THE COURT:  Mr. Kataev, let's stick to both this

9   case and what this witness might know, given the difficulties

10  of getting his testimony.

11  BY MR. KATAEV:

12  Q    Safa, at one point or another, presented you with an IME

13  Watchdog invoice billed to Elefterakis, Elefterakis & Panek,

14  correct?

15  A    Again, I don't know (indiscernible) billed from my

16  nephews' firm.  I don't know if he (indiscernible) to

17  directly.

18  Q    But you recall reviewing that invoice, correct?

19  A    Well, I recall doing my diligence going to each of the

20  law firms and asking them specifically about the finances

21  and --

22  Q    My question is, did you see an invoice from IME Watchdog

23  to Elefterakis, Elefterakis & Panek?

24  A    I don't specifically recall, but certainly could have.  I

25  think I would have (indiscernible) what you're telling me.

1   Q    Okay.  And the only reason Safa came to you is because

2   she found that invoice, correct?

3           MR. GENOVESI:  Objection.

4   A    I don't know.

5           THE COURT:  Hold on.  Hold on.  Sorry.

6           THE COURTROOM DEPUTY:  One moment, one moment.

7           THE COURT:  Overruled.  If you know.

8           So the question is:  Is the only reason that that

9   invoice came to you is because she found it?

10          And so do you know the answer to that?

11          THE WITNESS:  No.

12          THE COURT:  All right.

13          So, Mr. Kataev, I want to keep this focused.  I

14  think you're going a little astray here.

15          The question really has to -- the questions I'm

16  interested in, or the information is, what he did to help

17  start this company.

18  BY MR. KATAEV:

19  Q    At some point your business relationship with Safa ended,

20  correct?

21  A    Correct.

22  Q    And what precipitated that was an email from Safa to you

23  directly at Greg.casecash@gmail.com, correct?

24  A    Correct.

25  Q    And in that email dated June 10th, 2018, she stated to

ELEFTERAKIS - CROSS - MR. KATAEV                51

1    you, among other things:  We came to you for a partnership

2    with a list of attorneys who currently use the service in

3    hopes of your share of the company with the sales and faster

4    growth.

5              Do you recall that?

6    A    I don't have the email in front of me, but if that's what

7    it says, that's what it says.

8    Q    That email also says:  You requested me when I showed

9    Roman the invoice and the list that I had on a well-thought

10   out complete business and was ready to move forward with other

11   partnerships but then decided to move forward with you as

12   business decision because you guaranteed the attorneys that we

13   now have.

14             It was a -- it was a good business decision, but now

15   I'm expected to do 90 percent of the work in a 50-50

16   partnership.

17             Do you recall receiving an email like that?

18   A    I absolutely do.

19   Q    And when Safa referred to the invoice, she was referring

20   to the invoice from IME Watchdog to Elefterakis, Elefterakis &

21   Panek, correct?

22             MR. GENOVESI:  Objection.

23             THE COURT:  Overruled.

24   A    I don't know what she was referring to.

25   Q    And when she referred to the list, she referred to the

ELEFTERAKIS - CROSS - MR. KATAEV                    52

1   2016 sales by customer summary list from IME Watchdog,

2   correct?

3   A    Again, I'm not sure what (indiscernible) if you're asking

4   me why the partnership broke up, I'll tell you.

5             THE COURT:  I'd like to know.

6             THE WITNESS:  Yes.  Well, the understanding from the

7   beginning with Safa was that I was not going to get involved

8   the day-to-day operations of this business.  I had no desire

9   to do that.

10             The only reason I went to the table was that I had

11   attorneys that I'm friendly with, that I've been doing

12   business with for a long time, that I've been asked whether or

13   not they use this business and used me under certain

14   circumstances, and that's the reason we got involved.

15             But there was never a representation by me that I

16   was going to do anything else than be a source, a referral

17   source.  (Indiscernible) doing all physical work without any

18   of my involvement.

19             She decided that the partnership wasn't a fair deal,

20   and I respectfully told her I disagree (indiscernible).

21             THE COURT:  I disagree.

22             You respectfully told her you disagree and?

23             THE WITNESS:  From the start, I wasn't going to do

24   any day-to-day work on this business and (indiscernible) let

25   the judge (indiscernible) we grow on the partnership.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

ELEFTERAKIS - CROSS - MR. KATAEV                    53

1          THE COURT:  And, Mr. Elefterakis, this is the Judge,

2     again.  I just want to make sure that I understand your

3     testimony in full.

4          Is it your recollection that the number of clients

5     you referred was about ten during the entire time you were in

6     business together with Ms. Gelardi?

7          THE WITNESS:  Yeah.  About ten clients, but I think

8     we retained more clients as the business started opening the

9     (indiscernible) doing the business, correct.

10          THE COURT:  So how many clients do you recall that

11     you actually referred to the business?

12          THE WITNESS:  I would think it was under 16, but

13     more than ten.  Between ten and 15 clients that I obtained

14     through my own, you know, personal contacts.

15          THE COURT:  Okay.  All right.  Thank you very much.

16          MR. KATAEV:  I have some more follow-up.

17          THE COURT:  Just a little bit, Mr. Kataev.

18          This is very difficult and I want to move this

19     along, because as far as I'm concerned, I've gotten what I'm

20     interested in from Mr. Elefterakis.

21     BY MR. KATAEV:

22     Q    Mr. Elefterakis, approximately how many personal injury

23     law firms do you work with at Case Cash Funding?

24     A    I probably -- between maybe (indiscernible) no more than

25     50, no less than ten.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

ELEFTERAKIS - CROSS - MR. KATAEV                54

1          MR. KATAEV:  I didn't hear the numbers.

2          THE COURT:  No more than 15, did you say?

3          THE WITNESS:  No, no more than 50, 5-0.  No less

4     than 10, I would say.

5          THE COURT:  Thirty-five to 50?

6     Q    And your testimony is that you were brought on in order

7     to help obtain customers for this IME Observer business,

8     correct?

9     A    Correct.

10    Q    So did you elicit them, then Roman Pollak would contact

11    you with the names of law firms and ask you about them?

12    A    Well, Roman would contact me saying do you have a

13    relationship with this firm, and if I said, yes, he would then

14    make a call and say (indiscernible) the same call that I made

15    initially and ask (indiscernible) would use.

16          If I said, no, then I would not make a phone call.

17    At that point, they would be on their own.  If they did call

18    the attorney I had no relationship with and ask him for

19    businesses, that would have nothing to do with me.

20    Q    Well, you just testified that you had a relationship with

21    approximately 35 to 50 law firms, correct?

22    A    What I'm saying is something different.  If Roman asked

23    me, do you have a relationship with a Smith law firm, and I

24    would say, no, I wouldn't contact the Smith law firm to ask

25    them for business --

PROCEEDINGS                                    55

1          THE COURT:  Okay.  Mr. Kataev --

2          THE WITNESS:  -- you do that with the others --

3          THE COURT:  Okay.  Mr. Kataev --

4          THE WITNESS:  -- I only contacted the attorneys that

5    I had personal relationships with.

6          THE COURT:  So, Mr. Kataev, that's enough in terms

7    of the questions you're asking.

8          Mr. Warner, did you want to ask anything?

9          MR. WARNER:  I have no questions.

10         THE COURT:  Okay.  And as his attorneys, do you want

11   folks want to clarify anything or ask any follow-up.

12         THE COURTROOM DEPUTY:  I'm sorry, you have to use

13   the microphone.

14         THE COURT:  You have to use the microphone.

15         MR. GENOVESI:  Your Honor, there was an instance

16   where Mr. Elefterakis was testifying and he used word

17   "disagreement" and Your Honor said that you dis -- I think,

18   we -- it was unclear what he said, and the Court or someone

19   characterized it as he disagreed with Safa.

20         I thought he was saying that he didn't disagree with

21   Safa's contention that it was unfair the way the -- he was

22   getting 50 percent of the revenue but wasn't doing the work.

23         THE COURT:  So, Mr. Elefterakis, you said that the

24   relationship between you and Ms. Gelardi broke up after she

25   said you weren't doing enough to help the business and your

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    56

1   position was you weren't going to work on the day-to-day

2   operations, correct?

3            THE WITNESS:  Correct.

4            THE COURT:  Okay.  Did you disagree, then, with

5   Ms. Gelardi about whether it was fair or not that you were

6   getting 50 percent but only doing whatever degree of work you

7   were doing, or did you agree with her?

8            THE WITNESS:  No, I disagreed her.  I respected her

9   opinion, but I didn't think it was fair.  I certainly

10  disagreed, based on our initial conversation and what I

11  proposed and explained to her preferred attorneys that I knew

12  (indiscernible).

13           THE COURT:  Okay.  All right.  Well, thank you very

14  much, Mr. Elefterakis.  I really appreciate you making

15  yourself available.

16           THE WITNESS:  Well, thanks for allowing me.  I do

17  appreciate it.

18           THE COURT:  Okay.  Thank you.  You're free to go and

19  continue your drive.  Just be careful.

20           THE WITNESS:  Thank you so much.  Thank you.  Bye.

21           (The witness was excused.)

22           THE COURT:  So, Mr. Warner, let me say this.  I

23  don't think that testimony was particularly helpful or proved

24  the point you were trying to make.

25           What I hear Mr. -- or what I heard Mr. Elefterakis

1  saying is that he talked to ten to 15 of his potential clients

2  at the some point before 2018, I gather there was a June 2018

3  email that signaled the beginning of the end, perhaps.

4         So it doesn't sound like he did what you're

5  claiming, or your client's claiming he did, which was help

6  start this business by just going and looking on public lists

7  of lawyers.  And nor do I think, although I'll hear from the

8  plaintiff on this, that number is anywhere near the number of

9  clients that IME Companions started their business with, the

10  majority of which is what I assume they got from the list they

11  took from Watchdog.

12         I mean, so --

13         MR. WARNER:  Can I say --

14         THE COURT:  Yeah, go right ahead.

15         THE COURTROOM DEPUTY:  You have to get close to the

16  microphone.

17         MR. WARNER:  I think Mr. Elefterakis' testimony

18  shows exactly how the business was started.  It wasn't started

19  with purloined information regarding a 2016 customer list that

20  Mr. Rosenblatt stole from his employer and sent to her.

21         THE COURT:  Well, let me stop you for one second.

22         What does the actual forensic evidence show, in

23  terms of how many customers they serviced early on in 2017

24  when the business was started and how many of those are

25  Watchdog customers versus the ten or 15 that might have come

PROCEEDINGS                              58

1   from Mr. Elefterakis?

2              MR. KATAEV:  In 2018, out of the 12 customers that

3   the defendants procured, ten of those were ours.  And I would

4   like to call Mr. Pollak to the stand on this point that

5   Mr. Elefterakis testified to.

6              I respectfully disagree with his testimony.  We

7   didn't get to fully cross-examine him, but we submit to Your

8   Honor that Mr. Elefterakis is simply not being truthful, and

9   the evidence shows otherwise.

10             THE COURT:  How many clients were listed on the 2016

11  customer list?

12             MR. KATAEV:  I would say, just from clients -- from

13  my memory, four pages worth, with about at least 30 on each

14  page, brings us to about a 120, maybe a 140, maybe.

15             THE COURT:  And the ten that you're referencing are

16  on that list?

17             MR. KATAEV:  That's correct, Your Honor.

18             THE COURT:  Okay.  So the only thing we don't know

19  is whether or not Mr. Elefterakis -- they were

20  Mr. Elefterakis' clients as well.

21             MR. KATAEV:  And best way to find that out, Your

22  Honor, because we can't accept Mr. Elefterakis' testimony as

23  gospel, is through a forensic examination of their phones.

24             THE COURT:  Right.  Well, do you -- okay, why don't

25  we have --

PROCEEDINGS                                    59

1              Mr. Pollak, you're here in the room, right?  Okay,

2     let's have you come forward, sir, and if you'll come up to the

3     witness stand.

4              MR. WARNER:  Will Your Honor be able to speak to the

5     issues that Your Honor has raised --

6              THE COURT:  Yes.  Yes.  I'd like to get a little bit

7     more information.

8              MR. KATAEV:  Your Honor, if I may take a few minutes

9     to compile the exhibits to present to the Court and to the

10    witness.

11             THE COURT:  Let's swear in Mr. Pollak.

12             THE COURTROOM DEPUTY:  Please raise your right hand.

13             (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                      60

1                    (Witness takes the witness stand.)

2      **ROMAN POLLAK**, called as a witness, having been first duly

3      sworn/affirmed, was examined and testified as follows:

4                    THE WITNESS:  I do.

5                    THE COURTROOM DEPUTY:  You can have a seat.  State

6      and spell your name for the record.

7                    THE WITNESS:  Roman Pollak.  First name R-O-M-A-N,

8      last name Pollak, P-O-L-L-A-K.

9                    THE COURT:  Take a moment so that Mr. Kataev can

10     organize himself.

