1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
IME WATCHDOG, INC.,                 :  22-CV-1032 (PKC)
                                    :
          Plaintiff,                :
                                    :
                                    :  United States Courthouse
     -against-                      :  Brooklyn, New York
                                    :
                                    :  May 4, 2023
                                    :  12:00 p.m.
SAFA ABDULRAHIM GELARDI,            :
VITO GELARDI, IME COMPANIONS,       :
LLC                                 :
                                    :
          Defendants.               :
                                    :
                                    :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE PAMELA K. CHEN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:    MILMAN LABUDA LAW GROUP, PLLC
                         3000 Marcus Avenue Suite 3W8,
                         North New Hyde Park, New York
                      BY:  EMANUEL KATAEV, ESQ.
                           JAMIE FELSEN, ESQ.


For the Defendants:   WARNER & SCHEUERMAN
                         6 West 18th Street, 10th Floor
                         New York, New York 10011
                      BY:  JONATHON D. WARNER, ESQ.

2

1   For ThirdParty        LAW OFFICES OF MICHAEL J. ALBER, P.C.
    Plaintiffs/Counter        21 Walt Whitman Road
2   Defendants IME           Huntington Station, NY 11746
    Companions, LLC,
3   Safa Abdulrahim
    Gelardi, Vito Gelardi  BY:  KENNETH C. BROWN, ESQ.
4

5

6   Court Reporter:  Michele D. Lucchese, RPR
                     Official Court Reporter
7                    E-mail: MLuccheseEDNY@gmail.com

8   Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.
9

10                        *     *     *

11

12           (In open court.)

13           THE COURTROOM DEPUTY:  Civil cause for motion

14   hearing, docket 22-CV-1032, IME versus Gelardi, et al.

15           Will the parties please state your appearances

16   starting with the plaintiff.

17           MR. KATAEV:  Good afternoon, Your Honor.  Emanuel

18   Kataev of Milman Labuda Law Group, PLLC, for the plaintiff.

19           THE COURT:  Good afternoon.  And I see Ms. Levi or

20   Levi here.

21           MR. FELSEN:  Levi.

22           THE COURT:  Good afternoon.

23           And the other individuals are?

24           MR. ROA:  Carlos Roa.  I'm a third-party defendant

25   and third-party counter-plaintiff and also an officer of IME

3

1    Watchdog.

2             THE COURT:  Okay.

3             MR. FELSEN:  Good afternoon, Your Honor.  Jamie

4    Felsen from Milman Labuda Law Group, counsel for the

5    plaintiff.

6             THE COURT:  Okay.

7             MR. LEVI:  Good afternoon, Your Honor.  Eli Levi,

8    officer of IME Watchdog.

9             MR. SHALIT:  Good afternoon, Your Honor.  Leo

10   Shalit, counsel for Carlos Roa.

11            MR. WARNER:  Good afternoon, Your Honor.  Jonathon

12   Warner, attorney for the Defendants.

13            MR. BROWN:  Good afternoon, Your Honor.  Ken Brown,

14   also new co-counsel for defendants.

15            THE COURT:  Have you enter an appearance?

16            MR. BROWN:  I did, Your Honor, yes.

17            THE COURT:  Okay.  Good.

18            Yes.

19            MR. GELARDI:  Vito Gelardi.

20            MRS. GELARDI:  Safa Gelardi.

21            THE COURT:  Good afternoon to all of you as well.

22            As I was saying before we went on the record, we do

23   have to be efficient because Mr. Kataev has to leave by three.

24            In that vein, Mr. Kataev, I want to tell you at

25   least with respect to the four former employees or agents of

4

1    the defendants whom you're going to call, I'm primarily

2    interested in knowing, A, or having you confirm that they were

3    at the locations that you said they were, and I'm going to

4    refer to them as the enjoined clients' locations, and how it

5    is that they came to be there.  That's my main concern.

6            And then the third thing is what is their

7    relationship to this new entity and the two individuals who

8    purportedly own it, Mr. Liddie and Ms. Hall.  In other words,

9    how did they -- well, if the question isn't answered how they

10   came to be at the locations, assuming you confirmed with them,

11   I do want to know what connection they have to the Liddie and

12   Hall entity, which is called, I guess, IME Legal Reps.

13           MR. KATAEV:  Correct, Your Honor.

14           THE COURT:  All right.  So who are you going to call

15   first?

16           MR. KATAEV:  We're going to call the only witness

17   that I see present here now, Mr. Beibin.

18           THE COURT:  That's right.  I remember you from

19   before, Mr. Beibin.  Please come forward and have a seat up

20   here in the witness stand, although we need to have you sworn

21   in first as you may recall.

22           (Witness sworn.)

23           THE COURTROOM DEPUTY:  State and spell your name for

24   the record.

25           THE WITNESS:  My name is Jeff Beibin, J-E-F-F

Beibin - direct - Kataev                                    5

1   B-E-I-B-I-N.

2           THE COURT:  Okay.  You may inquire, Mr. Kataev.

3           Why do you want to use the podium or do it from

4   there?

5           MR. KATAEV:  I was going to ask permission to do it

6   from here.

7           THE COURT:  That's fine.  You have to pull the

8   microphone a little closer to you.

9   **JEFF BEIBIN**,

10          called as a witness, having been first duly

11          sworn/affirmed, was examined and testified as follows:

12  DIRECT EXAMINATION

13  BY MR. KATAEV:

14  Q    Good afternoon.  Mr. Beibin, you were present at the last

15  hearing on an Order to Show Cause on March 27th, is that

16  correct?

17  A    Yes.

18  Q    And you provided truthful testimony that day; correct?

19  A    Correct.

20          THE COURT:  You have to go slower.

21  Q    Since the last hearing, you have observed other

22  independent medical examinations; correct?

23  A    Yes.

24  Q    And approximately how many have you attended?

25  A    I'm not sure exactly how many.

Beibin - direct - Kataev                                6

1    Q     Was it more --

2             THE COURT:  How about a ballpark?

3    A     15, 20, I'm not sure.

4             THE COURT:  All right.

5    Q     And of those 15 to 20, approximately, on behalf of which

6    company did you observe those IMEs?

7    A     I did a couple that were with Client Exam Services that

8    was directly after we had left the last hearing.

9             I did a few with IME Companions.

10            I did three with IME Legal Reps and one for an

11   attorney themselves.

12   Q     What was the name of that attorney?

13   A     Subin Associates.

14   Q     At IME companion you were an editor; correct?

15   A     Yes.

16   Q     Until when was that?

17   A     I don't recall exactly, sometime in April.

18   Q     On average, how many IME reports do you prepare in a

19   month?

20   A     Whatever I work on.  Whatever cases that I work on.

21            Are you asking as an editor?  I don't understand.

22   Q     Approximately how many IME reports do you prepare in any

23   capacity in one month?

24            THE COURT:  For whom?  I'm sorry.  Now I am

25   confused.

Beibin - direct - Kataev                                    7

1          MR. KATAEV:  For any of the entities.  He works at

2    multiple entities.  That's what he testified to.  My question

3    is how many does he prepare.

4          THE COURT:  You have to go slower, Mr. Kataev.  Are

5    you saying right now how many does he work on as an editor?

6          MR. KATAEV:  Correct for the month of April.

7          THE COURT:  Okay.

8    A    I'm not sure.  But I stopped doing it a few weeks back.

9    Q    And when was the last -- what was the last IME you

10   observed?  When was it?

11   A    April -- I don't remember exactly.  Late April.

12   Q    And have you been paid for observing those IMEs for the

13   month of April?

14   A    No.

15   Q    And --

16         THE COURT:  Can I inject for one moment?

17         The last IME you observed, which company or entity

18   was that for?

19         THE WITNESS:  I did three IMEs for IME Legal Reps.

20         THE COURT:  So you're saying in the month of April

21   you did three IMEs for IME Legal Reps?

22         THE WITNESS:  Yes.

23         THE COURT:  Who owns that company or who runs it?

24         THE WITNESS:  Eugene.

25         THE COURT:  Last name.

Beibin - direct - Kataev                    8

1          THE WITNESS:  Liddie.

2          THE COURT:  Go ahead, Mr. Kataev.

3   Q    In the month of March, you did not observe any IMEs or

4   IME Legal Reps; correct?

5   A    Correct.

6   Q    That's because it did not exist then; correct?

7   A    I'm not sure.  But I didn't work on any.

8   Q    Same question for Client Exam Services, did you do any in

9   March?

10  A    In March, yes.

11  Q    That was the first month you ever performed those

12  services; correct?

13  A    Yes.

14         THE COURT:  I'm sorry, who were you working for at

15  Client Exam Services?

16         THE WITNESS:  That was for Fari.

17         THE COURT:  F-A-R-A?

18         THE WITNESS:  F-A-R-I.

19         THE COURT:  Gutierrez; correct?

20         THE WITNESS:  Yes.

21         THE COURT:  Go ahead.

22  BY MR. KATAEV:

23  Q    Did you get paid for the IMEs that you observed in March?

24  A    Yes.

25  Q    Who paid you?

Beibin - direct - Kataev                               9

1   A    Fari.

2   Q    How did he pay you?

3   A    With cash.

4   Q    And you met with him personally to receive that money?

5   A    He dropped off the money at my mother-in-law's house when

6   I was there.

7   Q    And did -- what's the name of your mother-in-law?

8   A    Francesca.

9   Q    What's the last name?

10  A    Gelardi.

11  Q    Okay.  And did you observe Mr. Gutierrez personally drop

12  off the money for you?

13  A    I was there.

14  Q    You attended an IME on March 10, 2023 with Dr. Edward

15  Weiland at 186 West Montauk Highway, Building D6, Hampton

16  Bays, New York; correct?

17  A    I'm not sure.

18         MR. KATAEV:  I will just make things easier for you

19  and provide exhibits to the witness and to the Court and with

20  permission.  Mr. Levi will provide exhibits to opposing co

21  unsell.

22         THE COURT:  All right.  Go ahead.

23         MR. WARNER:  All exhibits?

24         MR. KATAEV:  All exhibits.

25         THE COURT:  You can hand it up through Ms. Gonzalez.

1   Thank you.

2   Q    After you remove the front cover page, you will see a

3   document titled Expert Witness Disclosure.  Do you see that?

4   A    Yes.

5   Q    And this document, this is involving a lawsuit brought by

6   Rohan Manragh, Jr.  Do you see that?

7          THE COURT:  Spelled R-O-H-A-N.  Last name

8   M-A-M-R-A-G-H.  Go ahead.

9   Q    Do you see his name there?

10  A    Yes.

11  Q    Do you know this individual?

12  A    Yes.

13  Q    And you observed an IME for this individual on March 10;

14  correct?

15  A    Yes.

16  Q    And Safa assigned this IME to you; correct?

17  A    Yes.

18  Q    In what manner did she assign this to you?

19  A    Text message.

20  Q    And if you go to the second page; Mr. Manragh is a

21  personal injury client of Subin Associates; correct?

22  A    Yes.

23  Q    So on March 10th, you performed services for Subin

24  Associates; is that right Subin Associates?

25  A    Yes.

Beibin - direct - Kataev                    11

1   Q    If you go to -- after this 14-page exhibit, you'll see a

2   document that says contact at clientexamservices.com?

3          THE COURT:  I'm sorry.  Can we go back for one

4   minute.  Is Mr. Manragh represented by Subin Associates, is

5   that what you said?

6          THE WITNESS:  He's a client of theirs.

7          THE COURT:  Manragh is a client of Subin Associates?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay, thank you.

10  Q    Six days later you attended an IME on March 16th, 2023 in

11  Commack with Dr. Dana Mannor; correct?

12  A    Yes.

13  Q    And Safa assigned this IME to you as well; correct?

14  A    No.

15  Q    Who assigned this IME to you?

16  A    That was Sammy.

17  Q    And for the record --

18         THE COURT:  S-A-M-I.

19         MR. KATAEV:  I believe it is S-A-M-M-Y.

20         THE COURT:  Is it?  Okay.  S-A-M-M-Y.

21  Q    For the record, Sammy is a nickname for Hesham,

22  H-E-S-H-A-M, Salamah, S-A-L-A-M-A-H; correct?

23  A    You told me that last time.

24  Q    Is that his full name?

25  A    I don't know.

1    Q    You only know him by Sammy; correct?

2    A    Correct.

3    Q    How did Sammy assign this IME to you?

4    A    He sent me a message.

5    Q    A text message?

6    A    I believe so.

7    Q    The IME that you observed was for the same plaintiff,

8    Rohan Manragh; correct?

9    A    Correct.

10   Q    And Mr. Manragh is a client of Subin Associates; correct?

11   A    Yes.

12   Q    On March 16th, 2023, you performed work for Subin

13   Associates; correct?

14   A    Yes.

15   Q    And Subin Associates is on the enjoined customers' list;

16   correct?

17   A    I don't know.

18   Q    No one has provided you with the enjoined customers'

19   list?

20   A    No.  I just know I was working for Client Exam Services.

21   Q    Has anyone informed you about the fact that there is an

22   enjoined customers' list and that IME Companions and its

23   agents are not permitted work for those, or perform services

24   for those customers?

25   A    I know that IME Companions cannot work with Subin

Beibin - direct - Kataev                                    13

1    Associates.

2    Q    But you believe it is permissible for Client Exam

3    Services to do so; correct?

4    A    Yes.

5    Q    Were you not present at this hearing on March 27th?

6    A    Yes.

7    Q    Did you not hear Judge Chen instruct the defendants that

8    Client Exam Services may not perform these services?

9            MR. WARNER:  Objection.

10           THE COURT:  Overruled.  Did you hear that?

11           THE WITNESS:  No, I left after I spoke.

12   Q    And no one informed you after that; correct?

13   A    I don't recall, no.

14           MR. FELSEN:  Your Honor, we would request any

15   witnesses that are going to be called be sequestered today.

16           THE COURT:  Yes, sir in the front row.

17           MR. LEVI:  He's not a witness.

18           THE COURT:  These are our IT folks.  Let's go ahead.

19   Q    You attended another IME with Dr. Dana Mannor on April 1,

20   2023; correct?

21   A    I don't recall.  Is that in here?

22   Q    So you don't recall one way or the other whether you were

23   present on April 21st with Dr. Dana Mannor or not; correct?

24   A    I don't recall.

25   Q    One way or the other; correct?

Beibin - direct - Kataev                              14

1   A     Correct.

2   Q     Do you recall attending any -- observing any IME on April

3   21st?

4   A     I don't recall the dates, no.

5   Q     If I told you April 21st was a Friday, would that refresh

6   your recollection?

7   A     No.

8              THE COURT:  You can just accept that fact.  Let's

9   move on.

10  Q     And you attended a total of three independent medical

11  examinations for the personal injury plaintiff Rohan Manragh;

12  correct?

13  A     In the past, I had done another one with him another

14  year, but, yes, I did two with him this year.

15  Q     You don't recall doing a third one with him?

16  A     No.

17  Q     You continued to accept assignments to observe IMEs after

18  March 27, 2023 for all the same customers; correct, such as

19  Subin?

20  A     Yes.

21  Q     And you've performed work for Subin since March 27, 2023;

22  correct?

23  A     I guess.  I don't recall.  Yes, I did because I did one a

24  couple weeks ago.

25  Q     And that was for IME Legal Reps; correct?

1   A     No.  I was hired from Subin.

2   Q     Who at Subin hired you?

3   A     Jonathan.

4   Q     What is Jonathan's last name?

5   A     Frobart.

6   Q     And Jonathan Frobart is an agent of IME Companions; is

7   that right?

8              MR. WARNER:  Objection.

9              THE COURT:  If you know, is Jonathan Frobart an

10  agent of IME, which one?

11             MR. KATAEV:  Legal Reps?

12             THE WITNESS:  No.

13  Q     What about Companions?

14  A     No.

15  Q     Now that you are aware of an injunction that prevents you

16  from performing services for customers on the enjoined

17  customers' list, are you going to continue to serve those

18  customers in violation of it?

19             MR. WARNER:  Objection, Your Honor.

20             THE COURT:  Sustained.  Sustained.

21             MR. KATAEV:  Just one second, Your Honor.

22  Q      If you can go to the exhibit that starts with docket

23  entry 211, it is titled Reply Declaration of Adam Rosenblatt.

24  Adam Rosenblatt?

25             MR. WARNER:  I'm sorry, what exhibit did you just

1  ask him to refer to?

2          MR. KATAEV:  Docket entry 211, the Reply Declaration

3  of Adam Rosenblatt.

4          MR. WARNER:  Thank you.

5          THE COURT:  I'm sorry, does he have it in front of

6  him?

7          MR. KATAEV:  Yes.

8  A    Yes.

9  Q    Have you seen this document before?

10  A    No.

11  Q    I will represent to you this is a sworn declaration by

12  Adam Rosenblatt.  On the second page of this, in paragraph 3,

13  Mr. Rosenblatt says that he was assigned to observe an IME

14  with Dr. Dorothy Scarpinato, S-C-A-R-P-I-N-A-T-O, and he says

15  in paragraph 4 that upon his arrival he observed you present

16  at this location.

17          Do you see that?

18  A    Yes.

19  Q    Do you recall running into Mr. Rosenblatt on April 20?

20  A    I don't know who Mr. Rosenblatt is.

21  Q    If you look at --

22          THE COURT:  Wait.  Were you at Scarpinato's office

23  on that day?

24          THE WITNESS:  Yes.

25          THE COURT:  Let's go on.

1  Q    And you were there to observe an IME; correct?

2  A    Yes.

3  Q    In paragraph 6 it says, when Beibin, Adam Rosenblatt

4  observed you quickly run out of the office.  Do you see that?

5  A    I see what?

6  Q    Do you recall running out of the office upon seeing Mr.

7  Rosenblatt?

8  A    No.

9  Q    And you were present to observe an IME for personal

10 injury plaintiff during that time Demetria Jones; correct?

11 A    Yes.

12 Q    And Demetria Jones is a client of Subin Associates;

13 correct?

14 A    Yes.

15 Q    So on April 20th, you were performing work for Subin

16 Associates; correct?

17 A    Yes.

18 Q    And with which company were you performing those

19 services?

20 A    Subin Associates.

21       THE COURT:  I just want to clarify.  When you say

22 working for Subin Associates, who paid you for that IME?

23       THE WITNESS:  I plan to invoice Subin Associates

24 themselves.  I was called from them.

25       THE COURT:  How do they pay you?

1          THE WITNESS:  I would invoice them.

2          THE COURT:  Right.

3          THE WITNESS:  I've never done that before.

4          THE COURT:  Okay.  Is it your understanding they

5    will send you a check?

6          THE WITNESS:  Yes, I would receive a check.

7          THE COURT:  All right.  How long have you been

8    working directly with Subin Associates?

9          THE WITNESS:  That was the only time.

10         THE COURT:  Do you have an employment agreement with

11   them now?

12         THE WITNESS:  No.

13         THE COURT:  Do you have any kind of independent

14   contractor arrangement with Subin Associates now?

15         THE WITNESS:  No.

16         THE COURT:  I'm sorry to jump in.  I do want to ask

17   some questions to make sure they get answered.

18         At some point you said you did three IMEs for IME

19   Legal Reps; right?

20         THE WITNESS:  Yes.

21         THE COURT:  And you said further that Eugene Liddie

22   was the person who manages that company; correct?

23         THE WITNESS:  Yes.

24         THE COURT:  How did you come to do those particular

25   IMEs?

Beibin - direct - Kataev                    19

1              THE WITNESS:  He called me.

2              THE COURT:  When did he call you in relation, I

3    guess, to the IMEs themselves?

4              THE WITNESS:  He called me prior to the

5    appointments, the day before.

6              THE COURT:  Okay.  So this would be in late April?

7              THE WITNESS:  Yes.

8              THE COURT:  All right.  And did you know Mr. Liddie

9    from before?

10             THE WITNESS:  I met him one time.

11             THE COURT:  When?

12             THE WITNESS:  Last year.

13             THE COURT:  And under what circumstances?

14             THE WITNESS:  He was looking to start a business and

15   he wanted to see what an IME was like in realtime.

16             THE COURT:  So where did this happen, this meeting?

17             THE WITNESS:  Somewhere in Long Island, a doctor's

18   office.

19             THE COURT:  Was it a chance encounter or were you

20   scheduled to meet with him?

21             THE WITNESS:  No, I knew I was meeting with him due

22   to his interest.

23             THE COURT:  And you were meeting in a doctor's

24   office?

25             THE WITNESS:  Correct.

Beibin - direct - Kataev                    20

1           THE COURT:  Who picked the location?

2           THE WITNESS:  I was there to meet with another

3    client and he wanted to observe me.

4           THE COURT:  Was this the first time you met Mr.

5    Liddie?

6           THE WITNESS:  Yes, the only time I met Mr. Liddie.

7           THE COURT:  And what did you understand his

8    background, if any, to be in this business?

9           THE WITNESS:  All I knew is that he wanted to start

10   his own business and it was an IME business.

11          THE COURT:  Did he say, though, he had done this

12   before?

13          THE WITNESS:  No.

14          THE COURT:  Was he at that office at that time to do

15   an IME?

16          THE WITNESS:  Not to do one, to observe me.

17          THE COURT:  So he literally watched you do an IME?

18          THE WITNESS:  Right.  Well, the doctor didn't let

19   him into the office, but he stayed in the waiting room with me

20   and was with me and the client prior to.

21          THE COURT:  Do you know how it is Mr. Liddie got in

22   touch with you or knew who you were?

