# EXHIBIT "B"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
IME WATCHDOG, INC.,

                    Plaintiff,

        - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS, LLC, CLIENT EXAM
SERVICES, LLC, and IME MANAGEMENT
& CONSULTING, LLC,

                    Defendants.
-----------------------------------------------------------x
SAFA GELARDI and IME COMPANIONS,
LLC,

                    Third-Party
                    Plaintiffs,

        - against -

CARLOS ROA,

                    Third-Party
                    Defendant.
-----------------------------------------------------------x
CARLOS ROA,

                    Third-Party
                    Counter-Claimant,

        - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, and IME COMPANIONS, LLC,

                    Third-Party Counter-
                    Defendants.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

1

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") initiated this action on February 25, 2022, against Safa Abdulrahim Gelardi ("Safa") and Vito Gelardi (collectively "Individual Defendants"), and IME Companions, LLC ("Companions"), alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.[1] (Compl., Dkt. 1.) On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction"). (*See* Dkts. 6–14, 66; 3/29/2022 Docket Order; 4/5/2022 Docket Order.) As part of the April 2022 Injunction, the Court ordered a forensic examination in which Defendants would "provide complete and unrestricted access to their records and electronic accounts to the forensic analyst" (Dkt. 66-1, at 3), so that the Court could determine whether "Companions is built entirely on misappropriated information and poached clients" (Dkt. 66, at 17). On June 8, 2022, the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction"). (Dkt. 80; *see also* 6/8/2022 Docket Order.)

Discovery has proceeded over the past year and has included the forensic analysis of Defendants' records and depositions of Defendant Safa. (*See* Dkts. 86, 105, 115; 2/2/2023 Minute Entry; 2/3/2023 Minute Entry.) On March 10, 2023, Plaintiff filed (1) a second motion for a temporary restraining order ("TRO"), (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April

---

[1] Plaintiff filed an Amended Complaint on October 13, 2022, adding Gregory Elefterakis, Roman Pollak, Anthony Bridda, and Nicholas Liakis as additional Defendants. (Dkt. 114.) However, Plaintiff does not seek a preliminary injunction as to these Defendants. (*See* Dkt. 151, at 2 ("Let the defendants, Safa Abdulrahim Gelardi, Vito Gelardi, and IME Companions LLC (collectively the 'Defendants'), show cause . . . why an order should not be issued[.]").)

2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motion for preliminary injunction and contempt on March 27, 2023. (Dkt. 156; *see also* Dkt. 167.) Defendants filed their opposition to Plaintiff's motions on March 17, 2023. (Dkts. 160–66.) Plaintiff filed their reply on March 22, 2023. (Dkts. 171–73.) At the March 27, 2023 preliminary injunction hearing, the parties presented and examined witnesses and presented documentary evidence.

Based on the parties' papers, affidavits, and witness testimony, the Court now makes the below Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure Rules 52(a) and 65(d), with respect to Plaintiff's renewed motion for a preliminary injunction and request to hold Defendants in contempt for violating the Court's previous orders. *See Eyewonder, Inc. v. Abraham*, 293 F. App'x 818, 820 (2d Cir. 2008) (vacating preliminary injunction because district court did not "state the reasons why it issued"). For the reasons stated below, the Court expands the scope of the Amended Injunction against Defendants and moreover, finds Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO.[2]

---

[2] After the March 27th preliminary injunction hearing, on April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment. (*See* Dkts. 196–98.) The Court held a hearing on May 4, 2023, pursuant to that motion, and directed the parties to submit supplemental briefing. (*See* 5/4/2023 Minute Entry; Dkts. 218–20, 224–25.) The Court denied Plaintiff's renewed motion for contempt on July 13, 2023 and does not address that motion here. (Dkt. 231.)

## FINDINGS OF FACT

### I.      Previous Findings of Fact[3]

Plaintiff Watchdog and Defendant Companions are competitors in the personal injury litigation business.  When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination ("IME") of the plaintiff to evaluate his or her alleged injuries. (*See* Levi Decl., Dkt. 8, ¶¶ 4–8.)  Both Watchdog and Companions provide third-party services to personal injury attorneys, which involves Watchdog and/or Companions associates accompanying plaintiffs to IMEs, where the associate observes, takes notes, and helps the plaintiffs fill out forms. (*Id.* ¶¶ 3, 6–18.)  The associates produce reports of the IMEs for the plaintiffs' counsel to use in the personal injury lawsuits.  (*Id.* ¶¶ 15–16, 27–28.)

Watchdog is a New York corporation (*see* Am. Compl., Dkt. 114, ¶ 4) established in May 2011 by Daniella Levi (*see* Levi Decl., Dkt. 8, ¶¶ 1, 14).  Levi is a personal injury attorney who saw a "need for a service" that could accompany personal injury clients to IMEs.  (Am. Compl., Dkt. 114, ¶¶ 18–22.)  She "developed forms and reports for the 'watch dogs' to complete relating to the different types of IMEs . . . , established price lists," and "built a customer database through her long-lasting relationships and friendships with other personal injury attorneys[.]"  (*Id.* ¶¶ 25–26.)  Watchdog developed information regarding its customers' preferences, "such as how soon each customer wants its reports, and whether the [associates] should have a conference with the customer in advance of the IME[.]"  (Levi Decl., Dkt. 8, ¶ 30.)

---

[3]  The Court issued a Memorandum & Order in support of the April 2022 Injunction in which the Court made numerous Findings of Fact.  *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, (E.D.N.Y. May 13, 2022).  The relevant Findings of Fact to this latest Memorandum & Order are repeated here.

Adam Rosenblatt was Watchdog's President at all relevant times. (Am. Compl., Dkt. 114, ¶ 40.) Only he and Levi had access to "Watch[d]og's entire database, including the identity of all its customers and clients, their contact information, their preferences, pricing information, and all of the financial details of IME Watch[d]og." (*Id.* ¶¶ 41–43.) The confidential documents in the database were password protected, such that only Levi and Rosenblatt had access to them. (Levi Decl., Dkt. 8, ¶¶ 34–35.)

