

|               |                  |
|---------------|------------------|
| **CORE Order #** | 241906 |
| **CORE Partner** | GIANT PARTNERS |
| **CORE List Advisor** | Corey Weissman |
| **Client** | IME Legal Reps |
| **Client Contact** | Eugene Liddy |
| **Date** | April 10, 2023 |

# GIANTPARTNERS

1461 Lawrence Drive
Thousand Oaks, CA 91320
P: (805) 267-1575

Order No 241
Order
Amount ${a
Date Ap
 202
Terms Re
CompanyCo
Contact We

Ship to
---

**IME Legal Reps**
Eugene Liddy
205 Charleston Lane
Fate, TX 75189
P: (800) 409-9921

**IME Legal Reps**
Eugene Liddy
205 Charleston Lane
Fate, TX 75189

## Line Item Description

| Item | Description | Amount |
|---|---|---|
| **Digital Marketing Partnership (Starter)** | **IME Legal Reps brand and website buildout with corresponding advertising campaign** | **7250** |

TARGET MARKET

Primary and secondary targeting will be ongoingly adjusted to maximize campaign performance—client approval required.

> Texas, New York, Pennsylvania, New Jersey

Targeting parameters discussed: Plans to target Metro Service Areas and expand to other states.
Custom Audiences: Lists uploaded directly into client ad manager account(s) at no additional charge.

CUSTOMER PERSONAS

Personas will be targeted with tailored communications across marketing channels. Persona profiles and corresponding creatives will be adjusted based on campaign performance—client approval required.

> Personal Injury Law Firms (Persona 1)
> Workers Comp Law Firms (Persona 2)

ADVERTISING CHANNELS

Channels based on strategic discussions. Finalized channel selections for promotion (see supported channels list below) will be recommended by Giant Partners marketing team during onboarding and confirmed by client. Advertising channel mix will be adjusted based on campaign performance—client approval required.

> Channel 1: Meta (Facebook/Instagram)
> Channel 2: Google (PPC, Display, YouTube)
> Channel 3: Email Outreach

Note: Includes creation of new Meta and Google Advertising accounts. Discussed potential affiliate lead source management.

Supported Channels: Meta (Facebook/Instagram), Email Outreach (3 deployments/month)*, LiveIntent (Email Display), Google (PPC/Display), YouTube (Video Ads), SEO (Site maintenance with up to 3 published pages per month), LiveRamp (Connected TV Ads), Bing (PPC), Twitter (Promoted Tweets), TikTok (Promoted Videos), Linkedin (Sales Navigator), Linkedin (Ads), Organic Social (Scheduled posts on up to 3 platforms), Snapchat, NextDoor, Pinterest, Taboola, Outbrain. Alternative channels available.

Additional advertising channels can be added to partnership at any time for an additional $1000/month.

*3rd party email data purchase required (see data acquisition rates below).

Ad Spend: Daily, weekly and monthly ad spend budgets to be recommended by Giant Partners marketing team based on campaign parameters. Ad spend approved and paid directly by client to each advertising platform (Example: Meta, Google).

Note: Minimum $50 to $100 per day ad spend required for each channel to establish and maintain advertising accounts.

PARTNERSHIP SERVICES

> Data Enrichment: 1st party* customer data list cleaning, appending and validation (Example: Address, phone, email, demographics, interests, purchases) included at no additional cost. Limitations may apply.

*3rd party data enrichment not included—Standard data append pricing applies (see data acquisition pricing below).

> Content Publishing: Ongoing quarterly content calendar collaboration for publishing of graphics, videos, creative copywriting, resources, and presentations. Content calendar recommended by Giant Partners marketing team with original source content (Example:

|   |   |   |
|---|---|---|
|   | As soon as payment is received we will begin immediate buildout of IME Legal Reps website and brand. Timeline: Week 1-4 will be completion of new website, brand and advertising accounts with nurture communications. Week 5-6 will be ad creation and implementation. This is a replacement agreement for # 238416. We look forward to getting this campaign off to a great start as quickly as possible. Thank you for your business. If you have any questions please reach out to Corey Weissman at (805) 267-1575 ext 126 or email corey@giantpartners.com. |   |
|   |   |   |
|   | **Total** | **7,250.00** |

