UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

                Plaintiff,

        - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS, LLC, CLIENT EXAM
SERVICES, LLC, and IME MANAGEMENT
& CONSULTING, LLC,

                Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Plaintiff" or "Watchdog") brings this action against Defendants Safa Abdulrahim Gelardi ("Safa"), Vito Gelardi ("Vito"), Gregory Elefterakis ("Elefterakis"), Roman Pollak ("Pollak"), Anthony Bridda ("Bridda"), IME Companions, LLC ("Companions"), Client Exam Services ("CES"), and IME Management & Consulting, LLC ("IME M&C") (collectively, "Defendants"). Plaintiff asserts claims for misappropriation of trade secrets, unfair competition, tortious interference, unjust enrichment, civil conspiracy, conversation, and defamation. Defendants Elefterakis, Pollak, and Bridda (the "Former Owner Defendants") move to dismiss the claims brought against them pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6). The Former Owner Defendants also move to strike portions of Plaintiff's Second Amended Complaint. Safa and IME Companions, LLC (the "Defamation

Defendants") move to dismiss the defamation claim brought against them pursuant to FRCP 12(b)(6).  Finally, Plaintiff Watchdog cross-moves to file a Third Amended Complaint.[1]

For the reasons set forth below, the Former Owner Defendants' motion to dismiss is granted in part and denied in part and their motion to strike is denied; the Defamation Defendants' motion to dismiss is denied; and Plaintiff's motion for leave to amend is denied.

## BACKGROUND

### I.    Factual Allegations[2]

#### A.    IME Watchdog

Plaintiff Watchdog is a New York corporation established in May 2011 by Daniella Levi ("Levi").  (*See* Second Am. Compl. ("SAC"), Dkt. 203, ¶¶ 4, 28.)[3]  Levi is a personal injury attorney who saw a "need for a service" that would provide observers to accompany personal injury clients to independent medical examinations ("IMEs").  (*Id.* ¶¶ 18–27.)  Watchdog's IME observers "accompany personal injury law firm clients to IMEs and report back about what did and did not occur during those IMEs."  (*Id.* ¶ 29.)

---

[1] Plaintiff refers to the operative complaint, (*see* Dkt. 203), as the First Amended Complaint, and requests leave to file a Second Amended Complaint, (*see generally* Pl.'s Mem. Opp'n Mot. Dismiss & Supp. Cross-Mot. Am. ("Pl.'s Br."), Dkt 245).  Because Plaintiff has already amended its complaint twice, (*see* Dkts. 114, 203), the Court refers to the operative complaint as the Second Amended Complaint and construes Plaintiff's cross-motion as requesting leave to file a Third Amended Complaint.

[2] For purposes of Defendants' FRCP 12(b)(6) motions, the Court "accept[s] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor."  *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010)); *Hamilton v. Westchester County*, 3 F.4th 86, 90–91 (2d Cir. 2021) (same).

[3] Levi is Watchdog's sole shareholder and Chief Operating Officer ("COO").  (*Id.* ¶ 48.)

In addition to coming up with the business concept, Levi developed report forms for the observers to complete for different types of IMEs, established price lists, and developed recruitment and training procedures.  (*Id.* ¶ 30.)  The documents and forms that Levi developed "are confidential and proprietary, and took great costs and efforts to create."  (*Id.* ¶ 33.)  Levi also "built a customer database through her long-lasting relationships and friendships with other personal injury attorneys who[m] she frequently interacted with in court, through memberships in different legal organization[s] such as New York State Trial Lawyers Association, American Association for Justice, various bar associations, and related list services."  (*Id.* ¶ 31.)  Watchdog "has spent over a decade marketing its services and cultivating relationships with its customers."  (*Id.* ¶¶ 32, 44.)  Its "carefully curated customer preferences . . . are vital to its business," and provide Watchdog "a unique competitive advantage in the IME observer industry."[4]  (*Id.* ¶ 45.)

The only two people who have access to Watchdog's "entire database, including the identity of all of its customers and clients, their contact information, their preferences, pricing information, and all of [Watchdog's] financial details" are Levi and Adam Rosenblatt ("Rosenblatt").  (*Id.* ¶¶ 49–50.)  Rosenblatt has been employed by Watchdog since 2011, and became the company's president in or about 2016.  (*Id.* ¶¶ 46–47.)  Both Levi and Rosenblatt "are required to maintain [the] confidentiality" of these materials.  (*Id.* ¶¶ 51, 54.)

B.     **The Misappropriation Scheme**

On or about January 28, 2022, Levi received a text message from an unknown number asking to meet to discuss Watchdog's declining revenues.  (*Id.* ¶ 55.)  On February 2, 2022, Levi met with the individual who identified himself as Carlos Roa ("Roa"), then an employee of

---

[4] Watchdog was also involved in litigation in or about 2016, after the insurance industry sought to "keep the 'watch dogs' out of the exam room," (*id.* ¶ 34), to ensure that observers would be permitted to accompany plaintiffs to IMEs, (*id.* ¶¶ 34–44).

Defendants.  (*Id.* ¶ 56.)  At the meeting, Roa presented Levi with documentary evidence that Rosenblatt had been selling Watchdog's customer and financial information to Defendants since June or July of 2016.  (*Id.* ¶ 57.)  Defendants had bribed Rosenblatt with money in exchange for WatchDog's "customer lists, financial information, and details about customers."  (*Id.* ¶ 59.)  With these materials, Defendants "duplicate[d]" Watchdog's "operational, service, and development techniques," and established Companions, another company in the IME observation industry that directly competed with Watchdog.  (*Id.* ¶¶ 60–61, 66, 69.)  Using this information, Defendants had solicited "a significant number of [Plaintiff's] customers."  (*Id.* ¶ 67.)

Sometime before November 2017,[5] Safa presented Elefterakis with the idea of running an IME observation business by showing Elefterakis two invoices from Watchdog.  (*Id.* ¶ 69.) Thereafter, but no later than November 2017, Safa and Elefterakis opened Companions together. (*Id.* ¶ 12.)  Safa owned half of the business; Elefterakis owned a quarter of it; Pollak and Bridda each owned half of the remaining quarter.  (*Id.* ¶ 70; *see also id.* ¶ 12 (alleging that the Former Owner Defendants—Elefterakis, Pollak, and Bridda—each had a direct ownership interest in Companions from November 2017 through August 2018).)

Plaintiff alleges that the Former Owner Defendants "were each aware of and privy to the confidential trade secrets Safa and Vito misappropriated from [Watchdog] . . . and each of [them] nonetheless decided to participate in and profit from Companions."  (*Id.* ¶ 71.)  "Specifically, as soon as Safa came into possession of Plaintiff's confidential information and trade secrets by bribing Rosenblatt [starting in June or July 2016, (*id.* ¶ 57)], Safa sent this information to Pollak for the purpose of having him analyze it and discuss investing in Companions with Elefterakis and

---

[5] The Court infers the approximate date from the Second Amended Complaint's allegation that Elefterakis, Pollak, and Bridda each had a direct ownership interest in Companions from November 2017 through August 2018.  (*Id.* ¶ 12.)

Bridda," (*id.* ¶ 72). According to Plaintiff, Pollak knew that the information was confidential and did not belong to Safa, and that Safa was bribing and manipulating Rosenblatt for information. (*Id.* ¶ 73.) Pollak also informed Elefterakis and Bridda that Safa had bribed Rosenblatt in order to obtain Plaintiff's confidential information and trade secrets. (*Id.* ¶ 74.) The Former Owner Defendants "decided to partner up with Safa based on their review of the illegally obtained financial information of [Watchdog]." (*Id.* ¶ 75.)

### C.   Events Since the Filing of the Present Lawsuit

Plaintiff filed the present lawsuit on February 25, 2022. (*Id.* ¶ 68; *see also* Compl., Dkt. 1.) Subsequently, in March 2023, the Court issued a temporary restraining order ("TRO") that impacted Companions' ability to operate. (SAC, Dkt. 203, ¶ 78; *see also* Dkt. 156.) Safa and Vito then "formed CES to serve as an alter ego and/or successor of Companions in an effort to end-run [the TRO]." (SAC, Dkt. 203, ¶ 78.) After the Court also enjoined CES, Safa and Vito formed IME M&C, again to serve as an alter ego and/or successor of Companions. (*Id.* ¶ 79.)

On or about June 8, 2022, Defendants created a GoFundMe page to raise $250,000 in donations to fund their defense in this case. (*Id.* ¶ 80.) The page stated:

> Business was doing so well we caught up with our number one competitor, who is a greedy ruthless attorney That [sic] is abusing the law to sue me out of business because she has the means to do so. This lawsuit is costing her nothing as she is using her connections to represent her. She is using fear tactics and is bullying us broke using the legal system. . . . She is suing us out of business solely because she cannot compete. our [sic] attorney told us her tactic is to sue us bankrupt. . . . [She] is refusing to settle because agian [sic] her tactic is to sue us out of business.

