# EXHIBIT "E"

**WARNER & SCHEUERMAN**
**Attorneys at Law**
**6 West 18th Street, 10th Floor**
**New York, New York 10011**
**Tel: (212) 924-7111**
**Fax: (212) 924-6111**

**Jonathon D. Warner, Esq.**
**jdwarner@wslaw.nyc**

**Karl E. Scheuerman, Esq.**
**kescheuerman@wslaw.nyc**                                        September 6, 2024

**VIA EMAIL**

Jamie S. Felsen, Esq.
Milman Labuda Law Group PLLC
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042

Re:     *IME Watchdog, Inc. v. Gelardi, et al.*
        Case No.: 1:22-cv-1032 (PKC)(JRC)

Dear Mr. Felsen:

        Please be advised that your so-called "safe harbor notice" is hereby rejected as defective due to your failure to comply with the separate motion and safe harbor provisions of Rule 11. Indeed, your "safe harbor notice" fails to describe the specific conduct that allegedly violates Rule 11(b) and your notice of motion demands various form of relief in addition to sanctions.

        Moreover, there is absolutely no basis for your scurrilous accusations where the statements made in our submissions to the Court concerning the status of the proposed sale of the Staten Island home owned by Vito and Safa Gelardi ("Defendants") were made for the proper purpose of advising the Court of the status of the sale and were based upon our communications with defendants' real estate counsel. As you know, my firm did not represent the Defendants in connection with the proposed sale of their Staten Island home, and we thus relied upon the information supplied to us by real estate counsel when providing status reports to the Court. It was objectively reasonable for us to rely upon statements made to us by an attorney with knowledge of the facts, and we made it clear in our submissions to the Court that we were simply relaying to the Court information which had been provided to us by others since we lacked personal knowledge. Moreover, none of our submissions contained any false statements, unlike your letter motion for sanctions cited in your "safe harbor notice" which contains multiple false accusations and statements. The truth, as demonstrated by the documentary evidence, is that all statements I made to the Court concerning the sale of the Staten Island home were truthful to the best of my knowledge and were based upon my firm's reasonable and good faith investigation into the facts. Any Rule 11 motion would be inappropriate and baseless under the circumstances.

In order to ensure compliance with Judge Chen's Order of Attachment, on March 1, 2024, my partner, Karl E. Scheuerman, Esq., emailed Defendants' real estate attorney, Matthew Lenza, Esq., informing him of the Order of Attachment and advising him that the net sale proceeds from the closing cannot be released to the Defendants, but must be paid over to Warner & Scheuerman to be held in escrow. Mr. Scheuerman wrote:

> Please see below Minute Order of Judge Pamela Chen directing that the net proceeds from the sale of the premises known as 148 Clay Pit Road, Staten Island, New York, not be released to the sellers and instead be delivered to Warner & Scheuerman, as attorneys, to be held in escrow. I also attach the Judge's Memorandum & Order dated February 29, 2024.

> Warner & Scheuerman will also need you to deliver with the escrow check any HUD Settlement Statement or other document reflecting charges against the sale proceeds at the closing, including any closing statement prepared by your office.

> It is absolutely imperative that you comply with the Judge's Order.

> Thank you for your anticipated cooperation.

A copy of Mr. Scheuerman's March 1 email to Mr. Lenza is enclosed.

On March 8, 2024, I informed the Court that: "we have been advised by the real estate attorney for Safa and Vito that the closing of the sale of their Staten Island home has not yet been scheduled. We have further been advised that the purchaser's loan application remains "in underwriting" and that the lender has not cleared the loan for closing." (297). While you asserted in your sanctions motion filed with the Court (and referenced by your purported safe harbor notice) that "[t]his was similarly a false statement," the documentary evidence shows that it is you who has made a false statement to the Court by falsely accusing me of misrepresenting my communications with Mr. Lenza. Indeed, my March 8th submission was made after Mr. Lenza emailed my office on March 7th stating that: "Loan not clear still in underwriting of course before closing I will reach out to you to confirm." A copy of Mr. Lenza's March 7th email is enclosed. My March 8th submission accurately set forth the facts relayed to my firm by Mr. Lenza.

Mr. Lenza's subsequent emails to my firm confirm that all of my statements to the Court concerning the real estate transaction were truthful and accurate. On March 28, 2024, Mr. Lenza emailed us: "We are getting very close. I believe we should be scheduled to close next week." On April 5, 2024, Mr. Lenza emailed us: "Finally have a date - a week from today 4-12." On April 11, 2024, and in response to our email asking "Are you closing tomorrow," Mr. Lenza emailed us: "No, the bank attorney does not yet have the clear to close." On April 19, 2024, Mr.

-2-

Lenza emailed us: "Buyer still hasn't gotten loan clearance. Its killing me. Confirming that no funds will be released to seller until confirmed with your office." On May 2, 2024, Mr. Lenza emailed us: "I think it may be dead. I'm confirming today." On May 17, 2024, Mr. Lenza emailed us: "The buyer killed the deal. I am still holding escrow for the initial downpayment and will likely need to pay it into the court." Copies of Mr. Lenza's emails are enclosed.

As you can plainly see, my submissions to the Court simply mirrored the facts as relayed to my firm by Mr. Lenza, and the submissions indicated on their face that the facts therein were based upon the information supplied to us by others, namely: Defendants' real estate counsel. We had no reason to believe that Mr. Lenza had misrepresented any fact to us when we made our submissions, and we have no reason to believe that any of Mr. Lenza's statements to us were untruthful in any respect. That a separate agreement was entered into between Defendants and the purchaser which apparently required the purchaser to, among other things, pay Defendants' mortgage with Mr. Cooper while the purchaser resided at the premises does not mean that any misrepresentation of fact was made by anyone or that any fraud had been practiced on the Court.

Not only are the truthfulness of my statements to the Court proven by the enclosed emails from Defendants' real estate counsel, but Mr. Lenza has now provided my firm with a summary of the transaction at our request. In his letter, Mr. Lenza states that the deal fell through due to "the inability of the purchaser to both obtain financing" and to "sell his Brooklyn property." Mr. Lenza states:

> After weeks of waiting for a response and based on the inability of the purchaser to both obtain financing, sell his Brooklyn property in which this deal was contingent on OR obtain approval for a 1031 exchange from a suitable trustee this deal was terminated, and all downpayment funds were returned to the purchaser's attorney.

A copy of Mr. Lenza's letter dated September 5, 2024, is enclosed.

In light of the foregoing, we hereby demand that you withdraw your defective and baseless "safe harbor notice." Please be advised that if you fail to withdraw your "safe harbor notice" and proceed with your sanctions motion, we will be seek Rule 11 sanctions against you and your firm.

Sincerely,

*/s/ Jonathon D. Warner*

JDW/ks
Encs.
cc:    Emanuel Kataev, Esq.

-3-

## Karl Scheuerman

| | |
|---|---|
| **From:** | Karl Scheuerman |
| **Sent:** | Friday, March 1, 2024 9:29 AM |
| **To:** | matthew@lenzalawfirm.com; office@lenzalawfirm.com |
| **Cc:** | Jonathon Warner; Safa Gelardi; vito gelardi |
| **Subject:** | FW: Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion to Deposit Funds |
| **Attachments:** | Memorandum&OrderDatedFebruary292024.pdf |
| | |
| **Importance:** | High |

Dear Mr. Lenza:

Please see below Minute Order of Judge Pamela Chen directing that the net proceeds from the sale of the premises known as 148 Clay Pit Road, Staten Island, New York, not be released to the sellers and instead be delivered to Warner & Scheuerman, as attorneys, to be held in escrow.  I also attach the Judge's Memorandum & Order dated February 29, 2024.

Warner & Scheuerman will also need you to deliver with the escrow check any HUD Settlement Statement or other document reflecting charges against the sale proceeds at the closing, including any closing statement prepared by your office.

It is absolutely imperative that you comply with the Judge's Order.

Thank you for your anticipated cooperation.

Karl E. Scheuerman
Warner & Scheuerman
6 West 18th Street, 10th Floor
New York, New York 10011
Office: 212-924-7111
Cell: 516-375-0645

---

**From:** ecf_bounces@nyed.uscourts.gov <ecf_bounces@nyed.uscourts.gov>
**Sent:** Thursday, February 29, 2024 2:39 PM
**To:** nobody@nyed.uscourts.gov
**Subject:** Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion to Deposit Funds

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

### U.S. District Court

### Eastern District of New York

## Notice of Electronic Filing

1

The following transaction was entered on 2/29/2024 at 2:39 PM EST and filed on 2/29/2024

**Case Name:**          IME WatchDog, Inc. v. Gelardi et al

**Case Number:**        1:22-cv-01032-PKC-JRC

**Filer:**

**Document Number:** 284

**Docket Text:**
**ORDER: For the reasons stated in the attached Memorandum and Order, Plaintiff's [270] Motion for Attachment is granted in part and denied in part, and Plaintiff's [278] Motion for a Temporary Restraining Order ("TRO") is denied as moot.**

**Pursuant to CPLR § 6201(3), the Court orders attachment of the net proceeds from the Individual Defendants' sale of the Staten Island Property. Within fourteen (14) days of the closing and no later than March 15, 2024, the Individual Defendants are directed to file: (1) proof that the net proceeds from the sale were deposited in the escrow account of their attorneys in this matter; (2) an accounting of all funds disbursed as part of the sale, including all closing costs.**

**Plaintiff is directed to post an undertaking in accordance with CPLR § 6212(b) in the sum of $920 within fourteen (14) days of this order. Ordered by Judge Pamela K. Chen on 2/29/2024. (HMM)**

**1:22-cv-01032-PKC-JRC Notice has been electronically mailed to:**

Steven Siegler    steven@kilegal.com, karen@kilegal.com, samantha@kilegal.com, ssiegler123@gmail.com

Anthony Joseph Genovesi    agenovesi@abramslaw.com, anthony@genovesi.us

Jonathon D. Warner    jdwarner@warnerandscheuerman.com, diana@warnerandscheuerman.com, kescheuerman@warnerandscheuerman.com, melanie@warnerandscheuerman.com

Jamie Scott Felsen    jamiefelsen@mmmlaborlaw.com

Melanie I. Wiener    mwiener@abramslaw.com

Andreas Koutsoudakis    andreas@kilawgroup.com, calendar@kilawgroup.com, karen@kilegal.com, samantha@kilegal.com, zoe@kilegal.com

Kenneth C. Brown    kcb@alberlegal.com

James Francis Valentino    james@valentinolegal.com, valentino@clayro.com, valentino.james@gmail.com

Emanuel Kataev    emanuel@sagelegal.nyc, 4119461420@filings.docketbird.com, daniellalevi@levilawny.com, ekesq2014@recap.email, mail@emanuelkataev.com

Maria Zieher    mzieher@zieherlaw.com

**1:22-cv-01032-PKC-JRC Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=2/29/2024] [FileNumber=18725439-0]
[8ee7aac62c09967242cd3f38afe257e5c7c88f3e26c28b937c7bac9c63c29fc08c7e
20b14251535e8483bcebaad4fdf7326ea4ecd017f7c205a6ad1c40bb4be4]]

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Karl Scheuerman**

| | |
|---|---|
| **From:** | Matthew Lenza <matthew@lenzalawfirm.com> |
| **Sent:** | Friday, May 17, 2024 8:18 AM |
| **To:** | Karl Scheuerman |
| **Cc:** | Jonathon Warner |
| **Subject:** | Re: Gelardi closing |

The buyer killed the deal. I am still holding escrow for the initial downpayment and will likely need to pay it into the court.

On Fri, May 17, 2024, 7:13 AM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Matthew,

Please let us know the status of the closing.  The Judge expects a status report today.

Thanks,

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

## Karl Scheuerman

**From:** Matthew Lenza <matthew@lenzalawfirm.com>
**Sent:** Thursday, May 2, 2024 2:06 PM
**To:** Karl Scheuerman
**Subject:** Re: Gelardi/148 Clay Pitts

Hey Karl,

I think it may be dead. Im confirming today

On Thu, May 2, 2024, 2:00 PM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Matthew,

We have to report back to the Judge tomorrow.  Any closing date yet?

