1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - X
3                                        :
4    IME WATCHDOG, INC.,                 : 22-cv-01032-PKC
                                         :
5              Plaintiff,                :
                                         :
6                                        : United States Courthouse
        -against-                        : Brooklyn, New York
7                                        :
                                         :
8                                        : Wednesday, September 25, 2024
     SAFA ABDULRAHIM GELARDI, et         : 2:00 p.m.
9    al,                                 :
                                         :
10             Defendant.                :
                                         :
11
12   - - - - - - - - - - - - - - - X
13        TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
                BEFORE THE HONORABLE PAMELA K. CHEN
14                 UNITED STATES DISTRICT JUDGE
15
                        A P P E A R A N C E S:
16
17   For the Plaintiff:    MILMAN LABUDA LAW GROUP PLLC
                              3000 Marcus Avenue
                              Lake Success, New York 11042
18                         BY: JAMIE S. FELSEN, ESQ.
19   For the Plaintiff:    SAGE LEGAL LLC
                              18211 Jamaica Avenue
20                            Jamaica, New York 11423
                           BY: EMANUEL KATAEV, ESQ.
21
22   For the Defendant:    WARNER & SCHEUERMAN
                              6 West 18th Street
23                            10th Floor
                              New York, New York 10011
24                         BY: JONATHON D. WARNER, ESQ.
25
```

```
 1   For Eugene Liddie:      THE CHARRINGTON FIRM P.C.
                                 One Cross Island Plaza
 2                               Suite 212
                                 Rosedale, New York 11422
 3                           BY: KAREN H. CHARRINGTON, ESQ.

 4
     For the Giant           ALLEN MITCHELL & ALLEN
 5   Partners:                   2091 E. Murray Holladay Road
                                  Suite 21
 6                               Salt Lake City, Utah  84117
                             BY: ERIC ALLEN, ESQ.
 7


 8


 9   Court Reporter:  Nicole J. Sesta, RMR, CRR
                      Official Court Reporter
10                    E-mail:  NSestaRMR@gmail.com

11   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Proceedings*                                                            3

1          THE COURTROOM DEPUTY:  Civil cause for an

2    evidentiary hearing, docket 22-CV-1032, IME Watchdog, Inc.

3    versus Gelardi, et al.  Before asking the parties to state

4    their appearances I would like to note the following:  Persons

5    granted remote access to proceedings are reminded of the

6    general prohibition against photographing, recording, and

7    rebroadcasting of court proceedings.

8          Violation of these prohibitions may result in

9    sanctions, including removal of court issued media

10   credentials, restricted entry to future hearings, denial of

11   entry to future hearing, or any other sanctions deemed

12   necessary by the Court.

13         Will the parties please state their appearances for

14   the record, starting with plaintiff.

15         MR. KATAEV:  Good morning, everyone.  Emanuel Kataev

16   of Sage Legal LLC for the plaintiff.

17         MR. FELSEN:  Good afternoon.  Jamie Felsen from

18   Milman Labuda Law Group, also for the plaintiff.

19         MR. WARNER:  For the defendants, Jonathon Warner of

20   Warner & Scheuerman.  Good afternoon.

21         MR. ALLEN:  Eric Allen, Your Honor, for non-party

22   Giant Partners, Inc., and its corporate witnesses, Corey

23   Weissman and Jeremy Koenig.

24         THE COURT:  And Ms. Charrington.

25         MS. CHARRINGTON:  Yes.  Good afternoon, everyone.

*Proceedings* 4

1  Karen Charrington from the Charrington Firm, for non-party

2  Eugene Liddie and IME Legal Reps.

3            THE COURT:  Good afternoon to everyone.  As I said

4  before we went on the record, the purpose of today's

5  continuation of the contempt hearing that began on July 29,

6  2024 is to hear from Mr. Koenig, a non-party witness.  So I

7  did want to advise you, Mr. Koenig, as I said or alluded to a

8  few minutes ago, you were subpoenaed to testify here as

9  purely, as far as I know, a fact witness and to help me

10 resolve a factual dispute between the parties in this case.

11            I want to let you know that based on everything I

12 know about the case, but obviously I can't possibly know

13 everything, I don't see that you or your company, Giant

14 Partners, or anyone in the company has any liability or

15 potential liability in this matter or has done anything to

16 violate a court order, for example.

17            But I do want to advise you at least that, as I said

18 a moment ago, this is a contempt hearing and the issue I have

19 to resolve is whether or not the defendants violated a court

20 order of mine.  And the only potential issue I could see for

21 you or your company is if you or the company knowingly aided

22 and abetted or assisted anyone, including the defendants, of

23 course, to violate my court order, which was a preliminary

24 injunction.

25            So that's the reason you're called here today.

*Proceedings*                                                                    5

1   Obviously, if at any point you want to talk further with your

2   attorney, I'll let you do that.  You have the right, as any

3   witness does, to invoke the Fifth, if you think for some

4   reason that's a valid thing to do.

5            But bear in mind, as you know or your lawyer may

6   have told you, in the civil context I could infer, perhaps,

7   something negative from that.  Again, I don't have any reason

8   to believe that you or your company have any actual exposure

9   to liability in this case.

10           But I want you to just be on notice that this is a

11  contempt hearing and the issue I have to resolve is whether

12  the defendants violated a court order that I issued earlier.

13           So what we're going to do is, Mr. Kataev, I'll let

14  you lead by asking direct examination questions of Mr. Koenig.

15  Remember to keep your answers open-ended, yes or no, and

16  you're not cross-examining Mr. Koenig because, as far as I can

17  tell, he's not a hostile witness to the plaintiff.  And then

18  I'll let Mr. Warner cross-examine, if he'd like.

19           I'll let Ms. Charrington a chance as a

20  representative for Mr. Liddie to ask questions, as well.  And

21  then what could also happen is I might ask some follow-up

22  questions myself, if I feel like I haven't gotten all the

23  information that I need.

24           So Mr. Allen, obviously if at any point you think

25  there's something objectionable, you can voice that objection.

*Proceedings*                                                          6

1   But I'd prefer that we just use this opportunity to get some

2   relevant information from Mr. Koenig.  So with that, Mr.

3   Koenig, I do have to ask you to rise, you may be out of

4   screen, and raise your right hand.

5           MR. KATAEV:  Your Honor, I apologize.  Before we

6   start, could we address two small housekeeping matters?

7           THE COURT:  Go ahead.

8           MR. KATAEV:  First, while Mr. Koenig is a witness,

9   for purposes of the hearing and for chronology sake, we do

10  have Mr. Weissman here, who we'd like to present first and

11  then Mr. Koenig after that.

12          THE COURT:  I'm worried about the time.  I'd like to

13  hear -- is your concern that Mr. Koenig doesn't know the

14  entire history of the relationship?

15          MR. KATAEV:  Chronologically Mr. Weissman is first

16  because he was involved in sort of onboarding, so to speak.

17  I'll represent to the Court my outline for both is less than

18  half a page.  So we should go through in short order.

19          THE COURT:  Okay.  All right.  So, Mr. Allen, I

20  assume you have no objection if we ask Mr. Weissman to go

21  first as a witness.  I hadn't, quite frankly, anticipated that

22  he would testify, but it seems like it might be useful for

23  setting the stage.

24          MR. ALLEN:  No objection, Your Honor.

25          THE COURT:  Mr. Weissman, let's have you come back

*Proceedings*                                                              7

1   on screen and Mr. Koenig -- is anyone going to invoke the rule

2   on witnesses or can we let Mr. Koenig listen in?

3           MR. KATAEV:  For plaintiff, we have no position on

4   the manner.

5           THE COURT:  Mr. Warner, Ms. Charrington?

6           MR. WARNER:  I have no position.

7           THE COURT:  Ms. Charrington?

8           MS. CHARRINGTON:  Thank you, Your Honor.  No

9   position.

10          THE COURT:  Mr. Koenig, if you'll turn off your

11  video that might help, but you can listen in.  So Mr.

12  Weissman, we're going to swear you in.  So if you raise your

13  right hand so you can be sworn in.

14          (Witness sworn.)

15          THE COURTROOM DEPUTY:  Please state and spell your

16  name for the record.

17          THE WITNESS:  Corey Weissman, C-O-R-E-Y

18  W-E-I-S-S-M-A-N.

19          THE COURTROOM DEPUTY:  Thank you.

20          THE COURT:  So Mr. Weissman, I trust that you were

21  listening when I was explaining the situation, vis-à-vis your

22  firm.

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Just a reminder, now that you're under

25  oath you have to tell the truth or else that's the one area

1    where you can get into trouble, because if you make a false

2    statement, it's, quite frankly, criminal but it might just

3    cause more problems for you down the road.

4              Do you understand that?

5              THE WITNESS:  Understood, Your Honor.

6              THE COURT:  Again, if you have any trouble

7    understanding any question, make sure you get it clarified

8    before you answer it.  If at some point you want to take a

9    break to talk to Mr. Allen, just let me know.  All right?

