## MILMAN LABUDA LAW GROUP PLLC

**3000 MARCUS AVENUE**
**SUITE 3W8**
**LAKE SUCCESS, NY 11042**
_____

**TELEPHONE (516) 328-8899**
**FACSIMILE (516) 328-0082**

October 25, 2024

**VIA ECF**
United States District Court
Eastern District of New York
<u>Attn</u>: Hon. Pamela K. Chen, U.S.D.J.
225 Cadman Plaza East
Courtroom 4F North
Brooklyn, NY 11201-1804

> ***Re:*** **IME WatchDog, Inc. v. Gelardi, *et al.***
> **Case No.: 1:22-cv-1032 (PKC) (JRC)**
> **MLLG File No.: 25-2022_____**

Dear Judge Chen:

This office, along with Sage Legal LLC, represents the Plaintiff, IME WatchDog, Inc. ("Plaintiff") in the above-referenced case. Plaintiff respectfully submits its post-hearing letter summarizing the evidence and its arguments in support of the motion for contempt and for injunctive relief against Defendants Safa Gelardi ("Safa"), Vito Gelardi ("Vito"), IME Companions LLC ("Companions"), as well as non-parties, Eugene Liddie ("Liddie") and IME Legal Reps ("IMELR") (ECF Docket Entries 288, 353).

**Procedural History**

On March 10, 2023, this Court issued a temporary restraining Order ("TRO") enjoining Defendants from operating their business or any other business that unfairly competes with Plaintiff in violation of the law. <u>See</u> ECF Docket Entry 156. Following a hearing on March 27, 2023, this Court expanded its previous May 13, 2022 preliminary injunction to preclude Defendants from serving customers on the Enjoined Customers List. <u>See</u> Text Only Orders dated March 27, 2023 and April 7, 2023. On April 10, 2023, this Court authorized a notice to all of Plaintiff's customers – the identities of which Defendants misappropriated – stating: "PLEASE BE ADVISED, that IME Companions, LLC, its managers, agents, and/or employees, have been enjoined by Order of Judge Pamela K. Chen, in IME Watchdog, Inc. v. Gelardi (22-cv-1032), from providing any services to you pending a further order of the Court." <u>See</u> ECF Docket Entry 190. The Court also authorized Plaintiff to send copies of the foregoing notice to the customers identified on the Enjoined Customers List. <u>See</u> Text Only Order dated April 7, 2023 (<u>citing</u> ECF Docket Entry 180-7, filed under seal). As set forth below, Defendants and Liddie demonstrably violated the TRO and expanded preliminary injunction.

**Defendants Repeatedly Violated the Court's Orders**

### A. Defendants Provided Giant Partners With Plaintiff's Customers List Containing the Enjoined Customers' Contact Information

Critically, at the May 29, 2024 hearing, Safa herself conceded that, in violation of the Court's Orders, Defendants disseminated Plaintiff's customer list in an email to Giant Partners, Inc. ("GP") on February 6, 2023 in violation of the May 13, 2022 Order.  See ECF Docket Entry 355-1 at 86:21-89:16; Declaration of Jamie Felsen, Esq. ("Felsen Decl.") ¶ 6, Exhibit ("Ex.") "D." That customer list was used by GP in its LinkedIn accelerator spreadsheet listing 228 customers who were contacted by GP at the behest of IMELER, all of which are on the Enjoined Customers List.  See ECF Docket Entries 321 at 228-229 & 322 (Ex. C, filed under seal).

