
**WARNER & SCHEUERMAN**
Attorneys at Law
6 West 18th Street, 10th Floor
New York, New York 10011
Tel: (212) 924-7111
Fax: (212) 924-6111

| | |
|---|---|
| **Jonathon D. Warner, Esq.** | **Karl E. Scheuerman, Esq.** |
| jdwarner@wslaw.nyc | kescheuerman@wslaw.nyc |

October 25, 2024

**VIA ECF**

Pamela K. Chen, U.S.D.J.
United States District Court, Eastern District of New York
225 Cadman Plaza East, Courtroom 4F North
Brooklyn, New York 11201-1804

Re:  *IME Watchdog, Inc. v. Gelardi, et al.*
     Case No.: 1:22-cv-1032 (PKC)(JRC)

Dear Judge Chen:

We represent defendants Safa Gelardi ("Safa"), Vito Gelardi ("Vito") and IME Companions LLC ("IME Companions") and submit the instant post-hearing letter brief with respect to plaintiff's contempt application. (Dkt. 288).

Plaintiff's latest contempt motion, improperly filed by letter motion without a supporting declaration, was initially based upon plaintiff's hearsay allegation that Defendants had serviced law firms on the enjoined customer list in the Spring of 2023 in violation of Court Orders. To the extent those services were performed by agents of Client Exam Services, Defendants were already found in contempt for such acts, and plaintiff's allegations should be ignored. Indeed, the alleged acts of contempt in servicing law firms on the enjoined customer list occurred in the Spring of 2023, and were largely heard by this Court last year. Even the alleged "Subin invoices" were previously introduced by plaintiff. This Court found that plaintiff did not sustain any actual damages as a result of Defendants' alleged contempt, other than costs and attorneys' fees. (Dkt. 394).

This Court permitted plaintiff to cure some of the defects in its moving papers by allowing plaintiff to belatedly submit the supporting declarations mandated by Local Rule 83.6. With each such declaration, plaintiff expanded the scope of its contempt application, which transmogrified from being based upon Defendants' alleged servicing of law firms on the enjoined customer list in the Spring of 2023 to Defendants' alleged ongoing violation of this Court's injunction by using Eugene Liddie ("Liddie") and his company, IME Legal Reps, as a "front" to continue to service law firms on the enjoined customer list, after Liddie had purchased IME Companions' website from Defendants. Plaintiff claims that IME Legal Reps is IME

Companions' "alter ego" or "successor." This Court has previously held that Liddie and IME Legal Reps may service law firms on the enjoined customer list. (Dkt. 231).

Before addressing plaintiff's new "proof" concerning Liddie and IME Legal Reps, it must be noted that plaintiff failed to submit any admissible evidence supporting its initial allegations of contempt pertaining to Defendants' alleged servicing of law firms on the enjoined customer list in the Spring of 2023. Plaintiff did not call a single employee from any of the subject law firms to testify that they had employed Defendants after Defendants had been restrained and/or enjoined from servicing them. In sharp contrast, and to obstruct the introduction of exculpatory evidence in this quasi-criminal proceeding, plaintiff objected to Defendants' introduction of sworn declarations from employees of the law firms on the ground that their in-person testimony should be required. Plaintiff then objected to in-person testimony from the law firms on the ground that Defendants failed to identify by name the specific individuals who would testify on behalf of the law firms subpoenaed by Defendants. This Court sustained plaintiff's objections and refused to allow Defendants to introduce any sworn statements or in-person testimony from any of the involved law firms on the ground that in-person testimony would only be permitted by specifically-named individuals on Defendants' witness list rather than by law firm name.

Plaintiff also failed to call any of the individuals who allegedly observed IME's on Defendants' behalf in violation of any Court Order. Plaintiff's "proof" was thus limited to the hearsay and double hearsay documents attached to its principal's declarations. Plaintiff failed to call witnesses who could lay a foundation for the admission of any of these hearsay documents. As a result, no admissible evidence was submitted supporting plaintiff's claim that Defendants had serviced law firms on the enjoined customer list in the Spring of 2023.

