1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
IME WATCHDOG, INC.,                 : 22-CV-01032 (PKC)
                                    :
          Plaintiff,                :
                                    :
                                    : United States Courthouse
     -against-                      : Brooklyn, New York
                                    :
                                    :
SAFA ABDULRAHIM GELARDI, ET         : Monday, July 29, 2024
AL.,                                : 10:00 a.m.
                                    :
          Defendant.                :

- - - - - - - - - - - - - - - X


TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
BEFORE THE HONORABLE PAMELA K. CHEN
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

For the Plaintiffs:    MILMAN LABUDA LAW GROUP PLLC
                          3000 Marcus Avenue
                          Suite 3W8
                          Lake Success, New York 11042
                       BY: EMANUEL KATAEV, ESQ.

                       MILMAN LABUDA LAW GROUP PLLC
                          3000 Marcus Avenue
                          Suite 3W8
                          Lake Success, New York 11042
                       BY: JAMIE SCOTT FELSEN, ESQ.

For the Defendants:    WARNER & SCHEUERMAN
                          6 West 18th Street
                          10th Floor
                          New York, New York 10011
                       BY: JONATHON WARNER, ESQ.

Court Reporter:  VICTORIA A. TORRES BUTLER, CRR
225 Cadman Plaza East / Brooklyn, NY 11201
VButlerRPR@aol.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

```
                     Proceedings                        2

 1              (In open court.)

 2              (Judge PAMELA K. CHEN enters the courtroom.)

 3              THE LAW CLERK:  All rise.

 4              THE COURT:  Good morning, everyone.

 5              Why don't we get started and our IT staff will come

 6   and fix whatever technology needs to be up and running.

 7              I want to go on the record at least and start off

 8   with some preliminary remarks.

 9              Are you the lawyer for Mr. Liddie?

10              MS. CHARRINGTON:  Yes.

11              THE COURT:  Why don't you come up and sit at counsel

12   table here.

13              MS. CHARRINGTON:  Thank you.

14              THE COURT:  Perhaps like the far side over there,

15   that chair that is facing this way.

16              (Pause in the proceedings.)

17              THE LAW CLERK:  Civil cause for Order to Show Cause

18   and evidentiary hearing, 22-CV-1032, IME Watchdog, Inc.

19   against Gelardi, et al.

20              Will the parties please state their appearances for

21   the record, starting with plaintiffs.

22              MR. KATAEV:  Good morning, Your Honor.

23              Emanuel Kataev of Sage Legal LLC, for the plaintiff,

24   IME Watchdog.

25              THE COURT:  Good morning.
```

VB        OCR        CRR

```
                        Proceedings                        3

1              MR. FELSEN:  Good morning, Your Honor.

2              Jamie Felsen from Milman Law Group also for

3    plaintiff.  I'm joined by Daniella Levi and Carlos Roa.

4              THE COURT:  Good morning to all of you.

5              ALL:  Good Morning.

6              MR. WARNER:  Good morning, Your Honor.

7              Jonathon Warner of Warner & Scheuerman for the

8    defendant.

9              THE COURT:  Good morning.

10             Then I see you have Ms. Gelardi next to you; is that

11   right?

12             MR. WARNER:  She is.

13             THE COURT:  Good morning to you as well.

14             MS. CHARRINGTON:  Good morning, Your Honor.

15             Karen Charrington with The Charrington Firm for

16   non-party Eugene Liddie.

17             THE COURT:  Okay.  Good morning to you.

18             Is your client in the hallway?

19             MS. CHARRINGTON:  He is.

20             THE COURT:  Okay.  That is good.  Thank you.

21             So as everyone knows, we are here today for the

22   continuation of the evidentiary hearing that began on May 29,

23   2024, relating to plaintiff's third motion for contempt

24   against defendants.  And plaintiff's deposition for yet

25   another TRO and preliminary injunction, this time against
```

Proceedings                                            4

1    defendant and third-party Eugene Liddie.

2           I would like to start by recapping the situation and

3    explaining what I would like to get evidence on today.

4           At the initial part of the hearing on May 29, 2024,

5    and at a prior evidentiary hearing on May 4, 2023, I heard

6    testimony from defendants Safa and Vito Gelardi, and

7    Mr. Liddie.

8           Collectively, and in substance, they denied that the

9    Gelardis had any control over or ownership interest in IME

10   Legal Reps, which Mr. Liddie testified he began on his own.

11          In light of evidence obtained by plaintiffs prior to

12   May 24, 2024, when we were last here, from a company called

13   Giant Partners, the Gelardis and Mr. Liddie more specifically

14   testified at the May 24th hearing that the emails and messages

15   between them, and Giant Partners, did not, in fact, show that

16   the Gelardis were involved in running IME Legal

17   Representatives, and that the only reason that Safa Gelardi

18   was communicating with Giant Partners was because she had an

19   existing relationship with them in connection with the website

20   for IME Companions, and she was merely assisting with the

21   porting, P-O-R-T-I-N-G, of the IME Companions's website to IME

22   Legal Representatives.

23          The bottom line of their combined testimony was that

24   the defendants and Mr. Liddie, under oath, stated that IME

25   Legal Representatives was solely created by and is solely

Proceedings                                                    5

1   owned and operated by Mr. Liddie and that the Gelardis have no

2   control over or interest in that company.

3          However, on June 11, 2024, in anticipation of the

4   continuation of this hearing, plaintiff submitted via video, a

5   recorded video conference on April 10, 2023 -- so less than a

6   month before Mr. Liddie testified the first time in this

7   case -- between the Gelardis, both Vito and Safa, and Jeremy

8   common spelling, Koenig, K-O-E-N-I-G, who was on-screen, and

9   Cory, C-O-R-Y, Weissman, W-E-I-S-S-M-A-N, who is off-screen of

10  Giant Partners.

11         I have reviewed the video which makes clear to me

12  that the Gelardis were at least the silent partners, and that

13  comes directly from the video meeting, with Mr. Liddie in

14  accompany, that was supposed to be called Plaintiff Advocates

15  and that the Gelardis and Mr. Liddie had an agreement

16  memorializing that business relationship.

17         I am going to read from the transcript provided by

18  plaintiff of that call, just a portion of it.  I am starting

19  at a minute and 27, 16 seconds.

20         Ms. Gelardi says:  I'm just going to make my life

21  simpler by shutting IME Companions (plaintiff's company)

22  down, and I'm going to just move my clients over, move my

23  business over to plaintiffadvocates.com --

24         Plaintiffadvocates is one word for the court

25  reporter, .com.

VB        OCR        CRR

Proceedings                                                      6

1          -- and I need to change the website around a little

2     bit to make it look like quote:  Hey this is not the

3     IME Companions's website, end quote.

4          Mr. Koenig:  Yeah, I understand.

5          And then Ms. Gelardi goes on:  We moved that to go

6     or maybe make a better video, or let's do something stronger.

7     Let's police that thing.  Let's make it like, well, because

8     the gentleman who's going to be partner up with me is a

9     detective with the NYP -- it says in the transcript, but I

10    presume it means NYPD -- he's going to be the face of the

11    company.

12         And then she goes on:  Yeah, no worries.  He's going

13    to be the face of the company for the first six to nine, maybe

14    a year or so, until we get this criminal off my back.

15         And this presumably is referring to Ms. Levi and the

16    plaintiffs.

17         He's going to be the face of the company.  Because

18    he's a police officer, I was thinking maybe we go down that

19    route, you know.  I don't know.  Something to protect your

20    clients.  Maybe not.  Maybe not even because not everybody

21    likes cops in New York.  This is New York, we like criminals.

22         And then later in the conversation, at 5:25:24,

23    Ms. Gelardi says:  There is an operating agreement between me

24    and a gentleman named Eugene Liddie, who's the officer that I

25    mentioned to you a couple of minutes ago.

VB          OCR          CRR

Proceedings                                              7

1           Koenig says:  Yeah.

2           Then Safa says:  He will be the face and, per se,

3    owner of plaintiffadvocates.com, face value.  But there's an

4    operating agreement behind the scenes where he doesn't own it.

5    It's actually -- he's a small partner in it.

6           And then going on further, at -- this is the last

7    excerpt I will read -- but going on to 10 minutes, 25 seconds,

8    or it is actually 10:25:09, so I am not sure what the exact

9    timing is, but, Ms. Gelardi says -- oh.

10          Mr. Koenig says:  And you're a silent partner,

11   right?  You have a percentage.

12          Ms. Gelardi:  A hundred percent.  I have a 90

13   percentage in this business.

14          Koenig:  But even that doesn't matter, right?

15   You're just a silent partner.

16          Ms. Gelardi:  Correct.

17          So it is clear -- and let me say this -- there are

18   other similar comments throughout this 30-some minute

19   conversation in which Ms. Gelardi makes clear, unequivocally

20   clear, that she, and I presume her husband, because he comes

21   on later in the video, are the ones who actually own

22   90 percent of what was to be plaintiffadvocates.com, and

23   Mr. Liddie was supposed to be just the front man.

24          There is a part of the conversation where

25   Ms. Gelardi says:  I have Mr. Liddie's credit card

Proceedings                                8

1   information.  And she presumed -- she then purports to give

2   all the information needed to make it appear like Mr. Liddie

3   was the owner and operator of the plaintiffadvocates.com

4   website that was going to be created by Giant Partners.

5          Regardless of the difference in the name between

6   Plaintiff Advocates and IME Legal Representatives, or IME

7   Legal Reps, the fact that the defendants and Liddie had an

8   agreement about running an IME business together in itself,

9   contradicts Mr. Liddie's and the defendants's testimony in

10  which they, in substance, deny that there was any business

11  relationship between them.

12         I distinctly recall both of them testifying that all

13  Ms. Gelardi was doing with respect to Giant Partners was

14  porting over this website, but that Mr. Liddie was the sole

15  owner and operator of that business, IME Legal

16  Representatives.

17         Before, in May of 2023, I recall them both

18  vehemently denying that they had any kind of business

19  relationship, or there was any plan for them to start up an

20  IME business together.  That could not have been clearer.

21         Now, obviously, you are here, Ms. Charrington; is

22  that right?

23         MS. CHARRINGTON:  Charrington.

24         THE COURT:  Charrington.  I am sorry.  To explain or

25  have your client explain and affirm that there is no business

Proceedings                                                            9

1   relationship, and I think you called Ms. Gelardi's statements

2   delusional, I think, potentially.

3        Be that as it may, I want you to understand that the

4   video pretty clearly indicates, to me at least, some

5   contradiction and, to me, perjury, is what I am concerned

6   about between Mr. Liddie's testimony, Ms. Gelardi's testimony,

7   Mr. Gelardi's testimony, and that videotape of the remote

8   conference that I heard or -- and saw.

9        What I want to hear today is testimony from Safa

10  Gelardi and Mr. Liddie as to why I should not find that they

11  did not perjure themselves when they testified under oath on

12  May 4, 2023, and/or May 29, 2024, when they denied being

13  business partners in a new IME venture, and denied that the

14  Gelardis were involved in owning and operating, as silent

15  partners or otherwise, what is nominally Liddie's IME

16  business, current or the one that they were perhaps planning

17  to stand up.

18       Now, in particular, Ms. Charrington, I do want to

19  caution your client and I hope you communicate this or I ask

20  you to communicate it, that though -- that, sorry, a finding

21  of perjury by me could have far more serious consequences for

22  him than for the Gelardis because he is an active officer of

23  the NYPD.  So I want to advise you, so there can be no claim

24  of a lack of notice, that if I make a finding of perjury,

25  perjury, I am going to ask the plaintiff's counsel to send

VB        OCR        CRR

Proceedings                                                    10

1  that finding, along with the necessary transcript and

2  evidence, to the NYPD, since I believe the NYPD has a duty to

3  disclose such information as potential <u>Giglio</u> information,

4  should he testify at any proceeding in his capacity as an NYPD

5  officer, or potentially to disclose it in discovery in any

6  civil matter in which he is named as a party or he is going to

7  appear as a witness.

8          So he is on notice that this testimony he has given

9  already and any testimony he gives today carries with it some

10 potential ramifications for him beyond what I decide in this

11 case in which he is not a party.

12         So lastly, in terms of the order of WITNESSES, I

13 would like to hear from Ms. Gelardi first, and I am also

14 imposing a rule on witnesses under Federal Rule of Evidence

15 615(a), and I am excluding Mr. Liddie, who I understand is

16 already in the hallway and outside the courtroom, from the

17 courtroom during Ms. Gelardi's testimony.

18         And then I would like to hear from Mr. Liddie

19 immediately after Ms. Gelardi testifies.

20         Bear in mind that I certainly will ask, or if

21 plaintiff's counsel doesn't, Ms. Charrington, whether or not

22 Mr. Liddie conferred with Ms. Gelardi at all about their

23 anticipated testimony today.

24         So with that, Mr. Kataev, I do not want to hear any

25 opening statements from you or from Mr. Warner.

```
                      Proceedings                    11
```

 1          Are you ready to go into terms of calling

 2    Ms. Gelardi as a witness?

 3          MR. KATAEV:  Yes, Your Honor.  We plan on calling

 4    her first.

 5          THE COURT:  Okay.  Let's start with that.

 6          Ms. Gelardi, if you will take the stand and remain

 7    standing for a moment so you can be sworn in.

 8          (Witness sworn.)

 9          THE COURT:  Okay.  If you will remain standing for

10    one moment.

11          THE LAW CLERK:  Please, raise your right hand.

12    **SAFA GELARDI**,

13               called as a witness having been first

14                duly sworn/affirmed, was examined and testified

15               as follows:

16          THE WITNESS:  Yes.

17          THE LAW CLERK:  Please, state and spell your name

18    for the record.

19          THE COURT:  Have a seat.

20          THE WITNESS:  S, as in Sam, A-F, as in Frank, A.,

21    G-E-L-A-R-D-I.

22          THE COURT:  Okay.

23          Now, you can move the microphone, yes, so that you

24    can speak directly into it and remember, the chair does not

25    move, but the microphone does.  All right.

Safa Gelardi - direct - Felsen                    12

1           THE WITNESS:  Your Honor, may I have that water?

2           THE COURT:  Oh, you want a water, okay.

3           Go ahead.  Sure.

4           (Pause in the proceedings.)

5   DIRECT EXAMINATION

6   BY MR. FELSEN:

7           THE COURT:  Okay.

8           You may inquire, Mr. Felsen.

9   Q    Good morning, Ms. Gelardi.

10          THE COURT:  Ms. Gelardi, you need to use the

11  microphone so have it -- there you go.

12          Okay.  Go ahead.

13  Q    Ms. Gelardi, you watched the video that was produced by

14  Giant Partners from which the Judge just accorded some

15  statements, correct?

16  A    I watched the first maybe minute or so, and just shut it

17  off.

18  Q    That was you in the video, correct?

19  A    That was me, yes.

20  Q    The Judge referenced a discussion about an operating

21  agreement during that video.

22          You haven't produced that operating agreement

23  between you and Mr. Liddie, correct?

24  A    There is no operating agreement, so I couldn't produce

25  it.

Safa Gelardi - direct - Felsen                    13

1   Q    Yes or no, Ms. Gelardi?

2              MR. WARNER:  Objection, Your Honor.

3              THE COURT:  Overruled.

4              The question is:  Did you produce it?

5              THE WITNESS:  That so I say yes or no?

6              THE COURT:  Yes.

7   A    There was nothing to produce, no.

8   Q    So you were lying in the video when you said there was an

9   operating agreement?

10  A    The video --

11  Q    Ms. Gelardi, yes or no, please.

12  A    No.  Please, this is not a yes or no.  I understand you

13  want to get to a point, I get it.  But the video doesn't

14  constitute biblical language.  I was talking in a video --

15  Q    Ms. Gelardi, your attorney --

16  A    -- about something that was possible that something that

17  I wanted to something that I was concocting.  That doesn't

18  mean I have it.

19             THE COURT:  Ms. Gelardi, focus on the question.

20             THE WITNESS:  Yes.

21             THE COURT:  Did you lie to Mr. Koenig about

22  having --

23             THE WITNESS:  I didn't lie about anything.  I was

24  just talking.  Talking doesn't mean you lie -- you can talk

25  about anything.  I can say the sky is green, it doesn't mean

it's a lie.  I was venting.  I was, I was --

THE COURT:  Ms. Gelardi, let me stop you for a
second.

THE WITNESS:  Yes.

THE COURT:  Simple question.

At the time you told Mr. Koenig --

THE WITNESS:  Your Honor --

THE COURT:  Hang on just a second.  Do not -- do not
interrupt me.

THE WITNESS:  I'm sorry.

THE COURT:  At the time you said to Mr. Koenig:  I
have an agreement with Mr. -- listen to me.

THE WITNESS:  Understood, yeah.

THE COURT:  Listen to me.

An agreement with Mr. Liddie for this company,
Plaintiff Advocates, was that true or not true?

THE WITNESS:  That was false.  I'm sorry.  I didn't
understand the question.

He didn't ask it the way you did, Your Honor.

THE COURT:  All right.

Go ahead, Mr. Felsen.

Q   Ms. Gelardi, when you testified at the last hearing on
May 29th, 2024, that you told Giant Partners that you were,
quote, out of this game, and, quote, walking away, you were
lying, right?

Safa Gelardi - direct - Felsen                    15

A     I really don't understand your question exactly.

      So you said that I told --

Q     Ms. Gelardi, yes or no?

A     I'm trying to understand your question, Mr. Felsen.

Q     Do you remember at the last hearing on May 29, 2024,
testifying here under oath, that you told Giant Partners that
you were, quote, out of this game?

A     If I recall testifying to that?  I don't a hundred
percent recall that, but I -- I did -- I do -- I do believe I
did say that.

Q     Okay.

      And you were lying, right?

A     No, I wasn't lying.

      THE COURT:  Let's be a little clearer.

      Did you testify that you told Giant Partners that
you were getting out of the game?

      There's two parts of it.

      Did you testify last time that you told Giant
Partners that?

      THE WITNESS:  I -- I -- did I testify that I told
Giant Partners that I'm getting out of the game?

      THE COURT:  Yes.  That is the first question.

      Do you remember testifying to that?

      THE WITNESS:  I honestly don't, yeah.

      MR. FELSEN:  Okay.  Let's --

VB      OCR      CRR

Safa Gelardi - direct - Felsen                    16

1           THE COURT:  Wait.  Hang on a second.

2           Did you tell Giant Partners at any point --

3           THE WITNESS:  I believe so.

4           THE COURT:  Okay.  Go a head.

5    BY MR. FELSEN:

6    Q    So when you told them that, you were lying, correct?

7    A    No, I was not.

8    Q    So you're out of the game?  You've been out of the game?

9    Is that what you're testifying to?

10   A    I'm testifying that I'm out of the game in New York

11   currently.

12   Q    And when you testified at the hearing that you told Giant

13   Partners that you were, quote, walking away, that was also a

14   lie, correct?

15   A    Isn't that the same question?

16   Q    You used different verbiage to make the same point.

17   A    Again, I don't --

18   Q    Yes or no, Ms. Gelardi?

19   A    I do not recall -- stop bullying me, please -- I do not

20   recall exactly what I testified to, but I stand by that I

21   walked away from the IME business in New York currently.

22   Q    Do you recall testifying at the May 29th, 2024, hearing

23   that the only Zoom that you had with Giant Partners was

24   back -- way back in 2020 when you discussed on-boarding with

25   them?

Safa Gelardi - direct - Felsen                 17

1   A    I -- I don't recall, but I -- I can -- what I am going to

2   say is that's the only one I remembered.

3   Q    Right.

4        You conveniently last time forgot about this

5   30-minute Zoom meeting?

6   A    I didn't conveniently forget it.  I totally forgot it

7   because it didn't take place.

8   Q    And at no point during this proceeding, which is now has

9   now spanned several years, have you ever testified or provided

10  any information about the contents of that April 10th, 2020,

11  Zoom meeting, correct?

12       MR. WARNER:  Objection.

13  A    I don't --

14       THE COURT:  Hold on.  Hold on.  Hold on.

15       (Pause in the proceedings.)

16       THE COURT:  Overruled.

17       THE WITNESS:  Okay.

18  A    So I don't really understand your question because you

19  always speak in circles, Mr. Felsen.  But I did hear something

20  about expanding this case for several years, and that is

21  because your client doesn't want to go to trial, or be

22  deposed.  It has nothing to do with me.  It's your smoke

23  screens that are continuing to expand this case.

24  Q    Ms. Gelardi, my question is:  At no point in this

25  proceeding that's now spanned several years, have you ever

VB        OCR        CRR

Safa Gelardi - direct - Felsen                    18

1    provided any testimony about a meeting with Giant Partners

2    where the contents of this video was explained?

3    A    Yes.

4              MR. WARNER:  Objection, Your Honor.

5              THE COURT:  Sustained.

6              Maybe you should clarify that question.

7              Are you asking whether or not she ever disclosed the

8    fact that she had this Zoom meeting on April 10, 2023?

9              MR. FELSEN:  Correct, Your Honor.

10             THE COURT:  Okay.

11             THE WITNESS:  I don't -- I honestly cannot, for the

12   life of me remember -- I did not remember until I saw it into

13   evidence, Your Honor.  I did not remember this video.

14             THE COURT:  Next question, Mr. Felsen.

15   Q    Now, last time we were here, we looked at several emails

16   between you and Giant Partners and between the email address

17   IME Legal Reps and Giant Partners, correct?

18   A    What we looked at were emails from Giant Partners to us.

19   There was barely any correspondence back.

20   Q    There were emails between you and Giant Partners,

21   correct?

22   A    Not that I recall.  I recall looking at emails from them

23   and I -- I didn't -- I didn't see any emails going back to

24   them.

25   Q    You communicated with Giant Partners by email on

Safa Gelardi - direct - Felsen                    19

1    April 10th, 2023, the same day you had a Zoom meeting.

2              You communicated with them by email, didn't you?

3    A    I don't recall that.  Can you show me?

4    Q    Sure.

5    A    I don't recall it.

6              MR. FELSEN:  Okay.  Exhibit 39 from the last

7    hearing, I believe.

8              THE COURT:  Mr. Felsen, are you going to show it on

9    the ELMO?

10             MR. FELSEN:  Yes.

11             THE COURT:  I have a binder of exhibits, do you want

12   me to hand this to her?

13             MR. FELSEN:  Sure.

14             Thank you, Your Honor.

15             MR. YAHU:  Thank you, Your Honor.

16             THE WITNESS:  So this is April 12th.

17             THE COURT:  Hold on, one second.

18             THE WITNESS:  Oh, okay.

19             THE COURT:  Mr. Felsen is getting organized.

20             (Pause in the proceedings.)

21             THE LAW CLERK:  Mr. Kataev, do you have an

22   exhibit binder for us?

23             MR. KATAEV:  Yeah.

24             (Exhibit published.)

25             MR. KATAEV:  We only have enough copies to post this

VB        OCR        CRR

Safa Gelardi - direct - Felsen                    20

1    up on the ELMO.

2            THE COURT:  Okay.  That is fine.

3            Mr. Felsen, when you are asking your questions and

4    referring to Mr. Liddie, which is spelled, L-I-D-D-I-E, can

5    you clarify if you are referring to something where it is

6    spelled, L-I-D-D-Y, for the court reporter's benefit?

7            MR. FELSEN:  Sure.

8            THE COURT:  So the exhibit is projected on the

9    screen in front of the witness.

10           You can ask your questions, Mr. Felsen.

11   BY MR. FELSEN:

12   Q    So there's an email that I'm showing you from Exhibit 39.

13   It's dated April 10th.  It's in the middle of the page from

14   Corey Weissman and it says:  Hi, Safa.  Here is the link to

15   the new agreement, same details, just new company, and us

16   helping you build the new website.  Please let me know if you

17   have any questions.

18           THE COURT:  Okay.  For the record it is spelled,

19   L-I-D-D-Y.

20   Q    So does this refresh your recollection, Ms. Gelardi, that

21   you were communicating with Giant Partners on April 10th, the

22   same day that the video took place?

23           MR. WARNER:  Objection, Your Honor.

24           THE COURT:  Overruled.

25   A    No, it doesn't refresh my collection (sic) because I

Safa Gelardi - direct - Felsen                    21

1    didn't talk to Corey and I remember -- it was just very vague.

2    It doesn't -- I'm not going to -- I'm just going to say it

3    doesn't refresh my collection.  Because it's -- this -- this

4    doesn't explain anything.  This is just a third-party sending

5    an email through third-party information.

6    Q    And then the following day there's an email, on

7    April 11th, from Corey Weissman.  It says:  Good morning,

8    Safa.  I hope all is well with you.

9            Are you planning on securing the agreement today so

10   we can get going on the website.

11           THE COURT:  Use the microphone.

12           MR. FELSEN:  Sorry.

13           THE COURT:  Go slower.

14   Q    There is another email at the top of this page from

15   April 11th, the following day after the video took place, with

16   Giant Partners.  And in this email it states:  Good morning,

17   Safa.  I hope all is well with you.

18           Are you planning on securing the agreement today so

19   we can get going on the website?  Please let me know if you

20   have any questions.

21           Does that refresh your recollection as to whether

22   you communicated --

23   A    No.

24   Q    -- with Giant Partners the day after you had this --

25   A    It does not refresh my recollection --

Safa Gelardi - direct - Felsen                    22

1        THE COURT:  Hey, Ms. Gelardi.  You have to --

2    A    -- it does not refresh my --

3        THE WITNESS:  I know the question, Your Honor.

4        THE COURT:  Hang on.  Hang on.

5        This is being transcribed.  You have to stop and let

6    him finish his question before you answer and you cannot talk

7    over him or me.

8        Okay.  Mr. Felsen, go ahead.  Finish the question.

9    Q    Does that refresh your recollection that you were

10   communicating with Giant Partners on April 11th, by email?

11   A    No, it does not, because I did not communicate with Corey

12   I do not recall communicating with Corey.

13       Again, Giant Partners is a company.  You talk to one

14   person, they pass on information, they pass on information to

15   another.  It -- it -- this was all passed -- everything was

16   misconstrued.

17       So I do not recall this email.  And I don't even

18   remember if it was sent to me.

19   Q    You would agree with me, though, Ms. Gelardi, that the

20   contents of this email is directly related to the contents of

21   the video that happened just the prior day about transferring

22   everything over to Mr. Liddie, correct?

23   A    That --

24       MR. WARNER:  Objection.

25       THE COURT:  Overruled.

VB        OCR        CRR

1    A    That is incorrect, Mr. Felsen.  You see, you guys pick

2    and choose what you want to here and see, and I get it, I

3    totally understand.

4         What happened was, I did have a meeting to transfer

5    the website, and then I did have a meeting with Jeremy which,

6    I -- I -- honest to God, on my mother's grave, totally forgot

7    because it was shot down.  So there was a meeting to transfer

8    the website.  And then there was Jeremy, he -- who wanted to

9    actually -- who set up the meeting, to the best of my

10   recollection, I, at that -- at the moment of the meeting, I

11   kind of wanted to get back at the criminal for everything that

12   she's done to me.  That doesn't mean, just because you venting

13   you say you're going to do so something, that it's going to be

14   done or that it was ever done.

15        THE WITNESS:  So the initial meeting was to transfer

16   the website, Your Honor.  The second meeting with Jeremy or --

17   first or second, I don't recall -- the meeting with Jeremy was

18   just -- it just happened at the moment where I made a decision

19   that I didn't want to leave my home, that I didn't want to

20   leave New York, that I didn't want to being sued bankrupt,

21   that I didn't want this woman to continue badgering and

22   harassing me.

23        THE COURT:  Ms. --

24        THE WITNESS:  So those were feeling that were let

25   out into that video.  It was feelings.  It wasn't facts.

Safa Gelardi - direct - Felsen                    24

1   Q    And --

2          THE COURT:  Ms. Gelardi, I will ask you to keep your

3   voice down.

4          Ask your next question, Mr. Felsen.

5   Q    Ms. Gelardi, that same day, the first page of Exhibit 39,

6   there's yet another email concerning the GoDaddy account

7   information with the password Levicunt62, correct?

8   A    Levicunt62 was my password for everything after she put

9   this case -- after what she put me through.  That was my

10  password.  This was no not my email.  This was not sent to me.

11  This was not sent from me.

12         MR. FELSEN:  Your Honor --

13  A    Gene asked me for my password --

14         THE COURT:  Ms. Gelardi --

15         THE WITNESS:  -- I'm answering him, Your Honor.

16         THE COURT:  No, no, no.

17         Again, keep your voice down.

18         THE WITNESS:  Your Honor, they're -- they're --

19  they're twisting things to fit their narrative.  It has to end

20  already.

21         Levicunt62 has become my password for almost

22  everything that I owned after everything this woman put me

23  through.  When Gene called me and said they need the

24  password --

25         MR. FELSEN:  Your Honor --

VB      OCR      CRR

Safa Gelardi - direct - Felsen                    25

1          THE WITNESS:  -- I gave him my password.  I gave him

2    the password.  This email does not come to me.  This email

3    wasn't sent from me.

4          THE COURT:  Next question.

5          Ms. Gelardi, again, if you keep this up I am going

6    to --

7          THE WITNESS:  I'm sorry.  I'm really not trying to

8    speak loud.  I'm just trying to get my point across.

9          THE COURT:  Then you can do it in a calm tone.

10          Go ahead.

11   Q    Ms. Gelardi, regardless of whether you sent this email or

12   not, wouldn't you agree with me that this email is sent in

13   conjunction with the contents of the meeting that happened on

14   the prior day?

15   A    No.

16          MR. WARNER:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          The question is:  Was it sent in conjunction with --

19          THE WITNESS:  No, Your Honor.  It wasn't.

20          THE COURT:  All right.

21          Next question.

22          MR. FELSEN:  Okay.

23          Let's look at Exhibit 54 from the last hearing.

24          (Exhibit published.)

25          MR. KATAEV:  I do have a binder for this.

1          THE COURT:  Okay.  Go ahead.

2          MR. KATAEV:  Should I give it to the witness or to

3    the Court?

4          THE COURT:  It depends on if she needs it.  She

5    obviously has a screen in front of her, that may suffice, but

6    it is up to you.

7          THE WITNESS:  The --

8          THE COURT:  There is no question pending, let's keep

9    going.

10         Mr. Felsen.

11   Q    So I'm showing you Exhibit 54, which is more conversation

12   with Giant Partners in the week following the April 10th,

13   2023, Zoom meeting.

14         So the first email is from April 19th and is says:

15   Hello, everyone.  This is Eugene, L-I-D-D-Y.  I am the owner

16   of IME Legal Reps.

17         You wrote this email, didn't you?

18   A    No, Mr. Felsen.  I did not write that email.  We've

19   already established that I did not write this email.

20         You said that the first time you asked me and I'm

21   saying it again.

22   Q    Did you --

23   A    Does that answer your question?

24   Q    Did you see the portion of the Giant Partners's video

25   where you informed Giant Partners that Liddie is spelled

Safa Gelardi - direct - Felsen                    27

1   L-I-D-D-I-E -- L-I-D-D-Y?

2   A    Yes, I did.  Did you see the portion where I said I have

3   his credit card right in front of me.  If I did, I wouldn't

4   have spelled it L-I-D-D-Y.

5   Q    So Ms. Gelardi, did you in fact watch the whole video or

6   did you only watch --

7   A    I did not.

8   Q    -- the first minute?

9   A    I -- I did not.  I went through a couple of minutes of it

10  and -- and -- and I totally forgot all about that video

11  because nothing from that video happened and it just went

12  away.  And then I was forced to leave New York.

13           So with that --

14  Q    Ms. Gelardi --

15  A    -- said, no, IME Legal Reps is not mine.  I did not send

16  this email.  I know you want to connect it somehow.

17  Q    Ms. Gelardi --

18  A    I'm helping you by giving you the answers that you're

19  asking for.

20           I did not write this email.  I did not send this

21  email.  Liddie can be spelled -- however you -- I mean, Eugene

22  can spell his name however he wants to spell his name.

23           MR. FELSEN:  Your Honor, this --

24           THE COURT:  Next question.

25           Go ahead, Mr. Felsen.

Safa Gelardi - direct - Felsen                    28

1   Q    So Ms. Gelardi, how do you know that the entire contents

2   of the video is not true if you only watched the first minute?

3            MR. WARNER:  Objection.

4   A    I only watched --

5            THE COURT:  Overruled.

6            Answer the question.

7   A    I only watched a minute or so.  And then I would fast

8   forwarded it and -- I fast forwarded it as much as I could.  I

9   did -- I couldn't watch it.  I totally forgot about it.  It

10  escaped my memory.  I blocked it.  Whatever you want to call

11  it.  I didn't remember that video until it came up into

12  evidence.

13           THE COURT:  Ms. Gelardi --

14  A    I totally forgot about it.

15           THE COURT:  -- you are not helping yourself if you

16  what you want to do is get off the stand by having these

17  tirades and outbursts.  So you just need to --

18           THE WITNESS:  Your Honor, they are asking me the

19  same questions that they did --

20           THE COURT:  You can give them a short, simple answer

21  then.

22           THE WITNESS:  Okay.

23           THE COURT:  Let me ask -- interject, though, and ask

24  you one question.

25           In the conversation you tell Mr. Koenig that you

Safa Gelardi - direct - Felsen                    29

1    have Mr. Liddie's credit card information right in front of

2    you.  His credit card.

3            Did you?

4            THE WITNESS:  No, I did not.

5            THE COURT:  So that was not true what you told --

6            THE WITNESS:  That was not true, no.

7            THE COURT:  All right.

8            Go ahead.

9    BY MR. FELSEN:

10   Q    Ms. Gelardi, I think you just said it was -- was it

11   painful to watch this video or at least the portions of it

12   that you saw?

13   A    I -- I was not -- it was not painful.  It was

14   embarrassing, because it was a -- something that I wanted to

15   do that I'm -- I -- I -- I don't want to say I'm ashamed of it

16   because it's not the right thing to do, whatever you want to

17   call it.  It was embarrassing to watch, because I totally

18   forgot that this was something that I concocted and, thank

19   God, it never took place, because I want out of New York and I

20   want nothing to do with Ms. Levi or anything else.

21           THE COURT:  Okay.

22   Q    It was painful because you had hoped all along --

23   A    No, I did not.

24   Q    -- and you never expected that we would get our hands on

25   it, correct?

Safa Gelardi - direct - Felsen                    30

 1          THE WITNESS:  Your Honor, that is an absolute false
 2   statement Mr. Felsen made.  I wasn't hoping it never came up.
 3   I totally forgot about it.
 4          THE COURT:  Okay.
 5          Next question.
 6   Q    Okay.  Let's move on to the next email on Exhibit 54.
 7   Let's go to the bottom, April 14, 2023.
 8          There's an email from SafaGelardi@gmail.com.  That
 9   is you, correct?
10   A    That is me, yes.
11   Q    And it says:  Please deactivate IMECompanions.com.  It is
12   very important that the domain IMECompanions.com be
13   deactivated ASAP.  IMELegalReps.com has to go up ASAP and when
14   a client books, we should get an email to info@IMElegalreps.
15   It is imperative that that is done ASAP.
16          You wrote that email three days after -- four days
17   after the meeting with Giant Partners on Zoom, correct?
18   A    If it said so.
19          THE WITNESS:  And, Your Honor, may I elaborate?
20   Q    You answered the question.
21          THE COURT:  The question is -- yes.
22          THE WITNESS:  Yes.  May I?
23          THE COURT:  No.  That is it.
24          THE WITNESS:  Okay.
25   A    Yes, I wrote that email.

Safa Gelardi - direct - Felsen                    31

1    Q    And there is an email right after that from Estefania

2    Sedano at GiantPartners.com.  It says:  Good morning, Safa.

3    Happy Friday.  Got it.  Will work on a couple of mockups for

4    your review.

5              And I think that's leading up to the -- I think

6    that's a follow-up to an email on the following page.

7              But you received that email, didn't you?

8    A    I don't recall.

9              Was that sent to me?

10   Q    Moving on to the second page of this exhibit, there's an

11   email from SafaGelardi.com that says:  Let's change it up a

12   little bit.

13             You wrote that email, didn't you?

14             MR. WARNER:  That's the day before, Your Honor.  He

15   asked if it was sent to her.

16             THE COURT:  Hold on a second.

17             What are you referring to, Mr. Warner?

18             MR. WARNER:  The date.  It's April 13th.  That's the

19   prior day, not the day that she said was it sent to me, which

20   was the April 14th email, and Mr. Felsen went back to

21   April 13th.

22             THE COURT:  All right.

23             So with that clarification, this is an April 13th

24   email.

25             What is your question, Mr. Felsen?

Safa Gelardi - direct - Felsen                 32

1   Q    My question is:  You wrote this email three days after

2   you had a discussion with Giant Partners about being a silent

3   partner because of the Court order and moving everything over

4   to Mr. Liddie, didn't you?

5   A    You guys are so desperate.  No.

6   Q    You didn't write that email?

7   A    No, I wrote that email, yeah.

8   Q    Okay.

9           THE COURT:  I am sorry.

10          But so what is "no" the answer to?  There wasn't a

11  call in which you said you were starting a new business?

12          THE WITNESS:  No.  That he asked a two-part

13  question.  Did you write the email because of -- in

14  conjunction to the video.

15          THE COURT:  Okay.

16          THE WITNESS:  I said no.  I didn't write it in

17  conjunction to the video, but yes, I did write that email.

18          THE COURT:  Okay.

19  Q    And the other two emails on this page --

20  A    And that -- excuse me, Mr. Felsen.  Let's change it up a

21  little bit.

22  Q    I didn't -- there's no question pending.

23  A    But --

24  Q    There's no question pending.

25  A    But --

Safa Gelardi - direct - Felsen                    33

1   Q    Ms. Gelardi, I didn't ask you a question.

2         THE COURT:  No, no.  Ms. Gelardi, there is no

3   question pending.  Wait for the next question.  Your lawyer

4   can redirect.

5   Q    On April 12th at 12:53 Conor McDaniel from Giant Partners

6   wrote:  Hey, Safa.  I hope all has been well.  It's great to

7   have you back on board.  I want to introduce you to your

8   account manager Estefania Sedano.  You're in excellent hands

9   with Estefania.

10        I've been brought up to speed and notified that the

11  immediate high-priority item is to develop a new logo and

12  transfer the IME Companions website over to the

13  IMELegalReps.com domain, and rebrand for IME Legal Reps.

14        Couple of questions for you, the GoDaddy credentials

15  you provided to Corey are incorrect.  Can you check on those

16  and send over the updated credentials for IME Legal Reps.  Can

17  we use the same colors as IME Companions?

18        You received that email, didn't you?

19  A    Yes.  And the response --

20  Q    All right.  I didn't ask a question.  You answered the

21  question.  We can move on.

22  A    That's fine.  Yes, I received that email, correct.

23  Q    And the contents of this email --

24  A    It was sent --

25  Q    Ms. Gelardi, I'm speaking.  Please let me ask a question.

1          The contents of this email is directly related to

2     that April 10th meeting with Giant Partners on Zoom, isn't it?

3     A     No.  As you see, there's a Conor, there's a Corey,

4     there's a Jeremy, there's an Estefania.  This is what you guys

5     don't understand.  You created your whole narrative in your

6     head.

7          Yes, we had a meeting with Giant Partners to

8     transfer the website.  Yes, then I had a meeting with Jeremy

9     to say, you know what, maybe I want to do this instead, so --

10    Q     Okay.  You answered the question.

11    A     These are multiple people.  They are -- they are not

12    communicating properly with each other.

13         Yes, this is the truth.  I did transfer over the

14    website.  I did initially -- I transferred over the website.

15    That was -- the initial meeting was to move everything from

16    Companions over.  That was the whole migration issue.

17         And then, you know what, in the interim, I decided

18    maybe I can stay.  Maybe Eugene would want to do this with me

19    and that's not what happened.

20         So go -- you can go ahead to your next question.

21         THE COURT:  Hold on one second.

22         Spelling of Estefania is, E-S-T-E-F-A-N-I-A, last

23    name is Soldano, I think, S-O-L-D-A-N-O, for the court

24    reporter.

25         Mr. Felsen, please remember you have a court

Safa Gelardi - direct - Felsen                    35

1    reporter for whom you need to speak slower and provide

2    spellings.

3              MR. FELSEN:  Understood, Your Honor.

4              THE WITNESS:  And I've never communicated with

5    Estefania, ever.

6              MR. FELSEN:  All right.  We're going to show you

7    Exhibit 61 from the last hearing.

8              (Exhibit published.)

9    Q    Okay.  I'm showing you in Exhibit 61 at the bottom

10   there's an email from April 25th, 2023, from

11   IMELegalReps@gmail.com.

12             It says:  Conor, you have to fix this.  People are

13   associating IME Companions to IME Legal Reps.  And that is a

14   significant issue.  We will sue Giant Partners if we lose any

15   clients because of this and it looks like we will.  We are not

16   IME Companions and the site should not be linked.  This has to

17   be fixed now.

18             That email was sent by you, wasn't it?

19   A    No, it was not.

20   Q    The we was referring to you and Eugene Liddie, correct?

21   A    I just said no.  So no, this email was not sent by me and

22   maybe you should ask the person who we is who sent the email.

23   Q    Okay.

24             I'm showing you what's been marked as Exhibit 11.

25   It's a new exhibit for this hearing.

1           (Exhibit published.)

2    Q    Now, your current company in Texas is called IME Legal

3    Advocates, correct?

4    A    My company is called The IME Company.

5    Q    IME Legal Advocates is another one of your several

6    entities, correct?

7    A    No.  IME Legal Advocates is doing business as The IME

8    Company.

9    Q    Okay.

10           And this documents that in front of you is from your

11   website, correct?

12   A    Yes, it seems so.

13   Q    Okay.

14           And under the about section of your website it says:

15   The purpose of IME Advocates is to memorialize what really

16   happened in the examination room to prevent the IME physician

17   from conducting a second EBT and to provide rebuttal testimony

18   at trial.  There are additional fees for travel to locations

19   outside of New York City.

20           That's from what your website, right?

21   A    Yes.

22   Q    Now, a new questions.

23           You just testified that you're not doing any work in

24   New York City, correct?

25   A    Yes.

Safa Gelardi - direct - Felsen                    37

1              MS. CHARRINGTON:  Your Honor.

2    Q    So why is there a reference --

3              THE COURT:  Hold on, hold on.

4              Do you have an objection?

5              MS. CHARRINGTON:  I want to object, because I have a

6    copy of these exhibits.  Actually, I have no copies of any

7    exhibits.

8              THE COURT:  Oh, give some copies --

9              MS. CHARRINGTON:  I know that Mr. Kataev said it may

10   be possible to share with Mr. Warner, but I would rather not

11   do so, so I don't know if there is any --

12             MR. ROA:  Your Honor, this is the Court's copy.  We

13   can give it to you after.

14             THE COURT:  Okay.  Fine.

15             MS. CHARRINGTON:  Okay.  Thank you.

16             THE COURT:  Okay.

17             Go ahead, Mr. Felsen.

18             MR. FELSEN:  Okay.

19   BY MR. FELSEN:

20   Q    So you just testified that this is from your website.

21             My question to you, or my first question to you is:

22   It states there are additional fees for travel to locations

23   outside of New York City.  So that means that, typically,

24   these IMEs are occurring in New York City, correct?

25   A    Wrong.

Safa Gelardi - direct - Felsen                    38

1    Q    Why would you make a separate note on your website that

2    there's additional fees for travel outside of New York City?

3    A    Sure.  I can explain that.

4          THE WITNESS:  Your Honor, when I built my website

5    for The IME Company, I don't know if you recall, but in my

6    last testimony, in the last hearing, I said I had to go the

7    cheapest route.  And I went into the Wayback Machine, and I

8    told the new website company to please just get the old

9    website.  It was the cheapest way for me to do it and just,

10   you know, I need for The IME Company.

11         So that's why it states that.  I must have not gone

12   through this thoroughly.  It is the exact website that I had

13   for IME Companions.  It is the exact same one.

14         So, okay, maybe I didn't go through it and remove

15   every single thing, but that's why it says that.

16   Q    I'll represent to you that this is the website as of

17   today.

18         So as of today, you still haven't removed that,

19   correct?

20   A    I can remove it now.  I mean, I don't see why I should

21   remove it, whether I want to do business or not.  I'm only

22   enjoined from her marketing list.

23   Q    Okay.

24         I am going to show you the second --

25         THE WITNESS:  However, Your Honor.

Safa Gelardi - direct - Felsen                    39

1          THE COURT:  No.  That is fine.  You have answered

2     the question.

3          Go ahead, Mr. Felsen.

4     Q    Okay.

5          I'm going to show you the second page of this

6     Exhibit?

7          (Exhibit published.)

8     Q    This is from IMELegalReps.com's website.  And it says:

9     The purpose of IME Legal Reps is to memorialize what really

10    happened in the examination room to prevent the IME physicians

11    from conducting a second EBT and to provide rebuttal testimony

12    at trial.  There are additional fees for travel to locations

13    outside of NYC.

14         You'd agree with me that it says verbatim what the

15    IME Legal Advocates's web page says, correct?

16    A    Correct.  And it says that on every IME website.  It says

17    that on IME Guards, it said that on IME Watchdog website, it

18    says that on all websites.  That's just a general term.

19         And again, let's not forget that Gene bought the

20    website.  So there are going to be similarities.

21    Q    And they all say the same thing because they're all your

22    companies, correct?

23    A    So is IME Watchdog my company, too?  Because it says that

24    exact same thing on IME Watchdog.

25    Q    IME Companions got that from IME Watchdog; isn't that

Safa Gelardi - direct - Felsen                    40

1  true?

2  A    No, that is not true.  That is what every company does.

3  That is the purpose of an IME.

4       THE COURT:  Not if they are operating outside of

5  New York City, they do not say that, correct?

6       THE WITNESS:  Well, only that part of the outside

7  New York City fee, but the -- the rest is, that's the whole

8  purpose of an IME company.

9       THE COURT:  Right.

10      But you are being asked about that additional fees's

11 sentence.  It would make no sense if you did not operate in

12 New York City, correct?

13      THE WITNESS:  That is correct, yes.

14      THE COURT:  All right.  Go ahead.

15 Q    Wouldn't you agree with me that if you're servicing

16 solely Texas, that it would say IMEs outside of Texas would

17 incur an additional fee?

18 A    It would make sense, Mr. Felsen.  Like I said, I just

19 explained to you.  I just had them pull up the old website,

20 make it The IME Company -- and I don't service solely Texas.

21 I serve wherever I want to serve.  I'm not enjoined from

22 servicing anyone other than her marketing list.

23 Q    During the virtual meeting with Giant Partners you

24 referred to an Apple phone.

25      Do you have more than one phone?

VB        OCR        CRR

Safa Gelardi - direct - Felsen                    41

1   A    No, I have a Samsung.

2   Q    That's your only phone?

3   A    That's my only phone.

4   Q    So when you were referring to an Apple phone, were you

5   lying again?

6   A    Well, I don't recall anything that I said about an Apple

7   phone, so I don't know what you're talking about.

8   Q    When was the last time you served the Subin firm as a

9   customer under IME Companions?

10          THE COURT:  S-U-B-I-N.

11  A    Last year of 2023, sometime last year.

12  Q    What month?

13  A    I don't recall, possibly end of March, maybe possibly

14  into the first week in April.  It was sometime last year in

15  2023.

16  Q    Okay.

17          I'm going to show you a declaration from Arnold Baum

18  dated July 23rd, 2024.

19          MR. WARNER:  Objection, Your Honor.

20          Your Honor, prohibited declarations.

21          THE COURT:  Well, he is not offering it into

22  evidence.

23          Can you explain, Mr. Felsen, why you are showing her

24  someone else's declaration?

25          MR. FELSEN:  To refresh her recollection,

VB        OCR        CRR

Safa Gelardi - direct - Felsen                    42

1  Your Honor.  She said she doesn't know exactly when the IMEs

2  went to this declaration gives a specific date from Subin.

3           THE COURT:  Let me say this to you, Mr. Warner.

4           You are right that, strictly speaking, that document

5  should only be shown to the witness.  So I am not going to

6  look at it.  I am not going to take it into account.

7           The only question is whether or not looking at that

8  affidavit, which is not being offered in evidence, refreshes

9  your memory about --

10          Mr. Felsen?

11          MR. FELSEN:  The fact that on April 21st, 2023,

12  effective April 21st, 2023, Subin Associates LLP stopped using

13  IME Companions LLC.

14          MR. WARNER:  Objection, Your Honor.

15  Q    Is that a fair statement?

16          THE COURT:  Overruled.

17          The question is, does it refresh your memory.

18          THE WITNESS:  Does it refresh my memory when they

19  stopped using me?

20          No, it still doesn't refresh my memory.  I mean,

21  like I said, it was sometime in April, March or April of 2023.

22  Q    So regardless of the actual date, wouldn't you agree with

23  me that you were serving Subin after you were enjoined to not

24  do so?  I think you already confirmed that, correct?

25  A    No, I am not going to confirm that because, like I stated

Safa Gelardi - direct - Felsen                    43

1   prior, there were calendered appointments that people went on

2   to that I did not assign.

3   Q   At the last hearing you testified that you're in poverty

4   because of this case that was brought against you, correct?

5   A   I -- I testified that I -- I am broke and I'm going even

6   more broke.

7   Q   You currently live at 26118 Crosswood Trails Lane,

8   Cypress Texas.  Correct?

9   A   Yes.

10          MR. FELSEN:  Just bear with me one minute.  We just

11  want to pull up something on the screen.

12          MR. WARNER:  Your Honor, what's the relevance of

13  this, in light of Your Honor's direction?  We went three hours

14  last time with them on May 29th, and now this is past Giant.

15          What's the relevance of this matter?

16          THE COURT:  Well, I think some of it does relate

17  back to what she testified before, which I have already

18  indicated I have some issues with in terms of veracity.  So

19  they are retreading some prior testimony in light of the

20  April 10, 2023, Zoom call.

21          This is, I gather, just new information plaintiff

22  has obtained about her claim of indigence or going broke or

23  being broke.  I assume what we are going to see in a moment is

24  an image of the house?  Is that what is coming?

25          MR. FELSEN:  We were trying to but I don't think we

                    Safa Gelardi - direct - Felsen                    44

1    can --

2            MR. ROA:  Yeah, we can't connect the computer.

3            THE COURT:  If you have a picture, you can put it on

4    top of the ELMO.

5            MR. ROA:  We don't.

6            THE COURT:  Okay.

7            Why don't you submit it later.

8            Well, we have to switch the -- you have to have the

9    right connector, and we have to switch --

10           MR. KATAEV:  I'm just going to put the screen.

11           THE COURT:  All right.  Go ahead.

12           MR. KATAEV:  I'll do it the old-fashioned way.

13           THE COURT:  Can I ask why you are waving your hand

14   over there?  Does that help?  Are you trying to make it go

15   faster?

16           MR. KATAEV:  I push the buttons faster.

17           THE COURT:  Okay.

18           MR. KATAEV:  Let's see if this works.

19           (Exhibit published.)

20           THE COURT:  All right.  So there you go.

21           This is Exhibit Number?

22           MR. KATAEV:  12.

23           THE COURT:  12, okay.

24           Plaintiff's Exhibit 12.

25           For what it is worth, it does have a caption called

Safa Gelardi - direct - Felsen                    45

1    Texas Mansion although claiming poverty.  That is, obviously,

2    editorializing by plaintiff, correct?

3              MR. KATAEV:  Correct.

4              THE COURT:  All right.

5              I am just looking at the image.  Let's focus on the

6    image.

7              So the question is:  Is this your home?

8              THE WITNESS:  Yes, this is my home.

9    BY MR. FELSEN:

10   Q    And you bought this home without having to sell your

11   Staten Island home that you recently took off the market,

12   correct?

13   A    I bought this home by selling my Philadelphia home.

14   Q    Isn't it true that you have a brother named Jusuf

15   Abdulrahim?

16   A    I do.

17   Q    And Mr. Abdulrahim started the company that we've heard

18   previously about that's called Accompanied Exams, correct?

19   A    No, that's incorrect.  There is no company called

20   Accompanied Exams.  He owns a domain.  He doesn't own a

21   company.  There's no company that's ever started.

22   Q    So IME -- I'm sorry.  Accompanied Exams is the entity

23   that we heard testimony about previously that you referred

24   Subin to, correct?

25   A    Yes, I sent that email to Subin.  Subin never used anyone

Safa Gelardi - direct - Felsen                    46

1    other -- after IME Companions.

2            THE WITNESS:  They started their own IME business,

3    Your Honor, internally.  They've only used themselves after

4    IME Companions.

5            THE COURT:  I am sorry, but the obvious question is

6    why would you refer Subin to Accompanied Exams if it actually

7    was not a viable operating business?

8            THE WITNESS:  It could have been.  I proposed to my

9    brother to start a business with me.  He shot me down, too.

10           THE COURT:  Go ahead, Mr. Felsen.

11   BY MR. FELSEN:

12   Q    Do you remember at the last hearing when Judge Chen was

13   asking you questions about Accompanied Exams and why you would

14   refer this company to Subin, you couldn't really give any type

15   of explanation and you downplayed your knowledge about what

16   Accompanied Exams was.

17           You just had -- you testified that you had just

18   heard of them, correct?

19   A    Okay.  So there was no company.

20   Q    Correct?

21           THE COURT:  No, hang on a second.

22   A    There was no company, Mr. Felsen.

23           THE COURT:  Hang on, hang on, hang on.

24           Do you recall previously testifying in response to

25   my questions --

Safa Gelardi - direct - Felsen                    47

1          THE WITNESS:  Yes.

2          THE COURT:  -- that you had just heard of

3   Accompanied Exams?

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.

6          And you did not know anything about it, correct?

7          THE WITNESS:  I didn't know anything about it

8   because it never started.  It was never a business.

9          THE COURT:  But you just testified that your brother

10  owns a domain name, correct?

11         THE WITNESS:  My brother wanted to start an IME

12  business.  He bought the domain, but then he never started the

13  business so, I didn't know anything about the business.

14         THE COURT:  But you knew it was your brother's

15  putative business, or potential business, correct?

16         THE WITNESS:  No, Your Honor.  Honestly, I did not

17  know.  I know that I talked to my brother and I asked him if

18  he wanted to do something like this.  He was like, I'll think

19  about it.

20         And then he did purchase the domain, but he never

21  followed through on the business so I never knew anything

22  about it.

23         THE COURT:  Go ahead, Mr. Felsen.

24  BY MR. FELSEN:

25  Q    And your brother bought that domain name on March 13,

Safa Gelardi - direct - Felsen                    48

1    2023, merely three days after Judge Chen issued a TRO,

2    correct?

3    A    Correct.

4    Q    And at the last hearing you conveniently and

5    intentionally omitted the fact that your brother owned that

6    domain name, when Judge Chen was asking you questions about

7    it, correct?

8              MR. WARNER:  Objection, Your Honor.

9              THE COURT:  Overruled.

10   A    Okay.  I did not want to give your client my brother's

11   information because she's a criminal and, as you see, she goes

12   after people --

13             MR. WARNER:  Move of strike, Your Honor.

14   A    -- in an unethical way using the law, using legal --

15   she's a legal bully and a legal criminal.  And I did not want

16   to put my brother in her way.

17             THE COURT:  All right.  Move on.

18   Q    Have you formed any companies other than Companions, IME

19   Legal Reps, The IME Company, and CES?

20             MR. WARNER:  Objection, Your Honor.  She's already

21   testified that she didn't form IME Legal Reps.

22             THE COURT:  Overruled.

23             Can you answer that question?

24   A    I did not form IME Legal Reps.  I did not form CES.  I

25   formed The IME Company, I formed IME Companions.

Safa Gelardi - direct - Felsen                    49

1   Q    So you're still denying that you formed Client Exam

2   Services, notwithstanding the Court's order that you did, in

3   fact, form that?

4   A    No, I did not form Client Exam Services.  We actually

5   encouraged a good friend of ours, Fari Gutierrez, to do it

6   because he knows everything that we do because he worked with

7   us for so long.  I did not form it.

8              THE COURT:  Spelling, F-A-R-I, Gutierrez, common

9   spelling.

10             Okay.  Go ahead.

11  Q    And did you likewise encourage Eugene Liddie to form IME

12  Legal Reps?

13  A    No, I did not likewise encourage Eugene.  But when Eugene

14  approached us, I thought -- I thought it would be a great idea

15  for him, anyone to do it.  Anyone to do it.

16             I'm going to start an IME university and I am going

17  to teach everybody how to do an IME business.  Because you

18  guys, your entire claim is false.  Your entire claim is built

19  on lies.  You're threatened by me --

20             MR. FELSEN:  Move to strike.

21  A    -- but then I'm just a banker.  She is just a banker.

22  She doesn't even know anything.  She's stupid.

23             THE COURT:  Okay.  Ms. --

24  A    Why would she know anything about an IME business?

25             THE COURT:  Ms. Gelardi.  Ms. Gelardi.

Safa Gelardi - direct - Felsen                    50

1    A    --  about the threat of the IME world.

2              THE COURT:  Ms. Gelardi.

3              THE WITNESS:  I'm sorry.

4              THE COURT:  You are yelling.  Okay?  You have to

5    keep your voice down or else I am going to have to remove you.

6              Go ahead.

7    Q    So Mr. Liddie, so -- after Client Exam Services was shut

8    down, Mr. Liddie just happened to come along and -- and ask

9    you about joining a new -- starting a new business?

10             MR. WARNER:  Objection to form, Your Honor.

11             THE COURT:  Overruled.

12   A    Mr. Liddie didn't just come along.  Mr. Liddie was always

13   and his wife was always involved.  His wife was a companion.

14   Mr. Liddie is an entrepreneur.  I do not control him.  I do

15   not control anyone.

16             I encouraged Fari.  I encouraged my brother.

17   Neither one of them wanted to do it.  When Liddie wanted to do

18   it, I said all I can offer you is my website.  It's a great

19   website.  Do it.  His wife new everything already.  Jeff knew

20   everything.  It's the simplest business in the world.

21             THE COURT:  Okay.

22   A    Anybody can do it.

23             THE COURT:  Ms. Gelardi again, keep your voice down.

24             Let me just interject for one second.

25             I want to make sure your testimony is clear.

Safa Gelardi - direct - Felsen                    51

1           Are you saying that you never spoke to Mr. Liddie
2   about forming an IME company called Plaintiff Advocates; yes
3   or no?  Did you ever speak to him about that?
4           THE WITNESS:  I tried.
5           THE COURT:  Tried speaking to him or you tried to
6   get him to agree to it?
7           Did you speak to him?  That is all.  Did you say
8   let's start a company called Plaintiff Advocates?  Yes or no?
9           THE WITNESS:  Not in those exact words.
10          THE COURT:  Okay.
11          Did he know that you were speaking to -- or did you
12  tell him, I should be clear -- did you tell him you were going
13  to speak to Giant Partners about setting up a website for
14  Plaintiff Advocates?
15          THE WITNESS:  No.
16          THE COURT:  So just so I understand, everything that
17  was spoken about in this Zoom conversation on April 10, 2023,
18  was false?
19          THE WITNESS:  For the most part about us working
20  together, yeah.
21          THE COURT:  So why were you speaking and spending
22  30 minutes plus, speaking to Mr. Koenig and his colleague,
23  about setting up a website for plaintiffadvocates.com?
24          THE WITNESS:  Because I would have loved for it to
25  go through at the time.  The initial meeting, Your Honor, was

1    set to -- for transferring over the website.  So it was over

2    the phone.  And that was a hundred percent clear, listen, I

3    got to sell my website.  I'm going to transfer it over to this

4    guy.

5          They set up a meeting with Jeremy.  When Jeremy --

6    right before the meeting -- I really -- I really didn't want

7    to leave my house.  I didn't want to leave New York.

8          THE COURT:  Let me stop you again.

9          THE WITNESS:  I didn't want to leave my business.

10         THE COURT:  Let me stop you again because you are

11   going off topic.

12         You told Mr. Koenig that you had an agreement with

13   Mr. Liddie to start this company; that was false.

14         THE WITNESS:  Yes.

15         THE COURT:  You said to Mr. Koenig you had credit

16   card information, Mr. Liddie's credit card information, right

17   in front of you, that was false.

18         THE WITNESS:  Yes.

19         THE COURT:  You went through and designed a whole

20   website for plaintiffadvocates.com with Mr. Koenig and

21   Mr. Weissman, over the course of about 15, 20 minutes; that

22   was all just wishful thinking on your part?

23         THE WITNESS:  Yeah.

24         THE COURT:  And you also said, very specifically,

25   that you were a 90 percent owner in this business and that

Safa Gelardi - direct - Felsen                    53

1    Mr. Liddie was just the front man.

2              That was false?

3              THE WITNESS:  That was the agreement -- that was

4    false.  That was the agreement that I was going to propose to

5    him.

6              THE COURT:  And you were going to then run a company

7    with Mr. Liddie as the front person.

8              That was your plan.

9              THE WITNESS:  That was my plan.

10             THE COURT:  And why would you make a plan like that?

11   Why, if Mr. Liddie has his own company?  Why would you do

12   that?

13             THE WITNESS:  Well, Mr. Liddie, I believe that day,

14   was coming to purchase the website.  He was coming to pay us

15   for the website.  And I thought I could convince him.

16             THE COURT:  To be the front-man for you to run

17   another company?

18             THE WITNESS:  Yeah.  To run his company.

19             THE COURT:  No, you said -- I just asked you.  You

20   said:  For him to the be the front man while you own

21   90 percent.

22             That was your plan.

23             THE WITNESS:  That would have been the -- that would

24   have been great if -- yeah, I would have loved.

25             THE COURT:  That was your plan.  That is my

VB        OCR        CRR

1   question.

2         THE WITNESS:  Honestly, Your Honor, that was my

3   plan.

4         THE COURT:  Okay.  Hang on a second.

5         THE WITNESS:  It was something that -- it wasn't

6   even a plan.  It wasn't something drawn out or thought out.

7   It was spoken.  You know, sometimes when you want to do

8   something and you just speak it, but you don't really think it

9   through or draw it out?  It was at the moment.

10        So when I -- when I originally had the meeting with

11  Jeremy, it wasn't about this.  That's what I'm trying to get

12  across.

13        THE COURT:  So your testimony is that this 30 plus

14  minute meeting was just you venting and saying spur of the

15  moment ideas about a company that Mr. Liddie would be a front

16  man of, that he had no idea about.

17        That is your testimony?

18        THE WITNESS:  He had absolutely, no clue.

19        THE COURT:  Go ahead.

20  BY MR. FELSEN:

21  Q    Mr. Liddie submitted a declaration in conjunction with

22  this motion saying that you made him an offer and he rejected

23  it.

24  A    Yeah.

25  Q    But that contradicts -- so you did make him an offer and

Safa Gelardi - direct - Felsen                    55

1    he rejected it?

2    A    I tried to make him an offer.  I -- I -- I attempted.  I

3    attempted.

4            See, Gene doesn't -- Gene doesn't allow you to

5    finish if he's not interested.  I notice that about his

6    personality.  So I wanted to.  I wanted to partner up with

7    him.  I wanted to work with him.  I wanted this plan to, you

8    know -- I tried to propose this plan, but I don't recall ever

9    getting my words out because he was just gnawing me, he was

10   just knew.  He was just gnawing me the entire time.  So --

11   Q    Ms. Gelardi --

12           THE WITNESS:  He left me alone, Your Honor.

13           THE COURT:  Go ahead.

14   Q    Ms. Gelardi, do you realize that this whole plan was a

15   blatant violation of the Court's orders?  You were looking --

16   A    If it would have went through, it would have been a

17   blatant violation, and I'm grateful that it didn't, but it did

18   not go through.

19           You can attempt to kill someone and not kill them

20   and say go to jail for murder.

21           THE COURT:  Well, if you took a substantial step,

22   you could.

23           But go ahead.

24   Q    So you had every intention in the world --

25           MR. WARNER:  I'm sorry, Your Honor, I didn't hear

Safa Gelardi - direct - Felsen                          56

1   what you --

2          THE COURT:  Never mind.  I'm just talking to myself.

3          All right.  Go ahead.

4   Q    You had every intention in the world of violating this

5   Court's order by operating a business through Eugene Liddie as

6   the front man, correct?

7   A    I had every intention in the world to keep my home and

8   keep food on the table and stay in New York, the only state

9   I've ever lived in, the only state I have ever known, and I

10  was -- I was -- I was panicking.

11         And I didn't want to --

12         THE WITNESS:  It's so hard, Your Honor, like at the

13  spur of a dime, like you can't afford to be here.  You have to

14  go.  How am I going to go?  It was so many emotions.  I would

15  have loved to be able to stay.

16         It didn't go through.  I didn't get a chance to

17  propose anything to him.  I wanted to, I tried to.  I don't

18  even remember if I got any nigh details out to him.  I don't

19  recall.

20         But I know that I wanted to.  And it -- it didn't

21  happen.

22         THE COURT:  Can I ask one last question?  I am sorry

23  to keep interrupting you, Mr. Felsen.

24         You told Mr. Koenig that you were just going to take

25  your customers from IME Companions and run this new

Safa Gelardi - direct - Felsen                    57

1   Plaintiff Advocates business with Mr. Liddie as the front man,
2   correct?

3           THE WITNESS:  That's what I would love to do.

4           THE COURT:  And why have Mr. Liddie again as a front
5   man when you could, as you said, run your own IME business
6   and, obviously, you started that.  Why do you need a front
7   man?

8           THE WITNESS:  I started it, Your Honor, but outside
9   of -- I don't live in New York.  I -- I live in Texas.  I
10  started The IME Company in Texas.  I didn't start it in
11  New York.

12          THE COURT:  But Plaintiff Advocates was going to
13  operate in New York.  Is that what you are saying?

14          THE WITNESS:  Yeah, I would have stayed in my home.
15  I would have stayed in New York.

16          THE COURT:  Again, why do you need a front person?
17  You are allowed to run a business in New York.  You just
18  cannot do it using the stolen customer list.

19          THE WITNESS:  It wasn't stolen, Your Honor.

20          THE COURT:  I already made the finding that it was,
21  but let's go on from there.

22          THE WITNESS:  I respect your finding, Your Honor,
23  but it wasn't stolen.  And it's not a customer list.  It was a
24  marketing list.

25          THE COURT:  No, answer my question though.

Safa Gelardi - direct - Felsen                    58

1          The question is:  Why did you need a front person

2    when you could run an IME business?  Why have Mr. Liddie be

3    your front person?

4          THE WITNESS:  Nothing made sense.  The whole plan

5    didn't make sense.  That's what we're trying to get across to

6    the Court.

7          THE COURT:  Let me ask you a another question.  When

8    you said you were going to take your client list from IME

9    Companions what list would that be, since 90 percent of it you

10   were prohibited from using?

11         THE WITNESS:  Your Honor, I didn't even have anymore

12   customers.  She slandered me.

13         THE COURT:  Again, when you said you were going --

14   you said it was a plan.

15         THE WITNESS:  Right.

16         THE COURT:  You offered it to Mr. Liddie.

17         What clients were you going to take from

18   IME Companions to start this new business with Mr. Liddie as a

19   front man?

20         THE WITNESS:  Your Honor, again, it was -- it was

21   talk.  It wasn't -- it wasn't thought out or drawn out.  It

22   wasn't a plan.  It was just talk.

23         So first of all, I barely had any clients to

24   transfer.  They were all gone.  They were -- first of all, I

25   was enjoined from her marketing list.  It was never a client

Safa Gelardi - direct - Felsen                    59

1    list.  At 473 clients, she shouldn't be making 45,000 a year.

2          THE COURT:  All right.  Ms. Gelardi, you have

3    answered the question.

4          Go ahead, Mr. Felsen.

5    BY MR. FELSEN:

6    Q    Ms. Gelardi, you wanted to use Mr. Liddie as the front

7    man because you knew you couldn't be out in the open violating

8    the Court order, correct?

9    A    Again, I --

10   Q    Yes or no.

11   A    -- every single way I possibly could have.  I said no

12   multiple times.

13   Q    And you're sitting here attempting to insult the Court by

14   saying that that plan which you agreed you talked about, and

15   then subsequent emails within the days thereafter, based on

16   all that evidence, you're sitting here today testifying that

17   you have absolutely nothing to do with IME Legal Reps; is that

18   correct?

19         MR. WARNER:  Objection to the insulting the Court

20   language.

21         THE COURT:  Yes.  I am going to disregard that part.

22         Go ahead.

23   A    The subsequent emails were at that point transferring

24   migration and migrating the site over.  So I'm going to say

25   your entire -- I get it and I understand, and I understand the

Safa Gelardi - direct - Felsen                    60

1  Court, and I understand your narrative.

2       The video was -- was, oh, my God.  I totally forgot

3  about it because it never came into effect because it never

4  came into life.  So again, it's -- it's -- it was talk.

5  People talk.  People say things all the time.

6  Q    Contrary to your desire, right?

7  A    Was it my desire?

8  Q    I said it didn't come to fruition contrary to your strong

9  desire, right?

10 A    I don't want to say strong, but yeah, it was something

11 that I would have -- I probably -- if he would have accepted,

12 maybe gone through with.  But no one is going to accept

13 something like that.

14 Q    Ms. Gelardi, that's your house that's up on the screen,

15 right?

16 A    Yes, it is.

17 Q    And you continue to pay the mortgage on your

18 Staten Island home; is that correct?

19 A    I rent it.

20 Q    As of when?

21 A    As of when you guys destroyed the deal, like you do with

22 every single time I'm trying to sell a house.

23 Q    You're no longer actively selling that house, are you?

24 A    No, because I rented it.

25 Q    When did you start renting it?

Safa Gelardi - direct - Felsen                    61

1    A    I don't recall, you have to ask Vito that question.  It

2    probably was right after the sale fell through.

3    Q    Why, when the sale fell through, why did you remove it

4    from the market?

5    A    I don't know, if you -- I don't know if we're

6    understanding each other.  It was rented.  It's now rented.

7    Q    How soon after the deal fell through did you find a

8    renter?

9              THE WITNESS:  I don't recall, Your Honor.  That's

10   not something that I handle.

11             Again, it was a very hefty mortgage and we needed to

12   sell or rent.  The guy was going to buy it, something went

13   through with his mortgage.  I don't know the details because I

14   don't get involved, but then he got scared -- because this is

15   what they do.

16             They did this to my Florida property.  We lost

17   $80,000 on that sale, because they threatened the people

18   buying our properties.

19   Q    You took the house off the market to avoid the plaintiff

20   from getting an attachment on that house; isn't that true?

21   A    I don't know anything about attachment or the house.  I

22   don't get involved in the real estate, Mr. Felsen.  I've

23   already told you that.

24   Q    What's the rent that the tenant is paying, currently?

25   A    I don't recall.  I know that they're paying the mortgage.

Safa Gelardi - direct - Felsen                    62

1    I know that the mortgage is -- the mortgage payment, not

2    pay -- the mortgage payment is the burden that was lifted off

3    our back.

4    Q    And you took the house off the market after the Court

5    issued the order of ATTACHMENT, correct?

6    A    No.  That is not correct.  It was still for sale.  For

7    months afterwards.  We still try to sell it.  We -- we push

8    the sale.

9          My -- my attorney was writing emails to the real

10   estate attorney continuously, what's going on with the sale?

11   What's going on with the sale?

12   Q    I don't think you understood my question.

13   A    It all fell through because the buyer couldn't --

14   couldn't buy it.  I don't know what his issue was exactly.

15   Q    The Court issued an order attaching that house and

16   thereafter is when the house was taken off the market after

17   the deal fell through, correct?

18          THE WITNESS:  Your Honor, they create their own

19   narratives.  This is what I'm trying to explain to you.  I

20   said no.  That is not what happened.

21   A    You lie, you guys lie.

22   Q    Ms. Gelardi --

23   A    You guys create your narratives.

24   Q    Ms. Gelardi, you were ordered --

25   A    You guys makeup stuff.

                   Safa Gelardi - direct - Felsen              63

1   Q    -- you were ordered --

2              THE COURT:  Ms. Gelardi, stop.

3              THE WITNESS:  Okay.  The answer is no.  We continued

4   trying --

5              THE COURT:  Ms. Gelardi --

6              THE WITNESS:  -- to sell that house for months,

7   Your Honor.

8              THE COURT:  Listen to me, just answer the question

9   so we can move on.

10             THE WITNESS:  I did.

11             THE COURT:  Your lawyer will ask follow-up.

12             But no hurling accusations, all right?

13             Mr. Felsen, go ahead.

14  Q    But you ultimately took the house off the market after

15  the Court issued the order of attachment, correct?

16  A    My God, Jesus Christ.  We said no.

17             THE WITNESS:  It was -- I think your order came

18  in --

19             THE COURT:  The question is -- you should -- the

20  answer is rather is no.

21             Next question.

22             THE WITNESS:  Thank you.

23             THE COURT:  Let's go.

24  Q    And this picture on the screen is an accurate and fair

25  depiction of your house, correct?

Safa Gelardi - direct - Felsen                    64

1   A    Yes.

2        THE COURT:  Okay.

3   Q    What's the mortgage on your current house?

4   A    I don't know if that's any of your business, Mr. Felsen.

5   Q    Please after the answer the question.

6        THE COURT:  It is, yes.

7        THE WITNESS:  Your Honor --

8        MR. FELSEN:  Objection, Your Honor.

9        THE COURT:  Yes, because there's an issue here about

10  defendants's failure to pay --

11       THE WITNESS:  Your Honor --

12       THE COURT:  Hang on a second.

13       -- pay the already-ordered forensic examination fee,

14  which is what I was going to ask you about.  And this claim

15  that somehow you cannot pay it.  I, too, want to test that.

16       So go ahead, Mr. Felsen.

17  A    My mortgage amount is a little over 4,000 a month.

18  Q    And with what money are you paying that mortgage?

19  A    I think you guys totally disregard that my husband is a

20  contractor, that he's been working hard to support his family.

21  We do more than just an IME business.  He's a contractor.

22  He's been paying the mortgage.

23  Q    And what is his -- what is his annual income?

24  A    He just started a construction company.  I don't know

25  what the annual will be.

Safa Gelardi - direct - Felsen                    65

1          THE COURT:  Let me interject just for one second.

2          Why haven't you paid the forensic examiner?

3          THE WITNESS:  Your Honor, we don't have extra to pay

4     anyone.  We can barely put food on the table.

5          We pay our bills.

6          THE COURT:  Okay.

7          THE WITNESS:  We pay our mortgage.  We live paycheck

8     to paycheck.

9          THE COURT:  Ms. Gelardi, this is why this photo is

10    rather telling.  You are living in what is fairly described as

11    a very large house, if not a mansion, with a pool.  And yet

12    you claim you cannot pay the 30 or $40,000 that is owed to the

13    forensic examiner that I have repeatedly directed you to pay,

14    that you were ordered to pay in the very beginning when this

15    case started.

16         These excuses, quite frankly --

17         THE WITNESS:  Your Honor --

18         THE COURT:  Hang on a second.

19         -- ring hollow --

20         THE WITNESS:  Okay.

21         THE COURT:  -- when I look at the lifestyle that you

22    are living and I know that you have multiple properties.

23         I do want to clarify with you as well that there is

24    no attachment that prevents the property from being sold, your

25    multiple properties.  All that is required is the proceeds

Safa Gelardi - direct - Felsen                    66

1   from it will have to go into an escrow account so that you can

2   actually then pay what is owed.  At least for the forensic

3   examination, as well as the contempt order that I have filed,

4   and the attorneys' fees requests that will accompany that.

5           So understand, you can sell your properties sell

6   your properties.  You just have to put the proceeds from it in

7   escrow.

8           THE WITNESS:  Your Honor, first I want to answer

9   your question about the lifestyle that I have.  This is a

10  middle-income house.  This is Texas.  All of Texas houses are

11  large.  Texas -- this may look like a multimillion dollar

12  house.

13          We purchased this house -- for your information, for

14  the Court's information, for $630,000.  It was not a mansion.

15  It's just another state that -- that where you can get way

16  more for less money.  At 600,000 in New York you couldn't get

17  an apartment.

18          However, we used the proceeds from our Philadelphia

19  home to purchase this house.  I -- I give you my word.  I will

20  make a deal with the forensics people after this Court date.

21  I will figure out a payment plan to get some of the money to

22  them as soon as possible.  The attachment didn't scare us and

23  didn't move us.  It just didn't happen.

24          THE COURT:  Okay.

25          THE WITNESS:  It didn't happen.

Safa Gelardi - direct - Felsen                67

 1          THE COURT:  Moving on.

 2   Q    The house has nine bedrooms, right?

 3   A    No, it does not have nine bedrooms.  It that four

 4   bedrooms.

 5   Q    Doesn't have six bedrooms?

 6   A    No, it has four bedrooms.

 7          THE COURT:  All right.

 8          Let's move on.

 9   Q    What about -- I asked you a little while ago about these

10   various companies that you formed.

11          What about The Little Companions company?

12   A    Yes.

13   Q    What's that?

14   A    That's my company.

15   Q    That's another company?

16   A    That's another company.

17   Q    And what's -- where is that company based out of, Texas?

18   A    It's not an IME company.  It's in Texas and I don't

19   understand your question.

20   Q    The Little Companions.  Where is that based, in Texas?

21   A    Texas.

22   Q    And what is the function of The Little Companions

23   company?

24   A    It's going to be a day care.

25   Q    Isn't it true that The IME Company is a member of an

                 VB      OCR      CRR

1   attorney association in Houston?

2   A    Yes.

3   Q    And isn't it true that The IME Company paid $15,000 to be

4   a member of that association?

5   A    No, that is not true.

6   Q    How much money did The IME Company pay to be a member of

7   that association?

8   A    We have yet to establish that.  We're talking to the

9   HTLA.  I made one payment to them to go to a few meetings with

10  them, which was, I believe, 2,000 and change.

11  Q    So you had $2,000 for that, but you didn't have $2,000 to

12  pay to forensic, right?

13  A    Like I said, I will make a deal with forensics

14  afterwards.  My husband's business is sometimes extra,

15  sometimes not.

16          THE WITNESS:  Your Honor, it's construction.  It's

17  whether he gets jobs or not.

18  Q    Vito -- Vito has a sister named Angela, correct?

19  A    Yes.

20  Q    Does she work for Eugene?

21  A    No, she does not.

22  Q    Why does she get paid by Eugene?

23  A    Why don't you ask Eugene?  Why would I know?

24  Q    You don't know whether or not Vito's sister gets paid by

25  Eugene?

Safa Gelardi - redirect - Warner                    69

```
 1   A    No, I do not.

 2   Q    Did you see the records that Ms. Charrington used on

 3   behalf of Mr. Liddie over the weekend?

 4   A    No, I did not.

 5            MS. LEVI:  Okay.

 6            I don't have anything further.

 7            THE COURT:  All right.  Thank you.

 8            Technically cross-examination, but it will

 9   effectively be a redirect by you, Mr. Kataev.

10   REDIRECT EXAMINATION

11   BY MR. WARNER:

12   Q    One question for you, Ms. Gelardi.

13            Did you receive any payments from the Subin firm for

14   any IMEs that were done after this Court's injunction?

15   A    No.  No, Jonathon.

16            The last payment I received from Subin Associates

17   was for the invoice of March of 2023.

18            MR. WARNER:  I have no further questions,

19   Your Honor.

20            THE COURT:  All right.  Thank you.

21            And for the record, I allowed plaintiff's counsel to

22   treat Ms. Gelardi as a hostile witness.

23            Any other questions for you?

24            MS. CHARRINGTON:  Your Honor, I have questions.

25            THE COURT:  Yes, I'm so sorry, Ms. Charrington.
```

VB        OCR        CRR

Safa Gelardi - cross - Charrington                70

1           MS. CHARRINGTON:  Just briefly.

2           THE COURT:  Yes.

3    CROSS-EXAMINATION

4    BY MS. CHARRINGTON:

5    Q    Good morning, Ms. Gelardi.

6           My name is Karen Charrington.  I represent Eugene

7    Liddie in this case, the nonparty.  I just have a couple

8    questions for you.

9           Now, you were questioned about emails.  I believe

10   they were Exhibits 39 and 54.

11          Now, is it possible that Giant Partners was not made

12   aware that you were no longer going along with the plan that

13   you were talking about on the April 10th video?

14          MR. FELSEN:  Objection.  Calls for speculation.

15          THE COURT:  Well, yes.

16          Sustained as to form but you can ask another

17   question.

18          MS. CHARRINGTON:  Yes.

19   Q    Was Giant Partners aware that you were no longer going

20   forward with the plan you discussed on April 10th?

21          THE COURT:  Sustained.

22          Let's just reform it.

23          Did you ever tell Giant Partners you were not going

24   forward with the plan for Plaintiff Advocates?

25          THE WITNESS:  No, because we had two meetings.

Safa Gelardi - cross - Charrington                71

1          THE COURT:  No, okay.

2          Go ahead.  Next question.

3    Q    So is it possible -- well, let me rephrase.

4          MS. CHARRINGTON:  I structured questions for direct.

5    I had planned to call her, but I'll rephrase.

6          THE COURT:  Well, is it possible is never going to

7    be acceptable.

8          MS. CHARRINGTON:  Yes.

9          THE COURT:  So go ahead.

10         MS. CHARRINGTON:  Yes.

11   Q    So now, when you had emailed Giant Partners, I believe on

12   or about April 14th, you weren't emailing them with respect to

13   formulating or developing a website for Plaintiff Advocates,

14   were you?

15   A    No, not anymore -- no, I never sent an email in regard to

16   Plaintiff Advocates, no.

17         THE COURT:  She said:  Not anymore.

18         THE WITNESS:  Not anymore.

19         THE COURT:  Go ahead.

20   Q    So is it a fact that you never actually formed a website

21   for Plaintiff Advocates?

22   A    I never formed a website.  I owned the domain.  I -- I

23   did try, like I said earlier, to proposition Gene.  It didn't

24   fall through.  I -- Plaintiff Advocates I owned.  So I just

25   rerouted it to my own company, The IME Company.

Safa Gelardi - cross - Charrington                72

1   Q    Okay.

2            So when Giant Partners was emailing and mentioning

3   your name on the emails you saw on the screen, at that time

4   they were not aware that you were no longer going forward with

5   your plan that you talked about on April 10th, correct?

6            MR. FELSEN:  Objection.

7            THE COURT:  Sustained as to form.

8            THE WITNESS:  Correct.

9            THE COURT:  Sustained as to form.

10           I get your point, you can make that argument later,

11  Ms. Charrington.

12           MS. CHARRINGTON:  Yes.

13  A    They were never informed.

14           THE COURT:  No, no, no.  No question is pending.

15           Go ahead.

16           MS. CHARRINGTON:  Thank you.

17  Q    Now, did you have any conversation with Mr. Liddie with

18  respect to the name of his now company, IME Legal Reps?

19  A    Did I -- did I have a conversation about -- the name?

20  Q    About his name, about naming his company.

21  A    No.

22  Q    Now, do you have any business interest in IME Legal Reps?

23  A    I don't.

24  Q    Do you receive any profits from Mr. Liddie with respect

25  to IME Legal Reps?

Safa Gelardi - cross - Charrington                73

1    A    No.

2    Q    Do you receive any monies whatsoever from Mr. Liddie?

3    A    I don't.

4    Q    Now, when --

5         MS. CHARRINGTON:  I'll withdraw that.

6    Q    You had testified previously that Mr. Liddie purchased a

7    website from you, correct?

8    A    Yes.

9    Q    When he purchased that website, did you physically turn

10   over any information related to the site to Mr. Liddie?

11   A    No.

12   Q    Did you ever personally provide any customer list or

13   marketing list to Mr. Liddie?

14   A    No.

15   Q    Did you provide any forms, reports or documentation with

16   respect to your business, to Mr. Liddie?

17   A    No.

18   Q    So when it was alleged, by showing you Exhibits 39 and

19   54, that you were actually communicating with Giant Partners

20   via an IME Legal Reps's email address, isn't it a fact that

21   you were not, in fact, communicating with Giant Partners via

22   that website -- that email, sorry?

23   A    That is true.

24   Q    And the subsequent emails where you were, in fact,

25   emailing Giant Partners, isn't it a fact that that was after

Safa Gelardi - redirect - Felsen                74

1    Mr. Liddie rejected your attempt to partner with him?

2    A    Yes.

3            MS. CHARRINGTON:  Nothing further, Your Honor.

4            THE COURT:  Thank you very much.

5            Redirect?

6            MR. FELSEN:  Thank you, Your Honor.

7    REDIRECT EXAMINATION

8    BY MR. FELSEN:

9    Q    Ms. Gelardi, you testified that you didn't email Giant

10   Partners regarding IME Advocate, correct?

11   A    IME Advocates?

12   Q    Yes.

13           I'm sorry, Plaintiff Advocates?

14   A    I don't recall.  Did I?  I'm not sure.  I mean, again,

15   nothing came through, so I don't -- I blocked it all out.

16   Nothing happened.

17   Q    I thought you just testified a moment ago that you

18   never --

19   A    I still stand by my testimony, but if I did, please show

20   it to me and refresh my memory.  I'm not trying to lie.  I

21   just don't recall.

22   Q    But -- but you -- you clearly did email Giant Partners

23   about IME Legal Reps, correct?

24   A    About IME Legal Reps?  What did I email them about IME

25   Legal Reps?

Safa Gelardi - redirect - Felsen                    75

1   Q    Did you email Giant Partners about IME Legal Reps?  Yes

2   or no?

3   A    I don't -- I don't -- I don't think I did.  I know that I

4   spoke to Corey over the phone and I told him what we were --

5   we were transferring over the website and I was walking away.

6   I don't recall sending an email in regards to IME Legal Reps

7   other than transferring the website.

8   Q    But those -- those -- those communications in the days

9   subsequent to the meeting on April 10th, all related IME Legal

10  Reps, correct?

11  A    Were they from me, Mr. Felsen?

12  Q    Yes.

13  A    Please stop switching your words.  If it's from

14  IMELegalReps@gmail, that is not me.

15  Q    Ms. Gelardi, we went through several emails 20 minutes

16  ago when you --

17  A    The only emails --

18  Q    Hold on a second.  Hold on a second.

19  A    -- that I sent.

20          THE COURT:  Let him finish the question.

21          Go ahead.

22  Q    We went through several emails where you testified that

23  it was your gmail account and you were communicating with

24  Giant Partners.  Those emails concerned IME Legal Reps in

25  relation to that April 10th meeting, correct?

1   A    No, they weren't in relation to the April 10th meeting.

2   I -- I -- like I stated, I did respond to whatever needed to

3   be done to transfer the website.  That's it.

4         Maybe there were one or two, I remember being like,

5   beat up and let down, okay.  It's over.  It's done.  I -- I

6   cannot recall every single email that I sent for a short

7   period of time to transfer over a website.

8   Q    At no point in time did you ever communicate to Giant

9   Partners that the discussion that you had on April 10th was

10  not going to happen; isn't that true?

11  A    No, we just dropped it, because, like I said, there were

12  two discussions.

13        THE WITNESS:  Your Honor, I had the initial phone

14  call that I made to Giant Partners was to, hey, look, I'm

15  selling my website.  I'm transferring it over.  I got to make

16  the connection between you and this guy.

17        Then after that phone call, it's all understood,

18  this is why I say they create a narrative.

19        Corey understood the project.  He -- he

20  recommended -- he was like, okay.  We're going to set up a

21  meeting with Jeremy and you're just going to tell him -- what

22  -- how we are going to -- he's going to help you through the

23  migration.

24        And, but, what I went on was a whole tangent about

25  something else and, no, we never went -- I never went back to

Safa Gelardi - redirect - Felsen                    77

1    tell Jeremy, hey, scrap that.  We're just going to be doing

2    what I told Corey.

3              So if that answers your question, I hope, I hope it

4    does.

5    Q    So if, in fact, this deal was being scratched, wouldn't

6    it make sense to tell Giant Partners, I'm done.  Don't --

7    disregard everything we just discussed for the last half-hour.

8              Wouldn't that make sense?

9    A    It would being perfect sense.

10   Q    And you never did that though, right?

11   A    No.  I never did that because we moved forward with the

12   first phone call that I had with Corey, which was just

13   transferring the website.

14   Q    In those emails that we looked at in the days subsequent

15   to the Zoom meeting with Giant Partners, you sent emails about

16   the colors of the website for IME Legal Reps, didn't you?

17   A    No, I did not.  What I noticed -- I saw an email in my

18   emails that said should we use the same colors?  And no one

19   responded.  And I didn't want them to move forward with that.

20             So yes, I did respond to that and said let's change

21   it up.  Because I don't want Gene to use my colors.  I want

22   him to create his own vision.  It was my website.  I created

23   that website.

24   Q    And you also communicated with Giant Partners about the

25   logo for IME Legal Reps, correct?

Safa Gelardi - redirect - Felsen                78

1   A    My logo was my logo.  I wanted mine to be mine.  I -- I

2   sold a website.  I sold the functionality of the back end.

3   The front end made no difference.  That was up to Gene to

4   change it, to remove, to do what he wanted to do.

5            THE COURT:  Okay.  Ms. Gelardi, again, keep your

6   voice down.

7            Mr. Felsen, you are going a bit beyond the --

8   certainly.

9            THE WITNESS:  It's on --

10           THE COURT:  You know, please.

11           THE WITNESS:  It's repetitive.

12  Q    You --

13           THE COURT:  The examinations of both of the lawyers.

14           Go ahead.

15  Q    You provided the watchdog list of customers to Giant

16  Partners; isn't that true?

17  A    I did.  It was the marketing list, yes.

18           It was a marketing list and it was sent for

19  marketing purposes.  You get it?  It was a marketing list.

20           THE COURT:  Ms. Gelardi, you have to -- hang on a

21  second -- you have to maintain proper decorum.  No more

22  yelling.  No more outbursts, okay?

23           Go ahead.

24  Q    And that was -- IME Watchdog's client list, which you

25  were precluded by this Court from utilizing.  And, in fact,

Safa Gelardi - redirect - Felsen                    79

1    you were supposed to turn it over to the plaintiff, but

2    nevertheless, you gave that to the marketing company, correct?

3              MR. WARNER:  Objection.

4              THE COURT:  Sustained as to compound.

5              The question is:  Did you give over the prohibited

6    customer list to Giant Partners for IME Legal Reps?

7              THE WITNESS:  For IME Legal Reps no, absolutely not.

8    I had nothing to do with IME Legal Reps marketing.

9              THE COURT:  Did you give over the prohibited

10   customer list to Giant Partners ever, for any purpose, period?

11   Simple yes or no.

12             THE WITNESS:  Yes.

13   Q    And you also provided the --

14             THE WITNESS:  Yes, but, Your Honor --

15             THE COURT:  No, no, no, no.  I do not want to hear

16   any more about it.  You can have your lawyer --

17   Q    You also provided Giant Partners with the list of

18   customers on the website, correct?

19   A    The list -- Mr. Felsen, you guys need to stop with the

20   stupid customers.  The customers's public information.

21             THE COURT:  All right.

22             Ms. Gelardi, that is it.  You are not giving any

23   more answers like this.  Enough.

24             MR. FELSEN:  I don't -- I don't believe I have any

25   further questions, Your Honor.

Safa Gelardi - recross - Charrington          80

1          THE COURT:  Okay.  Thank you.

2          Enough.  Enough, Ms. Gelardi.

3          Mr. Warner, do you want to ask anything else?

4          MR. WARNER:  No, Your Honor.

5          THE COURT:  Okay.

6          Ms. Charrington?

7          MS. CHARRINGTON:  Brief question, Your Honor.

8   RECROSS EXAMINATION

9   BY MS. CHARRINGTON:

10  Q    When you answered that you gave the customer list or

11  marketing list to Giant Partners, that was for the purpose of

12  marketing, correct?

13  A    That was not -- that was for the purpose of

14  IME Companions marketing.

15         MS. CHARRINGTON:  Thank you.

16  A    That list was in a folder of a bunch of -- 60,000

17  attorneys, not just 473.  There were 60,000 attorneys on that

18  list.

19         THE COURT:  All right.  Enough.  Thank you.  Okay.

20         MS. CHARRINGTON:  Thank you.

21         THE COURT:  You can step down, Ms. Gelardi.

22         THE WITNESS:  It's a marketing list.

23         THE COURT:  Strike the last answers.

24         (Witness excused.)

25         THE COURT:  Okay.

Liddie - direct - Kataev                    81

1          Let's have Mr. Liddie in here.

2          MS. CHARRINGTON:  Your Honor, do you want me to give

3    him that notice that you mentioned about perjury?  Do you want

4    me to reaffirm that with him?

5          THE COURT:  I will say it while he is here.

6          MS. CHARRINGTON:  All right.

7          THE COURT:  Just so that you do not have to speak to

8    him.  I would prefer to just hear from him without any break.

9          Thanks.

10         MS. CHARRINGTON:  Okay.

11         THE COURT:  Mr. Liddie, if you will come forward and

12   approach the witness stand.  I will swear you in and then I

13   just want to give you a quick caution before we start.

14         (Witness enters and takes stand.)

15         THE COURT:  So remain standing for one minute.

16         Go ahead.

17         THE LAW CLERK:  Please, raise your right hand.

18   **EUGENE LIDDIE**,

19         called as a witness having been first

20          duly sworn/affirmed, was examined and testified

21         as follows:

22         THE WITNESS:  Yes.

23         THE LAW CLERK:  Please state and spell your name for

24   the record.

25         THE WITNESS:  Eugene Liddie, E-U-G-E-N-E,

VB        OCR        CRR

Liddie - direct - Kataev                    82

1    L-I-D-D-I-E.

2              THE COURT:  Have a seat.

3              As you may recall, the microphone moves, but the

4    seat does not.

5              THE WITNESS:  Yeah.

6              THE COURT:  So you need to pull it close enough for

7    you.

8              Okay.

9              So Mr. Liddie, while you were outside the courtroom,

10   I did advise your attorney, but I want to do so to you in

11   person -- that for you, the potential consequences of a

12   finding by me, should I render one, that you have been

13   untruthful under oath, that is, perjured yourself --

14             THE WITNESS:  Yes.

15             THE COURT:  -- could have severe ramifications for

16   you because you are an active police officer of the NYPD.

17             THE WITNESS:  Yes.

18             THE COURT:  And if, in fact, I make such a finding,

19   I want you to be on notice that I will direct plaintiff's

20   counsel to provide that finding, the transcript and any

21   supporting evidence, or relevant evidence to that finding, to

22   the NYPD, because I think they have an obligation to advise an

23   opposing party, should you testify at any kind of a trial or a

24   hearing.

25             THE WITNESS:  Okay.

VB        OCR        CRR

Liddie - direct - Kataev                   83

1          THE COURT:  Or if you are named as a witness or a

2     party in a civil action.

3          So I just want you to understand that before you

4     testify.

5          THE WITNESS:  Correct.

6          THE COURT:  All right.

7          And use the microphone.

8          Are you still willing to testify today?

9          THE WITNESS:  Yes.

10         THE COURT:  All right.

11         So we will start with -- sorry, Mr. Kataev.

12         Pull the microphone closer to you again, because you

13    have to speak clearly.  You have a very sort voice, as I

14    recall.

15         THE WITNESS:  All right.

16         THE COURT:  Mr. Kataev, go ahead.

17

18         (Continued on following page.)

19

20

21

22

23

24

25

*Liddie - direct - Kataev*                                              84

1    (Continuing.)

2    DIRECT EXAMINATION

3    BY MR. KATAEV:

4    Q    Good morning, Mr. Liddie.

5    A    Good morning.

6    Q    On July 1st, 2024, you have been enjoined from serving

7    the customers on IME WatchDog's Joint Customers List.

8         You recognize this, correct?

9    A    Yes.

10   Q    What steps have you taken to comply with the Court's

11   order?

12   A    We notified the customers that we are not able to service

13   them at the moment, just the ones that actually -- anyone who

14   submitted IME request, we let them know --

15             THE COURT:  Keep your voice up, please.

16             THE WITNESS:  Yes.

17             THE COURT:  You've got to speak louder.

18             THE WITNESS:  Sorry.

19   Q    Just repeat what you said.

20   A    Oh, so any of the firms that submitted the requests for

21   an IME, we let them know we're not able service.

22   Q    How did you notify them?

23   A    Mr. Beibin, he notified them.

24             THE COURT:  Mr. Beibin.

25             THE WITNESS:  Beibin.

*Liddie - direct - Kataev*                                          85

1        THE COURT:  B-E-I-B-I-N.

2        Raise the microphone a bit.

3        THE WITNESS:  Sorry.

4        THE COURT:  Yes.  Very close to your mouth.

5        THE WITNESS:  Sorry.

6        THE COURT:  There you go.

7   BY MR. KATAEV:

8   Q    The question is how, how did Mr. Beibin notify them?

9   A    I believe that he called or he went to the office to let

10  them know sometimes in person to inform them why I wasn't

11  gonna be able to service them.

12  Q    Are you aware of any text messages that Mr. Beibin sent

13  to any customer?

14  A    No.

15  Q    Are you aware of any e-mails that Mr. Beibin sent to any

16  customers?

17  A    No.

18  Q    Did you discuss with Mr. Beibin the format of the

19  communication with the customers?

20  A    No.

21  Q    Did you instruct Mr. Beibin to only tell them via --

22  sorry -- to tell customers via telephone or in person?

23  A    Did I instruct him?

24  Q    Correct.

25  A    No.

*Liddie - direct - Kataev*                                                86

1    Q    Did you examine the Enjoined Customers List and compare
2    it to your own?
3    A    Yes.
4    Q    And you were given this list by the Court on May 4th,
5    2023, correct?
6    A    May -- no.
7            You're referring to the list that I received on the
8    1st -- I mean on the 2nd?
9            No, I never received that in May of 2023.
10   Q    You came to testify here in court on May 4th, 2023,
11   correct?
12   A    Yes.
13   Q    That was the first time you appeared in court in this
14   case?
15   A    Yes.
16   Q    And on that date, the Court gave you a copy of the
17   Enjoined Customers List, correct?
18   A    I never got it.  I never received that.
19   Q    To your knowledge, how many customers of IME Legal Reps
20   were on the Enjoined Customers List as of July 1st, 2024?
21   A    It was probably one that may not have been on there, two
22   that may not have been on there.
23   Q    So out of all your customers, your testimony is that one
24   or two were not on the list, correct?
25   A    Yes.

*Liddie - direct - Kataev*                                                      87

1   Q     So, can you quantify the total number of customers so we

2   could determine how many were on the list?

3   A     There's about ten.

4   Q     Okay.

5         And when is it that you notified these,

6   approximately, eight customers about the order and that you

7   were enjoined from serving them?

8   A     When they would request the IME.

9   Q     So, if a customer on the Enjoined Customers List did not

10  submit any request for an IME, did you not notify them?

11  A     Yeah, we didn't.

12  Q     To your knowledge, what did Mr. Beibin say to customers?

13  A     Well, the professional way to handle it would be to go

14  and sit and explain to them what happened of why we're not

15  able to service them versus to just shoot them an e-mail or

16  just not showing up at all.

17  Q     And you did not personally do that, you sent Mr. Beibin

18  to do that, correct?

19  A     Correct.

20  Q     When you were seeking to gain these customers, you

21  personally went to get them, correct?

22  A     Correct.

23  Q     And to your knowledge, what is it that Mr. Beibin said to

24  each customer?

25  A

*Liddie - direct - Kataev*                                              88

1          He said we're not moving forward.  We're just not

2    gonna be able to service -- to my understanding, just moving

3    forward we're not gonna be able to service you.  At the

4    moment, we're doing restructuring.

5    Q    Did you inform them that there's a court order

6    prohibiting you from serving them?

7    A    I'm not sure if he went into details about a court order.

8    Q    Did you tell Mr. Beibin anything about --

9    A    He's aware of it, yeah.

10   Q    Did you tell Mr. Beibin to tell the customers that there

11   exists a court order?

12   A    I didn't instruct him to do that.  I just tell him to let

13   them know that we're not gonna be able to service them.

14   Q    You did not want the customers to know about the

15   existence of the order?

16   A    No, not necessarily.

17   Q    Have you stopped serving Bergman & Bergman since

18   July 1st, 2024?

19   A    Yes.

20   Q    To your knowledge, who was spoken to at Bergman & Bergman

21   about the order?

22   A    I have no -- I don't know who was spoken to, but we

23   haven't serviced them.

24   Q    Did you stop serving Ginarte, G-I-N-A-R-T-E?

25   A    Yes.

1    Q    Who was spoken to there?

2    A    Once again, I am not sure who we spoke to, but we haven't

3    serviced anyone.

4    Q    Did you stop serving Zemsky & Salomon, Z-E-M-S-K-Y?

5    A    Yes.

6    Q    And to your knowledge, who was spoken to there?

7    A    I'm not sure.  It would either been -- I know who we

8    speak to on a basis, but it would either been Jonathan at

9    Zemsky, Gladys at Ginarte, or Melissa at Bergman.

10   Q    Right about July 1st, 2024, Mr. Beibin performed services

11   for you full-time, correct?

12   A    Say that again.  Can you repeat that?

13   Q    Right before the July 1st, 2024 order, Mr. Beibin

14   performed services for IME Legal Reps full time, correct?

15   A    Yes.

16   Q    To your knowledge, did he work in any other capacity at

17   any other business?

18   A    Not to my knowledge.

19   Q    Did you stop serving Rizutto Law, R-I-Z-U-T-T-O?

20   A    Yeah, I haven't gotten an IME from them.

21   Q    To your knowledge, who was spoken to at Rizutto Law about

22   the order?

23   A    I haven't gotten an IME from them.

24   Q    So they haven't been notified yet, correct?

25   A    No.

1    Q    Did you stop serving Rosenbaum & Rosenbaum?

2    A    Yes.

3    Q    Who was spoken to there, to your knowledge?

4    A    I haven't received an IME.

5    Q    So they're not notified about the order?

6    A    Yeah.  It wasn't to my knowledge --

7              THE WITNESS:  Your Honor, maybe I misunderstand.

8              I didn't understand I had to go and inform each of

9    them that I had a TRO.  I just did it based on the receiving

10   of the IME.

11             THE COURT:  Okay.  Go ahead.

12   BY MR. KATAEV:

13   Q    Did you stop serving Cherny & Podolsky, C-H-E-R-N-Y --

14   A    Yes, I haven't received an IME.

15   Q    -- P-O-D-O-L-S-K-I [sic]?

16             And was anyone to your knowledge notified there

17   about the order?

18   A    No, I haven't received anything.

19   Q    Have you refunded any customers that prepaid?

20   A    No one prepaid.

21   Q    Have you spoken to any other customers that we have not

22   discussed so far that were on the Enjoined Customers List

23   about the fact that you cannot serve them?

24   A    No.

25   Q    Have any customers booked IMEs on your website since

1    July 1st, 2024?

2    A    No.

3    Q    How are you notified about bookings for IMEs?

4    A    Some through the website, some through e-mail.

5    Q    Any other method?

6    A    No.

7    Q    Did you cancel any IMEs that were booked since July 21st,

8    2024?

9    A    Yes.

10    Q    To your knowledge, can you recall any of them?

11    A    I believe I think we received one from Ginarte.  I think

12    we received a couple from Ginarte, and then maybe Bergman.

13    Q    Did you recommend that Ginarte go to any other company in

14    order to have the IME services performed?

15    A    No.

16    Q    Did Jeff Beibin do so?

17    A    Not to my knowledge.

18    Q    Were any customers who booked and paid since July 1st,

19    2024, refunded?

20    A    No.  We haven't received anything since July -- since

21    when, July?

22    Q    1st, 2024.

23    A    No.

24    Q    When a customer books an IME on your website, they have

25    to pay in advance, don't they?

1  A    Yes.

2  Q    And you testified earlier that you only notified a

3  customer on the Enjoined Customers List if they booked an IME,

4  correct?

5  A    Correct.

6  Q    So, how is it that you didn't refund anyone anything if

7  they booked and then you notified them that you can't serve

8  them?

9  A    It's a good question.

10        So, a lot of the clients we have now, they actually

11  booked through e-mail, so it's not prepaid.

12  Q    So your testimony today is no one prepaid?

13  A    No, no one prepaid.

14  Q    You recognize that the Temporary Restraining Order issued

15  on July 1st, 2024 directs you to return IME WatchDog's trade

16  secrets, correct?

17  A    Correct.

18  Q    You acknowledge that you received via e-mail, through

19  e-mails with Giant Partners, a list of IME WatchDog's

20  customers, correct?

21  A    I never received that.

22  Q    Have you searched for any data containing IME WatchDog's

23  trade secrets and returned it to the plaintiff?

24  A    No.

25  Q    And you haven't done a search either, correct?

1   A    No.

2   Q    You testified on May 29th, 2024, that you sent an e-mail

3   to Giant Partners stating that you were in charge of IME Legal

4   Reps and Safa was no longer involved, correct?

5   A    Correct.

6   Q    And you signed that e-mail as Eugene Liddy, L-I-D-D-Y,

7   correct?

8   A    Correct.

9   Q    And your explanation, per the testimony at your last

10  hearing, was that you used spellcheck, which changed the

11  spelling of your name from L-I-D-D-I-E to L-I-D-D-Y, correct?

12  A    Correct.

13  Q    That's how you explained the discrepancy, right?

14  A    Correct.

15  Q    What e-mail program were you using when you sent the

16  e-mails to Giant Partners with your named spelled L-I-D-D-Y?

17  A    I wasn't using a program.  Sometimes I send an e-mail

18  from my phone and I draft it, and once I get home then I'll

19  submit it.  Sometimes I just send it from the phone.

20          MR. KATAEV:  Permission to use a demonstrative.

21          THE COURT:  Go right ahead.

22          (Demonstrative published.)

23  BY MR. KATAEV:

24  Q    You use an iPhone, Mr. Liddie?

25  A    Yes.

*Liddie - direct - Kataev*                                              94

1    Q    And you use the Mail app to send e-mails, is that right?

2    A    Yes, or Outlook.

3    Q    I'll represent to you that I'm currently using Outlook on

4    my cell phone here.

5    A    Okay.

6    Q    And I am going to type in -- one second.

7         (Pause.)

8    Q    -- your name as L-I-D-D-I-E, and I pressed space.

9         Do you see that?

10   A    Okay.

11   Q    Is there any spellcheck that alters it to L-I-D-D-Y?

12   A    No.

13        MS. CHARRINGTON:  Objection, Your Honor, only

14   because this demonstrative evidence may show whether or not

15   there will be a spellcheck on his phone.

16        THE COURT:  Right.

17        MS. CHARRINGTON:  But oftentimes, if you purchase a

18   new phone or you're using another phone, spellcheck is

19   different.

20        THE COURT:  That's true.

21        THE WITNESS:  Correct.

22        THE COURT:  Did they let you keep your phone,

23   Mr. Liddie?

24        THE WITNESS:  Right now, no.

25        THE COURT:  Interesting.

1          Because I was going to suggest you do it on his

2    phone to make it a more accurate test.  But I, unfortunately,

3    can't accept this as showing anything other than your phone

4    doesn't correct the spelling of his name to L-I-D-D-Y.

5          MS. CHARRINGTON:  But also, Your Honor, once you

6    start spelling a word a way often, spellcheck will no longer

7    change it.

8          THE COURT:  Hang on, hang on.  I don't want you

9    testifying.  So, have a seat.  You can tell me about that

10   later.

11         MS. CHARRINGTON:  Yes.

12         THE COURT:  So ask your next question, Mr. Kataev.

13   BY MR. KATAEV:

14   Q    In order for spellcheck to change the spelling of your

15   name on your phone using Outlook, did you have to use a

16   specific spellcheck function?

17   A    No.

18   Q    So what you're referring to actually when you refer to

19   spellcheck is autocorrect, right?

20   A    Yes.

21   Q    It's your testimony that the word L-I-D-D-I-E

22   autocorrects to L-I-D-D-Y, is that right?

23   A    Correct.

24   Q    But when we looked at the phone on my phone just now,

25   that did not happen, correct?

1    A     Correct.

2    Q     Did you ever set up your phone to spell your last name as

3    L-I-D-D-Y?

4    A     No.

5    Q     And on your phone, presumably, you spell your name

6    correctly, right?

7    A     Yes.

8    Q     Now, there's been testimony -- withdrawn.

9          Are you aware of the existence of a recorded April

10   10, 2023 virtual meeting between Safa Gelardi, Vito Gelardi,

11   and Giant Partners?

12   A     I am aware of it, now, yes.

13   Q     You reviewed the video, correct?

14   A     Yes.

15   Q     During that virtual meeting, Safa spells your name as

16   L-I-D-D-Y, correct?

17   A     Correct.

18   Q     You testified before that you sought to make changes to

19   the IME Legal Reps' website to make it "your vision," do you

20   recall that?

21   A     Yes.

22   Q     Can you testify as to any specific changes you made?

23   A     As far as what?  Pertaining to what?

24   Q     Anything related to the website.

25         What specific changes did you make?

1  A    Well, the previous website -- the website I have now is

2  actually a new website because the one that I had before was

3  hacked.

4         So, the one that GoDaddy assisted with doing the

5  updates, a lot of changes I made was as far as -- I mean it's

6  not much changes.  A lot of the websites of any IME company is

7  very simplistic and straightforward.

8         So -- but I made minor tweaks as far as services,

9  like I was offering investigation work, I was doing plaintiff

10 narratives.  No IME companies offer plaintiff narratives.

11        So those are just a couple of different changes.

12 Q    Where did you get the idea to do a plaintiff narrative?

13 A    From visiting law firms.  A lot of law firms were

14 requesting plaintiff narratives.

15 Q    What's one law firm you discussed the plaintiff

16 narratives with?

17 A    It's a big one, let's see.  I can't recall the name.

18 They don't even do IMEs.  They said if you do plaintiff

19 narratives, we'll use your services, but I can't remember

20 their name.

21 Q    Can you explain to the Court what a plaintiff narrative

22 is?

23 A    It's, basically, just a narrative of the -- the story

24 line of what took place in the case.

25             THE COURT:  Mr. Kataev, could you clarify when it is

 1   that Mr. Liddie said he changed the website to reflect his own

 2   vision?

 3           In other words, not when he said it, but rather when

 4   he asked to make that change.

 5           MR. KATAEV:  Sure.

 6   BY MR. KATAEV:

 7   Q    Do you recall when you directed Giant Partners to make

 8   changes to the website according to your vision?

 9   A    Do I recall the exact date?

10   Q    Give me a month and year.

11           THE COURT:  More specifically, was it back in April

12   of 2023 when the website was --

13           THE WITNESS:  Yes.

14           THE COURT:  -- first being developed?

15           THE WITNESS:  Correct.

16           THE COURT:  Okay.  So your reference to a new

17   website, that has nothing to do with what you did back then?

18           THE WITNESS:  No.

19           THE COURT:  Okay.

20           Go ahead.

21   BY MR. KATAEV:

22   Q    I am going to show you some screenshots from the IME

23   Legal Reps website and some other websites, okay.

24   A    And which other one?  I didn't -- I didn't --

25           THE COURT:  Hold on.  He said, and some other

*Liddie - direct - Kataev*                                                99

```
 1   websites.
 2              THE WITNESS:  Oh, okay.
 3              (Exhibit published.)
 4   BY MR. KATAEV:
 5   Q    Mr. Liddie, I'll represent to you that this is a
 6   screenshot from the virtual meeting that we just discussed
 7   earlier.
 8              Do you recognize that video?
 9   A    Yes.
10   Q    And in this particular screenshot of the video, it shows
11   the IME Companions website, right?
12   A    Correct.
13   Q    And the big bold letters state "Protect Your Clients"
14   right?
15   A    Correct.
16   Q    Mr. Liddie, I am now showing you a screenshot of your
17   website, www.IMELegalReps.com.
18              Do you recognize it?
19   A    Yes.
20              THE COURT:  Is it current or as of April 2023?
21              MR. KATAEV:  It's as of April 20 -- I'm sorry.
22              I'm sorry, Your Honor.  It's as of July 23rd, 2023.
23              THE COURT:  Okay.
24   Q    This website also says, "Protect Your Clients," in the
25   same way that it did with Companions, correct?
```

1    A    Correct.

2    Q    At least with respect to this page, will you agree with

3    me that you did not make any changes according to your vision?

4    A    It has some similarities, yeah.

5    Q    Now, there was a lot of testimony about a Bergman &

6    Bergman at the last hearing on May 29, 2024.

7         Do you recall that?

8    A    Yes.

9    Q    Can you explain to the Court how you obtained that firm

10   as a customer again?

11   A    I -- so at the last hearing I actually misspoke and I

12   misunderstood.

13        I do -- I do recall actually calling the firm, and

14   then I did speak to directly to Mr. Bergman because he's the

15   one who approves who does IMEs for his company.

16   Q    But somebody initially called you first, correct?

17   A    No.

18        THE COURT:  I think the question is how did you

19   decide to call Bergman.

20        THE WITNESS:  So, like I mentioned before, my wife

21   suggested to call.

22        THE COURT:  So you're saying your wife is the one

23   who told you to call?

24        THE WITNESS:  She said they're a good firm, yeah.

25   She didn't tell me to call, she actually recommended, she said

1   they were a good firm.

2            THE COURT:  Okay.  So that's what you said the first

3   time you testified.

4            THE WITNESS:  Yes.

5            THE COURT:  But last time you were here, you gave a

6   different answer.

7            Do you recall that?

8            THE WITNESS:  I do recall that.

9            THE COURT:  Okay.

10           THE WITNESS:  I spoke and at the end you questioned

11  me on that and I told you I couldn't recall.

12           THE COURT:  Okay.  Go ahead, Mr. Kataev.

13  BY MR. KATAEV:

14  Q    Now, you are aware that Bergman & Bergman is on the

15  Enjoined Customers List, correct?

16  A    I'm aware now, I wasn't aware before.

17  Q    Throughout the time that you were making changes to the

18  IMELegalReps.com website, did Safa and Vito have access to

19  make changes as well?

20  A    Can you repeat the question?  Sorry.

21  Q    Throughout the time that you were making changes to the

22  IME Legal Reps website, did Safa and/or Vito have access to

23  make changes as well?

24  A    No.

25  Q    Did Safa and/or Vito direct Giant Partners to make

1    changes at the same time?

2    A    No.

3    Q    I am going to move on to another line, but we are going

4    to come back to this with some exhibits.

5              Who are the current customers of IME Legal Reps as

6    of today?

7    A    I have G. Wesley Simpson.

8    Q    G as an initial?

9    A    Yes.

10   Q    W-E-S-L-E-Y?

11   A    Yes.

12   Q    Simpson.

13   A    And Mr. Marshall -- the law firm of Marshall Law Firm,

14   but neither has booked.

15             THE COURT:  But neither what?

16             THE WITNESS:  Neither has booked any IMEs.  They're

17   like smaller firms.

18   Q    For each of the firms that you just listed, can you give

19   us an approximate number of IMEs they book with you per month?

20   A    One.  Marshall -- Marshall probably books one maybe,

21   maybe one.  And G. Wesley Simpson is a case-by-case basis,

22   it's not --

23   Q    For the customers on the Enjoined Customers List who you

24   recently said that you can't serve anymore, how many IMEs a

25   month do they do, do they book?

1  A    It varies.  It's not consistent.  Some don't book every

2  month.

3  Q    Can you give a range month-to-month?

4  A    Anywhere from 65 to 80 maybe.

5  Q    There's a big disparity in the number of IMEs booked

6  between the enjoined customers and the customers that you were

7  left with, correct?

8  A    Correct.

9  Q    I am going to show you Exhibit 39.

10         THE COURT:  Previously admitted.

11         (Exhibit published.)

12  Q    Referring to the April 11, 2023 e-mail at 10:14 a.m.,

13  it's your testimony that you sent this e-mail to Giant

14  Partners?

15  A    Yes.

16         THE COURT:  With the password, I'm sorry to say this

17  out loud, LeviCunt62?

18         THE WITNESS:  That wasn't my information, that was

19  Safa's credentials.

20         THE COURT:  Okay.  But you sent it?

21         THE WITNESS:  Yeah, because they wanted -- they

22  pretty much asked me to get her credentials so they can start

23  the migration.

24         THE COURT:  Okay.

25  Q    Let me ask you, when you used the IMELegalReps@gmail.com

1    e-mail address, is there a particular place that you typically

2    are working from when you send those e-mails from that e-mail

3    address?

4    A    I don't understand.

5    Q    So, whenever you work on your business, IME Legal Reps,

6    and you send e-mails from this particular Gmail address, are

7    you frequently in the same setting, such as at your home, in a

8    home office, or some other location?

9    A    Yeah, it varies.  I could be anywhere.  Yeah, because I

10   work from my phone, too.

11   Q    Okay.  Do you answer any e-mails for IME Legal Reps,

12   either e-mail address, while you're on duty?

13   A    No.

14   Q    Who answers e-mails, if anyone, while you're on duty?

15   A    The only two people that have access to the e-mails is me

16   and Jeff Beibin.

17   Q    And is Jeff still working for you full-time now?

18   A    Well, we don't have any IMEs, so yeah, he's still -- if I

19   called him if we had IME, he would be available to do it, but

20   we don't have any business.  It's nothing going on.

21   Q    To your knowledge, when Jeff works and sends e-mails from

22   the IMELegalReps@gmail.com address, where does Jeff work?

23   A    I don't know where he's at at all times.

24   Q    Do you have any knowledge or sense as to where he is at

25   times when he's performing services for IME Legal Reps?

1  A     He's either on the road, maybe home.  He could be

2  anywhere.  I mean I don't know.

3  Q     To your knowledge, where does Mr. Beibin live?

4  A     He lives in Queens, Middle Village.

5  Q     At the last hearing you testified that you engaged in

6  various marketing and cold calling efforts.

7          Do you recall that testimony?

8  A     Repeat that.  Sorry.

9  Q     At the last hearing on May 29th, 2024, you testified that

10 you engaged in various marketing and cold calling efforts.

11         Do you recall that testimony.

12 A     Correct.

13 Q     How many customers have you obtained from these efforts?

14 A     All the customers that I have.

15         THE COURT:  Including the ones that are on the

16 Enjoined Customers List?

17         THE WITNESS:  Yes.

18         THE COURT:  So you cold-called those individuals?

19         THE WITNESS:  Not cold-called.

20         Initially, I would call and I wasn't really getting

21 anywhere because what happens is when you call these law firms

22 you can't get through to the people you need to speak to.  So

23 I said, let me get creative.

24         So that's when I started purchasing the Edible

25 Arrangements to go to the law firms to kind of have an entry

1    point to just speak to the necessary people you need to speak

2    to, to kind of gain access to getting their services.

3                    THE COURT:  I want to make sure I understand.

4                    When did you become aware that there was an Enjoined

5    Customer List, when was the first time you became aware of

6    that?

7                    THE WITNESS:  April -- the actual list, when did I

8    see the list or when did I know of a list?

9                    THE COURT:  Know of a list.

10                   THE WITNESS:  When I came here for the first time.

11                   THE COURT:  May of twenty-twenty --

12                   THE WITNESS:  No -- yeah, May of 2023, yes.

13                   THE COURT:  And had you cold-called any of the

14   customers on that list by the time that you were here in May

15   of 2023 to testify?

16                   THE WITNESS:  Prior?

17                   THE COURT:  Yes, prior.

18                   THE WITNESS:  Prior, no.  Prior to that -- well,

19   yes, it would have been Bergman, but I didn't even know he was

20   on the list.

21                   THE COURT:  Okay.

22                   But now you're saying you cold-called all of your

23   other customers, and that would be seven or eight who were on

24   the Enjoined Customer List, after May of 2023 when you knew

25   there was such a list?

1              THE WITNESS:  No.  I knew of the list.  I didn't

2     know who was on the list.

3              THE COURT:  And you're saying you did not get a copy

4     of the list --

5              THE WITNESS:  I never received it.

6              THE COURT:  -- after you testified the last time

7     here?

8              THE WITNESS:  Me or my attorney.  We never received

9     that.  I never received anything, Your Honor.

10              THE COURT:  But yet you knew there was a list and

11    never bothered to ask for it so that you could avoid calling

12    those individuals?

13              Because I mean at the time you knew you weren't

14    supposed to call them, correct?

15              THE WITNESS:  No.  When I left the courtroom that

16    day you said:  Stay away from Subin.  Do not go near that

17    client.

18              That was the last thing you told me.  You said:  Do

19    not go near Subin.  Everybody else, make sure you get that

20    business on your own.

21              And I've done just that.

22              THE COURT:  Okay.

23              All right.  Go ahead Mr. Kataev.

24    Q    Isn't it true, Mr. Liddie, at the end of the May 4th,

25    2023 hearing, Judge Chen took the time to warn you about the

1   existence of the order and gave you a copy of the order,

2   either in your hand or your attorney's hands?

3   A     Incorrect.  I never received anything.

4         THE COURT:  Mr. Kataev, do you have a copy of the

5   transcript?

6         MR. KATAEV:  I can pull it up.

7         THE COURT:  Okay.  Well, you can show that to me

8   later or, perhaps, you should ask the witness about it because

9   I don't recall exactly either, but if you have a copy of the

10  transcript, that would be helpful.

11        THE WITNESS:  The -- sorry.  The --

12        MR. KATAEV:  There's no question pending.

13        THE COURT:  There's no question.

14        Go ahead.  Ask your next question.

15  BY MR. KATAEV:

16  Q     In your testimony just now about Edible Arrangements you

17  referred to that as a marketing tool to obtain customers,

18  correct?

19  A     Yeah, that's the way I felt.  Not to obtain them because

20  that doesn't -- because you give somebody some chocolate fruit

21  that doesn't mean they gonna work with you.  But it's just

22  pretty much a token of their time.  Like, hey, I appreciate

23  your time.  Thank you for giving me the opportunity to speak

24  with you.

25  Q     You didn't purchase the Edible Arrangements to give the

1  law firms fruit, you purchased the Edible Arrangements to get

2  the law firms as a customer, correct?

3  A    No, that's not gonna get -- I'm not gonna get a customer

4  from giving somebody a fruit basket.

5  Q    What was the purpose of purchasing the Edible

6  Arrangements?

7  A    It was to thank them for their time, that was my creative

8  way just to thank them for their time, for taking the time out

9  of their day.  And just to give them a token of my

10  appreciation, here's an afternoon snack for your time.

11        THE COURT:  Let's move on.  I think you're quibbling

12  over semantics.  Let's go.

13        MR. KATAEV:  Okay.

14  BY MR. KATAEV:

15  Q    You responded to a subpoena that we issued you in advance

16  of this hearing, correct, through your attorney?

17  A    Through my attorney.

18  Q    And in responding to that subpoena you produced certain

19  documentation, correct?

20  A    Yes.

21  Q    One of the documents you produced was an IME Legal Reps,

22  LLC Chase Bank statement from March of 2024, correct?

23  A    Yes.

24  Q    Showing you page 2 of that bank statement, do you

25  recognize this exhibit?

1    A    Yes.

2    Q    And the first page shows IME Legal Reps, LLC, correct?

3    A    Yes.

4              MR. KATAEV:  For the record, for identification this

5    is Plaintiff's Exhibit 9 for this hearing.

6              THE COURT:  All right.

7              MR. KATAEV:  I am going to offer into evidence

8    Plaintiff's Exhibit 9 because he authenticated it.

9              THE COURT:  Yes.

10             Any objection, Ms. Charrington?

11             MS. CHARRINGTON:  No objection.

12             THE COURT:  Okay, admitted.

13             (Plaintiff's Exhibit 9 was received in evidence.)

14             (Exhibit published.)

15   BY MR. KATAEV:

16   Q    On page 2 for the period of March 14th through March 29th

17   of 2024, there are a little over a dozen Edible Arrangements

18   purchases, correct?

19   A    Correct.

20   Q    Based on all the bank statements you sent us, this is the

21   only time that you engaged in this campaign of purchasing

22   Edible Arrangements, correct?

23   A    No, incorrect.

24   Q    When was the last time you purchased an Edible

25   Arrangements?

1   A    I purchased them, from my recollection I purchased them

2   in -- aside from like January, to all the way -- I was

3   purchasing them through my personal bank account originally

4   until I made enough money to purchase it from the business

5   account.

6   Q    Can you give us the last four digits of the account

7   number for your personal from which you purchased those?

8   A    4889.

9   Q    And that's your only personal account?

10  A    No.

11  Q    And why is it that you didn't produce that bank statement

12  with your subpoena response?

13  A    I did, it's the Bank of America.

14  Q    You redacted all the transactions on your personal

15  account, correct?

16  A    Yes.

17  Q    Another question about this particular exhibit.

18       Pointing to the March 25th transaction for

19  StraightTalk Services, do you see that?

20  A    Correct.

21  Q    What is that?

22       THE COURT:  Use your microphone.

23  A    Correct.

24       THE COURT:  What is it?

25       THE WITNESS:  Oh, it's a -- it's a phone service.

1  Q    And what was the purpose of you obtaining that phone
2  service?
3  A    So, when I started the business, Mr. Beibin, he didn't
4  want to conflict his personal line with business, so I ended
5  up purchasing a phone and I paid the monthly bill.  It was
6  actually charged through the business account.
7  Q    So your testimony is that StraightTalk is for Mr. Beibin?
8  A    Correct.
9  Q    Okay.  But you used the Grasshopper app, correct?
10 A    No.  That's his personal phone.  Yeah, I use Grasshopper,
11 yes.
12 Q    Okay.
13       Before July 1st, 2024, how many observers did IME
14 Legal Reps utilize to perform services?
15 A    I can't remember.  Maybe six, five -- five or six.
16 Q    Currently how many IME observers are you utilizing?
17 A    None.
18 Q    Going back to Edible Arrangements, to your recollection
19 when was the first time you started purchasing them, month and
20 year?
21 A    I can't say.  I can't recall.
22 Q    If you purchased any Edible Arrangements, they would
23 appear on your bank records, correct?
24 A    Some, because some I would buy cash, some I would buy
25 card.  And the reason you see so many is because --

*Liddie - direct - Kataev*                                                113

1   Q    There's no question pending, Mr. Liddy.

2   A    Okay.

3   Q    I'm going to move on to another line of questioning.

4        How many hours a week do you work as a police

5   officer?

6   A    40 -- 40 -- 40 hours.

7        THE COURT:  I'm sorry to interrupt you, Mr. Kataev.

8        Why are there so many in such a short period of

9   time, were those all related to customer thank you's or

10  potential customer thank you's?

11       THE WITNESS:  No -- yeah, for the most part.

12       But what happened was they were putting -- it's

13  something within Edible Arrangements.  They would put -- they

14  would charge me -- I would buy three or four, and then it

15  accumulates points, and then they'll give you like a free one,

16  a complimentary one.  So what happened was -- but they had to

17  charge it separately.

18       So what they were doing initially was they were

19  charging me for four, and they would put it on one bill.  So I

20  was getting to see one, but I would have gotten four Edible

21  Arrangements.

22       THE COURT:  But more to the point, those Edible

23  Arrangement charges were all related to trying to drum up

24  business for your IME company, correct?

25       THE WITNESS:  Correct.

1              THE COURT:  Okay.

2              Go ahead.

3    BY MR. KATAEV:

4    Q    To your knowledge, how did customers react when you

5    informed them that you could no longer serve them?

6    A    They didn't react any way.

7    Q    How many hours a week do you work as a police officer?

8    You said 40 hours.

9              My next question is your hours as a police officer

10   are from 7:00 a.m. to 3:30 p.m., correct?

11   A    Correct.

12   Q    That's your scheduled shift and you don't work different

13   hours, correct?

14   A    That's my scheduled shift.

15   Q    I'm sorry?

16   A    Yes, that's my scheduled shift.

17             THE COURT:  I'm sorry, I didn't --

18             THE WITNESS:  That's my scheduled shift.

19             THE COURT:  Oh, okay.

20   Q    And you work five days a week according to that schedule,

21   correct?

22   A    Yes.

23   Q    But the days always rotate?

24   A    They rotate, yes.

25   Q    You also testified previously that you have a tax

1    business, correct?

2    A     Correct.

3    Q     When do you work on your tax business?

4    A     During tax season.

5    Q     What time period is that, month and year to month and

6    year?

7    A     That's January to April 15th, April 19th.  Just depends.

8    Q     And what work do you perform for the tax business?

9    A     I do taxes.

10   Q     Are you certified as a tax preparer?

11   A     Yes.

12   Q     So from January through April, how many hours do you

13   allot in a week to work on the tax business?

14   A     It just varies.  I have workers.  I have employees that

15   work at the store.  I can't be there all day.

16   Q     How many employees do you have?

17   A     Two.

18   Q     You also testified and provided evidence in the course of

19   this case about an e-commerce business named Amway, correct?

20   A     Correct.

21   Q     How many hours do you spend on that every week?

22   A     Maybe two; two, three.

23   Q     How many hours a week do you work for IME Legal Reps?

24   A     Maybe -- the work is all relative, three, four, maybe,

25   just doing different things, but not IMEs.  I don't do

1    physical IMEs.

2    Q    As a police officer, do you frequently work overtime?

3    A    No.

4    Q    So you just testified about the work you perform at IME

5    Legal Reps.

6              Can you break down in a given week how much time you

7    spend on the business?

8    A    Well, it depends.  If -- on my days off, that's when I

9    would normally go visit law firms.  So, three to four hours.

10   I mean it's on my days off.

11   Q    On Saturday and Sunday you visit these firms?

12   A    No, no.  My days rotate.  It's when I'm off during the

13   week.

14   Q    Is your testimony today that the only duty you really

15   perform for IME Legal Reps is visiting law firms?

16   A    No.

17   Q    What else do you do?

18   A    I do the invoicing for Jeff.  We work together with that.

19   But all the day-to-day operations, Jeff pretty much handles

20   that.

21   Q    When someone calls the number for IME Legal Reps on the

22   website, who answers the phone?

23   A    I do.

24   Q    What about when you're on duty?

25   A    Then Jeff will answer it.

1  Q    How does that work, how does it go to Jeff if you can't

2  answer it?

3  A    It's through the Grasshopper app, you can add multiple

4  users.

5  Q    So, if I understand correctly, Jeff Beibin has access to

6  the Grasshopper app, as well as you, correct?

7  A    Correct.

8  Q    So why is it that you needed to purchase StraightTalk for

9  him?

10 A    Because the StraightTalk actually he talks to the

11 observers through the StraightTalk, so that it doesn't

12 overflow into personal phone.

13 Q    So you're saying Jeff.  You purchased a separate phone

14 for Jeff, as well?

15 A    Correct.

16 Q    In response to the subpoena that we previously discussed,

17 did you provide us with any communications you had with

18 Mr. Beibin?

19 A    Yes.

20 Q    How many hours a night do you sleep?

21        MS. CHARRINGTON:  Objection.

22        THE COURT:  I'll allow it.  But let's have this be

23 the last question in this line of questioning.  Go ahead.

24        How many hours?

25 A    Five or six.

1            MR. KATAEV:  Last question on this topic, and I'll

2      move on, Your Honor.

3            THE COURT:  All right.

4            MR. KATAEV:  Not about sleep.

5      BY MR. KATAEV:

6      Q    You testified previously that you're separated from your

7      wife.

8            Do you have a joint custody -- do you have a custody

9      arrangement with your child?

10           MS. CHARRINGTON:  Objection.

11           THE COURT:  Ask it differently.  Just ask the

12     question you're getting at without asking about --

13     Q    Do you have any parenting time with your child?

14     A    Yeah, for sure.  I'm very involved.

15     Q    What time do you allot for parenting time in a week?

16     A    I mean if I can, every day I try to see my child.

17     Q    Is there any specific schedule in place?

18     A    No.

19     Q    How often do you see your child in a week?

20     A    At least six, seven days.

21     Q    And how many hours do you spend with your child on each

22     day?

23     A    Depends on the day.

24     Q    Can you give me a range?

25     A    So I visit -- it just depends on the day.  But if it's a

1    day that I work, maybe an hour or two, but it's late night.

2    It's the summertime, so she doesn't have school.

3                But during -- during the school year, obviously, she

4    goes to bed a lot earlier, so I don't -- I don't see her as

5    frequent.

6    BY MR. KATAEV:

7    Q    You testified at the last hearing that you're expanding

8    to Florida, Chicago and Texas, correct?

9    A    Correct.

10   Q    What customers, if any, do you have from those states?

11   A    None at the moment.

12   Q    And you're engaging in the same marketing efforts in

13   those states as you do or did in New York, correct?

14   A    Correct.

15   Q    To your knowledge, what is an EUO?

16               MS. CHARRINGTON:  Objection.

17               THE COURT:  Overruled.

18   A    Is it an examination under oath?

19   Q    To your knowledge, why do examinations under oath take

20   place?

21   A    It's pretty much an exam before -- if they're not gonna

22   settle the case, then they -- to my understanding, if they're

23   not gonna settle the case, then they actually the last -- they

24   have an examination under oath if they're not gonna settle the

25   case.

*Liddie - direct - Kataev*                                    120

1   Q    I'm going to show you the May 4th, 2023 hearing

2   transcript on page 127, lines 16 through 25.

3            (Exhibit published.)

4   Q    I'll represent to you, Mr. Liddie, that this is an

5   excerpt of the Court's statements to you starting from line 16

6   and I quote:  But I do want to give a copy of this amended

7   preliminary injunction to your lawyer so she can properly

8   advise you about the overall contours of that, because you

9   have in some way received information, it appears, maybe...

10  so -- that is covered now by this injunction.

11           Do you see that?

12           THE COURT:  Well, it says:  maybe through your

13  wife -- I say your wife.  This is back in 2021 or so -- that

14  is now covered by this injunction.

15           Do you remember me saying that to you?

16           THE WITNESS:  I can't remember exactly, Your Honor,

17  but....

18  BY MR. KATAEV:

19  Q    When you were here on May 4th, 2023 and the Court made

20  this statement to you, the Court gave your attorney a copy of

21  the preliminary injunction, didn't the Court?

22  A    No.  I never received it.

23           MS. CHARRINGTON:  Objection.  Objection, Your Honor,

24  as to the actual document that was received.

25           I don't know if you'd like me to have a speaking

1  objection, if we should approach outside of the presence of

2  the witness, but what was stated was the preliminary

3  injunction, not the customer list.

4          MR. KATAEV:  I'll move on.

5          MS. CHARRINGTON:  Okay.

6          THE COURT:  Let's move on.  We can discuss this

7  outside the presence of Mr. Liddie.

8  BY MR. KATAEV:

9  Q    Regardless of whether you physically received something,

10 you don't deny that the judge said this to you, correct?

11 A    Yeah.  I remember she mentioned it in the case, yes.

12 Q    And it's written in black and white on what I just showed

13 you, correct?

14 A    Correct.

15 Q    After hearing that statement, you didn't take any effort

16 to obtain a copy of the injunction or the Enjoined Customer

17 List, did you?

18         MS. CHARRINGTON:  Objection.

19         THE COURT:  Overruled.

20         Did you make any effort to get a copy of the

21 injunction or the Enjoined Customer List?

22         THE WITNESS:  No.  I -- I was -- I didn't -- no, I

23 did not make a effort.  I didn't know I needed to get a copy

24 of it.

25         THE COURT:  Can I ask, Mr. Kataev?

1          The transcript also says that I did warn you,

2   Mr. Liddie, not to take any recommendations for clients from

3   Mr. Beibin because his customer list would have --

4          THE WITNESS:  Correct.

5          THE COURT:  -- come from IME --

6          THE WITNESS:  Correct.

7          THE COURT:  -- Companions, which is the Enjoined

8   Customer List, in large part --

9          THE WITNESS:  Correct.

10          THE COURT:  -- you understood that, right?

11          THE WITNESS:  Yes, I did understand.

12          THE COURT:  So, have you taken any recommendations

13   from Mr. Beibin as to clients or potential clients to contact?

14          THE WITNESS:  No.

15          THE COURT:  Never?

16          THE WITNESS:  Never.

17          THE COURT:  Okay.

18          Go ahead.

19   BY MR. KATAEV:

20   Q    And that's your testimony despite the fact you just

21   testified that Mr. Beibin handles the day-to-day operations

22   for IME Legal Reps, correct?

23   A    Yeah, he does.

24   Q    On May 4th, 2023, you understood that the purpose of the

25   hearing was to determine the extent of Safa and Vito's

*Liddle - direct - Kataev*                                              123

1    involvement in IME Legal Reps, correct?

2    A    Correct.

3    Q    And you were asked questions about the extent of their

4    involvement in IME Legal Reps, correct?

5    A    Are you talking about May 2023?

6    Q    May 4th, 2023?

7    A    Yes.

8    Q    And you testified at the hearing that Safa's only

9    involvement was selling you the website and transferring the

10   contents over, correct?

11   A    Correct.

12   Q    Are you aware that Mr. Koenig of Giant Partners submitted

13   a declaration confirming that everything discussed at the

14   April 10th, 2023 hearing -- sorry, April 10th, 2023 virtual

15   meeting was for IME Legal Reps?

16        MS. CHARRINGTON:  Objection.

17        MR. KATAEV:  It's awareness.

18        THE COURT:  Sustained as to form.

19        Ask the question again.

20   Q    Are you aware of the existence of any declaration

21   provided by Mr. Jeremy Koenig of Giant Partners?

22   A    We -- no, I'm not aware.

23        THE COURT:  No, no, no.  Let's have a quick sidebar

24   on this.

25        MR. KATAEV:  Sure.

1              (Sidebar conference held on the record in the

2     presence of the Court and counsel.)

3              THE COURT:  As a general matter, Mr. Kataev, I don't

4     want you to have one witness commenting on what other witness

5     states in a declaration or otherwise.

6              You're, basically, pitting him against another

7     witness, but you can ask him the question:  Isn't it true that

8     whatever followed after April or -- first, you should ask him

9     if he was aware of the Zoom or virtual meeting.

10             MR. KATAEV:  I believe he testified so, but I'll ask

11    it again.

12             THE COURT:  Yes, ask that again and just say:  Were

13    you aware or isn't it true that all of that related to IME

14    Legal Reps?  And just let his answer fall where it may.

15             If you have a declaration that contradicts it, I'll

16    consider it against that, but I don't want you saying:  Are

17    you aware of this declaration?  Can you explain why he said

18    this and you're saying that?

19             Okay?

20             MR. KATAEV:  Okay.  Thank you, Your Honor.

21             (Sidebar concluded; proceedings continued.)

22             (In open court.)

23             THE COURT:  Sustained.  Ask another question.

24    BY MR. KATAEV:

25    Q    Mr. Liddie, you are aware of a reported April 10th, 2023

1  virtual meeting, correct?

2          THE COURT:  Between Giant Partners and Safa and Vito

3  Gelardi, were you aware of that virtual meeting on April 10,

4  2023?

5          THE WITNESS:  Prior to seeing it through the courts

6  or --

7          THE COURT:  Well now, let's start with now.

8          THE WITNESS:  Now, yes.

9          THE COURT:  And are you saying you are only aware of

10  it because of the video?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.

13          Go ahead.

14          Have you viewed that video?

15          THE WITNESS:  I saw the video.

16          THE COURT:  The entire video?

17          THE WITNESS:  Yeah.

18          THE COURT:  Okay, go ahead.

19  BY MR. KATAEV:

20  Q    During that video there was a discussion about opening up

21  a company called Plaintiff Advocates, correct?

22  A    Correct.

23  Q    But isn't it true that everything that was discussed for

24  Plaintiff Advocates was ultimately implemented for IME Legal

25  Reps?

1    A    No.

2    Q    Now, at the May 4th, 2023 hearing, you did not mention or

3    testify about any discussions you had with Ms. Gelardi about a

4    partnership, correct?

5    A    Correct.

6    Q    And you did not mention any such discussions about such a

7    partnership during the May 29th, 2024 hearing, correct?

8    A    Correct.

9    Q    You did not mention any proposals from Safa at either of

10   those hearings or in any of your declarations until after the

11   video, correct?

12   A    Correct.

13   Q    The only reason you now mention any such proposal in a

14   subsequent declaration was because the video of the

15   April 10th, 2023 virtual meeting surfaced, correct?

16   A    Incorrect.

17   Q    The proposal Safa made to you you rejected, correct?

18   A    Correct.

19   Q    But the proposal Safa made to you is relevant to her

20   involvement or lack of involvement in IME Legal Reps, correct?

21              MS. CHARRINGTON:  Objection.

22              THE COURT:  Overruled.  If you understand the

23   question.

24   A    I don't understand the question.

25              MR. KATAEV:  Okay.

```
 1              THE COURT:  Okay.  Go ahead.
 2   Q    You -- you submitted a declaration swearing that Safa
 3   made this proposal and you rejected it, correct?
 4   A    But she never made the proposal.  I wasn't interested in
 5   any partnership.  Just because for the very exact reason being
 6   dragged into court.  I didn't want nothing to do with this.
 7   Q    But Safa discussed her proposal with you, didn't she?
 8   A    No, she did not go into detail.
 9   Q    She discussed a proposal without going into detail,
10   correct?
11   A    No.  She mentioned a partnership and I said, I'm not
12   interested.  I just want to move forward with buying the
13   website like we initially agreed on.
14   Q    Okay.  So, you did not testify about the fact that she
15   mentioned a partnership at either hearing, correct?
16   A    Correct.
17   Q    By omitting that information during your testimony, you
18   were not truthful, correct?
19              MS. CHARRINGTON:  Objection.
20              THE COURT:  Sustained.
21              MR. KATAEV:  Can I have just a minute to see if I
22   have anything else?
23              THE COURT:  All right.
24              (Pause.)
25   BY MR. KATAEV:
```

1  Q    You formed IME Legal Reps in April of 2023, correct?

2  A    Correct.

3  Q    That was during your busiest time of tax season, wasn't

4  it?

5  A    No, tax season was done by -- by the end of March, tax

6  season is done.

7  Q    You had an observer perform services for IME Legal Reps

8  named Angela, correct?

9  A    Incorrect.

10 Q    In the bank statements you produced, there are Zelle

11 payments to a woman named Angela, correct?

12 A    Correct.

13 Q    Can you explain why there are transactions to Angela?

14 A    So, the transactions were to Angela because that's Jeff

15 Beibin's wife.  So when he was up for disbursement something

16 was wrong with his Zelle, so he asked me if I could Zelle it

17 to his wife.

18 Q    And Angela is related to Vito Gelardi, correct?

19 A    To my understanding, yes.

20 Q    Angela is Vito's sister, correct?

21 A    Correct.

22       MR. KATAEV:  Final question, Your Honor.

23 Q    Isn't it true that approximately 98 percent of IME Legal

24 Reps' legal income is from customers on the Enjoined Customers

25 List?

1    A    Yes.  I mean that would be true, yeah.

2            MR. KATAEV:  I have no further questions.

3            THE COURT:  All right.  Thank you, Mr. Kataev.

4            We will go in the same order.

5            Mr. Warner, any questions?

6            MR. WARNER:  No questions, Your Honor.

7            THE COURT:  Okay.  Ms. Charrington.

8    CROSS-EXAMINATION

9    BY MS. CHARRINGTON:

10   Q    Now, Mr. Liddie, you testified that Mr. Beibin conducts

11   the day-to-day operations at IME Legal Reps, correct?

12   A    Yes.

13   Q    Does he conduct any marketing tasks for IME Legal Reps?

14   A    No.

15   Q    You were also asked whether or not you work overtime as a

16   police officer.

17           Now, must you work overtime in your position you're

18   in now?

19   A    No.

20   Q    So you can choose to work overtime if you please?

21   A    Correct.

22   Q    Okay.

23           Now, you were also asked about the Edible

24   Arrangements and why there were so many purchases during that

25   time of the month.

1          Why did you purchase the Edible Arrangements or that

2    many Edible Arrangements during that time of the month or, I

3    should say, rephrase, during that time of the year?

4    A    There's no specific reason.  It was just during that time

5    of the year I had weekdays off, so my availability was more

6    open to visit law firms because I had a weekday off.  When I

7    have weekends off, I can't visit law firms.  When I have

8    weekdays off -- it's based on my schedule.

9    Q    Now, you were also asked about -- one moment.

10         You were also asked whether or not you worked with

11   Giant Partners to develop IME Legal Reps' website to be your

12   own.

13         Do you remember that testimony?

14   A    Yes.

15   Q    And so isn't it a fact that you did work with someone by

16   the name of Estefania at Giant Partners to develop the

17   website?

18   A    Yes.

19   Q    Okay.  And do you recall having several e-mails back and

20   forth with Estefania to develop the IME Legal Reps' website?

21   A    Yes.

22         MR. KATAEV:  Objection, leading.

23         THE COURT:  Overruled.

24   Q    And do you recall that you changed certain sections of

25   the website to make it your own with Estefania?

1  A    Yes.

2  Q    And there were sections such as the About Us section of

3  the website that you changed with her, correct?

4  A    Correct.

5         MR. FELSEN:  Your Honor, these are all leading

6  questions.

7         THE COURT:  Understood.  It's fine.  This is,

8  technically speaking, cross, so I am going to allow her to do

9  that.

10        MS. CHARRINGTON:  Thank you, Your Honor.

11 MS. CHARRINGTON:

12 Q    And you also changed areas, such as the Our Client page,

13 on your website with Estefania, correct?

14 A    Correct.

15 Q    And you recall e-mailing or do you recall e-mailing with

16 her between the dates of April 19th to April 20th or

17 April 21st?

18 A    Correct.

19 Q    Do you recall that?

20 A    Yes.

21 Q    Now, you were also questioned about the spelling of your

22 name in one of the e-mails.

23        Are there times when you send e-mails without

24 proofreading your e-mail?

25 A    Yes.

1    Q    Are there times when you draft an e-mail and it

2    autocorrects certain words in an e-mail?

3    A    Yes.

4              MR. KATAEV:  Objection, leading.

5              THE COURT:  Again, overruled.

6              You can answer.

7    A    Correct.

8    Q    Now, prior to forming IME Legal Reps, did you have any

9    prior desire to develop or form such a company related to

10   IMEs?

11   A    Yes.

12   Q    And was that prior to April of 2023?

13   A    Yes.

14   Q    How far prior to April 2023 can you recall having that

15   desire?

16   A    Probably as early as 2021.

17   Q    Now, we talked a little or you talked a little bit about

18   the April 10th recording where Safa Gelardi was speaking to

19   someone at Giant Partners.

20             Do you recall that testimony?

21   A    Correct.

22   Q    And you stated that you viewed the video, correct?

23   A    Yes.

24   Q    And do you recall in that video where Safa Gelardi speaks

25   about an operating agreement that you would have with her, do

1  you recall that?

2  A    Yes.

3  Q    Do you have any operating agreement, whether written or

4  oral, with Safa Gelardi?

5  A    No.

6  Q    Regarding any company whatsoever?

7  A    No.

8  Q    And specifically, regarding IME Legal Reps?

9  A    No.

10 Q    And did you also hear what she said that she had your

11 credit card in her possession at the time?

12 A    Correct.

13 Q    Did she, in fact, have a copy of your credit card or your

14 credit card?

15 A    No.

16 Q    Has Safa Gelardi ever had a physical credit card with

17 your credit card information?

18 A    No.

19 Q    Did you authorize her to use your credit card for any

20 purchases whatsoever?

21 A    No.

22 Q    And when it comes to or when it came to purchasing your

23 domain name for IME Legal Reps, who made that purchase for the

24 domain name?

25 A    I did.

1   Q    Now, you mentioned that Safa Gelardi mentioned something

2   about a partnership with you sometime around April 10th of

3   that recording, correct?

4   A    Yes.

5   Q    And you were also asked whether or not you rejected that

6   proposal, correct?

7   A    Yes.

8   Q    And you did reject the proposal?

9   A    Yes.

10  Q    So after rejecting the proposal, did you continue to work

11  with Giant Partners with respect to developing the website for

12  IME Legal Reps?

13  A    Yes.

14  Q    And in the process of developing that website, did you

15  receive any documents whatsoever from Safa Gelardi?

16  A    No.

17  Q    Did you receive any customer list?

18  A    No.

19  Q    Did you receive any lists of law firms in the state of

20  New York?

21  A    No.

22  Q    Did you receive any list where you were knowledgeable

23  about whether or not those were customers for Safa Gelardi or

24  IME Companions?

25  A    No.

*Liddie - cross - Charrington*                                    135

1    Q    Now, did you play a specific role in changing the website

2    from IME Companions to IME Legal Reps -- withdrawn.  I'll ask

3    it a different way.

4            Giant Partners developed the website for IME Legal

5    Reps, correct?

6    A    Correct.

7    Q    And they handled all of the changes that needed to be

8    made to the website to make it your own, correct?

9    A    Correct.

10   Q    Did you have to make specific changes to that website, or

11   did Giant Partners make the changes on your behalf?

12   A    They made the changes on my behalf.

13   Q    So, as part of receiving -- withdrawn.

14           As part of your purchase of the website, did you

15   have to actually receive any materials or documents related to

16   the website?

17           MR. KATAEV:  Objection, argumentative.

18           THE COURT:  Overruled.

19   Q    Did you have to receive -- did you physically receive any

20   documents --

21   A    No.

22   Q    -- or -- or anything of the like regarding the website,

23   itself?

24   A    No.

25   Q    Did Giant Partners handle the receipt of any of that

1    information, if there was any?

2             MR. KATAEV:  Objection, calls --

3             THE COURT:  Sustained.  Calls for speculation.

4             MS. CHARRINGTON:  Okay.

5             THE COURT:  I am going to interject here for one

6    second, though.

7             Did you communicate with Safa Gelardi, though,

8    during this process where the website --

9             THE WITNESS:  Yes.

10            THE COURT:  -- IME Companions website was being

11   migrated to your website?

12            THE WITNESS:  Did we talk during that timeframe?

13            THE COURT:  Yes.

14            THE WITNESS:  Yes.

15            THE COURT:  And did you ask Ms. Gelardi if she

16   provided documents to Giant Partners for that purpose?

17            THE WITNESS:  No.  When we would talk, it wouldn't

18   be about that.  That was minor.  Like if we did talk on the

19   phone, it was mostly about life, different things.  It wasn't

20   about migration.  It was little -- little small talk about

21   migration, but it wasn't nothing where we were talking about

22   what she was giving because -- it was -- it was no documents

23   to give.

24            THE COURT:  Didn't you pay her for the website?

25            THE WITNESS:  I did.

1        THE COURT:  Okay.  But you didn't talk to her about

2   facilitating that process and what she was doing to make that

3   happen with Giant Partners?

4        THE WITNESS:  She just told me she spoke to them and

5   that they was gonna start the migration process.  So they were

6   gonna reach out to me to start that process.

7        It wasn't -- she had the contract with them, so she

8   had to kind of, like, initiate everything so that I can then

9   come on board and pay for the services as well, so they start

10  work on it.  That's what I did.

11       Once I paid for the service, then they could start

12  communicating.  Prior to that, it was her.  She was the one

13  who had the relationship with them.

14       THE COURT:  But there was an e-mail that we saw

15  where you were conveying the GoDaddy information from Safa

16  Gelardi's account, right?

17       THE WITNESS:  Right.

18       THE COURT:  So you had to get that from her, right?

19       THE WITNESS:  Yes.  I did get that from her, yes.

20       THE COURT:  Okay.  And wasn't there other

21  information that you had to get from her in order to

22  facilitate the migration process?

23       THE WITNESS:  No.

24       THE COURT:  So that's the only thing that --

25       THE WITNESS:  The only thing.

1    THE COURT:  -- you got from her, and that's the only

2  time you talked to her about this migration process?

3    THE WITNESS:  Correct.

4    THE COURT:  Go ahead.

5  BY MS. CHARRINGTON:

6  Q    And just following up on that point, when you were asked

7  is that the only thing you talked about, you did mention that

8  you would have small talk about the migration of the website,

9  is that correct?

10  A    Right.

11  Q    And is it fair to say that the reason why you wouldn't

12  need to have detailed conversations with Safa Gelardi is

13  because Giant Partners was the middle company handling the

14  migration of the website?

15    MR. KATAEV:  Objection.

16    THE COURT:  Sustained.

17  A    Correct.

18    THE COURT:  Sustained.  That's a little bit too much

19  leading.

20    MS. CHARRINGTON:  Okay.

21    THE COURT:  You're, basically, telling him what to

22  say.

23    So, just answer the question open-endedly.

24    MS. CHARRINGTON:  Yes.

25  Q    So why wouldn't you have needed to have detailed

1   conversations with Safa Gelardi about the migration of the

2   website?

3   A    Because I was gonna be working with Giant Partners as far

4   as the sampling and the mock-ups, as far as how I was gonna

5   set the website up.

6   Q    So just to be clear, when there were communications that

7   you viewed on the e-mails between yourself and Giant Partners,

8   you were speaking -- let me ask you, were you speaking to

9   Giant Partners with respect to your company IME Legal Reps?

10  A    Correct.

11  Q    You were not speaking to Giant Partners with respect to

12  any other company, such as Plaintiff Advocates or IME

13  Companions, is that right?

14  A    That's right.

15  Q    Now, to your knowledge, did Safa Gelardi have access to

16  your e-mail info@legalreps or info@legalreps.com?

17  A    No.

18         THE COURT:  So you're saying she could never have

19  sent an e-mail from your IMELegalRepresentatives.com e-mail?

20         THE WITNESS:  No, Your Honor.

21  MS. CHARRINGTON:

22  Q    So, Mr. Liddie, you understand the issue here, right,

23  where there is an e-mail with your name spelled L-I-D-D-Y, and

24  on the video Safa Gelardi is spelling your name that way.

25         You -- what is your explanation for how that

*Liddie - cross - Charrington*                                               140

1    happened?

2    A    I have -- I really don't have no explanation for that.

3    Most people would spell my name L-I-D-D-Y.

4    Q    Right.

5              THE COURT:  Yet --

6    Q    But the point is --

7              THE COURT:  My apologies, I interrupted you.

8              I'm just asking now, but you wouldn't?

9              THE WITNESS:  No.

10             THE COURT:  Yet you say that in the e-mail your own

11   name was misspelled --

12             THE WITNESS:  Right.

13             THE COURT:  -- because of why?

14             THE WITNESS:  Autocorrect.

15             THE COURT:  The autocorrect?

16             THE WITNESS:  Right.

17             THE COURT:  Just so you know, Ms. Charrington, I am

18   going to ask him to bring his phone up here --

19             MS. CHARRINGTON:  Yes.

20             THE COURT:  -- later so I can see this in action.

21             MS. CHARRINGTON:  Absolutely.

22   MS. CHARRINGTON:

23   Q    When you're saying it's because of autocorrect, you are

24   assuming that that's what happened, that you drafted an e-mail

25   and autocorrect changed the name, that's what you're

1   testifying to?

2   A    Correct.

3   Q    Meaning you don't know for a fact that happened, but

4   that's your only explanation?

5   A    Correct.

6   Q    Now, did Giant Partners have to market -- withdrawn.

7         Did Giant Partners market IME Legal Reps for

8   business?

9   A    No.

10  Q    Was their only purpose to migrate the website and -- and

11  make it your own for IME Legal Reps?

12  A    Yes.

13  Q    Now, to do that, if you know, would they have needed

14  customer lists --

15  A    No.

16  Q    -- If you know?  Okay.

17         Does Safa Gelardi or Vito Gelardi have any ownership

18  rights or interest in your business at all?

19  A    No.

20  Q    Do you have to pay them any money whatsoever?

21  A    No.

22  Q    Do you need to send them any monies or profits from your

23  business?

24  A    No.

25  Q    You were also asked about a list that you -- that you

*Liddle - cross - Charrington*                                    142

1   were told you may or may not have been given prior -- in your

2   prior testimony.

3           Did you utilize any list or information from this

4   proceeding to acquire any of your customers?

5   A    No.

6   Q    And let me ask you about that list.

7           Have you now had an opportunity to view the list?

8   A    Yes, briefly.  Yes, I scanned it.

9   Q    And in terms of the firms -- well, let me ask you:

10          What does this list compose -- what is this list

11  composed of?

12  A    It's a lot of personal injury law firms.

13  Q    And are these personal injury law firms unique in any

14  way?

15  A    No.

16  Q    So, can you just state for the Court how it is that you

17  locate the firms that you'd like to serve?

18  A    I just do a Google search.

19          THE COURT:  Of what?

20          THE WITNESS:  Of different personal injury law

21  firms.

22          THE COURT:  In what area?

23          THE WITNESS:  All areas.

24          THE COURT:  Geographically.

25          THE WITNESS:  I go as far as out to Jersey now.

1          THE COURT:  So, New York City?

2          THE WITNESS:  New York City, New Jersey,

3  Philadelphia.  I went to school in Philadelphia, so sometimes

4  I go to Philadelphia.

5  MS. CHARRINGTON:

6  Q    So what specifically do you search, do you just say

7  "personal injury firms in New York or New Jersey" or are you

8  looking for anything specific?

9          MR. KATAEV:  Objection, leading.

10          THE COURT:  Overruled.

11  A    Repeat that.  Sorry.

12  Q    When you do your Google search, are you just searching

13  generally for personal injury firms in New York and New Jersey

14  or is it anything else specific you're searching for?

15  A    I just put -- it -- it varies.  I put top law firms,

16  personal injury law firms in New York, top law firms --

17  personal injury law firms in Jersey, and I just go through it

18  that way.

19  Q    Okay.

20          So, in doing such a search, would any of the firms

21  that's on this list that you've now seen come up in your

22  normal course of Google searching?

23  A    Yes.

24  Q    And would you say most of those firms that's on that list

25  could come up from a general Google search?

1  A    Absolutely.  If you keep going through the pages, you're

2  gonna see all the firms that's personal injury.

3  Q    So from your experience, is there anything unique about

4  these firms that's on this list?

5  A    No.

6  Q    Now, you also understand that there is a request by

7  plaintiffs to enjoin you from actually from operating

8  generally, but also soliciting any of these law firms.

9        Now, what would such an injunction do for your

10  business?

11  A    I wouldn't be able to operate, at least not in New York.

12  Q    Why not?

13  A    Because that list is pretty much every law firm in

14  New York.  It's every single law firm.

15  Q    And do you know whether or not all of the law firms on

16  that list are customers of the plaintiffs, if you know?

17  A    I don't know.

18  Q    Are you aware that there are some firms on that list that

19  are not customers of the plaintiff?

20  A    I'm not aware.

21        THE COURT:  You're saying currently?

22        MS. CHARRINGTON:  Currently.

23        THE COURT:  Do you know?

24        THE WITNESS:  I don't know.

25        THE COURT:  Okay.

*Liddie - cross - Charrington*                                    145

1   MS. CHARRINGTON:

2   Q    Have you heard that, whether or not there are some firms

3   on that list that are not --

4          THE COURT:  Sustained.

5   A    Oh, not.

6          THE COURT:  I'm not sure his awareness matters --

7   A    I didn't --

8          THE COURT:  Hang on.

9          -- matters or not, and I think you're trying to get

10  it in for the truth.  So that will have to come in some other

11  way, if it's relevant.

12         MS. CHARRINGTON:  Yes, Judge.

13         Just briefly, possibly.  I may be done here.

14         (Pause.)

15  MS. CHARRINGTON:

16  Q    Now, you were also asked, and I'm not sure if this

17  question was clear, about whether or not you searched your

18  records to confirm whether or not you have in your possession

19  any information regarding plaintiffs or the defendants in this

20  case.

21         Do you recall being asked that question?

22  A    Correct.

23  Q    Did you search your e-mails or your records to confirm

24  that you don't have any of those documents?

25  A    I did.

*Proceedings*                                                    146

1    Q    And do you have any of those documents?

2    A    No.

3              MS. CHARRINGTON:  I have nothing further, Your

4    Honor.

5              THE COURT:  Thank you very much, Ms. Charrington.

6              Before I let plaintiff ask some more questions, I

7    want to ask you a few questions myself.

8              Without telling me what was said, who are all the

9    people that you spoke to today about your testimony?

10             THE WITNESS:  Who did I speak to about my testimony?

11             THE COURT:  Yes.

12             THE WITNESS:  I didn't speak to anyone.

13             THE COURT:  Well, did you speak to your lawyer?

14             THE WITNESS:  My lawyer.

15             THE COURT:  Again, without telling me what you said.

16             THE WITNESS:  Yes.  My lawyer is the only person I

17   spoke to.

18             THE COURT:  Okay.

19             Did you speak to your wife, or I don't know if she's

20   still your wife?

21             THE WITNESS:  She's still, but no, I didn't speak to

22   her.

23             THE COURT:  Mr. Beibin?

24             THE WITNESS:  No.

25             THE COURT:  Safa Gelardi?

*Proceedings*                                                    147

1          THE WITNESS:  No.

2          THE COURT:  And when I say speak, I mean communicate

3   in any way by e-mail, by text, by posting something on social

4   media.

5          THE WITNESS:  No.

6          THE COURT:  That's what I mean.

7          THE WITNESS:  My wife knew I was coming to court,

8   that's about it.

9          THE COURT:  Okay.  And what about Mr. Gelardi?

10         THE WITNESS:  No.

11         THE COURT:  So you're saying the only person about

12  whom or to whom you spoke about your anticipated testimony

13  today was your own lawyer?

14         THE WITNESS:  Yes.

15         THE COURT:  All right.

16         Before you testified -- withdrawn.

17         There were a number of e-mails between IME

18  Representatives e-mail address and Giant Partners that you

19  were shown the last time you were here and were referred to

20  again today.

21         Do you recall those e-mails?

22         THE WITNESS:  I don't fully recall, but I

23  remember -- I'm aware of what e-mails you're talking about,

24  yes.

25         THE COURT:  Is it your testimony that any e-mail

1  that came from the IME Legal Reps e-mail address were sent by

2  you?

3              THE WITNESS:  Correct.

4              THE COURT:  And not Safa Gelardi?

5              THE WITNESS:  Correct.

6              THE COURT:  Or anyone else?

7              THE WITNESS:  Correct.

8              THE COURT:  Not even Mr. Beibin?

9              THE WITNESS:  Correct.

10             THE COURT:  Okay.  So even the e-mails, or at least

11 the one e-mail where your name is misspelled, you're saying

12 you sent that, correct?

13             THE WITNESS:  Correct.

14             THE COURT:  And you're saying it was misspelled

15 because of autocorrect?

16             THE WITNESS:  Correct.

17             THE COURT:  Okay.

18             Was there ever an e-mail from Giant Partners to you

19 or any communication, phone call, anything, from Giant

20 Partners saying:  Hey, what about Plaintiff Advocates, aren't

21 you going forward with that?

22             THE WITNESS:  No.

23             THE COURT:  So, these e-mails that we're talking

24 about were right after the April 10 virtual meeting between

25 Safa Gelardi and the Giant Partners, correct?

*Proceedings*                                                           149

1              THE WITNESS:  Correct.

2              THE COURT:  And yet, none of those e-mails said to

3    you -- or in none of those e-mails did Giant Partners say to

4    you:  What are we doing about Plaintiff Advocates, is that

5    correct?

6              THE WITNESS:  That's correct.

7              THE COURT:  And they never asked you about it?

8              THE WITNESS:  No.

9              THE COURT:  They never referenced this entity to you

10   at all?

11             THE WITNESS:  No.

12             THE COURT:  And they never asked you if you and Safa

13   wanted to go forward with that company?

14             THE WITNESS:  No.

15             THE COURT:  Or website?

16             THE WITNESS:  No.

17             THE COURT:  Who at Giant Partners did you

18   communicate with most?

19             THE WITNESS:  Estefania Sedano.

20             THE COURT:  Okay.  So not Mr. --

21             THE WITNESS:  Weissman.

22             THE COURT:  -- Koenig or Mr. Weissman, correct?

23             THE WITNESS:  No.

24             THE COURT:  Okay.

25             Did you ever have a conversation with those two

*Proceedings*                                                      150

1    individuals and Estefania?

2            THE WITNESS:  No.

3            THE COURT:  So you dealt with her exclusively?

4            THE WITNESS:  Yes.

5            THE COURT:  Okay.

6            Did you pay Giant Partners for their services in

7    setting up your IME Legal Reps website or migrating the IME

8    Companions website?

9            THE WITNESS:  Not the IME Companions, but yeah.  Did

10   I pay them to migrate my website?  Yes.

11           THE COURT:  Yes.  Meaning create your IME Reps

12   website from the migrated --

13           THE WITNESS:  Yes.

14           THE COURT:  -- IME Companions website?

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.

17           Where is that payment reflected?

18           THE WITNESS:  It should be on my credit card.  I

19   paid them on my credit card.  I submitted that, hopefully.

20           THE COURT:  You did submit that before?

21           THE WITNESS:  I did submit that in the past.  I did.

22           THE COURT:  Is that part of the record, anyone?  I

23   don't think I've seen that.

24           MR. KATAEV:  We are searching for it.  We don't see

25   it.

*Proceedings*                                                    151

 1              THE COURT:  So, Ms. Charrington, I am going to
 2    direct you to provide that documentation.
 3              MS. CHARRINGTON:  Yes.
 4              THE COURT:  What credit card was it, Bank of America
 5    or something?
 6              THE WITNESS:  Bank of America credit card, yeah.
 7              THE COURT:  Do you recall when it is you paid them
 8    in relation to April 2023, before or after that month?
 9              THE WITNESS:  It was in April, yeah.
10              THE COURT:  In April you paid them?
11              THE WITNESS:  Yes.
12              THE COURT:  Do you recall how much you paid them?
13              THE WITNESS:  It was 7200.
14              THE COURT:  Okay.  And then just one last question.
15              You say that Mr. Beibin has been effectively your
16    right-hand person, right?
17              THE WITNESS:  Correct.
18              THE COURT:  Okay.
19              Did you tell him about potential customers you were
20    trying to woo?
21              THE WITNESS:  I never told him about customers.  We
22    didn't discuss that.
23              I took what you told me serious.  So I took that
24    upon myself to go and initiate getting new clients.
25              THE COURT:  Okay.

*Proceedings*                                                            152

 1              THE WITNESS:  And if I got a new client, I'm like,
 2    hey, I just picked up a firm.
 3              THE COURT:  You what?
 4              THE WITNESS:  I just let him know:  Hey, I just
 5    picked up a new firm.
 6              THE COURT:  Okay.
 7              And did Mr. Beibin tell you when you say, I picked
 8    up a new firm, that these were former or, perhaps, current IME
 9    WatchDog clients?
10              THE WITNESS:  No, he wouldn't say that.  He never
11    said something like that, that these are former IME WatchDog.
12    He never said that.
13              THE COURT:  Well, I guess you've been asked about
14    the fact or you've acknowledged the fact that about eight or
15    nine of your current or at least your total customer base were
16    on the Enjoined Customer List, right?
17              THE WITNESS:  Now that I saw the customer list, but
18    prior to that I didn't know.
19              THE COURT:  Right.  But the question I have for you
20    is did Mr. Beibin ever say to you:  Oh, by the way, Ginarte or
21    Bergman --
22              THE WITNESS:  No.
23              THE COURT:  -- Zemsky, those are all IME WatchDog
24    clients?  He never said that to you?
25              THE WITNESS:  He wouldn't say that.  He wouldn't say

*Proceedings*                                                              153

1    that.

2          He would say:  Hey, we had -- I remember using this

3    firm with IME Companions.

4          But they were firms that he never used, like Cherny.

5          THE COURT:  Okay.  Hang on a second, though.

6          Did Mr. Beibin ever say to you:  Hey, that is a firm

7    that we used to service when I was at IME Companions?

8          THE WITNESS:  He said that before, yeah.

9          THE COURT:  And yet, you didn't think to make sure

10   that they weren't part of this Enjoined Customer List?

11         THE WITNESS:  I never knew the enjoined -- when I

12   left here May of 2023, the last thing you told me was

13   everybody -- you can build your business on your own, just

14   make sure you never work or go after Subin.

15         THE COURT:  Well, I said more than that.  I said

16   don't take any recommendations from Mr. Beibin.

17         THE WITNESS:  Well, I didn't.  I haven't.

18         THE COURT:  So, in your mind it was fine if you came

19   up with them separately, even if Mr. Beibin said to you those

20   were former IME Companion clients, knowing what the nature of

21   the allegations are here?

22         Do you see what I'm saying?

23         THE WITNESS:  I understand what you're saying, but I

24   didn't coordinate anything with him in regards to going to

25   seek the law firms.

*Proceedings*                                                    154

1          THE COURT:  Right.

2          And you weren't deterred from taking them on as

3    clients when Beibin said these are former IME Companion

4    clients, because he clearly knew them, correct?

5          THE WITNESS:  He knew of -- yeah, because they used

6    to service.

7          THE COURT:  Right.

8          And he told you:  Yes, I know them because they are

9    former IME Companions clients, is that also correct?

10         THE WITNESS:  Right, correct.

11         THE COURT:  But yet, that didn't raise any red flag

12   for you about them potentially being on this Enjoined Customer

13   List?

14         I understand you didn't know about the list, per se,

15   but --

16         THE WITNESS:  But also, I didn't know who I can and

17   can't work with.  Now, I'm -- now, I'm -- based on what you're

18   saying, you're saying pretty much that list I seen on

19   July 2nd, I wasn't supposed to service anyone on it.

20         THE COURT:  Okay.  But you were in the courtroom

21   when I said:  I'm going to give your lawyer a list of those

22   customers that the defendants certainly are enjoined from

23   servicing, and I warned you that you want to steer clear of

24   those customers.

25         But you say you didn't get the list, but you didn't

*Proceedings*                                                    155

1   ask your lawyer for one?

2          THE WITNESS:  Maybe I misunderstood, Your Honor.

3          If I would have known that I can't service that

4   list, that list that I seen on July 2nd, if I would have known

5   I can't service no one on there, I would have shut down the

6   business that month.  Because when you do a Google search, all

7   those clients are online.  It would -- or I'll move to another

8   state to do business because it wouldn't make sense to do

9   business in New York looking at that list.

10         THE COURT:  Okay.

11         All right.  I understand your answer.

12         Okay.  So any further questions from plaintiff's

13  counsel?

14         MR. KATAEV:  Yes, Your Honor.  But for time

15  conservancy purposes, do we want -- does the Court wish to

16  obtain Mr. Liddie's phone to do the demonstrative?

17         THE COURT:  Well, why don't we do this, because I'm

18  sure you folks might need a bit of a break.

19         So, everyone, be ready to go at 1:20.  I do want to

20  finish this before I let you all go for good, and I know some

21  of you may be hungry, but I do want to get this done.

22         These are the only two witnesses, as far as I am

23  aware, correct?

24         MR. KATAEV:  I'm sorry, Your Honor?

25         THE COURT:  These are the only two witnesses,

*Proceedings*                                                    156

1  correct?

2           MR. KATAEV:  That's correct.

3           THE COURT:  And the same for you, Ms. Charrington?

4           MS. CHARRINGTON:  That's right, Your Honor.

5           Now, will my client need an order from the Court to

6  get his phone?

7           THE COURT:  Yes.  We are going to call down to the

8  CSOs and let them know that he should get his phone.

9           MS. CHARRINGTON:  Okay.

10          Prior to him doing that, I'd like to just make a

11 record outside of his presence.

12          Do you think we should do that now or once we get

13 the phone?

14          THE COURT:  Why don't you do that after you get the

15 phone, Then he can wait outside and you can make a record.

16          MS. CHARRINGTON:  Okay.

17          THE COURT:  Okay.

18          So you can step down, Mr. Liddie, and accompany your

19 lawyer.  We are going to call down to the CSOs --

20          MR. KATAEV:  Your Honor.

21          THE COURT:  -- and have them release your phone.

22          MR. KATAEV:  I apologize.

23          THE COURT:  You know what, actually, maybe I'll send

24 me law clerk down with you.

25          THE WITNESS:  Your Honor.  Your Honor.  Your Honor,

*Proceedings*                                                    157

1    my phone is in my car.  I didn't bring it in.

2            THE COURT:  Okay.  So why don't we take then 15, 20

3    minutes, as long as it takes you --

4            THE WITNESS:  Right.

5            THE COURT:  -- or it takes Mr. Liddie to get his

6    phone from his car and then come back in.  And by then, we'll

7    be able to let the CSOs know that they should let you come

8    back with him in possession of his phone because I want to see

9    it.  Okay?

10           MR. KATAEV:  Your Honor, I apologize.

11           We have a concern about the alterations made to the

12   phone.  I don't know if it's possible --

13           THE COURT:  No, no, I'm going to trust

14   Ms. Charrington.

15           MS. CHARRINGTON:  And I'll go with him to get his

16   phone.

17           THE COURT:  Yes.

18           MS. CHARRINGTON:  And an officer of the court, we

19   are not going to alter the phone.

20           But I would like to say something maybe even before

21   we get the phone, if maybe Mr. Liddie could step out.

22           THE COURT:  That's fine.

23           MS. CHARRINGTON:  Okay.

24           THE COURT:  That's fine.

25           Why don't you step outside, Mr. Liddie, for just a

*Proceedings*                                                    158

1  moment, and then wait for your lawyer and she'll come and get

2  you to go get your phone.

3          Obviously, Ms. Charrington, what I'll say to you,

4  don't let him turn the phone on until he gets back into court.

5          MS. CHARRINGTON:  Yes.

6          (Witness steps down and exits the courtroom.)

7          THE COURT:  Okay.

8          What did you want to say, Ms. Charrington?

9          MS. CHARRINGTON:  Briefly, I was just saying, I mean

10 without me even having an expert as to autocorrect works,

11 because I know, let's say, for me personally, if I get a new

12 phone, my autocorrect is different from when I use it often.

13 So when I use my phone often, my autocorrect will conform to

14 how I spell things.  So it's not continuously autocorrecting

15 the same word that I may often use that would be misspelled.

16         So I'm just saying that if now, after like my client

17 has had his phone and is using his proper spelling, it may no

18 longer autocorrect it.

19         So I just wanted to put that on the record that it's

20 not a clear test as to whether or not -- because funny enough,

21 personally, personal story, in writing an e-mail and using

22 Liddy, I have seen on, I believe it may have been Grammarly,

23 has corrected L-I-D-D-I [sic] to L-I-D-D-Y, that has happened

24 to me in an autocorrect for whatever reason.  So -- and I was

25 shocked, too, by seeing that because I said that's weird that

*Proceedings*                                                                    159

1    it would change from one name to another.

2              So just in terms of using a test of a phone that

3    he's had where he may use his name, I don't think would be so

4    telling to say that now years later that would happen on his

5    phone.  But I wonder if there is some other mechanism to

6    research whether it's at all possible that L-I-D-D-I-E could

7    be auto corrected to L-I-D-D-Y because I think that would be

8    the issue.

9              Is that possible?

10             THE COURT:  Oh, I think anything is possible, but if

11   someone wants to offer up some expert testimony, that's fine,

12   but I'd just like to see how his phone operates now.

13             If it doesn't autocorrect to L-I-D-D-Y, I guess

14   you'll make your argument that, perhaps, this is what happens

15   over time when L-I-D-D-I-E has been the preferred spelling.

16             Quite honestly, and this is based on my own use of

17   the phone, it typically gives you three choices.  So it will

18   give you the one that you put in or the alternate spellings.

19             MS. CHARRINGTON:  My phone will automatically

20   correct if you have it on that format.

21             So, there's a format where your phone can

22   automatically correct words for you.  And if you don't

23   carefully proofread, it will leave that word there.

24             THE COURT:  Right.  I just want to see if his phone

25   ever comes up with L-I-D-D-Y.

*Proceedings*                                                        160

1              MS. CHARRINGTON:  Okay.

2              THE COURT:  That's all I'd like to see.

3              For what it's worth, you can argue about the weight

4    of it, but until I hear from an expert I am at least

5    interested to see what his phone does because that's his

6    explanation for something that strikes me as extremely

7    counterintuitive --

8              MS. CHARRINGTON:  Yes.

9              THE COURT:  -- and suggests perjury, as I said

10   before, and that's my concern.

11             Okay.  So why don't you go down.  Let's start again

12   at 1:30.  That will give us enough time to call down to the

13   CSOs and make sure they let you back in with his phone.

14             Okay.  Thanks, everyone.

15             And everyone else can, obviously, take a break until

16   1:30.

17             (Recess taken.)

18

19             (Continued on the following page.)

20

21

22

23

24

25

Proceedings                                        161

1              AFTERNOON SESSION:

2              (In open court.)

3              (Judge PAMELA K. CHEN enters the courtroom.)

4              THE COURT:  Let's go back on the record, here.

5              So, let's have Mr. Liddie get back up on the stand.

6              MS. CHARRINGTON:  Should I hand him the phone,

7     Your Honor?

8              THE COURT:  I want you to hand the phone actually

9     to -- well, you keep it, but I want you to go up to where the

10    podium is and just show me on the ELMO, as they call it.

11             (Witness resumes stand.)

12             THE COURT:  Have a seat, Mr. Liddie.

13             So we are back on the record and the phone has been

14    retrieved.  That is Mr. Liddie's phone, and I have asked

15    Ms. Charrington to place it on the overhead projector, turn it

16    on, and open the e-mail function.

17             (Exhibit published.)

18             THE COURT:  Oh, is it password protected, however?

19             Do you want to go up and whisper it to her?

20             THE WITNESS:  Yes.

21             THE COURT:  Yes.

22             (Pause in the proceedings.)

23             THE COURT:  Yes, there you go.  Okay.

24             MS. CHARRINGTON:  Now is there just one e-mail?

25             THE COURT:  Okay.

Proceedings                                              162

1              MS. CHARRINGTON:  So we're opening to the e-mail

2     function.

3              THE COURT:  Yes.  Mr. Liddie entered his password

4     and --

5              THE WITNESS:  I don't see it on the screen,

6     Your Honor.

7              THE COURT:  No, no.  It is not on the ELMO yet.  So

8     go ahead and place it down there.

9              (Exhibit published.)

10             THE COURT:  We might have to dim the lights for

11    this.

12             MR. KATAEV:  Or increase the brightness on the

13    phone.

14             MS. CHARRINGTON:  Let's see.

15             THE COURT:  Okay.

16             So if you will just go down to the body of that

17    e-mail and type:  L-I-D-D-I-E.  All right.

18             And then hit, I guess -- I cannot see the bottom of

19    it.

20             Can you read what is in the choices for spelling?

21             MS. CHARRINGTON:  Liddie, kiddie, kiddies.

22             THE COURT:  All right.  So L-I-D-D-I-E, K-I-D-D-I-E,

23    and the last choice is kiddies, K-I-D-D-I-E-S.  Okay.

24             MS. CHARRINGTON:  Correct.

25             THE COURT:  Okay.

Liddie - cross - Charrington                    163

1          But none of those are L-I-D-D-Y; am I correct?

2               MS. CHARRINGTON:  That's correct.

3               THE COURT:  Okay.  All right.  Thank you very much.

4               Did anyone have any other questions for Mr. Liddie?

5     I think we had --

6               MS. CHARRINGTON:  I did, actually.

7               THE COURT:  Yes, go ahead.

8     CROSS-EXAMINATION (Continuing)

9     BY MS. CHARRINGTON:

10    Q    So, Mr. Liddie, just going on this topic with respect to

11    the spelling.

12              Do you know --

13              MS. CHARRINGTON:  Withdrawn.

14    Q    Do you recall exactly where you were on the day that

15    e-mail was sent where your name is misspelled?

16    A    No.  No.

17              THE COURT:  Use the microphone, okay?

18    A    No.

19    Q    Well, as you sit here today, do you recall drafting this

20    specific e-mail?

21              MR. KATAEV:  Objection.  Asked and answered.

22              THE COURT:  Overruled.

23    A    I can't recall the exact e-mail, but I --

24              THE COURT:  Pull the microphone closer to you.

25              THE WITNESS:  Oh.

Liddie - cross - Charrington                  164

1            THE COURT:  The chair does not move.  There you go.

2    A    I can't recall the exact e-mail, but I'm the user of the

3    e-mail.

4    Q    So when you say you're the user of the e-mail, are you

5    assuming that you must have sent that e-mail because you're

6    the user of the e-mail?

7            MR. KATAEV:  Objection.  Calls for speculation.

8            THE COURT:  Overruled.

9            I asked this before, but I just want to have you

10   reiterate:  Can anyone else send an e-mail from that

11   IMELegalReps.com e-mail address, besides you.

12           THE WITNESS:  Currently, now?

13           THE COURT:  No, back in --

14           THE WITNESS:  Back then?

15           THE COURT:  Back in April of 20 --

16           THE WITNESS:  Not that I am aware of, no.  Not to my

17   knowledge, no.

18           THE COURT:  You were the only one who had access

19   to that --

20           THE WITNESS:  That's to my -- yeah.

21           THE COURT:  You have to remember.

22           THE WITNESS:  Sorry.

23           THE COURT:  You were the only one who had access

24   to that that e-mail account, is that correct?

25           THE WITNESS:  Yes.

Liddie - cross - Charrington                    165

1           THE COURT:  That is your testimony.

2           THE WITNESS:  Yes.

3           THE COURT:  All right.

4           Go ahead.

5    BY MS. CHARRINGTON:

6    Q    To your knowledge, could your e-mail have been

7    compromised during that time?

8           THE COURT:  Sustained.

9           MS. CHARRINGTON:  Yeah.

10          THE COURT:  That calls for just pure speculation.

11          Well, did you ever get any indication during that

12   time that your e-mail address had been compromised?

13          THE WITNESS:  No, not that I'm aware of.

14          THE COURT:  Okay.

15   Q    And do you know how you sent the e-mail on that specific

16   day?

17          THE COURT:  Meaning via your phone or on a computer?

18          MS. CHARRINGTON:  Correct.

19   A    Yeah, no.  That, I don't remember.

20   Q    Do you have other sources to send E-mails in your

21   possession?

22   A    Yeah.

23   Q    What are those ways?

24   A    Do it from laptop, computer, iPad.

25          MS. CHARRINGTON:  Just one moment.

Liddie - cross - Charrington                    166

1              THE COURT:  All right.

2              (Pause in the proceedings.)

3              MS. CHARRINGTON:  Is there any way that I could --

4    which exhibit was that?  Can it be pulled up?  Is it --

5              THE COURT:  39?

6              MS. CHARRINGTON:  -- 39, only because I don't have

7    the exhibit.  So if we could put 39 up, I just want --

8              THE COURT:  Yes.  If you can assist with that, I

9    think it was 39.

10             MS. CHARRINGTON:  Thank you.  Thank you.

11             THE COURT:  Oh, no, that was the one with the

12   GoDaddy information.

13             THE LAW CLERK:  Yes, it was 39, I think.  I think it

14   was 39.

15             THE COURT:  Oh, it was?  Hang on.

16             THE LAW CLERK:  Oh, maybe it wasn't.

17             THE COURT:  Wait.

18             MR. KATAEV:  The record reflects we've handed the

19   attorney Plaintiff's Exhibit 39, Your Honor.

20             MS. CHARRINGTON:  So noted, thank you.

21             THE COURT:  Okay.  But I am not sure -- all right.

22             Oh, yes, it is the right one because on page 2 of

23   that, there's a very lengthy spelling eugeneliddy, L-I-D-D-Y,

24   with a parenthetical, IMELegalReps@gmail.com, end

25   parenthetical.

Liddie - cross - Charrington                    167

1          Then it says again Eugene Liddy, L-I-D-D-Y, comma.

2          So it appears that way twice in an e-mail on

3   April 10, 2023, at 2:16 p.m.

4          And it starts with Mr. Weissman writing to Safa

5   Gelardi or saying:  Hi, Safa.

6          MS. CHARRINGTON:  Right.

7          (Exhibit published.)

8          MS. CHARRINGTON:  So I'm not sure if that's the

9   right e-mail.

10         THE COURT:  Okay.

11

12  BY MS. CHARRINGTON:

13  Q    With respect to Exhibit 39, Mr. Liddie, this Monday,

14  April 10, 2:16 p.m. e-mail, that was written by a Corey

15  Weissman, correct?

16  A    Correct.

17  Q    So you didn't write that e-mail?

18  A    No.

19         THE COURT:  Well, looking at it more carefully, look

20  at the language.  It says:  Here is the link to the new

21  agreement.

22         You see that?

23         MS. CHARRINGTON:  Yes.

24         THE COURT:  I am asking the witness.

25         THE WITNESS:  I see it.

Liddie - cross - Charrington                    168

1          THE COURT:  Same details, just new company, comma.

2          You see that?

3          THE WITNESS:  Same details...

4          THE COURT:  Same details, just new company.

5          You can enlarge that.  Do you know how to work

6     the --

7          MS. CHARRINGTON:  Mm-hmm.

8          THE COURT:  There you go.  Okay, see it in the

9     middle there?

10         So even though it says Mr. Weissman wrote it -- oh,

11    and it says:  And us helping you build the new website.

12         Actually, what is strange about this e-mail is it

13    does not say who it was sent to.

14         MS. CHARRINGTON:  Well, that's what I was looking

15    for, Your Honor.

16         THE COURT:  So, plaintiff, is there somewhere in

17    this e-mail that says who it went to?

18         MR. KATAEV:  Your Honor, this is part of a chain.

19    If you go to the first page of the exhibit, it has all of the

20    participants on it.

21         MR. ROA:  At the top.

22         MS. CHARRINGTON:  Well --

23         MR. KATAEV:  Right there.

24         THE COURT:  Yes.

25         MR. ROA:  There you go.

1          THE COURT:  So the April 12th e-mail is from Conor

2     C-O-N-O-R, McDaniel, from Giant Partners, to Corey Weissman,

3     and then cc'ing Jeremy Koenig.

4          MR. KATAEV:  But as you go down the chain,

5     Your Honor, you see that it's sent to and from -- it may not

6     show that it was sent to Safa, but there are E-mails showing

7     that it was sent from her.  Or at least

8     IMELegalReps@gmail.com.

9          THE COURT:  Well, at the bottom of the first page on

10    Exhibit 39 it purports, I think, to forward a message from IME

11    Legal Reps.  Okay.

12         So do you see that part, Mr. Liddie, on the first

13    page?

14         You have to go back to the first page,

15    Ms. Charrington.

16         (Exhibit published.)

17         MR. KATAEV:  Yeah.

18         THE COURT:  Further down, at the bottom of that

19    page.  Okay.  There you go.

20         So if you can enlarge that.  Okay.

21         So that is clearly a message you sent, correct,

22    Mr. Liddie?  The one that is on April 11th at 10:14 a.m., and

23    this is in 2023.

24         THE WITNESS:  Yeah.

25         THE COURT:  And you sent that to Mr. Weissman.

Liddie - cross - Charrington                    170

1          THE WITNESS:  Yeah.

2          THE COURT:  Okay.

3          So that is not Ms. Es --

4          THE COURT:  Not Ms. Estefania.

5          THE WITNESS:  Correct.

6          THE COURT:  You sent it to Mr. Weissman.

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.

9          So you were working with Mr. Weissman.

10         THE WITNESS:  No.  He just needed the credentials so

11  he could mig- -- so he could mig- -- this is what was

12  explained to me.  He just needed the credentials so he could

13  start the migration.  Then Ms. Estefania, the account manager,

14  I was going to be working with her thereon after as far as

15  changing over the website.

16         THE COURT:  Okay.

17         Then let me ask the plaintiff, what comes next in

18  this chain?  Because then there is a 10:59 a.m. e-mail on

19  April 11th that says it is from Corey Weissman and it is

20  addressed to Ms. Gelardi, by the first name Safa.

21         So is that attached somehow to this e-mail chain?

22  Because it does not indicate who it was sent to.

23         MR. KATAEV:  You have to look through the

24  production.

25         MR. FELSEN:  The e-mail is -- it says:  Hi, Safa.

Liddie - cross - Charrington                171

1    So clearly it was being sent to Safa, Your Honor.

2              MR. WARNER:  Clearly, there is no address for her.

3              THE COURT:  Right.  The problem --

4              MR. WARNER:  It is not so clear.

5              THE COURT:  Right.

6              What is not clear about the next couple of E-mails

7    is who it went to and whether it was attached to this whole

8    chain started by Mr. McDaniel, which is unusual, because

9    usually if E-mails are in a chain, they have both the to and

10   the from.

11             Let me just point out the reason this is somewhat

12   significant is because the e-mail that contains the

13   misspelling of Mr. Liddie's name is an e-mail from

14   Mr. Weissman.

15             I have seen another one, though, where I think it

16   was purportedly from IME Legal Reps.  So I think we should

17   probably focus on that one in which Mr. Liddie's name is

18   misspelled.

19             Which one is that one?  I am asking the plaintiffs.

20             MR. KATAEV:  We're looking for it, Your Honor.

21             THE COURT:  Or plaintiff, rather.

22             MS. LEVI:  April 19th.

23             THE COURT:  Well, what is the exhibit number,

24   anybody?

25             MR. WARNER:  Your Honor, it doesn't appear that this

Liddie - cross - Charrington                   172

1  is an e-mail chain at all, Your Honor.  It goes from the

2  bottom of the page where they have a Tuesday, April 11th --

3          Oh, you just moved it, Ms. Charrington.

4          MS. CHARRINGTON:  Sorry.

5          MR. WARNER:  It goes -- it goes in the bottom of the

6  page from April 11 at 10:14, to the next one above it, is at

7  10:17., and then next one above that is April 12th.

8          MS. CHARRINGTON:  It's 54.

9          MR. KATAEV:  54.  Yeah, found it.

10         Okay.  Your Honor, it's Exhibit 54.  I'll pull it

11 up.

12         THE COURT:  Okay.

13         But just to go to your point, Mr. Warner, it, in

14 theory, could be a number of attached forwarded E-mails

15 because it goes in reverse chronological order.  But again, it

16 is curious in that it does not have who it is from and who it

17 is to in the banner.

18         But moving on.  Let's look at Exhibit 54?  Is that

19 the one?

20         MS. CHARRINGTON:  Yes.

21         THE COURT:  Okay.

22         MS. CHARRINGTON:  Exhibit 54.

23         (Exhibit published.)

24         THE COURT:  So that is what you want to show him,

25 Ms. Charrington?

1      MS. CHARRINGTON:  Yes, Your Honor.

2      THE COURT:  Okay.  Go ahead.

3   BY MS. CHARRINGTON:

4   Q    So Mr. Liddie, just looking at the top of this e-mail,

5   here, April 19, 2023, at 10:23, where it's saying:  This is

6   Eugene Liddie.

7        My question to you is:  Do you recall specifically

8   drafting that e-mail?

9   A    I can't recall drafting the e-mail, but I -- I was the

10  user, so I obviously wrote the e-mail.

11     THE COURT REPORTER:  I'm sorry?

12     MR. KATAEV:  "So I obviously wrote the e-mail."

13     THE COURT:  And it reads:  This is Eugene Liddie

14  period.  I am the owner of IME Legal Reps.

15     THE WITNESS:  Yes.

16     THE COURT:  Correct?

17     THE WITNESS:  Yes.

18     THE COURT:  Okay.

19     So as best you recall, you wrote this e-mail?

20     THE WITNESS:  Correct.

21     THE COURT:  With a misspelling of your name?

22     THE WITNESS:  Yes, Your Honor.

23     THE COURT:  Okay.

24  Q    And can you testify as to --

25     THE COURT:  Well, the bottom line is, you do not

Liddie - cross - Charrington                    174

1    know why your name is misspelled, correct?

2            THE WITNESS:  Correct.

3            THE COURT:  Okay.

4            MS. CHARRINGTON:  Okay.

5            THE COURT:  All right.

6            MS. CHARRINGTON:  Just one moment, Your Honor.

7            THE COURT:  I do want to ask one question though.

8            Do you know or remember, Mr. Liddie, why it is that

9    Corey Weissman is also copied on this?

10           Did you copy him specifically, or do you know if you

11   were responding to an e-mail that had him copied on it

12   originally.

13           THE WITNESS:  So initially, what started the e-mail

14   chain was, I guess, after the communication with Mr. Weissman

15   and Safa, her informing him that she was migrating the

16   website.  So they started the e-mail chain.  So he was on that

17   initial e-mail chain.

18           THE COURT:  Right.

19           And you continue then to e-mail on that same chain,

20   so he was copied?  Is that what you are saying?

21           THE WITNESS:  That's -- that's -- that's what I can

22   recall.

23           THE COURT:  All right.

24           THE WITNESS:  I can't remember.

25           THE COURT:  Okay.

VB        OCR        CRR

1          Ms. Charrington, do you have any other questions?

2          MS. CHARRINGTON:  Yeah.

3          No, nothing further, Judge.

4          THE COURT:  Okay.  Thank you.

5          MS. CHARRINGTON:  I will leave these.

6          THE COURT:  Yes, thanks.

7          Anyone have any other questions for Mr. Liddie?

8          MR. KATAEV:  I have redirect, Your Honor.

9          THE COURT:  Okay.  Go ahead.

10   REDIRECT EXAMINATION

11   BY MR. KATAEV:

12          THE COURT:  And I will note you have been allowed to

13   ask leading questions since you are treating, I think, this

14   party, as hostile.

15          MR. KATAEV:  Thank you, Your Honor.

16          I'm going to be jumping around from a lot of topics.

17   BY MR. KATAEV:

18   Q    Mr. Liddie, the purchases we saw in the Chase Bank

19   statement from March of 2024, those represent the first time

20   you ever bought Edible Arrangements, correct?

21   A    No.

22   Q    Your testimony is that you previously purchased Edible

23   Arrangements?

24   A    Yeah.

25   Q    But you did so not using bank account, you did some other

Liddie - redirect - Kataev                    176

1   form of payment, correct?

2   A    Correct.

3   Q    And what form of payment was that?

4   A    It was another bank and/or cash.  Sometimes I pay cash.

5   It's only $40.  It's like $43.

6   Q    You previously testified today that tax season is busiest

7   in March, correct?

8   A    No.  It is busiest in February -- January, February.

9   Q    All of the purchases of Edible Arrangements were in

10  March, correct?

11  A    No, there was other purchases throughout the year.

12  Q    But the ones that we saw from the bank statement today

13  where there were a lot of them, those were in March, correct?

14  A    Because they try to separate them individually.

15          THE COURT:  Two things:  You talk too softly, so

16  pull up the microphone and you keep stepping on the question.

17          THE WITNESS:  Okay.

18          THE COURT:  So, give it a beat and then, speak

19  loudly.

20          MR. KATAEV:  I'll rephrase.

21  Q    The purchases that we saw were all in March, correct?

22  A    It was more purchases in March because they separated the

23  actual purchase, yeah.

24  Q    And you did not have those Edible Arrangements delivered,

25  you picked them up and dropped them off at the law firms,

Liddie - redirect - Kataev                    177

1    correct?

2    A    Yes.

3    Q    You testified before that you only dealt with Estefania

4    at Giant Partners, correct?

5    A    Estefania, yes.

6    Q    But the E-mails that we just looked at showed that you

7    also corresponded with Mr. Weissman, correct?

8    A    Yes, that was her boss.

9    Q    And you did not create the password with the derogatory

10   name for Ms. Levi, correct?

11   A    Absolutely not.

12   Q    You did ask in one e-mail to Giant Partners for them to

13   the hide the customers listed on the website, correct?

14   A    No.

15   Q    You testified that you did have some discussions with

16   Safa Gelardi about the website, correct?

17   A    No.  I don't recall that.

18   Q    Did you ever communicate with Safa Gelardi by text or

19   e-mail about the changes to the website?

20   A    No.

21   Q    All of your conversations were over the phone, correct?

22   A    No, not about what I was doing with my site.

23   Q    You saw E-mails where Safa told Giant Partners what to do

24   or not to do with the website, correct?

25   A    Some E-mails she did chime in, yes.

Liddie - redirect - Kataev                    178

1   Q    Such as:  Let's change it up a little bit, right?

2   A    Yes.  Yes, I do recall that, yes he.

3   Q    There's no e-mail following that where you say, hey,

4   Safa, don't, don't write anything about the website, I got

5   this, right?

6   A    No, but I did tell her to call and then I specifically

7   wrote another e-mail asking them to remove her from the

8   E-mails moving forward.

9   Q    When you testified about changing the website to your

10  vision, that would entail many changes to the website,

11  correct?

12  A    Yes and no.

13  Q    Okay.

14       But you testified just now, earlier, that you only

15  made minor tweaks to the website, correct?

16  A    Correct.

17  Q    Your prior testimony about the auto correct or spell

18  check did not come to fruition just now when we did the

19  demonstrative, correct?

20       MS. CHARRINGTON:  Objection.

21       THE COURT:  Sustained.

22  Q    You worked with Giant Partners to transition the website

23  from Companions to IME Legal Reps, correct?

24       MS. CHARRINGTON:  Objection.  Asked and answered.

25       THE COURT:  Overruled.

VB        OCR        CRR

Liddie - redirect - Kataev                     179

1    A    I worked with them, yeah; the migration, yes.

2    Q    But you also worked with Giant Partners to reach out to

3    prospective law firm customers through LinkedIn, correct?

4    A    Absolutely not, no.

5    Q    Based on the E-mails that you saw, Giant Partners had

6    access to the -- to customers on the enjoined customers's

7    list, correct?

8    A    Based on which e-mail?

9    Q    I'll rephrase the question.

10        Based on the E-mails that were exchanged, Giant

11   Partners had access to IME Watchdog's customer list, correct?

12        MS. CHARRINGTON:  Objection.

13        THE COURT:  Overruled.

14        I mean -- let me sustain that.

15        You need to establish which E-mails you are talking

16   about and then maybe you can point him to one, to see if he

17   was aware of that e-mail.  Because you are speaking in very

18   general terms.

19        MR. KATAEV:  I'll move on for now.

20   Q    Does every law firm --

21        MR. KATAEV:  Withdrawn.

22   Q    Does every personal injury law firm in New York use IME

23   services?  IME observer services?

24   A    No.

25   Q    And do you have any general knowledge about how many

Liddie - redirect - Kataev                    180

1    personal injury law firms exist in New York?

2    A    No.

3    Q    You acknowledge that IME Watchdog's list, customer list,

4    is unique because it contains law firms that use the IME

5    observer services, correct?

6              MS. CHARRINGTON:  Objection.

7              THE COURT:  Sustained.

8    Q    Did you have any conversations with Jonathon Warner about

9    your testimony today?

10   A    No.

11   Q    The phone that we looked at today, do you recall when you

12   purchased it?  Month and year?

13   A    I think it was -- I believe it was December 2023, maybe.

14   Q    And what, if anything, did you do with your prior phone?

15   A    With my prior phone?  Trade it in.  Upgrade -- it was

16   upgraded.

17   Q    Are you sure that's what you did?

18   A    Yeah, that -- exactly, I don't recall, but typically, I

19   upgrade the phones.

20   Q    How long have you had the prior phone?

21   A    I'm -- I'm thinking since December.

22   Q    Did you purchase that phone brand-new?

23   A    Yes.

24   Q    The e-mail containing the GoDaddy credentials with the

25   disparaging password about Ms. Levi was for the IME Legal

1    Reps's GoDaddy account, correct?

2    A    No.

3    Q    In order to run your business effectively, and as a

4    person who operates a tax preparation service, you obviously

5    keep track of your business expenses to deduct them when you

6    file your tax return, correct?

7    A    Correct.

8    Q    So when you purchased Edible Arrangements using cash, you

9    kept those receipts so you could substantiate the expenses,

10   correct?

11              MS. CHARRINGTON:  Objection.

12              THE COURT:  Overruled.

13              Did you?

14              THE WITNESS:  I probably have some receipts, yeah.

15              MR. KATAEV:  And we're going to ask you to preserve

16   those receipts.

17              Okay.  Let's look at... I can't recall, Your Honor,

18   the exhibit number for this.

19              (Exhibit published.)

20              MR. KATAEV:  It's a February 6th, 2023, e-mail at

21   4:50.

22              (Pause in the proceedings.)

23              MR. KATAEV:  Exhibit 45, Your Honor.

24              THE COURT:  All right.

25   Q    Mr. Liddie, this is an e-mail which Safa sent to Tiffany

Liddie - redirect - Kataev                    182

1   Laszlo at Giant Partners, correct?

2   A    I wouldn't know.  I mean, I see her name at the top, from

3   Safa Gelardi.

4   Q    And it's dated February 6, 2023, right?

5   A    Yeah.

6   Q    And this was two months before you opened your business,

7   correct?

8            MS. CHARRINGTON:  Objection.

9            THE COURT:  Overruled.

10  Q    Now --

11           THE COURT:  What was the answer?

12           THE WITNESS:  I said:  Correct.

13  Q    Now, this e-mail contains an attachment, correct?

14           MS. CHARRINGTON:  Objection.

15           THE COURT:  Overruled.

16           Do you know if it does.

17           THE WITNESS:  Yeah, I see up top.  I can...

18  Q    And one of those attachments is the IME clients's master

19  spreadsheet, right?

20           MS. CHARRINGTON:  Objection to this line of

21  questioning, Your Honor.  This is not an e-mail involving

22  Mr. Liddie.

23           MR. KATAEV:  Subject to connection, Your Honor.

24           THE COURT:  All right.

25           Overruled.

Liddie - redirect - Kataev                    183

1    Q    Does it have that attachment listed as IME clients's

2    master?

3    A    Yeah, I see it.

4    Q    And I'll represent to you, Mr. Liddie, that that

5    attachment is this IME Watchdog, Inc. customer list?

6            Do you see the name at the top?

7            MS. CHARRINGTON:  Objection.

8            THE COURT:  You have a continuing objection, but

9    overruled.

10           So I am sorry, who was the e-mail from and to, the

11   original one?

12           MR. KATAEV:  At the top it's between Safa Gelardi

13   and Tiffany Laszlo, but subject to connection, I'm getting

14   there.

15           THE COURT:  Okay.  Go ahead.

16   Q    This says IME Watchdog, Inc., correct?

17   A    Yes.

18   Q    Now, Giant Partners kept information such as this in a

19   Marketing Collaterals folder, correct?

20           MS. CHARRINGTON:  Objection.

21           THE COURT:  Sustained.

22           How would he know that?

23           MR. WARNER:  And, Your Honor, this is well beyond

24   the scope of cross.  I mean, this is --

25           THE COURT:  Well, I think the scope of cross is

Liddie - redirect - Kataev                    184

1    anyone testifying falsely about failing to comply with the

2    injunction.

3            I recognize Mr. Liddie's a third-party, but I will

4    give Mr. Kataev some leeway here, since I do not want to have

5    to call Mr. Liddie back again.

6            But why don't you get to the point, Mr. Kataev,

7    since none of this was sent to Mr. Liddie.

8    Q    When you worked with Giant Partners, you had access to

9    the Marketing Collaterals folder that Giant Partners provided

10   for IME Legal Reps, correct?

11   A    No.

12           MR. KATAEV:  Just a few more lines.

13           THE COURT:  Okay.

14   Q    The bank records you provided show Zelle payments to

15   various IME observers, correct?

16   A    Correct.

17   Q    I'll represent to you that there are no payments to IME

18   observers prior to August 2023.

19           My question, based on that representation, is:  How

20   did you pay IME observers prior to August of 2023?

21   A    Prior to August 2023?

22   Q    Correct.

23   A    When you say you don't see any Zelle payments, I'm not

24   understanding.

25   Q    Correct?

Liddie - redirect - Kataev                                185

1          THE COURT:  Based on the documents provided by your

2     lawyer.

3          THE WITNESS:  There wasn't no Zelle payments, yes.

4     Then no one got paid that money.  You have to wait, if there's

5     no money to pay...

6     Q    You started this business in April of 2023, correct?

7     A    Yes.

8     Q    So your testimony today is that the IME observers that

9     you hired did not get paid in April, May, June or July?

10    A    Of 2023?

11    Q    That's correct.

12    A    No, they got paid in May.

13    Q    Okay.

14          My understanding, based on a review of the bank

15    records you produced, is that there were no payments by Zelle

16    to any observers in May of '23.

17          Based on that representation I'm asking you:  How

18    did you pay the IME observers in May of '23?

19    A    I did pay them.

20    Q    How?

21    A    Through Zelle.  There should be a Zelle payment there.

22    Q    You also provided your 2023 tax return for IME Legal Reps

23    as part of the response to the subpoena, correct?

24    A    Yes.

25    Q    And you testified that you paid Giant Partners $7,200,

Liddie - redirect - Kataev                         186

1   correct?

2   A    Correct.

3   Q    The $7,200 you paid to Giant Partners is not reflected in

4   your 2023 tax return, is it?

5   A    No.

6   Q    Why did you not expense the $7,200 you spent on Giant

7   Partners in 2023 on your 2023 tax return?

8   A    No reason.  I actually -- I actually forgot to put that

9   in as an expense.  Truly.  I forgot to add that in as an

10  expense.

11  Q    And you run a tax preparation company?

12  A    Yeah.  Yeah, I do.

13  Q    You paid $4,300 for the website that Safa owned with Vito

14  in cash, correct?

15  A    Correct.

16  Q    Where did you obtain the cash from?

17  A    I had the cash at home.  I have cash at home.

18  Q    Did you withdraw it from a bank account?

19  A    No.

20         MR. KATAEV:  I may be done.  I just want to

21  double-check with the client.

22         THE COURT:  Okay.

23         So while you are doing that, let me just ask you

24  Mr. Liddie.

25         You emailed Giant Partners at some point and said to

Liddie - redirect - Kataev                    187

1   not communicate with Safa Gelardi anymore regarding IME Legal

2   Reps, right?

3            THE WITNESS:  Yes.

4            THE COURT:  When was that, approximately?

5            THE WITNESS:  I believe it was maybe around the 19th

6   or the 20th of April.

7            THE COURT:  Okay.

8            There are E-mails, Exhibit 63 is one of them, and

9   then Exhibit 65 is another, where Corey Weissman E-mails both

10  you and Safa Gelardi respectively at IME Legal Reps, and then

11  at Ms. Gelardi's gmail account saying that they cannot get

12  ahold of you and they want to know about an update regarding

13  the court date.

14           Do you recall those E-mails?

15           THE WITNESS:  No, I don't recall.

16           THE COURT:  Okay.

17           I do not know if someone can show him the e-mail.

18           Can someone put up Exhibit 63?

19           MR. KATAEV:  Sure, Your Honor.

20           THE COURT:  One is 63 and one is 65.

21           MR. KATAEV:  63, Your Honor.

22           (Exhibit published.)

23           THE COURT:  Yes.

24           And I may have been mistaken.  There is an e-mail

25  about a court date, but this one asks you when you want to, I

Liddie - redirect - Kataev                    188

1    guess, start the marketing campaign.

2            Do you remember receiving this e-mail?

3            THE WITNESS:  No, I don't recall.

4            MR. KATAEV:  This is 65, Your Honor.

5            (Exhibit published.)

6            THE COURT:  You do not recall.

7            Is it correct, though, that Giant Partners was still

8    communicating with both you and Safa in May and then June of

9    2023 about marketing for IME Legal Reps?

10           THE WITNESS:  No.

11           THE COURT:  You do not recall that.  That is what

12   the e-mail says, right?

13           It says:  If you could please update us regarding

14   the marketing efforts for IME Legal Reps and it is addressed

15   to both of you.

16           THE WITNESS:  Yeah.  I never had any intent to do

17   marketing.  I have a list to do marketing -- I had nothing to

18   do marketing with.  So I had nothing to market.

19           THE COURT:  Okay.

20           THE WITNESS:  I'm assuming now, my assumption, based

21   offer of the video, that that's what he was referring to, but

22   I didn't even know that video existed.  I didn't know they did

23   a Zoom -- back to a Zoom like that, where they was discussing

24   those kind of things.

25           THE COURT:  Okay.

Liddie - redirect - Kataev                    189

1          Which one is that that is up on the screen there?

2          MR. KATAEV:  65, Your Honor.

3          THE COURT:  Okay.

4          Then there is a reference to a court date in the

5    second e-mail, which is June 8 at 2:07 p.m.:  I wanted to

6    check in regarding the court date in May that you mentioned.

7          Did you mention a court date to Mr. Weissman or to

8    anyone else at Giant Partners?

9          THE WITNESS:  No.

10         THE COURT:  You did not do that.

11         THE WITNESS:  Not me.

12         THE COURT:  Okay.

13         So if you did not -- well, never mind.

14         Withdrawn.  Okay.

15         Can you see where it says:  I have our team asking

16   what is going on with this partnership?

17         All right.  Do you see that?

18         THE WITNESS:  Yes.

19         THE COURT:  Did you receive this e-mail?

20         THE WITNESS:  I'm not -- I can't remember,

21   Your Honor.

22         THE COURT:  This is 59; is that right?

23         MR. KATAEV:  55.

24         THE COURT:  55?  You do not recall receiving --

25         THE WITNESS:  IME, okay.  It went to the gmail,

Liddie - redirect - Kataev                    190

1   okay.

2           I do remember the -- I remember the e-mail because

3   I've seen it from the last time we was in court, yeah.

4           THE COURT:  But you do not remember if you actually

5   received it.

6           THE WITNESS:  I just, no.

7           THE COURT:  Okay.  All right.

8           Mr. Kataev, what are your last few questions?

9   BY MR. KATAEV:

10  Q    Okay.  I'm going to show you, Mr. Liddie --

11          (Exhibit published.)

12  Q    -- the August 2023 bank statement that you produced in

13  response to the subpoena.

14          My question is:  Is this the first bank statement

15  that you ever had for IME Legal Reps LLC?

16  A    No.

17  Q    When did you open the bank account for IME Legal Reps

18  LLC?

19  A    It was May 16th.

20          THE COURT:  Of what month?

21          THE WITNESS:  What year?  It was May 16th.

22          THE COURT:  Oh, May 16th.  Okay.

23  Q    I'll represent to you that this is the first bank

24  statement that appears for IME Legal Reps LLC.  In other

25  words, we submit that if you opened your bank account in

VB        OCR        CRR

Liddie - redirect - Kataev                        191

1   May of '23, we don't have the statements from May, June and
2   July of '23.
3            We ask you to preserve those records and we're going
4   to follow up with you about that.
5   A    Okay.
6   Q    I do have, however, a personal bank statement from May of
7   2023?
8            (Exhibit published.)
9   Q    Do you see that?
10  A    Yes.
11  Q    And in this bank statement there are no Zelle payments to
12  any IME observers, correct?
13  A    Right.
14  Q    Based on the first page?
15  A    Yeah, correct.
16  Q    And the second?
17  A    Correct.
18  Q    So your testimony is that there is a May 2023 bank
19  statement for IME Legal Reps LLC --
20  A    Yes.
21  Q    -- which would have those expenses?
22  A    Correct.
23            THE WITNESS:  They sent -- they sent.
24            THE COURT:  Do not talk to me.  He will ask you
25  another question.  You can obviously take it up with your

1   lawyer.

2           MR. KATAEV:  I believe this may be the last

3   question, I'll double-check after.

4           THE COURT:  Okay.

5           Let's get this wrapped up, folks.

6           MR. KATAEV:  This is Exhibit 61, for the record.

7           (Exhibit published.)

8           MR. KATAEV:  Previously admitted.

9   Q    In this e-mail, Conor asks Safa to send login credentials

10  to Estefania, correct?

11  A    Yes.

12  Q    The request for the credentials was for IME Companions's

13  credentials, correct?

14  A    Correct.

15          MR. KATAEV:  I may be done.

16          THE COURT:  Hang on a second.

17          But that e-mail was from you; is that correct?

18          THE WITNESS:  Yeah.  Those -- yeah, that's what --

19  it was her credentials.

20          THE COURT:  Okay.

21          And how do you have them or how --

22          THE WITNESS:  From here, I got it from her.

23          THE COURT:  Okay.

24  Q    So if these are the credentials for Companions, the

25  password where Ms. Levi is referred to in a disparaging

1  manner, is not the password for Companions, correct?

2  A    No, that was incorrect.  That password and user, that was

3  incorrect.  That's why he asked me for the other credentials.

4        Like, he asked.  He said, hey, that's not working.

5  So I asked her, hey, that's not working.  She sent these.

6        MR. KATAEV:  Just one second, Your Honor.

7        THE COURT:  All right.

8        MR. KATAEV:  Permission to approach the witness with

9  a copy of 61?

10        THE COURT:  Okay.

11        MR. KATAEV:  Let the record reflect that I'm handing

12  the witness a copy of 61.

13  Q    I just want to ask you, where does Giant Partners say

14  these are the incorrect credentials?  Please provide us the

15  correct ones?

16        MR. WARNER:  Objection, Your Honor.

17        MS. CHARRINGTON:  Objection.

18        THE COURT:  Overruled.

19        Is it in the exhibit?

20        THE WITNESS:  Oh, no.  It's not in the exhibit, no.

21        THE COURT:  Okay.

22  Q    Did you review the entire e-mail chain?

23        Mr. Liddie, based on your review of Exhibit 61, is

24  there any reference there to incorrect credentials provided

25  and a request for new credentials?

1   A    No, not here.

2   Q    Okay.

3        THE COURT:  So Mr. Kataev, there is no follow-up

4   question to that.  You could have just made that point through

5   argument.  You do not need to ask the witness with to confirm

6   what you can explain to me about the exhibit itself.

7        So unless you have a follow-up question.

8        MR. KATAEV:  Okay.  Exhibit 39, which is admitted.

9        (Exhibit published.)

10  Q    On April 11th, 2023, at 10:17 a.m., Mr. Weissman wrote:

11  Hi, Conor.  Here are the credentials for the GoDaddy account

12  for Safa at IME Legal Reps, correct?

13       THE COURT:  You need only confirm that that is what

14  it says.

15  A    Yeah.  I don't know why it said that -- yeah.

16       THE COURT:  You do not know what?

17       THE WITNESS:  I don't know why he wrote that.  Like,

18  why would he write that?

19  Q    You didn't respond to him and say this is incorrect,

20  right?

21  A    No.

22       THE COURT:  What is incorrect?

23       MR. KATAEV:  That the credentials are incorrect.

24       THE COURT:  Okay.

25       MR. KATAEV:  Just one second to confer with my

Liddie - redirect - Kataev                          195

1   client, Your Honor.

2            THE COURT:  All right.

3            (Pause in the proceedings.)

4            MR. KATAEV:  I'm putting 39 and 61 side-by-side.

5            (Exhibit published.)

6   Q    Based on our review today of these exhibits, the

7   credentials on the left are for IME Companions while the

8   credentials on the right are for IME Legal Reps, correct?

9   A    Incorrect.

10           MR. KATAEV:  I have nothing further, Your Honor.

11           THE COURT:  Okay.

12           I am sorry.  Could you put up Exhibit 61 and then I

13   will let anyone else ask any other follow-up.

14           At the very bottom of Exhibit 61 on page 1, you see

15   where it says -- and it is a little hard to read, but:  Conor

16   you have to fix this.

17           This is the message that was sent from IME Legal

18   Reps on April 25, 2023, at 7:05 a.m., okay.

19           It says:  People are associating IME Companions to

20   IME Legal Reps, and that is a significant issue.

21           Then it says:  We will sue Giant Partners if we lose

22   any clients because of this, and it looks like we will.

23   Period.

24           We are not IME Companions and the sites should not

25   be linked, period.

1              This has to be fixed now.  And now is in all caps.

2              Did you write this message?

3         THE WITNESS:  Yeah.

4         THE COURT:  Okay.

5              And what do you mean it looks like you were going to

6    lose clients?  What were you referring to?

7         THE WITNESS:  Because someone checked the website

8    and said that they saw information from the previous website.

9         THE COURT:  Use a microphone, yeah.

10        THE WITNESS:  Yes.

11        THE COURT:  So who said that to you?

12        THE WITNESS:  So when I was speaking with Jeff, me

13   and Jeff was looking at the website.  He said that he saw

14   information that was from IME Companions that was still on the

15   new migration of the IME Legal Reps.

16        THE COURT:  Okay.

17             And why -- did he say to you we're going to lose

18   clients.

19        THE WITNESS:  No, no.

20        THE COURT:  Or we have lost clients?

21        THE WITNESS:  No.

22             But if I'm out there marketing and some people are

23   on the list, and then they put the website in and they see

24   that something else, they see information from another company

25   on there, I can potentially lose clients.

1          THE COURT:  And how did Giant Partners respond, if
2   they did?
3          THE WITNESS:  They fixed it.
4          THE COURT:  What did they do?
5          THE WITNESS:  They re-evaluated the website and
6   anything that said IME Companions that was still on the
7   website, they removed it.
8          THE COURT:  So there was actually the words IME
9   Companions on the website when it went live --
10         THE WITNESS:  No, I can't recall -- no, it didn't go
11  live until I think in May sometime.
12         THE COURT:  Okay.  All right.
13         Go ahead, Mr. Kataev.  Are you done?
14         MR. KATAEV:  Last question.
15  BY MR. KATAEV:
16  Q    Since you -- as of today, have you ever asked the
17  New York Police Department for permission to operate this
18  business?
19  A    No, because I'm not working a job.  It's not a job.
20  Typically, it's off-duty employment you have to ask permission
21  for.
22         MR. KATAEV:  I have nothing further.
23         THE COURT:  Okay.
24         Yes, go ahead Ms. Charrington.
25         MS. CHARRINGTON:  Just briefly, thank you,

Liddie - recross - Charrington                198

1    Your Honor.

2    ///

3    RECROSS EXAMINATION

4    BY MS. CHARRINGTON:

5    Q    Now, Mr. Liddie, based on your experience, can a law firm

6    work with more than one IME companion company?

7    A    Yes.

8    Q    Okay.

9         So if you have a customer that you perform IMEs for,

10   they can also work with other customers, correct?

11        MR. KATAEV:  Objection.  Hypothetical.

12   A    Correct.

13        THE COURT:  What did you say?

14        MR. KATAEV:  Objection.  Hypothetical.

15        THE COURT:  Overruled.

16   Q    And now you were also asked about this e-mail where you

17   provided the credentials and you were given the e-mail to

18   review where you were asked whether or not it stated that the

19   credentials were incorrect, correct?

20   A    Correct.

21   Q    But do you recall that there was an e-mail an April 12th

22   from -- I believe from Conor Giant Partners, which stated

23   that:  The GoDaddy credentials you provided were incorrect and

24   can you check them and update them?

25        Do you recall that e-mail?

1  A    No.

2        MS. CHARRINGTON:  Now, Your Honor, I don't have the

3  exhibit specifically for that e-mail because I haven't gotten

4  a copy of the exhibits, but I know they exist.  I do have the

5  e-mail on my phone, but there is an e-mail which contradicts

6  what was stated and asked of Mr. Liddie that I would like to

7  present to the Court, which I don't have a copy of at this

8  time.

9        But it is an April 12 e-mail at 12:53 p.m. where it

10 is asked and stated that those credentials were incorrect.

11 And I believe at that time new credentials were sent.

12       THE COURT:  All right.

13       Well let's deal with that after Mr. Liddie is off

14 the stand.

15       MS. CHARRINGTON:  Okay.

16       THE COURT:  All right.

17       MS. CHARRINGTON:  And I may not have any other, just

18 one second.

19       (Pause in the proceedings.)

20 BY MS. CHARRINGTON:

21 Q    Now, did there come a time after your website went live,

22 that Giant Partners was trying to get you business to market

23 your website?

24 A    They wanted me to use them for marketing, yes.

25 Q    And did you reject their request to market your business?

Liddie - recross - Charrington                    200

1    A    I never told them I was going to do marketing of any

2    sort.

3    Q    Did you sign any contract with them for them to market

4    your business?

5    A    No.

6    Q    And did there come a time that they were sending you

7    numerous E-mails that you weren't responding to?

8    A    Correct.

9    Q    Okay.

10           In an attempt to solicit your business to market?

11   A    Correct.

12   Q    Okay.

13           MS. CHARRINGTON:  Nothing further, Your Honor.

14           THE COURT:  Okay.

15           MR. KATAEV:  Nothing further for plaintiff.

16           THE COURT:  Okay.

17           Mr. Liddie, I just have one other question for you

18   on Exhibit 61.

19           This is the same e-mail where you told Conor that

20   they had to fix the references to IME Companions's website,

21   essentially.

22           You said:  People are associating in Companions to

23   IME Legal Reps.

24           Suggesting, just the words you use, suggest that

25   that was happening.  But you said the website had not gone

Proceedings                                                      201

1    live yet.

2              THE WITNESS:  No, it didn't go live.

3              THE COURT:  So explain what you meant when you said:

4    People are associating IME Companions to IME Legal Reps.

5              THE WITNESS:  Because if you still -- if you typed

6    in the website, it would be like put it in the search engine,

7    it was popping up.  Because I guess it was in the process of

8    changing over.

9              THE COURT:  Right.

10             But you are saying people are associating --

11             THE WITNESS:  Well, he didn't know -- Jeff was

12   saying it, so I was just saying.

13             THE COURT:  I see.

14             So you are really referring to Jeff?

15             THE WITNESS:  Correct.

16             THE COURT:  All right.

17             Okay.  That is fine.

18             All right.  Anything else from anyone else?

19             Okay.

20             MR. KATAEV:  In terms of --

21             THE COURT:  Questions for the witness.

22             You can step down, thank you.

23             (Witness excused.)

24             THE COURT:  All right.

25             Okay.  Folks, so as a matter of process, I am not

1   going to make any ruling today about the contempt issue, as

2   well as what I had alluded to earlier about whether

3   witnesses -- Ms. Gelardi and Mr. Liddie -- testified falsely

4   at any point during the last round of contempt and TRO/PI

5   proceedings.  So that would encompass -- I mean, it actually

6   encompasses the May 29th, 2024, initial part of the hearing as

7   well as the May 4th, 2023, prior hearing, at which the same

8   topics were addressed.

9           I do not want to solicit anymore written submissions

10  from the parties.  I think I have everything I need.

11          I guess I will give each party 10 minutes or

12  15 minutes to sum up what you think the takeaways are from

13  this last hearing in terms of contempt by defendants and also

14  the need for the TRO/preliminary injunction relief that

15  plaintiffs are seeking, which is pretty vast, I will say.

16          And it also includes, I think, prohibiting

17  Mr. Liddie from servicing any of the clients on the enjoined

18  customer list.

19          So why don't I just hear from each of you.  Just,

20  like I said, 10, 15 minutes to sum up what you think I should

21  take away from the hearing, which began on May 29th, 2024.

22          Go ahead, Mr. Kataev.

23  SUMMATIONS

24  BY MR. KATAEV:

25          MR. KATAEV:  Just for the record, Your Honor, I

Summations - Mr. Kataev                                203

1    timed this at about 40, so I'm going to try to cut a lot of

2    meat.

3             THE COURT:  Please do because you do not need to

4    repeat everything.  Obviously, I have been here for all of it.

5    So just hit the high notes.

6             And let me just testimony you where I am, basically.

7    I think it would probably be helpful for you to focus your

8    arguments.

9             I understand what the plaintiff's argument is based

10   on the new information from Giant Partners; namely, that the

11   Gelardis really were behind IME Legal Reps; have an interest

12   in it, perhaps a 90 percent interest, as reflected in Safa

13   Gelardi's statements to Mr. Koenig and Mr. Weissman; that

14   basically, the Plaintiff Advocates entity is really what

15   became IME Legal Reps.

16            Obviously, Mr. Liddie is denying that, as is

17   Ms. Gelardi.  The combined response of the two of them is

18   essentially or I guess individually, I should say, Ms. Gelardi

19   just says it was her idea, a thought, a wish, but it never

20   came to fruition, even though that conversation occurred on

21   April 10, 2023, and all the E-mails about IME Legal Reps

22   getting created, the website, et cetera, occurred just a few

23   days later.

24            There is no evidence as to what happened to that

25   conversation.  I am particularly struck by the fact that there

Summations - Mr. Kataev                                204

1    is nothing in any E-mails or anything else I have received

2    that explains why Giant Partners does not say, hey, what about

3    Plaintiff Advocates?  Aren't we going forward with that?

4            So, quite honestly, I am suspicious that there is

5    some conversation no one is telling me about with Giant

6    Partners explaining that they were not going to go with that

7    idea, or that IME Legal Reps is effectively the same entity in

8    which the same Plaintiff Advocates entity in which Ms. Gelardi

9    and Mr. Gelardi have a 90 percent interest.

10           So there is some missing link here and I am sure the

11   plaintiff wants to argue by inference that IME Legal Reps is

12   Plaintiff Advocates.  That is what it became.  And that

13   Mr. Liddie is lying, because he said there is no agreement

14   between them.  And Ms. Gelardi is lying, because there is

15   supposedly no agreement between them giving the Gelardis an

16   ownership interest, 90 percent or so.

17           The one thing I would actually like to hear, and

18   this is why I am sort of thinking I do not want to hear

19   closing statements from you is because I would like to hear

20   from Giant Partners.  And I do not want to hear from just the

21   institutional custodial witness.  I would like to hear from

22   Mr. Koenig and Mr. Weissman.

23           I mean, I prefer they just testify via video.  I

24   realize I cannot drag them into court here, but it seems to me

25   there is an answer to this question.  And who were they

1    dealing with and what was represented to them, both by

2    Mr. Liddie and by Ms. Gelardi.

3          What happened after April 10th to this idea about

4    Plaintiff Advocates?  Had I mean, it does not make any sense

5    to me, and this is the question I -- in order to resolve this

6    credibility fight, because I have to be honest, Mr. Liddie, at

7    least on the face of it, I cannot tell that he is not speaking

8    the truth, but honestly, it does not square with the facts.

9          There is some unexplained, and I am just being

10   honest with you, Ms. Charrington, it does not make sense to me

11   that all of a sudden Giant Partners does not refer to

12   Plaintiff Advocates anymore in any communication with either

13   of them, e-mail or something else, asking what happened to

14   that entity.

15         MS. CHARRINGTON:  I think I can speak to that, Your

16   Honor.

17         THE COURT:  All right.

18         So Mr. Kataev -- I will give you ten minutes.  I

19   really do not want you to rehash everything I have heard.

20   Just tell me why it is I should believe that the Gelardis are

21   behind IME Legal Reps.

22         MR. KATAEV:  Documents and recordings don't lie and

23   in this case, they have unequivocally demonstrated, over the

24   course of the past two-and-a-half years, through discovery, a

25   forensic analysis and responses to subpoenas, the following

1    uncontroverted facts:

2         First, defendants stole plaintiff's trade secrets,

3    used them and were unjustly enriched by them.

4         Second, Safa, Vito and Liddie are liars, who

5    perjured themselves repeatedly and unabashedly.

6         THE COURT:  Mr. Kataev, I really need you to cut to

7    the chase about what, what about the current the state of

8    evidence tells me that they, once again, they have started

9    another company.  I know the entire history, trust me.  I made

10   those findings.

11        Tell me what evidence you have now that tells me IME

12   Legal Reps is the defendant's company.

13        MR. KATAEV:  All the facts point in favor of that

14   finding, Your Honor.

15        Mr. Liddie is a full-time police officer who runs,

16   apparently, a tax business and also serves as a salesperson at

17   Amway.  He is extremely busy and has an extremely busy

18   lifestyle.  He admitted that Jeff Beibin, who is

19   unquestionably an agent of IME Legal Companions.

20        THE COURT:  Was.  You say that now.  I understand

21   the relationship.  But he is entitled to work for somebody

22   else.

23        MR. KATAEV:  But he can't do it serving the same

24   customers and that's where the issue is.

25        Even if this Court were to somehow find, which it

1   should not, that Mr. Liddie is not a successor to the

2   Companions, the Court can still independently find that the

3   preliminary injunction has been violated by the actions of

4   Mr. Beibin.

5          THE COURT:  But Mr. Beibin is not necessarily an

6   agent of the defendants anymore, if he is not working for them

7   and they are not profiting from his work.

8          MR. KATAEV:  Well, that brings us to the other

9   facts.

10          It's undisputed that Safa and Vito remain in the IME

11   business.  They have The IME Company and used -- the Court saw

12   evidence that whatever was available on The IME Companions's

13   Facebook page, was transferred over to The IME Company

14   Facebook page.  In fact, it's the same page, the name was just

15   changed.

16          Beiben is a relative of the Gelardis.  He is dating

17   or married to Vito Gelardi's sister.  They're in tight with

18   each other.

19          THE COURT:  But the bottom line is, in order for me

20   to accept your theory of what is happening, I have to find

21   that Mr. Liddie is lying about how he approached or why he

22   decided to approach the eight or nine customers from the

23   enjoined customer list.

24          He claims he just did a cold search and it just

25   happened to be that eight or nine of his ten customers are on

1   the enjoined customer list.

2          So that is what you are asking me, right?  Is to

3   find that Mr. Liddie is flat-out lying under oath.

4          MR. KATAEV:  This Court can easily infer that just

5   from Mr. Liddie's own admission, that is his cold-calling

6   efforts with law firms in New York and outside of New York,

7   have not yielded him any results.

8          Mr. Liddie just admitted that 98 percent of his

9   customer base, paying-customer base, was -- were law firm

10  customers on the enjoined customer list.

11         THE COURT:  The question is the coincidence versus

12  causation.  That is what is, again, I have to disbelieve

13  Mr. Liddie, correct?

14         MR. KATAEV:  Yes, Your Honor.

15         But Mr. Liddie is not credible for a variety of

16  reasons.  He's testified inconsistently consistently

17  throughout these proceedings.  He's testified that March was

18  the busiest tax season.  And then when he was shown evidence

19  that the Edible Arrangements's purchases don't jibe with that,

20  he said, oh, wait, January and February are the busiest tax

21  season.  By the way, everyone with common sense and knows the

22  busiest tax season is April 1st through 15th, and that's when

23  he started the company.  So, just -- that's one example of

24  many where Liddie was just completely inconsistent about his

25  testimony.

Summations - Mr. Kataev                    209

1          He is, obviously, interested in financial gain.  He

2    obviously has a good relationship with the Gelardis, a strong

3    relationship.  The Court may recall there's an Instagram post

4    from 2011 or 2009, if memory serves, about the dynasty.

5          They have known each other for many years and I

6    believe Mr. Liddie confirmed that although he didn't speak to

7    them until 2021, he has known Mr. Vito Gelardi since in or

8    about 2009.  That relationship runs very deep.

9          It doesn't make sense for Liddie who's so busy with

10   all of the other things he has going on in his life to commit

11   to this business.  He admitted that he spends about three

12   hours a week on this business, solely on his days off.  He

13   denies using his cellular phone to conduct the business of IME

14   Legal Reps, while he's serving as an active police officer.

15   And this business can't run itself the way Mr. Liddie and the

16   defendants would like this Court to believe.

17         Law firm customers are demanding.  Attorneys are

18   demanding.  If they have a personal injury plaintiff going to

19   an IME, and they pick up a phone to call an IME legal service

20   company, they expect someone to answer the phone.  And so it

21   just doesn't jibe with what they're saying.

22         And all the evidence shows that what plaintiff is

23   advocating for is actually -- actually happened.  While

24   everything that the defendants and Liddie is saying are mere

25   denials, self-serving denials without any evidence to back it

1    up.  There is no evidence saying between Eugene Liddie and

2    Safa, stating -- Eugene to Safa, I can't go through with this

3    agreement.  It would be improper.  There's a court order.

4    There's no evidence such as that.

5            They haven't produced to this day one text message

6    exchange between each other.  One e-mail exchange between each

7    other.  That is highly suspect.  We live in a modern age where

8    everybody texts each other and E-mails each other.  And we

9    have seen that, Ms. Gelardi at least, actively sent text

10   messages to Mr. Rosenblatt.

11           I want to point out a couple of other important

12   things for the Court to consider.

13           Ms. Gelardi references her Apple phone during the

14   virtual meeting with Giant Partners.  She references an Apple

15   phone because she now has two phones.  That's the inference

16   that can be made.  You wouldn't call your phone an Apple phone

17   if you didn't have more than one phone.

18           Similarly, Ms. Gelardi, during the virtual meeting

19   with Giant Partners, instructs Giant Partners all E-mails will

20   go through IMELegalReps@gmail.com.  That's the way we're going

21   to do it.  And she even makes some sort of comment, so that

22   way everything is clean, if that's the recollection I'm

23   having.

24           All of this was designed to engage in the very

25   conduct they're engaging in now, which is to deny, deny, deny,

1   because there's no smoking-gun evidence showing exactly what

2   we're saying.  But the smoking gun is there.  The April 10th,

3   2023 virtual meeting speaks for itself.  This idea that's it's

4   venting, Ms. Gelardi was venting to Giant Partners for $7,200

5   a month?  There are therapists out there for $250 a visit.

6   And if you go once every day, it won't reach $7,200 a month.

7   It makes no sense that Ms. Gelardi would take the time to vent

8   while paying someone $7,200 a month.

9           I would invite the Court, since we're not allowed to

10  do post -- we're not allowed -- but we're not being asked to

11  do post-hearing briefing, that the e-mail dates and times

12  would suggest that Mr. Liddie was sending these E-mails during

13  working hours as a police officer, which he testified he did

14  not do.  A review of all of the E-mails exchanged should show

15  E-mails being sent during the day from 7:00 a.m. to 3:30 p.m.

16  and if we carefully review those, we could find examples of

17  that.

18          THE COURT:  All right.

19          Let me ask you a question about these E-mails,

20  though, because I have not focused on it before when we were

21  viewing them.

22          But how did you compile these e-mail chains that

23  were marked as 59, 61, et cetera?  Because they do not contain

24  the banner that says to and from, with all of the dates and

25  times.

Summations - Mr. Kataev                            212

1           Like I said before, I am a little concerned that a

2    lot of them say:  This person wrote, at this day and time.

3    But the rest of the e-mail information is not there; who did

4    it go to and what E-mails it went to?

5           Did someone cut and paste these and stick them in a

6    single exhibit?  Because I do not think they are in their

7    knave format.

8           MR. KATAEV:  So the answer to that question,

9    Your Honor, based on my memory is, we received a production

10   from Giant Partners directly.  And we downloaded that entire

11   production and we basically produced it in the same form,

12   except we didn't produce every single piece of it.

13          However, this Court may verify this because in one

14   of the submissions, written submissions we provided to the

15   Court, there is a DropBox link containing the entire Giant

16   Partners's production, except we removed two or three files

17   that contained trade secret information.  So that link

18   contains exactly how we received that evidence and it's,

19   essentially, the same here.

20          The only changes we've made to the exhibits is in

21   some instances we've highlighted, as the Court saw.  Those

22   highlights were not original.  The plaintiff added those

23   highlights for the ease of the proceeding since there's no

24   jury here.

25          THE COURT:  But let me just refer you as an example

Summations - Mr. Kataev                          213

1    to Exhibit 61, and this is the e-mail I was asking Mr. Liddie

2    about.  But it simply is an e-mail from Legal Reps and it

3    says:  They wrote X at a certain day and time, but then there

4    is nothing about who it went to.  And then the next thing you

5    see is a different e-mail where it says:  This person wrote on

6    X date something else.

7              So I guess what I am concerned about, I accept that

8    you got these this way, but the problem I have is I do not

9    know who they went to.  I do not -- I cannot follow the actual

10   chain of E-mails, if they were forwarded or not.  I cannot

11   tell that.  And that is obviously important here because

12   Mr. Liddie is disclaiming knowledge of some of these E-mails

13   and I do not know if he was copied on them or not.

14             Obviously, the IME Legal Reps's e-mail he claims

15   came from him, but like I said, the next one that follows

16   after that, I do not know who received it.

17             So I just wanted to understand how these exhibits

18   got generated.

19             But, okay.  Go ahead.  What else did you want to

20   say?

21             MR. KATAEV:  I'll just close about the e-mail

22   subject.

23             THE COURT:  Yes.

24             MR. KATAEV:  It's very common that a chain starts

25   off with participants and then gets forwarded to others, and

1    the Court may see that there are -- there's an e-mail chain

2    where either the Gelardis or Liddie and/or both of them are on

3    the e-mail chain initially, and then they're no longer on the

4    chain because it was forwarded as an internal e-mail and so on

5    and so forth.

6              THE COURT:  That is not my experience, but okay.  I

7    mean, I get lots of E-mails as we all do, and even when

8    someone forwards it to me, I see who the original e-mail was

9    to and from.  So it just feels like somebody, and I am not

10   saying you, maybe it was Giant Partners, excised some of the

11   data about who got these E-mails.

12             But all right, go ahead.

13             MR. KATAEV:  Okay.

14             With respect to the April 10, 2023, virtual meeting,

15   which was recorded, the defendant's and Liddie's primary

16   defense as well, it's not about IME Legal Reps, it's about

17   Plaintiff Advocates.  That's their primary argument that

18   they've made.

19             That argument is washed away by Mr. Koenig's

20   declaration where he unequivocally states that whatever we

21   discussed at that meeting was ultimately implemented for IME

22   Legal Reps.

23             So the evidence all points in one direction, and if

24   it looks like a duck and quacks like a duck, Your Honor, it's

25   a duck.  There is no actual evidence from the defendants or

1    Liddie refuting what is so clear to see; that IME Legal Reps

2    is a mere continuation of IME Companions.

3           There is also indisputable evidence for this Court

4    to find contempt for a variety of reasons.

5           THE COURT:  Okay.

6           MR. KATAEV:  First, Ms. Gelardi admitted on the

7    stand that she did forward plaintiff's customer list in

8    February of 2023.

9           In May of 2022, at docket entry 66, this Court

10   ordered that the defendants return all of those materials.

11          As of February 2023, there is evidence, black and

12   white, undisputed, admitted to by the defendants, that she

13   remains in possession of that information and forwarded it.

14   That's contemptuous conduct.  It was not supposed to be used.

15   There's a value to these trade secrets and they're still

16   being utilized.

17          THE COURT:  Right.

18          But the counter-argument, and I heard it mostly from

19   Ms. Gelardi herself, that this master list was amongst a bunch

20   of other documents or items that I guess was relevant to the

21   website, and it was not an intentional disclosure or

22   forwarding of that information.

23          What is your response to that?

24          MR. KATAEV:  And perhaps if that's a siloed

25   incident, that argument could be bought.  But it's not a

Summations - Mr. Kataev                          216

1    siloed incidents.

2          IME Legal Reps is a third iteration of IME

3    Companions.  We have Client Exam Services, which this Court

4    found should be enjoined from proceeding based on Mr. Beibin's

5    own testimony, that everything would be the same and all you

6    have to do is continue doing the work.  This Court enjoined

7    Client Exam Services because Fari Gutierrez was a relative of

8    defendants and started operating a business.

9          Ms. Gelardi claimed that she had no idea of who

10   Accompanied Exams is.  She comes up short with any

11   explanations as to how come her brother was the one that

12   opened it, but she failed to tell the Court about that.

13         So if --

14         THE COURT:  No, worse yet, she claims she did not

15   know them at all, and that was, I think, patently false.

16         But could we go back for a minute to Mr. Koenig's

17   declaration, which is quite brief.  It is only five

18   paragraphs.

19         But this is why I am a little concerned about

20   relying on it, because all it says is:  I attended a virtual

21   meeting on April 10, 2023, with Safa Gelardi, where she

22   discussed moving her then-existing business, IME Companions,

23   to a new company that she was going to name

24   Plaintiff Advocates.  After the virtual meeting, Safa decided

25   to use the name IME Legal Reps instead of Plaintiff Advocates.

1          Accepting all of that as true, it does not

2     necessarily implicate Mr. Liddie in what Ms. Gelardi said

3     about having an agreement with them, an operational agreement,

4     et cetera.

5          And I guess I am still concerned about whether or

6     not Mr. Liddie was aware of Ms. Gelardi's plan.

7          It could be that she said to him, I am going to use

8     the name IME Legal Reps, but the question still is:  What is

9     the evidence that there was an agreement between Mr. Liddie

10    and defendants for the defendants to have a 90 percent

11    interest or some ownership interest in the IME Legal Reps's

12    venture versus the Plaintiff Advocates one, which was

13    apparently abandoned.

14         MR. KATAEV:  I don't think the Court needs to make a

15    finding that there was an agreement.  Agreements can be

16    implied from conduct.  And the conduct here is that the same

17    customers that were being served by IME Companions were being

18    served by IME Legal Reps.  The fact is that the same employees

19    are independent contractors that were observing the IMEs were

20    the same ones that came to IME Legal Reps.

21         THE COURT:  Actually, let me just say, I misspoke

22    earlier.  I think a 32 deposition versus a 30B deposition, and

23    I am not sure what was taken.

24         Mr. Koenig was not deposed; is that right?

25         MR. KATAEV:  That's right, Your Honor, because it

Summations - Mr. Kataev                    218

1    was a Rule 32 deposition, as a 30(b)(6), because it was of

2    Giant Partners and not a specific witness, the Giant Partners,

3    non-party Giant Partners, selected the witness.  And in this

4    case, they chose Sheldon Katz, who was the custodian of

5    records and the chief operating officer.

6              THE COURT:  But why did you do a 30(b)(6)?  Why not

7    just depose Mr. Koenig?

8              MR. KATAEV:  Originally, prior to the witness being

9    produced, there were discussions about this subject, and the

10   counsel for Giant Partners stated unequivocally that only

11   Sheldon Katz would be produced.

12             We tried to reach an agreement with Giant Partners

13   that, it's fine if Sheldon Katz is the main witness, but the

14   Court did express an interest in hearing from Mr. Koenig

15   because he's in the video.

16             And the counsel for Giant Partners did not say no to

17   producing him, but on the date of the deposition, on

18   June 11th, only Mr. Katz was produced, and I was only told

19   that day that Mr. Koenig would not be appearing.  So that's

20   the reason why it happened that way.

21             We did seek it, but unfortunately, the non-party

22   Giant Partners did not cooperate with us as much as we would

23   have liked.

24             THE COURT:  Did Mr. Koenig, though, explain how he

25   learned that Ms. Gelardi wanted to use the name IME Legal

1   Representatives instead of Plaintiff Advocates?  Was that in a

2   private conversation?

3            MR. KATAEV:  No, we did seek to interview the

4   witness, but we were unable to do so, for Mr. Katz or

5   Mr. Koenig.

6            THE COURT:  How did this declaration get produced

7   then?

8            MR. KATAEV:  After the deposition was done with

9   Mr. Katz, we offered that to Giant Partners as a means of

10  avoiding the necessity of doing depositions, doing another

11  Rule 32 deposition.  We didn't sign any stipulation to that

12  effect, but we believed that what the declaration stated would

13  be sufficient.

14           THE COURT:  Okay.

15           MR. KATAEV:  So we're not foreclosed by any

16  stipulation from doing so if the Court deems it necessary.

17           THE COURT:  Okay.

18           All right.  Go ahead, I interrupted you.

19           MR. KATAEV:  That's okay.

20           We want to reference some of the relief that we're

21  seeking because we think it's important.

22           First, we ask this Court to expand the injunctive

23  relief to encompass IME Legal Reps, The IME Company, and The

24  Accompanied Exams.

25           Second, we ask for another Court-authorized notice,

1    which this Court previously authorized, to be both sent out by

2    first class mail as before and to be pasted on IME Legal

3    Reps's, IME Companies's and Accompanied Exams's websites.

4            We ask this Court, obviously, to find defendants and

5    Mr. Liddie in contempt of Court and award appropriate

6    attorneys's fees, compensatory damages and punitive damages.

7            We do think that based on the repeated revolving

8    history of noncompliance with this Court's orders, that this

9    Court is authorized under Rule 16(f) of the Federal Rules of

10   Civil Procedure to strike the defendants' answer.  Rule 16(f)

11   permits this Court to issue any just orders, including those

12   authorized by Rule 37, if a party or its attorney fails to

13   obey any pre-trial order.

14           There is evidence in this case of multiple pre-trial

15   orders, continuously not being followed.  Admitted violations.

16   This Court is authorized under Rule 16(f) to issue what are

17   referred to as case-ending sanctions.

18           We, the plaintiff, view this as a vehicle to

19   properly end this case once and for all.

20           We also want to ask the Court for a modification of

21   the prejudgment attachment order.  We heard evidence today for

22   the first time that rather than sell the property and be

23   forced to place the proceeds in escrow, the defendants have

24   opted to rent the property so they could enjoy the use of the

25   funds, and not pay the attorneys's fees, which we're expecting

1    an order on from the Court, and for the forensic examiner who

2    has patiently been waiting for payment on services provided

3    long ago.

4          I think this Court heard all the evidence that the

5    defendants basically pick and choose what they want to pay for

6    and they have decided not to pay for these Court-ordered

7    obligations.

8          This Court should modify the prejudgment attachment

9    order to have all the rent payments now go first to BRG, as

10   the forensic examiner, and then, once an order is issued on

11   the attorneys's fees, to go to plaintiff to cover its

12   attorneys's fees.

13         Furthermore, because this Court has already found

14   that the defendants are engaging in an effort to frustrate any

15   collection of an inevitable judgment, this Court is

16   authorized, under New York law, to attach prejudgment

17   properties outside the state of New York.

18         The authority for that is under Hotel 71 Mezz Lender

19   LLC versus Falor, F-A-L-O-R, and it's a Court of Appeals case

20   from 2010, 14 NY 3d 303.  We do believe that there's enough

21   evidence here for Safa, Vito and/or Liddie to be incarcerated

22   for their demonstrable perjury and contempt.

23         Last, but not least, we would ask this Court to

24   order another forensic analysis of the digital devices of the

25   defendants and Mr. Liddie.  The only way we're going to get

Summations - Mr. Kataev                                    222

1   the actual information about what happened is through a

2   forensic analysis.

3          We want to point out to the Court that we've issued

4   a subpoena to Mr. Liddie.  Initially, we received no documents

5   whatsoever, based on his feigned ignorance of receiving the

6   subpoena, which is not true.  We have an Affidavit of Service

7   that his mother and/or sister received.  They have a

8   two-family home that he lives in.  It's inconceivable that his

9   mother and/or sister would not tell Mr. Liddie about the

10  existence of the subpoena.

11         I further submit under 308 that that's sufficient

12  for a suitable agent's discretion for service of process of a

13  subpoena.  Notwithstanding, we finally did get a response to

14  the subpoena, but it was all done in a very gamesmanship

15  manner, where we were receiving in dribs and drabs

16  information.  Just yesterday, just yesterday we received

17  information from Mr. Liddie, and as the Court noticed, it was

18  incomplete.  Bank statements start in August of 2023.  We were

19  missing the bank statements from May, June and July.

20         There's no reason that Mr. Liddie would have to not

21  produce those statements.  There are statements, maybe 12 of

22  them.  It's as simple as clicking a button on the chase

23  website to obtain them.  They haven't been produced and

24  there's a reason they haven't been produced.  Mr. Liddie is

25  hiding something.

1          Also, not a single e-mail or text between the

2    defendants and Mr. Liddie was produced, despite the fact that

3    they admit that they speak about life and other things,

4    including about the purported sale of the website.

5          Based on all of the evidence adduced at these

6    hearings, and the record as a whole, plaintiff is entitled to

7    the relief it seeks.  It's patently apparent that IME Legal

8    Reps and The IME Company and The Accompanied Exams are

9    successors of IME Companions and, therefore, should be subject

10   to the same preliminary injunction as IME Companions and

11   Client Exam Services.

12         Plaintiff has established each factor to prevail on

13   a contempt motion, based solely on the video Giant Partners

14   produced of the April 2010 virtual meeting alone.

15         Regarding the first factor for contempt an

16   injunction is sufficiently clear and unambiguous, if it leaves

17   no doubt in the minds of those to whom it was addressed.

18   Precisely what acts are forbidden?  This first factor is

19   established here by a review of the video alone.  Safa

20   repeatedly referenced this case and this Court, and many times

21   even sought assurances that what she was doing was

22   confidential.  A critical admission during the virtual meeting

23   was Safa's statement that she was going to quote, play the

24   criminal's game, and do what she needs to do.

25         Another basis for this Court to find that the

1    injunction is sufficiently clear and unambiguous is the

2    March 30th, 2023, e-mail from Safa Gelardi to Subin,

3    recommending Accompanied Exams.  There, Safa expressly states:

4    As you know, IME Watchdog and IME Companions have been in a

5    heated litigation.  We are not allowed to service your law

6    firm anymore.  That shows that it was clear and unambiguous

7    because she understood the import of the order.

8            As to the second factor, noncompliance has to be

9    supported by clear and convincing evidence.  In this case,

10   we've provided just one exhibit alone which establishes that

11   there have been violations of the injunction.  That exhibit,

12   by itself, is the IME accelerator list.

13           When you compare that with the enjoined customers's

14   list, the Court will see that there are 228 violations of

15   Giant Partners reaching out to customers on the enjoined

16   customers's list via LinkedIn.  They sent a friend request,

17   and if it was accepted, they sent a message.  Sending a friend

18   request was contact and any subsequent message upon connecting

19   is another violation.

20           So this second factor is supported again by the

21   video evidence and the documentary evidence establishing that

22   defendants continued to contact and serve customers on the

23   enjoined customers's list.

24           THE COURT:  Let me ask you a question about the

25   Giant Partners, I guess, accelerator list or whatever they

1    sent out.

2              That was marketing, correct?

3              MR. KATAEV:  It was -- it was an item in the

4    Marketing Collaterals folder of the Giant Partners's

5    production in response to the subpoena.

6              THE COURT:  And it is your argument that that was

7    done for IME Legal Reps, regardless of Mr. Liddie's testimony

8    that he did not hire --

9              MR. WARNER:  Your Honor, there's no evidence as to

10   the time when this was done.  This is February.

11             THE COURT:  Hang on a second.  You can make your

12   argument in a minute.  I am just trying to clarify what the

13   argument is.

14             So these 228 violations, when was that done and who

15   was it done for or at the behest of?

16             MR. KATAEV:  So the evidence that I have to support

17   that plaintiff has to support our contention that it was IME

18   Legal Reps, is the mere fact that the Giant Partners's witness

19   testified, clearly, that whatever information was contained in

20   the Marketing Collaterals folder for IME Companions was made

21   available to IME Legal Reps.  It was shared.

22             THE COURT:  Okay.

23             So, still, did that occur, though, before the

24   injunction prohibiting any further marketing?  And quite

25   frankly, I have lost track of where the injunctions are, but

1    we are talking about March.

2              Did all that happen before March of 2023?

3              MR. KATAEV:  I -- I don't have the date in front of

4    me, Your Honor, I can't --

5              THE COURT:  Well, hang on.

6              Mr. Warner, take it easy.  You can make your

7    argument.

8              So in other words, you cannot really say that that

9    was a violation of the existing preliminary injunction, the

10   one issued, the amended one issued in March of 2023?

11             MR. KATAEV:  Well --

12             THE COURT:  Those contacts, in other words.

13             MR. KATAEV:  My understanding is that the order came

14   in, in March 27, 2023.  And there was a prior temporary

15   restraining order prohibiting any business activity from

16   March 10 of 2023.

17             From that date forward, the evidence is that

18   Mr. Liddie opened up IME Legal Reps in April of 2023.  So by

19   extension, if it was made available to IME Legal Reps in April

20   of 2023 or thereafter, it was a violation, just by sheer

21   chronology.

22             And I want to point out that there's two independent

23   bases there in terms of the sharing.  It's the Marketing

24   Collaterals folder and there's HubSpot.  HubSpot is a customer

25   relationship management tool and IME Legal Reps did not get

Summations - Mr. Kataev                              227

1    its own independent HubSpot.  It was linked to IME Companions.

2    The testimony from Giant Partners is clear on this point.

3    Based on the E-mails exchanged, Giant Partners confirmed that

4    whatever IME Companions had in HubSpot and the Marketing

5    Collaterals folder, IME Legal Reps obtained access to that.

6              And we don't need a far leap to confirm this.

7    Mr. Liddie admits, out of ten customers that he's had, eight

8    or nine of them are on the enjoined customers's list.  How can

9    that be?

10             In prior hearings, we've produced evidence that

11   IME Watchdog has approximately 400 law firm customers and that

12   in New York, there are approximately 1,500 personal injury law

13   firms.  IME Watchdog has not cornered the market and has every

14   single law firm as a customer.  IME Watchdog sourced its

15   customers appropriately and following proper means.

16             The defendants, as is evidenced through the text

17   messages with Mr. Rosenblatt, did not.  And the fight here is

18   about those customers who used the service, consistently, and

19   with longevity.

20             THE COURT:  Okay.

21             MR. KATAEV:  As to the second factor, we also want

22   to point out that the Subin invoice and publicly available

23   records shows that right after the March 10, 2023, TRO, the

24   defendants continued serving the customers on the enjoined

25   customers's list.

Summations - Mr. Kataev                              228

1          And for the third factor, a party who diligently

2    complies in a reasonable manner to ensure ^ ckckck or remains

3    in compliance with an injunction, can't petition the District

4    Court for a modification, clarification or a construction of

5    the order.  Importantly, as this Court has previously found, a

6    party's intent or state of mind does not matter for a finding

7    of contempt.

8          Moreover, as in this case, broader injunctions with

9    more general language are often necessary to prevent further

10   violations where a proclivity for unlawful conduct has been

11   shown, as plaintiff submits has been shown here.

12

13              (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                              229

1    (Continuing.)

2         MR. KATAEV:  The defendants did not petition this

3    Court for any type of relief with respect to the injunction.

4    Moreover, no such petition is warranted or available.  Whereas

5    here, the defendants have engaged in protracted and

6    unnecessary litigation forcing plaintiff to go through a

7    hearing in order to try to achieve compliance with this

8    Court's orders.

9         If the Court recalls, plaintiff sought to avoid

10   motion practice and a hearing by demanding sworn statements

11   from the defendants that they are no longer serving customers

12   on the Enjoined Customer List following March 27, 2023

13   hearing.  The defendants refused to do so because they knew

14   that was a lie.  When backed into a corner and forced to

15   defend themselves, instead of coming clean they chose to

16   repeatedly lie and hope for the best.  This strategy has not

17   worked for them.  More importantly, the strategy has forced

18   plaintiff to suffer through the expense of legal fees and

19   related costs to enforce compliance with an injunction.

20        Contrary to Safa's statements in the April 10, 2023

21   video, it was not the idea that she stole, it was the trade

22   secrets.  As Safa conceded during the virtual meeting with

23   Giant Partners, cold calling is hard and often not fruitful.

24   This Court just heard evidence Mr. Liddie, testimony from

25   Mr. Liddie that all of his cold-calling efforts in New York

*Proceedings*                                                              230

1   and outside of New York are not fruitful.

2          THE COURT:  Mr. Kataev, let's wrap this up.  I get

3   all of that.  I just want you to focus me on the evidence that

4   you think shows that the relief you're requesting is

5   warranted.  And I think you've covered the waterfront in that

6   regard.

7          I want to hear from the other parties because I

8   don't want this to go on too, too long.

9          MR. KATAEV:  I'll just tell the Court, I'll close

10  with this:  During today's hearing, Safa basically admitted it

11  was her plan to violate the order.  Whether that plan was

12  ultimately successful or not is irrelevant.  Between the

13  April 10th virtual meeting, Safa's testimony today that she

14  wanted to violate the order by having Liddy run everything,

15  and the e-mails between April 10th to April 14th, all of that

16  overwhelmingly established that IME Legal Reps is a successor

17  to IME Companions.  The customers that IME Legal Reps served,

18  Ginarte, Cherny, Rizutto, Zemsky and Bergman, all used IME

19  Companions, then Client Exam Services, and now IME Legal Reps.

20  It doesn't make sense for the chain to go that way if they

21  were independently obtained.

22          Based on all of these -- all the evidence adduced,

23  including this crazy theory that L-I-D-D-Y autocorrects to

24  L-I-D-D-I-E and vice versa, which was shown to be a farce,

25  this Court should find that plaintiff has established its

*Proceedings*                                                    231

1   burden for contempt and to expand the preliminary injunction

2   and temporary restraining order do IME Legal Reps and

3   Mr. Liddie.

4              Thank you, Your Honor.

5              THE COURT:  All right.  Thank you, Mr. Kataev.

6              Mr. Warner.

7              MR. WARNER:  Thank you, Your Honor.

8              I assume you want me to use the lectern, Your Honor?

9              THE COURT:  Yes.

10             MR. WARNER:  Thank you.

11             Good afternoon, Your Honor.  Thank you.

12             Your Honor, I think there's one thing I can agree

13   with Mr. Kataev, that plaintiff has suffered the expense of

14   legal fees.  And that's what this entire period of motions for

15   contempt has been about.

16             The one thing that you haven't seen ever during this

17   entire period is any evidence of damages that the plaintiff

18   has suffered, other than the continuous motion after motion

19   after motion by her counsel.  This is all about generating

20   legal fees, Your Honor.  There's just been no damages

21   whatsoever shown to the Court, either -- of any sort.

22             Yes, my client has acted in several ways

23   irresponsibly.  If we're going back to the discussion of the

24   original contempt motion, it clearly was not the smartest

25   thing to do to hire an investigator to try and get evidence

*Proceedings*                                                    232

1   against Mr. Roa, even though, Your Honor, Mr. Roa was making

2   claims against her and was a defendant in a lawsuit.  Whether

3   it was wrong for her to do it, Your Honor, has so held, but --

4              THE COURT:  It is not a question of investigating

5   Mr. Roa, it was making contact with Mr. Roa that --

6              MR. WARNER:  To investigate him, Judge, to

7   investigate him.

8              THE COURT:  But the reason is irrelevant.  She

9   ordered this ruse of striking up a conversation with him, and

10  that clearly violated the order.  So let's not --

11             MR. WARNER:  Well, it --

12             THE COURT:  -- relitigate this.

13             MR. WARNER:  -- would have violated the order, Your

14  Honor, had it happened.  Had it happened.  It never happened.

15             In the meantime, never were there any damages showed

16  with respect to any of the contempt issues here.  You know,

17  the purported attempt to contact -- not purported, the attempt

18  to contact Roa; never contacted him.  It never showed any

19  damage to WatchDogs under any circumstances.

20             I noted, Your Honor --

21             THE COURT:  Can I ask you a question?

22             A showing of damages is not required, right?

23             If you violate the order, regardless of whether or

24  not it cost the plaintiff business, it's a violation of the

25  Court order and that is what's being vindicated here.

*Proceedings*                                                    233

1          MR. WARNER:  Well, Your Honor, you and I have

2    disagreed as to whether an attempt to violate a court order

3    constitutes a violation of the court order.

4          THE COURT:  No, no, it's not an attempt.

5          I'm saying a violation of the court order, it

6    impugns the Court's order and the integrity of the Court and

7    law-abidingness of the litigants.

8          MR. WARNER:  Yes, it would, Your Honor.  If, in

9    fact, the order, as written, was violated.

10          THE COURT:  Right.

11          But you keep arguing the fact that the plaintiffs

12   haven't shown damages that they suffered by virtue of the

13   plaintiff's allegedly continuing to market to and service

14   clients on the Enjoined Customer List contrary to the order is

15   only -- it can only be -- are you suggesting it should only be

16   redressed or found to have occurred if the plaintiff showed

17   damages?

18          I don't agree with that.  Obviously, what I'm saying

19   is it's the Court, the integrity of the Court system that is

20   at issue here.

21          So even if they show me no damages, it doesn't

22   matter.  That's not the --

23          MR. WARNER:  Well, I think it reflects upon why

24   these proceedings are brought, Your Honor.

25          I don't think the plaintiff is -- is -- is doing

*Proceedings*                                                    234

1   this to ensure the integrity of this Court.

2          But irrespective -- and I might add that with

3   respect to that, you know, that today we've heard for the

4   first time that this alleged Giant Partners accelerator list

5   was a violation of the court order.  It simply wasn't, Judge.

6          I don't think there's any evidence that it occurred

7   after March 27th, which is the day that this Court issued the

8   Enjoined Customer List.  Actually, I think it was thereafter.

9   It was like a week later that the Enjoined Customer List came

10  down.

11         THE COURT:  I'd like you also to focus on the IME

12  Legal Reps' situation and the relationship between the

13  defendants, the Gelardis, in particular, and Mr. Liddie, and

14  whether or not the Gelardis are, once again, trying to

15  continue their IME operation using the Enjoined Customer List

16  through someone else, through a front man.

17         MR. WARNER:  Had I spoken to you about this on

18  May 29th, Judge, I would have said that there is a complete

19  absence of any evidence whatsoever supporting that claim.

20  They come up with my client ranting and raving to some Giant

21  personnel and that is supposed to be evidence.  It's simply

22  not evidence.

23         THE COURT:  For what it's worth, I don't agree with

24  you on that.  The e-mails were fairly damning, in and of

25  themselves.  And I know everyone is fixating on the

*Proceedings*                                                                235

1    autocorrect, but that actually is -- it's not a smoking gun,

2    it's a smoking something-or-other because it does indicate to

3    me that Mr. Liddie wasn't writing all of those e-mails he

4    claims to have been writing, misspelling his own name.

5            So far, the autocorrect hasn't come up with

6    L-I-D-D-Y as an alternative.  And I tried it myself, quite

7    frankly, and I came up with kiddie, K-I-D-D-I-E also.

8            So, all I'm saying is it was not nothing.  The

9    e-mails were concerning, but the video is really quite

10   disturbing.

11           MR. WARNER:  No question about it, Judge.  The

12   video, when I watched it, was disturbing.

13           But when you parse through exactly what happened

14   after the video, you don't have any real evidence.  What you

15   have is a person's wish list, and then you don't have any

16   evidence after it.

17           There is no evidence before Your Honor that IME --

18   excuse me, that IME Legal Reps is a successor in any respect.

19   There's just none.

20           THE COURT:  What about the Koenig declaration that

21   says after the virtual meeting Safa decided to use the name

22   IME Legal Reps instead of Plaintiff Advocates?

23           MR. WARNER:  This was written by Mr. Kataev and --

24   and sent to them.

25           THE COURT:  But Mr. Koenig signed it under penalty

*Proceedings*                                                                236

1    of perjury --

2              MR. WARNER:  Yes.

3              THE COURT:  -- so I am not going to assume that

4    Mr. Koenig --

5              MR. WARNER:  But you, Your Honor, just said to me at

6    the last hearing that we are not taking any declarations.

7              This declaration, I would request that you strike it

8    to the extent that it's evidence, which it's not, but it's

9    total hearsay.  And, in fact, when the deposition of Giant

10   occurred, the deponent, Mr. Katz, indicated that all he could

11   do was say that these were documents that were Giant

12   documents.

13             And, in fact, the documents, as Your Honor has

14   pointed out, don't seem to be e-mail chains at all.  They jump

15   all over the place.  They go -- they -- on the same page you

16   have three different dates, one above and below the other,

17   that doesn't seem to be connected in any respect.

18             I understand Your Honor is looking for evidence, but

19   it's very difficult to prove the evidence of a negative.

20   There's just no connection between these companies that's

21   before you Your Honor, other than --

22             THE COURT:  How --

23             MR. WARNER:  -- other than Your Honor's concern

24   about the misspelling of Mr. Liddie's name.

25             THE COURT:  No.  I'll be candid with you because the

*Proceedings*                                              237

1    tenor of those e-mails, and I've seen Mr. Liddie testify at

2    length and I have heard Ms. Gelardi testify at high volume and

3    at length, sound very much like Ms. Gelardi.  Even we're gonna

4    sue you if some -- we lose clients over this.

5            This is why I asked Mr. Liddie about it.  It does

6    not seem at all like him, and -- and the misspelling of Liddy

7    is concerning and it was given to him that way, there's no

8    question because it's regurgitated or recapitulated as Liddy

9    with the IME Reps Gmail account.  Obviously, that was all

10   erroneous, but it means Ms. Gelardi gave it to them.  And all

11   of the e-mails are addressed to Ms. Gelardi and/or the two of

12   them.

13           So, I know that your client claims that they're

14   idiots at Giant Partners and they don't know what they're

15   doing, but to me the evidence suggests the opposite, which

16   is -- and this April 10 video confirmed it, that she was

17   talking to Giant Partners in the thick of it, explained to

18   them exactly what her agenda was, which was to, basically,

19   ruin IME Companions by continuing to run a company under the

20   name Plaintiff Advocates.

21           That then I have a declaration, and I agree with

22   you, I'd prefer to hear from Mr. Koenig and maybe we could

23   arrange it via a remote deposition of him or remote testimony,

24   because I want to know why he said that.  If Ms. Gelardi said

25   to him:  I've decided to make Plaintiff Advocates IME Legal

*Proceedings*                                                    238

1   Reps, I'd like to hear that.  That's certainly what the
2   declaration suggests and the video could not be clearer, as
3   clear as Ms. Gelardi's testimony in person, it was her
4   speaking at a time when she had no reason to lie.
5           I mean why would she lie to Giant Partners?
6           She clearly wanted that to happen.
7           MR. WARNER:  Well, she so stated to Your Honor,
8   Judge, that she wanted it to happen, but this is a long
9   distance between wanting something and it being so.  Just a
10  long distance --
11          THE COURT:  No, it's more of a stone's throw, I have
12  to tell you, because the timing is so close and there is no
13  discussion at all about what's happening with Plaintiff
14  Advocates and then it becomes IME Legal Reps becomes the
15  company.  The inference is not a hard one to make.  It's not a
16  leap; if anything, it's a puddle jump.
17          And so the question becomes how do you explain that
18  conversation and then what happens with these e-mails where
19  it's clear to me Giant Partners is talking to Ms. Gelardi.
20          MR. WARNER:  Well, Giant Partners is pitching in
21  Ms. Gelardi, there's no question about it.  She stopped doing
22  business with them, marketing business in February and
23  Mr. Liddie never started it up.
24          This was part of their pitch, Giant's pitch.  We
25  want your marketing business.  We think you're working

*Proceedings*                                                              239

1    together.  Respond to us.  Respond to us.  Respond to us.

2           And that's what I think -- what you get mostly from

3    the e-mails is that Giant is sending out feelers, and it's not

4    getting anything back.  And ultimately, Mr. Liddie says, early

5    on in this exchange on April 19th:  Stop including Safa.  This

6    is me.  I'm involved in this.  Only me, not Safa.

7           And then you get nothing thereafter from them except

8    more pitches in June.  Pitch.  Pitch.  When are you gonna hire

9    us to do your marketing?  When are you gonna hire us to do

10   your marketing?

11          If I may, Your Honor, because Mr. Kataev approached

12   that, I just don't think there's anything there there.

13   There's no way for me to excuse my client's desires in April

14   of 2023, but ultimately cooler heads prevailed and none of

15   those desires became reality.  And we're here about reality.

16   We're here about damages.  We're here about, you know, orders

17   allegedly being violated.

18          They just haven't been violated, Judge.  They just

19   haven't been violated.

20          You know, the plaintiffs overstep and overreach

21   every chance they get.  And this latest -- you know, the

22   latest request that -- for you to review, the Giant Partners

23   accelerator list as 228 violations of your order is -- is just

24   one.

25          Did they tell you when this occurred?  No.

*Proceedings*                                                    240

1         I'm not -- I'm not going to testify before the

2    Court, but it's my understanding that this occurred in

3    February, long before Your Honor's injunction in March.

4         In the meantime, it was in February because that's

5    when the testimony before you shows that Giant stopped

6    marketing for IME Companions.

7         And, again, I ask that Koenig's declaration not be

8    given any credence in this.

9         The fact that 98 percent of Mr. Liddie's customer

10   base is from the Enjoined Customer List, Your Honor, it -- all

11   of the top firms, the PI firms, as Your Honor well understands

12   in this, this -- this business of sending Companions to IMEs

13   is a function of the volume of IMEs that a firm has.  The

14   biggest personal injury firms have the most IMEs since they

15   have the biggest inventory of cases.  And the fact that, you

16   know, this grouping of cases -- by the way, Subin, Your Honor,

17   just so we're really clear about this, the Subin firm, and

18   Your Honor's original injunction in March was enjoining anyone

19   from the 2'16 list and who were present customers.

20        If you look at Your Honor's order, it's specific.

21   It's the 2'16 list and present customers.

22        I submit to you, Your Honor, Subin was not on the

23   2'16 list or a present customer.  It wasn't a present

24   customer -- excuse me, it was on the 2'16 list, but wasn't a

25   then present customer of -- of WatchDogs.  They simply weren't

*Proceedings*                                                    241

1   at that time.  They were using Ms. Gelardi and had been using

2   Ms. Gelardi for quite some time.

3           So to the extent the claim is that there was a

4   violation of the order in March on account of Your Honor's

5   earliest order, if you look at the way the order is worded,

6   it's on the list and a present customer, and I don't think it

7   qualifies.

8           THE COURT:  I don't think it had to be both.

9           MR. WARNER:  Yes, it said "and," Your Honor.  It

10  said on the list, on the 2'16 customer list, which was the

11  document that Mr. Rosenblatt had sent to Ms. Gelardi and that

12  Ms. Gelardi then sent on to the Elefterakis group, et cetera,

13  "and" the present customer.

14          If you look at the order, I looked at it.

15          THE COURT:  I'll take another look.  That would --

16          MR. WARNER:  Yes.

17          THE COURT:  -- be surprising since --

18          MR. WARNER:  It wasn't "or," it was "and."

19          THE COURT:  All right.  I'll look at that.

20          So your argument about Subin is she didn't violate

21  because Subin wasn't a present customer --

22          MR. WARNER:  Present customer of, and you have --

23  and you have no evidence before you of Subin's being a then

24  present customer.

25          The latest request for relief, striking the answer,

*Proceedings*                                                        242

1    had not been asked for, Judge, before, and I don't think you

2    should hear it, nor do -- nor does the request for

3    modification of a prejudgment attachment should be heard as

4    well.

5              A defendant of a contempt motion is entitled, as a

6    matter of law, to be advised of the claims and of the

7    punishments.  Neither of these punishments were in the

8    original motion, nor in the second motion as well.

9              I would only say, Your Honor, that — I'm not going

10   to speak more than the time I have — that with respect to the

11   attorneys' fees that they've requested here, I think they give

12   new meaning to the word excessive.  They are ridiculous.  They

13   ask for attorney -- the attorneys' fees for the presence of

14   the principal of WatchDog.  They ask for attorneys' fees for

15   an attorney who is no longer involved in the case, Mr. Roa was

16   then counsel.

17             And I note, Your Honor, specifically that you issued

18   an order, the May 15 -- excuse me, not the May 15, I noted it

19   in my letter of May 15 of this year, that you issued a

20   judicial notice of minute order dated June 28, 2022

21   disqualifying Ms. Levi as counsel directing plaintiff to

22   withdraw Ms. Levi's notice of appearance in minute order dated

23   6/29/2022, and a notice of appearance.

24             In the meantime, they ask for attorneys' fees for

25   her time.  This is typical of their overreaching, very

*Proceedings*                                                    243

1    typical.

2         I say again, Your Honor, I've been involved in this

3    case for more than two years.  I've been asking for evidence

4    of damages for more than two years and all I've ever gotten

5    from plaintiffs is motions for contempt, motion after motion

6    after motion.  It's time that this case move to its trial

7    phase where the damages of plaintiff are reviewed.

8         The evidence that we've gotten so far showed that

9    she made $45,000 a year from this business.  They're asking

10   for four times that amount in legal fees on the contempt

11   motions alone.

12        Thank you, Your Honor.

13        THE COURT:  Don't go anywhere too fast.

14        Is your legal bill current right now in terms of

15   being paid by the defendants?

16        MR. WARNER:  No.  I haven't been paid in seven

17   months, Your Honor.

18        THE COURT:  All right.

19        MR. WARNER:  And I hadn't gone into personally, but

20   I know that my clients' are broke.  They haven't paid me.

21        THE COURT:  Well, that doesn't necessarily mean --

22        MR. WARNER:  No, it doesn't necessarily mean it,

23   Judge, but I firmly believe what they've said to me, namely

24   that they will pay me, they intend to pay me, and they just

25   haven't been able to pay me.

*Proceedings*                                                          244

1          THE COURT:  Okay.  Well, that's good for you to

2     believe that.

3          All right.

4          MR. WARNER:  Thank you, Your Honor, for the

5     encouragement.

6          THE COURT:  Yes, okay.  Have a seat.  Thank you.

7          Before I hear from Ms. Charrington, I just want to

8     ask you something, Mr. Kataev.

9          You made a lot about the fact that Mr. Liddie did

10    not volunteer the fact that Ms. Gelardi had proposed

11    partnering, although he said that there was some general

12    request and he said no without any specifics.

13         But do you know if he was ever specifically asked

14    the question of whether or not Ms. Gelardi ever asked him to

15    partner up?

16         MR. KATAEV:  I can tell the Court that there was no

17    specific question to that effect, but there were general

18    questions about what discussions did you have and the answers

19    were, we didn't talk about anything, just transferring the

20    website and that's it.

21         Her -- her sole involvement was transferring the

22    website over and they needed the mortgage payment.  And more

23    lulling us into a false sense of security that they're out of

24    the business, when Ms. Gelardi, herself, testified on May 29,

25    she's not.

*Proceedings*                                                            245

1          THE COURT:  Mr. Warner, I just want to say one

2    thing.

3          My law clerk was able to pull up the record from the

4    last time I expanded the preliminary injunction and,

5    basically, I said:  For the reasons stated on the record, or

6    this order said, the Court expands its previously-ordered

7    preliminary injunction to preclude defendants from providing

8    services to any customers who were former customers of

9    plaintiff IME WatchDog and, as you said, listed on

10   Plaintiff's 2016 customer list.

11         That obviously, predates the hearing.  So that would

12   be, yes, on their customer list, but from 2016.  So it doesn't

13   say current customers as of March 2023.

14         And then I asked the plaintiff to electronically

15   file a submission identifying these customers and proposing a

16   notice letter.  And then we got the Enjoined Customer List and

17   Subin was on that list.

18         So, I don't understand how you think that somehow

19   Ms. Gelardi or the defendants did not violate by providing

20   services to Subin in March of 2023 when they were clearly on

21   the Enjoined Customer List and there wasn't this qualification

22   that they also had to be current, i.e. March 2023, customers

23   of IME WatchDog.

24         MR. WARNER:  I think Your Honor is confusing the

25   Enjoined Customer List, which came about --

*Proceedings*                                                      246

1          THE COURT:  Use a microphone.

2          MR. WARNER:  -- which came about in April.

3          THE COURT:  Use a microphone?

4          MR. WARNER:  May I sit, Your Honor?

5          THE COURT:  Yes, please.

6          MR. WARNER:  I think Your Honor is confusing the

7    2'16 list, which was of some 400 -- no, the 2'16 list only had

8    about 30 or 40 law firms on the list.

9          THE COURT:  Right.

10         MR. WARNER:  That became the Enjoined Customer List

11   when Mr. Kataev submitted this list with 700 names on it.  And

12   the only reason we didn't fight that was because

13   Ms. Gelardi -- and that was in the first week of April, and

14   the only reason we didn't, you know, go to war on that list

15   was because I knew at that time that Ms. Gelardi was shutting

16   down the business.  So it just wasn't worth the time and money

17   and legal fees to fight about a list when you weren't gonna be

18   in business.

19         THE COURT:  Well, that clearly wasn't true.  She was

20   reformulating all sorts of businesses, which is what prompted

21   the second.

22         MR. WARNER:  But she didn't reformulate, Your Honor.

23         THE COURT:  Well, she did, that was actually the

24   problem.  We had the second contempt hearing because she,

25   basically, handed off the list to her relative or Mr. Beibin's

*Proceedings*                                                                247

1   wife or whoever, and I found that to be contemptuous.

2          MR. WARNER:  Yes, you did, Your Honor, but that

3   still --

4          THE COURT:  Contumacious, I should say.

5          MR. WARNER:  Your Honor, the Enjoined Customer List

6   was twenty times the size of the 2016 list.  And your

7   reference in your original order of March, I think it was, 10,

8   was not to the Enjoined Customer List.  The Enjoined Customer

9   List doesn't come about till April.

10          MR. KATAEV:  I can address this, Your Honor.

11          THE COURT:  Go ahead.

12          MR. KATAEV:  What happened was plaintiff provided

13   the text messages and the original customer list that the

14   defendants misappropriated.

15          What we did was we made an amalgam of all the firms

16   referenced in the text messages, because those were obviously

17   inappropriately obtained between Adam Rosenblatt and

18   Ms. Gelardi, and then the actual 2016 customer list, we

19   combined those two.  It was a 2017 list.  There was two.

20   There was a '16 list and a '17 list, and both are in the

21   record.

22          Both of those lists were misappropriated.  The

23   entirety of the firms listed in both of those lists are in the

24   Enjoined Customers List, as well as any additional firms that

25   are referenced in the text messages, I believe, at 154-2 or 5,

*Proceedings*                                                          248

1    I don't remember, but I know it's in Document 154.

2              MR. WARNER:  Your Honor, if I may.

3              The ultimate list was more than 700 firms.  WatchDog

4    didn't have close to that number of firms ever as their then

5    ongoing customers.  It was greatly expanded.

6              The Enjoined Customer List was, essentially, a

7    marketing list that the WatchDog firm went to go after or

8    wanted to go after.  It was a wish list, but we didn't fight

9    that because my client was shutting down her business.

10             MR. KATAEV:  Your Honor, it's a day late and a

11   dollar short to argue these points.

12             There was a deadline for notice of appeal and a

13   motion for reconsideration and that ship has sailed.  But in

14   any event, the representation that it's a marketing list is

15   just inaccurate.  My client is telling me right here that

16   those are the actual customers.

17             If the Court recalls, this 2017 list, which was

18   looked at today, has every one of those firms, the contact

19   information of the person responsible, the phone number of the

20   person responsible.

21             THE COURT:  Mr. Kataev, let me cut you off because

22   we have to get to Ms. Charrington's argument.

23             I just want to understand what you're arguing,

24   Mr. Warner.

25             It sounds to me like you're saying that the fact

*Proceedings*                                                              249

1   that Ms. Gelardi and, I don't know which company it was, if it

2   was Companions or the next one, provided service to Subin in

3   March of 2023 didn't violate the amended injunction because

4   the amended injunction didn't include Subin, is that your

5   argument?

6              MR. WARNER:  I believe that is correct, Judge.

7              THE COURT:  Okay.  Because the record does indicate

8   that on March 27, 2023, which is when we had the hearing, I

9   made the statement I told you about before, about who

10  defendants could not service.

11             And then in an April 3, 2023 docket order I

12  clarified that even though I mention the 2016 customer list in

13  the March 27, 2023 minute entry, I did not intend for that to

14  mean that defendants were only enjoined from servicing

15  customers on the 2016 list alone.  Rather they were enjoined,

16  I intended that they be enjoined from providing services to

17  all customers as to whom there is evidence that defendants

18  misappropriated the customer from plaintiff.

19             So, I think Mr. Warner is correct in the sense that

20  on March 27, 2023 it was not as clear as on April 3rd, 2023

21  when I issued this other docket order who was on the Enjoined

22  Customer List exactly.

23             And that's your point.

24             MR. WARNER:  Yes, it is, Judge.

25             Ultimately, what has been -- what we refer to now in

*Proceedings*                                                      250

1   the case as the Enjoined Customer List, I think, I believe

2   Mr. Kataev can correct me if I'm wrong, was -- ultimately was

3   a document on April 10 that was published to Your Honor by

4   Mr. Kataev and Your Honor accepted it.

5           THE COURT:  All right.

6           Let me just say this:  This is not as important to

7   me based on the evidence I've heard and what we're talking

8   about now in terms of timing, as the seeming revelation that

9   Ms. Gelardi either intended, but ultimately was unsuccessful,

10  or actually intended and was successful in starting yet

11  another company under the name of IME Legal Reps using

12  Mr. Liddie as the front man.  That is really the focus of my

13  concern with respect to contempt and the need for yet another

14  TRO or preliminary injunction, potentially one that covers IME

15  Legal Reps and Mr. Liddie.

16          So, let me hear from you, Ms. Charrington.

17          MS. CHARRINGTON:  So, Your Honor, I'll just start

18  off by talking about the main issue, which clearly is an

19  issue.  L-I-D-D-Y, my client, you know, misspelling his name

20  in an e-mail.  And I understand how suspicious that looks.

21  But with that limited issue, I think it has two -- it brings

22  about two issues.

23          One is whether or not my client perjured himself.

24  And from the perspective of my client sitting there saying

25  he -- he -- he's acknowledging he sent the e-mail because he

*Proceedings*                                                        251

1   is the only person he believes that would have had access to

2   sending that e-mail, but he -- he can't specifically state for

3   a fact that he sent that e-mail.  And I say that because that

4   goes to willfulness and whether or not he got on that stand

5   and is willfully lying to the Court about that specific issue.

6          THE COURT:  But can I ask you a question?

7          He said specifically:  Any e-mail that came from IME

8   Legal Reps had to come from me.  Full stop.

9          MS. CHARRINGTON:  Yes.  And he clarified that by

10  saying that he's assuming that because he was the only person

11  that had access.

12         And I only say that because we don't know what else

13  could have happened in that instance.  So, we're suspicious

14  about the fact that autocorrect probably didn't change the

15  name, that is the suspicion.  That is not a fact.  We tried

16  out the autocorrect with respect to a cell phone.  He could

17  have used a desktop.  He could have used a laptop.  He could

18  have used another mail app on his phone.  So, I'm just saying

19  that is not hard evidence of him being untruthful and

20  willfully lying to the Court.

21         And then the second component of that is how

22  material is that specific statement?

23         So when finding whether or not he perjured himself

24  is to look at how material is that statement?

25         And, again, you'd have to find that he willfully got

*Proceedings*                                                          252

1    on that stand and lied to you and said:  I sent it, when he

2    knew Safa Gelardi sent it or someone else sent it.  Not only

3    he was -- he wasn't sure, he didn't know, was his e-mail

4    compromised, you'd have to find that he got up there and told

5    you:  I -- I sent it because I'm lying for her.

6          And my point is the material issue of what was in

7    that e-mail does not rise to the level of him even needing to

8    lie about that because those e-mails were sent early on.  Yes,

9    there was a -- the April 10th call and there were e-mails that

10   were sent early on about the exchange of information.  It

11   wasn't anything specifically material, let's say, about a

12   customer list or somebody lying about a list.  It was literal

13   data, information in order to complete the migration.

14         So -- so whether or not if you find he lied about

15   it, that wouldn't even make sense for him to have to do that

16   because what my client is saying, and we could look at it both

17   ways, what can be perceived and what he's saying, he's saying

18   that, yes, she approached him about a partnership.  He shut it

19   down.  He moved on with Giant Partners to develop the website.

20   Right.  There was information they needed from her.  There

21   was -- messages transpired.  But he moved on.

22         So my explanation of why it may have never come up

23   is because in Giant Partners' mind, they may have believed

24   that they were still doing this plan for Safa Gelardi, and

25   Eugene Liddie is literally going on with waiting to get

*Proceedings*                                                        253

1    information about the migration, waiting to speak to Estefania

2    about the actual development for IME Legal Reps.

3              So I don't think it's so far-fetched to say:  Well,

4    why was there no e-mail about I'm not going forward with that?

5    Because I do believe all along Giant Partners did believe that

6    they were going along with Safa's plan, but Eugene Liddie is

7    of the mind of *I just need my website done*.

8              So, the communications, which you'll find in the

9    record, there were e-mails between Eugene Liddie and Estefania

10   where he's talking about the changes there.  So, when we also

11   talk about the declaration by Koenig, he has no idea.  I

12   believe they really thought this was now IME Legal Reps.

13   Eugene is going about the web development for IME Legal Reps.

14             So, I think it makes sense that no one told them

15   because even if you read the Sheldon Katz deposition, they're

16   asking about:  Well, what do you think about this information?

17   He's merely reading a transcript or hearing from the audio and

18   responding.

19             And something else very important about what Sheldon

20   Katz testified to, and I mentioned it in my memo, but he

21   testified that the back end was not transferred to IME Legal

22   Reps in the transcript, page 24 -- if you read between 24 to

23   26, he says the Hubspot, which is talked about by plaintiff's

24   office, is what was transferred to IME Legal Reps.  Sheldon

25   Katz testifies on page 24 to 25, where he's asked about

*Proceedings*                                                        254

1    whether or not the Hubspot is transferred, and on page 25

2    Mr. Katz says:  I would have to research.  But again, I got

3    the impression based on the video — which that's all he's

4    looking at, he has no personal knowledge about this — that

5    everything was gonna be completely separate.  So nothing would

6    be transferred.

7              This is what the -- the possessor of the information

8    of Giant Partners is saying.  So, he is telling Your Honor

9    that the transfer was not sent over to IME Legal Reps.  And

10   furthermore, on page 26, he's asked:  Based on this clip, is

11   it your understanding that the back-end information was also

12   transferred from Companions to new website?  No.  He says no

13   affirmatively on page 27.

14             So my point is there was never a transfer of any

15   confidential information from Companions to IME Legal, IME

16   Legal Reps.  He also goes on to say that they didn't do

17   marketing for IME Legal Reps.

18             So my point is the material aspect of Eugene Liddie

19   saying I sent that e-mail because he knows he's the only one

20   who has access to it is really of no consequence because there

21   was nothing transferred.  He received no trade secrets from

22   the Gelardis or from the plaintiffs or by way of the

23   defendants.  So, in this instance to find that -- that

24   Mr. Liddie perjured himself by saying I sent an e-mail, which

25   really has nothing to do with the crux of this case because

*Proceedings*                                                           255

1    even if -- even if Safa Gelardi sent that e-mail, it doesn't

2    change whether or not she was involved or not.  Meaning

3    because of him lying about that, that doesn't mean she wasn't

4    involved or was involved.  The point of -- of -- of our

5    argument of stating that she was not involved with Mr. Liddie

6    is what he said.  Why would he be involved with the Gelardis

7    when he knew of the legal consequences that they were going

8    through?

9                THE COURT:  Let me pause you for one moment.

10               MS. CHARRINGTON:  Yes.

11               THE COURT:  I'm not fixated on who sent the e-mail

12   as the material lie, if you will.

13               I am looking at that as some indicator of

14   credibility generally.  Because his bigger statement is all of

15   those e-mails from IME Legal Reps would have come from me,

16   unless perhaps there is some unexplained hacking going on or

17   something like that.  But more importantly, and the real issue

18   I care about that is material, is his claim that he never had

19   any arrangement, written agreement or anything with the

20   Gelardis where they were going to have some ownership or

21   operational interest in IME Legal Reps.

22               That's what I care about and the conversations or

23   all the evidence being introduced on who was sending out those

24   messages on behalf of IME Legal Reps is relevant to that

25   question.

*Proceedings*                                                      256

1          Did they have a relationship, a business one, the

2    Gelardis and Mr. Liddie?

3          And is that reflected in how Giant Partners were

4    treating them, addressing both Safa and Mr. Liddie?

5          And that is what I consider material and that would

6    be the essence of any kind of perjury charges, that he's lying

7    about that.

8          MS. CHARRINGTON:  Well, and so, Your Honor, I think

9    that's a little premature right now to find that he's lying

10   about that.  And the reason why I say that is because there is

11   no evidence of that because even during those e-mails, those

12   e-mails were about a website.

13         THE COURT:  Well, hang on a second.  Not premature.

14         You're saying it's not so, right?

15         I mean you represent him and his claim is I never

16   had a business partnership relationship with them relating to

17   IME?

18         MS. CHARRINGTON:  Right.  So, I mean it's premature

19   to even make that finding because there's no evidence of it.

20   My client is saying he has no agreement with Safa Gelardi, and

21   he explained why he would not.

22         And my point is, in terms of why it's premature, is

23   because there's no evidence to the contrary.  And the e-mails

24   alone only discuss the website and information about the

25   website.  Other than that, there is no other evidence to

*Proceedings*                                                           257

1    suggest that they are even currently in a partnership.

2          THE COURT:  Well, let me say, there is a piece of

3    evidence and it answers, to some extent, the question you

4    raise is why would he do this; he would do it because it's

5    hard to start one of these businesses if you don't have any

6    experience or a track record and, therefore, if you get a

7    client list, it's certainly much more helpful.

8          And so that would answer why would he do it?  That's

9    why.

10         And similarly, what is the evidence that he is?

11   It's the somewhat statistically improbable idea that he -- his

12   client basis 90 percent on the Enjoined Customer List.

13         Now, I gather that your response is that those are

14   the biggest producers, or I think somebody said that here a

15   moment ago.  So maybe it's coincidence that has an explanation

16   that these are the biggest producers or requesters for IME

17   Companions, maybe.  But that's the evidence I'm looking at,

18   which is his fledgling business.  They have only about ten

19   customers.  Eight or nine of them he says are on the Enjoined

20   Customer List.  It's clear that there 's evidence that Safa

21   and he were working together to some extent, just based on the

22   e-mails, with Giant Partners to launch IME Legal Reps'

23   website.  And, arguably, to try to do marketing for them, but

24   maybe that went nowhere.

25         And then you have this rather remarkable recorded

*Proceedings*                                                    258

1    meeting, remote meeting with Ms. Gelardi, explaining exactly

2    what she wants to do.  And then the only question for you and

3    your client is:  But does that show that Mr. Liddie was part

4    of the plan?

5            In other words, are those pieces of coincidence,

6    suggesting he was working off of the Enjoined Customer List,

7    mere coincidence or is it really just what the April 10th

8    conversation shows?

9            MS. CHARRINGTON:  Well, Your Honor, I would think if

10   he was work -- because remember, the Enjoined Customer List as

11   we saw it, is about 200 firms.  So, if he was using the list,

12   I think he'd have more than just ten clients at this point.

13   Because he could just go right in and --

14           THE COURT:  Well, there's only so many Edible fruit

15   arrangements one can buy.  That might be part of the problem.

16           MS. CHARRINGTON:  Look, I don't know if that would

17   be the only issue or the only bar to it, but I think that in

18   seeing that that could support the fact that it could be a

19   coincidence.

20           And, again, I -- I am arguing that it does not tip

21   enough to say absolutely he had the list because the evidence

22   shows he did not -- the list was not transferred.  So I think

23   that's a very important point, Your Honor, to note, that

24   there's evidence from Giant Partners that says we didn't --

25   the Hubspot was not transferred and they didn't get the back

*Proceedings*                                                               259

 1   end.  And secondly, even if they did, that doesn't mean

 2   Mr. Liddie would have.

 3         So I think that missing point is key when I'm saying

 4   it's premature for a finding to say full stop, yes, I believe

 5   that he was working with Safa Gelardi and is still now to this

 6   day.

 7         So -- so my point is --

 8         THE COURT:  I'm only quarreling with you on your use

 9   of the word premature because your argument is there is never

10   going to be a time when I should make that finding.

11         MS. CHARRINGTON:  There will never be a time, but

12   specifically this time there is not enough to say absolutely

13   he used that list to get these clients because there's

14   specific evidence that he wouldn't have had the list.  And

15   that's why I'm saying it's key.  This evidence isn't coming

16   from us.  This is their witness who testified about that.

17         And Mr. Koenig's declaration, he would have no

18   first-hand knowledge.  Again, he could have said that in his

19   declaration.  He could have said Safa Gelardi told me that

20   we're going with IME Legal Reps.

21         So, the information I'm putting forth is that

22   Mr. Liddie is going about with Giant Partners to develop the

23   site.  While Giant Partners is thinking, oh, we're doing

24   Plaintiff Advocates.  And clearly, they haven't been

25   corrected, Your Honor, because they continued on with that

*Proceedings*                                                    260

1    belief without any proof or without any statement of anyone

2    saying that they spoke to Safa Gelardi and she said:  We're

3    switching things up.  We're going IME Legal Reps.

4            So, it's not a straight line to IME Legal Reps

5    because Mr. Liddie could reasonably have been thinking

6    something different at the time based on paying for the

7    website.  So my point is for a perjury finding with respect to

8    Mr. Liddie would -- would -- there is not enough evidence or

9    proof to show that he willfully came into this court and lied

10   to Your Honor about who sent those e-mails.  Because he could

11   have sent the e-mails.  Although the tenor, as you said,

12   sounds as though it could have been Gelardi, but he could have

13   been upset.  I'm sure Mr. Liddie can get upset, and maybe you

14   haven't seen that side, but if he's under the impression that

15   he is possibly being associated with another individual that

16   has legal problems, he could get upset about that.

17           And so I say that just the fact that the tenor

18   sounds like Gelardi, the L-I-D-D-Y, could it be coincidence?

19   It could be, and that should not be discounted on such a

20   drastic finding of perjury.  It's -- that's what I'm saying

21   about that, Your Honor.

22           And there is also evidence that Mr. Liddie did not

23   use IME Legal Reps for marketing.  So, with respect to whether

24   or not Mr. Liddie had access to these lists, I think there's

25   evidence that he did not.  And I just ask the Court to really

*Proceedings*                                                    261

1  look at that evidence when making that type of finding.

2        THE COURT:  I think you meant that Mr. Liddie did

3  not use Giant Partners for marketing.  You said IME Legal

4  Reps.

5        MS. CHARRINGTON:  Sorry, yes.

6        THE COURT:  Okay.

7        MS. CHARRINGTON:  Did not use Giant Partners.

8        But that is not neither here nor there when you have

9  the testimony saying that the lists and the Hubspot and the

10 back end wasn't even transferred to IME Legal Reps.

11       THE COURT:  Okay.

12       MS. CHARRINGTON:  So, in other words, Mr. Liddie,

13 now going on to the second point, moving from perjury,

14 Mr. Liddie shouldn't be enjoined from operating a business if

15 there's been no finding or proof that he ever had access to

16 these lists.  There's contradictory evidence that IME Legal

17 Reps had access to these lists.  And it would lean more to it

18 being a coincidence if there's no allegation that there's just

19 suspicion -- not even suspicion, you can't be suspicious that

20 he had access to the list if the very company that had the

21 list from Safa Gelardi is stating it wasn't transferred.

22       THE COURT:  But let me ask you, his main worker is

23 Mr. Beibin.  So, Mr. Beibin clearly knows what customers IME

24 Companions had and, obviously, as I said before, 90 percent of

25 those were taken from IME WatchDog.

*Proceedings*                                              262

1          So what about that?

2          I mean this is who Mr. Liddie chooses to make his

3    main employee.  Shouldn't that require some guardrails so that

4    Mr. Beibin doesn't facilitate the continued, I guess,

5    marketing or attempting to retain those clients?

6          MS. CHARRINGTON:  Well, Mr. Liddie shouldn't be

7    responsible for that because there's no restriction on

8    Mr. Beibin.  He's never been part of an injunction.

9          So to say he can't -- he could go to someone else

10   tomorrow and work with them and develop a corporation.  So,

11   how do you stop Beibin?  You can't stop Beibin through

12   stopping Mr. Liddie.

13         So, to prevent Mr. Liddie, who had never had any of

14   this information, does not use Beibin for marketing, to stop

15   his business would be more than prejudicial and unjust to him

16   when you have evidence telling Your Honor that he didn't have

17   access to these records.

18         So if he hires a former employee of someone that has

19   the information on how to work in that environment, he should

20   not be shut down when there was no restriction for him to do

21   it.

22         So, for Mr. Liddie -- and, again, there are other

23   IME companies in existence.  Mr. Liddie also testified that

24   other IME companies worked with several firms.  There's not

25   just one IME company, one firm.  Firms can choose.  They have

*Proceedings*                                                                                    263

1    a choice.  They can use this company one day, use another

2    another day.  So to refrain him or restrain him from working

3    with firms that may want to have a choice, they may work with

4    WatchDog and work with IME Legal Reps.  So, to say that IME

5    WatchDog should have a monopoly over these firms when there's

6    no proof that he unlawfully obtained any of their secrets

7    would -- would be -- I don't know of the law to support

8    restraining and enjoining a nonparty who may have hired

9    someone that had information to stop operating.  Because the

10   key would be that he used something unlawful, he got something

11   wrong, or by way of someone who got it wrong, he's operating.

12   There is that middle person Beibin, who is not here today.

13            THE COURT:  To me, it's akin to noncompete clauses

14   almost.  In other words, an employer could say:  If you leave

15   us, for two years you can't compete against us.

16            MS. CHARRINGTON:  Correct, but he didn't have a

17   noncompete.

18            THE COURT:  Well, that may be so.

19            I'm just saying it's an analogy in a way because --

20   and I'm just thinking out loud here, that Mr. Beibin,

21   obviously, was privy to the information that was taken from

22   IME WatchDog illegally and, therefore, the question becomes is

23   it still appropriate or do I have the legal authority to say

24   to Mr. Beibin, as a third-party, you cannot use information

25   that you obtained while working at IME Companions because

*Proceedings*                                                        264

 1   those customer lists were not properly obtained.  And I'm

 2   just -- again, you say no.  I just don't know the answer.

 3            MS. CHARRINGTON:  No, but that niche should have

 4   been done some time ago, Your Honor.

 5            THE COURT:  Well, now that it's manifested itself as

 6   a potential issue, not necessarily -- and I wouldn't even

 7   necessarily say with the requisite mindset to violate the

 8   order, the preliminary injunction, --

 9            MS. CHARRINGTON:  But then you're restricting

10   someone to work at will.

11            So, I could work -- I could work at McDonald's and

12   find out their secret for their fries.  Does that mean if I

13   leave I can't open my own business and use that secret if I

14   just learned... if you're not contractually restrained from

15   using it --

16            THE COURT:  Right.

17            MS. CHARRINGTON:  -- and it's accessible, you

18   couldn't stop me legally if it was known to the company.

19            THE COURT:  Well, right.  Well, certainly you would

20   be contractually restrained, there's no question.  I'm sure

21   that McDonald's doesn't want anyone giving away their secrets.

22            But then the question becomes can it be by virtue

23   the court order?

24            So, in order to implement or effectuate the

25   preliminary injunction that I issue, do I have the authority

*Proceedings*                                                         265

1    to prevent third-parties, albeit maybe innocent ones, in that

2    they didn't commit the original unlawful act of taking these

3    trade secrets, from using them because they got them at a time

4    when they were not lawfully the property of their employer?

5          Again, I'm just posing the question.

6          MS. CHARRINGTON:  I mean but then you'd be stopping

7    many businesses from starting, unless you stop Beibin is what

8    I'm saying.

9          And, again -- and, obviously, I'm not making that as

10   a recommendation, but I'm saying it to say to stop Liddie from

11   operating when he did not have access is a reach, I would say,

12   legally.

13         THE COURT:  Well, unless he has it by virtue of

14   hiring Beibin.

15         That is sort of my thinking out loud.  And again, I

16   don't know the answer.

17         I'm just wondering about that now that we're focused

18   on the fact that Mr. Beibin is, essentially, running

19   Mr. Liddie's company on the day to -- in terms of the

20   day-to-day operations and it's come out that when Mr. Liddie

21   said to Mr. Beibin:  Here's a new customer, and it's someone

22   on the enjoined list; Mr. Beibin said:  Oh, I know that

23   company because or that law firm because I serviced them when

24   they were -- when I was at IME Companions.  It sort of puts

25   front and center this potential problem in terms of making the

*Proceedings*                                                    266

1    preliminary injunction effective.

2         In other words, how do I stop the original wrong

3    from producing more wrongs against IME WatchDog?

4         If I don't stop the proliferation in some way, even

5    if it's innocent by a nonparty, won't I undermine the effect

6    of the preliminary injunction, which was to prevent other

7    competitors from getting what was inappropriately-obtained

8    customer information?

9         MS. CHARRINGTON:  Well, I think there would have to

10   be a finding that -- and I don't know if innocently utilizing

11   the knowledge you learn from another company -- because,

12   again, and I don't know the answer to whether or not it was

13   proven that Beibin had access to the secrets, because I think

14   there should be a difference between regular runnings of a

15   business and secrets, what the trade secrets were.

16        THE COURT:  Well, the trade secrets were pretty much

17   all of their customers at IME Companions.  That is a finding

18   from before, that it was like 90 percent or --

19        MS. CHARRINGTON:  But that's my point, Your Honor,

20   the secrets was the customer list.  But my --

21        THE COURT:  I understand what you're saying.

22        MS. CHARRINGTON:  But my client, one, never had the

23   customer list; but two, was never enjoined.

24        So even on the last time we were here, you did

25   instruct my client to make sure that you don't rely on any

*Proceedings*                                                        267

1    recommendations by Beibin and you can run and build your

2    business, but you never said do not solicit any business from

3    the businesses on that list.

4           And secondly, the list seems quite confusing

5    because, again, it's almost over 200 or so firms there, which

6    we don't know if those firms are, in fact, clients of the

7    plaintiffs.  I don't know what --

8           THE COURT:  That doesn't matter.  The list is what

9    it is.

10          MS. CHARRINGTON:  Right.

11          THE COURT:  So, it's not unclear.  So we are just

12   debating something I'm raising, but I don't know the answer

13   to, so I am going to look into that further.

14          But go ahead.

15          MS. CHARRINGTON:  Yes.

16          So, I just want to make sure that I address the two

17   issues as it relates to Mr. Liddie.  One is whether he

18   perjured himself; and two, whether there should be some

19   injunction or even some statement on his website or something.

20          So, you know, just to wrap it up and not to be

21   repetitive, I -- my point is that either of those remedies are

22   drastic as it comes -- as it relates to Mr. Liddie.  And

23   legally the basis for enjoining him when there's proof he

24   didn't have the information, merely because he may have

25   incidentally or accidentally stumbled upon firms that may have

*Proceedings*                                                         268

1   been used by plaintiffs seems to be prejudicial and unjust

2   and -- and -- and unlawful to enjoin him.

3        And I understand Your Honor is looking for ways to

4   lessen the harm, but in a situation where if it's a fact that

5   Mr. Liddie is operating his business innocently and buying

6   Edible Arrangements and going to firms and trying to get

7   business when he's not monopolizing the firm, he's just

8   saying:  I have a service.  You can use me as well.  And I

9   think that's a key point too, is that they don't only have to

10  hire IME Legal Reps.  They have -- these firms have access and

11  the ability to use other — other firms.

12       So -- so, that is really the point is that, one,

13  Mr. -- Mr. Liddie did not deliberately get on the stand and

14  lie to Your Honor about forming his business.

15       And I just want to talk a little bit about that

16  video.  Safa Gelardi is talking about Plaintiff Advocates, and

17  I understand that the argument is that Plaintiff Advocates is

18  now truly IME Legal Reps.  But other than the video, there is

19  no other evidence to suggest that.  And, again, I think

20  Mr. Warner or someone said you can't disapprove a negative.

21  It's hard to prove something you did not do.  So in that

22  instance, I think the e-mails with Eugene Liddie working to

23  develop his website supports his intention of what he was

24  trying to do and there is no evidence of any monies being

25  exchanged between Liddie, Safa Gelardi.  There's no evidence

*Proceedings*                                                      269

1    of any agreement.  Although, I understand there may not have

2    to be one, but there's just no evidence that Eugene Liddie is

3    operating a business, buying Edible Arrangements, testifying

4    in court three times for a 10 percent interest into a company

5    to cover for Safa Gelardi.  There's just no proof there.

6           And, again, why I said premature, why are -- I

7    understand we're here and, yes, bombshell evidence as to that

8    video, I understand that.  But to say that there is proof to

9    support that the Gelardis are really running Mr. Liddie's

10   business and he's the face, the evidence is contrary, even

11   with respect to the bank statements we've submitted, of him

12   paying people and of him buying Edible Arrangements, from him

13   saying day one that was his marketing strategy, that he goes

14   out and he meets with the firms and he tries to get them to

15   sign on with him.

16          So, Your Honor, I leave it at a finding of perjury

17   you already said will have drastic and unbelievable

18   consequences to him.  So before the Court could even entertain

19   that, I would ask that all of the evidence is truly looked at

20   in finding that you believe Mr. Liddie got on the stand and

21   just lied to you and is covering for Safa Gelardi for some

22   reason or another.  He has testified that he has wanted to

23   have this business since prior to this case.  He even shadowed

24   Jeff Beibin.  Remember, he met Jeff Beibin before this case

25   even started.  He had wanted to do this.  He did want to do a

*Proceedings*                                                          270

1    franchise.  So they didn't just call him on April 10th and

2    say:  Hey, Liddie, let's get this business going.  This was

3    his intent for some time.  So, there is a lacking proof to say

4    he's lying for Safa Gelardi.

5              Is it suspicious?  It is suspicious.

6              But is it enough to find perjury?

7              Your Honor, there is not enough here to find perjury

8    and there's not enough here to say he had access to lists

9    because I can't stress enough that that shouldn't even be a

10   question for Your Honor as to whether or not he had the lists.

11             THE COURT:  All right.  So let me just say two

12   things.

13             One is I can't ignore the fact that Mr. Beibin, who

14   you now just said Mr. Liddie wanted to work with or talk to

15   about starting one of these businesses, has a very close

16   relationship with the defendant.  Namely, Mr. Beibin is

17   married to Vito Gelardi's sister.  So I'm not sure that the

18   fact that Mr. Liddie has had this long-standing desire to get

19   into this business and talked to Mr. Beibin about it is

20   necessarily helpful to your trying to distance them in some

21   way and suggest that Mr. Liddie was striking out on his own

22   and wasn't in any way trying to collude with the Gelardis to

23   end-run the preliminary injunction.

24             And the second thing I guess I'll ask you really is

25   a question.

*Proceedings*                                                    271

1          In your view then, I would have to believe that Safa

2    Gelardi was telling complete untruths, you can call it lying I

3    guess if you want, but completely untruthful when she spoke to

4    Mr. Koenig on April 10 when she said:  Yes, I have an

5    agreement with Mr. Liddie where he's the front man, had a

6    10 percent interest.  We had the 90 percent interest.  And

7    we're, basically, gonna run this business together.  That

8    would all have to be untrue.

9          MS. CHARRINGTON:  Well, so, Your Honor, this is

10   where I feel like there's a picking and choosing of when to

11   believe Safa Gelardi.

12         So, I don't know her, but she's been labeled a liar.

13   In this court, she's been labeled uncredible.  Could you think

14   that --

15         THE COURT:  Hang on.

16         MS. CHARRINGTON:  Yes.

17         THE COURT:  Well, Mr. Liddie is saying that none of

18   that is true.

19         MS. CHARRINGTON:  No, but what I'm saying is if you

20   believe she's not a credible person, then you could believe

21   she was lying on that video.  You could believe she was a liar

22   then.

23         If you've seen her lie here, she's lying on

24   April 10.  Lying because she may have wanted to do it.  She

25   may not even have been lying, but she may have been thinking

*Proceedings*                                                                272

1    in her head:  I'm gonna get him to do this.  And then Liddy

2    says:  No, I'm not doing this with you, I'm gonna do this on

3    my own.

4          So you could believe that she was lying because you

5    found her to not be credible.  So that wouldn't be a far

6    stretch that she made something up in her mind.

7          So I don't think you should choose now to believe

8    her and say, I believe there's a 90/10 split and there's an

9    operating agreement.  So, the fact that she's so incredible

10   also should flow into that video and you should consider the

11   lack of veracity for her during what she was saying there in

12   that video.

13         Only also too, because there is no support for that.

14   She was supposed to send the agreement to Giant Partners.

15   None was sent.  She could have sent it at that time.

16   Apparently, they were supposed to keep that under wraps and

17   they would also get the operating agreement.  There was never

18   an operating agreement.  So you could use those facts, as

19   well, to determine whether or not she was fulfilling what she

20   said she was going to do during that video.

21         So, that's my only thing, Your Honor, is please

22   don't rely on her truthfulness with respect to the April 10,

23   when I've read almost the entire docket and there hasn't been

24   much credence to some of the things she's said.  And that

25   should also be taken into consideration for April 10.

*Proceedings*                                                      273

1              THE COURT:  Okay.

2              All right.  Thank you very much --

3              MS. CHARRINGTON:  Thank you, Judge.

4              THE COURT:  -- Ms. Charrington.  I appreciate your

5      contribution.

6              I have one question for you, Mr. Warner, that I

7      forgot to ask you.

8              I did note in the April 10 video that Vito Gelardi

9      seems to have been present, I don't know if for all of it, but

10     at least for some of it, because he's speaking on the

11     conversation or during the meeting about the website towards

12     the end.

13             Is it your position that Mr. Vito Gelardi was also

14     participating in this wishful thinking, thought experiment,

15     projected idea that they hadn't run by Mr. Liddie to start up

16     a company called Plaintiff Advocates?

17             MR. WARNER:  I can't testify for Mr. Gelardi here.

18     I know that he was present for a small portion of that video.

19     You see him in the background.  He doesn't speak, I don't

20     believe.

21             THE COURT:  He does speak.

22             MR. WARNER:  On the video?

23             THE COURT:  Yes, he does speak on video.

24             MS. GELARDI:  Your Honor, he does speak, but

25     everything he said really didn't make sense because he had no

*Proceedings*                                                                 274

1   idea what the meeting was actually about either.

2          You can re-watch the video.  He starts off on his

3   own tangent about doctors.  And Vito doesn't know anything

4   about the IME business.

5          So he was there in and out, but, yeah, you can watch

6   the video again.  He has no clue what he's talking about when

7   it comes to the IME business, and he just said something to

8   say something.

9          THE COURT:  All right.  I'll take a look at it.

10  Because I think I also noticed him in the background walking

11  back and forth as you're having a meeting and maybe adjusting

12  things or giving you things, and then he does actually appear

13  and speak at the end there.  So, I'll take another look at

14  that.

15         MS. GELARDI:  Well, he just -- he says something so

16  unrelated, Your Honor, to the IME.

17         THE COURT:  All right.

18         So I am going to let you all go.  I know it's been a

19  very long day without a lunch break, so my apologies for that.

20         I am going to defer on ruling, however, except for

21  on one issue, which is I am going to set a deadline by which

22  defendants have to pay BRG.  And for every day past the

23  deadline when the full balance is not paid, defendants will be

24  assessed $200 a week.

25         So, we are getting to the point that this promise of

*Proceedings*                                                    275

1  paying has worn out its welcome and the payment should be made

2  because I have ordered it multiple times.

3        MS. GELARDI:  Your Honor, can --

4        THE COURT:  You said you were going to pay it.

5        MS. GELARDI:  Yes.

6        THE COURT:  You are going to pay it.

7        MS. GELARDI:  I am just gonna request if you could

8  just give me a time span that I can make these payments.

9        I wouldn't be able to make them in a short time

10  span, but I'm definitely gonna reach out to them today.  And I

11  am going to make an agreement.  I'm looking maybe if you could

12  kindly maybe give me at least 24 months to --

13        THE COURT:  Oh, no, no, no, no, no.

14        MS. GELARDI:  There's no possible way I could go

15  quicker than that.

16        THE COURT:  No.  I was thinking thirty days because

17  this has been --

18        MS. GELARDI:  I won't be able to.

19        THE COURT:  This has been over a year now that

20  you've owed this money and --

21        MS. GELARDI:  Your Honor, I would not be able to,

22  Your Honor.  I'm so sorry.

23        I'll give you all my bank statements.  There's no --

24  I promise you I will give you everything.  There's no possible

25  way I can come up with that.

*Proceedings*                                                                    276

1          However, I will make a payment agreement with them,

2    if you allow me to, and I will start making increments.  And I

3    know that they'll agree to it because they asked me to it

4    before.  And I am capable of doing it now, only because Vito

5    is doing construction.  And if -- if you --

6          THE COURT:  Hang on a second.

7          You claim he's been doing construction all of this

8    time?

9          MS. GELARDI:  No, he wasn't, Your Honor.  He just --

10   we were trying to do construction.  We depleted our savings

11   and just starting businesses to create an income.  And I will

12   show you.  Like, I'm not gonna hide it from you.

13         I will give you all our bank statements, anything

14   that you ask for, to prove to you there's no possible way I

15   could come up with something like that in thirty days.

16         However, if you allow me to reach out to them today

17   and if they allow me to, if they accept the payment agreement,

18   I will not, I will not go -- I will not be late on that

19   agreement and I will make a payment agreement with them and I

20   will pay them monthly.  And I'll -- I'll copy Mr. Warner on

21   every payment.  But there's no possible way I could do

22   something in thirty days.

23         THE COURT:  How much equity do you have in your

24   house in Texas right now?

25         MS. GELARDI:  I don't have income to be able to take

*Proceedings*                                                    277

1    out equity, but the downpayment that I used for my house was a

2    20 percent downpayment, which is conventional mortgage.  And I

3    used the proceeds from the Philadelphia property, Your Honor.

4            THE COURT:  Okay.  So there's some equity in that

5    600-thousand-dollar --

6            MS. GELARDI:  Correct.

7            THE COURT:  -- property?

8            MS. GELARDI:  Yes.

9            THE COURT:  So you could get a home equity loan and

10   get some cash?

11           MS. GELARDI:  Your Honor, I would love to, and I

12   tried to actually pay my attorney through an equity.  However,

13   the issue that I'm having in retrieving equity is I don't have

14   the income to support the payment.

15           This is why I keep getting turned down.  Mr. Warner

16   knows, I've tried even to -- to -- to get equity on multiple

17   of my properties in order to pay him.

18           THE COURT:  You said your monthly mortgage is only

19   $4,000 a month; is that it?

20           MS. GELARDI:  Four-thousand -- yeah, like around

21   4 -- like around 4200, yes.

22           THE COURT:  You realize it's relatively low for a

23   mortgage payment.  I mean in New York City you spend $5,000 in

24   monthly rent.

25           Now, obviously, I realize these are different

*Proceedings*                                                              278

1   markets, but if your husband is working and making money,

2   $4,000 a month should be doable and leave --

3           MS. GELARDI:  Now.  It's now doable for us.

4   Mr. Warner knows it's now doable for us.

5           And once I get my daycare open, this is the thing,

6   Your Honor, we've started businesses to create income.

7   Without income, we can't get -- we've tried to get these

8   equity loans.

9           THE COURT:  Let me ask you a question.

10          How many properties do you currently own besides

11  your residence?

12          MS. GELARDI:  I own the Staten Island property.

13          THE COURT:  Which is being rented.

14          MS. GELARDI:  Well, it's being rented, yes.

15          THE COURT:  For how much a month?

16          MS. GELARDI:  It's 4,500, which only covers the

17  mortgage.

18          THE COURT:  So you still have a 4500-dollar-a-month

19  mortgage on your Staten Island home?

20          MS. GELARDI:  Correct.

21          THE COURT:  All right.  And then --

22          MS. GELARDI:  And there's 4200 in Texas, right.  And

23  then the two properties in Pennsylvania, but they -- but

24  they're Airbnb'd, so they cover their mortgage.  They're not

25  liabilities to us.

*Proceedings*                                                    279

1          THE COURT:  Let me ask you a question.

2          Does plaintiff have all this information?  Because I

3    know you've sent me a lot of information about the defendant's

4    properties.

5          MR. KATAEV:  We have information based on deposition

6    testimony from February 2023, as well as information from

7    publicly available records.  Nothing from the defendant, other

8    than the deposition.

9          THE COURT:  All right.

10          So you are going to turn over all your financials

11   because, I hate to tell you --

12          MS. GELARDI:  I will.

13          THE COURT:  -- you do not have much of a reservoir

14   of credibility when it comes to --

15          MS. GELARDI:  That's totally fine, Your Honor.

16          I will turn it over to Jonathon by the end of the

17   week.  I will gather all the information you need to see for

18   yourself that we are living paycheck to paycheck.  We are

19   living mortgage to mortgage.  So, there's no excess.

20          And yes, I am going to -- listen, I've started

21   businesses before and I've succeeded in them.  I have no doubt

22   in my head that I will bounce back; however, we need income in

23   order to bounce back.  So now with Vito's construction

24   business, the daycare opening up, the IME company in Texas.  I

25   haven't acquired any -- any clients yet, but it all takes

*Proceedings*                                                        280

1   time.

2          So in the interim, I can make a payment agreement

3   with BRG, and I will -- I will submit all my financials for

4   you to see yourself, and the defendants if they need to see

5   it, that we are literally living paycheck to paycheck.  There

6   is no excess.

7          THE COURT:  All right.

8          So you have two weeks in which to report back on

9   your efforts to come up with a compromise deal with BRG.  You

10  will tell me exactly what it is that has been accepted, if

11  anything has been negotiated.

12         And then also, you will turn over all of your

13  financial records, bank records, property records, income

14  records, such as rental agreements, et cetera, so that I can

15  see exactly--

16         MS. GELARDI:  Okay.

17         THE COURT:  -- whether or not you have the means to

18  pay this.  Because it is a debt that's been outstanding for

19  far too long with no effort, no seeming effort to try to pay

20  it.

21         MS. GELARDI:  Your Honor, I just want to say in

22  regards to the BRG, I might have totally misunderstood in the

23  initial order in April of 2022, I believe.  For some reason, I

24  thought that it was going to be 30,000.  Right.  And I thought

25  that we were gonna pay 15, 15.

*Proceedings*                                                      281

1          Maybe I'm wrong, but this is what I understood.  And

2     then we made the initial payment of 75, which, again, I

3     thought was 50 percent of my payment.  So when this went

4     berserk, I got thrown off.  I didn't understand.

5          THE COURT:  All right.  We discussed this at the

6     last hearing.  That is just incorrect.

7          So even if you misunderstood, the situation is that

8     you still owe, I forget, about 30 or $40,000 to BRG for your

9     share of the forensic examination.

10          I think that's correct, right?

11          MR. KATAEV:  32,000, thereabouts.

12          THE COURT:  Okay.

13          So that's what has to be paid.  If you can come up

14     with some payment arrangement that BRG will accept, let me

15     know in two weeks, but otherwise I might impose a deadline

16     with some potential penalties --

17          MS. GELARDI:  Understood.

18          THE COURT:  -- civil penalties to follow.  These are

19     meant to be coercive, quite frankly, to get you to pay the

20     bill.  If you don't --

21          MS. GELARDI:  I will make a -- I will make a payment

22     agreement with them.  And I'm hoping that they accept it and

23     it will not be -- it will be paid every month without --

24     without a problem.

25          THE COURT:  That's fine.  If you can get them to

*Proceedings*                                                           282

1    agree to a longer payment plan, that's fine with me, but you

2    have to make an effort to get that down.

3              MS. GELARDI:  Okay.

4              THE COURT:  All right.

5              So I've deferred on ruling on all the other requests

6    of plaintiff.  I will issue a written decision in short order

7    on all of those requests.  Okay.

8              So thank you, everyone.

9              MR. FELSEN:  Your Honor.

10             THE COURT:  Yes.

11             MR. FELSEN:  There is one motion that has been

12   outstanding.  It's our motion for fees with respect to the

13   last contempt finding.

14             THE COURT:  Right.  I think where we left it was you

15   were supposed to submit -- oh, so we have the documentation of

16   your attorneys' fees request.  Okay.

17             MR. FELSEN:  Yes.

18             THE COURT:  So, we'll also take care of that as

19   well.

20             MR. FELSEN:  All right.  Thank you.

21             THE COURT:  Thank you, everyone.

22             MS. CHARRINGTON:  Your Honor, one other thing.

23             THE COURT:  Ms. Charrington, yes, go ahead.

24             MS. CHARRINGTON:  So I was given copies of the

25   exhibits for this hearing today, which I believe are the

*Proceedings*                                                          283

1  | Court's copies, and I'm just wondering if possibly plaintiff's
2  | counsel can just scan a copy of the exhibits --
3  |           THE COURT:  Yes.
4  |           MS. CHARRINGTON:  -- in to me just so I'll have
5  | them.
6  |           THE COURT:  Yes.
7  |           MR. KATAEV:  Your Honor, if I observed correctly,
8  | and I may be wrong, but the defendant just threw our exhibits
9  | out in the garbage.  So, we could take those and give it to --
10 |           MR. WARNER:  It's just a portion of the bank records
11 | for Mr. Liddie, which I didn't think I needed to take.
12 |           The rest of the documents you might give to
13 | Ms. Charrington, as you should have.
14 |           MR. KATAEV:  Okay.  We'll send her a scanned copy.
15 |           THE COURT:  Yes, you absolutely should.
16 |           Here is a question, though, for the record.
17 |           I don't recall how many of these exhibits, because
18 | these binders are rather bulky, but I don't remember that many
19 | exhibits actually being admitted, in addition to the green
20 | binders I have from the last time.
21 |           MR. KATAEV:  Correct.  From today, there were 11
22 | additional exhibits.
23 |           MR. WARNER:  None of them was admitted, Your Honor.
24 |           THE COURT:  Well, I think there was maybe one or
25 | two.  So, I know that Ms. Gonzalez is going to be angry with

*Proceedings*                                                284

1   me and she comes back and I didn't make a good record.

2          MS. CHARRINGTON:  I don't think anyone were

3   admitted.  I didn't hear any admission of the records.

4          THE COURT:  Oh, maybe it was just the bank record

5   for your client actually got admitted.  That one I do recall.

6          MR. KATAEV:  Yes.

7          THE COURT:  But did you want to admit any of these

8   other ones, because right now I don't think any of plaintiff's

9   exhibits were admitted?

10         It seemed like we referred to a lot of the prior.

11         MS. CHARRINGTON:  I think they were old exhibits as

12  well, maybe from prior, but I don't know if there were a

13  couple new ones.

14         THE COURT:  Well, no, there were a couple that

15  had stickers like 11 and 12.

16         MR. KATAEV:  We would want to offer 11 for evidence.

17  This was the two websites, publicly available documents.

18         THE COURT:  Okay.  I don't have copies of them

19  either I don't think, so....

20         THE COURTROOM DEPUTY:  We don't have copies of any

21  either from today.

22         MR. WARNER:  There was no request, Your Honor, for

23  its admission.

24         I don't think it's appropriate now, after the

25  hearing is closed, to have written documents admitted into

*Proceedings* 285

1   evidence when they weren't admitted earlier.

2        THE COURT:  All right.  Folks, we're not going to

3   stand on formality here.  I saw the exhibit.  I'd rather have

4   it part of the record.

5        Is there any objection to those exhibits, and which

6   ones are they, Mr. Kataev?

7        MR. KATAEV:  It was the bank statement, which was

8   admitted.  And then number 11, which is the screenshots of the

9   two websites.

10       THE COURT:  Okay, sorry.  Let me --

11       MR. WARNER:  I don't have any objection to the

12  screenshots of the two websites.

13       THE COURT:  Folks, nobody can be recorded this way.

14  Everyone, sit down and use the microphone.

15       MS. CHARRINGTON:  Yes, Your Honor.

16       I was only saying that I didn't question my client

17  as to Exhibit 11 and it wasn't introduced.  And I don't know

18  if it was just for identification purposes, or not, but I did

19  not follow up with any questions with respect to this exhibit.

20       THE COURT:  So, one of the binders contains exhibits

21  1 through 5 for this continuation of the hearing, which is a

22  bit confusing since we already have binders for Exhibits 1

23  through 92, which I can't imagine I admitted any -- I mean all

24  of those, I'm pretty sure, from the last.

25       MR. WARNER:  You certainly did not, Your Honor.

*Proceedings*                                                        286

1          THE COURT:  No.

2          Quite honestly, it is a bit of a mess right now and

3   I am going to ask the plaintiffs to at least give us a list of

4   which ones were actually admitted so the record is clear.

5          With respect to 11, I see that it's a couple pages

6   out of the IME Legal Reps website.  So those will be admitted

7   based on Mr. Liddie's testimony.

8          (Plaintiff's Exhibit 11 was received in evidence.)

9          THE COURT:  And then there was a 12, I think, but I

10  don't have a copy of that either.

11         MR. WARNER:  There's no 12, Judge.  It goes up to

12  11.

13         THE COURT:  Okay.  So just 11 is the only new

14  exhibit admitted today?

15         MR. KATAEV:  Correct, Your Honor.

16         THE COURT:  All right.

17         So I am going to ask plaintiffs to submit an actual

18  admitted exhibits list so that we know exactly which of the

19  almost 110 exhibits were actually admitted between the two

20  days of the hearing.

21         Because I have a lot of binders, but I think at the

22  end of the day there are only maybe 15 or so exhibits

23  admitted, based on my recollection.

24         Okay.  So, do that within two weeks as well.

25         (Pause.)

*Proceedings*                                                               287

1          THE COURT:  The court reporter informs me that the

2     transcript from the last time we were here has all the

3     admitted exhibits.  So, I guess the only one that will be

4     added to that one is Exhibit Number 11 from today.

5          MR. KATAEV:  And the other one that was admitted,

6     the bank statement.

7          THE COURT:  Well, that was Mr. Liddie's document.

8          That was number 12.

9          MR. KATAEV:  Yes.

10         MS. CHARRINGTON:  12?

11         MR. KATAEV:  We added a 12.

12         THE COURT:  Okay.  So do you have a marked copy of

13    that, though, Exhibit 12?

14         MR. KATAEV:  We'll get you one right now.

15         THE COURT:  You know, I guess so long as you know

16    which one it is, that's all that really matters, because I

17    have, I think, the exhibit submitted by Ms. Charrington.  So

18    that will be number 12 for the plaintiff.

19         That was attached to your letter that we got.

20         MS. CHARRINGTON:  Oh, right.  Okay.

21         So, you're admitting it as to defendant's exhibit,

22    because I think I had it as Liddie A, but they also admitted

23    it.

24         THE COURT:  It's Plaintiff's Exhibit 12.

25         (Plaintiff's Exhibit 12 was received in evidence.)

*Proceedings*                                                    288

1          MS. CHARRINGTON:  Perfect.

2          THE COURT:  All right.

3          Thank you, everyone.

4          MS. CHARRINGTON:  Thank you.

5          MR. WARNER:  Thank you, Your Honor.

6          THE COURT:  Good meeting, Ms. Charrington.

7          MS. CHARRINGTON:  Thank you.

8          MR. KATAEV:  Thank you, Your Honor.

9          (Matter adjourned.)

10

11                          ooo0ooo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

289

1                              I N D E X

2

3    WITNESS                                              PAGE

4

5      SAFA GELARDI

6          DIRECT EXAMINATION

7          BY MR. FELSEN                                   12

8          REDIRECT EXAMINATION

9          BY MR. WARNER                                   69

10         CROSS-EXAMINATION

11         BY MS. CHARRINGTON                              70

12         REDIRECT EXAMINATION

13         BY MR. FELSEN                                   74

14         RECROSS EXAMINATION

15         BY MS. CHARRINGTON                              80

16

17     EUGENE LIDDIE

18         DIRECT EXAMINATION

19         BY MR. KATAEV                                   84

20         CROSS-EXAMINATION

21         BY MS. CHARRINGTON                             129

22         REDIRECT EXAMINATION

23         BY MR. KATAEV                                  175

24         RECROSS EXAMINATION

25         BY MS. CHARRINGTON                             198

290

1    SUMMATIONS

2    BY MR. KATAEV                                    202

3

4

5

6

7

8                        **E X H I B I T S**

9

10

11   Plaintiff's Exhibit 9                           110

12

13   Plaintiff's Exhibit 11                          286

14

15   Plaintiff's Exhibit 12                          287

16

17

18

19

20

21

22

23

24

25

## $

**$15,000** [1] - 68:3
**$2,000** [2] - 68:11
**$200** [1] - 274:24
**$250** [1] - 211:5
**$4,000** [2] - 277:19, 278:2
**$4,300** [1] - 186:13
**$40** [1] - 176:5
**$40,000** [2] - 65:12, 281:8
**$43** [1] - 176:5
**$45,000** [1] - 243:9
**$5,000** [1] - 277:23
**$630,000** [1] - 66:14
**$7,200** [6] - 185:25, 186:3, 186:6, 211:4, 211:6, 211:8
**$80,000** [1] - 61:17

## '

**'16** [1] - 247:20
**'17** [1] - 247:20
**'23** [4] - 185:16, 185:18, 191:1, 191:2

## 1

**1** [3] - 195:14, 285:21, 285:22
**1,500** [1] - 227:12
**10** [28] - 5:5, 7:7, 18:8, 43:20, 51:17, 96:10, 125:3, 148:24, 167:3, 167:14, 202:11, 202:20, 203:21, 214:14, 216:21, 226:16, 227:23, 229:20, 237:16, 247:7, 250:3, 269:4, 271:4, 271:6, 271:24, 272:22, 272:25, 273:8
**10011** [1] - 1:24
**10:00** [1] - 1:8
**10:14** [3] - 103:12, 169:22, 172:6
**10:17** [2] - 172:7, 194:10
**10:23** [1] - 173:5
**10:25:09** [1] - 7:8
**10:59** [1] - 170:18
**10th** [27] - 1:23, 17:10, 19:1, 20:13, 20:21, 26:12, 34:2, 70:13, 70:20, 72:5, 75:9, 75:25, 76:1, 76:9, 123:14, 124:25, 126:15, 132:18, 134:2, 205:3, 211:2, 230:13, 230:15, 252:9, 258:7, 270:1
**11** [15] - 5:3, 35:24, 103:12, 172:6, 283:21, 284:15, 284:16, 285:8, 285:17, 286:5, 286:8, 286:12, 286:13, 287:4, 290:13
**110** [2] - 286:19, 290:11
**11042** [2] - 1:18, 1:21
**11th** [8] - 21:7, 21:15, 22:10, 169:22, 170:19, 172:2, 194:10, 218:18
**12** [17] - 44:22, 44:23, 44:24, 199:9, 222:21, 284:15, 286:9, 286:11, 287:8, 287:10, 287:11, 287:13, 287:18, 287:24, 287:25, 289:7, 290:15
**127** [1] - 120:2
**129** [1] - 289:21

**12:53** [2] - 33:5, 199:9
**12th** [5] - 19:16, 33:5, 169:1, 172:7, 198:21
**13** [1] - 47:25
**13th** [3] - 31:18, 31:21, 31:23
**14** [2] - 30:7, 221:20
**14th** [4] - 31:20, 71:12, 110:16, 230:15
**15** [10] - 52:21, 157:2, 202:12, 202:20, 242:18, 242:19, 280:25, 286:22
**154** [1] - 248:1
**154-2** [1] - 247:25
**15th** [2] - 115:7, 208:22
**16** [3] - 5:19, 120:2, 120:5
**16(f** [3] - 220:9, 220:10, 220:16
**16th** [3] - 190:19, 190:21, 190:22
**175** [1] - 289:23
**18th** [1] - 1:23
**19** [1] - 173:5
**198** [1] - 289:25
**19th** [6] - 26:14, 115:7, 131:16, 171:22, 187:5, 239:5
**1:20** [1] - 155:19
**1:30** [2] - 160:12, 160:16
**1st** [12] - 84:6, 86:8, 86:20, 88:18, 89:10, 89:13, 91:1, 91:18, 91:22, 92:15, 112:13, 208:22

## 2

**2** [3] - 109:24, 110:16, 166:22
**2'16** [7] - 240:19, 240:21, 240:23, 240:24, 241:10, 246:7
**2,000** [1] - 68:10
**20** [6] - 52:21, 75:15, 99:21, 157:2, 164:15, 277:2
**200** [2] - 258:11, 267:5
**2009** [2] - 209:4, 209:8
**2010** [2] - 221:20, 223:14
**2011** [1] - 209:4
**2016** [6] - 245:10, 245:12, 247:6, 247:18, 249:12, 249:15
**2017** [2] - 247:19, 248:17
**202** [1] - 290:2
**2020** [2] - 16:24, 17:10
**2021** [3] - 120:13, 132:16, 209:7
**2022** [3] - 215:9, 242:20, 280:23
**2023** [96] - 4:5, 5:5, 8:17, 9:12, 18:8, 19:1, 26:13, 30:7, 35:10, 41:11, 41:15, 42:11, 42:12, 42:21, 43:20, 48:1, 51:17, 69:17, 86:5, 86:9, 86:10, 96:10, 98:12, 99:20, 99:22, 103:12, 106:12, 106:15, 106:24, 107:25, 120:1, 120:19, 122:24, 123:5, 123:6, 123:14, 124:25, 125:4, 126:2, 126:15, 128:1, 132:12, 132:14, 151:8, 153:12, 167:3, 169:23, 173:5, 180:13, 181:20, 182:4, 184:18, 184:20, 184:21, 185:6, 185:10, 185:22, 186:4, 186:7, 188:9, 190:12, 191:7, 191:18, 194:10, 195:18, 202:7, 203:21, 211:3, 214:14, 215:8, 215:11, 216:21, 222:18,

224:2, 226:2, 226:10, 226:14, 226:16, 226:18, 226:20, 227:23, 229:12, 229:20, 239:14, 245:13, 245:20, 245:22, 249:3, 249:8, 249:11, 249:13, 249:20, 279:6
**2024** [30] - 1:8, 3:23, 4:4, 4:12, 5:3, 9:12, 14:23, 15:5, 16:22, 41:18, 84:6, 86:20, 88:18, 89:10, 89:13, 91:1, 91:8, 91:19, 91:22, 92:15, 93:2, 100:6, 105:9, 109:22, 110:17, 112:13, 126:7, 175:19, 202:6, 202:21
**20th** [2] - 131:16, 187:6
**21st** [4] - 42:11, 42:12, 91:7, 131:17
**22-CV-01032** [1] - 1:4
**22-CV-1032** [1] - 2:18
**228** [3] - 224:14, 225:14, 239:23
**23rd** [2] - 41:18, 99:22
**24** [5] - 4:12, 253:22, 253:25, 275:12
**24th** [1] - 4:14
**25** [5] - 7:7, 120:2, 195:18, 253:25, 254:1
**25th** [2] - 35:10, 111:18
**26** [2] - 253:23, 254:10
**26118** [1] - 43:7
**27** [7] - 5:19, 226:14, 229:12, 249:8, 249:13, 249:20, 254:13
**27th** [1] - 234:7
**28** [1] - 242:20
**286** [1] - 290:13
**287** [1] - 290:15
**29** [7] - 1:8, 3:22, 4:4, 9:12, 15:5, 100:6, 244:24
**29th** [10] - 14:23, 16:22, 43:14, 93:2, 105:9, 110:16, 126:7, 202:6, 202:21, 234:18
**2:07** [1] - 189:5
**2:16** [2] - 167:3, 167:14
**2nd** [3] - 86:8, 154:19, 155:4

## 3

**3** [1] - 249:11
**30** [5] - 51:22, 54:13, 65:12, 246:8, 281:8
**30(b)(6** [2] - 218:1, 218:6
**30,000** [1] - 280:24
**30-minute** [1] - 17:5
**30-some** [1] - 7:18
**3000** [2] - 1:17, 1:20
**303** [1] - 221:20
**308** [1] - 222:11
**30B** [1] - 217:22
**30th** [1] - 224:2
**32** [3] - 217:22, 218:1, 219:11
**32,000** [1] - 281:11
**37** [1] - 220:12
**39** [17] - 19:6, 20:12, 24:5, 70:10, 73:18, 103:9, 166:5, 166:6, 166:7, 166:9, 166:13, 166:14, 166:19, 167:13, 169:10, 194:8, 195:4

**3:30** [2] - 114:10, 211:15
**3d** [1] - 221:20
**3rd** [1] - 249:20
**3W8** [2] - 1:17, 1:20

## 4

**4** [3] - 4:5, 9:12, 277:21
**4,000** [1] - 64:17
**4,500** [1] - 278:16
**40** [6] - 113:6, 114:8, 203:1, 246:8
**400** [2] - 227:11, 246:7
**4200** [2] - 277:21, 278:22
**45** [1] - 181:23
**45,000** [1] - 59:1
**4500-dollar-a-month** [1] - 278:18
**473** [2] - 59:1, 80:17
**4889** [1] - 111:8
**4:50** [1] - 181:21
**4th** [9] - 86:4, 86:10, 107:24, 120:1, 120:19, 122:24, 123:6, 126:2, 202:7

## 5

**5** [2] - 247:25, 285:21
**50** [1] - 281:3
**54** [10] - 25:23, 26:11, 30:6, 70:10, 73:19, 172:8, 172:9, 172:10, 172:18, 172:22
**55** [2] - 189:23, 189:24
**59** [2] - 189:22, 211:23
**5:25:24** [1] - 6:22

## 6

**6** [2] - 1:23, 182:4
**6/29/2022** [1] - 242:23
**60,000** [2] - 80:16, 80:17
**600,000** [1] - 66:16
**600-thousand-dollar** [1] - 277:5
**61** [12] - 35:7, 35:9, 192:6, 193:9, 193:12, 193:23, 195:4, 195:12, 195:14, 200:18, 211:23, 213:1
**615(a** [1] - 10:15
**63** [4] - 187:8, 187:18, 187:20, 187:21
**65** [5] - 103:4, 187:9, 187:20, 188:4, 189:2
**66** [1] - 215:9
**69** [1] - 289:9
**6th** [1] - 181:20

## 7

**70** [1] - 289:11
**700** [2] - 246:11, 248:3
**71** [1] - 221:18
**7200** [1] - 151:13
**74** [1] - 289:13
**75** [1] - 281:2
**7:00** [2] - 114:10, 211:15

**7:05** [1] - 195:18

## 8

**8** [1] - 189:5
**80** [2] - 103:4, 289:15
**84** [1] - 289:19

## 9

**9** [4] - 110:5, 110:8, 110:13, 290:11
**90** [13] - 7:12, 7:22, 52:25, 53:21, 58:9, 203:12, 204:9, 204:16, 217:10, 257:12, 261:24, 266:18, 271:6
**90/10** [1] - 272:8
**92** [1] - 285:23
**98** [3] - 128:23, 208:8, 240:9

## A

**a.m** [8] - 1:8, 103:12, 114:10, 169:22, 170:18, 194:10, 195:18, 211:15
**abandoned** [1] - 217:13
**Abdulrahim** [2] - 45:15, 45:17
**ABDULRAHIM** [1] - 1:8
**abidingness** [1] - 233:7
**ability** [1] - 268:11
**able** [16] - 56:15, 84:12, 84:21, 85:11, 87:15, 88:2, 88:3, 88:13, 144:11, 157:7, 243:25, 245:3, 275:9, 275:18, 275:21, 276:25
**absence** [1] - 234:19
**absolute** [1] - 30:1
**absolutely** [10] - 54:18, 59:17, 79:7, 140:21, 144:1, 177:11, 179:4, 258:21, 259:12, 283:15
**accelerator** [4] - 224:12, 224:25, 234:4, 239:23
**accept** [7] - 60:12, 95:3, 207:20, 213:7, 276:17, 281:14, 281:22
**acceptable** [1] - 71:7
**accepted** [4] - 60:11, 224:17, 250:4, 280:10
**accepting** [1] - 217:1
**access** [24] - 101:18, 101:22, 104:15, 106:2, 117:5, 139:15, 164:18, 164:23, 179:6, 179:11, 184:8, 227:5, 251:1, 251:11, 254:20, 260:24, 261:15, 261:17, 261:20, 262:17, 265:11, 266:13, 268:10, 270:8
**accessible** [1] - 264:17
**accidentally** [1] - 267:25
**Accompanied** [12] - 45:18, 45:20, 45:22, 46:6, 46:13, 46:16, 47:3, 216:10, 219:24, 220:3, 223:8, 224:3
**accompany** [3] - 5:14, 66:4, 156:18
**accorded** [1] - 12:14
**according** [4] - 98:8, 100:3, 114:20
**account** [23] - 24:6, 33:8, 42:6, 66:1, 75:23, 111:3, 111:5, 111:6, 111:9,

111:15, 112:6, 137:16, 164:24, 170:13, 175:25, 181:1, 186:18, 187:11, 190:17, 190:25, 194:11, 237:9, 241:4
**accumulates** [1] - 113:15
**accurate** [2] - 63:24, 95:2
**accusations** [1] - 63:12
**achieve** [1] - 229:7
**acknowledge** [2] - 92:18, 180:3
**acknowledged** [1] - 152:14
**acknowledging** [1] - 250:25
**acquire** [1] - 142:4
**acquired** [1] - 279:25
**act** [1] - 265:2
**acted** [1] - 231:22
**action** [2] - 83:2, 140:20
**actions** [1] - 207:3
**active** [3] - 9:22, 82:16, 209:14
**actively** [2] - 60:23, 210:9
**activity** [1] - 226:15
**acts** [1] - 223:18
**actual** [4] - 42:22, 106:7, 120:24, 176:23, 213:9, 214:25, 222:1, 247:18, 248:16, 253:2, 286:17
**Adam** [1] - 247:17
**add** [3] - 117:3, 186:9, 234:2
**added** [3] - 212:22, 287:4, 287:11
**addition** [1] - 283:19
**additional** [8] - 36:18, 37:22, 38:2, 39:12, 40:10, 40:17, 247:24, 283:22
**address** [14] - 18:16, 73:20, 104:1, 104:3, 104:6, 104:12, 104:22, 147:18, 148:1, 164:11, 165:12, 171:2, 247:10, 267:16
**addressed** [5] - 170:20, 188:14, 202:8, 223:17, 237:11
**addressing** [1] - 256:4
**adduced** [2] - 223:5, 230:22
**adjourned** [1] - 288:9
**adjusting** [1] - 274:11
**admission** [4] - 208:5, 223:22, 284:3, 284:23
**admit** [2] - 223:3, 284:7
**admits** [1] - 227:7
**admitted** [29] - 103:10, 110:12, 192:8, 194:8, 206:18, 208:8, 209:11, 215:6, 215:12, 220:15, 230:10, 283:19, 283:23, 284:3, 284:5, 284:9, 284:25, 285:1, 285:8, 285:23, 286:4, 286:6, 286:14, 286:18, 286:19, 286:23, 287:3, 287:5, 287:22
**admitting** [1] - 287:21
**advance** [2] - 91:25, 109:15
**advise** [4] - 9:23, 82:10, 82:22, 120:8
**advised** [1] - 242:6
**Advocate** [1] - 74:10
**Advocates** [43] - 5:14, 8:6, 14:16, 36:3, 36:5, 36:7, 36:15, 51:2, 51:8, 51:14, 57:1, 57:12, 70:24, 71:13, 71:16, 71:21, 71:24, 74:11, 74:13, 125:21, 125:24, 139:12, 148:20, 149:4, 203:14,

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 293 of 324
All Word // EDV # Gabordi, et al.
PageID #: 8880
3

204:3, 204:8, 204:12, 205:4, 205:12, 214:17, 216:24, 216:25, 217:12, 219:1, 235:22, 237:20, 237:25, 238:14, 259:24, 268:16, 268:17, 273:16

**Advocates's** [1] - 39:15
**advocating** [1] - 209:23
**AF** [1] - 11:20
**affidavit** [1] - 42:8
**Affidavit** [1] - 222:6
**affirm** [1] - 8:25
**affirmatively** [1] - 254:13
**afford** [1] - 56:13
**AFTERNOON** [1] - 161:1
**afternoon** [1] - 109:10, 231:11
**afterwards** [2] - 62:7, 68:14
**age** [1] - 210:7
**agenda** [1] - 237:18
**agent** [2] - 206:19, 207:6
**agent's** [1] - 222:12
**ago** [7] - 6:25, 67:9, 74:17, 75:16, 221:3, 257:15, 264:4
**agree** [13] - 22:19, 25:12, 39:14, 40:15, 42:22, 51:6, 100:2, 231:12, 233:18, 234:23, 237:21, 276:3, 282:1
**agreed** [2] - 59:14, 127:13
**agreement** [42] - 5:15, 6:23, 7:4, 8:8, 12:21, 12:22, 12:24, 13:9, 14:12, 14:15, 20:15, 21:9, 21:18, 52:12, 53:3, 53:4, 132:25, 133:3, 167:21, 204:13, 204:15, 210:3, 217:3, 217:9, 217:15, 218:12, 255:19, 256:20, 269:1, 271:5, 272:9, 272:14, 272:17, 272:18, 275:11, 276:1, 276:17, 276:19, 280:2, 281:22
**agreements** [2] - 217:15, 280:14
**ahead** [62] - 12:3, 12:12, 14:21, 22:8, 25:10, 26:1, 27:25, 29:8, 34:20, 37:17, 39:3, 40:14, 44:11, 46:10, 47:23, 49:10, 50:6, 54:19, 55:13, 55:23, 56:3, 59:4, 59:22, 63:13, 64:16, 71:2, 71:9, 71:19, 72:15, 75:21, 78:14, 78:23, 81:16, 83:16, 90:11, 93:21, 98:20, 101:12, 107:23, 108:14, 114:2, 117:23, 122:18, 125:13, 125:18, 127:1, 138:4, 162:8, 163:7, 165:4, 173:2, 175:9, 183:15, 197:13, 197:24, 202:22, 213:19, 214:12, 219:18, 247:11, 267:14, 282:23
**ahold** [1] - 187:12
**Airbnb'd** [1] - 278:24
**akin** [1] - 263:13
**AL** [1] - 1:8
**al** [1] - 2:19
**albeit** [1] - 265:1
**ALL** [1] - 3:5
**allegation** [1] - 261:18
**allegations** [1] - 153:21
**alleged** [2] - 73:18, 234:4
**allegedly** [2] - 233:13, 239:17
**allot** [2] - 115:13, 118:15
**allow** [6] - 55:4, 117:22, 131:8, 276:2, 276:16, 276:17

**allowed** [6] - 57:17, 69:21, 175:12, 211:9, 211:10, 224:5
**alluded** [1] - 202:2
**almost** [4] - 24:21, 263:14, 267:5, 272:23, 286:19
**alone** [7] - 55:12, 223:14, 223:19, 224:10, 243:11, 249:15, 256:24
**already-ordered** [1] - 64:13
**alter** [1] - 157:19
**alterations** [1] - 157:11
**alternate** [1] - 159:18
**alternative** [1] - 235:6
**alters** [1] - 94:11
**amalgam** [1] - 247:15
**amended** [4] - 120:6, 226:10, 249:3, 249:4
**America** [3] - 111:13, 151:4, 151:6
**amount** [2] - 64:17, 243:10
**Amway** [2] - 115:19, 206:17
**analogy** [1] - 263:19
**analysis** [3] - 205:25, 221:24, 222:2
**Angela** [7] - 68:18, 128:8, 128:11, 128:13, 128:14, 128:18, 128:20
**angry** [1] - 283:25
**annual** [2] - 64:23, 64:25
**answer** [31] - 22:6, 26:23, 28:6, 28:20, 32:10, 48:23, 57:25, 63:3, 63:8, 63:20, 64:5, 66:8, 101:6, 104:11, 116:25, 117:2, 124:14, 132:6, 138:23, 155:11, 182:11, 204:25, 209:20, 212:8, 220:10, 241:25, 257:8, 264:2, 265:16, 266:12, 267:12
**answered** [4] - 30:20, 33:20, 34:10, 39:1, 59:3, 80:10, 163:21, 178:24
**answering** [1] - 24:15
**answers** [8] - 27:18, 77:3, 79:23, 80:23, 104:14, 116:22, 244:18, 257:3
**anticipated** [2] - 10:23, 147:12
**anticipation** [1] - 5:3
**apartment** [1] - 66:17
**apologies** [2] - 140:7, 274:19
**apologize** [2] - 156:22, 157:10
**app** [5] - 94:1, 112:9, 117:3, 117:6, 251:18
**apparent** [1] - 223:7
**appeal** [1] - 248:12
**Appeals** [1] - 221:19
**appear** [5] - 8:2, 10:7, 112:23, 171:25, 274:12
**appearance** [2] - 242:22, 242:23
**appearances** [1] - 2:20
**appeared** [1] - 86:13
**appearing** [1] - 218:19
**Apple** [6] - 40:24, 41:4, 41:6, 210:13, 210:14, 210:16
**appointments** [1] - 43:1
**appreciate** [2] - 108:22, 273:4
**appreciation** [1] - 109:10
**approach** [4] - 81:12, 121:1, 193:8,

207:22
**approached** [4] - 49:14, 207:21, 239:11, 252:18
**appropriate** [3] - 220:5, 263:23, 284:24
**appropriately** [1] - 227:15
**approves** [1] - 100:15
**approximate** [1] - 102:19
**April** [111] - 5:5, 17:10, 18:8, 19:1, 19:16, 20:13, 20:21, 21:7, 21:15, 22:10, 26:12, 26:14, 30:7, 31:18, 31:20, 31:21, 31:23, 33:5, 34:2, 35:10, 41:14, 42:11, 42:12, 42:21, 43:20, 51:17, 70:13, 70:20, 71:12, 72:5, 75:9, 75:25, 76:1, 76:9, 96:9, 98:11, 99:20, 99:21, 103:12, 106:7, 115:7, 115:12, 123:14, 124:8, 124:25, 125:3, 126:15, 128:1, 131:16, 131:17, 132:12, 132:14, 132:18, 134:2, 148:24, 151:8, 151:9, 151:10, 164:15, 167:3, 167:14, 169:1, 169:22, 170:19, 171:22, 172:2, 172:6, 172:7, 173:5, 185:6, 185:9, 187:6, 194:10, 195:18, 198:21, 199:9, 203:21, 205:3, 208:22, 211:2, 214:14, 216:21, 223:14, 226:18, 226:19, 229:20, 230:13, 230:15, 237:16, 239:5, 239:13, 246:2, 246:13, 247:9, 249:11, 249:20, 250:3, 252:9, 258:7, 270:1, 271:4, 271:24, 272:22, 272:25, 273:8, 280:23
**area** [1] - 142:22
**areas** [2] - 131:12, 142:23
**arguably** [1] - 257:23
**argue** [3] - 160:3, 204:11, 248:11
**arguing** [3] - 233:11, 248:23, 258:20
**argument** [18] - 72:10, 159:14, 194:5, 203:9, 214:17, 214:19, 215:18, 215:25, 225:6, 225:12, 225:13, 226:7, 241:20, 248:22, 249:5, 255:5, 259:9, 268:17
**argumentative** [1] - 135:17
**arguments** [1] - 203:8
**Arnold** [1] - 41:17
**arrange** [1] - 237:23
**Arrangement** [1] - 113:23
**arrangement** [3] - 118:9, 255:19, 281:14
**Arrangements** [23] - 105:25, 108:16, 108:25, 109:1, 109:6, 110:17, 110:22, 110:25, 112:18, 112:22, 113:13, 113:21, 129:24, 130:1, 130:2, 175:20, 175:23, 176:9, 176:24, 181:8, 268:6, 269:3, 269:12
**arrangements** [1] - 258:15
**Arrangements's** [1] - 208:19
**ASAP** [3] - 30:13, 30:15
**ashamed** [1] - 29:15
**aside** [1] - 111:2
**aspect** [1] - 254:18
**assessed** [1] - 274:24
**assign** [1] - 43:2
**assist** [1] - 166:8

**assisted** [1] - 97:4
**assisting** [1] - 4:20
**associated** [1] - 260:15
**Associates** [2] - 42:12, 69:16
**associating** [5] - 35:13, 195:19, 200:22, 201:4, 201:10
**association** [3] - 68:1, 68:4, 68:7
**assume** [3] - 43:23, 231:8, 236:3
**assuming** [4] - 140:24, 164:5, 188:20, 251:10
**assumption** [1] - 188:20
**assurances** [1] - 223:21
**at..** [1] - 181:17
**attach** [1] - 221:16
**attached** [4] - 170:21, 171:7, 172:14, 287:19
**attaching** [1] - 62:15
**attachment** [11] - 61:20, 61:21, 63:15, 65:24, 66:22, 182:13, 183:1, 183:5, 220:21, 221:8, 242:3
**ATTACHMENT** [1] - 62:5
**attachments** [1] - 182:18
**attempt** [7] - 55:19, 74:1, 200:10, 232:17, 233:2, 233:4
**attempted** [2] - 55:2, 55:3
**attempting** [2] - 59:13, 262:5
**attended** [1] - 216:20
**attorney** [14] - 13:15, 62:9, 62:10, 68:1, 82:10, 107:8, 109:16, 109:17, 120:20, 166:19, 220:12, 242:13, 242:15, 277:12
**attorney's** [1] - 108:2
**attorneys** [3] - 80:17, 209:17
**attorneys'** [6] - 66:4, 242:11, 242:13, 242:14, 242:24, 282:16
**attorneys's** [2] - 220:6, 220:25, 221:11, 221:12
**audio** [1] - 253:17
**August** [5] - 184:18, 184:20, 184:21, 190:12, 222:18
**authenticated** [1] - 110:8
**authority** [3] - 221:18, 263:23, 264:25
**authorize** [1] - 133:19
**authorized** [6] - 219:25, 220:1, 220:9, 220:12, 220:16, 221:16
**auto** [2] - 159:7, 178:17
**autocorrect** [16] - 95:19, 140:14, 140:15, 140:23, 140:25, 148:15, 158:10, 158:12, 158:13, 158:18, 158:24, 159:13, 235:1, 235:5, 251:14, 251:16
**autocorrecting** [1] - 158:14
**autocorrects** [3] - 95:22, 132:2, 230:23
**automatically** [2] - 159:19, 159:22
**availability** [1] - 130:5
**available** [8] - 104:19, 207:12, 225:21, 226:19, 227:22, 229:4, 279:7, 284:17
**Avenue** [2] - 1:17, 1:20

**avoid** [3] - 61:19, 107:11, 229:9
**avoiding** [1] - 219:10
**award** [1] - 220:5
**aware** [30] - 70:12, 70:19, 72:4, 85:12, 85:15, 88:9, 96:9, 96:12, 101:14, 101:16, 106:4, 106:5, 123:12, 123:20, 123:22, 124:9, 124:13, 124:17, 124:25, 125:3, 125:9, 144:18, 144:20, 147:23, 155:23, 164:16, 165:13, 179:17, 217:6
**awareness** [2] - 123:17, 145:6

## B

**B-E-I-B-I-N** [1] - 85:1
**back-end** [1] - 254:11
**backed** [1] - 229:14
**background** [2] - 273:19, 274:10
**badgering** [1] - 23:21
**balance** [1] - 274:23
**bank** [30] - 109:24, 110:20, 11:3, 111:11, 112:23, 128:10, 175:25, 176:4, 176:12, 184:14, 185:14, 186:18, 190:12, 190:14, 190:17, 190:23, 190:25, 191:6, 191:11, 191:18, 222:18, 222:19, 269:11, 275:23, 276:13, 280:13, 283:10, 284:4, 285:7, 287:6
**Bank** [5] - 109:22, 111:13, 151:4, 151:6, 175:18
**banker** [2] - 49:21
**bankrupt** [1] - 23:20
**banner** [2] - 172:17, 211:24
**bar** [1] - 258:17
**barely** [3] - 18:19, 58:23, 65:4
**base** [4] - 152:15, 208:9, 240:10
**based** [36] - 59:15, 67:17, 67:20, 90:9, 110:20, 130:8, 154:17, 159:16, 179:5, 179:8, 179:10, 184:19, 185:1, 185:14, 185:17, 188:20, 191:14, 193:23, 195:6, 198:5, 203:9, 212:9, 216:4, 220:7, 222:5, 223:5, 223:13, 227:3, 230:22, 250:7, 254:3, 257:21, 260:6, 279:5, 286:7, 286:23
**Based** [1] - 254:10
**bases** [1] - 226:23
**basis** [5] - 89:8, 102:21, 223:25, 257:12, 267:23
**basket** [1] - 109:4
**Baum** [1] - 41:17
**bear** [2] - 10:20, 43:10
**beat** [2] - 76:5, 176:18
**became** [5] - 106:5, 203:15, 204:12, 239:15, 246:10
**become** [2] - 24:21, 106:4
**becomes** [5] - 238:14, 238:17, 263:22, 264:22
**bed** [1] - 119:4
**bedrooms** [5] - 67:2, 67:3, 67:4, 67:5, 67:6
**BEFORE** [1] - 1:13
**began** [3] - 3:22, 4:10, 202:21

**beginning** [1] - 65:14
**behalf** [4] - 69:3, 135:11, 135:12, 255:24
**behest** [1] - 225:15
**behind** [3] - 7:4, 203:11, 205:21
**Beiben** [1] - 207:16
**Beibin** [60] - 84:23, 84:24, 84:25, 85:8, 85:12, 85:15, 85:18, 85:21, 87:12, 87:17, 87:23, 88:8, 88:10, 89:10, 89:13, 91:16, 104:16, 105:3, 112:3, 112:7, 117:5, 117:18, 122:3, 122:13, 122:21, 129:10, 146:23, 148:8, 151:15, 152:7, 152:20, 153:6, 153:19, 154:3, 206:18, 207:4, 207:5, 261:23, 262:4, 262:8, 262:11, 262:14, 263:12, 263:20, 263:24, 265:7, 265:14, 265:18, 265:21, 265:22, 266:13, 267:1, 269:24, 270:13, 270:16, 270:19
**Beibin's** [3] - 128:15, 216:4, 246:25
**belief** [1] - 260:1
**believes** [1] - 251:1
**below** [1] - 236:16
**benefit** [1] - 20:6
**Bergman** [15] - 88:7, 88:20, 89:9, 91:12, 100:5, 100:6, 100:14, 100:19, 101:14, 106:19, 152:21, 230:18
**berserk** [1] - 281:4
**best** [3] - 23:9, 173:19, 229:16
**better** [1] - 6:6
**between** [37] - 4:15, 5:7, 6:23, 8:5, 8:11, 9:6, 12:23, 18:16, 18:20, 76:16, 96:10, 103:6, 125:2, 131:16, 139:7, 147:17, 148:24, 183:12, 204:14, 204:15, 210:1, 210:6, 217:9, 223:1, 230:12, 230:15, 234:12, 236:20, 238:9, 247:17, 253:9, 253:22, 266:14, 268:25, 286:19
**beyond** [3] - 10:10, 78:7, 183:23
**biblical** [1] - 13:14
**big** [3] - 97:17, 99:13, 103:5
**bigger** [1] - 255:14
**biggest** [4] - 240:14, 240:15, 257:14, 257:16
**bill** [4] - 112:5, 113:19, 243:14, 281:20
**bills** [1] - 65:5
**binder** [3] - 19:11, 19:22, 25:25
**binders** [5] - 283:18, 283:20, 285:20, 285:22, 286:21
**bit** [12] - 6:2, 31:12, 32:21, 78:7, 85:2, 132:17, 138:18, 155:18, 178:1, 268:15, 285:22, 286:2
**black** [2] - 121:12, 215:11
**blatant** [2] - 55:15, 55:17
**blocked** [2] - 28:10, 74:15
**board** [2] - 33:7, 137:9
**boarding** [1] - 16:24
**body** [1] - 162:16
**bold** [1] - 99:13
**bombshell** [1] - 269:7
**book** [3] - 102:19, 102:25, 103:1

**booked** [9] - 90:25, 91:7, 91:18, 92:3, 92:7, 92:11, 102:14, 102:16, 103:5
**bookings** [1] - 91:3
**books** [3] - 30:14, 91:24, 102:20
**boss** [1] - 177:8
**bothered** [1] - 107:11
**bottom** [11] - 4:23, 30:7, 35:9, 162:18, 169:9, 169:18, 172:2, 172:5, 173:25, 195:14, 207:19
**bought** [7] - 39:19, 45:10, 45:13, 47:12, 47:25, 175:20, 215:25
**bounce** [2] - 279:22, 279:23
**brand** [1] - 180:22
**brand-new** [1] - 180:22
**break** [5] - 81:8, 116:6, 155:18, 160:15, 274:19
**BRG** [7] - 221:9, 274:22, 280:3, 280:9, 280:22, 281:8, 281:14
**brief** [2] - 80:7, 216:17
**briefing** [1] - 211:11
**briefly** [5] - 70:1, 142:8, 145:13, 158:9, 197:25
**brightness** [1] - 162:12
**bring** [2] - 140:18, 157:1
**brings** [2] - 207:8, 250:21
**broader** [1] - 228:8
**broke** [5] - 43:5, 43:6, 43:22, 43:23, 243:20
**Brooklyn** [1] - 1:6
**brother** [10] - 45:14, 46:9, 47:9, 47:11, 47:17, 47:25, 48:5, 48:16, 50:16, 216:11
**brother's** [2] - 47:14, 48:10
**brought** [3] - 33:10, 43:4, 233:24
**build** [4] - 20:16, 153:13, 168:11, 267:1
**built** [2] - 38:4, 49:18
**bulky** [1] - 283:18
**bully** [1] - 48:15
**bullying** [1] - 16:19
**bunch** [2] - 80:16, 215:19
**burden** [2] - 62:2, 231:1
**busiest** [6] - 128:3, 176:6, 176:8, 208:18, 208:20, 208:22
**business** [114] - 5:16, 5:23, 7:13, 8:8, 8:10, 8:15, 8:18, 8:20, 8:25, 9:13, 9:16, 16:21, 32:11, 36:7, 38:21, 46:2, 46:7, 46:9, 47:8, 47:12, 47:13, 47:15, 47:21, 49:17, 49:24, 50:9, 50:20, 52:9, 52:25, 56:5, 57:1, 57:5, 57:17, 58:2, 58:18, 64:4, 64:21, 68:14, 72:22, 73:16, 89:17, 104:5, 104:20, 107:20, 111:4, 112:3, 112:4, 112:6, 113:24, 115:1, 115:3, 115:8, 115:13, 115:19, 116:7, 141:8, 141:18, 141:23, 144:10, 153:13, 155:6, 155:8, 155:9, 181:3, 181:5, 182:6, 185:6, 197:18, 199:22, 199:25, 200:4, 200:10, 206:16, 207:11, 209:11, 209:12, 209:13, 209:15, 216:8, 216:22, 226:15, 232:24, 238:22, 238:25,

240:12, 243:9, 244:24, 246:16, 246:18, 248:9, 256:1, 256:16, 257:18, 261:14, 262:15, 264:13, 266:15, 267:2, 268:5, 268:7, 268:14, 269:3, 269:10, 269:23, 270:2, 270:19, 271:7, 274:4, 274:7, 279:24
**businesses** [8] - 246:20, 257:5, 265:7, 267:3, 270:15, 276:11, 278:6, 279:21
**busy** [3] - 206:17, 209:9
**but...** [1] - 120:17
**button** [1] - 222:22
**buttons** [1] - 44:16
**buy** [6] - 61:12, 62:14, 112:24, 113:14, 258:15
**buyer** [1] - 62:13
**buying** [5] - 61:18, 127:12, 268:5, 269:3, 269:12
**BY** [60] - 1:18, 1:21, 12:6, 16:5, 20:11, 29:9, 37:19, 45:9, 46:11, 47:24, 54:20, 59:5, 69:11, 70:4, 74:8, 80:9, 84:3, 85:7, 90:12, 93:23, 95:13, 98:6, 98:21, 99:4, 101:13, 108:15, 109:14, 110:15, 114:3, 118:5, 119:6, 120:18, 121:8, 122:19, 124:24, 125:19, 127:25, 129:9, 138:5, 163:9, 165:5, 167:12, 173:3, 175:11, 175:17, 190:9, 197:15, 198:4, 199:20, 202:24, 289:7, 289:9, 289:11, 289:13, 289:15, 289:19, 289:21, 289:23, 289:25, 290:2
**BY:JONATHON** [1] - 1:24

# C

**calendered** [1] - 43:1
**calm** [1] - 25:9
**campaign** [2] - 110:21, 188:1
**can..** [1] - 182:17
**cancel** [1] - 91:7
**candid** [1] - 236:25
**cannot** [15] - 18:11, 22:6, 57:18, 64:15, 65:12, 76:6, 90:23, 162:18, 187:11, 204:24, 205:7, 213:9, 213:10, 226:8, 263:24
**capable** [1] - 276:4
**capacity** [2] - 10:4, 89:16
**caps** [1] - 196:1
**caption** [1] - 44:25
**car** [2] - 157:1, 157:6
**card** [17] - 7:25, 27:3, 29:1, 29:2, 52:16, 112:25, 133:11, 133:13, 133:14, 133:16, 133:17, 133:19, 150:18, 150:19, 151:4, 151:6
**care** [4] - 67:24, 255:18, 255:22, 282:18
**carefully** [3] - 159:23, 167:19, 211:16
**Carlos** [1] - 3:3
**carries** [1] - 10:9
**case** [34] - 5:7, 10:11, 17:20, 17:23, 24:9, 43:4, 65:15, 70:7, 86:14, 97:24, 102:21, 115:19, 119:22, 119:23,

119:25, 121:11, 145:20, 205:23, 218:4, 220:14, 220:17, 220:19, 221:19, 223:20, 224:9, 228:8, 242:15, 243:3, 243:6, 250:1, 254:25, 269:23, 269:24
**case-by-case** [1] - 102:21
**case-ending** [1] - 220:17
**cases** [2] - 240:15, 240:16
**cash** [9] - 112:24, 176:4, 181:8, 186:14, 186:16, 186:17, 277:10
**causation** [1] - 208:12
**CAUSE** [1] - 1:12
**caution** [2] - 9:19, 81:13
**cc'ing** [1] - 169:3
**cell** [2] - 94:4, 251:16
**cellular** [1] - 209:13
**center** [1] - 265:25
**certain** [4] - 109:18, 130:24, 132:2, 213:3
**certainly** [7] - 10:20, 78:8, 154:22, 238:1, 257:7, 264:19, 285:25
**certified** [1] - 115:10
**CES** [2] - 48:19, 48:24
**cetera** [5] - 203:22, 211:23, 217:4, 241:12, 280:14
**chain** [18] - 168:18, 169:4, 170:18, 170:21, 171:8, 171:9, 172:1, 174:14, 174:16, 174:17, 174:19, 193:22, 213:10, 213:24, 214:1, 214:3, 214:4, 230:20
**chains** [2] - 211:22, 236:14
**chair** [3] - 2:15, 11:24, 164:1
**chance** [2] - 56:16, 239:21
**change** [13] - 6:1, 31:11, 32:20, 68:10, 77:20, 78:4, 95:7, 95:14, 98:4, 159:1, 178:1, 251:14, 255:2
**changed** [7] - 93:10, 98:1, 130:24, 131:3, 131:12, 140:25, 207:15
**changes** [21] - 96:18, 96:22, 96:25, 97:5, 97:6, 97:11, 98:8, 100:3, 101:17, 101:19, 101:21, 101:23, 102:1, 135:7, 135:10, 135:11, 135:12, 177:19, 178:10, 212:20, 253:10
**changing** [4] - 135:1, 170:15, 178:9, 201:8
**charge** [3] - 93:3, 113:14, 113:17
**charged** [1] - 112:6
**charges** [2] - 113:23, 256:6
**charging** [1] - 113:19
**Charrington** [35] - 3:15, 8:21, 8:23, 8:24, 9:18, 10:21, 69:2, 69:25, 70:6, 72:11, 80:6, 110:10, 129:7, 140:17, 146:5, 151:1, 156:3, 157:14, 158:3, 158:8, 161:15, 169:15, 172:3, 172:25, 175:1, 197:24, 205:10, 244:7, 250:16, 273:4, 282:23, 283:13, 287:17, 288:6
**CHARRINGTON** [165] - 2:10, 2:13, 3:14, 3:19, 8:23, 37:1, 37:5, 37:9, 37:15, 69:24, 70:1, 70:4, 70:18, 71:4, 71:8, 71:10, 72:12, 72:16, 73:5, 74:3, 80:7, 80:9, 80:15, 80:20, 81:2, 81:6,

81:10, 94:13, 94:17, 95:5, 95:11,
110:11, 117:21, 118:10, 119:16,
120:23, 121:5, 121:18, 123:16, 126:21,
127:19, 129:9, 131:10, 131:11, 136:4,
138:5, 138:20, 138:24, 139:21, 140:19,
140:21, 140:22, 143:5, 144:22, 145:1,
145:12, 145:15, 146:3, 151:3, 156:4,
156:9, 156:16, 157:15, 157:18, 157:23,
158:5, 158:9, 159:19, 160:1, 160:8,
161:6, 161:24, 162:1, 162:14, 162:21,
162:24, 163:2, 163:6, 163:9, 163:13,
165:5, 165:9, 165:18, 165:25, 166:3,
166:6, 166:10, 166:20, 167:6, 167:8,
167:12, 167:23, 168:7, 168:14, 168:22,
172:4, 172:8, 172:20, 172:22, 173:1,
173:3, 174:4, 174:6, 175:2, 175:5,
178:20, 178:24, 179:12, 180:6, 181:11,
182:8, 182:14, 182:20, 183:7, 183:20,
193:17, 197:25, 198:4, 199:2, 199:15,
199:17, 199:20, 200:13, 205:15,
250:17, 251:9, 255:10, 256:8, 256:18,
258:9, 258:16, 259:11, 261:5, 261:7,
261:12, 262:6, 263:16, 264:3, 264:9,
264:17, 265:6, 266:9, 266:19, 266:22,
267:10, 267:15, 271:9, 271:16, 271:19,
273:3, 282:22, 282:24, 283:4, 284:2,
284:11, 285:15, 287:10, 287:20, 288:1,
288:4, 288:7, 289:11, 289:15, 289:21,
289:25

**Charrington's** [1] - 248:22
**Chase** [2] - 109:22, 175:18
**chase** [2] - 206:7, 222:22
**cheapest** [2] - 38:7, 38:9
**check** [6] - 33:15, 178:18, 186:21,
189:6, 192:3, 198:24
**checked** [1] - 196:7
**CHEN** [3] - 1:13, 2:2, 161:3
**Chen** [4] - 46:12, 48:1, 48:6, 107:25
**Cherny** [3] - 90:13, 153:4, 230:18
**CHERNY** [1] - 90:13
**Chicago** [1] - 119:8
**chief** [1] - 218:5
**child** [5] - 118:9, 118:13, 118:16,
118:19, 118:21
**chime** [1] - 177:25
**chocolate** [1] - 108:20
**choice** [3] - 162:23, 263:1, 263:3
**choices** [2] - 159:17, 162:20
**choose** [5] - 23:2, 129:20, 221:5,
262:25, 272:7
**chooses** [1] - 262:2
**choosing** [1] - 271:10
**chose** [2] - 218:4, 229:15
**Christ** [1] - 63:16
**chronological** [1] - 172:15
**chronology** [1] - 226:21
**circles** [1] - 17:19
**circumstances** [1] - 232:19
**City** [11] - 36:19, 36:24, 37:23, 37:24,
38:2, 40:5, 40:7, 40:12, 143:1, 143:2,

277:23
**civil** [4] - 2:17, 10:6, 83:2, 281:18
**Civil** [1] - 220:10
**CIVIL** [1] - 1:12
**ckckck** [1] - 228:2
**claim** [11] - 9:23, 43:22, 49:18, 64:14,
65:12, 234:19, 241:3, 255:18, 256:15,
276:7
**claimed** [1] - 216:9
**claiming** [1] - 45:1
**claims** [7] - 207:24, 213:14, 216:14,
232:2, 235:4, 237:13, 242:6
**clarification** [2] - 31:23, 228:4
**clarified** [2] - 249:12, 251:9
**clarify** [5] - 18:6, 20:5, 65:23, 97:25,
225:12
**class** [1] - 220:2
**clauses** [1] - 263:13
**clean** [2] - 210:22, 229:15
**clear** [25] - 5:11, 7:17, 7:19, 7:20,
50:25, 51:12, 52:2, 139:6, 145:17,
154:23, 158:20, 171:4, 171:6, 215:1,
223:16, 224:1, 224:6, 224:9, 227:2,
238:3, 238:19, 240:17, 249:20, 257:20,
286:4
**clearer** [3] - 8:20, 15:14, 238:2
**clearly** [16] - 9:4, 74:22, 83:13, 154:4,
169:21, 171:1, 171:2, 225:19, 231:24,
232:10, 238:6, 245:20, 246:19, 250:18,
259:24, 261:23
**CLERK** [9] - 2:3, 2:17, 11:11, 11:17,
19:21, 81:17, 81:23, 166:13, 166:16
**clerk** [2] - 156:24, 245:3
**clicking** [1] - 222:22
**Client** [8] - 49:1, 49:4, 50:7, 131:12,
216:3, 216:7, 223:11, 230:19
**client** [32] - 3:18, 8:25, 9:19, 17:21,
30:14, 48:10, 58:8, 58:25, 78:24,
107:17, 152:1, 156:5, 158:16, 186:21,
195:1, 231:22, 234:20, 237:13, 248:9,
248:15, 250:19, 250:23, 250:24,
252:16, 256:20, 257:7, 257:12, 258:3,
266:22, 266:25, 284:5, 285:16
**client's** [1] - 239:13
**Clients** [2] - 99:13, 99:24
**clients** [31] - 5:22, 6:20, 35:15, 58:17,
58:23, 59:1, 92:10, 122:2, 122:13,
151:24, 152:9, 152:24, 153:20, 154:3,
154:4, 154:9, 155:7, 195:22, 196:6,
196:18, 196:20, 196:25, 202:17,
233:14, 237:4, 258:12, 259:13, 262:5,
267:6, 279:25
**clients'** [1] - 243:20
**clients's** [2] - 182:18, 183:1
**clip** [1] - 254:10
**close** [7] - 82:6, 85:4, 213:21, 230:9,
238:12, 248:4, 270:15
**closed** [1] - 284:25
**closer** [2] - 83:12, 163:24
**closing** [1] - 204:19

**clue** [2] - 54:18, 274:6
**coercive** [1] - 281:19
**coincidence** [7] - 208:11, 257:15,
258:5, 258:7, 258:19, 260:18, 261:18
**cold** [10] - 105:6, 105:10, 105:18,
105:19, 106:13, 106:22, 207:24, 208:5,
229:23, 229:25
**cold-called** [4] - 105:18, 105:19,
106:13, 106:22
**cold-calling** [2] - 208:5, 229:25
**Collaterals** [6] - 183:19, 184:9, 225:4,
225:20, 226:24, 227:5
**colleague** [1] - 51:22
**collection** [3] - 20:25, 21:3, 221:15
**collectively** [1] - 4:8
**collude** [1] - 270:22
**colors** [4] - 33:17, 77:16, 77:18, 77:21
**com** [1] - 5:25
**combined** [3] - 4:23, 203:17, 247:19
**coming** [6] - 43:24, 53:14, 147:7,
229:15, 259:15
**comma** [2] - 167:1, 168:1
**comment** [1] - 210:21
**commenting** [1] - 124:4
**comments** [1] - 7:18
**commerce** [1] - 115:19
**commit** [2] - 209:10, 265:2
**common** [4] - 5:8, 49:8, 208:21,
213:24
**communicate** [9] - 9:19, 9:20, 22:11,
76:8, 136:7, 147:2, 149:18, 177:18,
187:1
**communicated** [5] - 18:25, 19:2,
21:22, 35:4, 77:24
**communicating** [10] - 4:18, 20:21,
22:10, 22:12, 34:12, 73:19, 73:21,
75:23, 137:12, 188:8
**communication** [4] - 85:19, 148:19,
174:14, 205:12
**communications** [4] - 75:8, 117:17,
139:6, 253:8
**companies** [7] - 39:22, 48:18, 67:10,
97:10, 236:20, 262:23, 262:24
**Companies's** [1] - 220:3
**companion** [2] - 50:13, 198:6
**Companion** [2] - 153:20, 154:3
**Companions** [71] - 4:20, 5:21, 33:12,
33:17, 34:16, 35:13, 35:16, 38:13,
39:25, 41:9, 42:13, 46:1, 46:4, 48:18,
48:25, 56:25, 58:9, 58:18, 67:11, 67:20,
67:22, 80:14, 99:11, 99:25, 122:7,
134:24, 135:2, 136:10, 139:13, 150:8,
150:9, 150:14, 153:3, 153:7, 154:9,
178:23, 192:24, 193:1, 195:7, 195:19,
195:24, 196:14, 197:6, 197:9, 200:22,
201:4, 206:19, 207:2, 215:2, 216:3,
216:22, 217:17, 223:9, 223:10, 224:4,
225:20, 227:1, 234:17, 230:17, 230:19,
237:19, 240:6, 240:12, 249:2, 254:12,
254:15, 257:17, 261:24, 263:25,

Case 1:22-cv-01032-PKC-JRC    Document 438-1    Filed 12/30/24    Page 297 of 324
All Word //IME Gala bardi, et al.
PageID #: 5661
7

265:24, 266:17
**Companions's** [5] - 4:21, 6:3, 192:12, 200:20, 207:12
**Company** [16] - 36:4, 36:8, 38:5, 38:10, 40:20, 48:19, 48:25, 57:10, 67:25, 68:3, 68:6, 71:25, 207:11, 207:13, 219:23, 223:8
**company** [77] - 4:12, 5:2, 5:21, 6:11, 6:13, 6:17, 14:15, 20:15, 22:13, 36:2, 36:4, 38:8, 39:23, 40:2, 40:8, 45:17, 45:19, 45:21, 46:14, 46:19, 46:22, 51:2, 51:8, 52:13, 53:6, 53:11, 53:17, 53:18, 54:15, 64:24, 67:11, 67:14, 67:15, 67:16, 67:17, 67:18, 67:23, 71:25, 72:18, 72:20, 79:2, 91:13, 97:6, 100:15, 113:24, 125:21, 132:9, 133:6, 138:13, 139:9, 139:12, 149:13, 168:1, 168:4, 186:11, 196:24, 198:6, 206:9, 206:12, 208:23, 209:20, 216:23, 237:19, 238:15, 249:1, 250:11, 261:20, 262:25, 263:1, 264:18, 265:19, 265:23, 266:11, 269:4, 273:16, 279:24
**compare** [2] - 86:1, 224:13
**compensatory** [1] - 220:6
**compete** [1] - 263:15
**competitors** [1] - 266:7
**compile** [1] - 211:22
**complete** [3] - 234:18, 252:13, 271:2
**completely** [3] - 208:24, 254:5, 271:3
**compliance** [3] - 228:3, 229:7, 229:19
**complies** [1] - 228:2
**complimentary** [1] - 113:16
**comply** [2] - 84:10, 184:1
**component** [1] - 251:21
**compose** [1] - 142:10
**composed** [1] - 142:11
**compound** [1] - 79:4
**compromise** [1] - 280:9
**compromised** [3] - 165:7, 165:12, 252:4
**computer** [3] - 44:2, 165:17, 165:24
**conceded** [1] - 229:22
**concern** [4] - 157:11, 160:10, 236:23, 250:13
**concerned** [6] - 9:5, 75:24, 212:1, 213:7, 216:19, 217:5
**concerning** [3] - 24:6, 235:9, 237:7
**concluded** [1] - 124:21
**concocted** [1] - 29:18
**concocting** [1] - 13:17
**conduct** [7] - 129:13, 209:13, 210:25, 215:14, 217:16, 228:10
**conducting** [2] - 36:17, 39:11
**conducts** [1] - 129:10
**confer** [1] - 194:25
**conference** [3] - 5:5, 9:8, 124:1
**conferred** [1] - 10:22
**confidential** [2] - 223:22, 254:15
**confirm** [6] - 42:25, 145:18, 145:23, 194:5, 194:13, 227:6

**confirmed** [4] - 42:24, 209:6, 227:3, 237:16
**confirming** [1] - 123:13
**conflict** [1] - 112:4
**conform** [1] - 158:13
**confusing** [4] - 245:24, 246:6, 267:4, 285:22
**conjunction** [5] - 25:13, 25:18, 32:14, 32:17, 54:21
**connect** [2] - 27:16, 44:2
**connected** [1] - 236:17
**connecting** [1] - 224:18
**connection** [5] - 4:19, 76:16, 182:23, 183:13, 236:20
**connector** [1] - 44:9
**Conor** [9] - 33:5, 34:3, 35:12, 169:1, 192:9, 194:11, 195:15, 198:22, 200:19
**CONOR** [1] - 169:2
**consequence** [1] - 254:20
**consequences** [4] - 9:21, 82:11, 255:7, 269:18
**conservancy** [1] - 155:15
**consider** [4] - 124:16, 210:12, 256:5, 272:10
**consideration** [1] - 272:25
**consistent** [1] - 103:1
**consistently** [2] - 208:16, 227:18
**constitute** [1] - 13:14
**constitutes** [1] - 233:3
**construction** [7] - 64:24, 68:16, 228:4, 276:5, 276:7, 276:10, 279:23
**contact** [7] - 122:13, 224:18, 224:22, 232:5, 232:17, 232:18, 248:18
**contacted** [1] - 232:18
**contacts** [1] - 226:12
**contain** [1] - 211:23
**contained** [2] - 212:17, 225:19
**containing** [3] - 92:22, 180:24, 212:15
**contains** [5] - 171:12, 180:4, 182:13, 212:18, 285:20
**contempt** [21] - 3:23, 66:3, 202:1, 202:4, 202:13, 215:4, 220:5, 221:22, 223:13, 223:15, 228:7, 231:1, 231:15, 231:24, 232:16, 242:5, 243:5, 243:10, 246:24, 250:13, 282:13
**contemptuous** [2] - 215:14, 247:1
**contention** [1] - 225:17
**contents** [9] - 17:10, 18:2, 22:20, 25:13, 28:1, 33:23, 34:1, 123:10
**continuation** [4] - 3:22, 5:4, 215:2, 285:21
**continue** [6] - 23:21, 60:17, 134:10, 174:19, 216:6, 234:15
**continued** [6] - 63:3, 124:21, 224:22, 227:24, 259:25, 262:4
**Continued** [3] - 83:18, 160:19, 228:13
**continuing** [4] - 17:23, 183:8, 233:13, 237:19
**Continuing** [3] - 84:1, 163:8, 229:1

**continuous** [1] - 231:18
**continuously** [3] - 62:10, 158:14, 220:15
**contours** [1] - 120:8
**contract** [2] - 137:7, 200:3
**contractor** [2] - 64:20, 64:21
**contractors** [1] - 217:19
**contractually** [2] - 264:14, 264:20
**contradiction** [1] - 9:5
**contradictory** [1] - 261:16
**contradicts** [4] - 8:9, 54:25, 124:15, 199:5
**contrary** [6] - 60:6, 60:8, 229:20, 233:14, 256:23, 269:10
**contribution** [1] - 273:5
**control** [4] - 4:9, 5:2, 50:14, 50:15
**contumacious** [1] - 247:4
**conveniently** [3] - 17:4, 17:6, 48:4
**conventional** [1] - 277:2
**conversation** [17] - 6:22, 7:19, 7:24, 26:11, 28:25, 51:17, 72:17, 72:19, 149:25, 203:20, 203:25, 204:5, 219:2, 232:9, 238:18, 258:8, 273:11
**conversations** [5] - 138:12, 139:1, 177:21, 180:8, 255:22
**conveying** [1] - 137:15
**convince** [1] - 53:15
**convincing** [1] - 224:9
**cooler** [1] - 239:14
**cooperate** [1] - 218:22
**coordinate** [1] - 153:24
**copied** [4] - 174:9, 174:11, 174:20, 213:13
**copies** [7] - 19:25, 37:6, 37:8, 282:24, 283:1, 284:18, 284:20
**cops** [1] - 6:21
**copy** [23] - 37:6, 37:12, 86:16, 107:3, 108:1, 108:4, 108:9, 120:6, 120:20, 121:16, 121:20, 121:23, 133:13, 174:10, 193:9, 193:12, 199:4, 199:7, 276:20, 283:2, 283:14, 286:10, 287:12
**Corey** [16] - 20:14, 21:1, 21:7, 22:11, 22:12, 33:15, 34:3, 75:4, 76:19, 77:2, 77:12, 167:14, 169:2, 170:19, 174:9, 187:9
**corner** [1] - 229:14
**cornered** [1] - 227:13
**corporation** [1] - 262:10
**Correct** [2] - 122:9, 277:6
**correct** [318] - 7:16, 12:15, 12:18, 12:23, 16:6, 16:14, 17:11, 18:9, 18:17, 18:21, 22:22, 24:7, 29:25, 30:9, 30:17, 33:22, 35:20, 36:3, 36:6, 36:11, 36:24, 37:24, 38:19, 39:15, 39:16, 39:22, 40:5, 40:12, 40:13, 42:24, 43:4, 43:8, 45:2, 45:3, 45:12, 45:18, 45:24, 46:18, 46:20, 47:6, 47:10, 47:15, 48:2, 48:3, 48:7, 56:6, 57:2, 59:8, 59:18, 60:18, 62:5, 62:6, 62:17, 63:15, 63:25, 68:18, 72:5, 72:8, 73:7, 74:10, 74:23, 75:10, 75:25,

77:25, 79:2, 79:18, 80:12, 83:5, 84:8, 85:24, 86:5, 86:11, 86:17, 86:24, 87:18, 87:19, 87:21, 87:22, 89:11, 89:14, 89:24, 92:4, 92:5, 92:16, 92:17, 92:20, 92:25, 93:4, 93:5, 93:7, 93:8, 93:11, 93:12, 93:14, 94:21, 95:4, 95:23, 95:25, 96:1, 96:13, 96:16, 96:17, 98:15, 99:12, 99:15, 99:25, 100:1, 100:16, 101:15, 103:7, 103:8, 105:12, 107:14, 108:18, 109:2, 109:16, 109:19, 109:22, 110:2, 110:18, 110:19, 110:22, 111:15, 111:20, 111:23, 112:8, 112:9, 112:23, 113:24, 113:25, 114:10, 114:11, 114:13, 114:21, 115:1, 115:2, 115:19, 115:20, 117:6, 117:7, 117:15, 119:8, 119:9, 119:13, 119:14, 121:10, 121:13, 121:14, 122:4, 122:6, 122:22, 123:1, 123:2, 123:4, 123:10, 123:11, 125:1, 125:21, 125:22, 126:4, 126:5, 126:7, 126:8, 126:11, 126:12, 126:15, 126:17, 126:18, 126:20, 127:3, 127:10, 127:15, 127:16, 127:18, 128:1, 128:2, 128:8, 128:11, 128:12, 128:18, 128:20, 128:21, 129:11, 129:21, 131:3, 131:4, 131:13, 131:14, 131:18, 132:7, 132:21, 132:22, 133:12, 134:3, 134:6, 135:5, 135:6, 135:8, 135:9, 138:3, 138:9, 138:17, 139:10, 141:2, 141:5, 145:22, 148:3, 148:5, 148:7, 148:9, 148:12, 148:13, 148:16, 148:25, 149:1, 149:5, 149:6, 149:22, 151:17, 154:4, 154:9, 154:10, 155:23, 156:1, 156:2, 159:20, 159:22, 162:24, 163:1, 163:2, 164:24, 165:18, 167:15, 167:16, 169:21, 170:5, 170:7, 173:16, 173:20, 174:1, 174:2, 175:20, 176:1, 176:2, 176:7, 176:10, 176:13, 176:21, 177:1, 177:4, 177:7, 177:10, 177:13, 177:16, 177:21, 177:24, 178:11, 178:15, 178:16, 178:17, 178:19, 178:23, 179:3, 179:7, 179:11, 180:5, 181:1, 181:6, 181:7, 181:10, 182:1, 182:7, 182:12, 182:13, 183:16, 183:19, 184:10, 184:15, 184:16, 184:22, 184:25, 185:6, 185:11, 185:23, 186:1, 186:2, 186:14, 186:15, 188:7, 191:12, 191:15, 191:17, 191:22, 192:10, 192:13, 192:14, 192:17, 193:1, 193:15, 194:12, 195:8, 198:10, 198:12, 198:19, 198:20, 200:8, 200:11, 201:15, 208:13, 225:2, 249:6, 249:19, 250:2, 263:16, 278:20, 281:10, 283:21, 286:15

**corrected** [3] - 158:23, 159:7, 259:25
**correctly** [3] - 96:6, 117:5, 283:7
**corresponded** [1] - 177:7
**correspondence** [1] - 18:19
**Cory** [1] - 5:9
**CORY** [1] - 5:9
**cost** [1] - 232:24
**costs** [1] - 229:19
**counsel** [13] - 2:11, 9:25, 10:21, 69:21,

82:20, 124:2, 155:13, 218:10, 218:16, 231:19, 242:16, 242:21, 283:2
**counter** [1] - 215:18
**counter-argument** [1] - 215:18
**counterintuitive** [1] - 160:7
**couple** [12] - 6:25, 27:9, 31:3, 33:14, 70:7, 91:12, 97:11, 171:6, 210:11, 284:13, 284:14, 286:5
**course** [4] - 52:21, 115:18, 143:22, 205:24
**COURT** [724] - 1:1, 2:4, 2:11, 2:14, 2:25, 3:4, 3:9, 3:13, 3:17, 3:20, 8:24, 11:5, 11:9, 11:19, 11:22, 12:2, 12:7, 12:10, 13:3, 13:6, 13:19, 13:21, 14:2, 14:5, 14:8, 14:11, 14:14, 14:20, 15:14, 15:22, 16:1, 16:4, 17:14, 17:16, 18:5, 18:10, 18:14, 19:8, 19:11, 19:17, 19:19, 20:2, 20:8, 20:18, 20:24, 21:11, 21:13, 22:1, 22:4, 22:25, 23:23, 24:2, 24:14, 24:16, 25:4, 25:9, 25:17, 25:20, 26:1, 26:4, 26:8, 27:24, 28:5, 28:13, 28:15, 28:20, 28:23, 29:5, 29:7, 29:21, 30:4, 30:21, 30:23, 31:16, 31:22, 32:9, 32:15, 32:18, 33:2, 34:21, 37:3, 37:8, 37:14, 37:16, 39:1, 40:4, 40:9, 40:14, 41:10, 41:21, 42:3, 42:16, 43:16, 44:3, 44:6, 44:11, 44:13, 44:17, 44:20, 44:23, 45:4, 46:5, 46:10, 46:21, 46:23, 47:2, 47:5, 47:9, 47:14, 47:23, 48:9, 48:17, 48:22, 49:8, 49:23, 49:25, 50:2, 50:4, 50:11, 50:21, 50:23, 51:5, 51:10, 51:16, 51:21, 52:8, 52:10, 52:15, 52:19, 52:24, 53:6, 53:10, 53:16, 53:19, 53:25, 54:4, 54:13, 54:19, 55:13, 55:21, 56:2, 56:22, 57:4, 57:12, 57:16, 57:20, 57:25, 58:7, 58:13, 58:16, 59:2, 59:21, 63:2, 63:5, 63:8, 63:11, 63:19, 63:23, 64:2, 64:6, 64:9, 64:12, 65:1, 65:6, 65:9, 65:18, 65:21, 66:24, 67:1, 67:7, 69:7, 69:20, 69:25, 70:2, 70:15, 70:21, 71:1, 71:6, 71:9, 71:17, 71:19, 72:7, 72:9, 72:14, 74:4, 75:20, 78:5, 78:10, 78:13, 78:20, 79:4, 79:9, 79:15, 79:21, 80:1, 80:5, 80:19, 80:21, 80:23, 80:25, 81:5, 81:7, 81:11, 81:15, 82:2, 82:6, 82:15, 82:18, 83:1, 83:6, 83:10, 83:16, 84:15, 84:17, 84:24, 85:1, 85:4, 85:6, 90:11, 93:21, 94:16, 94:20, 94:22, 94:25, 95:8, 95:12, 97:25, 98:11, 98:14, 98:16, 98:19, 98:25, 99:20, 99:23, 100:18, 100:22, 101:2, 101:5, 101:9, 101:12, 102:15, 103:10, 103:16, 103:20, 103:24, 105:15, 105:18, 106:3, 106:9, 106:11, 106:13, 106:17, 106:21, 107:3, 107:6, 107:10, 107:22, 108:4, 108:7, 108:13, 109:11, 110:6, 110:9, 110:12, 111:22, 111:24, 113:7, 113:22, 114:1, 114:17, 114:19, 117:22, 118:3, 118:11, 119:17, 120:12, 121:6, 121:19, 121:25, 122:5, 122:7, 122:10, 122:12, 122:15, 122:17,

123:18, 123:23, 124:3, 124:12, 124:23, 125:2, 125:7, 125:9, 125:12, 125:16, 125:18, 126:22, 127:1, 127:20, 127:23, 129:3, 129:7, 130:23, 131:7, 132:5, 135:18, 136:3, 136:5, 136:10, 136:13, 136:15, 136:24, 137:1, 137:14, 137:18, 137:20, 137:24, 138:1, 138:4, 138:16, 138:18, 138:21, 139:18, 140:5, 140:7, 140:10, 140:13, 140:15, 140:17, 140:20, 142:19, 142:22, 142:24, 143:1, 143:10, 144:21, 144:23, 144:25, 145:4, 145:6, 145:8, 146:5, 146:11, 146:13, 146:15, 146:18, 146:23, 146:25, 147:2, 147:6, 147:9, 147:11, 147:15, 147:25, 148:4, 148:6, 148:8, 148:10, 148:14, 148:17, 148:23, 149:2, 149:7, 149:9, 149:12, 149:15, 149:17, 149:20, 149:22, 149:24, 150:3, 150:5, 150:11, 150:14, 150:16, 150:20, 150:22, 151:1, 151:4, 151:7, 151:10, 151:12, 151:14, 151:18, 151:25, 152:3, 152:6, 152:13, 152:19, 152:23, 153:5, 153:9, 153:15, 153:18, 154:1, 154:7, 154:11, 154:20, 155:10, 155:17, 155:25, 156:3, 156:7, 156:14, 156:17, 156:21, 156:23, 157:2, 157:5, 157:13, 157:17, 157:22, 157:24, 158:7, 159:10, 159:24, 160:2, 160:9, 161:4, 161:8, 161:12, 161:18, 161:21, 161:23, 161:25, 162:3, 162:7, 162:10, 162:15, 162:22, 162:25, 163:3, 163:7, 163:17, 163:22, 163:24, 164:1, 164:8, 164:13, 164:15, 164:18, 164:21, 164:23, 165:1, 165:3, 165:8, 165:10, 165:14, 165:17, 166:1, 166:5, 166:8, 166:11, 166:15, 166:17, 166:21, 167:10, 167:19, 167:24, 168:1, 168:4, 168:8, 168:16, 168:24, 169:1, 169:9, 169:18, 169:25, 170:2, 170:4, 170:6, 170:8, 170:16, 171:3, 171:5, 171:21, 171:23, 172:12, 172:21, 172:24, 173:2, 173:11, 173:13, 173:16, 173:18, 173:21, 173:23, 173:25, 174:3, 174:5, 174:7, 174:18, 174:23, 174:25, 175:4, 175:6, 175:9, 175:12, 176:15, 176:18, 178:21, 178:25, 179:13, 180:7, 181:12, 181:24, 182:9, 182:11, 182:15, 182:24, 183:8, 183:15, 183:21, 183:25, 184:13, 185:1, 186:22, 187:4, 187:7, 187:16, 187:20, 187:23, 188:6, 188:11, 188:19, 188:25, 189:3, 189:10, 189:12, 189:19, 189:22, 189:24, 190:4, 190:7, 190:20, 190:22, 191:24, 192:4, 192:16, 192:20, 192:23, 193:7, 193:10, 193:18, 193:21, 194:3, 194:13, 194:16, 194:22, 194:24, 195:2, 195:11, 196:4, 196:9, 196:11, 196:16, 196:20, 197:1, 197:4, 197:8, 197:12, 197:23, 198:13, 198:15, 199:12, 199:16, 200:14, 200:16, 201:3, 201:9, 201:13, 201:16, 201:21, 201:24, 203:3, 205:17, 206:6, 206:20, 207:5, 207:19, 208:11, 211:18, 212:25,

Case 1:22-cv-01032-PKC-JRC    Document 438-1    Filed 12/30/24    Page 299 of 324
All Word //IME Cabardi, et al.
PageID #: 8888
9

213:23, 214:6, 215:5, 215:17, 216:14,
217:21, 218:6, 218:24, 219:6, 219:14,
219:17, 224:24, 225:6, 225:11, 225:22,
226:5, 226:12, 227:20, 230:2, 231:5,
231:9, 232:4, 232:8, 232:12, 232:21,
233:4, 233:10, 234:11, 234:23, 235:20,
235:25, 236:3, 236:22, 236:25, 238:11,
241:8, 241:15, 241:17, 241:19, 243:13,
243:18, 243:21, 244:1, 244:6, 245:1,
246:1, 246:3, 246:5, 246:9, 246:19,
246:23, 247:4, 247:11, 248:21, 249:7,
250:5, 251:6, 255:9, 255:11, 256:13,
257:2, 258:14, 259:8, 261:2, 261:6,
261:11, 261:22, 263:13, 263:18, 264:5,
264:16, 264:19, 265:13, 266:16,
266:21, 267:8, 267:11, 270:11, 271:15,
271:17, 273:1, 273:4, 273:21, 273:23,
274:9, 274:17, 275:4, 275:6, 275:13,
275:16, 275:19, 276:6, 276:23, 277:4,
277:7, 277:9, 277:18, 277:22, 278:9,
278:13, 278:15, 278:18, 278:21, 279:1,
279:9, 279:13, 280:7, 280:17, 281:5,
281:12, 281:18, 281:25, 282:4, 282:10,
282:14, 282:18, 282:21, 282:23, 283:3,
283:6, 283:15, 283:24, 284:4, 284:7,
284:14, 284:18, 285:2, 285:10, 285:13,
285:20, 286:1, 286:9, 286:13, 286:16,
287:1, 287:7, 287:12, 287:15, 287:24,
288:2, 288:6
    **Court's** [12] - 37:12, 49:2, 55:15, 56:5,
66:14, 69:14, 84:10, 120:5, 220:8,
229:8, 233:6, 283:1
    **Court-authorized** [1] - 219:25
    **Court-ordered** [1] - 221:6
    **Courthouse** [1] - 1:6
    **COURTROOM** [1] - 284:20
    **courtroom** [8] - 2:2, 10:16, 10:17,
82:9, 107:15, 154:20, 158:6, 161:3
    **courts** [1] - 125:5
    **cover** [3] - 221:11, 269:5, 278:24
    **covered** [3] - 120:10, 120:14, 230:5
    **covering** [1] - 269:21
    **covers** [2] - 250:14, 278:16
    **crazy** [1] - 230:23
    **create** [8] - 62:18, 62:23, 76:18, 77:22,
150:11, 177:9, 276:11, 278:6
    **created** [5] - 4:25, 8:4, 34:5, 77:22,
203:22
    **creative** [2] - 105:23, 109:7
    **credence** [2] - 240:8, 272:24
    **credentials** [25] - 33:14, 33:16, 103:19,
103:22, 170:10, 170:12, 180:24, 192:9,
192:12, 192:13, 192:19, 192:24, 193:3,
193:14, 193:24, 193:25, 194:11,
194:23, 195:7, 195:8, 198:17, 198:19,
198:23, 199:10, 199:11
    **credibility** [3] - 205:6, 255:14, 279:14
    **credible** [3] - 208:15, 271:20, 272:5
    **credit** [16] - 7:25, 27:3, 29:1, 29:2,
52:15, 52:16, 133:11, 133:13, 133:14,

133:16, 133:17, 133:19, 150:18,
150:19, 151:4, 151:6
    **criminal** [4] - 6:14, 23:11, 48:11, 48:15
    **criminal's** [1] - 223:24
    **criminals** [1] - 6:21
    **critical** [1] - 223:22
    **cross** [4] - 69:8, 131:8, 183:24, 183:25
    **CROSS** [5] - 70:3, 129:8, 163:8,
289:10, 289:20
    **cross-examination** [1] - 69:8
    **CROSS-EXAMINATION** [5] - 70:3,
129:8, 163:8, 289:10, 289:20
    **Crosswood** [1] - 43:7
    **crux** [1] - 254:25
    **CSOs** [4] - 156:8, 156:19, 157:7,
160:13
    **curious** [1] - 172:16
    **current** [11] - 9:16, 36:2, 64:3, 99:20,
102:5, 152:8, 152:15, 206:7, 243:14,
245:13, 245:22
    **custodial** [1] - 204:21
    **custodian** [1] - 218:4
    **custody** [2] - 118:8
    **Customer** [28] - 106:5, 106:24, 121:16,
121:21, 122:8, 152:16, 153:10, 154:12,
229:12, 233:14, 234:8, 234:9, 234:15,
240:10, 245:16, 245:21, 245:25,
246:10, 247:5, 247:8, 248:6, 249:22,
250:1, 257:12, 257:20, 258:6, 258:10
    **customer** [58] - 41:9, 57:18, 57:23,
73:12, 79:6, 79:10, 80:10, 85:13, 87:9,
87:24, 91:24, 92:3, 100:10, 109:2,
109:3, 113:9, 113:10, 121:3, 122:3,
134:17, 141:14, 152:15, 152:17,
179:11, 180:3, 183:5, 198:9, 202:18,
207:23, 208:1, 208:9, 208:10, 215:7,
226:24, 227:14, 240:9, 240:23, 240:24,
240:25, 241:6, 241:10, 241:13, 241:21,
241:22, 241:24, 245:10, 245:12,
247:13, 247:18, 249:12, 249:18,
252:12, 264:1, 265:21, 266:8, 266:20,
266:23
    **Customers** [12] - 84:7, 86:1, 86:17,
86:20, 87:9, 90:22, 92:3, 101:15,
102:23, 105:16, 128:24, 247:24
    **customers** [76] - 56:25, 58:12, 78:15,
79:18, 79:20, 84:7, 84:12, 85:16, 85:19,
85:22, 86:19, 86:23, 87:1, 87:6, 87:12,
87:20, 88:10, 88:14, 90:19, 90:21,
90:25, 91:18, 92:20, 102:5, 102:23,
103:6, 105:13, 105:14, 106:14, 106:23,
108:17, 114:4, 119:10, 128:24, 134:23,
142:4, 144:16, 144:19, 151:19, 151:21,
154:22, 154:24, 177:13, 179:3, 179:6,
198:10, 206:24, 207:22, 207:25,
208:10, 209:17, 217:17, 224:15,
224:22, 227:7, 227:11, 227:15, 227:18,
227:24, 229:11, 230:17, 240:19,
240:21, 245:8, 245:13, 245:15, 245:22,
248:5, 248:16, 249:15, 249:17, 257:19,

261:23, 266:17
    **customers's** [7] - 79:20, 179:6,
224:13, 224:16, 224:23, 227:8, 227:25
    **cut** [4] - 203:1, 206:6, 212:5, 248:21
    **Cypress** [1] - 43:8

# D

    **damage** [1] - 232:19
    **damages** [12] - 220:6, 231:17, 231:20,
232:15, 232:22, 233:12, 233:17,
233:21, 239:16, 243:4, 243:7
    **damning** [1] - 234:24
    **Daniella** [1] - 3:3
    **data** [3] - 92:22, 214:11, 252:13
    **date** [15] - 31:18, 42:2, 42:22, 66:20,
86:16, 98:9, 187:13, 187:25, 189:4,
189:6, 189:7, 213:6, 218:17, 226:3,
226:17
    **dated** [5] - 20:13, 41:18, 182:4,
242:20, 242:22
    **dates** [4] - 131:16, 211:11, 211:24,
236:16
    **dating** [1] - 207:16
    **day-to-day** [4] - 116:19, 122:21,
129:11, 265:20
    **daycare** [2] - 278:5, 279:24
    **days** [19] - 30:16, 32:1, 48:1, 59:15,
75:8, 77:14, 114:20, 114:23, 116:8,
116:10, 116:12, 118:20, 203:23,
209:12, 275:16, 276:15, 276:22, 286:20
    **deactivate** [1] - 30:11
    **deactivated** [1] - 30:13
    **deadline** [4] - 248:12, 274:21, 274:23,
281:15
    **deal** [8] - 60:21, 61:7, 62:17, 66:20,
68:13, 77:5, 199:13, 280:9
    **dealing** [1] - 205:1
    **dealt** [2] - 150:3, 177:3
    **debating** [1] - 267:12
    **debt** [1] - 280:18
    **December** [2] - 180:13, 180:21
    **decide** [2] - 10:10, 100:19
    **decided** [6] - 34:17, 207:22, 216:24,
221:6, 235:21, 237:25
    **decision** [2] - 23:18, 282:6
    **declaration** [23] - 41:17, 41:24, 42:2,
54:21, 123:13, 123:20, 124:5, 124:15,
124:17, 126:14, 127:2, 214:20, 216:17,
219:6, 219:12, 235:20, 236:7, 237:21,
238:2, 240:7, 253:11, 259:17, 259:19
    **declarations** [3] - 41:20, 126:10, 236:6
    **decorum** [1] - 78:21
    **deduct** [1] - 181:5
    **deems** [1] - 219:16
    **deep** [1] - 209:8
    **defend** [1] - 229:15
    **Defendant** [1] - 1:9
    **defendant** [7] - 3:8, 4:1, 232:2, 242:5,
270:16, 279:7, 283:8

**defendant's** [4] - 206:12, 214:15, 279:3, 287:21
**Defendants** [3] - 1:22
**defendants** [42] - 3:24, 4:6, 4:24, 8:7, 145:19, 154:22, 202:13, 206:2, 207:6, 209:16, 209:24, 214:25, 215:10, 215:12, 216:8, 217:10, 220:4, 220:23, 221:5, 221:14, 221:25, 223:2, 224:22, 227:16, 227:24, 229:2, 229:5, 229:11, 229:13, 234:13, 243:15, 245:7, 245:19, 247:14, 249:10, 249:14, 249:17, 254:23, 274:22, 274:23, 280:4
**defendants'** [1] - 220:10
**defendants's** [2] - 8:9, 64:10
**defense** [1] - 214:16
**defer** [1] - 274:20
**deferred** [1] - 282:5
**definitely** [1] - 275:10
**deliberately** [1] - 268:13
**delivered** [1] - 176:24
**delusional** [1] - 9:2
**demanding** [3] - 209:17, 209:18, 229:10
**demonstrable** [1] - 221:22
**demonstrated** [1] - 205:23
**demonstrative** [5] - 93:20, 93:22, 94:14, 155:16, 178:19
**denials** [2] - 209:25
**denied** [3] - 4:8, 9:12, 9:13
**denies** [1] - 209:13
**deny** [2] - 8:10, 121:10, 210:25
**denying** [3] - 8:18, 49:1, 203:16
**Department** [1] - 197:17
**depiction** [1] - 63:25
**depleted** [1] - 276:10
**deponent** [1] - 236:10
**depose** [1] - 218:7
**deposed** [2] - 17:22, 217:24
**deposition** [12] - 3:24, 217:22, 218:1, 218:17, 219:8, 219:11, 236:9, 237:23, 253:15, 279:5, 279:8
**depositions** [1] - 219:10
**DEPUTY** [1] - 284:20
**derogatory** [1] - 177:9
**described** [1] - 65:10
**designed** [2] - 52:19, 210:24
**desire** [6] - 60:6, 60:7, 60:9, 132:9, 132:15, 270:18
**desires** [2] - 239:13, 239:15
**desktop** [1] - 251:17
**desperate** [1] - 32:5
**despite** [2] - 122:20, 223:2
**destroyed** [1] - 60:21
**detail** [2] - 127:8, 127:9
**detailed** [2] - 138:12, 138:25
**details** [6] - 20:15, 56:18, 61:13, 88:7, 168:1, 168:4
**details..** [1] - 168:3
**detective** [1] - 6:9

**determine** [3] - 87:2, 122:25, 272:19
**deterred** [1] - 154:2
**develop** [9] - 33:11, 130:11, 130:16, 130:20, 132:9, 252:19, 259:22, 262:10, 268:23
**developed** [2] - 98:14, 135:4
**developing** [3] - 71:13, 134:11, 134:14
**development** [2] - 253:2, 253:13
**devices** [1] - 221:24
**difference** [3] - 8:5, 78:3, 266:14
**different** [16] - 16:16, 94:19, 97:11, 101:6, 114:12, 115:25, 135:3, 136:19, 142:20, 158:12, 213:5, 236:16, 260:6, 277:25
**differently** [1] - 118:11
**difficult** [1] - 236:19
**digital** [1] - 221:24
**digits** [1] - 111:6
**diligently** [1] - 228:1
**dim** [1] - 162:10
**dime** [1] - 56:13
**direct** [4] - 71:4, 82:19, 101:25, 151:2
**DIRECT** [4] - 12:5, 84:2, 289:6, 289:18
**directed** [2] - 65:13, 98:7
**directing** [1] - 242:21
**direction** [2] - 43:13, 214:23
**directly** [6] - 5:13, 11:24, 22:20, 34:1, 100:14, 212:10
**directs** [1] - 92:15
**disagreed** [1] - 233:2
**disapprove** [1] - 268:20
**disbelieve** [1] - 208:12
**disbursement** [1] - 128:15
**disclaiming** [1] - 213:12
**disclose** [2] - 10:3, 10:5
**disclosed** [1] - 18:7
**disclosure** [1] - 215:21
**discounted** [1] - 260:19
**discovery** [2] - 10:5, 205:24
**discrepancy** [1] - 93:13
**discretion** [1] - 222:12
**discuss** [4] - 85:18, 121:6, 151:22, 256:24
**discussed** [14] - 16:24, 70:20, 77:7, 90:22, 97:15, 99:6, 117:16, 123:13, 125:23, 127:7, 127:9, 214:21, 216:22, 281:5
**discussing** [1] - 188:23
**discussion** [6] - 12:20, 32:2, 76:9, 125:20, 231:23, 238:13
**discussions** [6] - 76:12, 126:3, 126:6, 177:15, 218:9, 244:18
**disparaging** [2] - 180:25, 192:25
**disparity** [1] - 103:5
**disqualifying** [1] - 242:21
**disregard** [3] - 59:21, 64:19, 77:7
**distance** [2] - 238:9, 238:10, 270:20
**distinctly** [1] - 8:12
**District** [1] - 228:3

**DISTRICT** [3] - 1:1, 1:1, 1:13
**disturbing** [2] - 235:10, 235:12
**doable** [3] - 278:2, 278:3, 278:4
**docket** [4] - 215:9, 249:11, 249:21, 272:23
**doctors** [1] - 274:3
**Document** [1] - 248:1
**document** [5] - 42:4, 120:24, 241:11, 250:3, 287:7
**documentary** [1] - 224:21
**documentation** [4] - 73:15, 109:19, 151:2, 282:15
**documents** [19] - 36:10, 109:21, 134:15, 135:15, 135:20, 136:16, 136:22, 145:24, 146:1, 185:1, 205:22, 215:20, 222:4, 236:11, 236:12, 236:13, 283:12, 284:17, 284:25
**dollar** [2] - 66:11, 248:11
**domain** [9] - 30:12, 33:13, 45:20, 47:10, 47:12, 47:20, 47:25, 48:6, 71:22, 133:23, 133:24
**done** [25] - 23:12, 23:14, 30:15, 69:14, 76:3, 76:5, 77:6, 92:25, 107:21, 128:5, 128:6, 145:13, 155:21, 186:20, 192:15, 197:13, 219:8, 222:14, 225:7, 225:10, 225:14, 225:15, 253:7, 264:4
**double** [2] - 186:21, 192:3
**double-check** [2] - 186:21, 192:3
**doubt** [2] - 223:17, 279:21
**down** [34] - 5:22, 6:18, 23:7, 24:3, 24:17, 46:9, 50:5, 50:8, 50:23, 76:5, 78:6, 80:21, 116:6, 155:5, 156:7, 156:18, 156:19, 156:24, 158:6, 160:11, 160:12, 162:8, 162:16, 169:4, 169:18, 201:22, 234:10, 246:16, 248:9, 252:19, 262:20, 277:15, 282:2, 285:14
**downloaded** [1] - 212:10
**downpayment** [2] - 277:1, 277:2
**downplayed** [1] - 46:15
**dozen** [1] - 110:17
**drabs** [1] - 222:15
**draft** [2] - 93:18, 132:1
**drafted** [1] - 140:24
**drafting** [3] - 163:19, 173:8, 173:9
**drag** [1] - 204:24
**dragged** [1] - 127:6
**drastic** [3] - 260:20, 267:22, 269:1
**draw** [1] - 54:9
**drawn** [2] - 54:6, 58:21
**dribs** [1] - 222:15
**DropBox** [1] - 212:15
**dropped** [2] - 76:11, 176:25
**drum** [1] - 113:23
**duck** [3] - 214:24, 214:25
**duly** [2] - 11:14, 81:20
**during** [30] - 10:17, 12:21, 17:8, 40:23, 96:15, 115:4, 116:12, 119:3, 125:20, 126:7, 127:17, 128:3, 129:24, 130:2, 130:3, 130:4, 136:8, 136:12, 165:7, 165:11, 202:4, 210:13, 210:18, 211:12,

211:15, 223:22, 229:22, 230:10,
231:16, 256:11, 272:11, 272:20, 273:11
**duty** [6] - 10:2, 104:12, 104:14,
116:14, 116:24, 197:20
**dynasty** [1] - 209:4

# E

**e-commerce** [1] - 115:19
**e-mail** [132] - 87:15, 91:4, 92:11, 92:18,
93:2, 93:6, 93:15, 93:17, 103:12,
103:13, 104:1, 104:2, 104:12, 131:24,
132:1, 132:2, 137:14, 139:16, 139:19,
139:23, 140:10, 140:24, 147:3, 147:18,
147:25, 148:1, 148:11, 148:18, 158:21,
161:16, 161:24, 162:1, 162:17, 163:15,
163:20, 163:23, 164:2, 164:3, 164:4,
164:5, 164:6, 164:10, 164:11, 164:24,
165:6, 165:12, 165:15, 167:2, 167:9,
167:14, 167:17, 168:12, 168:17, 169:1,
170:18, 170:21, 170:25, 171:12,
171:13, 172:1, 173:4, 173:8, 173:9,
173:10, 173:12, 173:19, 174:11,
174:13, 174:16, 174:17, 174:19,
177:12, 177:19, 178:3, 178:7, 179:8,
179:17, 180:24, 181:20, 181:25,
182:13, 182:21, 183:10, 187:17,
187:24, 188:2, 188:12, 189:5, 189:19,
190:2, 192:9, 192:17, 193:22, 198:16,
198:17, 198:21, 198:25, 199:3, 199:5,
199:9, 200:19, 205:13, 210:6, 211:11,
211:22, 212:3, 213:1, 213:2, 213:5,
213:14, 213:21, 214:1, 214:3, 214:4,
214:8, 223:1, 224:2, 236:14, 250:20,
250:25, 251:2, 251:3, 251:7, 252:3,
252:7, 253:4, 254:19, 254:24, 255:1,
255:11
**e-mailing** [2] - 131:15
**E-mails** [30] - 165:20, 169:6, 171:6,
171:9, 172:14, 177:6, 177:23, 177:25,
178:8, 179:5, 179:10, 179:15, 187:8,
187:9, 187:14, 200:7, 203:21, 204:1,
210:8, 210:19, 211:12, 211:14, 211:15,
211:19, 212:4, 213:10, 213:12, 214:7,
214:11, 227:3
**e-mails** [41] - 85:15, 92:19, 93:16,
94:1, 104:2, 104:6, 104:11, 104:14,
104:15, 104:21, 130:19, 131:22,
131:23, 139:7, 145:23, 147:17, 147:21,
147:23, 148:10, 148:23, 149:2, 149:3,
230:15, 234:24, 235:3, 235:9, 237:1,
237:11, 238:18, 239:3, 252:8, 252:9,
253:9, 255:15, 256:11, 256:12, 256:23,
257:22, 260:10, 260:11, 268:22
**earliest** [1] - 241:5
**early** [4] - 132:16, 239:4, 252:8, 252:10
**ease** [1] - 212:23
**easily** [1] - 208:4
**EASTERN** [1] - 1:1
**easy** [1] - 226:6

**EBT** [2] - 36:17, 39:11
**Edible** [26] - 105:24, 108:16, 108:25,
109:1, 109:5, 110:17, 110:22, 110:24,
112:18, 112:22, 113:13, 113:20,
113:22, 129:23, 130:1, 130:2, 175:20,
175:22, 176:9, 176:24, 181:8, 208:19,
258:14, 268:6, 269:3, 269:12
**editorializing** [1] - 45:2
**effect** [4] - 60:3, 219:12, 244:17, 266:5
**effective** [2] - 42:12, 266:1
**effectively** [4] - 69:9, 151:15, 181:3,
204:7
**effectuate** [1] - 264:24
**effort** [7] - 121:15, 121:20, 121:23,
221:14, 280:19, 282:2
**efforts** [8] - 105:6, 105:10, 105:13,
119:12, 188:14, 208:6, 229:25, 280:9
**eight** [7] - 87:6, 106:23, 152:14,
207:22, 207:25, 227:7, 257:19
**either** [18] - 89:7, 89:8, 92:25, 104:12,
105:1, 108:2, 108:9, 126:9, 127:15,
205:12, 214:2, 231:21, 250:9, 267:21,
274:1, 284:19, 284:21, 286:10
**elaborate** [1] - 30:19
**electronically** [1] - 245:14
**Elefterakis** [1] - 241:12
**ELMO** [5] - 19:9, 20:1, 44:4, 161:10,
162:7
**email** [60] - 18:16, 18:25, 19:2, 20:12,
21:5, 21:6, 21:14, 21:16, 22:10, 22:17,
22:20, 24:6, 24:10, 25:2, 25:11, 25:12,
26:14, 26:17, 26:18, 26:19, 27:16,
27:20, 27:21, 30:6, 30:8, 30:14, 30:16,
30:25, 31:1, 31:6, 31:7, 31:11, 31:13,
31:20, 31:24, 32:1, 32:6, 32:7, 32:13,
32:17, 33:18, 33:22, 33:23, 34:1, 35:10,
35:18, 35:21, 35:22, 45:25, 71:15,
73:20, 73:22, 74:9, 74:22, 74:24, 75:1,
75:6, 76:6, 77:17
**emailed** [2] - 71:11, 186:25
**emailing** [3] - 71:12, 72:2, 73:25
**emails** [20] - 4:14, 18:15, 18:18, 18:20,
18:22, 18:23, 32:19, 59:15, 59:23, 62:9,
70:9, 72:3, 73:24, 75:15, 75:17, 75:22,
75:24, 77:14, 77:15, 77:18
**Emanuel** [2] - 2:23
**EMANUEL** [1] - 1:18
**embarrassing** [2] - 29:14, 29:17
**emotions** [1] - 56:14
**employee** [2] - 262:3, 262:18
**employees** [3] - 115:14, 115:16,
217:18
**employer** [2] - 263:14, 265:4
**employment** [1] - 197:20
**encompass** [2] - 202:5, 219:23
**encompasses** [1] - 202:6
**encourage** [2] - 49:11, 49:13
**encouraged** [2] - 49:5, 50:16
**encouragement** [1] - 244:5
**end** [19] - 6:3, 24:19, 41:13, 78:2, 78:3,

101:10, 107:24, 128:5, 166:24, 220:19,
253:21, 254:11, 259:1, 261:10, 270:23,
273:12, 274:13, 279:16, 286:22
**end-run** [1] - 270:23
**ended** [1] - 112:4
**endedly** [1] - 138:23
**ending** [1] - 220:17
**enforce** [1] - 229:19
**engage** [1] - 210:24
**engaged** [4] - 105:5, 105:10, 110:21,
229:5
**engaging** [3] - 119:12, 210:25, 221:14
**engine** [1] - 201:6
**enjoin** [2] - 144:7, 268:2
**enjoined** [27] - 38:22, 40:21, 42:23,
58:25, 84:6, 87:7, 103:6, 153:11,
154:22, 179:6, 202:17, 207:23, 208:1,
208:10, 216:4, 216:6, 224:13, 224:15,
224:23, 227:8, 227:24, 249:14, 249:15,
249:16, 261:14, 265:22, 266:23
**Enjoined** [39] - 86:1, 86:17, 86:20,
87:9, 90:22, 92:3, 101:15, 102:23,
105:16, 106:4, 106:24, 121:16, 121:21,
122:7, 128:24, 152:16, 153:10, 154:12,
229:12, 233:14, 234:8, 234:9, 234:15,
240:10, 245:16, 245:21, 245:25,
246:10, 247:5, 247:8, 247:24, 248:6,
249:21, 250:1, 257:12, 257:19, 258:6,
258:10
**enjoining** [3] - 240:18, 263:8, 267:23
**enjoy** [1] - 220:24
**enlarge** [2] - 168:5, 169:20
**enriched** [1] - 206:3
**ensure** [2] - 228:2, 234:1
**entail** [1] - 178:10
**entered** [1] - 162:3
**enters** [3] - 2:2, 81:14, 161:3
**entertain** [1] - 269:18
**entire** [13] - 28:1, 49:18, 55:10, 59:25,
125:16, 193:22, 206:9, 212:10, 212:15,
231:14, 231:17, 272:23
**entirety** [1] - 247:23
**entities** [1] - 36:6
**entitled** [3] - 206:21, 223:6, 242:5
**entity** [6] - 45:22, 149:9, 203:14,
204:7, 204:8, 205:14
**entrepreneur** [1] - 50:14
**entry** [3] - 105:25, 215:9, 249:13
**environment** [1] - 262:19
**equity** [8] - 276:23, 277:1, 277:4,
277:9, 277:12, 277:13, 277:16, 278:8
**erroneous** [1] - 237:10
**Es** [1] - 170:3
**escaped** [1] - 28:10
**escrow** [3] - 66:1, 66:7, 220:23
**ESQ** [3] - 1:18, 1:21, 1:24
**essence** [1] - 256:6
**essentially** [5] - 200:21, 203:18,
212:19, 248:6, 265:18
**establish** [2] - 68:8, 179:15

**established** [5] - 26:19, 223:12, 223:19, 230:16, 230:25
**establishes** [1] - 224:10
**establishing** [1] - 224:21
**estate** [2] - 61:22, 62:10
**ESTEFANIA** [1] - 34:22
**Estefania** [19] - 31:1, 33:8, 33:9, 34:4, 34:22, 35:5, 130:16, 130:20, 130:25, 131:13, 149:19, 150:1, 170:4, 170:13, 177:3, 177:5, 192:10, 253:1, 253:9
**ET** [1] - 1:8
**et** [6] - 2:19, 203:22, 211:23, 217:4, 241:12, 280:14
**EUGENE** [3] - 81:18, 81:25, 289:17
**Eugene** [30] - 3:16, 4:1, 6:24, 26:15, 27:21, 34:18, 35:20, 49:11, 49:13, 56:5, 68:20, 68:22, 68:23, 68:25, 70:6, 81:25, 93:6, 167:1, 173:6, 173:13, 210:1, 210:2, 252:25, 253:6, 253:9, 253:13, 254:18, 268:22, 269:2
**eugeneliddy** [1] - 166:23
**EUO** [1] - 119:15
**evaluated** [1] - 197:5
**event** [1] - 248:14
**Evidence** [1] - 10:14
**evidence** [94] - 4:3, 4:11, 10:2, 18:13, 28:12, 41:22, 42:8, 59:16, 82:21, 94:14, 110:7, 110:13, 115:18, 203:24, 206:8, 206:11, 207:12, 208:18, 209:22, 209:25, 210:1, 210:4, 211:1, 212:18, 214:23, 214:25, 215:3, 215:11, 217:9, 220:14, 220:21, 221:4, 221:21, 223:5, 224:9, 224:21, 225:9, 225:16, 226:17, 227:10, 229:24, 230:3, 230:22, 231:17, 231:25, 234:6, 234:19, 234:21, 234:22, 235:14, 235:16, 235:17, 236:8, 236:18, 236:19, 237:15, 241:23, 243:3, 243:8, 249:17, 250:7, 251:19, 255:23, 256:11, 256:19, 256:23, 256:25, 257:3, 257:10, 257:17, 257:20, 258:21, 258:24, 259:14, 259:15, 260:8, 260:22, 260:25, 261:1, 261:16, 262:16, 268:19, 268:24, 268:25, 269:2, 269:7, 269:10, 269:19, 284:16, 285:1, 286:8, 287:25
**evidenced** [1] - 227:16
**EVIDENTIARY** [1] - 1:12
**evidentiary** [3] - 2:18, 3:22, 4:5
**exact** [9] - 7:8, 38:12, 38:13, 39:24, 51:9, 98:9, 127:5, 163:23, 164:2
**exactly** [17] - 15:1, 16:20, 42:1, 62:14, 108:9, 120:16, 163:14, 180:18, 211:1, 212:18, 235:13, 237:18, 249:22, 258:1, 280:10, 280:15, 286:18
**exam** [1] - 119:21
**Exam** [7] - 49:1, 49:4, 50:7, 216:3, 216:7, 223:11, 230:19
**EXAMINATION** [19] - 12:5, 69:10, 70:3, 74:7, 80:8, 84:2, 129:8, 163:8, 175:10, 198:3, 289:6, 289:8, 289:10, 289:12, 289:14, 289:18, 289:20,

289:22, 289:24
**examination** [8] - 36:16, 39:10, 64:13, 66:3, 69:8, 119:18, 119:24, 281:9
**examinations** [2] - 78:13, 119:19
**examine** [1] - 86:1
**examined** [1] - 11:14, 81:20
**examiner** [4] - 65:2, 65:13, 221:1, 221:10
**example** [2] - 208:23, 212:25
**examples** [1] - 211:16
**Exams** [11] - 45:18, 45:20, 45:22, 46:6, 46:13, 46:16, 47:3, 216:10, 219:24, 223:8, 224:3
**Exams's** [1] - 220:3
**excellent** [1] - 33:8
**except** [4] - 212:12, 212:16, 239:7, 274:20
**excerpt** [2] - 7:7, 120:5
**excess** [2] - 279:19, 280:6
**excessive** [1] - 242:12
**exchange** [4] - 210:6, 239:5, 252:10
**exchanged** [4] - 179:10, 211:14, 227:3, 268:25
**excised** [1] - 214:10
**excluding** [1] - 10:15
**exclusively** [1] - 150:3
**excuse** [5] - 32:20, 235:18, 239:13, 240:24, 242:18
**excused** [2] - 80:24, 201:23
**excuses** [1] - 65:16
**exhibit** [23] - 19:22, 20:8, 31:10, 35:25, 109:25, 111:17, 166:4, 166:7, 168:19, 171:23, 181:18, 193:19, 193:20, 194:6, 199:3, 212:6, 224:10, 224:11, 285:3, 285:19, 286:14, 287:17, 287:21
**Exhibit** [65] - 19:6, 19:24, 20:12, 24:5, 25:23, 25:24, 26:11, 30:6, 35:7, 35:8, 35:9, 35:24, 36:1, 39:6, 39:7, 44:19, 44:21, 44:24, 99:3, 103:9, 103:11, 110:5, 110:8, 110:13, 110:14, 120:3, 161:17, 162:9, 166:19, 167:7, 167:13, 169:10, 169:16, 172:10, 172:18, 172:22, 172:23, 181:19, 181:23, 187:8, 187:9, 187:18, 187:22, 188:5, 190:11, 191:8, 192:6, 192:7, 193:23, 194:8, 194:9, 195:5, 195:12, 195:14, 200:18, 213:1, 285:17, 286:8, 287:4, 287:13, 287:24, 287:25, 290:11, 290:13, 290:15
**Exhibits** [3] - 70:10, 73:18, 285:22
**exhibits** [22] - 19:11, 37:6, 37:7, 102:4, 195:6, 199:4, 212:20, 213:17, 282:25, 283:2, 283:8, 283:17, 283:19, 283:22, 284:9, 284:11, 285:5, 285:20, 286:18, 286:19, 286:22, 287:3
**exist** [2] - 180:1, 199:4
**existed** [1] - 188:22
**existence** [6] - 88:15, 96:9, 108:1, 123:20, 222:10, 262:23
**existing** [3] - 4:19, 216:22, 226:9
**exists** [1] - 88:11

**exits** [1] - 158:6
**expand** [3] - 17:23, 219:22, 231:1
**expanded** [2] - 245:4, 248:5
**expanding** [2] - 17:20, 119:7
**expands** [1] - 245:6
**expect** [1] - 209:20
**expected** [1] - 29:24
**expecting** [1] - 220:25
**expense** [5] - 186:6, 186:9, 186:10, 229:18, 231:13
**expenses** [3] - 181:5, 181:9, 191:21
**experience** [4] - 144:3, 198:5, 214:6, 257:6
**experiment** [1] - 273:14
**expert** [3] - 158:10, 159:11, 160:4
**explain** [15] - 8:24, 8:25, 21:4, 38:3, 41:23, 62:19, 87:14, 97:21, 100:9, 124:17, 128:13, 194:6, 201:3, 218:24, 238:17
**explained** [6] - 18:2, 40:19, 93:13, 170:12, 237:17, 256:21
**explaining** [3] - 4:3, 204:6, 258:1
**explains** [1] - 204:2
**explanation** [8] - 46:15, 93:9, 139:25, 140:2, 141:4, 160:6, 252:22, 257:15
**explanations** [1] - 216:11
**express** [1] - 218:14
**expressly** [1] - 224:3
**extension** [1] - 226:19
**extent** [6] - 122:25, 123:3, 236:8, 241:3, 257:3, 257:21
**extra** [2] - 65:3, 68:14
**extremely** [1] - 160:6, 206:17

**F**

**face** [7] - 6:10, 6:13, 6:17, 7:2, 7:3, 205:7, 269:10
**Facebook** [2] - 207:13, 207:14
**facilitate** [2] - 137:22, 262:4
**facilitating** [1] - 137:2
**facing** [1] - 2:15
**fact** [48] - 4:15, 8:7, 18:8, 27:5, 42:11, 48:5, 49:3, 71:20, 73:20, 73:21, 73:24, 73:25, 77:5, 78:25, 82:18, 90:23, 122:20, 127:14, 130:15, 133:13, 141:3, 152:14, 203:25, 207:14, 217:18, 223:2, 225:18, 233:9, 233:11, 236:9, 236:13, 240:9, 240:15, 244:9, 244:10, 248:25, 251:3, 251:14, 251:15, 258:18, 260:17, 265:18, 267:6, 268:4, 270:13, 270:18, 272:9
**factor** [7] - 223:12, 223:15, 223:18, 224:8, 224:20, 227:21, 228:1
**facts** [6] - 23:25, 205:8, 206:1, 206:13, 207:9, 272:18
**failed** [1] - 216:12
**failing** [1] - 184:1
**fails** [1] - 220:12
**failure** [1] - 64:10

**fair** [3] - 42:15, 63:24, 138:11
**fairly** [2] - 65:10, 234:24
**fall** [2] - 71:24, 124:14
**Falor** [1] - 221:19
**FALOR** [1] - 221:19
**false** [10] - 14:17, 30:1, 49:18, 51:18, 52:13, 52:17, 53:2, 53:4, 216:15, 244:23
**falsely** [2] - 184:1, 202:3
**family** [2] - 64:20, 222:8
**far** [18] - 2:14, 9:21, 90:22, 96:23, 97:5, 97:8, 132:14, 139:3, 139:4, 142:25, 155:22, 170:14, 227:6, 235:5, 243:8, 253:3, 272:5, 280:19
**far-fetched** [1] - 253:3
**farce** [1] - 230:24
**Fari** [3] - 49:5, 50:16, 216:7
**FARI** [1] - 49:8
**fashioned** [1] - 44:12
**fast** [3] - 28:7, 28:8, 243:13
**faster** [2] - 44:15, 44:16
**favor** [1] - 206:13
**February** [12] - 176:8, 181:20, 182:4, 208:20, 215:8, 215:11, 225:10, 238:22, 240:3, 240:4, 279:6
**Federal** [2] - 10:14, 220:9
**fee** [3] - 40:7, 40:17, 64:13
**feelers** [1] - 239:3
**feelings** [1] - 23:25
**fees** [20] - 36:18, 37:22, 38:2, 39:12, 66:4, 220:6, 220:25, 221:11, 221:12, 229:18, 231:14, 231:20, 242:11, 242:13, 242:14, 242:24, 243:10, 246:17, 282:12, 282:16
**fees's** [1] - 40:10
**feigned** [1] - 222:5
**fell** [5] - 61:2, 61:3, 61:7, 62:13, 62:17
**FELSEN** [45] - 1:21, 3:1, 12:6, 15:25, 16:5, 18:9, 19:6, 19:10, 19:13, 20:7, 20:11, 21:12, 24:12, 24:25, 25:22, 27:23, 29:9, 35:3, 35:6, 37:18, 37:19, 41:25, 42:11, 43:10, 43:25, 45:9, 46:11, 47:24, 49:20, 54:20, 59:5, 64:8, 70:14, 72:6, 74:6, 74:8, 79:24, 131:5, 170:25, 282:9, 282:11, 282:17, 282:20, 289:7, 289:13
**Felsen** [38] - 3:2, 12:8, 14:21, 15:4, 17:19, 18:14, 19:8, 19:19, 20:3, 20:10, 22:8, 23:1, 24:4, 26:10, 26:18, 27:25, 30:2, 31:20, 31:25, 32:20, 34:25, 37:17, 39:3, 40:18, 41:23, 42:10, 46:10, 46:22, 47:23, 56:23, 59:4, 61:22, 63:13, 64:4, 64:16, 75:11, 78:7, 79:19
**felt** [1] - 108:19
**fetched** [1] - 253:3
**few** [5] - 68:9, 146:7, 184:12, 190:8, 203:22
**fight** [5] - 205:6, 227:17, 246:12, 246:17, 248:8
**figure** [1] - 66:21

**file** [2] - 181:6, 245:15
**filed** [1] - 66:3
**files** [1] - 212:16
**final** [1] - 128:22
**finally** [1] - 222:13
**financial** [2] - 209:1, 280:13
**financials** [2] - 279:10, 280:3
**findings** [1] - 206:10
**fine** [14] - 20:2, 33:22, 37:14, 39:1, 131:7, 153:18, 157:22, 157:24, 159:11, 201:17, 218:13, 279:15, 281:25, 282:1
**finish** [5] - 22:6, 22:8, 55:5, 75:20, 155:20
**Firm** [2] - 3:15, 102:13
**firm** [30] - 41:8, 69:13, 97:15, 100:9, 100:13, 100:24, 101:1, 102:13, 144:13, 144:14, 152:2, 152:5, 152:8, 153:3, 153:6, 179:3, 179:20, 179:22, 198:5, 208:9, 209:17, 224:6, 227:11, 227:14, 240:13, 240:17, 248:7, 262:25, 265:23, 268:7
**firmly** [1] - 243:23
**firms** [63] - 84:20, 97:13, 102:17, 102:18, 105:21, 105:25, 109:1, 109:2, 116:9, 116:11, 116:15, 130:6, 130:7, 134:19, 142:9, 142:12, 142:13, 142:17, 142:21, 143:7, 143:13, 143:15, 143:16, 143:17, 143:20, 143:24, 144:2, 144:4, 144:8, 144:15, 144:18, 145:2, 153:4, 153:25, 176:25, 180:1, 180:4, 208:6, 227:13, 240:11, 240:14, 246:8, 247:15, 247:23, 247:24, 248:3, 248:4, 248:18, 258:11, 262:24, 262:25, 263:3, 263:5, 267:5, 267:6, 267:25, 268:6, 268:10, 268:11, 269:14
**first** [49] - 5:6, 6:13, 10:13, 11:4, 11:13, 12:16, 15:22, 23:17, 24:5, 26:14, 26:20, 27:8, 28:2, 37:21, 41:14, 58:23, 58:24, 66:8, 77:12, 81:19, 86:13, 98:14, 100:16, 101:2, 106:5, 106:10, 110:2, 112:19, 124:8, 168:19, 169:9, 169:12, 169:14, 170:20, 175:19, 190:14, 190:23, 191:14, 206:2, 215:6, 219:22, 220:2, 220:22, 221:9, 223:15, 223:18, 234:4, 246:13, 259:18
**first-hand** [1] - 259:18
**fit** [1] - 24:19
**five** [5] - 112:15, 114:20, 117:25, 216:17
**fix** [4] - 2:6, 35:12, 195:16, 200:20
**fixated** [1] - 255:11
**fixating** [1] - 234:25
**fixed** [3] - 35:17, 196:1, 197:3
**flag** [1] - 154:11
**flat** [1] - 208:3
**flat-out** [1] - 208:3
**fledgling** [1] - 257:18
**Floor** [1] - 1:23
**Florida** [2] - 61:16, 119:8
**flow** [1] - 272:10

**focus** [7] - 13:19, 45:5, 171:17, 203:7, 230:3, 234:11, 250:12
**focused** [2] - 211:20, 265:17
**folder** [7] - 80:16, 183:19, 184:9, 225:4, 225:20, 226:24, 227:5
**Folks** [1] - 285:13
**folks** [4] - 155:18, 192:5, 201:25, 285:2
**follow** [9] - 31:6, 63:11, 191:4, 194:3, 194:7, 195:13, 213:9, 281:18, 285:19
**follow-up** [5] - 31:6, 63:11, 194:3, 194:7, 195:13
**followed** [3] - 47:21, 124:8, 220:15
**following** [12] - 21:6, 21:15, 26:12, 31:6, 83:18, 138:6, 160:19, 178:3, 205:25, 227:15, 228:13, 229:12
**follows** [3] - 11:15, 81:21, 213:15
**food** [2] - 56:8, 65:4
**FOR** [1] - 1:12
**forbidden** [1] - 223:18
**forced** [4] - 27:12, 220:23, 229:14, 229:17
**forcing** [1] - 229:6
**foreclosed** [1] - 219:15
**forensic** [11] - 64:13, 65:2, 65:13, 66:2, 68:12, 205:25, 221:1, 221:10, 221:24, 222:2, 281:9
**forensics** [2] - 66:20, 68:13
**forget** [3] - 17:6, 39:19, 281:8
**forgot** [12] - 17:4, 17:6, 23:6, 27:10, 28:9, 28:14, 29:18, 30:3, 60:2, 186:8, 186:9, 273:7
**form** [16] - 48:21, 48:24, 49:3, 49:4, 49:7, 49:11, 50:10, 70:16, 72:7, 72:9, 123:18, 132:9, 176:1, 176:3, 212:11
**formality** [1] - 285:3
**format** [4] - 85:18, 159:20, 159:21, 212:7
**formed** [4] - 48:18, 48:25, 49:1, 67:10, 71:20, 71:22, 128:1
**former** [7] - 152:8, 152:11, 153:20, 154:3, 154:9, 245:8, 262:18
**forming** [1] - 51:2, 132:8, 268:14
**forms** [1] - 73:15
**formulating** [1] - 71:13
**forth** [4] - 130:20, 214:5, 259:21, 274:11
**forward** [17] - 70:20, 70:24, 72:4, 77:11, 77:19, 81:11, 88:1, 88:3, 127:12, 148:21, 149:13, 169:10, 178:8, 204:3, 215:7, 226:17, 253:4
**forwarded** [7] - 28:8, 172:14, 213:10, 213:25, 214:4, 215:13
**forwarding** [1] - 215:22
**forwards** [1] - 214:8
**Four** [1] - 277:20
**four** [10] - 30:16, 67:3, 67:6, 111:6, 113:14, 113:19, 113:20, 115:24, 116:9, 243:10
**Four-thousand** [1] - 277:20
**franchise** [1] - 270:1

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 304 of 324
All Word // IME Gelardi, et al.
PageID #: 6562
14

**Frank** [1] - 11:20
**frankly** [4] - 65:16, 225:25, 235:7, 281:19
**free** [1] - 113:15
**frequent** [1] - 119:5
**frequently** [2] - 104:7, 116:2
**Friday** [1] - 31:3
**friend** [3] - 49:5, 224:16, 224:17
**fries** [1] - 264:12
**front** [27] - 7:23, 20:9, 26:5, 27:3, 29:1, 36:10, 52:17, 53:1, 53:7, 53:16, 53:20, 54:15, 56:6, 57:1, 57:4, 57:6, 57:16, 58:1, 58:3, 58:19, 59:6, 78:3, 226:3, 234:16, 250:12, 265:25, 271:5
**front-man** [1] - 53:16
**fruit** [4] - 108:20, 109:1, 109:4, 258:14
**fruitful** [2] - 229:23, 230:1
**fruition** [3] - 60:8, 178:18, 203:20
**frustrate** [1] - 221:14
**fulfilling** [1] - 272:19
**full** [7] - 89:11, 104:17, 206:15, 251:8, 259:4, 274:23
**full-time** [3] - 89:11, 104:17, 206:15
**fully** [1] - 147:22
**function** [5] - 67:22, 95:16, 161:16, 162:2, 240:13
**functionality** [1] - 78:2
**funds** [1] - 220:25
**funny** [1] - 158:20
**furthermore** [2] - 221:13, 254:10

### G

**G-E-L-A-R-D-I** [1] - 11:21
**gain** [3] - 87:20, 106:2, 209:1
**game** [6] - 14:24, 15:7, 15:16, 15:21, 16:8, 16:10, 223:24
**gamesmanship** [1] - 222:14
**garbage** [1] - 283:9
**gather** [3] - 43:21, 257:13, 279:17
**Gelardi** [165] - 2:19, 3:10, 4:6, 4:17, 5:20, 6:5, 6:23, 7:9, 7:12, 7:16, 7:19, 7:25, 8:13, 9:10, 10:3, 10:19, 10:22, 11:2, 11:6, 12:9, 12:10, 12:13, 13:1, 13:11, 13:15, 13:19, 14:2, 14:22, 15:3, 16:18, 17:24, 20:20, 22:1, 22:19, 24:2, 24:5, 24:14, 25:5, 25:11, 27:5, 27:14, 27:17, 28:1, 28:13, 29:10, 33:1, 33:2, 33:25, 49:25, 50:2, 50:23, 55:11, 55:14, 59:2, 59:6, 60:14, 62:22, 62:24, 63:2, 63:5, 65:9, 69:12, 69:22, 70:5, 74:9, 75:15, 78:5, 78:20, 79:22, 80:2, 80:21, 96:10, 125:3, 126:3, 128:18, 132:18, 132:24, 133:4, 133:16, 134:1, 134:15, 134:23, 136:7, 136:15, 138:12, 139:1, 139:15, 139:24, 141:17, 146:25, 147:9, 148:4, 148:25, 167:5, 170:20, 177:16, 177:18, 182:3, 183:12, 187:1, 187:10, 202:3, 203:17, 203:18, 204:8, 204:9, 204:14, 205:2, 209:7, 210:9, 210:13,

210:18, 211:4, 211:7, 215:6, 215:19, 216:9, 216:21, 217:2, 218:25, 224:2, 237:2, 237:3, 237:10, 237:11, 237:24, 238:19, 238:21, 241:1, 241:2, 241:11, 241:12, 244:10, 244:14, 244:24, 245:19, 246:13, 246:15, 247:18, 249:1, 250:9, 252:2, 252:24, 255:1, 256:20, 258:1, 259:5, 259:19, 260:2, 260:12, 260:18, 261:21, 268:16, 268:25, 269:5, 269:21, 270:4, 271:2, 271:11, 273:8, 273:13, 273:17
**GELARDI** [30] - 1:8, 11:12, 273:24, 274:15, 275:3, 275:5, 275:7, 275:14, 275:18, 275:21, 276:9, 276:25, 277:6, 277:8, 277:11, 277:20, 278:3, 278:12, 278:14, 278:16, 278:20, 278:22, 279:12, 279:15, 280:16, 280:21, 281:17, 281:21, 282:3, 289:5
**Gelardi's** [11] - 9:1, 9:6, 9:7, 10:17, 137:16, 187:11, 203:13, 207:17, 217:6, 238:3, 270:17
**Gelardis** [23] - 4:9, 4:13, 4:16, 5:1, 5:7, 5:12, 5:15, 9:14, 9:22, 203:11, 204:15, 205:20, 207:16, 209:2, 214:2, 234:13, 234:14, 254:22, 255:6, 255:20, 256:2, 269:9, 270:22
**Gene** [8] - 24:13, 24:23, 39:19, 55:4, 71:23, 77:21, 78:3
**general** [8] - 39:18, 124:3, 143:25, 179:18, 179:25, 228:9, 244:11, 244:17
**generally** [3] - 143:13, 144:8, 255:14
**generated** [1] - 213:18
**generating** [1] - 231:19
**gentleman** [2] - 6:8, 6:24
**Geographically** [1] - 142:24
**Giant** [168] - 4:13, 4:15, 4:18, 5:10, 8:4, 8:13, 12:14, 14:23, 15:6, 15:15, 15:18, 15:21, 16:2, 16:12, 16:23, 18:1, 18:16, 18:17, 18:18, 18:20, 18:25, 20:21, 21:16, 21:24, 22:10, 22:13, 26:12, 26:24, 26:25, 30:17, 32:2, 33:5, 34:2, 34:7, 35:14, 40:23, 43:14, 51:13, 70:11, 70:19, 70:23, 71:11, 72:2, 73:19, 73:21, 73:25, 74:9, 74:22, 75:1, 75:24, 76:8, 76:14, 77:6, 77:15, 77:24, 78:15, 79:6, 79:10, 79:17, 80:11, 92:19, 93:3, 93:16, 96:11, 98:7, 101:25, 103:13, 123:12, 123:21, 125:2, 130:11, 130:16, 132:19, 134:11, 135:4, 135:11, 135:25, 136:16, 137:3, 138:13, 139:3, 139:7, 139:9, 139:11, 141:6, 141:7, 147:18, 148:18, 148:19, 148:25, 149:3, 149:17, 150:6, 169:2, 177:4, 177:12, 177:23, 178:22, 179:2, 179:5, 179:10, 182:1, 183:18, 184:8, 184:9, 185:25, 186:3, 186:6, 186:25, 188:7, 189:8, 193:13, 195:21, 197:1, 198:22, 199:22, 203:10, 204:2, 204:5, 204:20, 205:11, 210:14, 210:19, 211:4, 212:10, 212:15, 214:10, 218:2, 218:3, 218:10, 218:12, 218:16, 218:22,

219:9, 223:13, 224:15, 224:25, 225:4, 225:18, 227:2, 227:3, 229:23, 234:4, 234:20, 236:9, 236:11, 237:14, 237:17, 238:5, 238:19, 238:20, 239:3, 239:22, 240:5, 252:19, 252:23, 253:5, 254:8, 256:3, 257:22, 258:24, 259:22, 259:23, 261:3, 261:7, 272:14
**Giant's** [1] - 238:24
**GiantPartners.com** [1] - 31:2
**Giglio** [1] - 10:3
**Ginarte** [7] - 88:24, 89:9, 91:11, 91:12, 91:13, 152:20, 230:18
**GINARTE** [1] - 88:24
**given** [8] - 10:8, 86:4, 116:6, 142:1, 198:17, 237:7, 240:8, 282:24
**Gladys** [1] - 89:9
**gmail** [3] - 75:23, 187:11, 189:25
**Gmail** [2] - 104:6, 237:9
**gnawing** [2] - 55:9, 55:10
**God** [4] - 23:6, 29:19, 60:2, 63:16
**GoDaddy** [9] - 24:6, 33:14, 97:4, 137:15, 166:12, 180:24, 181:1, 194:11, 198:23
**gonna** [27] - 85:11, 88:2, 88:3, 88:13, 108:21, 109:3, 119:21, 119:23, 119:24, 137:5, 137:6, 139:3, 139:4, 144:2, 237:3, 239:8, 239:9, 246:17, 254:5, 271:7, 272:1, 272:2, 275:7, 275:10, 276:12, 280:25
**Gonzalez** [1] - 283:25
**Google** [5] - 142:18, 143:12, 143:22, 143:25, 155:6
**Grammarly** [1] - 158:22
**Grasshopper** [4] - 112:9, 112:10, 117:3, 117:6
**grateful** [1] - 55:17
**grave** [1] - 23:6
**great** [4] - 33:6, 49:14, 50:18, 53:24
**greatly** [1] - 248:5
**green** [2] - 13:25, 283:19
**Group** [1] - 3:2
**group** [1] - 241:12
**GROUP** [2] - 1:16, 1:19
**grouping** [1] - 240:16
**guardrails** [1] - 262:3
**Guards** [1] - 39:17
**guess** [17] - 152:13, 159:13, 162:18, 174:14, 188:1, 201:7, 202:11, 203:18, 213:7, 215:20, 217:5, 224:25, 262:4, 270:24, 271:3, 287:3, 287:15
**gun** [3] - 211:1, 211:2, 235:1
**Gutierrez** [3] - 49:5, 49:8, 216:7
**guy** [3] - 52:4, 61:12, 76:16
**guys** [10] - 23:1, 32:5, 34:4, 49:18, 60:21, 62:21, 62:23, 62:25, 64:19, 79:19

### H

**hacked** [1] - 97:3

Case 1:22-cv-01032-PKC-JRC    Document 438-1    Filed 12/30/24    Page 305 of 324
All Word //PageID #: 9984di, et al.    IME Costa

15

**hacking** [1] - 255:16
**half** [2] - 77:7, 205:24
**half-hour** [1] - 77:7
**hallway** [2] - 3:18, 10:16
**hand** [9] - 11:11, 19:12, 44:13, 81:17, 108:2, 151:16, 161:6, 161:8, 259:18
**handed** [2] - 166:18, 246:25
**handing** [1] - 193:11
**handle** [3] - 61:10, 87:13, 135:25
**handled** [1] - 135:7
**handles** [2] - 116:19, 122:21
**handling** [1] - 138:13
**hands** [3] - 29:24, 33:8, 108:2
**hang** [21] - 14:8, 16:1, 22:4, 46:21, 46:23, 54:4, 64:12, 65:18, 78:20, 95:8, 153:5, 166:15, 192:16, 225:11, 226:5, 256:13, 276:6
**Hang** [2] - 145:8, 271:15
**happy** [1] - 31:3
**harassing** [1] - 23:22
**hard** [8] - 56:12, 64:20, 195:15, 229:23, 238:15, 251:19, 257:5, 268:21
**harm** [1] - 268:4
**hate** [1] - 279:11
**head** [4] - 16:4, 34:6, 272:1, 279:22
**heads** [1] - 239:14
**hear** [23] - 9:9, 10:13, 10:18, 10:24, 17:19, 55:25, 79:15, 81:8, 133:10, 160:4, 202:19, 204:17, 204:18, 204:19, 204:20, 204:21, 230:7, 237:22, 238:1, 242:2, 244:7, 250:16, 284:3
**heard** [16] - 4:5, 9:8, 45:17, 45:23, 46:18, 47:2, 145:2, 205:19, 215:18, 220:21, 221:4, 229:24, 234:3, 237:2, 242:3, 250:7
**hearing** [56] - 2:18, 3:22, 4:4, 4:5, 4:14, 5:4, 14:22, 15:5, 16:12, 16:22, 19:7, 25:23, 35:7, 35:25, 38:6, 43:3, 46:12, 48:4, 82:24, 93:10, 100:6, 100:11, 105:5, 105:9, 107:25, 109:16, 110:5, 119:7, 120:1, 121:15, 122:25, 123:8, 123:14, 126:2, 126:7, 127:15, 202:6, 202:7, 202:13, 202:21, 211:11, 218:14, 229:7, 229:10, 229:13, 230:10, 236:6, 245:11, 246:24, 249:8, 253:17, 281:6, 282:25, 284:25, 285:21, 286:20
**HEARING** [1] - 1:12
**hearings** [3] - 112:10, 223:6, 227:10
**hearsay** [1] - 236:9
**heated** [1] - 224:5
**hefty** [1] - 61:11
**held** [2] - 124:1, 232:3
**hello** [1] - 26:15
**help** [2] - 44:14, 76:22
**helpful** [4] - 108:10, 203:7, 257:7, 270:20
**helping** [4] - 20:16, 27:18, 28:15, 168:11
**herself** [2] - 215:19, 244:24
**hi** [2] - 167:5, 170:25

**Hi** [2] - 20:14, 194:11
**hide** [2] - 177:13, 276:12
**hiding** [1] - 222:25
**high** [3] - 33:11, 203:5, 237:2
**high-priority** [1] - 33:11
**highlighted** [1] - 212:21
**highlights** [1] - 212:22, 212:23
**highly** [1] - 210:7
**himself** [4] - 250:23, 251:23, 254:24, 267:18
**hire** [5] - 225:8, 231:25, 239:8, 239:9, 268:10
**hired** [2] - 185:9, 263:8
**hires** [1] - 262:18
**hiring** [1] - 265:14
**history** [2] - 206:9, 220:8
**hit** [2] - 162:18, 203:5
**hmm** [1] - 168:7
**hold** [11] - 17:14, 19:17, 31:16, 34:21, 37:3, 75:18, 98:25
**hollow** [1] - 65:19
**home** [20] - 23:19, 45:7, 45:8, 45:10, 45:11, 45:13, 56:7, 57:14, 60:18, 66:19, 93:18, 104:7, 104:8, 105:1, 186:17, 222:8, 277:9, 278:19
**honest** [3] - 23:6, 205:6, 205:10
**honestly** [8] - 15:24, 18:11, 47:16, 54:2, 159:16, 204:4, 205:8, 286:2
**Honor** [221] - 2:22, 3:1, 3:6, 3:14, 11:3, 12:1, 13:2, 14:7, 14:19, 18:4, 18:9, 18:13, 19:14, 19:15, 20:23, 22:3, 23:16, 24:12, 24:15, 24:18, 24:25, 25:16, 25:19, 27:23, 28:18, 30:1, 30:19, 31:14, 35:3, 37:1, 37:12, 38:4, 38:25, 41:19, 41:20, 42:1, 42:14, 43:12, 46:3, 47:16, 48:8, 48:13, 48:20, 50:10, 51:25, 54:2, 55:12, 55:25, 56:12, 57:8, 57:19, 57:22, 58:11, 58:20, 61:9, 62:18, 63:7, 64:7, 64:8, 64:11, 65:3, 65:17, 66:8, 68:16, 69:19, 69:24, 74:3, 74:6, 76:13, 79:14, 79:25, 80:4, 80:7, 81:2, 90:7, 94:13, 95:5, 99:22, 107:9, 118:2, 120:16, 120:23, 124:20, 128:22, 129:6, 131:5, 131:10, 139:20, 146:4, 155:2, 155:14, 155:24, 156:4, 156:20, 156:25, 157:10, 161:7, 162:6, 166:19, 168:15, 168:18, 169:5, 171:1, 171:20, 171:25, 172:1, 172:10, 173:1, 173:22, 174:6, 175:8, 175:15, 181:17, 181:23, 182:21, 182:23, 183:23, 187:19, 187:21, 188:4, 189:2, 189:21, 193:6, 193:16, 195:1, 195:10, 198:1, 199:2, 200:13, 202:25, 205:16, 206:14, 208:14, 212:9, 214:24, 217:25, 225:9, 226:4, 231:4, 231:7, 231:8, 231:11, 231:12, 231:20, 232:1, 232:3, 232:14, 232:20, 233:1, 233:8, 233:24, 235:17, 236:5, 236:13, 236:18, 236:21, 238:7, 239:11, 240:10, 240:11, 240:16, 240:22, 241:9, 242:9, 242:17, 243:2, 243:12, 243:17, 244:4, 245:24,

246:4, 246:6, 246:22, 247:2, 247:5, 247:10, 248:2, 248:10, 250:3, 250:4, 250:17, 254:8, 256:8, 258:9, 258:23, 259:25, 260:10, 260:21, 262:16, 264:4, 266:19, 268:3, 268:14, 269:16, 270:7, 270:10, 271:9, 272:21, 273:24, 274:16, 275:3, 275:21, 275:22, 276:9, 277:3, 277:11, 278:6, 279:15, 280:21, 282:9, 282:22, 283:7, 283:23, 284:22, 285:15, 285:25, 286:15, 288:5, 288:8
**Honor's** [6] - 43:13, 236:23, 240:3, 240:18, 240:20, 241:4
**HONORABLE** [1] - 1:13
**hope** [7] - 9:19, 21:8, 21:17, 33:6, 77:3, 229:16
**hoped** [1] - 29:22
**hopefully** [1] - 150:19
**hoping** [2] - 30:2, 281:22
**hostile** [2] - 69:22, 175:14
**Hotel** [1] - 221:18
**hour** [2] - 77:7, 119:1
**hours** [16] - 43:13, 113:4, 113:6, 114:7, 114:8, 114:9, 114:13, 115:12, 115:21, 115:23, 116:9, 117:20, 117:24, 118:21, 209:12, 211:13
**house** [25] - 43:24, 52:7, 60:14, 60:22, 60:23, 61:19, 61:20, 61:21, 62:4, 62:15, 62:16, 63:6, 63:14, 63:25, 64:3, 65:11, 66:10, 66:12, 66:13, 66:19, 67:2, 276:24, 277:1
**houses** [1] - 66:10
**Houston** [1] - 68:1
**HTLA** [1] - 68:9
**Hubspot** [8] - 226:24, 227:1, 227:4, 253:23, 254:1, 258:25, 261:9
**hundred** [2] - 7:12, 15:8, 52:2
**hungry** [1] - 155:21
**hurling** [1] - 63:12
**husband** [2] - 7:20, 64:19, 278:1
**husband's** [1] - 68:14
**hypothetical** [2] - 198:11, 198:14

**I**

**i.e** [1] - 245:22
**idea** [13] - 49:14, 54:16, 97:12, 203:19, 204:7, 205:3, 211:3, 216:9, 229:21, 253:11, 257:11, 273:15, 274:1
**ideas** [1] - 54:15
**identification** [2] - 110:4, 285:18
**identifying** [1] - 245:15
**idiots** [1] - 237:14
**ignorance** [1] - 222:5
**ignore** [1] - 270:13
**illegally** [1] - 263:22
**image** [3] - 43:24, 45:5, 45:6
**imagine** [1] - 285:23
**IME** [350] - 1:4, 2:18, 2:24, 4:9, 4:16, 4:20, 4:21, 4:24, 5:21, 6:3, 8:6, 8:8, 8:15, 8:20, 9:13, 9:15, 16:21, 18:17,

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 306 of 324
All Word //IME Gelbardi, et al.
PageID #: 8862
16

26:16, 27:15, 33:12, 33:13, 33:16, 33:17, 35:13, 35:16, 36:2, 36:4, 36:5, 36:7, 36:15, 36:16, 38:5, 38:10, 38:13, 39:9, 39:10, 39:15, 39:16, 39:17, 39:23, 39:24, 39:25, 40:3, 40:8, 40:20, 41:9, 42:13, 45:22, 46:1, 46:2, 46:4, 47:11, 48:18, 48:19, 48:21, 48:24, 48:25, 49:11, 49:16, 49:17, 49:24, 50:1, 51:2, 56:25, 57:5, 57:10, 58:2, 58:8, 58:18, 59:17, 64:21, 67:18, 67:25, 68:3, 68:6, 71:25, 72:18, 72:22, 72:25, 73:20, 74:10, 74:11, 74:23, 74:24, 75:1, 75:6, 75:9, 75:24, 77:16, 77:25, 78:24, 79:6, 79:7, 79:8, 80:14, 84:7, 84:14, 84:21, 86:19, 87:8, 87:10, 89:14, 89:20, 89:23, 90:4, 90:10, 90:14, 91:14, 91:24, 92:3, 92:15, 92:19, 92:22, 93:3, 96:19, 97:6, 97:10, 98:22, 99:11, 101:22, 102:5, 104:5, 104:11, 104:19, 104:25, 109:21, 110:2, 112:13, 112:16, 113:24, 115:23, 116:4, 116:15, 116:21, 122:5, 122:22, 123:1, 123:4, 123:15, 124:13, 125:24, 126:20, 128:1, 128:7, 128:23, 129:11, 129:13, 130:11, 130:20, 132:8, 133:8, 133:23, 134:12, 134:24, 135:2, 135:4, 136:10, 139:9, 139:12, 141:7, 141:11, 147:17, 148:1, 150:7, 150:9, 150:11, 150:14, 152:8, 152:11, 152:23, 153:3, 153:7, 153:20, 154:3, 154:9, 169:10, 171:16, 173:14, 178:23, 179:11, 179:22, 179:23, 180:3, 180:4, 180:25, 182:18, 183:1, 183:5, 183:16, 184:10, 184:15, 184:17, 184:20, 185:8, 185:18, 185:22, 187:1, 187:10, 188:9, 188:14, 189:25, 190:15, 190:17, 190:24, 191:12, 191:19, 192:12, 194:12, 195:7, 195:8, 195:17, 195:19, 195:20, 195:24, 196:14, 196:15, 197:6, 197:8, 198:6, 200:20, 200:23, 201:4, 203:11, 203:15, 203:21, 204:7, 204:11, 205:21, 206:11, 206:19, 207:10, 207:11, 207:12, 207:13, 209:13, 209:19, 213:14, 214:16, 214:21, 215:1, 215:2, 216:2, 216:22, 216:25, 217:8, 217:11, 217:17, 217:18, 217:20, 218:25, 219:23, 220:2, 220:3, 223:7, 223:8, 223:9, 223:10, 224:4, 224:12, 225:7, 225:17, 225:20, 225:21, 226:18, 226:19, 226:25, 227:1, 227:4, 227:5, 227:11, 227:13, 227:14, 230:16, 230:17, 230:18, 230:19, 231:2, 234:11, 234:15, 235:17, 235:18, 235:22, 237:9, 237:19, 237:25, 238:14, 240:6, 245:9, 245:23, 250:11, 250:14, 251:7, 253:2, 253:12, 253:13, 253:21, 253:24, 254:9, 254:15, 254:17, 255:15, 255:21, 255:24, 256:17, 257:16, 257:22, 259:20, 260:3, 260:4, 260:23, 261:3, 261:10, 261:16, 261:23, 261:25, 262:23, 262:24, 262:25, 263:4, 263:22, 263:25, 265:24, 266:3, 266:17, 268:10, 268:18, 274:4, 274:7, 274:16, 279:24,
286:6
  **IMECompanions.com** [2] - 30:11, 30:12
  **IMELegalRepresentatives.com** [1] - 139:19
  **IMELegalReps.com** [4] - 30:13, 33:13, 101:18, 164:11
  **IMELegalReps.com's** [1] - 39:8
  **IMELegalReps@gmail** [1] - 75:14
  **IMELegalReps@gmail.com** [6] - 35:11, 103:25, 104:22, 166:24, 169:8, 210:20
  **IMEs** [22] - 37:24, 40:16, 42:1, 69:14, 90:25, 91:3, 91:7, 97:18, 100:15, 102:16, 102:19, 102:24, 103:5, 104:18, 115:25, 116:1, 132:10, 198:9, 217:19, 240:12, 240:13, 240:14
  **immediate** [1] - 33:11
  **immediately** [1] - 10:19
  **imperative** [1] - 30:15
  **implement** [1] - 264:24
  **implemented** [2] - 125:24, 214:21
  **implicate** [1] - 217:2
  **implied** [1] - 217:16
  **import** [1] - 224:7
  **important** [7] - 30:12, 210:11, 213:11, 219:21, 250:6, 253:19, 258:23
  **importantly** [3] - 228:5, 229:17, 255:17
  **impose** [1] - 281:15
  **imposing** [1] - 10:14
  **impression** [2] - 254:3, 260:14
  **improbable** [1] - 257:11
  **improper** [1] - 210:3
  **impugns** [1] - 233:6
  **inaccurate** [1] - 248:15
  **inappropriately** [2] - 247:17, 266:7
  **inappropriately-obtained** [1] - 266:7
  **Inc** [3] - 2:18, 183:5, 183:16
  **INC** [1] - 1:4
  **incarcerated** [1] - 221:21
  **incident** [1] - 215:25
  **incidentally** [1] - 267:25
  **incidents** [1] - 216:1
  **include** [1] - 249:4
  **includes** [1] - 202:16
  **including** [5] - 105:15, 220:11, 223:4, 230:23, 239:5
  **income** [10] - 64:23, 66:10, 128:24, 276:11, 276:25, 277:14, 278:6, 278:7, 279:22, 280:13
  **incomplete** [1] - 222:18
  **inconceivable** [1] - 222:8
  **inconsistent** [1] - 208:24
  **inconsistently** [1] - 208:16
  **incorrect** [19] - 23:1, 33:15, 45:19, 108:3, 110:23, 126:16, 128:9, 193:2, 193:3, 193:14, 193:24, 194:19, 194:22, 194:23, 195:9, 198:19, 198:23, 199:10,
281:6
  **increase** [1] - 162:12
  **incredible** [1] - 272:9
  **increments** [1] - 276:2
  **incur** [1] - 40:17
  **independent** [3] - 217:19, 226:22, 227:1
  **independently** [2] - 207:2, 230:21
  **indicate** [3] - 170:22, 235:2, 249:7
  **indicated** [2] - 43:18, 236:10
  **indicates** [1] - 9:4
  **indication** [1] - 165:11
  **indicator** [1] - 255:13
  **indigence** [1] - 43:22
  **indisputable** [1] - 215:3
  **individual** [1] - 260:15
  **individually** [2] - 176:14, 203:18
  **individuals** [3] - 105:18, 107:12, 150:1
  **inevitable** [1] - 221:15
  **infer** [1] - 208:4
  **inference** [3] - 204:11, 210:15, 238:15
  **info@IMElegalreps** [1] - 30:14
  **info@legalreps** [1] - 139:16
  **info@legalreps.com** [1] - 139:16
  **inform** [3] - 85:10, 88:5, 90:8
  **information** [64] - 8:1, 8:2, 10:3, 17:10, 21:5, 22:14, 24:7, 29:1, 43:21, 48:11, 52:16, 66:13, 66:14, 73:10, 79:20, 103:18, 120:9, 127:17, 133:17, 136:1, 137:15, 137:21, 142:3, 145:19, 166:12, 183:18, 196:8, 196:14, 196:24, 203:10, 212:3, 212:17, 215:13, 215:22, 222:1, 222:16, 222:17, 225:19, 248:19, 252:10, 252:13, 252:20, 253:1, 253:16, 254:7, 254:11, 254:15, 256:24, 259:21, 262:14, 262:19, 263:9, 263:21, 263:24, 266:8, 267:24, 279:2, 279:3, 279:5, 279:6, 279:17
  **informed** [3] - 26:25, 72:13, 114:5
  **informing** [1] - 174:15
  **informs** [1] - 287:1
  **initial** [10] - 4:4, 23:15, 34:15, 51:25, 76:13, 102:8, 174:17, 202:6, 280:23, 281:2
  **initiate** [2] - 137:8, 151:24
  **injunction** [37] - 3:25, 69:14, 120:7, 120:10, 120:14, 120:21, 121:3, 121:16, 121:21, 144:9, 184:2, 202:14, 207:3, 223:10, 223:16, 224:1, 224:11, 225:24, 226:9, 228:3, 229:3, 229:19, 231:1, 240:3, 240:18, 245:4, 245:7, 249:3, 249:4, 250:14, 262:8, 264:8, 264:25, 266:1, 266:6, 267:19, 270:23
  **injunctions** [2] - 225:25, 228:8
  **injunctive** [1] - 219:22
  **injury** [13] - 142:12, 142:13, 142:20, 143:7, 143:13, 143:16, 143:17, 144:2, 179:22, 180:1, 209:18, 227:12, 240:14
  **innocent** [1] - 265:1, 266:5
  **innocently** [2] - 266:10, 268:5

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 307 of 324
All Word //IME Gabardi, et al.
PageID #: 8884
17

**inquire** [1] - 12:8
**Instagram** [1] - 209:3
**instance** [3] - 251:13, 254:23, 268:22
**instances** [1] - 212:21
**instead** [5] - 34:9, 216:25, 219:1, 229:15, 235:22
**institutional** [1] - 204:21
**instruct** [4] - 85:21, 85:23, 88:12, 266:25
**instructs** [1] - 210:19
**insult** [1] - 59:13
**insulting** [1] - 59:19
**integrity** [3] - 233:6, 233:19, 234:1
**intend** [2] - 243:24, 249:13
**intended** [3] - 249:16, 250:9, 250:10
**intent** [3] - 188:16, 228:6, 270:3
**intention** [4] - 55:24, 56:4, 56:7, 268:23
**intentional** [1] - 215:21
**intentionally** [1] - 48:5
**interest** [15] - 4:9, 5:2, 72:22, 141:18, 203:11, 203:12, 204:9, 204:16, 217:11, 218:14, 255:21, 269:4, 271:6
**interested** [5] - 55:5, 127:4, 127:12, 160:5, 209:1
**interesting** [1] - 94:25
**interim** [2] - 34:17, 280:2
**interject** [4] - 28:23, 50:24, 65:1, 136:5
**internal** [1] - 214:4
**internally** [1] - 46:3
**interrupt** [2] - 14:9, 113:7
**interrupted** [2] - 140:7, 219:18
**interrupting** [1] - 56:23
**interview** [1] - 219:3
**introduce** [1] - 33:7
**introduced** [2] - 255:23, 285:17
**inventory** [1] - 240:15
**investigate** [2] - 232:6, 232:7
**investigating** [1] - 232:4
**investigation** [1] - 97:9
**investigator** [1] - 231:25
**invite** [1] - 211:9
**invoice** [2] - 69:17, 227:22
**invoicing** [1] - 116:18
**involved** [15] - 4:16, 9:14, 50:13, 61:14, 61:22, 93:4, 118:14, 239:6, 242:15, 243:2, 255:2, 255:4, 255:5, 255:6
**involvement** [6] - 123:1, 123:4, 123:9, 126:20, 244:21
**involving** [1] - 182:21
**iPad** [1] - 165:24
**iPhone** [1] - 93:24
**irrelevant** [2] - 230:12, 232:8
**irrespective** [1] - 234:2
**irresponsibly** [1] - 231:23
**Island** [4] - 45:11, 60:18, 278:12, 278:19
**issue** [24] - 34:16, 35:14, 62:14, 64:9,

139:22, 159:8, 195:20, 202:1, 206:24, 220:11, 220:16, 233:20, 250:18, 250:19, 250:21, 251:5, 252:6, 255:17, 258:17, 264:6, 264:25, 274:21, 277:13, 282:6
**issued** [14] - 48:1, 62:5, 62:15, 63:15, 92:14, 109:15, 221:10, 222:3, 226:10, 234:7, 242:17, 242:19, 249:21
**issues** [4] - 43:18, 232:16, 250:22, 267:17
**IT** [1] - 2:5
**item** [2] - 33:11, 225:3
**items** [1] - 215:20
**iteration** [1] - 216:2
**itself** [7] - 8:8, 135:23, 194:6, 209:15, 211:3, 224:12, 264:5

## J

**jail** [1] - 55:20
**JAMIE** [1] - 1:21
**Jamie** [1] - 3:2
**January** [5] - 111:2, 115:7, 115:12, 176:8, 208:20
**Jeff** [21] - 50:19, 91:16, 104:16, 104:17, 104:21, 104:22, 116:18, 116:19, 116:25, 117:1, 117:5, 117:13, 117:14, 128:14, 196:12, 196:13, 201:11, 201:14, 206:18, 269:24
**Jeremy** [14] - 5:7, 23:5, 23:8, 23:16, 23:17, 34:4, 34:8, 52:5, 54:11, 76:21, 77:1, 123:21, 169:3
**Jersey** [5] - 142:25, 143:2, 143:7, 143:13, 143:17
**Jesus** [1] - 63:16
**jibe** [2] - 208:19, 209:21
**job** [2] - 197:19
**jobs** [1] - 68:17
**joined** [1] - 3:3
**joining** [1] - 50:9
**joint** [1] - 118:8
**Joint** [1] - 84:7
**Jonathan** [1] - 89:8
**Jonathon** [4] - 3:7, 69:15, 180:8, 279:16
**JUDGE** [1] - 1:13
**Judge** [22] - 2:2, 12:14, 12:20, 46:12, 48:1, 48:6, 107:25, 145:12, 161:3, 175:3, 232:6, 234:5, 234:18, 235:11, 238:8, 239:18, 242:1, 243:23, 249:6, 249:24, 273:3, 286:11
**judge** [1] - 121:10
**judgment** [1] - 221:15
**judicial** [1] - 242:20
**July** [20] - 1:8, 41:18, 84:6, 86:20, 88:18, 89:10, 89:13, 91:1, 91:7, 91:18, 91:20, 91:21, 92:15, 99:22, 112:13, 154:19, 155:4, 185:9, 191:2, 222:19
**jump** [2] - 236:14, 238:16
**jumping** [1] - 175:16

**June** [9] - 5:3, 185:9, 188:8, 189:5, 191:1, 218:18, 222:19, 239:8, 242:20
**jury** [1] - 212:24
**Jusuf** [1] - 45:14

## K

**K-I-D-D-I-E-S** [1] - 162:23
**Karen** [2] - 3:15, 70:6
**KATAEV** [167] - 1:18, 2:22, 11:3, 19:23, 19:25, 25:25, 26:2, 44:10, 44:12, 44:16, 44:18, 44:22, 45:3, 84:3, 85:7, 90:12, 93:20, 93:23, 95:13, 98:5, 98:6, 98:21, 99:4, 99:21, 101:13, 108:6, 108:12, 108:15, 109:13, 109:14, 110:4, 110:7, 110:15, 114:3, 118:1, 118:4, 118:5, 119:6, 120:18, 121:4, 121:8, 122:19, 123:17, 123:25, 124:10, 124:20, 124:24, 125:19, 126:25, 127:21, 127:25, 128:22, 129:2, 130:22, 132:4, 135:17, 136:2, 138:15, 143:9, 150:24, 155:14, 155:24, 156:2, 156:20, 156:22, 157:10, 162:12, 163:21, 164:7, 166:18, 168:18, 168:23, 169:4, 169:17, 170:23, 171:20, 172:9, 173:12, 175:8, 175:11, 175:15, 175:17, 176:20, 179:19, 179:21, 181:15, 181:20, 181:23, 182:23, 183:12, 184:12, 186:20, 187:19, 187:21, 188:4, 189:2, 189:23, 190:9, 192:2, 192:6, 192:8, 192:15, 193:6, 193:8, 193:11, 194:8, 194:23, 194:25, 195:4, 195:10, 197:14, 197:15, 197:22, 198:11, 198:14, 200:15, 201:20, 202:24, 202:25, 205:22, 206:13, 206:23, 207:8, 208:4, 208:14, 212:8, 213:21, 213:24, 214:13, 215:6, 215:24, 217:14, 217:25, 218:8, 219:3, 219:8, 219:15, 219:19, 225:3, 225:16, 226:3, 226:11, 226:13, 227:21, 229:2, 230:9, 244:16, 247:10, 247:12, 248:10, 279:5, 281:11, 283:7, 283:14, 283:21, 284:6, 284:16, 285:7, 286:15, 287:5, 287:9, 287:11, 287:14, 288:8, 289:19, 289:23, 290:2
**Kataev** [35] - 2:23, 10:24, 19:21, 37:9, 69:9, 83:11, 83:16, 95:12, 97:25, 101:12, 107:23, 108:4, 113:7, 121:25, 124:3, 129:3, 184:4, 184:6, 190:8, 194:3, 197:13, 202:22, 205:18, 206:6, 230:2, 231:5, 231:13, 235:23, 239:11, 244:8, 246:11, 248:21, 250:2, 250:4, 285:6
**Katz** [11] - 218:4, 218:11, 218:13, 218:18, 219:4, 219:9, 236:10, 253:15, 253:20, 253:25, 254:2
**keep** [19] - 24:2, 24:17, 25:5, 26:8, 50:5, 50:23, 56:7, 56:8, 56:23, 78:5, 84:15, 94:22, 144:1, 161:9, 176:16, 181:5, 233:11, 272:16, 277:15
**kept** [2] - 181:9, 183:18

Case 1:22-cv-01032-PKC-JRC    Document 438-1    Filed 12/30/24    Page 308 of 324
All Word // PageID #: 8383
IME Colai
Guardi, et al.
18

**key** [4] - 259:3, 259:15, 263:10, 268:9
**kiddie** [2] - 162:21, 235:7
**KIDDIE** [2] - 162:22, 235:7
**kiddies** [2] - 162:21, 162:23
**kill** [2] - 55:19
**kind** [8] - 8:18, 23:11, 82:23, 105:25, 106:2, 137:8, 188:24, 256:6
**kindly** [1] - 275:12
**knave** [1] - 212:7
**knowing** [1] - 153:20
**knowledge** [28] - 46:15, 86:19, 87:12, 87:23, 88:20, 89:6, 89:16, 89:18, 89:21, 90:3, 90:6, 90:16, 91:10, 91:17, 104:21, 104:24, 105:3, 114:4, 119:15, 119:19, 139:15, 164:17, 165:6, 179:25, 213:12, 254:4, 259:18, 266:11
**knowledgeable** [1] - 134:22
**known** [6] - 56:9, 155:3, 155:4, 209:5, 209:7, 264:18
**knows** [7] - 3:21, 49:6, 208:21, 254:19, 261:23, 277:16, 278:4
**Koenig** [32] - 5:8, 6:4, 7:1, 7:10, 7:14, 13:21, 14:6, 14:11, 28:25, 51:22, 52:12, 52:15, 52:20, 56:24, 123:12, 123:21, 149:22, 169:3, 203:13, 204:22, 217:24, 218:7, 218:14, 218:19, 218:24, 219:5, 235:20, 235:25, 236:4, 237:22, 253:11, 271:4
**KOENIG** [1] - 5:8
**Koenig's** [4] - 214:19, 216:16, 240:7, 259:17

## L

**L-I-D-D-I-E** [2] - 82:1, 162:17
**L-I-D-D-Y** [6] - 20:19, 26:15, 27:4, 95:4, 140:3, 159:25
**labeled** [2] - 271:12, 271:13
**LABUDA** [2] - 1:16, 1:19
**lack** [3] - 9:24, 126:20, 272:11
**lacking** [1] - 270:3
**Lake** [2] - 1:18, 1:21
**Lane** [1] - 43:7
**language** [4] - 13:14, 59:20, 167:20, 228:9
**laptop** [2] - 165:24, 251:17
**large** [3] - 65:11, 66:11, 122:8
**last** [59] - 4:12, 7:6, 14:22, 15:5, 15:18, 17:4, 18:15, 19:6, 25:23, 34:22, 35:7, 38:6, 41:8, 41:11, 41:14, 43:3, 43:14, 46:12, 48:4, 56:22, 69:16, 77:7, 80:23, 93:9, 96:2, 100:6, 100:11, 101:5, 105:5, 105:9, 107:6, 107:18, 110:24, 111:6, 117:23, 118:1, 119:7, 119:23, 147:19, 151:14, 153:12, 162:23, 190:3, 190:8, 192:2, 197:14, 202:4, 202:13, 221:23, 236:6, 245:4, 266:24, 281:6, 282:13, 283:20, 285:24, 287:2
**lastly** [1] - 10:12
**Laszlo** [2] - 182:1, 183:13

**late** [3] - 119:1, 248:10, 276:18
**latest** [3] - 239:21, 239:22, 241:25
**launch** [1] - 257:22
**LAW** [11] - 1:16, 1:19, 2:3, 2:17, 11:11, 11:17, 19:21, 81:17, 81:23, 166:13, 166:16
**law** [48] - 48:14, 97:13, 97:15, 102:13, 105:21, 105:25, 109:1, 109:2, 116:9, 116:15, 130:6, 130:7, 134:19, 142:12, 142:13, 142:20, 143:15, 143:16, 143:17, 144:8, 144:13, 144:14, 144:15, 153:25, 156:24, 176:25, 179:3, 179:20, 179:22, 180:1, 180:4, 198:5, 208:6, 208:9, 209:17, 221:16, 224:5, 227:11, 227:12, 227:14, 233:7, 242:6, 245:3, 246:8, 263:7, 265:23
**Law** [4] - 3:2, 89:19, 89:21, 102:13
**law-abidingness** [1] - 233:7
**lawfully** [1] - 265:4
**lawsuit** [1] - 232:2
**lawyer** [15] - 2:9, 33:3, 63:11, 79:16, 120:7, 146:13, 146:14, 146:16, 147:13, 154:21, 155:1, 156:19, 158:1, 185:2, 192:1
**lawyers** [1] - 78:13
**leading** [7] - 31:5, 130:22, 131:5, 132:4, 138:19, 143:9, 175:13
**lean** [1] - 261:17
**leap** [2] - 227:6, 238:16
**learn** [1] - 266:11
**learned** [1] - 218:25
**learned..** [1] - 264:14
**least** [18] - 2:7, 5:12, 9:4, 29:11, 66:2, 100:2, 118:20, 144:11, 148:10, 152:15, 160:4, 169:7, 205:7, 210:9, 221:23, 273:10, 275:12, 286:3
**leave** [12] - 23:19, 23:20, 27:12, 52:7, 52:9, 159:23, 175:5, 263:14, 264:13, 269:16, 278:2
**leaves** [1] - 223:16
**lectern** [1] - 231:8
**leeway** [1] - 184:4
**left** [6] - 55:12, 103:7, 107:15, 153:12, 195:7, 282:14
**Legal** [171] - 2:23, 4:10, 4:16, 4:22, 4:25, 8:6, 8:7, 8:15, 18:17, 26:16, 27:15, 33:13, 33:16, 35:13, 36:2, 36:5, 36:7, 39:9, 39:15, 48:19, 48:21, 48:24, 49:12, 59:17, 72:18, 72:22, 72:25, 73:20, 74:23, 74:24, 74:25, 75:1, 75:6, 75:9, 75:24, 77:16, 77:25, 79:6, 79:7, 79:8, 86:19, 89:14, 93:3, 96:19, 98:23, 101:22, 102:5, 104:5, 104:11, 104:25, 109:21, 110:2, 112:14, 115:23, 116:5, 116:15, 116:21, 122:22, 123:1, 123:4, 123:15, 124:14, 125:24, 126:20, 128:1, 128:7, 128:23, 129:11, 129:13, 130:11, 130:20, 132:8, 133:8, 133:23, 134:12, 135:2, 135:4, 139:9, 141:7, 141:11, 148:1, 150:7, 169:11, 171:16, 173:14,

178:23, 180:25, 184:10, 185:22, 187:1, 187:10, 188:9, 188:14, 190:15, 190:17, 190:24, 191:19, 194:12, 195:8, 195:17, 195:20, 196:15, 200:23, 201:4, 203:11, 203:15, 203:21, 204:7, 204:11, 205:21, 206:12, 206:19, 209:14, 213:2, 213:14, 214:16, 214:22, 215:1, 216:2, 216:25, 217:8, 217:11, 217:18, 217:20, 218:25, 219:23, 220:2, 223:7, 225:7, 225:18, 225:21, 226:18, 226:19, 226:25, 227:5, 230:16, 230:17, 230:19, 231:2, 234:12, 235:18, 235:22, 237:25, 238:14, 250:11, 250:15, 251:8, 253:2, 253:12, 253:13, 253:21, 253:24, 254:9, 254:15, 254:16, 254:17, 255:15, 255:21, 255:24, 257:22, 259:20, 260:3, 260:4, 260:23, 261:3, 261:10, 261:16, 263:4, 268:10, 268:18, 286:6
**legal** [14] - 48:14, 48:15, 128:24, 209:19, 229:18, 231:14, 231:20, 243:10, 243:14, 246:17, 255:7, 260:16, 263:23
**legally** [2] - 264:18, 265:12, 267:23
**Lender** [1] - 221:18
**length** [2] - 237:2, 237:3
**lengthy** [1] - 166:23
**less** [2] - 5:5, 66:16
**lessen** [1] - 268:4
**letter** [3] - 242:19, 245:16, 287:19
**letters** [1] - 99:13
**level** [1] - 252:7
**Levi** [7] - 3:3, 6:15, 29:20, 177:10, 180:25, 192:25, 242:21
**LEVI** [1] - 69:5, 171:22
**Levi's** [1] - 242:22
**Levicunt62** [4] - 24:7, 24:8, 24:21, 103:17
**liabilities** [1] - 278:25
**liar** [2] - 271:12, 271:21
**liars** [1] - 206:4
**LIDDI** [1] - 158:23
**Liddie** [203] - 2:9, 3:16, 4:1, 4:7, 4:10, 4:13, 4:24, 5:1, 5:6, 5:13, 5:15, 6:24, 7:23, 8:2, 8:7, 8:14, 9:10, 10:15, 10:18, 10:22, 12:23, 14:15, 20:4, 22:22, 26:25, 27:21, 32:4, 35:20, 49:11, 50:7, 50:8, 50:12, 50:14, 50:17, 51:1, 52:13, 53:1, 53:7, 53:11, 53:13, 54:15, 54:21, 56:5, 57:1, 57:4, 58:2, 58:16, 58:18, 59:6, 69:3, 70:7, 72:17, 72:24, 73:2, 73:6, 73:10, 73:13, 73:16, 74:1, 81:1, 81:11, 81:25, 82:9, 84:4, 93:24, 94:23, 98:1, 99:5, 99:16, 107:24, 120:4, 121:7, 122:2, 124:25, 129:10, 139:22, 156:18, 157:5, 157:21, 157:25, 161:5, 161:12, 162:3, 162:21, 163:4, 163:10, 167:13, 174:8, 175:7, 175:18, 181:25, 182:22, 183:4, 184:5, 184:7, 186:24, 190:10, 193:23, 198:5, 199:6, 199:13, 200:17,

202:3, 202:17, 203:16, 204:13, 205:2, 205:6, 206:4, 206:15, 207:1, 207:21, 208:3, 208:8, 208:13, 208:15, 208:24, 209:6, 209:9, 209:15, 209:24, 210:1, 211:12, 213:1, 213:12, 214:2, 215:1, 217:2, 217:6, 217:9, 220:5, 221:21, 221:25, 222:4, 222:9, 222:17, 222:20, 222:24, 223:2, 226:18, 227:7, 229:24, 229:25, 231:3, 234:13, 235:3, 237:1, 237:5, 238:23, 239:4, 244:9, 250:12, 250:15, 252:25, 253:6, 253:9, 254:18, 254:24, 255:5, 256:2, 256:4, 258:3, 259:2, 259:22, 260:5, 260:8, 260:13, 260:22, 260:24, 261:2, 261:12, 261:14, 262:2, 262:6, 262:12, 262:13, 262:22, 262:23, 265:10, 265:20, 267:17, 267:22, 268:5, 268:13, 268:22, 268:25, 269:2, 269:20, 270:2, 270:14, 270:18, 270:21, 271:5, 271:17, 273:15, 283:11, 287:22

**LIDDIE** [11] - 20:4, 27:1, 81:18, 93:11, 94:8, 95:21, 159:6, 159:15, 162:22, 230:24, 289:17

**Liddie's** [20] - 7:25, 8:9, 9:6, 9:15, 29:1, 52:16, 155:16, 161:14, 171:13, 171:17, 184:3, 208:5, 214:15, 225:7, 236:24, 240:9, 265:19, 269:9, 286:7, 287:7

**Liddy** [8] - 93:6, 113:1, 158:22, 167:1, 230:14, 237:6, 237:8, 272:1

**LIDDY** [20] - 20:6, 27:1, 93:6, 93:11, 93:16, 94:11, 95:22, 96:3, 96:16, 139:23, 158:23, 159:7, 159:13, 163:1, 166:23, 167:1, 230:23, 235:6, 250:19, 260:18

**lie** [17] - 13:21, 13:23, 13:24, 14:1, 16:14, 62:21, 74:20, 205:22, 229:14, 229:16, 238:4, 238:5, 252:8, 255:12, 268:14, 271:23

**lied** [4] - 252:1, 252:14, 260:9, 269:21

**lies** [1] - 49:19

**life** [6] - 5:20, 18:12, 60:4, 136:19, 209:10, 223:3

**lifestyle** [3] - 65:21, 66:9, 206:18

**lifted** [1] - 62:2

**light** [3] - 4:11, 43:13, 43:19

**lights** [1] - 162:10

**likewise** [2] - 49:11, 49:13

**limited** [1] - 250:21

**line** [11] - 4:23, 97:24, 102:3, 112:4, 113:3, 117:23, 120:5, 173:25, 182:20, 207:19, 260:4

**lines** [2] - 120:2, 184:12

**link** [5] - 20:14, 167:20, 204:10, 212:15, 212:17

**linked** [3] - 35:16, 195:25, 227:1

**LinkedIn** [2] - 179:3, 224:16

**List** [40] - 84:7, 86:1, 86:17, 86:20, 87:9, 90:22, 92:3, 101:15, 102:23, 105:16, 106:5, 106:24, 121:17, 121:21,

122:8, 128:25, 152:16, 153:10, 154:13, 229:12, 233:14, 234:8, 234:9, 234:15, 240:10, 245:16, 245:21, 245:25, 246:10, 247:5, 247:8, 247:9, 247:24, 248:6, 249:22, 250:1, 257:12, 257:20, 258:6, 258:10

**list** [137] - 38:22, 40:22, 57:18, 57:23, 57:24, 58:8, 58:9, 58:25, 59:1, 73:12, 73:13, 78:15, 78:17, 78:18, 78:19, 78:24, 79:6, 79:10, 79:17, 79:19, 80:10, 80:11, 80:16, 80:18, 80:22, 86:4, 86:7, 86:24, 87:2, 92:19, 106:7, 106:8, 106:9, 106:14, 106:20, 106:25, 107:1, 107:2, 107:4, 107:10, 121:3, 122:3, 134:17, 134:22, 141:25, 142:3, 142:6, 142:7, 142:10, 143:21, 143:24, 144:4, 144:13, 144:16, 144:18, 145:3, 152:17, 154:14, 154:18, 154:21, 154:25, 155:4, 155:9, 179:7, 179:11, 180:3, 183:5, 188:17, 196:23, 202:18, 207:23, 208:1, 208:10, 215:7, 215:19, 224:12, 224:14, 224:16, 224:23, 224:25, 227:8, 227:25, 234:4, 235:15, 239:23, 240:19, 240:21, 240:23, 240:24, 241:6, 241:10, 245:10, 245:12, 245:17, 246:7, 246:8, 246:11, 246:14, 246:17, 246:25, 247:6, 247:13, 247:18, 247:19, 247:20, 248:3, 248:7, 248:8, 248:14, 248:17, 249:12, 249:15, 252:12, 257:7, 258:11, 258:21, 258:22, 259:13, 259:14, 261:20, 261:21, 265:22, 266:20, 266:23, 267:3, 267:4, 267:8, 286:3, 286:18

**listed** [5] - 102:18, 177:13, 183:1, 245:9, 247:23

**listen** [4] - 14:12, 52:2, 63:8, 279:20

**Listen** [1] - 14:14

**lists** [11] - 134:19, 141:14, 247:22, 247:23, 260:24, 261:9, 261:16, 261:17, 264:1, 270:8, 270:10

**literal** [1] - 252:12

**literally** [2] - 252:25, 280:5

**litigants** [1] - 233:7

**litigation** [2] - 224:5, 229:6

**live** [11] - 43:7, 57:9, 65:7, 105:3, 197:9, 197:11, 199:21, 201:1, 201:2, 210:7

**lived** [1] - 56:9

**lives** [2] - 105:4, 222:8

**living** [5] - 65:10, 65:22, 279:18, 279:19, 280:5

**LLC** [9] - 2:23, 42:13, 109:22, 110:2, 190:15, 190:18, 190:24, 191:19, 221:19

**LLP** [1] - 42:12

**loan** [1] - 277:9

**loans** [1] - 278:8

**locate** [1] - 142:17

**location** [1] - 104:8

**locations** [3] - 16:18, 37:22, 39:12

**login** [1] - 192:9

**logo** [4] - 33:11, 77:25, 78:1

**long-standing** [1] - 270:18

**longevity** [1] - 227:19

**look** [22] - 6:2, 25:23, 42:6, 65:21, 66:11, 76:14, 167:19, 170:23, 172:18, 181:17, 240:20, 241:5, 241:14, 241:15, 241:19, 251:24, 252:16, 258:16, 261:1, 267:13, 274:9, 274:13

**looked** [9] - 18:15, 18:18, 77:14, 95:24, 177:6, 180:11, 241:14, 248:18, 269:19

**looking** [17] - 18:22, 42:7, 45:5, 55:15, 143:8, 155:9, 167:19, 168:14, 171:20, 173:4, 196:13, 236:18, 254:4, 255:13, 257:17, 268:3, 275:11

**looks** [5] - 35:15, 195:22, 196:5, 214:24, 250:20

**lose** [6] - 35:14, 195:21, 196:6, 196:17, 196:25, 237:4

**lost** [3] - 61:16, 196:20, 225:25

**loud** [4] - 25:8, 103:17, 263:20, 265:15

**louder** [1] - 84:17

**loudly** [1] - 176:19

**love** [2] - 57:3, 277:11

**loved** [1] - 51:24, 53:24, 56:15

**low** [1] - 277:22

**lulling** [1] - 244:23

**lunch** [1] - 274:19

**lying** [24] - 13:8, 14:25, 15:12, 15:13, 16:6, 41:5, 204:13, 204:14, 207:21, 208:3, 251:5, 251:20, 252:5, 252:12, 255:3, 256:6, 256:9, 270:4, 271:2, 271:21, 271:23, 271:24, 271:25, 272:4

## M

**Machine** [1] - 38:7

**Mail** [1] - 94:1

**mail** [134] - 87:15, 91:4, 92:11, 92:18, 93:2, 93:6, 93:15, 93:17, 103:12, 103:13, 104:1, 104:2, 104:12, 131:24, 132:1, 132:2, 137:14, 139:16, 139:19, 139:23, 140:10, 140:24, 147:3, 147:18, 147:25, 148:1, 148:11, 148:18, 158:21, 161:16, 161:24, 162:1, 162:17, 163:15, 163:20, 163:23, 164:2, 164:3, 164:4, 164:5, 164:6, 164:10, 164:11, 164:24, 165:6, 165:12, 165:15, 167:2, 167:9, 167:14, 167:17, 168:12, 168:17, 169:1, 170:18, 170:21, 170:25, 171:12, 171:13, 172:1, 173:4, 173:8, 173:9, 173:10, 173:12, 173:19, 174:11, 174:13, 174:16, 174:17, 174:19, 177:12, 177:19, 178:3, 178:7, 179:8, 179:17, 180:24, 181:20, 181:25, 182:13, 182:21, 183:10, 187:17, 187:24, 188:2, 188:12, 189:5, 189:19, 190:2, 192:9, 192:17, 193:22, 198:16, 198:17, 198:21, 198:25, 199:3, 199:5, 199:9, 200:19, 205:13, 210:6, 211:11, 211:22, 212:3, 213:1, 213:2, 213:5,

213:14, 213:21, 214:1, 214:3, 214:4, 214:8, 220:2, 223:1, 224:2, 236:14, 250:20, 250:25, 251:2, 251:3, 251:7, 251:18, 252:3, 252:7, 253:4, 254:19, 254:24, 255:1, 255:11

**mailing** [2] - 131:15

**mails** [71] - 85:15, 92:19, 93:16, 94:1, 104:2, 104:6, 104:11, 104:14, 104:15, 104:21, 130:19, 131:22, 131:23, 139:7, 145:23, 147:17, 147:21, 147:23, 148:10, 148:23, 149:2, 149:3, 165:20, 169:6, 171:6, 171:9, 172:14, 177:6, 177:23, 177:25, 178:8, 179:5, 179:10, 179:15, 187:8, 187:9, 187:14, 200:7, 203:21, 204:1, 210:8, 210:19, 211:12, 211:14, 211:15, 211:19, 212:4, 213:10, 213:12, 214:7, 214:11, 227:3, 230:15, 234:24, 235:3, 235:9, 237:1, 237:11, 238:18, 239:3, 252:8, 252:9, 253:9, 255:15, 256:11, 256:12, 256:23, 257:22, 260:10, 260:11, 268:22

**main** [4] - 218:13, 250:18, 261:22, 262:3

**maintain** [1] - 78:21

**makeup** [1] - 62:25

**man** [14] - 7:23, 53:1, 53:16, 53:20, 54:16, 56:6, 57:1, 57:5, 57:7, 58:19, 59:7, 234:16, 250:12, 271:5

**management** [1] - 226:25

**manager** [2] - 33:8, 170:13

**manifested** [1] - 264:5

**manner** [3] - 193:1, 222:15, 228:2

**Mansion** [1] - 45:1

**mansion** [2] - 65:11, 66:14

**March** [36] - 41:13, 42:21, 47:25, 69:17, 109:22, 110:16, 111:18, 128:5, 175:19, 176:7, 176:10, 176:13, 176:21, 176:22, 208:17, 224:2, 226:1, 226:2, 226:10, 226:14, 226:16, 227:23, 229:12, 234:7, 240:3, 240:18, 241:4, 245:13, 245:20, 245:22, 247:7, 249:3, 249:8, 249:13, 249:20

**Marcus** [2] - 1:17, 1:20

**marked** [3] - 35:24, 211:23, 287:12

**market** [15] - 45:11, 61:4, 61:19, 62:4, 62:16, 63:14, 141:6, 141:7, 188:18, 199:22, 199:25, 200:3, 200:10, 227:13, 233:13

**Marketing** [6] - 183:19, 184:9, 225:4, 225:20, 226:23, 227:4

**marketing** [45] - 38:22, 40:22, 57:24, 58:25, 73:13, 78:17, 78:18, 78:19, 79:2, 79:8, 80:11, 80:12, 80:14, 80:22, 105:6, 105:10, 108:17, 119:12, 129:13, 188:1, 188:9, 188:14, 188:17, 188:18, 196:22, 199:24, 200:1, 225:2, 225:24, 238:22, 238:25, 239:9, 239:10, 240:6, 248:7, 248:14, 254:17, 257:23, 260:23, 261:3, 262:5, 262:14, 269:13

**markets** [1] - 278:1

**married** [2] - 207:17, 270:17

**Marshall** [4] - 102:13, 102:20

**master** [3] - 182:18, 183:2, 215:19

**material** [8] - 251:22, 251:24, 252:6, 252:11, 254:18, 255:12, 255:18, 256:5

**materials** [2] - 135:15, 215:10

**matter** [10] - 7:14, 10:6, 43:15, 124:3, 201:25, 228:6, 233:22, 242:6, 267:8, 288:9

**matters** [3] - 145:6, 145:9, 287:16

**maybe..** [1] - 120:9

**McDaniel** [3] - 33:5, 169:2, 171:8

**McDonald's** [2] - 264:11, 264:21

**mean** [40] - 13:18, 13:24, 13:25, 23:12, 27:21, 38:20, 42:20, 74:14, 86:8, 97:5, 105:2, 107:13, 108:21, 116:10, 118:16, 129:1, 147:2, 147:6, 158:9, 179:14, 182:2, 183:24, 196:5, 202:5, 204:23, 205:4, 214:7, 238:5, 243:21, 243:22, 249:14, 255:3, 256:15, 256:18, 259:1, 262:2, 264:12, 265:6, 277:23, 285:23

**meaning** [5] - 141:3, 150:11, 165:17, 242:12, 255:2

**means** [6] - 6:10, 37:23, 219:9, 227:15, 237:10, 280:17

**meant** [3] - 201:3, 261:2, 281:19

**meantime** [3] - 232:15, 240:4, 242:24

**meat** [1] - 203:2

**mechanism** [1] - 159:5

**media** [1] - 147:4

**meeting** [59] - 5:13, 17:5, 17:11, 18:1, 18:8, 19:1, 23:4, 23:5, 23:7, 23:9, 23:10, 23:15, 23:16, 23:17, 25:13, 26:13, 30:17, 34:2, 34:7, 34:8, 34:15, 40:23, 51:25, 52:5, 52:6, 54:10, 54:14, 75:9, 75:25, 76:1, 76:21, 77:15, 96:10, 96:15, 99:6, 123:15, 124:9, 125:1, 125:3, 126:15, 148:24, 210:14, 210:18, 211:3, 214:14, 214:21, 216:21, 216:24, 223:14, 223:22, 229:22, 230:13, 235:21, 258:1, 273:11, 274:1, 274:11, 288:6

**meetings** [2] - 68:9, 70:25

**meets** [1] - 269:14

**Melissa** [1] - 89:9

**member** [3] - 67:25, 68:4, 68:6

**memo** [1] - 253:20

**memorialize** [2] - 36:15, 39:9

**memorializing** [1] - 5:16

**memory** [4] - 28:10, 42:9, 42:17, 42:18, 42:20, 74:20, 209:4, 242:9

**mention** [7] - 126:2, 126:6, 126:9, 126:13, 138:7, 189:7, 249:12

**mentioned** [10] - 6:25, 81:3, 100:20, 121:11, 127:11, 127:15, 134:1, 189:6, 253:20

**mentioning** [1] - 72:2

**mere** [4] - 209:24, 215:2, 225:18, 258:7

**merely** [4] - 4:20, 48:1, 253:17, 267:24

**mess** [1] - 286:2

**message** [7] - 169:10, 169:21, 195:17, 196:2, 210:5, 224:17, 224:18

**messages** [9] - 4:14, 85:12, 210:10, 227:17, 247:13, 247:16, 247:25, 252:21, 255:24

**met** [1] - 269:24

**method** [1] - 91:5

**Mezz** [1] - 221:18

**microphone** [16] - 11:23, 11:25, 12:11, 21:11, 82:3, 83:7, 83:12, 85:2, 111:22, 163:17, 163:24, 176:16, 196:9, 246:1, 246:3, 285:14

**Middle** [1] - 105:4

**middle** [5] - 20:13, 66:10, 138:13, 168:9, 263:12

**middle-income** [1] - 66:10

**mig** [2] - 170:11

**might** [7] - 155:18, 162:10, 234:2, 258:15, 280:22, 281:15, 283:12

**migrate** [2] - 141:10, 150:10

**migrated** [2] - 136:11, 150:12

**migrating** [3] - 59:24, 150:7, 174:15

**migration** [17] - 34:16, 59:24, 76:23, 103:23, 136:20, 136:21, 137:5, 137:22, 138:2, 138:8, 138:14, 139:1, 170:13, 179:1, 196:15, 252:13, 253:1

**Milman** [1] - 3:2

**MILMAN** [2] - 1:16, 1:19

**mind** [8] - 10:20, 56:2, 153:18, 189:13, 228:6, 252:23, 253:7, 272:6

**minds** [1] - 223:17

**mindset** [1] - 264:7

**mine** [2] - 27:15, 78:1

**minor** [3] - 97:8, 136:18, 178:15

**minute** [15] - 5:19, 7:18, 12:16, 27:8, 28:2, 28:7, 43:10, 54:14, 81:15, 127:21, 216:16, 225:12, 242:20, 242:22, 249:13

**minutes** [11] - 6:25, 7:7, 27:9, 51:22, 52:21, 75:15, 157:3, 202:11, 202:12, 202:20, 205:18

**misappropriated** [3] - 247:14, 247:22, 249:18

**misconstrued** [1] - 22:16

**missing** [3] - 204:10, 222:19, 259:3

**misspelled** [7] - 140:11, 148:11, 148:14, 158:15, 163:15, 171:18, 174:1

**misspelling** [6] - 171:13, 173:21, 235:4, 236:24, 237:6, 250:19

**misspoke** [2] - 100:11, 217:21

**mistaken** [1] - 187:24

**misunderstand** [1] - 90:7

**misunderstood** [4] - 100:12, 155:2, 280:22, 281:7

**mock** [1] - 139:4

**mock-ups** [1] - 139:4

**mockups** [1] - 31:3

**modern** [1] - 210:7

**modification** [3] - 220:20, 228:4, 242:3

**modify** [1] - 221:8

Case 1:22-cv-01032-PKC-JRC   Document 437-1   Filed 12/30/24   Page 311 of 324
All Word // Gebardi, et al.
TIME Goba
PageID #:8663
21

**moment** [17] - 11:7, 11:10, 23:10, 23:18, 43:23, 54:9, 54:15, 74:17, 84:13, 88:4, 119:11, 130:9, 158:1, 165:25, 174:6, 255:9, 257:15
**Monday** [2] - 1:8, 167:13
**money** [11] - 64:18, 66:16, 66:21, 68:6, 111:4, 141:20, 185:4, 185:5, 246:16, 275:20, 278:1
**monies** [3] - 73:2, 141:22, 268:24
**monopolizing** [1] - 268:7
**monopoly** [1] - 263:5
**month** [25] - 5:6, 41:12, 64:17, 98:10, 102:19, 102:25, 103:2, 103:3, 112:19, 115:5, 129:25, 130:2, 151:8, 155:6, 180:12, 190:20, 211:5, 211:6, 211:8, 277:19, 278:2, 278:15, 281:23
**month-to-month** [1] - 103:3
**monthly** [4] - 112:5, 276:20, 277:18, 277:24
**months** [5] - 62:7, 63:6, 182:6, 243:17, 275:12
**moreover** [2] - 228:8, 229:4
**morning** [17] - 2:4, 2:22, 2:25, 3:1, 3:4, 3:6, 3:9, 3:13, 3:14, 3:17, 12:9, 21:7, 21:16, 31:2, 70:5, 84:4, 84:5
**Morning** [1] - 3:5
**mortgage** [21] - 60:17, 61:11, 61:13, 61:25, 62:1, 62:2, 64:3, 64:17, 64:18, 64:22, 65:7, 244:22, 277:2, 277:18, 277:23, 278:17, 278:19, 278:24, 279:19
**most** [6] - 51:19, 113:11, 140:3, 143:24, 149:18, 240:14
**mostly** [3] - 136:19, 215:18, 239:2
**mother** [2] - 222:7, 222:9
**mother's** [1] - 23:6
**motion** [17] - 3:23, 54:22, 223:13, 229:10, 231:18, 231:19, 231:24, 242:5, 242:8, 243:5, 243:6, 248:13, 282:11, 282:12
**motions** [3] - 231:14, 243:5, 243:11
**mouth** [1] - 85:4
**Move** [1] - 49:20
**move** [24] - 5:22, 11:23, 11:25, 30:6, 33:21, 34:15, 48:13, 48:17, 63:9, 66:23, 67:8, 77:19, 102:3, 109:11, 113:3, 118:2, 121:4, 121:6, 127:12, 155:7, 164:1, 179:19, 243:6
**moved** [5] - 6:5, 77:11, 172:3, 252:19, 252:21
**moves** [1] - 82:3
**moving** [9] - 31:10, 32:3, 67:1, 88:1, 88:2, 172:18, 178:8, 216:22, 261:13
**multimillion** [1] - 66:11
**multiple** [8] - 34:11, 59:12, 65:22, 65:25, 117:3, 220:14, 275:2, 277:16
**murder** [1] - 55:20
**must** [3] - 38:11, 129:17, 164:5

# N

**name** [56] - 8:5, 11:17, 27:22, 34:23, 47:10, 47:25, 48:6, 70:6, 72:3, 72:18, 72:19, 72:20, 81:23, 93:11, 94:8, 95:4, 95:15, 96:2, 96:5, 96:15, 97:17, 97:20, 130:16, 131:22, 133:23, 133:24, 139:23, 139:24, 140:3, 140:11, 140:25, 148:11, 159:1, 159:3, 163:15, 170:20, 171:13, 171:17, 173:21, 174:1, 177:10, 182:2, 183:6, 207:14, 216:23, 216:25, 217:8, 218:25, 235:4, 235:21, 236:24, 237:20, 250:11, 250:19, 251:15
**named** [9] - 6:24, 10:6, 45:14, 68:18, 83:1, 93:16, 115:19, 128:8, 128:11
**namely** [3] - 203:10, 243:23, 270:16
**names** [1] - 246:11
**naming** [1] - 72:20
**narrative** [7] - 24:19, 34:5, 60:1, 76:18, 97:12, 97:21, 97:23
**narratives** [7] - 62:19, 62:23, 97:10, 97:14, 97:16, 97:19
**nature** [1] - 153:20
**near** [2] - 107:16, 107:19
**necessarily** [8] - 88:16, 207:5, 217:2, 243:21, 243:22, 264:6, 264:7, 270:20
**necessary** [4] - 10:1, 106:1, 219:16, 228:9
**necessity** [1] - 219:10
**need** [30] - 6:1, 12:10, 24:23, 28:17, 35:1, 38:10, 57:6, 57:16, 58:1, 79:19, 82:6, 105:22, 106:1, 138:12, 141:22, 155:18, 156:5, 179:15, 194:5, 194:13, 202:10, 202:14, 203:3, 206:6, 227:6, 250:13, 253:7, 279:17, 279:22, 280:4
**needed** [13] - 8:2, 61:11, 76:2, 117:8, 121:23, 135:7, 138:25, 141:13, 170:10, 170:12, 244:22, 252:20, 283:11
**needing** [1] - 252:7
**needs** [4] - 2:6, 26:4, 217:14, 223:24
**negative** [2] - 236:19, 268:20
**negotiated** [1] - 280:11
**never** [70] - 29:19, 29:24, 30:2, 35:4, 45:25, 47:8, 47:12, 47:20, 47:21, 51:1, 56:2, 58:25, 60:3, 71:6, 71:15, 71:20, 71:22, 72:13, 74:18, 76:25, 77:10, 77:11, 86:9, 86:18, 92:21, 107:5, 107:8, 107:9, 107:11, 108:3, 120:22, 122:15, 122:16, 127:4, 139:18, 149:7, 149:9, 149:12, 151:21, 152:10, 152:12, 152:24, 153:4, 153:11, 153:14, 188:16, 189:13, 200:1, 203:19, 232:14, 232:15, 232:18, 238:23, 252:22, 254:14, 255:18, 256:15, 259:9, 259:11, 262:8, 262:13, 266:22, 266:23, 267:2, 272:17
**nevertheless** [1] - 79:2
**NEW** [1] - 1:1
**new** [38] - 9:13, 20:15, 20:16, 32:11, 33:11, 35:25, 36:22, 38:8, 43:21, 50:9, 50:19, 56:25, 58:18, 94:18, 97:2, 98:16,

151:24, 152:1, 152:5, 152:8, 158:11, 167:20, 168:1, 168:4, 168:11, 180:22, 193:25, 196:15, 199:11, 203:10, 216:23, 242:12, 254:12, 265:21, 284:13, 286:13
**New** [52] - 1:6, 1:18, 1:21, 1:24, 6:21, 16:10, 16:21, 23:20, 27:12, 29:19, 36:19, 36:24, 37:23, 37:24, 38:2, 40:5, 40:7, 40:12, 52:7, 56:8, 57:9, 57:11, 57:13, 57:15, 57:17, 66:16, 119:13, 134:20, 143:1, 143:2, 143:7, 143:13, 143:16, 144:11, 144:14, 155:9, 179:22, 180:1, 197:17, 208:6, 221:16, 221:17, 227:12, 229:25, 230:1, 277:23
**next** [22] - 3:10, 18:14, 24:4, 25:4, 25:21, 27:24, 30:5, 30:6, 33:3, 34:20, 63:21, 71:2, 95:12, 108:14, 114:9, 170:17, 171:6, 172:6, 172:7, 213:4, 213:15, 249:2
**niche** [1] - 264:3
**nigh** [1] - 56:18
**night** [2] - 117:20, 119:1
**nine** [6] - 6:13, 67:2, 67:3, 152:15, 207:22, 207:25, 227:8, 257:19
**nobody** [1] - 285:13
**nominally** [1] - 9:15
**non** [3] - 3:16, 218:3, 218:21
**non-party** [3] - 3:16, 218:3, 218:21
**noncompete** [2] - 263:13, 263:17
**noncompliance** [2] - 220:8, 224:8
**none** [11] - 112:17, 119:11, 149:2, 149:3, 163:1, 184:7, 235:19, 239:14, 271:17, 272:15, 283:23
**nonparty** [3] - 70:7, 263:8, 266:5
**normal** [1] - 143:22
**normally** [1] - 116:9
**note** [5] - 38:1, 175:12, 242:17, 258:23, 273:8
**noted** [3] - 166:20, 232:20, 242:18
**notes** [1] - 203:5
**nothing** [30] - 13:7, 17:22, 27:11, 29:20, 58:4, 59:17, 74:3, 74:15, 74:16, 79:8, 98:17, 104:20, 127:6, 136:21, 146:3, 175:3, 188:17, 188:18, 195:10, 197:22, 200:13, 200:15, 204:1, 213:4, 235:8, 239:7, 254:5, 254:21, 254:25, 279:7
**notice** [11] - 9:24, 10:8, 55:5, 81:3, 82:19, 219:25, 242:20, 242:22, 242:23, 245:16, 248:12
**noticed** [3] - 77:17, 222:17, 274:10
**notified** [10] - 33:10, 84:12, 84:23, 87:5, 89:24, 90:5, 90:16, 91:3, 92:2, 92:7
**notify** [3] - 84:22, 85:8, 87:10
**notwithstanding** [2] - 49:2, 222:13
**nowhere** [1] - 257:24
**Number** [2] - 44:21, 287:4
**number** [14] - 87:1, 102:19, 103:5, 111:7, 116:21, 147:17, 171:23, 172:14,

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 312 of 324
All Word // PageID #: 8589
Gardi, et al.
22

181:18, 248:4, 248:19, 285:8, 287:8, 287:18
**numerous** [1] - 200:7
**NY** [1] - 221:20
**NYC** [1] - 39:13
**NYP** [1] - 6:9
**NYPD** [7] - 6:10, 9:23, 10:2, 10:4, 82:16, 82:22

## O

**oath** [8] - 4:24, 9:11, 15:6, 82:13, 119:18, 119:19, 119:24, 208:3
**obey** [1] - 220:13
**object** [1] - 37:5
**objection** [56] - 13:2, 17:12, 18:4, 20:23, 22:24, 25:16, 28:3, 37:4, 41:19, 42:14, 48:8, 48:20, 50:10, 59:19, 64:8, 70:14, 72:6, 79:3, 94:13, 110:10, 110:11, 117:21, 118:10, 119:16, 120:23, 121:1, 121:18, 123:16, 126:21, 127:19, 130:22, 132:4, 135:17, 136:2, 138:15, 143:9, 163:21, 164:7, 178:20, 178:24, 179:12, 180:6, 181:11, 182:8, 182:14, 182:20, 183:7, 183:8, 183:20, 193:16, 193:17, 198:11, 198:14, 285:5, 285:11
**obligation** [1] - 82:22
**obligations** [1] - 221:7
**observed** [1] - 283:7
**observer** [3] - 128:7, 179:23, 180:5
**observers** [10] - 112:13, 112:16, 117:11, 184:15, 184:18, 184:20, 185:8, 185:16, 185:18, 191:12
**observing** [1] - 217:19
**obtain** [6] - 108:17, 108:19, 121:16, 155:16, 186:16, 222:23
**obtained** [11] - 4:11, 43:22, 100:9, 105:13, 227:5, 230:21, 247:17, 263:6, 263:25, 264:1, 266:7
**obtaining** [1] - 112:1
**obvious** [1] - 46:5
**obviously** [26] - 8:21, 26:5, 45:1, 57:6, 119:3, 158:3, 160:15, 173:10, 173:12, 181:4, 191:25, 203:4, 203:16, 209:1, 209:2, 213:11, 213:14, 220:4, 233:18, 237:9, 245:11, 247:16, 261:24, 263:21, 265:9, 277:25
**occur** [1] - 225:23
**occurred** [7] - 203:20, 203:22, 233:16, 234:6, 236:10, 239:25, 240:2
**occurring** [1] - 37:24
**OF** [2] - 1:1, 1:12
**off-duty** [1] - 197:20
**off-screen** [1] - 5:9
**offer** [9] - 50:18, 54:22, 54:25, 55:2, 97:10, 110:7, 159:11, 188:21, 284:16
**offered** [3] - 42:8, 58:16, 219:9
**offering** [2] - 41:21, 97:9
**office** [3] - 85:9, 104:8, 253:24

**officer** [15] - 6:18, 6:24, 9:22, 10:5, 82:16, 113:5, 114:7, 114:9, 116:2, 129:16, 157:18, 206:15, 209:14, 211:13, 218:5
**often** [7] - 95:6, 118:19, 158:12, 158:13, 158:15, 159:22, 229:23
**oftentimes** [1] - 94:17
**old** [4] - 38:8, 40:19, 44:12, 284:11
**old-fashioned** [1] - 44:12
**omitted** [1] - 48:5
**omitting** [1] - 127:17
**on-boarding** [1] - 16:24
**on-screen** [1] - 5:8
**Once** [1] - 137:11
**once** [10] - 89:2, 93:18, 95:5, 156:12, 206:8, 211:6, 220:19, 221:10, 234:14, 278:5
**one** [139] - 5:24, 9:16, 11:10, 17:2, 19:17, 22:13, 28:24, 34:21, 36:5, 38:13, 40:25, 43:10, 50:17, 50:24, 56:22, 60:12, 65:1, 68:9, 69:12, 76:4, 77:18, 81:15, 82:12, 86:21, 86:23, 90:20, 91:11, 92:12, 92:13, 94:6, 97:2, 97:4, 97:15, 97:17, 98:24, 100:15, 100:22, 102:20, 102:21, 109:21, 113:15, 113:16, 113:19, 113:20, 124:4, 130:9, 131:22, 136:5, 137:12, 148:11, 151:14, 155:1, 155:5, 159:1, 159:18, 161:24, 164:18, 164:23, 165:25, 166:11, 166:22, 169:22, 171:15, 171:17, 171:19, 172:6, 172:7, 172:19, 174:6, 174:7, 177:12, 179:16, 182:18, 183:11, 185:4, 187:8, 187:20, 187:25, 189:1, 193:6, 194:25, 198:6, 199:18, 200:17, 204:5, 204:17, 208:23, 210:5, 210:6, 210:17, 212:13, 213:15, 214:23, 216:11, 217:12, 224:10, 226:10, 231:12, 231:16, 236:16, 238:15, 239:24, 245:1, 248:18, 249:2, 250:14, 250:23, 253:14, 254:19, 255:9, 256:1, 257:5, 258:15, 262:25, 263:1, 266:22, 267:17, 268:12, 269:2, 269:13, 270:13, 270:15, 273:6, 274:21, 282:11, 282:22, 283:24, 284:5, 285:20, 287:3, 287:4, 287:5, 287:14, 287:16
**ones** [11] - 7:21, 84:13, 105:15, 176:12, 193:15, 217:20, 265:1, 284:8, 284:13, 285:6, 286:4
**ongoing** [1] - 248:5
**online** [1] - 155:7
**ooo0ooo** [1] - 288:11
**open** [10] - 2:1, 59:7, 124:22, 130:6, 138:23, 161:2, 161:16, 190:17, 264:13, 278:5
**open-endedly** [1] - 138:23
**opened** [4] - 182:6, 190:25, 216:12, 226:18
**opening** [4] - 10:25, 125:20, 162:1, 279:24
**operate** [4] - 40:11, 57:13, 144:11,

197:17
**operated** [1] - 5:1
**operates** [2] - 159:12, 181:4
**operating** [24] - 6:23, 7:4, 9:14, 12:20, 12:22, 12:24, 13:9, 40:4, 46:7, 56:5, 132:25, 133:3, 144:7, 216:8, 218:5, 261:14, 263:9, 263:11, 265:11, 268:5, 269:3, 272:9, 272:17, 272:18
**operation** [1] - 234:15
**operational** [2] - 217:3, 255:21
**operations** [4] - 116:19, 122:21, 129:11, 265:20
**operator** [2] - 8:3, 8:15
**opportunity** [2] - 108:23, 142:7
**opposing** [1] - 82:23
**opposite** [1] - 237:15
**opted** [1] - 220:24
**oral** [1] - 133:4
**order** [79] - 10:12, 32:3, 49:2, 56:5, 59:8, 62:5, 62:15, 63:15, 63:17, 66:3, 84:11, 87:6, 88:5, 88:7, 88:11, 88:15, 88:21, 89:13, 89:22, 90:5, 90:17, 91:14, 95:14, 108:1, 129:4, 137:21, 156:5, 172:15, 181:3, 205:5, 207:19, 210:3, 220:13, 220:21, 221:1, 221:9, 221:10, 221:24, 224:7, 226:13, 226:15, 228:5, 229:7, 230:11, 230:14, 231:2, 232:10, 232:13, 232:22, 232:25, 233:2, 233:3, 233:5, 233:6, 233:9, 233:14, 234:5, 239:23, 240:20, 241:4, 241:5, 241:14, 241:22, 242:20, 242:22, 245:6, 247:7, 249:11, 249:21, 252:13, 264:8, 264:23, 264:24, 277:17, 279:23, 280:23, 282:6
**Order** [2] - 2:17, 92:14
**ordered** [9] - 62:24, 63:1, 64:13, 65:14, 215:10, 221:6, 232:9, 245:6, 275:2
**orders** [6] - 55:15, 220:8, 220:11, 220:15, 229:8, 239:16
**organized** [1] - 19:19
**original** [10] - 183:11, 212:22, 214:8, 231:24, 240:18, 242:8, 247:7, 247:13, 265:2, 266:2
**originally** [4] - 54:10, 111:3, 174:12, 218:8
**otherwise** [3] - 9:15, 124:5, 281:15
**outbursts** [2] - 28:17, 78:22
**Outlook** [3] - 94:2, 94:3, 95:15
**outside** [18] - 10:16, 36:19, 37:23, 38:2, 39:13, 40:4, 40:6, 40:16, 57:8, 82:9, 121:1, 121:7, 156:11, 156:15, 157:25, 208:6, 221:17, 230:1
**outstanding** [2] - 280:18, 282:12
**overall** [1] - 120:8
**overflow** [1] - 117:12
**overhead** [1] - 161:15
**overreach** [1] - 239:20
**overreaching** [1] - 242:25
**Overruled** [25] - 13:3, 17:16, 20:24, 22:25, 25:17, 28:5, 42:16, 48:9, 48:22, 50:11, 119:17, 121:19, 126:22, 130:23,

135:18, 143:10, 163:22, 164:8, 178:25, 179:13, 181:12, 182:9, 182:15, 193:18, 198:15
**overruled** [3] - 132:5, 182:25, 183:9
**overstep** [1] - 239:20
**overtime** [4] - 116:2, 129:15, 129:17, 129:20
**overwhelmingly** [1] - 230:16
**owe** [1] - 281:8
**owed** [3] - 65:12, 66:2, 275:20
**own** [32] - 4:10, 7:4, 7:21, 45:20, 46:2, 53:11, 53:20, 57:5, 62:18, 71:25, 77:22, 86:2, 98:1, 107:20, 130:12, 130:25, 135:8, 140:10, 141:11, 147:13, 153:13, 159:16, 208:5, 216:5, 227:1, 235:4, 264:13, 270:21, 272:3, 274:3, 278:10, 278:12
**owned** [6] - 5:1, 24:22, 48:5, 71:22, 71:24, 186:13
**owner** [6] - 7:3, 8:3, 8:15, 26:15, 52:25, 173:14
**ownership** [5] - 4:9, 141:17, 204:16, 217:11, 255:20
**owning** [1] - 9:14
**owns** [2] - 45:20, 47:10

# P

**p.m** [6] - 114:10, 167:3, 167:14, 189:5, 199:9, 211:15
**page** [36] - 20:13, 21:14, 24:5, 31:6, 31:10, 32:19, 39:5, 39:15, 83:18, 100:2, 109:24, 110:2, 110:16, 120:2, 131:12, 160:19, 166:22, 168:19, 169:9, 169:13, 169:14, 169:19, 172:2, 172:6, 191:14, 195:14, 207:13, 207:14, 228:13, 236:15, 253:22, 253:25, 254:1, 254:10, 254:13
**PAGE** [1] - 289:3
**pages** [2] - 144:1, 286:5
**paid** [23] - 65:2, 68:3, 68:22, 68:24, 91:18, 112:5, 137:11, 150:19, 151:7, 151:10, 151:12, 185:4, 185:9, 185:12, 185:25, 186:3, 186:13, 243:15, 243:16, 243:20, 274:23, 281:13, 281:23
**painful** [3] - 29:11, 29:13, 29:22
**PAMELA** [3] - 1:13, 2:2, 161:3
**panicking** [1] - 56:10
**paragraphs** [1] - 216:18
**parenthetical** [2] - 166:24, 166:25
**parenting** [2] - 118:13, 118:15
**parse** [1] - 235:13
**part** [22] - 4:4, 7:24, 32:12, 40:6, 51:19, 52:22, 59:21, 113:11, 122:8, 135:13, 135:14, 150:22, 153:10, 168:18, 169:12, 185:23, 202:6, 238:24, 258:3, 258:15, 262:8, 285:4
**participants** [2] - 168:20, 213:25
**participating** [1] - 273:14
**particular** [6] - 9:18, 99:10, 104:1,

104:6, 111:17, 234:13
**particularly** [1] - 203:25
**parties** [4] - 2:20, 202:10, 230:7, 265:1
**partner** [8] - 6:8, 7:5, 7:10, 7:15, 32:3, 55:6, 74:1, 244:15
**partnering** [1] - 244:11
**partners** [3] - 5:12, 9:13, 9:15
**Partners** [157] - 4:13, 4:15, 4:18, 5:10, 8:4, 8:13, 12:14, 14:23, 15:6, 15:15, 15:19, 15:21, 16:2, 16:13, 16:23, 18:1, 18:16, 18:17, 18:18, 18:20, 18:25, 20:21, 21:16, 21:24, 22:10, 22:13, 26:12, 26:25, 30:17, 32:2, 33:5, 34:2, 34:7, 35:14, 40:23, 51:13, 70:11, 70:19, 70:23, 71:11, 72:2, 73:19, 73:21, 73:25, 74:10, 74:22, 75:1, 75:24, 76:9, 76:14, 77:6, 77:15, 77:24, 78:16, 79:6, 79:10, 79:17, 80:11, 92:19, 93:3, 93:16, 96:11, 98:7, 101:25, 103:14, 123:12, 123:21, 125:2, 130:11, 130:16, 132:19, 134:11, 135:4, 135:11, 135:25, 136:16, 137:3, 138:13, 139:3, 139:7, 139:9, 139:11, 141:6, 141:7, 147:18, 148:18, 148:20, 148:25, 149:3, 149:17, 150:6, 169:2, 177:4, 177:12, 177:23, 178:22, 179:2, 179:5, 179:11, 182:1, 183:18, 184:8, 184:9, 185:25, 186:3, 186:7, 186:25, 188:7, 189:8, 193:13, 195:21, 197:1, 198:22, 199:22, 203:10, 204:2, 204:6, 204:20, 205:11, 210:14, 210:19, 211:4, 212:10, 214:10, 218:2, 218:3, 218:10, 218:12, 218:16, 218:22, 219:9, 223:13, 224:15, 224:25, 227:22, 227:3, 229:23, 234:4, 237:14, 237:17, 238:5, 238:19, 238:20, 239:22, 252:19, 253:5, 254:8, 256:3, 257:22, 258:24, 259:22, 259:23, 261:3, 261:7, 272:14
**Partners'** [1] - 252:23
**Partners's** [4] - 26:24, 212:16, 225:4, 225:18
**partnership** [10] - 126:4, 126:7, 127:5, 127:11, 127:15, 134:2, 189:16, 252:18, 256:16, 257:1
**parts** [1] - 15:17
**party** [16] - 3:16, 4:1, 10:6, 10:11, 21:4, 21:5, 82:23, 83:2, 175:14, 184:3, 202:11, 218:3, 218:21, 220:12, 228:1, 263:24
**party's** [1] - 228:6
**pass** [2] - 22:14
**passed** [1] - 22:15
**password** [16] - 24:7, 24:8, 24:10, 24:13, 24:21, 24:24, 25:1, 25:2, 103:16, 161:18, 162:3, 177:9, 180:25, 192:25, 193:1, 193:2
**past** [4] - 43:14, 150:21, 205:24, 274:22
**paste** [1] - 212:5
**pasted** [1] - 220:2
**patently** [2] - 216:15, 223:7

**patiently** [1] - 221:2
**pause** [1] - 255:9
**Pause** [13] - 2:16, 12:4, 17:15, 19:20, 94:7, 127:24, 145:14, 161:22, 166:2, 181:22, 195:3, 199:19, 286:25
**pay** [41] - 53:14, 60:17, 62:2, 64:10, 64:13, 64:15, 65:3, 65:5, 65:7, 65:12, 65:13, 65:14, 66:2, 68:6, 68:12, 91:25, 136:24, 137:9, 141:20, 150:6, 150:10, 176:4, 184:20, 185:18, 185:19, 220:25, 221:5, 221:6, 243:24, 243:25, 274:22, 275:4, 275:6, 276:20, 277:12, 277:17, 280:18, 280:19, 280:25, 281:19
**pay..** [1] - 185:5
**paycheck** [6] - 65:7, 65:8, 279:18, 280:5
**paying** [9] - 61:24, 61:25, 64:18, 64:22, 208:9, 211:8, 260:6, 269:12, 275:1
**paying-customer** [1] - 208:9
**payment** [24] - 62:1, 62:2, 66:21, 68:9, 69:16, 150:17, 176:1, 176:3, 185:21, 221:2, 244:22, 275:1, 276:1, 276:17, 276:19, 276:21, 277:14, 277:23, 280:2, 281:2, 281:3, 281:14, 281:21, 282:1
**payments** [10] - 69:13, 128:11, 184:14, 184:17, 184:23, 185:3, 185:15, 191:11, 221:9, 275:8
**penalties** [2] - 281:16, 281:18
**penalty** [1] - 235:25
**pending** [7] - 26:8, 32:22, 32:24, 33:3, 72:14, 108:12, 113:1
**Pennsylvania** [1] - 278:23
**people** [19] - 34:11, 35:12, 43:1, 48:12, 60:5, 61:17, 66:20, 104:15, 105:22, 106:1, 140:3, 146:9, 195:19, 196:22, 200:22, 201:4, 201:10, 269:12
**per** [4] - 7:2, 93:9, 102:19, 154:14
**perceived** [1] - 252:17
**percent** [22] - 7:12, 7:22, 15:9, 52:2, 52:25, 53:21, 58:9, 128:23, 203:12, 204:9, 204:16, 208:8, 217:10, 240:9, 257:12, 261:24, 266:18, 269:4, 271:6, 277:2, 281:3
**percentage** [2] - 7:11, 7:13
**perfect** [2] - 77:9, 288:1
**perform** [6] - 112:14, 115:8, 116:4, 116:15, 128:7, 198:9
**performed** [3] - 89:10, 89:14, 91:14
**performing** [1] - 104:25
**perhaps** [8] - 2:14, 9:16, 108:8, 152:8, 159:14, 203:12, 215:24, 255:16
**period** [10] - 76:7, 79:10, 110:16, 113:8, 115:5, 173:14, 195:23, 195:25, 231:14, 231:17
**perjure** [1] - 9:11
**perjured** [6] - 82:13, 206:5, 250:23, 251:23, 254:24, 267:18
**perjury** [15] - 9:5, 9:21, 9:24, 9:25, 81:3, 160:9, 221:22, 236:1, 256:6,

260:7, 260:20, 261:13, 269:16, 270:6, 270:7

**permission** [4] - 93:20, 193:8, 197:17, 197:20

**permits** [1] - 220:11

**person** [22] - 22:14, 35:22, 53:7, 57:16, 58:1, 58:3, 82:11, 85:10, 85:22, 146:16, 147:11, 151:16, 181:4, 212:2, 213:5, 238:3, 248:19, 248:20, 251:1, 251:10, 263:12, 271:20

**person's** [1] - 235:15

**personal** [23] - 111:3, 111:7, 111:9, 111:14, 112:4, 112:10, 117:12, 142:12, 142:13, 142:20, 143:7, 143:13, 143:16, 143:17, 144:2, 158:21, 179:22, 180:1, 191:6, 209:18, 227:12, 240:14, 254:4

**personality** [1] - 55:6

**personally** [6] - 73:12, 87:17, 87:21, 158:11, 158:21, 243:19

**personnel** [1] - 234:21

**perspective** [1] - 250:24

**pertaining** [1] - 96:23

**petition** [3] - 228:3, 229:2, 229:4

**phase** [1] - 243:7

**Philadelphia** [6] - 45:13, 66:18, 143:3, 143:4, 277:3

**phone** [87] - 40:24, 40:25, 41:2, 41:3, 41:4, 41:7, 52:2, 75:4, 76:13, 76:17, 77:12, 93:18, 93:19, 94:4, 94:15, 94:18, 94:22, 95:2, 95:3, 95:15, 95:24, 96:2, 96:5, 104:10, 111:25, 112:1, 112:5, 112:10, 116:22, 117:12, 117:13, 136:19, 140:18, 148:19, 155:16, 156:6, 156:8, 156:13, 156:15, 156:21, 157:1, 157:6, 157:8, 157:12, 157:16, 157:19, 157:21, 158:2, 158:4, 158:12, 158:13, 158:17, 159:2, 159:5, 159:12, 159:17, 159:19, 159:21, 159:24, 160:5, 160:13, 161:6, 161:8, 161:13, 161:14, 162:13, 165:17, 177:21, 180:11, 180:14, 180:15, 180:20, 180:22, 199:5, 209:13, 209:19, 209:20, 210:13, 210:15, 210:16, 210:17, 248:19, 251:16, 251:18

**phones** [2] - 180:19, 210:15

**photo** [1] - 65:9

**physical** [2] - 116:1, 133:16

**physically** [3] - 73:9, 121:9, 135:19

**physician** [1] - 36:16

**physicians** [1] - 39:10

**PI** [1] - 240:11

**pick** [3] - 23:1, 209:19, 221:5

**picked** [4] - 152:2, 152:5, 152:7, 176:25

**picking** [1] - 271:10

**picture** [2] - 44:3, 63:24

**piece** [2] - 212:12, 257:2

**pieces** [1] - 258:5

**pitch** [4] - 238:24, 239:8

**pitches** [1] - 239:8

**pitching** [1] - 238:20

**pitting** [1] - 124:6

**PKC** [1] - 1:4

**place** [12] - 17:7, 20:22, 21:15, 29:19, 97:24, 104:1, 118:17, 119:20, 161:15, 162:8, 220:23, 236:15

**plaintiff** [50] - 2:23, 3:3, 5:4, 5:18, 43:21, 45:2, 61:19, 79:1, 92:23, 97:9, 97:10, 97:12, 97:14, 97:15, 97:18, 97:21, 144:19, 146:6, 168:16, 170:17, 171:21, 200:15, 204:11, 209:18, 209:22, 212:22, 220:18, 221:11, 223:6, 223:12, 225:17, 228:11, 229:6, 229:9, 229:18, 230:25, 231:13, 231:17, 232:24, 233:16, 233:25, 242:21, 243:7, 245:9, 245:14, 247:12, 249:18, 279:2, 282:6, 287:18

**Plaintiff** [39] - 1:5, 5:14, 8:6, 14:16, 51:2, 51:8, 51:14, 57:1, 57:12, 70:24, 71:13, 71:16, 71:21, 71:24, 74:13, 125:21, 125:24, 139:12, 148:20, 149:4, 203:14, 204:3, 204:8, 204:12, 205:4, 205:12, 214:17, 216:24, 216:25, 217:12, 219:1, 235:22, 237:20, 237:25, 238:13, 259:24, 268:16, 268:17, 273:16

**Plaintiff's** [1] - 44:24, 110:5, 110:8, 110:13, 166:19, 245:10, 286:8, 287:24, 287:25, 290:11, 290:13, 290:15

**plaintiff's** [15] - 3:23, 3:24, 5:21, 9:25, 10:21, 69:21, 82:19, 155:12, 203:9, 206:2, 215:7, 233:13, 253:23, 283:1, 284:8

**plaintiffadvocates** [1] - 5:24

**plaintiffadvocates.com** [6] - 5:23, 7:3, 7:22, 8:3, 51:23, 52:20

**Plaintiffs** [1] - 1:16

**plaintiffs** [16] - 2:21, 4:11, 6:16, 144:7, 144:16, 145:19, 171:19, 202:15, 233:11, 239:20, 243:5, 254:22, 267:7, 268:1, 286:3, 286:17

**plan** [28] - 8:19, 11:3, 53:8, 53:9, 53:10, 53:22, 53:25, 54:3, 54:6, 55:7, 55:8, 55:14, 58:4, 58:14, 58:22, 59:14, 66:21, 70:12, 70:20, 70:24, 72:5, 217:6, 230:11, 252:24, 253:6, 258:4, 282:1

**planned** [1] - 71:5

**planning** [3] - 9:16, 21:9, 21:18

**play** [2] - 135:1, 223:23

**PLLC** [2] - 1:16, 1:19

**plus** [2] - 51:22, 54:13

**podium** [1] - 161:10

**PODOLSKI** [1] - 90:15

**Podolsky** [1] - 90:13

**point** [43] - 13:13, 16:2, 16:16, 17:8, 17:24, 25:8, 59:23, 72:10, 76:8, 106:1, 113:22, 138:6, 140:6, 171:11, 172:13, 179:16, 184:6, 186:25, 194:4, 202:4, 206:13, 210:11, 222:3, 226:22, 227:2, 227:22, 249:23, 252:6, 254:14, 254:18, 255:4, 256:22, 258:12, 258:23, 259:3, 259:7, 260:7, 261:13, 266:19, 267:21,

268:9, 268:12, 274:25

**pointed** [1] - 236:14

**pointing** [1] - 111:18

**points** [3] - 113:15, 214:23, 248:11

**police** [11] - 6:7, 6:18, 82:16, 113:4, 114:7, 114:9, 116:2, 129:16, 206:15, 209:14, 211:13

**Police** [1] - 197:17

**pool** [1] - 65:11

**popping** [1] - 201:7

**porting** [2] - 4:21, 8:14

**PORTING** [1] - 4:21

**portion** [5] - 5:18, 26:24, 27:2, 273:18, 283:10

**portions** [1] - 29:11

**posing** [1] - 265:5

**position** [2] - 129:17, 273:13

**possession** [5] - 133:11, 145:18, 157:8, 165:21, 215:13

**possessor** [1] - 254:7

**possible** [14] - 13:16, 37:10, 66:22, 70:11, 71:3, 71:6, 157:12, 159:6, 159:9, 159:10, 275:14, 275:24, 276:14, 276:21

**possibly** [6] - 41:13, 59:11, 145:13, 260:15, 283:1

**post** [4] - 19:25, 209:3, 211:10, 211:11

**post-hearing** [1] - 211:11

**posting** [1] - 147:3

**potential** [10] - 10:3, 10:10, 47:15, 82:11, 113:10, 122:13, 151:19, 264:6, 265:25, 281:16

**potentially** [5] - 9:2, 10:5, 154:12, 196:25, 250:14

**poverty** [2] - 43:3, 45:1

**practice** [1] - 229:10

**pre** [2] - 220:13, 220:14

**pre-trial** [2] - 220:13, 220:14

**precisely** [1] - 223:18

**preclude** [1] - 245:7

**precluded** [1] - 78:25

**predates** [1] - 245:11

**prefer** [3] - 81:8, 204:23, 237:22

**preferred** [1] - 159:15

**prejudgment** [4] - 220:21, 221:8, 221:16, 242:3

**prejudicial** [2] - 262:15, 268:1

**preliminary** [17] - 2:8, 3:25, 120:7, 120:21, 121:2, 207:3, 223:10, 226:9, 231:1, 245:4, 245:7, 250:14, 264:8, 264:25, 266:1, 266:6, 270:23

**premature** [7] - 256:9, 256:13, 256:18, 256:22, 259:4, 259:9, 269:6

**prepaid** [5] - 90:19, 90:20, 92:11, 92:12, 92:13

**preparation** [2] - 181:4, 186:11

**preparer** [1] - 115:10

**presence** [5] - 121:1, 121:7, 124:2, 156:11, 242:13

**present** [13] - 199:7, 240:19, 240:21,

Case 1:22-cv-01032-PKC-JRC    Document 438-1    Filed 12/30/24    Page 315 of 324
All Word //IME-Colarardi, et al.
PageID #: 9812
25

240:23, 240:25, 241:6, 241:13, 241:21, 241:22, 241:24, 273:9, 273:18
**preserve** [2] - 181:15, 191:3
**pressed** [1] - 94:8
**presumably** [2] - 6:15, 96:5
**presume** [2] - 6:10, 7:20
**presumed** [1] - 8:1
**pretty** [10] - 9:4, 103:22, 108:22, 116:19, 119:21, 144:13, 154:18, 202:15, 266:16, 285:24
**prevail** [1] - 223:12
**prevailed** [1] - 239:14
**prevent** [6] - 36:16, 39:10, 228:9, 262:13, 265:1, 266:6
**prevents** [1] - 65:24
**previous** [2] - 97:1, 196:8
**previously** [14] - 45:18, 45:23, 46:24, 73:6, 103:10, 114:25, 117:16, 118:6, 175:22, 176:6, 192:8, 220:1, 228:5, 245:6
**previously-ordered** [1] - 245:6
**primary** [2] - 214:15, 214:17
**principal** [1] - 242:14
**priority** [1] - 33:11
**private** [1] - 219:2
**privy** [1] - 263:21
**problem** [6] - 171:3, 213:8, 246:24, 258:15, 265:25, 281:24
**problems** [1] - 260:16
**Procedure** [1] - 220:10
**proceeding** [6] - 10:4, 17:8, 17:25, 142:4, 212:23, 216:4
**proceedings** [13] - 2:16, 12:4, 17:15, 19:20, 124:21, 161:22, 166:2, 181:22, 195:3, 199:19, 202:5, 208:17, 233:24
**proceeds** [5] - 65:25, 66:6, 66:18, 220:23, 277:3
**process** [10] - 134:14, 136:8, 137:2, 137:5, 137:6, 137:22, 138:2, 201:7, 201:25, 222:12
**proclivity** [1] - 228:10
**produce** [6] - 12:24, 13:4, 13:7, 111:11, 212:12, 222:21
**produced** [18] - 12:13, 12:22, 109:18, 109:21, 128:10, 185:15, 190:12, 210:5, 212:11, 218:9, 218:11, 218:18, 219:6, 222:23, 222:24, 223:2, 223:14, 227:10
**producers** [2] - 257:14, 257:16
**producing** [2] - 218:17, 266:3
**production** [5] - 170:24, 212:9, 212:11, 212:16, 225:5
**professional** [1] - 87:13
**profiting** [1] - 207:7
**profits** [2] - 72:24, 141:22
**program** [2] - 93:15, 93:17
**prohibited** [4] - 41:20, 58:10, 79:5, 79:9
**prohibiting** [4] - 88:6, 202:16, 225:24, 226:15
**project** [1] - 76:19

**projected** [2] - 20:8, 273:15
**projector** [1] - 161:15
**proliferation** [1] - 266:4
**promise** [2] - 274:25, 275:24
**prompted** [1] - 246:20
**proof** [8] - 260:1, 260:9, 261:15, 263:6, 267:23, 269:5, 269:8, 270:3
**proofread** [1] - 159:23
**proofreading** [1] - 131:24
**proper** [3] - 78:21, 158:17, 227:15
**properly** [4] - 34:12, 120:7, 220:19, 264:1
**properties** [10] - 61:18, 65:22, 65:25, 66:5, 66:6, 221:17, 277:17, 278:10, 278:23, 279:4
**property** [9] - 61:16, 65:24, 220:22, 220:24, 265:4, 277:3, 277:7, 278:12, 280:13
**proposal** [10] - 126:13, 126:17, 126:19, 127:3, 127:4, 127:7, 127:9, 134:6, 134:8, 134:10
**proposals** [1] - 126:9
**propose** [3] - 53:4, 55:8, 56:17
**proposed** [2] - 46:8, 244:10
**proposing** [1] - 245:15
**proposition** [1] - 71:23
**prospective** [1] - 179:3
**protect** [1] - 6:19
**Protect** [2] - 99:13, 99:24
**protected** [1] - 161:18
**protracted** [1] - 229:5
**prove** [3] - 236:19, 268:21, 276:14
**proven** [1] - 266:13
**provide** [9] - 35:1, 36:17, 39:11, 73:12, 73:15, 82:20, 117:17, 151:2, 193:14
**provided** [25] - 5:17, 17:9, 18:1, 33:15, 78:15, 79:13, 79:17, 115:18, 123:21, 136:16, 184:9, 184:14, 185:1, 185:22, 193:24, 198:17, 198:23, 212:14, 221:2, 224:10, 247:12, 249:2
**providing** [3] - 245:7, 245:19, 249:16
**public** [1] - 79:20
**publicly** [3] - 227:22, 279:7, 284:17
**published** [25] - 19:24, 25:24, 35:8, 36:1, 39:7, 44:19, 93:22, 99:3, 103:11, 110:14, 120:3, 161:17, 162:9, 167:7, 169:16, 172:23, 181:19, 187:22, 188:5, 190:11, 191:8, 192:7, 194:9, 195:5, 250:3
**puddle** [1] - 238:16
**pull** [10] - 40:19, 43:11, 82:6, 83:12, 108:6, 163:24, 172:10, 176:16, 245:3
**pulled** [1] - 166:4
**punishments** [2] - 242:7
**punitive** [1] - 220:6
**purchase** [12] - 47:20, 53:14, 66:19, 94:17, 108:25, 111:4, 117:8, 130:1, 133:23, 135:14, 176:23, 180:22
**purchased** [13] - 66:13, 73:6, 73:9, 109:1, 110:24, 111:1, 111:7, 112:22,

117:13, 175:22, 180:12, 181:8
**purchases** [9] - 110:18, 129:24, 133:20, 175:18, 176:9, 176:11, 176:21, 176:22, 208:19
**purchasing** [7] - 105:24, 109:5, 110:21, 111:3, 112:5, 112:19, 133:22
**pure** [1] - 165:10
**purported** [3] - 223:4, 232:17
**purportedly** [1] - 171:16
**purports** [2] - 8:1, 169:10
**purpose** [12] - 36:15, 39:9, 40:3, 40:8, 79:10, 80:11, 80:13, 109:5, 112:1, 122:24, 136:16, 141:10
**purposes** [3] - 78:19, 155:15, 285:18
**push** [2] - 44:16, 62:7
**put** [20] - 24:8, 24:9, 24:22, 44:3, 44:10, 48:16, 65:4, 66:6, 113:13, 113:19, 143:15, 158:19, 159:18, 166:7, 186:8, 187:18, 195:12, 196:23, 201:6
**putative** [1] - 47:15
**puts** [1] - 265:24
**putting** [3] - 113:12, 195:4, 259:21

## Q

**quacks** [1] - 214:24
**qualification** [1] - 245:21
**qualifies** [1] - 241:7
**quantify** [1] - 87:1
**quarreling** [1] - 259:8
**Queens** [1] - 105:4
**questioned** [3] - 70:9, 101:10, 131:21
**questioning** [3] - 113:3, 117:23, 182:21
**questions** [32] - 20:3, 20:10, 20:17, 21:20, 28:19, 33:14, 36:22, 46:13, 46:25, 48:6, 69:18, 69:23, 69:24, 70:8, 71:4, 79:25, 123:3, 129:2, 129:5, 129:6, 131:6, 146:6, 146:7, 155:12, 163:4, 175:1, 175:7, 175:13, 190:8, 201:21, 244:18, 285:19
**quibbling** [1] - 109:11
**quick** [2] - 81:13, 123:23
**quicker** [1] - 275:15
**quite** [11] - 65:16, 159:16, 204:4, 216:17, 225:24, 235:6, 235:9, 241:2, 267:4, 281:19, 286:2
**quote** [8] - 6:2, 6:3, 14:24, 15:7, 16:13, 120:6, 223:23

## R

**raise** [5] - 11:11, 81:17, 85:2, 154:11, 257:4
**raising** [1] - 267:12
**ramifications** [2] - 10:10, 82:15
**range** [2] - 103:3, 118:24
**ranting** [1] - 234:20
**rather** [10] - 37:10, 63:20, 65:10, 98:3, 171:21, 220:22, 249:15, 257:25,

283:18, 285:3
**raving** [1] - 234:20
**re** [2] - 197:5, 274:2
**re-evaluated** [1] - 197:5
**re-watch** [1] - 274:2
**reach** [7] - 137:6, 179:2, 211:6, 218:12, 265:11, 275:10, 276:16
**reaching** [1] - 224:15
**react** [2] - 114:4, 114:6
**read** [7] - 5:17, 7:7, 162:20, 195:15, 253:15, 253:22, 272:23
**reading** [1] - 253:17
**reads** [1] - 173:13
**ready** [2] - 11:1, 155:19
**reaffirm** [1] - 81:4
**real** [4] - 61:22, 62:9, 235:14, 255:17
**reality** [2] - 239:15
**realize** [4] - 55:14, 204:24, 277:22, 277:25
**really** [31] - 15:1, 17:18, 25:7, 36:15, 39:9, 46:14, 52:6, 54:8, 105:20, 116:14, 140:2, 201:14, 203:11, 203:14, 205:19, 206:6, 226:8, 235:9, 240:17, 250:12, 253:12, 254:20, 254:25, 258:7, 260:25, 268:12, 269:9, 270:24, 273:25, 287:16
**reason** [19] - 4:17, 112:25, 126:13, 127:5, 130:4, 138:11, 158:24, 171:11, 186:8, 218:20, 222:20, 222:24, 232:8, 238:4, 246:12, 246:14, 256:10, 269:22, 280:23
**reasonable** [1] - 228:2
**reasonably** [1] - 260:5
**reasons** [3] - 208:16, 215:4, 245:5
**rebrand** [1] - 33:13
**rebuttal** [2] - 36:17, 39:11
**recapitulated** [1] - 237:8
**recapping** [1] - 4:2
**receipt** [1] - 135:25
**receipts** [3] - 181:9, 181:14, 181:16
**receive** [11] - 69:13, 72:24, 73:2, 134:15, 134:17, 134:19, 134:22, 135:15, 135:19, 189:19
**received** [35] - 31:7, 33:18, 33:22, 69:16, 86:7, 86:9, 86:18, 90:4, 90:14, 90:18, 91:11, 91:12, 91:20, 92:18, 92:21, 107:5, 107:8, 107:9, 108:3, 110:13, 120:9, 120:22, 120:24, 121:9, 190:5, 204:1, 212:9, 212:18, 213:16, 222:4, 222:7, 222:16, 254:21, 286:8, 287:25
**receiving** [6] - 90:9, 135:13, 188:2, 189:24, 222:5, 222:15
**recently** [2] - 45:11, 102:24
**recess** [1] - 160:17
**recognize** [6] - 84:8, 92:14, 99:8, 99:18, 109:25, 184:3
**recollection** [10] - 20:20, 21:21, 21:25, 22:9, 23:10, 41:25, 111:1, 112:18, 210:22, 286:23
**recommend** [1] - 91:13

**recommendation** [1] - 265:10
**recommendations** [4] - 122:2, 122:12, 153:16, 267:1
**recommended** [2] - 76:20, 100:25
**recommending** [1] - 224:3
**reconsideration** [1] - 248:13
**record** [30] - 2:7, 2:21, 11:18, 20:18, 69:21, 81:24, 110:4, 124:1, 150:22, 156:11, 156:15, 158:19, 161:4, 161:13, 166:18, 192:6, 193:11, 202:25, 223:6, 245:3, 245:5, 247:21, 249:7, 253:9, 257:6, 283:16, 284:1, 284:4, 285:4, 286:4
**recorded** [5] - 5:5, 96:9, 214:15, 257:25, 285:13
**recording** [2] - 132:18, 134:3
**recordings** [1] - 205:22
**records** [17] - 69:2, 112:23, 145:18, 145:23, 184:14, 185:15, 191:3, 218:5, 227:23, 262:17, 279:7, 280:13, 280:14, 283:10, 284:3
**RECROSS** [4] - 80:8, 198:3, 289:14, 289:24
**red** [1] - 154:11
**redacted** [1] - 111:14
**redirect** [4] - 33:4, 69:9, 74:5, 175:8
**REDIRECT** [6] - 69:10, 74:7, 175:10, 289:8, 289:12, 289:22
**redressed** [1] - 233:16
**refer** [6] - 46:6, 46:14, 95:18, 205:11, 212:25, 249:25
**reference** [6] - 37:2, 98:16, 189:4, 193:24, 219:20, 247:7
**referenced** [4] - 12:20, 149:9, 223:20, 247:16, 247:25
**references** [3] - 200:20, 210:13, 210:14
**referred** [7] - 40:24, 45:23, 108:17, 147:19, 192:25, 220:17, 284:10
**referring** [12] - 6:15, 20:4, 20:5, 31:17, 35:20, 41:4, 86:7, 95:18, 103:12, 188:21, 196:6, 201:14
**reflect** [2] - 98:1, 193:11
**reflected** [4] - 150:17, 186:3, 203:12, 256:3
**reflects** [2] - 166:18, 233:23
**reform** [1] - 70:22
**reformulate** [1] - 246:22
**reformulating** [1] - 246:20
**refrain** [1] - 263:2
**refresh** [1] - 20:20, 20:25, 21:3, 21:21, 21:25, 22:2, 22:9, 41:25, 42:17, 42:18, 42:20, 74:20
**refreshes** [1] - 42:8
**refund** [1] - 92:6
**refunded** [2] - 90:19, 91:19
**refused** [1] - 229:13
**refuting** [1] - 215:1
**regard** [2] - 71:15, 230:6
**regarding** [10] - 74:10, 133:6, 133:8,

135:22, 145:19, 187:1, 187:12, 188:13, 189:6, 223:15
**regardless** [6] - 8:5, 25:11, 42:22, 121:9, 225:7, 232:23
**regards** [3] - 75:6, 153:24, 280:22
**regular** [1] - 266:14
**regurgitated** [1] - 237:8
**rehash** [1] - 205:19
**reiterate** [1] - 164:10
**reject** [2] - 134:8, 199:25
**rejected** [6] - 54:22, 55:1, 74:1, 126:17, 127:3, 134:5
**rejecting** [1] - 134:10
**relate** [1] - 43:16
**related** [12] - 22:20, 34:1, 73:10, 75:9, 96:24, 113:9, 113:23, 124:13, 128:18, 132:9, 135:15, 229:19
**relates** [2] - 267:17, 267:22
**relating** [2] - 3:23, 256:16
**relation** [3] - 75:25, 76:1, 151:8
**relationship** [15] - 4:19, 5:16, 8:11, 8:19, 9:1, 137:13, 206:21, 209:2, 209:3, 209:8, 226:25, 234:12, 256:1, 256:16, 270:16
**relative** [4] - 115:24, 207:16, 216:7, 246:25
**relatively** [1] - 277:22
**release** [1] - 156:21
**relevance** [2] - 43:12, 43:15
**relevant** [5] - 82:21, 126:19, 145:11, 215:20, 255:24
**relief** [7] - 202:14, 219:20, 219:23, 223:7, 229:3, 230:4, 241:25
**relitigate** [1] - 232:12
**rely** [2] - 266:25, 272:22
**relying** [1] - 216:20
**remain** [4] - 11:6, 11:9, 81:15, 207:10
**remains** [2] - 215:13, 228:2
**remarkable** [1] - 257:25
**remarks** [1] - 2:8
**remedies** [1] - 267:21
**remember** [34] - 11:24, 15:5, 15:23, 18:12, 18:13, 21:1, 22:18, 28:11, 34:25, 46:12, 56:18, 76:4, 97:19, 112:15, 120:15, 120:16, 121:11, 130:13, 147:23, 153:2, 164:21, 165:19, 174:8, 174:24, 188:2, 189:20, 190:2, 190:4, 248:1, 258:10, 269:24, 283:18
**remembered** [1] - 17:2
**remote** [4] - 9:7, 237:23, 258:1
**remove** [7] - 38:14, 38:20, 38:21, 50:5, 61:3, 78:4, 178:7
**removed** [3] - 38:18, 197:7, 212:16
**render** [1] - 82:12
**rent** [6] - 60:19, 61:12, 61:24, 220:24, 221:9, 277:24
**rental** [1] - 280:14
**rented** [5] - 60:24, 61:6, 278:13, 278:14
**renter** [1] - 61:8

Case 1:22-cv-01032-PKC-JRC    Document 438-1    Filed 12/30/24    Page 317 of 324
All Word //IME Gelardi, et al.
PageID #: 8618
27

renting [1] - 60:25
repeat [6] - 84:19, 89:12, 101:20, 105:8, 143:11, 203:4
repeated [1] - 220:7
repeatedly [4] - 65:13, 206:5, 223:20, 229:16
repetitive [2] - 78:11, 267:21
rephrase [5] - 71:3, 71:5, 130:3, 176:20, 179:9
report [1] - 280:8
reported [1] - 124:25
REPORTER [1] - 173:11
reporter [4] - 5:25, 34:24, 35:1, 287:1
reporter's [1] - 20:6
reports [1] - 73:15
represent [10] - 38:16, 70:6, 94:3, 99:5, 120:4, 175:19, 183:4, 184:17, 190:23, 256:15
representation [3] - 184:19, 185:17, 248:14
Representatives [7] - 4:17, 4:22, 4:25, 8:6, 8:16, 147:18, 219:1
represented [1] - 205:1
Reps [149] - 4:10, 8:17, 18:17, 26:16, 27:15, 33:13, 33:16, 35:13, 39:9, 48:19, 48:21, 48:24, 49:12, 59:17, 72:18, 72:22, 72:25, 74:23, 74:24, 74:25, 75:1, 75:6, 75:10, 75:24, 77:16, 77:25, 79:6, 79:7, 79:8, 86:19, 89:14, 93:4, 98:23, 101:22, 102:5, 104:5, 104:11, 104:25, 109:21, 110:2, 112:14, 115:23, 116:5, 116:15, 116:21, 122:22, 123:1, 123:4, 123:15, 124:14, 125:25, 126:20, 128:1, 128:7, 129:11, 129:13, 132:8, 133:8, 133:23, 134:12, 135:2, 135:5, 139:9, 141:7, 141:11, 148:1, 150:7, 150:11, 169:11, 171:16, 173:14, 178:23, 184:10, 185:22, 187:2, 187:10, 188:9, 188:14, 190:15, 190:17, 190:24, 191:19, 194:12, 195:8, 195:18, 195:20, 196:15, 200:23, 201:4, 203:11, 203:15, 203:21, 204:7, 204:11, 205:21, 206:12, 209:14, 213:2, 214:16, 214:22, 215:1, 216:2, 216:25, 217:8, 217:18, 217:20, 219:23, 223:8, 225:7, 225:18, 225:21, 226:18, 226:19, 226:25, 227:5, 230:16, 230:17, 230:19, 231:2, 235:18, 235:22, 237:9, 238:1, 238:14, 250:11, 250:15, 251:8, 253:2, 253:12, 253:13, 253:22, 253:24, 254:9, 254:16, 254:17, 255:15, 255:21, 255:24, 259:20, 260:3, 260:4, 260:23, 261:4, 261:10, 261:17, 263:4, 268:10, 268:18, 286:6
Reps' [6] - 96:19, 128:24, 130:11, 130:20, 234:12, 257:22
Reps's [5] - 73:20, 181:1, 213:14, 217:11, 220:3
request [17] - 84:14, 87:8, 87:10, 144:6, 192:12, 193:25, 199:25, 224:16, 224:18, 236:7, 239:22, 241:25, 242:2,

244:12, 275:7, 282:16, 284:22
requested [1] - 242:11
requesters [1] - 257:16
requesting [2] - 97:14, 230:4
requests [4] - 66:4, 84:20, 282:5, 282:7
require [1] - 262:3
required [2] - 65:25, 232:22
requisite [1] - 264:7
rerouted [1] - 71:25
research [2] - 159:6, 254:2
reservoir [1] - 279:13
residence [1] - 278:11
resolve [1] - 205:5
respect [28] - 8:13, 57:22, 71:12, 72:18, 72:24, 73:16, 100:2, 134:11, 139:9, 139:11, 163:10, 167:13, 214:14, 229:3, 232:16, 234:3, 235:18, 236:17, 242:10, 250:13, 251:16, 260:7, 260:23, 269:11, 272:22, 282:12, 285:19, 286:5
respectively [1] - 187:10
respond [7] - 76:2, 77:20, 194:19, 197:1, 239:1
responded [2] - 77:19, 109:15
responding [4] - 109:18, 174:11, 200:7, 253:18
response [11] - 33:19, 46:24, 111:12, 117:16, 185:23, 190:13, 203:17, 215:23, 222:13, 225:5, 257:13
responses [1] - 205:25
responsible [3] - 248:19, 248:20, 262:7
rest [3] - 40:7, 212:3, 283:12
restrain [1] - 263:2
restrained [2] - 264:14, 264:20
Restraining [1] - 92:14
restraining [3] - 226:15, 231:2, 263:8
restricting [1] - 264:9
restriction [2] - 262:7, 262:20
restructuring [1] - 88:4
results [1] - 208:7
resumes [1] - 161:11
retain [1] - 262:5
retreading [1] - 43:19
retrieved [1] - 161:14
retrieving [1] - 277:13
return [6] - 92:15, 181:6, 185:22, 186:4, 186:7, 215:10
returned [1] - 92:23
revelation [1] - 250:8
reverse [1] - 172:15
review [10] - 31:4, 185:14, 193:22, 193:23, 195:6, 198:18, 211:14, 211:16, 223:19, 239:22
reviewed [5] - 5:11, 96:13, 243:7
revolving [1] - 220:7
ridiculous [1] - 242:12
right-hand [1] - 151:16
rights [1] - 141:18

ring [1] - 65:19
rise [2] - 2:3, 252:7
Rizutto [3] - 89:19, 89:21, 230:18
RIZUTTO [1] - 89:19
ROA [5] - 37:12, 44:2, 44:5, 168:21, 168:25
Roa [7] - 3:3, 232:1, 232:5, 232:18, 242:15
road [1] - 105:1
role [1] - 135:1
room [2] - 36:16, 39:10
Rosenbaum [1] - 90:1
Rosenblatt [4] - 210:10, 227:17, 241:11, 247:17
rotate [2] - 114:23, 114:24, 116:12
round [1] - 202:4
route [2] - 6:19, 38:7
ruin [1] - 237:19
rule [1] - 10:14
Rule [7] - 10:14, 218:1, 219:11, 220:9, 220:10, 220:12, 220:16
Rules [1] - 220:9
ruling [3] - 202:1, 274:20, 282:5
run [16] - 53:6, 53:16, 53:18, 56:25, 57:5, 57:17, 58:2, 181:3, 186:11, 209:15, 230:14, 237:19, 267:1, 270:23, 271:7, 273:15
running [5] - 2:6, 4:16, 8:8, 265:18, 269:9
runnings [1] - 266:14
runs [2] - 206:15, 209:8
ruse [1] - 232:9

## S

S-U-B-I-N [1] - 41:10
Safa [94] - 4:6, 4:17, 5:7, 7:2, 9:9, 20:14, 21:8, 21:17, 31:2, 33:6, 93:4, 96:10, 96:15, 101:18, 101:22, 101:25, 122:25, 125:2, 126:9, 126:17, 126:19, 127:2, 127:7, 132:18, 132:24, 133:4, 133:16, 134:1, 134:15, 134:23, 136:7, 137:15, 138:12, 139:1, 139:15, 139:24, 141:17, 146:25, 148:4, 148:25, 149:12, 167:4, 167:5, 169:6, 170:20, 170:25, 171:1, 174:15, 177:16, 177:18, 177:23, 178:4, 181:25, 182:3, 183:12, 186:13, 187:1, 187:10, 188:8, 192:9, 194:12, 203:12, 206:4, 207:10, 210:2, 216:21, 216:24, 221:21, 223:19, 224:2, 224:3, 229:22, 230:10, 235:21, 239:5, 239:6, 252:2, 252:24, 255:1, 256:4, 256:20, 257:20, 259:5, 259:19, 260:2, 261:21, 268:16, 268:25, 269:5, 269:21, 270:4, 271:1, 271:11
SAFA [1] - 1:8, 11:12, 289:5
Safa's [6] - 103:19, 123:8, 223:23, 229:20, 230:13, 253:6
SafaGelardi.com [1] - 31:11
SafaGelardi@gmail.com [1] - 30:8

**Sage** [1] - 2:23
**sailed** [1] - 248:13
**sale** [8] - 61:2, 61:3, 61:17, 62:6, 62:8, 62:10, 62:11, 223:4
**salesperson** [1] - 206:16
**Salomon** [1] - 89:4
**Sam** [1] - 11:20
**sampling** [1] - 139:4
**Samsung** [1] - 41:1
**sanctions** [1] - 220:17
**Saturday** [1] - 116:11
**savings** [1] - 276:10
**saw** [19] - 9:8, 18:12, 29:12, 72:3, 77:17, 125:15, 137:14, 152:17, 175:18, 176:12, 176:21, 177:23, 179:5, 196:8, 196:13, 207:11, 212:21, 258:11, 285:3
**scan** [1] - 283:2
**scanned** [2] - 142:8, 283:14
**scare** [1] - 66:22
**scared** [1] - 61:14
**scenes** [1] - 7:4
**schedule** [3] - 114:20, 118:17, 130:8
**scheduled** [4] - 114:12, 114:14, 114:16, 114:18
**Scheuerman** [1] - 3:7
**SCHEUERMAN** [1] - 1:22
**school** [3] - 119:2, 119:3, 143:3
**scope** [2] - 183:24, 183:25
**SCOTT** [1] - 1:21
**scrap** [1] - 77:1
**scratched** [1] - 77:5
**screen** [11] - 5:8, 5:9, 20:9, 26:5, 43:11, 44:10, 60:14, 63:24, 72:3, 162:5, 189:1
**screens** [1] - 17:23
**screenshot** [3] - 99:6, 99:10, 99:16
**screenshots** [3] - 98:22, 285:8, 285:12
**se** [2] - 7:2, 154:14
**search** [10] - 92:25, 142:18, 143:6, 143:12, 143:20, 143:25, 145:23, 155:6, 201:6, 207:24
**searched** [2] - 92:22, 145:17
**searching** [4] - 143:12, 143:14, 143:22, 150:24
**season** [8] - 115:4, 128:3, 128:5, 128:6, 176:6, 208:18, 208:21, 208:22
**seat** [6] - 11:19, 82:2, 82:4, 95:9, 161:12, 244:6
**second** [45] - 14:3, 14:8, 16:1, 19:17, 23:16, 23:17, 31:10, 31:16, 34:21, 36:17, 38:24, 39:5, 39:11, 46:21, 50:24, 54:4, 64:12, 65:1, 65:18, 75:18, 78:21, 94:6, 136:6, 153:5, 189:5, 191:16, 192:16, 193:6, 194:25, 199:18, 206:4, 219:25, 224:8, 224:20, 225:11, 227:21, 242:8, 246:21, 246:24, 251:21, 256:13, 261:13, 270:24, 276:6
**secondly** [2] - 259:1, 267:4
**seconds** [2] - 5:19, 7:7
**secret** [3] - 212:17, 264:12, 264:13

**secretes** [1] - 215:15
**secrets** [13] - 92:16, 92:23, 206:2, 229:22, 254:21, 263:6, 264:21, 265:3, 266:13, 266:15, 266:16, 266:20
**section** [2] - 36:14, 131:2
**sections** [2] - 130:24, 131:2
**securing** [2] - 21:9, 21:18
**security** [1] - 244:23
**Sedano** [3] - 31:2, 33:8, 149:19
**see** [66] - 3:10, 18:23, 23:1, 23:2, 26:24, 27:2, 34:3, 38:20, 43:23, 44:18, 48:11, 55:4, 69:2, 94:9, 97:17, 106:8, 111:19, 112:25, 113:20, 118:16, 118:19, 119:4, 120:11, 127:21, 140:20, 144:2, 150:24, 153:22, 157:8, 159:12, 159:24, 160:2, 160:5, 162:5, 162:14, 162:18, 167:22, 167:25, 168:2, 168:8, 169:5, 169:12, 179:16, 182:2, 182:17, 183:3, 183:6, 184:23, 189:15, 189:17, 191:9, 195:14, 196:23, 196:24, 201:13, 213:5, 214:1, 214:8, 215:1, 224:14, 273:19, 279:17, 280:4, 280:15, 286:5
**seeing** [3] - 125:5, 158:25, 258:18
**seek** [3] - 153:25, 218:21, 219:3
**seeking** [3] - 87:20, 202:15, 219:21
**seeks** [1] - 223:7
**seem** [3] - 236:14, 236:17, 237:6
**seeming** [2] - 250:8, 280:19
**selected** [1] - 218:3
**self** [1] - 209:25
**self-serving** [1] - 209:25
**sell** [5] - 45:10, 52:3, 60:22, 61:12, 62:7, 63:6, 66:5, 220:22
**selling** [4] - 45:13, 60:23, 76:15, 123:9
**semantics** [1] - 109:12
**send** [17] - 9:25, 27:15, 27:20, 33:16, 93:17, 93:19, 94:1, 104:2, 104:6, 131:23, 141:22, 156:23, 164:10, 165:20, 192:9, 272:14, 283:14
**sending** [9] - 21:4, 75:6, 200:6, 211:12, 224:17, 239:3, 240:12, 251:2, 255:23
**sends** [1] - 104:21
**sense** [20] - 40:11, 40:18, 58:4, 58:5, 77:6, 77:8, 77:9, 104:24, 155:8, 205:4, 205:10, 208:21, 209:9, 211:7, 230:20, 244:23, 249:19, 252:15, 253:14, 273:25
**sent** [77] - 22:18, 24:10, 24:11, 25:3, 25:11, 25:12, 25:18, 31:9, 31:15, 31:19, 33:24, 35:18, 35:21, 35:22, 45:25, 71:15, 75:19, 76:6, 77:15, 78:18, 85:12, 85:15, 87:17, 93:2, 93:15, 103:13, 103:20, 110:20, 139:19, 148:1, 148:12, 163:15, 164:5, 165:15, 168:13, 169:5, 169:6, 169:7, 169:21, 169:25, 170:6, 170:22, 171:1, 181:25, 184:7, 191:23, 193:5, 195:17, 199:11, 210:9, 211:15, 220:1, 224:16, 224:17, 225:1, 235:24, 241:11, 241:12, 250:25, 251:3, 252:1, 252:2, 252:5, 252:8, 252:10, 254:9,

254:19, 254:24, 255:1, 255:11, 260:10, 260:11, 272:15, 279:3
**sentence** [1] - 40:11
**separate** [4] - 38:1, 117:13, 176:14, 254:5
**separated** [2] - 118:6, 176:22
**separately** [2] - 113:17, 153:19
**serious** [2] - 9:21, 151:23
**serve** [8] - 40:21, 90:23, 92:7, 102:24, 114:5, 142:17, 224:22
**served** [4] - 41:8, 217:17, 217:18, 230:17
**serves** [2] - 206:16, 209:4
**service** [55] - 40:20, 84:12, 84:21, 85:11, 87:15, 88:2, 88:3, 88:13, 111:25, 112:2, 137:11, 153:7, 154:6, 154:19, 155:3, 155:5, 181:4, 209:19, 222:12, 224:5, 227:18, 233:13, 249:2, 249:10, 268:8
**Service** [1] - 222:6
**serviced** [3] - 88:23, 89:3, 265:23
**Services** [5] - 49:2, 49:4, 50:7, 111:19, 216:3, 216:7, 223:11, 230:19
**services** [18] - 89:10, 89:14, 91:14, 97:8, 97:19, 104:25, 106:2, 112:14, 128:7, 137:9, 150:6, 179:23, 180:5, 221:2, 245:8, 245:20, 249:16
**servicing** [5] - 40:15, 40:22, 154:23, 202:17, 249:14
**serving** [15] - 42:23, 84:6, 87:7, 88:6, 88:17, 88:24, 89:4, 89:19, 90:1, 90:13, 206:23, 209:14, 209:25, 227:24, 229:11
**SESSION** [1] - 161:1
**set** [7] - 23:9, 52:1, 52:5, 76:20, 96:2, 139:5, 274:21
**setting** [4] - 51:13, 51:23, 104:7, 150:7
**settle** [3] - 119:22, 119:23, 119:24
**seven** [3] - 106:23, 118:20, 243:16
**several** [10] - 17:9, 17:20, 17:25, 18:15, 36:5, 75:15, 75:22, 130:19, 231:22, 262:24
**severe** [1] - 82:15
**shadowed** [1] - 269:23
**share** [2] - 37:10, 281:9
**shared** [1] - 225:21
**sharing** [1] - 226:23
**sheer** [1] - 226:20
**Sheldon** [6] - 218:4, 218:11, 218:13, 253:15, 253:19, 253:24
**shift** [4] - 114:12, 114:14, 114:16, 114:18
**ship** [1] - 248:13
**shocked** [1] - 158:25
**shoot** [1] - 87:15
**short** [7] - 28:20, 76:6, 113:8, 216:10, 248:11, 275:9, 282:6
**shot** [2] - 23:7, 46:9
**show** [24] - 4:15, 19:3, 19:8, 35:6, 38:24, 39:5, 41:17, 74:19, 94:14, 98:22, 103:9, 108:7, 120:1, 161:10, 169:6,

172:24, 184:14, 187:17, 190:10,
211:14, 233:21, 258:3, 260:9, 276:12
**Show** [1] - 2:17
**showed** [6] - 121:12, 177:6, 232:15,
232:18, 233:16, 243:8
**showing** [13] - 20:12, 26:11, 35:9,
35:24, 41:23, 73:18, 87:16, 95:3, 99:16,
109:24, 169:6, 211:1, 232:22
**shown** [8] - 42:5, 147:19, 208:18,
228:11, 230:24, 231:21, 233:12
**shows** [9] - 99:10, 110:2, 209:22,
224:6, 227:23, 230:4, 240:5, 258:8,
258:22
**shut** [5] - 12:16, 50:7, 155:5, 252:18,
262:20
**shutting** [3] - 5:21, 246:15, 248:9
**sic** [3] - 20:25, 90:15, 158:23
**side** [4] - 2:14, 195:4, 260:14
**side-by-side** [1] - 195:4
**sidebar** [1] - 123:23
**Sidebar** [2] - 124:11, 124:21
**sign** [3] - 200:3, 219:11, 269:15
**signed** [2] - 93:6, 235:25
**significant** [3] - 35:14, 171:12, 195:20
**silent** [5] - 5:12, 7:10, 7:15, 9:14, 32:2
**siloed** [2] - 215:24, 216:1
**similar** [1] - 7:18
**similarities** [2] - 39:20, 100:4
**similarly** [2] - 210:18, 257:10
**simple** [4] - 14:5, 28:20, 79:11, 222:22
**simpler** [1] - 5:21
**simplest** [1] - 50:20
**simplistic** [1] - 97:7
**simply** [4] - 213:2, 234:5, 234:21,
240:25
**Simpson** [3] - 102:7, 102:12, 102:21
**single** [9] - 38:15, 59:11, 60:22, 76:6,
144:14, 212:6, 212:12, 223:1, 227:14
**sister** [7] - 68:18, 68:24, 128:20,
207:17, 222:7, 222:9, 270:17
**sit** [5] - 2:11, 87:14, 163:19, 246:4,
285:14
**site** [5] - 35:16, 59:24, 73:10, 177:22,
259:23
**sites** [1] - 195:24
**sitting** [3] - 59:13, 59:16, 250:24
**situation** [4] - 4:2, 234:12, 268:4,
281:7
**six** [6] - 6:13, 67:5, 112:15, 117:25,
118:20
**size** [1] - 247:6
**sky** [1] - 13:25
**slandered** [1] - 58:12
**sleep** [2] - 117:20, 118:4
**slower** [2] - 21:13, 35:1
**small** [4] - 7:5, 136:20, 138:8, 273:18
**smaller** [1] - 102:17
**smartest** [1] - 231:24
**smoke** [1] - 17:22

**smoking** [4] - 211:1, 211:2, 235:1,
235:2
**smoking-gun** [1] - 211:1
**snack** [1] - 109:10
**so...** [1] - 284:19
**social** [1] - 147:3
**softly** [1] - 176:15
**sold** [3] - 65:24, 78:2
**Soldano** [1] - 34:23
**SOLDANO** [1] - 34:23
**sole** [2] - 8:14, 244:21
**solely** [6] - 4:25, 40:16, 40:20, 209:12,
223:13
**solicit** [3] - 200:10, 202:9, 267:2
**soliciting** [1] - 144:8
**someone** [22] - 41:24, 55:19, 116:21,
130:15, 132:19, 159:11, 187:17,
187:18, 196:7, 209:20, 211:8, 212:5,
214:8, 234:16, 252:2, 262:9, 262:18,
263:9, 263:11, 264:10, 265:21, 268:20
**something-or-other** [1] - 235:2
**sometime** [5] - 41:11, 41:14, 42:21,
134:2, 197:11
**sometimes** [8] - 54:7, 68:14, 68:15,
85:10, 93:17, 93:19, 143:3, 176:4
**somewhat** [2] - 171:11, 257:11
**somewhere** [1] - 168:16
**soon** [2] - 61:7, 66:22
**Sorry** [3] - 84:18, 85:3, 85:5
**sorry** [37] - 8:24, 9:20, 14:10, 14:17,
21:12, 25:7, 32:9, 45:22, 46:5, 50:3,
55:25, 56:22, 69:25, 73:22, 74:13,
83:11, 85:22, 99:21, 99:22, 101:20,
103:16, 105:8, 108:11, 113:7, 114:15,
114:17, 123:14, 143:11, 155:24,
164:22, 172:4, 173:11, 183:10, 195:12,
261:5, 275:22, 285:10
**sort** [7] - 83:13, 200:2, 204:18, 210:21,
231:21, 265:15, 265:24
**sorts** [1] - 246:20
**sought** [3] - 96:18, 223:21, 229:9
**sound** [1] - 237:3
**sounds** [3] - 248:25, 260:12, 260:18
**sourced** [1] - 227:14
**sources** [1] - 165:20
**space** [1] - 94:8
**span** [2] - 275:8, 275:10
**spanned** [2] - 17:9, 17:25
**speaking** [17] - 33:25, 42:4, 51:5,
51:11, 51:21, 51:22, 120:25, 131:8,
132:18, 139:8, 139:11, 179:17, 196:12,
205:7, 238:4, 273:10
**speaks** [2] - 132:24, 211:3
**specific** [18] - 42:2, 95:16, 96:22,
96:25, 118:17, 130:4, 135:1, 135:10,
143:8, 143:14, 163:20, 165:15, 218:2,
240:20, 244:17, 251:5, 251:22, 259:14
**specifically** [15] - 4:13, 52:24, 98:11,
133:8, 143:6, 173:7, 174:10, 178:6,
199:3, 242:17, 244:13, 251:2, 251:7,

252:11, 259:12
**specifics** [1] - 244:12
**speculation** [4] - 70:14, 136:3, 164:7,
165:10
**speed** [1] - 33:10
**spell** [9] - 11:17, 27:22, 81:23, 96:2,
96:5, 140:3, 158:14, 178:17
**spellcheck** [8] - 93:10, 94:11, 94:15,
94:18, 95:6, 95:14, 95:16, 95:19
**spelled** [8] - 20:4, 20:6, 20:18, 26:25,
27:4, 27:21, 93:16, 139:23
**spelling** [14] - 5:8, 34:22, 49:9, 93:11,
95:4, 95:6, 95:14, 131:21, 139:24,
158:17, 159:15, 162:20, 163:11, 166:23
**Spelling** [1] - 49:8
**spellings** [2] - 35:2, 159:18
**spells** [1] - 96:15
**spend** [4] - 115:21, 116:7, 118:21,
277:23
**spending** [1] - 51:21
**spends** [1] - 209:11
**spent** [1] - 186:6
**split** [1] - 272:8
**spoken** [10] - 51:17, 54:7, 88:20,
88:22, 89:1, 89:6, 89:21, 90:3, 90:21,
234:17
**spreadsheet** [1] - 182:19
**spur** [2] - 54:14, 56:13
**square** [1] - 205:8
**staff** [1] - 2:5
**stand** [10] - 9:17, 11:6, 16:20, 28:16,
74:19, 81:12, 81:14, 161:5, 161:11,
199:14, 215:7, 251:4, 252:1, 268:13,
269:20, 285:3
**standing** [4] - 11:7, 11:9, 81:15,
270:18
**start** [29] - 2:7, 4:2, 8:19, 11:5, 46:9,
47:11, 49:16, 51:8, 52:13, 57:10, 58:18,
60:25, 81:13, 83:11, 95:6, 103:22,
125:7, 137:5, 137:6, 137:9, 137:11,
160:11, 170:13, 188:1, 222:18, 250:17,
257:5, 273:15, 276:2
**started** [25] - 2:5, 45:17, 45:21, 46:2,
47:8, 47:12, 57:6, 57:8, 57:10, 64:24,
65:15, 105:24, 112:3, 112:19, 171:8,
174:13, 174:16, 185:6, 206:8, 208:23,
216:8, 238:23, 269:25, 278:6, 279:20
**starting** [9] - 2:21, 5:18, 32:11, 50:9,
120:5, 250:10, 265:7, 270:15, 276:11
**starts** [3] - 167:4, 213:24, 274:2
**state** [14] - 2:20, 11:17, 56:8, 56:9,
66:15, 81:23, 99:13, 134:19, 142:16,
155:8, 206:7, 221:17, 228:6, 251:2
**statement** [14] - 30:2, 42:15, 109:22,
109:24, 111:11, 120:20, 121:15,
175:19, 176:12, 190:12, 190:14,
190:24, 191:6, 191:11, 191:19, 223:23,
249:9, 251:22, 251:24, 255:14, 260:1,
267:19, 285:7, 287:6
**statements** [18] - 9:1, 10:25, 12:15,

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 320 of 324
All Word // PageID #: 8828
Time Colavardi, et al.
30

110:20, 120:5, 128:10, 191:1, 203:13, 204:19, 222:18, 222:19, 222:21, 229:10, 229:20, 269:11, 275:23, 276:13
**Staten** [4] - 45:11, 60:18, 278:12, 278:19
**states** [8] - 21:16, 37:22, 38:11, 119:10, 119:13, 124:5, 214:20, 224:3
**STATES** [2] - 1:1, 1:13
**States** [1] - 1:6
**stating** [4] - 93:3, 210:2, 255:5, 261:21
**statistically** [1] - 257:11
**stay** [3] - 34:18, 56:8, 56:15
**Stay** [1] - 107:16
**stayed** [2] - 57:14, 57:15
**steer** [1] - 154:23
**step** [6] - 55:21, 80:21, 156:18, 157:21, 157:25, 201:22
**stepping** [1] - 176:16
**steps** [2] - 84:10, 158:6
**stick** [1] - 212:5
**stickers** [1] - 284:15
**still** [26] - 38:18, 42:20, 49:1, 62:6, 62:7, 74:19, 83:8, 104:17, 104:18, 146:20, 146:21, 188:7, 196:14, 197:6, 201:5, 207:2, 215:15, 217:5, 217:8, 225:23, 247:3, 252:24, 259:5, 263:23, 278:18, 281:8
**stipulation** [2] - 219:11, 219:16
**stole** [2] - 206:2, 229:21
**stolen** [3] - 57:18, 57:19, 57:23
**stone's** [1] - 238:11
**stop** [25] - 14:2, 16:19, 22:5, 52:8, 52:10, 63:2, 75:13, 79:19, 88:24, 89:4, 89:19, 90:1, 90:13, 239:5, 251:8, 259:4, 262:11, 262:14, 263:9, 264:18, 265:7, 265:10, 266:2, 266:4
**stopped** [5] - 42:12, 42:19, 88:17, 238:21, 240:5
**stopping** [2] - 262:12, 265:6
**store** [1] - 115:15
**story** [2] - 97:23, 158:21
**straight** [1] - 260:4
**straightforward** [1] - 97:7
**StraightTalk** [5] - 111:19, 112:7, 117:8, 117:10, 117:11
**strange** [1] - 168:12
**strategy** [3] - 229:16, 229:17, 269:13
**Street** [1] - 1:23
**stress** [1] - 270:9
**stretch** [1] - 272:6
**strictly** [1] - 42:4
**strike** [5] - 48:13, 49:20, 80:23, 220:10, 236:7
**strikes** [1] - 160:6
**striking** [3] - 232:9, 241:25, 270:21
**strong** [3] - 60:8, 60:10, 209:2
**stronger** [1] - 6:6
**struck** [1] - 203:25
**structured** [1] - 71:4

**stuff** [1] - 62:25
**stumbled** [1] - 267:25
**stupid** [2] - 49:22, 79:20
**Subin** [25] - 41:8, 42:2, 42:12, 42:23, 45:24, 45:25, 46:6, 46:14, 69:13, 69:16, 107:16, 107:19, 153:14, 224:2, 227:22, 240:16, 240:17, 240:22, 241:20, 241:21, 245:17, 245:20, 249:2, 249:4
**Subin's** [1] - 241:23
**subject** [5] - 182:23, 183:13, 213:22, 218:9, 223:9
**submission** [1] - 245:15
**submissions** [3] - 202:9, 212:14
**submit** [11] - 44:7, 87:10, 93:19, 150:20, 150:21, 190:25, 222:11, 240:22, 280:3, 282:15, 286:17
**submits** [1] - 228:11
**submitted** [10] - 5:4, 54:21, 84:14, 84:20, 123:12, 127:2, 150:19, 246:11, 269:11, 287:17
**subpoena** [12] - 109:15, 109:18, 111:12, 117:16, 185:23, 190:13, 222:4, 222:6, 222:10, 222:13, 222:14, 225:5
**subpoenas** [1] - 205:25
**subsequent** [7] - 59:15, 59:23, 73:24, 75:9, 77:14, 126:14, 224:18
**substance** [2] - 4:8, 8:10
**substantial** [1] - 55:21
**substantiate** [1] - 181:9
**succeeded** [1] - 279:21
**Success** [2] - 1:18, 1:21
**successful** [2] - 230:12, 250:10
**successor** [3] - 207:1, 230:16, 235:18
**successors** [1] - 223:9
**sudden** [1] - 205:11
**sue** [3] - 35:14, 195:21, 237:4
**sued** [1] - 23:20
**suffer** [1] - 229:18
**suffered** [3] - 231:13, 231:18, 233:12
**suffice** [1] - 26:5
**sufficient** [2] - 219:13, 222:11
**sufficiently** [2] - 223:16, 224:1
**suggest** [6] - 95:1, 200:24, 211:12, 257:1, 268:19, 270:21
**suggested** [1] - 100:21
**suggesting** [3] - 200:24, 233:15, 258:6
**suggests** [3] - 160:9, 237:15, 238:2
**suitable** [1] - 222:12
**Suite** [2] - 1:17, 1:20
**sum** [2] - 202:12, 202:20
**SUMMATIONS** [2] - 202:23, 290:1
**summertime** [1] - 119:2
**Sunday** [1] - 116:11
**support** [8] - 64:20, 225:16, 225:17, 258:18, 263:7, 269:9, 272:13, 277:14
**supported** [2] - 224:9, 224:20
**supporting** [2] - 82:21, 234:19
**supports** [1] - 268:23
**supposed** [10] - 5:14, 7:23, 79:1,

107:14, 154:19, 215:14, 234:21, 272:14, 272:16, 282:15
**supposedly** [1] - 204:15
**surfaced** [1] - 126:15
**surprising** [1] - 241:17
**suspect** [1] - 210:7
**suspicion** [3] - 251:15, 261:19
**suspicious** [6] - 204:4, 250:20, 251:13, 261:19, 270:5
**sustain** [1] - 179:14
**Sustained** [12] - 18:5, 70:21, 72:7, 72:9, 79:4, 127:20, 136:3, 138:16, 138:18, 165:8, 178:21, 180:7, 183:21
**sustained** [4] - 70:16, 123:18, 124:23, 145:4
**swear** [1] - 81:12
**swearing** [1] - 127:2
**switch** [2] - 44:8, 44:9
**switching** [2] - 75:13, 260:3
**sworn** [3] - 11:7, 11:8, 229:10
**sworn/affirmed** [1] - 11:14, 81:20
**system** [1] - 233:19

### T

**table** [3] - 2:12, 56:8, 65:4
**takeaways** [1] - 202:12
**talks** [1] - 117:10
**tangent** [2] - 76:24, 274:3
**tasks** [1] - 129:13
**tax** [20] - 114:25, 115:3, 115:4, 115:8, 115:10, 115:13, 128:3, 128:5, 176:6, 181:4, 181:6, 185:22, 186:4, 186:7, 186:11, 206:16, 208:18, 208:20, 208:22
**taxes** [1] - 115:9
**teach** [1] - 49:17
**team** [1] - 189:15
**technically** [2] - 69:8, 131:8
**technology** [1] - 2:6
**telephone** [1] - 85:22
**Temporary** [1] - 92:14
**temporary** [2] - 226:14, 231:2
**ten** [6] - 87:3, 205:18, 207:25, 227:7, 257:18, 258:12
**tenant** [1] - 61:24
**tenor** [3] - 237:1, 260:11, 260:17
**term** [1] - 39:18
**terms** [14] - 10:12, 11:1, 43:18, 142:9, 159:2, 179:18, 201:20, 202:13, 226:23, 243:14, 250:8, 256:22, 265:19, 265:25
**test** [4] - 64:15, 95:2, 158:20, 159:2
**testified** [56] - 4:10, 4:14, 5:6, 9:11, 11:14, 14:22, 16:12, 16:20, 17:9, 36:23, 37:20, 43:3, 43:5, 43:17, 46:17, 47:9, 48:21, 73:6, 74:9, 74:17, 75:22, 81:20, 92:2, 93:2, 96:18, 101:3, 105:5, 105:9, 107:6, 114:25, 115:18, 116:4, 118:6, 119:7, 122:21, 123:8, 124:10, 129:10, 147:16, 176:6, 177:3, 177:15, 178:9, 178:14, 185:25, 202:3, 208:16, 208:17,

211:13, 225:19, 244:24, 253:20,
253:21, 259:16, 262:23, 269:22
  **testifies** [2] - 10:19, 253:25
  **testify** [18] - 10:4, 15:15, 15:18, 15:20,
82:23, 83:4, 83:8, 86:10, 96:22, 106:15,
126:3, 127:14, 173:24, 204:23, 237:1,
237:2, 240:1, 273:17
  **testifying** [13] - 8:12, 15:6, 15:8,
15:23, 16:9, 16:10, 16:22, 46:24, 59:16,
95:9, 141:1, 184:1, 269:3
  **testimony** [62] - 4:6, 4:23, 8:9, 9:6,
9:7, 9:9, 10:8, 10:9, 10:17, 10:23, 18:1,
36:17, 38:6, 39:11, 43:19, 45:23, 50:25,
54:13, 54:17, 74:19, 86:23, 92:12, 93:9,
95:21, 96:8, 100:5, 103:13, 105:7,
105:11, 108:16, 112:7, 116:14, 122:20,
127:17, 130:13, 132:20, 142:2, 146:9,
146:10, 147:12, 147:25, 159:11, 165:1,
175:22, 178:17, 180:9, 185:8, 191:18,
203:6, 208:25, 216:5, 225:7, 227:2,
229:24, 230:13, 237:23, 238:3, 240:5,
261:9, 279:6, 286:7
  **Texas** [19] - 36:2, 40:16, 40:20, 43:8,
45:1, 57:9, 57:10, 66:10, 66:11, 67:17,
67:18, 67:20, 67:21, 119:8, 276:24,
278:22, 279:24
  **text** [10] - 85:12, 147:3, 177:18, 210:5,
210:9, 223:1, 227:16, 247:13, 247:16,
247:25
  **texts** [1] - 210:8
  **themselves** [5] - 9:11, 46:3, 206:5,
229:15, 234:25
  **then-existing** [1] - 216:22
  **theory** [3] - 172:14, 207:20, 230:23
  **therapists** [1] - 211:5
  **thereabouts** [1] - 281:11
  **thereafter** [5] - 59:15, 62:16, 226:20,
234:8, 239:7
  **therefore** [3] - 223:9, 257:6, 263:22
  **thereon** [1] - 170:14
  **they've** [4] - 46:3, 214:18, 242:11,
243:23
  **thick** [1] - 237:17
  **thinking** [11] - 6:18, 52:22, 180:21,
204:18, 259:23, 260:5, 263:20, 265:15,
271:25, 273:14, 275:16
  **third** [9] - 3:23, 4:1, 21:4, 21:5, 184:3,
216:2, 228:1, 263:24, 265:1
  **third-parties** [1] - 265:1
  **third-party** [5] - 4:1, 21:4, 21:5, 184:3,
263:24
  **thirty** [3] - 275:16, 276:15, 276:22
  **thoroughly** [1] - 38:12
  **thousand** [1] - 277:20
  **threat** [1] - 50:1
  **threatened** [2] - 49:19, 61:17
  **three** [31] - 30:16, 32:1, 43:13, 48:1,
113:14, 115:22, 115:24, 116:9, 159:17,
209:11, 212:16, 236:16, 269:4
  **threw** [1] - 283:8

  **throughout** [5] - 7:18, 101:17, 101:21,
176:11, 208:17
  **throw** [1] - 238:11
  **thrown** [1] - 281:4
  **Tiffany** [2] - 181:25, 183:13
  **tight** [1] - 207:17
  **timed** [1] - 203:1
  **timeframe** [1] - 136:12
  **timing** [3] - 7:9, 238:12, 250:8
  **tip** [1] - 258:20
  **tirades** [1] - 28:17
  **today** [38] - 3:21, 4:3, 9:9, 10:9, 10:23,
21:9, 21:18, 38:17, 38:18, 59:16, 83:8,
92:12, 102:6, 116:14, 146:9, 147:13,
147:20, 163:19, 176:6, 176:12, 180:9,
180:11, 185:8, 195:6, 197:16, 202:1,
220:21, 230:13, 234:3, 248:18, 263:12,
275:10, 276:16, 282:25, 283:21,
284:21, 286:14, 287:14
  **today's** [1] - 230:10
  **together** [7] - 8:8, 8:20, 51:20, 116:18,
239:1, 257:21, 271:7
  **token** [2] - 108:22, 109:9
  **tomorrow** [1] - 262:10
  **tone** [1] - 25:9
  **took** [12] - 20:22, 21:15, 29:19, 45:11,
55:21, 61:19, 62:4, 63:14, 97:24,
107:25, 151:23
  **tool** [2] - 108:17, 226:25
  **top** [11] - 21:14, 44:4, 143:15, 143:16,
168:21, 173:4, 182:2, 182:17, 183:6,
183:12, 240:11
  **topic** [3] - 52:11, 118:1, 163:10
  **topics** [2] - 175:16, 202:8
  **total** [3] - 87:1, 152:15, 236:9
  **totally** [12] - 17:6, 23:3, 23:6, 27:10,
28:9, 28:14, 29:17, 30:3, 60:2, 64:19,
279:15, 280:22
  **towards** [1] - 273:11
  **track** [3] - 181:5, 225:25, 257:6
  **trade** [11] - 92:15, 92:23, 180:15,
206:2, 212:17, 215:15, 229:21, 254:21,
265:3, 266:15, 266:16
  **Trails** [1] - 43:7
  **transaction** [1] - 111:18
  **transactions** [3] - 111:14, 128:13,
128:14
  **transcribed** [1] - 22:5
  **TRANSCRIPT** [1] - 1:12
  **transcript** [11] - 5:17, 6:9, 10:1, 82:20,
108:5, 108:10, 120:2, 122:1, 253:17,
253:22, 287:2
  **transfer** [12] - 23:4, 23:7, 23:15, 33:12,
34:8, 34:13, 52:3, 58:24, 76:3, 76:7,
254:9, 254:14
  **transferred** [12] - 34:14, 207:13,
253:21, 253:24, 254:1, 254:6, 254:12,
254:21, 258:22, 258:25, 261:10, 261:21
  **transferring** [10] - 22:21, 52:1, 59:23,
75:5, 75:7, 76:15, 77:13, 123:9, 244:19,

244:21
  **transition** [1] - 178:22
  **transpired** [1] - 252:21
  **travel** [4] - 36:18, 37:22, 38:2, 39:12
  **treat** [1] - 69:22
  **treating** [2] - 175:13, 256:4
  **trial** [7] - 17:21, 36:18, 39:12, 82:23,
220:13, 220:14, 243:6
  **tried** [12] - 51:4, 51:5, 55:2, 55:8,
56:17, 218:12, 235:6, 251:15, 277:12,
277:16, 278:7
  **tries** [1] - 269:14
  **TRO** [5] - 3:25, 48:1, 90:9, 227:23,
250:14
  **TRO/PI** [1] - 202:4
  **TRO/preliminary** [1] - 202:14
  **true** [26] - 14:16, 28:2, 29:5, 29:6, 40:1,
40:2, 45:14, 61:20, 67:25, 68:3, 68:5,
73:23, 76:10, 78:16, 94:20, 107:24,
124:7, 124:13, 125:23, 128:23, 129:1,
217:1, 222:6, 196:9, 271:18
  **truly** [3] - 186:9, 268:18, 269:19
  **trust** [2] - 157:13, 206:9
  **truth** [3] - 34:13, 145:10, 205:8
  **truthful** [1] - 127:18
  **truthfulness** [1] - 272:22
  **try** [9] - 62:7, 71:23, 118:16, 176:14,
203:1, 229:7, 231:25, 257:23, 280:19
  **trying** [22] - 15:4, 25:7, 25:8, 43:25,
44:14, 54:11, 58:5, 60:22, 62:19, 63:4,
74:20, 113:23, 145:9, 151:20, 199:22,
225:12, 234:14, 268:6, 268:24, 270:20,
270:22, 276:10
  **Tuesday** [1] - 172:2
  **turn** [7] - 73:9, 79:1, 158:4, 161:15,
279:10, 279:16, 280:12
  **turned** [1] - 277:15
  **tweaks** [2] - 97:8, 178:15
  **twenty** [3] - 106:11, 247:6
  **twenty-twenty** [1] - 106:11
  **twice** [1] - 167:2
  **twisting** [1] - 24:19
  **two** [45] - 15:17, 32:12, 32:19, 70:25,
76:4, 76:12, 86:21, 86:24, 104:15,
115:17, 115:22, 119:1, 149:25, 155:22,
155:25, 176:15, 182:6, 203:17, 205:24,
210:15, 212:16, 222:8, 226:22, 237:11,
243:3, 243:4, 247:19, 250:21, 250:22,
263:15, 266:23, 267:16, 267:18,
270:11, 278:23, 280:8, 281:15, 283:25,
284:17, 285:9, 285:12, 286:19, 286:24
  **two-and-a-half** [1] - 205:24
  **two-family** [1] - 32:8
  **two-part** [1] - 32:12
  **type** [5] - 46:14, 94:6, 162:17, 229:3,
261:1
  **typed** [1] - 201:5
  **typical** [2] - 242:25, 243:1
  **typically** [5] - 37:23, 104:1, 159:17,
180:18, 197:20

## U

**ultimate** [1] - 248:3
**ultimately** [9] - 63:14, 125:24, 214:21, 230:12, 239:4, 239:14, 249:25, 250:2, 250:9
**unabashedly** [1] - 206:5
**unable** [1] - 219:4
**unambiguous** [3] - 223:16, 224:1, 224:6
**unbelievable** [1] - 269:17
**unclear** [1] - 267:11
**uncontroverted** [1] - 206:1
**uncredible** [1] - 271:13
**under** [22] - 4:24, 9:11, 10:14, 15:6, 36:14, 41:9, 82:13, 119:18, 119:19, 119:24, 208:3, 220:9, 220:16, 221:16, 221:18, 222:11, 232:19, 235:25, 237:19, 250:11, 260:14, 272:16
**undermine** [1] - 266:5
**understood** [10] - 14:13, 35:3, 62:12, 76:17, 76:19, 122:10, 122:24, 131:7, 224:7, 281:1
**Understood** [1] - 281:17
**undisputed** [2] - 207:10, 215:12
**unequivocally** [4] - 7:19, 205:23, 214:20, 218:10
**unethical** [1] - 48:14
**unexplained** [2] - 205:9, 255:16
**unfortunately** [2] - 95:2, 218:21
**unique** [3] - 142:13, 144:3, 180:4
**UNITED** [2] - 1:1, 1:13
**United** [1] - 1:6
**university** [1] - 49:16
**unjust** [2] - 262:15, 268:1
**unjustly** [1] - 206:3
**unlawful** [4] - 228:10, 263:10, 265:2, 268:2
**unlawfully** [1] - 263:6
**unless** [4] - 194:7, 255:16, 265:7, 265:13
**unnecessary** [1] - 229:6
**unquestionably** [1] - 206:19
**unrelated** [1] - 274:16
**unsuccessful** [1] - 250:9
**untrue** [1] - 271:8
**untruthful** [3] - 82:13, 251:19, 271:3
**untruths** [1] - 271:2
**unusual** [1] - 171:8
**up** [96] - 2:6, 2:11, 6:8, 8:19, 9:17, 20:1, 23:9, 25:5, 26:6, 28:11, 30:2, 30:13, 31:5, 31:6, 31:11, 32:20, 33:10, 40:19, 43:11, 51:13, 51:23, 52:5, 55:6, 60:14, 63:11, 76:5, 76:20, 77:21, 78:3, 84:15, 87:16, 96:2, 108:6, 112:5, 113:23, 125:20, 128:15, 138:6, 139:5, 140:18, 143:21, 143:25, 150:7, 152:2, 152:5, 152:8, 153:19, 159:11, 159:25, 161:5, 161:9, 161:19, 166:4, 166:7, 172:11, 176:16, 176:25, 178:1, 182:17,

187:18, 189:1, 191:4, 191:25, 192:5, 194:3, 194:7, 195:12, 195:13, 201:7, 202:12, 202:20, 209:19, 210:1, 216:10, 226:18, 230:2, 232:9, 234:20, 235:5, 235:7, 238:23, 244:15, 245:3, 252:4, 252:22, 260:3, 267:20, 272:6, 273:15, 275:25, 276:15, 279:24, 280:9, 281:13, 285:19, 286:11
**update** [3] - 187:12, 188:13, 198:24
**updated** [1] - 33:16
**updates** [1] - 97:5
**upgrade** [2] - 180:15, 180:19
**upgraded** [1] - 180:16
**ups** [1] - 139:4
**upset** [3] - 260:13, 260:16
**user** [5] - 164:2, 164:4, 164:6, 173:10, 193:2
**users** [1] - 117:4
**utilize** [2] - 112:14, 142:3
**utilized** [1] - 215:16
**utilizing** [3] - 78:25, 112:16, 266:10

## V

**vague** [1] - 21:1
**value** [2] - 7:3, 215:15
**varies** [4] - 103:1, 104:9, 115:14, 143:15
**variety** [2] - 208:15, 215:4
**various** [4] - 67:10, 105:6, 105:10, 184:15
**vast** [1] - 202:15
**vehemently** [1] - 8:18
**vehicle** [1] - 220:18
**vent** [1] - 211:7
**venting** [5] - 14:1, 23:12, 54:14, 211:4
**venture** [2] - 9:13, 217:12
**veracity** [2] - 43:18, 272:11
**verbatim** [1] - 39:14
**verbiage** [1] - 16:16
**verify** [1] - 212:13
**versa** [1] - 230:24
**versus** [5] - 87:15, 208:11, 217:12, 217:22, 221:19
**via** [10] - 5:4, 73:20, 73:21, 85:21, 85:22, 92:18, 165:17, 204:23, 224:16, 237:23
**viable** [1] - 46:7
**vice** [1] - 230:24
**video** [71] - 5:4, 5:5, 5:11, 5:13, 6:6, 7:21, 9:4, 12:13, 12:18, 12:21, 13:8, 13:10, 13:13, 13:14, 18:2, 18:13, 20:22, 21:15, 22:21, 23:25, 26:24, 27:5, 27:10, 27:11, 28:2, 28:11, 29:11, 32:14, 32:17, 60:2, 70:13, 96:13, 99:8, 99:10, 125:10, 125:14, 125:15, 125:16, 125:20, 126:11, 126:14, 132:22, 132:24, 139:24, 188:21, 188:22, 204:23, 218:15, 223:13, 223:19, 224:21, 229:21, 235:9, 235:12, 235:14, 237:16,

238:2, 254:3, 268:16, 268:18, 269:8, 271:21, 272:10, 272:12, 272:20, 273:8, 273:18, 273:22, 273:23, 274:2, 274:6
**videotape** [1] - 9:7
**view** [3] - 142:7, 220:18, 271:1
**viewed** [3] - 125:14, 132:22, 139:7
**viewing** [1] - 211:21
**Village** [1] - 105:4
**vindicated** [1] - 232:25
**violate** [8] - 230:11, 230:14, 232:23, 233:2, 241:20, 245:19, 249:3, 264:7
**violated** [7] - 207:3, 232:10, 232:13, 233:9, 239:17, 239:18, 239:19
**violating** [2] - 56:4, 59:7
**violation** [10] - 55:15, 55:17, 224:19, 226:9, 226:20, 232:24, 233:3, 233:5, 234:5, 241:4
**violations** [6] - 220:15, 224:11, 224:14, 225:14, 228:10, 239:23
**virtual** [21] - 40:23, 96:10, 96:15, 99:6, 123:14, 124:9, 125:1, 125:3, 126:15, 148:24, 210:14, 210:18, 211:3, 214:14, 216:20, 216:24, 223:14, 223:22, 229:22, 230:13, 235:21
**virtue** [3] - 233:12, 264:22, 265:13
**vision** [6] - 77:22, 96:19, 98:2, 98:8, 100:3, 178:10
**visit** [6] - 116:9, 116:11, 118:25, 130:6, 130:7, 211:5
**visiting** [2] - 97:13, 116:15
**Vito** [33] - 4:6, 5:7, 61:1, 68:18, 96:10, 101:18, 101:22, 101:25, 125:2, 128:18, 141:17, 186:13, 206:4, 207:10, 207:17, 209:7, 221:21, 270:17, 273:8, 273:13, 274:3, 276:4
**Vito's** [4] - 68:24, 122:25, 128:20, 279:23
**voice** [10] - 24:3, 24:17, 50:5, 50:23, 78:6, 83:13, 84:15
**volume** [2] - 237:2, 240:13
**volunteer** [1] - 244:10

## W

**wait** [6] - 16:1, 156:15, 158:1, 166:17, 185:4, 208:20
**Wait** [1] - 33:3
**waiting** [3] - 221:2, 252:25, 253:1
**walked** [1] - 16:21
**walking** [4] - 14:24, 16:13, 75:5, 274:10
**wants** [4] - 27:22, 159:11, 204:11, 258:2
**war** [1] - 246:14
**warn** [2] - 107:25, 122:1
**warned** [1] - 154:23
**WARNER** [79] - 1:22, 1:24, 3:6, 3:12, 13:2, 17:12, 18:4, 20:23, 22:24, 25:16, 28:3, 31:14, 31:18, 41:19, 42:14, 43:12, 48:8, 48:13, 48:20, 50:10, 55:25, 59:19,

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 323 of 324

All Word //IME Gol ardi, et al.
Page ID #:8813

33

69:11, 69:18, 79:3, 80:4, 129:6, 171:2,
171:4, 171:25, 172:5, 183:23, 193:16,
225:9, 231:7, 231:10, 232:6, 232:11,
232:13, 233:1, 233:8, 233:23, 234:17,
235:11, 235:23, 236:2, 236:5, 236:23,
238:7, 238:20, 241:9, 241:16, 241:18,
241:22, 243:16, 243:19, 243:22, 244:4,
245:24, 246:2, 246:4, 246:6, 246:10,
246:22, 247:2, 247:5, 248:2, 249:6,
249:24, 273:17, 273:22, 283:10,
283:23, 284:22, 285:11, 285:25,
286:11, 288:5, 289:9
    **Warner** [20] - 3:7, 10:25, 31:17, 37:10,
42:3, 80:3, 129:5, 172:13, 180:8, 226:6,
231:6, 245:1, 248:24, 249:19, 268:20,
273:6, 276:20, 277:15, 278:4
    **warranted** [2] - 229:4, 230:5
    **washed** [1] - 214:19
    **watch** [7] - 27:5, 27:6, 28:9, 29:11,
29:17, 274:2, 274:5
    **watchdog** [1] - 78:15
    **Watchdog** [25] - 2:18, 2:24, 39:17,
39:23, 39:24, 39:25, 152:9, 152:11,
152:23, 183:5, 183:16, 224:4, 227:11,
227:13, 227:14, 242:14, 245:9, 245:23,
248:3, 248:7, 261:25, 263:4, 263:5,
263:22, 266:3
    **WATCHDOG** [1] - 1:4
    **Watchdog's** [7] - 78:24, 84:7, 92:15,
92:19, 92:22, 179:11, 180:3
    **WatchDogs** [2] - 232:19, 240:25
    **watched** [6] - 12:13, 12:16, 28:2, 28:4,
28:7, 235:12
    **water** [2] - 12:1, 12:2
    **waterfront** [1] - 230:5
    **waving** [1] - 44:13
    **Wayback** [1] - 38:7
    **ways** [4] - 165:23, 231:22, 252:17,
268:3
    **web** [2] - 39:15, 253:13
    **website** [151] - 4:19, 4:21, 6:1, 6:3, 8:4,
8:14, 20:16, 21:10, 21:19, 23:5, 23:8,
23:16, 33:12, 34:8, 34:14, 36:11, 36:14,
36:20, 37:20, 38:1, 38:4, 38:8, 38:9,
38:12, 38:16, 39:8, 39:16, 39:17, 39:20,
40:19, 50:18, 50:19, 51:13, 51:23, 52:1,
52:3, 52:20, 53:14, 53:15, 71:13, 71:20,
71:22, 73:7, 73:9, 73:22, 75:5, 75:7,
76:3, 76:7, 76:15, 77:13, 77:16, 77:22,
77:23, 78:2, 79:18, 90:25, 91:4, 91:24,
96:19, 96:24, 97:1, 97:2, 98:1, 98:8,
98:12, 98:17, 98:23, 99:11, 99:17,
99:24, 101:18, 101:22, 116:22, 123:9,
127:13, 130:11, 130:17, 130:20,
130:25, 131:3, 131:13, 134:11, 134:14,
135:1, 135:4, 135:8, 135:10, 135:14,
135:16, 135:22, 136:8, 136:10, 136:11,
136:24, 138:8, 138:14, 139:2, 139:5,
141:10, 149:15, 150:7, 150:8, 150:10,
150:12, 150:14, 168:11, 170:15,

174:16, 177:13, 177:16, 177:19,
177:24, 178:4, 178:9, 178:10, 178:15,
178:22, 186:13, 196:7, 196:8, 196:13,
196:23, 197:5, 197:7, 197:9, 199:21,
199:23, 200:20, 200:25, 201:6, 203:22,
215:21, 222:23, 223:4, 244:20, 244:22,
252:19, 253:7, 254:12, 256:12, 256:24,
256:25, 257:23, 260:7, 267:19, 268:23,
273:11, 286:6
    **websites** [8] - 39:18, 97:6, 98:23, 99:1,
220:3, 284:17, 285:9, 285:12
    **week** [17] - 26:12, 41:14, 113:4, 114:7,
114:20, 115:13, 115:21, 115:23, 116:6,
116:13, 118:15, 118:19, 209:12, 234:9,
246:13, 274:24, 279:17
    **weekday** [1] - 130:6
    **weekdays** [2] - 130:5, 130:8
    **weekend** [1] - 69:3
    **weekends** [1] - 130:7
    **weeks** [3] - 280:8, 281:15, 286:24
    **weight** [1] - 160:3
    **weird** [1] - 158:25
    **Weissman** [23] - 5:9, 20:14, 21:7,
52:21, 149:21, 149:22, 167:4, 167:15,
168:10, 169:2, 169:25, 170:6, 170:9,
170:19, 171:14, 174:9, 174:14, 177:7,
187:9, 189:7, 194:10, 203:13, 204:22
    **WEISSMAN** [1] - 5:9
    **welcome** [1] - 275:1
    **Wesley** [2] - 102:7, 102:21
    **WESLEY** [1] - 102:10
    **West** [1] - 1:23
    **whatsoever** [8] - 73:2, 133:6, 133:20,
134:15, 141:20, 222:5, 231:21, 234:19
    **whereas** [1] - 229:4
    **whisper** [1] - 161:19
    **white** [2] - 121:12, 215:12
    **whole** [10] - 27:5, 34:5, 34:16, 40:7,
52:19, 55:14, 58:4, 76:24, 171:7, 223:6
    **wife** [14] - 50:13, 50:19, 100:20,
100:22, 118:7, 120:13, 128:15, 128:17,
146:19, 146:20, 147:7, 247:1
    **willfully** [4] - 251:5, 251:20, 251:25,
260:9
    **willfulness** [1] - 251:4
    **willing** [1] - 83:8
    **wish** [4] - 155:15, 203:19, 235:15,
248:8
    **wishful** [2] - 52:22, 273:14
    **withdraw** [3] - 73:5, 186:18, 242:22
    **withdrawn** [8] - 96:8, 135:2, 135:13,
141:6, 147:16, 163:13, 179:21, 189:14
    **witness** [28] - 10:7, 11:2, 11:13, 20:9,
26:2, 42:5, 69:22, 81:12, 81:19, 83:1,
108:8, 121:2, 124:4, 124:7, 167:24,
193:8, 193:12, 194:5, 201:21, 204:21,
218:2, 218:3, 218:8, 218:13, 219:4,
225:18, 259:16
    **Witness** [6] - 11:8, 80:24, 81:14,
158:6, 161:11, 201:23

    **WITNESS** [306] - 11:16, 11:20, 12:1,
13:5, 13:20, 13:23, 14:4, 14:7, 14:10,
14:13, 14:17, 15:20, 15:24, 16:3, 17:17,
18:11, 19:16, 19:18, 22:3, 23:15, 23:24,
24:15, 24:18, 25:1, 25:7, 25:19, 26:7,
28:18, 28:22, 29:4, 29:6, 30:1, 30:19,
30:22, 30:24, 32:12, 32:16, 35:4, 38:4,
38:25, 40:6, 40:13, 42:18, 45:8, 46:2,
46:8, 47:1, 47:4, 47:7, 47:11, 47:16,
50:3, 51:4, 51:9, 51:15, 51:19, 51:24,
52:9, 52:14, 52:18, 52:23, 53:3, 53:9,
53:13, 53:18, 53:23, 54:2, 54:5, 54:18,
55:12, 56:12, 57:3, 57:8, 57:14, 57:19,
57:22, 58:4, 58:11, 58:15, 58:20, 61:9,
62:18, 63:3, 63:6, 63:10, 63:17, 63:22,
64:7, 64:11, 65:3, 65:7, 65:17, 65:20,
66:8, 66:25, 68:16, 70:25, 71:18, 72:8,
76:13, 78:9, 78:11, 79:7, 79:12, 79:14,
80:22, 81:22, 81:25, 82:5, 82:14, 82:17,
82:25, 83:5, 83:9, 83:15, 84:16, 84:18,
84:25, 85:3, 85:5, 90:7, 94:21, 94:24,
98:13, 98:15, 98:18, 99:2, 100:20,
100:24, 101:4, 101:8, 101:10, 102:16,
103:18, 103:21, 105:17, 105:19, 106:7,
106:10, 106:12, 106:16, 106:18, 107:1,
107:5, 107:8, 107:15, 108:11, 111:25,
113:11, 113:25, 114:18, 120:16,
121:22, 122:4, 122:6, 122:9, 122:11,
122:14, 122:16, 125:5, 125:8, 125:11,
125:15, 125:17, 136:9, 136:12, 136:14,
136:17, 136:25, 137:4, 137:17, 137:19,
137:23, 137:25, 138:3, 139:20, 140:9,
140:12, 140:14, 140:16, 142:20,
142:23, 142:25, 143:2, 144:24, 146:10,
146:12, 146:14, 146:16, 146:21,
146:24, 147:1, 147:5, 147:7, 147:10,
147:14, 147:22, 148:3, 148:5, 148:7,
148:9, 148:13, 148:16, 148:22, 149:1,
149:6, 149:8, 149:11, 149:14, 149:16,
149:19, 149:21, 149:23, 150:2, 150:4,
150:9, 150:13, 150:15, 150:18, 150:21,
151:6, 151:9, 151:11, 151:13, 151:17,
151:21, 152:1, 152:4, 152:10, 152:17,
152:22, 152:25, 153:8, 153:11, 153:17,
153:23, 154:5, 154:10, 154:16, 155:2,
156:25, 157:4, 161:20, 162:5, 163:25,
164:12, 164:14, 164:16, 164:20,
164:22, 164:25, 165:2, 165:13, 167:25,
168:3, 169:24, 170:1, 170:5, 170:7,
170:10, 173:15, 173:17, 173:20,
173:22, 174:2, 174:13, 174:21, 174:24,
176:17, 181:14, 182:12, 182:17, 185:3,
187:3, 187:5, 187:15, 188:3, 188:10,
188:16, 188:20, 189:9, 189:11, 189:18,
189:20, 189:25, 190:6, 190:21, 191:23,
192:18, 192:22, 193:20, 194:17, 196:3,
196:7, 196:10, 196:12, 196:19, 196:21,
197:3, 197:5, 197:10, 201:2, 201:5,
201:11, 201:15, 289:3
    **WITNESSES** [1] - 10:12
    **witnesses** [4] - 10:14, 155:22, 155:25,

Case 1:22-cv-01032-PKC-JRC    Document 437-1    Filed 12/30/24    Page 324 of 324

All Word //PID.Dv.Cola rdi, et al.
Page #: 8882

34

202:3
  **woman** [3] - 23:21, 24:22, 128:11
  **wonder** [1] - 159:5
  **wondering** [2] - 265:17, 283:1
  **woo** [1] - 151:20
  **word** [8] - 5:24, 66:19, 95:6, 95:21, 158:15, 159:23, 242:12, 259:9
  **worded** [1] - 241:5
  **words** [15] - 51:9, 55:9, 75:13, 98:3, 132:2, 159:22, 190:25, 197:8, 200:24, 226:8, 226:12, 258:5, 261:12, 263:14, 266:2
  **worker** [1] - 261:22
  **workers** [1] - 115:14
  **works** [3] - 44:18, 104:21, 158:10
  **world** [5] - 50:1, 50:20, 55:24, 56:4, 56:7
  **worn** [1] - 275:1
  **worries** [1] - 6:12
  **worse** [1] - 216:14
  **worth** [4] - 44:25, 160:3, 234:23, 246:16
  **wrap** [2] - 230:2, 267:20
  **wrapped** [1] - 192:5
  **wraps** [1] - 272:16
  **write** [11] - 26:18, 26:19, 27:20, 32:6, 32:13, 32:16, 32:17, 167:17, 178:4, 194:18, 196:2
  **writing** [5] - 62:9, 158:21, 167:4, 235:3, 235:4
  **written** [10] - 121:12, 133:3, 167:14, 202:9, 212:14, 233:9, 235:23, 255:19, 282:6, 284:25
  **wrongs** [1] - 266:3
  **wrote** [17] - 26:17, 30:16, 30:25, 31:13, 32:1, 32:7, 33:6, 168:10, 173:10, 173:12, 173:19, 178:7, 194:10, 194:17, 212:2, 213:3, 213:5
  **www.IMELegalReps.com** [1] - 99:17

## Y

**YAHU** [1] - 19:15
  **year** [18] - 6:14, 41:11, 41:14, 59:1, 98:10, 112:20, 115:5, 115:6, 119:3, 130:3, 130:5, 176:11, 180:12, 190:21, 242:19, 243:9, 275:19
  **years** [9] - 17:9, 17:20, 17:25, 159:4, 205:24, 209:5, 243:3, 243:4, 263:15
  **yelling** [2] - 50:4, 78:22
  **yesterday** [2] - 222:16
  **yielded** [1] - 208:7
  **YORK** [1] - 1:1
  **York** [49] - 1:6, 1:18, 1:21, 1:24, 6:21, 16:10, 16:21, 23:20, 27:12, 29:19, 36:19, 36:24, 37:23, 37:24, 38:2, 40:5, 40:7, 40:12, 52:7, 56:8, 57:9, 57:11, 57:13, 57:15, 57:17, 66:16, 119:13, 134:20, 143:1, 143:2, 143:7, 143:13, 143:16, 144:11, 144:14, 155:9, 179:22,

180:1, 197:17, 208:6, 221:16, 221:17, 227:12, 229:25, 230:1, 277:23
  **you's** [2] - 113:9, 113:10
  **yourself** [5] - 28:15, 82:13, 139:7, 279:18, 280:4

## Z

  **Zelle** [10] - 128:10, 128:16, 184:14, 184:23, 185:3, 185:15, 185:21, 191:11
  **Zemsky** [4] - 89:4, 89:9, 152:23, 230:18
  **ZEMSKY** [1] - 89:4
  **Zoom** [14] - 16:23, 17:5, 17:11, 18:8, 19:1, 26:13, 30:17, 34:2, 43:20, 51:17, 77:15, 124:9, 188:23

## —

  **—** [5] - 242:9, 242:10, 254:3, 254:4, 268:11