UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
IME WATCHDOG, INC.,

                              Plaintiff,

                    - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS LLC, CLIENT EXAM
SERVICES LLC, and IME MANAGEMENT
& CONSULTING LLC,

                              Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Plaintiff" or "Watchdog") brings this action against Defendants Safa Abdulrahim Gelardi ("Safa"), Vito Gelardi ("Vito"), Gregory Elefterakis ("Elefterakis"), Roman Pollak ("Pollak"), Anthony Bridda ("Bridda"), IME Companions LLC ("Companions"), Client Exam Services LLC ("CES"), and IME Management & Consulting LLC ("IME M&C"). Before the Court are Plaintiff's motions filed in March and June 2024: (1) to hold Defendants Safa and Vito Gelardi and Companions (collectively, "Defendants"), non-party Eugene Liddie ("Liddie"), and non-party IME Legal Representatives ("IMELR") in contempt, and (2) for a preliminary injunction. The Court now makes Findings of Fact and Conclusions of Law, pursuant to Federal Rules of Civil Procedure 52(a) and 65(d), with respect to Plaintiff's motions, and finds Defendants, Liddie, and IMELR in civil contempt of this Court's previous Orders, and issues a separate Order setting forth the requirements of the preliminary injunction going forward.

# BACKGROUND

## I.    Relevant Procedural History[1]

### A.    April 2022 Injunction and Amended Injunction

Plaintiff initiated this action on February 25, 2022, against Defendants, alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.  (Compl., Dkt. 1.)  The same day, Plaintiff also filed a motion for a temporary restraining order ("TRO"), which the Court denied, (2/28/2022 Docket Order), as well as a motion for a preliminary injunction, which the Court granted in part and denied in part on April 5, 2022, ("April 2022 Injunction"), (*see* Dkts. 6–10; 4/5/2022 Docket Order).  The Court also reserved ruling on the remainder of Plaintiff's request for a preliminary injunction and, after supplemental briefing, the Court issued the Memorandum & Order ("M&O") related to the April 2022 Injunction on May 13, 2022.  (Apr. 2022 Inj. Mem. & Order ("M&O"), Dkt. 66.[2])  The April 2022 Injunction, *inter alia*, barred Defendants from using Plaintiff's trade secrets "in any manner whatsoever," franchising Companions, and contacting Plaintiff's clients, employees, and agents.  (Apr. 2022 Inj., Dkt. 66-1, at 2.)  It also directed Defendants, *inter alia*, "to return to Plaintiff all originals and copies of documents, records, and information . . . that contain Plaintiff's trade secrets and confidential and proprietary information," including "customer information."  (*Id.* at 2–3.)

On June 8, 2022, Plaintiff filed a letter motion for contempt, alleging, *inter alia*, that Safa's GoFundMe page contained defamatory statements about Watchdog and its founder, Daniella Levi ("Levi").  (Dkt. 79; Dkt. 8, ¶¶ 1, 14.)  That same day, the Court issued the Amended Injunction,

---

[1] Because of the extensive procedural background in this case, the Court recounts only those facts necessary to resolve the present motions.

[2] The M&O relating to the April 2022 Injunction is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486 (E.D.N.Y. May 13, 2022).

which added an injunction against both parties from making misleading or defamatory statements about one another and further enjoined "Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them," from "contacting Plaintiff's current clients, employees, and agents." (Am. Inj., Dkt. 80, at 2; *see also* 6/8/2022 Docket Order). On June 10, 2022, the Court otherwise denied Plaintiff's contempt motion. (*See* 6/10/2022 Docket Order (denying, *inter alia*, "Plaintiff's request for coercive [monetary] sanctions and injunctive relief to compel Defendants to take down the GoFundMe page").)

    **B.    Client Exam Services ("CES")**

On March 10, 2023, Plaintiff filed (1) a second motion for a TRO, (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April 2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) Plaintiff alleged, *inter alia*, that Defendants had (a) improperly contacted Plaintiff's customers by sending them "libelous or slanderous materials concerning [] Levi and Carlos Roa," ("Roa"), a Watchdog employee "who was associated with Companions prior to this litigation and blew the whistle on Defendants' illegal conduct," and (b) hired a private investigator to track Roa. (Dkt. 152, at 7–8.) The Court ordered the TRO the same day ("March 2023 TRO")—enjoining Defendants from operating their business and from contacting any of Plaintiff's customers—and further ordered the parties to appear for a hearing on March 27, 2023, regarding Plaintiff's motion for preliminary injunction and contempt. (3/10/2023 Docket Order; Dkt. 156.)

On March 22, 2023, Plaintiff filed a Declaration from Mayra Gomez, an independent contractor for Watchdog, attesting that she saw non-party Jeff Beibin ("Beibin"), who had worked for Companions, at an independent medical examination ("IME") on March 16, 2023. (Dkt. 173, ¶¶ 1, 9.) On March 24, 2023, Defendants filed an affidavit from Beibin, in which he acknowledged

being at an IME that day, but denied attending the IME on behalf of Defendants; rather, he was there as "an agent of [CES], which [was] owned and operated by Fari Gutierrez" ("Gutierrez"). (Dkt. 176, ¶ 3.)  At the March 27, 2023 hearing, the Court found that: (1) Safa had arranged for Gutierrez, a "friend of the [Gelardi] family," to create CES with the help of Safa's nephew, Hesham Salameh ("Sammy"), in order to continue IMELR's business in violation of the Amended Injunction; and (2) Sammy had hired Beibin, who described himself as Vito's "brother in-law," to conduct the March 16, 2023 IME at issue in the contempt proceeding.  (3/27/2023 Hr'g Tr., Dkt. 199, at 97–100, 106, 114–15, 118 (Court stating: "The testimony [from Beibin] I just heard and the documents I've seen indicate to me that this creation of a new corporation via the defendant's family friend and nephew, and based on the same exact clients and business model as IME Companions is an effort to end run the condition of the TRO I set, and that to me, is contemptuous conduct or contumacious conduct.")

On the record during the March 27, 2023 hearing, the Court "expand[ed] its previously ordered preliminary injunction to preclude Defendants from providing services to any customers who were former customers of Plaintiff IME Watchdog and listed on Plaintiff's 2016 customer list," and ordered Plaintiff to "file a submission identifying these customers" ("March 2023 Expanded Injunction").  (3/27/2023 Min. Entry.)  The Court also ordered that CES provide "no more services . . . using the information from IME Companions."  (3/27/2023 Hr'g Tr., Dkt. 199, at 139:24–25.)  That same day, Plaintiff filed under seal a spreadsheet of all Watchdog customers (the "Enjoined Customers List").  (Enjoined Customers List, Dkt. 180-7.)  The Court approved that list on April 7, 2023.  (4/7/2023 Docket Order.)   Thus, as of March 27, 2023, Defendants were prohibited from providing services to any customers on the Enjoined Customers List.

4

In October 2023, the Court found all Defendants in contempt of the Amended Injunction—by hiring a private investigator to contact and track Roa—and the March 2023 TRO—by helping to start CES, which the Court found the Gelardis controlled and operated after Safa directed Gutierrez to create it.  (*See* Sec. Am. Inj. M&O, Dkt. 254,[3] at 26–32; Attach. & TRO M&O, Dkt. 284, at 3 n.3.)  The Court also granted Plaintiff's request for a second preliminary injunction ("Second Amended Injunction"), denied its request for a TRO and permanent injunction, and reserved ruling on Plaintiff's motion for contempt, sanctions, and damages pending resolution of Plaintiff's motion for attorneys' fees.  (Sec. Am. Inj. M&O, Dkt. 254; Sec. Am. Inj., Dkt. 254-1.)  The Court later amended its October 2023 Order to clarify that it had found "Safa in civil contempt of the Amended Injunction and the March 2023 TRO," but reserved "making a final ruling on damages and imposing sanctions" until the parties briefed the issue of compensatory damages, including attorneys' fees, relating to the March 27, 2023 contempt proceedings.  (Am. Sec. Am. Inj. M&O, Dkt. 299,[4] at 33.)

In December 2023, Plaintiff and Roa moved for attorneys' fees incurred as a result of Defendants' contempt of the Amended Injunction.  (Dkts. 261–65, 267.)  On September 25, 2024, the Court awarded Plaintiff $47,321.63 in attorneys' fees and $11,036.60 in costs, and Roa $6,890 in attorneys' fees and $1,209.11 in costs.  (Dkt. 394, at 22.)  On October 9, 2024, Plaintiff filed a motion for reconsideration, (Dkt. 399), which the Court denied in part, clarifying "that Plaintiff will not be precluded from seeking" damages caused by Defendants' conduct that forms the basis of Plaintiff's underlying claims "even if those damages overlap with consequential damages

---

[3] The Second Amended Injunction M&O is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 6958855 (E.D.N.Y. Oct. 20, 2023).

[4] The Amended Second Amended Injunction M&O is reported at *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224 (E.D.N.Y. 2024).

flowing from Defendants' contumacious conduct," (11/4/2024 Docket Order).  In that same Order, the Court denied Defendants' request for attorneys' fees and costs for responding to Plaintiff's reconsideration motion.  (*Id.*; *see also* Dkt. 409.)

### C.    IME Legal Representatives ("IMELR")

On April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment, based on alleged violations of the March 2023 Expanded Injunction.  (*See* Dkts. 196–98.)  Plaintiff argued that "Defendants did not stop serving customers on the Enjoined Customers List and instead—in a clear attempt to circumvent this Court's [O]rder—Defendants migrated their IME Companion website to a new domain name, https://imelegalreps.com."  (Dkt. 197, at 2.) Pursuant to that motion, the Court held a hearing on May 4, 2023, ("May 2023 Hearing"), during which non-parties Liddie, Beibin, and Shakkiya Hall ("Hall") testified.  (*See* 5/4/2023 Min. Entry; 5/4/2023 Hr'g Tr., Dkt. 219-1, at 154.)  At the conclusion of the hearing, the Court stated that it found Liddie's claim that he had started IMELR on his own credible, and that the Court was not convinced that the Gelardis had used Liddie to "end-run" the March 2023 Expanded Injunction. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 147–48.)   The Court also directed the parties to submit supplemental briefing.  (*See* 5/4/2023 Min. Entry; Dkts. 218–20, 224–25.)

In Plaintiff's supplemental memorandum, it again asserted that "Defendants transferred their website to" Liddie, "whose role is that of a straw man on behest of Companions."  (Dkt. 218, at 2.)  Plaintiff requested, among other things, that the Court "expand[] the preliminary injunction" to non-parties Liddie, Beibin, and IMELR.  (*Id.* at 1.)  In a written decision issued on July 13, 2023, the Court denied Plaintiff's renewed motion for contempt, reiterating its findings from the May 2023 Hearing "that Eugene Liddie was a credible witness, that he started [IMELR] as 'a venture of his own,' and that Liddie's business, [IMELR], was not in violation of the Court's

injunctions." (July 2023 Contempt M&O, Dkt. 231,[5] at 3.)  The decision also explained that "[t]he Court also found Jeff Beibin's testimony at the hearing was credible, and did not find that he or any of Defendants' other agents were still serving customers on the Enjoined Customers List in violation of the Court's injunctions." (*Id.*)  The Court also denied Plaintiff's request to attach the Gelardis' New York property.[6]  (*Id.* at 4.)

On March 6, 2024, Plaintiff filed another contempt motion against Defendants ("March 2024 Contempt Motion"), alleging that they were continuing to serve customers on the Enjoined Customers List—specifically, the Gucciardo Law Firm PLLC ("Gucciardo"). (March 2024 Contempt Mot., Dkt. 288.)  The Court deferred ruling and converted a previously scheduled evidentiary hearing into an omnibus hearing that would include discussion of Plaintiff's contempt motion.  (3/8/2024 Docket Order.)  This contempt motion is one of the subjects of this M&O.

