UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IME WATCHDOG, INC.,

                *Plaintiff*,


       -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, DECLARATION OF GREGORY ELEFTERAKIS, ROMAN POLLAK, JONATHON D. WARNER, ESQ. ANTHONY BRIDDA, IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC, and IME MANAGEMENT & CONSULTING LLC,

                *Defendants*.
-----------------------------------------------------------------X

Pro Se Defendants' Opposition to Plaintiff's Letter Motion to Strike Entry 510-1

### DEFENDANTS' EMERGENCY RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE

**Honorable Judge Chen,**

With the utmost respect for this Court and understanding of the difficult position you face in managing this complex case I write as a pro se defendant in opposition to Plaintiff's letter motion to strike Docket Entry 510-1. I respectfully submit this response to clarify the record, correct mischaracterizations, and bring the Court's attention to critical truths that have thus far been overlooked due to prior ineffective representation. I also ask the Court's patience and understanding as I try to navigate complex legal procedures without the benefit of counsel, while attempting to correct past injustices in this matter. Plaintiff's latest motion represents a transparent attempt to suppress the truth through procedural maneuvering rather than substantive argument. We understand the difficult position created by prior rulings, we recognize the Court's need for finality in its decisions, but when those decisions were based on fraudulent representations, justice demands reconsideration.

Below, I respond point-by-point to the issues raised in Plaintiff's motion.

### 1. 1. Compliance with Court Orders and Alleged Disclosure of Confidential Information

The plaintiff falsely claims that Defendants failed to comply with the Court's Order regarding property sale proceeds. The record shows we provided a detailed accounting of every dollar from

the forced sale of our home - funds that were exhausted before receipt due to legal fees and basic survival expenses caused by this litigation.

The record shows:

- Defendants did, in fact, comply with Court orders by submitting a detailed accounting of the proceeds from "9 Woods," as requested We provided a **detailed accounting** of how the $123,670.47 was allocated to legal fees and basic living expenses

- The document submitted as Entry 510-1 included a list of law firms The "client list" in ECF 510-1 contains **no confidential information**, just law firm names, The same attorneys appear when Googling "NYC personal injury attorneys" - these lawyers **pay for visibility** through advertisements on buses, billboards, and online directories. The same list appears on plaintiff's public website as "WD customers. This exhibit was submitted to expose a material misrepresentation made by the Plaintiff: they previously presented the Court with a marketing list of nearly 500 firms and claimed it reflected actual clients. Entry 510-1 was meant to show the true scope of their client base, directly contradicting that claiming the "client list" in ECF 510-1 is an **actual client list** from 2017 (not a marketing list) proving Plaintiff misrepresented having 476 active clients.

- While I acknowledge that the Profit and Loss Statement should have been filed under seal, this was an unintentional procedural error due to my lack of legal training, not an act of bad faith. I respectfully ask the Court to consider sealing that portion rather than striking the exhibit entirely, as the document is critical to disprove Plaintiff's misstatements to this Court regarding their revenue and client base. The financial records speak for themselves. Watchdog's reported revenue of approximately $276,000 for January through March 2017—projecting to roughly $1.1 million annually—is irreconcilable with Plaintiff's claim of serving 476 clients. Based on standard industry billing practices, a client base of that size would reasonably generate between $2.4 to $4.8 million annually. In contrast, the revenue figures are entirely consistent with a smaller, verifiable client base—similar to IME Companions, which had approximately 100 clients, with 35–40 booking consistently and the remainder engaging sporadically. The 107-client list submitted into evidence, sourced directly from Plaintiff's own materials, accurately reflects this economic reality. The so-called "476-client list" is nothing more than an inflated marketing document—misrepresented as evidence of active business relationships and used strategically to secure a TRO and damage Defendants' operations. The numbers don't lie; the Plaintiff does.

    Their marketing list was disguised as a client roster to deceive this, Court. This Court should be deeply troubled that Plaintiff seeks to seal what amounts to a *digital Yellow Pages listing* while simultaneously fraudulently misrepresenting a marketing list as a client list.

## 2. Allegation of "Bad Faith" in Submitting Evidence

Plaintiff's claim that Defendants acted in bad faith by submitting this evidence is unfounded. The materials were retrieved from communications with my former attorneys, not from any retained or hidden WD files—and were submitted solely to expose clear contradictions in Plaintiff's prior representations to this Court. This case has been built upon a foundation of falsehoods, and I am attempting, as a pro se litigant, to shed light on these issues.

