*** Filed ***
11:23 AM, 21 Jul, 2025
U.S.D.C., Eastern District of New York

**Safa Gelardi**
Pro Se Defendant

**July 21, 2025**

**VIA ECF**
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *IME Watchdog, Inc. v. Gelardi, et al.*, Case No. 1:22-cv-01464 (PKC)(JRC)

## DE DEFENDANT'S MOTION FOR JUDICIAL NOTICE AND RELIEF TO ADDRESS BAD FAITH LITIGATION, COERCIVE SETTLEMENT TACTICS, AND EXTRAJUDICIAL INTIMIDATION

**TO THE HONORABLE COURT:**

Defendant Safa Gelardi, appearing pro se, respectfully moves this Court to take judicial notice of a pattern of bad faith litigation, coercive settlement practices, and extrajudicial intimidation orchestrated by Plaintiffs and their affiliates. These actions have materially impaired the fairness of this proceeding and corroded its integrity.

## I. LEGAL BASIS FOR JUDICIAL NOTICE

Under Federal Rule of Evidence 201, a court may take judicial notice of facts that are not subject to reasonable dispute because they are either (1) generally known within the trial court's jurisdiction, or (2) capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned.

Judicial notice is routinely granted for public records, prior litigation, and patterns of conduct that bear on the integrity of judicial proceedings. See, e.g., *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (judicial notice proper for SEC filings and public records); *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (courts may take notice of public records and verifiable facts).

Additionally, this Court retains inherent authority to safeguard its proceedings from abuse. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980).

Settlements procured under threats or intimidation are unenforceable. See *F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982); *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 186–87 (1972). Waivers of legal rights must be knowing and voluntary. See *Gonzalez v. United States*, 553 U.S. 242, 246 (2008).

This motion seeks judicial notice of the following:

- The terms of Plaintiffs' settlement demand (Exhibit A);

- Public records concerning Plaintiffs' investigator Steven Rambam (Exhibit B);

- NYSCEF records showing Daniella Levi as attorney for Carlos Roa in unrelated estate proceedings (Exhibit C);

- Carlos Roa's separately submitted settlement demand (Exhibit D

## II. PATTERN OF COERCION, INTIMIDATION, AND ABUSE

### A. Preliminary Context: Defendant's Use of a Private Investigator

I did not seek to violate any order or act outside the bounds of lawful conduct. Rather, I was attempting to defend herself — to uncover the truth about who was targeting me and my family and to bring that truth before the Court.

The investigator was found through a simple Google search — a retired NYPD officer based in Staten Island. I did not pursue anyone with a government or intelligence background. Plaintiffs, however, retained a high-profile operative known for confrontation, intimidation, and covert tactics. This contrast is not just stark — it is alarming.

Only during court proceedings did I recognize Rambam as the "ex-Mossad guy Daniella uses as muscle" — a phrase once mentioned by Adam Rosenblatt in passing. That reference seemed unremarkable then. In hindsight, it revealed a premeditated strategy of pressure, not evidence.

I instructed the investigator to befriend Carlos Roa, not manipulate him, based on prior knowledge of his tendency to boast and self-aggrandize. There was no intent to deceive or

coerce. At no point did I suggest placing a GPS tracker — that idea originated with the investigator as a cheaper alternative to surveillance. Believing it lawful, I agreed, hoping to lawfully obtain clarity in a hostile and asymmetric litigation. There was no malice, only desperation.

## B. Coercive Settlement Demands (Exhibit A)

Plaintiffs' April 25, 2025, settlement demand was not a sincere effort at resolution. It was a demand for total surrender. The terms included:

- A $1,000,000 payment over three years at an initial 9% interest rate, later reduced to 7%.

- A lifetime ban from the IME industry.

- A gag order forbidding any speech about Plaintiffs or this litigation.

- A $5,000,000 confession of judgment to be triggered by any alleged violation.

- Forced transfer of all digital domains.

- Collateralization of real estate, life insurance, and cryptocurrency.

These were not settlement terms — they were debt instruments and control mechanisms. The interest rate resembled that of a high-risk commercial loan. The confession of judgment posed catastrophic liability at the slightest breach. The lifetime industry ban and gag order defied basic constitutional protections.

One term stood out above all: Plaintiffs demanded to be named beneficiaries of mine and my husband's life insurance policies. This was not a legal term — it was a psychological weapon. No civil litigant seeks control over their opponent's death benefits unless their goal is domination, not compensation. This was not negotiation — it was subjugation.

## C. Pattern of Misconduct by Steven Rambam (Exhibit B)

Steven Rambam is a self-described ex-Mossad agent and public figure who promotes himself as "The Nazi Hunter." He is not a neutral investigator — he is a provocateur known for psychological warfare, witness confrontation, and covert infiltration.

These allegations are not mere conjecture. In *Jewish Defense Organization, Inc. v. Steven Rambam*, 1999 NY Slip Op 03052 (1st Dept. 1999), the Appellate Division affirmed a judicial finding of harassment and abuse by Rambam during civil litigation — confirming a documented pattern of extrajudicial overreach. Rambam has also publicly described himself as an ex-Mossad agent and psychological operative, as profiled in the Times of Israel article titled, *"P.I. turned Nazi hunter blames passive Jewish leaders for the 99.9% who got away"*. He has been federally charged for impersonating law enforcement, has faced witness tampering allegations in the NXIVM case, and was cited by the New York Department of State for operating under false names and intimidating witnesses. These are not media exaggerations — they are part of a public record. Plaintiffs did not retain a neutral investigator. They hired a high-profile intimidator with a history of misconduct — one who later appeared in court and engaged in real-world surveillance of me and my family. That choice was not incidental. It was a strategy.

While shopping with my children, I observed Rambam watching her in the supermarket. He smiled and made direct eye contact. On another day, he was parked behind me at school pickup. Drone activity was later observed over my Texas residence. This was not an investigation, it was psychological siege.

### D. Coordination Between Plaintiffs' Counsel and Carlos Roa (Exhibits C & D)

Plaintiffs' central fact witness, Carlos Roa, is represented by Plaintiffs' counsel, Daniella Levi, in an unrelated estate matter, a fact never disclosed to the Court. This dual representation compromises the independence of Roa's participation and undermines the credibility of his testimony.

Mr. Roa's separate $500,000 settlement demand mirrored Plaintiffs' language and tone, including demands for monetary payment and a written apology. This was not a coincidence, it was coordination.

