UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

                Plaintiff,

             - against -

SAFA ABDULRAHIM GELARDI, *et al.*,

                Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

This case began nearly four years ago as a lawsuit for misappropriation of trade secrets between competitors in the personal injury litigation business. Since then, the case has devolved beyond recognition into a case not about trade secrets, but about contempt and abuse of the litigation process. For the reasons set forth below, the Court orders case-ending sanctions against the remaining Defendants in this case.

## BACKGROUND

The Court assumes the parties' familiarity with the extensive factual and procedural history of this case, and so only sets forth those facts relevant to this Memorandum and Order.

## I.    Pre-Litigation Background

In this case, Plaintiff IME Watchdog, Inc. ("Watchdog") has sued Defendants Safa Abdulrahim Gelardi ("Safa"), Vito Gelardi ("Vito"), IME Companions LLC ("Companions"), Client Exam Services LLC ("CES"), and IME Management & Consulting LLC ("IME M&C") (collectively, "Defendants").[1]

---

[1] The corporate Defendants—Companions, CES, and IME M&C—are all unrepresented by counsel and are therefore in default. *See* 28 U.S.C. § 1654; *Lattanzio v. COMTA*, 481 F.3d 137, 139–40 (2d Cir. 2007) (interpreting 28 U.S.C. § 1654 to require an LLC to be represented by a licensed attorney to appear in federal court); (*see also* 10/30/2025 Dkt. Order (deeming

Watchdog and Companions are competitors in the personal injury litigation business.  *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 232 (E.D.N.Y. 2024).  When a plaintiff brings a personal injury lawsuit, the defendant in that lawsuit can obtain an independent medical examination, or IME, of the plaintiff to evaluate their alleged injuries.  *Id.*  Both Watchdog and Companions provide third-party services to personal injury attorneys, in which Watchdog or Companions associates (or "observers") accompany plaintiffs to IMEs, observe the IME, take notes, and help plaintiffs fill out forms.  *Id.*  The observers produce reports of the IMEs for the plaintiffs' counsel to use in the personal injury lawsuits.  *Id.*

Watchdog was established in May 2011 by Daniella Levi ("Levi").  *Id.*  Companions was established in November 2017 by Safa and Vito (together, the "Gelardis"), who are married to one another.  *Id.*  Safa "got Companions off the ground" by using confidential materials and information misappropriated from Watchdog.  *IME Watchdog, Inc.*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, at *3 (E.D.N.Y. May 13, 2022).  More specifically, the Gelardis paid Watchdog's President, Adam Rosenblatt ("Rosenblatt"), to surreptitiously provide them with Watchdog's materials and information in or around April 2017.  *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232–35, 239.

## II.    Prior Contempt Findings by the Court

Plaintiff Watchdog initiated this action on February 25, 2022 against Safa, Vito, and Companions, alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.  (Compl., Dkt. 1, ¶ 1.)  Throughout the pendency of this case, the Court has issued multiple temporary restraining orders ("TROs") and preliminary

---

Companions to be in default)).  Additionally, while other defendants were previously named in this action, they have since been dismissed.  (*See* Stipulation of Dismissal, Dkt. 131; 1/17/2023 Order Dismissing Parties; Stipulation of Dismissal, Dkt. 592; 9/4/2025 Order Dismissing Parties.)

injunctions ("PIs"), along with other orders directing the parties to act or refrain from acting in certain ways. Without detailing the extensive factual and procedural history leading to each, the Court summarizes the relevant orders and injunctions.

### A.    Relevant Court Orders

#### 1.    April 2022 PI

In April 2022, the Court issued its first preliminary injunction in this case, which enjoined Defendants from (1) using Plaintiff's trade secrets "in any manner whatsoever," (2) franchising Companions, and (3) contacting Plaintiff's current clients, employees, and agents. (*See* Mar. 2025 Mem. & Order ("M&O"), Dkt. 448, at 2 (quoting Apr. 2022 Inj., Dkt. 66-1, at 2).) The Court also ordered Defendants "to return to Plaintiff all originals and copies of documents, records, and information . . . that contain Plaintiff's trade secrets and confidential and proprietary information," including "customer information." (*Id.* (quoting same at 2–3).)

#### 2.    June 2022 Amended PI

In June 2022, the Court amended the portion of the injunction enjoining Defendants from contacting Plaintiff's current clients, employees, and agents to apply not only to Defendants but also to "their agents, officers and employees, and all other persons and entities in active concert or participation with them." (*Id.* at 3 (quoting Am. Inj., Dkt. 80, at 2; 6/8/2022 Dkt. Order).) Also as of that date, the Court prohibited both parties from making misleading or defamatory statements about one another. (*Id.* at 2–3; Am. Inj., Dkt. 80, at 3.)[2]

---

[2] Notably, the Court's expansion of the April 2022 PI was prompted by Plaintiff's motion for contempt based, in part, on the Gelardis' posting of a GoFundMe page that contained disparaging statements seemingly about Watchdog and Levi that Plaintiff claimed were "defamatory." (Pl.'s Mot. for Contempt, Dkt. 79, at 2.) Although the Court did not find that the statements met the legal definition of defamation as to Watchdog and Levi, (6/10/2022 Dkt. Order), the Court noted that such statements were barred by the Court's prior instruction, at the April 2022 show cause hearing, to refrain from making statements that could be construed as defamatory, (*see* Am. Inj., Dkt. 80). The Court warned Safa "that any further attempts to make

3.     <u>March 2023 TRO and Expanded PI</u>

On March 10, 2023, the Court issued a TRO that temporarily restrained Defendants from operating Companions, or "any other business that unfairly competes with Plaintiff in violation of the law," pending a hearing on March 27, 2023.  (Mar. 2023 TRO, Dkt. 156, at 2–3.)  At the March 27 hearing, the Court converted the TRO into a PI that allowed Companions to resume operations but enjoined Defendants from "providing services to all customers as to whom there is evidence that Defendants misappropriated the customer from Plaintiff."  (4/3/2023 Dkt. Order (summarizing ruling on the record at 3/27/2023 hearing); 3/27/2023 Min. Entry.)  Those customers were listed on a spreadsheet filed in the case under seal (the "Enjoined Customers List"), (Enjoined Customers List, Dkt. 180-7).

4.     <u>Summary of Restrictions on Defendants' Conduct Since April 2022</u>

As a result of the TROs and PIs issued by the Court in this case beginning in April 2022, Defendants have been prohibited from doing the following:

- Using Plaintiff's trade secrets in any manner (since April 2022);

- Retaining copies of any documents containing Plaintiff's trade secrets, including customer information (since April 2022);

- Contacting Plaintiff's current clients, employees, or agents (since April 2022);

---

statements regarding any parties in this action that can be interpreted as disparaging will result in sanctions—whether they are 'defamatory' or not."  (6/10/2022 Dkt. Order.)  The Court rejected Defendants' argument that Safa, as a layperson, "did not understand what 'defamatory' meant" because "Safa Gelardi [was] represented by counsel and it is counsel's responsibility to advise their client regarding proper compliance with Court orders and directives."  (*Id.*)  The Court also rejected the argument that "Safa Gelardi's statements [were] mere opinions," finding instead that had the statements "identified Watchdog or Levi in any manner, they would have been defamatory *per se*."  (*Id.* (citing *Celle v. Filipino Reporter Enter. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) ("A writing which tends to disparage a person in the way of his office, profession or trade is defamatory per se . . . ." (internal quotation marks and citation omitted))).)

- Going through Defendants' agents to contact Plaintiff's current clients, employees, or agents (since June 2022);

- Making misleading or defamatory statements about Plaintiff (since June 2022);

- Operating Companions (between March 10–27, 2023); and

- Operating Companions to provide services to customers on the Enjoined Customers List (since March 27, 2023).

**B.      Defendants' Contumacious and Otherwise Improper Conduct**

Defendants have repeatedly violated the Court's orders and injunctions, and the Court has already found them in contempt multiple times.  In particular, the Court has found that Safa "understood the Court's Orders very well" and took steps "to conceal her efforts to violate them, including by making multiple successor entities and attempting to hide the related paper trails." (Mar. 2025 M&O, Dkt. 448, at 40.)  "Indeed, Safa's only frustration appears to be that she was not more successful in violating this Court's Orders."  (*Id.* (citing 7/29/2024 Hr'g Tr., Dkt. 437-1, at 55:14–18, 51:24–25).)  Relatedly, the Court has found that Safa has directly lied to the Court while under oath throughout this litigation.  (*See id.* at 13 ("Throughout this lengthy, hearing-filled lawsuit, the Court has found 'that Safa Gelardi has repeatedly perjured herself . . . .'" (quoting *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232 n.4)).)  The Court has thus formed the opinion that Safa is "wholly uncredible as a witness."  *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232 n.4.

1.      Safa's Contempt as to the April 2022 PI: Retaining Plaintiff's Customer Information

Safa violated the April 2022 PI requiring Defendants to return all of Plaintiff's trade secrets, including customer information.  In February 2023, Safa sent Watchdog's client list to a third party, proving that she had kept the client list in her possession after April 2022, in contravention of the April 2022 PI.  (Mar. 2025 M&O, Dkt. 448, at 16 (citing 5/29/2024 Hr'g Tr.,

Dkt. 355-1, at 87:1–89:16).)  In March 2025, the Court found that "Safa failed to comply with the Court's Orders by not deleting Watchdog's client list from her computer as of February 2023," (*id.*), and held her in contempt for this conduct, (*see id.* at 39–41).

        2.     <u>Safa's Contempt as to the June 2022 Expanded PI: Contacting Carlos Roa</u>

Safa violated the June 2022 expanded PI that prohibited her from initiating contact with Plaintiff's employees through Defendants' agents.  In November 2022, Safa hired a private investigator to contact and track Plaintiff's employee, Carlos Roa.  *IME Watchdog, Inc.*, 732 F. Supp. 3d at 236.  Among other things, Safa paid the private investigator to place a GPS tracker on Roa's car.  *Id.*  The Court found Safa in contempt for this conduct.  (Mar. 2025 M&O, Dkt. 448, at 5 (citing Sec. Am. Inj. M&O, Dkt. 254, at 26–32; Attach. & TRO M&O, Dkt. 284, at 3 n.3).)