11                   (Pause in the proceedings.)

12                   THE COURT:  So are you folks ready?

13                   MR. KATAEV:  One moment, Your Honor.

14                   THE COURT:  Let me say this.  If it's among some of

15     the materials you already gave me, I have a copy here.

16                   MR. KATAEV:  I can give this to the Court now.

17                   THE COURT:  Okay.

18                   MR. KATAEV:  (Proffering.)  My copy, I just want to

19     give one for the defendants and the one for the witness.

20                   THE COURT:  All right.

21                   So are you ready to go?

22                   MR. KATAEV:  Yes, Your Honor.

23                   THE COURT:  All right.  Please, you can examine.

24

25

1    DIRECT EXAMINATION

2    BY MR. KATAEV:

3    Q    Mr. Pollak, you're currently employed by Case Cash

4    Funding, correct?

5    A    Correct.

6    Q    And you have been employed by Case Cash in 2017 and 2018,

7    as well, correct?

8    A    Yes.

9    Q    And Cash Funding is owned by Greg Elefterakis, correct?

10   A    Correct.

11   Q    And that individual is your boss, correct?

12   A    Correct.

13          THE COURT:  Okay, slower, please.

14   Q    And as your boss, it's fair to say that you run all major

15   decisions by him, correct?

16   A    Correct.

17   Q    And it's also fair to say that you present all the

18   relevant facts to your boss so that he can make informed

19   decisions, correct?

20   A    Correct.

21   Q    And you met Safa Gelardi at the bank where she worked

22   where Case Cash had a banking relationship, correct?

23   A    Correct.

24   Q    And that was Sterling Bank, correct?

25   A    Yes.

POLLAK - DIRECT - MR. KATAEV                    62

1    Q    And at some point in the 2017, Ms. Gelardi approached you

2    about a medical malpractice screening business, correct?

3    A    I don't recall.

4    Q    And sometime in the summer of 2017, Ms. Gelardi

5    approached you about a business venture she wanted to pitch to

6    Greg concerning an IME Observer business, correct?

7    A    Yes.

8    Q    And she emailed you an IME Watchdog invoice listing

9    customer Elefterakis, Elefterakis & Panek, correct?

10   A    Correct.

11   Q    Out of the two Elefterakis are relatives of Gregory

12   Elefterakis, correct?

13   A    Yes.

14   Q    And I'd like for you turn your attention to the first

15   exhibit in front of you.  It's marked Plaintiff's 32.

16        Do you see this exhibit?

17   A    Yes.

18   Q    Do you recognize it?

19        The first page, sir.

20   A    It's an IME invoice.

21   Q    And on the first page, do you recognize what that is?

22        THE COURT:  I think you can lead him a little bit.

23        Is this an email that was sent to you on July 18,

24   2017 that includes that --

25        THE WITNESS:  Yes.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

POLLAK - DIRECT - MR. KATAEV                    63

1          THE COURT:  -- invoice you just mentioned?

2          THE WITNESS:  Yes.

3    BY MR. KATAEV:

4    Q    And the email says, RPollak002@gmail.com is your email,

5    correct?

6    A    Yes.

7    Q    And Ms. Gelardi emailed you this invoice because she

8    wanted to know about this business, correct?

9    A    I don't know why she emailed it.

10   Q    She emailed you to find out whether Gregory Elefterakis

11   knows anything about this invoice, correct?

12   A    I don't know.

13   Q    The only reason Ms. Gelardi emailed you about this

14   invoice is because she learned that your boss' relatives may

15   be involved with this company, correct?

16   A    That's possible.

17   Q    She only knew to approach you because she received this

18   invoice, correct?

19   A    I don't know.

20          THE COURT:  Can I ask you a question?

21          Do you recall anything about why she sent this

22   invoice to you?

23          THE WITNESS:  No.

24          THE COURT:  Do you remember the conversation you

25   were having with her around that time?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POLLAK - DIRECT - MR. KATAEV                    64

 1              THE WITNESS:  Vaguely.

 2              THE COURT:  What was it?

 3              THE WITNESS:  That she wanted to start an IME

 4     Observer business and that she used our clients as possible --

 5     as potential clients.

 6              THE COURT:  Okay.  Thank you.  And did she email

 7     this to you unsolicited or did you ask her to send this to

 8     you?

 9              (Court reporter interrupts for clarification.)

10              THE WITNESS:  I did not ask her.

11              THE COURT:  Okay.  Go ahead.

12     BY MR. KATAEV:

13     Q    So as far as you know, without this invoice in hand, Safa

14     Gelardi would have no reason to ask you about this business,

15     correct?

16              MR. WARNER:  Objection.

17              THE COURT:  Sustained.

18     Q    After you received this invoice, you discussed it with

19     Mr. Elefterakis, correct?

20     A    I discussed the potential meeting with Safa, not the

21     invoice.

22              MR. KATAEV:  I'd like for you to go to the second

23     exhibit, please.

24              I'll offer what's marked as Plaintiff's 32, which is

25     a deposition exhibit, into evidence as Plaintiff's 1.

POLLAK - DIRECT - MR. KATAEV                    65

1          THE COURT:  Yes, it's admitted.

2          You don't have to go through the formalities of

3    admitting anything.  Obviously, I'm looking at it, so it's

4    admitted.

5          MR. KATAEV:  Thank you.

6    Q    Looking at the next exhibit, which is marked

7    Plaintiff's 18, this is another email that Safa sent to you on

8    August 8th, 2017, correct?

9    A    It is.

10   Q    And in this email, there's an attachment that's titled,

11   "Attorney List Over 10,000 In Revenue," correct?

12   A    Yes.

13   Q    And that's a spreadsheet that Ms. Gelardi prepared, as

14   far as you know, correct?

15          MR. WARNER:  Objection.

16          THE COURT:  Overruled.

17          Is that your understanding?

18          THE WITNESS:  That is my understanding.

19   Q    And turning to the next page, do you see the list of

20   attorneys listed there?

21   A    Yes.

22   Q    And you are aware that this list of attorneys is actually

23   from the 2016 sales by customer summary list, correct?

24   A    No.

25   Q    And you are aware that the customers listed here are the

1   top grossing revenue producing customers for IME Watchdog,

2   correct?

3   A     I'm not aware.

4              THE COURT REPORTER:  I'm sorry?

5              THE COURT:  He's not aware.

6   Q     And you're saying you're not aware now or were you aware

7   at any point in time?

8   A     I'm not aware at all of these.  I recognize these names

9   from the attorneys that we do funding with.

10              THE COURT:  You do what?  Funding with?

11              THE WITNESS:  Funding, right.

12              THE COURT:  All right.

13   Q     If these were customers that you do funding with, why

14   would Safa send this list to you?

15              MR. GENOVESI:  Objection.

16              THE COURT:  Sustained.

17              You can save it for argument.

18              But can I ask you a question, while we're talking

19   about this.  Looking at this list, how many of these names do

20   you recognize as clients of Cash -- Case Cash?

21              THE WITNESS:  About half of them.

22              THE COURT:  All right.  Go ahead.

23   BY MR. KATAEV:

24   Q     So it's fair to say that Safa produced this information

25   to you and not the other way around, correct?

POLLAK - DIRECT - MR. KATAEV                    67

1    A    This particular list.

2    Q    Did you ask Ms. Gelardi where she obtained this

3    information?

4    A    No.

5    Q    Let's go to the next exhibit.

6              It's marked as Plaintiff's Exhibit 35.

7              This is another email that Safa sent to you with

8    attachments, correct?

9    A    Yes.

10   Q    And in this email, she sends you the IME Watchdog profit

11   and loss statements for the last three years, which at that

12   point was December -- was 2016, 2015 and 2014, correct?

13   A    Correct.

14             THE COURT:  And let me just note the date on this

15   email is September 29, 2017.

16             Okay, go ahead.

17   BY MR. KATAEV:

18   Q    And IME Companions was formed in November of 2017,

19   correct?

20   A    I believe so.

21   Q    Just a little over a month after you received this email,

22   correct?

23   A    Yes.

24   Q    And you recognized, when you received this email, that

25   IME Watchdog's financial sensitive information was in there,

1    correct?

2    A    No.

3    Q    It says in this email for to you see attached and that

4    Safa is coming to see you, correct?

5    A    Correct.

6    Q    And you discussed with Safa the profitability of this

7    business based on the sensitive financial information

8    received, correct?

9    A    Yes.

10            MR. GENOVESI:  Objection.  I'm just going to object

11   to the --

12            THE COURT:  Characterize.

13            MR. GENOVESI:  Yes.

14            THE COURT:  Understood.  All right.  It's overruled.

15            Go ahead.

16            Just note what's the caption?  When it says,

17   "subject", what does it say?

18   BY MR. KATAEV:

19   Q    And the subject of this email says, IME Watchdog P&L,

20   last three years, correct?

21   A    Correct.

22   Q    And so as part of your discussions surrounding your

23   emails -- withdrawn.

24            As part of your discussions by telephone and in

25   person surrounding these emails, you were discussing the

POLLAK - DIRECT - MR. KATAEV                    69

1    sensitive financial information of IME Watchdog, correct?

2              THE COURT:  Same objection.

3              I understand.  Sustained.

4              Let me ask you a question.  Did you ever ask

5    Ms. Gelardi how she got those documents?

6              THE WITNESS:  No.

7              THE COURT:  When you received it, what was your

8    reaction to getting that information from her, if you had one?

9              THE WITNESS:  Just to do what I do and to analyze --

10             THE COURT REPORTER:  I'm sorry, just what?

11             THE WITNESS:  To do what I do and to analyze the

12   expenses.

13             THE COURT:  I'm going to ask the obvious.

14             Did it seem odd to you that she would have those

15   particular documents?

16             THE WITNESS:  No.

17             THE COURT:  Why not?

18             THE WITNESS:  I get presented profit and loss and

19   other financial statements all the time, so it's kind of a

20   normal course of business for me.  I didn't think anything of

21   it.

22             THE COURT:  But do you get it from people who are

23   not working for that company?

24             THE WITNESS:  There have been instances where I've

25   gotten financial documents to try to pitch to Greg.

1          THE COURT:  But from the person who doesn't work for

2     the company.  In other words, these are financials -- hold

3     on -- for a company that Ms. Gelardi didn't work for.

4          Did that strike you as odd?

5          THE WITNESS:  No, I didn't know if she was involved

6     with them or not at that point.

7          THE COURT:  Okay.  All right.

8          Go ahead, Mr. Kataev.

9     BY MR. KATAEV:

10    Q    You are aware that Daniella Levi is a personal injury

11    attorney, correct?

12    A    Yes.

13    Q    And she's known in the personal injury community as a

14    personal injury attorney, correct?

15         MR. GENOVESI:  Objection.

16         THE COURT:  Yes, overruled.

17         Go ahead.  To your knowledge.

18         THE WITNESS:  Yes.

19         THE COURT:  Go ahead.

20    BY MR. KATAEV:

21    Q    And you knew that, right?

22    A    I know that now.

23    Q    Did you know that then when you received this?

24    A    No, I didn't know who she was.

25    Q    But you were aware that Daniella Levi owned IME Watchdog,

1   correct?

2   A    No.

3   Q    Let's look at Plaintiff's 37.  This is an October 3rd,

4   2017 email from you to Safa Gelardi.

5        You sent this email, correct?

6   A    Yes.

7   Q    And in this email you are analyzing profit and loss

8   statements, correct?

9   A    Yes.

10  Q    And the reason why you're analyzing these profit and loss

11  statements is to determine whether you also, with Greg and

12  Anthony, want to get into a similar business, correct?

13  A    I analyzed it because Safa asked me to.

14  Q    And the reason why you fulfilled her request is to

15  determine whether you wished to use this information to start

16  a competing business, correct?

17  A    No.

18  Q    Well, isn't it true that this email that you're analyzing

19  the insurance expense to determine how much money is spent on

20  insurance, for example?

21  A    Yes.

22  Q    And you're stating in here that you will not have similar

23  expensing related to utilities, correct?

24  A    Correct.

25  Q    And you have questions about items such as the

POLLAK - DIRECT - MR. KATAEV                    72

1   commissioner of labor expense and lawyer expense, correct?

2   A    Yes.

3   Q    And you've analyzed that and used that information to

4   determine whether you wanted to open a competing business,

5   correct?

6   A    No.

7   Q    Let's go to Plaintiff's 38.

8           THE COURT:  So can I ask you, what was the purpose

9   of your email back to her with these responses?

10          THE WITNESS:  Well, yeah, Safa asked me to analyze

11  the P&L and give her my thoughts, and these were the items

12  that stuck out to me.

13          THE COURT:  But for what purpose?  In other words,

14  what -- did she say why she wanted you to do that?

15          THE WITNESS:  Well, she was trying to -- I guess see

16  if the business was profitable.

17          THE COURT:  Okay.  But why come to you and say, can

18  you analyze this?