23          THE WITNESS:  He was looking to buy a franchise.

24          THE COURT:  But how would he know you?

25          THE WITNESS:  I was going to the appointment and I

Beibin - direct - Kataev                        21

1   guess he lives close by.

2            THE COURT:  But, again, you said you told him where

3   you were going and he met you; correct?

4            THE WITNESS:  I don't remember exactly how.  Back

5   then, it was I met him at the office.  I don't remember

6   exactly how I found out I was meeting him.

7            THE COURT:  But you didn't arrange that meeting?

8            THE WITNESS:  No.

9            THE COURT:  Who did?

10           THE WITNESS:  Probable Safa.

11           THE COURT:  When you say probably, why do you say

12   that?

13           THE WITNESS:  It was either Eugene or Safa.  I don't

14   recall exactly whether she had given him my contact

15   information or vice versa, I don't recall.

16           THE COURT:  Did Ms. Gelardi tell you she knew Mr.

17   Liddie before?

18           THE WITNESS:  She told me he was interested in

19   buying a franchise.

20           THE COURT:  And did you know anything about their

21   relationship?

22           THE WITNESS:  No.

23           THE COURT:  Okay.  But it was from Mr. Gelardi that

24   you learned that you would be meeting Mr. Liddie; is that

25   correct?

1           THE WITNESS:  Well, I also knew his wife because his

2    wife worked for us, so I don't recall exactly.  That's why I

3    tell you.

4           THE COURT:  Is that Ms. Hall?

5           THE WITNESS:  Yes.

6           THE COURT:  When did Ms. Hall work for I guess IME

7    Companions?

8           THE WITNESS:  I don't recall exactly.

9           THE COURT:  Okay.  But when, I guess, in relation to

10   how long you had been there, in other words, how many years

11   did you work with her, if you remember?

12          THE WITNESS:  I probably worked with her for a year

13   and a half, two years, I don't remember exactly.

14          THE COURT:  Okay.  Did she do what you did?

15          THE WITNESS:  Yes, I trained her.

16          THE COURT:  I see.  Okay.  So let me ask a silly

17   question.  Do you know why it is Mr. Liddie would follow you

18   around if his your wife actually did the same kind of work you

19   did for several years?

20          THE WITNESS:  Because I trained her, I guess.  I'm

21   not sure exactly.

22          THE COURT:  He never explained.

23          THE WITNESS:  I just knew he wanted to start his own

24   business.

25          THE COURT:  And you said this is a year ago from

Beibin - direct - Kataev                                    23

1  when?  I think you said a year ago.

2             THE WITNESS:  It was about a year ago, either the

3  beginning of last year, I don't remember, sometime in 2022.

4             THE COURT:  Okay.  When you say beginning of last

5  year, do you think it was as early as January 2022?

6             THE WITNESS:  It could have been.

7             THE COURT:  Was there -- did you talk to him after

8  that?

9             THE WITNESS:  No.

10            THE COURT:  Okay.  Until April of this year?

11            THE WITNESS:  Correct.

12            THE COURT:  All right.  Let me turn it back to you.

13  I'm sorry, Mr. Kataev.

14            MR. KATAEV:  I just want to confirm with my client.

15  I believe I'm done, but let me confirm.

16  BY MR. KATAEV:

17  Q    When you were the editor at IME Companions, you observed

18  Jonathan Frobart's reports when he also worked at IME

19  Companions; correct?

20  A    Yes.

21  Q    And as far as you know Mr. Frobart was an agent of IME

22  Companions until recently; correct?

23  A    Yeah.

24            MR. KATAEV:  I have no further questions for this

25  witness.

Beibin - direct - Kataev                24

1              THE COURT:  I'm sorry.  Can I ask someone to

2       clarify.  Let me turn to you, Mr. Beibin, when you said yes,

3       Frobart was an agent of IME Companions, what does the term

4       agent mean to you?

5              THE WITNESS:  He worked for IME Companions.

6              THE COURT:  Like you?

7              THE WITNESS:  He -- I know that he worked for Subin

8       Associates for IME Companions.

9              THE COURT:  Okay.  Do you consider yourself, or did

10      you consider yourself an agent for IME Companions when you did

11      work for them?

12             THE WITNESS:  I just considered I worked for

13      somebody.  I never thought of the word agent.

14             THE COURT:  But I'm trying to understand when you

15      affirmed that Frobart was an agent, what do you mean?

16             THE WITNESS:  That he worked for them.

17             THE COURT:  He got paid by them for doing the exams?

18             THE WITNESS:  Yes.

19             THE COURT:  They sent him out on the jobs?

20             THE WITNESS:  Yes.

21             THE COURT:  Just like you; is that right?

22             THE WITNESS:  Correct.

23             THE COURT:  Okay.  All right.  Let me go back for

24      one more minute.

25             Have you ever spoken to Ms. Hall since IME Reps was

Beibin - direct - Kataev                          25

1  created?

2            THE WITNESS:  No.

3            THE COURT:  And do you know what, if any,

4  involvement she has in that entity?

5            THE WITNESS:  No.

6            THE COURT:  Okay.  Thank you very much, Mr. Beibin.

7  I appreciate it.  Let me see if I have any other questions for

8  you.

9            MR. KATAEV:  Your Honor, I have one last question.

10            THE COURT:  Go ahead.

11  BY MR. KATAEV:

12  Q    Did you have any discussions with Mr. Liddie about IME

13  Legal Reps?

14  A    What do you mean by discussions?  Just working for him.

15  Q    Exactly.  To work for him?

16  A    He asked me if I wanted to do an IME and I said yes.

17  Q    Okay.  And as far as you know, after your -- when did you

18  testify your meeting was for him to observe an IME that he

19  could not get into it?

20  A    Last year.

21  Q    As far as you know, did he ever ultimately observe such

22  IME?

23  A    He was with me at the office.

24  Q    And, so, everything he learned about observing IMEs, he

25  learned through you; correct?

1           MR. WARNER:  Objection.

2           THE COURT:  If you know.

3    A    I believe also his wife.

4           MR. KATAEV:  I have nothing further.

5           THE COURT:  I do have a couple more questions for

6    you.

7           With regard to IME Reps, did Mr. Liddie ever explain

8    to you when it was created?

9           THE WITNESS:  No.

10          THE COURT:  And with respect to the three

11   assignments you did for IME legal reps, and if this was

12   covered before, my apologies, but who were the law firms

13   involved in those three cases?

14          THE WITNESS:  Two of them were Bergman, Bergman

15   Fields & Lamonsoff.

16          THE COURT:  I'm sorry.  Bergman, Bergman?

17          THE WITNESS:  Lamonsoff.

18          THE COURT:  How do you spell that?

19          THE WITNESS:  L-A-M-O-N-S-O-F-F.

20          THE COURT:  Okay.  And what was the third one?

21          THE WITNESS:  Kohan.

22          THE COURT:  Spelled?

23          THE WITNESS:  K-O-H-A-N.

24          THE COURT:  And do you know if either of those law

25   firms were customers of IME WatchDog?  Do you know?

Beibin - direct - Kataev                    27

1           THE WITNESS:  No.

2           THE COURT:  "No," meaning you don't know?

3           THE WITNESS:  I don't know.

4           THE COURT:  Okay.  And did Mr. Liddie ever explain

5    to you how IME Reps or he got those clients relating to the

6    jobs that you went out on?

7           THE WITNESS:  No.

8           THE COURT:  All right.  Did you ever see the IME

9    Reps's website?

10           THE WITNESS:  No.

11           THE COURT:  Thank you, Mr. Beibin.

12           Cross-examination.

13           MR. WARNER:  Thank you, Your Honor.

14   CROSS EXAMINATION

15   BY MR. WARNER:

16   Q   Mr. Beibin, isn't it true that Jonathan Frobart stopped

17   doing IME observations for IME Companions more than a year

18   ago?

19           MR. KATAEV:  Objection.  Leading.

20           THE COURT:  Overruled.  It is cross-examination.  If

21   you know.  Do you know?

22           THE WITNESS:  If he did any, it would have been a

23   few, but he worked for the Subin account since the lawsuit

24   started.

25           THE COURT:  How do you know that?

Beibin - direct - Kataev                    28

1          THE WITNESS:  Because Carlos used to run that

2    department and then Jonathan became the person that I would

3    contact.

4          THE COURT:  Who is Carlos?

5          THE WITNESS:  Roa.

6          THE COURT:  Roa.  Okay.

7    Q    To your knowledge, Mr. Frobart worked directly for Subin

8    Associates?

9    A    I think that he worked for Safa.  I think he worked for

10   IME Companions.

11   Q    Did there come a time that he stopped working for IME

12   Companions and worked directly for Subin Associates?

13   A    Yes.

14   Q    And when was that?

15   A    Sometime in March, I think.

16          THE COURT:  Of this year.

17   A    Of this year.

18          MR. WARNER:  I have no further questions.

19          MR. KATAEV:  Just one on redirect.

20          THE COURT:  Yes.

21   REDIRECT EXAMINATION

22   BY MR. KATAEV:

23   Q    The three law firm customers that you served for IME

24   Legal Reps, they were previously customers of IME Companions;

25   correct?

```
                    Proceedings                    29
```

1  A    They were.

2            MR. KATAEV:  I have nothing further.

3            THE COURT:  Okay.  You may step down.  Thank you

4  very much, Mr. Beibin.  You are also free to go.

5            (Witness steps down.)

6            THE COURT:  Now, it doesn't appear, unless they are

7  out in the hallway, that the three other individuals that you

8  subpoenaed are here.

9            Do you know if they are, Mr. Kataev?

10           MR. KATAEV:  I'm not aware, but the next person I

11 would want to call, if he is here, is Jonathan Frobart.

12           THE COURT:  Okay.  Okay.  Is Mr. Frobart here?

13           MR. LEVI:  I'm going to check.

14           THE COURT:  Okay.

15           MR. KATAEV:  Do you know whether he's here?

16           MR. WARNER:  I don't.  I gave him notice in

17 accordance with the Court's order.  I didn't want to be seen

18 as, quote/unquote, tampering with the witness.

19           THE COURT:  You are certainly free to talk to a

20 witness but that's okay.

21           Is anyone out in the hallway?

22           MR. LEVI:  No.

23           THE COURT:  Who is out in the hallway?

24           MR. LEVI:  Currently, no one, Your Honor.

25           THE COURT:  Did you say there was someone there?

Proceedings                                          30

1          MR. LEVI:  Before I saw two people last time.

2          THE COURT:  Sir, who are you?

3          MR. LEVI:  Haim Levi.

4          MR. KATAEV:  It's Haim Levi, Your Honor, the husband

5     of Danielle Levi.

6          THE COURT:  But Mr. Levi, either of you, you don't

7     know if the person who was in the hallway before had anything

8     to do with this case; is that right?

9          MR. LEVI:  That's right.

10         THE COURT:  It appears to me at the moment we have a

11    little bit of a lull.  I can take this opportunity to talk

12    through a few issues with the parties.  I will say that based

13    on the allegations and what appears to be some undisputed

14    events, namely the selling of the IME Companions websites with

15    the name of the enjoined customers still on it to me is in

16    contravention of my order.

17         The defendants were not supposed to transfer or

18    transmit the customer list that contained any former IME

19    WatchDog clients.  So the selling of that website, which Ms.

20    Gelardi has admitted, with the names of those customers

21    clearly violates my order and I don't understand the

22    explanation for why that happened.

23         MS. GELARDI:  Are you asking me?

24         THE COURT:  I'm asking your lawyer because that on

25    its face is in violation of the order even if they were taken

Proceedings                                                   31

1    down by the subsequent buyers of website.  The transfer was

2    made and then at that point the damages will flow towards your

3    client because she violated my order.

4              Is there an explanation, Mr. Gelardi, do you want to

5    explain?

6              And, Mr. Warner, I don't know if you want your

7    client simply speaking on the record.

8              MR. WARNER:  Yes, I want her to speak on the record.

9    And by the way, I disagree, I don't think Your Honor's order

10   had anything to do with the sale of the website.  And

11   specifically --

12             THE COURT:  You can sit down and use the microphone.

13             How is transferring, selling the exact names of

14   those customers to another party not transferring and using,

15   in some way those names?  I don't care if it went through a

16   website or text or by carrier pigeon.  I believe it's

17   transferring the names.

18             MR. WARNER:  I don't believe that that's what

19   happened.  I can put my client on the stand if you'd like.

20             THE COURT:  Unless I misread something in the record

21   here, I think Ms. Gelardi acknowledged that when they

22   transferred the website, it did contain the names of some of

23   the enjoined customers, but the defense's explanation is the

24   new company took down those names.  That is irrelevant to me.

25   The transfer is what I'm concerned about.

Proceedings                                                    32

1          MS. GELARDI:  Your Honor, we sold the website only.

2    We gave them access to the website, gave him the people who

3    were hosting the website.  He then was working with the

4    website developers to migrate into his own -- into his own

5    website.  It was in migration mode.  They were supposed to get

6    that done, within 48 hours.  I had no control over the

7    website.  When I got served the order, as soon as we made the

8    transfer, IME Companions, I had no control over it.  They

9    wouldn't even speak to me.

10         THE COURT:  Let me ask you a simple question, you

11   sold, you knowingly sold your website?

12         MS. GELARDI:  Correct, I sold the website that I

13   built and we transferred that website to the domain that he

14   wanted.

15         THE COURT:  But let me --

16         MS. GELARDI:  That was the transaction.

17         THE COURT:  At the time you sold it, you knew that

18   that website displayed the names of customers who are on this

19   enjoined customer list; correct?

20         MS. GELARDI:  Your Honor --

21         THE COURT:  That's my question.  Did you know that

22   the names of these customers who are on this enjoined customer

23   list were still being displayed on that website or were in

24   some way in the website?  I don't know the precise technical

25   term.  But that conveyed, basically, to the buyer?

Proceedings                                                  33

1          MR. KATAEV:  Your Honor, I apologize.  Before she

2     answers, may she be sworn in?

3          THE COURT:  I'm not interested in that.  I'm viewing

4     your statements as --

5          MS. GELARDI:  Your Honor, so, when I sold the

6     website, we needed the money.  That's all we had.  We had to

7     do something.  We needed to pay our mortgage.  We --

8          THE COURT:  No, no, no, no.  Stop.  Stop.  Stop.

9     Stop.

10         MS. GELARDI:  I'm sorry.

11         THE COURT:  The question is did you know that the

12    names, some of which were from this enjoined customer list

13    were still on that website when you sold it?  That's my only

14    question.

15         MS. GELARDI:  Your Honor, I didn't pay attention.  I

16    didn't even think of that when I sold the website.  The whole

17    website was supposed to change.  I wasn't thinking what was on

18    it.

19         I just know that it's a very well-built website and

20    it was worth money and I sold it.  I never even thought to say

21    remove this quick.  I just said you have to change it all.  He

22    had his own vision.  All I did was sell it because I needed to

23    sell it and it was very expensive.  I didn't think of any

24    other portion of that, to be honest.  I had no idea to tell

25    him remove this immediately.  We just sold it.  We sold the

Proceedings                                                   34

1     back-end.  We didn't even sell the front-end.  The wholesale

2     was the back-end of the website was very well-built.  The

3     front-end -- anyone can change a picture, anyone can change a

4     word.

5            What I sold him on was how it works on the back-end

6     and then he was like oh, this is great.  He took it.  He was

7     going to put his own vision into it.

8            I didn't even think after I sold it, I didn't even

9     think about what was on it.

10           THE COURT:  Let me say this in terms of the law,

11    quite, frankly, for civil contempt, whether you knowingly

12    violated the order or not is not relevant and isn't required.

13           The question is did your action violate the

14    preliminary injunction.  And to me, it did, because you ended

15    up conveying exactly the customer list that you were not

16    supposed to transfer to anyone.  That you did it unknowingly

17    is not the issue.  Your conduct ended up doing that and the

18    question becomes what consequence there ought to be.  That's a

19    baseline.

20           And then further, I do want to find out if you had

21    any role in some way of enabling the successor organization --

22    I shouldn't call it that, but what you're saying is this new

23    organization created by Ms. Liddie and Ms. Hall, the same

24    prohibited information, the same stolen trade secret, namely,

25    the customer list from IME WatchDog, and my concern is it's

Proceedings                                                    35

1    clear to me that the same individuals who worked for you first

2    at IME Companions and, quite honestly, Stealth for the next

3    entity you created in complete contravention of my order went

4    to go work for Mr. Hall and Mr. Liddie.

5              It's also clear that they went and provided

6    services, albeit for Liddie and Hall to some of these same

7    enjoined customers.  That's my concern.  These former

8    employees of yours took with them the same knowledge and used

9    it.

10             I understand that perhaps, and I don't know where

11   the evidence is going to lead, you didn't specifically

12   instruct them to do that, but this is a problem in terms of

13   compliance with the order.  I basically have to order that Mr.

14   Liddie and Ms. Hall do not use that information.  To me it is

15   no different then, and I'm going to use this analogy, someone

16   who works at Coca-Cola, they learn what the formula is, the

17   secret formula is, the protected trade secret as to the

18   formula with Coca-Cola and take it with them and use it

19   somewhere else.  It cannot be used elsewhere and it's not

20   necessarily relevant that you were the one who told them to do

21   it or somehow had a hand in that.  But the bottom-line is it

22   violated the terms of or the restrictions I placed via the TRO

23   and the preliminary injunction.  That those trade secrets

24   should not be -- and here we are talking about the customer

25   list from WatchDog -- should not be conveyed to other IME

1   companies to be used.

2           MS. GELARDI:  Your Honor, I never gave any list,

3   Your Honor.  There are zero trade secrets to this business.

4   There are no trade secrets.

5           THE COURT:  You can dispute this with me, but I

6   found otherwise.  The website alone ended up --

7           MS. GELARDI:  And the agents are independent

8   contractors, Your Honor, they are not employees.

9           THE COURT:  You know what, Mr. Warner, please

10  control Ms. Gelardi.  I'm not going to argue legal points with

11  you.

12          I'm telling you -- I'm more speaking to your lawyer

13  about this -- to me the violence has occurred merely by the

14  website being transmitted with the enjoined customers still

15  listed on it.  That's a fact.

16          MS. GELARDI:  I was never even told to take them

17  down, Your Honor.  I never touched the website, even after the

18  -- no one told me to remove those clients from -- as previous

19  customers of IME Companions.  I was never even told to take

20  them down.  I would have taken them down.

21          THE COURT:  Ms. Gelardi, the problem is for you for

22  civil contempt it doesn't matter that you intended to violate

23  the order.  Your actions ended up violating the order.

24          When you transmitted that website in its state with

25  the information still embedded in it, even if you thought he

Proceedings                                                    37

1   was supposed to change it, you ended up transferring they

2   actually -- and I'm calling them trade secrets -- that's what

3   I found, the stolen list of IME customers, the contacts -- I

4   shouldn't say contacts -- the names of the customers ended up

5   going with the website.

6            MS. GELARDI:  Your Honor, I was never asked to take

7   down that list.  I would have taken it down before I sold it.

8            THE COURT:  Okay.  I'm not debating this with you

9   any more, in the sense that you can't debate the law for me.

10  The law doesn't necessarily require that you acted knowingly

11  in violation of the order.  You did end up violating the

12  order, and that's the point.

13           MR. WARNER:  Your Honor, can I be heard on this.

14           THE COURT:  Yes, please.

15           MR. WARNER:  Respectfully, your order does not

16  enjoin any transfer of information.  If you look at your

17  order, specifically it says they cannot do work for the

18  enjoined customers on the list.

19           THE COURT:  But they can't sell the list either.

20  That's, in effect, what happened.

21           MR. WARNER:  But, Your Honor, there was no such

22  order.  There was no such order.

23           MR. GELARDI:  May I speak?

24           THE COURT:  Hold on.  I don't want to hear from the

25  parties.  I just want to hear from the lawyers, go ahead, Mr.

Proceedings                                                    38

1    Kataev.

2           MR. KATAEV:  Your Honor, with respect to this

3    argument that your most recent order doesn't prohibit the

4    conduct, that's untrue.  Your most recent order on March 27th

5    expanded the prior amended preliminary injunction.

6           The prior amended preliminary injunction prohibits

7    the transfer of the trade secrets.

8           More importantly, the DTSA not only prohibits

9    misappropriation, but prohibits the next step:  The

10   dissemination.  And that's what happened here.  There was

11   dissemination.

12          This discussion last year with Mr. Liddie about

13   opening up a franchise, that's been prohibited.  So if he

14   discussed it last year prior to the injunction that came in

15   that prohibited franchising, he's effectively doing that now.

16   That's a violations.

17          And these new companies:  IME Legal Reps, Client

18   Exam Services, we're learning of other new companies coming

19   out of the blue, they are alteregos or successors.  And we

20   would be able to prove that by showing that the same

21   customers, the same individuals that worked there, whether

22   they are independent contractors or employees, the same

23   equipment, all of the same tools used, that's what creates an

24   alterego or successor relationship.  And we're here playing

25   Whac-A-Mole and it's just not fair.

Proceedings                                              39

1          THE COURT:  Mr. Warner, I'm going to take a look at

2     the preliminary injunction.

3          MR. WARNER:  Thank you, Your Honor.

4          THE COURT:  I will be very surprised if it doesn't

5     include a prohibition on disseminating that information

6     because that is the essence of the harm that is caused by the

7     theft of trade secrets, the whole purpose of an injunction.