Companions is a New York company (Am. Compl., Dkt. 114, ¶ 5) established in November 2017 by Defendants Safa and Vito Gelardi, a married couple. (*See* Safa Gelardi Decl., Dkt. 26, ¶¶ 2, 33.) Safa did not have any previous experience in the personal injury or IME field when starting Companions—rather, she had worked at a bank in various positions. (*See* April 4, 2022 Hearing Tr. ("April 2022 Tr."), Dkt. 98, 24:21–25:10, 29:16–30:7.) However, through meetings with Rosenblatt and his father in early 2017, Safa learned about Watchdog's business, reviewed Plaintiff's confidential documents that Rosenblatt shared with her, and decided to open Companions. (*See* Safa Gelardi Decl., ¶¶ 16–18, 20–22, 28, 33; April 2022 Tr. 35:19–21, 84:10–85:1, 155:12–14.)[4]

---

[4] The Court also finds that Safa Gelardi has repeatedly perjured herself throughout this case and is thus wholly uncredible as a witness. For example, at the April 2022 hearing, Safa was asked "[y]ou instructed Adam [Rosenblatt] to sabotage the customer accounts of IME WatchDog?" and she responded: "[a]bsolutely untrue." (Apr. 2022 Tr., 42:15–17.) But the forensic evidence shows that Safa sent text messages to Rosenblatt from 2019 through 2022 directing him to sabotage Plaintiff's customer accounts in exchange for monetary payments—including in the very months preceding the April 2022 hearing. *See infra* Findings of Fact Section II.B. (*See also* Dkt. 154-2, at 250–251 (showing text messages between Safa and Rosenblatt on February 22, 2022, in which she asks Rosenblatt to "turn [Douglas and Londin] down the next time" they ask Plaintiff to observe an IME in New York); *id.* at 252 (showing text from Safa to Rosenblatt on February 22, 2022 stating "Listen[,] turn all Wingate [] down so you can take them back when y[o]u work for your[self]"); March 27, 2023 Hearing Tr. ("March 2023 Tr."), Dkt. 199, 29:14–24.) At the March 27, 2023 hearing, the Court warned Defendants' counsel of Safa's history of perjury, and counsel ultimately chose not to have Safa testify. (March 2023 Tr. 121:17–24, 125:20–23.)

## II.    Plaintiff's Trade Secrets

### A.    Defendant Safa Gelardi's Receipt and Use of Plaintiff's Confidential Customer Lists and Financial Documents

The forensic examination of Defendant Safa's emails reveals that she received troves of confidential information about Plaintiff's business in the Spring of 2017 that helped her start Companions. In late April of 2017, Plaintiff's employee, Adam Rosenblatt, began emailing copies of Plaintiff's confidential financial records and customer lists to Safa. (Pl.'s Br., Dkt. 152 (hereinafter, "Dkt. 152"), at 3; *see also* Dkt. 154-3, at ECF[5] 112 (Rosenblatt emailing Plaintiff's "Sales by Client 2016.pdf" to Safa Gelardi with the message "On day one I could bring in money"); *id.* at ECF 1–27 (Rosenblatt sending copies of Plaintiff's Profit and Loss statements from 2014 through 2016 and Watchdog's 2016 Quarterly Review to Safa Gelardi); *id.* at ECF 22 (slide summarizing Watchdog's top 10 clients in 2015 and 2016).) Safa immediately forwarded these emails containing Plaintiff's confidential information to others. (Dkt. 154-3, at ECF 8 (forwarding copy of Plaintiff's 2016 Quarterly Review to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 34 (forwarding copy of "IME Watchdog Clients Master List 2017.xlsx" to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 40 (forwarding Rosenblatt's email with "a breakdown of March 2017, [i]ncluding the monthly P&L, list of clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs[.] what we billed, etc." to "jay@fivepillarsgroup.com" on April 29, 2017).)

In the first week of May 2017, Rosenblatt emailed Safa explaining what materials she needed to buy to get a competing business started and sent her Plaintiff's invoices to use as models. (Dkt. 152, at 4; Dkt. 154-3, at ECF 118 (Rosenblatt email to Safa dated May 1, 2017, with subject

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

line "Needed" and listing items to buy including "Computer with 3 monitors" and "Quickbooks").)
On May 4, 2017, Safa's accountants formed IME GuardDog Inc.—the name that Safa wanted to
call her competing business at the time, although she ultimately settled on IME Companions LLC.
(Dkt. 152, at 4.)   On the previous day, Rosenblatt had started an email thread with a website
designer, Lumina, and Safa, explaining that "[a]s discussed, we need a website for IME Guard
Dog with a significant amount of content to be taken from IME Watchdog." (Dkt. 154-3, at ECF
122.)

Safa used the financial information and customer lists from Rosenblatt to create her own
"top revenue" customers, organized by customers who paid the most revenue to Plaintiff so that
she could target them.   (Dkt. 152, at 5; *see also* Dkt. 154-3, at 136 (forwarding "Attorney List Over
10,000 in Revenue.xlsx" to Defendant Roman Pollak on August 8, 2017).)   On September 29,
2017, Safa sent Watchdog's confidential financial records to Defendant Roman Pollak in the hopes
that he would pitch the idea of IME observers as a business opportunity to Defendant Greg
Elefterakis.  (*See* Dkt. 152, at 4 (citing Dkt. 154-3, at ECF 141–47); March 2023 Tr. 72:8–73:3.)[6]
Neither Defendant Pollak nor Defendant Elefterakis knew anything about the IME observer
business before Safa contacted them.  (March 2023 Tr. 81:6–9 (establishing that fact as to Pollak);
*id.* 42:18–19 (establishing that fact as to Elefterakis).)   Pollak analyzed Watchdog's financial
records to determine the business's profitability and asked Safa follow-up questions on October 3,
2017.  (March 2023 Tr. 72:8–73:3; Dkt. 154-3, at ECF 148.)  Pollak specifically mentioned in his
October 3rd email to Safa, regarding "travel expenses.. [sic] I assume that is mostly the

---

[6] Plaintiff called Pollak and Elefterakis as witnesses at the March 27, 2023 hearing.  Their
testimony established that, in 2017, Elefterakis owned a business called Case Cash Funding, which
worked with personal injury law firms to provide non-recourse loans to prospective plaintiffs.
(March 2023 Tr. 46:15–23.)   Pollak was the CFO of Case Cash Funding and reported to
Elefterakis. (*Id.* 46:24–25, 61:3–12.)

doc/[A]dam." (Dkt. 154-3, at ECF 148.)  At the hearing, Pollak testified that it was likely he was referring to Adam Rosenblatt at the time of the email, but did not know whether Adam Rosenblatt was affiliated with Watchdog when he wrote the email.[7]  (March 2023 Tr. 74:8–75:10.)  On October 5, 2017, Pollak emailed Lumina and Safa, requesting to "have a functional version [of the website] by months [sic] end" and indicating that "90% of the [website's] content will come from the IME watchdog site and the brochure provided by Safa." (Dkt. 154-3, at 149–50.)