## Order History: 241906

| Date | Status | User |
| --- | --- | --- |
| April 10, 2023 13:42 | New | Corey Weissman <corey@giantpartners.com> |
| April 10, 2023 14:00 | Ready for Manager | Corey Weissman <corey@giantpartners.com> |
| April 10, 2023 14:00 | Approved by Manager | Conor McDaniel <conor@giantpartners.com> |
| April 10, 2023 14:00 | Ready for Client | Conor McDaniel <conor@giantpartners.com> |
| April 10, 2023 17:46 | Approved by Client | Eugene Liddy <IMELegalReps@Gmail.com> |
| April 10, 2023 17:46 | Awaiting Payment | Eugene Liddy <IMELegalReps@Gmail.com> |
| April 11, 2023 16:04 | Ready for Processing | Eugene Liddy <IMELegalReps@Gmail.com> |
| April 11, 2023 16:04 | Processing | Eugene Liddy <IMELegalReps@Gmail.com> |
| April 11, 2023 16:19 | Complete | Erica Barile <erica@rankgiant.com> |
| July 11, 2023 16:10 | Contract Cancelled | Nicole Pinto <nicole@giantpartners.com> |

## Confirmation Input Data: 241906

| Did We Get it Right? | |
|---|---|
| Yes, My Order is Correct | X |
| No, Please Contact Me | |
| Name | Eugene Liddy |
| TRANSACTIONAL META DATA | |
| Date | April 10, 23 |
| USER ID | 26204 |
| USER EMAIL | IMELegalReps@Gmail.com |
| IP ADDRESS | 70.23.95.208 |
| USERAGENT | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/111.0.0.0 Safari/537.36 |
| TIMESTAMP | 2023-10-04GMT12:10:2099 |

## Payment Input Data: 241906

| | |
|---|---|
| Name As It Appears on Card | |
| Address | |
| | |
| City | |
| State/Region/Province | |
| Zip/Postal Code | |
| Country | |
| Credit Card Number | |
| CVV | |
| Expiration Date | |
| Save CC for Future Orders | |
| I Accept the billing terms and conditions | X |
| Full Name | EUGENE LIDDIE |
| TRANSACTIONAL META DATA | |
| USER ID | 26204 |
| USER EMAIL | IMELegalReps@Gmail.com |
| IP ADDRESS | 100.33.165.48 |
| USERAGENT | Mozilla/5.0 (X11; CrOS x86_64 14541.0.0) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/111.0.0.0 Safari/537.36 |
| TIMESTAMP | 2023-11-04GMT23:04:00100 |
| AVS Only Authorization Results | |
| Litle ID | |
| Response | |
| Message | |
| Auth Code | |
| AVS Result | |
| Amount | |
| Authorization Results | |
| Litle ID | 8384981099710600 |
| Response | 000 |
| Message | Approved |
| Auth Code | 02112A |
| Amount | 7250.00 |

**These Terms and Conditions supplement and are made a part of the Order Confirmation between Customer and Company as if fully set forth therein.**

**Order Confirmation.** Customer acknowledges and agrees that the Order Confirmation and these Terms and Conditions constitute the entire agreement (together, the "Agreement") between the parties regarding the data, records, lists and/or products described therein (the "Product") and supersede any and all agreements and understandings, oral and written, with respect to the subject matter hereof. No representation, warranty, promise, inducement or statement of intention has been made which is not embodied in these Terms and Conditions, the Order Confirmation, or any other document, and no party shall be bound by, or be liable for, any alleged representation, warranty, promise, inducement or statement of intention not embodied herein or therein. Furthermore, handwritten information on the Order Confirmation will NOT be deemed to be a part of the Agreement. Any additional terms will be in "Notes to Client" on Client's Order Confirmation.

**Use of Product and Lists.** Customer represents and warrants that: (a) he/she/it is a merchant as understood and defined in the Uniform Commercial Code of the State(s) in which it operates, (b) the Product rented hereunder is for one-time use only, (c) no record in the Product, including without limitation, names, addresses, emails, etc. will be retained or duplicated, and (d) it will not use any Product in connection with the promotion or sale of sexually explicit materials, drugs, alcohol products or publicly traded securities. <u>Further, Customer is strictly prohibited from using source or origination information regarding any rented Product as part of Customer's telephonic presentation or printed mail piece, including without limitation, disclosing the name, identity or contact information of Company</u>. **NO EXCEPTIONS.**

**Disclosure of Proprietary Data.** To the extent that either Company or Customer discloses proprietary data and information to the other pursuant to this Agreement, they each acknowledge and agree that: (a) the disclosing party claims and reserves all rights and benefits afforded proprietary information under law, (b) this Agreement and disclosure to the other does not effectuate any transfer of title or interest in or to any proprietary data or information of the disclosing party, and (c) the other party is granted only a limited right of use of such proprietary data and information as may be necessary for the performance of this Agreement.