(*Id.*) Safa also published these statements on her Facebook page. (*Id.*) That same day, Safa wrote on Facebook that she "never bribed anyone" and that "these are all false accusations." (*Id.* ¶ 82.) Safa further stated that "[Levi] took [the idea for the business] 12 years ago," and "was in contact

with [Safa's] employee[6] for months and used [the employee] for inside information against [Safa] and now [the employee] works for [Levi] as well."  (*Id.* (first two alterations in original).)

The SAC alleges that Plaintiff has "suffered special damages in the form of lost dealings with customers with whom Defendants sabotaged Plaintiff's business relationships."  (*Id.* ¶ 84.) "For example, Defendants caused Plaintiff to lose its business relationship with Subin Associates LLP, with whom Plaintiff generated $94,977.00 in revenue in 2017."[7]  (*Id.* ¶ 85.)

## II.    Procedural History

The procedural background of this case is extensive, and the Court will recount only those facts necessary to resolve the present motions.

Plaintiff initiated this action on February 25, 2022, against Safa, Vito, and Companions, alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.  (Compl., Dkt. 1.)  On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction").  (*See* Dkts. 6–14, 66; 3/29/2022 Dkt. Orders; 4/5/2022 Dkt. Order.)

On June 8, 2022, after Plaintiff filed a letter motion for contempt related to Safa's GoFundMe page, (Dkt. 79), the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction"), (Dkt. 80; *see also* 6/8/2022 Dkt. Order).  On June 10, 2022, the Court denied Plaintiff's contempt motion.  (*See* 6/10/2022 Dkt. Order.)  Specifically, the Court concluded that

---

[6] The Court assumes this is a reference to Roa.

[7] It is unclear whether this allegation is specific to Plaintiff's defamation claim or related to the damages that Plaintiff sustained as a result of Defendants' overall conduct.

the statements on the GoFundMe page "were not 'of and concerning' Watchdog and Levi" as is required to be defamatory.[8]   (6/10/2022 Dkt. Order (quoting *Goldman v. Reddington*, 417 F. Supp. 3d 163, 175 (E.D.N.Y. 2019)).)

Plaintiff filed an Amended Complaint on October 13, 2022, adding Elefterakis, Pollak, and Bridda as additional Defendants and asserting a cause of action for defamation.  (Dkt. 114.)  On October 26, 2024, Safa and Companions requested a pre-motion conference ("PMC") for a contemplated motion to dismiss the defamation claim.  (Dkt. 116.)  The Court held a PMC on December 6, 2022, and set a briefing schedule for the motion.  (12/6/2022 Min. Entry.)  Safa and Companions' motion to dismiss and Plaintiff's cross-motion to amend were fully briefed on February 21, 2023.  (Dkts. 141–47.)

On March 10, 2023, Plaintiff filed (1) a second motion for a TRO, (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April 2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions.  (Dkts. 151–55.)  The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motion for preliminary injunction and contempt on March 27, 2023.  (Dkt. 156.)  The Court ultimately found Defendants in contempt of the Amended Injunction—by hiring a private investigator to contact and track Roa—and the March 2023 Temporary Restraining Order—by

---

[8] As the Defamation Defendants acknowledge, the Second Amended Complaint contains additional factual allegations that were not know to the Court when it found that the statements on the GoFundMe page were not "of and concerning" Plaintiff.  (*See* Safa & Companions' Mot. Dismiss ("D. Defs.' Mot."), Dkt. 243, at 3.)  Specifically, the Court was not aware that Safa had linked the GoFundMe page to her Facebook page and made additional comments about the lawsuit on her Facebook page.  (*Id.*)

helping to start CES, which the Court found the Gelardis controlled and operated.[9]  (*See* Dkt. 254 at 26–32.)

On March 20, 2023, the Former Owner Defendants requested a PMC for a motion to dismiss.  (Dkt. 169.)  Plaintiff responded on April 5, 2023, and requested leave to amend its complaint based on evidence adduced at the March 27, 2023 hearing.  (Dkt. 186.)  On April 7, 2023, the Court denied the Former Owner Defendants' PMC request and granted Plaintiff leave to amend its Amended Complaint.  (4/7/2023 Dkt. Order.)  In so granting, the Court "[found] that the evidence adduced at the March 27, 2023 preliminary injunction hearing provided enough grounds for Plaintiff to sufficiently allege claims against [the Former Owner Defendants]."  (*Id.*)  However, the Court warned Plaintiff "that repeated failures to cure deficiencies by amendment will result in denials of future requests to amend."[10]  (*Id.*)

Plaintiff filed its Second Amended Complaint on April 28, 2023.  (SAC, Dkt. 203.)  On May 18, 2023, the Former Owner Defendants requested a PMC to discuss a contemplated motion to dismiss the Second Amended Complaint.  (Dkt. 217.)  The Court denied the PMC request as unnecessary and adopted the parties' proposed briefing schedule.  (7/10/2023 Dkt. Order; 7/11/2023 Dkt. Order.)  The motion was fully briefed on November 18, 2023.  (Dkt. 259.)

---

[9] On April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment.  (*See* Dkts. 196–98.)  The Court held a hearing on May 4, 2023, pursuant to that motion, and directed the parties to submit supplemental briefing.  (*See* 5/4/2023 Min. Entry; Dkts. 218–20, 224–25.)  The Court denied Plaintiff's renewed motion for contempt on July 13, 2023.  (Dkt. 231.)

[10] On July 25, 2023, Plaintiff and Defendants Safa, Vito, and Companions requested a "global in-person settlement conference."  (Dkt. 232.)  In light of the request, the Court terminated Safa and Companions' motion to dismiss and Plaintiff's cross-motion to amend without prejudice to refile.  (7/25/2024 Dkt. Order.)  After the settlement conference was unsuccessful, the parties refiled their motion papers.  (10/3/2023 Dkt. Order; Dkts. 240–49.)

**MOTIONS TO DISMISS**

I.      **Legal Standard**

To survive a motion to dismiss under FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The pleading standard does not require detailed factual allegations, but still "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "In addressing the sufficiency of a complaint[, the court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

II.     **Consideration of Materials Outside the Second Amended Complaint**

The Former Owner Defendants and Plaintiff ask the Court to consider certain extrinsic materials in deciding Defendants' motions to dismiss. Specifically, the Former Owner Defendants ask the Court to consider their testimony from the March 27, 2023 preliminary injunction hearing, (*see generally* Frmr. Owner Defs.' Mot. Dismiss ("F.O. Defs.' Mot."), Dkt. 259-6), whereas Plaintiff asks the Court to consider additional posts from Safa's Facebook page in evaluating its

9

defamation claim, (*see generally* Pl.'s Br. Opp'n Mot. Dismiss & Supp. Cross-Mot. ("Pl.'s Br."), Dkt. 245).  The Court denies both sides' requests.

"The question on a motion to dismiss 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *LM Ins. Corp. v. James River Ins. Co.*, No. 22-CV-7472 (ER), 2023 WL 5509264, at *3 (S.D.N.Y. Aug. 25, 2023) (quoting *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012)).  When considering an FRCP 12(b)(6) motion, the court must "test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). As such, courts typically "do not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim."  *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("Because [an FRCP] 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials.").  However, in addition to the facts alleged in the complaint, the court may also consider documents that are appended to the complaint, incorporated in the complaint by reference, or integral to the complaint, as well as matters of which judicial notice may be taken. *Goel*, 820 F.3d at 559.

Here, none of the extrinsic material at issue clearly falls into any of the aforementioned exceptions.  Nor do the parties make any effort to argue why it would be procedurally proper for the Court to consider documents outside of the Second Amended Complaint in ruling on Defendants' FRCP 12(b)(6) motions.  Accordingly, the Court declines to consider either the Former Owner Defendants' show-cause hearing testimony or Safa's Facebook posts in its analysis.

*See Hoy v. Inc. Village of Bayville*, 765 F. Supp. 2d 158, 164 (E.D.N.Y. 2011) ("Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with an [FRCP] 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment." (citation omitted)).

## III.    The Former Owner Defendants' Motion

### A.    Plaintiff's Misappropriation Claims Against the Former Owner Defendants

Plaintiff alleges that the Former Owner Defendants misappropriated Watchdog's trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and New York common law.  (SAC, Dkt. 203, ¶¶ 88–123.)  The elements required under the DTSA and New York law are "fundamentally the same" and "[d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims."  *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citation omitted).  "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).  The Former Owner Defendants argue that Plaintiff's allegations fall short of meeting both elements.  (*See* F.O. Defs.' Mot., Dkt. 259-6, at 7–10.)

#### 1.    Watchdog's Trade Secrets

"The DTSA defines 'trade secret' to include 'all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes,

procedures, programs, or codes,' so long as: (1) 'the owner thereof has taken reasonable measures to keep such information secret'; and (2) 'the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'"   *Iacovacci*, 437 F. Supp. 3d at 380 (alteration in original) (quoting 18 U.S.C. § 1839(3)).