Thanks again,

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Karl Scheuerman**

| | |
|---|---|
| **From:** | Matthew Lenza <matthew@lenzalawfirm.com> |
| **Sent:** | Friday, April 19, 2024 10:57 AM |
| **To:** | Karl Scheuerman |
| **Cc:** | vito gelardi; Safa Gelardi; Jonathon Warner |
| **Subject:** | Re: Gelardi Staten Island Home |

Buyer still hasn't gotten loan clearance.It's killing me. Confirming that no funds will be released to seller until confirmed with your office.

Regards,
Matthew

On Fri, Apr 19, 2024 at 9:52 AM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Dear Mr. Lenza,

We are required to provide the Judge with another status report today concerning the closing of or mutual clients' Cuba Hill Road property in Staten Island.  Please let us know if a closing has been scheduled.

Thank you for your anticipated cooperation and patience.

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

## Karl Scheuerman

| | |
|---|---|
| **From:** | Matthew Lenza <matthew@lenzalawfirm.com> |
| **Sent:** | Thursday, April 11, 2024 3:01 PM |
| **To:** | Jonathon Warner |
| **Cc:** | Karl Scheuerman; Safa Gelardi; vito gelardi |
| **Subject:** | Re: 148 Clay Pit Road, Staten Island, New York |

No, the bank attorney does not yet have the clear to close.

Jeannine Uske,
for Matthew Lenza

On Thu, Apr 11, 2024 at 11:06 AM Jonathon Warner <jdwarner@wslaw.nyc> wrote:

Are you closing tomorrow?

Jonathon D. Warner, Esq.

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, NY 10011

Office: 212.924.7111

Fax:     212.924.6111

Cell:    917.656.4197

www.wslaw.nyc



---

**From:** Matthew Lenza <matthew@lenzalawfirm.com>
**Sent:** Friday, April 5, 2024 10:23 AM
**To:** Karl Scheuerman <kescheuerman@wslaw.nyc>
**Cc:** Jonathon Warner <jdwarner@wslaw.nyc>; Safa Gelardi <safagelardi@gmail.com>; vito gelardi

<vitogelardi@gmail.com>
**Subject:** Re: 148 Clay Pit Road, Staten Island, New York

Finally have a date- a week from today 4-12

On Fri, Apr 5, 2024 at 10:17 AM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Matt –

We need to provide the Judge with another update today.  Any word on the closing?

Thanks,

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

**From:** Matthew Lenza <matthew@lenzalawfirm.com>
**Sent:** Thursday, March 28, 2024 10:33 AM
**To:** Karl Scheuerman <kescheuerman@wslaw.nyc>
**Cc:** Jonathon Warner <jdwarner@wslaw.nyc>; Safa Gelardi <safagelardi@gmail.com>; vito gelardi <vitogelardi@gmail.com>
**Subject:** Re: 148 Clay Pit Road, Staten Island, New York

We are getting very close. I believe we should be scheduled to close next week.

-Matt

On Thu, Mar 28, 2024 at 10:27 AM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Matthew,

We have to provide Judge Chen with another status report regarding the closing of the above.

Please let us know the status of the transaction and whether a closing date has been scheduled.

Thank you,

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Karl Scheuerman**

| | |
|---|---|
| **From:** | Matthew Lenza <matthew@lenzalawfirm.com> |
| **Sent:** | Friday, April 5, 2024 10:23 AM |
| **To:** | Karl Scheuerman |
| **Cc:** | Jonathon Warner; Safa Gelardi; vito gelardi |
| **Subject:** | Re: 148 Clay Pit Road, Staten Island, New York |

Finally have a date- a week from today 4-12

On Fri, Apr 5, 2024 at 10:17 AM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Matt –

We need to provide the Judge with another update today. Any word on the closing?

Thanks,

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

---

**From:** Matthew Lenza <matthew@lenzalawfirm.com>
**Sent:** Thursday, March 28, 2024 10:33 AM
**To:** Karl Scheuerman <kescheuerman@wslaw.nyc>
**Cc:** Jonathon Warner <jdwarner@wslaw.nyc>; Safa Gelardi <safagelardi@gmail.com>; vito gelardi <vitogelardi@gmail.com>
**Subject:** Re: 148 Clay Pit Road, Staten Island, New York

We are getting very close. I believe we should be scheduled to close next week.

-Matt

On Thu, Mar 28, 2024 at 10:27 AM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Matthew,

We have to provide Judge Chen with another status report regarding the closing of the above.

Please let us know the status of the transaction and whether a closing date has been scheduled.

Thank you,

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

2

**Karl Scheuerman**

| | |
|---|---|
| **From:** | Matthew Lenza <matthew@lenzalawfirm.com> |
| **Sent:** | Thursday, March 28, 2024 10:33 AM |
| **To:** | Karl Scheuerman |
| **Cc:** | Jonathon Warner; Safa Gelardi; vito gelardi |
| **Subject:** | Re: 148 Clay Pit Road, Staten Island, New York |

We are getting very close. I believe we should be scheduled to close next week.

-Matt

On Thu, Mar 28, 2024 at 10:27 AM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Matthew,

We have to provide Judge Chen with another status report regarding the closing of the above.

Please let us know the status of the transaction and whether a closing date has been scheduled.

Thank you,

Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

**Karl Scheuerman**

| | |
|---|---|
| **From:** | Matthew Lenza <matthew@lenzalawfirm.com> |
| **Sent:** | Thursday, March 7, 2024 4:55 PM |
| **To:** | Karl Scheuerman |
| **Cc:** | Jonathon Warner; vito gelardi; Safa Gelardi |
| **Subject:** | Re: 148 Clay Pit Road, Staten Island, New York |

Loan not clear still in underwriting of course before closing i will reach out to you to confirm

On Thu, Mar 7, 2024, 4:21 PM Karl Scheuerman <kescheuerman@wslaw.nyc> wrote:

Dear Mr. Lenza,


As you know, we represent Vito and Safa Gelardi.  We have been ordered to provide the Court with an update tomorrow concerning the closing of the above property.  Please provide us with an update as soon as possible.


Thank you for your cooperation.


Sincerely,


Karl E. Scheuerman

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, New York 10011

Office: 212-924-7111

Cell: 516-375-0645

1



## LENZA LAW FIRM, PLLC

*elder law, estate & legacy planning*

1110 SOUTH AVENUE, SUITE 303
STATEN ISLAND, NEW YORK 10314
PHONE: 347-273-1280 • FAX: 646.736.0460

WWW.LENZALAWFIRM.COM
OFFICE@LENZALAWFIRM.COM

MATTHEW LENZA, ESQ.*
CHRISTINA PASATURO, ESQ.*
*ADMITTED IN NEW JERSEY

September 5, 2024

Karl E. Scheuerman
Warner & Scheuerman
6 West 18th Street, 10th Floor
New York, New York 10011
**Via e-mail and US Mail**

**Re: Gelardi to Masullo**
**Property Address: 148 Clay Pit Road, Staten Island, New York**

Dear Mr. Scheurman:

As you are aware I was retained to represent Mr. Vito Gelardi in connection with the sale of his premises at 148 Clay Pit Road, Staten Island, New York.

For a brief history and timeline of this transaction please see the below:

1. On January 26th, 2024 the undersigned received an Offer to Purchase signed by all parties (Annexed here as Exhibit "A")

2. On February 6, 2024 a fully executed Contract of Sale was established between Mr. Gelardi, his wife Safa Gelardi and the Purchaser Anthony Masullo. (Annexed here as Exhibit "B")

3. The Contract of Sale referenced above contained a sales contingency on behalf of the Purchaser, meaning that this transaction as contingent on the purchaser Anthony Masullo selling a property that he owned in Brooklyn, New York (See Cover Letter from buyer attorney annexed here as Exhibit "C")

4. On February 29, 2024 this office received an e-mail from Jamie S. Felsen, Esq. of Milman Labuda Law Group about pending litigation regarding my clients and attached a

copy of an Order signed by Judge Pamela K. Chen directing the withholding of any proceeds of this transaction. I spoke with my clients regarding this Order and they understood and agreed that pending a further Order of the court that they could not receive any proceeds from this transaction. On March 1st I then received an e-mail correspondence from Karl Scheuerman, Esq. of Warner & Scheuerman with a copy of the same order and with the same directives regarding the release of any proceeds of this transaction (Order of Judge Chen annexed hereto as Exhibit "D").

5. On April 1, 2024 this office received a Notice from the purchaser attorney along with a partially signed contract amendment that the purchaser was seeking to enter into a 1031 exchange with regards to the purchase of my client's property. (See Proposed Amendment annexed hereto as Exhibit "E"). I spoke with my clients who conceptually had no issue with this as it would not have affected their side of the transaction in any way.

6. On April 4, 2024 I spoke with the buyer's attorney who informed me that "his client's loan was not clear nor did they have a mortgage commitment". I informed said attorney that my client would not be providing authority on the 1031 documents nor could we proceed on the transaction without confirmation of a loan commitment. I was assured that the same would be forthcoming.

7. After weeks of waiting for a response and based on the inability of the purchaser to both obtain financing, sell his Brooklyn property in which this deal was contingent on OR obtain approval for a 1031 exchange from a suitable trustee this deal was terminated, and all downpayment funds were returned to the purchaser attorney.

**I unequivocally and firmly state that no funds were ever given to Mr. or Mrs. Gelardi either directly or indirectly through any other means. There was simply no funds to give as none were ever exchanged.**

The real estate agent involved in the transaction was an individual named James Barry from NestSeekers International. Tragically Mr. Barry passed away in a motorcycle accident on July 20, 2024.

I hope that this provides clarity for your file.

Of course you can always call my office with any questions or concerns or if you wish to discuss the file.

Very truly yours,5

Matthew Lenza, Esq.

ML/

Exhibit A

DocuSign Envelope ID: 4B6DAC11-2496-44A8-BE5F-2BE2495525DE

# OFFER TO PURCHASE


THE MASTERS DIVISION
AT NEST SEEKERS INTERNATIONAL

**PROPERTY:** Address  148 Clay Pt Rd Staten Island, NY    Block: 7267  Lot: 307

☐ 1 Family  ☐ 2 Family  ☐ MultiFamily  ☐ Condo  ☐ Coop  ☐ Other: _____

| SELLER | PURCHASER |
|---|---|
| Name: Vito Gelardi | Name: Anthony Masullo |
| Address: 148 Clay Pt Rd Staten Island, NY | Address: 6506 10th Ave Brooklyn, NY |

**TERMS:** Price: $ 975,000    Contract Down Payment $ 5,000    Closing Down Payment $ 970,000
Loan Amount $ 630,000    Loan Type Conventional    Anticipated Closing Date March 1, 2024

**SUBJECT TO:** ☐Home Inspection  ☐Termite Inspection  ☐Tenancy  ☐Contingency
☒Other/Details: Contigent on the sale of Purchasers home at 6506 10th Ave Brooklyn, NY

**INCLUDED / EXCLUDED ITEMS** Included: ☒Washer ☒Dryer ☒Refrigerator ☒Stove
Other Included Items: _____
Excluded Items: _____

**BROKERS:** Sellers and Purchasers agree that the following brokers/agents brought about this transaction:

| LISTING AGENT/BROKER | LISTING AGENT/BROKER |
|---|---|
| Agent Name: James Barry | Agent Name: James Barry |
| Agent Phone: 917-932-4536 Agent ID: 10401312191 | Agent Phone: 917-932-4536 Agent ID: 10401312191 |
| Agent Email: jamesb@nestseekers.com | Agent Email: jamesb@nestseekers.com |
| Broker Name: Nest Seekers International | Broker Name: Nest Seekers International |
| Office Address: 505 Park Ave FL 19 New York, NY | Office Address: 505 Park Ave FL 19 New York, NY |
| Office Phone: (212) 252-8772 Broker ID: 10491203697 | Office Phone:(212) 252-8772 Broker ID: 10491203697 |

| SELLERS ATTORNEY | PURCHASER'S ATTORNEY |
|---|---|
| Name: Matthew Lenza | Name: Kerry Katshorhis |
| Address: 1110 South Ave Suite 303 SI, NY 10314 | Address: 77-53 Main St, Kew Gardens Hills, NY 11367 |
| Phone: (347) 273-1280 | Phone: (718) 591-6900 |
| Email: office@lenzalawfirm.com | Email: gklawny@gmail.com |

*THE PARTIES AGREE THAT THIS "OFFER TO PURCHASE IS NOT A CONTRACT OR MEMORANDUM OF CONTRACT, AND IS NOT BINDING ON THE PARTIES IN ANY FASHION, UNTIL A FORMAL CONTRACT IS PREPARED AND NEGOTIATED BY THE ATTORNEYS FOR THE PARTIES AND SIGNED BY BOTH PARTIES.*

## SELLER'S SIGNATURE

X _[signature] DocuSigned by:_
4F0453DF2CE44BA...