10             THE WITNESS:  Thank you, Your Honor.  Yes.

11             THE COURT:  Mr. Kataev, you can begin.

12   **COREY WEISSMAN**,

13        called as a witness by the Plaintiff, having been first

14        duly sworn/affirmed by the Courtroom Deputy, was examined

15        and testified as follows:

16   DIRECT EXAMINATION

17   BY MR. KATAEV:

18   Q    Mr. Weissman, good afternoon.

19   A    Good afternoon.

20   Q    Do you currently work?

21   A    Yes.

22   Q    Where?

23   A    At Giant Partners, Incorporated.

24   Q    What is your title there?

25   A    I'm a senior sales representative.

1  Q    How long you have served in that capacity?

2  A    It will be seven years in November.

3  Q    In the course of performing duties for Giant Partners,

4  have you ever performed any work for a customer called IME

5  Companions?

6  A    Yes.  They were my client from -- yes, they were my

7  client.

8  Q    Okay.  And generally speaking, what type of work did you

9  perform for IME Companions or did Giant Partners perform for

10 IME Companions?

11 A    We signed a contract to do a web site build for them, and

12 then also going to a marketing campaign, which we never did.

13 We just did the web site, to my knowledge.

14 Q    Okay.  Did you also perform -- did Giant Partners also

15 perform, to your knowledge, any work for a company called IME

16 Legal Reps?

17 A    Yes.  I believe that's the same company.

18 Q    What work, to your knowledge, did Giant Partners perform

19 for IME Legal Reps?

20 A    The same exact work for IME Companions.

21 Q    In terms of the operations and/or the strategy that you

22 worked on at Giant Partners for both companies, was it the

23 same, different, or something else?

24 A    It was the same, to my knowledge.  I'm just a

25 salesperson.  However, we do have a digital team that performs

1   the duties of the contract.  But it was the same duties, to my

2   knowledge.

3   Q    Who is the leader of that digital team?

4   A    Jeremy is the leader of our digital team.

5   Q    In the course of performing work for IME Legal Reps, in

6   what manner did you communicate with your customer?

7   A    Mainly through email.  We had a few phone calls.  But

8   yes, basically email.  After the onboarding they deal with the

9   digital team mainly, and I'm just in communication if there's

10  any payment issues or things like that.

11  Q    In the course of performing your duties at Giant Partners

12  for IME Legal Reps, did you come to have telephone

13  conversations with anyone for IME Legal Reps?

14  A    Yes.  I had a few phone calls with Safa, and then I spoke

15  to Eugene in March of this year.

16  Q    Okay.  I'd like to play now a recording so that you can

17  listen to it.  I'm going to mark it for identification

18  purposes as Plaintiff's 1.

19       (Audio played.)

20  Q    Did you hear that so far?

21  A    Yes.

22  Q    Okay.  I'm going to start over.  I'll represent to the

23  Court that it's a two-minute, nine second phone call.

24       (Audio played.)

25  Q    Do you recognize the voices that you heard on that phone

1    call?

2    A    Yes, I do.

3    Q    Whose voices are they?

4    A    Myself and Safa.

5    Q    And the recording that you heard, is it a fair and

6    accurate depiction of what was said during that phone call?

7    A    Yes.

8            MR. KATAEV:  Your Honor, I move to admit Plaintiff's

9    Exhibit 1 into evidence.

10            THE COURT:  Any objection?

11            MR. WARNER:  Yes, Your Honor.  We object.

12            THE COURT:  What is the basis?

13            MR. WARNER:  Relevance to the issues here before

14    Your Honor on the contempt motion.

15            THE COURT:  All right.  Ms. Charrington?

16            MS. CHARRINGTON:  No objection, Your Honor.

17            THE COURT:  The objection is overruled and that's

18    admitted.  Do you have it marked as an exhibit number?

19            MR. KATAEV:  Plaintiff's Exhibit 1, Your Honor.

20            THE COURT:  Okay.

21            (Plaintiff's Exhibit 1 was received in evidence.)

22            THE COURT:  Do you have a date?  Can someone tell me

23    the date, or Mr. Weissman, do you know the date of that,

24    approximately?

25            THE WITNESS:  I believe that was April 10th.

1          THE COURT:  2023?  What year, sir?

2          THE WITNESS:  2023.

3          MR. KATAEV:  I can represent to the Court that date

4    is accurate, Your Honor.

5          THE COURT:  All right.  Please proceed.

6          MS. CHARRINGTON:  Do we have a time of the phone

7    call?

8          MR. KATAEV:  No, we don't.

9          THE COURT:  All right.  Go ahead.

10   BY MR. KATAEV:

11   Q    This phone call followed a virtual meeting that you had

12   with Safa Gelardi and Mr. Koenig, correct?

13   A    Correct.

14   Q    And in this phone call, the name of the company changed,

15   right?

16   A    Yes.

17   Q    Do you remember the original name and what the new name

18   became?

19   A    To my knowledge, I believe it was IME Companions

20   originally and then it changed to IME Legal Reps.

21   Q    This phone call was recorded, correct?

22   A    Correct.

23   Q    To your knowledge, does Giant Partners record phone

24   calls?

25   A    To my knowledge, we do record inbound phone calls and

1    some of our phone calls, as well, yes.

2    Q    Whenever somebody calls Giant Partners are they notified

3    that the phone call will be recorded?

4    A    When they do call, yes, to my knowledge.

5    Q    In the course of performing your duties for Giant

6    Partners, did you present anyone at IME Legal Reps with a

7    contract?

8    A    Yes.

9         MR. KATAEV:  Your Honor, I'd like to place up on the

10   screen for identification Plaintiff's Exhibit 3.

11        THE COURT:  Go ahead.  You don't have to wait.

12   Q    Mr. Weissman, I'm going to page through the pages in this

13   exhibit.

14        THE COURT:  All we see so far is your -- we don't

15   see the document.  I think you have to click on the document.

16        MR. KATAEV:  My apologies.  I chose the wrong

17   screen.  Let the record reflect that Plaintiff's Exhibit 3

18   marked for ID is up.

19   Q    I'm going to page through this exhibit so you can get a

20   sense of what's here.  I'm going to ask you after you page

21   through whether you recognize this document.

22   A    Okay.  Yes, I recognize this.

23   Q    What is this document?

24   A    This is our contract.

25   Q    And did you send this to IME Legal Reps?

1    A    Yes, I did.

2              MR. KATAEV:  Your Honor, I move to have Plaintiff's

3    Exhibit 3 admitted in evidence.

4              THE COURT:  Objections, Mr. Warner?

5              MR. WARNER:  Just brief voir dire, Your Honor.

6              THE COURT:  Go ahead.

7    VOIR DIRE EXAMINATION

8    BY MR. WARNER:

9    Q    Is the name of the recipient on the document, Mr.

10   Weissman?

11   A    Yes.

12   Q    And did you send this to Safa Gelardi?

13   A    Yes.

14   Q    And where is her name on the content of the document?

15   A    Her email address.  So all of our contracts are sent via

16   email.  And so her email should be somewhere on here.  It was

17   sent directly to her email.  She accepted it and logged into

18   our system and signed it.

19   Q    Where is her email address on the document?

20   A    I don't have access.  If someone can scroll down, we can

21   take a look.  Let's look on that first page there.

22   Q    Am I mistaken, is it sent to Mr. Liddie?

23   A    So the name is Mr. Liddie.  However, the email was Safa's

24   email.  You can see IMELegalReps@Gmail.com.  That was

25   requested by Safa as the email to use.  Now, when we bring on

1    a client, we have to take on just a few pieces of basic

2    information, their name, their address, their company name,

3    their phone and their email.  They can use a different name

4    for the email.  We allow that, as long as it's their partner

5    or other business owner.  And so that's what you see there.

6    Q    Am I mistaken, Mr. Weissman, that this was sent to Eugene

7    Liddie at IME Legal Reps?

8              MR. KATAEV:  Objection.  Asked and answered.

9              THE COURT:  Overruled.

10   A    To my knowledge, it was sent to Safa.

11   Q    I'm just trying to understand.  Where is Safa's email

12   address on this?

13             MR. KATAEV:  Objection.  Asked and answered.

14             THE COURT:  Overruled.  Can we go back to the page

15   that has the email addresses, just so we can focus on that?

16   Thank you very much.

17             So we're looking at page five of the document.  Do

18   you see, Mr. Weissman, where it says Eugene Liddie, then a

19   lesser sign, IMELegalReps@Gmail.com?  Can you explain why it

20   says that when you're testifying that this was sent to Safa

21   Gelardi?

22             THE WITNESS:  Yes, Your Honor.  So when we take down

23   the pieces of information for a client when we're onboarding,

24   we take down their company name, their full name, their

25   address, phone and email.  And in this situation we asked Safa

1   what was the contact name she wanted to use for the main

2   person on this account.

3          And so instead of electing to use her name, she said

4   I want to use my business partner, Eugene Liddie's name.  And

5   so we put in Eugene Liddie's name, along with their email, IME

6   Legal Reps, which from my understanding was Safa's email that

7   she shared with Eugene.

8          THE COURT:  In answer to one of the follow-up

9   questions, you reference a meeting you had with Mr. Liddie and

10  Ms. Gelardi remotely.

11         Was that something discussed during that remote

12  meeting in April?