### B. The Defendants and Liddie Continued to Serve Customers On the Enjoined Customer List in Violation of the Orders

Defendants have continued to contact and serve customers on the Enjoined Customers List. Safa testified that an invoice to Subin & Associates ("Subin"), Plaintiff's former largest customer who Defendants stole, for work Companions performed for Subin in March and April 2023 after Defendants were enjoined, was fabricated by Carlos Roa ("Roa").  See ECF Docket Entry 355-1 at 53:15-57:6.  However, the same invoice that Safa testified was fabricated by Roa was produced by Subin in response to a subpoena.  See Felsen Decl. ¶ 4, Ex. "B."  This invoice confirms that Defendants served Subin, despite Subin's presence on the Enjoined Customers List, in violation of the Court's Orders.  Subin was not the only law firm that Defendants served in violation of this Court's Orders.  Indeed, Defendants repeatedly served customers on the Enjoined Customers List in violation of the Court's Orders.  See ECF Docket Entries 317 and 321.[1]  98% of Defendants' total revenue came from Plaintiff's customers on the Enjoined Customers List.  See IME Watchdog, Inc. v. Gelardi, 2023 U.S. Dist. LEXIS 189054 (E.D.N.Y. Oct. 20, 2023).  Defendants then created successor entities, as discussed in more detail below, including Accompanied Exam Services ("AES"), Client Exam Services ("CES"), and IMELR, through which they served customers on the Enjoined Customers List.

### C. Defendants Created IME Legal Reps to Circumvent the Court's Orders

IMELR is at least the third company Defendants have created to attempt to serve Plaintiff's customers in violation of this Court's Orders.  In attempt to end run the Court Orders, Defendants first created AES, another IME business, on March 13, 2023, merely three (3) days after the Court issued the TRO.  At the May 29, 2024 hearing, Safa perjured herself by testifying that she is not familiar with AES, has no relationship to it, and that she merely heard of it and that was the reason why she referred it to Subin.  See ECF Docket Entry 355-1 at 64:3-69:7.  Indeed, only after Safa was presented evidence from GoDaddy identifying Safa's brother, Yousef Abdulrahman, as the individual who purchased AES' domain name, Safa had no choice but to confirm her connection to AES at the July 29, 2024 hearing.  See Felsen Decl. ¶ 3, Ex. A at 45:14-48:17.

---

[1] Notably, recently, in June 2024, Mark Purificati, an observer for Companions and then IMELR, observed  IMEs for Zemsky & Solomon, a firm on the Enjoined Customers List.  See Tappier v. Adam, Queens Cty. Supreme Court, index no. 713859/2023, NYSCEF Doc. 29 and 30.

On March 16, 2023, Defendants formed yet another company, CES[2], and utilized a family friend, Fari Gutierrez, as the front man for that end-run around this Court's Orders. See Felsen Decl. ¶ 3, Ex A at 49:1-7. This Court enjoined CES from using Plaintiff's trade secrets and serving custsomers on the Enjoined Customers List on March 27, 2023. See ECF Docket Entry 197-5 at 129:20-130:12. This Court later held Defendants in contempt for violating the March 10, 2023 Order by assisting in the creation of CES and for serving customers on the Enjoined Customer List. See IME Watchdog, Inc. v. Gelardi, 2023 U.S. Dist. LEXIS 189054 (E.D.N.Y. Oct. 20, 2023).

At the March 27, 2023 hearing, Defendants became aware that their scheme involving CES was uncovered, so within two (2) weeks, on April 10, 2023, they initiated and attended a virtual meeting with Giant Partners ("GP") during which meeting they outlined their new scheme to evade this Court's Orders as follows: first, create a new corporate entity, Plaintiff Advocates, by using Liddie, a full-time NYPD police officer, as the face of the company; second, Safa would remain the majority owner as well as the operator of the business behind the scenes to evade this Court's Orders – just like Defendants did with Gutierrez until they got caught. See ECF Docket Entries 355-5 and 355-6.

Notably, during this meeting Safa told GP that Liddie's name is spelled "Liddy". Id. at 00:7:30. Safa explained during the virtual meeting that the plan was to have Liddie be the front man for just six months to one year until Defendants got Plaintiff "off [Defendants'] back." Id. at 00:02:55.23 – 00.03:24.17. Defendants also stated during the virtual meeting that there is an operating agreement which establishes that Safa was the 90% owner and that Liddie was a 10% owner. Id. at 00:5:42-00:6:15. Safa also stated during the meeting that she is going to "play the criminal's game" and do what she needed to. Id. at 00:10:13.[3] Safa's statement consititutes an admission against interest.