Contempt proceedings are governed by the Federal Rules of Evidence. See Fed. R. Evid. 1101(b)("These rules apply in:... contempt proceedings, except those in which the court may act summarily"). "Evidence that would not be admissible under established federal rules regarding the competency of evidence at trial may not be considered on a motion for contempt." Really Good Stuff, LLC v. BAP Investors, L.C., 2021 WL 2469707*3 (S.D.N.Y. June 17, 2021). "A charge as serious as contempt must be supported by competent evidence." Id. at *5.

Plaintiff's failure to call any witnesses with knowledge of the facts who testified as to Defendants' alleged servicing of law firms on the enjoined customer list mandates the denial of plaintiff's contempt application to the extent it is based upon Defendants' alleged misconduct in servicing law firms on the enjoined customer list in the Spring of 2023. Indeed, the only "proof" submitted by plaintiff supporting its allegations are unauthenticated emails and expert medical reports from personal injury cases, all of which are hearsay (or double-hearsay). A statement by a defendant's expert in an unauthenticated IME report that a "companion" appeared on a personal injury plaintiff's behalf for IME Companions (or Client Exam Services) is inadmissible hearsay.

The only competent proof concerning plaintiff's initial allegations was Safa's testimony that IME Companions invoiced Subin for services rendered through March 30, 2023. (5/29/24, pgs. 55-58). However, no proof was submitted showing that Defendants were restrained from

servicing Subin at that time where Subin 1) was <u>not</u> one of plaintiff's law firm clients, 2) was <u>not</u> on plaintiff's 2016 client list, and 3) did <u>not</u> want to work with plaintiff.[1]  Simply put, Defendants were not "unfairly compet[ing] with plaintiff" in violation of the March 10, 2023 TRO by servicing Subin in March 2023, where Subin was not one of plaintiff's clients and had no intention of employing plaintiff. No evidence of unfair competition in violation of the law was submitted by plaintiff with respect to Subin (or any other law firm). Nor were Defendants violating this Court's March 27, 2023 expanded injunction by servicing Subin through March 30, 2023. This Court's expanded injunction prohibited "Defendants from providing services to any customers who were former customers of Plaintiff IME Watchdog **and** listed on Plaintiff's 2016 customer list." (Emphasis added). Subin was <u>not</u> listed on Plaintiff's 2016 customer list. Moreover, Defendants previously submitted an email dated March 30, 2023, from Subin's CEO, Arnie Baum, stating: "As you know, before we retained IME Companions we used IME Watchdog, but stopped using them because serious issues arose." (Dkt. 225). Clearly, servicing a law firm that had no interest in employing plaintiff was not "unfairly compet[ing] with plaintiff in violation of the law." Defendants were only restrained from servicing Subin later, upon the completion of the enjoined customer list in April 2023. No admissible evidence was submitted showing that Defendants serviced Subin after the enjoined customer list was finalized.

   Where no admissible evidence was submitted supporting plaintiff's allegation that Defendants wrongfully serviced law firms on the enjoined customer list in the Spring of 2023 (which was the initial basis for the instant contempt application), that leaves for judicial determination plaintiff's allegation that Liddie's IME Legal Reps was really a "front" for Defendants, which they used to violate this Court's injunction. Plaintiff's "alter-ego" theory of contempt rests on 1) plaintiff's allegation that Safa, whom they have repeatedly referred to as a serial liar and perjurer, was telling Giant Partners the truth during a virtual meeting on April 10, 2023, when she discussed with them her alleged intention to use Liddie as a front man for "Plaintiff Advocates," which would continue to service law firms in New York, 2) the confusion within Giant Partners as a result of the above meeting with Safa and its nearly simultaneous retention by Liddie to migrate the IME Companions website he had purchased from Defendants to serve as the website for his independently-owned IME Legal Reps, 3) Giant Partners' mistaken belief that Liddie rather than Vito was with Safa during the virtual meeting, and 4) the conflation of Safa and Liddie by Giant Partners as it continued to seek Liddie's marketing business.