On March 22, 2024, Defendants filed a response in opposition to Plaintiff's March 2024 Contempt Motion, arguing that the motion was procedurally deficient because it "was brought by letter motion rather than by notice of motion or by order to show cause and lacks any supporting affidavit."  (Dkt. 307, at 1.)  The Court directed Plaintiff to file a supporting affidavit for its contempt motion and Defendants to file an opposition.  (4/15/2024 Docket Order.)  The Court also permitted Defendants' counsel to "contact [Gucciardo] for the purpose of defending Plaintiff's []

---

[5] The July 2023 Contempt M&O is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 4532459 (E.D.N.Y. July 13, 2023).

[6] Later, in February 2024, the Court partially granted another request by Plaintiff to attach several of the Gelardis' properties, and ordered attachment of the net proceeds from the sale of the Gelardis' Staten Island property.  (Attach. & TRO M&O, Dkt. 284, at 14.)  As of May 29, 2024, that Staten Island property had not yet been sold.  (5/29/2024 Hr'g Tr., Dkt. 355-1, at 175:7–176:7.)

7

contempt motion," and modified the Second Amended Injunction accordingly, "to the extent that [it] could be read as encompassing such communications," to permit this contact.  (*Id.*)

On April 19, 2024, Plaintiff filed a procedurally deficient emergency motion for a TRO and to amend its complaint, (Dkt. 315), which the Court denied with leave to refile,[7] (4/19/2024 Docket Order).  On April 21, 2024, Plaintiff filed a Supplemental Declaration of Daniella Levi in Further Support of the March 2024 Contempt Motion ("First Supplemental Levi Declaration"). (First Suppl. Levi Decl., Dkt. 317.)  Defendants responded in opposition the following day, arguing that this, too, was procedurally deficient.  (Defs.' Opp'n First Levi Decl., Dkt. 318.) On April 25, 2024, the Court accepted the First Supplemental Levi Declaration and permitted Plaintiff to file a second Levi affidavit in support of its March 2024 Contempt Motion.  (4/25/2024 Docket Order.)  On May 3, 2024, Plaintiff filed the Second Supplemental Declaration of Daniella Levi in Further Support of the March 2024 Contempt Motion ("Second Supplemental Levi Declaration").  (Second Suppl. Levi Decl., Dkt. 321.)  Both Supplemental Levi Declarations contain additional allegations of Defendants violating this Court's Orders by servicing various law firms, not just Gucciardo, and that IMELR, like CES, is an alter ego and/or proxy of Companions.[8] (First Suppl. Levi Decl., Dkt. 317, ¶¶ 4, 7–21; Second Suppl. Levi Decl., Dkt. 321, ¶¶ 9, 13–18, 20–40.)  The Second Supplemental Levi Declaration further alleges that Defendants "set[] up" Liddie "as the face of [IMELR] . . . while Safa continued to work with Plaintiff's customers which are on the Enjoined Customers List."  (Second Suppl. Levi Decl., Dkt. 321, ¶ 14.)  After various additional filings, (*see* Dkts. 323–27), the Court permitted Defendants' counsel, but not Defendants themselves, to communicate with certain law firms on the Enjoined Customers List in

---

[7] Plaintiff did not refile or raise again the request to amend.

[8] *See* discussion *infra* Factual Findings §§ IV.B–D.

8

advance of the May 29, 2024 hearing, "solely for the purpose of defending Plaintiff's contempt motion," (5/7/2024 Docket Order). On May 10, 2024, Defendants filed another response in opposition to Plaintiff's March 2024 Contempt Motion. (Defs.' Second Opp'n Contempt, Dkt. 328.)

On May 29, 2024, the Court held an evidentiary hearing ("May 2024 Hearing") on Plaintiff's March 2024 Contempt Motion, during which the Court heard testimony from Safa, Vito, and Liddie and scheduled an additional hearing for June 17, 2024. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 255–56.) On June 11, 2024, Plaintiff filed a motion to compel Defendants' and Liddie's appearances at the June 17, 2024 hearing. (Dkt. 345.) Alongside this motion, Plaintiff submitted to the Court links to and a transcript of an April 10, 2023 Zoom meeting (the "April 2023 Zoom" or the "Zoom") between Defendants and representatives of a marketing and web development company called Giant Partners, with which Safa had previously worked when she was running Companions. (Apr. 2023 Zoom Tr., Dkt. 345-1; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 73:22–74:2.)

Also on June 11, 2024, the Court granted Plaintiff's motion to compel and directed both Safa and Liddie to appear at the next hearing, which was eventually rescheduled for July 29, 2024. (6/11/2024, 6/13/2024, 6/17/2024, and 7/2/2024 Docket Orders.) On June 13, 2024, Plaintiff filed a procedurally deficient TRO motion, to which Liddie responded. (Dkt. 348; Liddie First Resp. to TRO Mot., Dkt. 350.) The Court denied Plaintiff's TRO motion the next day as procedurally deficient and directed that Plaintiff comply with the Federal Rules of Civil Procedure, if it wished to proceed with the motion, by "specifically address[ing] the legal standards for seeking a TRO or any other injunctive relief and/or leave to amend." (6/14/2024 Docket Order.)

On June 19, 2024, Plaintiff filed another TRO motion and another preliminary injunction motion ("June 2024 TRO and PI Motion")—the second motion that is the subject of this M&O— this time requesting that the Court enjoin Liddie, IMELR, "and any persons or entities acting in concert with or on behalf of Defendants, Liddie, and IMELR from" taking certain actions. (June 2024 TRO and PI Mot., Dkt. 353.)  Alongside the June 2024 TRO and PI Motion, Plaintiff filed two recordings of the April 2023 Zoom.  (Mem. Supp. June 2024 TRO and PI Mot. ("Pl.'s Mem."), Dkt. 354, at 2; *see also* Dkts. 355-5, 355-6.)

On July 1, 2024, the Court granted in part and denied in part the June 2024 TRO and PI Motion ("July 2024 TRO").  (7/1/2024 Docket Order; Dkt. 365.)  In so doing, the Court found "that Plaintiff has demonstrated a likelihood of success on the merits and irreparable harm and that a TRO [was] justified."  (7/1/2024 Docket Order.)  The Court temporarily enjoined Liddie and IMELR "from serving customers on the enjoined customer[s] list," and scheduled a show cause hearing for July 29, 2024.  (*Id.*)  On July 18, 2024, Defendants filed their opposition to the June 2024 TRO and PI Motion.  (Defs.' Opp'n to June 2024 TRO and PI Mot. ("Defs.' Mem."), Dkt. 369.)  On July 29, 2024, the Court held an evidentiary and show cause hearing ("July 2024 Hearing"), during which it heard testimony from Safa and Liddie and after which it further reserved ruling on the March 2024 Contempt Motion and June 2024 TRO and PI Motion.  (7/29/2024 Min. Entry; 7/29/2024 Hr'g Tr., Dkt. 437-1, at 289.)  On July 30, 2024, the Court ordered Plaintiff to arrange for Jeremy Koenig ("Koenig") of Giant Partners to testify.  (7/30/2024 Docket Order.)

On September 25, 2024, the Court held another show cause hearing ("September 2024 Hearing"),[9] and heard testimony from Koenig and Corey Weissman ("Weissman"), also of Giant

---

[9] For purposes of this M&O, the May 2024 Hearing, July 2024 Hearing, and September 2024 Hearing will be referred to collectively as "the 2024 Hearings," and the 2024 Hearings and the May 2023 Hearing will be referred to collectively as "the Hearings."

Partners. (9/25/2024 Min. Entry; 9/25/2024 Hr'g Tr., Dkt. 410, at 63.) The Court once again reserved ruling on the March 2024 Contempt Motion and June 2024 TRO and PI Motion, and directed the parties (and Liddie, if he so chose) to submit letters summarizing the relevant evidence and their legal arguments. (9/25/2024 Min. Entry.) The parties and Liddie (along with IMELR) filed numerous post-hearing briefs in October and November 2024. (*See* 10/16/2024 Docket Order; Pl.'s Post-Hr'gs Letter ("Pl.'s PHL"), Dkt. 411; Defs.' Post-Hr'gs Letter ("Defs.' PHL"), Dkt. 413; Liddie's[10] Post-Hr'gs Letter ("Liddie's PHL"), Dkt. 415; Liddie's Post-Hr'gs Resp. ("Liddie's PHR"), Dkt. 421; Defs.' Post-Hr'gs Resp. ("Defs.' PHR"), Dkt. 422; Pl.'s Post-Hr'gs Resp. ("Pl.'s PHR"), Dkt. 423.) On December 12, 2024, Plaintiff filed certified copies of transcripts of two phone calls introduced into evidence in the September 2024 Hearing. (4/10/2023 Phone Call Tr., Dkt. 429-1; 4/11/2023 Phone Call Tr., Dkt. 429-2.)

## FACTUAL FINDINGS

Given the complicated history in this case, the Court begins by reiterating which motions are being resolved in this M&O: (1) the March 2024 Contempt Motion, wherein Plaintiff alleges that Defendants continue to serve customers on the Enjoined Customers List, (March 2024 Contempt Mot., Dkt. 288); and (2) the June 2024 TRO and PI Motion, wherein Plaintiff requests that the Court enjoin Liddie, IMELR, "and any persons or entities acting in concert with or on behalf of Defendants, Liddie, and IMELR from" taking certain actions, (June 2024 TRO and PI Mot., Dkt. 353).

## I.    Previous Relevant Findings of Fact

The Court presumes the parties' familiarity with the Court's previous findings of fact in this case, some of which have been recapitulated above, some of which have been set forth orally

---

[10] Liddie submitted his post-hearings briefing along with IMELR.

on the record at past hearings, and some of which have been recited in the Court's M&Os and reported decisions. The Court includes here only previous factual findings necessary to provide information about certain relevant persons and entities.

Watchdog and Companions are competitors in the personal injury litigation business. *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232. When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination, or IME, of the plaintiff to evaluate their alleged injuries. *Id.* Both Watchdog and Companions provide third-party services to personal injury attorneys that involve Watchdog and/or Companions associates (or "observers") accompanying plaintiffs to IMEs, observing the medical examination, taking notes, and helping plaintiffs fill out forms. *Id.* The observers produce reports of the IMEs for the plaintiffs' counsel to use in personal injury lawsuits. *Id.* Watchdog was established in May 2011 by Levi. *Id.* Companions was established in November 2017 by Safa and Vito, who are married to one another. *Id.* Safa started Companions by using materials and information misappropriated from Watchdog. *IME Watchdog, Inc.*, 2022 WL 1525486, at *3. More specifically, Defendants obtained Watchdog's materials and information by paying Plaintiff's President, Adam Rosenblatt ("Rosenblatt"), to share them with Safa in or about April 2017. *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232–33, 239. Then, in March 2023, after Defendants were enjoined from contacting Watchdog's customers, Gutierrez (as previously explained, a friend of the Gelardis and former part-time Companions IME observer), at Safa's direction, created CES "specifically to continue operating Defendants' business in contravention of the Court's TRO." (*Id.* at 237.) Finally, in or about Spring 2023, Liddie founded IMELR, his own IME business that Defendants were not involved in, even though Liddie was using the former Companions website for his new business. *IME Watchdog, Inc.*, 2023 WL 4532459, at *1; (Dkt. 197, at 2 (Plaintiff alleging that "Defendants

migrated their IME Companion website to a new domain name, https://imelegalreps.com.");
5/4/2023 Hr'g Tr., Dkt. 219-1, at 100:19–101:6 (Liddie explaining that, as of the May 2023
Hearing, IMELR was operating but not yet legally formed).)