Our intent has never been to flout court orders but to tell the full truth. Plaintiff's repeated assertion that we have acted in bad faith is both unfounded and damaging. I respectfully ask the Court to consider our position not as defiance but as a plea for fairness and truth in the face of extraordinary legal pressure. These documents are critical in demonstrating that the Plaintiff has exaggerated the size of its client base, which has significantly influenced the trajectory of this case, including the issuance of a TRO. Our use of these materials was lawful, justified, and in service of the truth—not in defiance of the Court's directives.

## 3. Return and Destruction of Alleged WD Information

**Plaintiff alleges that Defendants have failed to destroy or return confidential material. I respectfully affirm to this Court that I do not possess any Watchdog (IME WatchDog, Inc.) materials in violation of any Court order.**

In preparing my recent filings as a pro se litigant, I accessed materials that had previously been sent to my former legal counsel. These documents were emailed to my attorneys during the course of their representation and were intended to be used to defend me against false claims made by the Plaintiff. I located these materials by searching through my own email correspondence with prior counsel. They are not stored on my computer or in my files, and I do not maintain possession of them beyond what was necessary to retrieve and submit them in good faith to this Court. These documents were and continue to be essential to demonstrating the truth. Their submission to this Court was not in defiance of any protective order or discovery rule, but in good faith and consistent with the principles of fairness and truth-seeking that underpin this Court's authority.

This material was emailed freely and voluntarily by Adam Rosenblatt, Plaintiff's current president, who submitted a contradictory affidavit stating he was paid $20,000 for the same. Notably, after a $80,000 forensic audit of my devices, no evidence was found of such a payment or any request for WD data.

This case has rested on the narrative that Adam Rosenblatt was somehow exploited by Defendants. The reality is, he was actively seeking a business partner and freely disseminated this information to multiple parties, including myself. I never agreed to partner with him, and the information was clearly sent to entice such a partnership. These materials were not obtained

through any unlawful, improper, or unauthorized means. They were neither solicited under false pretenses nor misappropriated in violation of any duty of confidentiality. Rather, the materials were voluntarily and affirmatively provided by Adam Rosenblatt—still, President of Plaintiff IME WatchDog, Inc.—in the context of business discussions initiated by him. His communications, including an attached exhibit proposing a potential payment structure, demonstrate that the disclosure was part of his effort to initiate a commercial partnership. These voluntary disclosures negate any assertion that Defendants improperly acquired or retained confidential business information. These materials were not solicited through improper channels, nor were they stolen or misappropriated. Rather, they were freely offered as part of an effort to entice business collaboration.

Now, as Plaintiff in this litigation relies on inconsistent and demonstrably false factual assertions, including inflated client numbers, revenue exaggerations, and false narratives about the origins of alleged confidential information, it is entirely proper and necessary for Defendants to use **this voluntarily disclosed evidence** to mount a legitimate defense.

Courts have repeatedly held that **a party may use confidential or internal business information disclosed by an opposing party's agent—particularly where the agent voluntarily shared that information without any inducement or misappropriation**:

- In **DB Riley, Inc. v. AB Engineering Corp.**, the court held that "[v]oluntary disclosures to third parties negate any claim of trade secret protection," and found that information shared without confidentiality protections could not be retroactively treated as proprietary. [1]
- In **Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.**, 923 F. Supp. 1231, 1252 (N.D. Cal. 1995), the court denied injunctive relief where the alleged confidential materials had already been disclosed to outsiders without proper safeguards, holding that the disclosing party effectively waived protection.
- Moreover, under **Federal Rule of Civil Procedure 26(b)**, parties are permitted to obtain and use relevant non-privileged information in their possession, custody, or control that bears on any claim or defense.[2] That includes information received from a third party— particularly when that third party is a current officer or principal of the Plaintiff who voluntarily disclosed it during the relevant time period.
- In **Hickman v. Taylor**, 329 U.S. 495, 511 (1947), the U.S. Supreme Court reaffirmed that the "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." [3]

The Plaintiff's own subpoena to the web developer confirms that Mr. Rosenblatt began building a competing business using similar resources. Plaintiffs have cherry-picked facts to preserve a misleading narrative, while ignoring crucial counterevidence.