Plaintiffs appear to have developed a playbook: threaten, isolate, then financially bleed the opposing party into surrender. This is not a conjecture, it has worked before. An industry peer facing nearly identical pressure vanished. Their domain now redirects to IME Watchdog. Their business dissolved. Their voice silenced. This was not a resolution, it was conquest.

### III. RELIEF REQUESTED

Courts may impose sanctions where litigation is weaponized to intimidate, punish, or manipulate. See *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 386 (2d Cir. 1981); *In re Itel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986); *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991).

In light of the above, Defendant respectfully requests:

1. That the Court take judicial notice of Exhibits A–D;

2. That any remaining BRG forensic balance be reassigned to Plaintiff's counsel Daniella Levi, given the absence of evidence supporting the coercion theory that justified the forensic review;

3. That sanctions and attorney's fees related to Defendant's private investigator be reversed, in light of the context now presented;

4. That the Court exercise its inherent authority to:

    o   Bar further reliance on sealed or unproduced affidavits;

    o   Reject any settlement offers tainted by coercive tactics;

    o   Impose sanctions under FRCP 11 or its inherent powers to deter continued litigation abuse.

## IV. CONCLUSION

This motion is not an act of vengeance — it is a final, clear call for fairness.

For nearly three years, I have been dragged through a legal gauntlet designed not to resolve a dispute, but to break me. I have endured sealed affidavits, coordinated proxy attacks, threats, drone surveillance, public intimidation, and settlement demands so grotesquely invasive they bordered on extortion. And through it all — I have not retaliated. I have not disappeared. I have not asked this Court for pity. Only for the opportunity to defend myself.

This case has not been prosecuted through the adversarial process. It has been executed through silence, fear, and concealment. When Plaintiffs could not win with facts, they resorted to force — psychological, financial, and reputational. What was presented to this Court as litigation has, in truth, been an organized campaign to isolate, intimidate, and silence me.

And yet I stayed. I showed up. I followed the rules. I complied with orders, even as I was labeled, sanctioned, and threatened. Not because I had power, but because I had truth — and I believed this Court would recognize it.

I submit this motion not as a legal technician, but as a human being whose life has been invaded and upended under color of litigation. The facts speak for themselves. The pattern is undeniable. The abuse is documented. The record is clear. What remains now is for the Court to act.

This is a moment that transcends procedure. It is about the integrity of this process. I am not asking for special treatment. I am asking for equal protection — and for this Court to acknowledge what it has now seen: that this case has been poisoned by intimidation, secrecy, and coercion.

I have done everything I could, with the little I have. It is now in the Court's hands.

**Dated: 7/21/2025**
**Respectfully submitted,**

**Safa Gelardi, Pro Se Defendant**

 Gmail

**Safa Gelardi <safagelardi@gmail.com>**

---

## FW: IME Watchdog v. Gleardi
3 messages

---

**Jonathon Warner** <jdwarner@wslaw.nyc>                                          Fri, Apr 25, 2025 at 3:26 PM
To: Safa Gelardi <safagelardi@gmail.com>, vito gelardi <vitogelardi@gmail.com>

>Just received from Watchdogs' lawyers.


>Jonathon D. Warner, Esq.

>Warner & Scheuerman

>6 West 18th Street, 10th Floor

>New York, NY 10011

>Office: 212.924.7111

>Fax:     212.924.6111

>Cell:    917.656.4197

>www.wslaw.nyc


>


---

**From:** Jamie Felsen <jamiefelsen@mllaborlaw.com>
**Sent:** Friday, April 25, 2025 4:14 PM
**To:** Jonathon Warner <jdwarner@wslaw.nyc>
**Cc:** Emanuel Kataev <emanuel@sagelegal.nyc>
**Subject:** IME Watchdog v. Gleardi


**<u>FOR SETTLEMENT PURPOSES ONLY</u>**


Jonathon,


In light of Judge Cho's request that we have settlement discussions prior to the settlement conference,
plaintiff's demand is as follows:

- $1,000,000.00 payment to plaintiff;

- Nationwide injunction in the IME business forever;
- Worldwide/Nationwide/Worldwideweb injunction on defendants engaging in slander, disparagement, libel, defamation of Plaintiff, its employees, agents, etc.;
- Confession of Judgement of $5,000,000.00 for violating either injunction;
- Transfer of ownership of imecompanions.com, accompaniedexams.com, theimecompany.com and any other domain name/website related to the IME business owned or operated by defendants; and
- Collateral on all properties, mortgages, life insurance, assets, stocks, and cryptocurrency until the settlement proceeds are fully paid.

_____

Jamie S. Felsen - Partner

Milman Labuda Law Group PLLC

3000 Marcus Ave., Suite 3W8

Lake Success, NY 11042

Telephone (516) 328-8899

Fax (516) 328-0082

This information contained in this message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication, and as such, is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this message and the enclosed documents in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify me immediately. Thank you.

 Gmail

**Safa Gelardi <safagelardi@gmail.com>**

---

## FW: Settlement Demand Carlos Roa
3 messages

---

**Jonathon Warner <jdwarner@wslaw.nyc>**                    Mon, Apr 10, 2023 at 4:16 PM
To: Safa Gelardi <safagelardi@gmail.com>

See attached.


Jonathon D. Warner, Esq.

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, NY 10011

Office: 212.924.7111

Fax:    212.924.6111

Cell:    917.656.4197

www.wslaw.nyc

Martindale-Hubbell®

AV PREEMINENT®
Peer Rated for Highest Level
of Professional Excellence    2022

---

**From:** LEO SHALIT <leo@shalit-law.com>
**Sent:** Monday, April 10, 2023 4:14 PM
**To:** emanuel kataev <Emanuel@mllaborlaw.com>; Jonathon Warner <jdwarner@wslaw.nyc>
**Subject:** Settlement Demand Carlos Roa


Hello Jonathan,


My client wishes to pursue a settlement conference. He is an seeking an apology as well as damages as itemized on the
attached spreadsheet.


Yours truly,

Leo Shalit, Esq.