        3.     <u>The Gelardis' Contempt as to the March 2023 TRO: Continuing to Operate Companions as CES</u>

After the March 10, 2023 TRO went into effect, preventing Defendants from operating Companions, the Gelardis went through Safa's nephew and a family friend to create CES, a Companions copycat using the "exact same" business model and client list as Companions. (Mar. 2025 M&O, Dkt. 448, at 4 (quoting 3/27/2023 Hr'g Tr., Dkt. 199, at 97–100, 106, 114–15, 118).)  Based on an evidentiary hearing held on March 27, 2023, the Court determined that the creation of CES was "an effort to end run the condition of the [Court's prior order]," and found that Defendants had engaged in "contemptuous," "contumacious conduct."  (*Id.* (quoting same).) As the Court stated on the record, "[i]t's clear . . . that it was [Safa] continuing [Companions] under a different name and using family members or a family member and a friend to perpetrate what I consider quite frankly a fraud on this court and very, very disturbing."  (3/27/2023 Hr'g Tr., Dkt. 199, at 120:17–20.)  The Court issued a written decision, dated October 20, 2023, memorializing its finding that the Gelardis and Companions were in contempt for starting or

helping to start CES in violation of the March 2023 TRO.  (Mar. 2025 M&O, Dkt. 448, at 5 (citing Sec. Am. Inj. M&O, Dkt. 254, at 26–32; Attach. & TRO M&O, Dkt. 284, at 3 n.3).)[3]  Despite denying this fact at the March 27, 2023 hearing, Safa later admitted that she had, in fact, "helped create" CES "for the purpose of [evading] the TRO."  (*See* Defs.' Final Resp. to Order on Contempt & Sanctions ("Third Opp'n"), Dkt. 605, at ECF[4] 1, 54.)

4.     <u>Safa's Failed Effort to Violate the March 2023 TRO: Attempting to Continue Operating Companions as Accompanied Exam Services</u>

Three days after the Court issued the March 2023 TRO, Safa's brother purchased the domain name for a company called "Accompanied Exam Services" ("AES").  (Mar. 2025 M&O, Dkt. 448, at 15 (quoting 7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3).)  Safa initially lied to the Court about her involvement with AES, testifying under oath at a contempt hearing on May 29, 2024 that she had "heard of" a company called Accompanied Exam Services, but was "not familiar with who they [were]."  (*Id.* at 14 (quoting 5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:3–5).)  Even after being confronted with an email she had sent three days after the March 10, 2023 TRO, explaining to a customer that Companions was "not allowed to service [their] law firm anymore" and "recommend[ed]" that the customer use "Accompanied Exams," (*see id.* at 14 (citation omitted)), Safa again denied owning or operating AES, (*id.* at 14 (citing 5/29/2024 Hr'g Tr., Dkt. 355-1, at 65:19–66:2)).  Months later, however, at a contempt hearing on July 29, 2024, Safa admitted that

---

[3] The Court later amended its October 2023 order to clarify that it had found "Safa in civil contempt of the Amended Injunction and the March 2023 TRO," but reserved "making a final ruling on damages and imposing sanctions" until the parties briefed the issue of compensatory damages, including attorneys' fees, relating to the March 27, 2023 contempt proceedings.  (Am. Sec. Am. Inj. M&O, Dkt. 299, at 33.)  The amended order is reported at *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224.

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

her brother had purchased the AES domain name because Safa had "proposed to [her] brother to start a business with [her]." (*Id.* (alterations in original) (quoting 7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3).) Although Safa contended that AES never went into business, the Court found that, regardless, AES "was yet another attempt by Safa to circumvent this Court's Orders and to continue to provide IME services to customers on the Enjoined Customers List." (*Id.* at 15.)

     5.    <u>Defendants' Contempt of the March 2023 Expanded PI: Continuing to Operate Companions as IME Legal Representatives</u>

As of at least April 2023, Defendants operated yet another IME company, IME Legal Representatives ("IMELR"), with third party Eugene Liddie. (*See id.* at 16–23.) Again, at first, Defendants denied being involved with IMELR. (*Id.* at 6–7.) This time, they were initially successful in convincing the Court of the lie. (*See id.*) After a hearing in May 2023, the Court stated that "it found Liddie's claim that he had started IMELR on his own credible, and that the Court was not convinced that the Gelardis had used Liddie to 'end-run'" the Court's prior orders. (*Id.* at 6 (citing 5/4/2023 Hr'g Tr., Dkt. 219-1, at 147–48); *see also id.* at 6–7 (describing the Court's written decision reaffirming its findings at the evidentiary hearing (July 2023 M&O, Dkt. 231,[5] at 3)).)

However, Plaintiff continued to pursue its claim that Defendants were serving customers on the Enjoined Customers List through IMELR, which Plaintiff alleged was operating as a proxy/alter ego for Companions. (*See id.* at 8–11 (citing, *inter alia*, Dkts. 315, 317, 321, 348, 353–55, 411, 423, 429-1, and 429-2).) The Court held additional hearings in May 2024, July 2024, and September 2024 that addressed, *inter alia*, the allegation that Defendants were involved in IMELR. (*See id.*)

---

[5] The July 2023 M&O is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 4532459 (E.D.N.Y. July 13, 2023).

Finally, in March 2025, after reviewing the extensive evidence presented to the Court through the parties' submissions and the four in-person hearings addressing this issue, the Court concluded that "at least as of April 2023, Defendants were, in fact, operating IMELR with Liddie, contrary to the Court's prior findings." (*Id.* at 17.) The Court specifically held that "it is clear that IMELR was Safa's creation, and that Liddie's role was to serve just as 'the face' of the business." (*Id.* at 39 (quoting Apr. 2023 Zoom Tr., Dkt 345-1, at 1).) Indeed, Safa eventually conceded, in effect, that she had attempted to work with Liddie through IMELR, and that, although she claimed her plan never came to fruition, she "would have loved for [the plan] to go through at the time," i.e., in April 2023. (*Id.* at 21–22 (quoting 7/29/2024 Hr'g Tr., Dkt. 437-1, at 51:24–25, 55:14–18).) Safa also admitted that "it would have been a blatant violation" of the Court's orders if the plan had succeeded. (*Id.* (quoting same).) The Court ultimately found Safa's and Liddie's denials of an attempted partnership uncredible, (*see id.* at 23), and that although Safa took the lead, "all three Defendants—Safa and Vito Gelardi and their company Companions—were involved in the plan to create and run IMELR as an IME business and solicit work from the Enjoined Customers List," (*id.* at 39 n.33). Notably, as of July 2024, 98% of IMELR's income came from customers on the Enjoined Customers List. (*Id.* at 23 (citing 7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:23–129:1).)

### 6.  Failure to Pay the Forensic Examiner Berkeley Research Group, LLC

In tandem with the June 2022 Expanded PI, the Court issued an order on June 27, 2022 appointing Berkeley Research Group, LLC ("BRG") to conduct a forensic examination of Safa's, Vito's, and Companions's personal and business digital electronic devices. (6/27/2022 Dkt. Order; Consent Order for Forensic Exam., Dkt. 90-1, at 2–3.) The Court required the parties to share equally in the cost of the examination. (Consent Order for Forensic Exam., Dkt. 90-1, at 7.) Defendants, however, failed to pay their portion of BRG's invoice, prompting the Court to issue multiple orders directing Defendants to pay. (*See, e.g.*, 9/11/2023 Dkt. Order for Dkt. 234 ("The

Court has been apprised . . . that [BRG] . . . is still owed almost $50,000 for its services, with Defendants owing $32,716.46, and Plaintiff owing $16,234.80. The Court orders both parties to resolve their share of the outstanding bill by 9/25/23 and confirm such resolution by that date, or risk sanctions."); 1/29/2024 Dkt. Order for Dkt. 271 (observing that BRG "is still owed by Defendants the full amount of $32,716.46" and ordering Defendants "to resolve their share of the outstanding bill by 2/9/2024 and confirm such resolution by that date or risk sanctions"); 2/14/2025 Dkt. Order for Dkt. 441 (ordering a show-cause hearing regarding sanctions because "BRG once again . . . has apprised the Court that Defendants Safa and Vito Gelardi still owe BRG").)

Ultimately, the Court has been forced to issue repeated civil contempt sanctions against Defendants based on their disregard of the Court's orders requiring them to pay. (4/2/2025 Min. Entry (ordering Safa to pay $2,000 to BRG by 4/4/2025, $500 on the first of each month after, imposing a $500 sanction per late or missed payment, and stating that "Defendants are again warned about the risk of criminal contempt, including jail, if these coercive sanctions do not result in their compliance with the Court's Orders"); 5/5/2025 Dkt. Order for Dkt. 482 (requiring Safa to pay $500 in sanctions because while she "paid the $2,000 payment the Court ordered . . . she did not pay BRG the $500 payment due May 1, 2025"); 7/7/2025 Dkt. Order for Dkt. 540 (imposing $500 in sanctions and ordering Safa to pay $500 to BRG after BRG informed the Court that it "did not receive a payment from Defendant Safa Gelardi by close of business on July 1, 2025"); 8/28/2025 Dkt. Order for Dkt. 589 (imposing "yet another $500 in sanctions" because "Individual Defendants have failed to make the $500 payments due on July 1 and August 1 [2025], and have failed to pay the additional $500 in sanctions the Court imposed for the missed July 1 payment"); 10/6/2025 Dkt. Order for Dkt. 599 ("BRG did not receive the $1,500 payment that was due [for July, August, and September 2025] . . . nor did [BRG] receive the additional $500 that was due on

October 1, 2025. . . . Individual Defendants still owe BRG $29,216.47 in unpaid fees, which goes up to $41,040.19 when accounting for interest owed as set forth in their engagement letter. . . . Individual Defendants [also] failed to pay the $1,000 in sanctions ordered by the Court . . . . The Court sanctions them an additional $500 for both [the September and October 2025] missed payments, for a total in sanctions of $2,000."); 1/28/2026 Dkt. Order for Dkt. 615 (imposing $1000 in civil contempt sanctions for the Gelardis' failure to timely pay BRG on December 1, 2025 and January 1, 2026).)