19          THE WITNESS:  Well, she was trying to get me to

20  present it to Greg --

21          THE COURT:  Okay.

22          THE COURT REPORTER:  Present it to who?

23          THE WITNESS:  To Greg as a business opportunity.

24          THE COURT:  Okay.  So is it accurate that you were

25  doing this analysis, in part, because you were trying to

1   decide if you should pitch it to Greg as a business he should

2   get involved in?

3           THE WITNESS:  In part.

4           THE COURT:  Okay.  All right.

5           Go ahead.

6   BY MR. KATAEV:

7   Q    Now, you knew from your discussions with Safa that she

8   had Adam on the inside of the IME Watchdog, correct?

9   A    No, not at this time.

10  Q    But in this email, you ended with -- with respect to

11  travel expenses, I, quote:  I will assume that is mostly the

12  dock or Adam.

13          Do you see that?

14          THE COURT:  Hang on.  So hang on.

15          For the court reporter, you got to go slower.

16          MR. KATAEV:  All right.

17          THE COURT:  It says, I assume that is mostly the

18  dock, slash, Adam.  None of that capitalized.

19          Okay.  Go ahead.

20          THE WITNESS:  Correct.  Can you repeat that?

21  Q    You stated in this email, with respect to travel

22  expenses, that you assume that is mostly the dock or Adam,

23  correct?

24  A    Yes.

25  Q    And when you refer to "Adam," you're referring to Adam

POLLAK - DIRECT - MR. KATAEV                    74

1    Rosenblatt, correct?

2    A    I don't recall.

3    Q    And you know about Adam Rosenblatt because Safa told you

4    about him, correct?

5    A    Yes.  I do now.

6              THE COURT REPORTER:  Wait.  Wait.

7              THE COURT:  He says, I do now.

8              I'm sorry, can we go back.  What did you mean when

9    you wrote, I assumed that is mostly the dock, slash, Adam and

10   prefaced by and travel expenses?

11             THE WITNESS:  I honestly don't recall.

12             THE COURT:  Is there another Adam you would have

13   been referring to at that time, other than Adam Rosenblatt?

14             And this is back in October 2017.

15             THE WITNESS:  No, not likely.

16             THE COURT:  Okay.  So it's likely that you were

17   referring to Adam Rosenblatt?

18             THE WITNESS:  Yeah.  Yes.

19             THE COURT:  And at that time, what did you

20   understand his role to be at any company, or what role he

21   might play in this business venture that was being discussed?

22             THE WITNESS:  I don't recall.  I mean, I know now

23   he -- he's the president.

24             THE COURT:  Of?

25             THE WITNESS:  Of IME Watchdog.

POLLAK - DIRECT - MR. KATAEV                    75

1         THE COURT:  But then you don't recall what you knew

2   about Adam back in October 2017?

3         THE WITNESS:  No.  I remember just hearing his name.

4   But I didn't know specifically.

5         THE COURT:  Okay.  And did you know if Adam

6   Rosenblatt was involved with Ms. Gelardi at that time?

7         THE WITNESS:  No.

8         THE COURT:  You didn't know, you mean?

9         THE WITNESS:  No, I don't.

10         THE COURT:  Okay.

11   BY MR. KATAEV:

12   Q    In your due diligence, you also reviewed IME Watchdog's

13   website, correct?

14   A    Yes.

15   Q    And on the website, Adam Rosenblatt is listed as a

16   employee of the company, correct?

17   A    I don't remember.

18   Q    Let's go to 38.

19         THE COURT:  Sorry, can we go back for one second to

20   that last exhibit?

21         MR. KATAEV:  Sure.

22         THE COURT:  So in your email back to Ms. Gelardi,

23   you say:  And travel expenses.  And this is where that

24   reference to Adam comes in.

25         Do you recall which travel expenses you were

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

POLLAK - DIRECT - MR. KATAEV                              76

1    referring to?

2              Because now I'm looking back at Exhibit 35, which is

3    the P&L statement that appears to be the topic of discussion,

4    and there are various travel expenses listed in each of those

5    years.

6              Do you recall what travel expenses you were

7    referring to in this email to Ms. Gelardi?

8              THE WITNESS:  No, I do not.

9              THE COURT:  Okay.  All right.

10             Go ahead, Mr. Kataev.

11   BY MR. KATAEV:

12   Q    And when you looked at the website for IME Watchdog, you

13   also learned that it was a company owned by Daniella Levi,

14   correct?

15   A    I don't recall what the website said at that time.

16   Q    Going to Exhibit 38.

17             This is another email from you to Luminus support,

18   Safa Gelardi, Jessica Chang, and the Yaniv Liron, Y-A-N-I-V,

19   L-I-R-O-N, dated October 5th of '17.

20             Did you send this email?

21   A    Yes.

22   Q    And you state in this email:  Please see responses below

23   in red, correct?

24   A    Yes.

25   Q    And so everything that's written in red is a response

1    that you drafted to questions, correct?

2    A    Yes.

3    Q    And if you go to the top of the second page.

4              Next to company information, you wrote:  As

5    explained in previous email from Safa, parentheses, and our

6    meeting, close parentheses, 90 percent of the content will

7    come from the IME Watchdog site and the brochure provided by

8    Safa, correct?

9    A    Yes.

10   Q    And the "brochure" that you're referring to is brochure

11   from IME Watchdog, correct?

12   A    I don't remember.

13   Q    And on paragraph 7, next to photos and videos, you

14   reference an animation video depicting the IME benefits and

15   process that's similar to that of IME Watchdogs, open parens,

16   but better, close parens, correct?

17   A    Yes.

18   Q    And you asked the website company to use IME Watchdog's

19   information in order to start this business, correct?

20             MR. WARNER:  Objection.

21             THE COURT:  Overruled.

22             Did you ask the website company to do that?

23             THE WITNESS:  Yes, we asked the website company to

24   mimic the Watchdog site.

25   Q    And you were to serve as the CFO of IME Companions,

1   correct?

2   A    Yes.

3   Q    Let's go to the last exhibit.  That's not marked.  I'll

4   represent to you that it's a June 10th, 2018 email that Safa

5   sent to Greg.

6         Do you recall seeing this email at any point in

7   time?

8   A    Recently, yes.

9   Q    Okay.  I've highlighted two portions of it that I'd like

10  to focus on.  I've read them into the record before.

11        So with respect to the first portion, there's a

12  reference to a list of attorneys who currently use the

13  service.

14        Do you see that?

15  A    I do.

16  Q    And that list of attorneys who currently use the service

17  refers to the IME Watchdog 2016 sales by customer summary,

18  correct?

19        MR. GENOVESI:  Objection.

20        This appears to be an email --

21        THE COURTROOM DEPUTY:  I'm sorry, you need to use

22  the microphone.

23        THE COURT:  Yes, have a seat and use the microphone.

24        Mr. Kataev, you're really just going too fast for me

25  to even keep up with you.  So if you want me to pay attention,

POLLAK - DIRECT - MR. KATAEV                    79

1   you've got to go a little slower.

2          MR. KATAEV:  Sorry, I'll slow down.

3          THE COURT:  So what exhibit are we on now?

4          MR. KATAEV:  We're on the last exhibit.  It's marked

5   June 10th, 2018.

6          THE COURT:  What is the exhibit number?

7          MR. KATAEV:  There's none.

8          THE COURT:  Okay.  All right.  I see it now.

9          And the question you asked was, the highlighted

10  portions -- there's a list, okay.

11         We came to you with a partnership -- or for a

12  partnership with a list.

13         That's what you're asking about?

14         MR. KATAEV:  Who's on that list is the IME Watchdog

15  2016 sales by customer summary list.

16         THE COURT:  But this email isn't addressed to him.

17         MR. KATAEV:  That's correct.  But he just said that

18  he recently reviewed it and he's aware of it.

19         THE COURT:  Okay.  But you're asking him to opine

20  about what Ms. Gelardi meant.

21         MR. KATAEV:  Correct.

22         THE COURT:  Well, how would he know?

23         MR. KATAEV:  Because he was in this business as the

24  CFO, Your Honor.

25         THE COURT:  Okay.  So I guess --

POLLAK - DIRECT - MR. KATAEV                    80

1           And your objection is -- yes, okay.

2           Looking at the highlighted portion, do you know what

3    Ms. Gelardi's referring to or do you --

4           THE WITNESS:  I don't recall.

5           THE COURT:  I was going to say, based on any

6    conversations you had with Mr. Elefterakis or Ms. Gelardi?

7           THE WITNESS:  No.

8    BY MR. KATAEV:

9    Q    Going further down to the second highlighted portion,

10   which I'll reread into the record, it says, from Safa to Greg:

11   You requested me, when I showed Roman the invoice and the

12   list, that we had on a well-thought out complete business.

13          Do you see that?

14   A    Yes.

15   Q    The list that she's refer -- that Safa's referring to

16   showing you is the 2016 sales by customer summary list,

17   correct?

18          MR. GENOVESI:  Objection.

19          THE COURT:  If you know.  Do you know what she's

20   referring to?

21          THE WITNESS:  I do not.

22   Q    And the invoice that she's referring to, that's not the

23   invoice from IME Watchdog to Elefterakis, Elefterakis & Panek?

24          MR. GENOVESI:  Objection.

25          THE COURT:  Overruled.

POLLAK - DIRECT - MR. KATAEV                    81

1        THE WITNESS:  I do not know of any invoice.

2   Q    Do you know one way or another or are you guessing?

3   A    I do not know.

4        MR. KATAEV:  I just have a few move questions, Your

5   Honor.

6   Q    Prior to Safa showing you any of this information, you

7   had no knowledge about how to run or operate an IME Observer

8   business, correct?

9   A    Correct.

10  Q    And you did not, in fact, run or operate this particular

11  business, correct?  You dealt about with financials, correct?

12  A    Yes.

13       THE COURT:  Mr. Kataev, really, you've got to slow

14  down.

15       MR. KATAEV:  Sorry.

16  Q    And you're not an attorney or paralegal with any

17  experience concerning independent medical examinations,

18  correct?

19  A    Correct.

20  Q    And Safa represented to you that she would be able to run

21  this business, correct?

22  A    Correct.

23  Q    And she told you that she will be able to run this

24  business based on her relationship with Adam, correct?

25  A    I do not recall that.

POLLAK - DIRECT - MR. KATAEV                      82

1    Q     And Safa, in fact, came to you with this list of

2    customers from IME Watchdog, correct?

3    A     Yes.

4    Q     And you reviewed this list of customers and the revenue

5    that they generated, correct?

6    A     I recall the revenue.

7    Q     And there were other documents that Safa provided to you

8    from IME Watchdog, correct?

9    A     I don't recall.

10   Q     She showed you training materials, correct?

11   A     I don't recall.

12   Q     At some point you were involved in a business called IME

13   Companions, LLC, correct?

14   A     Yes.

15   Q     And you were involved in a marketing campaign for the

16   business, correct?

17   A     Marketing, no.

18   Q     You never sent any emails with --

19   A     No.

20   Q     -- sample reports or anything of the sort?

21   A     I don't recall.

22   Q     And with all the information that you received and you

23   reviewed, you discussed and reviewed that with Gregory

24   Elefterakis, correct?

25   A     I don't recall whether I reviewed it with him.  I did

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1    present to him the opportunity to speak with Safa.

2    Q    And were you present at that meeting with Safa and Greg?

3    A    I don't recall.

4    Q    And you similarly showed or discussed this information

5    with Anthony Bridda, correct?

6    A    I don't recall to what extent.

7    Q    But to some extent you did, correct?

8    A    Yes.

9    Q    You knew, when you looked at this information, that it

10   was confidential and proprietary, correct?

11   A    No.

12   Q    You knew when you looked at this information that Safa

13   was not supposed to have it, correct?

14   A    No.

15   Q    You went into business with Safa because you viewed this

16   as a profitable business based on what you've seen on P&L

17   reports from IME Watchdog, correct?

18   A    I did not make that decision.

19   Q    To your knowledge, did Greg make that decision based on

20   that information?

21   A    I don't know.

22   Q    But you presented Greg with that information, correct?

23   A    I presented him with the opportunity to speak with Safa.

24   Q    And you're denying that you informed Greg about the

25   profitability of IME Watchdog, correct?

POLLAK - DIRECT - MR. KATAEV                    84

1    A     I don't recall doing that.

2    Q     And you recommended to Greg to get involved in this

3    business, correct?

4    A     Yes.

5    Q     Based on the profitability of IME Watchdog, correct?

6    A     No, based on all the attorneys that we deal with and the

7    potential of the business with them.

8              THE COURT:  With who?

9              THE WITNESS:  Our attorneys.

10             THE COURT:  I'm sorry, I don't really understand.

11             You mean that you would get income from the

12   attorneys you were already working with --

13             THE WITNESS:  Correct.

14             THE COURT:  -- if you also got involved in this

15   IME --

16             THE WITNESS:  -- yes.

17             THE COURT:  -- Companion business?

18             THE WITNESS:  Yes, (indiscernible).

19   BY MR. KATAEV:

20   Q     And in the course of the time that you worked with Safa

21   at IME Companions, you received distributions, correct?