8     And it would just be shrewd and calculated interpretation on

9     your part or your client's part to read it otherwise, that

10    somehow she was allowed to disseminate the stolen information

11    to another company.  We've been through this already, and I

12    cannot imagine there's any genuine misunderstanding, because

13    that is the specific harm that is intended to be prevented

14    from a preliminary injunction.  That's why these types of

15    trade secrets, client lists, et cetera, are considered to be

16    such.

17         Let me get the order here.

18         MR. KATAEV:  While you're pulling that you up, Your

19    Honor.

20         THE COURT:  Hang on a second.

21         Go ahead, Mr. Kataev.

22         MR. KATAEV:  It's docket entry 80 for the original

23    preliminary injunction.

24         And I also want to point out from the March 27th

25    hearing transcript at pages 129 to 131, you expressly told Ms.

Proceedings                                                    40

1  Gelardi that all of the information that IME Companions has

2  should not be disseminated.  The defendants may not use that

3  information in any way, either give it to any other company to

4  use or to use it themselves --

5            THE COURT:  You got to go slower.  Please, Mr.

6  Kataev.

7            MR. KATAEV:  -- to conduct any business in the IME

8  space or industry, full stop.

9            The Court took the time to explain this to the

10 defendants on March 27th, and they still went ahead and

11 engaged in this conduct.

12           THE COURT:  Mr. Warner, I'm rejecting any argument

13 that suggests that somehow you and your client believed she

14 was allowed to disseminate the list.

15           I'm focused on the fact that she said she didn't do

16 it intentionally, but ultimately that doesn't matter because

17 the effect of her conduct was to violate the order by

18 disseminating through this website --

19           MS. GELARDI:  Your Honor --

20           THE COURT:  I don't want to hear from you anymore,

21 Ms. Gelardi; you're not a witness and you're not a lawyer.  I

22 don't want to debate issues of law or your --

23           MS. GELARDI:  They lied.

24           THE COURT:  No. Stop.

25           MS. GELARDI:  They lied.  They lied.  They have

Proceedings                                                    41

1   deceived you, Your Honor.

2            THE COURT:  We're going to have to remove you if you

3   don't control yourself.  We are going to call a court officer

4   in a moment.

5            Any more outbursts, you're going to be removed.

6            These are points of law.  For one, the preliminary

7   injunction does prohibit the dissemination of this

8   information, the use of it in any way.  I'm actually looking

9   at it now.

10           And it should not be read otherwise.  And Mr. Kataev

11  is right, I have been very clear on the record about that.

12  And it should be obvious.

13           And, Mr. Warner, you cannot argue to me as an

14  officer of the Court that somehow an injunction that is based

15  a finding of harm because of the potential risk of

16  dissemination of trade secrets, that the PI wouldn't cover

17  that dissemination and prohibit it.  That's just not a

18  reasonable, and I would say good-faith argument, and I would

19  urge you not to keep arguing that, that somehow your client

20  was somehow free to disseminate the stolen customer list.

21           I'm looking at it now.  In fact, they were supposed

22  to return all of that information under the order and I don't

23  know if that's ever happened.  I'm looking at the specific

24  prohibitions.

25           So, to me, there has already been a violation by

Proceedings                                              42

1   virtue of the transfer of this website that contained the

2   customer list.  Now, whether that resulted in harm or not is

3   unclear to me.

4           What I don't know, and I want to hear from the

5   owners of this new company is how that entity came into being,

6   what information they did use to start their business because

7   clearly they are using, or they are servicing some of the same

8   clients that were serviced by IME Companions, but apparently

9   stolen from IME WatchDog.

10          I gather that Mr. Subin's firm is one such customer;

11  is that right?

12          MR. KATAEV:  That's correct.

13          THE COURT:  So, again, I think just to state the

14  law, the elements for a civil contempt are basically three:

15  First is that the order that the party failed to comply with

16  is clear and unambiguous; second, that the proof of

17  noncompliance is clear and convincing; and third, that the

18  party has not diligently attempted to comply in a reasonable

19  manner.

20          (Continued on next page.)

21

22

23

24

25

Proceedings                                                    43

1    (Continuing)

2           THE COURT:  Now I will say, what Ms. Gelardi says

3    about not knowingly transferring the names from the website

4    may inform that last element.  But again, the question is

5    diligence.

6           Here I find that just selling the website without

7    any consideration of the information contained in it, does not

8    suggest diligence to me.  And I want to hear further, however,

9    about what connection, if any, the defendants have to this new

10   entity that is apparently exploiting some of this information.

11          Can you find out, I don't know if you're going to be

12   able to find out, whether these other witnesses are coming.

13          Did anyone contact you, Mr. Kataev?

14          MR. KATAEV:  There is only one attorney who

15   contacted me, a Ms. Charrington.  She represents Mr. Liddie.

16   She does not apparently represent Ms. Hall.  Their marital

17   status appears to be in question; that's irrelevant, as far as

18   I'm concerned.  I haven't received word back from her after I

19   informed her of the order that this Court issued.  She

20   confirmed receipt of it.

21          The only issue she had was, she at Nassau County

22   Supreme Court at 9:30 morning and she wasn't sure she'd be

23   able to get here by noon.  I told her 1:30 is fine.

24          I can reach out to her if you would like.

25          THE COURT:  I'm wondering about are the other three

Proceedings                    44

1    agents.

2              MR. KATAEV:  I haven't heard from any of them, but

3    they have been served.  The defendants were directed to inform

4    them of it.

5              THE COURT:  Well, they did that, I gather, from what

6    Mr. Warner said, he did provide them with the subpoenas.

7              MR. WARNER:  Not the subpoenas, I sent them your

8    order itself.

9              THE COURT:  Right.  Notifying them that they were

10   supposed to be here at noon.

11             MS. GILARDI:  Your Honor, may I, please?

12             THE COURT:  You can speak through your lawyer.

13             Why don't we do this, I suspect we should take a

14   short break while we wait for Ms. Hall and Mr. Liddie.  They

15   are not due here until 1:30.

16             MR. KATAEV:  That's correct, your Honor.

17             THE COURT:  It's about 1:00 o'clock now.

18             MR. KATAEV:  If the Court wishes, we could call

19   Ms. Gelardi to the stand.  We have some questions prepared for

20   her.  I'm not sure if the Court wants to hear from her.

21             THE COURT:  If you think it's relevant, I will hear

22   from her.

23             MR. KATAEV:  Let me confer with my client.

24             THE COURT:  You can ask whether or not she had any

25   role -- and she has denied that -- in this new entity being

Rivka Teich, Official Court Reporter

Proceedings                                           45

1    created, other than selling the website.

2              MR. KATAEV:  I conferred with my clients.  We're

3    amenable to taking a break.

4              THE COURT:  Before we do, though, I want to discuss

5    a couple of aspects of your application, though, that as a

6    matter of law, I think I'm prepared at least to give you some

7    indication of how I would rule.

8              You've requested criminal contempt, that I cannot

9    do.  Any kind of criminal sanction would have to be, I

10   believe, found by a jury rather than me and based on beyond a

11   reasonable doubt standard.

12             There is a step-wise progression, as you probably

13   know, for civil contempt.  And then usually coercive find, if

14   I find civil contempt.  And then if there is further

15   contumacious conduct, some notice that to be given for the

16   potential for criminal contempt.  And if there is going to be

17   any kind of criminal process, that has to be initiated with an

18   actual arrest warrant and all the attending criminal

19   processes.

20             I have been through that process before, but it

21   would be inappropriate in this case at this stage.  So I'm not

22   granting any kind of criminal contempt relief.

23             Now there is also this issue about attachment.

24   Obviously, some of that will depend, the resolution of that,

25   will depend on what evidence I hear relating to fraud by the

Proceedings                                    46

1   defendants.  As you know, the relevant test has to do with

2   whether there are badges of fraud established.  But I guess

3   even beyond that, there are certain facts that I don't have

4   any evidence about that I would have to have before making any

5   finding of attachment.

6        So under CPLR 6021(3), in order to get the kind of

7   attachment the plaintiff wants, they have to demonstrate that

8   there is a stated claim for a money judgment; that there is a

9   probability of success on the merits; that the defendant, with

10  the intent to defraud the creditors, would frustrate the

11  enforcement of adjustment; removed or tried to dispose of or

12  incumber property within the state.  Then lastly, that the

13  amount demanded from the defendant is greater than the amount

14  of all counter claims known to plaintiff.

15       So, much of the evidence that I would need to make

16  these findings, especially the last one, hasn't been produced

17  yet, because I have no idea what the purported damage amount

18  is that's being claimed here, and I don't have any idea of the

19  value of the property at this point.  But more importantly, I

20  think some kind of damage calculation has to be done.  And I

21  know, Mr. Kataev, you said that you would retain an expert for

22  that purpose.  But it certainly would be premature, I think,

23  at this point for me to order attachment until I get some of

24  that information.

25       The other factors obviously may depend, as I said,

Proceedings                                          47

1   on what evidence I hear today about actual fraud or an intent

2   to defraud.  Right now I couldn't attach any property based on

3   the record, even based on the alleged acts here because I am

4   missing some critical information.

5           The other thing I'll address sua sponte, or I think

6   the defense did raise this, there was a request for me to

7   remove or modify the injunction regarding the making of

8   statements that might be viewed as defamatory.  Here I think

9   the defense is right, based on the law relating to prior

10  restraints on expression.

11          There is considerable case law that says that Courts

12  should not issue such prior restraints that do risk infringing

13  speech; but rather, the preferred course is that the Court

14  deal with any actual allegations of slander, libel, defamation

15  after the fact rather than restraining the parties before

16  they've occurred from engaging in such conduct.  Now it may be

17  counter-intuitive perhaps to say that people should be given

18  license in some sense to defame others, but it's a balance

19  here between the right to express oneself without prior

20  restriction by the Court.  Therefore, I will remove that part

21  of the prior injunction I've issued.

22          It applies to both sides.  So both sides will no

23  longer be constrained in that regard.  Except for, obviously,

24  if either side does engage in a defamatory or libel attack,

25  the other side is free to bring them up on either a lawsuit

Proceedings                    48

1    relating to that libel or slander or contempt -- or actually

2    not contempt, just a lawsuit I guess, or a claim I should say

3    perhaps in this case, for such libel or slander or defamation.

4    But that I'm going to do because I think the case law does not

5    allow me to in advance prohibit people from making potentially

6    defamatory statements.  I'm just trying to use the time that

7    we have efficiently here.

8              I think otherwise with respect to civil contempt, I

9    am still, I still need to hear from Ms. Hall and Mr. Liddie to

10   determine if the defendants are in contempt beyond what I

11   already found, which is the conveying of the website, the

12   selling of the website with the names of enjoined customers on

13   it violated the order.

14             As I said before, though, however, the third factor

15   may depend, in part, on what I hear from either of these

16   witnesses.  And perhaps I don't know if it's worth hearing

17   from Ms. Gelardi further on this from the stand.  But what I

18   hear her to say is she simply didn't think about what was on

19   the website before she sold it to Mr. Liddie and Ms. Hall.

20             MR. WARNER:  May I respond to that last statement?

21             THE COURT:  Yes.

22             MR. WARNER:  I think what she said was well beyond

23   that, your Honor.  She said that the sale of the website was

24   supposed to result in a new website being done by the

25   purchaser.  And that to that extent, that the inclusion of

Rivka Teich, Official Court Reporter

Proceedings                                              49

1   names, all publicly available names of law firms, in the

2   original website that she had was not going to be continued.

3   I believe, your Honor, that the new website that the buyer has

4   or is developing doesn't have the names of the enjoined

5   customer list on it or was supposed to have.

6            THE COURT:  Well, the plaintiff has offered proof of

7   that, that in fact the website did contain those names.

8   So elaborate on that proof.

9            MR. WARNER:  My understanding is those names were

10  supposed to be removed by the purchaser.

11           THE COURT:  That's not in any agreement, I don't

12  think.  Is it?

13           MR. WARNER:  No.  The agreement you have that I put

14  before your Honor, it is there.

15           THE COURT:  But more importantly, it doesn't matter

16  if the person is supposed to remove it, she transferred it to

17  another party, and that's the problem.  She should have

18  removed it before turning over this website which clearly

19  contained this information.  And this notion that these are

20  publicly known firms is irrelevant.

21           The point is, by turning over the names of customers

22  that IME Companions had and serviced was a violation of the

23  order itself.  Because these were names that are on the

24  enjoined customer list.  So that is clear.

25           And the preliminary injunction says use in any way.

Proceedings                                            50

1    I gather, you're going to argue that somehow that doesn't

2    cover transferring.  But I don't think there can be any

3    reasonable, good-faith argument that the defendants didn't

4    know that they weren't allowed to transfer these names as

5    customers of IME Companions to another party, when this is

6    specifically the reason I imposed the injunction, is to

7    prevent the continued use of this list by her or anyone else

8    to take business from IME Watchdog in affect.

9            If somehow that's what she believed, I don't think

10   that's a reasonable belief.  I would be surprised if you

11   counseled her in that way.  I think that would be extremely

12   questionable given the extensive proceedings we've had in this

13   case and the pronouncement I've made on the record and the

14   case law itself about why customer lists are considered

15   trademark and protected because of the potential that they

16   will be transferred to other parties and thereby exploited to

17   the detriment of the original owners of those lists.

18           So Mr. Warner, I really do not accept your argument

19   that somehow this was not covered by the injunction.  And

20   again, the fact that the injunction does not specifically say

21   that does not mean that the injunction doesn't apply.

22           The case law is clear that where the conduct is --

23   that the injunction, rather, is legitimately more general in

24   nature because of the necessity to prevent further violations

25   by a defendant where there has been shown a proclivity for

Proceedings                                         51

1   unlawful conduct.  I have found that here, to be sure, through

2   multiple hearings and multiple rounds of submissions.

3        I don't want to be labor this because it will

4   perhaps only inflame the defendants.  There is no doubt in my

5   mind there was actual theft of trade secrets, purposeful,

6   deliberate, even paid for by the defendant of these customer

7   lists and contacts and names and pricing structures from

8   Watchdog.

9        We went through this then another time when

10  Ms. Gelardi effectively created another company that was

11  essentially the same as her company through relatives or

12  friends; then tried to pretend this was an honest, third-party

13  deal with another company just using the information that

14  Ms. Gelardi had stolen, or the Gelardi's had stolen.

15       So I did find here there was a proclivity for

16  unlawful conduct that had to be addressed by a very broad

17  injunction.  And so the fact that every specific way of

18  violating the order is not specified is appropriate here

19  because of the pattern of illegal or inappropriate conduct or

20  contumacious conduct, quite frankly.  Under the case of

21  McComb, which is Supreme Court case 336 U.S. specifically

22  referring to page 192:  It does not lie in the defendant's

23  mouths to say that they have immunity from civil contempt

24  because the plan or scheme which they adopted was not

25  specifically enjoined.  So I rely on that principle here, that

Proceedings                                    52

1  even if there wasn't the specific reference to transferring as

2  opposed to using in any way, which is what is in the

3  injunction, the customer names and lists, that conduct is

4  clearly covered, I find, for purposes of civil contempt,

5  unambiguously and clearly by the preliminary injunction that I

6  offered before.

7          So as I said before, the only issue, factual

8  question that remains, is whether the party has acted

9  diligently in an attempt to comply in a reasonable manner.

10  That I will consider further.

11          But at this moment I'm not convinced of that because

12  it appears that Ms. Gelardi didn't think at all about what was

13  on the website when she sold it to Mr. Liddie.  Let me also

14  note that my June 2022 injunction stated -- I've already

15  looked at that.

16          We can take a few minutes here just to wait for the

17  other witnesses.

18          Before that I'll make one final note, that if I

19  should find that there is civil contempt there are two ways to

20  address it.  One is through coercive penalties or sanction;

21  and the other is through some kind of compensatory damage

22  awarded.  But again, that would require, normally does

23  require, at the time of the filing of the contempt action some

24  calculation of the damages by plaintiff.  So that has not been

25  submitted thus far, so I wouldn't be in a position to order

Proceedings                                                53

1    any kind of compensatory damages.

2              For you folks to consider, while we take a break.

3              It's about 1:15, let's be ready to go at 1:30.

4              MS. FELSEN:  May I make one point, please.

5              This is a never-ending cycle here.  Last time we

6    were here there was one company that was opened up.  When we

7    established that there was a connection to Ms. Gelardi, that

8    company apparently closed.  And from what we heard from

9    Mr. Bibin is now there is a new company.  It's a never-ending

10   cycle.  I don't know that financial penalties is going to do

11   anything.  We need this business to be shut down.  They are

12   just going to continue to use their agents to open up new

13   companies.  This is a third time we're here on this point.

14             THE COURT:  I'm not sure what you mean by shut them

15   down.  In effect, I ordered that IME Companions, or whatever

16   the successor company was called, could not use the contact

17   list stolen from IME Watchdog.  That effectively, or had the

18   effect I gather, of shutting down their business.

19             This new business, I don't know yet.  I can't make a

20   finding until I hear from Mr. Liddie and Ms. Hall whether it

21   is the defendant's company or an actual third-party company.

22             But I will say this, if they, though, are using the

23   enjoined customer list then I'm going to enjoin them from

24   using that information.  It wasn't supposed to have been

25   transferred to them.  I don't know if that will have the

Proceedings                                        54

1  effect of shutting them down; presumably so.  If 90 percent of

2  any business that was built on IME Companion is what

3  Mr. Liddie is running, then they too will be shut down.  But I

4  can't just shut anyone down until I hear the actual evidence

5  that proves that somehow they are using the stolen information

6  or that the defendants are actually involved in someway in

7  this new entity.

8          MS. FELSEN:  I believe Mr. Bibin established that

9  today.  He basically just keeps jumping from one of these

10  companies that goes back to Safa to another company.  He is

11  still doing IMEs for companies on the restricted list.

12          THE COURT:  That is true.  But the question -- I can

13  enjoin that, but I don't know how that happened.  That's what

14  I was trying to figure out how it is he came to work for

15  Mr. Liddie; and again, the missing pieces.  I want to know how

16  Liddie started his business.  Quite honestly, I assume he

17  might say, I took the website, I called all these customers

18  that were listed on it, and we started working it.  Or, I

19  called the former workers for that company.  And although it

20  sounds like he's the one that told them where to go, they

21  didn't independently say I should go to Subin & Associates.

22  When I asked him, he didn't suggest it and you didn't ask him

23  point blank.

24          But it seems to me the instructions are coming from

25  Mr. Liddie.  The question is, how did Mr. Liddie find those

Proceedings                                          55

1   clients.

2          And again, let me go back here.  There was in the

3   order, at one point on the record I did say, that the enjoined

4   customer list could not be posted anywhere.  So certainly they

5   weren't supposed to be on a website.  And certainly shouldn't

6   have been on the website that you transferred to another

7   company.

8          How ever you look at this issue, the transfer of the

9   website still containing those names, purportedly as customers

10  of IME -- I forget the name of the last one, Client Services.

11         MR. KATAEV:  Legal Reps.

12         THE COURT:  Client Services I think was the one that

13  was essentially set up by Ms. Gelardi through her family

14  members.  That shouldn't have had that website -- that website

15  should not have contained those names.  Period.  They

16  shouldn't have been posted on there, contained in their

17  metadata or anything, I don't know what the right expression

18  is.

19         But what is clear to me is it did get transferred.

20  I'm assuming Mr. Liddie is going to confirm that to him and he

21  probably used it to start his business.  And I'm going to have

22  to shut that down.

23         MR. KATAEV:  Your Honor, the inference could be made

24  that if the website was transferred from the defendants to

25  Mr. Liddie, and if he last year went to observe an IME to

Proceedings                                              56

1  learn about the industry, which appears but has not been

2  confirmed was done by Safa -- Mr. Bibin himself said it was

3  probably Safa -- then it could be inferred that everything

4  that flows from it is from the Gelardi's to Liddie.

5          The point is that the same customer is being served.

6  Subin and Associates on the customer list.  Subin and

7  Associates was served initially by my client, IME Watchdog.

8  It was misappropriated by the defendants at Companions.  Then

9  it was served by Client Exam Services.  And it's now being

10 served by IME Legal Reps.

11         It's not a fatal leap of logic to infer that this is

12 something that was continued to be misappropriated and

13 disseminated to these new companies.

14         THE COURT:  If Mr. Liddie was actually trying to

15 start a business a year ago, it seems to me that might have

16 predated the filing of when was this case filed.

17         MR. KATAEV:  The point is, your Honor, once

18 defendants have the enjoined customer lists and the injunction

19 went into effect, I believe they had a legal obligation to say

20 to Mr. Liddie, hey, we are enjoined from serving these

21 customers.  You are taking over the mantel here to proceed

22 with this business.  You're not allowed to serve these

23 customers.  There was a duty at that point.

24         THE COURT:  I'm not disputing that necessarily.  I

25 want to know what information Mr. Liddie got when he got the

Rivka Teich, Official Court Reporter

Proceedings                                        57

1   website.  My assumption, based on what I have before me at

2   this point, is that that's how he found these names; unless

3   Ms. Gelardi flat out violated the injunction by giving him a

4   list.  But I'm assuming that he used the website information

5   to start his business.  But I have to hear from him.

6            Your reference to Mr. Liddie wanting to start his

7   own business a year ago, I don't think helps you; I think it

8   works against you.  Because it suggests that maybe Mr. Liddie

9   on his own did in fact want to start a business.  And that

10  Ms. Gelardi is in fact not involved in that business.  And

11  unlike the last time we were here, didn't get Mr. Liddie to

12  take it over so she could continue in someway to profit from

13  it.