Importantly, Defendants openly conceded during the March 2023 hearing that Safa took Plaintiff's confidential information from Rosenblatt. (March 2023 Tr. 29:8–13 (The Court: "[Safa] clearly took information via Mr. Rosenblatt and started her business.  Are you denying that?" Defendants' counsel: "No, Judge.  Mr. Rosenblatt sent her a customer list and[,] . . . I believe, gross revenue figures for 2016 on that list."); *see also id.* 31:1–3 (Defendants' counsel: "Mr. Rosenblatt sent the customer list with the general revenue provisions on it to Ms. Gelardi.  There's no dispute as to that.").)[8]  However, Defendants contend that it was of no consequence that Safa took Plaintiff's confidential information, because Plaintiff's customers—personal injury firms— are public knowledge and obtainable through daytime television advertisements (March 2023 Tr. 32:4–8), and moreover, that Defendant Gregory Elefterakis "was very well aware of the top personal injury firms, because he's in the cash provision business, and he knew all these firms

---

[7] The Court found Defendant Pollak to be evasive and untrustworthy throughout his examination.  Pollak admitted that he reviewed Watchdog's website during his analysis of Watchdog's profitability but did not recall seeing Adam Rosenblatt listed as an employee on the website. (March 2023 Tr. 75:12–17.)  At this time, the Court does not make a finding as to whether Pollak was lying during the hearing about his knowledge of Rosenblatt's employment with Watchdog because it is not necessary for resolving this motion.

[8] The Court notes that in light of these admissions, Safa perjured herself at the April 2022 hearing when she was asked "[Rosenblatt] gave you a Sales by Customer Summary for 2016 in or about April of [20]17, correct?" and she responded "No." (April 2022 Tr. 35:24–36:1.)

intimately" (*id.* 32:13–16). Defendants therefore claim that Safa built her business "through introductions by Mr. Elefterakis, not through [] the Rosenblatt [documents]." (*Id.* 32:16–20.) However, Defendant Elefterakis's testimony during the hearing flatly contradicted that argument.

At the hearing, Elefterakis testified that he joined Companions "to help [it] obtain customers[.]" (March 2023 Tr. 54:6–9.) But he also conceded that he introduced at most, 15 customers to Companions throughout his time at the company. (*See id.* at 44:3–14 ("[The Court]: And how many clients did you recall approaching[?] . . . [Elefterakis]: Originally, it was within, probably, ten clients to get a good sampling of what the response would be[.] . . . [The Court]: And did you, at any point, approach any other clients besides these ten? [Elefterakis]: No. [The Court]: And so this was at the beginning before Companions started; is that right? [Elefterakis]: Yes, correct."); *id.* 53:12–14 (Elefterakis testifying that he introduced "[b]etween ten and 15 clients that I obtained through my own, you know, personal contacts" to Companions).)

The documentary evidence shows that today, 90% of Defendants' customers are comprised of Plaintiff's former customers (Dkt. 152, at 5), with well over 400 of those customers being traceable to the customer lists and confidential information that Defendant wrongfully obtained from Rosenblatt (*see* Dkts. 180, 187; 4/3/2023 Docket Order). Moreover, 98.3% of the total revenue Defendants have generated since Companions' inception was obtained through sales from Plaintiff's former customers. (Levi Decl., Dkt. 172, at 2–3; March 2023 Tr. 10:24–11:10.) Thus, Defendants' claim that Safa built her business primarily through client introductions by Mr. Elefterakis is thoroughly contradicted by the evidence in the record, and plainly false.[9]

---

[9] During the hearing, Plaintiff submitted that in 2018, Defendants had only 12 customers, with 10 of those customers being former clients of Plaintiff. (March 2023 Tr. 58:2–3.) No competent evidence was adduced at the hearing as to whether these ten former Watchdog customers were also Elefterakis's clients. (*See id.* 58:18–23.) Furthermore, Defendant Pollak testified that he recalled providing customer names to Safa in the summer of 2017 beyond the ones

**B.    Defendant Safa Gelardi's Text Messages and Venmo Payments to Plaintiff's Employee Adam Rosenblatt**

Plaintiff has produced over 200 pages of text messages between Safa and Rosenblatt spanning from September 2019 through March 2022. (Dkt. 154-2.) These text messages establish that over the course of at least three years, Safa told Rosenblatt which of Plaintiff's customers she wanted and that she would pay Rosenblatt to sabotage Plaintiff's relationship with those customers so that they would use Companions instead. (*See, e.g.*, Dkt. 154-2, at ECF 85–86 (Safa: "Ignore them[,] fuck up a few times[,] and when they switch [to me] I will pay you big." Rosenblatt: "Sounds good . . . Will have some more immediate clients for you tomorrow." Safa: "Yes baby. Make that money."); *id.* at ECF 81 (Safa: "When am I gona [sic] get Parker Waichman. Name your price I got you[.]" Rosenblatt: "They pay 95[.]" Safa: "I will give you half in advance and half after they start booking[.]"); Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.) Moreover, Defendants conceded as much during the March 2023 hearing:

> THE COURT: Okay[—t]here's forensic evidence[—a]m I wrong that there actually are communications where [Safa]'s saying to Mr. Rosenblatt, send me this, or sabotage this? I read something in the papers where it says, go and get them, baby, or something to that effect, where he's basically trying to delay things, or the services aren't as good from Watchdog or to do other things to sabotage those clients of Watchdog. Is that not in evidence?

---

listed in Plaintiff's confidential customer lists. (March 2023 Tr. 92:19–93:11; *see also id.* 94:1–3.) Pollak could not recall the dates he provided such information and could not recall how he provided the information to Safa. (*Id.* 92:19–93:11.) To date, Defendants have not submitted any evidence of Pollak or Elefterakis providing Safa with any customer names. The Court therefore cannot make a factual finding at this time regarding how many of Defendants' initial 12 customers were procured through the confidential information Defendants misappropriated from Plaintiff versus through Elefterakis's or Pollak's pre-existing client relationships. However, the Court does not find this fact to be necessary or material to resolving the instant motion because of the plethora of other evidence showing that Safa Gelardi relied on Plaintiff's trade secrets to start her business and to continue building the business, which warrants an expanded preliminary injunction.