**Payment of Product.** Unless expressly provided on the applicable Order Confirmation, Customer shall pay for all Product by credit card, ACH, or wire transfer in the amounts and at the times provided on the Order Confirmation. Customer hereby irrevocably authorizes Company to charge the credit card account that has been provided by Customer to Company. Recurring payments will be charged on the same day of month as first payment. If the billing day of month lands on a weekend or holiday the payment will be charged on the previous business day. Customer acknowledges and agrees that it has read and fully understands this Agreement and Cancellation Policy referenced herein. In the event Customer fails to timely pay the full contract price when due per the terms of the Order Confirmation, Company shall, in addition to the other rights and remedies set forth herein, have the right to exercise one or more of the following without further notice to Customer: (a) suspend Customer's access to its website created by Company, (b) remove any and all website content created by Company, (c) delete Customer's entire website containing intellectual properties created by Company, (d) replace Customer's website designed by Company with Customer's pre-existing website, and/or (e) terminate all work by Company for Customer in connection with any digital marketing program designed by Company, including without limitation, logos, landing pages, and email campaigns. In connection therewith, Company accepts no responsibility and shall have no liability for any reliance by Customer on the continued availability of any content or resources on Customer's website.

**Cancellation Policy.** Customer acknowledges that all Product orders received from Customer require Company to create a custom product for Customer. Accordingly, Customer agrees that: (a) no returns of Product or reimbursements therefore will be made; (b) Customer is responsible for the full payment of such custom order; and (c) such financial responsibility shall not be released due to any of: (i) Customer rejecting said order, (ii) refusing to accept shipment, (iii) stopping payment on its check, (iv) requesting its credit card company to charge back or reverse the transaction or (v) changing the nature of the order, etc.

**Company Representations and Warranties.** Company represents and warrants to Customer that:

1. any work or materials produced or provided pursuant to this Agreement: (i) shall be free from computer viruses introduced into the software as a result of the negligence or intentional acts of Company and that the software will be free of software traps, viruses, worms, or code (including any undisclosed disabling device or code ) which would interfere with the intended use of the software in accordance with the specifications or which destroy or alter Customer's data, files, or systems and (ii) shall not infringe upon or violate any patent, trademark, copyright, trade secret or any other intellectual property rights of any third party;
2. its work under this Agreement shall be of professional quality consistent with industry standards and expectations for work of a similar nature;
3. it has the right to enter into and perform its obligations under this Agreement and such performance will not breach any other agreement by which it is bound; and
4. Product delivered to Customer under this Agreement (or under any Order Confirmation) shall not be subject to any prior or conflicting rights of any third party of any nature whatsoever.

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, COMPANY MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCT AND SERVICES PROVIDED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**Customer Representations and Warranties.** Customer represents and warrants to Company that:

1. it has the right to enter into and perform its obligations under this Agreement and such performance will not breach any other agreement by which it is bound;
2. it understands that Company is not affiliated with search engines including but not limited to Google, Yahoo, Bing, Ask and MSN and therefore, Company will not be held responsible for search engine policy, structure or algorithm changes;
3. Company has the right to use Customer's name, Customer's domain name, Customer's logo and Customer's keyword rankings on websites, case studies and other marketing materials;
4. if contacted by an existing customer or potential customer of Company, Customer will not disclose terms of this Agreement including but not limited to pricing, pricing structure, and agreement term;
5. it will not name or refer to Company in any of Customer's advertisements or promotional or marketing materials; and
6. it will use the Product and other goods and services of Company in full compliance with the law and industry best practices.