New York courts typically consider the following six factors in determining whether information qualifies as a trade secret under either the DTSA or state law:

> (1) The extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (cleaned up) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)).   "These factors are guideposts, not elements, and it is not necessary to plead every single factor to state a claim."   *Id.* (quoting *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015)).   "Although there is no heightened pleading requirement on actions brought under the DTSA, . . . district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated."   *Id.* (citations omitted).

Here, Plaintiff alleges that Defendants misappropriated Watchdog's "customer lists, financial information, and details about customers."   (SAC, Dkt. 203, ¶¶ 57–59.)   This includes information about "the identity of [Watchdog's] customers and clients, their contact information, their preferences, [and] pricing information."   (*Id.* ¶¶ 49, 90.)   Plaintiff further alleges these client

12

relationships took "years to build," (*id.* ¶ 32), and that Watchdog "spent over a decade marketing its services and cultivating relationships with its customers," (*id.* ¶ 44).  Moreover, Watchdog's "carefully curated customer preferences and customer relations are vital to its business," and "provide[] [Watchdog with] a unique competitive advantage in the IME observer industry."  (*Id.* ¶ 45.)  Finally, the only individuals who have access to this information are Watchdog's President and COO.  (*Id.* ¶¶ 49–51.)

The Court finds these facts sufficient to allege Plaintiff's trade secrets in the context of this case.  "The question of whether or not a customer list is a trade secret is generally a question of fact."  *N. Atl. Instruments, Inc.*, 188 F.3d at 44 (quoting *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991)).  Nevertheless, "[n]umerous cases . . . have held that where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply."  *Id.* at 46 (collecting cases); *see, e.g.*, *Iacovacci*, 437 F. Supp. 3d at 380–81 (denying motion to dismiss counterclaims where "the purportedly misappropriated trade secrets include[d] . . . non-public sourcing information for over 2,000 clients"); *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 675 (S.D.N.Y. 2022) (finding plaintiff adequately alleged that its customer list merited trade secret protection where plaintiff "gathered the information by developing relationships . . . , conducting personalized interviews . . . , and performing individualized assessments").  Furthermore, Plaintiff alleges that it took reasonable measures to keep Watchdog's customer information secret by only permitting the company's two highest ranking employees to access it.  (SAC, Dkt. 203, ¶¶ 49–51); *see Catalyst Advisors, L.P.*, 602 F. Supp. 3d at 675 (finding that plaintiff adequately alleged that it safeguarded the secrecy of purported trade secrets where, *inter alia*, plaintiff restricted access to such information to partners and limited other employees); *Dorset Indus., Inc. v. Unified Grocers,*

13

*Inc.*, 893 F. Supp. 2d 395, 411–12 (E.D.N.Y. 2012) (similar).  Thus, for purposes of the Former

Owner Defendants' motion to dismiss, the Court finds that Plaintiff has adequately alleged that its

customer lists, financial information, and details about customers merit trade secret protection.[11]

Plaintiff's trade secrets claims may proceed as to its customer lists, financial information,

customer details, and IME report forms.[12]

### 2.    Misappropriation

The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a

person who knows or has reason to know that the trade secret was acquired by improper means,"

or the "disclosure or use of a trade secret of another without express or implied consent."  18

U.S.C. § 1839(5); *accord Catalyst Advisors, L.P.*, 602 F. Supp. 3d at 676; *see also Garvey v. Face

of Beauty LLC*, 634 F. Supp. 3d 84, 95–96 (S.D.N.Y. 2022) ("Under the Defend Trade Secrets

Act, . . . 'a party must show an unconsented disclosure or use of a trade secret by one who (i) used

---

[11] Furthermore, although the Second Amended Complaint does not specifically allege that Plaintiff sought to protect the secrecy of its report forms, the Court finds it reasonable to infer at this stage that such materials could qualify as trade secrets, in that they reflect Plaintiff's years of experience in the IME observation industry and provide a competitive advantage.  However, the same is not true of Watchdog's invoices.  Plaintiff's argument that the two Watchdog invoices that Safa presented to Elefterakis constitute trade secrets is borderline frivolous as the invoices were undoubtedly shared with the customers who were charged for Watchdog's services, and thus cannot be considered secret.  (*See* Pl.'s Opp'n to F.O. Defs.' Mot. Dismiss ("Pl.'s Opp'n"), Dkt. 381, at 4 & n.1); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020) ("Courts dismiss trade secrets claims when the alleged trade secrets are not, in fact, secret."), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) (summary order).

[12] Plaintiff also argues that the Court has already found that there is a likelihood of success on the merits as to Plaintiff's trade secret claims, and thus, that the law of the case doctrine applies. (Pl.'s Opp'n, Dkt. 381, at 3–4.)  For their part, the Former Owner Defendants contend that they "did not have a full chance to litigate the issue of trade secrets" as they were not involved in the motion practice around Plaintiff's numerous applications for injunctive relief.  (F.O. Defs.' Reply Supp. Mot. Dismiss ("F.O. Defs.' Reply"), Dkt. 269-7, at 3.)  Ultimately, however, "the law of the case doctrine is 'discretionary and does not limit a court's power to reconsider its own decision prior to final judgment.'"  *Cangemi v. United States*, 13 F.4th 115, 140 (2d Cir. 2021) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'"). "[I]mproper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A).

Here, Plaintiff plausibly alleges that Safa bribed a high-level Watchdog employee for Watchdog's customer information, and that Safa, with the Former Owner Defendants, used this information to steal Watchdog's customers and build a competing business, Companions. (SAC, Dkt. 203, ¶¶ 57–77.) As an initial matter, the Court notes that the DTSA's definition of "improper means" expressly encompasses bribery. *See* 18 U.S.C. § 1839(6)(A). At minimum, then, the Amended Complaint adequately alleges misappropriation as to Safa.

Regarding the Former Owner Defendants, Plaintiff alleges that Safa sent the information she obtained by bribing Rosenblatt to Pollak "for the purpose of having [Pollak] analyze it and discuss investing in Companions with Elefterakis and Bridda." (SAC, Dkt. 203, ¶ 72.) Pollak knew that the information Safa sent him was obtained through bribery, and informed Elefterakis and Bridda about Safa's access to Plaintiff's trade secrets, which informed their decision to partner with Safa to create Companions. (*Id.* ¶¶ 72–75.) While the Second Amended Complaint may not be the paragon of specificity, the Court finds that it sufficiently pleads that the Former Owner Defendants disclosed or otherwise used the information that Safa obtained through improper means. *See Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 150–51 (E.D.N.Y. 2007) (finding defendant liable for misappropriation of trade secrets where defendant used plaintiff's customer list and software to start competing business); *see also Uni-Sys., LLC v. U.S. Tennis Ass'n, Inc.*,

350 F. Supp. 3d 143, 177 (E.D.N.Y. 2018) (finding allegations that a defendant, *inter alia*, "encouraged and facilitated" the acquisition of trade secrets to be "more than sufficient to allege that [it] was a participant, if not the leader in a coordinated effort to misappropriate plaintiff's trade secrets"). Furthermore, even without these allegations, the Court finds it reasonable to infer, based on the very nature of the materials Safa shared with Pollak, i.e., another company's customer list, customer details, financial information, and report forms, that the Former Owner Defendants knew, or at least, should have known, that those materials were not obtained with Plaintiff's consent or knowledge. Safa shared Watchdog's confidential materials with Pollak, who, it can reasonably be inferred, shared, or discussed those materials with the other Former Owner Defendants. (SAC, Dkt. 203, ¶ 72.) Coupled with the fact that Safa shared two of Watchdog's invoices with Elefterakis directly (even though those invoices are not trade secrets), (*id.* ¶ 69), this at least gives rise to the inference that the Former Owner Defendants had knowledge that the Watchdog materials they were using to launch Companions were obtained through improper means, *see Kraus USA, Inc. v. Magarik*, No. 17-CV-6541 (ER), 2020 WL 2415670, at *4 (S.D.N.Y. May 12, 2020) (quoting *Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17-CV-589 (LGS), 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018)).

* * *

For the reasons stated above, Plaintiff's allegations are sufficient to state a claim against Defendants for misappropriation of trade secrets under the DTSA and New York law.

### B.     Plaintiff's Unfair Competition Claim Against the Former Owner Defendants

The Second Amended Complaint asserts an unfair competition claim against Defendants, alleging that "[a]s a result of Defendants' bribery of Rosenblatt to obtain confidential trade secrets, Defendants have stolen customers from [Watchdog]." (SAC, Dkt. 203, ¶ 126.) To state a claim for unfair competition under New York law, "a plaintiff must allege that a defendant

16

misappropriated plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so." *Data Device Corp. v. W.G. Holt, Inc.*, No. 19-CV-4105 (JS) (ARL), 2020 WL 7024312, at *6 (E.D.N.Y. Nov. 30, 2020) (quoting *Shroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 693 (N.Y. App. Div. 2015)).  The Former Owner Defendants argue, *inter alia*, that Plaintiff's unfair competition claim is duplicative of its trade secret claims.  (F.O. Defs.' Mot., Dkt. 259-6, at 11–12; F.O. Defs.' Reply, Dkt. 259-7, at 6.)  The Court agrees.