X _____

Date: 1/26/2024

## PURCHASER'S SIGNATURE

X _[signature] DocuSigned by:_
B6E668E9558E4DE...

X _____

Date: 1/24/2024

Exhibit B

WARNING: NO REPRESENTATION IS MADE THAT THIS FORM OF CONTRACT FOR THE SALE AND PURCHASE OF REAL ESTATE COMPLIES WITH SECTION 5-702 OF THE GENERAL OBLIGATIONS LAW ("PLAIN LANGUAGE").

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.

This contract form does not provide for what happens in the event of fire, or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

### Residential Contract of Sale

Contract of Sale made as of ~~January~~ February, 2024, Between

**VITO GELARDI** AND SAFA GELARDI
Address: **148 CLAY PIT ROAD, SI, NY 10309**
Social Security Number/ Fed. I.D. No(s):

hereinafter called "Seller" and

**ANTHONY MASULLO**
Address: **6506 10th Ave, Bklyn, NY**
Social Security Number/ Fed. I.D. No(s):

hereinafter called "Purchaser".

The parties hereby agree as follows:

Premises. Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as:

Street Address: **148 CLAY PIT ROAD, SI, NY 10309**

Tax Map Designation: Block 7267, Lot 307

together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

Personal Property. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below (*strike out inapplicable items*). ALL AS EXISTING AND "AS IS".

Excluded from this sale are furniture and household furnishings

As per MLS and to the extent that any of the above currently exist on premises.

3. **Purchase Price.** The purchase price is $975,000.00 payable as follows:

(a) on the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt or which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the "Downpayment"):

$5,000.00

~~(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser shall assume by joinder in the deed:~~ $N/A

~~(c) by a purchase money note and mortgage from Purchaser to Seller:~~ $N/A

~~(d) by a Seller's Price Concession~~ $N/A

(e) balance at Closing in accordance with paragraph 7: $970,000.00

~~4. Existing Mortgage. (Delete if inapplicable) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~

~~(a) The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with interest at the rate of ___ percent per annum, in monthly installments of $ ___ which include principal, interest and escrow amounts, if any, and with any balance of principal being due and payable on ___~~

~~(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be made between the date hereof and Closing.~~

~~(c) If there is a mortgage escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser shall pay the amount in the escrow account to Seller at Closing.~~

~~(d) Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for recording such certificate. If the holder of the~~

~~isting mortgage is a bank or other institution as defined in Section 274-~~
~~of the Real Property Law it may, instead of the certificate, furnish a~~
~~ter signed by a duly authorized officer, employee or agent, dated not~~
~~ore then 30 days before Closing, containing the same information.~~
~~(e) Seller represents and warrants that (i) Seller has delivered to~~
~~rchaser true and complete copies of the existing mortgage, the note~~
~~sured thereby and any extensions and modifications thereof, (ii) the~~
~~isting mortgage is not now, and at the time of Closing will not be, in~~
~~fault, and (iii) the existing mortgage does not contain any provision~~
~~t permits the holder of the mortgage to require its immediate payment~~
~~full or to change any other term thereof by reason of the sale or~~
~~nveyance of the Premises.~~

~~Purchase Money Mortgage. (Delete if inapplicable) If there is to~~
~~a purchase money mortgage as indicated in paragraph 3(c) above:~~
~~(a) The purchase money note and mortgage shall be drawn by the~~
~~orney for Seller in the form attached or, if not, in the standard form~~
~~opted by the New York State Land Title Association. Purchaser shall~~
~~y at Closing the mortgage recording tax, recording fees and the~~
~~orney's fees in the amount of $~~
~~r its preparation.~~
~~(b) The purchase money note and mortgage shall also provide that~~
~~is subject and subordinate to the lien of the existing mortgage and any~~
~~tensions, modifications, replacements or consolidations of the existing~~
~~ortgage, provided that (i) the interest rate thereof shall not be greater~~
~~an      percent per annum and the total debt service thereunder shall~~
~~t be greater than $            per annum, and (ii) if~~
~~e principal amount thereof shall exceed the amount of principal owing~~
~~d unpaid on the existing mortgage at the time of placing such new~~
~~ortgage or consolidated mortgage, the excess be paid to the holder of~~
~~ch purchase money mortgage in reduction of the principal thereof. The~~
~~rchase money mortgage shall also provide that such payment to the~~
~~lder thereof shall not alter or affect the regular installments, if any, of~~
~~incipal payable thereunder and that the holder thereof will, on demand~~
~~d without charge therefor, execute, acknowledge and deliver any~~
~~reement or agreements further to effectuate such subordination.~~

Downpayment in Escrow. (a) Seller's attorney ("Escrowee") shall
ld the Downpayment in escrow in a segregated bank account at JP
organ Chase Bank, 200 New Dorp Lane, Staten Island, New York until
losing or sooner termination of this contract and shall pay over or apply
e Downpayment in accordance with the terms of this paragraph.
scrowee shall hold the Downpayment in a non interest-bearing ~~account~~
~~r the benefit of the parties. If interest is held for the benefit of the~~
~~rties, it shall be paid to the party entitled to the Downpayment and the~~
~~rty receiving the interest shall pay any income taxes thereon. If interest~~
~~not held for the benefit of the parties, the Downpayment shall be~~
~~aced in an~~ IOLA account or as otherwise permitted or required by law.
he Social Security or Federal Identification numbers of the parties shall
furnished to Escrowee upon request. At Closing, the Downpayment
all be paid by Escrowee to Seller. If for any reason Closing does not
cur and either party gives Notice (as defined in paragraph 25) to
scrowee demanding payment of the Downpayment, Escrowee shall give
ompt Notice to the other party of such demand. If Escrowee does not
ceive Notice of objection from such other party to the proposed
ayment within 10 business days after the giving of such Notice,
scrowee is hereby authorized and directed to make such payment. If
scrowee does receive such Notice of objection within such 10 day
eriod or if for any other reason Escrowee in good faith shall elect not to
lake such payment, Escrowee shall continue to hold such amount until
therwise directed by Notice from the parties to this contract or a final,
on-appealable judgment, order or decree of a court. However, Escrowee
all have the right at any time to deposit the Downpayment and the
terest thereon with the clerk of a court in the county in which the
remises are located and shall give Notice of such deposit to Seller and
urchaser. Upon such deposit or other disbursement in accordance with
e terms of this paragraph, Escrowee shall be relieved and discharged of
l further obligations and responsibilities hereunder.
(b) The parties acknowledge that Escrowee is acting solely as a

stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against of all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f) The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

7. **Acceptable Funds.** All money payable under this contract, unless otherwise specified, shall be paid by:
(a) Cash, but not over $ 1,000.00;
(b) Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;
(c) As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $ 500.00; and
(d) As otherwise agreed to in writing by Seller or Seller's attorney.

8. **Mortgage Commitment Contingency.** (*Delete paragraph if inapplicable. For explanation, see Notes on Mortgage Commitment Contingency Clause.*) (a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before FORTY FIVE days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $630,000.00 for a term of at least 30 years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date, Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason.

(b) Purchaser shall (i) make prompt application to one or, at

rchaser's election, more than one Institutional Lender for such rtgage loan, (ii) furnish accurate and complete information regarding rchaser and members of Purchaser's family, as required, (iii) pay all :s, points and charges required in connection with such application and in, (iv) pursue such application with diligence, and (v) cooperate in od faith with such Institutional Lender(s) to obtain a Commitment. rchaser shall accept a Commitment meeting the terms set forth in bparagraph 8(a) and shall comply with all requirements of such mmitment (or any other commitment accepted by Purchaser). rchaser shall furnish Seller with a copy of the Commitment promptly er receipt thereof.

(c)  (*Delete this subparagraph if inapplicable*) Prompt submission Purchaser of an application to a mortgage broker registered pursuant Article 12-D of the New York Banking Law ("Mortgage Broker") all constitute full compliance with the terms and conditions set forth in bparagraph 8(b)(i), provided that such Mortgage Broker promptly bmits such application to such Institutional Lender(s). Purchaser shall operate in good faith with such Mortgage Broker to obtain a mmitment from such Institutional Lender(s).

(d)  If all Institutional Lenders to whom applications were made ny such applications in writing prior to the Commitment Date, irchaser may cancel this contract by giving Notice thereof to Seller, th a copy of such denials, provided that Purchaser has complied with . its obligations under this paragraph 8.

(e)  If no Commitment is issued by an Institutional Lender on or fore the Commitment Date, then, unless Purchaser has accepted a itten commitment from an Institutional Lender that does not conform the terms set forth in subparagraph 8(a), Purchaser may cancel this ntract by giving Notice to Seller within 5 business days after the mmitment Date, provided that such Notice includes the name and dress of the Institutional Lender(s) to whom application was made and at Purchaser has complied with all its obligations under this paragraph

(f)  If this contract is canceled by Purchaser pursuant to bparagraphs 8(d) or (e), neither party shall thereafter have any further ghts against, or obligations or liabilities to, the other by reason of this ntract, except that the Downpayment shall be promptly refunded to irchaser and except as set forth in paragraph 27.

(g)  If Purchaser fails to give timely Notice of cancellation or if irchaser accepts a written commitment from an Institutional Lender at does not conform to the terms set forth in subparagraph 8(a), then irchaser shall be deemed to have waived Purchaser's right to cancel this ntract and to receive a refund of the Downpayment by reason of the ntingency contained in this paragraph 8.

(h)  If Seller has not received a copy of a commitment from an stitutional Lender accepted by Purchaser by the Commitment Date, :ller may cancel this contract by giving Notice to Purchaser within 5 isiness days after the Commitment Date, which cancellation shall :come effective unless Purchaser delivers a copy of such commitment Seller within 10 business days after the Commitment Date. After such ncellation neither party shall have any further rights against, or ligations or liabilities to, the other by reason of this contract, except at the Downpayment shall be promptly refunded to Purchaser rovided Purchaser has complied with all its obligations under this iragraph 8) and except as set forth in paragraph 27.

(i)  For purposes of this contract, the term "Institutional Lender" iall mean any bank, savings bank, private banker, trust company, ivings and loan association, credit union or similar banking institution hether organized under the laws of this state, the United States or any her state; foreign banking corporation licensed by the Superintendent f Banks of New York or regulated by the Comptroller of the Currency transact business in New York State; insurance company duly ganized or licensed to do business in New York State; mortgage banker censed pursuant to Article 12-D of the Banking Law; and any istrumentality created by the United States or any state with the power make mortgage loans.

(j)  For purposes of subparagraph 8(a), Purchaser shall be deemed have been given a fully executed copy of this contract on the third isiness day following the date of ordinary or regular mailing, postage

prepaid.

9.  **Permitted Exceptions.** The Premises are sold and shall be conveyed subject to:

(a)  Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

(b)  Consents for the erection of any structures on, under or above any streets on which the Premises abut;

(c)  Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

(d)  Real estate taxes that are a lien, but are not yet due and payable; and

(e)  The other matters, if any, including a survey exception, set forth in a Rider attached.

10.  **Governmental Violations and Orders.** (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b)  (*Delete if inapplicable*) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

11.  **Seller's Representations.** (a) Seller represents and warrants to Purchaser that:

(i)  The Premises abut or have a right of access to a public road;

(ii)  Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii)  Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

(iv)  The Premises are not affected by any exemptions or abatements of taxes; and

(v)  Seller has been known by no other name for the past ten years, except

NONE

(b)  Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c)  Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

12.  **Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(e)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract

:chaser and its authorized representatives shall have the right, at
sonable times and upon reasonable notice (by telephone or otherwise)
Seller, to inspect the Premises before Closing.