13         THE WITNESS:  Yes, Your Honor.  It could have been

14  on that remote meeting or before, to my knowledge.  We did

15  speak about this before they signed off.  As you can see, it

16  was approved by the client there on April 10th.

17         THE COURT:  And just to clarify, whenever it was

18  spoken about, was Mr. Liddie present?  That's what I'm trying

19  to get to, I guess.

20         THE WITNESS:  To my knowledge, I believe he might

21  have been present.  I'm not 100 percent sure, though.

22         THE COURT:  Okay.  All right.  Go ahead.

23         MR. KATAEV:  Is Exhibit 3 admitted?

24         THE COURT:  Yes, it is admitted.

25         (Plaintiff's Exhibit 3 was received in evidence.)

1    Q    I'd like to focus your attention, Mr. Weissman, on

2    page 4, which I focused in on at the top.  Based on what this

3    says, can you explain what the work was going to be?

4    A    Yes.  So this was basically a replacement agreement for

5    order 238416, which was for IME Companions, which was a

6    switchover to IME Legal Reps to do the web site, and then

7    after we do the web site to do the marketing outreach for

8    them.

9         We never got to do the marketing outreach, but this

10   is -- you can see week one through four will be the completion

11   of the new web site brand and advertising accounts, and then

12   week five through six will be the ad creation and

13   implementation, which means the marketing efforts begin on

14   week five.

15   Q    If I understand your testimony correctly, the first part

16   was getting the web site setup and then the second part it was

17   intended to do marketing; right?

18   A    Correct.

19   Q    Okay.  To your knowledge, was that the same marketing

20   that you were previously performing for IME Companions?

21   A    Correct.

22   Q    How do you know that?

23   A    Because in there it says this is a replacement agreement.

24   So it's an identical agreement to the other agreement we had

25   for IME Companions, just a different name.

1  Q    Was the marketing work for IME Legal Reps ever done?

2  A    No.

3  Q    Why not?

4  A    Unfortunately, Safa and Eugene went dark on us during the

5  web site build.  And I tried to reach out to them multiple

6  times to get their next payment to begin their marketing

7  efforts, which we never received.

8          I did speak to Eugene, or actually he called me

9  March of this year, requesting to build his -- to get his web

10  site back up and running and to begin marketing efforts again.

11  And then I tried to set up a call with him and Jeremy and

12  myself, and then he stopped responding, once again, and then

13  since then I have not heard back.

14  Q    Going back to the week five to six where we had creation

15  and implementation, had IME Legal Reps paid for the services,

16  would Giant Partners have performed the same services as they

17  did for IME Companions?

18  A    Yes.

19  Q    And who requested those marketing services for IME Legal

20  Reps?

21  A    Safa.

22  Q    And you referenced a call that you had with Mr. Liddie in

23  March of this year; is that right?

24  A    Yes.

25  Q    Other than that one phone call, did you ever have any

1    phone calls with Liddie?

2    A    No.  There was a virtual call that I had with Safa, and I

3    believe it was Mr. Liddie in the background.  But other than

4    that, just that one virtual call and this call in March of

5    this year.

6    Q    During the virtual meeting where you said you believed it

7    was Mr. Liddie in the background, you physically saw that

8    gentleman in the virtual meeting?

9    A    Yes.

10   Q    Do you recall whether he was bald or had hair?

11   A    I do not recall.

12   Q    Did you ever speak with Liddie about his vision for the

13   web site?

14   A    No, not to my knowledge.

15            MR. KATAEV:  One second, Your Honor.  I may be done.

16   Q    Now, I'm going to play the final recording.  Let me just

17   stop sharing.  Mr. Weissman, I'm going to play what has been

18   marked as Plaintiff's Exhibit 2.  It's a three-minute phone

19   call.  Please listen and I'll ask you some questions about it.

20            (Audio played.)

21   Q    Mr. Weissman, do you recognize the voices during this

22   phone call?

23   A    Yes.

24   Q    Whose voices are they?

25   A    Myself and Safa.

1  Q    And is this a fair and accurate depiction of what was
2  said during that phone call?
3  A    Yes.
4         MR. KATAEV:  Your Honor, I'd like to move
5  Plaintiff's 2 into evidence.
6         MR. WARNER:  No objection, Your Honor.
7         THE COURTROOM DEPUTY:  One moment, everyone.
8         THE COURT:  I'm having trouble with my audio.  Yes.
9  Any objection from Ms. Charrington, did you say?
10        MS. CHARRINGTON:  No objection, Your Honor.
11        THE COURT:  It's admitted.  Plaintiff's Exhibit 2.
12        (Plaintiff's Exhibit 2 was received in evidence.)
13 BY MR. KATAEV:
14 Q    Based on what we heard in this recording and your overall
15 time spent working at Giant Partners for IME Companions and
16 IME Legal Reps, what was your understanding of the working
17 relationship between Eugene and Safa?
18        MR. WARNER:  Objection, Your Honor.
19        MS. CHARRINGTON:  Objection.
20        THE COURT:  Overruled.
21 A    Can you ask that question again?
22 Q    Sure.  Based on your experience working at Giant Partners
23 serving customers IME Companions and IME Legal Reps, what was
24 your understanding of the working relationship between Eugene
25 Liddie and Safa Gelardi?

*Proceedings*                                                      21

1    A    From my understanding, they were business partners.

2    Q    And based on your conversation --

3              THE COURT:  Hang on a second, Mr. Kataev.  Can you

4    elaborate on that?  Why did you come to that belief?

5              THE WITNESS:  Based on the conversations that I was

6    having with her on the phone where it sounded like a business

7    account she was sharing with Mr. Liddie.

8              On that last recording that they played, the

9    payment, she didn't submit the payment right away.  So I asked

10   her if there were any issues with it and she said she was

11   meeting up with Eugene and she'll check with him, and then if

12   all is good then they'll submit it.  So it seemed like they

13   were a team in making transactions together and decisions

14   together.

15             THE COURT:  Can I ask you something in a similar

16   vein?  At the very beginning of your testimony, you said IME

17   Legal Reps is the same company, referring to IME Companions.

18   Why did you say that?

19             THE WITNESS:  Because, to my knowledge, it

20   basically is.  She hired us -- Safa hired us to do a web site

21   built for IME Companions, and then right away she asked us to

22   change the name to IME Legal Reps.  And then, so the web site

23   was built on the marketing.  And then so, we built the web

24   site for IME Legal Reps and then we didn't get to do the

25   marketing for them.  It was essentially the same exact

*Proceedings*                                                    22

1    contract, just a different company name.  Same person, same

2    point of contact.  I really didn't see -- obviously, they are

3    different company names but, essentially, it's the same thing,

4    to my knowledge.

5            THE COURT:  You had testified earlier that you spoke

6    more often with Safa alone without Mr. Liddie; correct?

7            THE WITNESS:  Correct.

8            THE COURT:  Is it true, then, that the instructions

9    you got about the services you were going to provide came more

10   from Safa versus Mr. Liddie?

11           THE WITNESS:  Yes, Your Honor.

12           THE COURT:  Okay.  Did you ever speak to Mr. Liddie

13   about the build out or the marketing or anything?

14           THE WITNESS:  Not to my knowledge, Your Honor.  He

15   was in the background on that one virtual call we had, and

16   then he just called me recently in March of this year to ask

17   to rebuild his -- or to get his web site back up and running.

18           THE COURT:  When you say "his web site", which one

19   was he referring to?

20           THE WITNESS:  He wasn't really specific about it.  I

21   was just surprised to hear from him because I had been trying

22   to get ahold of him for so long, since they haven't paid us.

23   And then he reached out to me randomly asking can we start

24   working together again, basically.

25           I'm like well, let me grab Jeremy, who is the head

*Proceedings*                                                    23

1   of our digital department.  Let's get on a three-way call to

2   figure this out, and then he didn't respond to that or even

3   attempt to try to make that happen.  And since then, I have

4   not been able to get ahold of him.

5           THE COURT:  Are you still owed money by Safa or

6   Liddie?

7           THE WITNESS:  I mean, I'm just the sales guy.  They

8   did not fulfill the contract, so I believe we just wrote it

9   off as a company.

10          THE COURT:  You said that Mr. Liddie contacted you

11  about March 2024 about resuming the marketing.  When was it,

12  did you say, that they stopped communicating with you?

13          THE WITNESS:  I would say within the first three

14  months of working together in April of last year, to my

15  knowledge, Your Honor.  So I would say April, so by like June

16  or July of 2023.

17          THE COURT:  Okay.  And then I have one last

18  question.  My apologies, Mr. Kataev, for interrupting you.

19  Did Mr. Liddie or Safa ever say to you that all they needed

20  you to do was to port over the IME Companion's web site to an

21  IME Legal Reps web site?

22          THE WITNESS:  That's not all they wanted us to do.

23  They wanted us to also do marketing and to change the web

24  site.  They didn't want it to be an identical web site build.

25  They didn't want it to look the same.  They wanted to change

1  things up and not make it look like it's the same company.

2  That was their orders.  But yes.

3          THE COURT:  Okay.  Thank you very much, Mr.

4  Weissman.  Mr. Kataev.

5          MR. KATAEV:  I think I have just a few more

6  questions.