Defendants did not expect then that Plaintiff would eventually obtain a copy of the April 10, 2023 zoom meeting. Therefore, on May 29, 2024, Safa again lied under oath and testified that she told GP that she is "out of the game," when, in fact, that was far from the truth as confirmed in the April 10, 2023 virtual meeting and subsequent phone calls with GP on the same day. See ECF Docket Entry 355-1 at 114:25-115:6.

Meanwhile, Liddie conceded during his testimony that Safa did, in fact , tell him that she wanted to create a partnership with him. Id. at 127:127:2-16. However, Liddie denies agreeing to go into business with Defendants because Liddie "is not the person for that type of partnership." See ECF Docket Entry 362 ¶ 6.

---

[2] See Felsen Decl. ¶ 19, Ex N.

[3] Safa previously testified at the May 29, 2024 hearing that, after she deactivated Companions, she did not have any meetings to market any IME business in NY. See ECF Docket Entry 355-1 at 144:19-24. She also testified that the only remote conference she had with GP was an onboarding meeting back in 2020. Id. at 139:2-140:9; 144:19-24. She falsely testified that she told Corey Weissman at GP that she "is out of the game" and she sold out. Id. at 114:25-115:115:6 The April 10, 2023 virtual meeting confirms yet mores perjury by Safa. The entire purpose of the virtual meeting with GP was for Safa to carry out her plan to violate this Court's Orders by having Liddie as the front man through IMELR.

3

Be that as it may, it is undisputed that Liddie has no experience in the IME industry, has a full-time job with the NYPD, and, apparently, another job with Amway with a tax preparation business to boot.  See ECF Docket Entry 219-1 at 67:1-10, 73:20-74:3, and 125:6-8; see also ECF Docket Entry 355-1 at 115:18-20.  Therefore, Liddie was the perfect person to create the smoke and mirrors for Defendants to hide behind. Notably, the purported sale of the website agreement between Companions and Liddie is conveniently dated April 10, 2023, the same date as the virtual meeting with GP and the very same day Safa purchased the IMELR domain name.  See Felsen Decl. ¶ 7, Ex. E; see also ECF Docket Entries 355-5 and 355-6.  Liddie testified that he paid the Defendants $4,300.00 in cash which he just conveniently had at home.  See ECF Docket Entry 355-1 at 232:13-19.

Safa incredulously testified that the April 10, 2023 virtual meeting with GP was just her venting and she never went through with the elaborate plan discussed during that meeting.  See Felsen Decl. ¶ 3, Ex. A at 29:10-20; 51:16-54:19.  However, this is proven to be just another lie. Indeed, on the same day as the virtual meeting with GP, Safa called GP to inform it that the name Plaintiff Advocates is being used by a law firm in Chicago, so she wanted to use the name IMELR instead.  See Felsen Decl. ¶ 16.

Mere hours after the April 10, 2023 virtual meeting, the IMELR domain name was purchased by Safa using Liddie's credit card which she stated during the virtual meeting that she had in her possession, and the log in credentials were sent to GP via email that very day.  See ECF Docket Entry 355-1 at 93:24-94:6; see also Felsen Decl. ¶ 8, Ex. F.

Before this information came to light, on April 28, 2023, Safa submitted a declaration averring that she merely sold IME Companion's website to Liddie and that she had no involvement thereafter.  See ECF Docket Entry 202-3.  This, too, was proven false.  In fact, the same day Safa met virtually with GP on April 10, 2023, Corey Weissman ("Weissman") from GP sent Safa an email stating "Safa here is the new agreement, *same details just new company*, and us helping you build the new website."  See Felsen Decl. ¶ 5, Ex. C.   The next day, on April 11, 2023 an email was sent by imelegalreps@gmail.com to Weissman with the godaddy log-in info to IMELR with the password "Levicunt62," which Safa testified she created and which is a reference to Daniella Levi, the owner of Plaintiff  Id.; see also Felsen Decl., ¶ 3, Ex. A at 24:5-24.  Also on April 11, Safa confirmed with GP that they "got what [they] needed" (Id. ¶ 18), namely the GoDaddy password for IMLRP, which was "Levicunt62", a disgusting reference to Plaintiff's owner.  The documentary evidence, including the emails and audio recordings establish that Safa had access to and was utilizing the imelegalreps@gmail.com e-mail account.