   When a party fails to comply with a Court Order, they may be held in civil contempt if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." <u>Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.</u>, 369 F.3d 645, 655 (2nd Cir. 2004). "[T]he party seeking to hold another in civil contempt bears the burden of proof" to establish the offense by clear and convincing evidence." <u>Levin v. Tiber Holding Corp.</u>, 277 F.3d 243, 250 (2nd Cir. 2002)(citations omitted). "[T]he clear

---

[1]    We submit that none of the subject law firms want to work with plaintiff, which is why plaintiff involved them in this proceeding without any concern for upsetting them as potential clients.

and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." Id. "[A] bare preponderance of the evidence will not suffice." In re Weiss, 703 F.2d 653,662 (2ⁿᵈ Cir. 1983)(quotations omitted); see also Drew-King for & on behalf of N.L.R.B. v. Deep Distributors of Greater NY, Inc., 274 F.Supp.3d 132,137 (E.D.N.Y. 2017)(clear and convincing evidence is "more than a mere preponderance"). "The Second Circuit has recognized that 'a contempt order is a potent weapon that is inappropriate if there is a fair ground of doubt as to the wrongfulness of the defendant conduct." Drew-King, 274 F.Supp.3d at 136 (quotations omitted).

Here, plaintiff fell far short of establishing "by clear and convincing evidence" that Defendants used Liddie and IME Legal Reps as a "front" to service law firms on the enjoined customer list. While the video of Safa's virtual meeting with Giant Partners discussing her intention to use Liddie as a front to continue to work in New York would be damning if corroborated by evidence suggesting that her plan came to fruition, the fact remains that plaintiff failed to submit a scintilla of proof suggesting that Safa's plan was ever actually acted upon in any fashion, let alone agreed to by Liddie. As Safa testified, the video depicted something that she "wanted to do" but did not because she instead chose to leave New York. (7/29/24, pg.29,14-20). Safa explained: "And you know what, in the interim, I decided maybe I can stay. Maybe Eugene would want to do this me and that's not what happened." (7/29/24, pg.34,17-19). Safa testified that what she told Giant Partners was merely a "plan" that did not come to fruition, and that everything she told Giant partners was false. (7/29/24, pgs. 52-54). Safa described her conversation with Giant Partners as "just talk," "which wasn't thought out or drawn out." (7/29/24, pg. 58,20-22). Liddie, after being explicitly warned by the Court concerning the consequences of committing perjury at the hearing (7/29/24, pgs. 82-83), corroborated Safa's testimony. Liddie testified: "She mentioned a partnership and I said, I'm not interested. I just want to move forward with buying the website like we initially agreed on." (7/29/24, pg. 127,11-13). When asked "But isn't it true that everything that was discussed for Plaintiff Advocates was ultimately implemented for IME Legal Reps," Liddie testified: "No." (7/29/24, pgs. 125-126).

No evidence was submitted showing that the alleged company Safa discussed with Giant Partners (plaintiffadvocates.com) was ever formed. However, Safa did later form the similarly-named Texas company, "IME Legal Advocates," which does business in Texas as "The IME Company." (7/29/24, pg. 36,2-8). No allegation of wrongdoing has been made with respect to IME Legal Advocates, but that its name includes the word "advocates" corroborates Safa's testimony that "plaintiffadvocates.com" was her "plan" which never came to fruition with Liddie.

No evidence was submitted showing that an operating agreement of any type existed between Safa and Liddie, although mentioned by Safa on April 10, 2023. Safa testified: "There is no operating agreement, so I couldn't produce it." (7/29/24, pg.12,24-25). When asked by the Court whether it was true that she had "[a]n agreement with Mr. Liddie for this company, Plaintiff Advocates," Safa testified: "That was false." (7/29/24, pg.14,15-17). When asked whether he had any operating agreement with Safa regarding any company, Liddie answered "No." (7/29/24, pg. 133,3-9).