## II.    Safa's Credibility

Throughout this lengthy, hearing-filled lawsuit, the Court has found "that Safa Gelardi has
repeatedly perjured herself . . . and is thus wholly uncredible as a witness." *IME Watchdog, Inc.*,
732 F. Supp. 3d at 232 n.4.  Safa's testimony throughout the 2024 Hearings has done nothing to
change the Court's unfavorable assessment of Safa's credibility.  (*See, e.g.*, 5/29/2024 Hr'g Tr.,
Dkt. 355-1, at 165:7–9 (Safa testifying that "[in speaking to Rosenblatt,] I [was] making a bunch
of stuff up because he's a liar and that's how you talk to liars.  You lie to liars."); 7/29/2024 Hr'g
Tr., Dkt. 437-1, at 13:23–14:1 ("I didn't lie about anything.  I was just talking.  Talking doesn't
mean you lie—you can talk about anything.  I can say the sky is green, it doesn't mean it's a lie.");
*id.* at 51:16–20 (The Court: "[J]ust so I understand, everything that was spoken about [by you] in
this Zoom conversation on April 10, 2023, was false?"  Safa: "For the most part . . . , yeah."));
*compare* 5/29/2024 Hr'g Tr., Dkt. 355-1, at 65:19–66:2, 68:9–24 (Safa denying any involvement
in, or meaningful knowledge about, a purported IME company ("AES")) *with* 7/29/2024 Hr'g Tr.,
Dkt. 437-1, at 45:14–48:12 (Safa admitting that her brother had purchased the AES domain name
three days after the March 2023 TRO, that she had "proposed to [her] brother to start a business
with [her]," that "[h]e shot [her] down," and that Safa did not acknowledge this during the
May 2024 Hearing because she "did not want to give [Levi her] brother's information because
[Levi]'s a criminal" who "goes after people.").)  Accordingly, the Court continues to find that Safa
Gelardi is not a credible witness.

III.    **Safa's Attempts to Circumvent the Court's Orders Unrelated to IMELR**

A.    **Companions**

In March 2023, Safa sent Subin Associates, LLP ("Subin")[11], a law firm on the Enjoined Customers List, an invoice for services provided by Companions that month. (Enjoined Customers List, Dkt. 180-7; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 54:18–20.) This invoice included services up to and including March 30, 2023. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 54:4–10 (publishing Subin invoice exhibit); *id.* at 58:16–18 (The Court: "And is it correct that you sent an invoice billing [Subin] for services provided on March 30th, 2023?" Safa: "Yes, Your Honor."); Subin Invoice, Dkt. 220-3, at 2–5 (showing dozens of IMEs performed by IME Companions for Subin in March 2023).) Thus, Companions serviced a customer on the Enjoined Customers List after the Court issued the March 2023 TRO (March 10, 2023) and after the Court ordered the March 2023 Expanded Injunction, which incorporated the Enjoined Customers List (March 27, 2023).

B.    **Accompanied Exams Services ("AES")**

During the May 2024 Hearing, Safa was asked about another company, AES, and testified that she had "heard of" them but was "not familiar with who they are." (5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:3–5.) She was shown Plaintiff's Exhibit 37, a March 30, 2023 email—sent three days after the March 2023 Expanded Injunction—from Safa's Companions email account to Arnie Baum, the Subin Chief Operating Officer. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:24–65:4; Pl.'s Ex. 37.) In it, she wrote that Companions was "not allowed to service [Baum's] law firm anymore [i.e., Subin]," and "recommend[ed]" Subin use "Accompanied Exams." (Pl.'s Ex. 37.) Safa testified that she did not know who told her about AES, that she did not know who owns it, and that she did not operate it. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 65:19–66:2.) She did not explain

---

[11] Subin is "Plaintiff's former largest customer." (Pl.'s PHL, Dkt. 411, at 2.)

why she had recommended AES to Subin—which Safa described as a "very particular" company—and testified that she "[did not] even know" AES. (*Id.* at 66:17–67:24.) Safa was then shown Plaintiff's Exhibit 38, a GoDaddy search showing that the domain "accompaniedexams.com" was created on March 13, 2023, three days after the March 2023 TRO went into effect. (*Id.* at 68:9–21; Pl.'s Ex. 38.) Safa again denied owning or operating AES. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 68:22–24.)

During the July 2024 Hearing, however, Safa admitted that her brother, Jusuf Abdulrahim, had purchased the AES domain name three days after this Court issued the March 2023 TRO, that she had "proposed to [her] brother to start a business with [her]," that "[h]e shot [her] down," and that the company AES never went into operation. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3.) Safa testified that she did not explain the connection between her brother and AES during the May 2024 Hearing because she "did not want to give [Levi her] brother's information because [Levi]'s a criminal" who "goes after people." (*Id.* at 48:4–12.) Thus, Safa's testimony at the May 2024 Hearing about not being familiar with AES was deliberately false. Based on Safa's admitted perjury at the May 2024 Hearing and the GoDaddy record introduced at the hearing (Plaintiff's Exhibit 38), the Court finds that AES, regardless of whether it ultimately went into operation, was yet another attempt by Safa to circumvent this Court's Orders and to continue to provide IME services to customers on the Enjoined Customers List.

## C.    The IME Company

Safa's current company is IME Legal Advocates, which is doing business as The IME Company. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 36:2–8.) Though Safa testified at the July 2024 Hearing that she was not doing any work in New York City, The IME Company's website states that "there are additional fees for travel to locations outside of New York City." (*Id.* at 36:23–

38:3.)  Notably, The IME Company's website "is the exact website that [Safa] had for IME Companions," and contains language verbatim to IMELR's website.  (*Id.* at 38:4–39:20.)

In February 2023, Safa sent Watchdog's client list—different than the Enjoined Customers List—to Giant Partners, which demonstrates that she did not delete the list from her computer as she was required to do under the Court's Orders.  (5/29/2024 Hr'g Tr., Dkt. 355-1, at 87:1–89:16.) Testimony during the Hearings did not illuminate why, or related to which company, Safa sent Watchdog's client list to Giant Partners.  Thus, the Court finds that Safa failed to comply with the Court's Orders by not deleting Watchdog's client list from her computer as of February 2023.

## IV.    IMELR and Liddie

### A.    Origins of Liddie's Involvement with the Gelardis

Liddie first met the Gelardis in 2021, when he began discussing with them the possibility of helping to create a franchise of their business.  (5/4/2023 Hr'g Tr., Dkt. 219-1, at 67:18–20, 70:17–25.)  This franchising did not take place because of the April 2022 Injunction, and Liddie instead planned to work with the Gelardis to help them with marketing by "reach[ing] out to different law firms."  (*Id.* at 71:18–72:6.)  Even though Liddie had no experience with marketing, he wanted to learn so that he could open his own business.  (*Id.* at 72:1–14, 73:20–74:14.)  Liddie later bought the Gelardis' Companions website for the price of one of their mortgage payments. (*Id.* at 88:4–25, 89:11–13; *see also* 5/29/2024 Hr'g Tr., Dkt. 355-1, at 203:13–15 (Liddie testifying that on April 10, 2023, he signed a contract with the Gelardis to buy the Companions website).) Vito was a party to the agreement to sell the website to Liddie.  (5/29/2024 Hr'g Tr., Dkt. 355-1, at 170:6–16.)

### B.    Creation of IMELR

As discussed earlier, following the May 2023 Hearing, the Court found that Liddie "started [IMELR] as 'a venture of his own,' and that Liddie's business, [IMELR], was not in violation of

the Court's injunctions[,]" i.e., the business was not being used by Defendants to violate the Court's Orders.  (July 2023 Contempt M&O, Dkt. 231, at 3.)  Thereafter, however, Plaintiff produced the Giant Partners/April 2023 Zoom evidence, discussed further below, which suggests that at least as of April 2023, Defendants were, in fact, operating IMELR with Liddie, contrary to the Court's prior findings.

During the April 2023 Zoom, Safa solicited Giant Partners' help to create a website for a new business, then-titled Plaintiff Advocates, but renamed shortly after the Zoom meeting to IMELR.[12]  (April 2023 Zoom Tr., Dkt. 345-1, at 6, 9.)  Jeremy Koenig and Corey Weissman were on the Zoom for Giant Partners.  (April 2023 Zoom Tr., Dkt. 345-1.)  Liddie was not present for the Zoom.  (*Id.*)  Though Vito was present for the Zoom and contributed at times, Safa led the conversation.  (*Id.*)  Safa told Giant Partners that she was "going to make [her] life simpler by shutting IME Companions down, and [she was] going to just move [her] clients over, move [her] business over to plaintiffadvocates.com," and so she needed to "change the website around a little bit to make it look like, 'Hey, this is not the IME Companions website.'"  (*Id.* at 1.)  When she and Giant Partners discussed the design of the website further, Safa said she "was thinking [they] just use the same IME [C]ompanion's website, the same exact one, just change the pictures, the same template.  Just change the pictures and the words."  (*Id.* at 8.)  Koenig described her request as "a simple rebrand," and told Safa that "if we want to kill the paper trail," "[l]et's do it."  (*Id.* at 2–3.)  Safa said that she was "going to play the criminal's game, and [she was] going to just rebrand,"

---

[12] Safa decided to use the name IMELR (instead of Plaintiff Advocates) for the new entity shortly after the Zoom.  (4/10/2023 Phone Call Tr., Dkt. 429-1, at 1 (Safa: "So, I'm kind of [veering] away from [P]laintiff [A]dvocates, I'm in the process of buying imelegalreps.com"); Koenig Decl., Dkt. 355-8, ¶ 4 ("After the [April 2023 Zoom], Safa decided to use the name [IMELR] instead of Plaintiff Advocates.").)

but that she "[did not] want to call it a rebrand." (*Id.* at 3.) She requested that Giant Partners help

this website "go live ASAP" because she "really need[ed] it to go live before [Levi[13]] tries to

destroy [her] and put [her] in contempt for still operating with clients that [Levi] claims she owns."

(*Id.* at 5.)

While the Zoom was ongoing, Safa created a GoDaddy account in Liddie's name, and set

up the email address "plaintiffadvocates@gmail.com" because she did not "want to use [her]

email." (*Id.* at 4.) She said that she and Giant Partners would "communicate through that [email]

until the business is up completely," and then once she "purchase[d] the office, [they could] either

switch emails to communicate [to] info@plaintiffadvocates, or [they] could continue at

plaintiffadvocates@gmail." (*Id.* at 10.)

At the May 2024 Hearing, Safa was shown Plaintiff's Exhibit 39, which includes an

April 11, 2023 email from "imelegalreps@gmail.com" (the "IMELR Gmail") to Weissman

containing GoDaddy account login credentials with the username "imelegalreps@gmail.com" and

a password comprised of Levi's name combined with a vulgar word. (5/29/2024 Hr'g Tr.,

Dkt. 355-1, at 100:24–101:15; Pl.'s Ex. 39.) Safa denied sending the email with the GoDaddy

credentials, and instead "assume[d]" that Liddie had sent it. (5/29/2024 Hr'g Tr., Dkt. 355-1,

at 71:4–72:7.) She confirmed, though, that the password was her creation, explaining that "[Levi]

put [Safa] through hell." (*Id.* 72:13–14; *see also id.* 124:19–125:17 (Safa testifying that "that's

been [her] password to almost everything after the case started").) Safa further testified that the

credentials shown were *her* credentials for the Companions GoDaddy account, (*id.* at 125:24–

---

[13] Though Safa referred to Levi as "she" or "her" on the Zoom, the Court infers based on
the context of the conversation and other evidence in this case that Safa was referring to Daniella
Levi. (*See, e.g.*, April 2023 Zoom Tr., Dkt. 345-1, at 9 (referring "to courts and deadlines and
things like that"); 7/29/2024 Hr'g Tr., Dkt. 437-1, at 29:10–20 (testifying about the Zoom and
referring to Levi).)

127:1), and that "[her] credentials to IME Companions [were] given to [Liddie] so that he [could] give [them] to Giant Partners to migrate the domains," (*id.* at 73:14–18). As indicated in Plaintiff's Exhibit 39, Weissman then forwarded those credentials to Conor McDaniel, Director of Operations at Giant Partners, and wrote, "[h]ere are the credentials for the GoDaddy account for Safa at [IMELR]." (Pl.'s Ex. 39.)

During the September 2024 Hearing, Koenig and Weissman from Giant Partners both testified that they had received all of their instructions from Safa and had not spoken to Liddie.[14] (9/25/2024 Hr'g Tr., Dkt. 410, at 22:8–14, 42:16–20, 43:2–7; *see also id.* at 37:9–19 (Weissman testifying that though Safa said "that [Liddie] was going to be the face and the main point of contact, . . . she kept communicating with [Weissman], communicating with [Giant Partners]").) Koenig also added that Giant Partners performed LinkedIn marketing outreach for IMELR, not just the website redesign. (*Id.* at 53:2–15.)