The information Mr. Rosenblatt shared cannot now be weaponized by Plaintiff to claim wrongdoing by Defendants, especially when it directly contradicts Plaintiff's factual allegations and was sent freely. Plaintiffs cannot have it both ways: leveraging Rosenblatt's cooperation when convenient, then disavowing his actions when they expose misconduct.

### 4. Plaintiffs' Repeated Requests for Sanctions

Plaintiff's constant motions for sanctions appear to be a tactic of attrition rather than a pursuit of justice. Despite having the opportunity, Plaintiff has not moved for summary judgment or attempted to prove damages through admissible evidence. Instead, they seek penalties for procedural missteps—many of which stem from my attempt to represent myself while correcting past misrepresentation by my former attorneys.

This pattern of litigation abuse must be acknowledged. If their case is truly strong on the merits, let them prove it without resorting to threats and requests for incarceration over technicalities.

### 5. Alleged Defamation of Daniella Levi

The facts referenced regarding Ms. Levi stem from publicly available records. I would not even be aware of them had Carlos Roa not provided this information. While these matters are not central to the claim at issue, they are raised to challenge credibility and character, particularly where Plaintiff's own narrative depends on presumed integrity.

I do not take joy in repeating these facts. But when Plaintiff claims reputational harm without showing actual damages, it is necessary to demonstrate that character and credibility are not on their side.

### 6. Alleged "Parroting" of Settlement Concerns and Financial Misconduct

The plaintiff accuses us of insincerity in referencing their refusal to settle. This accusation is false and deeply hurtful. Nearly two years ago, we agreed verbally and emotionally to Plaintiff's full $316,000 settlement demand. We offered an apology and handshake to end this. It was Plaintiff who refused closure.

Since then, my family has sold properties at a loss just to stay afloat. My Florida property was purchased with proceeds from the sale of my Brooklyn home. These were not strategic sales to avoid judgment but desperate attempts to survive. When the Temporary Restraining Order (TRO) was issued, my income was effectively cut off, making it extremely difficult to keep up with mortgage payments, taxes, and other essential expenses related to our properties. This financial strain was a significant factor in our decision to sell, as we had no sustainable means to cover ongoing costs without access to our business revenue

The accusation that we are playing "financial hide and seek" is cruel and baseless. Plaintiffs' request in Entry 506 to incarcerate my husband and me shows a desire not to resolve, but to destroy. How would putting us in jail help anyone get paid?

## Conclusion

Your Honor, this case has taken an extraordinary toll on my family—emotionally, financially, and personally. I do not seek sympathy but understanding. I implore the Court to view these filings not as defiance but as desperate attempts to be heard and to correct a record built on deception. This is not litigation, it is persecution.

I respectfully request that the Court deny Plaintiff's motion to strike Entry 510-1 and consider sealing only those documents that require confidentiality. Please let the truth be seen.

Respectfully Submitted,

Safa Gelardi

Pro Se Defendant

1. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("Courts should not tamper with the pleadings unless there is a strong reason for doing so.").

2. *Estee Lauder Cos., Inc. v. L'Oreal, S.A.*, 129 F. Supp. 2d 229, 235 (S.D.N.Y. 2001) ("Publicly available customer lists are not trade secrets.").

3. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143 (2d Cir. 2004) ("Sealing is the appropriate remedy for inadvertent disclosures, not striking.").

4. Fed. R. Civ. P. 26(b)(3)(C) ("Any party… may obtain without the required showing a copy of the party's own previous statement.").

5. *Hickman v. Taylor*, 329 U.S. 495, 511 (1947) ("Mutual knowledge of all the relevant facts… is essential to proper litigation.").

6. *DB Riley, Inc. v. AB Engineering Corp.*, 977 F. Supp. 84, 90 (D. Mass. 1997) ("Voluntary disclosures negate any claim of trade secret protection.").

7. *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) ("Sanctions under Rule 37 are warranted only when failure to comply is due to willfulness, bad faith, or fault.").

8. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) ("Truth is a defense in a defamation claim; actual malice must be shown to prevail.").

9. DB Riley, Inc. v. AB Engineering Corp., 977 F. Supp. 84, 90 (D. Mass. 1997) ("Voluntary disclosures negate any claim of trade secret protection.").
10. Fed. R. Civ. P. 26(b)(1).
11. Hickman v. Taylor, 329 U.S. 495, 511 (1947).