45 Glen Cove Road

Greenvale, New York 11548

Telephone:  833.742.5481 ex. 2

The information contained in this message is intended only for the use of the individual or entity named above and may be privileged by law. If
the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in
error, please notify the sender immediately by reply e-mail, permanently delete all copies of the original message and destroy any hard copies.
Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work-product privilege. Nothing herein shall
constitute an electronic signature unless specifically so designated. Although this email and any attachments are believed to be free of any virus
or other defect that might affect any computer system into which it is received and opened it is the responsibility of the recipient to ensure that it
is virus free and no responsibility is accepted by us for any loss or damage arising in any way from its use. This email may contain Attorney
Advertising. Prior Results Do Not Guarantee Future Outcome. Super Lawyers is a rating service. Nothing should be construed to imply that
by virtue of inclusion into this rating service, attorney is holding himself out to be a "super lawyer" or possess any specialized skills or
qualifications or imply that he is inherently a better lawyer than any other lawyer. The attorney was merely included for rating by said service.

 **2023-04-07 Damage Calculations.xlsx**
15K

| | |
|---|---|
| **Date:** | 4/7/2023 |
| **Complaint date:** | 5/5/2022 |
| **Name**: | Carlos Roa |
| **Date of Hire**: | 1/1/2018 |
| **Date of Termination:** | 3/1/2022 |
| **Assumptions:** | All facts in third-party complaint are true |

| PERIOD | Regular Hours | OT Hours | Total Hours Worked | Regular Rate | Regular Pay Owed | OT Rate | OT Pay Owed | Lawful Pay Owed | Total Actual Paid | Total Weekly Under-payment | Weeks In Period | Total Underpayment | Federal Liquidated Damages | State Liquidated Damages | Total Owed | Total Damages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/2018 - 12/31/2018 | 40 | 40 | 80 | $21.88 | $875.20 | $32.82 | $1,312.80 | $2,188.00 | $1,750.00 | $438.00 | 52 | $22,776.00 | $0.00 | $22,776.00 | $45,552.00 | |
| 1/1/2019 - 12/31/2019 | 40 | 40 | 80 | $21.88 | $875.20 | $32.82 | $1,312.80 | $2,188.00 | $1,750.00 | $438.00 | 52 | $22,776.00 | $0.00 | $22,776.00 | $45,552.00 | |
| 1/1/2020 - 12/31/2020 | 40 | 40 | 80 | $21.88 | $875.20 | $32.82 | $1,312.80 | $2,188.00 | $1,750.00 | $438.00 | 52 | $22,776.00 | $22,776.00 | $0.00 | $45,552.00 | |
| 1/1/2021 - 12/31/2021 | 40 | 40 | 80 | $21.88 | $875.20 | $32.82 | $1,312.80 | $2,188.00 | $1,750.00 | $438.00 | 52 | $22,776.00 | $22,776.00 | $0.00 | $45,552.00 | |
| 1/1/2022 - 3/1/2022 | 40 | 40 | 80 | $21.88 | $875.20 | $32.82 | $1,312.80 | $2,188.00 | $1,750.00 | $438.00 | 8 | $3,504.00 | $3,504.00 | $0.00 | $7,008.00 | |
| | | | | | | | | | | | 216 | | $22,776.00 | $45,552.00 | $136,656.00 | $204,984.00 |

**Lost pay due to retaliation/whistleblower claims**

| | | | | | | | | | Total Actual Paid | | Weeks In Period | Total Underpayment | Federal Liquidated Damages | State Liquidated Damages | Total Owed | Total Damages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/2/2022 - 12/31/2022 | | | | | | | | | $1,750.00 | | 43 | $0.00 | $0.00 | $0.00 | $0.00 | $75,250.00 |
| 1/1/2023 - 4/7/2023 | | | | | | | | | $1,750.00 | | 16 | $0.00 | $0.00 | $0.00 | $0.00 | $28,000.00 |
| | | | | | | | | | | | 59 | | | | | $103,250.00 |

| | | |
|---|---|---|
| Punitive Damages | $ | 150,000.00 |
| Attorneys' Fees | $ | 10,000.00 |
| **TOTAL** | | **$468,234.00** |

Case 1:22-cv-01032-PKC-JRC    Document 569    Filed 07/23/25    Page 12 of 28 PageID #: 10281

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------X
CARLOS ROA, Proposed Administrator of the Estate of
DELFINO EDUARDO MACEDA, Deceased,
and Proposed Administrator of the Estate of TAURINO
ROSENDO MORALES,

                        Plaintiff,

      -against-

BALDOR SPECIALTY FOODS, INC., BALDOR
EXPRESS TRANSPORTATION CO. LLC, MILEA
LEASING CORP., and FRANK PETER SPORTELLO,
Individually,

                       Defendants.
---------------------------------------------------------------------X

Index No.: 153519/2022

**STIPULATION TO
ADJOURN DEFENDANTS'
MOTION TO DISMISS**

       **IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned,

attorneys for the respective parties herein that defendants BALDOR SPECIALTY FOODS, INC.,

BALDOR EXPRESS TRANSPORTATION CO. LLC, MILEA LEASING CORP., and FRANK

PETER SPORTELLO's motion to dismiss currently returnable on August 17, 2022, is here by

adjourned on consent of all parties to September 16, 2022, opposition papers to be served

September 2, 2022, and any reply papers to be served by September 15, 2022; and

       **IT IS FURTHER STIPULATED AND AGREED** that this stipulation may be executed

in counterparts and that facsimile/PDF signatures may be accepted as originals for all purposes.

Dated: New York, New York
       August 9, 2022

_Maria Zieher_____
Maria C. Zieher, Esq.
**ZIEHER & ASSOCIATES, P.C.**
Attorneys for Plaintiff
11 Broadway, Suite 615
New York, New York 10004
(212) 235-7010

_____
Daniella Levi, Esq.
**DANIELLA LEVI & ASSOCIATES, P.C.**
Attorneys for Plaintiff
159-16 Union Turnpike, Suite 200
Queens, New York 11366
(718) 380-7440

*Christopher Clarke*
_____
Christopher D. Clarke, Esq.
**LEAHEY & JOHNSON, P.C.**
Attorneys for Defendants
120 Wall Street, Suite 2220
New York, New York 10005
(212) 269-7308

**Tab B-1: 1999 NY Appellate Decision - Jewish Defense Org. v. Rambam**

This page represents the intended content for 'Tab B-1: 1999 NY Appellate Decision - Jewish Defense Org. v. Rambam'.

Source URL:

https://www.nycourts.gov/reporter/3dseries/1999/1999_03052.htm

**Tab B-2: Times of Israel Article on Steven Rambam**

This page represents the intended content for 'Tab B-2: Times of Israel Article on Steven Rambam'.