7.    <u>Summary of Contumacious Conduct</u>

In sum, Defendants have repeatedly flouted the Court's orders by retaining Plaintiff's customer information; contacting Plaintiff's employees; continuing—or attempting to continue—Companions' IME work as AES, CES, and IMELR; and failing to pay BRG.  Although the Court has already imposed sanctions for some of Defendants' contumacious conduct, it has yet to impose sanctions for its March 2025 findings of contempt.  (Mar. 2025 M&O, Dkt. 448, at 54.)

**DISCUSSION**

There are several pending matters in this case that the Court addresses here.  First, Plaintiff has brought new contempt allegations against Defendants.  The Court will make findings of fact and issue conclusions of law as to those allegations, and, for the reasons stated below, the Court finds Defendants in contempt yet again.  Second, the Court will discuss the appropriate sanctions for the contempt found here, as well as for the contempt found in the Court's March 2025 Memorandum and Order, (Dkt. 448).  As discussed below, the Court finds that, based on Defendants' repeated and flagrant violations of the Court's orders and their willful efforts to dissipate assets that the Court ordered preserved for purposes of paying a potential judgment, case-ending sanctions, in addition to compensatory monetary sanctions for Plaintiff's attorneys' fees, are warranted.

11

I.      **Plaintiff's Current Contempt Motion Based on the Gelardis' Dissipation of Assets**

After Plaintiff filed this lawsuit, the Gelardis sold three of their properties: (1) a home in East Stroudsburg, Pennsylvania for $569,400 on April 29, 2022; (2) a home in Philadelphia, Pennsylvania for $229,000 on December 5, 2023; and (3) a home in Champions Gate, Florida for $760,000 on December 15, 2023.   (Attach. & TRO M&O, Dkt. 284, at 8 (citing Levi Decl., Dkt. 279, ¶¶ 10–16).)   In January 2024, Plaintiff informed the Court that the Gelardis were planning to sell a fourth property located at 148 Clay Pit Road in Staten Island, New York (the "Staten Island" property).   (*Id.* at 3 (citing Pl.'s Attach. Mot., Dkt. 270, at 3).)   Plaintiff requested an order of attachment on the Staten Island property and/or an order requiring the Gelardis to place the proceeds from the sale in escrow until the Court rendered a final decision on one of Plaintiff's earlier requests for contempt sanctions.   (*Id.* at 3–4 (citing same).)   The Court found that the Gelardis were selling their properties with fraudulent intent in order to frustrate Plaintiff's ability to enforce a potential judgment against them, and the Court therefore attached the net proceeds from any potential sale of the Staten Island property.   (*Id.* at 8–10, 12.)

The following week, on March 8, 2024, the Court ordered the Gelardis to "notify the Court within three (3) days of entering into any contract to sell their ownership interest in any other property, including the identity(ies) of the buyers and an anticipated closing date."   (3/8/2024 Dkt. Order (the "Property Sale Order").)

On May 2, 2025, Plaintiff filed a motion for contempt, (Dkt. 477), alleging that the Gelardis had violated the Property Sale Order by selling their property located at 9 Woods End, Lake Harmony, PA (the "Woods End" property) without notifying the Court, in order "to avoid having the net proceeds [of the sale] attached by this Court."   (Pl.'s Mem. in Supp. Mot. for Contempt

("Contempt Mot."), Dkt. 478, at 1, 5.)[6]  As evidence, Plaintiff attached public records obtained from the Carbon County, Pennsylvania recorder of deeds.  (Roa Decl., Dkt. 479, ¶ 7; Deed, Dkt. 479-1.)  Those records show that the sale of the Woods End property was, in fact, recorded on March 20, 2025.  (Deed, Dkt. 479-1, at ECF 2.)  The records also include an indenture agreement, dated February 27, 2025, between the Gelardis and Evermark Investments, LLC, for the sale of the Woods End property in the amount of $390,000.  (*Id.* at ECF 3–5.)  The indenture is signed by both Safa and Vito, and their signatures are notarized.  (*Id.* at ECF 4.)

Based on this conduct, Plaintiff requests that the Court find Safa and Vito in *criminal* contempt and issue case-ending sanctions.  (Contempt Mot., Dkt. 478, at 7–10.)[7]

## A.     Procedural Background

On May 5, 2025, the Court issued an Order to Show Cause "[i]n light of what appear[ed] to be the [Gelardis'] clear and direct defiance of the Court's March 8, 2024 Order, and the need to ensure that the proceeds of any property sales by the [Gelardis] are not dissipated, concealed, or rendered unattachable."  (O.S.C., Dkt. 482, at 2.)  The Court ordered the Gelardis to provide a summary of their financial information from the last two years, including details about the sales

---

[6] Plaintiff also alleged that the Gelardis had entered into a contract to sell their property located at 5265 Milford Road, East Stroudsburg, PA (the "Milford Road" property) without informing the Court for the same reason.  (Contempt Mot., Dkt. 478, at 1, 5.)  Safa responded that they had not sold the Milford Road property.  (Dkt. 508 at ECF 3.)  On June 26, 2025, the Gelardis filed an emergency motion asking the Court to allow them to sell the Milford Road property due to their severe financial distress.  (Dkt. 516.)  The Court ruled that the sale could go through, but that "each and every dollar and cent of the proceeds of that sale" were to be deposited into the Court Registration Investment System "*within one (1) business day of receipt of the proceeds of that sale.*"  (July 2025 M&O, Dkt. 561, at 5–6.)

[7] Plaintiff also requests that the Court issue an order of pre-judgment attachment for the Woods End property and "any other properties sold by the Gelardis."  (*Id.* at 14.)  The Court has already granted the request as to the Woods End property, (*see* May 2025 Attach. & O.S.C. M&O, Dkt. 500), and denied Plaintiff's request as to any other properties as moot given the Court's Order to Show Cause, (O.S.C., Dkt. 482), which is described next.

of any real property since March 8, 2024. (*Id.*) The Court further ordered the Gelardis to show cause "why they should not be required to deposit all proceeds from any sales of their properties since March 8, 2024, with the Court Registration Investment System ('CRIS') during the pendency of this case." (*Id.* at 3.) On May 19, 2025, the Gelardis filed a letter in response to the Court's Order to Show Cause, (Dkt. 485), along with various financial disclosures, (Dkts. 487, 489–91). They confirmed that they had sold the Woods End property, but argued that the proceeds should not be attached because they were financially destitute and needed those proceeds to avoid insolvency. (Dkt. 485, at 1–2.) Shortly thereafter, the Court ordered the Gelardis to deposit the proceeds of the Woods End property sale into CRIS by June 6, 2025. (May 2025 Attach. & O.S.C. M&O, Dkt. 500, at 1–2.) The Gelardis were further directed that, if they no longer had the entire proceeds from the sale, they must "(1) deposit <u>all</u> remaining proceeds into CRIS, and (2) submit a detailed, itemized summary . . . explaining what they have done with the outstanding proceeds." (*Id.* at 2.) On June 6, 2025, the Gelardis filed a letter explaining that they had spent all of the proceeds from the Woods End property sale. (*See* Dkt. 508, at 3.)

On May 28, 2025, the Gelardis submitted an opposition to Plaintiff's motion for contempt. (Defs.' First Opp'n to Contempt Mot. ("First Opp'n"), Dkt. 498.)[8] They argued that the Court should not hold them in contempt for selling the property without notifying the Court because they had "kept [their former] Attorney Jonath[o]n Warner fully informed at every step," including by updating him "once [they] had . . . a contract." (*Id.* at ECF 1–2.) Safa filed another opposition on June 9, 2025, which argued that the Gelardis should not be held in criminal contempt because "[t]he law does not permit incarceration for unproven civil claims, and this motion should be seen

---

[8] In their opposition, Defendants also asked the Court to "[v]acate the contempt for transferring the business" and "[d]rop the contempt for the PI investigation." (*Id.* at ECF 3.) The Court denied those requests. (May 2025 Attach. & O.S.C. M&O, Dkt. 500.)

for what it is—an act of intimidation." (Defs.' Second Opp'n to Contempt Mot. ("Second Opp'n"), Dkt. 509, at ECF 1.)

On May 30, 2025, the Court notified the Gelardis that "they ha[d], in effect, waived their attorney-client privilege regarding whether they told their former counsel about the impending sale" of the Woods End property. (May 2025 Attach. & O.S.C. M&O, Dkt. 500, at 3.) The Court ordered Attorney Jonathon Warner ("Warner") to submit a sworn affidavit by August 1, 2025, stating whether the Gelardis "ever advised him that they had sold the Woods End property and, if so, when and how that communication occurred." (7/18/2025 Dkt. Order.) On July 21, 2025, Warner submitted a letter requesting that the Court reconsider its finding that the Gelardis had waived their attorney-client privilege. (Warner Letter, Dkt. 566-1, at 1.) He repeated this request in another letter dated July 31, 2025. (Warner Letter, Dkt. 572, at 2.) On August 25, 2025, the Court denied Warner's requests and affirmed its finding that the Gelardis had waived their attorney-client privilege. (Aug. 2025 M&O, Dkt. 585, at 10.) The Court gave Warner a new deadline of September 2, 2025 to file a responsive affidavit. (*Id.*)

On August 29, 2025, Warner submitted the affidavit requested by the Court. (Warner Decl., Dkt. 590-1.) In it, he stated that the Gelardis had *not* informed him when they entered into a contract to sell the Woods End property. (*Id.* ¶¶ 3–5.) Instead, Warner swore that Safa told him about the contract for the first time on March 11, 2025, after the property had already been sold. (*Id.* ¶ 2.) Finally, he stated that "[a]fter [he] learned about the closing, [he] did not notify the Court that the closing had already occurred because [he] was specifically instructed by Safa not to do so." (*Id.* ¶ 7.)