22   A     Yes.

23   Q     And you profited from the information that Safa found,

24   correct?

25             MR. GENOVESI:  Objection.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

1              THE COURT:  Overruled.

2              When you say, "you," do you mean Cash -- what's it

3    called again?

4              THE WITNESS:  Case Cash.

5              THE COURT:  Case Cash?

6              MR. KATAEV:  Him, personally.

7              THE COURT:  Oh, did you personally benefit?

8              THE WITNESS:  I received distribution.

9    Q    Because you were a 12-and-a-half percent shareholder,

10   correct?

11   A    Correct.

12   Q    And you've never once observed an IME, correct?

13   A    No.

14   Q    And throughout the time that you worked with Safa, she

15   assured you that she has everything she needs to run this

16   business, correct?

17   A    Yes.

18   Q    And that's because she had the confidential information

19   from IME Watchdog, correct?

20             MR. GENOVESI:  Objection.

21             THE COURT:  Sustained.

22   Q    At any point during your due diligence, you never

23   discussed with Safa her prior experience in such a business;

24   did you?

25   A    No.

PROCEEDINGS                                          86

1    Q    And you received a portion of $123,000 that Safa paid

2    back to you to buy out your membership interest, correct?

3    A    Correct.

4    Q    And you received 12 and a half percent of that?

5    A    Yes.

6    Q    Or was it a pro rata?

7    A    I believe it was 12 and a half percent.

8              MR. KATAEV:  I have nothing further, Your Honor.

9              THE COURT:  All right.  Let me just ask a couple

10   follow-up questions here.

11             You said that you were, essentially, the go-between

12   from Ms. Gelardi to Mr. Elefterakis about whether Cash --

13             THE WITNESS:  Case Cash.

14             THE COURT:  -- Case Cash should get involved in this

15   business, right?

16             THE WITNESS:  Yes.

17             THE COURT:  Okay.  What exactly was the proposal

18   that you told Mr. Elefterakis was being offered?  What exactly

19   was going to be the arrangement that you told him about?

20             THE WITNESS:  I believe it was 50-50 where Safa

21   would run the day-to-day, and Greg would reach out to his

22   attorneys and to see who would use the business.

23             THE COURT:  Now, referring to Plaintiff's

24   Exhibit 18, you said you recognize roughly half of those law

25   firms on the list as clients of Mr. Elefterakis, right?

PROCEEDINGS                                              87

1              THE WITNESS:  Yes.

2              THE COURT:  All right.  Do you know whether -- well,

3    let me ask this.

4              Had you heard of IME Watchdog before you received

5    the July 18, 2017 email from Ms. Gelardi?

6              THE WITNESS:  I had not heard of the Watchdogs, but

7    I knew of the IME industry.

8              THE COURT:  Okay.  But you hadn't specifically heard

9    of Watchdog?

10             THE WITNESS:  No.

11             THE COURT:  Okay.  Then, I assume the answer to this

12   is going to be no, but do you -- did you know at the time you

13   received this list of law firms from Ms. Gelardi whether any

14   of them worked with IME Watchdog?

15             THE WITNESS:  No.

16             THE COURT:  And when you say "have," I mean how

17   certain are you of that number?  Is it really half?  And why

18   don't you go through and count them.

19             THE WITNESS:  There's -- I count thirteen, and I'll

20   put the total --

21             THE COURT:  Okay.  All right.  So you say 13 were

22   clients of Mr. Elefterakis?

23             THE WITNESS:  Yes.

24             MR. KATAEV:  Your Honor, there would 20 --

25             THE COURTROOM DEPUTY:  You need to use the

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                    88

1    microphone.

2                THE COURT:  I understand.

3                At any point in time, were you asked by

4    Mr. Elefterakis to the pass on names of your clients to

5    Ms. Gelardi?

6                THE WITNESS:  You mean the attorneys?

7                THE COURT:  Yes.

8                THE WITNESS:  Yes.

9                THE COURT:  When did that happen?

10               THE WITNESS:  Weekly.  I don't --

11               THE COURT:  But how about in relation to this email,

12   8/8/2017, so August 8, 2017, had you yet given any names of

13   Case Cash's customer?

14               THE WITNESS:  I don't recall.

15               THE COURT:  Would you have done that at that stage,

16   do you believe, before the deal was made to actually join up

17   with them?

18               THE WITNESS:  Not likely.

19               THE COURT:  So even though there might be some

20   people on this list who were clients of Mr. Elefterakis', as

21   far as you know, that information didn't come from

22   Mr. Elefterakis; is that right?

23               Do you understand what I'm saying?

24               THE WITNESS:  No.

25               THE COURT:  In other words, you said to me you

POLLAK - CROSS - MR. WARNER                     89

1    recognize half of the people on this list in Plaintiff's 18 as

2    clients of Mr. Elefterakis and yours.  But as far as you know,

3    Mr. Elefterakis did not provide these names that were on the

4    list at that point in time, which is back in August 2017,

5    correct?

6              THE WITNESS:  Correct, as far as I know.

7              THE COURT:  And if there was going to be a

8    communication of clients, would that have gone through you to

9    Mr. Gelardi?

10             THE WITNESS:  Most likely, yes.

11             THE COURT:  Okay.  Were you the main conduit of

12   information between Mr. Elefterakis and Ms. Gelardi?

13             THE WITNESS:  Yes.  Yes.

14             THE COURT:  Okay.  All right.  I think I just

15   have -- yes, I think that's all the questions I have.

16             So, Mr. Warner, did you want to ask anything?

17             MR. WARNER:  I did, Your Honor.

18             THE COURT:  Okay.

19   CROSS-EXAMINATION

20   BY MR. WARNER:

21   Q    Good afternoon, Mr. Pollak.

22   A    Good afternoon.

23   Q    Mr. Pollak, I'd like you to take a look at the P&L

24   statements that have been marked as Exhibit 35.

25             We've been talking about profitability.

1   A    Okay.

2   Q    What were the gross profits over three years for the

3   Watchdogs?

4            MR. KATAEV:  Objection, Your Honor, relevance.

5            THE COURT:  Well, I can look at the document.  You

6   don't need to have him answer that question, unless it leads

7   to another question --

8            MR. WARNER:  It does.

9            THE COURT:  Okay.  Of this witness?

10            MR. WARNER:  Yes.

11            THE COURT:  Okay.  Go ahead.

12            So looking at that exhibit.

13   Q    2014, they lost $42,000, correct?  Is that correct?

14   A    It's a $42,000 loss in 2014.

15   Q    And 2015, how did they do?

16   A    Almost 70,000 of net income.

17   Q    And in 2016?

18   A    Almost 75,000 of income.

19   Q    So what would be the approximate average income that they

20   made annually?

21   A    With the loss?

22   Q    Yes.

23   A    Maybe 30,000.

24   Q    Were you interested in this business because it made

25   about $30,000 a year, or for some other reason?

POLLAK - CROSS - MR. WARNER                    91

1              MR. KATAEV:  Objection.  Argumentative.

2              THE COURT:  Overruled.

3              THE WITNESS:  Can I answer?

4              THE COURT:  Yes, go ahead.

5              THE WITNESS:  No, no.

6    Q    Why were you interested in the business?

7    A    Just a potential that Greg saw in the amount of IMEs that

8    occurred, and the amount of attorneys that we deal with that

9    they used that type of service.

10   Q    And did ultimately you and Greg supply various names to

11   Ms. Gelardi to try and prospect, as that term was used?

12   A    Yes.

13   Q    And as far as you're aware, did she prospect them

14   successfully?

15   A    Yes.

16   Q    And the document that Your Honor had you look at,

17   Exhibit 18, where you said you recognized 13 out of the 20

18   names on that list.

19              Were these some of the major advertising firms --

20   excuse me, I'll rephrase that.

21              Were these personal injury firms that had

22   substantial advertising in the community during that period of

23   time?

24              MR. KATAEV:  Objection.

25              THE COURT:  Overruled.

PROCEEDINGS                                          92

1              THE WITNESS:  I don't recall the advertising.

2    Q    Were these some of the most successful personal injury

3    firms in the city of New York?

4              MR. KATAEV:  Objection.

5              THE COURT:  Sustained.  Sustained.  He just said he

6    doesn't know.

7              MR. WARNER:  I asked about advertisement, Judge.  I

8    didn't ask him about success.

9    Q    Would these be some of the high reputation personal

10   injury firms in the city?

11             MR. KATAEV:  Same objection.

12             THE COURT:  Overruled.

13             Did you know of these firms?

14             THE WITNESS:  I know that at least two of these

15   firms are very large, as far as the amount of funding that

16   Case Cash does with them.

17             MR. WARNER:  I have no further questions, Judge.

18             THE COURT:  I have one follow up.

19             You said that at some point Mr. Elefterakis or you,

20   or through you, provided names of the attorneys you work with;

21   is that right?

22             THE WITNESS:  Yes.

23             THE COURT:  When?  In relation to when you got

24   involved with the business or a date, if you remember one?

25             THE WITNESS:  I would say it was late summer of

POLLAK - REDIRECT - MR. KATAEV                    93

1    2017.  I couldn't give you an exact date.

2               THE COURT:  But after you received this July email

3    that we're talking about, which is Exhibit Number 35?

4               THE WITNESS:  Yeah.  Yeah.

5               THE COURT:  And did you provide names that went

6    beyond the names that are on this list, if you recall?

7               THE WITNESS:  I believe so.

8               THE COURT:  Did you send that via email, or how did

9    you do that?

10              THE WITNESS:  I don't recall.  Email.  Probably

11   text.  Phone call.

12              THE COURT:  All right.

13              MR. KATAEV:  I just have one question on redirect.

14              THE COURT:  Go ahead.

15   REDIRECT EXAMINATION

16   BY MR. KATAEV:

17   Q    You testified that Safa would call you with names that

18   you would then call Greg with, correct?

19   A    No.

20   Q    Earlier today Greg Elefterakis testified that he would

21   get phone calls from you asking whether Greg is familiar with

22   those firms, correct?

23   A    Yes.

24   Q    And you did that because Safa provided you those names,

25   correct?

PROCEEDINGS                                              94

1   A    No.  I did that upon learning of this possible business,

2   as I would come across names during, you know, Case Cash

3   operating hours, I would ask him about those attorneys.

4   Q    And that's something you remembered today, correct?

5   A    Yes.

6              MR. KATAEV:  Okay.  No further questions.

7              THE COURT:  Okay.  All right.

8              Thank you very much.  You may step down.

9              (The witness steps down.)

10             THE COURT:  All right.  So let's go back -- I think,

11  Mr. Warner, you wanted to address a couple of points.

12             MR. WARNER:  I did, Your Honor.  Thank you.

13             THE COURTROOM DEPUTY:  Mr. Warner, would you please

14  use the microphone.

15             MR. WARNER:  I'm sorry.

16             THE COURT:  And let me just say this for

17  Mr. Beibin's sake.

18             I do actually want to hear from you at some point.

19  So, you know, maybe in fairness to the witnesses here, we

20  should maybe hear from them first, and then I can hear

21  argument.

22             So, Mr. Beibin -- is it Beibin?  Yeah, Mr. Beibin,

23  if you'll come up and take the stand, I'd appreciate that.

24             MR. GENOVESI:  Judge, is it going to --

25             THE COURT:  You folks can sit down.  He's your

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    95

1    client, Mr. Elefterakis.  Anybody else?

2              MR. GENOVESI:  Mr. Bridda is in the back.

3              THE COURT:  B-R-I-T-T-A?

4              THE COURTROOM DEPUTY:  D-D-A.

5              THE COURT:  Oh, D-D.

6              Are you planning to call him as a witness?

7              MR. KATAEV:  Not at this time, Your Honor.

8              THE COURT:  Okay, well, when you say, "not at this

9    time," I want to let them go if they're not needed.

10             MR. KATAEV:  I'll ask them to stay until the end of

11   the hearing for rebuttal purposes, Your Honor.

12             THE COURT:  Okay.  So he's a defendant as well.

13             Do you want him to come and sit up here?  It's not

14   necessary.  I know it's not the most --

15             Okay, so you folks are free to sit back there, if

16   you like, or whatever -- wherever you're most comfortable.

17   But, unfortunately, just stick around for a little while.

18   Thank you.

19             All right.  Let's have you sworn in.

20             (Continued on next page.)

21

22

23

24

25

BEIBIN - DIRECT - THE COURT                96

1          (Witness takes the witness stand.)