14           I think that fact -- and I want to hear what he says

15  about it -- is relevant to whether or not he's acting truly as

16  an independent third-party who started a business, seemingly

17  and potentially unknowingly using the trade secrets

18  information he wasn't supposed to have or use.

19           But I'm not at this point finding that he has acted

20  in knowing violation of the order at all.  I've already found

21  that the order was violated by the transfer of the website

22  with that information in it.  But again, let's go back to

23  that.  Your proof on that, is what?

24           MR. KATAEV:  On this issue that we're discussing

25  with Liddie?

Proceedings                                        58

1          THE COURT:  No, simply on the website being

2    transferred to Liddie with the names of the clients

3    essentially stolen from IME Watchdog still on it.

4          MR. KATAEV:  At 197-2, docket entry?

5          THE COURT:  Yes.

6          MR. KATAEV:  I believe the pages are --

7          THE COURT:  These are screenshots, correct?

8          MR. KATAEV:  Page nine of that document, there is a

9    review by Eric D. Subin of Subin and Associates.

10         THE COURT:  These are screenshot on what date?

11         MR. KATAEV:  It's in my brief, I can pull it up.  I

12   may have put the last access date.  On or about April 14

13   sounds right.

14         THE COURT:  April 16, 2023.

15         MR. KATAEV:  I believe it was before.  This was

16   filed on April 18, so we know it was before then.  It was a

17   short time before then, I can't give you the exact date.  I

18   would say on or about April 14, that's one.

19         And the other point I would make.

20         THE COURT:  Who are you, ma'am?

21         MS. HALL:  Shakkiya Hall.

22         THE COURT:  Ms. Hall is here.  I think you want her

23   to step outside though.

24         Please step outside.  We'll be with you in a second.

25         MR. KATAEV:  That's our proffer on the website.

Rivka Teich, Official Court Reporter

Proceedings                                    59

1          The other issue that I think should be raised about

2     the website, and I'll admit we don't have evidence on this

3     point, is the IME Watchdog website was designed to accept

4     orders by law firms through the website.  That functionality

5     was something that may have been misappropriated by the

6     defendants as well because of their extensive contact with

7     Adam Rosenblatt.  That's something we have to explore.  Even

8     without the customer names there, the mere transfer of the

9     website itself, I submit, is part of the complaintive conduct

10    here.

11          MR. WARNER:  Your Honor, if I may.  I don't believe

12    that.  I'm looking at the exhibit that Mr. Kataev has.  He

13    constantly talks about the enjoined customer lists being

14    included; but it's not included on the website, your Honor.

15    There is a single -- it's just not.  I'm looking --

16          THE COURT:  I'm looking at 197-2.

17          MR. WARNER:  Yes, exactly, your Honor.

18          THE COURT:  Mr. Kataev, where are the names of the

19    clients.

20          MR. KATAEV:  197-2, page nine of 12, there is a

21    review left by a customer, the customer Subin and Associates.

22    That customer is on the enjoined customer lists.  There are

23    other reviews, this is what was taken at the time.

24          If you look at left and right, there are arrows.  If

25    you click the arrows, it shows different customers.  Virtually

Rivka Teich, Official Court Reporter

Proceedings                                          60

1    all of them are on the enjoined customers' list.

2            THE COURT:  How many were on the website at that

3    time?  Because this is -- obviously it's been changed or taken

4    down.  So unless someone preserved it, I don't know what other

5    evidence you have.

6            MR. KATAEV:  It was not preserved.  But I can

7    represent to the Court that there were approximately at least

8    six reviews, six separate reviews.

9            MR. WARNER:  Your Honor, perhaps we can have

10   testimony about this rather than Mr. Kataev's testimony.

11   There is no list on this website.  The name of a Subin from

12   Subin and Associates in a review.

13           THE COURT:  All right.  I will hear from Ms. Hall

14   and Mr. Liddie about what they received via the website or

15   otherwise when they started their business.

16           The one last point I want to make too, is that the

17   plaintiff did file a motion essentially alleging that

18   Ms. Gelardi engaged in defamation when she posted words to the

19   affect of:  Even criminals and predators are treated better

20   than others in the legal system.

21           I know that plaintiff argues that that is clearly

22   referencing Ms. Levi and Mr. Roa.  But I don't find that

23   posting in and of itself is so specific to either of them.

24   It's only people who are involved in this case who would

25   presumably make that association.

Rivka Teich, Official Court Reporter

Proceedings                                                    61

1        While it's clear to me that the intent of it was to

2   actually antagonize the plaintiffs in this case, that doesn't

3   make it defamatory in and of itself.  Free speech being fairly

4   broad, I'm not going to find any kind of actual defamation

5   respect to that.

6        I think it's a bad idea, Ms. Gelardi, because

7   obviously you don't just mean you keep having to come back to

8   court when the plaintiff gets upset about it and makes an

9   issue.  You're throwing good money after bad by sending out

10  such ill-advised or posting such ill-advised statements, but

11  that's your choice.

12       I don't find that constitutes defamation and

13  violation of then-existing order.  With the caveat that it

14  probably wasn't proper for me to issue a prior restraint on

15  speech in that record.

16            MR. WARNER:  Your Honor, may Mr. Kataev and I

17  approach the bench specifically about this issue?

18            THE COURT:  I'm done with it.

19            MR. WARNER:  I prefer not to be in open court on the

20  record.

21            THE COURT:  I ruled in your client's favor.

22            MR. WARNER:  I think your Honor should be aware of

23  certain things.  I don't want to be on the record in open

24  court, irrespective with the dissolution of the prior

25  injunction.

```
                          Sidebar                        62
```

1          THE COURT:  Do you care if the parties who are here

2     hear it?  We can just seal this portion of the transcript.

3     The only other individuals are --

4          MR. WARNER:  I prefer if your Honor if we could.

5          (Sidebar conference.)

6          MR. WARNER:  There is another reason why these

7     aren't defamatory but also true, Judge.  I have documents

8     here today to provide to you.

9          THE COURT:  No, no.  I'm not interested in those.

10    I'm not here to discuss whether or not her allegations about

11    child predation are true or.  I'm not interested.  That's not

12    what this case is about.

13         MR. WARNER:  I know it's not, Judge, but,

14    defamation, defamation, liable, liable five or six times in

15    Mr. Kataev's memorandum.  And I think it's inappropriate for

16    us to be called back, it's one thing to be called to say that

17    we're in contempt for selling a website with a name on it.

18    But it's another thing to be accused of defamation, when the

19    reality is that might have -- that it's not defamatory.

20         MR. KATAEV:  They had an opportunity to submit this

21    in opposition and they didn't.  Why are they raising it now?

22         THE COURT:  I'm not sure you want to invite that.

23         MR. WARNER:  Specifically because of what your Honor

24    said about disparagement as well.  I didn't want to be in

25    violation of the order.

```
                              Sidebar                    63

  1            THE COURT:  What I suggest is, Mr. Kataev, you are

  2    now on notice that the defendants believe that they actually

  3    have information establishing that Mr. Roa, I guess.

  4            MR. WARNER:  Not Mr. Roa.

  5            THE COURT:  Ms. Levi is a criminal?

  6            MR. WARNER:  Yes.

  7            THE COURT:  And the prior allegation was something

  8    about working with narcotics traffickers?

  9            MR. WARNER:  Judge, I have a copy an Indictment.

 10            MR. FELSEN:  How was she was admitted as an

 11    attorney?

 12            MR. WARNER:  How?  It's a very good question.

 13            THE COURT:  Hang on.  I want to clarify.

 14            You're not suggesting you have any evidence

 15    indicating that Mr. Roa is a child predator that was alleged

 16    before by your client.

 17            MR. WARNER:  I do not have evidence at this time.

 18            THE COURT:  Okay.  But you are claiming and putting

 19    your adversaries on notice that you say you have competent

 20    evidence, an Indictment or something else --

 21            MR. WARNER:  And a guilty plea.

 22            THE COURT:  And a guilty plea, supposedly, by

 23    Ms. Levi indicating that she was guilty of some drug

 24    trafficking-related crime.  Obviously, you can show that to

 25    the opposing counsel.  They will be on notice that perhaps
```

Sidebar                                                    64

1   they shouldn't be bringing defamation claims in the future.

2          Right now I'm lifting the ban on anyone potentially

3   making those statements.  But obviously, if the plaintiff

4   decides to bring a later claim for defamation, they are on

5   notice that you think you have the goods to show that it's

6   true, the allegation.

7          MR. WARNER:  I don't just think it, I have the

8   documents.

9          THE COURT:  I really don't care about the merits of

10  this argument, to be honest.

11         MR. WARNER:  That's why I didn't put it in my

12  papers, Judge.  But at the same time, it's hard to not to be

13  dragged into court.

14         THE COURT:  I suggest you share it with the other

15  side if you want to prevent being hauled into court.  Give him

16  the information that you have.

17         MR. KATAEV:  We can work together on it.

18         THE COURT:  You're put on notice that he claims he

19  has information that shows a true statement that she was

20  convicted of a drug trafficking crime.

21         MR. WARNER:  Not drug trafficking, that's a

22  misstatement, of a money laundering conspiracy charge.

23         THE COURT:  Where the alleged underlying activity

24  was drug dealing.

25         MR. WARNER:  Correct.

```
                        Sidebar                         65
```

1           THE COURT:  You're on notice.

2           Share that information with them so this they won't

3   bring a defamation complaint, should your client decide to go

4   public with some statement.

5           MR. KATAEV:  Which was done.

6           MR. WARNER:  I avoided going public today

7   specifically, I didn't think it was appropriate.

8

9           (End of sidebar conference.)

10          (In open court.)

11          THE COURT:  Let's have Ms. Hall come in.

12          MR. KATAEV:  We have Mr. Liddie here, I can make a

13  proffer as to him.

14          THE COURT:  We can.  Or do you want to call him

15  first?

16          MR. KATAEV:  I will call him first.  But I'd like to

17  make the proffer briefly.

18          The evidence will show his testimony will show, we

19  anticipate, that he's currently and has been for over a decade

20  a police officer.  Police officers are not permitted to work

21  outside of being a police officer without prior approval,

22  according to the administrative guide for police officers.

23  And it's limited to no more than 20 hours a week additional.

24          There is just no way that this full-time police

25  officer, who is not permitted to work more than 20 hours a

Liddie - direct - Kataev                    66

1  week, is someone who is capable of starting, forming, running

2  an IME observer business.  It is very much a full-time,

3  80-hour a week type of job.

4            THE COURT:  So ask him the questions to establish

5  that.

6            MR. KATAEV:  One last point is, we have evidence

7  that he previously served as an IME observer.  We'll be

8  presenting that evidence today, for IME Companions.

9            THE COURT:  Okay.  Let's hear from Mr. Liddie first

10 then.

11           Your name, please?

12           MS. CHARRINGTON:  Karen Charrington,

13 C-H-A-R-R-I-N-G-T-O-N.

14           (Witness takes the witness stand.)

15 **EUGENE LIDDIE**, called as a witness, having been first duly

16 sworn/affirmed, was examined and testified as follows:

17           THE COURTROOM DEPUTY:  State and spell your name for

18 the record.

19           THE WITNESS:  Eugene, E-U-G-E-N-E, Liddie,

20 L-I-D-D-I-E.

21           THE COURT:  You may inquire, Mr. Kataev.

22 DIRECT EXAMINATION

23 BY MR. KATAEV:

24 Q    Mr. Liddie, good afternoon.

25 A    Good afternoon.

Liddie - direct - Kataev                         67

1   Q     You are currently an NYPD officer at the 101 Precinct,

2   correct?

3   A     Yes.

4   Q     Your badge number is 22207, correct?

5   A     Yes.

6   Q     You have served as an NYPD officer since July of 2011,

7   correct?

8   A     Yes.

9   Q     You work full-time; is that right?

10  A     Yes.

11  Q     You also know of Safa and Vito Gelardi, seated at the

12  table across from me, correct?

13  A     Correct.

14        THE COURT:  Please go slower.

15  Q     Your relationship with the Gelardis dates back to before

16  they opened their business IME Companions in 2017, correct?

17  A     Incorrect.

18  Q     When was the first time you met the Gelardis what year?

19  A     I met the Gelardis, met them like conversation, 2021, in

20  2021.

21        MR. KATAEV:  I'd like to approach the witness and

22  the Court with exhibits for Mr. Liddie.

23        THE COURT:  All right.

24        MR. KATAEV:  Let the record reflect that Ms. Levi is

25  handing over a set for the defendants.

Liddie - direct - Kataev                                    68

1   Q    If you open up the first cover page you'll see an

2   Instagram post.  Do you recognize this post?

3   A    Yes.

4   Q    This is a picture of you with Mr. Vito Gelardi and a

5   third person, correct?

6   A    Correct.

7   Q    This post was made on August 28 of 2022, correct?

8   A    Yes.

9   Q    On the right side in the comment it says:  The original

10  dynasty, correct?

11  A    Yes.

12  Q    What is that a reference to?

13  A    That's Josh Runge, the gentleman in the middle.

14           THE COURT:  Who?

15           THE WITNESS:  Joshua Runge.

16           THE COURT:  Spell the last name.

17           THE WITNESS:  R-U-N-G-E.

18  Q    How long have you known Mr. Runge?

19  A    I've known Mr. Runge since I would say 2009.

20  Q    When you say that the original dynasty refers to him,

21  what do you mean by that?

22  A    I didn't write that, that's not my post.

23  Q    I understand.  But do you know what the original dynasty

24  means?

25  A    So how I now Runge is through a networking business, an

Liddie - direct - Kataev                                    69

1    e-commerce online business, Amway local.  I've been in that

2    business since college.  That's how I know Runge.

3              Vito was a cross line business in his organization.

4    Because it's a network, multi-level marketing.  Vito was a

5    cross line in that network marketing business.  We had no

6    ties, no conversations.  That's what he's referring to as the

7    original dynasty.

8    Q    So the original dynasty refers to the business that you

9    all participated in together in Amway, correct?

10   A    Separate though.  It was separate entity.  I had no

11   conversation in that business with Vito.

12   Q    You have no real background in medicine, correct?

13   A    No.

14   Q    The same question for personal injury, you have no

15   background in that, correct?

16   A    No.

17   Q    You began working for Safa and Vito Gelardi IME

18   Companions before April 19, 2022, correct?

19   A    Incorrect.

20   Q    When did you first start working --

21   A    I never worked for them.

22   Q    Let's go to the next page.  I'll represent to you,

23   Mr. Liddie, that this is apart of a production of subpoenaed

24   documents from Go Daddy, on the bottom GD2202, that's a

25   reference to Go Daddy's production.  Highlighted for you is an

Liddie - direct - Kataev                    70

1   entry made by Go Daddy concerning an e-mail address:

2   Eugene@IMECompanions.com.

3          Do you see that?

4   A    Yes.

5   Q    You have an e-mail address at IME Companions, correct?

6   A    Yes.

7   Q    The reason you have that is you performed services for

8   IME Companions, correct?

9   A    Never performed services.

10  Q    Why was an e-mail address set up for you?

11  A    They created an email in the event that they would

12  forward and created a franchise.  That was the initial -- how

13  I connected --

14         Your Honor, can I go through, he's asking me the

15  question.  In order to answer the questions --

16         THE COURT:  Just answer the question.  Go ahead.

17  A    The e-mail was created because when I connected with Vito

18  and Safa, they was in talks of creating a franchise long-term,

19  they was going to move forward and create a franchise.  So

20  they created the e-mail just to keep communications open as

21  far as in the event that they did start a franchise.  That's

22  what the e-mail was created for.

23  Q    When did you first start discussing the possibility of a

24  franchise?

25  A    2021.

Liddie - direct - Kataev                    71

1  Q    What month?

2  A    I can't recall the month, but probably like beginning of

3  2021.  They said that they would long-term like to start,

4  like, franchise their model.  At that point, they didn't have

5  any licenses, they didn't have anything.

6  Q    On April 19, 2022, there was an act in furtherance of you

7  opening this franchise, correct?

8  A    Say it again, April?

9  Q    April 19, 2022 the date that's listed in this Go Daddy

10 log, that e-mail was created in furtherance of your intent to

11 start a franchise, correct?

12 A    No.

13 Q    So why was the e-mail created?

14 A    Yes, yes, correct.  The e-mail was created in the event I

15 move forward and create --

16           THE COURT:  So why do you need an e-mail if you're

17 discussing franchising?

18           THE WITNESS:  What I was going to start to do was I

19 was going to learn how to market to different law firms and

20 reach out to different law firms, and start that process how

21 to learn, how to process, how to build the business.

22           THE COURT:  I see.  I'm just going to assume for the

23 moment, the franchise would be a franchise of an IME business.

24           THE WITNESS:  Yes.

25           THE COURT:  Go ahead.

Liddie - direct - Kataev                                    72

1   Q    The franchise would be IME Companions, correct?

2   A    It would have been an extension of it, yes.

3   Q    Were you ever informed by Gelardis in the April of 2022

4   about the existence of an injunction prohibiting the

5   franchising of Companions?

6   A    That's why it never took place, yep.

7   Q    Why was an e-mail created on April 19 when that

8   injunction was entered on April 4?

9   A    Because at that point it was just going to be for

10  marketing purposes, to help grow their business; but I can

11  learn in the process.

12  Q    So you did perform services for them.

13  A    Not for pay, it wasn't for pay, it was not for pay.  It

14  was for experience and to learn.

15           THE COURT:  Can we go back?  Did you say that the

16  Gelardis did inform you of an injunction?

17           THE WITNESS:  They told me that they were going to

18  have to discontinue the process of moving forward with

19  franchising because of the legal issues, like they had in

20  court.

21           THE COURT:  So the question becomes, if they weren't

22  going to franchise why did you have an e-mail?  In other

23  words, you said the purpose of the e-mail was so that you

24  could learn how to sell or --

25           THE WITNESS:  Yes.

Liddie - direct - Kataev                73

1          THE COURT:  -- solicit clients.  But they informed

2   you before April 19 of an injunction --

3          THE WITNESS:  I can't say it was before April 19,

4   but they did inform me that they were going through legal

5   issues therefore they weren't going to be able to go forward

6   with franchising.  They put that on pause.  They were working

7   on the licenses to franchise.

8          THE COURT:  How did they describe the legal issues

9   to you?  What did they tell you?

10         THE WITNESS:  It was brief.  They was in court,

11  going through legal issues with another competitor.

12         THE COURT:  Anything more specific about what the

13  nature of those legal issues was?

14         THE WITNESS:  No, it was brief.

15         THE COURT:  Any discussion about any court order

16  that prevented them from doing anything?

17         THE WITNESS:  No.  It never got in details with me.

18         THE COURT:  Go ahead, Mr. Kataev.

19  BY MR. KATAEV:

20  Q    So initially the email was created for purposes of

21  franchising, but then used for marketing?

22  A    What I was going to do at that point, I was going to

23  transition to helping them grow.

24  Q    Why would you do that without getting compensated for it?

25  A    For experience.  I wanted to learn how to market.  I

Liddie - direct - Kataev                     74

1   wanted to learn -- if I was going to start a franchise I

2   wanted to learn how to start the process of communicating with

3   law firms and just making those transitions.

4   Q    So the real reason you were learning how to market, was

5   so you could nonetheless go and open up a separate business,

6   correct?

7   A    Absolutely.

8   Q    You were planning on not opening up an IME Companions

9   franchise, but just another IME observer company with a

10  different name, correct?

11  A    Yes.

12  Q    That came to fruition when you formed IME Legal Reps,

13  correct?

14  A    Yes.

15  Q    So effectively what you you've done is, you've done

16  exactly what you wanted to do but just didn't do it as a

17  franchise of IME Companions, correct?

18          MR. WARNER:  Objection.

19          THE COURT:  Overruled.

20  Q    You can answer.

21  A    Yes, ultimately, yes.

22  Q    I'm going to show you the next exhibit, an e-mail.

23  You'll see a green highlight on the top with your e-mail

24  address.  Do you recognize that?

25  A    This page?

Liddie - direct - Kataev                    75

1        MR. KATAEV:  May I approach the witness to show him?

2        THE COURT:  Go ahead.

3   BY MR. KATAEV:

4   Q    That's your e-mail address, correct?

5   A    Yes.

6        MR. KATAEV:  I'll represent to the Court two things.

7   Number one, this is part of the forensic production.  And

8   number two, the date is cut off on the top but I represent to

9   the Court it's May 18, 2022.

10  BY MR. KATAEV:

11  Q    In this e-mail if you look at the middle of it where it's

12  bolded, you refer to your current client list, correct?

13  A    Yes.

14  Q    So you did in fact send this e-mail, correct?

15  A    Yes.

16  Q    You sent it to ArgyLaw in order to have them be a

17  customer of IME Companions?

18  A    Yes.

19       THE COURT:  That's spelled A-R-G-Y Law, all one

20  word, dot com.

21  BY MR. KATAEV:

22  Q    This was part of your training in order to ultimately

23  form what became IME Legal Reps, correct?

24  A    No.

25  Q    Why was this e-mail sent if it wasn't for that purpose?

Liddie - direct - Kataev                    76

1   A    This is sent on 2-21-23.  At that point I didn't know I

2   was going to form IME Legal Reps.

3            THE COURT:  What was the day?

4            This is the date it was filed in court.  He

5   represented that it's dated May 18, 2022.

6            THE WITNESS:  But it -- I wouldn't have done this

7   because I knew I was going to start IME Legal Reps, I didn't

8   know that until recently.

9            THE COURT:  So what was the purpose of this?

10           THE WITNESS:  To help them grow IME Companions; it

11   wasn't for IME Legal Reps.