MR. WARNER [(Defendants' counsel)]: There are text exchanges, Judge, that indicate what you are saying. But this was well after this business was set up and started. Well after.

(March 2023 Tr. 29:14–24.) Safa has pleaded the Fifth Amendment and invoked her right against self-incrimination with respect to her payments to Rosenblatt. (*See* Apr. 2022 Tr. 53:8–11; *id.* 61:14–62:16.)

## III. Defendant Safa Gelardi's Contacts with Carlos Roa

On November 4, 2022, Defendant Safa Gelardi hired a private investigator, Steve Stanulis, to track and contact Third-Party Defendant and Plaintiff's employee, Carlos Roa ("Roa"). (Dkt. 153, at 4–5; *see also* Dkt. 153-5, at ECF 1.) Stanulis works for a company called Silver Shield. (Dkt. 153-5, at ECF 1.) Safa hired Stanulis to "investigate" Roa because she believed that he, as a former employee, was "soliciting clients and slandering her name." (*Id.*) Specifically, Safa directed Stanulis to "befriend" Roa (March 2023 Tr. 137:18–20) and "try to relate to him" with the goal of getting Roa "to defame [Defendants] very badly" (Dkt. 181-1, at ECF 1). Safa provided Stanulis with scripted things to say to Roa, including complimenting him because "he loves it" and asking him "how long have you been in the sports business?" (*Id.* at ECF 1.)[10]

---

[10] During the hearing, Defendants' counsel claimed that hiring a private investigator to befriend Roa did not violate the Court's Amended Injunction barring contact between the parties, because it "wouldn't be contact initiated by [Safa] or her [private investigator]. It was supposed to go the other way around, Judge." (March 2023 Tr. 137:22–24.) Specifically, Defendants' counsel argued that Safa hiring a private investigator to "accept contact" was distinguishable from Safa *initiating* contact. (*Id.* 138:3–6.) The Court finds this argument to be meritless and bordering on frivolous. Defendants' counsel is, again, cautioned not to make disingenuous representations and frivolous arguments to the Court in future proceedings. (*See also id.* 138:8–16 (The Court: "I don't care if Mr. Roa initiates [contact] if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. I don't care who initiated it. . . . Again, this is the kind of parsing that you and your client are doing that strikes me as troublesome and will only result in further restrictions.").)

Moreover, Safa paid Stanulis to place a GPS tracker on Roa's car.  (Dkt. 153-5.)  On November 11, 2022, Roa discovered the tracker because his security camera captured Stanulis placing the GPS tracker.  (Dkt. 153, at 3.)  Roa reported the incident to the police on November 12, 2022.  (*Id.* at 4.)  Defendant Safa claimed that the GPS tracker was placed without her knowledge. (March 2023 Tr. 139:6–11.)  However, the documentary evidence once again shows that Safa was being untruthful; in fact, she knowingly paid for the use of a tracker by her private investigator, Stanulis, and actively monitored the tracker before it was found.  (Dkt. 153-5, at ECF 1, *id.* at ECF 11–16 (Safa texting Stanulis regarding whether GPS tracker is working).)

## IV. Defendants' Circumvention of the Court's March 2023 Temporary Restraining Order

The Court enjoined Defendants on March 10, 2023, from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law."  (Dkt. 156, at 3; 3/10/2023 Docket Order.)   Six days later, Mayra Gomez, one of Plaintiff's independent contractors, saw Jeff Beibin ("Beibin"), a Companions employee, at an IME on March 16, 2023 in Commack, New York.  (Dkt. 173, ¶¶ 1, 9.)  Beibin filed a declaration conceding that he was at an IME on that date, but that he was there as "an agent of Client Exam Services, which is owned and operated by Fari Gutierrez."  (Dkt. 176, ¶ 3.)  Based on evidence presented at the March 27, 2023 hearing, the Court finds that Fari Gutierrez ("Gutierrez")—a friend of the Gelardi family (March 2023 Tr. 98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)— created Client Exam Services at Safa's direction specifically to continue operating Defendants' business in contravention of the Court's TRO.

Documentary evidence and witness testimony from the hearing establishes that after the TRO was issued, Safa Gelardi told Fari Gutierrez that "I have been shut down.  I cannot operate [Companions].  It's yours, if you want it."  (March 2023 Tr. 25:1–3.)  On March 11, 2023, Safa

told Beibin that Companions was shutting down until further notice and that Gutierrez had started

a company and would contact Beibin. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel

explaining that Safa told Mr. Beibin that "Fari may be taking over the business").) On March 12,

2023, Beibin received a call from "Sammy" on behalf of Client Exam Services, an IME observer

business. Sammy explained "that everything would pretty much be operating the same way as

they did" at Companions, and gave Beibin an IME assignment. (*Id.* 97:11–14, 100:21–24.)

Sammy is Safa's nephew and his full name is Hesham Salameh. (*Id.* 107:2–110:15.) Client Exam

Services was incorporated on March 16, 2023 (*id.* 6:23, 105:2–15), the same day that Beibin ran

into Plaintiff's independent contractor, Gomez. Beibin's sole communication with Client Exam

Services was with Sammy via phone and email. (*Id.* 104:16–20.) Beibin has never been to an

office for Client Exam Services and is not aware of whether there is a physical office. (*Id.* 104:11–

15.)

Since March 10, 2023, Beibin has attended approximately 12 IMEs on behalf of Client

Exam Services, for the same clients he had been servicing when he worked at Companions. (*Id.*

100:25–101:2, 103:14–16, 115:2–5.) There are no differences in operations between Client Exam

Services and Companions. (*Id.* 113:25–114:11.) In fact, Beibin did not think to ask Sammy or

Client Exam Services about his pay rate or frequency because "[w]hen IME Companions was

closed[,]" Safa informed him "that all of the business was now going to be taken over by Fari

Gutierrez . . . [a]nd everything would remain the same, except for the name of the company[.]"