**Compliance with Applicable Laws.** Customer acknowledges and agrees that: (a) it is not relying any legal advice from Company in connection with the use of the Product and (b) all Product which Customer receives under the Order Confirmation shall be used only in strict compliance with all applicable Federal, State, and local laws, rules, regulations, and ordinances, including but not limited to, those concerning privacy, telephone solicitation, email solicitation, fax broadcasts and direct marketing, such as: (i) the Federal Fair Credit Reporting Act; (ii) the Gramm, Leach, Bliley Privacy Act; (iii) the Do-Not-Call Implementation Act of 2003; (iv) the Telephone Consumer Protection Act of 1991; (v) the Federal Trade Commission Act; (vi) the Children's Online Privacy Protection Act; (vii) the California Consumer Privacy Act, and (viii) similar privacy laws. Customer understands that any person violating such laws may be subject to civil and criminal penalties. Customer further acknowledges and agrees that it is Customer's sole responsibility to determine the applicability of any such laws, rules, regulations and ordinances.

**Disclaimer of Warranties.** Customer acknowledges and agrees that: (a) all Product and other goods and services are provided by Company on an "AS IS" basis, (b) no liability is assumed by Company for the accuracy, completeness, condition, suitability or performance of any Product and information provided hereunder, (c) output fields are subject to change without notice, (d) all representations and warranties, express or implied, relating to any such goods or services, including all warranties of merchantability and fitness for a particular purpose, their quality, their security, or their non-infringement are hereby disclaimed, (e) due to the fact that data products can be copied easily, no order will be returned or accepted for credit or otherwise, unless first approved in writing by Company, (f) although industry averages may be quoted by representatives from time to time, individual results vary, and thus, except as expressly provided in this Agreement, no guarantee whatsoever is given for any results from the use of Product sold or services provided, (g) Company will not be responsible for any records that are selected incorrectly and/or downloaded improperly by

Customer, (h) any and all records downloaded from the "Portal" (as hereunder defined) will be deducted from the amount of records purchased as set forth on the Order Confirmation, (i) Company will not be held liable for any records that are downloaded in error, (j) should at any time Customer does not completely understand how to use the Portal, Customer shall notify Company to seek supplemental training, and (k) the "Limitation of Liability" section set forth below shall govern the rights of the parties hereto.

**Limitation of Liability.** Customer agrees, understands, and expressly acknowledges that: (a) when Company rents Product to any person or entity including Customer, Company neither assumes nor accepts any responsibility of any kind for defects, deficiencies, mistakes, ambiguities or inaccuracies of any kind or effect with respect to Product rented pursuant hereto; and (b) while Company believes its information to be accurate, it does not, except as otherwise expressly provided in the Order Confirmation, warrant or guarantee any degree of accuracy of the Product rented, nor the outcome or results of any mailing or promotion or any other undertaking of Customer, and Company shall not be held liable in any manner with respect thereto. In all events, any liability hereunder or otherwise of Company and its representatives shall be limited to the amount paid by Customer for Product within the twelve (12) months preceding the event which gives rise to liability and no more. Customer acknowledges and agrees that Company shall not be liable for indirect, special, incidental or consequential damages (including, but not limited to, damages for loss of business, loss of profits or investment or the like) whether based on breach of contract, breach of warranty, tort (including negligence), product liability or otherwise, even if Company or its representatives have been advised of the possibility of such damages, and even if a remedy set forth herein is found to have failed of its essential purpose. The limitations of liability set forth herein are fundamental elements of the basis of the bargain between Company and Customer, and Customer acknowledges and agrees that Company would not, under any circumstances, provide its goods and services without such express limitations.

**Indemnification.** Customer agrees to defend, indemnify and hold harmless Company, its subsidiaries and affiliates, and their respective officers, directors, agents, and employees from and against any loss, damage, expense, or cost, including reasonable attorneys' fees arising out of or related to: (a) Customer's act or omission that constitutes a breach or an alleged breach, or the breach or alleged breach of any person or entity to whom Customer may sell Product (if permitted hereunder), of any covenant, duty, representation, or warranty of Customer under this Agreement and (b) any claim that Company's use of Customer's trademarks infringes on any trademark, trade name, service mark, copyright, license, intellectual property, or other proprietary right of any third party. Company shall not be liable to Customer, or to anyone who may claim any right, due to the parties' relationship, for any acts or omissions in the performance of said services on the part of Company or on the part of its agents, officers, directors or employees or assigns which result from the delivery of services made to Customer by Company and its agents, officers, directors, employees or assigns, unless said acts or omissions of Company or its agents, officers, directors, employees or assigns are due to gross negligence or willful misconduct. Customer agrees to reimburse Company, for all expenses, including reasonable attorneys' fees incurred, to enforce the terms and conditions of this Agreement, collect payments due hereunder, and defend against claims or actions by any person or entity arising from Customer's breach or alleged breach hereunder. These indemnification provisions shall survive the expiration or termination of this Agreement.