"It is well-established that a claim for unfair competition based on the same allegations as a claim for misappropriation of trade secrets is treated as a single cause of action, and should be dismissed as duplicative." *TileBar v. Glazzio Tiles*, No. 22-CV-3823 (PKC) (RML), 2024 WL 1186567, at *19 (E.D.N.Y. Mar. 15, 2024) (cleaned up) (collecting cases).  Here, the factual allegations underlying Plaintiff's trade secrets claims are the same as those underlying Plaintiff's unfair competition claim.  *See Uni-Sys., LLC*, 350 F. Supp. 3d at 179 (finding that complaint "fail[ed] to state a cause of action [for unfair competition] as it fail[ed] to allege tortious conduct separate from its [misappropriation of trade secret claims]").  Just like Plaintiff's trade secret claims, Plaintiff's unfair competition claim focuses on Safa's bribery of Rosenblatt, and Defendants' use of Plaintiff's trade secrets to steal customers from Watchdog and establish Companions.  (*See* SAC, Dkt. 203, ¶¶ 90–100, 106–114, 125–26.)  Notably, "Plaintiff does not allege any acts of unfair competition separate from Defendants' disclosure and use of [Watchdog's] confidential and proprietary information." *See TileBar*, 2024 WL 1186567, at *20.  Nor does Plaintiff respond to the Former Owner Defendants' duplicity argument in its opposition brief.  (*See* Pl.'s Opp'n, Dkt. 381, at 8–9.)  The Court therefore deems any contrary argument abandoned. *See Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) (summary order) ("[W]hen a party fails adequately to present arguments' in a brief, a court may properly 'consider

those arguments abandoned,' especially 'in the case of a counseled party' . . . ."  (first quoting *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir. 2004); then quoting *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014))); *see also Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 646 (S.D.N.Y. 2015) ("A plaintiff effectively concedes a defendant's arguments by his [or her] failure to respond to them." (alteration in original) (quoting *Felske v. Hirschmann*, No. 10-CV-8899 (RMB), 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012))).

Accordingly, the Court dismisses Plaintiff's unfair competition claim as duplicative of its misappropriation claims.  *See Data Device Corp.*, 2020 WL 7024312, at *6 (dismissing unfair competition claim that was "based on [the] allegation that [the defendants] misappropriated [plaintiff's] valuable, proprietary information including trade secret materials and data," as duplicative of plaintiff's claim for misappropriation of trade secrets (citation omitted)); *TileBar*, 2024 WL 1186567, at *19–20 (similar).

### C.    Tortious Interference Claims Against the Former Owner Defendants

#### 1.    Tortious Interference with Contract

Plaintiff asserts a tortious interference with contract claim against Defendants for interfering with Watchdog's contracts with its customers.  (SAC, Dkt. 203, ¶¶ 127–137.)  "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff."  *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001) (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996)).  The plaintiff also "must allege that the contract would not have been breached 'but for' the defendant's conduct.  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting *Burrowes v. Combs*, 808 N.Y.S.2d 50, 53 (N.Y. App. Div. 2006)).

Plaintiff's tortious interference with contract claim against the Former Owner Defendants fails because, *inter alia*, the Second Amended Complaint does not allege facts indicating that the Former Owner Defendants had "actual knowledge" of Watchdog's contracts with its clients. *See GWG MCA Cap., Inc. v. Nulook Cap., LLC*, No. 17-CV-1724 (SIL), 2020 WL 10508196, at *14 (E.D.N.Y. June 28, 2020) (quoting *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 796–97 (S.D.N.Y. 2008)).  "While a defendant need not be aware of the details of a contract, it must have 'actual knowledge' of the contract's existence, and conclusory allegations that a defendant knew or should have known of a contract are insufficient to plead a tortious interference with contract claim." *Id.* (quoting *Medtech Prods. Inc.*, 596 F. Supp. 2d at 796–97).  Here, Plaintiff merely alleges that Watchdog "has entered into valid written agreements with its clients and customers," and that Defendants were "aware of these agreements" "[t]hrough their bribery of [Rosenblatt]." (SAC, Dkt. 203, ¶¶ 128–29.)  These conclusory allegations are insufficient to allege the existence of a specific contract, let alone that the Former Owner Defendants had actual knowledge of Watchdog's contracts with its customers.[13]  *See Medtech Prods. Inc.*, 596

---

[13] The Court acknowledges that an argument could be made—though Plaintiff did not do so—that the Second Amended Complaint alleges facts from which to infer the existence of contracts and the Former Owner Defendants' actual knowledge of those contracts.  The Second Amended Complaint's allegations that Safa and the Former Owner Defendants started the Companions business in November 2017 based, in whole or part, on Plaintiff's customers lists, customer details, and financial data gives rise to a reasonable inference that the Former Owner Defendants knew that at least some of the customers Defendants solicited had ongoing contractual relationships with Plaintiff and that Defendants therefore knowingly sought to divert Plaintiff's customers away from it, i.e., interfere with Plaintiff's contracts with those customers.  However, the Second Amended Complaint still fails to identify any contract that was breached or damages resulting from that breach.  While Plaintiff does allege that Defendants' conduct "caused [Watchdog] to lose its business relationship with Subin Associates LLP, with whom Plaintiff generated $94,977.00 in revenue in 2017," *(id.* ¶ 85), that allegation does not specify that Defendants' conduct caused Subin to breach a contract it had with Plaintiff.  Indeed, it is possible that the relationship between Plaintiff and Subin was based on episodic assignments and not an ongoing service contract and that Defendants therefore could have lured Subin away as a client without causing Subin to breach any contract with Plaintiff.  In any event, because Plaintiff has

F. Supp. 2d at 813 ("[T]he plaintiff must 'provide specific allegations' of the defendant's knowledge and cannot survive a motion to dismiss by making merely a 'conclusory assertion' of knowledge." (quoting *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001))); *see also, e.g.*, *N. Shipping Funds I, L.L.C. v. Icon Cap. Corp.*, No. 12-CV-3584 (JCF), 2013 WL 1500333, at *4 (S.D.N.Y. Apr. 12, 2013) (dismissing tortious interference with contract claim where counterclaimant failed to allege that defendants had knowledge of the specific covenants that were allegedly breached, and instead only alleged general knowledge about the contract) (collecting cases).   Nor does the Second Amended Complaint allege that any of Plaintiff's customers actually breached their purported contracts, which "is an essential element of a tortious-interference [with contract] claim under New York law." *See A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 485 (S.D.N.Y. 2017) (dismissing tortious interference with contract claim where there was no allegation that the contract at issue was breached).

Accordingly, Plaintiff's tortious interference with contract claim against the Former Owner Defendants must be dismissed.

### 2.   Tortious Interference with Business Relations

Plaintiff asserts a claim for tortious interference with business relations against all Defendants.  To state this claim under New York law, a plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 336 (E.D.N.Y. 2014)

---

failed to allege the breach element as to any contract, this claim cannot survive.  However, as discussed next, these allegations are sufficient to state a tortious interference with business relations claim.

(quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).   "Wrongful means" includes physical violence, fraud, misrepresentation, civil suits, criminal prosecutions, and "some degrees of economic pressure."  *See NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 497 (N.Y. 1996) (citation omitted).   "While proof of an existing contract is not necessary, the complaint must allege 'interference with a specific identified business relationship with a third party.'"  *Camp Summit of Summitville, Inc. v. Visinski*, No. 06-CV-4994 (CM) (GAY), 2007 WL 1152894, at *14 (S.D.N.Y. Apr. 16, 2007) (quoting *Mobile Data Shred, Inc. v. United Bank of Switz.*, No. 99-CV-10315 (SAS), 2000 WL 35156, at *7 (S.D.N.Y. 2000)).

The Court finds that the Second Amended Complaint plausibly states a tortious interference with business relations claim against the Former Owner Defendants.   Plaintiff specifically alleges that Defendants' conduct "caused [Watchdog] to lose its business relationship with Subin Associates LLP, with whom Plaintiff generated $94,977.00 in revenue in 2017." (SAC, Dkt. 203, ¶ 85.)   Thus, Plaintiff has adequately identified a specific business relationship with a third party and injury to that relationship.  *See A.V.E.L.A., Inc.*, 241 F. Supp. 3d at 486–87 (finding counterclaimant satisfied elements of a prospective economic advantage claim[14] by alleging that it had a business relationship with a specified company and that it suffered damages as a result of counter-defendants' interference in that relationship).   Moreover, Plaintiff alleges that the Former Owner Defendants targeted specific customers that they identified using the confidential information and trade secrets that Safa obtained from Rosenblatt.  (SAC, Dkt. 203, ¶ 131.)   These

---

[14] As the Second Circuit has explained, "tortious interference with business relations is sometimes referred to 'by an alternative name, tortious interference with prospective economic advantage[.]'"  *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 105 (2d Cir. 2012) (summary order) (quoting *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)) ("[T]ortious interference with business relations and tortious interference with prospective economic advantage are not distinct causes of action.").

allegations give rise to the inference that the Former Owner Defendants intentionally and directly interfered with Watchdog's relations with customers, including Subin.  *See A.V.E.L.A., Inc.*, 241 F. Supp. 3d at 486–87 (finding counterclaimant plausibly established intentional interference with prospective economic advantage claim by alleging counter-defendants interfered in its business relations by intentionally, willfully, and maliciously "diverting [counterclaimant's] customers away").    Finally, Plaintiff's allegations that the Former Owner Defendants engaged in independently tortious conduct—here, the misappropriation of Watchdog's trade secrets—"suffice to establish the 'wrongful means' element at the pleadings stage."  *See Insight Glob., LLC v. Wenzel*, No. 17-CV-8323 (PGG), 2018 WL 11318728, at *5 (S.D.N.Y. Aug. 27, 2018) (collecting cases).