 Insurable Title. Seller shall give and Purchaser shall accept such
e as:  any reputable title company licensed to do business in the City
i State of New York shall be willing to approve and insure in
:ordance with its standard form of title policy approved by the New
rk State Insurance Department, subject only to the matters provided
· in this contract.

. Closing, Deed and Title. (a) "Closing" means the settlement of the
ligations of Seller and Purchaser to each other under this contract,
:luding the payment of the purchase price to Seller, and the delivery to
rchaser of a Bargain and Sale deed with covenants against Grantor's
:s in proper statutory short form for record, duly executed and
nowledged, so as to convey to Purchaser fee simple title to the
:mises, free of all encumbrances, except as otherwise herein stated.
.e deed shall contain a covenant by Seller as required by subd. 5 of
ction 13 of the Lien Law.

~~(b)  If Seller is a Corporation, it shall deliver to Purchaser at the~~
~~1e of Closing (i) a resolution of its Board of Directors authorizing the~~
~~e and delivery of the deed, and (ii) a certificate of the Secretary or~~
~~:sistant  Secretary  of the corporation certifying such resolution and~~
~~:ting forth facts showing that the transfer is in conformity with the~~
~~quirements of Section 909 of the Business Corporation Law. The deed~~
~~such case shall contain a recital sufficient to establish compliance with~~
~~it Section.~~

. Closing Date and Place. Closing shall take place at the office of:
:NZA LAW FIRM, PLLC., 1110 SOUTH AVENUE, SUITE 303,
:ATEN ISLAND, NEW YORK at 10:00 o'clock on or about
arch 1, 2024 or, upon reasonable notice (by telephone or otherwise)
· Purchaser, at the office of  Purchaser's lending institution in
:TATEN ISLAND, NY. subject to Closing of Buyer's
 Sidence

.. Conditions to Closing. This contract and Purchaser's obligation to
rchase the Premises are also subject to and conditioned upon the
lfillment of the following conditions precedent:
   (a)  The accuracy, as of the date of Closing, of the representations
d warranties of Seller made in this contract.
   (b)  The delivery by Seller to Purchaser of a valid and subsisting
:rtificate of Occupancy or other required certificate of compliance, or
idence that none was required, covering the building(s) and all of the
her improvements located on the property authorizing their use as a
1e (1) family dwelling at the date of Closing.
   (c)  The delivery by Seller to Purchaser of a certificate stating that
:ller is not a foreign person, which certificate shall be in the form then
:quired by FIRPTA or a withholding certificate from the I.R.S. If Seller
ils to deliver the aforesaid certificate or if Purchaser is not entitled
ider FIRPTA to rely on such certificate, Purchaser shall deduct and
ithhold from the purchase price a sum equal to 10% thereof (or any
sser amount permitted by law) and shall at Closing remit the withheld
nount with the required forms to the Internal Revenue Service.
   (d)  The delivery of the Premises and all building(s) and
1provements comprising a part thereof in broom clean condition, vacant
1d free of leases or tenancies, together with keys to the Premises.
   (e)  All plumbing (including water supply and septic systems, if
1y), heating and air conditioning, if any, electrical and mechanical
·stems, equipment and machinery in the building(s) located on the
·operty and all appliances which are included in this sale being in
·orking order as of the date of Closing.
   (f)  If the Premises are a one or two family house, delivery by the
irties at Closing of affidavits in compliance with state and local law
quirements to the effect that there is installed in the Premises a smoke
:tecting alarm device or devices.
   (g)  The delivery by the parties of any other affidavits required as a
·ndition of recording the deed.

17. Deed Transfer and Recording Taxes. At Closing, certified or
official bank checks payable to the order of the appropriate State, City or
County officer in the amount of any applicable transfer and/or recording
tax payable by reason of the delivery or recording of the deed or
mortgage, if any, shall be delivered by the party required by law or by
this contract to pay such transfer and/or recording tax, together with any
required tax returns duly executed and sworn to, and such party shall
cause any such checks and returns to be delivered to the appropriate
officer promptly after Closing. The obligation to pay any additional tax
or deficiency and any interest or penalties thereon shall survive Closing.

18. Apportionments and Other Adjustments; Water Meter and
Installment Assessments. (a) To the extent applicable, the following
shall be apportioned as of midnight of the day before the day of Closing:
   (i)  taxes, water charges and sewer rents, on the basis of the fiscal
period for which assessed; (ii) fuel; (IF OIL) ~~(iii) interest on the existing~~
~~mortgage; (iv) premiums on existing transferable insurance policies and~~
~~renewals of those expiring prior to Closing; (v) vault charges; (vi) rents~~
~~as and when collected.~~
   (b)  If Closing shall occur before a new tax rate is fixed, the
apportionment of taxes shall be upon the basis of the tax rate for the
immediately preceding fiscal period applied to the latest assessed
valuation.
   (c)  If there is a water meter on the Premises, Seller shall furnish a
reading to a date not more than 30 days before Closing and the unfixed
meter charge and sewer rent, if any, shall be apportioned on the basis of
such last reading.
   (d)  If at the date of Closing the Premises are affected by an
assessment which is or may become payable in annual installments, and
the first installment is then a lien, or has been paid, then for the purposes
of this contract all the unpaid installments shall be considered due and
shall be paid by Seller at or prior to Closing.
   (e)  Any errors or omissions in computing apportionments or other
adjustments at Closing shall be corrected within a reasonable time
following Closing. This subparagraph shall survive Closing.

19. Allowance for Unpaid Taxes, etc. Seller has the option to credit
Purchaser as an adjustment to the purchase price with the amount of any
unpaid taxes, assessments, water charges and sewer rents, together with
any interest and penalties thereon to a date not less than five business
days after Closing, provided that official bills therefor computed to said
date are produced at Closing.

20. Use or Purchase Price to Remove Encumbrances. If at Closing
there are other liens or encumbrances that Seller is obligated to payor
discharge, Seller may use any portion of the cash balance of the purchase
price to payor discharge them, provided .Seller shall simultaneously
deliver to Purchaser at Closing instruments in recordable form and
sufficient to satisfy such liens or encumbrances of record, together with
the cost of recording or filing said instruments. As an alternative Seller
may deposit sufficient monies with the title insurance company
employed by Purchaser acceptable to and required by it to assure their
discharge, but only if the title insurance company will insure Purchaser's
title clear of the matters or insure against their enforcement out of the
Premises and will insure Purchaser's Institutional Lender clear or such
matters. Upon reasonable prior notice (by telephone or otherwise),
Purchaser shall provide separate certified or official bank checks as
requested to assist in clearing up these matters.

21. The Examination; Seller's Inability to Convey; Limitations of
Liability. (a) Purchaser shall order an examination of title in respect or
the Premises from a title company licensed or authorized to issue title
insurance by the New York State Insurance Department or any agent for
such title company promptly after the execution of this contract or, if this
contract is subject to the mortgage contingency set forth in paragraph 8,
after a mortgage commitment has been accepted by Purchaser. Purchaser
shall cause a copy of the title report and of any additions thereto to be
delivered to the attorney(s) for Seller promptly after receipt thereof.
   (b)(i)  If at the date of Closing Seller is unable to transfer title to

rchaser in accordance with this contract, or Purchaser has other valid
ounds for refusing to close, whether by reason of liens, encumbrances
 other objections to title or otherwise (herein collectively called
efects"), other than those subject to which Purchaser is obligated to
ept title hereunder or which Purchaser may have waived and other
n those which Seller has herein expressly agreed to remove, remedy
 discharge and if Purchaser shall be unwilling to waive the same and to
se title without abatement of the purchase price, then, except as
einafter set forth, Seller shall have the right, at Seller's sole election,
her to take such action as Seller may deem advisable to remove,
nedy, discharge or comply with such Defects or to cancel this contract;
) if Seller elects to take action to remove, remedy or comply with such
efects. Seller shall be entitled from time to time, upon Notice to
rchaser, to adjourn the date for Closing hereunder for a period or
riods not exceeding 60 days in the aggregate (but not extending
yond the date upon which Purchaser's mortgage commitment, if any,
all expire), and the date for Closing shall be adjourned to a date
ecified by Seller not beyond such period. If for any reason whatsoever,
ller shall not have succeeded in removing, remedying or complying
th such Defects at the expiration of such adjournment(s), and if
rchaser shall still be unwilling to waive the same and to close title
thout abatement of the purchase price, then either party may cancel
is contract by Notice to the other given within 10 days after such
journed date; (iii) notwithstanding the foregoing, the existing mortgage
nless this sale is subject to the same) and any matter created by Seller
ter the date hereof shall be released, discharged or otherwise cured by
ller at or prior to Closing.

   (c)   If this contract is cancelled pursuant to its terms, other than as a
sult of Purchaser's default, this contract shall terminate and come to an
d, and neither party shall have any further rights, obligations or
bilities against or to the other hereunder or otherwise, except that: (i)
ller shall promptly refund or cause the Escrowee to refund the
wnpayment to Purchaser and, unless cancelled as a result of
rchaser's default or pursuant to paragraph 8, to reimburse Purchaser
r the net cost of examination of title, including any appropriate
ditional charges related thereto, and the net cost, if actually paid or
curred by Purchaser, for updating the existing survey of the Premises
 of a new survey, and (ii) the obligations under paragraph 27 shall
rvive the termination of this contract.

. Affidavit as to Judgments, Bankruptcies, etc. If a title
amination discloses judgments, bankruptcies or other returns against
rsons having names the same as or similar to that of Seller, Seller shall
liver an affidavit at Closing showing that they are not against Seller.

. Defaults and Remedies. (a) If Purchaser defaults hereunder,
ller's sole remedy shall be to receive and retain the Downpayment as
quidated damages, it being agreed that Seller's damages in case of
rchaser's default might be impossible to ascertain and that the
ownpayment constitutes a fair and reasonable amount of damages
der the circumstances and is not a penalty.

   (b)   If Seller defaults hereunder, Purchaser shall have such
medies as Purchaser shall be entitled to at law or in equity, including,
t not limited to, specific performance.

. Purchaser's Lien. All money paid on account of this contract, and
e reasonable expenses of examination of title to the Premises and of
y survey and survey inspection charges, are hereby made liens on the
emises, but such liens shall not continue after default by Purchaser
der this contract.

. Notices. Any notice or other communication ("Notice") shall be in
riting and either (a) sent by either of the parties hereto or by their
spective attorneys who are hereby authorized to do so on their behalf or
 the Escrowee, by registered or certified mail, postage prepaid, or

   (b)   delivered in person or by overnight courier, with receipt
knowledged, to the respective addresses given in this contract for the
rty and the Escrowee, to whom the Notice is to be given, or to such

other address as such party or Escrowee shall hereafter designate by
Notice given to the other party or parties and the Escrowee pursuant to
this paragraph. Each Notice mailed shall be deemed given on the third
business day following the date of mailing the same, except that any
notice to Escrowee shall be deemed given only upon receipt by Escrowee
and each Notice delivered in person or by overnight courier shall be
deemed given when delivered, or

   (c)   with respect to ¶7 (b) or ¶20, sent by fax to the party's
attorney. Each Notice by fax shall be deemed given when transmission is
confirmed by the sender's fax machine. A copy of each Notice sent to a
party shall also be sent to the party's attorney. The attorneys for the
parties are hereby authorized to give and receive on behalf of their clients
all Notices and deliveries.

**26. No Assignment.** This contract may not be assigned by Purchaser
without the prior written consent of Seller in each instance and any
purported assignment(s) made without such consent shall be void.

**27. Broker.** Seller and Purchaser each represents and warrants to the
other that it has not dealt with any broker in connection with this sale
other than:

### NEST SEEKERS INTERNATIONAL

("Broker") and Seller shall pay Broker any commission earned pursuant
to a separate agreement between Seller and Broker. Seller and Purchaser
shall indemnify and defend each other against any costs, claims and
expenses, including reasonable attorneys' fees, arising out of the breach
on their respective parts of any representation or agreement contained in
this paragraph. The provisions of this paragraph shall survive Closing or,
if Closing does not occur, the termination of this contract.