7  BY MR. KATAEV:

8  Q    Did -- in your work at Giant Partners for IME Legal Reps,

9  did Safa share her vision of what the web site should look

10 like?

11 A    I believe she did, to my knowledge, but that would be

12 something she wouldn't share with me directly.  That would be

13 something with out digital team.

14         MR. WARNER:  Objection, Your Honor.

15         THE COURT:  To the answer or to the question?

16         MR. WARNER:  To the answer.  It's hearsay.  His

17 answer, Your Honor, is essentially admitting that he doesn't

18 know that.  It's hearsay from some other person.

19         THE COURT:  Okay.  That's fine.  Obviously I'll

20 consider only the fact that he doesn't know.  I won't consider

21 the rest.  Go ahead.

22 BY MR. KATAEV:

23 Q    Based your conversations with Safa throughout this time

24 period, what was your understanding as to who is the leader or

25 decisionmaker at IME Legal Reps?

1          MS. CHARRINGTON:  Objection.

2          THE COURT:  I missed the question.  Say it again.

3    Q    What was his understanding of who the leader and/or

4    decisionmaker was at IME Legal Reps?

5          THE COURT:  Sustained.  Let's move on.

6          MR. KATAEV:  I have nothing further for this

7    witness.

8          THE COURT:  Okay.  All right.  Mr. Warner, cross.

9          MR. WARNER:  Thank you, Your Honor.

10   CROSS-EXAMINATION

11   BY MR. WARNER:

12   Q    Mr. Weissman, didn't there come a time that you were

13   advised to take Ms. Gelardi's name off of your communications

14   with IME Legal Reps?

15   A    Can you ask that question again?

16   Q    I'll repeat it.  Didn't there come a time in April of

17   2023 when you were instructed specifically to take Safa

18   Gelardi's name off of any communications relating to IME Legal

19   Reps?

20   A    Yes, I believe so.

21   Q    Wasn't that on or about April 17th?

22   A    I don't know.

23   Q    But it was very early on in your relationship with IME

24   Legal Reps, wasn't it?

25   A    I believe so.

1          MR. WARNER:  No further questions, Your Honor.

2          MS. CHARRINGTON:  Your Honor, just briefly.

3    CROSS-EXAMINATION

4    BY MS. CHARRINGTON:

5    Q    Mr. Weissman, you just testified that you did a new web

6    site for IME Legal Reps, correct?

7    A    Correct.

8    Q    And you initially testified that you were sort of

9    transferring the IME Companion's web site to IME Legal Reps,

10   correct?

11   A    Correct.

12   Q    Isn't it a fact that you built a brand new web site for

13   IME Legal Reps?

14   A    So, personally I didn't.  I'm just the sales guy.  From

15   my understanding, the contract and what was stated was the

16   same exact contract for IME Companions for IME Legal Reps.

17   And I had a conversation with Safa where she basically asked

18   us to switch everything over to IME Legal Reps, don't make it

19   look identical, change a few things here and there.  But to my

20   knowledge, it was essentially the same thing.

21   Q    Who would be that person that would actually fulfill

22   transferring or creating a new web site with your company?

23   A    So that would go to our digital team, and then I'm not

24   sure who the exact person is.  Jeremy is the head of our

25   digital team.  So he would assign it to a certain account

1  manager and that account manager and digital team would be

2  responsible for that account.  So he would be able to give you

3  more information.

4  Q    As you sit here today, you couldn't say that all of the

5  information from IME Companions was literally transferred over

6  to the IME Legal Reps' web site?

7  A    Correct.  I do not know.

8  Q    And you also testified that you never talked to Eugene

9  Liddie about his views or opinions with respect to the IME

10  Legal Reps' web site, correct?

11  A    So I spoke to him twice, to my knowledge, in our

12  relationship.  And the first time I believe it was a virtual

13  call where he was in the background with Safa, and he may have

14  spoke during that call but Safa led that call with us.  From

15  my knowledge, it was all Safa's vision and Safa's ideas.

16  Q    What was that second time?  You said there was the first

17  time you spoke to him where he was in the background of the

18  virtual call.  When was the second time?

19  A    The second time was March of this year when he called to

20  inquire about getting services back up and running, and then

21  he stopped responding once again.

22  Q    So in March of this year, isn't it a fact that he

23  contacted your company because his web site had crashed and he

24  wanted Giant Partners to help bring his web site back into

25  good standing?

1   A    I don't know what happened with his web site because he

2   stopped communicating with us late last year, but he just

3   reached out to us wanting to work again.  I tried to set up a

4   three-way call with our president, digital strategy, Jeremy.

5   That's our process, how we work, and he did not respond or

6   continue communications after that.

7   Q    So when you say you talked to him in March of 2024, how

8   did you talk to him?  Was it over the phone or by email?

9   A    It was by phone.  He called us.

10  Q    What exactly did he say to you when you spoke to him

11  about what he wanted in March of 2024?

12            MR. KATAEV:  Objection.  Hearsay.

13            THE COURT:  Overruled.  Go ahead and answer that

14  question, Mr. Weissman.

15  A    I would have to listen to the recording as it was a while

16  ago.  But to my knowledge, he called in and said hi, Corey, I

17  would like to see what we can do to work together again or

18  what it would cost to resume working together.  And I said,

19  it's great to hear from you, let's set up a call with Jeremy

20  and myself.

21            I think I was like wow, it's been so long since I

22  heard from you, let's set up a call with Jeremy so we can

23  talk.  The thing with Jeremy is his calendar fills up really

24  quick.  And so I said, let me check with Jeremy's calendar,

25  I'll send you some times, let me get back to you.  Sent him

1    some times and then he never got back to me.

2    Q    But the first time you said you spoke to him, you didn't

3    actually speak to Mr. Liddie.  You're saying you thought you

4    saw him in the background of a video, correct?

5    A    Correct.  It was like -- so it was our kick off call,

6    where when we onboard a client it's basically that client and

7    us communicating about how we're going to work together.  And

8    Eugene was sitting like behind Safa, like right next to her.

9    Q    How would you describe how that person looked?

10   A    Unfortunately, I would have to look at the video because

11   it's been so long and I wouldn't be able -- I would want to

12   look at the video to be able to recall.

13   Q    Do you recall what their skin color was?

14   A    I do not.

15   Q    But other than you just seeing a male in that video, did

16   you have any other indication that that, in fact, was Mr.

17   Liddie?

18   A    To my knowledge, just based off what Safa said, no.  She

19   said this is Eugene and that was it.

20   Q    So you're saying that Safa actually introduced you to who

21   that person was in the video, is that what you're saying?

22   A    I believe so, yes.  I believe that's what she did.

23   Q    And did that person speak to you at all during this

24   meeting?

25   A    I don't believe so.  I believe Safa was the main person

1   who led that meeting.

2   Q    And you don't know whether or not that person could have

3   been Safa's husband sitting on the video?

4          MR. KATAEV:  Objection.  Asked and answered.

5          THE COURT:  Overruled.  Have you ever seen Safa's

6   husband?

7          THE WITNESS:  I mean, that guy could have been her

8   husband.  I don't know.

9   Q    All right.  So you had mentioned that you just handle

10  sales.  So when it comes to developing a web site, you

11  wouldn't be the point person to talk to about developing a web

12  site, correct?

13  A    Correct.

14  Q    Do you have a person, if you know, by the name of

15  Estefania Sedano?

16  A    I know she is on our digital team.  I mean, Jeremy would

17  know more information about that.

18  Q    Isn't it a fact that Estefania Sedano was assigned to

19  work with developing the web site with Mr. Liddie?

20         MR. KATAEV:  Objection.

21         THE COURT:  Overruled.  If you know.

22  Q    If you know.

23  A    I mean, I don't 100 percent know.  I'm sorry.

24  Q    So you wouldn't be aware of the number of emails between

25  Eugene Liddie and Estefania in developing the IME Legal Reps'

1  web site, correct?

2  A    Correct.

3  Q    And you testified that pursuant to the contract that I

4  believe is Plaintiff's Exhibit 1, you indicated that there was

5  a $7,200 payment, correct?

6  A    I don't believe I indicated, but I believe it's on the

7  thing there, yeah.

8  Q    If we could just pull that exhibit up, please, quickly.

9  Thank you.  It's Exhibit 3, actually.  I said Exhibit 1.

10            MR. KATAEV:  I'll pull it up as a courtesy.

11            MS. CHARRINGTON:  I appreciate that.

12  Q    On this page here it looks as though the contract was

13  $7,250, correct?

14  A    Correct.

15  Q    And you said this contract was for developing a web site

16  and for marketing, correct?

17  A    Yes.  However, the total, that's a monthly payment.

18  That's not the overall payment.

19  Q    I see.  So it would be $7,250 a month for marketing?

20  A    Correct.

21  Q    I see.  Did you ever speak to Mr. Liddie with respect to

22  whether he would have agreed or whether he agreed to pay

23  $7,200 a month for marketing?

24  A    Safa was the one who agreed to a contract.

25  Q    Does it say in the contract that it's $7,250 a month?

*Proceedings*                                                              32

1    A    Yes, it does.

2            THE COURT:  Can I interject and ask a question while

3    you have this exhibit up?  Mr. Weissman, who signed the

4    contract for IME Legal Reps?