Three (3) days later, on April 14, 2023 Safa, from her personal gmail account, emailed GP "lets change it up a little bit" so it doesn't look so much like companions and GP responds: "Got it.  We'll work on a couple of mockups for your review"  See Felsen Decl. ¶¶ 5 and 9, Exs. C and G. The same day, Safa emailed GP: "please deactivateimecompanions.com. it is very important that the domainimecompanions.com be deactivated asap.  imelegalreps.com has to go up asap and when a client books we should get an email toinfo@imelegalreps.com. It is imperative this is done asap" Id. at Ex. G.  Notably, Liddie is not even copied on these emails, thereby confirming what Safa told Weissman: that she opened IMLER to circumvent the Court Orders and she would be operating it.

4

On April 14, 2023, IMELR covered its first IME for Bergman, Bergman, Fields & Lamonsoff ("Bergman"), a customer on the Enjoined Customer List. Liddie initially testified that he told Mr. Bergman that he did not know whether he was using an IME observer company at the moment he allegedly cold-called to solicit its business. See ECF Docket Entry 219-1 at 108:6-13.

Liddie later changed his story and testified that he did not cold-call Bergman, but rather, Bergman reached out to Liddie to find out if he had an IME business. See ECF Docket Entry 355-1 at 208:6-210:14. The Court was quite puzzled by this contradictory testimony. Id.

On the same day, Safa also emailed GP stating the IMELR website has to go up asap. See Felsen Decl. ¶ 9, Ex. G. The only inference that can be drawn is that, based on the urgency with which Defendants wanted to continue their existing Companion's business without interruption, there was an intent and intense effort to defy this Court's Orders. On April 18, 2023, GP sent Safa a logo mock up for IMELR and provided her an update on the website transfer. See Felsen Decl. ¶ 10, Ex. H. That same day, Plaintiff filed an order to show cause to hold Defendants in contempt. The very next morning an email was sent from the email address IMELegalreps@gmail.com to GP stating: "This is Eugene Liddy. I am the owner of IMELR… Please communicate only with me as Safa is no longer involved. Id. ¶ 11, Ex. I.

The facts and circumstances establish that Safa sent this email. First, Liddie's name was misspelled twice in one email in the same manner that Safa misspelled it during the April 10, 2023 virtual meeting with GP. Second, Liddie's name was misspelled in the same manner that it was misspelled on the IMELR website. Id. ¶ 13, Ex. K. Third, this email was sent the day after Defendants filed a contempt motion.[4] Following the filing of the April 18, 2023 order to show cause, there was a flurry of activity, urgency, and threats by Defendants to sue GP to remove all things Companions from IMELR's website – all in an immediate response due to Plaintiff's motion. Neither Defendants nor Liddie would scramble as they did if they committed no wrongdoing. Critically, on April 19, 2023, Liddie e-mailed GP asking that the "client page" which had all of the clients on the enjoined customer list be hidden. See Felsen Decl. ¶ 14, Ex. L. This demonstrates Liddie's intent to violate the Orders in this case. Safa similarly continued to engage in wrongdoing and perjury. On June 21, 2023, she requested from GP access to a folder labeled marketing materials. Id. ¶ 12, Ex. J. This was almost two (2) months after the May 4, 2023 hearing where she represented that all she did was assist Liddie to transfer the website and after she swore in her declaration she had nothing to do with IMELR and was "out of the IME business." See ECF Docket Entry 219-1.

In the unlikely event that the above-described actions are insufficient to find Defendants and Liddie in contempt, there is a mountain of additional evidence establishing that Safa did not merely sell the IME Companion's website to Liddie and then go off into the sunset with her new life in Texas, where she claims poverty whilst living in the lap of luxury with the profits she's made

---

[4] Liddie lied to the court on 5/29/24 when he testified he wrote this email and the spell check changed it to "Liddy." See ECF Docket Entry 355-1 at 211:22-212:13. Indeed, during the 7/29/24 hearing, the court utilized Liddie's phone which did not auto correct "Liddie" to "Liddy." See Felsen Decl. ¶ 3, Ex. A at 161:6-163:1.

through her unabashed theft of Plaintiff's trade secrets. The overwhelming evidence establishes that IMELR is a successor to Companions, AES, and CES, and are merely tools and instrumentalities through which Defendants continue to benefit from their theft.