-4-

  No evidence was submitted showing that Safa has any ownership interest in IME Legal Reps. When asked if she has any ownership interest in IME Legal Reps, Safa testified: "No, I do not." (5/29/24, pg. 70,7-8). When asked "Isn't it true that you formed IME Legal Reps in order to circumvent this Court's Order," Safa testified: "No, your Honor." (5/29/24, pg. 70,9-11). When asked "Do you have any financial stake in IME Legal Reps," Safa testified: "No, your Honor." (5/29/24, pg. 70,12-13). When asked "do you have any business interest in IME Legal Reps," Safa testified: "I don't." (5/29/24, pg. 72,22-23). When asked "Do you receive any profits from Mr. Liddie with respect to IME Legal Reps," Safa testified: "No." (5/29/24, pgs. 72-73). Safa's testimony was corroborated by Liddie. When asked whether Safa is a partner, officer or member of IME Legal Reps, Liddie testified: "No." (5/29/24, pg. 217,12-14). When asked whether Safa ever asked for a piece of IME Legal Reps, Liddie testified: "No." (5/29/24, pg. 217,18-19). When asked "Does Safa Gelardi or Vito Gelardi have any ownership rights or interest in your business at all," Liddie testified: "No." (5/29/24, pg. 141,17-19). No documents from any Department of State showing that Safa an interest in IME Legal Reps were introduced into evidence.

  No evidence was submitted showing that Safa received any remuneration of any type from IME Legal Reps. When asked whether he ever paid Safa any money other than the $4,300 he paid for the website, Liddie testified: "No." (5/29/24, pg. 217,8-10). When asked "Do you have to pay them [Safa and Vito] any money whatsoever," Liddie testified: "No." (7/29/24, pg. 141,20-21). When asked "[d]o you need you send them any monies or profits from your business," Liddie testified: "No." (7/29/24, pg. 141,22-24). When asked whether she received any profits from Liddie with respect to IME Legal Reps, Safa testified: "No." (7/29/24, pgs. 72-73). When asked "Do you receive any monies whatsoever from Mr. Liddie," Safa testified: "I don't." (7/29/24, pg.73,2-3). This testimony was unrefuted.

  No evidence was submitted showing that Safa was involved in the day-to-day operations of IME Legal Reps. Safa testified that she "never worked with Eugene at IME Legal Reps" and that all she "did was help him migrate the site over." (5/29/24, pg. 136,12-16). Liddie again corroborated Safa. When asked whether he had any further involvement with Safa after the migration of the website was complete, Liddie testified: "No." (5/29/24, pg. 217, 4-7).

  No evidence was submitted showing that Safa had an IME Legal Reps' email account or phone. Liddie testified that only he and Jeff Beiben ("Beiben") have access to IME Legal Reps' email account. (5/29/24, pgs. 212-213). Liddie testified: "The only two people that have access to the emails is me and Jeff Beiben." (7/29/24, pg. 104,15-16). Beiben also has an IME Legal Reps phone and access to all applicable apps. (7/29/24, pgs. 116-117). No evidence was submitted by plaintiff suggesting that Safa had a company phone or access to the company's email accounts and the apps it has used in the ordinary course of business.

  No evidence was submitted showing that Safa turned over any marketing materials or customer lists to IME Legal Reps. When asked whether she turned over any other information when Defendants sold the website to Liddie, Safa testified: "No." (7/29/24, pg.73,9-11). When asked if she ever provided any customer list or marketing list to Liddie, Safa testified: "No." (7/29/24, pg.73,12-14). Liddie testified:

-5-

> Q: And in the process of developing that website, did you receive any documents whatsoever from Safa Gelardi?
> A: No.
> Q: Did you receive any customer list?
> A: No.
> Q: Did you receive any lists of law firms in the State of New York?
> A: No.
> Q: Did you receive any list where you were knowledgeable about whether or not those were customers for Safa Gelardi or IME Companions.
> A: No.