In contrast, during the May 2023 Hearing—before the Court was made aware of the April 2023 Zoom—Liddie testified that he "went to GoDaddy and created a domain name, [his] own domain name which is IME Legal Reps," then "got the [Companions] website," and got "it redesigned and redone by the web developers," Giant Partners.[15] (5/4/2023 Hr'g Tr., Dkt. 219-1, at 89:5–8.) Once he "got the website," Liddie testified, Giant Partners "redesigned the whole

---

[14] Defendants argue that another Giant Partners employee, Estefania Sedano ("Sedano"), who did not testify, worked primarily with Liddie, and so Koenig and Weissman are "incompetent witness[es]." (Defs.' PHL, Dkt. 413, at 8.) The portions of the September 2024 Hearing to which Defendants cite, though, reflect Koenig testifying only that Sedano "just [sent] some emails back and forth, just trying to chase down the customer," but that "there was almost no back and forth whatsoever." (9/25/2024 Hr'g Tr., Dkt. 410, at 59:8–23.) The Court accordingly disregards Defendants' argument, for which they offer no competent evidence and which is contradicted by Koenig's testimony.

[15] During the May 2024 Hearing, Liddie clarified that these "web developers" were Giant Partners. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 191:9–11.)

website to [his] vision, to what [he] liked."  (*Id.* at 95:6–9; see also *id.* at 117:7–16 (Liddie testifying that he worked with "the marketing company," i.e., Giant Partners, via phone to make changes to the website).)  During the May 2024 Hearing, Liddie testified that Giant Partners did not do any marketing for IMELR, and only worked on its website.  (5/29/2024 Hr'g Tr., Dkt. 355-1, at 192:1–11.)

In light of the April 2023 Zoom and two recorded phone calls[16] between Safa and Giant Partners—which demonstrate that Safa, not Liddie, created the IMELR GoDaddy account and that Safa, not Liddie, gave Giant Partners all of the instructions on creating the IMELR website—the Court finds that Liddie's testimony at the May 2024 Hearing is false.  The testimony from Koenig and Weissman further confirms this.  Furthermore, the Court finds that Giant Partners not only performed IMELR's website redesign, but also engaged in some marketing outreach on LinkedIn on IMELR's behalf.

## C.  Defendants' Agreement with Liddie

During the April 2023 Zoom, Safa explained Defendants' partnership with Liddie to Giant Partners, stating that "the gentleman who's going to . . . partner up with me is a detective with the" New York Police Department ("NYPD"), and he is "going to be the face of the company" for "maybe a year or so until *we* get this criminal [Levi] off my back."  (April 2023 Zoom Tr., Dkt. 345-1, at 1 (emphasis added).)  Safa claimed that she and Liddie had "an operating agreement

---

[16] As explained previously, Plaintiff submitted to the Court transcripts of two phone calls between Safa and representatives from Giant Partners from April 10 and 11, 2023, after the Zoom. In one of those phone calls, Safa said she "[was] kind of [veering] away from [P]laintiff [A]dvocates," and was "in the process of buying imelegalreps.com."  (4/10/2023 Phone Call Tr., Dkt. 429-1, at 1; *see also id.* (Safa: "I'm gonna do IME Legal Reps as soon as I finish coordinating the phone number, the emails and everything").)  During the May 2024 Hearing, before Plaintiff submitted these transcripts, Safa denied buying the domain IMELegalReps.com, and instead "assume[d] that . . . Liddie bought it."  (5/29/2024 Hr'g Tr., Dkt. 355-1, at 72:15–19.)

behind the scenes where he doesn't own" the business but is "a small partner in it," later claiming that she had a 90% interest in the business and that she was a "silent partner" to Liddie. (*Id.* at 2, 4.) Koenig said that they would "write up a new agreement with [P]laintiff [A]dvocates under [Liddie's] name," which would "be exactly the same price" as their contract with Companions with "exactly the same scope of services," and would "just have a clause that says [they were] converting over the one site to the other site." (*Id.* at 10.) Safa confirmed this but said "that will only [be] between us. Confidential." (*Id.*) Email correspondence between Giant Partners and the IMELR Gmail reflects this language. (*See* Pl.'s Ex. 39 (reflecting 4/10/2023 email from Weissman to IMELR Gmail: "Hi Safa, Here is the link to the new agreement, same details just new company, and us helping you build the new website").)

During the July 2024 Hearing, Safa testified that "[f]or the most part," everything discussed on the April 2023 Zoom about she and Liddie "working together" was false. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 51:16–20.) She stated that there was no agreement with Liddie to work for Plaintiff Advocates, (*id.* at 14:11–17), even though it had been her plan to have a 90% interest in the business with Liddie functioning just as the face of it, (*id.* at 52:24–53:9, 54:5–18 (testifying that the 90% arrangement was "the agreement that [she] was going to propose to [Liddie]," but "[i]t wasn't something drawn out or thought out" and Liddie "had absolutely[] no clue" about it)). She then sought to clarify that she had "tried to make [Liddie] an offer" and "attempted" to do so, but that Liddie was not interested, and so she could not finish making the offer. (*Id.* at 55:2–10.) Safa acknowledged that, had the plan discussed in the Zoom gone "through, it would have been a blatant violation" of the Court's orders,[17] and that she was accordingly "grateful that it didn't" go through,

---

[17] Safa's counsel also confirmed that this would be violative of the Court's Orders in their Post-Hearing Letter. (*See* Defs.' PHL, Dkt. 413, at 4 ("While the video of Safa's virtual meeting with Giant Partners discussing her intention to use Liddie as a front to continue to work in New

(*id.* at 55:14–18), though she "would have loved for it to go through at the time," (*id.* at 51:24–25). Safa spontaneously offered the analogy that "[y]ou can attempt to kill someone and not kill them and[,] say[,] go to jail for murder." (*Id.* at 55:19–20.) Safa never told Giant Partners that she was not going forward with the plan for Plaintiff Advocates or IMELR. (*Id.* at 70:23–25.)

Also on the Zoom, Safa provided a Texas address for the new business: 205 Charleston Lane in Fate, Texas, which is the home address of Liddie's brother. (April 2023 Zoom Tr., Dkt. 345-1, at 6; Liddie Decl., Dkt. 282, ¶ 6.) Liddie does not live in Texas and estimated that he had not been to the state since visiting his brother for Christmas in 2022. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 205:10–13, 206:17–21.) The parties' briefing does not address why, during the April 2023 Zoom, Safa used Liddie's brother's address to set up IMELR, or how she would have had Liddie's brother's address if she were not partnering with Liddie.

Liddie disputes that he and Safa ever had any sort of business arrangement beyond the sale of the IME Companions website. But this testimony is not credible because of the inconsistencies within Liddie's submissions to the Court and testimony during the Hearings. For example, during the May 2023 Hearing—over a year before Plaintiff filed the April 2023 Zoom transcript—Liddie testified that he, not Safa, both created the IMELR domain name on GoDaddy and worked with Giant Partners to develop the IMELR website. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 89:5–8, 95:6–9, 117:7–16.) In Liddie's first response to the TRO Motion (filed shortly after Plaintiff filed the April 2023 Zoom transcript), he "denie[d] any involvement or associations with any company related to the defendants and/or what was discussed within the new videos presented." (Liddie First Resp. to TRO Mot., Dkt. 350, at 1.) In Liddie's second response (filed 12 days later), though, he

---

York would be damning if corroborated by evidence suggesting that her plan came to fruition, the fact remains that [P]laintiff failed to submit a scintilla of proof suggesting that Safa's plan was ever actually acted upon in any fashion, let alone agreed to by Liddie.").)

elaborated that he was "not acting in concert with the Defendants, nor has he acted with the Defendants regarding [IMELR *in any way other than the development of the [IMELR] website*." (Liddie Second Resp. to TRO Mot., Dkt. 361, at 3 (emphasis added).)  In sum, Liddie first claimed, falsely, to have created the IMELR domain name and website, then claimed that he had no "involvement or associations with any company related to the defendants," (Liddie First Resp. to TRO Mot., Dkt. 350, at 1), and eventually admitted that he had at least worked with Defendants to develop the IMELR website, (Liddie Second Resp. to TRO Mot., Dkt. 361, at 3).

During the July 2024 Hearing, Liddie testified that he never had a written or oral operating agreement with Safa related to IMELR or any other company.  (7/29/2024 Hr'g Tr., Dkt. 437-1, at 133:3–9.)  He said that Safa "mentioned a partnership and [he] said, [he was not] interested," and that he "just want[ed] to move forward with buying the website like [they] initially agreed on." (*Id.* at 127:11–13.)  Liddie acknowledged that he did not mention or testify to any discussions with Safa about a partnership at either the May 2023 or May 2024 Hearings.  (*Id.* at 126:2–12.)

The Court does not find credible either Safa's or Liddie's denials of an attempted partnership between the two.  Whether or not the two ever came close to finalizing the details of a partnership, Safa clearly acted as though a partnership between them existed, and then repetitively and unambiguously represented the existence of that partnership to Giant Partners.  Further, though the parties and Liddie have offered no explanation for why Safa registered IMELR with Liddie's brother's address in Texas, this fact strongly supports the inference that Liddie intended, however briefly, to enter into a partnership with Safa and provided his brother's address to Safa for that purpose.

### D.    IMELR Clients

As of the July 2024 Hearing, 98% of IMELR's income came from customers on the Enjoined Customers List.  (7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:23–129:1.)  As of the May 2024

Hearing, IMELR had used six or seven independent contractors, all of whom used to work for Companions.  (5/29/2024 Hr'g Tr., Dkt. 355-1, at 196:1–13, 197:14–16.)    One of these independent contractors is Beibin, who referred the rest of the independent contractors to Liddie.  (*Id.* at 196:21–22, 197:19–25.)  During the May 2023 Hearing, the Court warned Liddie not to rely on client referrals from Beibin because he is an agent of Companions and the Gelardis.  (5/4/2023 Hr'g Tr., Dkt. 219-1, at 127:23–129:1; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 241:16–242:4.)  Between the May 2023 and May 2024 Hearings, however, only Beibin[18] observed IMEs for IMELR.  (5/29/2024 Hr'g Tr., Dkt. 355-1, at 198:9–16.)  At the July 2024 Hearing, Liddie testified that he had obtained new customers by "[taking] that upon [himself] to go and initiate getting new clients," (7/29/2024 Hr'g Tr., Dkt. 437-1, at 151:23–24), with methods that included "purchasing . . . Edible Arrangements" for law firms, (*id.* at 105:20–106:2).  Liddie claimed that he obtained "[a]ll the customers that [he has]," including those on the Enjoined Customers List, via his various marketing efforts.  (*Id.* at 105:9–16.)

While the Court previously found Liddie's and Beibin's testimony at the May 2023 Hearing credible, and that neither Beibin nor "any of Defendants' other agents were still serving customers on the Enjoined Customer[s] List in violation of the Court's injunctions," *IME Watchdog, Inc.*, 2023 WL 4532459, at *1, the evidence introduced at the July 2024 Hearing, especially the April 2023 Zoom, and the Court's related finding that Safa helped create IMELR requires the Court to now conclude otherwise.  Clearly, since 98% of IMELR's income in July 2024 was from customers on the Enjoined Customers List, and since Beibin is the only observer from IMELR who performed IMEs after the May 2023 Hearing, Beibin continued to serve

---

[18] Beibin is the Gelardis' brother-in-law because he is married to Vito's sister, Angela.  (7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:10–21.)  At times, when Beibin had issues with his Zelle account, IMELR would make payments to Angela.  (*Id.*)

customers on the Enjoined Customers List in violation of the Court's injunctions.  The Court finds that the most reasonable inference is that IMELR's business with customers on the Enjoined Customers List was not due to Liddie's sales tactics, but was instead due to Liddie's reliance on Beibin.