Source URL:

https://www.timesofisrael.com/p-i-turned-nazi-hunter-blames-passive-jewish-leaders-for-the-99-9-who-got-away/

**Tab B-3: JDO Watchdog Report on Rambam and NXIVM Allegations (Unofficial Source)**

This page represents the intended content for 'Tab B-3: JDO Watchdog Report on Rambam and NXIVM Allegations (Unofficial Source)'.

Source URL:

https://jewishdefenseorganization.net/NXIVM_Rombom.htm

*Democracy Dies in Darkness*

# Agents Arrest Background Specialist at Hackers Forum

July 24, 2006   More than **18 years ago**

By Brian Krebs

Steven Rombom never got a chance to share the results of an hours-long experiment in getting someone's background at a hackers convention in New York City last week.

Before he could sit down to lead a Saturday afternoon panel discussion entitled "Privacy is Dead . . . Get Over It," federal agents moved in to arrest him for his methods of digging up information on people.

The arrest of Rombom, who also goes by Steven Rambam, was unrelated to the experiment at the Hackers on Planet Earth, or HOPE, conference.

Authorities allege that Rombom, owner and chief executive of the online investigative service Pallorium Inc., is accused of impersonating a federal officer this year while trying to locate a government informant involved in a 2003 money-laundering indictment of a former Brooklyn assistant district attorney.

He faces charges of witness tampering and obstruction of justice. He appeared in U.S. District Court for the Southern District of New York yesterday and was released on his own recognizance. He is scheduled to appear again on Aug. 7.

Rombom's fellow panelists said Rombom was escorted out of the conference along with his laptop and other equipment that contained the PowerPoint slides that were to make up the bulk of his scheduled two-hour presentation.

"If you know Steve then you know he's very flamboyant, and at first I thought it was just PR, you know?" said Kelly Riddle, a private investigator from San Antonio who was to speak alongside Rombom. "So, they asked him to step out in the hallway, placed the handcuffs on him and started to lead him off."

Rombom was scheduled to discuss how he dug up -- in just over four hours of searching private and public databases -- more than 500 pages worth of data on Rick Dakan, who was attending the conference and had agreed to participate in the project.

"All I had given him was my e-mail and name," Dakan said. "He knew everywhere I'd lived, every car I had driven, and even someone else in Alabama who was using my Social Security number since 1983. He found all my friends, pictures of friends, knew about my brother's criminal history."

JEWISH DEFENSE ORGANIZATION INC v. Steven Rambam, Real Party in Interest. (1999) | FindLaw

# FindLaw

FINDLAW / CASE LAW / CALIFORNIA / CA CT. APP. /
JEWISH DEFENSE ORGANIZATION INC V. STEVEN RAMBAM, REAL PARTY IN INTEREST.

# JEWISH DEFENSE ORGANIZATION INC v. Steven Rambam, Real Party in Interest. (1999)

## Court of Appeal, Second District, Division 7, California.

JEWISH DEFENSE ORGANIZATION, INC. et al., Petitioners, v. The SUPERIOR COURT of Los Angeles County, Respondent. Steven Rambam, Real Party in Interest.

## No.  B129319.

## Decided: June 08, 1999

 R. Samuel Paz and Sonia M. Mercado, Los Angeles, for Petitioners. No appearance for Respondent. Sherman & Kurtz and Gary Kurtz for Real Party in Interest.

By this petition for writ of mandate, defendants in a defamation action seek to vacate the trial court's order of January 25, 1999, denying their motion to quash service of summons for lack of jurisdiction over them, or in the alternative, to stay or dismiss the action on the ground of forum non conveniens. The principal issue for review is whether California can properly assert jurisdiction over nonresident defendants based on  their contract with several Internet service providers with offices in California to operate world wide web-sites from New York;  defendants' web site allegedly contained defamatory statements about plaintiff.

FACTUAL AND PROCEDURAL BACKGROUND

In October 1997, plaintiff Steven Rambam filed an unverified complaint against Jewish Defense Organization, Inc. (JDO) and Mordechai Levy (Levy) for defamation and related causes of action, alleging that in 1997 and continuing to the present time, JDO and Levy posted a world wide web page containing defamatory statements about Rambam, including the statements that Rambam is a government

informant and a "snitch"; Rambam is a dangerous psychopath who tried to kill his mother; Rambam kidnapped people but was never charged by the police; Rambam secretly admires the Nazis and hates Jews; and Rambam is an anti-Semite who has been known to entrap Jews with no prior criminal record into committing crimes.

Levy and JDO filed a motion to quash service of summons or in the alternative a motion to stay or dismiss the action as brought in an inconvenient forum. The declarations and exhibits offered in support of, or in opposition to, the motions reveal the following:

Levy has been a resident of New York City since about 1985 and earns his living as an accountant. He conducts no commercial activities in California and owns no property in California; the last time Levy came to California was in 1989, for the purpose of making a public speech on an issue of public concern; between 1984 and 1989, Levy would come to California from time to time to make public speeches.

Levy lived in California from 1982 to 1984, when he was an undergraduate college student at California State University at Los Angeles; at some time in the early 1980's, Levy was associated with the Los Angeles chapter of a militant Jewish activist organization, the Jewish Defense League (JDL), headed by Irving Rubin. According to plaintiff, Levy was kicked out of the JDL "for refusing to accept organizational discipline"; according to Levy, he left the JDL voluntarily in 1981, and formed his own group in Los Angeles, known as the JDO. In the early 1980's Barry Krugel participated in the JDO in Los Angeles; according to Krugel, the JDO "had meetings, conducted self-defense education classes, prepared political literature, participated in and conducted demonstrations, [and] wrote articles." After Levy left Los Angeles in 1984, there was no longer any presence by JDO in Los Angeles. When Levy and the JDO left California, JDO no longer maintained any California telephone number or post office box. There is currently no California chapter of the JDO; since the JDO left California in 1984, Krugel has not been in any way associated with JDO.