On September 2, 2025, the Court ordered the Gelardis to respond again to Plaintiff's motion for contempt and to "explain why the Court should not hold them in criminal contempt

15

and/or issue case-ending sanctions" given their "clear violation" of the Court's Property Sale Order. (9/2/2025 Dkt. Order for Dkt. 590 (emphasis omitted).) On November 11, 2025, the Gelardis submitted a third response. (Third Opp'n, Dkt. 605.) They argue that the Property Sale Order was "ambiguous," that "any failure of notice . . . was counsel's duty and not attributable to [the Gelardis]," and that "the record shows continuous disclosure and good-faith compliance." (*Id.* at ECF 10, 13 (emphasis omitted).)

**B.    The Court Finds Defendants Safa and Vito Gelardi in Civil Contempt of the Property Sale Order[9]**

"A court may hold a party in [civil] contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) (citing *Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004)). Here, the Court finds the standard for civil contempt has been met with respect to the Gelardis' sale of the Woods End property.

First, the Court's Property Sale Order was clear and unambiguous. An order "is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id.* (quoting *Drywall Tapers & Pointers v. Loc.*

---

[9] Defendants have not requested a hearing on the contempt allegations per Local Civil Rule 83.6(b). Moreover, it is clear from "unchallenged documentary evidence before the [C]ourt," as well as the Court's prior findings of fact throughout this case, "that [Defendants] ha[ve] continually and wil[l]fully disobeyed court orders." *Sassower v. Sheriff of Westchester Cnty.*, 824 F.2d 184, 190 (2d Cir. 1987). Therefore, "a full-blown hearing is not required before [Defendants] may be held in [civil] contempt." *Id.* Additionally, because the Court ultimately declines to hold Defendants in criminal contempt (as discussed further below), they are not entitled to the procedural protections that a criminal contempt finding or conviction might otherwise require. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831–34 (1994).

*530*, 889 F.2d 389, 395 (2d Cir. 1989)).  The exact language of the Court's Property Sale Order reads: "The Individual Defendants shall also notify the Court within three (3) days of entering into any contract to sell their ownership interest in any other property [besides the Gelardis' Staten Island property], including the identity(ies) of the buyers and an anticipated closing date." (3/8/2024 Dkt. Order.)  This language could leave no doubt in the Gelardis' minds about precisely what they were required to do.  *See CBS Broad. Inc.*, 814 F.3d at 98.

The Gelardis' response states, without any additional explanation, that "[t]he order was ambiguous as applied to [them]."  (Third Opp'n, Dkt. 605, at 10.)  Because this point was "'adverted to [only] in a perfunctory manner, unaccompanied by [any] effort at developed argumentation,' it must be 'deemed waived,'—or, more precisely, *forfeited*."  *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) (alterations in original) (internal citations omitted); *Espinoza v. Foundry Workers LLC*, 792 F. Supp. 3d 344, 353 (E.D.N.Y. 2025) (same).  Regardless, the argument is meritless, since the Property Sale Order's unambiguous directive was plainly addressed to the "Individual Defendants," Safa and Vito.  (*See* 3/8/2024 Dkt. Order.)

Second, the evidence that the Gelardis violated the Court's order is clear and convincing. Proof of noncompliance is "clear and convincing" if it is "adequate to demonstrate a reasonable certainty that a violation occurred."  *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (citation and internal quotation marks omitted).  It is undisputed that on or around December 18, 2024, the Gelardis executed a contract to sell the Woods End property for $390,000. (Third Opp'n, Dkt. 605, at ECF 5.)  It is also undisputed that on or around March 10, 2025, the Gelardis closed on the sale of the Woods End property.  (*See id.* at ECF 5, 57.)[10]  Finally, it is

---

[10] The Gelardis submitted to the Court an unsigned "Settlement Statement (HUD-1)" for the Woods End property dated March 10, 2025, with a contract sale price of $390,000.  (*Id.* at ECF 57–59.)

undisputed that the Gelardis did not inform the Court that they had entered into a contract to sell or had sold the Woods End property.[11]  (*See generally id.*)  Therefore, the undisputed evidence demonstrates with a reasonable certainty—in fact, beyond any doubt—that the Gelardis violated the Court's order.

Third, the Gelardis did not diligently attempt to comply with the Property Sale Order in a reasonable manner.  The Gelardis' claim that they kept their former attorney Warner informed about the status of the sale is directly refuted by Warner in a sworn affidavit; indeed, he states that he "was specifically instructed by Safa" *not* to advise the Court of the Woods End property sale, (*see* Warner Decl., Dkt. 590-1, ¶¶ 2–7).  The Gelardis thus have put forth no credible evidence that they made any attempt to comply with the Property Sale Order, let alone a diligent attempt.

The Court therefore holds the Gelardis in civil contempt for violating the Property Sale Order by failing to notify the Court of the Woods End property sale.[12]

## C.    The Court Declines to Initiate the Criminal Contempt Process at This Time

"Unlike civil contempt, which is aimed at 'compel[ling] future compliance with a court order' and is 'remedial[] and for the benefit of the complainant,' criminal contempt is 'punitive' and meant to 'vindicate the authority of the court.'"  *United States v. Donziger*, 38 F.4th 290, 305 (2d Cir. 2022) (alterations in original) (quoting *Bagwell*, 512 U.S. at 827–28).  "Although the power of a court to punish for contempt may be 'inherent,' the power of a United States court

---

[11] The sale was first brought to the Court's attention on May 2, 2025, when Plaintiff filed its motion for contempt.  (Dkts. 477–78.)

[12] Although the Gelardis attempt to blame their former attorney, Warner, for not notifying the Court of the Woods End property sale, (*see* Third Opp'n, Dkt. 605, at ECF 5–6), it is well-established that reliance on counsel is not a defense to an act of contempt, *see SEC v. Musella*, 818 F. Supp. 600, 606–07 (S.D.N.Y. 1993) (collecting cases).  The Gelardis' purported reliance on their counsel may be considered only to determine the appropriate sanction.  *See id.*  The Court therefore addresses this issue in its discussion of sanctions below.

today to impose criminal penalties for contempt of court is provided by criminal statutes." *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 129 (2d Cir. 1998) (first quoting *Ex Parte Robinson,* 86 U.S. 505, 510 (1873), and then citing 18 U.S.C. §§ 401, 402). The criminal statute provides:

> A court of the United States shall have the power to punish by fine or imprisonment, or both, at its discretion, such contempt of authority, and none other, as—
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions; [and]
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.

For purposes of procedure, there are two recognized categories of criminal contempt. *See* 3A Wright & Miller's Federal Practice and Procedure Criminal §§ 701, 705 (4th ed. 2025). "Direct" contempt, which occurs in the presence of the court, can be prosecuted through a summary process. *Id.* § 706; Fed. R. Crim. P. 42(b) (the Court can "summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies" by issuing an order that "recite[s] the facts, [is] signed by the judge, and [is] filed with the clerk"). "The summary contempt power is generally limited to cases in which 'immediate corrective steps are needed to restore order and maintain the dignity and authority of the court,' and in which there is an 'open, serious threat to orderly procedure.'" *United States v. Cooper*, 353 F.3d 161, 164 (2d Cir. 2003) (internal citations omitted) (first quoting *Johnson v. Mississippi* 403 U.S. 212, 214 (1971); and then quoting *Harris v. United States*, 382 U.S. 162, 165 (1965)).

For "indirect" criminal contempt that occurs outside the presence of the court, or where summary proceedings are otherwise inappropriate, the criminal prosecution must be pursued through a more formal process. *See Bagwell*, 512 U.S. at 833–34; 3A Wright & Miller's Federal

Practice and Procedure Criminal §§ 701, 705, 708; Fed. R. Crim. P. 42(a).  The defendant must receive notice, which must "state the time and place of the trial," "allow the defendant a reasonable time to prepare a defense," and "state the essential facts constituting the charged criminal contempt."  Fed. R. Crim P. 42(a)(1)(A)–(C).  The court must appoint a prosecutor, which in most cases must be an attorney for the government.  *See id.* 42(a)(2).  Finally, the defendant has the right to a jury trial, and the court can only impose punishment after a guilty finding or verdict.  *See id.* 42(a)(3).

Here, although Defendants—in particular, Safa—have committed acts of contempt in the Court's presence, such as lying under oath, to obstruct the administration of justice and disobey the Court's orders or commands, 18 U.S.C. §§ 401(1), (3), the Woods End property sale did not happen in Court's immediate presence, and was thus indirect contempt.  This means that before the Court can punish the Gelardis for criminal contempt based on the Woods End sale, they must be afforded the procedural protections of the prosecution-on-notice process.  Fed. R. Crim. P. 42(a).  The Gelardis have not been afforded those protections, and therefore the Court cannot hold them in criminal contempt at this time.  *See CBS Broad. Inc.*, 814 F.3d at 101 ("A district court cannot impose criminal sanctions without affording the defendant the constitutional procedural protections of a jury trial." (citing *Bagwell*, 512 U.S. at 837–38)).  Because criminal contempt currently is not an option, the Court need not evaluate whether the evidence is sufficient to meet the substantive standard for criminal contempt.  Plaintiff's request for the Court to hold the Gelardis in criminal contempt for selling the Woods End property is denied.

## II.   Appropriate Sanctions for Defendants' Civil Contempt

The Court is now tasked with determining the appropriate sanctions for both the instant finding of civil contempt as well as the civil contempt described in the Court's March 2025 Memorandum and Order, as to which the Court has yet to determine sanctions.  (*See* Mar. 2025

M&O, Dkt. 448, at 35, 41, 43–44.)  In that order, the Court held that: (1) "Companions knowingly violated the March 2023 TRO and Expanded PI by performing IMEs for [a client on the Enjoined Customers List] through March 30, 2023," (*id.* at 38); (2) the Gelardis and Companions violated the Court's March 2023 TRO and Expanded PI "by attempting to partner with Liddie and helping to create IMELR," (*id.* at 38–39, 39 n.33); and (3) Safa violated the Court's April 2022 PI (and the June 2022 amended version of that PI) "by still possessing Plaintiff's customer list in February 2023, and then by emailing it" to a third party, (*id.* at 39–40).[13]  Despite finding Defendants in civil contempt, the Court *could not* "enter an order finding them in civil contempt at [that] time because Plaintiff [had] not submitted the required affidavit 'set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party.'" (Mar. 2025 M&O, Dkt. 448, at 41 (first two alterations added) (first quoting Loc. R. 83.6(a), and then citing Loc. R. 83.6(c)).)  The Court ordered Plaintiff to file supplemental briefing setting forth the specific amounts of compensatory damages and attorneys' fees it was claiming.  (*Id.* at 43–44, 54.)  Plaintiff filed supplemental briefing on July 1, 2025, (Dkts. 521–24), which the Court denied as overbroad, (7/21/2025 Dkt. Order).  Plaintiff filed revised supplemental briefing on August 25, 2025.  (Dkts. 580–83.)  The Gelardis responded on September 15, 2025.  (Dkt. 595.)