2     **JEFF BEIBIN**, called as a witness, having been first duly

3     sworn/affirmed, was examined and testified as follows:

4               THE WITNESS:  Yes.

5               THE COURTROOM DEPUTY:  Have a seat.

6               State and spell your name for the record.

7               THE WITNESS:  Jeff Beibin.  J-E-F-F, B-E-I-B-I-N.

8               THE COURT:  Okay.  You may inquire, Mr. Kataev.

9               MR. KATAEV:  Your Honor, we were not expecting these

10    witnesses to be called in this turn.  We just need two minutes

11    to get the exhibits.

12              THE COURT:  Okay.

13              (Pause in the proceedings.)

14              THE COURT:  Maybe I can start off, while you folks

15    assemble your exhibits.

16              MR. KATAEV:  Sure.

17    EXAMINATION

18    BY THE COURT:

19    Q    So, Mr. Beibin, what kind of work do you do?

20    A    I go to IMEs, and I was the editor.

21    Q    What's an "editor"?

22    A    I would get the reports sent to me.  I would read through

23    them, and I would put them into a drive and then I would put

24    the hours into a tracking sheet.

25    Q    So were you employed by IME Companions?

BEIBIN - DIRECT - THE COURT                    97

1    A    Yes.

2    Q    For what period of time?  Since when?

3    A    Since 2019, probably January 2019 until the 10th.

4    Q    Of March?

5    A    Of March.

6    Q    Okay.  And then what happened?

7    A    I spoke to Safa Gelardi Saturday, the 11th, and she told

8    me that they were shutting down until further notice.  And she

9    told me that Fari had started a company and that somebody may

10   be reaching out to me.

11          Sunday I got a call from somebody named Sammy

12   explaining that the company that I would be working for is

13   Client Exam Services, and that everything would pretty much be

14   operating the same way as they did.

15   Q    Now, you've been working in the IME industry since 2019;

16   is that right?  Or before then?

17   A    2019.

18   Q    Okay.  And do you know most of the companies that provide

19   IME services?

20   A    Yes.

21   Q    Had you ever heard of Client Services -- or Client Exam

22   Services before?

23   A    No.

24   Q    And do you know how or when it got created?

25   A    I didn't know when.  I just was told on Saturday that

BEIBIN - DIRECT - THE COURT                    98

1    Fari was starting a company and asked if I would want to join.

2    Q    Are you were you told that by Ms. Gelardi, right?

3    A    Correct.

4    Q    And do you know -- did you know Fari before?

5    A    I had met Fari before, yes.

6    Q    And how do you know her?

7    A    Fari is a man.

8    Q    Oh, sorry.  Him.  Sorry.

9         How do you know Fari?

10   A    Fari was a friend of the family.

11   Q    Who's family?

12   A    Of the Gelardi's.

13   Q    And how do you know that?

14   A    Because I'm brother in-law of his brother in-law.

15        Well, my girlfriend is Vito's sister.

16   Q    Okay.  So you are somewhat related to the Gelardi's by --

17   via your girlfriend, who is Vito Gelardi's sister?

18   A    Correct.

19   Q    Okay.  And what is Fari's relationship to the family,

20   then?

21   A    Just a friend.

22   Q    Oh, just a friend.  Okay.

23        And how long have you known Fari?

24   A    I don't know him too well.  I met him a few times.

25   Q    And did you know him to ever be involved in the IME

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

BEIBIN - DIRECT - THE COURT                    99

1    business before this March?

2    A     No.

3    Q     Do you know what, if any, kind of work he did?

4    A     No.

5    Q     Do you know if he worked at all?

6    A     I know that he worked.  I just don't know what he does.

7    Q     How old is he?

8    A     I'm not sure.

9    Q     Well, an age range.  I know you may not know exactly.

10         But 50?  Older or younger?

11   A     Probably 40-ish.

12   Q     And what happened after you were told that Fari might be

13   starting a company or -- actually, tell me what exactly you

14   were told by Ms. Gelardi?

15   A     Just that they had shut the business until further

16   notice, and that was the gist of the conversation.

17   Q     But what about Fari?

18   A     Just that Fari is starting the company.

19   Q     And can I ask you, did that seem odd to you?

20   A     No.  I just wanted to keep working.

21   Q     Uh-huh.

22         In all the time you worked for the Gelardis, had you

23   ever heard that Fari might be someone involved in the IME

24   business?

25   A     No.

BEIBIN - DIRECT - THE COURT                    100

1   Q     How many times had you met Fari before you worked for

2   that company?

3   A     Three or four times.

4   Q     Okay.  And what were the occasions you met him under?

5   A     I don't recall exactly.

6   Q     Social?  Professional?

7   A     Social.

8   Q     Family related?

9   A     Yes.

10  Q     Okay.  So then what happened after you were you told this

11  about Fari?  Did you reach out to him or did he reach out to

12  you?

13  A     Somebody named Sammy reached out to me the following day.

14  He called me.

15  Q     And had you met Sammy before?

16  A     No.

17  Q     And do you know what relationship Sammy has to Fari or to

18  the defendants, the Gelardis?

19  A     No.

20  Q     Okay.  And what happened then?

21  A     He explained to me that he's with Client Exam Services,

22  and said that this company is similar to IMEs.  We would go

23  about business the same way.  And he sent me on an assignment

24  later on.

25  Q     And the assignment that you went on thereafter, were they

BEIBIN - CROSS - MR. KATAEV                101

1   the same clients as you had worked with for IME Companions?

2   A    Yes.

3           THE COURT:  All right.

4           Go ahead, Mr. Kataev.

5   CROSS-EXAMINATION

6   BY MR. KATAEV:

7   Q    You stated that your title at IME Companions was editor,

8   but you really serve any and all functions necessary at

9   Companions, correct?

10  A    No.

11          MR. KATAEV:  I'm just going to quickly pause to give

12  the exhibits --

13          THE COURT:  Yes, go right ahead.

14          (Pause in the proceedings.)

15  Q    And you were an individual who had your phone and

16  computer imaged by the --

17          THE COURT REPORTER:  You were an individual what?

18          MR. KATAEV:  I'll slow down.  I'll repeat.

19  Q    And you were an individual who had your phone and

20  computer imaged by the forensic examiner pursuant to this

21  Court's order because of your role at Companions, correct?

22  A    Yes.

23  Q    And you are aware that you were observed by agents of the

24  plaintiff performing services at an IME doctor's office on

25  March 16, 2023 in Commack, New York, correct?

BEIBIN - CROSS - MR. KATAEV                    102

1    A    My client didn't show up, but I was at that office on

2    March 16th.

3    Q    And when your client failed to show up, you called Safa

4    about that, correct?

5    A    No.

6    Q    And when your client failed to show up, you texted Safa

7    about that, correct?

8    A    No.

9    Q    And the reason why you did not text or call Safa is

10   because this Court issued an order for Companions to cease

11   operating, correct?

12             MR. GENOVESI:  Objection.

13             THE COURT:  Sustained.

14             Why don't we just ask a direct question.

15             What did you do then when the client didn't show up?

16             THE WITNESS:  I contacted Sammy from Client Exam

17   Services, and I reached out to the contact from the law firm.

18             THE COURT:  Okay.  And then what happened?

19             THE WITNESS:  The client didn't show up.

20             THE COURT:  And you didn't get any business that

21   day; is that right?

22             THE WITNESS:  No.  After -- after that exam was

23   completed, then I got a call from that particular plaintiff

24   and he told me that he got to the office and that he had been

25   in court, and that's what's within the report.

BEIBIN - CROSS - MR. KATAEV                          103

 1              THE COURT:  Okay.  Go ahead.

 2     BY MR. KATAEV:

 3     Q     And which law firm were you serving on that day?

 4     A     Subin Associates.

 5     Q     And when you worked at IME Companions, Subin Associates

 6     was a very large account, correct?

 7     A     Yes.

 8     Q     And IME Companions receives booking appointments on its

 9     website, correct?

10     A     I'm not sure, but I'm not privy to that.

11     Q     And your testimony today is you're not aware that those

12     bookings were forwarded to Client Exam Services?

13     A     I don't know how they're getting their business.

14     Q     And how many IMEs have you observed since March 10th,

15     2023?

16     A     Approximately 12.

17     Q     And you're still being paid by Safa at IME Companions,

18     correct?

19     A     No.

20     Q     And you've been paid by Client Exam Services for the

21     services that you performed?

22     A     Not as yet.

23              THE COURT:  Can I ask a question?

24              Did you give any tax information or anything like

25     that to someone at Client Exam Services?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

BEIBIN - CROSS - MR. KATAEV                    104

1          THE WITNESS:  I sent a signed W-9.

2          THE COURT:  Because you're an independent

3   contractor?

4          THE WITNESS:  I'm an independent contractor.

5          THE COURT:  Were you told when you would be paid in

6   relation to performing the work?

7          THE WITNESS:  Once a month.

8   BY MR. KATAEV:

9   Q    And who did you provide that W-9 to?

10  A    Sammy.

11         THE COURT:  Did you ever go to an office for Client

12  Exam Services?

13         THE WITNESS:  No.

14         THE COURT:  Do you know if they have one?

15         THE WITNESS:  No.

16         THE COURT:  So did they indicate to you your

17  communications would just be via --

18         THE WITNESS:  Through Sammy.

19         THE COURT:  And through phone or text or email?

20         THE WITNESS:  Through phone or text and email.

21  BY MR. KATAEV:

22  Q    To your knowledge, was Client Exam Services formed in

23  order to circumvent this Court's order?

24         MR. WARNER:  Objection.

25         THE COURT:  Sustained.  Sustained.  Sustained.

BEIBIN - CROSS - MR. KATAEV                    105

BY MR. KATAEV

1

2   Q    I'm going to show you the first exhibit in front of you,

3   and I'm going to represent to you that this is a

4   publicly-available document certified by the New York State

5   Department of State concerning the organization of Client Exam

6   Services, LLC.

7          Do you see that?

8   A    I'm sorry, the first?

9   Q    The one that says, State of New York, Department of

10  State.

11  A    Okay, yes.

12  Q    If you go to the second page, please.

13         Do you see on the bottom where it says, "Legal Zoom,

14  dot, com, Inc. organizer"?

15  A    Yes.

16  Q    Were you involved with the creation of Client Exam

17  Services, LLC?

18  A    No.

19  Q    And you were informed that Fari Gutierrez is the member

20  of Client Exam Services, LLC, correct?

21  A    Yes.

22  Q    I'm going to this next exhibit.  It's a single-page

23  document, with the title "IME Companions" on top.

24         Do you see that Fari Gutierrez is listed as a

25  part-time IME Observer for IME Companions in this document?

BEIBIN - CROSS - MR. KATAEV                    106

1    A    I see that.

2    Q    And have you ever heard of the name Hesham Salameh?

3    H-E-S-H-A-M is the first name.  Last name is S-A-L-A-M-E-H.

4    A    I see the name.

5    Q    And that individual is a relative of the Gelardis,

6    correct?

7    A    I don't know.

8    Q    And Sammy is the nickname for Hesham, correct?

9    A    I don't know.

10            THE COURT:  I'm sorry, what document are you

11   referring to now?

12            MR. KATAEV:  I'm not referring to any document just

13   yet.

14            THE COURT:  Oh, okay.  Well, he's look at a

15   document.  What is he looking at?

16            MR. KATAEV:  He was looking at a document that says

17   "IME Companions" that lists Fari Gutierrez as an IME Observer.

18            THE COURT:  Why don't I have a copy?  That's what

19   I'm wondering.

20            MR. KATAEV:  Oh, it's the second document after the

21   Department of State document, Your Honor.

22            THE COURT:  I only got one document, I think.

23            MR. KATAEV:  I apologize.

24            THE COURT:  Sorry, I got it.  Okay.  None of these

25   are marked, but okay.

1    BY MR. KATAEV:

2    Q     To your knowledge, is Sammy Safa's nephew?

3    A     No, I don't know.

4    Q     You don't know?

5    A     No.

6    Q     One way or the other, correct?

7    A     Correct.

8    Q     Let's go to the third exhibit.  It's your declaration.

9          In this declaration, on the fourth page, you

10   provided a -- the first two pages of the five-page report,

11   correct?

12   A     Correct.

13   Q     And on the bottom of that report is a phone number,

14   correct?

15   A     Correct.

16   Q     And is that Sammy's phone number?

17   A     I'm not sure.

18   Q     Have you ever called that number?

19   A     No.

20         THE COURT:  Well, hang on a second.

21         That's not the number from which you got a call for

22   this --

23         THE WITNESS:  It could be.  I have the phone number

24   in my phone.

25         THE COURT:  And you had to forfeit that?

BEIBIN - CROSS - MR. KATAEV                    108

1          THE WITNESS:  Yes.

2          THE COURT:  Oh, darn.  Okay.

3    Q    Going back to the first exhibit, the date this

4    document -- sorry, withdrawn.

5          The date that Client Exam Services, LLC, was formed

6    was the same day that you observed an IME for Subin, correct?

7    A    According to the document.  That's on the first page.  I

8    did an IME for Client Exam Services.