12           THE COURT:  Who told you to send this e-mail, if

13   anyone?  Or how did you get the idea to send it?

14           THE WITNESS:  This was the companies I was reaching

15   out to.

16           THE COURT:  How did you know which companies to

17   reach out to?

18           THE WITNESS:  Some of this is self-initiatives,

19   Google searches, companies call, just pitch.

20           THE COURT:  And some of it was what?

21           THE WITNESS:  Some of it is, my family is comprised

22   of lawyers, nurses, police officers.  I get referrals as well

23   from law firms, that's the other component I used to contact

24   some law firms.

25           THE COURT:  Was ArgyLaw not a customer of IME

Liddie - direct - Kataev                    77

1    Companions at the time you sent this e-mail in May of 2022?

2              THE WITNESS:  I wasn't aware if it was.  I wasn't

3    aware.

4              THE COURT:  Did you ever get direction from the

5    Gelardis to send or do marketing with respect to customers

6    that they identified for you?

7              THE WITNESS:  No.  So it was always put together a

8    list and then reach out and start the expansion and helping

9    them grow.  That's how I was going to learn, it was to Google

10   my own list, make calls, and whoever I got the sale from, it

11   would help them grow.

12             THE COURT:  So you were generating your own

13   potential list of customers.

14             THE WITNESS:  Not for me, I was helping them.  My

15   wife works for the company, that's why.

16             THE COURT:  She was working for IME Companions at

17   time?

18             THE WITNESS:  Yes.

19             THE COURT:  But again, I want to make sure I

20   understand, that to the extent that you were trying to help

21   them grow the company, the way you found potential customers

22   was on your own.

23             THE WITNESS:  On my own, yes.

24             THE COURT:  Nobody gave you a list.

25             THE WITNESS:  No, there was no list.

Liddie - direct - Kataev                    78

1    THE COURT:  This was all new potential business.

2    THE WITNESS:  Exactly.  I made a list of Google

3    Suffolk, Nassau, Queens, Brooklyn and just call.

4    THE COURT:  Go ahead, Mr. Kataev.

5    BY MR. KATAEV:

6    Q    When you formed IME Legal Reps you sent observers to

7    observe IMEs, correct?

8    A    Again?

9    Q    You sent individuals to observe IMEs?

10   A    Did I send IMEs?

11   Q    Yes.

12   A    Yes.

13   Q    You did that for Subin and Associates, correct?

14   A    No.

15   Q    If you look at this list on this exhibit in bold, the

16   first customer, Subin and Associates, your testimony today is

17   you've never performed any services for Subin since you opened

18   up IME Legal Reps?

19   A    Me personally, no.  I only had three companies for IME

20   Legal Reps.

21   Q    Which law firms?

22   A    But Bergman & Bergman, which I spoke to Michael Bergman

23   himself, Martin Gindsberg, and Kohan Law Group.

24   Q    Were you provided at any point by the defendants the

25   enjoined customers' list, which sets forth the list of

1   customers that you're not permitted to serve?

2   A    No.

3   Q    They never provided you that?

4   A    No.

5   Q    Out of these customers listed here in bold in this

6   exhibit, which have you performed services for through IME

7   Legal Reps?

8            THE COURT:  Which exhibit are you speaking about,

9   the 5/18/22 e-mail?

10           MR. KATAEV:  Correct.

11           THE COURT:  In what capacity?  When he opened up IME

12  Reps?

13  BY MR. KATAEV:

14  Q    IME Legal Reps.  After he formed the company, which of

15  these, in any, did he serve?

16  A    Bergman & Bergman.

17  Q    That's the only one?

18  A    Yes.

19  Q    You testified earlier about independent efforts to find

20  new customers.  What fruit did that bear?  How many customers

21  did you obtain?

22  A    Repeat that?

23  Q    How many customers did you obtain from your efforts to

24  market, get new customers in --

25  A    All three.

Liddie - direct - Kataev                    80

1   Q    You're including Bergman & Bergman as one of those

2   companies?

3   A    Yes, I actually spoke to Michael Bergman himself.  He has

4   law enforcement background, that's how we -- he gave me the

5   opportunity to service his company.

6              THE COURT:  You folks you have to keep it down.

7   You're making it impossible to hear the witness.

8   Q    When you worked at IME Companions performing marketing

9   services, how many customers did you get?

10  A    Two or three maybe.

11  Q    Do you recall who?

12  A    You have to refer to defendants, they'll probably

13  remember more than me.

14  Q    Let's go to the next exhibit.  I'll represent to you this

15  is an August 16, 2022 e-mail from the forensic examiner to

16  counsel of record in this case.  Your name is highlighted in

17  the body.  I know you've never seen this document before, but

18  I'm using it to ask you, are aware that your e-mails at IME

19  Companions were part of the forensic search that was

20  performed?

21  A    No, I was not.

22             THE COURT:  Are you aware of a forensic search being

23  done?

24             THE WITNESS:  No.

25  BY MR. KATAEV:

Rivka Teich, Official Court Reporter

Liddie - direct - Kataev                                    81

1   Q    With respect to the prior exhibit, the May 18, 2022

2   e-mail, was it you that sent it or was it Safa?

3   A    Which one?

4   Q    The prior exhibit, May 18, 2022 e-mail, did you send it

5   or did Safa send it?

6   A    Which one are you referring to?

7   Q    May 18, 2022 e-mail with the names of the customers in

8   bold.

9            THE COURT:  Going back one page, to the last

10  document we were talking about, where you e-mailed ArgyLaw.

11           Is that what you're referring to, Mr. Kataev?

12           MR. KATAEV:  Yes.

13           THE WITNESS:  I've got it.  I sent it.

14  Q    Where did you get the contents of that e-mail?

15  A

16           THE COURT:  He didn't answer your question.  Who

17  sent it?

18           THE WITNESS:  I sent it.

19           MR. KATAEV:  I thought I heard him say he sent it.

20           THE COURT:  I'm sorry, go ahead.  He did.

21  BY MR. KATAEV:

22  Q    Who drafted this e-mail?

23  A    The defendants.

24  Q    Your role was just to send it out under your name,

25  correct.

Rivka Teich, Official Court Reporter

1    A    Yes.

2    Q    While you were performing services for IME Companions,

3    did you come to learn the identity of IME Companions'

4    customers?

5    A    No.  When you say the customers, can you be more

6    specific?

7    Q    The names of the law firms.

8    A    No.

9         THE COURT:  How about through your wife?

10        THE WITNESS:  No, not really.  She was telling me

11   more about the day, how the day went.

12   BY MR. KATAEV:

13   Q    So for example, in this e-mail where you list customer

14   names, the reason why you don't know is because you never read

15   this e-mail that was sent, correct?

16   A    I would read the e-mails, yes.

17   Q    Isn't it true that you came to learn the names of IME

18   Companions --

19   A    So many different law firms.

20        THE COURT:  Don't interrupt each other.

21        What was your question, and go slowly.

22   BY MR. KATAEV:

23   Q    Isn't it true that at least with respect to this e-mail,

24   you learned the names of some the law firm customers of IME

25   Companions?

Liddie - direct - Kataev                      83

1   A    No.

2          THE COURT:  So you didn't read the part where it

3   says --

4          THE WITNESS:  I read.

5          THE COURT:  Hang on.  It says:  Our current clients

6   include.

7          At the time you sent this e-mail, did you read that?

8          THE WITNESS:  Yes, I would read.  But to say I'm

9   going to have a recollection of every single law firm, no.

10          THE COURT:  All right.

11  BY MR. KATAEV:

12  Q    Did you ever keep any list of the customers that that IME

13  Companions?

14  A    No.

15  Q    Did you ever any such list?

16  A    No.

17          THE COURT:  Let me ask you a question.  When you

18  started your new company, IME Legal Reps -- do you have a copy

19  of this e-mail that we've been talking about?

20          THE WITNESS:  No.

21          THE COURT:  Go ahead.

22          (Continued on next page.)

23

24

25

Liddie - direct - Kataev                                    84

1    DIRECT EXAMINATION

2    BY MR. KATAEV:   (Continuing)

3    Q    Why is it that when you formed IME Legal Reps you

4    contacted Mr. Bergman?

5    A    When I was initially building the business I was going to

6    start in Long Island and just work my way down to the City.

7    Q    How did you know that Mr. Bergman operated in Long

8    Island?

9    A    Through my wife.

10   Q    And your wife works or worked at IME Companions?

11   A    Yes.

12   Q    You said you contacted Mr. Bergman personally?

13   A    Yes.  Oh, no.  I contacted the firm first and then they

14   redirected me to him.

15   Q    So you contacted the main number; correct?

16   A    Yeah.

17   Q    Your wife is Shakkiya Hall; correct?

18   A    Yes.  Yes.

19   Q    And she's present here in this courtroom?

20   A    She's not present.

21        THE COURT:  I don't think we need to go into that,

22   I've seen Ms. Hall.  Go ahead.

23   Q    She performed services for IME Companions as an IME

24   observer; correct?

25   A    Yes.

Liddie - direct - Kataev                    85

1  Q    And, in fact, she's still observing IMEs; correct?

2  A    No.

3  Q    It's not true that she observes IMEs for IME Legal Reps?

4  A    No.

5          THE COURT:  Let's try a more open-ended format.

6          When did your wife work for IME Companions?

7          THE WITNESS:  She worked for them in 2021.

8          THE COURT:  The whole year?

9          THE WITNESS:  I don't remember if it was the whole

10  year.

11          THE COURT:  Okay.

12          THE WITNESS:  Up until -- I want to say maybe

13  January of 2022.

14          THE COURT:  All right.  And then what did she do for

15  work, if anything?

16          THE WITNESS:  Like outside of --

17          THE COURT:  Outside the home.

18          THE WITNESS:  Okay.  She works for the City.  She

19  has a City job.  She does Housing Preservation Department.

20          THE COURT:  Okay.  So she no longer did IMEs after

21  January of 2022?

22          THE WITNESS:  Yeah.  I mean, I could be incorrect as

23  far as January, but I know it wasn't no more than -- because

24  my dad passed away in February of 2022.

25          THE COURT:  Your dad what?

Liddie - direct - Kataev                    86

1           THE WITNESS:  My father passed away in 2022 --

2           THE COURT:  I'm sorry.

3           THE WITNESS:  -- I don't believe she was doing it

4    after that point.

5           THE COURT:  But you're saying sometime in 2022 she

6    stopped doing IME work?

7           THE WITNESS:  Yes.  Yes.

8           THE COURT:  Okay.  Is she working with you now --

9           THE WITNESS:  No.

10          THE COURT:  Hang on.

11          -- with respect to the new company?

12          THE WITNESS:  She didn't even know I started a new

13   company.  We're co-parenting.

14          THE COURT:  I see.

15          Who's running your new company, IME Legal Reps?

16          THE WITNESS:  I'm.

17          THE COURT:  So are you doing that full-time?

18          THE WITNESS:  Part-time.  I only have two clients

19   it's not much to do.

20          THE COURT:  But you are the CEO?

21          THE WITNESS:  Yes.

22          THE COURT:  Do you have any people who work for you?

23          THE WITNESS:  I brought in an independent

24   contractor, Jeffrey Beibin.

25          THE COURT:  So he is your only sort of quasi

Liddie - direct - Kataev                    87

1   employee?

2            THE WITNESS:  Yes.

3            THE COURT:  Is he working with you right now?

4            THE WITNESS:  Yes.

5            THE COURT:  When is the last time you sent him on an

6   IME assignment?

7            THE WITNESS:  It was -- I believe it was the 4th.

8            THE COURT:  Of?

9            THE WITNESS:  April.

10           THE COURT:  Go ahead, , Mr. Kataev.

11  BY MR. KATAEV:

12  Q    In order to run IME Legal Rep, after the IME is observed,

13  your observer has to prepare a report; correct?

14  A    Yes.

15  Q    To your knowledge, how did you come into possession of

16  any such reports?

17  A    As far as the template that they have to prepare?

18  Q    Yes.

19  A    I used to see my wife's when she used to do reports.

20  Q    So, effectively, you have obtained copies of sample

21  reports from your wife who performed -- who drafted reports

22  while at IME Legal Companions?

23  A    Yes, I seen the reports, of course.

24  Q    You did not create your own?

25  A    I did create my own off of what I saw.

1   Q    You used those samples to create your own; correct?

2   A    Switched around some things, yes, but I did use samples

3   yes, uh-hum.

4   Q    Isn't it true that you opened IME Legal Rep at the behest

5   of Safa?

6   A    Yeah, and Vito, both, yeah.

7   Q    And you started this company on April 15th?

8   A    You said on the behest?

9   Q    At the behest.

10  A    What do you mean by that?

11  Q    They asked you to do this?

12  A    No, they did not.

13  Q    You're saying you came to them and asked them to do it?

14  A    No.  What happened was they called me --

15       THE COURT:  Please.

16  A    So they called.  They called me because they were

17  struggling financially, and they said, hey, we're closing

18  everything down; we'll sell you our website if you are still

19  interested in opening up an IME business.  So I said sure.

20  How much is your website?  They said, Listen, right now you

21  just need 4,300, that will cover our mortgage payment, because

22  they were struggling.

23       I thought it was a win-win.  I thought I would pay

24  their mortgage because they wanted to put their house up for

25  sale, and I get the website, which obviously I was going to

Liddie - direct - Kataev                                    89

1   have change it around, which I did.  I spent $7,200 to a

2   marketing company to get the website redone.

3           THE COURT:  Explain exactly what you got when you

4   say you got a website.

5           THE WITNESS:  So I got the back-end of the website.

6   I went to GoDaddy and created a domain name, my own domain

7   name which is IME Legal Reps.  Then I got the website, which I

8   had to get it redesigned and redone by the web developers.

9           THE COURT:  So let me ask you a completely naïve

10  question because I don't know anything about how websites

11  work.  You basically got the program for the website that the

12  Gelardis used for IME Companions?

13          THE WITNESS:  Right.  I had to get it redone.

14          THE COURT:  What was on it when you brought it to

15  your developer?  What did you see when you pulled touch?

16          THE WITNESS:  I didn't see -- it would have been IME

17  Companions until I redid everything.

18          THE COURT:  You basically got what used to appear on

19  the website for IME Companions?

20          THE WITNESS:  Right.

21          THE COURT:  Okay.  And did that include the names of

22  any of their clients?

23          THE WITNESS:  No.

24          THE COURT:  Okay.  Did it include comments or praise

25  or feedback from clients?

1           THE WITNESS:  That was probably still on there but

2   it got taken off by the developer, yeah.

3           THE COURT:  Do you recall, though, looking at any

4   of the names of the clients --

5           THE WITNESS:  No.

6           THE COURT:  -- who sent in recommendations?

7           THE WITNESS:  No.

8           THE COURT:  So you didn't actually use those names

9   to research out to --

10          THE WITNESS:  No.

11          THE COURT:  -- to start your business?

12          THE WITNESS:  No, I did not.

13          THE COURT:  Why not?

14          THE WITNESS:  Why?

15          THE COURT:  Well, because they clearly were

16  satisfied with IME Companions, so didn't you think maybe I'll

17  start with these folks?

18          THE WITNESS:  No.

19          THE COURT:  I'm trying to understand why not.

20          THE WITNESS:  Because I wanted to stay away from

21  what they had going on in court.

22          THE COURT:  Why did you think that that would be

23  implicated by you using some of the same clients who were

24  identified in the website?

25          THE WITNESS:  Because my assumption, that's why they

Liddie - direct - Kataev                    91

1   ran into some of the issues they have now, like -- it's like

2   five guys trying to talk to one girl, it's like -- there's

3   other companies out here, so you can reach out to other

4   companies to avoid any issues.

5           THE COURT:  Well, tell me -- sorry.  Go ahead.  I

6   interrupted you.

7           What was the last part of what you said?

8           THE WITNESS:  You could build your company.  You

9   have other states.  You have other boroughs.  Like, there are

10  so many ways you could diversify and expand your business,

11  other than fighting over or soliciting.

12          THE COURT:  What do you know about this lawsuit?

13          THE WITNESS:  I don't know much.  I know they're

14  going back and forth with, I guess, WatchDog.  That's a

15  competitor.

16          THE COURT:  Do you know what the nature of

17  WatchDog's cliam is against the Gelardis or their company?

18          THE WITNESS:  That they started -- they copyrighted

19  I guess their blueprint of how to build a business.  I mean,

20  that's the only thing I know of.

21          THE COURT:  And how do you know that?

22          THE WITNESS:  Based on conversations.

23          THE COURT:   With the Gelardis?

24          THE WITNESS:  Yes.

25          THE COURT:  So tell me everything they told you

Liddie - direct - Kataev                                    92

1    about what's going on in lawsuit?

2            THE WITNESS:  Pretty much that's it. It's real

3    surface level, nothing in depth.

4            THE COURT:  Did they ever say whether they were

5    winning or losing this lawsuit?

6            THE WITNESS:  They probably feel like they're losing

7    because they're hurting financially, but, yeah.

8            THE COURT:   Did you ever ask them why they were

9    shutting down their business?

10           THE WITNESS:  Because they're running out of money,

11   and a lot of their clients, I'm assuming based on the Court

12   proceedings, they can't use, that was maybe the bulk of their

13   business,  I gueeess.

14           THE COURT:  When you say I guess, your wife

15   obviously knew the Gelardis too, right?

16           THE WITNESS:  Uh-hum.

17           THE COURT:  You mean to tell me you didn't talk more

18   with them about what exactly was going on that made their

19   financial situation so difficult?

20           THE WITNESS:  Oh, yeah, they were hurting

21   financially because they were losing business.  Their

22   representation was being damaged.

23           THE COURT:  That's what they told you?

24           THE WITNESS:  Yeah, that's what they told me.

25           THE COURT:  All right.  It's your testimony, though,

Liddie - direct - Kataev                93

1    that even if you saw some of these positive reviews by the IME

2    Companions customers on their website, you didn't contact any

3    of those customers?

4              THE WITNESS:  No, not based on that.

5              THE COURT:  What about Subin did you ever -- didn't

6    you have Jeffrey Beibin contact Subin?

7              THE WITNESS:  Me, no.

8              THE COURT:  Sorry.  Let me take that back.  Are you

9    aware of whether or not Beibin worked for Subin to do any IMEs

10   in April?

11             THE WITNESS:  I'm not aware.

12             THE COURT:  So he didn't do that work for you?

13             THE WITNESS:  He bounced around, so that was one of

14   the reasons I had complications with him.  I said, hey, listen

15   since your struggling to find work right now, maybe you can

16   partner and come over here, because he's an editor.  He's

17   really good at what he does.  So I figured if I want to start

18   a company, I'd rather start with him because he's good across

19   the board as far as his work ethic, how he does support an

20   IME.

21             THE COURT:  And you said that you have three clients

22   right now, right?

23             THE WITNESS:  Yes.

24             THE COURT:  Bergman, the other two were?

25             THE WITNESS:  Martin Ginsberg and Cohan Logan Group.

Liddie - direct - Kataev                          94

1        THE COURT:  Cohen is C-O-H-E-N?

2        THE WITNESS:  A-N.

3        THE COURT:  And Gitsinberg?

4        THE WITNESS:  Ginsberg.

5        THE COURT:  How do you spell that?

6        THE WITNESS:  G-I-N-S-B-E-R-G.

7        THE COURT:  How did you get the other two?

8        THE WITNESS:  Called.  Just regular calls.

9        THE COURT:  So cold calls?

10        THE WITNESS:  Yeah.

11        THE COURT:  All right.  And go back again, Bergman

12   you said you got from your wife?

13        THE WITNESS:  Yeah, just hearing the name.  She did

14   a lot out on Long Island.

15        THE COURT:  Now, when you had conversations with the

16   Gelardis about this lawsuit, was your wife present as well?

17        THE WITNESS:  No.

18        THE COURT:  So you only had those conversations by

19   yourself with them, with the Gelardis?

20        THE WITNESS:  Well, I only had the conversations at

21   the end when they offered the website.  That's when I had,

22   yeah.

23        THE COURT:  And did you folks meet in person to do

24   that or was that over the -- -

25        THE WITNESS:  No, that was over the phone.

1          THE COURT:  Okay.  So then tell me exactly then what

2  happened after you agreed to buy the website.  Tell me all of

3  the steps you took to form IME Reps, Legal Reps.

4          THE WITNESS:  So, I got the domain.  When you say

5  the steps, what do you mean?

6          THE COURT:  Well, you're running this business.  How

7  did you get it up and running?

8          THE WITNESS:  So I got the website.  The company

9  redesigned the whole website to my vision, to what I liked,

10  some things that I seen, what I researched, and then I created

11  the template form for the interviews for the IME exams.

12          THE COURT:  Now, you say you did get forms from your

13  wife, though, as a model.

14          THE WITNESS:  Yeah, from when she was doing the

15  IMEs.

16          The question, from my understanding, is you can't

17  change them around but so much because these are the questions

18  that the doctors are asking the plaintiff in the exam, so it's

19  about so much you can alter a question.

20          THE COURT:  Okay.  So you created your own form

21  based on what your wife gave you?

22          THE WITNESS:  Right.  What I saw.  She didn't give

23  me the form, but from what I saw.

24          THE COURT:  What do you mean saw?

25          THE WITNESS:  Like the questions.

1           THE COURT:  Did she hand you a copy of one?

2           THE WITNESS:  No, I didn't get a copy.

3           THE COURT:  Not even electronically?

4           THE WITNESS:  No.

5           THE COURT:  Okay.  So you created a form and then

6    what?  How did you decide who to hire?