(*Id.* 114.)[11]

---

[11] The Court found Defendants' arguments and defense counsel's credibility troubling
throughout the Court's probing of the Client Exam Services issue. Defense counsel opened the
March 27, 2023 hearing by unequivocally asserting that "there's no connection" between
Defendants and Client Exam Services, and boldly stated that "[Defendants] have nothing to do
with Client Exam Services." (March 2023 Tr. 24:13–16.) However, Beibin's testimony during

## CONCLUSIONS OF LAW

### I.     Preliminary Injunction

#### A.          Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right.  A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 64 F.4th 658, 666–67 (2d Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)).  "In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by showing a clear or substantial likelihood of success on the merits, and by making a strong showing of irreparable harm."  *Id*. at 667 (cleaned up).  "First, a plaintiff must meet that standard if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits . . . . Second, a plaintiff must meet that standard if he seeks a so-called 'mandatory injunction' – that is, an injunction that 'alter[s] the status quo,' which usually is done by commanding some positive act."  *Id*. (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34–35 (2d Cir. 1995)).  "Under the heightened standard, [the party seeking a preliminary injunction] 'must show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm.'"  *Id.* at 669 (quoting *New York ex rel. Schneiderman*

---

the hearing plainly revealed Safa's integral role in creating Client Exam Services, and her close—even familial—relationship with Client Exam Services' managers, Gutierrez and "Sammy."  Thus, after Beibin's testimony, defense counsel conceded "[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [it] leads back to [Safa]." (*Id*. 126:3–5.)  Defense counsel is again warned that future false, disingenuous, and/or irresponsible claims and arguments could result in sanctions and/or findings of contempt.

*v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole from Plaintiff.

### B.   Likelihood of Success on the Merits

#### 1.   Legal Standard for Trade Secrets Claim

Plaintiff asserts, *inter alia*, causes of action under the Defend Trade Secrets Act ("DTSA") and misappropriation of trade secrets under New York common law. (*See* Am. Compl., Dkt. 114, at 2.) Section 1836 of the DTSA is a private cause of action for "[1] [a]n owner of a trade secret" which was "[2] misappropriated" and "[3] related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "The elements for a misappropriation claim under New York law are fundamentally the same [as under Section 1836] . . . [and] [d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (cleaned up). When a claimant proves "actual or threatened misappropriation," then "injunctive relief is authorized," but when "that there has been 'unjust enrichment' or 'actual loss caused by the misappropriation of the trade secret,' [then] damages are authorized." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403–04 (S.D.N.Y. 2021) (citing 18 U.S.C. § 1836.)

"Under New York law, a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (citing *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and

which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007). In general, the following factors must be considered to determine whether information is a trade secret:

(1) The extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the business to guard the secrecy of the information;

(4) the value of the information to the business and its competitors;

(5) the amount of effort or money expended by the business in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)).

Most relevant to this case, "[c]ustomer lists may constitute trade secrets under certain limited circumstances. Specifically, the identity of customers is protected if the list was developed through substantial effort and kept in confidence." *Id.* at 148 (citing *N. Atl. Instruments, Inc.*, 188 F.3d at 44). "[L]ists of customers will not be deemed protected trade secret information where customers are readily ascertainable as prospective users or consumers, of the product at issue." *Id.* at 149 (internal quotations and citation omitted). "The issue of whether and to what extent a customer list constitutes trade secret information is a question of fact for th[e] court. When determining the confidentiality of customer lists[,] . . . the court considers the trade secret criteria referred to above." *Id.* In particular, although lists of customers may be publicly available or back-trackable, "the *identities of individual contact people*" at customers' companies can be "protectable trade secrets." *N. Atl. Instruments, Inc.*, 188 F.3d at 45.

16

2.    Plaintiff's Customer Lists Constitute Trade Secrets

Here, the record shows that Plaintiff developed its customer list through Daniella Levi's experience in the personal injury field, and that Plaintiff took measures to keep Watchdog's customer lists secret, such as password-protecting the lists and limiting access to them to only company executives.  (Levi Decl., Dkt. 8, ¶¶ 34–35, 41–43.)   The customer information was clearly valuable to individuals outside the business, as evidenced by Defendant Safa Gelardi's own text messages, and her willingness to pay Rosenblatt for the information.  (Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.)  Moreover, although Defendants argue that the names of personal injury law firms are public information (March 2023 Tr. 32:4–8), Plaintiff's customer lists contained not only firm names, but the identities of individual contacts for the firms, and the revenue paid and services contracted for by Watchdog's customers (*see* Dkts. 180-1, 180-2).  In fact, Safa was able to use the details in Plaintiff's customer lists to create a spreadsheet of "top revenue" customers, organized by the firms who paid the most revenue to Plaintiff, so that Defendants could target them for poaching.  (Dkt. 152, at 5.)  Plaintiff's customer lists and information fall squarely within the definition of trade secrets, as found by the Second Circuit in *Heyman*:

> While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured.  Moreover, the data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way.  Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, but rather upon how he did in fact *actually* acquire it.  "It matters not that defendants *could* have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. *The fact is that they did not.*  Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."

*Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590–91 (2d Cir. 1963) (emphasis added) (quoting

*Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953)). Here, there are volumes of undisputed

evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases,

but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants. *See supra*

Findings of Fact Section II. Thus, the Court finds that Plaintiff's customer lists constitute trade

secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against

Defendants.

### C.   Irreparable Harm

#### 1.   Legal Standard for Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction. . . . and plaintiffs must demonstrate that absent a preliminary injunction

they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one

that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC*,

62 F.4th at 672 (citations and quotation marks omitted). "[L]oss of reputation, good will, and

business opportunities" may constitute irreparable harm. *Rex Med. L.P. v. Angiotech Pharm. (US)*

*Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d

393, 404 (2d Cir. 2004)). Good will is defined as the "expectancy of continued patronage[.]"

*Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976 (RJH), 2011 WL 497978,

at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012) (summary order); *see also*

*Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562 (ERK) (RML), 2008 WL

207843, at *5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the

likelihood that customers will return to the old place of business, but the competitive advantage of

an established business"), *aff'd*, 282 F. App'x 885 (2d Cir. 2008) (summary order). "[G]ood will

constitutes the intangible qualities of a business that attracts customers . . . ." *Nat'l Elevator Cab & Door Corp.*, No. 07-CV-1562, at *5.

2. <u>Plaintiff Has Shown Irreparable Harm</u>

First and foremost, the Court notes that it already found evidence of irreparable harm to Plaintiff when the Court issued its April 2022 Injunction. *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, at *6 n.12 (E.D.N.Y. May 13, 2022) ("[I]n light of the overwhelming evidence of irreparable harm and clear likelihood of success, Plaintiff has met the heightened, mandatory injunction standard as well."). Thus, even prior to filing its renewed preliminary injunction motion and its contempt motion, Plaintiff had already met this standard. Now, the forensic examination and other discovery has laid bare the full extent of Defendants' theft of Plaintiff's trade secrets.