**PORTAL**
**Portal Term, Blocks, and Subscriptions.** All Product rented hereunder may be used by Customer on a confidential basis for the shorter of: (a) the period set forth on the applicable Order Confirmation or (b) twelve (12) months from the date of rental to Customer (the "Term"). Without the prior written consent from Company (which may be granted or withheld at Company's sole discretion), Customer shall not: (i) re-rent any Product or otherwise permit any use of Product by or for the benefit of any party other than Customer; (ii) publish, distribute or permit disclosure of any Product, other than to employees and agents of Customer on a need-to-know basis for use in Customer's business; (iii) use or permit use of any Product for the purpose of compiling, enhancing, verifying, supplementing, adding to, or deleting from any mailing list, geographic or trade business directories, classified directories, classified advertising, or other compilation of information which is sold, rented, published, furnished or in any manner provided to a third party; (iv) use or permit use of Product for the generation of any statistical information which is sold, rented, published, furnished or in any manner provided to a third party; (v) use or permit use of any Product to prepare any comparison to other information databases, which is sold, rented, published, furnished or in any

manner provided to a third party; or (vi) use or permit use of any Product in connection with individual credit, employment or insurance applications.

**Portal Unused Records.** Customer understands that this Agreement expires at the end of the Term and any and all unused records that have not been downloaded will expire on said date. It is highly recommended that Customer use/download all records before the end of the Term as such records will not be available thereafter.

**Portal Expense Reimbursement.** For Product accessed on the "Portal" and "White Label Product" (each as defined below), Customer shall reimburse Company for Product that is accessed and has not been paid for pursuant to the Order Confirmation at the rate of 2.5 cents ($0.025) per record to be billed when and as accessed and shall be paid by Customer within five (5) business days thereafter.

**Portal Delivery of Product.** Unless specified on the applicable Order Confirmation, during the Term, Company grants to Customer a non-exclusive, non-transferable license to access the Company's website portal (the "Portal") to run counts and access the Data as provided in this Agreement and any documentation related thereto. Customer expressly agrees that such access to the Portal is for the sole use of Customer and it will not assign, license, distribute, or otherwise transfer any of its rights under this Agreement to any other person, firm, corporation, or other organization without the prior written consent of Company which may be granted or withheld at Company's sole and unfettered discretion.

**Portal Cancellation.** If Customer elects to terminate this Agreement prior to expiration of the Term, Customer agrees to pay an early termination fee of fifty percent (50%) of the remaining balance due as set forth on the applicable Order Confirmation. Customer understands that except as specifically set forth in this Agreement, the Product and payments provided for herein are non-returnable and non-refundable.

**Portal White Label Use.** For orders of Product designated as "White Label" on the applicable Order Confirmation, Customer agrees to explain and direct to its clients how to access Product through the White Label platform. Customer agrees for itself and on behalf of its clients that they are fully versed on and agree to adhere to all current FTC, FCC, State and Local laws that pertain to the use of White Label Product. Customer is responsible for all data costs that are associated with Customer's White Label instance. In connection with the White Label portal, Company's identity shall remain confidential for goods and services rendered by Company that are rented by Customer to rebrand and sell as its own.