As such, Plaintiff's tortious interference with business relations claim may proceed.  *See A.V.E.L.A., Inc.*, 241 F. Supp. 3d at 485–87 (dismissing tortious interference with contract claim but allowing tortious interference with business relations claim to proceed).

## D.    Unjust Enrichment Claim Against the Former Owner Defendants

Plaintiff asserts an unjust enrichment claim against all Defendants.  To state a claim for unjust enrichment under New York law, "a plaintiff must allege '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'"  *Techno-Comp, Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 743–44 (E.D.N.Y. 2015) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  As the New York Court of Appeals has recognized, unjust enrichment "is not a catchall cause of action to be used when others fail."  *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  Rather, it is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."  *Id.*  "An

unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.*

The Former Owner Defendants argue that Plaintiff's unjust enrichment fails because Plaintiff has not alleged any relationship with Defendants. (F.O. Defs.' Mot., Dkt. 259-6, at 15.) The New York Court of Appeals has "held that a plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." *Accord Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (citing *Sperry v. Crompton Corp.*, N.E.2d 1012 (N.Y. 2007)) (holding that the relationship between the parties was "too attenuated" to sustain an unjust enrichment claim "because they simply had no dealings with each other"); *see also Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 447–48 (E.D.N.Y. 2011) (explaining that an unjust enrichment claim requires "a connection or relationship between the parties that could have caused reliance or inducement on the plaintiff's part"); *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321 (JGK), 2023 WL 2051739, at *11 (S.D.N.Y. Feb. 16, 2023) (finding that the connection between competitors "[wa]s far too attenuated to state a claim" for unjust enrichment (quoting *GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc.*, 352 F. Supp. 3d 265, 286 (S.D.N.Y. 2018))).

Plaintiff does not respond to this argument. (*See* Pl.'s Opp'n, Dkt. 381, at 10.) Indeed, Plaintiff's entire argument in support of its unjust enrichment claim consists of a single run-on sentence that merely summarizes the allegations in the Second Amended Complaint, without any attempt to connect those allegations to legal principles.[15] (*See* Pl.'s Opp'n, Dkt. 381, at 10 ("As a

---

[15] The Court further notes that Plaintiff's opposition to the Former Owner Defendants' motion to dismiss and motion to strike is less than 14 pages long, (*see* Pl.'s Opp'n, Dkt. 381), despite the fact that the Court's Individual Rules permit opposition briefs to be up to 25 pages, *see* Judge Pamela K. Chen Individual Practices and Rules 3.B. Although the Court appreciates brevity,

result of their use of Plaintiff's trade secrets, as detailed in the SAC, the Former Owner Defendants have been enriched at Plaintiff's expense, by—among other things—receiving substantial revenues from sales of IME observer services based on Plaintiff's creation of the IME observer business concept without bearing the expense and risk of developing the services, materials, and marketing plans necessary to achieve sales and luring Plaintiff's customers away through the use of Plaintiff's confidential information obtained through bribery.").)  "To make a legal argument is 'to advance one's contentions by connecting law to facts.'"  *Cicvara v. Duracell*, 515 F. App'x 27, 28 (2d Cir. 2013) (summary order) (quoting *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002)).  As importantly, Plaintiff's one-sentence "response" does not address or even mention the Former Owner Defendants' business-relationship argument.  It is not the Court's responsibility to research the record and relevant case law and form arguments on Plaintiff's behalf, particularly where, as here, Plaintiff is represented by counsel.[16]  *See Lipton*, 315 F. Supp. 2d at 439 n.3.  Thus, the Court finds that Plaintiff has effectively abandoned any counterargument to the Former Owner Defendants' point that Plaintiff has not alleged a sufficiently close relationship between the parties. *Belfon v. Credit Check Total Consumerinfo.com, Inc.*, No. 18-CV-408 (ADS) (SIL), 2018 WL 4778906, at *8 (E.D.N.Y. Oct. 1, 2018) (collecting cases).

---

this may be a circumstance where Plaintiff's excessive brevity is simply unhelpful and counter-productive.

[16] Here, Plaintiff is represented by two law firms.  Moreover, Levi, Watchdog's COO, is herself an attorney and is heavily involved in this case.  Thus, this is not a case in which an unsophisticated party is being taken advantage of by its counsel or is being "unfairly penalized" for its counsel's inadequate briefing.  *Cf. Lipton v. County of Orange*, 315 F. Supp. 2d 434, 439 n.3 (S.D.N.Y. 2004) (reviewing the record in case alleging constitutional violations where factual allegations were "sufficiently disturbing to warrant independent [c]ourt review to ensure that plaintiff [was] not unfairly penalized for inadequate briefing by counsel").

Plaintiff's unjust enrichment claim against the Former Owner Defendants is therefore dismissed. *See id.*[17]

### E.    Civil Conspiracy Claim Against the Former Owner Defendants

Plaintiff asserts a civil conspiracy claim against all Defendants. (SAC, Dkt. 203, ¶¶ 143–51.) "To state a claim for civil conspiracy under New York law, a plaintiff, in addition to alleging an underlying tort, must plead facts sufficient to support an inference of the following elements: '(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.'" *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (quoting *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (N.Y. 2010)).

The Former Owner Defendants first argue that Plaintiff has not alleged an independent tort to form the basis of its conspiracy claim. (F.O. Defs.' Mem., Dkt 259-6, at 17.) This argument assumes that the Court will dismiss Plaintiff's misappropriation, unfair competition, tortious interference, and conversion claims. However, as discussed above, the Court has found that Plaintiff has stated a viable basis for its misappropriation and tortious interference with business relations claims. *See supra* pp. 11–16, 20–22.

The Former Owner Defendants further contend that Plaintiff's allegations regarding the elements of civil conspiracy are conclusory and not supported by facts. (F.O. Defs.' Mot., Dkt. 259-6, at 17.) While Plaintiff's argument in opposition leaves much to be desired (e.g., there are no citations to the Second Amended Complaint, nor any attempt to connect Plaintiff's allegations

---

[17] Although the Former Owner Defendants do not raise this argument, the other obvious flaw in Plaintiff's unjust enrichment claim is that it is plainly duplicative of their misappropriation and tortious interference claims. *See Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." (quoting *Corsello*, 967 N.E.2d at 1185)).

to caselaw), (Pl.'s Opp'n, Dkt. 381, at 11), the Court finds that the allegations in the Second Amended Complaint are adequate to allege a civil conspiracy.  Specifically, Plaintiff alleges that the Former Owner Defendants "partner[ed] up with Safa" based on their review of information that Safa obtained from Rosenblatt.  (SAC, Dkt. 203, ¶ 75.)  Together, Defendants created Companions and poached Plaintiff's customers using Watchdog's trade secrets and confidential information.  (*Id.* ¶¶ 75–77, 131.)  In short, Plaintiff has at least alleged that the Former Owner Defendants engaged in conduct that implies the existence of an agreement between Defendants to misappropriate Plaintiff's trade secrets and tortiously interfere with Plaintiff's customer relations for Defendants' own benefit.  *See M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-2798 (PKC) (VMS), 2014 WL 2931398, at *12 (E.D.N.Y. June 27, 2014) (finding that allegations about defendants' conduct implied they "had an agreement to undertake [the fraudulent] program together").  Moreover, because discovery in this matter will proceed on Plaintiff's misappropriation and tortious interference with business relations claims against the Former Owner Defendants, the "better course" is not to dismiss Plaintiff's related civil conspiracy claim against these same Defendants.  *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 241 (E.D.N.Y. 2015) (finding that "better course" was not to dismiss claim based on same evidence as surviving claims); *Thibodeaux v. Travco Ins. Co.*, No. 13-CV-5599 (ERK) (VVP), 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").  Of course, the Former Owner Defendants are free to raise this issue again at summary judgment if the evidence so warrants.

Thus, Plaintiff's civil conspiracy claim may proceed.

### F.     Conversion Claim Against the Former Owner Defendants

Plaintiff alleges that "Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets constitutes conversion."  (SAC, Dkt. 203, ¶ 157.)  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).  "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property . . . and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* (citations omitted).  "[W]rongful intent is not required."  *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 133 (2d Cir. 2022).