**28. Miscellaneous.** (a) All prior understandings, agreements,
representations and warranties, oral or written, between Seller and
Purchaser are merged in this contract; it completely expresses their full
agreement and has been entered into after full investigation, neither party
relying upon any statement made by anyone else that is not set forth in
this contract.

   (b)   Neither this contract nor any provision thereof may be waived,
changed or cancelled except in writing. This contract shall also apply to
and bind the heirs, distributees, legal representatives, successors and
permitted assigns of the respective parties. The parties hereby authorize
their respective attorneys to agree in writing to any changes in dates and
time periods provided for in this contract.

   (c)   Any singular word or term herein shall also be read as in the
plural and the neuter shall include the masculine and feminine gender,
whenever the sense of this contract may require it.

   (d)   The captions in this contract are for convenience or reference
only and in no way define, limit or describe the scope of this contract and
shall not be considered in the interpretation of this contract or any
provision hereof.

   (e)   This contract shall not be binding or effective until duly
executed and delivered by Seller and Purchaser.

   (f)   Seller and Purchaser shall comply with IRC reporting
requirements, if applicable. This Subparagraph shall survive Closing.

   (g)   Each party shall, at any time and from time to time, execute,
acknowledge where appropriate and deliver such further instruments and
documents and take such other action as may be reasonably requested by
the other in order to carry out the intent and purpose of this contract. This
subparagraph shall survive Closing.

   (h)   This contract is intended for the exclusive benefit of the parties
hereto and, except as otherwise expressly provided herein, shall not be
for the benefit of, and shall not create any rights in, or be enforceable by,
any other person or entity.

**29. Rider.** Continued on Rider annexed hereto.

n Witness Whereof, this contract has been duly executed by the parties hereto.

*Vito Gelardi*

dotloop verified
02/06/24 11:57 AM EST
DUME-GXZV-TYOB-UFV2

VITO GELARDI
**SELLER**

ANTHONY MASULLO
**PURCHASER**

*Safa Gelardi*

dotloop verified
02/03/24 10:01 AM CST
HBA8-N08S-XIOA-FAAQ

SAFA GELARDI
SELLER

**Attorney for Seller:**
Matthew Lenza, Esq.
Lenza Law Firm, PLLC
Address: 1110 South Avenue, Suite 303
Staten Island, New York 10314
Tel.:(347)273-1280  Fax:(646) 736-0460
matthew@lenzalawfirm.com
office@lenzalawfirm.com

**Attorney for Purchaser:**
Kerry Katshorhis, Esq. KATSORHIS
Address:  77-53 Main Street
Kew Gardens Hills, NY 11367
Tel.:  (718) 591-6900
gklawny@gmail.com

# NOTES ON MORTGAGE COMMITMENT CONTINGENCY CLAUSE
## for
## RESIDENTIAL CONTRACT OF SALE

WARNING: the mortgage commitment contingency clause for the Residential Contract or Sale is a bar association form that attempts to provide a :chanism that makes the rights and obligations of the parties clear in sales or residences in ordinary circumstances. It should be reviewed carefully by ller and Purchaser and their attorneys in each and every transaction to make sure that all the provisions are appropriate for that transaction. Negotiated )difications should be made whenever necessary.

Under the clause, the obligation of Purchaser to purchase under the contract of sale is contingent on Purchaser's obtaining a mortgage commitment ter from an Institutional Lender within the number of days specified for the amount specified. This refers to calendar days. Seller's attorney should state :/her calculation of the Commitment Date in the letter delivering the executed contract to Purchaser's attorney, to prevent confusion later. Purchaser should )mptly confirm or correct that date. In applying for a loan, Purchaser should inform its lender of the scheduled date of closing in the contract and request it the expiration date of the commitment occur after the scheduled date of closing. Purchaser must comply with deadlines and pursue the application in od faith. The commitment contingency is satisfied by issuance of a commitment in the amount specified on or before the Commitment Date, unless the mmitment is conditioned on approval of an appraisal. If the commitment is conditioned on approval of an appraisal and such approval does not occur prior the Commitment Date, Purchaser should either cancel the contract or obtain an extension of the Commitment Date. If the commitment is later withdrawn not honored, Purchaser runs the risk of being in default under the contract of sale with Seller.

If there are loan terms and conditions that are required or would not be acceptable to Purchaser, such as the interest rate, term of the loan, points, fees or :ondition requiring sale of the current home, those terms and conditions should be specified in a rider.

This clause assumes that initial review and approval of Purchaser's credit will occur before the commitment letter is issued. Purchaser should confirm th the lender that this is the case before applying for the commitment.

If, as has been common, the commitment letter itself is conditioned on sale of Purchaser's home or payment of any outstanding debt or no material verse change in Purchaser's financial condition, such a commitment will satisfy the contract contingency nonetheless, and Purchaser will take the risk of lfilling those commitment conditions, including forfeiture or the downpayment if Purchaser defaults on its obligation to close. Under New York case law, lefaulting purchaser may not recover any part of the downpayment, and Seller does not have to prove any damages. If Purchaser is not willing to take that . :k, the clause must be modified accordingly.

Purchaser may submit an application to a registered mortgage broker instead of applying directly to an Institutional Lender.

This clause allows Seller to cancel if a commitment is not accepted by Purchaser by the Commitment Date, unless Purchaser timely supplies a copy of e commitment, to allow Seller the option to avoid having to wait until the scheduled date of closing to see if Purchaser will be able to close. Seller may efer to cancel rather than to wait and settle for forfeiture of the downpayment if Purchaser defaults. Because of Seller's right to cancel, Purchaser may not aive this contingency clause. This clause means that Purchaser is subject to cancellation by Seller even if Purchaser is willing to risk that he/she will obtain e Commitment after the Commitment Date. Some Purchasers may not want to be subject to such cancellation by Seller.

Purchaser may want to add to paragraph 22 that Purchaser's reimbursement should include non-refundable financing and inspection expenses of irchaser, which should be refunded by Seller if Seller willfully defaults under the contract or sale [alternative: if Seller is unable to transfer title under the ntract of sale].

## Rider to Contract of Sale

eller(s):        **VITO GELARDI** *and Safa Gelardi*

urchaser(s):     **ANTHONY MASULLO**

remises:         **148 CLAY PIT ROAD, STATEN ISLAND, NY 10309**

)ate:            *February*
                 ~~**JANUARY**~~       , 2024

_____

ntroduction: If and to the extent that any of the provisions of this rider conflict or are otherwise inconsistent with ny of the printed provisions of the Contract, whether or not such inconsistency is expressly noted in this rider, the rovisions of this rider shall prevail. In all other respects, this rider supplements the Contract. Any headings are for nformational purposes only.

.1.: Supplementing ¶ 2 of the main Contract, any televisions affixed to the Premises are excluded from this sale. eller makes no representations as to the condition of the personal property included in this transaction, except that t will be delivered at closing in "as is" condition, subject to reasonable wear and tear between the date hereof and Closing. No consideration is being paid for the personal property. However, if any federal, state or local government ody deems any part of the purchase price to have been paid for any personal property transferred hereunder, 'urchaser agrees to pay to Seller at Closing, or at any subsequent time such tax is imposed, upon demand, the amount f any sales tax payable in connection therewith. This provision shall survive Closing. The personal property shall ot be sold to Purchaser if Closing does not occur.

.2.: Supplementing ¶ 8 of the main Contract, Purchaser agrees, at their own cost and expense, to maintain their Commitment to the date of Closing.

.3.: Supplementing ¶ 9 of the main Contract, the Premises are sold and shall be conveyed subject to:

f)      Laws and governmental regulations that affect the use and/or maintenance of the Premises, provided that they re not violated by the buildings and improvements erected on the Premises.

g)      Any state of facts which an accurate survey would show provided such facts do not render the title nmarketable.

h)      Covenants, restrictions and easements, if any, contained in former instruments of record affecting the 'remises so far as the same may now be in force and effect, provided same are not violated by existing structures or heir present use.

i)      Encroachments of retaining walls, fences, and fire escapes, if any, upon any street or highway, and/or record roperty line or lines; and any variation between record property line or lines, and fences and/or walls and the record ax map.

j)      Any proposed, adopted or actual widening of any street, abutting or adjacent to the above-described Premises rovided, however, that the building or buildings thereon are not affected thereby.

k)      Party walls and sewer agreements, if any.

l)      Rights, if any, acquired by any utility company and/or municipality to maintain and operate lines, cables, oles, boxes and/or transformers in, over, under and/or upon the Premises.

m)      Standard exceptions of the Title Insurance Company.

.4.: Supplementing ¶ 10.a. of the main Contract, if the cost of such compliance exceeds $1,000.00, Seller may ancel this Contract and upon returning to the Purchaser herein the Downpayment, all further liability on the part of

ie Seller shall cease and this Contract shall be canceled and be of no further force and effect and the Seller shall not e liable for any other costs or damages. *or Buyer may accept same proceed with closing*

_.5.: Supplementing ¶ 10.b. of the main Contract, if such money obligation exceeds $1,000.00, Seller may cancel his Contract and upon returning to the Purchaser herein the Downpayment, all further liability on the part of the eller shall cease and this Contract shall be canceled and be of no further force and effect and the Seller shall not be able for any other costs or damages.

_.6. ¶ 11(a)(iv) of the main Contract is hereby stricken. Seller has made no representations whatsoever regarding the eal estate taxes for the Premises.

_.7.: Seller shall not be required to bring any action or proceeding or otherwise incur any expense in excess of 1,000.00 to clear violations against or affecting the Premises. In the event any such cost exceeds $1,000.00, Seller hay cancel this Contract and upon returning to the Purchaser herein the Downpayment, all further liability on the art of the Seller shall cease and this Contract shall be canceled and be of no further force and effect and the Seller hall not be liable for any other costs or damages.

_.8.: Seller shall not be liable or bound, in any way, by any verbal or written statements, representations, or nformation pertaining to the above Premises furnished by any real estate broker, agent, employee, servant or other erson unless the same are specifically set forth herein.

_.9.: The acceptance of a deed by Purchaser shall be deemed to be a full performance and discharge of every greement and obligation on the part of Seller to be performed pursuant to the provisions of this agreement, except hose, if any, which are herein specifically stated to survive delivery of the deed.

R.10.: ¶16(b) of the main Contract is hereby stricken in its entirety, and replaced with the following: Seller represents hat the Premises is improved by a **ONE family dwelling**. Seller agrees to deliver a Certificate of Occupancy for ame, or in the alternative, an Affidavit to the effect that to the best of his knowledge and belief, the dwelling at the remises was constructed prior to 1938. Purchaser acknowledges and accepts all information set forth on the Certificate(s) of Occupancy attached to this Contract, if any. Seller makes no representation as to the legality of any tructural changes, additions, decks, screen rooms, sun rooms or alterations made to the Premises, except as set forth n this Paragraph R.10., and shall have no responsibility to have any of these items corrected or legalized, unless equired by Purchaser's lender. In the event Purchaser's lending institution does raise such an issue, Seller's liability hall not exceed $1,000.00. If the cost of correcting any such condition, remedying any such issue, or restoring the remises to the condition required by this Contract shall exceed $1,000.00, Seller may elect to cancel the Contract. f this Contract is cancelled pursuant to this Paragraph, Seller's sole liability shall be to return the down payment aid hereunder, and all liability between the parties hereunder shall cease, except as set forth in ¶ 27 of the main Contract.

R.11.: Seller and Purchaser hereby authorize their respective attorneys to execute on their behalf any and all written modifications and amendments to this Contract. *a fully executed copy*

R.12.: Purchaser is hereby given the right to have the Premises inspected for termite or other wood boring insect nfestation at his sole cost and expense until 9:00 P.M. on the tenth calendar day after the date of this contract. In he event that any such condition is found to exist, then the Seller shall have the option of either eliminating such condition or declaring this Contract null and void and returning all monies paid hereunder. In the further event that he Seller's attorney is not notified in writing within fifteen (15) days from the date hereof as to the existence of any such condition, then it shall be deemed that no such condition exists.