5            THE WITNESS:  The IMELegalReps@gmail.com email and

6    Eugene Liddie was the one who signed it.

7            THE COURT:  Is that indicated with an E-signature

8    anywhere, do you know?  Perhaps we can go to the last page,

9    whoever is controlling that.  Thank you.

10           MR. KATAEV:  I'll start from the top.

11           THE WITNESS:  Yes.  That's going to be the approval

12   right there.

13           THE COURT:  So there's no actual E-signature but

14   it's just an internal order history that reflects a signature

15   by Eugene Liddie at IMELegalReps@Gmail.com.

16           THE WITNESS:  Yes.  Where he signed off, or Safa, he

17   or Safa signed off on our terms and conditions, the payment,

18   the agreement, all of the information and then approved it,

19   submitted their credit card, and they knew that that day of

20   the month is when they're going to be billed ongoing.

21           THE COURT:  Whose credit card was received?  Is

22   there any record of that?

23           THE WITNESS:  I don't believe so, Your Honor.

24           THE COURT:  Do you recall?

25           THE WITNESS:  I'm sure our accounting department

*Proceedings*                                                              33

1    knows that information, but I do not know that information.

2            THE COURT:  And do you recall speaking to Safa about

3    signing the contract?  In other words, contemporaneous with

4    the signing, did you speak to either her or Mr. Liddie?

5            THE WITNESS:  Yes, Your Honor.  I spoke to Safa on

6    the phone to get the agreement signed.  There's a phone

7    recording of her saying that she thought she paid for it, but

8    she didn't and then she had to click the button twice, which

9    she didn't realize, and then so I called her back and she said

10   she was going to speak to Eugene and get the payment submitted

11   in the next five minutes.

12           THE COURT:  Is that the call that was just played to

13   you, the Go Daddy?

14           THE WITNESS:  I believe it was the first call.

15           THE COURT:  I think there was a reference to Go

16   Daddy in the first call.  Is that the same phone call?

17           THE WITNESS:  I believe so, Your Honor.

18           THE COURT:  Okay.  But the reference to payment and

19   getting with Mr. Liddie to ensure payment, that was in

20   relation to this contract that we're looking at Exhibit No. 3;

21   is that right?

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  Thank you very much, Mr. Weissman.

24   Sorry, Ms. Charrington.  You may ask more questions.

25           MS. CHARRINGTON:  That's fine.  Thank you, Your

1    Honor.

2    CONTINUED CROSS BY MS. CHARRINGTON:

3    Q    Mr. Weissman, on that phone call Safa Gelardi had

4    mentioned she had tried to pay it, it didn't go through, and

5    so forth.  Would that have been reflected on this order

6    history, attempts to make payment?

7    A    No.  It would only be an internal thing our accounting

8    sees and they'd let me know, hey, your client just tried

9    paying, it didn't go through, reach out to them so it goes

10   through.

11   Q    As you sit here today, you don't know whether or not Safa

12   Gelardi did, in fact, make attempts to pay prior to this

13   contract being signed or paid for?

14   A    I don't know if she attempted.  I know I spoke to her and

15   she said that she tried to pay but she didn't actually finish

16   the process.  And then I told her you need to click -- you

17   need to enter your information twice.  She said oh, I didn't

18   realize, I didn't want to submit the payment twice, let me go

19   ahead and do it now.

20   Q    And so when this contract is paid for, is that how the

21   contract would be listed that it's approved by the client or

22   is there a separate signature where you signed the contract

23   and then pay for it, or is paying for it the signature?

24          MR. KATAEV:  Objection.  Compound, relevance.

25          THE COURT:  Overruled.  Can you answer that

1  question?

2  A    Yes.  So it's just disagreement.  So once they go through

3  this agreement, agree to our terms and conditions and pay for

4  that agreement, that initiates the relationship between us and

5  the client.

6  Q    And if somehow you could go through this agreement, or if

7  it can be scrolled, is there somewhere where it says that this

8  is a monthly payment?  I just want you to point that out.  I

9  just didn't see that.  Can you indicate where it says monthly?

10 A    It will probably be towards the bottom in the terms and

11 conditions.  If you could keep scrolling, please.

12         THE COURT:  In the interest of time, unless you have

13 some follow-up on this, Ms. Charrington, you can look at the

14 document later.  It's about 3:00, so I want to let the next

15 witness get on, unless anybody else has more questions for Mr.

16 Weissman.

17         MS. CHARRINGTON:  I just had one or two really quick

18 questions, Your Honor.  I just want to go back to that.

19 Actually, just maybe --

20 BY MS. CHARRINGTON:

21 Q    Now, Mr. Weissman, do you know -- you testified about the

22 two phone calls that were entered into evidence.  Do you know

23 when those phone calls were turned over to plaintiff?

24 A    I do not.

25 Q    And did you confirm anything Safa Gelardi said to you

1    about her partnership with Eugene Liddie?

2              MR. WARNER:  Objection.  Vague.

3              THE COURT:  Overruled.

4    A    I'm sorry.  Can you repeat that?

5    Q    Other than what you heard Safa Gelardi say about her

6    relationship with Eugene Liddie or IME Legal Reps, did you

7    confirm any of that information with respect to that

8    relationship?

9    A    I believe she actually confirmed that Eugene is her

10   business partner.  So I didn't ask any further questions about

11   that.

12   Q    So your complete understanding about the relationship

13   between Safa Gelardi and Eugene Liddie was based on what Safa

14   Gelardi said, correct?

15   A    Correct.

16   Q    And you also testified that you did not do any marketing

17   on behalf of IME Legal Reps, correct?

18             MR. KATAEV:  Objection.  Asked and answered.

19             THE COURT:  I'm sorry.  I apologize.  Can you ask

20   the question again?

21   Q    You testified that you didn't do any marketing on behalf

22   of IME Legal Reps, correct?

23             THE COURT:  Go ahead.

24   A    To my knowledge, no.

25             MS. CHARRINGTON:  Nothing further, Your Honor.

1           THE COURT:  Let me ask one last follow-up question.

2    You were asked about whether Ms. Gelardi confirmed the

3    business relationship between her and Mr. Liddie.  Do you

4    recall a meeting in April 2023 where you, Mr. Koenig, and Safa

5    Gelardi were all present?

6           I think it was maybe a video meeting.  Do you recall

7    such a meeting?  It was April 10th, I believe.

8           THE WITNESS:  I believe so, Your Honor.

9           THE COURT:  Do you remember Safa Gelardi ever saying

10   to you that Mr. Liddie was going to be the face of the company

11   for the first six to nine, maybe a year or so, until we get

12   this criminal off my back?  Do you remember that statement?

13          THE WITNESS:  No, not that statement, Your Honor.

14          THE COURT:  Do you remember any statement that was

15   similar?

16          THE WITNESS:  I remember her saying something that

17   Eugene was going to be the face and the main point of contact,

18   and then she kept communicating with me, communicating with

19   us.

20          THE COURT:  All right.  Mr. Kataev, do you have any

21   other questions?

22          MR. KATAEV:  Just one brief line on redirect.

23          THE COURT:  Go ahead.

24   REDIRECT EXAMINATION

25   BY MR. KATAEV:

1  Q    Mr. Weissman, do you recall during the questions by the

2  defendants and Mr. Liddie's counsel about an email stating

3  that Safa is no longer involved with IME Legal Reps?

4  A    Yes.

5  Q    Do you recall anything strange in that email?

6          MS. CHARRINGTON:  Objection.

7          THE COURT:  Overruled.  Do you remember anything

8  that struck you as strange?

9  A    I believe the spelling of Eugene's last name was spelled

10  incorrectly.  It was twice, actually, but I figured she was

11  having a bad day or something.  I don't know.

12  Q    What conclusions, if any, did you draw about who drafted

13  that email?

14          THE COURT:  Sustained.  Sustained.  Let's move on to

15  the next witness.

16          MR. KATAEV:  Okay.  Thank you, Mr. Weissman.

17          THE COURT:  Thank you, Mr. Weissman, very much.

18  Let's have Mr. Koenig.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Mr. Koenig, if you would raise your

21  right hand.

22          (Witness sworn.)

23          THE COURTROOM DEPUTY:  Please state and spell your

24  name for the record.  You can put your hand down.

25          THE WITNESS:  Jeremy Koenig, J-E-R-E-M-Y

1    K-O-E-N-I-G.

2          THE COURT:  Mr. Kataev, you may inquire.

3    **JEREMY KOENIG**,

4          called as a witness by the Plaintiff, having been first

5          duly sworn/affirmed by the Courtroom Deputy, was examined

6          and testified as follows:

7    DIRECT EXAMINATION

8    BY MR. KATAEV:

9    Q    Mr. Koenig, do you currently work at Giant Partners?

10   A    Yes.

11   Q    What is your title there?

12   A    President of digital strategy.

13   Q    How long have you worked at Giant Partners?

14   A    I don't know the exact time frame.  About six to seven

15   years.

16   Q    Did you -- did Giant Partners perform any work for IME

17   Companions?

18   A    Yes.

19   Q    Focusing on the marketing aspect of the work, what type

20   of marketing did Giant Partners perform for IME Companions?