In that regard, it is worthy to note that Jeffrey Beiben ("Beiben") is dating and/or married to Vito's sister. See ECF Docket Entry 197-5 at 98:6-18.

Beiben was employed by Companions when this lawsuit was commenced. Id. at 96:25-97:14. When Defendants created CES to try to evade this Court's Order, they hired Beiben. Id. at 97:7-101:2. After CES was shut down by this Court, IMLER hired Beiben who, according to Liddie, oversees IMELR's entire operation. See Felsen Decl. ¶ 3, Ex. A at 89:10-18; 116:17-20; 122:20-23; 129:10-12. In response to a subpoena served on him, Liddie produced *zero* communications he had with (i) Liddie, (ii) Safa, and/or (iii) Vito between the issuance of the March 10, 2023 Order and the present. Liddie's failure to produce any documents, especially between Liddie and Beiben, who he testified is operating Liddie's purported business, IMELR, is telling, and only supports Plaintiff's request for a forensic examination of Liddie's and Defendants' electronic devices.

In addition to employing Vito's relative, Beiben, at Companions and at CES, all of IMELR's observers previously worked as observers for Companions, CES, and/or AES. See ECF Docket Entry 355-1 at 196:1-197:16. IMELR has the same website as Companions, still bore the name "IME Companions LLC" throughout the website, listed as its customers law firms contained on the Enjoined Customer List, and included the Gelardis' bios. See ECF Docket Entry 197-2. Five (5) of IMELR's twelve (12) customers are on the enjoined customer list.[5]

Liddie also repeatedly perjured himself at the hearings, including but not limited to:
- o The circumstances surrounding his name being misspelled;
- o The circumstances under which he allegedly began to serve Bergman;
- o He initially testified that his interactions with GP were solely by phone, and then his testimony changed after Plaintiff obtained emails between GP and, purportedly, him at which time he changed his testimony;
- o Falsely testifying that Defendants' involvement with him was solely to sell the website to Liddie so Defendants could make a mortgage payment; in fact, Defendants maintained an active and primary role with respect to Liddie and the IME Legal Reps website; and
- o Liddie denied receiving Plaintiff's customer list, when, in fact, this Court provided same to him (ECF Docket Entry 219-1 at 127:16-129:6) and Liddie's purported website developer, GP, was in possession of the customer list. Moreover, information about Plaintiff's customers was on the backend of IMELR's website.
- o Liddie testified that he never gave Safa his credit card despite Safa's testimony to the contrary.

---

[5] Liddie has not produced any documentary evidence identifying any of his customers; he expects Plaintiff and the Court to accept his word that these are his only customers despite his repeated lies.

o Liddie testified that he never had any agreement with Safa under which he would be a silent partner despite Safa's statements to the contrary during her virtual meeting with GP.

The totality of the circumstances makes it patently apparent that IMELR and AES are successors to Companions and therefore should be subject to the same preliminary injunction as Companions and CES. In that regard, Plaintiff respectfully submits that it has easily established each factor to prevail on a contempt motion.

The first factor - whether an injunction is sufficiently clear and unambiguous as it leaves no doubt in the minds of those to whom it was addressed precisely what acts are forbidden - is established here from the video and the phone call recordings with GP. Safa repeatedly referenced this case and this Court, and many times sought assurances from GP that what she was doing was confidential. A critical admission during the virtual meeting was Safa's statement that she was going to play the criminal's game. Another basis for this Court to find that the injunction is sufficiently clear and unambiguous is the March 30, 2023 email from Safa to Subin recommending Accompanied Exams. There, Safa expressly states "as you know, IME Watch dog and IME Companions have been in a heated litigation. We are not allowed to service your law firm anymore." See Felsen Decl. ¶ 17, Ex. M.