(7/29/24, pg. 134, 10-25). When asked whether he had utilized any list or information from this proceeding to acquire any of costumers, Liddie testified: "No." (7/29/24, pg.142,3-5). Plaintiff's attempt to show that Liddie had access to purportedly confidential marketing and client lists through his business relationship with Giant Partners was shot down at the hearing. When asked whether he had access to Giant Partners "marketing collaterals folder" while working with Giant Partners, Liddie testified: "No." (7/29/24, pg.184,8-11). Corey Weismann ("Weismann") of Giant Partners admitted that Giant Partners "never got to do the marketing outreach" for IME Legal Reps. (9/25/24, pg.17,9). When directly asked whether marketing work for IME Legal Reps was ever done, Weismann testified: "No." (9/25/24, pg.18,1-2). Jeremy Koenig ("Koenig") of Giant Partners admitted that Giant Partners' list of 50,000 contacts did not necessarily include the IME Watchdog customer list. (9/25/24, pg. 51,9-17). Koenig testified:

> Q: And you have no reason to believe that this IME Watchdog list was integrated in any manner into your list, do you?
> A: That's the first time I've seen that file
> Q: To your knowledge, do you know whether that Watchdog list, I'll call it that, the Watchdog list was integrated into your list of 50,000 law firms?
> A: Those would be two separate lists.
> Q: So your 50,000 law firm list wouldn't contain necessarily those Watchdog clients, would it?
> A: Would not necessarily contain. Could.
> Q: But you wouldn't know whether it did or didn't, correct?
> A: I do not know that, no.

(9/25/24, pg. 51,9-20). Incredibly, plaintiff's principal swore under oath in her second supplemental declaration that IME Companions and IME Legal Reps "employ the same marketing company," <u>after</u> plaintiff had obtained Giant Partners' response to its subpoena. (Dkt. 321). Giant Partners' witnesses confirmed that plaintiff's principal had lied to this Court.

Further disputing plaintiff's allegations was Liddie's detailed testimony concerning his efforts to obtain law firm clients. Liddie credibly testified that he obtained law firm clients by cold calling and following up with in-person deliveries of Edible Arrangements. (7/29/24, pgs.105-109). Liddie's testimony was corroborated by IME Legal Reps' bank records confirming

purchases of Edible Arrangement baskets. (7/29/24, pg.110). Liddie explained how personal injury law firms are readily ascertained through Google searches. (7/29/24, pgs.142-144). Plaintiff does not claim that Safa was an authorized signatory on IME Legal Reps' bank account, although plaintiff's attorney used the bank records to cross-examine Liddie.

Nor did plaintiff introduce any evidence showing that Defendants invested any sum of money into IME Legal Reps. Liddie testified that he purchased the domain name for IME Legal Reps. (7/29/24, pg.133,22-25). Liddie testified that he paid Giant Partners for the migration of the website to IME Legal Reps. (7/29/24, pgs. 150-151). Liddie's testimony was corroborated by Koenig, who testified that Liddie paid for the migration by credit card and that only Liddie's name was on the Giant Partners' contract. (9/25/24, pg.54).