Further, additional evidence demonstrates that Safa improperly referred firms on the Enjoined Customers List to IMELR.  IMELR was not formed as a corporate entity until May 9, 2023—five days after the May 2023 Hearing—and did not have its own bank account until May 2023, yet IMELR performed an IME for Bergman, Bergman, Fields & Lamonsoff ("Bergman")[19] weeks earlier, on April 14, 2023, which was four days after Liddie bought the Companions website from the Gelardis.  (Pl.'s PHL, Dkt. 411, at 5; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 204:1–205:10.)

During the April 2023 Zoom, which took place four days before the Bergman IME, Safa stated that she was "going to call [her clients] up" as soon as the Zoom was finished and "tell them, please start booking with plaintiffadvocates.com," which shortly thereafter became IMELR. (April 2023 Zoom Tr., Dkt. 345-1, at 2.)  She also stated that she "really need[ed the website] to go live before [Levi] tries to destroy [her] and put [her] in contempt for still operating with clients that [Levi] claims she owns."  (*Id.* at 5.)

Liddie's testimony about the Bergman IME is inconsistent and not credible.  During the May 2023 Hearing, Liddie testified that he contacted Bergman first, and that he knew that the firm operated in Long Island through his wife, Hall, who has worked for Companions.  (5/4/2023 Hr'g Tr., Dkt. 219-1, at 84:3–25.)  In the May 2024 Hearing, though, Liddie testified that he instead

---

[19] Bergman is a firm on the Enjoined Customers List, (Enjoined Customers List, Dkt. 180-7, at 1), and was a Companions client, (S. Gelardi Aff., Dkt. 51, ¶ 4(24)).

obtained Bergman's business via referral, i.e., that someone from Bergman called Liddie to ask if he had an IME company, and Liddie did not ask the caller how they knew about him. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 208:8–209:7.)  While Liddie did wonder how Bergman knew to contact him, he "guess[ed he] was more excited about the opportunity," and so it did not occur to him to ask Bergman how the firm knew about him.  (*Id.* at 209:3–16.)  But when questioned at the July 2024 Hearing about this testimony, Liddie claimed that he "misspoke" and "misunderstood" during the May 2024 Hearing, and that he "[did] recall actually calling [Bergman], and then [he] did speak directly to Mr. Bergman."  (7/29/2024 Hr'g Tr., Dkt. 437-1, at 100:5–15.)  He also claimed that no one from Bergman called him directly.  (*Id.* at 100:16–17.)  Instead, Liddie testified that his wife suggested he call Bergman.  (*Id.* at 100:18–21.)

Evaluating Liddie's inconsistent testimony on this issue in the context of his demonstrably false testimony about Safa's statements regarding their partnership on the April 2023 Zoom, the Court finds Liddie's claim that he reached out to Bergman first is false, and that he was instead referred to Bergman by Safa, as suggested by Safa's statements to Giant Partners that she was going to start referring clients to Plaintiff Advocates, which became IMELR.

### E.    Spelling of Liddie's Name

Evidence presented during multiple hearings included various instances of Liddie's name being misspelled as "Liddy" in his purported communications with Giant Partners.  (*See* 5/29/2024 Hr'g Tr., Dkt. 355-1, at 215:17–19 (Liddie agreeing he had been shown "four or five instances where [his] name [was] spelled wrong").)  For example, the April 2023 email exchange between Giant Partners, Safa's Gmail account, and the IMELR Gmail account, included an email sent from the IMELR Gmail that was signed "Eugene Liddy [sic]" and stated "Hello Everyone, This is Eugene Liddy [sic].  I am the owner of IME Legal Reps.  Please . . . get the new mock ups ready as soon as possible.  [W]e need this website up as [IMELR's] vision immediately.  Please

communicate only with me as Safa is no longer involved." (5/29/2024 Hr'g Tr., Dkt. 355-1, at 95:5–6 (admitting into evidence Plaintiff's Exhibit 54); Pl.'s Ex. 54.) Notably, during the April 2023 Zoom, Safa spelled Liddie's name out loud and incorrectly as "L-i-d-d-y." (April 2023 Zoom Tr., Dkt. 345-1, at 3.)

At the May 2024 Hearing, Safa and Liddie both testified that Liddie had sent the emails misspelling his own name. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 95:5–23, 211:12–20.) Liddie testified that he did this because he "did the spell check once the email was completed," and his spell check "normally does that." (5/29/2024 Hr'g Tr., Dkt. 355-1, at 211:15–212:3.) He testified that he was "certain" that he sent the email in Plaintiff's Exhibit 54 and that Safa did not, and that he does spell check every time he sends an email. (*Id.* at 212:4–24.)

During the July 2024 Hearing, Liddie's counsel used Liddie's cell phone to demonstrate how its spell check function worked by typing "L-I-D-D-I-E" into the email application. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 161:13–17, 162:16–17.) But this demonstration yielded the following spell check options: "Liddie," "kiddie," and "kiddies." (*Id.* at 162:20–23.) Critically, "Liddy" was not among them. (*Id.* at 163:1–2.)

The evidence, common sense, and the Court's assessment of Safa's and Liddie's credibility dictate that Liddie's testimony that he misspelled his own name on multiple occasions in the communications with Giant Partners is false, as is Safa's testimony that Liddie, and not she, sent the emails misspelling his name. First, the April 2023 Zoom shows Safa misspelling Liddie's name as "Liddy," the same way it is improperly spelled in the emails in evidence. Second, there

is no evidence to corroborate Liddie's claim about his cell phone auto-correcting "Liddie" to "Liddy"—indeed, "Liddy" did not come up as a spell check option on Liddie's own cell phone.[20]

## CONCLUSIONS OF LAW

Plaintiff moves for contempt based on Defendants' alleged violations of the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction, and Liddie's alleged violations of the March 2023 TRO and March 2023 Expanded Injunction.[21]  Central to the Court's inquiry is whether IMELR, like CES, is an attempt by Safa to "operate a 'business that unfairly competes with Plaintiff in violation of the law.'"  *IME Watchdog, Inc.*, 732 F. Supp. 3d at 246–48 (citation omitted).  Plaintiff argues that IMELR is "yet another thinly-veiled sham to create a successor entity . . . . after Defendants were already enjoined from operating [CES], which was similarly set up with a front-man[,] Fari Gutierrez, who is related to the Defendants."  (Pl.'s Mem., Dkt. 354, at 1.)  Plaintiff argues that Defendants intended to replicate this scheme with IMELR, and that "Liddie, a full-time NYPD police officer," would be "the face of the company" while "Safa would remain the majority owner as well as the operator of the business behind the scenes

---

[20] During the July 2024 Hearing, the Court warned Liddie that the potential consequences of a finding that he had been untruthful under oath "could have severe ramifications for [him] because [he is] an active police officer of the NYPD."  (7/29/2024 Hr'g Tr., Dkt. 437-1, at 82:9–17.)  The Court also warned that if it "[made] such a finding," it wanted Liddie "to be on notice that [it] will direct [P]laintiff's counsel to provide that finding, the transcript[,] and any supporting evidence, or relevant evidence to that finding, to the NYPD, because [the Court] think[s] they have an obligation to advise an opposing party, should [Liddie] testify at any kind of a trial or a hearing."  (*Id.* at 82:18–24.)  Accordingly, the Court will direct Plaintiff's counsel to provide a copy of this decision, in which the Court has found parts of Liddie's testimony to be knowingly false, along with the transcripts of the hearings at which Liddie testified and the other relevant and supporting evidence, to the appropriate unit within the NYPD, which will be determined later.

[21] As explained *infra* n.30, Plaintiff also requests the Court find Defendants in contempt of the April 2022 Injunction.  But because the Amended Injunction, issued in June 2022, (*see* Am. Inj., Dkt. 80), superseded the April 2022 Injunction, the Court analyzes and refers to the Amended Injunction and not the April 2022 Injunction.

to evade this Court's Orders." (Pl.'s PHL, Dkt. 411, at 3.) In support of this argument, Plaintiff relies on the April 2023 Zoom recording, during which Defendants allegedly "outlined their new scheme to evade this Court's Orders" via a new company, Plaintiff Advocates.[22] (*Id.*; *see also* April 2023 Zoom Tr., Dkt. 345-1.) Plaintiff further argues that "IMELR is merely a continuation of and successor to the Defendants' original business and," with it, Defendants are "continuing to use Plaintiff's trade secrets and serve customers on the Enjoined Customers List." (Pl.'s Mem., Dkt. 354, at 1.) Thus, Plaintiff requests that the Court find Defendants, Liddie, and IMELR to be in contempt of Court, that the Second Amended Injunction be extended to apply to Liddie, IMELR, The IME Company,[23] and Accompanied Exams,[24] and that the Second Amended Injunction contain additional restrictions. (Pl.'s PHL, Dkt. 411, at 8.)

## I.    Civil Contempt

### A.    Legal Standard

"A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Regarding the first factor, "[a]n injunction is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id.* (quoting *Drywall Tapers & Pointers v.*

---

[22] As explained *supra* n.12, the name "Plaintiff Advocates" was short lived, and the new company was renamed IMELR shortly after the April 2023 Zoom.

[23] Though not introduced until the 2024 Hearings and Plaintiff's post-hearings briefing, Safa's current company is IME Legal Advocates, which is doing business as The IME Company. (*See supra* p. 15.)

[24] AES was also not introduced until the 2024 Hearings and Plaintiff's post-hearings briefing. (*See supra* pp. 14–15.)

*Local 530*, 889 F.2d 389, 395 (2d Cir. 1989)).  As to the second factor, noncompliance has to be "supported by clear and convincing evidence." *Id.* at 99.  For the third factor, a confused party attempting to diligently comply in a reasonable manner, "to ensure that it remain[s] in compliance with the Injunction . . . 'c[an] petition[] the District Court for a modification, clarification[,] or construction of the order.'"  *Id.* (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)).  Importantly, a party's intent or state of mind does not matter for finding civil contempt. *See McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act.") (citations omitted).  Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown."  *Id.* at 192. Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined."  *Id.*

Federal Rule of Civil Procedure 65(d)(2) provides that an injunction binds only those "who receive actual notice" of the injunction, including non-parties "who are in active concert or participation with" the parties or their officers, agents, servants, employees, and attorneys. Fed. R. Civ. P. 65(d)(2).  "[A] person who is not a named party to an injunction and who is not legally identified with such a party is bound by the injunction only from acting for the benefit of, or to assist, a named party in violating the injunction."  *Havens v. James*, 76 F.4th 103, 108 (2d Cir. 2023).  "The nonparty must either be 'legally identified' with the enjoined party or 'abet' the enjoined party's violation of the injunction."  *Id.* at 111 (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)).

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for

losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id.* at 1353 (citation omitted). On the other hand, coercive sanctions are "left to the informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Id.* (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

## B.    Plaintiff's Contempt Allegations

Plaintiff requests that the Court find Defendants, Liddie, and IMELR[25] in contempt of the Court's Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction, and that the Court "issue case ending sanctions pursuant to Rule 16(f) due to the multiple and repeated violations of this Court's . . . Orders including entry of judgment in favor of Plaintiff against Defendants, Liddie[,] and IMELR for compensatory damages, attorneys' fees and costs, and punitive damages." (Pl.'s PHL, Dkt. 411, at 8.)

---

[25] Plaintiff's March 2024 Contempt Motion did not request that the Court find that Liddie and IMELR are in contempt of court, but Plaintiff's Post-Hearings Letter and Response did. Further, Plaintiff's March 2024 Contempt Motion requested Defendants be ordered to show cause why they should not be incarcerated, (Dkt. 288, at 2), but Plaintiff's Post-Hearings Letter and Response do not request the Court to find either Defendants or Liddie in criminal contempt, (Dkts. 411, 423). Accordingly, the Court only evaluates civil contempt here.