According to Levy, the JDO, an organization dedicated to fighting anti-Semitism, has been operating in New York City since 1985; the JDO conducts no commercial activities or services anywhere, and its only operation is to disseminate information concerning the status of Jewish affairs. Levy incorporated JDO in New York in 1989. The JDO maintains a world wide web site for the dissemination of information to anyone in the world where the Internet is available; the web site is "passive," in that the JDO does not seek to attract readers or others to the site and does not capture or receive any information from those who may "hit" its web site; the web site "merely provides information for those people who seek access to it"; as far as Levy can ascertain, the only reaction from California with respect to the web site has been the instant lawsuit. To set up JDO's Internet web site, JDO established its domain names with Network Solutions, Inc., which apparently has offices in Virginia; all of JDO's negotiations and activities with Network Solutions were conducted by JDO in New York; one of the domain names registered by JDO was "RAMBAM-STEVE.COM." JDO's administrative and billing

contact for the web sites is listed on the Network Solutions contracts as Alan J. Weberman, a New York resident;  Levy declared that Weberman is not an officer, employee, or agent of JDO and is not authorized to speak on behalf of JDO.

From 1988 to the present, Rambam was the president of a licensed private investigative agency, Pallorium, Inc., located in Brooklyn, New York;  in 1989, Rambam was employed by Jan Tucker, a California licensed investigator, to locate and serve process on Levy in New York on behalf of Irving Rubin of the Jewish Defense League, who was suing Levy for libel in a California court;  in August 1989, while Rambam and Rubin were on a public street in front of Levy's New York residence, Levy opened fire on them, missed them, but wounded an innocent bystander.    Levy was allegedly convicted of assault with a deadly weapon and sentenced to prison.    Rubin's libel action against Levy was dismissed.

In the aftermath of Rubin's libel action, and in 1991, a lawyer, Mark Schapiro, sued Levy and Bertram Zweibon, seeking about $9,500 in contract damages;  in 1993, Schapiro obtained a judgment of about $11,000 against Levy and Zweibon;  Zweibon was allegedly the attorney who represented Levy in his criminal trial involving his shooting at Rambam and Rubin.    Levy declared that although a judgment was entered against him in the Schapiro suit, he was never served with the Schapiro suit, did not appear, and did not know of its existence until plaintiff mentioned it in the instant lawsuit.

 Sometime prior to the time Rambam filed the instant lawsuit against Levy and JDO, Rambam had filed in California a similar defamation lawsuit against the JDL and Rubin arising out of an allegedly defamatory web page;  during the discovery stage of the JDL action, Krugel contacted Levy in New York about the lawsuit;  in 1997, after Rambam filed the instant lawsuit against Levy, Levy sent him (Krugel) some documents purporting to be about Rambam, which documents Krugel then passed on to Rubin to use in defense of Rambam's lawsuit.    Krugel also testified in deposition that sometime in about 1997 a woman telephoned him about a speaking engagement by Levy in Orange County, but Krugel had no personal information about whether Levy came to Orange County;  Levy denied coming to California at any time after 1989.

After Rambam filed the instant lawsuit against Levy and the JDO, defamatory information about Rambam similar to that on the JDO web sites allegedly appeared on several "mirror" web pages served by providers Xoom, Inc., Geocities, Inc., and Whowhere?   Inc., located in California.    According to Rambam, Levy and JDO are associated with the "mirror" web sites served by the California providers because the JDO web site admits that "we have established these mirror sites so that Rambam will have to sue many Internet providers."    The documents from the "mirror" web sites, however, reveal that the "mirror" web sites in California were maintained by Alan Weberman, whom Levy asserts is not an employee, officer or agent of JDO and is not authorized to speak on behalf of JDO.

Rambam engaged in a public records investigation about Levy, and asserts that Mordechai Levy owns real property in Los Angeles County, maintains post office box No. 25764 in Los Angeles, operates a service station known as Motty's Arco in Anaheim, owes the Franchise Tax Board about $13,000 in taxes, and participated in other California lawsuits as a plaintiff and defendant.   Levy provided a declaration stating that his own investigation revealed that there is a person known as Mordechai Motty Levy, a native of Maryland, who moved to North Hollywood in 1992, and then moved to Los Angeles in 1995, and maintains post office box No. 25764, along with an Andrina Levy, probably his wife.   Levy declared that he is not Mordechai Motty Levy, that a social security number associated with Motty Levy is not his social security number, and that Rambam was deliberately confusing Motty Levy with him;  he has never heard of this other Levy who is in no way connected with him.   Levy also denied that he is married and denied that he or the JDO invoked the benefits or protection of California law.

In opposition to the motions, Rambam supplied, inter alia, a declaration by California private investigator Jan Tucker which stated that "Beginning in  the early 1980's I have had contacts, associations, and business relationships with the [JDL] and the [JDO], and the leaders of both organizations.   My relationship to the [JDO] of Mordechai Levy has always been adversarial in nature."   Without any supporting details, Tucker states that "Since its inception, and through today, the JDO has always had a presence in the Los Angeles area," and that "Barry Krugel is and for many years has been the leader of the JDO's Chapter in Los Angeles."   Tucker then alleged various activities of the Los Angeles Chapter of the JDO, without providing any dates for the alleged activities, and in some instances failing to name the people allegedly taking the actions on behalf of JDO. Some of the incidents allegedly involved only Krugel and/or others;  other incidents, such as Levy's alleged expulsion from the JDL and his distributing leaflets with the JDO symbol at a Temple in the Sepulveda Pass, clearly related back to the early 1980's when Levy lived in Los Angeles.   Tucker also declared that "Levy has at all times maintained post office boxes at various locations in Los Angeles County.   I am informed and believe and thereon allege that he currently maintains U.S. Postal Service Post Office Box 25764."

On December 12, 1997, the court granted Rambam's application to continue Levy and JDO's motions to quash service of summons or in the alternative to stay or dismiss the action, in order for plaintiff to conduct discovery on the jurisdictional issues.   The minute order also recited that "The court determines that the forum non conveniens issue should be determined after resolution of the personal jurisdictional issue."

After hearing on the motions on November 4, 1998, the court took the matters under submission.   By minute order of January 25, 1999, the court issued the following ruling:  "Motion to Quash Service of Summons, or in the alternative, to Stay or Dismiss this Action by [Levy and JDO] initially heard on November 4, 1998, is denied."   We infer from the minute order that the trial court denied both the motion to quash service of summons for lack of personal jurisdiction over the defendants and the

alternative motion to stay or dismiss the action on the ground of forum non conveniens.   Levy and JDO filed timely petition for writ of mandate challenging the denial of both motions.