Based on the Court's contempt findings from the March 2025 Memorandum and Order, Plaintiff seeks case-ending sanctions, lost profits, attorneys' fees, and an immediate entry of judgment.  (*See* Contempt Mot., Dkt. 478; Pl.'s Am. Mem. Supp. Compensatory Damages

---

[13] The Court also found non-parties Liddie and IMELR in civil contempt.  (*See* Mar. 2025 M&O, Dkt. 448, at 41–43.)  Plaintiff has since entered a settlement agreement with Liddie and IMELR, and "does not seek damages from them in connection with the Court's contempt finding." (Levi Decl., Dkt. 584, at 1 n.1.)

("Compensatory Damages Mem."), Dkt. 582.)  For the Woods End property sale, Plaintiff requests case-ending sanctions and attorneys' fees. (*See* Contempt Mot., Dkt. 478.)[14]

For the reasons set forth below, the Court finds that case-ending sanctions are warranted based on Defendants' continuous and brazen pattern of contumacious conduct, which has risen to the level of fraud upon this Court.  While the Court finds that Plaintiff has failed to show that lost profits should be awarded as a sanction for Defendants' contempt, given the case-ending sanctions, Plaintiff will have an opportunity to seek lost profits as part of Plaintiff's overall damages request for the underlying conduct charged in its complaint.  Finally, the Court awards Plaintiff $105,881.78 in attorneys' fees as a sanction for Defendants' civil contempt in connection with the Court's March 2025 Memorandum and Order.

A.      **Case-Ending Sanctions**

1.      Legal Standard

"[I]t is firmly established that the power to punish for contempts is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (internal quotation marks and alterations omitted); *see also* 11A Wright & Miller's Federal Practice and Procedure, § 2960 (3d ed. Sep. 2025) ("A court's ability to punish contempt is thought to be an inherent and integral element of its power and has deep historical roots.").  This inherent authority is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  *Chambers*, 501 U.S. at 43 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–631 (1962)); *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991

---

[14] Plaintiff also requested that the Court find the Gelardis in criminal contempt, which the Court has denied *supra*, and that the Court issue a pre-judgment attachment order for the proceeds of any of the Gelardis' property sales, which the Court granted as to the Woods End property, (*see* May 2025 Attach. & O.S.C. M&O, Dkt 500; *see also* O.S.C., Dkt. 482 (denying Plaintiff's request as to other properties as moot)).

F.3d 361, 367 (2d Cir. 2021).  The Court "has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants." *Shangold v. Walt Disney Co.*, No. 03-CV-9522 (WHP), 2006 WL 71672, at *1 (S.D.N.Y. Jan. 12, 2006) (citing *Chambers*, 501 U.S. at 44), *aff'd*, 275 F. App'x 72 (2d Cir. 2008) (summary order); *see Potts v. Postal Trucking Co.*, No. 17-CV-2386 (ARR) (VMS), 2018 WL 794550, at *2 (E.D.N.Y. Feb. 8, 2018) (compiling cases).  Additionally, the Second Circuit has made clear that Federal Rule of Civil Procedure ("Rule") 55(a) empowers district courts to enter a default against defendants that fail to "otherwise defend," which is a term broadly construed.  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128–31 (2d Cir. 2011).  A defendant can fail to "otherwise defend" by failing to comply with court orders.  *Id.* (citing *Cotton v. Slone*, 4 F.3d 176, 179, 181 (2d Cir. 1993); *Eagle Assocs. v. Bank of Montr.*, 926 F.2d 1305, 1310 (2d Cir. 1991)).  Similarly, under Rule 41(c), the Court may dismiss a defendant's counterclaims pursuant to Rule 41(b) if the counterclaimant has failed to "comply with . . . a court order."  Fed. R. Civ. P. 41(b); *see id.* 41(c).

Harsh sanctions, such as the dismissal of a case or an entry of a default judgment, may be "appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party."  *Shangold*, 275 F. App'x at 74 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *cf. S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 147–48 (2d Cir. 2010) (affirming district court's imposition of default as sanction under Rule 37 against defendants who acted "willfully and in bad faith" and whose conduct formed a "pattern of prolonged and vexatious obstruction" (citations and internal quotation marks omitted)).

"Fraud upon the court" is a paradigmatic example of extreme misconduct warranting harsh sanctions.  *See McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 461

(S.D.N.Y. 2002) (acknowledging that case-ending sanctions are "only to be used in extreme situations," but holding that "[w]hen faced with a fraud upon the court, . . . such a[] powerful sanction is entirely appropriate"); *see also Chambers*, 501 U.S. at 42, 44 (affirming lower court's holding that the "wielding of that inherent power [to sanction] is particularly appropriate when the offending parties have practiced a fraud upon the court"). As recognized by other courts in this Circuit, examples of fraud upon the court include "improperly influenc[ing] the trier," "unfairly hamper[ing] the presentation of the opposing party's claim or defense," "l[ying] to the court and [the party's] adversary intentionally, repeatedly, and about issues that are central to the truth-finding process," and "knowingly submit[ting] fraudulent documents to the [c]ourt." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (internal citations, quotation marks, and alterations omitted). In these situations, "it can fairly be said that [the offending party] has forfeited his right to have his claim decided on the merits." *McMunn*, 191 F. Supp. 2d at 445. "This is the essence of a fraud upon the court." *Id.*

For the court to grant sanctions based on fraud upon the court, "it must be established by clear and convincing evidence that [the party at fault] has 'sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate' the action." *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002) (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)), *aff'd*, 81 F. App'x 396 (2d Cir. 2003) (summary order). Courts in this Circuit generally consider the following factors when evaluating if case-ending sanctions for fraud upon the court are warranted: (1) "whether the misconduct was the product of intentional bad faith"; (2) "whether and to what extent the misconduct prejudiced the other party"; (3) "whether there is a pattern of misbehavior, rather than an isolated instance"; (4) "whether and when the misconduct was corrected"; and (5) "whether

further misconduct is likely to continue in the future." *McMunn*, 191 F. Supp. 2d at 446 (citing *Skywark v. Isaacson*, No. 96-CV-2815 (JFK) (NRB), 1999 WL 1489038, at *15 (S.D.N.Y. Oct. 14, 1999) (collecting cases)).

### 2.    Plaintiff's Request for Case-Ending Sanctions

Here, the Court considers the extensive evidence of the Gelardis' willful, bad-faith, contumacious conduct.  This "conduct was not isolated but rather formed a pattern of 'prolonged and vexatious'" behavior.  *S. New England Tel. Co.*, 624 F.3d at 148 (quoting *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 388 (2d Cir. 1981)) (affirming imposition of default on defendants for bad-faith conduct).  Indeed, the Gelardis' efforts to perpetrate a fraud on the Court began with the very first TRO hearing, during which Safa denied under oath that she and Vito had stolen Plaintiff's confidential information and customer list by paying Watchdog's President, Rosenblatt, to provide that information[15]—only to be flatly contradicted moments later by an audio recording of a call between the Gelardis and Rosenblatt confirming that they had been paying Rosenblatt for that information.[16]  In a subsequent hearing, the Court admonished the Gelardis for

---

[15] (4/4/2022 Hr'g Tr., Dkt. 98, at 46:10–47:12 (Safa stating that "[Rosenblatt] took it upon himself to send [her] whatever it is he sent" but averring that she "never used the information" he sent to build her business); *id.* at 86:10–25 (Safa declaring that she "[a]bsolutely . . . did not pay [Rosenblatt] for any of the documents he sent," denying "ask[ing] him to send them," and claiming she did not give him "any reward or benefit of any kind for the documents that he sent to [her] in 2017"); *id.* at 124:7–125:16 (Safa attempting to "plead the Fifth" when asked whether she believed the information Rosenblatt sent her "was confidential business information of IME WatchDog," admitting she "paid Rosenblatt for this information," but denying doing so "pursuant to some agreement with Mr. Rosenblatt that he would give [her] this information in exchange for money")).

[16] The Court noted: "I just heard a recording where it is clear to me the defendants, Mr. and Mrs. Gelardi, are acknowledging that they have this ongoing relationship or had it with Mr. Rosenblatt where they were willing to pay him money to get information and then provide him safe haven by bringing him over to their company and possibly paying him $2500 in that moment . . . ." (4/4/2022 Hr'g Tr., Dkt. 98, at 154:21–155:3.)  As a result, the Court concluded, "I don't believe for a moment that [Safa] thought that the information Rosenblatt was sharing with [her], even if it was volunteered in the beginning, was anything other than confidential. . . . I believe that [she] and [her] husband knew full well [they] were essentially stealing this information

attempting to "perpetrate . . . a fraud on this [C]ourt" by establishing CES as an attempt to get around the Court's TRO on Companions. (3/27/2023 Hr'g Tr., Dkt. 199, at 120:17–20.) The Gelardis' scheme with IMELR, which is described in detail in the Court's March 2025 Memorandum and Order and established by clear and convincing evidence, is an even more flagrant instance of fraud upon the Court. (*See* Mar. 2025 M&O, Dkt. 448, at 16–23, 54.) The Court has imposed many lesser sanctions, none of which have proven effective against the Gelardis' "undeterrable resolve to circumvent this Court's Orders and improperly use Plaintiff's trade secrets." (*Id.* at 51.) And the Court has given the Gelardis more than sufficient warning that their continued contemptuous conduct could result in case-ending sanctions. (*See, e.g.*, *id.* at 50 n.35 ("The Court might revisit Plaintiff's request for case-ending sanctions . . . ."); O.S.C., Dkt. 482, at 4–5 ("*Failure to timely comply with any direction in this Order could result in . . . additional sanctions, including case-ending sanctions—i.e., the issuance of a default judgment against Defendants . . . .*").)