9    Q    And it's your testimony today that Fari somehow suddenly

10   obtained an order for an IME to be observed by Subin, correct?

11         MR. WARNER:  Objection, Your Honor.

12         THE COURT:  Overruled.

13         What's your understanding of how Sammy --

14         THE WITNESS:  I don't -- I don't have an

15   understanding of how.  I just get the job.  I get the text

16   with whatever assignment is forwarded the next day.

17         THE COURT:  I'm sorry, can we go back to this IME

18   Companions document?

19         You had seen it before or you had not?  The one that

20   says, "dear future client"?

21         THE WITNESS:  That I had never seen.

22         THE COURT:  Okay.  But you do see Fari Gutierrez's

23   name on it, correct?

24         THE WITNESS:  Yes.

25         THE COURT:  All right.

1           Had you shown him this one yet, Mr. Kataev?

2           MR. KATAEV:  The IME was the second exhibit that I

3    showed him, yes.

4           I have no further questions.

5           THE COURT:  All right.

6           Mr. Warner?

7           MR. KATAEV:  I have --

8           THE COURT:  Oh, you have more.  Go ahead.

9           MR. KATAEV:  I have no further questions for that

10   exhibit.

11          THE COURT:  All right.

12   BY MR. KATAEV:

13   Q    The final exhibit is a one-page document with the name

14   Hesham Salameh.

15          Do you see that?

16   A    Yes.

17   Q    I'll represent to you that this is a résumé of his.

18          I want you to tell me whether this is the same phone

19   number that's listed in the IME report?

20   A    It is.

21   Q    Is it fair to say, then, that Hesham Salameh's number is

22   listed -- it is Hesham Salameh's number that is listed on that

23   IME report?

24   A    That's the same number that's on both reports, on the

25   résumé and the report.

BEIBIN - CROSS - MR. KATAEV                    110

1          THE COURT:  I'm sorry, where is the report?  I don't

2    have a copy of that.

3          MR. KATAEV:  The report is the exhibit at the end of

4    his declaration.

5          THE COURT:  Okay.  Thank you.

6          MR. KATAEV:  It's page --

7          THE COURT:  All right.  Got it.

8          So the number on your report is the same number as

9    Mr. Salameh's, basically, now that we're comparing them,

10   correct?

11         THE WITNESS:  Correct.

12         THE COURT:  Thank you.

13         MR. KATAEV:  And I'll represent to you the Court

14   that this résumé was obtained through the firm as evidence.

15         THE COURT:  I see.  Okay, thank you.

16         Can we go back for one second, though, I have one

17   more question.

18         The document that says IME Companions at the top and

19   seems to be a client letter, or future client letter, which

20   lists Mr. Fari Gutierrez as a part-timer.

21         As far as you know, did Mr. Gutierrez ever work for

22   IME Companions?

23         THE WITNESS:  I've seen a couple reports with his

24   name.

25         THE COURT:  Okay.  All right.  Thank you.

```
 1   BY MR. KATAEV:

 2   Q     And same question for Mr. Hesham Salameh.

 3         Have you ever seen any reports with his name?

 4   A     I don't recall.

 5   Q     What about an individual named Sammy?

 6   A     No.

 7   Q     Do you have any knowledge as to the relationship between

 8   Safa and Sammy?

 9   A     No.

10   Q     Do you have any knowledge as to the relationship between

11   Hesham and Safa?

12   A     No.

13         THE COURT:  What was the last question, the

14   relationship between Hesham and who?

15         MR. KATAEV:  Safa.

16         THE COURT:  Oh, okay.

17   Q     And it's your testimony today that you no longer use the

18   reports at IME Companions dot com email address?

19   A     Correct.

20   Q     And those emails do not get forwarded to your new email

21   address?

22   A     No.

23   Q     But you're currently operating at Client Exam Services

24   using the same devices and tools that you used at IME

25   Companions, correct?
```

BEIBIN - CROSS - MR. KATAEV                    112

1          MR. WARNER:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  I use a computer, but I have a laptop

4    that I just got.

5    Q    You referenced that you observed approximately 12 IMEs

6    since March 10th, 2023, correct?

7    A    Yes.

8          THE COURT:  Wait, can we go back?  You're saying you

9    use a computer that belongs to IME Companions?

10         THE WITNESS:  It's still at my house, but I don't

11   use the reports at IME Companions email.

12         THE COURT:  Where did you get the report that you

13   filled out for Client Exam Services from?

14         THE WITNESS:  It was sent to my personal email.

15         THE COURT:  By?

16         THE WITNESS:  By a contact at Client Exam Services,

17   or something like that.  I don't remember exactly.

18         THE COURT:  Well, was it from an email address or

19   signed by someone named Sammy?

20         THE WITNESS:  Sammy, yes.

21         THE COURT:  So Sammy sent you the form?

22         THE WITNESS:  Sammy sent it.

23         THE COURT:  Okay, go ahead.

24   BY MR. KATAEV:

25   Q    As to the other 11 IMEs that you observed, which law

1    firms did those orders come from?

2    A    I don't recall.

3    Q    But you have those in your emails and text messages,

4    correct?

5    A    You mean the assignments or reports?

6    Q    Correct.

7    A    I would probably have them on my text messages.

8    Q    And to your knowledge, Fari has not observed any IMEs for

9    the last several years, correct?

10   A    I don't recall.

11   Q    To your knowledge, Hesham or Sammy have not observed any

12   IMEs in the last several years, correct?

13   A    I don't recall.

14   Q    And you expect this Court to believe that Hesham, Fari

15   and/or Sammy, who have not performed IME services in years,

16   are all of sudden united to form Client Exam Services just six

17   days after the --

18             MR. GENOVESI:  Objection.

19             THE COURT:  Sustained.  This is -- don't ask him

20   these questions.  You can make your argument, but this witness

21   won't know.  Let's not use him as a passthrough to make your

22   argument.  You can make your argument later.

23             MR. KATAEV:  Understood, Your Honor.

24   BY MR. KATAEV:

25   Q    Is there any difference in operations between Client Exam

BEIBIN - CROSS - MR. KATAEV                114

1   Services and IME Companions?

2   A     No.

3              THE COURT:  Are you paid the same?

4              THE WITNESS:  I haven't been paid yet.

5              THE COURT:  But were you promised the same pay --

6              THE WITNESS:  It would be the same, yeah.

7              THE COURT:  But did you discuss that specifically?

8              THE WITNESS:  No.

9              THE COURT:  So why do you assume that?

10             THE WITNESS:  Because I was told that everything

11  would operate the way that it had before.

12             THE COURT:  Say that again?  Who told you that?

13             THE WITNESS:  That's what Sammy told me.

14             THE COURT:  As before what?  The company didn't

15  exist.

16             THE WITNESS:  When IME Companions was closed, I was

17  made to believe that all of the business was now going to be

18  taken over by Fari Gutierrez and --

19             THE COURT:  Sammy.

20             THE WITNESS:  -- Sammy would give me my assignments.

21             THE COURT:  And everything would remain the same,

22  except for the name of the company, as far as you were told?

23             THE WITNESS:  As far as I was told, yeah.

24             THE COURT:  Okay.  All right.  Thank you.

25

PROCEEDINGS                                              115

1   BY MR. KATAEV:

2   Q    Is it fair to say that of the other 11 IMEs that you

3   observed, those law firm customers were the same as IME

4   Companions law firm customers?

5   A    Yes.

6           MR. KATAEV:  I have nothing further, Your Honor.

7           THE COURT:  Thank you.

8           Any questions, Mr. Warner?

9           MR. WARNER:  Yes, Judge.

10  CROSS-EXAMINATION

11  BY MR. WARNER:

12  Q    Mr. Beibin, you submitted a declaration in connection

13  with this case?

14  A    Yes.

15  Q    Is everything in the declaration true, and do you stand

16  by it?

17  A    Yes.

18          MR. WARNER:  I have no further questions.

19          THE COURT:  One question.

20          In your affidavit, you say Client Exam Services is

21  owned on operated by Fari Gutierrez.

22          What's your basis of knowledge for that?

23          THE WITNESS:  That's what I was told by Safa when

24  she stopped running IME Companions.

25          THE COURT:  A week ago, or two weeks ago?

PROCEEDINGS                                        116

1          THE WITNESS:  Two weeks ago.

2          THE COURT:  All right.  Okay.  Thank you.

3          Thank you very much.  You may step down.

4          (The witness steps down.)

5          THE COURT:  Mr. Kataev, are there any other

6    witnesses you want to call now before I hear additional

7    argument?

8          MR. KATAEV:  The only other witness, Your Honor,

9    will be Safa Gelardi, but my cross-examination is very

10   extensive, so I would imagine if you would like to hear

11   argument, that should go first.

12         THE COURT:  Well, I don't know about that.  I think

13   we need to hear from Ms. Gelardi on some of these points.

14         So, Ms. Gelardi, if you'll take the stand.

15         MR. GENOVESI:  Your Honor --

16         THE COURT:  Yes.

17         MR. GENOVESI:  Is Mr. Brieta --

18         THE COURT:  Let's let Mr. Brieta go, unless you

19   think there's some reason I need to hear from him now.

20         As far I know, he doesn't figure in this narrative.

21   I'm not saying the case, not the case itself, but I haven't

22   read anything that implicated him or involved him in any way.

23         So you're free to go, folks.  Thank you very much.

24         MR. WARNER:  Your Honor, before Ms. Gelardi takes

25   the stand, could we take a five-minute break?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                                    117

1              THE COURT:  Yes, absolutely.

2              (A recess was taken at 4:36 p.m.)

3              THE COURT:  Let's go back on the record, I know your

4    clients are still outside the courtroom, Mr. Warner, but I do

5    want to say this:

6              I don't feel a need to hear from Ms. Gelardi.  I

7    think I have what I need.  If you want to call her,

8    Mr. Warner, to answer to any of these accusations or issues,

9    you can do that.  But it's pretty clear to me that this latest

10   ploy is something that she orchestrated, because it cannot be

11   a coincidence that the people who started up a company a

12   week -- less than a week ago, are a friend and a nephew

13   working for them.

14             So if she wants to take the stand to explain it,

15   fine, but I don't need to hear any more, and I am prepared, as

16   I said before, to extend the preliminary injunction and

17   actually make it a little more robust, as I said.

18             So that's the only thing I'll offer up to you.  If

19   you want to have your client testify you can, but I'm not

20   going to require her to be called.

21             So do you want to take a couple minutes to talk with

22   her?  I know Mr. Kataev wants to, but I don't, again, feel any

23   need to elicit anything more from her.  I've seen and read

24   enough -- heard and seen and read enough.

25             MR. WARNER:  Yes, I'd like some time.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS

118

1          THE COURT:  Okay.  Take a couple of minutes.

2          (Pause in the proceedings.)

3          THE COURT:  So we need to get moving here.  So,

4   Mr. Warner, if it helps, what I'll do is tell you how I am, at

5   this moment, thinking of ruling on all these different issues

6   because we've obviously been here now for about three hours.

7          As I said before, I am prepared to issue a broader,

8   more restrictive preliminary injunction based both on a

9   finding of contempt with respect to the TRO I issued.

10          The testimony I just heard and the documents I've

11   seen indicate to me that this creation of a new corporation

12   via the defendant's family friend and nephew, and based on the

13   same exact clients and business model as IME Companions is an

14   effort to end run the condition of the TRO I set, and that to

15   me, is contemptuous conduct or contumacious conduct.

16          In addition, even if I didn't find that contempt, I

17   would find that there's a basis now to impose greater

18   restrictions on defendant's use of information that he took,

19   or stole, from IME Watchdog, the 90 percent of the customers

20   that they took, as well -- that generate about 98 percent of

21   their business.

22          I'm prepared to write on it in a decision in terms

23   of my fact-findings but everything I've heard today reinforces

24   that conclusion in my mind.

25          And this argument, Mr. Warner, that you're making

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1    about those customer lists being public information, that

2    could well be, but that's not how IME Companions started their

3    business or, more importantly, grew their business.

4              Because even if I were to accept some of the

5    testimony from Mr. Elefterakis and Mr. Pollak about them

6    offering up some names of attorneys, including some on this

7    list that Ms. Gelardi provided early on, there's also evidence

8    that one or two years later, Ms. Gelardi was still

9    communicating with Mr. -- conspiring, really, with

10   Mr. Rosenblatt, right, to both sabotage Watchdog's business

11   and get more information to use to grow IME Companions, which

12   apparently wasn't doing that well, since they appeared to only

13   have 12 customers early on.

14

15              (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

120

1        THE COURT:  (Cont'g.)  So, for all of those reasons

2    and based on what the forensic examination has revealed, the

3    appropriate scope of the injunction pending the resolution of

4    this case should be that the defendants do not get to use any

5    of the customers who were on watch dogs customer list as

6    reflected in the forensic examination or whose identity or

7    names or information were provided by Mr. Rosenblatt as

8    reflected in the forensic evidence to IME companions at any

9    point after the company started.  That would simply be

10   improper.