7           THE WITNESS:  Well, that's what I knew from the time

8    I was doing those calls you just make calls.  Once you get the

9    IME company.

10          This is not rocket science.  Once you get a law firm

11   to say hey, we will service you, give you an opportunity, then

12   the next day you can be doing cases.

13          THE COURT:  Did you ever ask the Gelardis who their

14   best clients were or anything like that?

15          THE WITNESS:  No.  No.

16          THE COURT:  Did you get any client-related

17   information from them?

18          THE WITNESS:  No.  The only thing they ever told me

19   was if you want to build this business, you have to look up

20   the law firms, Google, make calls.

21          THE COURT:  Now, Mr. Beibin, why did you hire him?

22          THE WITNESS:  I feel like any IME company, if you

23   was going to start a company -- this is my personal bias, if

24   you were going to start a company, I would bring him on as a

25   worker.

Liddie - direct - Kataev                    97

1         THE COURT:  Why him?

2         THE WITNESS:  Because he not only edits reports,

3    which is very important to the attorneys --

4         THE COURT:  Let me stop you.  How did you know all

5    of this about Mr. Beibin?

6         THE WITNESS:  So, in February of 2022 -- I remember

7    the date because it's right before my birthday -- he was

8    talking with my wife about editing a report that she did.  And

9    I asked him if I can meet him to go see an IME, like how an

10   IME is done.  At that point I never went to an IME.  He said

11   sure, I'm doing one out in Long Island not too far from you,

12   and I met him for the first time.

13        THE COURT:  So you instigated that meeting?

14        THE WITNESS:  Yes, because I wanted to see --

15   because he did all of the trainings for IME Companions.  So I

16   figured if I'm going to learn how an IME is done, I'll see an

17   IME Companions one, I'll just go check it out while he is in

18   the neighborhood.

19        THE COURT:  Did you let the Gelardis know that you

20   were meeting with Mr. Beibin for that purpose?

21        THE WITNESS:  No.

22        THE COURT:  So you did this completely on your own?

23        THE WITNESS:  Yeah.  Yeah.

24        THE COURT:  And then what happened when the two of

25   you met?

1            THE WITNESS:  Nothing.  I saw how he did the -- he

2    told me what the process is like, he meets the client, he gets

3    there 15 minutes beforehand, meets the client, preps them, go

4    into the exam.  I can't go in there with him.  So he was just

5    telling me, like, the structure and how everything goes.

6            THE COURT:  Now, that was February of 2022.

7            THE WITNESS:  Right.

8            THE COURT:  You didn't start a new IME business up

9    until this year, over a year later.  Why didn't you do

10    anything before then?

11            THE WITNESS:  Because they were going through the

12    legal issues.

13            THE COURT:  "They" being?

14            THE WITNESS:  The defendants.

15            THE COURT:  Okay.

16            THE WITNESS:  Yeah.  So, initially, like I said, if

17    they were going to franchise a business, I would have used the

18    credibility of a successful company.  Just like it's no

19    different if I'm going to open up a burger stop, I'm going to

20    open up McDonald if I could afford it because the credibility,

21    the success, the name.  So it's going to be no different with

22    a company like IME Companions, why not open one that already

23    has credibility, success, backing versus starting from

24    scratch.

25            THE COURT:  So the meeting that you had with Mr.

Liddie - direct - Kataev                                      99

1    Beibin was still in the context of thinking you might create a

2    franchise or --

3                THE WITNESS:  Yes.

4                THE COURT:  -- open a franchise?

5                THE WITNESS:  Right, because I never had no desire

6    to be an employee.

7                THE COURT:  Mr. Kataev, I'm sorry.  I just wanted to

8    make sure I asked these questions of Mr. Liddie.

9                MR. KATAEV:  No problem, Your Honor.  Thank you.

10   BY MR. KATAEV:

11   Q    Is it your plan to stop working as a police officer once

12   this business becomes successful?

13   A    It would be another option, yeah.

14   Q    Do you currently plan to resign as a police officer?

15   A    Not at the moment.

16   Q    You intend to continue serving as a full-time police

17   officer?

18   A    Yes.

19   Q    Other than paying Safa for the website, was there ever

20   any other money exchanged between you, Safa and Vito?

21   A    No.

22   Q    Are you paying them in any way for help with building

23   your business?

24   A    No.

25   Q    Are you giving them any employees of what you earn

Liddie - direct - Kataev                          100

1   through IME Legal Reps?

2   A    No.

3   Q    And for the $4,300, what method did you make that

4   payment?

5   A    It was cash.

6   Q    Now, IME Legal Reps was formed legally on April 15, 2023;

7   correct?

8   A    April?

9   Q    15th.

10  A    No.

11  Q    Let's go to the next exhibit.  You could skip the one

12  that says Client Exam Services and go to the next one.

13       I will represent to you, Mr. Liddie, this is a

14  publicly-filed document from New York State Department of

15  State and it has information about an entity called IME

16  Management and Consulting, LLC.  Is that the company that you

17  formed?

18  A    No.

19  Q    What is the name of the company that you formed that's

20  IME Legal Reps?

21  A    What is the name of it?

22  Q    Yes.

23  A    It's IME Legal Reps.

24  Q    Did you form an actual corporation or LLC?

25  A    I'm forming an LLC.  It's not even completed.

Liddie - direct - Kataev                                    101

1   Q    So you are operating IME Legal Reps currently without

2   forming any corporate entity?

3   A    Yes, because the P.O. box office that I'm going to use in

4   the Rockaway, New York, for the last two weeks, post office --

5   the system has been down at that post office so I can't get a

6   P.O. box.

7   Q    Why are you going to use a P.O. box?

8   A    Because I'm going to use a P.O. box.  I'm not going to

9   use my personal address.  I don't have a commercial location.

10  Q    Have you ever heard of IME Management and Consulting, LLC

11  before?

12  A    No.

13  Q    Have you made any payments to that company?

14  A    No.

15  Q    Have you been paid for the three IMEs that you have

16  performed so far?

17  A    No.

18  Q    Have you invoiced them?

19  A    Not yet.

20  Q    And when you will invoice them, what payment directions

21  will you provide?

22  A    I'm going to pay by check.

23  Q    Payable to whom?

24  A    Jeffrey Beibin.

25  Q    And then Jeffrey Beibin is going to pay you your cut?

Liddie - direct - Kataev                          102

1   A     No.

2         So once I establish -- I pay once a month, but

3   that's what I'm going to do moving forward once everybody gets

4   established.

5         This is a - old business and I'm being and I'm being

6   subpoenaed into court.  I haven't finalized everything, I'm

7   thinking even subject to change.

8         But I'm going to pay once a month.  I haven't -- I

9   told Mr. Beibin before I pay him.

10  Q     I'm referring to the payments you're expecting from the

11  customers that you have served.  So my question is when they

12  pay you, how will they pay you?

13  A     I didn't invoice it yet.  I didn't invoice it yet because

14  I don't have the business bank account.  Once I get the

15  business bank account, they can pay me by check or they can

16  make their own deposit.

17        THE COURT:  I apologize.  I missed your answers

18  about IME Management and Consulting LLC.  Is that an entity

19  you have any affiliation with?

20        THE WITNESS:  No.

21        THE COURT:  But do you know whether or not IME

22  Management and Consulting, LLC does business as IME Legal

23  Reps?

24        THE WITNESS:  I would be unaware of that.  I don't

25  know if that even exists.

Liddie - direct - Kataev                    103

1          THE COURT:  Which one?  IME Management?

2          THE WITNESS:  Yeah, I never heard of that.

3          THE COURT:  But you're running the business called

4    IME Legal Reps?

5          THE WITNESS:  Yes.

6          THE COURT:  But you didn't incorporate this IME

7    Management and Consulting, LLC?

8          THE WITNESS:  No.

9          THE COURT:  What's your official work address or

10   business address?

11         THE WITNESS:  That's why I was going to get the P.O.

12   box.

13         THE COURT:  I see.  So you don't have one yet?

14         THE WITNESS:  No.

15         THE COURT:  What about the address 228 Park Avenue

16   South, is that an address that you have any connection to?

17         THE WITNESS:  No.

18         THE COURT:  All right.

19   BY MR. KATAEV:

20   Q    And what about 7014 13th Avenue, Suite 202, in Brooklyn,

21   New York?

22   A    No, I don't know what that address is.

23         THE COURT:  And where is your P.O. box going to be?

24         THE WITNESS:  Queens.

25         THE COURT:  Do you live in Queens?

Liddie - direct - Kataev                    104

 1          THE WITNESS:  I live in Long Island.  I work in
 2  Queens.
 3          THE COURT:  Okay.  I think you said you have not yet
 4  incorporated IME Legal Reps.
 5          THE WITNESS:  No, because of the delay with the P.O.
 6  box.
 7          THE COURT:  How did you get that name then for this
 8  business?
 9          THE WITNESS:  The name?
10          THE COURT:  Yes.
11          THE WITNESS:  Brainstormed different names.  I
12  thought it would be a good name.
13          THE COURT:  You may have answered this question
14  either directly or indirectly.  Just tell me all of the
15  connections that the Gelardis have to your business now, IME
16  Legal Reps.
17          Aside from selling you the website that you use,
18  what, if anything, else have they given you, told you,
19  provided you or anything else related to your current
20  business?
21          THE WITNESS:  Nothing, literally nothing.  They are
22  like exhausted with this whole process.  I'm just being
23  transparent.
24          That last conversation I had with them before they
25  actually sold me the website, they're exhausted to the point

Liddie - direct - Kataev                    105

1    they're literally selling their house and moving.

2              THE COURT:  Are you aware of their other property

3    holdings besides their house in Staten Island, I believe it

4    is?

5              THE WITNESS:  I'm not aware.

6              THE COURT:  Have you ever been to any of their other

7    properties in any other state?

8              THE WITNESS:  No.

9              THE COURT:  How about in New York otherwise?  Just

10   their home?

11             THE WITNESS:  Yes.

12             THE COURT:  And that's in Staten Island, right?

13             THE WITNESS:  Yeah.

14             THE COURT:  Go ahead, Mr. Kataev.  Did you have any

15   other questions?

16             MR. KATAEV:  I do.

17             THE COURT:  Go ahead.

18   BY MR. KATAEV:

19   Q    It's fair to say that IME Legal Reps does the exact same

20   work that IME Companions did; right?

21             MR. WARNER:  Objection.

22             MR. KATAEV:  He worked there, Your Honor.

23             THE COURT:  No, he did not work there.

24             Overruled.

25             Can you answer that question based on anything your

1    wife perhaps told you?

2              THE WITNESS:  I mean.

3              THE COURT:  Let me strike the question.  It has to

4    be a little more precise.

5              When you say exactly the same work, what did you

6    mean, Mr. Kataev?  The same kind of work?

7              MR. KATAEV:  I will rephrase.

8    BY MR. KATAEV:

9    Q    When you perform marketing services for IME Companions,

10   you observed the type of work that IME Companions did;

11   correct?

12   A    No, I did not observe.  They had a whole marketing

13   company.  What I did was off the whim.  It was just pretty

14   much one-on-one call sales.

15   Q    And you are familiar with the work that IME Companions

16   does because your wife performs that work; correct?

17   A    Can you be more specific what work you're talking about?

18   Q    The actual process of observing an IME, creating a

19   report, speaking to customers.

20   A    That's what all IME companies does.  Everybody does the

21   same thing.

22   Q    My question specifically is you're aware of the type of

23   work performed through your wife; correct?

24   A    Yeah.

25   Q    You're doing that same exact work through this company;

Liddie - direct - Kataev                    107

1   correct?

2   A      Yeah.

3            THE COURT:  Let me ask you another question, have

4   you ever asked Mr. Beibin to suggest clients for your new

5   company, IME Legal Reps?

6            THE WITNESS:  No.

7            THE COURT:  What is his job or role at this time and

8   what do you envision for him in the future in terms of your

9   new company?

10           THE WITNESS:  It's mostly just trying to help him.

11  It's about win-win relationships.  So I figure if I help him

12  about the potential business we're going to get as far as

13  IMEs, he can create more income to feed his family, because,

14  once again, he's not working, or he's bouncing around picking

15  up work where he can.  So I look at it as a win-win

16  relationship because when I met him in February, a good guy,

17  and he's not working right now.  We're in a recession.  So my

18  goal is to just help him out and he help me from the

19  standpoint of editing the reports and doing IMEs.

20           THE COURT:  Have you heard of the firm Subin &

21  Associates?

22           THE WITNESS:  I've heard of it.

23           THE COURT:  Did you and Mr. Beibin ever talk about

24  Subin & Associates?

25           THE WITNESS:  No.

1          THE COURT:  And do you ever envision having Mr.

2    Beibin develop business for you in IME Legal Reps?

3          THE WITNESS:  No.

4          THE COURT:  Go ahead, Mr. Kataev.

5    BY MR. KATAEV:

6    Q    When you spoke to Mr. Bergman on the phone to solicit his

7    business, what did you say to him?  What was your sales pitch?

8    A    I pretty much said -- I introduced myself.  I'm Eugene

9    Liddie from IME Legal Reps.  I'm new in the area, just

10   established a business, would definitely like to service your

11   company.  I don't know if you are using someone right now, but

12   I would definitely like to be of assistance moving forward

13   with IME cases.

14   Q    And what questions, if any, did he ask you about your

15   qualifications to perform that business?

16   A    He mostly just wanted to know that pretty much work

17   ethic, integrity, am I going to have people miss IMEs,

18   accountability.  It was surface level.

19          We talked more about law enforcement then we talked

20   about IME stuff.

21   Q    Did Mr. Bergman, to your knowledge, know that you will be

22   calling him?

23   A    Well, I called the main number and then he wanted to

24   speak to me himself before he made a decision on whether or

25   not he was going to give me the opportunity to do cases.

1   Q      How did he learn about your involvement with law

2   enforcement?

3   A      Just through conversation.

4   Q      You told him I'm a police officer?

5   A      I mentioned it.

6   Q      And he didn't have any concerns that your active status

7   as a police officer would interfere with your ability to serve

8   him and his law firm?

9   A      Why?  Why would it?

10  Q      Well, wouldn't you need to be available more often than

11  part-time to help him with his business to perform services

12  for his law firm?

13  A      As things progress, I'm going to bring him more people.

14  I'm building a company.  So as things progress, I'm going to

15  hire more people and bring more people to help.

16  Q      During your discussions with Mr. Bergman, did you discuss

17  the Gelardis?

18  A      No.  Why would I?

19  Q      What office, if any, do you operate out of for IME Legal

20  Reps?

21  A      I have no office.  From home.

22  Q      And currently you have only one observer; correct?

23  A      Yes.

24  Q      And that's Mr. Beibin; right?

25  A      Yes.

1          THE WITNESS:  Can I ask you something, Your Honor?

2          THE COURT:  Go ahead.

3          THE WITNESS:  Even as I'm calling some of these

4    companies, some of these companies are like real hesitant on

5    using IME companies because of apparently what's going on

6    here.  I just feel like this is damaging everything in itself

7    because it's supposed to be a good thing.  We're helping

8    people, but instead it's doing the adverse opposite.

9          THE COURT:  Because of this lawsuit, you're saying?

10          THE WITNESS:  To some degree, yeah.

11          THE COURT:  All right.  I understand.  After you're

12    done testifying, I'm going to enlighten you a little bit about

13    what has happened here.

14          Go ahead, Mr. Kataev.

15    BY MR. KATAEV:

16    Q    Do you know what the term IME stands for?

17    A    Uh-hum.

18    Q    What does it stand for?

19    A    Independent medical exam.

20    Q    And what sort of tests are performed by doctors at IME?

21    A    What kind of tests?  What do you mean?

22          MR. WARNER:  Objection.  What's the relevance?

23          THE COURT:  I think I know where this is going.

24    I'll give you a little leeway.

25          Do you know what kinds of tests are performed at

Liddie - direct - Kataev                111

1   IMEs?

2          I think that's a hard question to answer, Mr.

3   Kataev, because doesn't it depend on what kind of doctor it

4   is?

5   Q    Let's say, for an orthopedist, do you know what type of

6   test an orthopedist performs at an independent medical

7   examination?

8   A    A neuro exam.  I mean, I don't know.  That's....

9          THE COURT:  You don't really --

10  A    Orthopedist, yeah, it's a regular body function, body

11  movements.

12  Q    And do you know the names of any of these tests?

13         MR. WARNER:  Objection, Your Honor.  He's not

14  performing tests.  He's observing -- his company.

15         THE COURT:  Overruled.

16         I think he's getting at how much do you actually

17  know about what happens in the IME business in terms of the

18  examination?

19         THE WITNESS:  I know the basic stuff.  I know basic

20  surface level of what goes on, yeah.

21         THE COURT:  But give me an example.  What do you

22  know?

23         THE WITNESS:  That pretty much personal injuries,

24  somebody gets into an accident, they go to a law firm, then

25  the law firm pretty much -- if they have an IME Companions --

Liddie - direct - Kataev                    112

1   or an IME service, then they'll have that client escort that

2   person.  You're going to be evaluated by two doctors:  You got

3   the insurance doctor and you got their regular medical doctor,

4   and we're going to send the plaintiff, the client with the

5   plaintiff to get examined by the insurance doctor to sit in

6   there just to make sure they're not asking any accusatory

7   questions as far as like questioning their injuries.

8           THE COURT:  Okay.  Actually, I am curious now.  Mr.

9   Beibin goes to an IME, what does he do exactly?

10          THE WITNESS:  He's sitting there, taking notes of

11  the start time, what time the doctor arrived, it's pretty much

12  everything -- it's like a detailed report of what happened

13  during that interview.

14          THE COURT:  And he is in the room with the patient

15  and the doctor?

16          THE WITNESS:  Yes.

17          THE COURT:  And does the IME person go into the --

18  go to both doctor appointments, the one hired by the insurance

19  company --

20          THE WITNESS:  No.  Yeah.  It's just the one hired by

21  insurance, yes.

22          THE COURT:  So the IME person goes into the exam

23  done by the doctor who is hired by the insurance company?

24          THE WITNESS:  Yeah.

25          THE COURT:  How does that person know whether the

1   doctor is doing something good or bad?  What are the things

2   that they are look for?

3           THE WITNESS:  I don't know if they know they're

4   doing something bad, but there's a certain question they ask

5   that they object, like if the doctor said, hey, this injury

6   that you had, did you hurt it when you played football in high

7   school, they can object, no, hey, that doesn't apply, that

8   injury just occurred from the accident.  That's an unnecessary

9   question.

10          THE COURT:  But suppose the doctor says do you have

11  any preexisting injuries or conditions, they're now allowed to

12  ask that?

13          THE WITNESS:  They can ask that.

14          THE COURT:  Okay.  So how does the examiner know

15  what questions are proper or not since they're obviously not

16  medical experts?

17          Do you have a list of questions that they're on the

18  lookout for.

19          THE WITNESS:  Not a list of questions they're on the

20  lookout for, but if something -- if they ask a question that

21  you may feel like doesn't align with the case, then you could

22  object to the question.

23          THE COURT:  Well, let me ask this:  Is it fair to

24  say that you actually could not open this business, IME Legal

25  Reps, unless you had experience at IME, I'm going to use the

Liddie - direct - Kataev                    114

 1   word Companions or agents, to do the work, someone like Mr.
 2   Beibin?
 3              THE WITNESS:  Yeah.  You need someone that can do
 4   the work.
 5              THE COURT:  Because you wouldn't actually know how
 6   to do it yourself, is that fair to say?
 7              THE WITNESS:  I can do it because it's not that
 8   complex.  You just go to the meeting, take the notes and just
 9   fill in, you just fill in the blanks, filling in -- the report
10   sheet is pretty much the guide of the meeting.
11              THE COURT:  I see.
12              THE WITNESS:  Of the examination.
13              THE COURT:  So that form is really important.
14              THE WITNESS:  It's the guide.  Yeah, it's guide.
15              THE COURT:  I see.
16              THE WITNESS:  Time, plaintiff, doctor, location,
17   what time did they arrive, what time did they leave, what time
18   did they end.  It's just a guide.
19              THE COURT:  What about the objections, does the
20   IME person --
21              THE WITNESS:  They can make a notation of that for
22   the attorney so the attorney knows what took place at the
23   meeting, what questions were asked.
24              THE COURT:  Does the IME have the authority to
25   object and say, doctor, we object to that question being

Liddie - direct - Kataev                              115

 1   asked?  In other words, would Mr. Beibin say doctor don't ask

 2   that question?

 3              THE WITNESS:  No.  He wouldn't tell the doctor.  He

 4   would tell the client maybe he didn't have to answer a certain

 5   question.

 6              THE COURT:  I see.

 7              Go ahead. , Mr. Kataev.

 8   BY MR. KATAEV:

 9   Q    Can you describe what a straight leg test is?

10              MR. WARNER:  Objection, Your Honor.

11              THE COURT:  Now I think we're going far afield.

12   Enough.  If you want to question Ms. Hall, you've only have

13   about half an hour.

14              MR. KATAEV:  Understood, Your Honor.

15   Q    The domain name imelegalreps.com, was that something that

16   you purchased directly from GoDaddy or was that from Safa?

17   A    No, it was from GoDaddy.

18   Q    Does -- in terms of making changes to the website, isn't

19   it true that Safa and Vito have access to make those changes?

20   A    No.

21   Q    Who has access to make the changes on the website?

22   A    IME Legal Reps?  I do and the marketing company.

23   Q    Other than you and the marketing company, is there anyone

24   else?