The forensic examination shows that beyond paying Rosenblatt to steal Watchdog's trade secrets to start Companions in 2017, Safa also paid Rosenblatt to intentionally sabotage Plaintiff's customer relationships and poach Plaintiff's clients over the course of almost three years. (*See, e.g.*, Dkt. 154-2, at ECF 83 (Safa asking Rosenblatt "[w]hat do I tell [Plaintiff's client] to get them to switch [to Companions?]"); *id.* at ECF 84–85 (Rosenblatt telling Safa to "be faster" when following up on clients he sends to Companions and advising her to "[m]ake them ready to switch [to Companions]" so that he "can just ignore them"); *id.* at ECF 92–93 (Safa offering "[$]400 paid semi[-]monthly on the 15th and the 1st" to Rosenblatt for "leads on [Plaintiff's] poachable clients" and marketing for Companions); *id.* at ECF 105 (Safa texting Rosenblatt to "[s]end me the attys [sic] that do last minute. Come on [Rosenblatt]. If you helped me out it won't put a dent in [W]atchdog. And you know I am willing to pay for them[.]").) Thus, notwithstanding Safa's self-serving and devious appeal to Rosenblatt about not "put[ting] a dent in [W]atchdog" (*id.*), Plaintiff has unquestionably lost good will, reputation, and business opportunities because of Defendants'

19

unlawful conduct and will continue to suffer irreparable harm absent an injunction. *See QBE Am., Inc. v. Allen*, Nos. 22-CV-756, 22-CV-757 (JSR), 2022 WL 889838, at \*15 (S.D.N.Y. Mar. 15, 2022) ("Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor."); *see also Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at \*3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x. 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal citation and quotation marks omitted)). Notably, the evidence presented throughout the multiple proceedings in this matter suggests that the IME market is relatively small and finite, such that finding new customers to replace the ones poached by Defendants has not and will not be easy for Plaintiff.

Moreover, a defendant's dissemination of trade secrets can be sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *Intertek Testing Servs.*, 443 F. Supp. 3d at 331; *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever."). Here, Defendants have conceded that they gave all of their customer information, including the information stolen from Plaintiff, to Fari Gutierrez to start Client Exam Services. (March 2023 Tr. 126–127.) Thus, Defendants not only wrongfully used Plaintiff's trade secrets to build Companions, Defendants further disseminated

Plaintiff's confidential information to outside parties in order to evade the Court's March 2023 TRO, resulting in further damage to Plaintiff's business, reputation, and good will.

Defendants argued during the March 2023 hearing that Safa "giving up" the misappropriated customer information to Gutierrez did not qualify as Safa "using" the information because "she's not profiting from it and she's not operating [Client Exam Services.]" (March 2023 Tr. 127:2–5.) However, Defendants misunderstand the plain text of both the Amended Injunction and trade secret law. The Amended Injunction states in relevant part: "Defendants . . . are preliminarily enjoined from . . . using *in any manner whatsoever* Plaintiff's trade secrets and confidential information" (Dkt. 80 (emphasis added)), and New York law is clear that the dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See, e.g., Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018) ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."); *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). Therefore, the Court finds that Plaintiff has shown they will be irreparably injured absent a preliminary injunction. Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction.

### D.     Narrowly Drawn Injunction

In the context of loss of trade secrets, the Second Circuit instructs that: "where irreparable injury has been demonstrated, a 'narrowly drawn' preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be 'narrowly

tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)). Here, the Court issues a narrowly tailored injunction, only enjoining Defendants from providing services to those customers who Plaintiff has shown were misappropriated from Plaintiff. (*See* Dkt. 180; 4/3/2023 Docket Order; 4/7/2023 Docket Order; 4/10/2023 Docket Order.) The Court notes again that this strengthened injunction is necessitated by Defendants' violation of the previous injunction.

### E.     Balance of Equities

The Court finds that the balance of equities tips decidedly in Plaintiff's favor. The Court has already found that Plaintiff has suffered and will continue to suffer irreparable harm if Defendants are not enjoined from using and disseminating Plaintiff's trade secrets. As for Defendants' claims of hardship, the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity. *See, e.g.*, *Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.*, No. 18-CV-8333 (ALC), 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) ("Where a party knowingly copies and uses another party's trademark without its permission, that party assumes the associated risks, and any potential loss suffered by an injunction may be considered to be self-imposed."); *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 247–48 (E.D.N.Y. 2009) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) for the proposition that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding that there was no real hardship to the defendant resulting from the issuance of an injunction other than loss of money from activity "it probably should not have engaged in to begin

with"); *Pearson Educ., Inc. v. Labos*, 19-CV-487 (CM), 2019 WL 1949820, at *6 (S.D.N.Y. Apr. 23, 2019) ("[I]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." (internal quotation marks and citation omitted)). Thus, here, Defendants' claim of hardship falls flat given the mountain of irrefutable evidence that Defendants engaged in a multi-year campaign, from the formation of Companions to the initiation of this lawsuit, to steal Plaintiff's confidential information and customers knowingly, methodically, and persistently. That is, Defendants assumed the risks of losing these customers when Defendants intentionally engaged in illegal activity to obtain them, and cannot legitimately claim any harm when they are forced to relinquish their ill-gotten business.

## F. Public Interest

Lastly, the Court finds that the public interest will be served by an injunction prohibiting Defendants from further using what the Court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets to poach clients from Plaintiff. As the Court stated in its previous Memorandum & Order issuing the April 2022 Injunction, "[i]t goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest." *IME Watchdog, Inc.*, 2022 WL 1525486, at *8.

## G. Bond

As before, the Court waives the bond requirement imposed by Federal Rule of Civil Procedure 65(c). Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party." *Nokia Corp. v. InterDigital, Inc*., 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond,

*see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant, *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted). If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction." *Corning, Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (per curiam).

Here, Defendants have not requested a security bond and Plaintiff similarly has not raised the issue. Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case. The Court has concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants from a preliminary injunction, if any, would therefore be minimal. *Golden Krust*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm."). Accordingly, the Court finds that no bond is required.