**Portal Uptime Guarantee.** Notwithstanding anything contrary contained in this Agreement, Company offers a service uptime guarantee for the Portal, which provides for a credit to Customer (as specified below) if, through the act or omission of Company, the total availability of Product falls below ninety-seven percent (97%), that is, access to Product through the Portal by Customer is guaranteed for at least 354 days per calendar year ("Uptime"). If Customer can demonstrate to Company's reasonable satisfaction that Company has failed to maintain the Uptime, Customer may contact Company and request a credit for that month proportional to the amount of downtime, to be applied towards the purchase of future goods and services. Credits cannot be redeemed for cash, credit card refunds, or data, and are exclusive of any applicable taxes. Notwithstanding anything contrary in this Uptime Guarantee section, the credit does not apply to service interruptions caused by: (a) periodic scheduled maintenance or repairs undertaken by Company from time to time; (b) downtime caused by Customer; (c) outages that do not limit manual data pulls (for example, interruptions that do not prevent Company from manually pulling requested data and delivering electronically); (d) suspension of Customer's account due to legal action taken or threatened against Customer or Customer's services; (e) suspension of Customer's account due to violations of the T&C or DNC, as determined by Company in its sole discretion, including but not limited to, excessive use of system resources, non-payment or other billing issues, or identification by the abuse team as fraudulent or otherwise in violation of the T&C; or (f) causes beyond the control of Company or that are not reasonably foreseeable by Company (for example, Acts of God/Force Majeure).

For use of Product comprised of phone numbers and email addresses, Customer also agrees as follows:

**PHONE NUMBERS** As a courtesy and if asked by Client, Company may elect, but is not obligated, to perform a soft scrub against the Federal "Do Not Call" list for consumer lists only. Customer acknowledges and agrees that if consumer phone numbers are downloaded, emailed, delivered, or contacted in any manner, Customer must: (a) subscribe to all applicable Do-Not-Contact lists and (b) strictly abide by all Do-Not-Call rules and regulations. There shall be no responsibility or liability upon or of Company for determining whether phone numbers on its lists may be registered under Federal and/or State "Do Not Call" laws or other laws governing telemarketers, and Customer shall be fully responsible for compliance therewith in connection with the use of Product rented hereunder.

**EMAIL ADDRESSES** Customer agrees that any use of any Product to send email messages will be in compliance with all applicable Federal and State laws, including the CAN-SPAM Act of 2003 and Customer's own privacy policies. If Customer uses any Product to send email messages, such compliance by Customer must, at a minimum, include: (a) no forged, false or misleading header information; (b) no false or misleading subject lines; (c) the sender's physical address (not a P.O. Box); (d) clear indemnification of the email message as an advertisement; (e) an opt-out notice with a functioning opt-out mechanism via email or the Internet which is operational for at least 30 days after sending the message; and (f) honoring opt-out notices within ten (10) business days of receipt of each opt-out request. Subject to the terms and conditions of this Agreement, if Customer resells, shares, rents or transfers any Product, such compliance must, at a minimum, include prohibiting reselling, sharing, renting or transferring the email addresses of recipients who have opted out of receiving email messages. CUSTOMER FURTHER AGREES NOT TO SELL, SHARE, RENT OR TRANSFER DATA TO OR WITH ANY PERSON OR ENTITY WHICH DOES NOT AGREE TO USE DATA IN COMPLIANCE WITH ALL APPLICABLE STATE AND FEDERAL LAWS, INCLUDING THE CAN-SPAM ACT OF 2003, AND WITH ITS OWN PRIVACY POLICIES. For email data purchased from Company which Customer chooses to deploy themselves, Customer acknowledges that they understand some third-party email deployment services do not permit deployment of purchased email data. It is highly recommended that Customer check with its internet service provider and its email deployment company, especially, but not limited to, companies such as Mail Chimp, Constant Contact and iContact (by way of example), before deploying any type of email advertisements, announcements, or other correspondence of any type regardless of its relationship with email recipients. Company will not be held liable for any issues arising as a result of Customer's third party email deployment service. Company guarantees a valid email address rate of 90% and a hard bounce rate of 5% or less so long as: (i) data is deployed by client within five (5) business days of receipt of data from Company and (ii) Customer uses a third party email deployment service that allows for purchased emails to be used. Any requests for hard bounce replacements must be provided within fifteen (15) days of data delivery. The request must include the hard bounced emails and a delivery report proving the hard bounces. Although Company endeavors to provide quality products and services, there shall be no liability or responsibility for the success of Customer's email campaign due to factors beyond the reasonable control of Company including but not limited to: (A) tracking and quantifying the success of Customer's campaign; (B) the look and feel of Customer's creative; and (C) deployment strategies, etc. Due to these factors, it is recommended that Customer have Company deploy email campaigns to track bounces, open rates, click-through to website offers, etc. Email deployments are subject to use of supplemental advertising based on the discretion of Company's email team. Customer is allowing Company to use the creative design that Customer has supplied or approved, plus alternate, similar versions Company produces for backfill sources, including but not limited to, Yahoo Gemini, Gmail Ads, and Social Ads (Facebook/Instagram). Simultaneously with deploying Customer's email campaign, Company's backfill sources will target the same geography identified by Customer's campaign, but demographics will be expert-selected to maintain the integrity of Customer's targeting.