The Former Owner Defendants contend that Plaintiff's "conversion claim is futile" because "the 'property' Defendants purportedly converted is intangible or not a specific identifiable thing." (F.O. Defs.' Mot., Dkt. 259-6, at 18.)  Yet again, Plaintiff fails to respond to this argument.  (*See* Pl.'s Opp'n, Dkt. 381, at 11.)  Nevertheless, the Court notes that the Former Owner Defendants are plainly wrong on the law as to this point.  In the 2007 case, *Thyroff v. Nationwide Mutual Insurance Co.*, the New York Court of Appeals held that a plaintiff may maintain a conversion claim in connection with electronic data and records, such as the materials and information at issue here.  864 N.E.2d 1272, 1273, 1278 (N.Y. 2007).  The caselaw that the Former Owner Defendants cite to is out-of-date.  (*See* Defs.' Mot., Dkt 259-6, at 18 (citing *Indep. Disc. Corp. v. Bressner*, 365 N.Y.S.2d 44, 46 (N.Y. App. Div. 1975); *In re Harvard Knitwear, Inc.*, 153 B.R. 617, 625 (Bankr. E.D.N.Y. 1993)).)

However, courts in this circuit frequently dismiss conversion claims involving electronic data where there are no allegations that defendants' conduct deprived plaintiff of using the material at issue.  *See, e.g.*, *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 19-CV-6793 (EK) (RML),

2021 WL 535217, at *6 (E.D.N.Y. Feb. 12, 2021) (dismissing conversion claim where plaintiff alleged that defendants accessed and copied its trade secrets, but did not allege that plaintiff was deprived or excluded from using the software at issue), *aff'd*, No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022) (summary order); *Stanacard, LLC v. Rubard, LLC*, No. 12-CV-5176, 2016 WL 462508, at *21 (S.D.N.Y. Feb. 3, 2016) (dismissing conversion claim on summary judgment where there was no evidence that defendants "alleged misappropriation of documents or electronic data interfered with Plaintiffs use of the same"); *Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 414–15 (S.D.N.Y. 2018) (dismissing counterclaim for conversion where there were no allegations that counter-defendant's copying of electronic files resulted in any alteration of the files or that counterclaimant was excluded from using the files). *But see Kim v. Lee*, No. 22-61, 2023 WL 2317248, at *4 (2d Cir. Mar. 2, 2023) (summary order) (noting that there are at least "two federal district court decisions and one New York state trial decision suggesting that the copying of data may constitute conversion under New York Law," and explaining that "[t]he New York Court of Appeals has not issued a controlling decision on this question").

Here, Plaintiff argues in its opposition that Defendants' possession of Plaintiff's customer and financial information "interfered with Plaintiff's right of possession when [Defendants] used it to further their competing business." (Pl.'s Opp'n, Dkt. 381, at 11.) But that argument has no basis in fact. There is nothing in the Second Amended Complaint that supports Plaintiff's claim that it was unable to use its own customer and financial information after Rosenblatt allegedly provided the same information to Defendants. Nor are there any facts in the Second Complaint that support an inference that Plaintiff was unable to retain and/or compete for business from its existing customers as a result of Defendants' obtaining Plaintiff's customer and financial information. This deficiency alone warrants dismissal of Plaintiff's conversion claim.

In addition and relatedly, the Former Owner Defendants contend that Plaintiff has failed to allege that they "exercised an unauthorized dominion over the said property," arguing that Plaintiff's conclusory allegations that Defendants "exercised unauthorized dominion" are insufficient "to meet the pleading threshold." (F.O. Defs.' Mot., Dkt. 259-6, at 18–19.)  Plaintiff responds by asserting that the Second Amended Complaint "adequately states that the Former Owner Defendants exercised control of Plaintiff's confidential information and trade secrets, and interfered with Plaintiff's right of possession when they used it to further their competing business." (Pl.'s Opp'n, Dkt. 381, at 11.)  Other than restating the elements of conversion, Plaintiff does not cite to specific allegations or caselaw in support of this assertion.  (*See id.*)  Thus, the Court assumes that Plaintiff is referring to the allegations in the Second Amended Complaint stating that Defendants "willfully exercised unauthorized dominion over Plaintiff's confidential information and trade secrets to the detriment of Plaintiff" and "to the exclusion of Plaintiff's rights." (SAC, Dkt. 203, ¶¶ 154–56.)  The Court agrees with the Former Owner Defendants that these allegations are too conclusory with respect to how Defendants' "dominion over Plaintiff's confidential information and trade secrets" was "to the detriment of Plaintiff" and "to the exclusion of Plaintiff's rights." (*Id.*)  As discussed, there is nothing in the Second Amended Complaint that supports the conclusion that Plaintiff was deprived of using its own confidential information and trade secrets for its continuing benefit even after Defendants allegedly obtained the same information.  *See Sobek v. Quattrochi*, No. 03-CV-10219 (RWS), 2004 WL 2809989, at *9 (S.D.N.Y. Dec. 8, 2004) (finding "conclusory allegations that defendants exercised unauthorized dominion" were insufficient to state a claim for conversion).

Thus, Plaintiff's conversion claim is dismissed as to the Former Owner Defendants.

## IV.     The Defamation Defendants' Motion

Plaintiff brings a defamation claim against Safa and Companions based on the statements on the GoFundMe page and Safa's Facebook.  "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander."  *Ganske v. Mensch*, 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020) (quoting *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012)).  New York law finds a statement "defamatory 'if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community.'"  *Sprewell v. NYP Holdings, Inc.*, 1 Misc. 3d 847, 849 (N.Y. Sup. Ct. 2003) (quoting *Golub v. Enquirer/Star Grp.*, 89 N.Y.2d 1074, 1086 (N.Y. 1997)).  The elements of a cause of action for defamation are: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability."  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).  Here, the first, fourth, and fifth elements are in dispute.  (*See* D. Defs.' Mot., Dkt. 243, at 1.)

### A.     Special Damages or Per Se Actionability

The Defamation Defendants first argue that Plaintiff's defamation claim must be dismissed because Plaintiff has alleged neither per se actionability nor special damages.  (*See* D. Defs.' Mot., Dkt. 243, at 8–16.)   In response, Plaintiff argues only that it has properly pled a claim for defamation per se.  (Pl.'s Br., Dkt. 245, at 4–7.)  Accordingly, the Court only considers the parties' arguments regarding whether Plaintiff has stated a claim for negligence per se.[18]

---

[18] To state a defamation claim under New York law, a plaintiff must plead either special damages *or* per se actionability, but is not required to plead both.  *See Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (explaining that a plaintiff must establish special damages or per se actionability); *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 164–65 (E.D.N.Y. 2014) ("A plaintiff is excused from pleading special damages, however, in cases of defamation *per se*.").

"Where defamation is per se actionable, a plaintiff need not plead or prove special damages, which consist of 'loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation.'" *Lucking v. Maier*, No. 03-CV-1401 (NRB), 2003 WL 23018787, at *4 (S.D.N.Y. Dec. 23, 2003) (quoting *Celle*, 209 F.3d at 179). "Rather, injury is assumed." *Id.* Statements that "tend to injure another in his or her trade, business, or profession" are actionable as defamation per se. *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992). However, such statements "must be made with reference to a matter of significance and importance for [the operation of the business], rather than [be] a more general reflection upon the plaintiff's character or qualities." *Id.* at 348 (citation omitted); *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) (explaining that the statement must "be targeted at the specific standards of performance relevant to the plaintiff's business and must impute conduct that is 'of a kind incompatible with the proper conduct of the business, trade, profession or office itself'" (quoting *Liberman*, 605 N.E.2d at 348)); *Van-Go Transp. Co. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997) ("Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties.").

The Defamation Defendants contend that the statements at issue are not per se actionable because they do not impugn Plaintiff's business, basic integrity, or creditworthiness. (D. Defs.' Mot., Dkt. 243, at 9–15.) The Court disagrees. When read together, the statements at issue accuse Plaintiff of pursuing an aggressive litigation strategy and attempting to sue a competitor out of business by bringing a lawsuit based on false allegations. (SAC, Dkt. 203, ¶¶ 80–82.) The Court finds that these accusations target the specific standards of performance relevant to Plaintiff's

business because Plaintiff offers services within the legal industry and Plaintiff's clients rely on the truthfulness and accuracy of its reports.  *Cf. Liberman*, 605 N.E.2d at 346, 348 (statements that plaintiff punched defendant, "screamed at [defendant's] wife and daughter," "called [defendant's] daughter a slut and threatened to kill [defendant] and [his family]" were not per se actionable under the "trade, business or profession" exception because statements did not relate to plaintiff's profession as a landlord); *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139–40 (N.Y. 1985) (statements that generally disparaged plaintiff's performance as a legislative assistant—e.g., "[plaintiff] is neglectful in her job"—were not per se actionable under the "trade, business, or profession" exception because statements did not reflect on "[plaintiff's] performance as a linguist or her ability to be a good writer or researcher"); *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 419–20 (S.D.N.Y. 2013) (accusation that plaintiff stole a watch was not defamatory per se under the "trade, business or profession exception" because plaintiff's business was in food sales, as opposed to watch or jewelry sales).  Notably, none of the cases that the Defamation Defendants cite for the proposition that "statements concerning a plaintiff's litigiousness are *not* defamatory per se" involved a plaintiff that worked in the legal industry.  (*See* D. Defs.' Mot., Dkt. 243, at 14 (emphasis in original) (first citing *Shea v. Angulo*, No. 93-CV-4183 (AGS), 1994 WL 86374, at *2–3 (S.D.N.Y. Mar. 16, 1994) (statement that plaintiff filed lawsuits against other money managers did not injure plaintiff in his trade or business as a stock broker); then citing *Mapinfo Corp. v. Spatial Re-Eng'g Consultants*, No. 02-CV-1008 (DRH), 2006 WL 2811816, at *1, *15 n.18 (N.D.N.Y. Sept. 28, 2006) (statement that software company was litigious did not constitute defamation per se)).)  Thus, Plaintiff has adequately pled per se actionability.