R.13.: Seller represents and agrees that he will deliver possession of the subject Premises to Purchaser vacant and proom clean within five (5) days after the Closing of title hereunder. However, the attorney for Seller shall hold, in escrow, the sum of $1,500.00 as security for the faithful performance of the above agreement. In the event that Seller does not deliver vacant possession as herein set forth, then and in that event, the attorney for Seller is authorized to

ay out of the said escrow deposit the sum of $150.00 a day to Purchaser, as liquidated damages, for each and every additional day that Seller remains in possession beyond the agreed period. The liability of Seller's attorney shall be limited to the amount of escrow set forth herein. Absent notice from the Purchaser's Attorney to the contrary, all escrow funds shall be released to Seller three (3) days after possession of the subject Premises is tendered to Purchaser. All adjustments, including Purchaser's per diem mortgage interest from the date of closing, shall be made through the date of possession.

.14.: This Contract may not be recorded by Purchaser without the prior written consent of Seller. Any such recording shall constitute a willful default hereunder. Should Purchaser record the Contract, Purchaser shall take all steps necessary to void the recording of the Contract at his sole cost and expense.

.15.: If applicable, Purchaser is aware that he is entitled to a Property Condition Disclosure Statement pursuant to Article 14 of the Real Property Law (the "Act") and hereby consents to waive this requirement.  In lieu of Seller delivering a Property Condition Disclosure Statement, the parties agree that Purchaser shall receive a $500.00 credit at Closing and the parties shall have no further rights as against each other under the Act.  This provision shall survive Closing.

.16.: Neither Seller nor any of its agents has made any representation concerning the presence or absence of toxic or hazardous substances. Purchaser has been given an opportunity to inspect and/or have the Premises inspected by others to determine the presence of lead paint, mold, radon gas, asbestos, and other toxic and/or hazardous substances in, on, over, under and/or about the Premises, as are appropriate to determine the existence of any environmental condition at the Premises. After the closing of title hereunder, Purchaser assumes all risk of loss, damage or injury which may arise as a result of, or may be in any way connected with, the presence of underground storage tanks, radon gas, mold, asbestos, or any other toxic or hazardous substance in, on, over, under and/or about the Premises. Purchaser fully and forever releases and discharges Seller, its officers, employees, agents, successors and assigns from any and all claims, liabilities, expenses and damages, whether now or hereafter known, which Purchaser has or may hereafter have against Seller, its officers, employees, and agents, with respect to toxic and/or hazardous substances, or any other environmental issues affecting the Premises. This provision shall survive Closing.

.17.: ~~Purchaser hereby acknowledges and agrees that by purchasing the Premises he is obligated to become a dues paying member of the————Home Owners Association (the "HOA") for so long as he is the owner of the Premises and will be subject to the HOA's governing documents, including, but not limited to, the By-laws and Rules and Regulations. Adjustment for HOA dues will be made at closing, in accordance with Contract Article 18. Current monthly dues for the HOA are in the amount of $———. Seller makes no representations that the dues will remain the same through the date of closing, and Purchaser shall have no right to cancel this Contract in the event that such dues are increased prior to closing.~~

.18.: a. Purchaser and Seller hereby represent and warrant to each other that this contract  is not a "Covered Contract"  as defined in the Home Equity Theft Prevention Act and, in particular, Section 265 of the Real Property Law of the State of New York.  In such connection, Seller warrants and represents to Purchaser as follows:
   i.  Seller is not in default of any mortgage affecting the Premises by reason of there being payments due and unpaid on any mortgage for two (2) months or more.
   ii.  There are no actions pending against the Premises to foreclose a mortgage.
   iii.  The Premises is not shown on an active property tax lien sale list and all real estate taxes are paid through the next lien date.

   b.   Purchaser warrants and represents to Seller as follows:
   i.  Purchaser is a bona fide purchaser and is acquiring the Premises for Purchaser's personal use and occupancy and not for investment purposes.
   ii.  Purchaser has not provided a mortgage or other financing or offered other services to Seller in connection with any delinquent mortgage obligation or in connection with a mortgage which is in foreclosure.

iii.  Purchaser will not be reselling the Premises to Seller or to a third party or entity where Purchaser will be assisting in providing financing to any such third party or entity.

c.  Seller and Purchaser each warrant to the other that to the best of their knowledge and belief, the PREMISES has not been the subject of a mortgage default or foreclosure proceeding which gave to any present or former seller of the Premises, any rights under the Home Equity Theft Prevention Act including, but not limited to, a right of rescission as permitted under said Act.

¶.19.: Purchaser agrees that at least  thirty  days prior to the date of Closing of title herein, he will furnish to Seller's attorney, notice in writing of any and all objections that he claims to title.

¶.20.: Purchaser shall have the right to inspect the Premises within twenty-four (24) hours prior to Closing.

¶.21.: In the event that this transaction does not close in Richmond County, City and State of New York, or the county in which the property is located if not located in Richmond County, then Purchaser shall reimburse to Sellers their attorney's travel fee as follows:
    i.   $400.00 if closing takes place in Kings County; or
    ii.  $500.00 if closing takes place anywhere other than Richmond County or Kings County.

¶.22.: It is the intention of the parties that this Contract shall be considered to have been drafted mutually by Seller and Purchaser, as each of the parties has cooperated in the drafting and preparation of this Contract. Accordingly, this Contract shall not be construed against any of the parties on the basis that such one of the parties was the draftsperson.

¶.23.: Pursuant to New York State Executive Law § 378 (5-a) and (5-b), there must be installed in the Premises an operable smoke detecting alarm and an operable carbon monoxide detector. Seller shall execute an Affidavit to this effect at Closing.

¶.24.: Except as otherwise expressly set forth in this Contract, none of Seller's covenants, representations, warranties or other obligations contained in this Contract shall survive Closing.

¶.25.: Purchaser hereby waives the right to file a lis pendens with respect to any action that arises in connection with this transaction.

¶.26.:  In the event that, through no fault, action or inaction of the Seller(s), a scheduled closing is adjourned with less than one full business day's prior written or emailed notice to the Seller(s) attorney, Purchaser(s) shall credit Seller(s) at closing the amount of $400.00 per such adjournment in coverage of Seller(s) additional attorney's fees related to adjournment of closing.

¶.27.:  In as much as NYSBA Opinion 817 prohibits the modification of an existing contract to include a "seller's concession" or "closing cost credit," any such modification must be done by a cancellation of an existing contract and execution of a new contract. Accordingly, any request for a revision of the financial terms of this contract shall only be accommodated on the condition that:
    a.  The Purchaser requests same in writing;
    b.  The Purchaser shall pay to the Seller's attorney the sum of
        $500 for the additional legal fees incurred by the Seller
        For termination of a contract and draft and execution of a new contract;
    c.  All requests for a contract modification shall be considered by the
        Seller without Seller being under any obligation to agree to same.

R. 28.: The Purchaser(s) herein acknowledge(s) that he/she/they has/have the right to a summary of the heating and/or commonly known as the Truth in Heating Law. The Purchaser(s) herein waive(s) his/her/their rights to copies of said bills and acknowledges that he/she/they have not requested them in connection with this transaction.

t. 29.: This Contract, and any Riders or Amendments thereto, may be signed in counterparts by the parties hereto. Signatures sent by facsimile and/or pdf shall have the same force and effect as "original" signatures of the parties hereto. In the event that any party requires a copy of the Contract and any Riders or Amendments thereto containing original signatures, the other party shall cooperate in so executing and delivering any such document(s).

N WITNESS WHEREOF, this Rider has been duly executed by the parties hereto the day and year first above written.

| _Ito Gelardi_ | dotloop verified 02/06/24 11:57 AM EST QYKR-T0PQ-HTTQ-KYD4 | | _(signature)_ |
|---|---|---|---|
| ITO GELARDI | | | ANTHONY MASULLO |
| SELLER | | | PURCHASER |

| _Rafa Gelardi_ | dotloop verified 02/03/24 10:01 AM CST J8TL-ROHT-JKQ0-LO8Q |
|---|---|

SAFA GELARDI
SELLER

## Lead Warning Statement

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

## Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing. (b) Records and reports available to the seller (check (i) or (ii) below):
☐ Seller has provided the purchaser with all available records and reports pertaining to leadbased paint and/or lead-based paint hazards in the housing (list documents below).

☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

## Purchaser's Acknowledgment (initial)

(c) _____ Purchaser has received copies of all information listed above.
(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
(e) Purchaser has (check (i) or (ii) below):

☐   received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

☒   waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)
(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | |
|---|---|
| *Vito Gelardi*    dotloop verified 02/06/24 11:57 AM EST BSIC-OZWL-DIDR-4WMA | _____  2/3/24 |
|                 Date |                  Date |
| *Safa Gelardi*    dotloop verified 02/03/24 10:01 AM CST AG1S-9MJK-G1DL-RPER | _____ |
|                 Date |                  Date |
| _____ | _____ |
|                 Date |                  Date |

Exhibit C



Kerry John Katsorhis, Esq.
*Former Sheriff of NYC*
kjk@katsorhislaw.com

February 2nd, 2024

Mathew Lenza, Esq.
Lenza Law Firm, P.C.
1110 South Avenue, Suite 303
Staten Island, New York 10314

Re: Gelardi to Masullo
Premsies:148 Clay Pit Road, S.I., New York 10309

Dear Mr. Lenza:

Enclosed please find two contracts of sale for the above captioned matter that have been signed by our client, Anthoiny Masullo. I have made changes to the contracts which I hope you do not find to be objectionable. Our client's check payable to your order as attorney in the sum of $5,000.00 representing the contract deposit is attached as well.

This contract is subject to the sale of our client's home in Brooklyn which is expected to take place next month subject to the existing tenant vacating on or before February 28th, 2024.

Please return one fully executed contract to our offices. If you have an existing survey pleases provide a copy of same.

Thank you for your anticipated cooperation.

Kerry John Katsorhis
KJK/ep
Encl.
Sent via email; and first-class mail
CC: Anthony Masullo

Exhibit D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
IME WATCHDOG, INC.,

                              Plaintiff,

            - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS, LLC, CLIENT EXAM
SERVICES, LLC, and IME MANAGEMENT
& CONSULTING, LLC,

                              Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Presently before this Court are Plaintiff IME Watchdog, Inc.'s motion for attachment

pursuant to New York Civil Practice Law and Rules ("CPLR") § 6201 and motion for an temporary

restraining order ("TRO") requesting the same relief. (*See* Dkts. 270, 278, 279.) Plaintiff requests

an order preventing Defendants Safa Abdulrahim Gelardi and Vito Gelardi (collectively, the

"Individual Defendants") from selling their former Staten Island residence (the "Staten Island

Property" or "Property") or, in the alternative, requiring the Individual Defendants to place the

proceeds of the sale in escrow until the Court resolves Plaintiff's pending application for attorneys'

fees and costs related to the Court's October 2023 contempt order against Defendants. (*See* Dkt.

270 at 1; *see also* Dkt. 278 at 1.) For the reasons stated below, the Court grants in part and denies

in part Plaintiff's motion for attachment under CPLR § 6201, and denies Plaintiff's motion for a

TRO as moot.

# BACKGROUND[1]

Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") initiated this action on February 25, 2022, against Safa Abdulrahim Gelardi ("Safa") and Vito Gelardi ("Vito"), and IME Companions, LLC ("Companions") (collectively, "Defendants"), alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.[2]  (Compl., Dkt. 1.)   On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction").  (*See* Dkts. 6–14, 66; 3/29/2022 Docket Order; 4/5/2022 Docket Order.)   On June 8, 2022, the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction"). (Dkt. 80; *see also* 6/8/2022 Docket Order.)

On March 10, 2023, Plaintiff filed (1) a second motion for a TRO, (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April 2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions.  (Dkts. 151–55.)  The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motions for a preliminary injunction and contempt on March 27, 2023.  (Dkt. 156; *see also*

---

[1] The facts and procedural background of this case have been set forth in detail in prior opinions in this litigation, most recently in the Court's October 20, 2023 Memorandum and Order on Plaintiff's motions for a second preliminary injunction and to hold Defendants in contempt for violating the Court's previous orders.  (*See generally* Dkt. 254.)   The Court thus assumes the parties' familiarity with the factual and procedural background in this matter and only recounts those facts necessary to resolve the instant motions.