21   A    We never implemented any marketing in terms of ads, other

22   than we did some outreach on LinkedIn.

23   Q    Okay.  Can you explain a little bit more about what that

24   outreach involves?

25   A    We modeled a database of leads, and then specifically we

1    reached out to those people letting them know about IME

2    services.

3    Q    And how did you know who to reach out to?

4    A    Discussions with Safa.  We do it with all of our clients.

5    Q    Did anyone at IME Companions provide you with any list?

6    A    That's a part of our normal process.  And to my

7    knowledge, they did not provide us a list.

8    Q    Are you familiar with something called a marketing

9    collaterals folder?

10   A    Yes.

11   Q    Can you explain what that is?

12   A    That's a folder in which our clients will drop in

13   different files that we will create ads based on, and then

14   also it's a folder where our clients will review ads that we

15   create.

16   Q    To your knowledge -- withdrawn.  After performing work

17   for IME Companions, did there come a time when Giant Partners

18   performed work for IME Legal Reps?

19   A    To my knowledge, we did not perform any advertising to

20   IME Legal Reps, other than the web site, the new web site

21   switch over.

22   Q    At the time that the contract was entered into with IME

23   Legal Reps, was it the intention of IME Legal Reps and Giant

24   Partners to have marketing services performed for IME Legal

25   Reps?

*Koenig - Direct - Mr. Kataev*                                        41

1          MR. WARNER:  Objection.

2          MS. CHARRINGTON:  Objection.  Relevance.

3          THE COURT:  Overruled.  But that would have to be

4   based on any statements made to you, Mr. Koenig.  Did they

5   ever ask you to do marketing for IME Legal Reps or did anyone

6   ever ask you, I should say?

7          THE WITNESS:  Yes.

8   Q    Were there any materials that Giant Partners received

9   from IME Companions that were subsequently intended to be used

10  by IME Legal Reps?

11         MS. CHARRINGTON:  Objection.  Intended?

12         THE COURT:  Overruled.  Rephrase it as did you

13  receive any marketing materials for the purposes of you doing

14  advertising for IME Legal Reps?

15         THE WITNESS:  To my knowledge, we didn't receive any

16  new collateral.  We simply used what we had previously done

17  for IME Companions.

18  Q    Where did you store the materials that were intended for

19  IME Companions?

20  A    In the shared Google drive.

21  Q    And what, if anything, happened to that Google drive when

22  Giant Partners entered into a contract by IME Legal Reps?

23  A    We either would have created a new folder or we would

24  have renamed the other folder.

25  Q    To your knowledge, was the same materials in the

1  marketing collaterals folder for IME Companions used for IME

2  Legal Reps?

3  A    Yes, because it was exactly the same contract.

4        THE COURT:  Can you explain that answer?  What do

5  you mean the same exact contract?

6        THE WITNESS:  Same scope of services.  So a web site

7  build and corresponding advertising once the web site was

8  complete.

9  Q    Outside of Giant Partners, who, if anyone else, had

10  access to that Google drive for IME Companions and/or IME

11  Legal Reps?

12  A    Whoever was the user accessing the drive with the two

13  Gmail accounts.  One was Safa, the other one was IME Legal

14  Reps.  Safa Gelardi, I believe it was Safa Gelardi at Gmail

15  and IME Legal Reps at Gmail.

16        THE COURT:  Let me interrupt for one second while

17  you're on this.  Who, if anyone, instructed you to use the

18  same materials for marketing between IME Companions and IME

19  Legal Reps?  Who made that decision, if anyone?

20        THE WITNESS:  Safa.

21        THE COURT:  How was that communicated to you?

22        THE WITNESS:  On the few calls, video calls, that we

23  had.

24        THE COURT:  Who did you speak to specifically about

25  that?

1          THE WITNESS:  Safa.

2          THE COURT:  What about Eugene, have you ever spoken

3    to him?

4          THE WITNESS:  I've never spoken to Eugene.  He was

5    on a few of the invites, and then there were phone numbers

6    that joined, but I've gone back and reviewed those.  I have

7    never spoken to Eugene.

8          THE COURT:  All right.

9    BY MR. KATAEV:

10   Q    At any point in time, did the Google drive for IME Legal

11   Reps give permission for SafaGelardi@Gmail.com to access it?

12   A    Can you ask that question again?

13   Q    Was SafaGelardi@Gmail.com an authorized or permitted user

14   for the IME Legal Reps Google drive?

15   A    Yes.

16   Q    How do you know that?

17   A    I would have to go double check, because she was one of

18   the users that the folders were shared with.

19   Q    You were present for the hearing when Mr. Weissman

20   testified, correct?

21   A    Yes.

22   Q    Do you recall the email that you received stating that

23   Safa is no longer involved?

24   A    Yes.

25   Q    Did you notice the misspelling that Mr. Weissman

1   testified about?

2   A    I did not notice it.  I noticed it when going back and

3   looking through the email logs that I-E Liddie was a Y, and

4   then that Y was on the contract, as well, which I felt was

5   peculiar.

6   Q    Why did you find that peculiar?

7   A    That his name was misspelled.

8             MS. CHARRINGTON:  Objection.

9             THE COURT:  Overruled.

10            MR. KATAEV:  Your Honor, just give me one second.  I

11  may be done.

12            THE COURT:  Okay.  I'd like you, Mr. Koenig, to let

13  me know if you ever -- or sorry.  Let me back up.  Do you

14  recall a video conference with Safa Gelardi and Mr. Weissman

15  on April 10, 2023?

16            THE WITNESS:  So I was on that call, as well, the

17  video call.

18            THE COURT:  Right.  Do you remember that one?

19            THE WITNESS:  Yes.

20            THE COURT:  You, Safa, and Corey.

21            THE WITNESS:  Yes.

22            THE COURT:  Do you recall Safa Gelardi saying

23  something to the effect of Mr. Liddie being the face of the

24  company for a bit of time, six to nine, maybe a year, until

25  Ms. Gelardi gets the criminal, I'm just quoting, off her back.

*Proceedings*                                                45

1   Do you remember a comment to that effect?

2            THE WITNESS:  I do not remember the time frame, but

3   I do remember her saying -- sorry.  Eugene would be the face

4   of the company, and she talked about him being -- kind of him

5   being a police officer and some of those details.  That's what

6   I recall.

7            THE COURT:  Tell me what you recall about that -- or

8   let me back up.  Was that your initial video call with Safa

9   and/or Eugene about IME Legal Reps?

10           THE WITNESS:  That was the call that we had where we

11  discussed changing what was previously IME Companions over to

12  IME Legal Reps.  I only spoke with Safa on that call, and she

13  only talked about Eugene.

14           THE COURT:  Okay.  Because he wasn't on the call or

15  the video call, right?

16           THE WITNESS:  There were numbers that were on there

17  because you can dial in to a video call.  I went back and

18  reviewed it.  That person never spoke.

19           THE COURT:  You didn't see him?

20           THE WITNESS:  He was not on camera.  It was a phone

21  call dial in.

22           THE COURT:  The purpose of that video conference was

23  what?

24           THE WITNESS:  To just touch base about getting the

25  contract started back up.

*Proceedings*                                                    46

1          THE COURT:  Meaning?

2          THE WITNESS:  The work that we had previously done

3   for IME Companions, all that went dark and it had stopped and

4   it had been a while.  So we got back on a call and that's

5   where she let us know that she wanted to change the name over

6   and correspondingly change the web site to a new domain.

7          THE COURT:  And that was going to be IME Legal Reps;

8   is that right?

9          THE WITNESS:  Correct.

10         THE COURT:  What was your task, then?

11         THE WITNESS:  Let me correct that.  It was Plaintiff

12  Advocates originally, and then she changed that with Corey

13  like very shortly after that, that same day, and then when I

14  saw the contract, I saw that it had the other name on it.

15         THE COURT:  All right.  And then tell me everything

16  you remember about that video conference.

17         THE WITNESS:  I just -- I recall Safa was very

18  frustrated with all the legal stuff that was going on

19  generically, and she was going to change the company over to a

20  new name to avoid legal problems.  And then she let us know

21  about Eugene and that he's a good guy, and we put a new

22  contract in place and we got started.

23         THE COURT:  What do you recall Safa saying about

24  Eugene, other than he's a good guy and a cop?  Anything else

25  about what his role would be, for example, in the new company?

*Proceedings*                                                47

1          THE WITNESS:  I'm just going off of memory.  That he

2    was going to be, basically, a silent partner.  I recall

3    something about Texas, and something about Texas and business,

4    and I remember that he was in New York, something about

5    New York.

6          THE COURT:  Okay.

7          THE WITNESS:  He was going to be a silent partner,

8    and it was his credit card that paid us.

9          THE COURT:  So you remember it was his credit card?

10          THE WITNESS:  Correct.

11          THE COURT:  And about the monthly fee versus some

12    other pricing structure, is it correct that the 7,250 that was

13    in the contract, was that supposed to be a month payment for

14    marketing?

15          THE WITNESS:  That PDF, it somehow got truncated but

16    it's right on there.  It's first payment and then -- I'm

17    looking right at it -- first payment and then the payments

18    that are just recurring on the same day of the month that the

19    payment was made.  That's standard.  That's the way our

20    digital marketing partnerships work.