As to the second factor, whether noncompliance is supported by clear and convincing evidence - the GP video and audio and the other documentary evidence establishes that the Defendants continued to contact and serve customers on the Enjoined Customers List. This is shown through the April 10, 2023 virtual meeting, emails with Giant Partners, the Subin invoice, the responses Plaintiffs received from subpoenas to defense firms (as well as publicly available documents), and the LinkedIn accelerator statistics discussed during the GP deposition. See ECF Docket Entry 321 at 228-229 & 322 (Ex. C, filed under seal).

For the third factor, a party who diligently complies in a reasonable manner, "to ensure it remain[s] in compliance with the Injunction" "c[an] petition[] the District Court for a modification, clarification or construction of the order." Importantly, a party's intent or state of mind does not matter for finding contempt. Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." Defendants did not petition the court. Moreover, no such petition is warranted or available where, as here, Defendants have engaged in protracted and unnecessary litigation forcing Plaintiff to go through multiple hearings to try to achieve compliance with this Court's Orders. Plaintiff sought to avoid motion practice and hearings by demanding sworn statements from Defendants that they are no longer serving customers on the enjoined customer list. Defendants refused to do so, because they knew that was a lie.

When backed into a corner and forced to defend themselves, instead of coming clean, Defendants chose to repeatedly lie and hope for the best. This strategy has not worked for them. More importantly, this strategy has forced Plaintiff to suffer through the expense of legal fees and related costs to enforce compliance with the injunction.

Contrary to Safa's statements in the virtual meeting, it is not the idea that she stole, it is the trade secrets. As Safa conceded during the virtual meeting with GP, cold-calling is hard and often not fruitful. As a result, it is evident Defendants continued to do what they have been doing all along - wrongly using Plaintiff's trade secrets to further their business. As this Court previously explained:

> Upon a finding of contempt, [a] civil contempt sanction may ... serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance. Compensatory sanctions should reimburse the injured party for its actual damages and be based upon evidence of such loss or injury." On the other hand, coercive sanctions are left to the informed discretion of the district court and should be based on (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. Notably, [t]he court may ... serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim.

See IME Watchdog, Inc. v. Gelardi, 2024 U.S. Dist. LEXIS 177014 (E.D.N.Y. March 13, 2024).

Here, costs and attorneys' fees have not been shown to be effective. Defendants have shown they have no regard whatsoever for this Court's Orders by flippantly disobeying them with abandon from the get-go. As a result, Plaintiff submits that this Court should exercise greater coercive sanctions, including the following:

1. Expand the TRO and Preliminary Injunction to also encompass Liddie, IMELR, the IME Company and AES;
2. Require the posting of a court notice on the websites of IMELR's and the IME Company, similar to the prior authorized court notice, and another mailing to customers on the Enjoined Customer List;
3. Attachment on all the properties owned by Safa, Vito and Liddie and any corporate entities they have an ownership interest in;
4. A finding that Defendants, Liddie and IMELR are in contempt of court and issue case ending sanctions pursuant to Rule 16(f) due to the multiple and repeated violations of this Court's pretrial Orders including entry of judgment in favor of Plaintiff against Defendants, Liddie and IMELR for compensatory damages, attorneys' fees and costs, and punitive damages. For compensatory damages, as was already established, 98% of Defendants' revenue came from Plaintiff's customers. Defendants' 2022 revenue was approximately $1M in spite of the original injunction issued in April 2022. See ECF Docket Entry 172 ¶ 6. The derived monthly revenue is $83,000. Defendants' have continued to serve Plaintiff's customers for 30 months. That totals $2,490,000.00 in damages; and
5. Forensic analysis paid for by Liddie and Defendants.

Plaintiff thanks this Court for its continued time and attention to this case.

Dated:  Lake Success, New York          Respectfully submitted,
        October 25, 2024

                                        **MILMAN LABUDA LAW GROUP PLLC**
                                        /s/ Jamie S. Felsen, Esq.

Dated:  Jamaica, New York
        October 25, 2024

                                        **SAGE LEGAL LLC**
                                        /s/ Emanuel Kataev, Esq.

cc: All Counsel of Record (via ECF)

9