The testimony of Safa and Liddie was unrefuted at the hearing. No IME observer was called to testify that they were working for Defendants rather than Liddie/IME Legal Reps. No law firm employee was called to testify that they were really hiring Defendants rather than Liddie/IME Legal Reps. The only "proof" which purports to support plaintiff's contempt application are the emails that Safa and Liddie exchanged with Giant Partners in connection with the migration of the IME Companions website to IME Legal Reps after it had been sold by Defendants to Liddie, and while Giant Partners' sales people were zealously attempting to obtain IME Legal Reps' marketing business through Safa. But these emails speak for themselves, including Liddie's email sent on April 19, 2023, at 9:23 AM, which stated: "Hello everyone, This is Eugene Liddie, I am the owner of IME Legal Reps. Please remove the video about IME Companions and please get the new mock ups ready as soon as possible. we need this website up as IME Legal reps visions immediately. **Please communicate with me as Safa is no longer involved**." (Emphasis added). Safa was no longer involved because she had sold the website to Liddie, who refused to participate in any plan wherein he would serve as Safa's front man. None of the Giant Partners' emails show that Safa's plan ever went into effect. They show only that Safa's involvement in the website migration was necessary 1) because her GoDaddy credentials were needed to complete the migration, and 2) to ensure that IME Legal Reps' website was distinct from IME Companions' old website and from her own personal vision for any future company she subsequently started on her own. Giant Partners' confusion about the relationship between Safa and Liddie and its continuing efforts to obtain Liddie's marketing business through Safa does not constitute clear and convincing evidence of a clandestine business arrangement between Safa and Liddie. While we appreciate the Court's concerns over the misspelling of Liddie's name (Liddy), suspicions and concerns regarding the veracity of testimony is not sufficient to support a finding of contempt. Moreover, why would Safa have been secretly emailing Giant Partners as Liddie from an IME Legal Reps email address, while also emailing Giant Partners as herself from SafaGelardi@gmail.com? If Safa wanted to hide her alleged involvement with Liddie's business while communicating with Giant Partners, she would not have been simultaneously emailing Giant Partners from her personal email account as well.

The testimony from the Giant Partners' employees failed to support plaintiff's hysterical accusations. While Weismann testified that it was his "understanding" that Safa and Vito were business partners, Weismann also testified that he thought that it was Liddie standing behind

Safa during the April 10, 2023 virtual meeting (9/25/24, pgs.20-21), although it was Vito. Weismann admitted that his "complete understanding about the relationship between Safa Gelardi and Eugene Liddie was based on what Safa Gelardi said." (9/25/24, pg.36,12-15). As established above, Safa testified that what she told Giant Partners on April 10th was "just talk" about an unrealized plan which was never implemented. Koenig similarly admitted that his understanding of the relationship between Safa and Liddie was based solely upon what Safa had said. Koenig testified:

> Q: So other than that payment and the email address you see with his name, you had no other information about the relationship between Safa Gelardi or IME, Plaintiff Advocates, and Eugene Liddie, correct?
>
> A: Only what Safa shared with us.

(9/25/24, pg.55,1-5). Koenig further testified:

> Q: But he paid for IME Legal Reps. When you say he paid, he didn't pay for anything regarding Safa Gelardi and himself. He paid for a contract, for a website development, for IME Legal Reps?
>
> A: Correct.

(9/25/24, pg.56,13-17).

    Koenig also corroborated Liddie's testimony that Liddie had worked primarily with Estefania Sedano ("Sedano") on his website. (9/25/24, pgs. 59-60). Plaintiff did not call Sedano to testify, although she is the Giant Partners' employee with knowledge of the pertinent facts. Plaintiff instead called a salesperson who did not get the sale and a digital strategist who did not work with Liddie on his website. These two incompetent witness based their testimony on mistaken impressions resulting from a virtual meeting which Liddie did not attend, although one of the witnesses mistakenly believed that Liddie was present.

    With respect to Safa's emailing of an IME Watchdog customer list to Giant Partners while IME Companions was still in business, Safa credibly explained how it was attached inadvertently among many other things, and Koenig testified that it was not used in Giant Partners' marketing efforts. Moreover, IME Legal Reps never retained Giant Partners for marketing, meaning that Liddie never got access to any of the subject marketing materials.

    Plaintiff's motion should be denied where plaintiff's proof of contempt falls woefully short of meeting the clear and convincing standard required to prove contempt.

                                                    Respectfully,

                                                    */s/ Jonathon D. Warner*