Plaintiff's contempt allegations fall into three categories. First, Plaintiff alleges that Defendants provided services to clients on the Enjoined Customers List in violation of the March 2023 TRO and March 2023 Expanded Injunction. (*See* 3/27/2023 Min. Entry; March 2024 Contempt Mot., Dkt. 288, at 2 (alleging that Defendants attended IMEs with plaintiffs represented by the Gucciardo Law Firm[26]); Pl.'s Ex. A, Dkt. 288-1, at ECF[27] 2–4 (expert witness report from witness retained by Gucciardo, including a note from orthopedic surgeon that on April 20, 2023, a patient "was accompanied in the examining room by Ms. Tiffany Uribe from 'IME Companions'"); (Second Suppl. Levi Decl., Dkt. 321, ¶¶ 22–40 (alleging that Defendants, including via representatives for Companions and CES, attended IMEs with plaintiffs represented by Subin, Ginarte Gallardo Gonzalez Winograd LLP, and Bergman[28]).)

Second, Plaintiff revives its allegations from the April 2023 Contempt Motion that, in violation of the March 2023 TRO and March 2023 Expanded Injunction, Liddie's IMELR is an alter ego of Companions, relying on new evidence[29] obtained from Giant Partners (Second Suppl. Levi Decl., Dkt. 321, ¶¶ 13–18; 5/1/2024 Pl. Letter, Dkt. 319, at 1), and further alleges that Defendants also created AES to circumvent this Court's Orders, (Pl.'s PHL, Dkt. 411, at 2).

---

[26] As noted previously, Gucciardo is on the Enjoined Customers List. (Enjoined Customers List, Dkt. 180-7, at 3.) Despite Plaintiff's initial focus on Defendant's allegedly improper servicing of Gucciardo, (*see* March 2024 Contempt Mot., Dkt. 288, at 2), this firm was not a focus of the 2024 Hearings, and so the Court does not address it further.

[27] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[28] Subin, Ginarte Gallardo Gonzalez Winograd LLP, and Bergman are on the Enjoined Customers List. (Enjoined Customers List, Dkt. 180-7, at 1, 3, 8.)

[29] *See supra* Factual Findings §§ IV.B–D.

Third, Plaintiff alleges that Defendants violated the Amended Injunction's order to return all documents containing Plaintiff's trade secrets and confidential information as evidenced by the February 2023 email with Giant Partners in which Defendants shared a customer list that primarily contained Plaintiff's clients.[30]  (Second Suppl. Levi Decl., Dkt. 321, ¶ 19; Pl.'s PHL, Dkt. 411, at 2.)

### C.    Defendants' and Liddie's Arguments

Defendants principally argue that Plaintiff's motion is a "repetitive/successive motion which raises allegations of contempt which have previously been adjudicated,"[31] (Defs.' Second Opp'n Contempt, Dkt. 328, at 1), that Plaintiff has failed to support its motion with admissible evidence, and that Plaintiff has fallen short of demonstrating a clear and convincing violation of any Court Order.[32]  (*See generally id.*; *see also* Defs.' PHL, Dkt. 413.)

---

[30] Though Plaintiff refers specifically to the April 2022 Injunction, the Court notes that by the time Safa sent the February 2023 email to Giant Partners, the Amended Injunction—which also ordered Safa to return all documents containing Plaintiff's trade secrets and confidential information—was already in effect, and so it is more appropriate to analyze whether Safa violated the Amended Injunction.

[31] Although Defendants are correct that Plaintiff has previously submitted some of the evidence and allegations concerning Subin during briefing for a previous contempt motion, the Court has not actually made any rulings based on this evidence yet.  Plaintiffs submitted evidence related to Subin after the May 2023 Hearing.  (*See* Dkt. 220-3 (filed 5/26/2023), Dkt. 225-1 (filed 6/9/2023).)  The Court scheduled a hearing on the new evidence for August 22, 2023.  *See IME Watchdog, Inc.*, 2023 WL 4532459, at *3.  At the parties' request, the Court adjourned that hearing while the parties engaged in settlement discussions.  (*See* Dkt. 232; 7/25/2023 Docket Order.)  Thus, before the 2024 Hearings, the Court had not previously had an opportunity to hear testimony on these allegations.

[32] Defendants also protest that Plaintiff's contempt application is procedurally defective, despite acknowledging that Plaintiff has corrected these defects with leave from the Court.  (Defs.' Second Opp'n Contempt, Dkt. 328, at 1–2; Defs.' PHL, Dkt. 413, at 1–2.)  The Court therefore does not address this issue further.

Liddie argues that he is not acting and has not acted in concert with Defendants, (Liddie Second Resp. to TRO Mot., Dkt. 361, at 3); that no one "from Giant Partners testified or stated that they ever spoke with . . . Liddie about [Safa's] scheme," (*id.* at 7); that he did not have "any idea of the Plaintiff's 'business plan'" and that "any lay person could visit the IME Watchdog website and learn all it needs to know about how to operate the very same . . . business," (*id.* at 12); that he did not have "access [to] any trade secrets that belonged to . . . Plaintiff" and that "he did not rely on any referrals from . . . [D]efendants or their agents," (Liddie PHL, Dkt. 415, at 4); that Plaintiff has not met its burden to "demonstrate . . . that there was some sort of agreement or arrangement where the Gelard[is] were going to have some own ownership or operational interest in [IMELR]," (*id.* at 5); that the evidence shows that he, and not the Gelardis, "is running" IMELR, (*id.*); that "his only explanation for" the emails misspelling his name as "Liddy" is that "autocorrect may have changed the spelling of his name," (*id.*); and that while he generally testified truthfully, (*id.* at 6), discrepancies in his testimony during the various hearings were the result of "mistake[s]," (Liddie PHR, Dkt. 421, at 2).

### D.    Admissibility of Evidence

In Defendants' Post-Hearings Letter, they argue that "[P]laintiff failed to submit any admissible evidence" during the various hearings.  (Defs.' PHL, Dkt. 413, at 2.)  Defendants elaborate on this claim by pointing to various forms of presented evidence and arguing that they are all inadmissible hearsay, but neglect to cite any specific caselaw or Federal Rules of Evidence, other than noting that "[c]ontempt proceedings are governed by the Federal Rules of Evidence." (*Id.* (first citing Fed. R. Evid. 1101(b); and then citing *Really Good Stuff, LLC v. BAP Investors, L.C.*, 19-CV-2218 (LLS) (GWG), 2021 WL 2469707 (S.D.N.Y. June 17, 2021) (holding that screenshots from Amazon and YouTube, which are not forms of evidence relevant here, were not admissible).)  Defendants also challenge Plaintiff's contempt allegations as weak, in part, because

34

they rest on "[P]laintiff's allegation that Safa, whom they have repeatedly referred to as a serial liar and perjurer, was telling Giant Partners the truth during" the April 2023 Zoom.  (*Id.* at 3.)

The Court finds that in addition to the testimony elicited during the Hearings, Plaintiff has presented admissible and relevant evidence that includes the April 2023 Zoom, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 5:3–10; April 2023 Zoom Tr., Dkt. 345-1), two recorded phone calls, (9/25/2024 Hr'g Tr., Dkt. 410, at 10:16–12:5, 19:16–20:12; 4/10/2023 Phone Call Tr., Dkt. 429-1; 4/11/2023 Phone Call Tr., Dkt. 429-2), and several emails, (*see, e.g.*, *supra* pp. 14–15, 18–19, 26–27).  The Court relies on this evidence and does not otherwise consider Defendants' arguments regarding the admissibility of Plaintiff's evidence.

### E.   The Court Finds Defendants in Contempt of the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction

The Court finds Defendants in contempt of the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction.  As discussed more below, the Court directs Plaintiff to submit additional briefing and the required affidavit setting forth its damages claim with particularity.

#### 1.   The Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction Are Clear and Unambiguous

The Amended Injunction, among other things, directed Defendants "to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets and confidential and proprietary information."  (Am. Inj., Dkt. 80, at 2–3.)  It also enjoined "Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them" from "using in any manner whatsoever Plaintiff's trade secrets and confidential and proprietary information," including "customer information."  (*Id.* at 2.)  New

York law is clear that the dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See, e.g.*, *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018) ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."); *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm.").

The March 2023 TRO barred "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly and unlawfully competes with Plaintiff in violation of the law." (March 2023 TRO, Dkt. 156, at 3; 3/10/2023 Docket Order.) The March 2023 Expanded Injunction "expand[ed] [the Court's] previously ordered preliminary injunction to preclude Defendants from providing services to any customers who were former customers of Plaintiff IME Watchdog and listed on Plaintiff's 2016 customer list." (3/27/2023 Min. Entry.) On the record at the March 27, 2023 hearing, the Court ruled that "[D]efendants do not get to use any of the customers who were on [IME Watchdog's] customer list as reflected in the forensic examination or whose identity or names or information were provided by Mr. Rosenblatt as reflected in the forensic evidence to IME [C]ompanions at any point after the company started." (3/27/2023 Hr'g Tr., Dkt. 199, at 120:1–9.) Plaintiff filed the Enjoined Customers List under seal the same day that the Court issued the March 2023 Expanded Injunction. (Enjoined Customers List, Dkt. 180-7.) As of March 27, 2023, Defendants were clearly and unambiguously precluded from providing services to any customers on the Enjoined Customers List.

2.    <u>Evidence of Defendants' Noncompliance is Clear and Convincing</u>

The evidence presented during the Hearings and in the related briefing clearly and convincingly establish that Defendants have attempted to circumvent the Court's previous Orders in numerous ways.

First, Companions continued to perform IMEs for Subin, a firm on the Enjoined Customers List, at least through March 30, 2023.  Defendants argue they were not actually restrained from servicing Subin at that time because the March 2023 Expanded Injunction prohibited Defendants from providing services to any customers who were *both* "former customers of Plaintiff IME Watchdog **and** listed on Plaintiff's 2016 customer list," and "Subin was <u>not</u> listed on Plaintiff's 2016 customer list."  (Defs.' PHL, Dkt. 413, at 2–3 (quoting, but not citing, 3/27/2023 Min. Entry) (emphasis in original).)

This argument is disingenuous at best.  On the record at the March 27, 2023 hearing, the Court ruled that "[D]efendants do not get to use any of the customers who were on [IME Watchdog's] customer list as reflected in the forensic examination or whose identity or names or information were provided by Mr. Rosenblatt as reflected in the forensic evidence to IME [C]ompanions at any point after the company started."  (3/27/2023 Hr'g Tr., Dkt. 199, at 120:1–9.)  Subin, as Defendants well know, is encompassed by this.  For example, in the April 2022 Injunction M&O, the Court found that "[a]s a result of Defendants' actions, Plaintiff lost many clients and business opportunities, including its largest account—the law firm of Subin & Associates, which was one of the accounts for which Rosenblatt shared proprietary information with Safa Gelardi in 2017."  *IME Watchdog, Inc.*, 2022 WL 1525486, at *4.  Indeed, the reason that the Court expanded the Amended Injunction to create the March 2023 Expanded Injunction, was based on a finding that Defendants had created CES in violation of the Amended Injunction and March 2023 TRO.  (*See supra* p.4.)  Defendants' disingenuous interpretation of the

March 2023 Expanded Injunction would clearly defeat its purpose, which was to expand, not decrease, the group of Watchdog clients that Defendants were prohibited from serving. If Defendants' reading were correct and a client had to be on both lists, the obvious effect would be that *fewer* Watchdog clients would be covered by the injunction, which Defendants cannot *in good faith* claim to believe was the Court's intent.

Thus, the Court finds that Companions knowingly violated the March 2023 TRO and the March 2023 Expanded Injunction by performing IMEs for Subin through March 30, 2023.

Furthermore, three days after the Court issued the March 2023 Expanded Injunction and mere weeks after the Court issued the March 2023 TRO, Safa emailed Subin to recommend that it use AES since Companions could no longer service the firm. (Pl.'s Ex. 37.) During the May 2024 Hearing, Safa blatantly lied by testifying that she was "not familiar with who they [AES] are" and that she did not know who owns or operates it, (5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:3–5, 65:19–66:2), while, as she admitted during the July 2024 Hearing, her brother purchased the AES domain after she had suggested that they go into business together, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3). The very act of soliciting Subin's business via a new company she sought to start, AES, is a violation of this Court's Orders, whether or not Subin subsequently used AES.