I

STANDARD OF REVIEW

   "California's long-arm statute authorizes California courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or the Constitution of California.   (Code Civ. Proc., § 410.10.)   A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' (International Shoe Co. v. Washington (1945) 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95.)"   (Vons Companies, Inc. v. Seabest Foods, Inc. (1996) 14 Cal.4th 434, 444-445, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)   "Personal jurisdiction may be either general or specific.   A nonresident defendant may be subject to the general jurisdiction of the forum if his or her contacts in the forum state are 'substantial . continuous and systematic.'   [Citations.]   In such a case, 'it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum.'   [Citations.]"   (Id. at p. 445, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)

   "If the nonresident defendant does not have substantial and systematic contacts in the forum sufficient to establish general jurisdiction, he or she still may be subject to the specific jurisdiction of the forum, if the defendant has purposefully availed himself or herself of forum benefits [citation], and the 'controversy is related to or "arises out of" a defendant's contacts with the forum.'   [Citations.]"   (Vons Companies, Inc. v. Seabest Foods, Inc., supra, 14 Cal.4th at p. 446, 58 Cal.Rptr.2d 899, 926 P.2d 1085.) "Finally, in analyzing the exercise of specific jurisdiction, '[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." '   [Citation.]   Courts may evaluate the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared interest of the several States in furthering fundamental substantive social policies." ' "   (Id. at pp. 447-448, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)   Thus, specific jurisdiction is determined under a three-part test:  "(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;  (2) the claim must be one which arises out of or results from the defendant's forum-related activities;  and (3) exercise of jurisdiction must be reasonable."   (Panavision Intern., L.P. v. Toeppen (9th Cir.1998) 141 F.3d 1316, 1320 [applying California law].)

"When a nonresident defendant challenges personal jurisdiction the burden shifts to the plaintiff to demonstrate by a preponderance of the  evidence that all necessary jurisdictional criteria are met. [Citation.]   This burden must be met by competent evidence in affidavits and authenticated documentary evidence.    An unverified complaint may not be considered as an affidavit supplying necessary facts."  (Ziller Electronics Lab GmbH v. Superior Court (1988) 206 Cal.App.3d 1222, 1232-1233, 254 Cal.Rptr. 410.)    Declarations are insufficient to support the assertions for which they are offered if they consist primarily of vague assertions of ultimate facts rather than specific evidentiary facts permitting a court to form an independent conclusion on the issue.   (Id. at p. 1233, 254 Cal.Rptr. 410.)    Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable.    (Vons Companies, Inc. v. Seabest Foods, Inc., supra, 14 Cal.4th 434, 449, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)    Where there is no conflict in the evidence, the question of personal jurisdiction is one of law;  in such a case, the lower court's determination is not binding on the reviewing court.   (Hall v. LaRonde (1997) 56 Cal.App.4th 1342, 1346, 66 Cal.Rptr.2d 399.)

II

INSUFFICIENT EVIDENCE TO SUPPORT GENERAL JURISDICTION

Rambam's contention that the evidence is sufficient to establish general jurisdiction over Levy and the JDO is based on the assertion that the trial court was required to accept as true Rambam's evidence offered to support the claims that Levy and the JDO have continuous and systematic contacts with California in that the JDO, allegedly Levy's alter ego, has always maintained a Los Angeles post office box, that the JDO maintains a chapter in Los Angeles, that Levy has used California courts twice as a plaintiff since the late 1980's, and that Levy entered into contracts with three California-based Internet service providers to publish at least seven defamatory web pages.    Rambam argues in his return to the petition for writ of mandate that "The trial court was required to presume the truth of the evidence presented by Rambam, and to resolve the conflicting evidence in Rambam's favor.    This court is required to resolve evidence disputes in favor of the trial court's ruling.    As there were no rulings on defendants' evidence objections, they should be presumed to have been denied."

    We agree with petitioners that the declarations offered by Rambam in opposition to the motions, particularly that of Tucker, fail to support the assertions set out therein pertaining to the JDO's alleged presence and activities in California after 1984 as a matter of law.    On the latter issues, Tucker's and Rambam's declarations lack foundation, contain conclusory  and vague statements, and are inadequate to support the legal and factual conclusions for which they are offered.

Even though our record contains no express rulings by the trial court on defendants' evidentiary objections, we infer from the record of the hearing on the motions that the trial court rejected Rambam's

assertions of JDO's and Levy's presence in California, and the claim of general jurisdiction; rather, the trial court clearly deemed the dispositive issue to be whether specific jurisdiction was established here based on the location of the Internet server in California.   At one point, the trial court remarked that "But the facts here are that the [Internet] provider was here," and "We are sort of riding in an area of new law. There is no question about that."   Thus, we infer from the instant record that the trial court disregarded the conclusions in Tucker's declaration and agreed with Levy's explanation that Levy and the JDO no longer had any presence in California and that the JDO, after 1984, did not maintain any chapter in California; rather, the public records revealing a post office box, lawsuits, tax liens, and property owned by a "Mordechai Levy" referred to a person other than petitioner.   Thus, the trial court properly rejected the theory of general jurisdiction and Rambam's assertion that Levy and the JDO maintained substantial, continuous and systematic contacts with California sufficient to establish a "presence" in California.

  Even if the instant ruling could be construed to be based on a finding of general jurisdiction, we would conclude that such a finding is not supported by the evidence.   No reasonable person could conclude on this record that the Mordechai Levy who heads the JDO and has lived for over a decade in New York is that Mordechai Levy who runs an Arco service station in Anaheim, maintains a Los Angeles post office box, and was recently a plaintiff in California lawsuits.   On the instant record, no reasonable person could interpret any of the declarations as supporting the claim that after Levy and the JDO left California in the 1980's, Barry Krugel was an agent of the JDO and/or Levy and acted on their behalf.   Nor was there sufficient evidence to establish that Alan Weberman, in allegedly establishing several "mirror" web sites using California Internet service providers, was acting as an agent or employee of JDO and/or Levy. " 'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.   The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' "   (Regents of University of New Mexico v. Superior Court (1975) 52 Cal.App.3d 964, 971, 125 Cal.Rptr. 413.)

  Accordingly, the instant record permits the conclusion that defendants' only contacts with California after 1989 consisted of (1) the use of the mail to send some documents to Krugel in California in connection with another libel lawsuit by Rambam against Rubin, and (2) contracting with one or more Internet service providers who happen to be located in California, so as to permit them to operate a passive web site from their residence in New York.[1] Even Rambam does not contend that the foregoing conduct alone is sufficient to provide a basis for the assertion of general jurisdiction over defendants in California, and provides no authorities or argument to support such proposition.   We thus conclude that there was an insufficient basis for the assertion of general jurisdiction over defendants.   We proceed to address the issue of whether defendants' conduct is sufficient to establish specific jurisdiction.