The Gelardis argue that their noncompliance can be blamed on their former attorney Warner, and that the "record shows continuous disclosure and good-faith compliance." (Third Opp'n, Dkt. 605, at ECF 10.) The Court disagrees. Even if the Court were persuaded that Warner was responsible for the Gelardis' persistent, contumacious conduct, the law is clear that "a client-principal is 'bound by the acts of his lawyer agent,'" *Chevron*, 833 F.3d at 150 (quoting *Link*, 370

---

or buying it from Mr. Rosenblatt at least as of 2019. . . . [I]t makes sense to me that [Safa] started paying for this information to grow [her] business just as [she] said in the phone call with Mr. Rosenblatt, that in fact it sounds like [her] business took off from 2019, which coincided with when [she was] getting all this information from Mr. Rosenblatt." (*Id.* at 155:15–156:15.) Although the Court admitted the recording into the record, (*see id.* at 131:24), Plaintiff did not prepare a written transcript of the recording and the recording's contents were not transcribed as part of the hearing transcript, (*see id.* at 132:7 (noting only "Audio recording played")).

U.S. at 634), and "even innocent clients may not benefit from the fraud of their attorney," *id.*  And here, the Court does not find that Warner was responsible.

The Woods End property sale provides the clearest example of why the Gelardis' reliance-on-counsel argument is disingenuous at best.  The Gelardis claim that they provided "continuous written notice" to Warner about the status of the sale.  (Third Opp'n, Dkt. 605, at ECF 13.)  Despite offering several emails and texts between the Gelardis and Warner regarding the Gelardis' efforts to sell the Woods End property, (*id.* at ECF 61–63), these messages ended in January 2025 and none of them indicated that the Gelardis had entered into a contract to sell the Woods End property, which occurred in December 2024 and closed in March 2025.  Contrary to Defendants' claim, these messages do nothing to "resolve[] this dispute" or show that "Warner had months of notice" that the Gelardis had entered into a contract of sale.  (*Id.* at ECF 4.)  Indeed, they conspicuously do not include any such messages.  And, notably, the Gelardis do not allege that they ever affirmatively instructed Warner to inform the Court.  (*See generally* First Opp'n, Dkt. 498; Second Opp'n, Dkt. 509; Third Opp'n, Dkt. 605; Warner Decl., Dkt. 590-1, ¶ 7.)

Given that Safa is "wholly uncredible as a witness," *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232 n.4, the Court credits Warner's sworn affidavit as a more reliable source of evidence than the Gelardis' unsupported, self-serving assertions.  Warner explains that on March 11, 2025, the Gelardis informed him by phone that they had sold the Woods End property.  (Warner Decl., Dkt. 590-1, ¶ 2.)  On March 14, 2025, Warner forwarded the Gelardis a copy of the Court's Property Sale Order.  (*Id.* Ex. 1, at ECF 6.)  In his email, Warner stated:

> Judge Chen's March 8 Order below, which I sent to you on March 8, 2024, and which you replied to, required that you notify the Court within 3 days of entering into a contract for the sale of "any of" your properties.  You have advised me that on Monday of this week you closed on the sale of one of the two PA properties, but you never sent me a copy of the contract, much less within "three days" of its being

signed. How do you expect me to defend you when the next contempt motion is made (as it surely will)?

(*Id.*)  The Gelardis did not respond to this email.  (*Id.* ¶ 9.)  On or around March 21, 2025, Warner's bank processed and cleared a $10,000 check from the Gelardis for "New York Coruption [sic]." (*Id.* at ECF 2–4.)[17]

Warner did not notify the Court that the property had sold because he "was specifically instructed by Safa not to do so."  (Warner Decl., Dkt. 590-1, ¶ 7.)  According to Warner, he was "unsure what to do . . . other than to move to be relieved as counsel at a time when such application would least prejudice [his] clients."  (*Id.* ¶ 8.)  On April 17, 2025, Warner filed a motion seeking to withdraw as counsel, along with his firm, Warner & Scheuerman.  (*See* Warner Decl., Dkt. 464.) In his declaration in support of the motion, Warner stated that he could not, "in good conscience[,] continue to represent Defendants (and zealously advocate for them) while saddled with the concern that [his] continued representation [would] cause [him] to be accused of engaging in wrongdoing or in breaching any duties either to [his] clients or the Court."  (*Id.* ¶ 10.)

Thus, contrary to the Gelardis' claim that they continuously disclosed and attempted to comply with the Court's order in good faith, (Third Opp'n, Dkt. 605, at ECF 10), the evidence shows that they in fact actively tried to evade the Court's order both by concealing information from their attorney and by instructing their attorney to withhold that information from the Court and Plaintiff after it was belatedly disclosed to him, (Warner Decl., Dkt. 590-1, ¶ 7).

Defendants' misconduct with respect to the Woods End property sale is emblematic of their conduct throughout this case and starting from the very beginning.  (*See, e.g.*, 4/4/2022 Hr'g Tr.)  Plaintiff and the Court have had to chase Defendants to get to the truth and to uncover and

---

[17] The check itself is dated October 13, 2025, but Defendants explain that this date was an error.  (Third Opp'n, Dkt. 605, at ECF 64; Dkt. 564, at ECF 1–2.)

deter their pernicious non-compliance at every turn.  Every motion and Court order has been met with obfuscation, deception, concealment, and defiance by Defendants.  Defendants' persistent efforts to obstruct the progress of this matter, while simultaneously dissipating assets that might be used to pay a judgment, if allowed to continue, will almost certainly prevent this matter from reaching a fair and just resolution on the merits.  Because Defendants' contumacious conduct has "infected the evidentiary record and continues to impair the search for truth," case-ending sanctions, "it turns out, represents the only fair resolution of this case."  *Esposito v. Suffolk Cnty. Cmty. Coll.*, 517 F. Supp. 3d 126, 127 (E.D.N.Y. 2021).

Case-ending sanctions are a harsh remedy, but the Gelardis' misconduct is well within the range of conduct that other courts in this Circuit have deemed to warrant the harshest sanctions. *See, e.g.*, *McMunn*, 191 F. Supp. 2d at 446–62 (imposing case-ending sanctions where the plaintiff lied and convinced others to lie about issues material to the case); *Skywark*, 1999 WL 1489038, at *1–18 (finding case-ending sanctions appropriate where the plaintiff violated discovery order and lied throughout discovery); *Ptak Bros. Jewelry v. Ptak*, No. 06-CV-13732 (DC), 2009 WL 807725, at *7–11 (S.D.N.Y. Mar. 30, 2009) (issuing case-ending sanctions because the defendants demonstrated a history of failing to comply with court orders, made misrepresentations to the court, and refused to comply with discovery obligations); *Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2019 WL 3281324, at *4–15 (E.D.N.Y. May 2, 2019) (recommending case-ending sanctions where defendants purposefully withheld documents and lied in deposition testimony), *report and recommendation adopted*, 2020 WL 1429472 (E.D.N.Y. Mar. 24, 2020), *aff'd sub nom. Abbott Lab'ys v. H&H Wholesale Servs., Inc.*, No. 23-446-CV, 2024 WL 4297472 (2d Cir. Sep. 26, 2024) (summary order); *Lawrence v. City of New York*, No. 15-CV-8947 (WHP), 2018 WL 3611963, at *1–3, *6–8 (S.D.N.Y. July 27, 2018) (imposing

29

case-ending sanctions where the plaintiff staged photos of the incident alleged in the complaint and engaged in deceptive conduct that undermined her credibility); *Esposito*, 517 F. Supp. 3d at 127, 135–37 (issuing case-ending sanctions where the plaintiff "altered, forged and tampered with evidence, and repeatedly perjured herself to conceal these misdeeds").

Finally, while the Court strongly prefers that cases be resolved on their merits, the Court has no hesitation about imposing case-ending sanctions here because it has already found, many times, that Plaintiff is likely to succeed on the merits. That conclusion is based on the extensive findings of fact the Court has made for the numerous TROs, PIs, and contempt orders in this case. (*See, e.g.*, 4/5/2022 Dkt. Order (finding, after an in-person hearing in April 2022, that Plaintiff had "demonstrated likelihood of success on the merits of its claims against Defendants," and that Defendants "clearly and convincingly" appeared to have "wrongfully obtained [Plaintiff's] trade secrets"); 7/1/2024 Dkt. Order (noting that the Court would not require Plaintiff to post bond in connection with motion for TRO and preliminary injunction because the Court had "determined it very likely that Plaintiff[] will prevail on the merits of [its] claims"); Mar. 2025 M&O, Dkt. 448, at 53 (concluding that "Plaintiff is highly likely to prevail on the merits in this litigation")); *IME Watchdog, Inc.*, 2022 WL 1525486, at *6 (applying the general standard for preliminary injunctions and "reiterat[ing the Court's] finding, made at the close of the show-cause hearing, that Plaintiff has established a likelihood of success"); *IME Watchdog, Inc.*, 732 F. Supp. 3d at 240 (applying the heightened standard for mandatory injunctions and finding "that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants," and that "there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants"). The Court has held at least *seven*

show cause or evidentiary hearings, at which both parties have had the opportunity to present documentary evidence and examine (and cross-examine) witnesses. (*See* 4/4/2022 Min. Entry; 3/27/2023 Min. Entry; 5/4/2023 Min. Entry; 5/29/2024 Min. Entry; 7/29/2024 Min. Entry; 9/25/2024 Min. Entry; 4/2/2025 Min. Entry.) Neither party can be heard to complain that they have not had their day in court. Based on the well-developed record, and even despite the Gelardis' persistent efforts to impair the Court's search for truth, the Court would almost certainly find that Plaintiff is entitled to judgment as a matter of law.