11        I have already found irreparable harm to plaintiff

12   and that was before I knew the full extent of the theft of

13   trade secrets by defendants and so that will be the amended

14   preliminary injunction based both on the forensic examination

15   that justifies a broader injunction and then the contempt I

16   find of the TRO condition of not continuing the IME companion

17   business.  It's clear to me that it was Ms. Gelardi continuing

18   it under a different name and using family members or a family

19   member and a friend to perpetrate what I consider quite

20   frankly a fraud on this court and very, very disturbing and,

21   worse yet, and Mr. Warner, you're relatively new to this

22   matter as are you, Mr. Beiben, but there's a history of

23   Ms. Gelardi I find of lying and percentage ring herself in

24   court and I think lying during depositions as far as I can

25   tell and then perpetrating conduct that is clearly in

PROCEEDINGS                                                    121

1    violation of either the letter of the order or at least the

2    spirit of it.

3         I started off this session with talking about the

4    GPS tracker that was placed on Mr. Roa's car.  There's no

5    justification for that being done in the context of this case.

6    I don't care how justified you believe it was, Ms. Gelardi.

7    It is not.  And though I don't find it violates the strict and

8    clear and unambiguous language of the preliminary injunction

9    so I don't find contempt based on that, it is conduct that is

10   intimidating to an opposing party and completely

11   inappropriate.  But I do find this effort to end run the TRO

12   restriction contempt.

13        And, so, I think it further, although I don't think

14   it's necessary supports, an expansion of the existing

15   preliminary injunction.  So I will issue a revised, a second

16   amended preliminary injunction.

17        Now, I had offered, Mr. Warner, to allow you to have

18   Ms. Gelardi testify if you want her to, but quite honestly I

19   almost warn you against it because if history is any guide, I

20   am concerned that she will say something that will prove to be

21   untrue down the road.  So perhaps you'll save her some further

22   consequence by not having her testify but you can if you want

23   to try to rebut some of the arguments or evidence that had

24   been presented.

25        Now, with respect to some of the other requests, I

PROCEEDINGS                                                    122

1    am not inclined to impose a $10,000 fine for every day that

2    the injunction was violated.  I don't think it's a good use of

3    anyone's time or resources to try to figure out when that

4    actually occurred and it would be quite difficult.  Plus, as I

5    just said a moment ago, I don't feel I can make a finding of

6    contempt as to the initial amended preliminary injunction and

7    the defendant's failure to comply with that based on the

8    incident with Mr. Roa, based on these contacts between

9    plaintiff's employees and defendant's employees and I'm not

10   saying plaintiff's employees initiated those, but there's a

11   lot of back and forth about that.  I don't think I can clearly

12   find that there's violations of the amended injunction based

13   on that.

14            And then as to these mailings which are clearly

15   defamatory and appear to be completely false, there's no

16   evidence other than a very strong odor of suspicion that the

17   defendants are behind this because unfortunately it seems to

18   be the kind of outrageous conduct that the defendants are

19   willing to engage in.  They're atrocious and obnoxious.  They

20   allege things that are just seemingly baseless and so absurd,

21   but yet harmful if they're believed, but I don't have enough

22   evidence to tie it at this point to these defendants.

23            That may perhaps support your request for more

24   forensic examination, but I would prefer that this case move

25   along towards discovery, that I freeze everything in terms of

PROCEEDINGS                                                    123

1   effectively shutting down IME Companions because 90 percent of

2   their customers, they won't be allowed to contact them because

3   those are the former customers of Watchdog.  That to me is

4   sufficient to, I think, keep the balance until we resolve this

5   case, but I don't intend to impose anymore hardship or

6   punishment, for lack of a better word, on defendants even

7   though I think there is a lot of bad conduct that has

8   followed.

9           The other issue is the sale of this property in

10  Florida.  Now, I'm prepared to write on it, but I don't think

11  the law allows me to attach that property under New York law.

12  As a fundamental principle it is rare that New York law can be

13  used to attach property outside the state.  There are

14  circumstances where that can happen, but they don't apply

15  here, at least in my assessment of the law.  There's also not

16  a clear showing that the purpose of the sale is somehow to

17  prevent plaintiff from collecting on any potential judgment

18  and I don't think that all the necessary baggage of fraud as

19  they're called have been established.

20          It appears that the defendants have multiple

21  properties, including I think two here in New York and then

22  multiple ones outside of the state.  So it's not clear to me

23  that the sale of this one property in Florida is being done to

24  prevent -- satisfaction of any judgment and there are many

25  other properties that the defendants still own so I don't

SN        RPR        OCR

PROCEEDINGS                                                          124

1    think there's any real risk of them becoming judgment proof

2    through the sale of this one property.  Now, obviously the

3    plaintiff can renew that request, but right now I don't think

4    the law supports it.  Obviously if the defendant sought to

5    sell one of their properties here in Brooklyn, perhaps the

6    case, at least legally, would be stronger.

7              I think at this point the defense has offer us some

8    explanation for the sale which is to pay for the litigation in

9    this matter and perhaps now it will be used to support them

10   given effectively I'm issuing an order that will curtail a

11   large portion of their business while this case is pending.

12             In terms of attorney's fees that's something I'm

13   actually considering, in light more so of the most recent

14   contempt with respect to the TRO.  Because I didn't find

15   contempt or I don't find contempt as to the amended

16   preliminary injunction, I wasn't inclined to award attorneys'

17   fees although they're mounting in general for the same reasons

18   that I didn't allow them for the initial obtaining of the

19   preliminary injunction.  I thought that they were premature.

20   But now it appears to me that there is some argument to be

21   made that the plaintiff should be allowed to collect

22   attorneys' fees for the interim litigation that's been spawned

23   by virtue of the defendants' conduct.  So that's something

24   that if -- I'm going to consider further and if I decide to

25   award attorney's fees, I'll explain that in the opinion and

PROCEEDINGS                                125

1   then ask for some kind of accounting by plaintiff's lawyers

2   that the defense can respond to because obviously today will

3   add to the bill to some extent.

4              And then the question of the forensic examination.

5   I'll hear from the parties on that.  I will include in the

6   revised preliminary injunction a no-contact provision that is

7   much more specific and when I say no contact this time I

8   include surveillance of any type so that it's clear that this

9   prior conduct cannot continue and then if the plaintiffs have

10  any other provisions they want to propose, they can file a

11  letter for those based on what additional evidence has been

12  elicited.

13             Mr. Warner, as I said, I wanted to give you the

14  benefit of where I am inclined to go with the ruling to ask if

15  would like to have your client testify about any factual

16  matter that has been raised and that could affect any of those

17  rulings.  And I will put you essentially in the driver's seat

18  and I'm not going to allow Mr. Kataev to call Ms. Gelardi

19  given that I have what I need.

20             MR. WARNER:  I don't see that I'm going to convince

21  you otherwise so there's no basis to put her on the stand.  I

22  don't think there's quote, unquote, evidence that's been

23  adduced today to rebut.

24             THE COURT:  Would you like to put her on the stand

25  to rebut my finding about the contempt of the TRO and the

PROCEEDINGS                                          126

1    clear footprint or fingerprint leading back to her in terms of

2    this newly created company.

3              MR. WARNER:  There's no question, Judge, of what

4    you've heard and I'm not denying it that, quote, leads back to

5    her, but I don't believe in light of what the temporary

6    restraining order stated, it's a violation.

7              THE COURT:  Let me ask you a question in terms of

8    your interpretation of it:  In my view, if she said to

9    Mr. Salmay and Mr. Gutierrez, why don't you form a company,

10   I'll give you all of our client lists and all of our format

11   and you can use all of our employees to run this, I would view

12   that as a violation because it's effectively trying to

13   continue her business through another company and I suspect

14   your view is going to be so long as she doesn't profit from

15   it, that that doesn't violating the order?

16             MR. WARNER:  If she doesn't operate it or profit

17   from it I don't believe it's a violation.  I'm shut down.  If

18   you want it, here it is.

19             THE COURT:  I will give you all of this information

20   that right now is subject to a preliminary injunction.

21             MR. WARNER:  The information wasn't subject to a

22   preliminary injunction.

23             THE COURT:  But she wasn't allowed to use it.

24             MR. WARNER:  She's not using it.

25             THE COURT:  She used it by giving it to another

*SN      RPR      OCR*

PROCEEDINGS                                                127

1    company.

2           MR. WARNER:  I don't believe that's use.  She's

3    giving it up and she's not profiting from it and she's not

4    operating it and I don't think it's a fair reading of Your

5    Honor's ruling.

6           THE COURT:  You would put her on the stand to say

7    that there's no arrangement that somehow she or her family

8    will get some of the profits from this company that is run by

9    her friend and nephew?

10          MR. WARNER:  She is not going to profit in any way

11   in any respect out of the client -- CES I call it.

12          THE COURT:  Let me say this so the record is clear

13   and I'll write on it as well, even if I did not find that

14   there was contempt as to the TRO restriction on continuing to

15   operate IME Companions by defendant, I would find there is

16   enough to expand the preliminary injunction I have ordered now

17   that I have more information based on the forensic examination

18   about the degree to which IME Companion's business was built

19   by information taken improperly from IME Watchdog over the

20   course of time starting from 2016 through 2019, I think the

21   evidence is, when Mr. Rosenblatt was still employed and you'll

22   tell me if I have the dates wrong, but still employed by

23   Watchdog and still feeding information to --

24          MR. WARNER:  I believe that Mr. Rosenblatt is still

25   employed by Watchdog.

PROCEEDINGS                                          128

1          MR. KATAEV:  That's correct, Your Honor.  That was

2     from 2017 until March 1, 2022.

3          THE COURT:  Wait a second.  He's not there now, is

4     he?

5          MR. KATAEV:  Mr. Rosenblatt remains employed by the

6     plaintiff, Your Honor.

7          THE COURT:  The person who fed all the information

8     is still employed?

9          MR. KATAEV:  That's correct.

10         THE COURT:  During what period of time do you have

11    evidence this that he was feeding information to IME

12    Companions.

13         MR. KATAEV:  April 28, 2017 until March 1, 2022.

14    The 2017 date by e-mail, the 2022 date by text message.

15         THE COURT:  And I can't tell you folks how to run

16    your business, but why would you keep on such a person?

17         MR. KATAEV:  Your Honor, I would respectfully submit

18    that that information is privileged and when Ms. Levy is

19    called on the stand, she can explain that.

20         THE COURT:  All right.  You think Ms. Gelardi has

21    that information.

22         MR. KATAEV:  Your Honor, to put it bluntly,

23    Mr. Rosenblatt is an individual who unfortunately suffers from

24    Asperger's Syndrome and he was manipulated and controlled.

25    You can see as evidenced from the text messages you don't need

PROCEEDINGS                                                    129

1    to go further than that to see how that relationship worked.

2    He is someone who is highly functional, but not highly

3    intelligent and as a result he was taken advantage of.

4                THE COURT:  In terms of human intelligence.

5                MR. KATAEV:  That's correct, Your Honor.

6                THE COURT:  I have admitted all of the documents,

7    some of which were marked and some of which were not, that

8    were provided by the plaintiff and questioned -- or about

9    which there were questions posed to the witnesses.  So those

10   are in the record.  I think at this point then I'm just going

11   to issue the order and go from there, but it should be very

12   clear that no more information -- the information from IME

13   Companions cannot be used by this new company because my

14   intent was not to -- the whole purpose of my finding of

15   irreparable harm, and this is part of the case law, is that it

16   constitutes irreparable harm if that information that

17   allegedly stolen, and I find it was, is then transmitted to

18   other individuals to further undermine the reputation and

19   business of the original owner of the trade secrets.

20                So this new company, Client Exam Services, cannot

21   use that information and if you want to, they can come in here

22   and they can make their case, but I'm not allowing them to use

23   it since it came from a tainted source and I intended to not

24   allow IME Companions to use it to give to other individuals to

25   take advantage of it and that should have been clear.  If it

PROCEEDINGS                                    130

1    wasn't explicitly stated, it should have been clear from the

2    entire proceeding that gave rise to the preliminary

3    injunction.

4              Mr. Warner you're obviously a good lawyer and you

5    can argue the law but, quite honestly, I don't believe for a

6    moment that somehow Ms. Gelardi or her family are not going to

7    benefit from this down the road and I just don't accept these

8    representations that somehow this was some innocent effort to

9    protect the client bast, the client's interest.  I reject that

10   based on everything that's happened so far in these

11   proceedings and your client's credibility, which is quite

12   minimal at this point.

13             MR. WARNER:  Can we have a moment?

14             THE COURT:  Yes.

15             (Pause in proceedings.)

16             THE COURT:  Did your client want to make any

17   statements.