25   A    No.

1   Q    Whenever you reached out to new customers, did you know

2   whether or not they were previous customers of IME Companions?

3   A    I had an idea that Bergman and Bergman was.  I'm unaware

4   of the others, no.

5   Q    And how did you know that Bergman, Bergman was?

6   A    Because my wife used to do cases for them when she was

7   with IME Companions out on Long Island.

8   Q    When you did marketing services for IME Companions, how

9   did you know who the customers of IME Companions were?

10           In other words, you were marketing to get new

11  customers; correct?

12  A    I was marketing, yeah.  I was going to help them build,

13  yeah.

14  Q    So your testimony was that you did that by doing Google

15  searches and stuff like that, right?

16           So how did you know whether or not the potential

17  customer you found on Google was not already a customer of IME

18  Companions?

19  A    Because I would call, before I called the companies, I

20  would ask Safa do you have this person.

21  Q    You would ask her everything single time?

22  A    No.  There is no list, is this a good person to call?  Do

23  you have this person?  Because I didn't want to call somebody

24  they already had.

25  Q    Let's go to the exhibit that says IME Legal Reps, you

1    will see green highlights.  It is a yellow logo.  It is a few

2    pages in.  I'm going to show it to you.

3                MR. WARNER:  Which exhibit?

4                MR. KATAEV:  I will show it to everyone.  It's this

5    one.

6    Q    Mr. Liddie.  This one right here.

7                Now, your testimony was that after you bought the

8    website from the Gelardis, you were involved in having it

9    changed; correct?

10   A    Yeah.

11   Q    Did you personally make the changes to the website?

12   A    No, the marketing company.

13   Q    You interacted with the marketing company; correct?

14   A    Yeah.

15   Q    You did that by e-mail?

16   A    No, by phone.

17   Q    Okay.  And when you worked with the marketing company,

18   did you ever provide them your name?

19   A    Yeah.

20   Q    Okay.  In this particular exhibit on the right side in

21   green, your name is misspelled.  Do you see that?

22   A    Yeah, I see that.

23   Q    How can you explain your name is misspelled when you

24   worked directly with the website company?

25   A    It's an error.

Liddie - direct - Kataev                    118

1    Q    Has that error been fixed?

2    A    It should be fixed now, yeah.

3    Q    On the bottom, this is a review by Robert Eisen from

4    Subin Associates; correct?

5    A    Yeah, I see that.

6    Q    But you testified that you did not perform any services

7    for Subin; isn't that right?

8    A    I have not performed any services for Subin.

9    Q    So this review is false?

10   A    This is false.

11   Q    And this remains on your website?

12   A    No.  This should not be on the website.  I don't think

13   this is on the website.

14        THE COURT:  Do you know how it got on the website?

15        THE WITNESS:  What happened was when they were doing

16   the changes, there was a lot of stuff that was getting mixed

17   and matched because of all of the changes, so we had to double

18   back on the website just to make sure everything was

19   completely gone from IME Companions.

20        THE COURT:  This was left over from IME Companions;

21   correct?

22        THE WITNESS:  Because he was probably tweaking, he

23   was taking names out, inserting, putting names in.  That's

24   probably what happened.

25        THE COURT:  But this is the review that came from

Liddie - direct - Kataev                    119

1    IME Companions website that you bought.

2                THE WITNESS:  Yes.

3                THE COURT:  And is it still there now?

4                THE WITNESS:  No.

5                THE COURT:  You fixed this problem?

6                THE WITNESS:  It should be fixed.

7                THE COURT:  All right.

8    BY MR. KATAEV:

9    Q    In terms of the website, you're name is no longer

10   anywhere on that website; correct?

11   A    No.

12   Q    You removed it?

13   A    Yeah.

14   Q    Why is that?

15   A    Because why -- my name doesn't have to be on the website.

16   I'm running the company.

17   Q    As the CEO of the company, you believe your name should

18   not be on the website?

19   A    It doesn't need to be.

20   Q    And that's your explanation for why you took it off?

21   A    Yes.

22   Q    Isn't it true that the reason you took it off so people

23   did not know that you were running this company?

24   A    No.  Why?

25   Q    Do you have any reason to hide?

Liddie - direct - Kataev                        120

1   A     No.  That's not the reason.

2              THE COURT:  Perhaps you should ask him the

3   straightforward question, which is are you, as a police

4   officer, a full-time NYPD officer, allowed to run a business?

5              THE WITNESS:  Yes.

6              THE COURT:  Why do you say that?  Upon what do you

7   say that?

8              THE WITNESS:  Why I'm able to run a business?

9              THE COURT:  Right.  Have you gotten any training at

10  all about any restrictions on your commercial activity while

11  you're a police officer?

12             THE WITNESS:  No.

13             THE COURT:  As far as you understand, you can be a

14  full-time owner and operator of a business --

15             THE WITNESS:  Yeah.

16             THE COURT:  -- obviously, assuming you can still

17  fulfill your responsibilities as a police officer?

18             THE WITNESS:  Yes.  That eight hours and 35 minutes

19  is for the New York City Police Department.  The other 15

20  hours and 25 minutes, that's my time.

21             THE COURT:  Of the day?

22             THE WITNESS:  Yeah.

23             THE COURT:  Okay, go ahead.

24  BY MR. KATAEV:

25  Q     Okay.  You testified earlier that you have not yet set up

Liddie - direct - Kataev                    121

1    a bank account for IME Legal Reps; is that right?

2    A    Yes.

3    Q    Are you familiar with the New York City Police Department

4    Administrative Guide?

5    A    Which one?

6    Q    If you go to the -- I believe it's the last exhibit of

7    this.  It starts with the police department logo on the MR.

8    FELSEN:  And it says Administrative Guide.

9         MR. KATAEV:  For the record, it's procedure number

10   332-04, and it is titled uniform member off-duty employment.

11   A    Okay.

12        THE COURT:  I think commonly referred to as the PG.

13   Q    Are you familiar with the PG, will Liddie?

14   A    Somewhat familiar.

15        THE COURT:  Hope so.  Sorry.

16   Q    Have you ever reviewed this particular part of the PG

17   concerning off-duty employment?

18   A    Yeah, when I'm studying for an exam.

19   Q    And you are aware that in order to perform work outside

20   of being a police officer, you have to obtain prior approval;

21   correct?

22   A    That's work.  That is a business.

23   Q    If you look at the first page, the last definition is

24   ownership interest.  Do you see that?

25   A    Okay.

Liddie - direct - Kataev                    122

1   Q    Are you aware that having an ownership interest in

2   another business is subject to this procedure?

3   A    Okay.

4   Q    Are you aware is my question?

5   A    No, I wasn't aware.

6   Q    So you have not obtained approval from the New York City

7   Police Department in order to run this business; correct?

8   A    No.  It's a new business.  Even if I was I was getting to

9   get approval, I didn't have a chance to.

10  Q    You had a chance to form the entity; correct?

11  A    It's not fully formed.  I'm still in the process.

12  Q    And you had a chance to make the website; correct?

13  A    Yeah, of course.

14  Q    Do you plan to obtain approval from the New York City

15  Police Department to run this business?

16  A    Possibly.

17  Q    Are you familiar with what a runner is?

18  A    No.

19  Q    Have you ever had any involvement with any runners in

20  your line of work as a police officer?

21  A    When you say runners, what do you mean?

22  Q    I'll explain that runners are individuals who look for

23  personal injury cases and pay people to help them obtain

24  personal injury cases.

25            Have you ever had experience with runners in your

Liddie - direct - Kataev                              123

1   line of work?

2   A    No.

3   Q    Earlier in your testimony, at the very beginning, you

4   mentioned that you worked with some attorneys concerning

5   referrals.  Do you recall that testimony?

6   A    Yeah.

7   Q    Were you not referring to compensation for referring

8   personal injury cases to law firms?

9   A    No, sir.  No, that's not what I was referring to.

10  Q    What were you referring to?

11  A    I said referrals.

12  Q    And what does that mean?

13  A    If I had a cousin, hey, do you know of any good personal

14  injury law firms?  I'd say hey, you might want to check this

15  law firm out.

16  Q    Was -- during the time that you had Mr. Beibin observe

17  IMEs for you, did he ever call you about a problem with an IME

18  that he had?

19  A    No.

20  Q    Does the name Rohan Manragh mean anything to you?

21  A    No.

22       MR. KATAEV:  I'm going to confer with my client.

23       THE COURT:  Let me ask you one question.  Why did

24  you decide to start this business on your own?

25       THE WITNESS:  Because just in 2020 with COVID, I

Liddie - direct - Kataev                    124

1   felt like I just needed to create more options financially,

2   because I actually didn't get the vaccine, and I was close to

3   being laid off, and just to have one financial stream of

4   revenue and to have bills, that can be a scary thing.  So

5   that's why I understand what Mr. Beibin is going through

6   because if you lost your income, you still have bills.  So I

7   said I need to diversify and create more options just in the

8   event something comes up.

9           THE COURT:  Or get vaccinated.  But putting that

10  aside, how many years have you served on the NYPD?

11          THE WITNESS:  12 years.

12          THE COURT:  So you are not that close to retirement;

13  correct?

14          THE WITNESS:  No.

15          THE COURT:  Go ahead.  Mr. Kataev, anything else?

16          MR. KATAEV:  Three quick questions.

17  BY MR. KATAEV:

18  Q    What phone number do you use to run Legal Reps?

19  A    The 1-800 number.

20  Q    What is the number?

21  A    It's on the website.  I don't know it by heart.

22  Q    Do you use your personal cell phone to conduct business?

23  A    No, I use the Grasshopper.

24  Q    Application.  And how did you learn about the Grasshopper

25  application?

Proceedings                                                    125

1  A    How did I learn about it?

2  Q    Yes.

3  A    The app. Most people use it for business.

4  Q    How did you learn the existence of the app?

5  A    I know of the app.

6  Q    How do you know about it?

7  A    I have a tax business.  I have an e-commerce business.  I

8  just know of the app.

9  Q    Isn't it true that the Gelardis told you about the

10 Grasshopper App?

11 A    No, that's not true.

12 Q    Are you aware that the Gelardis use the Grasshopper App?

13 A    I'm assuming so.  I mean, I don't know if they use it or

14 don't use it.

15 Q    Is it fair to say that you effectively franchised the

16 business concept of IME Companions?

17 A    No.

18            MR. WARNER:  Objection.

19            MR. KATAEV:  I have nothing further.

20            THE COURT:  Overruled.

21            Cross-examination?

22            MR. WARNER:  None, Your Honor.

23            THE COURT:  All right.  You are free to go.  But I

24 do want to do one thing, and I notice that you have an

25 attorney here.  I do want to give you some better idea, Mr.

Proceedings                                    126

1  Liddie, just about what this lawsuit does involve, partly

2  because you might inadvertently do something that could,

3  unfortunately, bring you back here and I don't really want

4  that to happen to you without you understanding what this case

5  is about.

6          The defendants, the Gelardis and their company, IME

7  Companions was sued by IME WatchDog based on an allegation

8  that the Gelardis stole trade secrets, specifically a customer

9  list and symptom other procedures and protocols used by IME

10 WatchDog to build IME Companions's business.  That was the

11 allegation.  We are still in the preliminary phases of this

12 case because there was a request for a temporary restraining

13 order brought, as well a preliminary injunction.  I have

14 issued both of those over the course of about a year now, I

15 guess, or a little less, because I did find, based on the

16 relevant standard, the plaintiff had proved a likelihood of

17 succeeding on its claims and specifically I did find that

18 there was a theft of trade secrets purposely done by the

19 defendants, and actually using someone who was inside the

20 company to do so.

21         I'm not telling you anything that isn't already in

22 the public record in terms of my decision.  But as a result of

23 various proceedings I have issued an amended preliminary

24 injunction, which prevents, as you I think deduced on your

25 own, the defendants from using any stolen information, client

Proceedings                                127

1  lists, contact information, et cetera, that came from

2  WatchDog, and there has been a forensic analysis to determine

3  what that information is in their own business or in any way.

4  And, quite honestly, part of allegation here was that even by

5  selling you the website they had violated that because it

6  contained, as you just noted a moment ago, one of those

7  customers who was stolen or allegedly stolen from WatchDog.

8          So, in a way, that's why you're here.  That's why

9  your lawyer has to be here.  But I don't want you to have a

10  feeling that somehow this business in some way is fraught with

11  potential legal complications.  This is a unique situation

12  based on specific allegations about defendant's conduct.  I

13  mean, to the extent you're feeling gun shy about the business,

14  I don't think there is necessarily a basis because of this

15  case.

16          But I do want to give a copy of this amended

17  preliminary injunction to your lawyer so she can properly

18  advise you about the overall contours of that, because you

19  have in some way received information, it appears, maybe

20  through your wife -- I say your wife.  This is back in 2021 or

21  so -- that is covered now by this injunction.  Obviously, the

22  injunction didn't exist at the time the information was

23  shared.  But I do want to give you a general warning in

24  building your own business, I would not rely on

25  recommendations from Mr. Beibin about clients.  That why I

Proceedings                                                128

1  asked you that question, because he has the same knowledge

2  base that your wife did during a period of time that is really

3  probably covered by this preliminary injunction.  And although

4  you may not be aware of exactly which customers were and

5  weren't, those two sources, namely your wife and Mr. Beibin,

6  know who these client are, even if they don't understand

7  whether they're covered by this, and by using that

8  information, you could end up back here again based on a claim

9  by the plaintiff that somehow you're trying to violate this

10  injunction, which doesn't name you, obviously, and doesn't

11  technically apply to you.  But we have this problem of the

12  regeneration and transferring of information that is covered

13  here but through people who aren't exactly covered by the

14  injunction itself.

15        Do you understand what I am saying?

16        THE WITNESS:  Got it.

17        THE COURT:  So for your sake --  and your lawyer can

18  advise you however she wants to -- I'd be careful about the

19  sources of your new contacts, your clients.  You should build

20  a record that you developed them on your own.

21        THE WITNESS:  Exactly.

22        THE COURT:  And didn't rely on your wife or Mr.

23  Beibin to get those, at a minimum, or anyone else who used to

24  be at IME Companions, and certainly not the Gelardis

25  themselves.  Do you understand what I am saying?

Proceedings                                                      129

1           THE WITNESS:  I understand.

2           THE COURT:  And that's for your sake.  So I'll have

3    my law clerk hand this over to your lawyer, who's here, Mr.

4    Charrington.

5           Thank you.  You're free to go and I appreciate your

6    testimony.

7           (Witness steps down.)

8           MR. KATAEV:  I call Ms. Hall.

9           THE COURT:  You only have a few minutes, though.

10          MR. KATAEV:  I think I can make it work.

11          THE COURT:  My suggestion is even though I am

12   allowing, in effect, you to treat these witnesses as hostile,

13   I think you will get more if you ask them an open-ended

14   question, because sometimes you guide them so specifically you

15   kind of miss the forest through the trees, as they say.  I

16   would try to get as much information as you can from Ms. Hall

17   and make your arguments from that.

18          So, Ms. Hall, why don't you come up to the witness

19   stand.  Sorry to have kept you waiting.

20          We are going to have you stand for a moment so you

21   can be sworn in.

22          (Continued on next page.)

23

24

25

Shakkiya Hall - direct - Felsen                    130

1    (Continuing)

2              THE COURT:  Remain standing for one moment.

3              (Witness takes the witness stand.)

4    **SHAKKIYA HALL**, called as a witness, having been first duly

5    sworn/affirmed, was examined and testified as follows:

6              THE COURTROOM DEPUTY:  You can have a seat.  State

7    and spell your name for the record.

8              THE WITNESS:  Shakkiya Hall, S-H-A-K-K-I-Y-A,

9    H-A-L-L.

10             THE COURT:  You may inquire, Mr. Felsen.

11   DIRECT EXAMINATION

12   BY MR. FELSEN:

13   Q    Good afternoon, Ms. Hall.  My name is Jaime Felsen.  I'm

14   one of the attorneys for the plaintiff, IME WatchDog.

15             You're married to Eugene Liddie, correct?

16   A    Correct.

17   Q    You know two of the defendants in this case, Safa and

18   Vito Gelardi, correct?

19   A    Yes.

20   Q    You know them through your employment at IME Companions?

21   A    Correct.

22   Q    You commenced your employment with IME Companions in

23   approximately 2020, correct?

24   A    No.

25   Q    When did you start working for IME Companions?

1   A    2021 -- sorry 2021.

2           MR. KATAEV:  With permission I'll give the exhibits

3   over --

4           THE COURT:  Yes, go ahead.

5           MR. KATAEV:  -- to the witness.

6   BY MR. FELSEN:

7   Q    During your employment at IME Companions, you worked as a

8   patient advocate; is that correct?

9   A    Yes.

10  Q    Among your responsibilities were to attend IME exams,

11  correct?

12  A    Correct.

13  Q    Also as part of your duties you prepared reports,

14  correct?

15  A    Yes.

16  Q    You've provided copies of reports that you prepared in

17  conjunction with your employment at IME Companions to

18  Mr. Liddie, correct?

19  A    No.

20  Q    You've never provided Mr. Liddie with any reports that

21  you prepared or saw while you worked at IME Companions?

22  A    No.  He sometimes when I was working on reports, because

23  he was interested in how the business worked, he would ask to

24  look at them.

25  Q    And you showed them to him, correct?

Shakkiya Hall - direct - Felsen                132

1   A    Yes.

2   Q    Did you maintain any copies of the reports in your home?

3   A    Well, once I finished, once I finished a report, I then

4   disregarded them.  Once they were sent over, submitted, I

5   discarded them.

6   Q    But you did have reports in your house at certain time,

7   correct?

8   A    I did.

9   Q    Mr. Liddie had access to those reports, correct?

10  A    No.

11  Q    During this period you lived with Mr. Liddie; is that

12  correct?

13  A    No.

14  Q    Did Mr. Liddie ever come into your residence during this

15  period?

16  A    Yes.

17  Q    Go ahead.

18  A    We were separated.  We lived in different addresses.

19  Q    At what point were you separated?

20  A    I can't remember exactly, a couple months now.

21  Q    Prior to the being separated you lived with Mr. Liddie?

22  A    No.

23  Q    You --

24  A    Yes, sorry.  Yes, yes.

25  Q    You lived with him during a point in time when you worked

Shakkiya Hall - direct - Felsen                133

1   for Companions, correct?

2   A    No.

3   Q    Are you still separated?

4   A    Yes.

5   Q    When did you stop working for IME Companions?

6   A    I would say September 2022; yes, September 2022.

7   Q    Why did you stop working for Companions at that time?

8   A    I returned back to -- I returned back to my city

9   employment in October of 2022.  I only worked for Safa and

10  Vito for a short period of time.

11  Q    When you worked for Safa and Vito, did you work for any

12  other entities that did IMEs?

13  A    No.

14  Q    When you worked at Companions, who trained you on your

15  job duties?

16  A    I was trained by two individuals, at two separate times.

17  One was Mark, and then the other was Jeff.

18  Q    What is Mark's last name?

19  A    Mark P, I can't remember.

20          MR. KATAEV:  Was it Purifacati, P-U-R-I-F-A-C-A-T-I?

21          THE WITNESS:  Yes.

22  BY MR. FELSEN:

23  Q    Jeff is Jeff Beibin; is that correct?

24  A    Yes.

25  Q    What was the training process like?

1  A    Basically I would meet them at the location that the IME

2  was scheduled at and I would shadow them.  I shadowed them.  I

3  went with Mark on two cases.  One case the doctor did not

4  allow me in the room.  And then I accompanied him to another

5  IME a vocational rehab, I was able to sit in on that case.

6          Then with Jeff, I met him at the location.  Again, I

7  was able to shadow -- well, to look, look on, observe.

8  Q    During the time that you and Mr. Liddie had been

9  separated, do you speak, are you on speaking terms?

10  A    Correct, yes.

11  Q    Do you speak with him about IME Companions?

12  A    Yes.

13  Q    Did he tell you that he was going to open up a

14  competitive business?

15  A    No.  He was always interested, from what I know, he was

16  always interested in how it worked.  He was interested in some

17  form of creating more income.  So I knew he was interested;

18  but starting a new company, no.

19  Q    How long has he known the Gelardis for?

20  A    We were introduced the same -- I believe the same time,

21  in 2021 through another friend of his.

22  Q    What were the circumstances under which you met the

23  Gelardis?

24  A    I'm a city employee.  I was out of work at the time

25  because of the vaccine mandate.  I was on leave.  I was

1    venturing off into another career.

2           While I was looking into another career, I didn't

3    know what would happen with my city employment due to not

4    being vaccinated.  We were -- Josh Runge, which is the

5    mutual -- which is the friend of Eugene's, introduced us to

6    Safa and Vito.  He let us know that Safa and Vito was hiring

7    at the time.  And that's how I got introduced.

8    Q    Did you ever come to learn that Mr. Liddie was

9    considering opening up a franchise of IME Companions?

10   A    No.

11   Q    Were you ever aware that Mr. Liddie performed services

12   for IME Companions?

13   A    No.

14   Q    He never told you that?

15   A    No.

16   Q    Did you ever come to learn that Mr. Liddie had an e-mail

17   address with IME Companions?

18   A    No.

19   Q    When you stopped working at Companions, had you been

20   involved in any manner in the IME business?

21   A    No.

22   Q    Are you aware that Mr. Liddie recently opened up an IME

23   business?