## II. Civil Contempt

### A. Civil Contempt Legal Standard

"A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Regarding the first factor, "[a]n injunction is sufficiently

clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id*. (quoting *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir.1989)).   As to the second factor, "[n]oncompliance [has] to be supported by clear and convincing evidence." *Id*. at 99. For the third factor, a party who diligently complies in a reasonable manner, "to ensure it remain[s] in compliance with the Injunction" "c[an] petition[] the District Court for a modification, clarification or construction of the order." *Id*. (quoting *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 192 (1949)).   Importantly, a party's intent or state of mind does not matter for finding contempt. *See McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act.").   Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id*. at 192.   Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id*.

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted).   "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id*. at 1353 (citation omitted).   On the other hand, coercive sanctions are "left to the informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent

25

seriousness of the sanction's burden." *Id.* (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

**B.** **The Court Finds Defendants in Contempt of the Amended Injunction and March 2023 TRO**

Applying this standard, the Court is prepared to find Safa Gelardi in contempt of the Amended Injunction, upon a showing of compensatory damages incurred by Plaintiff, with respect to the provisions in the Amended Injunction: (1) barring Defendants from making contact with Carlos Roa; and (2) operating Defendants' business or any other business that unfairly and unlawfully competes with Plaintiff.

1. Hiring a Private Investigator to "Befriend" Carlos Roa Constitutes "Contacting" Roa in Violation of the Amended Injunction

a. The Amended Injunction Clearly Prohibited Contact

The Court's Amended Injunction enjoins "Defendants, *their agents*, officers and employees, *and all other persons and entities in active concert or participation with them*" from "contacting Plaintiff's current clients, employees, and agents[.]" (Dkt. 80, at 2 (emphasis added).) Safa's hired investigator, Stanulis, undoubtedly qualifies as her agent and/or a person acting in concert with her." *See CBS Broad. Inc.*, 814 F.3d at 98 ("An injunction is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" (quoting *Drywall Tapers & Pointers*, 889 F.2d at 395)). Thus, the Court finds that the Amended Injunction clearly and unambiguously prohibited Safa from hiring Stanulis to contact Roa.

26

b.     Evidence of Safa's Violation is Clear and Convincing

Despite the plain language of the Amended Injunction, Safa hired a private investigator to contact Plaintiff's current employee, Roa.  (*See* Dkt. 153-4 (contract between Safa and private investigative agency dated "11/04/2022").)  Safa directed the private investigator to "befriend" Roa, even providing the hired agent with scripted questions and conversation topics.  (*See, e.g.*, Dkt. 181-1, at ECF 1 (email from Safa to the private investigator stating "Dear, Steve, this is my ex-employee [Carlos Roa], try to relate to him, he is a big mouth and will talk."); *id.* (Safa providing conversation material to the investigator including, "[Q]uestions to ask[:] how long have you been in the sports business? ([H]e claims to be a manager to runners[] and athletes[.] . . . Try to get him to talk shit about his current boss (Daniella Levi)[.]  Try to get him to defame her badly and disparage her, and have him talk about starting his own IME Business[.]").)  Moreover, Defendants "don't dispute" that Safa "had instructed the [private investigator] to befriend Mr. Roa."  (March 2023 Tr. 137:18–20.)

In response, Defendants argue that Safa's plan of hiring a private investigator to *elicit* contact was not *initiating* contact.  (*Id.* 137:22–138:6 (Safa's counsel arguing that "instruct[ing] the [private investigator] to befriend Mr. Roa" "wouldn't be a contact initiated by her or the [private investigator]" because it was "supposed to go the other way around"—that is—the investigator was hired to "accept contact, not to make contact.").)  However, for the reasons stated on the record, the Court finds this argument wholly unavailing, if not disingenuous and cynical.  (*Id.* 138:7–16 ("THE COURT: [W]hether [Stanulis] initiates it or not it's contact . . . if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. . . . She placed someone there to have contact with him.").)  Moreover, whether Safa *willfully* violated the no-contact provision is irrelevant to the Court's finding of contempt, *see*

27

*McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve from civil contempt . . . it matters not with what intent the defendant did the prohibited act."), although, based on the evidence produced in connection with the hearing, as well her conduct throughout these proceedings, the Court would find Safa's conduct willful, if that were a requirement. Thus, the Court finds that there is clear and convincing evidence that Safa attempted to contact Roa through a hired investigator in violation of the Amended Injunction.[12]

### c. Safa Did Not Exercise Reasonable Diligence

Lastly, although the plain language of the Amended Injunction clearly prohibited any individual working "in concert" with Safa from contacting Plaintiff's employees, to the extent Safa had any concerns about what the provision entailed, she could have asked the Court for "a modification, clarification[,] or construction of the order[.]" *CBS Broad. Inc.*, 814 F.3d at 99. Instead, she "incorrectly took it upon [her]self to interpret" the no-contact provision as allowing her to hire an individual to "befriend" Roa and did not exercise reasonable diligence in complying with the Amended Injunction. *Id.*[13] Moreover, any argument that the Amended Injunction's no-contact provision was too general is unavailing. Where a party's "proclivity for unlawful conduct has been shown[,]" as has been overwhelmingly established as to Defendants here, "[d]ecrees of

---

[12] Plaintiff also submitted clear and convincing evidence that Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5, at ECF 1 (Stanulis declaring that Safa "requested 10 hours of surveillance and agreed to a 'tracker' on [Roa's] car as well"); *id.* at ECF 11–16 (Safa texting Stanulis regarding whether the GPS tracker is working).) For the reasons stated on the record, the Court declines to find that Safa's attempt to track Roa violated the Amended Injunction. (*See* March 2023 Tr. 20:5–21:4.) However, the Court's Second Amended Preliminary Injunction will expressly prohibit Defendants from surveilling and tracking Plaintiff and Plaintiff's employees in addition to the no-contact provision.

[13] Furthermore, as noted, the Court does not find that Safa misunderstood the language of the no-contact provision. Rather, she deliberately sought to end run the injunction by directing the private investigator to elicit contact and "befriend" Roa.

[] generality are often necessary to prevent further violations." *McComb*, 336 U.S. at 192; *see also id.* ("It does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined.").

Thus, the Court is prepared to hold Safa in civil contempt for violating the Amended Injunction. However, the Court cannot enter an order finding Safa in civil contempt at this time because Plaintiff has not submitted the required affidavit "set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party." *See* Local Rule 83.6(a); *see also* Local Rule 83.6(c) (requiring the Court to "set[] forth the amount of damages, if any, to which the complainant is entitled" and "fixing the fine, if any, imposed by the Court" in an order of civil contempt). For this reason, the parties are directed to further brief the issue of damages and attorneys' fees before the Court can hold Safa in contempt. *See infra* Conclusions of Law, Section II.C.