**DIGITAL MARKETING SERVICES**
**Marketing Content.** Certain services may include a file management library allowing Customer to store and access certain marketing creative (e.g. logos, email creative, images) and other documents (collectively, "Marketing Content") for Customer's internal use. Any such Marketing Content and art will remain Customer's property; however, Customer gives Company permission to host, store, and to allow access to Customer's users. Customer is solely responsible for ensuring that it has all necessary rights and licenses to the Marketing Content and to use that Marketing Content in connection with the services. Company is not responsible for actions Customer takes with respect to

Customer's Marketing Content. Customer agrees to not upload Marketing Content that, or otherwise use the services, to: (a) violate the intellectual property rights of any third party; (b) engage in or promote illegal activity; or (c) distribute viruses, worms, or other malware or malicious software. Company reserves the right to delete or disable content alleged to violate the foregoing; however, Company has no obligation to monitor or review Customer's Marketing Content. Customer acknowledges that any file management library is made available for Customer's convenience and is not intended to be used as a data backup service or in connection with disaster recovery. Customer is responsible for maintaining independent copies of all Marketing Content, including backup copies. Marketing Content is subject to deletion upon termination.

**Third Party Services.** All software and platform fees will be paid by Customer directly to providers (CRM, Chat, Webinar, Hosting, Domains, Integrations, Automations, PRWire, Other).

**Ad Spend.** Ad spend is blended between web search and social media, and paid directly by Customer to advertising channels (Facebook Ad Manager, Google Ad Manager, LinkedIn Ad Manager, Bing Ad Manager, Twitter Ad Manager, etc.).

**Data Use.** Unless otherwise specified, if Customer is supplied with postal addresses, phone numbers or email addresses for a marketing campaign conducted/deployed by Company, said information is for Customer's internal use only.

**Cancellation.** For digital marketing services provided by Company to Customer, this Agreement will automatically renew at the end of the Term. Opt-out from services shall be provided in writing by sending an email to compliance@giantpartners.com. Customer's opt-out term and any other pertinent information pertaining to digital campaigns is stated explicitly in the "Notes to Client" section of Customer's Order Confirmation. Once the stated Term has been reached, Customer may then provide written opt-out notice. **If Customer cancels prior to the opt-out Term, Customer will be responsible for the payments until the opt-out period has been reached.** Payment amount may be adjusted for service changes and one-time projects upon Customer's request.

**Notices and Other Communications** Any notice made in accordance with this Agreement shall be: (i) sent by certified mail or by recognized national overnight courier or express mail, (ii) effective upon receipt, and (iii) addressed to:

If to Customer:
As set forth on the Order Confirmation:
Customer Shipping Address
Customer Contact Person

If to GP:
Giant Partners, Inc.
1461 Lawrence Dr, 2nd Floor
Thousand Oaks, CA 91320
Attn: Sheldon Katz, COO

**Arbitration, Class Action Waiver and Governing Law.** Any dispute, controversy or claim arising out of or relating in any way to this Agreement, including without limitation any dispute concerning the construction, validity, interpretation, enforceability or breach hereof, shall be exclusively resolved by binding arbitration upon a party's submission of the dispute to arbitration. In connection therewith:

1. In the event of a dispute, controversy or claim arising out of or relating in any way to this Agreement, the complaining party shall notify the other party in writing thereof. Within thirty (30) days of such notice, management level representatives of both parties shall attempt to resolve the dispute in good faith. Should the dispute not be resolved within thirty (30) days after such notice, the complaining party shall seek remedies exclusively through arbitration. The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after two (2) years from when the aggrieved party knew or should have known of the controversy, claim, dispute or breach.
2. This Agreement to arbitrate shall be specifically enforceable. A party may apply to any court with jurisdiction for interim or conservatory relief, including without limitation a proceeding to compel arbitration.
3. THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO HAVE DISPUTES LITIGATED IN A COURT, TO A TRIAL BY JURY, AND ANY RIGHTS THEY MAY HAVE TO PURSUE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION IN ANY DISPUTE RELATING TO OR ARISING FROM THIS AGREEMENT.
4. The arbitration shall be conducted by one arbitrator. If the parties are not able to agree upon the selection of an arbitrator, within twenty (20) days of commencement of an arbitration proceeding by service of a demand for arbitration, the arbitrator shall be selected by the American Arbitration Association in accordance with the terms of this Agreement.