**B.      Statement of and Concerning Plaintiff**

To state a claim for defamation, the Second Amended Complaint must allege that Defendants made a defamatory statement "of and concerning" Plaintiff.  "In other words, [] [P]laintiff must show that the statement refers to [Watchdog] such that those who know [Watchdog] would recognize [it] was the target of the libel." *Goldman*, 417 F. Supp. 3d at 172. "It is not necessary that the world should understand the libel;" rather, it is sufficient if those who know Plaintiff can make out that Plaintiff was the subject of the statement. *Id.*; *see also Elias v. Rolling Stone LLC*, 872 F.3d 97, 104–05 (2d Cir. 2017). "While the 'of and concerning' requirement is generally an issue of fact for the jury to decide, the court may properly dismiss an action where the libelous statement is 'incapable of supporting a jury's finding' that it refers to the plaintiff." *Goldman*, 417 F. Supp. 3d at 172 (quoting *Greene v. Paramount Pictures Corp.*, 138 F. Supp. 3d 226, 234 (E.D.N.Y. 2015)).

The Court finds that Plaintiff's allegations are sufficient to satisfy the "of and concerning" requirement at this stage of litigation.  *See Goldman*, 417 F. Supp. 3d at 172.  The statements at issue are all about the present lawsuit.  (*E.g.*, SAC, Dkt. 203, ¶ 80 ("[O]ur number one competitor, who is a greedy ruthless attorney . . . is *abusing the law to sue me out of business* . . . . This *lawsuit is costing her nothing* . . . ." (emphasis added)).)  Given this context, a trier of fact could reasonably find that the statements target *both* Watchdog and Levi, Watchdog's principal.  In particular, the statement "our number one competitor" clearly refers to Watchdog as a company as opposed to Levi as an individual.[19]   This makes the present case distinguishable from the cases that the

_____

[19] Similarly, the Court rejects the Defamation Defendants' argument that there is no basis for liability against Companions.  (D. Defs.' Mot., Dkt. 243, at 24.)  The phrase "*our* number one competitor" indicates that Safa made these statements on behalf of herself *and* Companions.  (*See* SAC, Dkt. 203, ¶ 80 (emphasis added).)

Defamation Defendants cite to in their opposition brief.  (*See* D. Defs. Mot., Dkt. 243, at 22–23); *Afftrex, Ltd. v. Gen. Elec. Co.*, 555 N.Y.S.2d 903, 904–05 (N.Y. App. Div. 1990) (affirming dismissal of defamation claim brought by corporation where defendant allegedly stated that corporation's owner was "an evil man"); *Carlucci v. Poughkeepsie Newspapers, Inc.*, 442 N.E.2d 442, 443 (N.Y. 1982) (concluding that statements about corporation's owner's gambling activity without mentioning corporation were not "of and concerning" corporation); *Alf v. Buffalo News, Inc.*, 953 N.Y.S.2d 797, 799 (N.Y. App. Div. 2012) (finding statements that referenced corporate owner and not wholly owned subsidiary were not "of and concerning" subsidiary), *aff'd*, N.E.2d 168 (N.Y. 2013).  Moreover, as Plaintiff points out, courts have frequently allowed defamation claims to proceed where the statements at issue "did not identify the plaintiff, [and instead] named an individual who was understood to represent that plaintiff."  *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 632 (E.D.N.Y. 2018); *e.g.*, *Wexler v. Allegion (UK) Ltd.*, No. 16-CV-2252 (ER), 2018 WL 1626346, at *9 (S.D.N.Y. Mar. 30, 2018) (concluding that facts alleged could support a jury's finding that statement about company was "of and concerning" plaintiff, the company's owner, where plaintiff alleged that "his wide-spread reputation in the industry made him 'synonymous with [the company]' and people in the industry would have understood that a reference to '[the company's] management' was effectively a reference to [plaintiff]").

Thus, the Court concludes that it would be plausible for a jury to find that the Defamation Defendants' statements were "of and concerning" Plaintiff.

### C.    Falsity of the Defamatory Statements

A defamatory statement must actually be false.  If the statement at the center of the allegation is in fact true, proof of that truth is an "absolute defense."  *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 383 (N.Y. App. Div. 2017) (citation omitted).  To determine whether a statement is "substantially true," courts look to "whether [the statement] as published would have a different

effect on the mind of the reader from that which the pleaded truth would have produced." *Id.*
(alteration in original) (emphasis added) (quoting *Fleckenstein v. Friedman*, 193 N.E. 537, 538
(N.Y. 1934)). Expressions of opinion are nonactionable because only "facts" are capable of being
proven false. *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993). "[O]pinions based
on false facts are actionable only against a defendant who had knowledge of the falsity or probable
falsity of the underlying facts." *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977).
However, "when a negative characterization of a person is coupled with a clear but false
implication that the author is privy to facts about the person that are unknown to the general
reader," "[l]iability for libel may attach." *Id.* ("If an author represents that he has private, first-
hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes
as damaging as an assertion of fact."); *Goldman*, 417 F. Supp. 3d at 172 ("[A]n exception to the
general rule exists for 'mixed opinion-fact defamation'; in such cases, an opinion 'implies that it
is based upon facts which justify the opinion but are unknown to those reading or hearing it.'"
(quoting *Sorvillo v. St. Francis Preparatory Sch.*, 607 F. App'x 22, 24 (2d Cir. 2015) (summary
order))). To determine whether a statement is a fact or opinion, courts consider (1) "whether the
specific language in issue has a precise meaning which is readily understood," (2) "whether the
statements are capable of being proven true or false," and (3) "whether either the full context of
the communication in which the statement appears or the broader social context and surrounding
circumstances are such as to 'signal[] readers or listeners that what is being read or heard is likely
to be opinion, not fact.'" *Gross*, 623 N.E.2d at 1167 (quoting *Steinhilber v. Alphonse*, 501 N.E.2d
550, 554 (N.Y. 1977)).

The Defamation Defendants contend that the statements at issue should be considered
opinions because they were made on social media. (*See* D. Defs.' Mot., Dkt. 243, at 18–19.) While

it is true that courts often consider statements made on social media and online forums to be opinions as opposed to facts, there is no brightline rule in that regard. *Compare, e.g.*, *Ganske v. Mensch*, 480 F. Supp. 3d 542, 553–54 (S.D.N.Y. 2020) (finding comments made on Twitter constituted opinions), *with Zuckerbrot v. Lande*, 167 N.Y.S.3d 313, 322, 332 (N.Y. Sup. Ct. 2022) (finding that plaintiffs sufficiently alleged that statements made on Instagram were statements of fact), *and Eminah Props. LLC v. Energizer Holdings, Inc.*, 531 F. Supp. 3d 593, 600, 608 (E.D.N.Y. 2021) (finding plaintiffs sufficiently alleged defamation claim based on comments made on eBay).  "Ultimately, context is more than just the medium through which a statement is conveyed; it is a holistic inquiry concerning 'the content of the communication as a whole,' including 'its tone and apparent purpose.'"  *Zuckerbrot*, 167 N.Y.S.3d at 332 (quoting *Brian v. Richardson*, 660 N.E.2d 1126, 1129–30 (N.Y. 1995)).  Here, the context weighs against a finding that the alleged defamatory statements were pure opinion, particularly because the statements were made as part of an attempt to raise money, the success of which one would expect to be based on truthful statements of fact.  Indeed, none of the cases that the Defamation Defendants cite address this precise scenario.  (*See* D. Defs.' Mot., Dkt. 243, at 18–19 (citing *Ganske*, 480 F. Supp. 3d at 553 (Twitter); *Biro v. Conde Nast*, No. 11-CV-4442 (JPO), 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014) (blog), *aff'd in part*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F. App'x 67 (2d Cir. 2015) (summary order); *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 290 (E.D.N.Y. 2015) (comment on online article), *aff'd*, 670 F. App'x 731 (2d Cir. 2016) (summary order)).)