[2] Plaintiff filed an Amended Complaint on October 13, 2022, adding Gregory Elefterakis, Roman Pollak, Anthony Bridda, and Nicholas Liakis as additional Defendants.  (Dkt. 114.)

Dkt. 167.)   At the March 27, 2023 preliminary injunction hearing, the parties presented and examined witnesses and presented documentary evidence.  (*See* 3/27/2023 Min. Entry.)

On October 20, 2023, "the Court expand[ed] the scope of the Amended Injunction against Defendants and . . . [found] Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO." [3]  (Dkt. 254 at 3.)  In connection with its contempt finding, the Court ordered Plaintiff to "file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages."  (*Id.* at 32 (citing Local Rule 83.6(a)).)  On December 19, 2023, Plaintiff submitted the requested briefing and documentation in support of its request for $186,038.67 in attorneys' fees and costs.  (*See* Dkts. 261–65.)   Safa responded on January 18, 2024, asking the Court to reconsider its contempt finding and disputing the amount requested by Plaintiff.  (*See* Dkt. 267.)[4]

On January 25, 2024, Plaintiff filed a letter motion (the "Attachment Motion") informing the Court that the Individual Defendants are planning to sell their property located at 148 Clay Pit Road, Staten Island, NY 10309 (i.e., the Staten Island Property), where the Individual Defendants resided before moving to Texas.  (Dkt. 270 at 3; *see also* Dkt. 257 (explaining that the Individual Defendants "have relocated to Texas, where their children are enrolled in school").) Plaintiff requests an attachment on the Staten Island Property and/or an order requiring the Individual

---

[3] To be clear, the Court's finding of contempt was as to all Defendants, i.e., the Individual Defendants and Companions.  (*See, e.g.*, Dkt. 254 at 3 (finding "Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO"); *id.* at 12–13, 29–32 (discussing Defendants' circumvention of the March 2023 TRO).) For procedural reasons, the Court reserved on issuing the formal contempt order pending the resolution of the amount of the contempt fine.  (*Id.* at 32–34.)

[4] The Court notes that Safa did not file an actual motion for reconsideration under Local Rule 6.3, which must be filed within 14 days of the decision that the movant is seeking to have reconsidered, but asked for reconsideration in her response to Plaintiff's request for attorneys' fees and costs.

Defendants to place the proceeds from the sale of the Property in escrow until the Court renders a final decision on contempt and damages. (*See* Dkt. 270.) Defendants filed a letter in opposition on February 7, 2024, which also informed the Court that the Attachment Motion was missing the statutorily required affidavit setting forth the evidence that supports the Attachment Motion. (*See* Dkt. 274 at 2 (citing N.Y. C.P.L.R. § 6212(a)).)

On February 21, 2024, the Court scheduled an evidentiary hearing on the Attachment Motion for March 13, 2024. (*See* 2/21/2024 Docket Order.) The Court directed Plaintiff to file the statutorily required affidavit prior to the hearing. (*Id.*) In light of Safa's request to reconsider the Court's contempt finding against Defendants and her objection to Plaintiff's request for fees and costs, the Court directed Safa to file a list identifying: "(1) all real property in which she currently has an ownership interest; (2) all real property in which she previously had an ownership interest that was sold or otherwise disposed of from February 1, 2022 to Present." (*Id.*)

Two days later, on February 23, 2024, Plaintiff filed a motion for a TRO in advance of the hearing (the "TRO Motion") in light of the fact that the Staten Island Property was listed as being under contract as of February 22, 2024. (*See* Dkt. 278 at 1.) Plaintiff also filed the statutorily required affidavit in support of its Attachment Motion. (*See* Dkt. 279.) The Court directed Safa to respond to the TRO Motion by February 27, 2024. (2/23/2024 Docket Order.) The Court further directed Safa to include the name of the prospective buyer of the Staten Island Property in her response, and informed the parties that it would consider moving up the hearing date. (*Id.*) Safa filed her opposition to the TRO Motion on February 27, 2024. (*See* Dkts. 280–82.) On February 28, 2024, Plaintiff filed a reply, indicating that the Individual Defendants were scheduled to close on the sale of the Staten Island Property on March 1, 2024. (Dkt. 283 at 1.)

4

# DISCUSSION

## I. Attachment Under CPLR § 6201

"Federal Rule of Civil Procedure 64 permits federal litigants to seek an order of attachment in the manner provided by the law of the state in which the district court sits." *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 318 (E.D.N.Y. 2009). New York law authorizes prejudgment attachment pursuant to CPLR §§ 6201(3) and 6212(a). *See Prabir v. Bukhara Indian Cuisine, Inc.*, No. 17-CV-3704 (AJN) (HBP), 2018 WL 2709231, at *2 (S.D.N.Y. May 17, 2018) (quoting N.Y. C.P.L.R. §§ 6212(a), 6201(3)) (collecting cases), *report & recommendation adopted*, 2018 WL 2694435 (S.D.N.Y. June 5, 2018). Attachment is "a drastic remedy," and is "strictly construed in favor of those against whom it may be employed." *Ne. United Corp. v. Lewis*, 26 N.Y.S.3d 810, 812 (N.Y. App. Div. 2016); *see also Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1073 (S.D.N.Y. 1994) ("Attachment is a harsh remedy, and should not be lightly granted by the court."). "A plaintiff seeking an order of attachment must show 'that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in [CPLR §] 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.'" *Cap. Ventures Int'l v. Republic of Arg.*, 443 F.3d 214 (2d Cir. 2006) (quoting N.Y. C.P.L.R. § 6212(a)).

Plaintiff easily satisfies the first and fourth requirements. With regard to the first requirement, which requires Plaintiff to state a cause of action for money judgment, Plaintiff's underlying suit against Defendants seeks a combination of legal and equitable relief (*see generally* Dkt. 203), and its contempt motion against Defendants seeks compensatory damages (*see generally* Dkt. 261). With regard to the fourth requirement, Defendants have not asserted any counterclaims against Plaintiff, and as such, it is undisputed that the amount demanded from

Defendants exceeds all counterclaims asserted against Plaintiff. (*See* Dkt. 279 ¶ 22 (citing Dkt. 87).) The Court therefore turns to whether the other two requirements for attachment are met.

As to the second requirement, the Court finds that Plaintiff has demonstrated a probability of success on the merits of its contempt motion and its underlying trade secret claims. "Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007) (citations omitted); *see also DLJ Mortg. Cap., Inc.*, 594 F. Supp. 2d at 319 (same). "In assessing whether a plaintiff can show a probability of success on the merits, the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 293 (E.D.N.Y. 2010) (citation and internal quotation marks omitted); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004) (same). Here, the Court has already found that Plaintiff is likely to succeed on the merits of its underlying trade secret claims. (*E.g.*, Dkt. 254 at 15–17.) Defendants provide no basis for reevaluating this finding, nor does the Court see any reason to do so. And although Safa is seeking reconsideration of the Court's finding of civil contempt against Defendants, the Court does not anticipate vacating or altering that finding,[5] and thus does not find that Safa's pending

---

[5] In their response to Plaintiff's supplemental briefing on compensatory damages, Safa asks the Court to reconsider its preliminary finding of contempt for two reasons. (*See* Dkt. 267.) First, Defendants argue that Safa did not violate the Preliminary Injunction because her attempt to contact Carlos Roa failed. (*Id.* at 2–3.) This argument is borderline frivolous, which is underscored by Safa's failure to provide any legal support for drawing such a distinction. (*See generally* Dkt. 267.) Second, Safa argues that the Court's preliminary finding that she disobeyed the TRO violated her due process rights because Plaintiff's order to show cause for contempt accused her of only violating the Amended Preliminary Injunction. (*Id.* at 3 (citing Dkt. 156).) Even assuming, *arguendo*, that this were true, this argument only applies to the Court's contempt

Case 1:22-cv-01032-PKC-JRC Document 284-7 Filed 02/29/24 Page 7 of 14 PageID #: 5432

reconsideration request diminishes the likelihood of success with respect to Plaintiff's contempt motion. The Court therefore finds that Plaintiff has demonstrated a likelihood of success on the merits of its contempt motion for the same reasons that it preliminarily found Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO. (Dkt. 254 at 24–32.)

Finally, the Court finds that Plaintiff has demonstrated that grounds for attachment exist. Plaintiff argues that Defendants, "with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in [P]laintiff's favor, [have] assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." N.Y. C.P.L.R. § 6201(3). Under CPLR § 6201(3), "it is incumbent upon [the plaintiff] to demonstrate that the defendant is acting with intent to defraud." *Colon v. Cole Bros. Circus, Inc.*, No. 04-CV-3606, 2007 WL 3014706, at *2 (E.D.N.Y. Oct. 12, 2007) (quoting *Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 331–32 (2d Cir. 1983)). It is "well established in New York" that "the mere removal or other disposition of property by a debtor is not a sufficient ground for an attachment." *Dafeng Hengwei Textile Co., Ltd. v. Aceco Indus. & Commercial Corp.*, 54 F. Supp. 3d 287, 293–94 (E.D.N.Y. 2014) (quoting *Bank of Leumi Trust Co. of N.Y. v. Istim, Inc.*, 892 F. Supp. 478, 483 (S.D.N.Y. 1995)). Courts in the Second Circuit have identified the following non-exhaustive list of "badges of fraud" that may be considered:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a

---

finding as to the TRO and has no bearing on the success of Plaintiff's contempt motion as to the Preliminary Injunction, which, as discussed, the Court has already credited. (Dkt. 254 at 24–32.) Although the Court will address both arguments further when it resolves Safa's reconsideration request and finalizes the Court's contempt order, neither argument persuades the Court to reevaluate its finding that Plaintiff is likely to succeed on the merits of its contempt motion.

pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, No. 12-CV-5565 (PKC) (RER), 2016 WL 7217641, at *7 (E.D.N.Y. Dec. 13, 2016) (quoting *CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-CV-5345, 2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016)).

Here, the Court infers the Individual Defendants' fraudulent intent from "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors" and "the general chronology of the events and transactions under inquiry." *Id.* Since the start of this action, the Individual Defendants have sold at least three other properties, including: (1) a home in East Stroudberg, PA for $569,400 on April 29, 2022; (2) a home in Philadelphia, PA for $229,000 on December 5, 2023; and (3) a home in Champions Gate, FL for $760,000 on December 15, 2023. (Dkt. 279 ¶¶ 10–16.) In addition to the Staten Island Property, the Individual Defendants also appear to be in the process of selling a house in Lake Harmony, PA. (*Id.* ¶ 17.) Notably, the Individual Defendants sold the Florida property for well below the initial listing price (*id.* ¶¶ 12–15), and appear poised to do the same with the Staten Island Property (Dkt. 283). Courts frequently find fraudulent intent where, as here, a defendant sells numerous pieces of property shortly after the commencement of litigation or while a plaintiff's motion for a preliminary injunction is pending. *E.g.*, *Prabir*, 2018 WL 2709231, at *2–6; *Coley*, 2016 WL 7217641, at *8–10; *JSC Foreign Econ. Ass'n Technostroyexport*, 306 F. Supp. 2d at 487–88.

The Individual Defendants' argument that Plaintiff has failed to "demonstrate some identifiable necessity for the attachment, such as the 'identifiable risk' that [D]efendants 'will not be able to satisfy the judgment' which [P]laintiff might obtain against Safa on its contempt

application" is without merit. (*See* Dkt. 274 at 4 (quoting *VisionChina Media Inc. v. Shareholder Representative Servs., LLC*, 967 N.Y.S.2d 338, 345–46 (N.Y. App. Div. 2013)).) To the contrary, the Individual Defendants' conduct throughout the course of this litigation has demonstrated that the risk of non-payment is real. Notably, Defendants have yet to pay *any* of their outstanding bill of $32,716.46 to Berkeley Research Group, LLC ("BRG"), the neutral forensic examiner appointed by the Court, despite being ordered by the Court to do so *multiple times*.[6] (*See* Dkt. 271; 1/29/2024 Docket Order). And, as we know from the contempt proceedings, this is just the latest example of the Individual Defendants' failure to comply with the Court's orders.