21          THE COURT:  Mr. Kataev, did you have any other

22    questions?

23          MR. KATAEV:  Yes, I would like to present the

24    witness what's previously been admitted as Exhibit 45.

25          THE COURT:  Okay.

1   BY MR. KATAEV:

2   Q    I'll represent to you, Mr. Koenig, that this is a mark up

3   email between Safa Gelardi and Giant Partners.  Do you see

4   that?

5   A    Yes.

6   Q    And I'm going to scroll down.  I want to find out, do you

7   see the attachment icon here?

8   A    Yes.

9   Q    It says in this email from Safa to Tiffany:  The

10  attachment you sent, is that the list we are marketing to?  I

11  thought it was approximately 50K on that list.  Please let me

12  know.

13        Does that refresh your recollection at all as to

14  whether there was any list provided?

15  A    The section that you highlighted, is that my team writing

16  that or is that -- I don't know.  The others are involved by

17  the attachment you sent.  So is she asking is this the list we

18  sent her?  That's the way I read that.  Safa is saying that

19  that's the list we sent her.

20  Q    I'll scroll down.  Maybe this will help refresh your

21  recollection.  Based on your reading of this email from

22  Tiffany where it's highlighted, does this refresh your

23  recollection as to whether Giant Partners provided any list by

24  Safa or anyone at IME Legal Reps IME Companions?

25  A    We asked for it.  To my knowledge, we never received a

1  list.

2  Q    I'm going to scroll down to the end and point to two

3  things.  Can you see this highlighted attachment here?

4  A    Yes.

5  Q    And do you see this actual attachment here?

6           THE COURT:  At the top, you can rotate it.

7           MR. KATAEV:  I tried, Your Honor.  We have a trial

8  version here.

9           THE COURT:  I see.

10 Q    Do you see this title on this Excel spreadsheet and does

11 it refresh your recollection in any way as to whether Giant

12 Partners was provided any list?

13 A    So I have not seen this before.  If this is the

14 attachment that was sent from Safa to Tiffany, this is the

15 first time that I'm seeing this.

16 Q    Is it fair to say that in your capacity as a director of

17 the marketing team, you don't get involved in the actual

18 day-to-day of performing the marketing work?

19           MS. CHARRINGTON:  Objection.

20           THE COURT:  Overruled.

21 A    I oversee the strategy.  It's a standard protocol that

22 our customers will send us a client list that we can use for

23 all sorts of different marketing purposes.  I was not familiar

24 with this.  I believe it's just a PDF.

25 Q    If you receive a list from a customer, is it standard

1    protocol for Giant Partners to utilize that list to reach out

2    to customers?

3             MS. CHARRINGTON:  Objection.

4             THE COURT:  Overruled.  Can you answer that

5    question?

6    A    We use it for modeling, for outreach, for all sorts of

7    purposes.  But they would be sending us their client list.

8    That is a standard protocol.

9    Q    Referring to the attachment that you're looking at right

10   now, it's an Excel spreadsheet, correct?

11   A    That is what the icon appears to be.

12            THE COURT:  Mr. Kataev, I would like to move on to

13   cross, if there is any.

14   Q    Mr. Koenig, based on what you've seen so far, is this

15   list -- does this list look like anything that Giant Partners

16   would make?

17            MS. CHARRINGTON:  Objection.

18            THE COURT:  I don't know if you can testify to that,

19   Mr. Koenig.

20   A    We would not have written IME Watchdog on a list.

21            THE COURT:  Let's go now to Mr. Warner.  Do you have

22   any cross?

23            MR. WARNER:  Yes, Judge.  Thank you.

24   CROSS-EXAMINATION

25   BY MR. WARNER:

1    Q    Mr. Koenig, the 50K reference in that email that we saw,

2    was that to a list of 50,000 law firms that you prepared on

3    behalf of IME Companions?

4              MR. KATAEV:  Objection to relevance.

5              THE COURT:  Overruled.

6    A    That would be the 50,000 contacts that we were going to

7    be targeting in the marketing campaign that we provided to the

8    client.  Correct.

9    Q    And you have no reason to believe that this IME Watchdog

10   list was integrated in any manner into your list, do you?

11   A    That's the first time I've seen that file.

12   Q    To your knowledge, do you know whether the Watchdog list,

13   I'll call it that, the Watchdog list was integrated into your

14   list of 50,000 law firms?

15   A    Those would be two separate lists.

16   Q    So your 50,000 law firm lists wouldn't contain

17   necessarily those Watchdog clients, would it?

18   A    Would not necessarily contain.  Could.

19   Q    But you don't know whether it did or it didn't, correct?

20   A    I do not know that, no.

21   Q    Now, the video conference that you were on in April 10th,

22   isn't it true that the man that was in the frame that you saw

23   was a white man?

24   A    I recall that person being a white man, but I would have

25   to go back and watch.

1   Q    Do you know the race of Mr. Liddie one way or the other?

2   A    At the time I did not.  After Googling his name in this

3   process, he's an African-American man.

4   Q    So you would agree with me that he wasn't on that call on

5   April 10th, correct?

6   A    I do not believe that I've seen with my eyes Eugene.

7   Q    So he wasn't the man you saw in that video conference,

8   correct?

9   A    I do not believe so.

10           MR. WARNER:  No further questions, Your Honor.

11           THE COURT:  All right.  Ms. Charrington?

12           MS. CHARRINGTON:  Thank you, Your Honor.

13  CROSS-EXAMINATION

14  BY MS. CHARRINGTON:

15  Q    So with respect to the 50K list of attorneys you

16  provided, what would be the circumstances of your company

17  creating such a list?

18  A    We're a data company, and so we have publicly available

19  data that we use for marketing campaigns.

20  Q    And when you create such a list, would that list be put

21  into that Google drive that you testified earlier about during

22  the creation of the IME Legal Reps web site?

23  A    It can be upon the request of the customer.

24  Q    But otherwise, you would use that list for the purposes

25  of marketing, correct?

1    A    Correct.

2    Q    And is it your testimony that you did not provide any

3    marketing services for IME Legal Reps?

4    A    Well, we did do LinkedIn outreach.

5    Q    So other than LinkedIn outreach, did you do any other

6    marketing on behalf of IME?

7    A    No.

8    Q    Would you have used your 50,000 number of attorney firms,

9    the list that you created, would you have used that list with

10   respect to IME Legal Reps?

11   A    Yes.

12   Q    In what way?

13   A    We click on the LinkedIn links, and then we directly

14   connect with attorneys or individuals that are connected with

15   those companies.

16   Q    But these are companies that come from the list that you

17   create?

18   A    Correct.

19   Q    Now, you testified that you had not had any conversations

20   with Mr. Liddie, correct?

21   A    To my recollection, no.

22   Q    So you didn't review any contract or any other

23   information or documents that would have confirmed a

24   relationship between Eugene Liddie and Safa Gelardi, would

25   you?

1   A    Other than it was his credit card.  And I reviewed the

2   contract before it was sent to that IME Legal Reps Gmail email

3   that confirmed that contract and then made the payment, and it

4   was his name on that.

5   Q    Yes.  But to your knowledge -- well, withdrawn.  Your

6   company actually developed a web site for IME Legal Reps,

7   correct?

8   A    Correct.

9   Q    And that first payment that was made pursuant to that

10  contract was used to develop that web site?

11  A    Correct.

12  Q    But that contract did not pertain to any specific

13  business relationship between Safa Gelardi and Eugene Liddie,

14  correct?

15          MR. KATAEV:  Objection.  Argumentative.

16          THE COURT:  Overruled.

17  A    I mean, his name was on it.  That's all we require is a

18  name.

19  Q    So his name was on it, meaning he paid for that contract,

20  correct?

21  A    He accepted the term and made the payment with his credit

22  card.

23  Q    Right.  And he made that payment for IME Legal Reps,

24  correct?

25  A    Correct.

1   Q    So other than that payment and the email address you see

2   with his name, you had no other information about the

3   relationship between Safa Gelardi or IME, Plaintiff Advocates,

4   and Eugene Liddie, correct?

5   A    Only what Safa shared with us.

6   Q    And when you testified about this Google drive that those

7   two email addresses would have access to, do you know, do you

8   have any personal knowledge, as to whether or not Eugene

9   Liddie specifically accessed that drive?

10  A    The IME Legal Reps' email address accessed that drive.

11  And if his name is associated with that email, yes.

12  Q    And would your list -- would that 50K list be in that

13  drive?

14  A    I would have to check.  It could have been at the request

15  of the customer.

16  Q    Did any customer related to this case make that specific

17  request?

18  A    Not to my knowledge.

19  Q    Now, you said you were on that call when Safa Gelardi

20  talked about you getting some side agreement between herself

21  and Eugene Liddie.

22       Do you remember that conversation?

23  A    Yes.  I don't remember her saying side agreement.  She

24  said that Eugene was going to be the face of the company.

25  Q    Did you ever receive any agreement between Safa Gelardi

1    and Eugene Liddie?

2    A    No.

3    Q    Do you know or do you have any specific knowledge as to

4    whether or not Eugene Liddie and Safa Gelardi are partners in

5    any way?  Other than what she told you, do you have any other

6    information that would support that claim?