In addition, Safa violated the March 2023 TRO and March 2023 Expanded Injunction by attempting to partner with Liddie and helping to create IMELR. During the April 2023 Zoom, Safa stated that she was "going to just rebrand" Companions into IMELR, and put pressure on Giant Partners for the new website to "go live ASAP" so that she could "call [her clients] up" and "tell them, please start booking with" the new website. (April 2023 Zoom Tr., Dkt. 345-1, at 2–3, 5.) During the Zoom, she told Giant Partners that she was a partner with Liddie and that she had a 90% interest in the new business. (*Id.* at 2, 4.) At the September 2024 Hearing, Koenig and

Weissman from Giant Partners both testified that Safa was their only point of contact for IMELR. (9/25/2024 Hr'g Tr., Dkt. 410, at 22:8–14, 42:16–20, 43:2–7.)  Koenig further testified that, "to [his] knowledge," Companions and IMELR are "basically" the same company.  (*Id.* at 21:15–22:4.)  Thus, it is clear that IMELR was Safa's creation, and that Liddie's role was to serve just as "the face" of the business.  (April 2023 Zoom Tr., Dkt. 345-1, at 1.)

As previously discussed, Safa acknowledged that, had the plan discussed in the Zoom gone "through, it would have been a blatant violation" of the Court's orders, and that she was purportedly "grateful that it didn't" go through, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 55:14–18), though she "would have loved for it to go through at the time," (*id.* at 51:24–25).  Her counsel also acknowledges that the video "would be damning if corroborated by evidence suggesting that her plan came to fruition."  (Defs.' PHL, Dkt. 413, at 4.)  The Court is not convinced by Safa's or her counsel's arguments, and instead finds that Defendants'[33] plan to start IMELR to continue to run Companions' IME business *did* come to fruition—for example, four days after Safa said on the April 2023 Zoom that she planned to call her clients and tell them to book on the new IMELR website, IMELR performed an IME for Bergman, a firm on the Enjoined Customers List. (Pl.'s PHL, Dkt. 411, at 5; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 204:1–205:10.)

Lastly, Safa violated the Amended Injunction first by still possessing Plaintiff's customer list in February 2023, and then by emailing it to Giant Partners.  Defendants argue that "Safa credibly explained how [the list] was attached inadvertently among many other things, and Koenig testified that it was not used in Giant Partners' marketing efforts."  (Defs.' PHL, Dkt. 413, at 8.)

---

[33] As previously noted, although Safa took the lead in the meetings with Giant Partners regarding IMELR, Vito was present for and briefly spoke during the April 2023 Zoom. (April 2023 Zoom Tr., Dkt. 345-1, at 8.)  The Court therefore finds that all three Defendants— Safa and Vito Gelardi and their company Companions—were involved in the plan to create and run IMELR as an IME business and solicit work from the Enjoined Customers List.

It does not matter whether Safa inadvertently attached the list or whether Giant Partners used it. Pursuant to both the April 2022 Injunction and Amended Injunction, Safa was not supposed to have that list in her possession *at all*, and so it should not have been physically possible for her to inadvertently send it to anyone. (*See* April 2022 Inj., Dkt. 66-1, at 2–3 ("Defendants are directed to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets and confidential and proprietary information"); *see also* Am. Inj., Dkt. 80, at 2–3 (same).) Pursuant to the Amended Injunction, Safa was prohibited from "using in any manner whatsoever Plaintiff's trade secrets and confidential and proprietary information." (Am. Inj., Dkt. 80, at 2.) Plaintiff's client list is indisputably part of Plaintiff's trade secrets and confidential information, and Safa was prohibited from emailing it, whether she did so intentionally or otherwise. *McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act.") (citations omitted)

Thus, the Court finds that there is clear and convincing evidence that Defendants violated the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction.

### 3.    Safa Did Not Exercise Reasonable Diligence

To the extent that Safa wished to comply with the Court's Orders but was confused about them, she could have asked the Court for "a modification, clarification[,] or construction of" them. *CBS Broad. Inc.*, 814 F.3d at 99 (quoting *McComb*, 336 U.S. at 192). She did not do so. Instead, it appears that she understood the Court's Orders very well and took efforts to conceal her efforts to violate them, including by making multiple successor entities and attempting to hide the related paper trails. Indeed, Safa's only frustration appears to be that she was not more successful in violating this Court's Orders. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 55:14–18, 51:24–25) (Safa

acknowledging that had the plan to create IMELR gone "through, it would have been a blatant violation," but stating that she "would have loved for it to go through at the time").)

Thus, the Court finds Safa and Companions, again, in civil contempt for violating the Amended Injunction, the March 2023 TRO, and the March 2023 Expanded Injunction. But the Court cannot enter an order finding them in civil contempt at this time because Plaintiff has not submitted the required affidavit "set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party." *See* Loc. R. 83.6(a); *see also* Loc. R. 83.6(c) (requiring the Court "to set[] forth the amount of damages, if any, to which the complainant is entitled" and "fixing the fine, if any, imposed by the court" in an order of civil contempt).

For this reason, the parties will further brief the issue of damages and attorneys' fees based on the schedule set forth at the end of this M&O, and in compliance with the instructions provided *infra* Conclusions of Law § I.G.

## F.  The Court Finds Liddie and IMELR in Contempt

As noted, while Plaintiff's March 2024 Contempt Motion, (Dkt. 288), did not request that the Court find Liddie and IMELR in civil contempt, Plaintiff's Post-Hearing Letter, (Dkt. 411), did. The Court finds that Liddie and IMELR are in contempt of the March 2023 TRO and March 2023 Expanded Injunction, and will issue an order of contempt, subject to the parties' briefing on damages and attorneys' fees.

As previously explained, the Court's previous Orders are clear and unambiguous. Further, during the May 2023 Hearing, the Court warned Liddie not to rely on client referrals from Beibin because he was an agent of Companions and the Gelardis. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 127:23–129:1; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 241:16–242:4.) The Court also stated that it would "give a copy of this amended preliminary injunction to [Liddie's] lawyer so she [could]

41

properly advise [him] about [its] overall contours." (5/4/2023 Hr'g Tr., Dkt. 219-1, at 127:16–18.) This sufficed to give Liddie and IMELR "actual notice" of this Court's Orders. Fed. R. Civ. P. 65(d)(2). Liddie confirmed during the July 2024 Hearing that he became aware of the Enjoined Customers List during the May 2023 Hearing, though he claimed that he did not know who was on the list because he never received it. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 106:4–107:5.)

Evidence of Liddie and IMELR's noncompliance is clear and convincing. 98% of IMELR's income is from customers on the Enjoined Customers List. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:23–129:1). As explained previously, IMELR was not formed as a corporate entity until May 9, 2023—five days after the May 2023 Hearing—and did not have its own bank account until sometime in May 2023. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 204:20–205:10.) Thus, as of the July 2024 Hearing, nearly all of IMELR's income had come from Watchdog customers on the Enjoined Customers List even though Liddie had notice of the list and the Court's Orders before IMELR was formed as a corporate entity. Whether Liddie and IMELR *willfully* violated the Court's Orders is irrelevant to the Court's finding of contempt. *McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act.") (citations omitted).

Lastly, Liddie and IMELR clearly did not exercise reasonable diligence because Liddie testified that he "did not make a[ny] effort" to get a copy of the Enjoined Customers list, despite being on notice that he and IMELR were not to serve any customers on it, and despite his attorney having received a copy of it at the May 2024 Hearing. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 121:20–24); *CBS Broad Inc.*, 814 F.3d at 99 (explaining that if someone "subject to an injunction . . . wanted to insure that [they] remained in compliance," that person "'could have

42

petitioned the District Court for a modification, clarification, or construction of the order'") (quoting *McComb*, 336 U.S. at 192)).

As previously stated, the parties are directed to further brief the issue of damages and attorneys' fees based on the schedule set forth at the end of this M&O, and in compliance with the instructions provided *infra* Conclusions of Law § I.G.

### G.    The Court Requires Further Briefing Regarding Compensatory Damages

Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages.  *See* Loc. R. 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be available to the moving party*.  A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353 (explaining that "[c]ompensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)).  Though Plaintiff seeks $2,490,000.00 in compensatory damages, (Pl.'s PHL, Dkt. 411, at 8), Plaintiff's briefing is not sufficient to support that amount.  The Court also notes that this amount is purportedly based in part on Defendants' 2022 revenue, (*id.*), even though the actions relevant to this M&O took place in 2023.

Thus, Plaintiff is directed to submit a motion that sets forth the actual damages it has incurred due to Safa, Companions, Liddie, IMELR, AES, and The IME Company's 2023 conduct as detailed above.  Plaintiff's briefing should be no more than five pages, should contain only information that is necessary to demonstrate its actual damages, and should not contain any

procedural history or colorful descriptors of the relevant conduct.  Plaintiff may file an affidavit supporting these costs that also contains only information that is necessary to demonstrate its actual damages.  Defendants and Liddie, if they so choose, may respond.  If they do, their responses similarly must be limited to no more than five pages (plus a supporting affidavit), should contain only information that is necessary to rebut Plaintiff's claimed damages, and should not contain any procedural history or colorful descriptors of the relevant conduct.

## II.    Preliminary Injunction

### A.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right. A plaintiff seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666–67 (2d Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)).  "As a general matter . . . monetary injuries, such as those alleged by Plaintiff, do not constitute irreparable harm because such injuries can be estimated and compensated." *Baptichon v. Fed. Rsvr. Bank of Minneapolis*, No. 24-CV-6748 (PKC) (LB), 2024 WL 4350825, at *2 (E.D.N.Y. Sept. 30, 2024) (citing *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)).

"In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by showing a clear or substantial likelihood of success on the merits, and by making a strong showing of irreparable harm." *JTH Tax, LLC*, 62 F.4th at 667 (cleaned up).  "First, a plaintiff must meet that standard if [they] seek[] an injunction that provides [them] substantially all the relief [they] seek[] in the litigation, and that cannot be meaningfully undone in the event

that the enjoined party prevails at trial on the merits . . . . Second, a plaintiff must meet that standard if [they] seek[] a so called 'mandatory injunction'—that is, an injunction that 'alter[s] the status quo,' which usually is done by 'commanding some positive act.'" *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34–35 (2d Cir. 1995)). "Under the heightened standard, [the party seeking a preliminary injunction] must 'show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm.'" *Id.* at 669 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole or attempted to steal from Plaintiff.

## B.    Likelihood of Success on the Merits

Plaintiff argues, correctly, that it has "previously proven a likelihood of success on the merits." (Pl.'s Mem., Dkt. 354, at 10.) The Court has found so under both the general standard for preliminary injunctions and the heightened standard for mandatory injunctions. *See IME Watchdog, Inc.*, 2022 WL 1525486, at *6 (applying the general standard for preliminary injunctions and "reiterat[ing the Court's] finding, made at the close of the show-cause hearing, that Plaintiff has established a likelihood of success"); *IME Watchdog, Inc.*, 732 F. Supp. 3d at 240 (applying the heightened standard for mandatory injunctions and finding "that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants").

Defendants argue that "Plaintiff has fallen far short of establishing its right [to] this drastic relief" because "Plaintiff has failed to identify any documents or electronic accounts in Defendants' possession that contain Plaintiff's alleged trade secrets, let alone show that they are being used by Defendants." (Defs.' Mem., Dkt. 369, at 7.) Further, Defendants argue that they

45

"cannot defend a trade secret violation case without access to the documents which purport to reflect the alleged trade secrets and would be handcuffed by the Court if forced to do so." (*Id.* at 8.) But Defendants' first argument is not true, and the second is nonsensical.

As the Court has already found, "there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 240. Further, as the Court found, *see supra* Factual Findings §§ III–IV, since the Amended Injunction, March 2032 TRO, and March 2023 Expanded Injunction were issued, Defendants: (1) continued to perform IMEs for Subin, Plaintiff's client; (2) created IMELR and AES as attempts to circumvent the Court's previous Orders; (3) referred a firm on the Enjoined Customers List, Bergman, to IMELR; (4) referred Subin to AES; and (5) distributed Watchdog's client list to Giant Partners long after Defendants were prohibited from possessing that list.