III

## INSUFFICIENT EVIDENCE TO SUPPORT SPECIFIC JURISDICTION

We first address the issue of specific jurisdiction in the context of the case law which has developed in defamation cases, and then in the context of the case law which is developing in the area of the use of the Internet.

In tort cases, the "purposeful availment" requirement for specific jurisdiction can be satisfied by the "effects test," set out in Calder v. Jones (1984) 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804. (Panavision Intern., L.P. v. Toeppen, supra, 141 F.3d 1316, 1321.) "Under Calder, personal jurisdiction can be based upon: '(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered-and which the defendant knows is likely to be suffered-in the forum state.' " (141 F.3d at p. 1321.)

In ascertaining the existence of specific jurisdiction, "we consider only those 'forum-related activities as they relate to the specific cause of action.' " [2] (Gordy v. Daily News, L.P. (9th Cir.1996) 95 F.3d 829, 835.) Thus, "the question is whether the quality and nature of petitioners' forum-related activity in relation to [the] complaint is sufficient to permit California to exercise jurisdiction over them. [Citations.] To prevail, [plaintiff] must establish the causes of action arose out of an act committed or transaction consummated in California, or that petitioners performed some other act by which they purposefully availed themselves of the . benefits and protections of the state's laws." (Mansour v. Superior Court (1995) 38 Cal.App.4th 1750, 1758-1759, 46 Cal.Rptr.2d 191.) "While [defendants] may have foreseen the allegedly defamatory statements might be published in California, that alone is not enough to subject them to personal jurisdiction in this state." (Id. at p. 1759, 46 Cal.Rptr.2d 191.)

" 'In a libel case, however, we do not think the likelihood that an offending publication will enter a forum is a fair measure of the reasonableness of the exercise of jurisdiction over a publisher. The nature of the press is such that copies of most major newspapers will be located throughout the world, and we do not think it consistent with fairness to subject publishers to personal jurisdiction solely because an insignificant number of copies of their newspapers were circulated in the forum state. In a defamation case, therefore, the appropriate jurisdictional analysis should be to determine whether or not it was foreseeable that a risk of injury by defamation would arise in the forum state.' " (Evangelize China Fellowship, Inc. v. Evangelize China Fellowship (1983) 146 Cal.App.3d 440, 447, 194 Cal.Rptr. 240.)

"It is reasonable to expect the bulk of the harm from defamation of an individual to be felt at his domicile." (Gordy v. Daily News, supra, 95 F.3d at p. 833.) In Core-Vent Corp. v. Nobel Industries AB (9th Cir.1993) 11 F.3d 1482, the Ninth Circuit held "that publication of a commercial libel in a worldwide medical journal did not permit suit against Swedish writers in California. Our primary ground for so

ruling was that it would have been unreasonable for writers to be required to be sued in California, . but we also expressed doubt that the defamation was truly targeted at California when the purported target was a corporation that did a worldwide business.   'A corporation does not suffer harm in a particular geographic location in the same sense that an individual does.' "   (Gordy v. Daily News, supra, 95 F.3d at p. 833.)

On the instant record, we conclude that Rambam failed to provide sufficient evidence to establish that it was foreseeable that a risk of injury by defamation would arise in California.   Rambam went to great lengths to state that New York is not his "full time" residence.   Yet, Rambam did not identify any other place of residence;  he stated that he traveled most of the time, including Europe, Israel, and the far east;  as to California, he stated only that he spends "considerable professional time" in California.   However, Rambam failed to establish he had any clients in California, or that the alleged defamatory statements herein would impact a business interest or reputation in California.   In Panavision International, L.P. v. Toeppen, supra, 141 F.3d at p. 1316, the court held that when a nonresident defendant engaged in a scheme to register Panavision's trademarks as his domain names and posted a web site on the Internet for the purpose of extorting money from Panavision, the "purposeful availment" requirement for specific jurisdiction over defendant was satisfied under the "effects test";  although Panavision was a Delaware limited partnership, its principal place of business was in California, and defendant's conduct, as he knew it likely would, had the effect of injuring Panavision in California;  thus, the brunt of the harm suffered by Panavision was in the state where it maintained its principal place of business.   (Id. at p. 1322.)

There is an insufficient basis in this record to conclude that California is Rambam's principal place of business, or that the alleged defamation was targeted at California or would cause the brunt of the harm in California.[3]   Accordingly, there is insufficient evidence showing defendants' minimum contacts with California under the analysis set out in cases dealing with defamation by nonresidents.   As is explained below, we reach the same result under the analysis in cases dealing with the use of the Internet.

"The Internet is a worldwide network of computers that enables various individuals and organizations to share information.   The Internet allows  computer users to access millions of web sites and web pages.   A web page is a computer data file that can include names, words, messages, pictures, sounds, and links to other information.   [¶] Every web page has its own web site, which is its address, similar to a telephone number or street address."   (Panavision Intern., L.P. v. Toeppen, supra, 141 F.3d at p. 1318.)

"The Internet makes it possible to conduct business throughout the world entirely from a desktop. With this global revolution looming on the horizon, the development of the law concerning the permissible scope of personal jurisdiction based on Internet use is in its infant stages.   The cases are scant.   Nevertheless, our review of the available cases and materials reveals that the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality

Case 1:22-cv-01032-PKC-JRC   Document 569   Filed 07/23/25   Page 25 of 28 PageID #: 10294

of commercial activity that an entity conducts over the Internet.    This sliding scale is consistent with well developed personal jurisdiction principles.    At one end of the spectrum are situations where a defendant clearly does business over the Internet.    If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.   [Citation.]   At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions.    A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction.   [Citation.]   The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.    In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site."   (Zippo Mfg. Co. v. Zippo Dot Com, Inc. (W.D.Pa.1997) 952 F.Supp. 1119, 1123-1124.)