Therefore, under this Court's inherent powers, as well as Rules 41 and 55 of the Federal Rules of Civil Procedure, the Court orders case-ending sanctions against the Gelardis. Along with the other remaining Defendants in this case—Companions, CES, and IME M&C—the Gelardis are adjudged to be in default. Safa's counterclaims, (Dkt. 547), are dismissed, and her request for the Court to take judicial notice "of a pattern of bad faith litigation, coercive settlement practices, and extrajudicial intimidation," (Dkt. 569), is denied.

## B.    Lost Profits

In addition to case-ending sanctions, Plaintiff seeks compensation for its lost profits related to the conduct described in the Court's March 2025 Memorandum and Order. (Compensatory Damages Mem., Dkt. 582, at 1–4.) As discussed below, the Court denies this request.

### 1.    Legal Standard

"A civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citations omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id.* at 1353 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)). Lost profits may be "an

appropriate measure of actual damages" for civil contempt sanctions "so long as [the lost profits] can be traced back to the contemnor's contemptuous actions." *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 2462333, at *3 (S.D.N.Y. June 13, 2019) (citing *Grand v. Schwarz*, No. 15-CV-8779 (KMW), 2018 WL 4026735, at *3 (S.D.N.Y. Aug. 18, 2018); *Upjohn Co. v. Medtron Lab'ys, Inc.*, 894 F. Supp. 126, 135 (S.D.N.Y. 1995)).  To prove such damages, the "moving party must demonstrate a causal connection between the contemnor's contemptuous behavior and the alleged damages." *Broker Genius*, 2019 WL 2462333, at *3 (citations omitted).

### 2.   Plaintiff's Lost-Profits Claim

Plaintiff requests $1,077,898.46 in sanctions as compensation for its lost profits from March 10, 2023 to March 31, 2025 related to Defendants' conduct described in the Court's March 2025 M&O.  (Compensatory Damages Mem., Dkt. 582, at 1–4.)  Of that figure, Plaintiff attributes $973,574.40 of the alleged lost profits to Companions, and $104,324.06 to IMELR.  (*Id.* at 3–4.)

For Companions, Plaintiff estimates its lost profits using the following assumptions and calculations:

- First, Plaintiff alleges that "[b]etween 2018 and 2022 . . . Defendants stole at least sixty-seven (67) customers from Plaintiff."  (*Id.* at 1.)

- Second, Plaintiff states that "[d]uring the period of contempt spanning from March 10, 2023 through March 31, 2025, . . . Defendants continued to serve some of these sixty-seven (67) customers."  (*Id.* at 2 (citing Mar. 2025 M&O, Dkt. 448).)

- Third, Plaintiff extrapolates Companions' sales for the period between March 10, 2023, and March 31, 2025, assuming that Companions' yearly revenue is $883,046 based on Companions' revenue from 2022.  (*Id.* at 3.)

- Fourth, Plaintiff relies on the Court's previous finding that, as of the March 27, 2023 hearing, "98.3% of the total revenue Defendants ha[d] generated since Companions' inception was obtained through sales from Plaintiff's former customers."  (*Id.* at 3 (citing *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 6958855, at *4 (E.D.N.Y. Oct. 20, 2023)).)  Plaintiff thus assumes that 98.3% of

Companions' revenue between March 10, 2023 and March 31, 2025 also came from Plaintiff's former customers. (*Id.* at 3–4.)

- Fifth, Plaintiff asserts that it charges 5.59% more than Companions for each IME, and so it asserts that "Plaintiff's revenue . . . would have been 5.59% higher than Companions' revenue." (*Id.* at 3–4.)

- Sixth, Plaintiff calculates its estimated lost profit by applying its typical profit margin to the estimated revenue. (*Id.* at 3–4.)[18]

For IMELR, Plaintiff estimates its lost profits using similar assumptions and calculations:

- First, Plaintiff estimates IMELR's revenue for "services it performed for Plaintiff's former customers," (Compensatory Damages Mem., Dkt. 582, at 4), based on a "summary of all of IMELR's income which IMELR produced to Plaintiff in response to a subpoena," (Levi Decl., Dkt. 584, ¶ 19). That summary shows "[a]ll payments made to date" to IMELR from 14 customers. (Ex. D to Levi Decl., Dkt. 584-4.) The summary is not dated. (*See generally id.*)

- Second, Plaintiff estimates that its revenue would have been 5.59% higher than IMELR's if it had served those same customers because Plaintiff charges 5.59% more per IME. (Compensatory Damages Mem., Dkt. 582, at 4.)

- Third, Plaintiff calculates its estimated lost profits by applying its typical profit margin to the estimated revenue. (*Id.*)

The Gelardis argue that Plaintiff's lost profits estimate is speculative and based on "[i]nflated and [u]nreliable [i]nputs." (Defs.' Resp. to Compensatory Damages Mem., Dkt. 595, at ECF 1–3.) They state that Plaintiff should be awarded $0 because Plaintiff failed to prove "actual, net loss cause by contempt, proven with reasonable certainty." (*Id.* at ECF 1.) The Gelardis also argue that they should not be made to pay damages based on IMELR's revenues because Plaintiff already settled with IMELR and Liddie. (*Id.* at ECF 2–3.)

Here, the Court agrees with the Gelardis that Plaintiff's proposed sanctions for lost profits would not be compensatory because they are not appropriately "calibrat[ed] . . . to the injuries

---

[18] Plaintiff's profit margin is redacted in the publicly-filed document. (*See id.* at 3; *see also* Dkt. 581 (sealed and unredacted version).)

inflicted on the victims of the *contumacious* conduct." *See Terry*, 159 F.3d at 94 (emphasis added). For example, it is untenable to assume that Companions continued making revenue at its 2022 level after the Court enjoined Companions in 2023 from serving nearly all of the customers that formed the basis for that revenue.   (3/27/2023 Dkt. Order.)   And, contrary to Plaintiff's assumptions, the Court did *not* find that, between March 2023 and March 2025, Companions continued to serve all of the customers that Defendants had misappropriated from Plaintiff.   At most, the Court found that Companions continued performing IMEs for *one* such customer.  (*See* Mar. 2025 M&O, Dkt. 448, at 14, 37–38.)  And the Court only found that Companions continued serving that customer through March 30, 2023, which was 20 days after the Court's TRO and three days after the Court's injunction.  (*See id.*)  These findings do not justify awarding Plaintiff the 24 months of alleged lost profits it claims, (Compensatory Damages Mem., Dkt. 582, at 4). Therefore, based on these untenable assumptions and others, the Court cannot award Plaintiff the lost-profits sanctions it seeks on compensatory grounds.

Most importantly, because the Court has decided to issue case-ending sanctions against the Gelardis, Plaintiff can now seek to recover its lost profits as damages for its underlying claims. (*See* 11/4/2024 Dkt. Order (clarifying that where there is an overlap between the damages "caused by the contumacious conduct at issue and the damages caused by Defendants' conduct that forms the basis of Plaintiff['s] underlying claims," Plaintiff would not be precluded from seeking the latter).)  Awarding lost profits as sanctions here would risk allowing Plaintiff double recovery.  *See Broker Genius Inc.*, 2019 WL 2462333, at *3 (declining to award lost profits damages as sanction for contempt when jury award included lost profits for the same time period).

For the same reasons, the Court will also not award Plaintiff lost-profits sanctions related to IMELR.  The Court therefore does not address Plaintiff's argument that it can recover its lost

profits related to IMELR from the Gelardis and Companions instead of Liddle and IMELR. (*See* Levi Decl., Dkt. 584, at 1 n.1.)

### C.    Attorneys' Fees

Plaintiff's motion for contempt regarding the Woods End property sale asks the Court to order "reasonable attorneys' fees and costs incurred in connection with the instant motion." (Contempt Mot., Dkt. 478, at 2.)   However, it provides no information about the amount of attorneys' fees and costs it has incurred.   Plaintiff did not attach an affidavit setting forth its damages pursuant to Local Rule 83.6.  (*See generally* Roa Decl., Dkt. 479 (supporting contempt motion with no description of damages sustained such as attorneys' fees or costs).)  The Court has made Plaintiff aware of this requirement multiple times, *see, e.g.*, 732 F. Supp. 3d at 248, and so the Court takes Plaintiff's failure to include the requisite affidavit as a concession that Plaintiff is not seeking damages, including attorneys' fees and costs, in association with its filings regarding the Woods End property sale.

The Court will, however, grant Plaintiff's request for attorneys' fees associated with the contempt found in the March 2025 M&O.[19]  Again, given the complex procedural history of this case, it is helpful to first summarize the relevant events and filings.  On March 6, 2024, Plaintiff filed a contempt motion alleging that Defendants were continuing to serve a customer or customers on the Enjoined Customers List, (Dkt. 288).   (*See* Mar. 2025 M&O, Dkt. 448, at 7.)   On

---

[19] The March 2025 M&O addressed both Plaintiff's motion for contempt, (Dkt. 288), as well as its motion for a TRO and PI, (Dkt. 353).  As this Court has previously held, a party who prevails on a motion for a preliminary injunction under the Defend Trade Secrets Act is *not* entitled to attorneys' fees for that motion until they obtain a final judgment or establish that they will not obtain a final judgment.  (Nov. 2022 M&O, Dkt. 117, *reported at IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 16636766 (E.D.N.Y. Nov. 2, 2022).)  Therefore, the Court only considers Plaintiff's attorneys' fees associated with its motion for contempt, but not its motion for a TRO and PI.