18             MR. WARNER:  No, Your Honor.

19             THE COURT:  That concludes this proceeding.  I'll

20   issue a written decision, but so it's clear on the record, at

21   this point all of the information that IME Companions has that

22   is -- and I think the plaintiff as to make clear who you say

23   is a former client of Watchdog's.  So send them a list to make

24   clear who you think are the former clients.  It seems to me

25   maybe through this process you all know who you're talking

PROCEEDINGS                                                                    131

1    about, but as to those clients, the defendants may not use

2    that information in any way; either give it to any other

3    company to use or to use it themselves, to conduct any

4    business in the IME space or industry.  Full stop.

5            I don't want there to be any ambiguity that that

6    information which I find that was taken improperly from

7    Watchdog cannot be used by the defendants which includes not

8    providing it to any individuals to use to support any kind of

9    business in this area.  It can't be posted anywhere.

10           I feel this need, unfortunately, to make clear you

11   can't post it, you can't make it public or give it away to

12   anyone else or somehow disseminate it so that IME Watchdog is

13   thereby further harmed.

14           Mr. Kataev, did you want to say anything.

15           MR. KATAEV:  I just wanted to go through the list of

16   things we requested and clarifying the logistics of it, if I

17   may.

18           THE COURT:  Go ahead.

19           MR. KATAEV:  In terms of the injunction shutting

20   down the business we'd like it to include something along the

21   lines of requiring the website to be taken down; the phone

22   number, the e-mails --

23           THE COURT:  I am not shutting down the business.  As

24   I understand it, there's still 10 percent of their customers

25   who were not former Watchdog customers; correct?

PROCEEDINGS                                        132

1          MR. KATAEV:  As I understand it currently, Your

2     Honor.

3          THE COURT:  So they get to run that part of their

4     business and that's why I'm saying -- I'm not finding a

5     justification for shutting it down entirely.  I think that

6     goes too far.

7          MR. KATAEV:  Understood.  Then in that case perhaps

8     the Court should consider a Court-authorized notice or another

9     notice to the actual customers that we do identify as ours.

10         THE COURT:  Yes.  You can propose a notice saying

11    that by order of this is Court, IME Companions is no longer

12    allowed to provide services to, and you can indicate who these

13    customers are.

14         MR. KATAEV:  Thank you.  Further, we'd like for the

15    order to be placed on the defendant's website.

16         THE COURT:  In terms of the customers that they

17    cannot provide services to?

18         MR. KATAEV:  The same Court-authorized notice that

19    we'll come to terms on or an order should be posted on the

20    website as well.

21         MR. WARNER:  We object to that, Your Honor.  There's

22    no reason other than to do some kind of public shaming.

23         THE COURT:  I'm not sure -- I don't agree with that,

24    although I do believe -- I do have a concern about ensuring

25    compliance, but I don't think putting any kind of notice like

PROCEEDINGS                                              133

1  that on the website is the way to achieve that.  I mean,

2  obviously what could happen is a client on that list, one of

3  the former Watchdog clients might contact IME Companions not

4  knowing that they're no longer going to provide services;

5  although, I think you should send them a letter and that

6  should put them on notice, but in that situation the defendant

7  has to decline to provide that service.

8         My concern, Mr. Warner, is that no injunction has

9  seemed to make a change to your client's behavior yet,

10 including creating or helping creating -- well, certainly

11 suggesting that someone else create a company that takes all

12 of IME Companions' business and runs with it.  That to me

13 certainly violates the spirit of it.

14        At this point I'm not going to require it to be put

15 on the website, but I will let and I think it's as effective

16 as it should be, let letters be sent to every single one of

17 those former Watchdog customers saying they're not allowed to

18 by court order -- that the defendants are not allowed to

19 provide them any services.

20        MR. KATAEV:  Would the Court consider appointing a

21 receiver or some individual at Companions to handle --

22        THE COURT:  I am not going to do that either.  I

23 think what's left of the defendant's business is not great,

24 but they should be allowed to run that; the 10 percent

25 customers that they have, they'll be allowed to work with

                    SN        RPR        OCR

PROCEEDINGS                                    134

1    those.

2              MR. KATAEV:  We're worried about ensuring

3    compliance.

4              THE COURT:  Unfortunately I will deal with this as

5    we go along.  I hope the defendants learned a lesson.  It's

6    expensive and it is not worth trying to skirt the injunctions

7    that I'm imposing.  It's just not.  You're throwing good money

8    after bad.

9              MR. KATAEV:  In terms of the forensics, we want to

10   be clear about what we're requesting.  We'd like a forensic

11   financial accounting to assist us with assessing damages and,

12   in addition, a second forensic examination of the electronic

13   devices and accounts.

14             THE COURT:  Can't you get that through regular

15   discovery?  Do we have to have this through an expedited

16   proceeding?

17             MR. KATAEV:  We could, Your Honor, but we're

18   concerned that we won't be provided with that evidence.

19             THE COURT:  Then you move to compel.  The only

20   reason I allowed the forensic exam before is because there was

21   some concern about destruction of records.  Now, I don't know

22   if what you're seeking now is -- would be thwarted by some

23   sort of destruction of records.  I assume you've gotten a fair

24   amount of information locked in now.

25             MR. KATAEV:  Sure.

PROCEEDINGS                                    135

1           THE COURT:  So I'm not going to grant that unless --

2    and I think you should pursue that with the magistrate judge

3    who is presiding over this in terms of discovery requests and

4    if you get noncompliance or obstruction, then obviously raise

5    it with the magistrate judge.

6           MR. KATAEV:  And as to the forensic financial

7    accounting?

8           THE COURT:  Yes, the same thing.  Judge Cho will be

9    all over this I know.  Just make propers requests thought, so

10   do it immediately, and then police it with Judge Cho and

11   explain the situation.

12          MR. KATAEV:  I'll check with my client, but I don't

13   think I have anything further.

14          THE COURT:  As I said before, I'm going to reinforce

15   the no-contact provision.  I'm also going to make clear that

16   there shouldn't be contact -- and I'm not saying if this is

17   innocent or not, but it seems to me there's some suggestion

18   that employees of IME Companions were talking to employees of

19   Watchdog using false names.  That sort of thing should not

20   happen.  I don't know what the story is there, but there

21   should just be no contact; no contact between any IME

22   Companion employees with IME Watchdog employees, under any

23   name or under any circumstances, they should not contact them

24   and no one should be following anyone around.

25          MR. KATAEV:  And, Your Honor, I have nothing else in

PROCEEDINGS                                            136

1    terms of relief requested, but you did raise a question.  The

2    Court did raise a question about contempt and I wanted to

3    provide some feedback on that as far as what evidence we're

4    prepared to show.

5              THE COURT:  Yes.

6              MR. KATAEV:  In the defendant's deposition, she had

7    testified that the private investigator was hired to befriend

8    and confront Mr. Roa.  Whether that happened or not is

9    irrelevant.  She testified that that was her intent that's a

10   violation.  So, she had the mens rea at least.  Second, we're

11   prepared to present today evidence through our private

12   investigator who is here, that the methods employed to place

13   the GPS device on the vehicle is something in the private

14   investigator world that's called rough shadowing.

15             This individual walked in the middle of the street

16   on a two-way street after midnight back and forth several

17   times.  He looked directly into the ring video door bell

18   camera and -- it's almost as if he wanted to be caught.  An

19   individual who sought to clandestinely place a GPS device

20   would not engage in that conduct; although, the testimony is

21   that the investigation was started to determine who was behind

22   the smear campaign from July 2022.  That information of where

23   Mr. Roa is would not provide information about who is behind

24   the smear campaign.  There are three e-mails that were sent.

25   How would following him show who sent the e-mails.

*SN        RPR        OCR*

PROCEEDINGS                                   137

1          MR. WARNER:  Your Honor, may I be heard on that?

2          THE COURT:  You can respond.

3          MR. WARNER:  My understanding, Your Honor, is that

4    there were many more than three e-mails.  We produced three

5    e-mails.

6          MS. WIENER:  Four.

7          MR. WARNER:  We produced four but more importantly

8    there were many, many more and not only were e-mails sent, but

9    individuals who worked with Companions were advised that they

10   had to stay away from Companions; that there was an FBI

11   investigation, that they would be dragged into this and a lot

12   of other things as well.  This was no fantasy, let's put it

13   that way, when it came to a smear campaign and obviously my

14   client hired the wrong -- what she thought was a licensed

15   investigator service, but I don't believe that that's the

16   ground for what the investigator did, ground for a finding of

17   contempt in connection with Your Honor's order.

18         THE COURT:  Well, do you dispute that she had

19   instructed the PI to befriend Mr. Roa?

20         MR. WARNER:  No we, don't dispute that, Judge.

21         THE COURT:  That would be a contact.

22         MR. WARNER:  That wouldn't be a contact initiated by

23   her or the PI.  It was supposed to go the other way around,

24   Judge.

25         THE COURT:  I am not understanding that.  If your

PROCEEDINGS                                        138

1    client instructed the PI to befriend Mr. Roa and make contact

2    with him --

3              MR. WARNER:  No, to accept contact, not to make

4    contact.  Mr. Roa is a very talkative man.  You haven't heard

5    him very much, but he does like to contact people in the IME

6    context.

7              THE COURT:  But whether he initiates it or not it's

8    contact, so I don't care if Mr. Roa initiates it if your

9    client knowingly puts a PI in the position to have contact

10   with Mr. Roa, I consider that contact.  I don't care who

11   initiated it.  You are in a sense are because you're placing a

12   person there.  She placed someone there to have contact with

13   him.  Whether he said the first word or not --

14             Again, this is the kind of parsing that you and your

15   client are doing that strikes me as troublesome and will only

16   result in further restrictions.

17             MR. WARNER:  I hear what Your Honor is saying and it

18   won't happen again.

19             THE COURT:  I do not know how you can say it's not

20   contact.  Your client is hinging on the notion of who

21   initiated it.  It is a contact.  The PI shouldn't be there

22   trying to strike up a conversation or wait to have a

23   conversation struck up.  He shouldn't be following him around

24   or any of this happening.

25             MR. WARNER:  Your Honor is heard.  Very well.

PROCEEDINGS                              139

1          THE COURT:  But unfortunately you have admitted that

2    at least it was her intent to try to violate the preliminary

3    injunction.

4          MR. KATAEV:  One final point on that?

5          THE COURT:  Yeah, go ahead.

6          MR. KATAEV:  The testimony from the defendant

7    Ms. Gelardi was that she had no knowledge whatsoever about the

8    tracking device.  I want the Court to be aware that one of the

9    exhibits to Carlos Roa's declaration is the private

10   investigator's affidavit stating that she was aware, and he

11   provided text messages showing that.

12         THE COURT:  I saw that.  Thank you.  I appreciate

13   that.

14         All right.  Thank you, everyone.  I appreciate your

15   thoughts on this.  I will issue the order shortly.

16         MR. WARNER:  Your Honor, with respect to the TRO

17   paragraph D, the property and sale can go forward?

18         THE COURT:  Yes, the property sale can go forward.

19         MR. WARNER:  Thank you.

20         THE COURT:  But, again no business being conducted

21   with any of the former Watchdog employees and I urge the

22   plaintiffs to promptly send over a list, fax it, e-mail it, so

23   that there's very little time lag.

24         And no more services being provided by Client Exam

25   Services using the information from IME Companions.

*SN       RPR       OCR*

PROCEEDINGS                                                140

1          MR. KATAEV:  With the Court's permission could we

2     e-file that list under seal?

3          THE COURT:  Absolutely.  Thank you, everyone.

4          MR. KATAEV:  One final question, Your Honor, other

5     than sending a written notice would my client be permitted to

6     contact those customers once they're determined?

7          THE COURT:  Yes.  I would like you to at least

8     propose or submit a draft of the letter if for no other reason

9     I think it's good to create a record given all of these

10    allegations going back and forth about each side trying to

11    ruin each other's business.  I want a record in terms of what

12    you're sending in terms of the format and if I have any issues

13    I will let you know very promptly.

14          And if the defense has an objection you'll file a

15    letter as well.

16          MR. WARNER:  Absolutely.

17          THE COURT:  Thank you.

18

19

20          (Matter adjourned.)

21                    - ooOoo -

22

23

24

25

                    SN          RPR          OCR

```
1                              I N D E X

2   WITNESS                                        PAGE

3   GREGORY ELEFTERAKIS

4   EXAMINATION             BY THE COURT           40

5   CROSS-EXAMINATION       BY MR. KATAEV          46

6
    ROMAN POLLAK
7
    DIRECT EXAMINATION      BY MR. KATAEV          61
8
    CROSS-EXAMINATION       BY MR. WARNER          89
9
    REDIRECT EXAMINATION    BY MR. KATAEV          93
10

11  JEFF BEIBIN

12  EXAMINATION             BY THE COURT           96

13  CROSS-EXAMINATION       BY MR. KATAEV          101

14  CROSS-EXAMINATION       BY MR. WARNER          115

15

16

17

18

19

20

21

22

23

24

25
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*