24   A    No.

25   Q    Are you familiar with a company Client Exam Services LLC?

Shakkiya Hall - direct - Felsen                    136

1   A    No.

2   Q    Are you familiar with a company IME Legal Reps?

3   A    No.

4   Q    What knowledge do you have, if any, about the lawsuit

5   that IME WatchDog brought against the Gelardi's and their

6   business?

7   A    None.

8   Q    Prior to being served with the subpoena in this case, did

9   you know that a lawsuit existed?

10  A    No.

11  Q    When you received that subpoena, did you reach out to

12  anybody?

13  A    No.

14  Q    You didn't contact Mr. Liddie?

15  A    He's the one who told me that the notice came to the

16  house.  He's the one that told me that I have to appear in

17  court today.

18  Q    But you guys don't live together, correct?

19  A    We don't.

20  Q    So when you say notice, are you talking about the

21  subpoena?

22  A    The subpoenas went to the residency where he lives.

23  Q    So when you spoke to him, did he tell you anything about

24  what this is about?

25  A    No.

Shakkiya Hall - direct - Felsen                137

1   Q    Did you reach out to the Gelardi's to find out what this

2   is all about?

3   A    No.

4   Q    Have you spoken with the Gelardi's since you stopped

5   working for them?

6   A    No.

7        MR. FELSEN:  I don't have any further questions for

8   you, Ms. Hall.

9        THE COURT:  One quick question for you.  You said

10  you weren't aware that Mr. Liddie started his own IME company

11  correct?

12       THE WITNESS:  Correct.

13       THE COURT:  Does it surprise you, or would it

14  surprise you, to learn that he has?

15       THE WITNESS:  No.

16       THE COURT:  Why not?

17       THE WITNESS:  Because he was always interested, he

18  was always interested on how it worked.  He always interested

19  in doing something where he can earn extra money, extra

20  income.

21       THE COURT:  Do you know why he's interested in extra

22  income other than the obvious?

23       THE WITNESS:  Always interested in passive income

24  he's very business-like minded.

25       THE COURT:  Got it.  Entrepreneurial.

Shakkiya Hall - direct - Felsen                138

1           THE WITNESS:  Yes.

2           THE COURT:  Any cross-examination?

3           MR. FELSEN:  I had one more question.

4           THE COURT:  Go ahead.

5    BY MR. FELSEN:

6    Q    So you had no understanding that Mr. Liddie had any

7    involvement with IME Companions whatsoever?

8    A    No.

9    Q    But yet you knew he had an interest in the business?

10   A    Yes.  Interest in the business and starting a company is

11   two different things.  I knew he was interested because he

12   always wanted to know how it worked; but starting his own

13   company, no, I didn't know that.

14   Q    Did you, in fact, tell him how it worked?

15   A    Yes.

16   Q    What did you tell him about the business?

17   A    How you get the case.  I knew very little, I was an

18   employee.  But I told him how it works on my side.  I get the

19   case the night before.  Then I contact, I touch base, with the

20   client.  We give them a few pointers prior to the exam, tell

21   them where we're going to meet, what time we're going to meet.

22   Then meet them, accompany them to the appointment, take the

23   notes, then prepare the report.

24   Q    Did you provide him with the identity of any IME

25   Companion's clients?

Rivka Teich, Official Court Reporter

Shakkiya Hall - direct - Felsen                139

1   A    No.

2   Q    And you explained to him the report.  Did he ever ask you

3   to see the report?

4   A    I would believe so.

5   Q    So your understanding is that he actually did see IME

6   Companion's reports, correct?

7   A    One day Jeff, whom is the editor of IME Companions, he

8   reached out to me.  He reached out to me, he had a couple of

9   questions on a specific report.

10          And at that time Eugene, if I can remember

11  correctly, Eugene asked to speak to Jeff.  He asked to speak

12  to him.  And I think he had questions.  And he spoke with Jeff

13  separately.  And I believe Jeff trained him.

14  Q    So he had questions about a report that you provided to

15  him?

16  A    Yes.

17  Q    That was an IME Companions report, correct?

18  A    Yes, yes.

19  Q    He met with Jeff to discuss an IME Companions report,

20  right?

21  A    No, to shadow him, to go out with him on a case to see

22  how it works.

23  Q    After he reviewed the IME Companions report, correct?

24  A    Yes.

25  Q    Did Eugene ever tell you that he had an interest in

Shakkiya Hall - direct - Felsen                    140

1   creating an IME Companions franchise?

2   A    Yes.

3            MR. FELSEN:  I don't have anything further.

4   A    An IME franchise?

5   Q    An IME Companions franchise.  Yes, correct.

6            THE COURT:  Or he did mention that?

7            THE WITNESS:  He wanted to start his own company.  I

8   didn't know it would have been IME Companions.

9            THE COURT:  Okay.  Did you know he wanted to start

10  an IME business or just any business?

11           THE WITNESS:  IME business.

12           THE COURT:  So that he specifically talked to you

13  about.  Do you remember when he talked to you about that?

14           THE WITNESS:  No.

15           THE COURT:  Maybe you could place it where you were

16  living at the time.  Or this way, were you working with IME

17  Companions at the time?

18           THE WITNESS:  While working with IME Companions, I

19  know that he was interested in the business itself.

20           THE COURT:  Whether he said I specifically want to

21  start my own IME business then, you're not sure.

22           THE WITNESS:  Correct.

23           THE COURT:  But obviously sometime after that.

24           THE WITNESS:  Correct.

25           THE COURT:  Thank you very much, Ms. Hall.

PROCEEDINGS                                  141

1          No questions from the defense, right?

2          MR. WARNER:  No questions.

3          THE COURT:  Thank you very much.  Again, sorry about

4    the delay.  Thank you for coming in and spending all afternoon

5    here.  Hopefully it wasn't a problem with your job.

6          (Whereupon, the witness was excused.)

7          THE COURT:  It's five after three.  Mr. Kataev, you

8    had a hard stop at three.  I'm prepared to issue a ruling in

9    writing and allow the parties to leave.  You have to go, don't

10   you.

11         MR. KATAEV:  I do.  I can leave, but I want to point

12   out, we did properly subpoena additional individuals and we

13   would like to reserve our right to move for contempt of

14   compliance with that subpoena.  So that's something that we

15   need to discuss internally before we close out the record

16   here.

17         THE COURT:  To be honest, although I understand that

18   technically these folks are not in compliance, but it wasn't a

19   subpoena, per se, it was really a docket order from me that

20   was communicated to them.  I certainly could issue a show

21   cause order as to them to explain why they didn't appear.  But

22   I'm not sure it's worth the resources to go after those

23   particular individuals any further.

24         I personally feel I've heard enough about the new

25   business that was started by Mr. Liddie.  I'll preview for

PROCEEDINGS                              142

1   you, I don't find that the defendants acted in contempt with

2   respect to Mr. Liddie starting this new company, which seems

3   to me, a venture of his own, fledging at best.  As far as I

4   could tell, not using any or not having any of the same

5   customers as are on the enjoined customer list.

6           And as I said before, the main concern I had was, or

7   what seemed to be, an evident violation of the preliminary

8   injunction has turned out to be not what I had thought or,

9   quite honestly, was represented by plaintiff's briefing.

10  There wasn't a list of clients on the website that was

11  transmitted by Ms. Gelardi or sold to Mr. Liddie; but rather

12  there was maybe a handful, based on your representation but I

13  haven't seen it, of some customer reviews Subin and Associates

14  being the only one I've actually seen.  There is no doubt that

15  remained on the website after Mr. Liddie took over the

16  company.  But he testified, I think he was actually credible,

17  that he had it taken down, that it obviously was up there in

18  error because referred to Mr. Liddie having been the person

19  who was responsible for the positive performance.

20          So at this point I don't find any actual violation

21  of the order, except for maybe a de minimis transfer of the

22  names of maybe six clients via the website because of these

23  reviews.  But no wholesale lists were ever transmitted.  And I

24  don't think there is any damages from it because Mr. Liddie

25  said he didn't even contact those clients.  He has three

PROCEEDINGS                            143

1    clients, and Bergman man is not one of --

2             MR. FELSEN:  Yes, they are.

3             THE COURT:  Oh, they are on the enjoined list?  All

4    three, Bergman and the other two he mentioned, Kohan and the

5    third one?

6             MR. FELSEN:  Yes.

7             MR. KATAEV:  My client represents that is the case,

8    yes.

9             THE COURT:  But were they part of the list that then

10   got taken by IME Companions?

11            MR. KATAEV:  Yes.  Anything on the enjoined customer

12   list is tied to those, yes.

13            THE COURT:  So then explain that, Mr. Warner.  I

14   think the only thing is that Mr. Liddie might have been an

15   innocent -- I would have to not credit his testimony that he

16   stumbled upon those on his own, and I don't really find that,

17   I find that he's credible.  I don't think he actually knew

18   that they were on any kind of prohibited list.  And he didn't

19   testify that he got it from the Gelardis.

20            Remember, the Gelardis are the only ones who are

21   barred from using that information.

22            MR. KATAEV:  And their agents, your Honor.  Would

23   the Court permit post-briefing on this?

24            THE COURT:  I don't find him to be an agent of

25   theirs either.  What is the evidence?

Rivka Teich, Official Court Reporter

PROCEEDINGS                    144

1      MR. KATAEV:  The Go Daddy e-mail from April 19,

2  2022.  He admitted that he performed marketing services for

3  free while working there in order to benefit from this

4  information.

5          THE COURT:  About a year ago.

6          MR. KATAEV:  That's correct.

7          THE COURT:  But then gave up on it because the

8  Gelardis weren't in a position to franchise him.  He says

9  basically he decided to start the business; but no, agreed,

10  that Ms. Gelardi called him and said we're closing shop.

11         MR. KATAEV:  He effectively franchised it.  He

12  didn't do in the official way of a franchise agreement.  But

13  effectively what he's done is franchise the business.

14         THE COURT:  But not using the prohibited

15  information, with the exception of these three individuals.  I

16  don't have the basis to find that the Gelardi's gave him that

17  information.

18         MR. FELSEN:  Ms. Hall a few moments ago testified

19  that she --

20         THE COURT:  Conveyed Bergman.

21         MR. FELSEN:  She gave him the report, which led him

22  to speak to Mr. Beibin and get trained.  The report is a trade

23  secret, you've already concluded that.

24         THE COURT:  She gave that at the time there was no

25  injunction, and she's not covered by the injunction.  It is

PROCEEDINGS                    145

1    true she shared information while working at IME Companions,

2    but before there was any injunction.  She's not the bad actor

3    here.  That happens.  She didn't know she wasn't supposed to

4    let her husband look at that.

5           MR. FELSEN:  This goes to my point before.  There is

6    a company being created using trade secrets that they received

7    from Companions.  We're going through a whole circle.

8           THE COURT:  The injunction prohibits the defendants

9    doing certain things, one of them is transferring or using the

10   client lists in any way.

11          What happened here, it appears from the evidence

12   I've heard, is that Mr. Liddie was married, is married, to

13   Ms. Hall; and a year ago or so Ms. Hall did show him various

14   forms.  He also testified, candidly, that his wife is the one

15   who suggested Bergman.  Again, but not with any knowledge --

16   or without any evidence that this came from the Gelardi's,

17   because she worked in that business.  These things will

18   happen.

19          But again, it's not within my authority to prevent

20   that from happening, per se.  It's to prevent the Gelardis

21   from using the information that was taken.  They aren't behind

22   this, is what I'm focused on.

23          MR. FELSEN:  But they have trade secrets that

24   Companions stole from WatchDog.  It's an extension.

25          THE COURT:  What is the remedy?  To make the

Rivka Teich, Official Court Reporter

PROCEEDINGS                              146

1    Gelardi's pay for that?

2              MR. FELSEN:  The remedy is that --

3              THE COURT:  To bar him.

4              MR. KATAEV:  From performing services for those

5    customers only, not from performing in the field.

6              He testified creditably he goes on Google and gets

7    these customers.  He should be provided the list and told he

8    can't perform services for these clients; the 470 out of

9    thousands and thousands of personal injury law firms in State

10   of New York.

11             THE COURT:  I don't imagine Mr. Warner has a dog in

12   this fight.  What do you say to that?

13             MR. WARNER:  I think it's absurd, you Honor to talk

14   about inferring from this.  There is no inference at all.

15   Mr. Liddie started his own business at a time when there was

16   no injunction.  He learned about a law firm with whom he

17   shares an underlying involvement in law enforcement.  They

18   chose to give him work.  There is no contempt.

19             I think your Honor focused exactly right, there is

20   no issue of contempt here.

21             THE COURT:  It's not an issue of contempt.  It's a

22   question of what is an appropriate -- it's really an extension

23   in some way of the preliminary injunction.  I'm not sure I can

24   do it, to be honest.  Essentially, to make it apply to other

25   individuals, who innocently and not with any knowledge of the

PROCEEDINGS                          147

1   injunction, received the stolen information.

2          MR. KATAEV:  Will the Court permit post-hearing

3   briefing on the subject of contempt and on this particular

4   issue?

5          THE COURT:  You can do that, that's fine.

6          What was the Go Daddy exhibit number?

7          MR. KATAEV:  GD202 on the bottom, Mr. Liddie, the

8   second or third exhibit in.

9          MR. FELSEN:  Each of these entities that has been

10  created since the injunction all go back to the Gelardis.

11  They are all associates of them, either former employees,

12  friends.  We haven't even had --

13         THE COURT:  What is the evidence that this person

14  started this as a way of end-running the preliminary

15  injunction?

16         MR. FELSEN:  This business started right when Client

17  Exam Service was shut down, and this new business opened up.

18  It's a revolving door here.

19         THE COURT:  Then I have to make a credibility

20  assessment.  And I don't find that he wasn't credible when he

21  said, yes, I decided to start this business.  The Gelardis

22  told me they are getting out of it.  They want to potentially

23  sell their home and move.  And I bought the website from them.

24         I think that's all pretty clear.  But it doesn't

25  mean that the Gelardis are in someway trying to run a business

Rivka Teich, Official Court Reporter

PROCEEDINGS                    148

1    through him; even though you kept asking whether or not he in

2    effect is franchising the IME Companions.

3          He doesn't even -- I mean he's using these three

4    customers -- and the question really is -- there are two

5    questions.  One is, do I find that somehow the Gelardis are in

6    contempt and using Mr. Liddie to basically end-run the

7    preliminary injunction.  As I've said, I don't at this point

8    preliminarily, I'm not convinced of that at all based on his

9    testimony and my assessment of his creditability.  Even his

10   wife said he's always been interested in starting this

11   business.  He said he was interested in franchising it.  I

12   don't think he's shying away from that.

13         MR. FELSEN:  He knows nothing about the business.

14   He's relying on Mr. Beibin, who was Companions' employee, who

15   has all the trade secrets.

16         THE COURT:  Businesses can be started that way.

17   There is the person who wants to be the CEO who hires the

18   talent.  He is not saying he's doing the examinations.  I

19   agree, he doesn't have the qualifications.  Although, he says

20   it's not that complicated and he did try to learn about it.

21         He's allowed to open a business and have Mr. Beibin,

22   who is the expert in it, work there.

23         I think you folks are getting so hung up on the fact

24   that, yes, there is a problem with a way to end-run the

25   purpose of the preliminary injunction because this information

PROCEEDINGS                        149

1    has been out there for a while.  Everyone who ever worked at

2    IME Companions knows who some of their clients were, or knows

3    who all of their clients were, and many of them are on this

4    enjoined customer list.  The question becomes, what authority

5    do I have to try to address that, and if I don't find the

6    contempt against the Gelardis.

7            But even if I find contempt against the Gelardis,

8    the remedy you're suggesting is I shut down someone else's

9    business, even though I don't find that the Gelardis are

10   actually involved in running that.

11           The only evidence you have is highly circumstantial

12   that you have a person who is friends with them, who did buy

13   their website.  In theory, doesn't know much about the IME

14   business as he's never done one; therefore, it must be that

15   the Gelardis are running this.  I heard from him directly, he

16   said no.  I really don't find him not credible on that point.

17           MR. FELSEN:  Your Honor, Mr. Beibin worked for the

18   other entity that was created, that's been established has a

19   connection to the Gelardis.  Mr. Beibin is basically the

20   strawman here.

21           THE COURT:  Mr. Beibin can work for any company,

22   right.  You're not going to have me shut down the next company

23   that he decides to work for.  There are other IME companies

24   out there.

25           MR. FELSEN:  Mr. Beibin, he can't service these

Rivka Teich, Official Court Reporter

PROCEEDINGS                    150

1    customers on the restricted list.  And that's what he's doing

2    for Mr. Liddie.

3             THE COURT:  I'm not sure, that's the problem I'm

4    having.  I don't know if my legal authority extends to

5    Mr. Beibin, who is not a defendant, who is an ex-employee of

6    the defendants, from using what he learned there.

7             I agree, it's a problem.  It sort of renders the

8    preliminary injunction a whole lot less effective, which is

9    why I tried to give a warning to Mr. Liddie not to get

10   references from Mr. Beibin or his wife.

11            But your claim is that these three already came from

12   the list, the enjoined customer list.  And he claims that he

13   found them, one through his wife and two others through cold

14   calling.

15            Again, I don't know.  I'm not saying I wouldn't

16   prohibit him from engaging in business with any of them, I

17   just don't know if I have that authority.

18            MR. KATAEV:  All subject to post-hearing briefing.

19   Do we want to set deadlines?

20            THE COURT:  Yes.

21            MR. KATAEV:  I would propose --

22            MR. FELSEN:  One final point, we submit that the

23   defendants violated the injunction by, in essence, franchising

24   the business.  They sold the website.  There has been

25   testimony where it seems that it was franchised.  They are

PROCEEDINGS                                    151

1   trying to get away around it, but in reality what they did is

2   franchise.  Mr. Liddie was looking to franchise, and that's in

3   fact what happened here.

4           THE COURT:  I don't agree with you here.  You can

5   call it a franchise, but the only similarity or overlap is the

6   website.  I don't know how similar the two websites are or

7   were.  But it's more the functionality of the website.

8           I gather, from what he said, I don't have any

9   evidence to the contrary, that it looks different.  It has a

10  different name.  Websites can resemble each other.

11  Businesses, business models can resemble each other.

12          He testified, and again I'm going to say this over

13  and over, seemed to me credibly he testified that he did this

14  on his own and had been exploring it either as a franchise or

15  a separate business -- I should say as a franchise, for a

16  while.  But when that didn't come to fruition, and he saw an

17  opportunity to buy the website and start the business, he did.

18          I agree that there is a problem here with the

19  leaking of information, inadvertently, that is covered.  But I

20  don't find right now it's the defendants who did that; albeit,

21  perhaps through the conveyance of the website.

22          Again, Mr. Liddie said he didn't get those names

23  from the website.  Your argument is that he's simply lying, I

24  guess, that he actually got the names from the Gelardis or

25  from the website.

PROCEEDINGS                          152

1          I don't think Bergman is on this website or at least

2   you don't know if the Bergman is on the website or Kohan.

3          MR. KATAEV:  I don't believe they are on the

4   website, no.

5          THE COURT:  Only Subin.

6          MR. KATAEV:  Subin.  And I have evidence of another

7   one, but we didn't present it.

8          We propose May 19, Friday, for our supplemental

9   brief.

10          THE COURT:  That's fine.

11          How much time do you want, Mr. Warner?

12          MR. WARNER:  The plaintiff is submitting by May 19,

13   Judge?

14          THE COURT:  Yes.

15          MR. KATAEV:  Friday.

16          MR. WARNER:  June 2 would be two weeks from that

17   day, right?

18          THE COURT:  That's fine.  I know you have to run.

19   I'm looking at the Go Daddy search result, is that what you're

20   referring to that somehow shows that the Gelardis are involved

21   in Mr. Liddie's starting this company?

22          MR. KATAEV:  Yes, your Honor.  It's the page that

23   says GD202 on the bottom.  It's highlighted and an entry

24   April 19, 2022, that's when the entry was created, the e-mail

25   address was created for him.  In other words, this Court

PROCEEDINGS                                    153

1   entered an injunction against franchise on April 4, 2022, as I

2   recall, and just a few weeks later this e-mail was created in

3   furtherance of a franchise.

4            THE COURT:  I understand what evidence you're

5   referring to.  All right.

6            So address that in your written submission.  I'm not

7   sure it goes quite as far as you think, now that you heard

8   from Mr. Liddie.

9            You can go, Mr. Kataev.  I know you have to run.

10           MR. WARNER:  With respect to this notion that

11  Mr. Felsen is indicating that my clients have a franchised

12  something, I would note that most franchisors get fees, get a

13  employees of the business, get all sorts of remuneration from

14  franchisee.  I think what you heard credibly is they are

15  getting none of it.  This is not a franchise.  If you put a

16  table up on a flag pole, it's not a flag.

17           THE COURT:  Unless you ignore the $3,400 or so that

18  was spent for the website, and unless, I assume there is other

19  payments going on.  But put it in your written submission.

20           Thank you everyone.  You're all free to go.

21           (Matter concluded.)

22

23

24

25

154

1                              **I N D E X**

2

3   **WITNESS**                                      **PAGE**

4   JEFF BEIBIN

5       DIRECT EXAMINATION BY MR. KATAEV                5

6       CROSS EXAMINATION BY MR. WARNER                27

7       REDIRECT EXAMINATION BY MR. KATAEV            28

8   **EUGENE LIDDIE**

9       DIRECT EXAMINATION BY MR. KATAEV              66

10  **SHAKKIYA HALL**

11      DIRECT EXAMINATION BY MR. FELSEN             130

12

13

14

15

16

17

18

19

20

21

22

23

24

25