      2.    <u>Defendants Violated the March 2023 TRO By Helping to Start Client Exam Services</u>

          a.    <u>The March 2023 TRO Clearly Prohibited Defendants from Helping to Start Client Exam Services</u>

On March 10, 2023, the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) This language is clear and unambiguous.

          b.    <u>Evidence of Defendants' Noncompliance is Clear and Convincing</u>

The evidence presented during the March 27, 2023 hearing clearly and convincingly established that Safa directed Fari Gutierrez—a friend of the Gelardi family (March 2023 Tr.

98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—to create Client Exam Services and circumvent the Court's TRO. Defendants' own counsel explained that after the issuance of the TRO, Safa "called Fari and said, [']I have been shut down. I cannot operate the business [Companions]. It's yours, if you want it.[']" (*Id.* 25:1–3.) Safa's employee, Beibin, also testified that on March 11, 2023, the day after the Court issued the TRO, Safa told him that Companions was shutting down until further notice and that Gutierrez had started a company and would contact him. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business").) On March 12, 2023, Beibin received a call from "Sammy," Safa's nephew, on behalf of Client Exam Services, who explained to Beibin "that everything would pretty much be operating the same way as they did" at Companions. (*Id.* 97:11–14, 100:21–24.) There were, in fact, no differences in operations between Client Exam Services and Companions:

> THE COURT: Are you paid the same?
>
> THE WITNESS: I haven't been paid yet.
>
> THE COURT: But were you promised the same pay[?]
>
> THE WITNESS: It would be the same, yeah.
>
> THE COURT: But did you discuss that specifically?
>
> THE WITNESS: No.
>
> THE COURT: So why did you assume that?
>
> THE WITNESS: Because I was told that everything would operate the way it had before.
>
> THE COURT: . . . . Who told you that?
>
> THE WITNESS: That's what Sammy told me.
>
> THE COURT: As before what? The company didn't exist [until March 16th].

THE WITNESS: When IME Companions was closed, I was made to believe that all of the business was now going to be taken over by Fari Gutierrez and . . . Sammy would give me my assignments.

THE COURT: And everything would remain the same, except for the name of the company as far as you were told?

THE WITNESS: As far as I was told, yeah.

(*Id.* 113:25–114:23.)  Beibin attended approximately 12 IMEs on behalf of Client Exam Services for the same clients he had been servicing when he worked at Companions after the March 2023 TRO was issued.  (*Id.* 100:25–101:2, 103:14–16, 115:2–5.)

Thus, the Court finds that there is overwhelming, undisputed evidence that "Defendants and any persons/entities acting in concert with them" have continued to operate a "business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.)

### c.   Defendants Did Not Exercise Reasonable Diligence

Lastly, Defendants clearly did not exercise reasonable diligence in complying with the March 2023 TRO.  Defendants argue that Safa provided Companions' clients and "outstanding assignments" to Gutierrez because she wanted to ensure they were "take[n] care of" after Companions was enjoined from servicing them. (March 2023 Tr. 26:16 – 27:4.) Therefore, it was not Safa who was operating the business or using the client information, but rather "she was letting someone else us[e] them." (*Id.* 27:5–15.) But Defendants ignore the fact that they were already enjoined by the Amended Injunction from "using *in any manner whatsoever* Plaintiff's trade secrets and confidential information." (Dkt. 80 (emphasis added).) Moreover, under New York law, dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See Capstone Logistics Holdings, Inc.*, 2018 WL

6786338, at *33 ("[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm.").[14]

Thus, if Defendants had exercised any amount of diligence, they would not have let a family friend "take over" Companions' business after the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating [Companions] or any other business that unfairly competes with Plaintiff" (Dkt. 156, at 3), because it was a clear violation of the Court's TRO. (*See* March 2023 Tr. 114:16–18 (Beibin testifying that "[w]hen IME Companions was closed, [he] was made to believe that all of the business was now going to be taken over by Fari Gutierrez[.]").) Even defense counsel conceded during the March 27, 2023 hearing that "[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [Client Exam Services] leads back to [Safa]." (*Id.* 126:3–5.)

Thus, the Court is prepared to hold Safa in civil contempt for violating the Court's March 2023 TRO.

## C.    The Court Requires Further Briefing Regarding the Compensatory Damages Sought

As discussed, in order to hold Safa in civil contempt, Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages. *See* Local Rule 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be*

---

[14] During the March 27, 2023 hearing, Defendants' counsel argued that giving Plaintiff's client lists to Gutierrez did not qualify as "use" of Plaintiff's trade secrets if Safa was "not profiting from it" and "not operating" the new business. (March 2023 Tr. 127:2–5.) However, New York trade secrets law clearly refutes this argument. Furthermore, this self-serving, post-hoc argument ignores the plain language of the Amended Injunction and the Court's written decisions and oral pronouncements in this matter.

*available to the moving party*. A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353 (explaining that "compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)). Thus, Plaintiff is directed to submit further briefing setting forth the actual damages it has incurred due to (1) Safa's "contact" with Roa, and (2) the creation of Client Exam Services, within 60 days of this Order.

## III.     Plaintiff's Other Requested Relief

In addition to the issues addressed above, Plaintiff is also seeking the following relief: (1) imposing upon Defendants a daily fine of $10,000 payable to Plaintiff for each day the Court finds Defendants in violation of the previous Injunctions; (2) attaching Defendants' real property or directing that all proceeds from the sale of any real property be held in escrow pending final disposition of this case; and (3) directing Defendants to submit to another forensic examination at their sole cost. The Court denied these requests for the reasons stated on the record at the March 27, 2023 hearing and does not find there is need to further supplement its reasoning at this time. (*See generally* March 2023 Tr.)

### CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiff's request for a second preliminary injunction. The Court attaches the Second Amended Preliminary Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order. Moreover, although the Court is prepared to find Safa in civil contempt of the Amended Injunction and the March 2023 TRO, the Court reserves on making a final ruling and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees for the March 27, 2023 contempt proceedings. Plaintiff's supplemental

brief setting forth the specific amounts of attorneys' fees and compensatory damages they believe they are owed as a result of Defendants' contact with Roa and the creation of Client Exam Services is due 60 days from the date of this Order.  Defendants will be permitted 30 days to respond, if they choose.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
          Brooklyn, New York