5. The arbitrator shall have ten (10) years of experience in contract dispute resolution and also shall have served as an arbitrator at least three (3) times prior to their service as an arbitrator in this arbitration.
6. The arbitration shall be conducted in accordance with the then existing Commercial Rules of the American Arbitration Association.
7. The arbitration shall be conducted in Ventura or Los Angeles Counties, California.
8. The laws of the State of California shall be applied in any arbitration proceedings (without regard to principles of conflict of laws) which shall be applied by the arbitrator in rendering a final decision.
9. It is the intent of the parties that, barring extraordinary circumstances, arbitration proceedings will be concluded within one hundred and twenty (120) days from the date the arbitrator is appointed. The arbitrator may extend this time limit in the interests of justice. Failure to adhere to this time limit shall not constitute a basis for challenging the award.
10. Except as may be required by law, neither a party nor its representatives may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.
11. The parties shall be entitled to discovery in the arbitration except that any Party shall be entitled to request no more than one thousand (1,000) pages of documents and to take three (3) depositions not to exceed eight (8) hours for each such deposition. Any party shall be entitled to depose any expert who will testify in the arbitration proceeding but shall pay the fees of such expert during such deposition. In addition to the foregoing, any party shall be entitled to take the deposition of a witness who will testify at the arbitration but who is unavailable to testify at the hearing to preserve such witness' testimony for the arbitration hearing.
12. The parties shall exchange a copy of all exhibits for the arbitration hearing and shall identify each witness who will testify at the arbitration, with a summary of the anticipated testimony of such witness ten (10) days before the arbitration hearing.
13. The arbitrator shall have no authority to award punitive, consequential, special or indirect damages. The arbitrator shall not be entitled to issue injunctive and other equitable relief. The arbitrators shall award interest from the time of the breach to the time of award at the prejudgment interest rate under the California Civil Code. The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs), shall be borne by the unsuccessful party, as determined by the arbitrator, and shall be awarded as part of the arbitrator's award. It is specifically understood and agreed that any party may enforce any award rendered pursuant to these arbitration provisions by bringing suit in any court of competent jurisdiction.
14. These arbitration provisions shall survive the termination or cancellation of this Agreement.
15. Notwithstanding anything to the contrary in this Arbitration section, if any claim or dispute falls within the jurisdiction and limits of small claims court, in lieu of Arbitration, either party may pursue resolution of such claim or dispute in the Small Claims Division of Ventura County Superior Court.

**MISCELLANEOUS**

**Amendments.** No modifications of this Agreement may be made unless they are in writing and hand or digitally signed by a duly authorized officer of the party to be charged.

**Time Being of the Essence.** Time is expressly declared to be the essence hereof, and it is specifically agreed that no waiver of any breach or default by Customer shall be deemed a waiver of any breach or default thereafter occurring.

**Counterparts.** This Agreement may be executed in electronically transmitted portable document format and may be in any number of counterparts each of which shall be deemed an original of the same document.

**Authority.** The person signing this Order Confirmation on behalf of Customer represents and warrants that: (i) he or she is duly authorized and has the legal capacity to execute and deliver this Order Confirmation and the related Terms & Conditions on behalf of Customer, (ii) the execution and delivery hereof and the performance of Customer's obligations hereunder have been duly authorized, and (iii) this Order Confirmation and the related Terms & Conditions is a valid and legal agreement binding on Customer and enforceable in accordance with its terms.

**For proper credit, please send the remittance form with payments. A finance charge of 1.5% per month shall be added to the balance due if the account is not paid within thirty (30) days from the invoice date.**

**ACCEPTANCE OF THIS ORDER CONSTITUTES ACCEPTANCE OF THESE TERMS AND CONDITIONS**