Moreover, though the Defamation Defendants focus on whether it is possible to prove or disprove "someone's subjective characterization of another person as 'ruthless and greedy'" and a bully, (D. Defs.' Mot., Dkt. 243, at 19), they overlook the fact that it *is* entirely possible to prove

or disprove the statements in Safa's Facebook post, i.e., whether the present lawsuit is based on false accusations, (*see* SAC, Dkt. 203, ¶ 82). While the Court agrees with the Defamation Defendants that whether some of the statements at issue present a closer question, the "better course" is to allow Plaintiff's entire defamation per se claim to proceed, given that doing so will not substantially change the course of discovery. *E.g.*, *Graham v. Ferretti*, No. 14-CV-5815 (PKC) (LB), 2018 WL 1392344, at *3 (E.D.N.Y. Mar. 20, 2018) (quoting *Bacchus*, 137 F. Supp. 3d at 241); *Chisolm-Mitchell v. Ahmed*, No. 20-CV-3434 (PKC) (LB), 2021 WL 512460, at *4 (E.D.N.Y. Feb. 11, 2021) (allowing a malicious prosecution claim to proceed because doing so was "not likely to alter or expand the scope of discovery").

## MOTION TO STRIKE

The Former Owner Defendants move to strike certain of the allegations pertaining to them in the Second Amended Complaint. (*See* F.O. Defs.' Mot., Dkt. 259-6, at 19–21 (citing SAC, Dkt. 203, ¶¶ 73–77).) FRCP 12(f) provides that a Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[M]otions to strike under [FRCP] 12(f) are generally disfavored at the early pleading stages," and such motions "will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." *Bank v. CreditGuard of Am.*, No. 18-CV-1311 (PKC) (RLM), 2019 WL 1316966, at *4 (E.D.N.Y. Mar. 22, 2019) (citation omitted). "A party seeking to strike allegations must show that evidence in support of the allegation would be inadmissible, the allegations have no bearing on relevant issues, and permitting the allegations to stand would result in prejudice to the movant." *Id.* (citing *OTG Brands, LLC v. Walgreen Co.*, No. 13-CV-9066 (ALC), 2015 WL 1499559, at *5 (S.D.N.Y. Mar. 31, 2015)). "Simply because a claim is dismissed . . . does not mean that allegations in support of that claim may as a matter of course be struck as immaterial, impertinent, or scandalous." *Id.* (alteration in original) (quoting *Anderson v. Davis Polk &*

*Wardwell LLP*, 850 F. Supp. 2d 392, 417 (S.D.N.Y. 2012), *overruled on other grounds by Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 108 (2d Cir. 2018) (en banc)).

Here, the Former Owner Defendants fall short of meeting this demanding standard. As an initial matter, the allegations at issue are highly relevant to Plaintiff's claims, as demonstrated by the Court's references to those allegations throughout this Memorandum and Order. *See, e.g.*, *supra* pp. 15, 26 (citing SAC, Dkt. 203, ¶¶ 74–77). Moreover, the Former Owner Defendants' only arguments as to why the Court should grant their motion to strike is because the allegations at issue contradict testimony that they gave at the March 27, 2023 preliminary injunction hearing and that "Plaintiff will be unable to substantiate [the] allegations because [they] are false." (F.O. Defs.' Mot., Dkt. 259-6, at 21.) In essence, the Former Owner Defendants are asking the Court to make credibility determinations and decide the key factual disputes underlying this lawsuit, which would be inappropriate at this (or any other) stage of the litigation. Finally, the Former Owner Defendants have failed to establish prejudice. *See Cnty. Vanlines Inc. v. Experian Info. Sols., Inc.*, 205 F.R.D. 148, 153 (S.D.N.Y. 2002) (explaining that a motion to strike must be denied absent a showing of prejudice). The Former Owner Defendants merely state that failure to strike the allegations "would severely prejudice [them]," without explaining how. (Defs.' Mot., Dkt 259-6, at 21.) However, "mere assertions by the moving party that he is prejudiced are insufficient." *Cnty. Vanlines Inc.*, 205 F.R.D. at 153; *see, e.g.*, *Bright Kids NYC Inc. v. Kelly*, No. 19-CV-1175 (JMF), 2020 WL 6891814, at *5 (S.D.N.Y. Nov. 24, 2020) (denying motion to strike where movant asserted "in conclusory fashion" that they would be "unfairly prejudice[d]" if the allegations at issue were allowed to remain); *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 308 (S.D.N.Y. 2011) ("Defendants' arguments as to prejudice are merely

conclusory, and given the disfavor with which federal courts view motions to strike, such arguments fail to suffice on such motions.").

Accordingly, the Former Owner Defendants' motion to strike is denied.

## MOTION TO AMEND

Plaintiff cross-moves to amend the Second Amended Complaint.  (*See* Pl.'s Br., Dkt. 245, at 13–14.)  Specifically, Plaintiff seeks to add allegations to its defamation claim concerning emails that the Defamation Defendants sent to some of Plaintiff's law firm customers.  (*Id.* at 13.)  One such email states:

> [Companions is] not a law firm.  We simply provide different services to law firms . . . .  Being that we are not a law firm, we get no "kick backs" or benefit from the success or failure of any case.  We are simply providing a service to our clients.

(Dkt. 246-3 at ECF 2 (emphasis omitted).)  Another email states: "[Companions is] independently owned, not owned by another law firm, or case 'loan' company." (Dkt. 246-4.)  Plaintiff contends that "[b]y reiterating to law firm customers that Defendants are not a law firm following a telephone call in which Defendants are alleged to have stated that the law firm customer's personal injury plaintiffs are not safe with IME WatchDog, Plaintiff has adequately stated a claim for relief on its defamation claim, both directly and by implication."  (Pl.'s Br., Dkt. 245, at 14.)

"Under [FRCP] 15(a), 'leave to amend shall be freely given when justice so requires.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)); *see* Fed. R. Civ. P. 15(a).  Nevertheless, "it is within the sound discretion of the district court to grant or deny leave to amend," *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009) (quoting *McCarthy*, 482 F.3d at 505), and leave to amend may be denied for, among other reasons, futility, *Williams v. Citigroup, Inc.*, 659 F.3d 208, 213–14 (2d Cir. 2011).  Amendment is futile where a Plaintiff cannot, in good faith, add allegations that would enable the complaint to survive a motion to dismiss.  *Quinio v. Aala*, No. 19-CV-4686

(PKC) (SJB), 2022 WL 21125, at *5 (E.D.N.Y. Jan. 3, 2022) (citing, *inter alia*, *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 235 (2d Cir. 2007)).

Here, the Court denies Plaintiff's cross-motion to amend based on the futility of the proposed amendments. Specifically, Plaintiff's proposed amendments would not survive a motion to dismiss pursuant to FRCP 12(b)(6) because, among other things, the alleged statements are not false. "[I]f an allegedly defamatory statement is 'substantially true,' a claim of libel is legally insufficient and . . . should [be] dismissed." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017) (alterations in original) (quoting *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12 (N.Y. App. Div. 2015)). "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Id.* (quoting *Fleckenstein*, 193 N.E. at 538). Defendants' literal statements are not false; they simply state that Companions is not a law firm, that they provide services to law firms, and that they do not benefit based on the success or failure of any lawsuit. As for Plaintiff's argument about the unstated implications of the Defamation Defendants' statements—which appears to be that because IME Watchdog is run by Levi, a lawyer with her own law firm, any law firm who works with Watchdog is at risk of losing their plaintiff clients to Levi's firm—is too much of a stretch, even assuming Defendants' emails followed phone calls in which the Defamation Defendants more explicitly referred to Watchdog. (*See* Dkt. 246-1 ¶ 65.) There is nothing in the Defamation Defendants' calls or emails that identifies Levi or Watchdog, makes a connection between Companions not being a law firm and Levi being a lawyer, or impugns either Levi's or Watchdog's reputation. Furthermore, Plaintiff filed this lawsuit over two years ago and has already been granted leave to amend its complaint several times. (*See, e.g.*, 10/12/2022 Dkt. Order; 4/7/2023 Dkt. Order.) "[I]t is time for this case

to move forward." *Rent-A-Ctr., Inc. v. 47 Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003).

## CONCLUSION

For the reasons set forth above, the Former Owner Defendants' motion to dismiss is granted in part and denied in part.  The Court dismisses Plaintiff's unfair competition, tortious interference with contract, unjust enrichment, and conversion claims as to the Former Owner Defendants.[20] The Court denies the Defamation Defendants' motion to dismiss Plaintiff's defamation claim against them.  That claim will proceed.  Finally, the Court denies the Former Owner Defendants' motion to strike and Plaintiff's motion to amend.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  September 30, 2024
         Brooklyn, New York

---

[20] The Court recognizes that the bases for dismissing these claims could also apply to Defendants Safa, Vito, Companions, CES, and IME M&C.  However, because those defendants have not moved to dismiss these claims and Plaintiff therefore has not had an opportunity to respond to any such motion to dismiss, the Court does not *sua sponte* dismiss these claims as to Defendants Safa, Vito, Companions, CES, and IME M&C.

41