Likewise, despite the Individual Defendants' assertions, this Court's prior finding that Plaintiff failed to demonstrate intent to defraud in the context of a previous attachment request does not bar Plaintiff's latest request. (*See* Dkt. 274 at 1.) Specifically, the Individual Defendants argue that the law of the case applies, and that Plaintiff has failed to submit any new evidence supporting its fraud allegations. (*Id.* at 2.) However, Plaintiff *has* submitted new evidence supporting its fraud allegations, including but not limited to the evidence showing that the Individual Defendants: (1) sold two properties in December 2023, at least one of which was sold for well below the initial listing price; (2) are in contract to sell the Staten Island Property for well below the initial listing price; (3) are in the process of selling *another* piece of property (the Lake

---

[6] The Court first ordered the parties to resolve their share of the outstanding bill on September 11, 2023 (*see* 9/11/2023 Docket Order), which Defendants failed to do (*see* Dkt. 271). On January 29, 2024, the Court ordered Defendants to resolve their share of the outstanding bill by February 9, 2024, and confirm such resolution by that date or risk sanctions. (1/29/2024 Docket Order.) To date, Defendants have yet to file confirmation that they have paid BRG any of the past due amount.

Harmony house); and (4) have defied several of this Court's orders, including the Court's orders to pay their outstanding bill of $32,716.46 to BRG. *See supra* at 8–9.[7]

Based on Plaintiff's submissions and the evidence in the record, the Court finds that Plaintiff has demonstrated a probability of success on the merits of its claims. Moreover, the Court finds that attachment is warranted in light of the evidence demonstrating Individual Defendants' fraudulent intent in selling their property and the uncertainty of Plaintiff's ability to enforce a potential judgment in its favor.[8]

## II.   Scope of Relief

As noted, Plaintiff requests an order preventing the Individual Defendants from selling the Staten Island Property or, alternatively, requiring the Individual Defendants to place the proceeds of the sale in escrow until the Court resolves Plaintiff's pending fee application. (*See* Dkt. 270 at

---

[7] Furthermore, as the Court has noted on the record several times, the Court does not find the Individual Defendants' factual representations to be credible. (*See, e.g.*, Dkt. 254 at 5 n.4 ("The Court also finds that Safa Gelardi has repeatedly perjured herself throughout this case and is thus wholly uncredible as a witness.").) Indeed, at the outset of this case, the Individual Defendants claimed that they did not steal confidential information from Plaintiff, which was demonstrably false. (*See, e.g., id.* at 8, 8 n.8.) Thereafter, they claimed that they did not initiate contact with Carlos Roa, which was again demonstrably false. (*See, e.g., id.* at 11–12, 11 n.10.) Similarly, they claimed that they were not involved in the creation and management of the IME business that took over Companions' business, which the Court found to be false. (*See, e.g., id.* at 12–13, 13 n.11.) In short, the credibility of the Individual Defendants' factual claims in this matter, as a result of their own conduct during this litigation, is virtually nil.

[8] Plaintiff also argues, and the Court agrees, that CPLR § 6201(1), which provides that grounds for attachment exist when "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state," applies. (Dkt. 279 ¶ 7 (citing N.Y. C.P.L.R. § 6201(1)). For their part, the Individual Defendants argue that Plaintiff should not be able to rely on CPLR § 6201(1) because that provision is only mentioned in Plaintiff's subsequently filed affidavit, and not in Plaintiff's initial motion. (*See* Dkt. 280 at 5.) Because the Court finds that grounds for attachment exist under CPLR § 6201(3), it declines to address the parties' arguments concerning CPLR § 6201(1) any further at this time.

1; *see also* Dkt. 278 at 1.)  The Court declines to issue an order that would even temporarily prevent the Individual Defendants from selling the Property.  However, for the reasons discussed above, the Court finds that attachment of the proceeds from the Individual Defendants' sale of the Staten Island Property is warranted.

As a starting point, the Court notes that Plaintiff requests $186,038.67 in compensatory damages in connection with the contempt proceedings.  The Individual Defendants represent that although they are selling the Staten Island Property for $975,000, they only expect to net approximately $184,000 from the sale.  (Dkt. 280 at 4; *see also* Dkt. 280-2.)  Defendants further contend that there are no grounds for an order of attachment against Vito, and as such, Plaintiff would only be entitled to Safa's expected share of the proceeds, which amounts to $92,000 and "is less than her $150,000 homestead exemption under [CPLR] § 5206."  (Dkt. 280 at 4.)  As an initial matter, the Court agrees with Plaintiff that the Individual Defendants' attempt to invoke CPLR § 5206 is unavailing because the evidence in the record indicates that Vito and Safa have relocated to Texas.  (*See* Dkt. 283 at 1 (citing Dkt. 257).)  By its terms, CPLR § 5206 only applies to property "owned and occupied as a principal residence."  N.Y. C.P.L.R. § 5206(a); *accord. In re Issa*, 501 B.R. 223, 226 (Bankr. S.D.N.Y. 2013) ("When occupancy of the exempt property ceases the purpose of the homestead ceases too." (citation and internal quotation marks omitted)).  Subject to certain exceptions, "a debtor must show 'actual physical occupancy on a *regular basis*' and an intent to reside permanently [on the property]."  *In re Issa*, 501 B.R. at 226 (emphasis added) (quoting *In re Bellafiore*, 492 B.R. 109, 113 (Bankr. E.D.N.Y. 2013)).  Here, the Individual Defendants have failed to demonstrate actual occupancy of the Staten Island Property or that any homestead or other exemption applies.

Nor is there a basis for separating Safa's proceeds from Vito's proceeds for purposes of the attachment to satisfy either the contempt order or Plaintiff's underlying trade secrets claims. First, the Court's contempt finding—though not yet finalized for the reasons previously discussed—is as to all Defendants, i.e., Safa and Vito and their company, Companions.[9] Although the Court's previous contempt findings focused on Safa, its findings concerning the March 2023 TRO was explicitly based on *Defendants'* use of Client Exam Services to circumvent the Court's order enjoining them from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 254 at 12 (citing Dkt. 156 at 3).)  Vito is named as a Defendant in this action and, with Safa, established Companions, the business at issue in the March 2023 TRO that Defendants had continued to operate in violation of the Court's orders.  (Dkt. 254 at 5, 29–32.)  Second, the Court findings concerning Plaintiff's likelihood of success on the underlying trade secret claims apply with full force to Vito (*see* Dkt. 254 at 15–18), as do the Court's findings that Plaintiff has grounds for attachment under CPLR § 6201, *see supra* at 7–10.

Accordingly, pursuant to CPLR § 6201(3), the Court orders attachment of the net proceeds from the Individual Defendants' sale of the Staten Island Property, which the Individual Defendants estimate will amount to approximately $184,000.  The Individual Defendants will be required to file proof of the deposit of those proceeds in their attorney's escrow account and an accounting of all funds disbursed.

## III.    Undertaking

CPLR § 6212(b) requires a plaintiff seeking an order of attachment "to provide an 'undertaking' as security for (1) costs and damages incurred by the defendant in the event that the

---

[9] Indeed, if anything, the fact that Safa alone has filed a request to reconsider the Court's contempt finding, as a technical matter, means that Vito and Companions are not seeking reconsideration of that ruling and are not contesting the amount of damages sought by Plaintiff.

Case 1:22-cv-01032-PKC-JRC    Document 408-5    Filed 10/21/24    Page 51 of 55 PageID #: 7583

court subsequently determines that the plaintiff was not entitled to an attachment or if defendant ultimately recovers judgment; and (2) certain fees incurred by the sheriff." *Herzi v. Ateliers De La Haute-Garonne*, No. 15-CV-7702 (RJS), 2015 WL 8479676, at *3 (S.D.N.Y. Oct. 13, 2015) (citing N.Y. C.P.L.R. §§ 6212(b), 8011). "The amount of the undertaking must be at least $500 but otherwise is within the discretion of the court." *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 672 n.2 (S.D.N.Y. 2017) (citing N.Y. C.P.L.R. § 6212(b)).

Courts frequently set the undertaking as a fraction of a percent of the value of the attachment. *See, e.g.*, *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (setting undertaking at 0.04% of the value of the attachment); *Disney Enters., Inc. v. Finanz St. Honore, B.V.*, No. 13-CV-6338 (NG) (SMG), 2017 WL 1862211, at *4 (E.D.N.Y. May 8, 2017) (setting undertaking at 0.5% of the value of the attachment); *Herzi*, 2015 WL 8479676, at *3 (setting undertaking at 0.67% of the value of the attachment); *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 313 (S.D.N.Y. 2010) (setting undertaking at 0.35% of the value of the attachment); *but see N.Y. Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, No. 07-CV-8008 (RJS), 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008) (setting undertaking at 4.5% of the value of the attachment). Here, the Court finds that an undertaking of $920, which amounts to approximately .5% of the value of the attachment, is appropriate, particularly considering the high likelihood that Plaintiff will succeed on the merits. *See Disney Enters., Inc.*, 2017 WL 1862211, at *4 (undertaking of .5% of the value of the attachment appropriate where plaintiff had already prevailed on the merits).

Finally, because the Court grants attachment of the net proceeds of the Staten Island Property sale, it denies Plaintiff's request for a TRO preventing the sale as moot.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiff's Attachment Motion.  Pursuant to CPLR § 6201(3), the Court orders attachment of the net proceeds from the Individual Defendants' sale of the Staten Island Property.  The Individual Defendants are further directed to provide an accounting of all funds disbursed as part of the sale, including all closing costs, and proof that the net proceeds from the sale were deposited in the escrow account of their attorneys in this matter, within **fourteen (14) days of the closing**, and in any event, no later than **March 15, 2024**.  Plaintiff is directed to post an undertaking in accordance with CPLR § 6212(b) in the sum of $920 within **fourteen (14) days of this order**.  Finally, the Court denies Plaintiff's TRO Motion as moot in light of this order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: February 29, 2024
       Brooklyn, New York

Exhibit E

# National Granite 1031 Services, Inc.

155 North Main Street
New City, New York   10956
(845) 639-6639    Fax (845) 639-1239

TO:         Kerry John Katsorhis, Esq.

E-MAIL:     gklawny@gmail.com

FROM:       Donna Imperato, Esq.

DATE:       April 1, 2024

RE:         Exchanger:   ANTHONY MASULLO
            Replacement Property: 50% TIC interest in 148 Clay Pit Road, Staten Island, NY

I am enclosing herewith the following documents that must be signed by the Exchanger so that the Exchanger can acquire title to the Replacement Property.

1.  An assignment of the contract to purchase the Replacement Property from the Exchanger to us.

2.  Our letter of instruction to the Exchanger in which we ask the Exchanger to act as our agent in acquiring title to this property directly in the Exchanger's name so that we can avoid double deeding.

3.  A Notice of the Assignment that must be given to the seller of the replacement property. If possible, please try to get the seller to acknowledge receipt of this notice.

4.  A list of Replacement Property Closing Costs which are allowed in the exchange and those that are not allowed. However, please note that this is not an exhaustive list of costs that are or are not deemed to be Exchange Expenses.

Please have the exchangers sign all four documents and return them to me either by mail, fax or e-mail.

2

# NOTICE OF ASSIGNMENT OF
## REPLACEMENT PROPERTY CONTRACT

To:          VITO GELARDI and SAFA GELARDI

From:        ANTHONY MASULLO

Re:          Replacement Property: 50% TIC interest in 148 Clay Pit Road, Staten Island, NY

Date:        April 1, 2024

You are hereby notified that all of my rights and interest (but not the obligations) in the contract for the sale dated February 6, 2024 for the above referenced property have been assigned to NATIONAL GRANITE 1031 SERVICES, INC. However, pursuant to the undersigned's agreement with the assignee, the property is to be transferred directly to the undersigned as to a 50% TIC interest in order to avoid double deeding.

Please acknowledge receipt of this notice by signing this notice in the space provided for this purpose.

Dated: April 1, 2024

_____
ANTHONY MASULLO

Receipt of this notice on April ____, 2024 is acknowledged:

_____
VITO GELARDI

_____
SAFA GELARDI