7    A    Only that he was on the calendar invites and accepted

8    those calendar invites, and then we received a payment with

9    his name on it.

10   Q    But other than that, you don't have any other documentary

11   evidence with respect to their relationship?

12   A    No.  He paid.

13   Q    But he paid for IME Legal Reps.  When you say he paid, he

14   didn't pay for anything regarding Safa Gelardi and himself.

15   He paid for a contract, for a web site development, for IME

16   Legal Reps.

17   A    Correct.

18              MR. KATAEV:  Objection.

19              THE COURT:  Overruled.

20   Q    I just wanted to make that clear.  I'm sorry.  Now, prior

21   to you testifying today, did you discuss this case in any way

22   with plaintiff's counsel?

23   A    Yes.

24   Q    About how many conversations would you say you had with

25   them?

1   A    A couple.

2   Q    Did you review any documents in relation to your

3   testimony today?  I was going to add, just provided by

4   plaintiffs.

5   A    The same documents that we've been going over for a while

6   now.

7   Q    When you say a while now, you mean for today or

8   previously from today?

9   A    Over the course of however long we've been going back and

10  forth on this case.

11  Q    How many conversations would you say you had with

12  plaintiffs since you've been going back and forth on this

13  case?

14  A    I'm sorry.  When you say plaintiffs, you mean the

15  attorneys?

16  Q    I'm sorry.  Attorneys for the plaintiff.

17  A    I would say I've had two conversations with them over the

18  last however many months it's been.

19  Q    And to your knowledge, do you know if he's had -- they've

20  had conversations with any other employees with your company?

21             THE COURT:  Sustained.  Calls for hearsay.

22             MS. CHARRINGTON:  Nothing further, Your Honor.

23             THE COURT:  I just want to clarify a bit of your

24  testimony, Mr. Koenig.  As I understand your testimony, this

25  is the first time you've seen that customer list that says IME

*Proceedings*                                                                            58

1    Watchdog on it; is that right?

2                THE WITNESS:  Correct.

3                THE COURT:  Do you recall or not whether or not that

4    the customers on that list made its way into your list of

5    50,000 potential customers?

6                THE WITNESS:  To my knowledge, those two lists are

7    different, separate.

8                THE COURT:  Do you recall ever incorporating any

9    customer list you got from Safa Gelardi or Eugene Liddie into

10   your 50,000 customer list?

11               THE WITNESS:  No.  I recall discussing receiving

12   their client list as a part of our normal process, but I was

13   not aware that we had ever received a list.  I just remember

14   discussing it as part of the strategy.  But it was their list.

15               THE COURT:  Right.  Is there any way that you could

16   confirm or verify what happened with respect to the generation

17   of the customer list?

18               For example, if you were to go back and look what's

19   in your files, could you determine if you might have merged

20   the customer list provided to you by Safa and/or Eugene into

21   your customer list, the one you generated?  Could you ever

22   determine that?

23               THE WITNESS:  They would not have been merged as a

24   purpose of data policy.  It could have been used, but I don't

25   have any evidence that it was used, other than I talked about

*Proceedings*                                                                59

1    that strategy with Safa.

2              THE COURT:  There's an individual named Estefania?

3              THE WITNESS:  Yes.

4              THE COURT:  Does she work with you?

5              THE WITNESS:  She's an account manager.  She was

6    assigned to the second IME agreement.  Tiffany was the first.

7              THE COURT:  Sorry.  Say that again.

8              THE WITNESS:  Tiffany was the account manager on the

9    first contract, and then Estefania was assigned to the second.

10   And just some emails back and forth, just trying to chase down

11   the customer.

12             THE COURT:  Who did that, chasing down the customer?

13             THE WITNESS:  Estefania.

14             THE COURT:  Do you know, and I realize I'm calling

15   for some hearsay, but from her do you know who she was

16   primarily in contact with?

17             THE WITNESS:  She was emailing back and forth with

18   Eugene.  I'm going off the email that said from IME Legal

19   Reps, we want you to communicate with Eugene not Safa from now

20   on.  So from Estefania's point of view, she was emailing IME

21   Legal Reps talking with Eugene.  But from my recollection,

22   there was almost no back and forth whatsoever.  There was very

23   little.

24             THE COURT:  And what, if anything, did you ask her

25   to do, Estefania, with respect to the IME Legal Reps account?

*Proceedings*                                                60

1          THE WITNESS:  It would be to get the deliverables

2     needed to continue the annual contract.

3          THE COURT:  Okay.  All right.  What about bill

4     payments, was she responsible for getting the bills paid?

5          THE WITNESS:  She's responsible for letting Corey

6     know when the bill was not paid, and that's where Corey, the

7     sales rep, would reach back out.

8          THE COURT:  All right.  Again, folks --

9          MS. CHARRINGTON:  Your Honor, I'm sorry.  I just had

10    one quick follow-up because you brought up Estefania.  Isn't

11    it a fact that Estefania e-mailed back and forth with IME

12    Legal Reps with respect to the brand markups and the design of

13    the web site?

14         THE WITNESS:  Correct.  That's my recollection.

15         THE COURT:  Did you see those emails or are you

16    basing it on your conversation with Estefania?

17         THE WITNESS:  I looked through the thread in our CRM

18    of all the emails to the client.

19         THE COURT:  Thank you.  So, folks, this is what

20    we're going to do.  My apologies that we have to cut this

21    short.  I at least feel like I've gotten the information I

22    need.

23         What I need you to do, Mr. Kataev, is provide copies

24    of all the exhibits that were introduced to the parties

25    because I don't think anybody got advanced copies of

*Proceedings*                                                                 61

1    plaintiff's exhibits, I think one through four.

2           MR. KATAEV:  Your Honor, we did provide them in

3    advance to the parties.

4           THE COURT:  Okay.  Then I need a copy.

5           MR. KATAEV:  Yes.

6           THE COURT:  And then each side has up to five pages

7    in letter form to sum up with respect to the pending contempt.

8    Mr. Koenig, you can feel free to drop off, if you'd like.

9    Thank you very much for your testimony.

10          I'll give you 30 days because I'm anticipating you

11   might want the transcript from this proceeding, and then put

12   it all together.

13          I'd like you to cite to whatever evidence you think

14   is relevant on the ultimate question of contempt, this now

15   being, I think, the third contempt motion.

16          Rather than responsive filings, why doesn't everyone

17   just file at the same time, 30 days from now.  So that would

18   be October 25th.  That's a weekday.  So October 25th.

19          MR. WARNER:  Your Honor, I don't think it's fair to

20   have my response at the same time as plaintiff's.  Plaintiff's

21   motion is a motion to hold my client in contempt.  I think I

22   should be able to respond to that, not give my response before

23   I even know what they're arguing.

24          THE COURT:  Well, my view is that you all have seen

25   the same evidence.  You can argue whether or not it shows

*Proceedings*                                                                    62

1    contempt or not.  That's why I want to expedite this process.

2    As it is, we've dragged it on for months now.

3              I don't want to prolong it any further.  I'll give

4    you each two weeks to respond to each other after the 30 days,

5    but I want to wrap this up.

6              MR. KATAEV:  Are we ordered to get an expedited

7    transcript of seven days?

8              THE COURT:  I'm not ordering you to do it, but you

9    should do it, obviously, and you should share the cost.  So I

10   would suggest you get it within two weeks if expedited, and

11   that gives you two weeks to incorporate it into your

12   submission.

13             You have, obviously, all the other submissions

14   because those transcripts, or those hearings, are from months

15   ago.  So just remember, Mr. Kataev, to give us a copy of all

16   those exhibits.  If it's audio, you have to do it via Dropbox,

17   I think.  But you can talk to my deputy afterwards about how

18   to manage that.  Thank you, again, everyone.  Thanks to the

19   court reporter and thanks to the witnesses.

20             (Proceedings concluded at 3:33 p.m.)

21             - - - - - - - - - - - - - - - - -

22             I certify that the foregoing is a correct transcript

23   from the record of proceedings in the above-entitled matter.

24   */S/ Nicole Sesta, RMR, CRR*
     *Court Reporter/Transcriber*

25
     *October 1, 2024*

63

1                            _I N D E X_

2   _WITNESS_                                        _PAGE_

3   *COREY WEISSMAN*
        DIRECT EXAMINATION BY MR. KATAEV:            8
4       VOIR DIRE EXAMINATION BY MR. WARNER          14
        CROSS-EXAMINATION BY MR. WARNER              25
5       CROSS-EXAMINATION BY MS. CHARRINGTON         26
        REDIRECT EXAMINATION BY MR. KATAEV:          37
6   **JEREMY KOENIG**
        DIRECT EXAMINATION BY MR. KATAEV:            39
7       CROSS-EXAMINATION BY MR. WARNER:             50
        CROSS-EXAMINATION BY MS. CHARRINGTON:        52

8

9

10

11                      _E X H I B I T S_

12

13      Plaintiff's Exhibit 1                        11

        Plaintiff's Exhibit 3                        16
14
        Plaintiff's Exhibit 2                        20
15

16

17

18

19

20

21

22

23

24

25