Liddie argues that "[t]he likelihood of success on the merits of the instant case between the actual parties has no bearing on whether Safa has any ownership in [IMELR]," and that it has "not been shown" that "Safa is operating [IMELR]." (Liddie Second Resp., Dkt. 361, at 10.) He also argues that "it has not been made clear as to whether the law firms that [IMELR] is servicing are [] even part of the [Enjoined Customers List]." (*Id.*) As the Court found, though, Safa helped create IMELR and referred to it one of its earliest clients, Bergman. *See supra* Factual Findings § IV.B–C. Further, nearly all of IMELR's income is from firms on the Enjoined Customers List. Thus, Liddie's arguments are unavailing, and the Court once again finds that Plaintiff is likely to succeed on the merits of its claims against Defendants.

## C. Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction" and "[p]laintiffs must demonstrate that absent a preliminary injunction

they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC*, 62 F.4th at 672 (citations and quotation marks omitted).  A defendant's dissemination of trade secrets can be sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 331 (E.D.N.Y. 2020); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever."); *Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal citation and quotation marks omitted)).

Plaintiff argues that "the imminent use of a trade-secret constitutes irreparable harm," and that "Defendants, Liddie[,] and IMELR have been and continue to utilize [and] solicit [Watchdog]'s customers and have repeatedly violated Court Orders related to [the] same."  (Pl.'s Mem., Dkt. 354, at 9.)  This, Plaintiff argues, "is evident from" Safa's February 2023 email distributing the Watchdog client list to Giant Partners.  (*Id.*)  In its post-hearings briefing, Plaintiff argues that Defendants created IMELR and AES to continue "to attempt to serve Plaintiff's customers in violation of this Court's Orders."  (Pl.'s PHL, Dkt. 411, at 2.)  In response, Defendants argue that Plaintiff has not "identified any imminent harm it will sustain in the absence of injunctive relief."  (Defs.' Mem., Dkt. 369, at 6.)  Defendants further argue that "none of the

subject law firms want to work with [P]laintiff." (Defs.' PHL, Dkt. 413, at 3 n.1.) For his part, Liddie argues that Plaintiff will not suffer irreparable harm because "Plaintiff[ has] not established that [IMELR] has utilized any trade secret of the Plaintiff." (Liddie Second Resp., Dkt. 361, at 10.)

The Court has previously found evidence of irreparable harm to Plaintiff based on the proven theft of Watchdog's trade secrets. *See IME Watchdog, Inc.*, 2022 WL 1525486, at *7 ("[T]here is no doubt that Companions' existence and growth is based in part on Watchdog's misappropriated trade secrets, customers, and business opportunities."); *see IME Watchdog, Inc.*, 732 F. Supp. 3d at 242 ("Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction."). Defendants wrongfully misappropriated Plaintiff's trade secrets and customer information by, *inter alia*, continuing to perform IMEs for firms on the Enjoined Customers List (such as Subin and Bergman), recommending Subin consider using AES, and by sending Watchdog's client list to Giant Partners.[34] Further, Defendants' argument that "none of the subject law firms want to work with [P]laintiff," (Defs.' PHL, Dkt. 411, at 3 n.1), works against Defendants' position. Though the Court need not consider this conclusory statement that has not been raised or addressed

---

[34] Defendants argue that they should not be directed to return Plaintiff's documents containing Plaintiff's trade secrets and confidential and proprietary information because "Plaintiff has failed to identify any documents or electronic accounts in Defendants' possession that contain Plaintiff's alleged trade secrets." (Defs.' Mem., Dkt. 369, at 7.) Given that Safa still had the Watchdog client list in her possession when she sent it to Giant Partners, this is patently false. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 87:1–89:16.) Furthermore, there is simply no legitimate reason for Defendants to retain Plaintiff's trade secrets or proprietary information and they should therefore be under a continuing obligation to turn them over upon learning that they have them. Their claimed or feigned ignorance about not possessing them is not a basis for the Court not to order their return.

elsewhere in the parties' briefing or the Hearings, if it is true that certain subject firms do not want to work with Plaintiff, this very well could be the result of "[l]oss of goodwill and injury to reputation," which are the injuries Plaintiff is claiming and "are difficult to measure in dollars." *Coastal Distrib., LLC*, 2006 WL 270252, at *3.

Once again, even with multiple injunctions and Court Orders in place, Defendants have continued to inflict, or attempt to inflict, harm on Plaintiff. Thus, the Court is convinced that absent a stricter preliminary injunction that encompasses Liddie, IMELR, AES, and The IME Company, this pattern of contumacious conduct will continue.

### D. Narrowly Drawn Injunction

In cases involving the alleged theft of trade secrets, the Second Circuit instructs that: "where irreparable injury has been demonstrated, a 'narrowly drawn' preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)). Here, the Court issues a narrowly tailored injunction, enjoining Defendants, Liddie, IMELR, AES, and The IME Company from: (1) providing services to or contacting those customers who Plaintiff has shown were misappropriated from Plaintiff; (2) using Plaintiff's trade secret and confidential and proprietary information in any manner; (3) returning to Plaintiff documents, records, and information that contain Plaintiff's trade secrets and confidential and proprietary information; (4) providing a list of all customers served by Defendants, Liddie, IMELR, AES, and The IME Company for purposes of issuing a Court-Authorized Notice; and (5) placing a public notice on the homepages of IME-related websites operated by Defendants, Liddie, IMELR, AES, and The

IME Company.[35]  The Court notes again that this strengthened injunction is necessitated by Defendants', Liddie's, and IMELR's violation of the previous Orders.

### E.    Balance of Equities

The Court once again finds that the balance of equities tips decidedly in Plaintiff's favor. *IME Watchdog Inc.*, 732 F. Supp. 3d at 242.  Plaintiff argues that its "legitimate interest in protecting against Defendants' exploitation of its trade secrets and its long-standing relationships and goodwill with its customers certainly outweighs Defendants' minimal interest in stealing that information through bribery so that it can do business with those customers in direct competition with [Watchdog], or do business at all given that Defendants have stolen everything they use to run their competing business, and do so by continuously violating this Court's Orders with impunity."  (Pl.'s Mem., Dkt. 354, at 13.)  Defendants do not address this factor in their briefing. (*See generally* Defs.' Mem., Dkt. 369; Defs.' PHL, Dkt. 413; Defs.' PHR, Dkt. 422.)  Liddie argues that "the balance of equities tip in [his] favor . . . because an injunction against his business or court notice or restriction on his business and/or website would cripple his ability to grow his business of which he has an indelible right to do."  (Liddie Second Resp., Dkt. 361, at 13.)

---

[35] The Court notes that Plaintiff seeks a more expansive preliminary injunction. (*See* June 2024 TRO and PI Mot., Dkt. 353, at 2–3 (proposing Defendants, Liddie, and IMELR be directed "to make all electronic accounts . . . in their control" and containing Watchdog-related information available to Plaintiff, that they pay for another forensic analysis of their digital devices, that they be enjoined from operating Companions and/or IMELR, and that the U.S. Marshals be directed to arrest Safa, Vito, and/or Liddie); Pl.'s PHL, Dkt. 411, at 8 (requesting attachment of all properties owned by Safa, Vito, and Liddie, as well as any corporate entities in which they have ownership interest, that the Court issue case-ending sanctions pursuant to Rule 16(f), and that Liddie and Defendants pay for a forensic analysis).  The Court declines to include these orders in this preliminary injunction.  The Court has already attached Defendants' Staten Island property.  Further, a forensic analysis has already been performed, and the burden of an additional one currently outweighs the benefit.  The Court might revisit Plaintiff's request for case-ending sanctions after the Show Cause hearing scheduled for April 2, 2025.

Here, Plaintiff has consistently demonstrated sufficient hardship and threat of irreparable harm, and Defendants have consistently demonstrated an undeterrable resolve to circumvent this Court's Orders and improperly use Plaintiff's trade secrets. Furthermore, "the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity." *IME Watchdog Inc.*, 732 F. Supp. 3d at 242 (collecting cases). Second, the Court is not persuaded that Liddie would be unduly burdened by an injunction impacting IMELR. This is an activity that Liddie "probably should not have engaged in to begin with," given that 98% of his customers are ones he should have known he was prohibited from servicing, and so he would suffer no real hardship from an injunction. *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding that "[t]he fact that [a party] expended a large sum of money on its [improper activity] is, of course, no basis for concluding that the balance of hardship tips in its favor").

Further, IMELR is far from Liddie's only or primary source of income. Liddie is employed full time as an NYPD officer, has a tax preparation business, and, apparently, is significantly involved with Amway, a multi-level marketing business. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 99:11–18 (Liddie is a full-time police officer), 68:25–69:5 (Amway is a multi-level marketing business); 7/29/2024 Hr'g Tr., Dkt. 437-1, at 186:11–12 (Liddie runs a tax preparation company); Liddie Decl., Dkt. 362, ¶ 9 (attesting that Liddie is a "Sapphire level member" with Amway, meaning that he "generates over $900,000.00 in one year for the company," and is "not desperate for passive income from the Gelardis").)[36] Defendants, Liddie, and IMELR "assumed the risks of losing

---

[36] The Court notes that, as of the July 2024 Hearing, Liddie had not informed the NYPD of his IMELR work, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 197:16–21), despite being informed during the May 2023 Hearing that the NYPD Administrative Guide requires approval for off-duty employment, including for work that relates to having an ownership interest in another business, (5/4/2023 Hr'g Tr., Dkt. 219-1, at 121:3–122:9).

[their] customers when [they] intentionally engaged in illegal activity to obtain them, and cannot legitimately claim any harm when they are forced to relinquish their ill-gotten business." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 243.

### F.     Public Interest

Defendants' briefing is also silent on the matter of public interest.  (*See generally* Defs.,' Mem., Dkt. 369; Defs.' PHL, Dkt. 413; Defs.' PHR, Dkt. 422.)  Liddie argues that an injunction would be of disservice to the public interest "because it would deprive New York law firms of the option of free choice in business," and would "send the message to the public that your mere association with an accused party can make you subject to the destruction of your business no matter the level of proof."  (Liddie Second Resp., Dkt. 361, at 13.)

As the Court has previously explained in this case, "[i]t goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest."  *IME Watchdog, Inc.*, 732 F. Supp. 3d at 243 (quoting *IME Watchdog, Inc.*, 2022 WL 1525486, at *8).  Contrary to Liddie's argument, the Court declining to order a stronger injunction would send the wrong "message to the public" that one can repeatedly misappropriate or attempt to misappropriate another's trade secrets—despite clear and unambiguous Court Orders prohibiting just that—without consequence.  The Court thus finds that the public interest will be best served by an injunction prohibiting Defendants, Liddie, IMELR, AES, and The IME Company from further using what the Court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets to poach clients from Plaintiff.

### G.     Bond

As before, the Court waives the bond requirement imposed by Federal Rule of Civil Procedure 65(c).  Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond, *see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant," *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted). If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (per curiam).

Here, Defendants, Liddie, and IMELR have not requested a security bond and Plaintiff similarly has not raised the issue. Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case. The Court has concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants, Liddie, IMELR, AES, and The IME Company from a preliminary injunction, if any, would therefore be minimal. *Golden Krust Patties, Inc.*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm."). Accordingly, the Court finds that no bond is required.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiff's motion for contempt and request for a third preliminary injunction. The Court attaches the Third Amended Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order. Moreover, although the Court finds Safa, Vito, Companions, Liddie, and IMELR in civil contempt of the Court's previous Orders, the Court reserves making a final ruling on damages and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees, for the 2024 Hearings. Plaintiff's supplemental brief setting forth the specific amounts of attorneys' fees and compensatory damages it seeks as a result of Defendants' and Liddie's conduct and the creation of IMELR should be filed within sixty (60) days of this Order, i.e., by May 30, 2025, and should comply with the guidance provided above. Defendants and Liddie will be permitted to respond within thirty (30) days of Plaintiff's supplemental brief being filed, i.e., by June 30, 2025, if they so choose, and their supplemental brief should comply with the guidance provided above.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 31, 2025
      Brooklyn, New York