    In the instant case, defendants' conduct in registering Rambam's name as a domain name and posting passive web sites on the Internet is not sufficient to subject them to jurisdiction in California.[4] (Panavision International, L.P. v. Toeppen, supra, 141 F.3d at p. 1322.)   "Creating a site, like placing a product into the stream of commerce, may be felt nationwide-or even worldwide-but, without more, it is not an act purposefully directed toward the forum state.   [ (Bensusan Restaurant Corp. v. King (S.D.N.Y.1996)]  937 F.Supp. 295, 301 citing the plurality opinion in Asahi Metal Indus. Co. v. Superior Court (1987) 480 U.S. 102, 112, [107 S.Ct. 1026, 1032, 94 L.Ed.2d 92].) "   (Cybersell, Inc. v. Cybersell, Inc. (9th Cir.1997) 130 F.3d 414, 418.)

In Pres-Kap v. System One, Direct Access (Fla.App.1994) 636 So.2d 1351, "a majority of a three-judge intermediate state appeals court refused to exercise jurisdiction over a consumer of an on-line airline ticketing service.   Pres-Kap involved a suit on a contract dispute in a Florida court by a Delaware corporation against its New York customer.   [Citation.]   The defendant had leased computer equipment which it used to access an airline ticketing computer located in Florida.   [Citation.]   The contract was solicited, negotiated, executed and serviced in New York. [Citation.]   The defendant's only contact with Florida consisted of logging onto the computer located in Florida and mailing payments for the leased equipment to Florida.   [Pres-Kap ] addressed the exercise of jurisdiction over a consumer of on-line services as opposed to a seller.   When a consumer logs onto a server in a foreign jurisdiction he is engaging in a fundamentally different type of contact than an entity that is using the Internet to sell or market products or services to residents of foreign jurisdictions.    The Pres-Kap court specifically expressed concern over the implications of subjecting users of 'on-line' services with contracts with out-of-state networks to suit in foreign jurisdictions."   (Zippo Mfg. Co. v. Zippo Dot Com, Inc., supra, 952 F.Supp. at p. 1125.)

The court in Pres-Kap identified its concerns as follows: "Across the nation, in every state, customers of 'on-line' computer information networks have contractual relationships with out-of-state supplier companies, putting such customers in a situation similar, if not identical, to the defendant in the instant case. Lawyers, journalists, teachers, physicians, courts, universities, and business people throughout the country daily conduct various types of computer-assisted research over telephone lines linked to supplier databases located in other states. Based on the trial court's decision below, users of such 'on-line' services could be haled into court in the state in which supplier's billing office and database happen to be located, even if such users, as here, are solicited, engaged, and serviced entirely instate by the supplier's local representatives. Such a result, in our view, is wildly beyond the reasonable expectations of such computer-information users, and, accordingly, the result offends traditional notions of fair play and substantial justice. [Citations.]" (Pres-Kap v. System One, Direct Access, supra, 636 So.2d at p. 1353, fn. omitted.)

In the instant case, defendants were mere customers of Internet service providers that happen to maintain offices or databases in California; such providers were engaged by JDO from its computer in New York. As in Pres-Kap, we conclude that defendants' conduct of contracting, via computer, with Internet service providers, which may be California corporations or which may maintain offices or databases in California, is insufficient to constitute "purposeful availment" and does not satisfy the first prong of the three-part test for specific jurisdiction. In light of our conclusion, we need not address the other prongs of the test for specific jurisdiction, or the motion to stay or dismiss on grounds of inconvenient forum.

DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to vacate its order of January 25, 1999, and to enter a new and different order granting petitioners' motion to quash service of summons. Petitioners are entitled to costs on review.

FOOTNOTES

1.    In their points and authorities supporting the petition for writ of mandate, Levy and JDO admit that they employed Internet servers such as Network Solutions, located in Virginia, Geocities, a Delaware Corporation located in California, and Xoom, Inc., located in California and New York. Petitioners maintain, however, that it is those servers who are present in California as independent contractors; petitioners are not present in California, and their contracting with the Internet servers was for the purpose of providing greater access to people all over the world via the Internet, and not to target California and New York. Petitioners argue: "California and New York are the hubs for world wide Internet dissemination. Contractors there were chosen not to target New York and California but because those states are leaders in the technology involved. Engaging an Internet server is as simple

Case 1:22-cv-01032-PKC-JRC   Document 569   Filed 07/23/25   Page 27 of 28 PageID #: 10296

as a few keystrokes while sitting at one's computer.   If the [court] found personal jurisdiction, based on the happenstance of the physical location of the Internet server, every complaint arising out of the alleged tort on the Internet would automatically result in personal jurisdiction wherever the Internet server is located.   That would not comport with traditional notions of what qualifies as purposeful activity invoking the benefits and protections of the forum state."   (Emphasis omitted.)

2.      Accordingly, for purposes of specific jurisdiction, we ignore the fact that Levy may have used the mail to mail some documents to Krugel in California for use in another lawsuit by Rambam;  there is no evidence establishing that such documents were defamatory or that the documents relate to the instant lawsuit in any way.

3.      The court in IMO Industries, Inc. v. Kiekert AG (3rd Cir.1998) 155 F.3d 254 agreed "with the conclusion reached by the First, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that jurisdiction under Calder requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum.   [ Rather] the Calder 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity.   Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement.   The defendant must 'manifest behavior intentionally targeted at and focused on' the forum for Calder to be satisfied."   (155 F.3d at p. 265, fn. omitted.)In the instant case, we need not resolve any conflict among the federal circuits;  Rambam has not even established that his residence or principal place of business is in California, so the purposeful availment prong of the special jurisdiction issue is not satisfied on that ground.

4.      Rambam's return questions Levy's characterization of the web sites as "passive," claiming that Levy's declaration is self-serving and that "we do not even know what that means."   Rambam also asserts, without citation of any authority, that expert evidence is needed to establish the web sites as passive or interactive.   Such challenges are without merit, as Levy's declarations explain in detail the nature of the web sites, which meet the definition of passive web sites set out in the Zippo Mfg. Co. case.

LILLIE, P.J.

JOHNSON, J., and WOODS, J., concur.

**Was this helpful?**      Yes 👍      No 👎



### Welcome to FindLaw's Cases & Codes

A free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and statutes visit FindLaw's Learn About the Law.

**Go to Learn About the Law** ›

### JEWISH DEFENSE ORGANIZATION INC v. Steven Rambam, Real Party in Interest. (1999)

**Docket No:** No.  B129319.

**Decided:** June 08, 1999

**Court:** Court of Appeal, Second District, Division 7, California.

## Need to find an attorney?