April 15, 2024, the Court directed Plaintiff to file a supporting affidavit. (4/15/2024 Dkt. Order.) On April 21 and May 3, 2024, Plaintiff filed supplemental declarations from Levi. (Dkts. 317, 321.) The Court held three hearings related to the contempt allegations, in May 2024, July 2024, and September 2024. (*See* Mar. 2025 M&O, Dkt. 448, at 6–11, 54.) In the March 2025 M&O, the Court found Defendants in contempt, but also found Plaintiff's briefing on compensatory damages (including attorneys' fees) insufficient and ordered Plaintiff to file supplemental briefing setting forth the actual damages it incurred related to the contempt proceedings. (*Id.* at 43 (citing Pl.'s Post-Hr'g Letter, Dkt. 411, at 8).) Plaintiff filed revised supplemental briefing on August 25, 2025. (Dkts. 580–83.) Plaintiff states that it "incurred $151,259.69 in attorneys' fees since March 28, 2023, in connection with Defendants' contempt." (Compensatory Damages Mem., Dkt. 582, at 4 (citing Levi Decl., Dkt. 584, ¶ 23).) The Gelardis responded on September 15, 2025. (Defs.' Resp. to Compensatory Damages Mem., Dkt. 595.)

### 1.    Legal Standard

As stated above, a civil contempt sanction can "serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Terry*, 886 F.2d at 1352. An award of attorneys' fees and costs to the contempt victim can "serve either goal—the coercive or the compensatory." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020); (*see also, e.g.*, Sep. 2024 M&O, Dkt. 394 (issuing contempt sanction of attorneys' fees and costs)).

Once a court has determined that an attorneys' fees award is appropriate, it must calculate the presumptively reasonable fee using the "lodestar" method. *See Treyger v. First Class Furniture & Rugs Inc.*, No. 21-CV-2902 (EK) (RLM), 2022 WL 18356256, at *5 (E.D.N.Y. July 14, 2022) (applying the lodestar method to calculate presumptively reasonable attorneys' fees on contempt motion), *report and recommendation adopted*, 2023 WL 199698 (E.D.N.Y.

Jan. 17, 2023); *see also id.* (collecting cases). The lodestar is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Stanczyk v. City of New York*, 752 F.3d 273, 284 (2d Cir. 2014) (quoting *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)).

"District courts have broad discretion, using 'their experience with the case, as well as their experience with the practice of law, to assess the reasonableness' of each component of a fee award." *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 94 (E.D.N.Y. 2012) (quoting *Fox Indus., Inc. v. Gurovich*, No. 03-CV-5166 (TCP) (WDW), 2005 WL 2305002, at *2 (E.D.N.Y. Sep. 21, 2005)). Among other considerations, the district court must determine a reasonable hourly rate for the attorneys' work. Reasonable hourly rates are informed in part by the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). In assessing fees, then, district courts "bear in mind all of the case-specific variables that . . . courts have identified as relevant to the reasonableness of [attorneys'] fees in setting a reasonable hourly rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008) (emphasis omitted). Ultimately, a "presumptively reasonable [attorneys'] fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (citation and internal quotation marks omitted).

Moreover, a fee applicant bears the burden of demonstrating the hours expended and the nature of the work performed through contemporaneous records. *Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 148 (2d Cir. 2014) (citing *N.Y. State Ass'n for Retarded Child., Inc. v.*

*Carey*, 711 F.2d 1136, 1147–48 (2d Cir. 1983)).  If a court finds that claimed hours are "excessive, redundant, or otherwise unnecessary," it should exclude those hours in calculating a fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).  "A district court is not, however, required to set forth item-by-item findings concerning what may be countless objections to individual billing items, and may either subtract uncompensable hours or use percentage reductions to eliminate excessive or duplicative hours."  *Marshall v. Reisman*, No. 11-CV-5764 (AAR) (VV), 2013 WL 1563335, at *4 (E.D.N.Y. Mar. 25, 2013) (citations and internal quotation marks omitted), *report and recommendation adopted*, 2013 WL 1561478 (E.D.N.Y. Apr. 12, 2013).

2.    Plaintiff's Attorneys' Fees Claim

Adhering to the lodestar method, the Court calculates a presumptively reasonable attorneys' fees award by first considering the reasonable hourly rate and then considering the reasonable number of hours required.  Here, Plaintiff seeks hourly rates of $300 for Emanuel Kataev and $450 for Jamie Felsen of Milman Labuda Law Group PLLC ("MLLG"), (Levi Decl., Dkt. 584, ¶ 24), and $300 for work performed by Sage Legal LLC ("Sage"), (*id.* ¶ 25).  The Gelardis do not argue that these rates are unreasonable.  (*See generally* Defs.' Resp. to Compensatory Damages Mem., Dkt. 595.)

As the Court has already held, "MLLG's hourly rates [of $300 and $450] are in-line with the prevailing hourly rates for attorneys within this District."  (Sep. 2024 M&O, Dkt. 394, at 11–12.)  The Court incorporates its reasoning and analysis from that prior decision and again holds that, "based on the Court's knowledge of the case and the attorneys' performance," MLLG's hourly rates are reasonable.  (*Id.* at 12.)  For the same reason, Sage's hourly rate of $300 is also reasonable.

Regarding the number of hours, Plaintiff seeks attorneys' fees for 250.6 hours of work from MLLG and 128.3 hours of work from Sage.  (Levi Decl., Dkt. 584, ¶¶ 24–25.)  Plaintiff

attaches MLLG's "billing descriptions provided in the invoices Plaintiff received," and Sage's "invoices to Plaintiff." (*Id.*; MLLG Billing Records, Dkt. 584-5; Sage Invoices, Dkt. 584-6.) The Gelardis argue that Plaintiff's request is "overbroad," that any attorneys' fee award should be "limit[ed] to compliance-related tasks," and that Plaintiff's requested fee should be reduced accordingly. (Defs.' Resp. to Compensatory Damages Mem., Dkt. 595, at ECF 4; *see also id.* at ECF 6 (arguing that "if fees are considered at all, they must be task-specific, non-duplicative, and reduced").)

The Court agrees with the Gelardis. As noted above, the Court "is not required to 'set forth item-by-item findings concerning what may be countless objections to individual billing items.'" *Gagasoules v. MBF Leasing LLC*, 296 F.R.D. 107, 111 (E.D.N.Y. 2013) (quoting *Siracuse v. Program for the Dev. of Hum. Potential*, No. 07-CV-2205 (CLP), 2012 WL 1624291, at *26 (E.D.N.Y. Apr. 30, 2012)). Nonetheless, a review of MLLG's billing descriptions shows that Plaintiff seeks to recover for numerous entries unrelated to Defendants' alleged non-compliance as set forth in the Court's March 2025 M&O. (*See generally* MLLG Billing Records, Dkt. 584-5.) MLLG's time entries include, for example, drafting a letter requesting to extend discovery; emailing the client and opposing counsel about settlement; and a call with opposing counsel about discovery deficiencies, among other things. (*See id.*) The Court is *yet again* "troubled by MLLG's 'efforts to inappropriately inflate their attorneys' fees,' . . . by including so many extraneous time entries." (Sep. 2024 M&O, Dkt. 394, at 14–15 (quoting *Wang v. XBB, Inc.*, No. 18-CV-7341 (PKC) (ST), 2023 WL 2614143, at *5 (E.D.N.Y. Mar. 23, 2023), *reconsideration denied*, 2024 WL 184263 (E.D.N.Y. Jan. 17, 2024)).) Similarly, a review of Sage's invoices shows numerous unrelated entries, as well as pervasive block-billing. (*See generally* Sage Invoices, Dkt. 584-6.) Sage's time entries include, for example, correspondences about settlement, judgment enforcement

39

strategy, and discovery; conducting legal research regarding cybersquatting; and reviewing various third-party subpoena responses, among other things; and many of the entries include more than ten different tasks billed in a single block. (*Id.*)

"[I]n dealing with such surplusage, the [C]ourt has the discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Gagasoules*, 296 F.R.D. at 111 (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)). As a result, the Court reduces the number of hours for which Plaintiff seeks attorneys' fees by 30%. *See Broker Genius*, 2019 WL 3773856, at *3 (reducing attorneys' fees award for contempt sanction by 30% to account for inclusion of work unrelated to contempt motion, vague entries, and block-billing).

The Court therefore holds that Plaintiff may recover $105,881.78 as reasonable attorneys' fees related to the contempt proceedings described in the March 2025 M&O, which represents a 30% reduction from the $151,259.69 Plaintiff seeks.

### D.    Immediate Entry of Judgment

Finally, Plaintiff asks the Court to enter an immediate judgment for any monetary sanctions the Court issues. (Compensatory Damages Mem., Dkt. 582, at 4–6.) Plaintiff correctly observes that the Court previously granted Plaintiff's motion for entry of judgment regarding an earlier contempt sanction of attorneys' fees and costs that Defendants had failed to pay. (*Id.* (citing Aug. 2025 M&O, Dkt. 578).) The reasoning behind the Court's earlier decision applies with equal force here. Therefore, for the reasons stated in that Memorandum and Order, (Dkt. 578), the Court grants Plaintiff's request for immediate entry of judgment pursuant to Rule 58(d) and 58(a).

**CONCLUSION**

For the reasons set forth above, Plaintiff's motion for contempt, (Dkt. 477), is granted in part and denied in part:

1. The Court denies Plaintiff's request for the Court to hold the Gelardis in criminal contempt.

2. The Court finds the Gelardis in civil contempt and orders case-ending sanctions. Default will be entered against the Gelardis under Rule 55(a) of the Federal Rules of Civil Procedure. The Court orders Plaintiff to file a motion for default judgment pursuant to Rule 55(b)(2) within thirty (30) days of this Memorandum and Order. The Gelardis shall submit any objections to Plaintiff's proposed judgment within thirty (30) days thereafter.

3. Safa's counterclaims, (Dkt. 547), are dismissed pursuant to Rule 41(c), and Safa's request for the Court to take judicial notice, (Dkt. 569), is denied.

4. The Court sanctions Defendants $105,881.78 for the contempt found in the Court's March 2025 Memorandum and Order, (Dkt. 448), which represents Plaintiff's reasonable associated attorneys' fees. The Court grants Plaintiff's request for immediate entry of judgment as to that amount, (Dkt. 582), pursuant to Rule 58(d) and 58(a).

The Clerk of Court is respectfully directed to enter default against all Defendants pursuant to Rule 55(a). The Clerk of Court is also respectfully directed to enter judgment in favor of Plaintiff against Defendants for $105,881.78 pursuant to Rule 58(d) and 58(a).

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: February 9, 2026
Brooklyn, New York