*** Filed ***
11:20 AM, 02 Jun, 2026
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

**IME WATCHDOG, INC.,**
**Plaintiff,**

**-against-**

**SAFA GELARDI, VITO GELARDI, and IME COMPANIONS LLC,**
**Defendants.**

**Case No. 1:22-cv-01032-PKC-JRC**

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT DAMAGES AND PERMANENT INJUNCTIVE RELIEF**

**Individual Defendants Safa Gelardi and Vito Gelardi, proceeding pro se, respectfully submit this opposition to Plaintiff IME WatchDog, Inc.'s motion for default judgment damages, punitive damages, prejudgment interest, attorneys' fees, costs, and permanent injunctive relief.**

# PRELIMINARY STATEMENT

Plaintiff's motion should be denied in full as to damages and permanent injunctive relief. Plaintiff asks this Court to enter a default judgment awarding $1,414,800 in claimed lost profits, $2,829,600 in punitive damages, $525,032 in prejudgment interest, $299,256.59 in attorneys' fees, post-judgment interest, and a permanent injunction prohibiting Defendants from conducting IME observations directly or indirectly in New York, New Jersey, and Connecticut. **Ex. 1, Plaintiff's Notice of Motion for Default Judgment Damages and Permanent Injunctive Relief, Dkt. 651 at 1, PageID 12478.** Plaintiff is therefore asking for more than $5 million, plus post-judgment interest, plus a permanent tri-state occupational ban.

But Plaintiff has not proven damages. It has not proven WatchDog's actual lost net profits. It has not proven a 50% profit margin. It has not proven customer-specific causation. It has not proven Companions' net unjust enrichment. It has not proven a reasonable royalty. It has not proven punitive damages or prejudgment interest. And it has not proven the equitable prerequisites for a permanent occupational ban.

This is a Rule 55 damages proceeding, not a liability rehearing. Defendants do not ask the Court to revisit the default or sanctions posture for purposes of this motion. The issue is narrower and dispositive: even after default, Plaintiff still had to prove a damages number with competent evidence and reasonable certainty. It did not.

Plaintiff's motion is not a lost-profit calculation. It is a gross-revenue conversion theory. Plaintiff took selected IME Companions gross Sales by Customer Detail figures, applied the prior 98.3% attribution figure, assumed a 50% profit margin, filled a blank 2022 Zemsky & Salomon entry with a prior-year number, added a price differential, and called the result WatchDog's lost profits. That is not proof of actual loss. It is not proof of net unjust enrichment. It is not a reasonable royalty. It is not a damages model the DTSA authorizes.

The 98.3% figure does not cure the defect because it was never a damages formula. The Court never held that 98.3% of Defendants' income "belongs" to WatchDog. The figure came from Levi's March 22, 2023 declaration, where she compared WatchDog's Sales by Customer Summary lists with Companions' records, separated Companions' gross sales into "Companions Sales for Plaintiff's Customers" and "Independent" sales, and noted that the 2022 list was "partial and incomplete." **Ex. 4, Levi Mar. 22, 2023 Declaration, Dkt. 172 at 2, PageID 3525.** That was a gross-revenue attribution assertion. It did not deduct expenses, calculate WatchDog's net lost profits, prove WatchDog's margin, prove customer-specific causation, calculate Companions' net unjust enrichment, or establish a reasonable royalty.

Nor did the Court convert the 98.3% figure into a damages award. The October 20, 2023 Order required further proof of actual damages before compensatory relief could be entered. **Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 32–34, PageID 4948–4950.** Plaintiff therefore cannot treat 98.3% as law of the case on damages. It is not.

Plaintiff also used the wrong records. Plaintiff did not begin with WatchDog's books. It did not submit complete WatchDog tax returns, P&Ls, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, distribution records, Zariz records, DLA-related records, cash-flow records, accountant analysis, or expert proof. It did not prove WatchDog's actual net lost

profits after expenses, payroll, observer costs, overhead, taxes, deductions, distributions, related-party outflows, and incremental costs. Instead, Plaintiff used Defendants' gross customer-sales records as the damages base. That choice is fatal. Lost profits are net profits, not gross receipts.

Plaintiff's own pre-motion conduct confirms the architecture of its damages theory. Plaintiff's counsel demanded Companions' 2023-present Sales by Customer Details and warned that if Defendants did not produce them, Plaintiff would "extrapolate damages using Companions' Sales by Customer Details for 2022." **Ex. 7, Aug. 13, 2025 Felsen Email re Companions Sales by Customer Detail and Extrapolation.** Plaintiff later disclaimed later-year extrapolation while still relying on selected 2018–2022 Companions Sales by Customer Detail figures. The model still begins with Companions' gross sales, not WatchDog's actual net loss.

Plaintiff's March 3, 2026 request confirms the same proof problem. At the March 3, 2026 hearing, Plaintiff sought additional time to file its default-judgment motion in connection with records it claimed it still needed. The Court granted Plaintiff a 90-day extension and granted Plaintiff leave to submit a motion to compel production of records. **Ex. 6, Mar. 3, 2026 Minute Entry granting 90-day extension and leave to move to compel.** Plaintiff then filed this damages motion weeks later without filing the contemplated motion to compel and without obtaining the records it had just sought leave to compel. That history does not shift the burden to Defendants; it confirms that Plaintiff proceeded on an incomplete damages record.

Levi admitted the defect under oath. She testified that "[t]he damages are 98.3 of your sales," that "98.3 percent of every dollar that was earned by IME Companions belong[s] to IME WatchDog," and that "[t]hose are my damages." **Ex. 9, Levi Dep. Tr. 102:21–22, 104:3–6.** Later, she admitted the dispositive point: "the damages calculation is not based on IME WatchDog's records" but is "based on Companions's records." **Ex. 9, Levi Dep. Tr. 152:21–23.** She also testified that "how the finances of the company were handled is immaterial and irrelevant." **Ex. 9, Levi Dep. Tr. 126:21–25.**

That is exactly backwards. WatchDog's finances are the proof. Companions' filed tax returns confirm the accounting reality Plaintiff ignores: gross receipts are not

profits. In 2018, IME Companions reported $358,183 in gross receipts but only $120,153 in ordinary business income. In 2019, it reported $505,825 in gross receipts but only $125,359 in ordinary business income. In 2020, it reported $638,175 in gross receipts but only $181,807 in ordinary business income. In 2021, it reported $822,103 in gross receipts but only $333,329 in ordinary business income. **Ex. 10, IME Companions Form 1065 Tax Return Excerpts, 2018–2021, PDF pp. 1–4.** Even using Companions' filed returns, the ordinary-income margins were approximately 33.5%, 24.8%, 28.5%, and 40.5% — never 50%. And those are Companions' figures, not WatchDog's.

WatchDog's historical financial reality is worse for Plaintiff. At the March 27, 2023 hearing, Roman Pollak testified that WatchDog's P&Ls reflected approximately a $42,000 loss in 2014, approximately $70,000 net income in 2015, approximately $75,000 net income in 2016, and only approximately $30,000 average annual income when the loss year was included. **Ex. 11, Dkt. 199, March 27, 2023 Hr'g Tr. 90:14–24, PageID 3974.** The historical figures previously testified to and discussed in this litigation show $2,330,916.14 in sales income and only $101,818.26 in net income from 2014 through 2016 — an approximate 4.4% aggregate margin. **Ex. 15, Gelardi Decl. ¶ 3.** Plaintiff's claimed 50% margin is more than eleven times that historical margin.

The March 2017 materials make Plaintiff's 50% margin impossible to accept on trust. Defendants do not attach restricted WatchDog internal materials because of prior Court directives concerning return, destruction, confidentiality, and use. But Adam Rosenblatt's April 28, 2017 email confirms that WatchDog maintained the very records needed to prove or disprove damages: the monthly P&L, the client list, the list of all IMEs covered, WatchDog invoices, and a breakdown of what WatchDog paid versus what WatchDog billed. **Ex. 13-A, Rosenblatt Apr. 28, 2017 Email re March 2017 WatchDog Materials.** Those are not side documents. They are the damages documents.

Based on Defendants' review of the March 2017 materials with former counsel before compliance with the Court's directives, those materials reflected that WatchDog hit 516 IMEs in March 2017, that Zariz received $25,000 that month, and that Zariz was already at $75,000 year-to-date. **Ex. 15, Gelardi Decl. ¶ 4.** Those numbers go directly to net profit. A 516-IME month, the P&L, invoices,

payroll/IME breakdown, pay-versus-billed records, bank records, and cash-flow materials would show whether high volume produced high profit. Plaintiff controls those records. Plaintiff did not submit them.

Plaintiff's own materials raise a fundamental damages question. WatchDog's March 2017 records reflected 516 IMEs in a single month, while Levi later marketed WatchDog as covering over 1,000 exams per month. **Ex. 15, Gelardi Decl. ¶ 4; Ex. 17, Jan. 24, 2023 Levi Marketing / Win-Back Email, PDF p. 1.** Before seeking millions in lost profits, Plaintiff must explain how a business claiming such growth suffered the losses it now attributes to Defendants.

The Zariz and DLA-related outflows make strict proof unavoidable. Based on the financial materials reviewed with former counsel and discussed in this litigation, WatchDog's historical records reflected significant outflows, including approximately $183,314.13 in distributions to DLA in 2014, approximately $165,000 in distributions to DLA and $90,000 to Zariz in 2015, and approximately $220,000 to Zariz in 2016. The March 2017 materials reflected that Zariz received $25,000 that month and was already at $75,000 year-to-date. **Ex. 15, Gelardi Decl. ¶¶ 4–5.** If those entries were expenses, they reduce profit. If they were distributions, related-party transfers, personal transfers, or non-operating payments, the books require scrutiny before damages can be entered. Plaintiff submitted none of the records needed to explain them.

Plaintiff had two easy ways to verify the claimed margin: produce the records or allow its owner and financial witness to answer questions. Plaintiff did neither. Levi admitted she controlled WatchDog's finances and had access to WatchDog's accounting records, yet repeatedly testified that she needed financial records to answer basic revenue and profit questions. **Ex. 9, Levi Dep. Tr. 114:6–16, 115:11–21, 117:6–22, 118:11–25, 119:7–24, 120:1–11.** When Defendants asked what services Zariz provided, who owned or operated Zariz, whether invoices or contracts existed, and whether payments were expenses, distributions, related-party transfers, or personal transfers, Plaintiff's counsel instructed Levi not to answer or Levi gave no meaningful answer. **Ex. 9, Levi Dep. Tr. 146:16–151:22.**

Levi's federal financial-crime conviction makes Plaintiff's trust-based damages request even more untenable. Levi is not a neutral accountant, independent

damages expert, or outside financial witness. She is Plaintiff's owner, the person seeking the money judgment, and the declarant supporting Plaintiff's claimed 50% margin. **The Judgment in Levi's federal criminal case states that Levi pleaded guilty and was adjudged guilty of conspiracy to knowingly evade federal reporting requirements. Ex. 18, Judgment in a Criminal Case, PDF p. 8. The federal indictment charged that Levi, then a Bank Leumi vice president, was asked to find someone who could launder money, introduced a co-conspirator to Alex Adjmi for that purpose, and received a fee for initiating money-laundering transactions. Ex. 18, Indictment, Doc. 8 at 9, PDF p. 10.** That history is not collateral where Plaintiff asks the Court to trust Levi's financial assertions while Plaintiff withholds WatchDog's books, leaves Zariz/DLA outflows unexplained, and blocks damages questioning.

Plaintiff's customer proof has the same defect: it assumes causation instead of proving it. WatchDog was the incumbent provider in this niche market and held itself out as "the first and largest IME company in New York," "covering over 1,000 exams per month." **Ex. 17, Levi Marketing / Win-Back Email, PDF p. 1**. In that market, overlap with a later competitor is expected market sequence, not proof of diversion. Customer overlap is not customer loss, causation, damages, or net lost profit. Plaintiff still had to prove which customers were lost, why they left, whether they would have used WatchDog absent the conduct at issue, and what net profit WatchDog actually lost. Plaintiff did not do that.

Nor did Plaintiff separate overlap from ordinary market forces, including market growth, Defendants' independent paid marketing and business-development efforts, attorney-event outreach, third-party lead generation, price competition, service dissatisfaction, customer choice, use of multiple vendors, or substitution by other providers. Plaintiff's customer materials included firms Defendants never serviced, firms whose WatchDog revenue continued or increased, firms that used multiple providers, firms that moved to other providers, and firms Plaintiff's own records identify as never returning with $0.00. **Ex. 8, Aug. 16, 2025 Discovery Follow-Up Email to Judge Cho, PDF pp. 1–2; Ex. 24, Jan. 18, 2023 Oresky Email re Percy Perez; Ex. 25, NYSCEF-Filed IME Reports Showing Other Legal Representatives / IME Providers, PDF pp. 1–13; Ex. 26,** WatchDog "Clients that Never Returned" Summary, PDF p. 1. A gross-sales report is not a damages

instrument. Plaintiff also failed to prove any basis for a permanent tri-state occupational ban. Plaintiff seeks a ban covering New York, New Jersey, and Connecticut, but WatchDog's March 2017 operating materials reflected 516 IMEs with only two New Jersey IMEs listed and no Connecticut IMEs listed. **Ex. 15, Gelardi Decl. ¶¶ 4–5.** Any injunction, if entered at all, must be limited to non-use, non-disclosure, and non-retention of specifically identified trade secrets. It cannot prohibit lawful IME-observation work across three states without proof of ongoing or threatened misuse and narrow tailoring.

This is not a case where damages are difficult but proven. It is a case where damages were never proven. Plaintiff asks for more than $5 million without a WatchDog lost-profit calculation, reliable margin, customer-specific causation, net unjust-enrichment analysis, reasonable-royalty analysis, complete financial records, expert proof, or live-tested damages evidence. Plaintiff proved only that it wants to convert Companions' gross customer-sales records into WatchDog's money judgment. The law does not permit that shortcut.

The Court should deny Plaintiff's damages request in full, enter zero compensatory damages, deny punitive damages and prejudgment interest, deny the requested permanent tri-state occupational ban, and limit any injunction, if entered at all, to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets. Defendants do not request an inquest as their primary relief. Only if the Court is inclined to consider any damages award despite Plaintiff's failure of proof should Plaintiff first be required to produce complete WatchDog financial records, submit any restricted materials for in camera review, and present live testimony subject to cross-examination.

**LEGAL STANDARD**

Default is not a blank check. Even where liability is deemed established by default or case-ending sanctions, damages remain separate. A default does not prove WatchDog's actual lost net profits, does not prove a 50% profit margin, does not prove customer-specific causation, does not prove IME Companions' net unjust enrichment, does not prove a reasonable royalty, does not prove punitive damages, does not prove prejudgment interest, does not prove attorneys' fees or costs, and does not justify a permanent occupational ban.

On default, well-pleaded liability allegations may be deemed admitted, but allegations concerning the amount of damages are not accepted as true. The Court must conduct an inquiry sufficient to determine damages with reasonable certainty. **Greyhound Exhibitgroup, Inc. v.**

**E.L.U.L. Realty Corp.**, 973 F.2d 155, 158 (2d Cir. 1992); **Credit Lyonnais Sec. (USA), Inc. v. Alcantara**, 183 F.3d 151, 155 (2d Cir. 1999).

Rule 55(b)(2) gives the Court broad authority before entering default-judgment damages. The Court may conduct a hearing, order an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter. Fed. R. Civ. P. 55(b)(2). A hearing is not always required, but damages may be awarded on papers only where the record contains sufficiently detailed affidavits and documentary evidence establishing a reliable basis for the award. **Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.**, 109 F.3d 105, 111 (2d Cir. 1997).

Judge Chen applies that rule strictly. In **United States v. Kemp**, Judge Chen explained that default may concede well-pleaded liability allegations, but it "is not considered an admission of damages," and the plaintiff bears the burden to prove damages with reasonable certainty. **United States v. Kemp**, No. 15-CV-2419 (PKC), 2015 WL 6620624, at *2 (E.D.N.Y. Oct. 30, 2015). Damages were awarded in **Kemp** only because the Government supported the requested amount with certificates of indebtedness, an attorney affirmation, and documentary proof. Id.

Judge Chen applied the same rule in **J & J Sports Productions, Inc. v. McAdam**, holding that after default, the amount of damages awarded, "if any," must be ascertained with reasonable certainty. **J & J Sports Prods., Inc. v. McAdam**, No. 14-CV-5461 (PKC) (CLP), 2015 WL 8483362, at *3–4 (E.D.N.Y. Dec. 9, 2015). That principle controls here. Default may establish liability allegations, but it does not establish the amount of damages.

Judge Chen has also denied default damages where the movant failed to submit competent support. In **Pasatieri v. Starline Productions, Inc.**, Judge Chen granted default judgment as to liability but denied damages without prejudice because the plaintiff failed to submit sufficient documentation supporting the requested award. **Pasatieri v. Starline Prods., Inc.**, No. 18-CV-4688 (PKC) (VMS), 2020 WL 207352, at *4–6 (E.D.N.Y. Jan. 14, 2020).

Likewise, in **Hicksville Water District v. Jerry Spiegel Associates, Inc.**, Judge Chen denied a default-judgment motion where the plaintiff failed to submit a sufficient statement of damages and backup documentation. The Court made clear that a damages statement cannot be a summarized list of costs without supporting documentation, and that default judgment will not be granted unless the movant satisfies the applicable procedural and evidentiary requirements. **Hicksville Water Dist. v. Jerry Spiegel Assocs., Inc.**, No. 19-CV-6070 (PKC) (RML), Dkt. 425, at 3–4 (E.D.N.Y. Sept. 4, 2024).

Magistrate Judge Cho's default-damages analysis points the same way. In **Krape, S.A. v. LIK Supply, Corp.**, Judge Cho recommended damages only where the plaintiff supported the request with concrete transactional records, including purchase agreements, wire-transfer records, communications, and purchase-order documentation. **Krape, S.A. v. LIK Supply, Corp.**, No. 21-CV-3742 (AMD) (JRC), 2022 WL 16754743, at *5–8 (E.D.N.Y. Sept. 15, 2022), report and recommendation adopted, 2022 WL 4596747 (E.D.N.Y. Sept. 30, 2022). **Krape** is the contrast case: there, damages were tied to actual documents. Here, Plaintiff relies on selected gross-sales summaries, Defendants' revenue, an assumed 50% margin, and declarations.

Under those authorities, Plaintiff cannot obtain default damages unless it proves the amount with competent evidence and reasonable certainty. Selected customer summaries, gross-sales reports, an assumed margin, a prior attribution finding, and declarations are not enough. This Court requires records, not assumptions.

When a default movant fails to prove damages with competent evidence, the Court may deny the requested damages, award no compensatory damages where the record does not support them, or require an evidentiary hearing, accounting, or inquest. Here, because Plaintiff seeks lost profits but submitted no WatchDog net-profit proof, no reliable margin proof, and no customer-specific causation proof, the legally supported damages award is zero.

The DTSA independently defeats Plaintiff's shortcut. The statute permits three monetary remedies: damages for actual loss caused by misappropriation; damages for unjust enrichment caused by misappropriation that is not already addressed in computing actual loss; or, in lieu of other methods, a reasonable royalty. 18 U.S.C. § 1836(b)(3)(B). Plaintiff has not proven any recognized DTSA damages measure.

Plaintiff did not prove WatchDog's actual loss because it did not prove WatchDog's actual lost net profits. Plaintiff did not prove IME Companions' net unjust enrichment because it did not prove Companions' net profits, deductions, expenses, apportionment, or causation. Plaintiff did not prove a reasonable royalty because it offered no royalty analysis. Instead, Plaintiff created an unauthorized shortcut: Companions' gross customer-sales figures plus the prior 98.3% attribution finding plus an unsupported 50% WatchDog margin.

That is not actual loss. It is not net unjust enrichment. It is not a reasonable royalty. It is a revenue-conversion model the DTSA does not authorize.

The Second Circuit's decision in **Syntel** confirms that DTSA compensatory damages must fit the statute's remedial framework and may not operate as punishment or windfall. **Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Group, Inc.**, 68 F.4th 792 (2d Cir. 2023). In **Syntel**, the Second Circuit vacated a $284,855,192 DTSA compensatory damages award where the award did not fit the statutory framework under the facts of that case. Id. **Syntel** reinforces the same statutory guardrail that controls here: DTSA damages must fit the statute and cannot become a punitive windfall. Plaintiff's model violates that guardrail because it does not measure WatchDog's proven loss, does not measure Companions' proven net gain, and does not supply a reasonable royalty. It uses Companions' gross revenue as the base, applies a prior attribution finding, assumes a margin, and asks the Court to treat the result as WatchDog's lost profits. **Syntel** does not permit DTSA compensatory damages to become a punitive or windfall remedy.

New York law reaches the same result. In **E.J. Brooks Co. v. Cambridge Security Seals**, the New York Court of Appeals held that compensatory damages in a trade-secret case must return the plaintiff, as nearly as possible, to the position it would have occupied absent the wrongdoing — but no more. **E.J. Brooks Co. v. Cambridge Sec. Seals**, 31 N.Y.3d 441, 449–50 (2018). The Court rejected a damages theory that substituted defendant-side cost information for the plaintiff's own proven loss. Id. at 453–54.

That principle is fatal to Plaintiff's damages motion. Plaintiff cannot take Companions' gross revenue, add an unsupported 50% margin, and call it WatchDog's loss. That does not restore WatchDog to a proven but-for position. It gives WatchDog a windfall.

Lost profits must be proven as net profits, not gross receipts. A plaintiff seeking lost profits must prove both the existence and amount of lost profits with reasonable certainty, and the calculation cannot be speculative. **Schonfeld v. Hilliard**, 218 F.3d 164, 172–73 (2d Cir. 2000); **Kenford Co. v. County of Erie**, 67 N.Y.2d 257, 261 (1986). Lost profits require proof of revenue, causation, and the expenses that would have been incurred to generate that revenue. Gross receipts, gross sales, customer summaries, customer lists, and assumed margins are not lost-profit proof.

The Second Circuit has likewise recognized that damages must be based on net profits rather than gross profits. **Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.**, 874 F.2d 95, 103 (2d Cir. 1989). Courts applying New York law have denied lost-profit damages where the plaintiff relied on gross-profit information without sufficient proof of net profit. See **RGI Brands LLC v. Cognac Brisset-Aurige, S.A.R.L.**, No. 12-CV-1369 (LGS) (AJP), 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013), report and recommendation adopted, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013).

Therefore, Plaintiff had to prove the incremental costs WatchDog would have incurred to perform the allegedly diverted work, including observer payments, independent-contractor costs, scheduling labor, payroll, reporting costs, administrative expense, overhead, payment-processing fees, taxes, marketing and business-development costs, and other operating expenses. Plaintiff did not submit that proof. That failure defeats lost profits.

The prior 98.3% finding cannot cure this defect. The 98.3% figure was not a damages formula. It came from Levi's March 22, 2023 declaration, where she compared WatchDog's Sales by Customer Summary lists with IME Companions' records, separated Companions' gross sales into alleged WatchDog-customer sales and "independent" sales, and noted that the 2022 list was partial and incomplete. **Ex. 4, Levi Mar. 22, 2023 Declaration, Dkt. 172 at 2, PageID 3525. That was a gross-revenue attribution assertion, not a damages model.** It did not prove WatchDog's lost net profits, WatchDog's actual margin, customer-specific causation, Companions' net unjust enrichment, or any reasonable royalty.

Nor did the Court convert that 98.3% figure into a damages award. In the October 20, 2023 Order, the Court recognized that compensatory contempt sanctions require proof of actual damages and directed Plaintiff to submit further evidence setting forth the compensatory damages it claimed. **Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 32–34, PageID 4948–4950.** The Court therefore did not find that 98.3% of Companions' gross revenue equals WatchDog's damages. Plaintiff still had to prove damages separately and with reasonable certainty.

Prior return, destruction, confidentiality, or use restrictions do not relieve Plaintiff of that burden. Defendants do not attach restricted WatchDog P&Ls or internal operating records because prior Court directives restricted Defendants' retention and use of WatchDog materials. But those restrictions do not shift the damages burden away from Plaintiff. Plaintiff owns and controls the

records. Plaintiff has the P&Ls, tax returns, general ledgers, expense ledgers, payroll records, bank records, cash-flow records, observer-payment records, Zariz records, DLA-related records, and distribution records. If Plaintiff wants lost profits, Plaintiff must prove lost profits with its own books.

The Court should not require Defendants to risk violating prior orders to disprove a damages theory Plaintiff failed to prove. If the historical P&Ls, March 2017 package, bank records, payroll records, cash-flow records, Zariz records, DLA-related records, or related financial materials are necessary to determine damages, Plaintiff should be ordered to submit its own copies under seal or for in camera review. Plaintiff cannot restrict Defendants from attaching WatchDog financial records and then ask the Court to accept an unsupported margin while refusing to submit those same records itself.

Plaintiff's blocked damages examination further supports denial of damages or, at minimum, an evidentiary inquest. Rule 30(c)(2) provides that objections must be stated concisely, nonargumentatively, and nonsuggestively, and that a witness may be instructed not to answer only to preserve privilege, enforce a court-ordered limitation, or present a Rule 30(d)(3) motion. Fed. R. Civ. P. 30(c)(2). Defendants' questions about Zariz, DLA-related entries, expenses, distributions, invoices, contracts, ownership, and whether payments were business expenses, profit distributions, or personal transfers went directly to net profit. Plaintiff cannot block inquiry into the financial entries that determine profit and then ask the Court to accept a 50% margin by declaration.

Punitive or exemplary damages cannot rescue the failed compensatory claim. Under the DTSA, exemplary damages are tied to damages awarded under § 1836(b)(3)(B). 18 U.S.C. § 1836(b)(3)(C). If Plaintiff has not proven actual loss, non-duplicative unjust enrichment, or a reasonable royalty, there is no reliable compensatory award to double.

Prejudgment interest likewise cannot be awarded on an unproven or speculative damages number. Interest presupposes a proven principal amount. Where the damages base is not proven with reasonable certainty, prejudgment interest cannot make the number reliable.

Attorneys' fees and costs also cannot substitute for damages proof. Any fee or cost award requires a lawful basis, competent documentation, and proper apportionment. Fees and costs cannot cure Plaintiff's failure to prove actual lost net profits, net unjust enrichment, reasonable royalty, causation, or a reliable margin.

Plaintiff's request for permanent injunctive relief is governed by settled equitable standards. A plaintiff seeking a permanent injunction must prove irreparable injury, inadequate remedies at law, that the balance of hardships warrants equitable relief, and that the public interest would not be disserved by the injunction. **eBay Inc. v. MercExchange, L.L.C.**, 547 U.S. 388, 391 (2006).

The DTSA also limits injunctive relief. A DTSA injunction may not prevent a person from entering an employment relationship, and any employment restraint must be based on evidence of threatened misappropriation, not merely on information the person knows. 18 U.S.C. § 1836(b)(3)(A)(i)(I). The DTSA further bars injunctions that conflict with applicable state law

prohibiting restraints on the practice of a lawful profession, trade, or business. 18 U.S.C. § 1836(b)(3)(A)(i)(II).

Accordingly, Plaintiff cannot obtain a permanent New York/New Jersey/Connecticut occupational ban by invoking trade-secret labels, a broad customer list, and an unsupported damages model. Any injunction, if entered at all, must be limited to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets. It cannot prohibit lawful IME-observation work across three states absent specific proof of ongoing or threatened misappropriation.

Under these standards, Plaintiff's motion fails. Plaintiff has not proven damages with reasonable certainty under Rule 55. Plaintiff has not proven a recognized DTSA damages measure. Plaintiff has not proven lost net profits. Plaintiff has not proven non-duplicative net unjust enrichment. Plaintiff has not proven a reasonable royalty. Plaintiff has not proven a compensatory damages base that can support punitive damages or prejudgment interest, and any request for attorneys' fees or costs must be separately supported, documented, apportioned, and cannot substitute for damages proof. Plaintiff also has not proven the equitable prerequisites for a permanent injunction, has not shown that a tri-state occupational ban is narrowly tailored, and has not proven a lawful basis to prohibit Defendants from performing lawful IME-observation work in New York, New Jersey, and Connecticut.

The Court should deny Plaintiff's damages request, enter zero compensatory damages, deny the requested permanent tri-state occupational ban, and limit any injunction, if entered at all, to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets. Defendants do not request an inquest as their primary relief. Only if the Court is inclined to consider any damages award despite Plaintiff's failure of proof, Defendants respectfully request that no award be entered unless and until Plaintiff first produces complete WatchDog financial records, submits any restricted materials for in camera review, and presents live testimony subject to cross-examination.

**ARGUMENT**

**SUMMARY OF PLAINTIFF'S DAMAGES-PROOF FAILURES**

The defects are not technical. They are the missing elements of damages. To award Plaintiff damages on this record, the Court would have to find actual net lost profits, a reliable margin, customer-specific causation, a recognized DTSA damages measure, and a narrow equitable basis for the injunction. Plaintiff did not submit the records needed for those findings. The following chart isolates the proof Plaintiff still had to provide after default and did not provide.

| What Plaintiff Had To Prove | What Plaintiff Submitted | What Is Missing | Why The Gap Defeats Damages |
|---|---|---|---|
| WatchDog's actual lost net profits | Selected Companions Sales by Customer Detail figures, 98.3%, and a 50% margin | WatchDog P&Ls, tax returns, ledgers, expense records, payroll records, observer-payment records, bank records, cash-flow records | Lost profits are net profits. Gross sales do not show net profit. |
| A reliable WatchDog profit margin | Levi's 50% assertion | WatchDog books reconciling the claimed margin with historical revenue, expenses, distributions, Zariz/DLA outflows, and net income | The claimed margin is contradicted by historical financial reality and unsupported by complete records. |
| Customer-specific causation | Broad overlap/customer-summary evidence | Proof identifying who left, why they left, whether they would have used WatchDog, and what work WatchDog would have performed | Overlap is not causation, customer loss, damages, or net lost profit. |
| Actual loss under the DTSA | Defendants' gross sales multiplied by 98.3% and 50% | WatchDog's own actual-loss calculation | The DTSA requires actual loss, not revenue conversion. |
| Non-duplicative unjust enrichment | Companions gross sales | Companions net profits, deductions, expenses, apportionment, and causation | Gross receipts are not net enrichment. |
| Reasonable royalty | No royalty analysis | Royalty base, rate, comparables, and hypothetical negotiation framework | No reasonable royalty was proven. |
| Punitive damages and prejudgment interest | Requests tied to the unproven lost-profit number | A proven compensatory base | No proven principal amount exists to double or accrue interest on. |

| What Plaintiff Had To Prove | What Plaintiff Submitted | What Is Missing | Why The Gap Defeats Damages |
|---|---|---|---|
| Permanent tri-state injunction | Broad customer list and default posture | eBay proof, threatened misuse, narrow tailoring, and geographic proof | Default does not justify a permanent occupational ban. |

The chart controls this motion. Plaintiff did not merely omit some minor corroborating document. Plaintiff controlled the books and records that determine profit, causation, and scope; chose not to submit them; and instead relied on gross-sales summaries, attribution assumptions, and insider declarations. Without the missing records, the legally supported damages award is zero.

## I. PLAINTIFF'S DAMAGES MODEL IS A GROSS-REVENUE CONVERSION THEORY, NOT A LOST-PROFIT CALCULATION.

Plaintiff's damages request should be denied at the threshold because it is built on the wrong measure of damages. Plaintiff did not prove WatchDog's actual lost net profits. Plaintiff did not begin with WatchDog's books. Plaintiff did not submit complete WatchDog tax returns, P&Ls, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, distribution records, Zariz records, DLA-related records, cash-flow records, or expert analysis.

Instead, Plaintiff asks the Court to convert IME Companions' gross customer-sales records into WatchDog's damages. Plaintiff took selected Companions Sales by Customer Detail figures, applied the prior 98.3% attribution figure, assumed a 50% profit margin, inserted a prior-year Zemsky & Salomon amount into a blank 2022 field, added a price differential, and called the result WatchDog's lost profits.

That is not a lost-profit calculation. It is a gross-revenue conversion theory.

The DTSA permits damages for actual loss caused by misappropriation, unjust enrichment caused by misappropriation that is not already addressed in computing actual loss, or, in lieu of other measures, a reasonable royalty. Plaintiff proved none of those measures. Plaintiff did not prove WatchDog's actual loss because it did not prove WatchDog's actual lost net profits. Plaintiff did not prove Companions' net unjust enrichment because it did not prove Companions' net profits, expenses, deductions, apportionment, or customer-specific causation. Plaintiff did not prove a reasonable royalty because it offered no royalty analysis.

Plaintiff's model is not merely weak. It is legally unavailable.

**A. The 98.3% figure was not a damages formula.**

Plaintiff's damages model begins with a misuse of the 98.3% figure. The Court never held that 98.3% of Defendants' income "belongs" to WatchDog. The figure came from Levi's March 22, 2023 declaration, where she compared WatchDog's Sales by Customer Summary lists with IME Companions' records, separated Companions' gross sales into "Companions Sales for Plaintiff's Customers" and Companions "Independent" Sales, expressly noted that the 2022 list was "partial and incomplete," and then asserted that 98.3% of Defendants' total revenue was obtained through alleged misappropriation. **Ex. 4, Levi Mar. 22, 2023 Declaration, Dkt. 172 at 2, PageID 3525.**

That declaration was a gross-revenue attribution assertion. It was not a damages model. It did not deduct expenses. It did not calculate WatchDog's net lost profits. It did not prove WatchDog's actual profit margin. It did not prove customer-specific causation. It did not calculate Companions' net unjust enrichment. It did not establish a reasonable royalty.

The Court's October 20, 2023 Order did not convert that 98.3% figure into damages. To the contrary, the Court recognized that compensatory contempt sanctions require proof of actual damages and directed Plaintiff to submit further evidence setting forth the compensatory damages it claimed. **Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 32–34, PageID 4948–4950.** The Court therefore did not find that 98.3% of Companions' gross revenue equals WatchDog's damages. Plaintiff still had to prove damages separately and with reasonable certainty.

Plaintiff now tries to use the 98.3% figure as a shortcut around that burden. It cannot. A gross-revenue attribution assertion is not proof of lost profits. It is not proof of net unjust enrichment. It is not a reasonable royalty. It is not proof that WatchDog would have earned the same revenue, at the same volume, with the same costs, and with a 50% net-profit margin.

**B. Plaintiff used Defendants' gross sales, not WatchDog's lost net profits.**

Plaintiff's own memorandum confirms that the damages request is built from Defendants' records. Plaintiff states that its calculation is based on Companions' annual Sales by Customer Detail for 2018 through 2022. It lists Companions sales of $72,847 in 2018, $411,215 in 2019, $435,316 in 2020, $823,345 in 2021, and $883,064 in 2022. **Ex. 2, Plaintiff's Damages Memorandum, Dkt. 652 at 16, PageID 12495.**

Those figures are not WatchDog's lost profits. They are not WatchDog's net income. They are not WatchDog's expenses. They are not WatchDog's tax returns. They are not WatchDog's P&Ls. They are not WatchDog's bank records. They are not WatchDog's profit margin.

They are selected gross customer-sales figures from Companions' records.

That distinction controls this motion. Lost profits are net profits. Plaintiff cannot prove WatchDog's lost profits by pointing to another company's gross customer sales. Plaintiff had to prove the revenue WatchDog actually lost, the expenses WatchDog would have incurred to generate that revenue, the incremental costs of performing the allegedly diverted work, and the net profit WatchDog would have earned. Plaintiff did none of that.

Plaintiff also did not prove Companions' net unjust enrichment. Companions' gross sales are not net enrichment. Gross revenue does not account for observer payments, contractor costs, scheduling labor, payroll, administrative costs, overhead, taxes, reporting costs, payment-processing fees, marketing and business-development costs, or other expenses. Plaintiff's model treats gross sales as if they were recoverable damages. They are not.

### C. Plaintiff's own counsel and Levi confirmed that Plaintiff used Companions' records as the damages model.

Plaintiff's pre-motion conduct confirms that it was building damages from Defendants' gross customer-sales records, not WatchDog's actual loss. On August 13, 2025, Plaintiff's counsel wrote that Companions had not produced its Sales by Customer Details since 2022, demanded production for 2023 through the present, and warned that if Defendants failed to produce those records, Plaintiff would "extrapolate damages using Companions' Sales by Customer Details for 2022." **Ex. 7, Aug. 13, 2025 Felsen Email re Companions Sales by Customer Detail and Extrapolation.**

That email is important because it reveals the architecture of Plaintiff's damages theory. Plaintiff was not calculating WatchDog's lost profits from WatchDog's books. Plaintiff was demanding Defendants' later Sales by Customer Detail reports and threatening extrapolation from Defendants' 2022 gross sales.

Plaintiff later filed a damages motion stating that it was not seeking later-year extrapolated damages, while still relying on selected 2018–2022 Companions Sales by Customer Detail figures as the base of its damages model. **Ex. 2, Plaintiff's Damages Memorandum, Dkt. 652 at 16, PageID 12495.** That shifting position does not cure the defect. It confirms it. Whether Plaintiff sought later-year extrapolation or later disclaimed it, the model still begins with Companions' gross sales, not WatchDog's actual net loss.

Levi admitted the same defect under oath. She testified that "[t]he damages are 98.3 of your sales," that "98.3 percent of every dollar that was earned by IME Companions belong[s] to IME WatchDog," and that "[t]hose are my damages." **Ex. 9, Levi Dep. Tr. 102:21–22, 104:3–6.** Later, she admitted the dispositive point: "the damages calculation is not based on IME WatchDog's records" but is "based on Companions's records." **Ex. 9, Levi Dep. Tr. 152:21–23.**

Levi went even further. When questioned about the fact that WatchDog had never made anything near the profit Plaintiff now claims, Levi testified that "98.3 percent of Companions's sales should've been IME WatchDog and those are my damages. Period. End of story," and that "how the finances of the company were handled is immaterial and irrelevant." **Ex. 9, Levi Dep. Tr. 126:21–25.**

That is exactly backwards. WatchDog's finances are not immaterial to a lost-profits claim. WatchDog's finances are the proof. Plaintiff cannot ask the Court to award lost profits while taking the position that WatchDog's own financial records are irrelevant.

Those admissions should end the lost-profit request. WatchDog's lost profits cannot be proven from Companions' gross sales. WatchDog's lost profits must be proven from WatchDog's own financial records showing actual net loss.

Plaintiff chose not to submit those records.

### D. Plaintiff's 2022 Zemsky adjustment shows the model is unreliable.

The 2022 Zemsky & Salomon adjustment exposes the unreliability of Plaintiff's method. Plaintiff did not rely on a filed 2022 tax return, bank record, invoice, payment receipt, customer confirmation, or forensic accounting trace. Plaintiff used a Sales by Customer Detail report and then admitted that the 2022 Zemsky & Salomon entry was blank. **Ex. 2, Plaintiff's Damages Memorandum, Dkt. 652 at 17, PageID 12496.**

Instead of proving the missing 2022 amount through actual records, Plaintiff inserted the 2021 Zemsky number — $54,015 — into 2022. **Ex. 2, Plaintiff's Damages Memorandum, Dkt. 652 at 17, PageID 12496.** That is not damages proof. It is a plug number.

A blank field in a gross-sales report cannot become default-judgment damages because Plaintiff inserted a prior-year amount. The later Zemsky evidence further undermines Plaintiff's causation theory. On April 10, 2023, Jason Zemsky signed a letter stating: "Our firm is no longer working with IME Companions as of March 10th, 2023." **Ex. 23, Zemsky Apr. 10, 2023 Letter, PDF p. 1.** That evidence matters because Plaintiff's damages model assumes that a firm's prior use of Companions represents a continuing loss to WatchDog. The Zemsky evidence demonstrates the opposite. Even where a firm previously used Companions, Plaintiff has not shown that the firm remained with Companions, returned to WatchDog, moved to another provider, used multiple providers, or ceased using the service altogether.

That uncertainty is fatal to Plaintiff's damages model. Plaintiff seeks to recover millions based on broad customer-overlap assumptions, yet it did not prove where customers actually went, why they moved, whether they would have used WatchDog absent the conduct at issue, or what net profit WatchDog actually lost. A customer's decision to stop using Companions does not

establish damages in WatchDog's favor. It demonstrates ordinary market movement that Plaintiff failed to analyze.

Plaintiff's own filings also show that the sales base moved across gross-sales summaries rather than a reconciled accounting. Defendants do not overstate that point; the core defect is not a small arithmetic variance. The core defect is that Plaintiff is using gross-sales attribution summaries as a substitute for WatchDog's actual net-profit records.

That cannot support damages with reasonable certainty.

**E. Plaintiff's counsel knew what plaintiff-side default-damages proof looks like, but did not provide it here.**

Plaintiff's damages submission should also be scrutinized carefully because Plaintiff's Notice of Motion in this case identifies the wrong case number — **23-cv-6186 (NRM)(JRC)** — even **though it was filed in this case, 22-cv-1032 (PKC)(JRC)** . **Ex. 1, Plaintiff's Notice of Motion for Default Judgment Damages and Permanent Injunctive Relief, Dkt. 651 at 1, PageID 12478.** Defendants do not rely on that clerical error as a standalone basis to deny relief. But the error points to an important contrast.

The wrong case number belongs to an unrelated Milman Labuda matter also assigned to Magistrate Judge Cho. In that unrelated default-damages submission, counsel supported damages with a sworn declaration from the plaintiff's authorized representative, documents maintained by the plaintiff, invoices reflecting storage charges, a stated rental-rate range, a formula tied to the plaintiff's alleged lost use of its own property, and an Amazon lease amendment used to calculate claimed lost rental income. **Ex. 31, Espada / AKP Default-Damages Submission, Dkt. 41 at 1–3, PageID 149–151; Dkt. 41-1; Dkt. 41-2.**

That contrast is telling. In that case, counsel supported default damages with plaintiff-side records and third-party documents. Here, Plaintiff asks for millions without WatchDog's own tax returns, P&Ls, ledgers, bank records, payroll records, observer-payment records, Zariz records, DLA-related records, distribution records, cash-flow records, or expert analysis. Plaintiff instead uses Defendants' gross Sales by Customer Detail records as the damages base.

Plaintiff's counsel knew how to submit plaintiff-side damages proof when such proof existed. Plaintiff did not do that here. That omission confirms why the Court should require records, not assumptions, and deny damages absent competent WatchDog financial proof.

**F. Plaintiff's lost-profit request should be denied.**

Plaintiff's damages model fails because it asks the Court to award WatchDog money based on Defendants' gross sales rather than WatchDog's actual net loss. The 98.3% figure is not a damages formula. The October 20, 2023 Order did not convert it into a damages award.

Plaintiff's own counsel threatened extrapolation from Companions' 2022 Sales by Customer Detail. Levi admitted the damages calculation is based on Companions' records, not WatchDog's records. Levi further testified that WatchDog's finances were "immaterial and irrelevant." Plaintiff inserted a prior-year Zemsky number into a blank 2022 field. Plaintiff did not submit WatchDog's books.

That is not proof with reasonable certainty. It is a gross-revenue conversion theory.

Because Plaintiff did not prove WatchDog's actual lost net profits, did not prove Companions' net unjust enrichment, and did not prove a reasonable royalty, Plaintiff's lost-profit request should be denied and the Court should enter zero compensatory damages.

## II. PLAINTIFF'S ASSUMED 50% MARGIN IS UNSUPPORTED AND CONTRADICTED BY THE RECORD.

Plaintiff's entire damages request depends on an assumed 50% net-profit margin. That assumption is the engine of Plaintiff's claimed lost profits, punitive damages, prejudgment interest, and damages-driven fee request. Without the 50% margin, Plaintiff's motion collapses.

Plaintiff did not prove that margin.

Plaintiff did not submit complete WatchDog tax returns, P&Ls, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, distribution records, Zariz records, DLA-related records, cash-flow records, or expert damages analysis. Plaintiff simply asserted a 50% margin.

The record contradicts that assertion.

### A. Companions' filed tax returns show that gross receipts are not profits.

Even Companions' own filed tax returns defeat Plaintiff's assumption. In 2018, IME Companions reported $358,183 in gross receipts but only $120,153 in ordinary business income. In 2019, it reported $505,825 in gross receipts but only $125,359 in ordinary business income. In 2020, it reported $638,175 in gross receipts but only $181,807 in ordinary business income. In 2021, it reported $822,103 in gross receipts but only $333,329 in ordinary business income. **Ex. 10, IME Companions Form 1065 Tax Return Excerpts, 2018–2021, PDF pp. 1–4.**

Those filed returns show the basic accounting reality Plaintiff ignores: gross receipts are not profits.

Even using Companions' returns, the ordinary-income margins were approximately 33.5% in 2018, 24.8% in 2019, 28.5% in 2020, and 40.5% in 2021 — never 50%. **Ex. 10, IME Companions Form 1065 Tax Return Excerpts, 2018–2021, PDF pp. 1–4**. Plaintiff's assumed 50% margin is higher than every actual filed-return margin in the record.

And those are Companions' figures, not WatchDog's. Plaintiff still did not prove WatchDog's own net-profit margin with WatchDog's own books.

**B. WatchDog's historical P&Ls destroy the 50% margin.**

WatchDog's own historical financial reality is even more damaging to Plaintiff's theory. At the March 27, 2023 hearing, Roman Pollak testified about WatchDog's historical P&Ls. Pollak confirmed that WatchDog's P&Ls reflected approximately a $42,000 loss in 2014, approximately $70,000 net income in 2015, approximately $75,000 net income in 2016, and only approximately $30,000 average annual income when the loss year was included. March 27, 2023 Tr. 90:14–24. **Ex. 11, Dkt. 199, March 27, 2023 Hr'g Tr. 90:14–24, PageID 3974.**

That testimony is fatal to Plaintiff's claimed 50% margin. A business with a loss year, two modest net-income years, and an approximate three-year average annual income of only about $30,000 cannot obtain a multi-million-dollar lost-profit award by simply declaring a 50% margin.

The historical P&L figures previously testified to and discussed in this litigation make the point unmistakable:

| Year | Sales Income | Net Income / (Loss) | Approximate Margin |
|---|---|---|---|
| 2014 | $525,199.40 | ($42,539.82) | Negative |
| 2015 | $835,016.90 | $69,800.66 | 8.4% |
| 2016 | $969,699.84 | $74,557.42 | 7.7% |
| Total | $2,330,916.14 | $101,818.26 | 4.4% |
| **Plaintiff's claimed margin** | — | — | 50.0% |

Plaintiff's 50% margin is not merely unsupported. It is false as a damages premise. WatchDog's own historical financial reality shows that from 2014 through 2016, WatchDog generated $2,330,916.14 in sales income and only

$101,818.26 in net income — an approximate 4.4% aggregate margin. Ex. 15, Gelardi Decl. ¶ 3. If Plaintiff's claimed 50% margin were true, WatchDog would have generated approximately $1,165,458.07 in net income during that same period. It did not. The difference exceeds $1 million.

That gap cannot be explained away as a rounding issue, an estimate, or a harmless accounting disagreement. It is the difference between WatchDog's actual historical financial reality and a made-for-litigation margin that Plaintiff now asks the Court to accept without the books. Plaintiff's 50% margin is more than eleven times WatchDog's historical aggregate margin. A financially trained owner who controls WatchDog's books cannot credibly claim a 50% net-profit margin while her own historical P&Ls show 4.4%.

This is why Plaintiff did not submit the P&Ls. The P&Ls do not support Plaintiff's damages theory; they destroy it. If the books supported a 50% margin, Plaintiff would have produced them. Instead, Plaintiff produced gross Sales by Customer reports and asked the Court to ignore the net-profit records that matter.

A damages award based on that gap would not restore WatchDog to a proven but-for position. It would give WatchDog a windfall.

## C. The March 2017 package contained the exact records that would prove or disprove Plaintiff's damages.

The March 2017 materials are not merely volume evidence. They are proof that Plaintiff had the exact records needed to test damages and chose not to submit them.

Defendants do not attach restricted WatchDog internal materials because prior Court directives restricted Defendants' retention and use of WatchDog materials. But the existence and contents of the March 2017 package are confirmed by Adam Rosenblatt's April 28, 2017 email. Rosenblatt wrote that the March 2017 package included "the monthly P&L," "list of clients for that month," "a list of all the IME covered," "the Watchdog invoices," and "a breakdown of their pay vs what we billed." E**x. 13-A, Rosenblatt Apr. 28, 2017 Email re March 2017 WatchDog Materials, PDF p. 1.** Those documents would show the only facts that matter for lost profits: volume, revenue, billing, pay, costs, and net profit.

Based on Defendants' review of the March 2017 materials with former counsel before compliance with the Court's directives, those materials reflected that WatchDog hit 516 IMEs in March 2017, that Zariz received $25,000 in March 2017, and that Zariz was already at $75,000 year-to-date. The materials also included the March P&L with prior-year comparison and YTD, bank-account records, WatchDog payroll with IME breakdowns, client information, and projected cash-flow materials. **Ex. 15, Gelardi Decl. ¶ 4.**

That evidence is devastating to Plaintiff's 50% margin. WatchDog was not a low-volume business. It handled 516 IMEs in a single month immediately after a 2016 year in which WatchDog's historical P&L reflected $969,699.84 in sales income but only $74,557.42 in net income, an approximate 7.7% margin. **Ex. 15, Gelardi Decl. ¶¶ 3–4**. High volume did not produce a 50% margin for WatchDog. It produced modest net income. Plaintiff's own marketing later claimed more than 1,000 IMEs per month. If WatchDog's volume approximately doubled, the Court should require actual financial records demonstrating loss rather than assume that customer overlap produced lost profits.

The same point is confirmed by Pollak's sworn testimony. At the March 27, 2023 hearing, Roman Pollak testified that WatchDog's historical P&Ls reflected approximately a $42,000 loss in 2014, approximately $70,000 net income in 2015, approximately $75,000 net income in 2016, and only approximately $30,000 average annual income when the loss year was included. March 27, 2023 Tr. 90:14–24. **Ex. 11, Dkt. 199, March 27, 2023 Hr'g Tr. 90:14–24, PageID 3974**. Those figures cannot be reconciled with Plaintiff's claimed 50% margin.

Plaintiff cannot have it both ways. It cannot rely on WatchDog's size and volume when it helps its story, then withhold the P&L, invoices, payroll/IME breakdown, bank records, cash-flow records, and pay-versus-billed breakdown that show whether that volume actually produced profit. If the March 2017 records supported a 50% margin, Plaintiff would have submitted them. If they do not, the damages claim fails.

The monthly-volume comparison makes the margin assumption even less credible. Defendants' records show that even in Companions' highest-volume year, Companions generally averaged approximately 350 to 375 IMEs per month,

with only one month reaching the 400–405 IME range. **Ex. 15, Gelardi Decl. ¶ 9; Ex. 16, IME Companions Volume Reports, Feb.–Apr. 2022, PDF pp. 1–31.**

The uploaded reports support the monthly volume point: February has 358 entries, March has 368 entries, and April has 405 entries. The reports list individual IMEs by date, length, doctor, specialty, and location, with client names redacted.

The Court should draw the obvious conclusion. Plaintiff has the better evidence. Plaintiff controls the March 2017 P&L, prior-year comparison, YTD records, invoices, bank records, payroll records, IME breakdowns, pay-versus-billed records, cash-flow records, and Zariz records. **Plaintiff chose not to submit them**. Plaintiff instead asks the Court to accept gross Sales by Customer reports and Levi's declaration. Rule 55 requires records, not trust.

### D. Plaintiff failed to prove incremental costs.

Lost profits are net profits, not gross receipts. To recover lost profits on allegedly diverted business, Plaintiff had to prove the additional expenses WatchDog would have incurred to perform the allegedly diverted work, including observer payments, independent-contractor costs, scheduling labor, payroll, administrative costs, reporting costs, overhead, payment-processing fees, taxes, marketing and business-development costs, and other operating expenses. Plaintiff did not do that.

Plaintiff assumed a flat 50% margin without proving whether WatchDog could have performed hundreds of additional IMEs at that margin. The historical record shows the opposite: high IME volume did not equal high net profit for WatchDog.

The Court should reject Plaintiff's 50% margin and deny lost-profit damages.

### III. PLAINTIFF CANNOT CLAIM A 50% MARGIN WHILE WITHHOLDING WATCHDOG'S BOOKS, BLOCKING FINANCIAL DISCOVERY, AND ASKING THE COURT TO TRUST A CONVICTED FEDERAL CRIMINAL IN A FINANCIAL-CRIME CONTEXT.

This is the clearest reason Plaintiff's damages request should be denied. Plaintiff asks the Court to accept a 50% net-profit margin, but Plaintiff did not produce the records needed to test that margin. This was not merely a failure to attach records at the end of the case. Plaintiff controlled the records, resisted

meaningful financial verification, produced Levi only after years of litigation and motion practice, and then did not permit a meaningful examination into the financial entries that determine profit.

Plaintiff had two ways to verify the claimed margin: produce the books or allow its owner and financial witness to answer the questions. Plaintiff did neither. It withheld the P&Ls, tax returns, ledgers, payroll records, observer-payment records, bank records, Zariz/DLA records, and cash-flow records; and when the questioning turned to Zariz and DLA-related outflows, Plaintiff's counsel blocked the examination. That is not proof. It is blocked verification.

**A. Levi controlled the records, but did not answer basic financial questions.**

Levi admitted she is WatchDog's sole owner, controls WatchDog's finances, reviewed the sales numbers submitted to the Court, and has full access to WatchDog's accounting records. **Ex. 9, Levi Dep. Tr. 114:6–16, 115:11–21.**

Yet when asked basic questions about WatchDog's historical revenue and net profit, Levi repeatedly testified that she needed financial records to answer. Plaintiff's counsel confirmed the point, stating: "we can stipulate that she needs documents to answer all these questions." **Ex. 9, Levi Dep. Tr. 117:6–22, 118:11–25, 119:7–24, 120:1–11.**

That testimony is fatal. Plaintiff's owner admitted, in substance, that financial records were necessary to answer the very profit questions Plaintiff now asks the Court to decide. Plaintiff then failed to submit those complete records with its damages motion.

A plaintiff cannot admit that records are needed to determine net profit, withhold those records, and ask the Court to award millions based on an assumed margin.

**B. Levi admitted WatchDog's finances were supposedly "immaterial and irrelevant."**

Levi's testimony became even more damaging when she was asked about WatchDog's actual profitability. Levi testified that "98.3 percent of Companions's sales should've been IME WatchDog and those are my damages. Period. End of story," and that "how the finances of the company were handled is immaterial and irrelevant." **Ex. 9, Levi Dep. Tr. 126:21–25.**

That is exactly backwards.

WatchDog's finances are not immaterial to a lost-profits claim. WatchDog's finances are the proof. Plaintiff cannot ask for lost profits while taking the position that WatchDog's own financial records are irrelevant. Lost profits require net-profit proof. Net-profit proof requires books, expenses, payroll, observer payments, bank records, tax records, distributions, Zariz records, DLA-related records, and cash-flow records.

Plaintiff did not submit them.

## C. Mr. Kataev blocked questioning into Zariz and DLA-related outflows.

When Defendants asked about Zariz, Plaintiff's counsel instructed Levi not to answer, or Levi gave no meaningful answer. The questions were directed to what services Zariz provided, who owned or operated Zariz, whether invoices or contracts existed, and whether the payments were business expenses, profit distributions, related-party transfers, or personal transfers. **Ex. 9, Levi Dep. Tr. 146:16–151:22.**

Those questions were not harassment. They were damages questions.

Lost profits are net profits. Net profits require proof of revenue minus expenses, transfers, distributions, payroll, observer payments, related-party outflows, and other financial entries. Questions about Zariz and DLA-related outflows went directly to Plaintiff's claimed 50% margin.

Plaintiff cannot demand millions in lost profits while blocking inquiry into the payments and distributions that determine whether profit existed at all. Plaintiff cannot ask the Court to accept a 50% margin while withholding the ledgers, invoices, contracts, bank records, distribution records, and related-party records necessary to test that margin.

## D. The Zariz and DLA-related outflows make strict proof necessary.

Defendants do not attach restricted WatchDog internal financial records because prior Court directives required return, destruction, confidentiality, and restricted use of WatchDog materials. Defendants are not attempting to evade those directives. These financial issues were reviewed in detail with former counsel and discussed in this litigation because they go directly to Plaintiff's claimed lost profits and 50% margin.

Based on that review and the financial information discussed in this case, WatchDog's historical records reflected significant outflows, including approximately $183,314.13 in distributions to DLA in 2014, approximately $165,000 in distributions to DLA and $90,000 to Zariz in 2015, and approximately $220,000 to Zariz in 2016. The March 2017 WatchDog materials also reflected that Zariz had received $25,000 that month and was already at $75,000 year-to-date.

Those numbers are not minor bookkeeping entries. They are six-figure financial outflows that directly affect net profit.

If the Zariz and DLA-related entries were legitimate business expenses, they reduce WatchDog's net profit and destroy Plaintiff's claimed 50% margin. If they were distributions, related-party transfers, personal transfers, or non-operating payments, then Plaintiff's books require scrutiny before any damages award can be entered. Either way, Plaintiff cannot recover lost profits while refusing to explain the financial entries that determine profit.

**E. Levi's claimed finance background makes her financial non-answers impossible to excuse.**

Levi's own marketing email makes her deposition posture impossible to excuse. Levi did not present herself to the market as a passive owner with no financial sophistication. She represented that she "earned a degree in finance," signed as Founder and CEO of IME WatchDog, and marketed WatchDog as "the first and largest IME company in New York," "**covering over 1,000 exams per month**." **Ex. 17, Levi Marketing / Win-Back Email, PDF p. 1.**

Those statements matter. A financially trained Founder and CEO who claims to operate the largest IME company in New York, covering over 1,000 exams per month, cannot appear as Plaintiff's owner and damages witness and then avoid basic financial questions by repeatedly saying she needs records. She cannot claim financial sophistication when soliciting business, but financial helplessness when asked to prove damages.

Levi controlled WatchDog's books. She admitted she had access to WatchDog's accounting records. She reviewed the sales numbers Plaintiff submitted to the Court. Yet when asked basic questions about WatchDog's historical revenue and net profit, she did not provide the answers. She repeatedly said she needed the records, and Plaintiff's counsel confirmed that she needed documents to answer those questions. **Ex. 9, Levi Dep. Tr. 114:6–16, 115:11–21, 117:6–22, 118:11–25, 119:7–24, 120:1–11.**

That testimony destroys Plaintiff's damages presentation. If Levi needed records to answer basic questions about WatchDog's revenue and profit, then the Court needs those records before awarding damages. Plaintiff cannot withhold the books from the Court, block Defendants from examining the financial entries, and then ask for millions based on Levi's declaration.

The problem became worse when the questioning turned to Zariz and DLA-related outflows. Those questions went directly to net profit: what services Zariz provided, who owned or operated Zariz, whether invoices or contracts existed, and whether the payments were business expenses, profit distributions, related-party transfers, or personal payments. Instead of allowing the financial/damages witness to answer, Plaintiff's counsel instructed Levi not to answer or Levi gave no meaningful answer. **Ex. 9, Levi Dep. Tr. 114:6–16, 115:11–21, 117:6–22, 118:11–25, 119:7–24, 120:1–11.**

That is the tell. Levi claimed financial sophistication when it helped her market WatchDog, but Plaintiff blocked financial verification when Defendants tried to test the claimed 50% margin. A finance-trained owner who controls the books cannot ask the Court to accept a 50% net-profit margin while refusing to produce the books, refusing to answer basic financial questions without records, and blocking inquiry into the very outflows that determine profit.

Plaintiff asks for trust where Rule 55 requires proof. The Court should require records, not Levi's say-so.

**F. Levi's federal financial-crime conviction, Plaintiff's selective financial production, and Plaintiff's blocked financial testimony make a trust-based damages award impossible.**

Strict proof is required because Plaintiff asks the Court to rely on financial assertions from Daniella Levi while Plaintiff withholds the ordinary financial records that would verify them. Levi is not a neutral accountant. She is not an independent damages expert. She is not an outside financial witness. She is Plaintiff's owner, the person seeking the money judgment, and the declarant asking this Court to accept Plaintiff's claimed 50% net-profit margin.

**Levi is also a convicted federal criminal in a financial-crime case. The Judgment in her federal criminal case states that Levi pleaded guilty to Count One and was adjudged guilty of conspiracy to knowingly evade federal reporting requirements under 31 U.S.C. § 5313(a), in violation of 31 U.S.C. § 5324(1) and 18 U.S.C. § 371. Ex. 18, Judgment in a Criminal Case, PDF p. 8.**

**The federal indictment charged conduct that goes directly to financial credibility. It charged that Levi was a vice president of Bank Leumi in New York; that a co-conspirator asked her to find a person who could launder money; that Levi introduced that co-conspirator to Alex Adjmi for that purpose; and that Levi received a fee for her role in introducing them and initiating money-laundering transactions. Ex. 18, Indictment, Doc. 8 at 9, PDF p. 10.**

**The federal indictment further charged that the broader scheme involved cash proceeds generated from drug trafficking, including cocaine trafficking; evasion of federal reporting requirements; concealment from law-enforcement scrutiny; commissions for laundering cash; counter-surveillance techniques; beepers; code names; and approximately $22.5 million in cash delivered to Prism Financial Services and transferred to accounts in the United States and abroad. Ex. 18, Indictment, Doc. 8 at 4, 7, 28; PDF pp. 11–12, 2.**

That history is not collateral. It is not a generic character attack. It goes directly to whether this Court should accept Levi's financial representations without records. Plaintiff's damages motion is another financial presentation controlled by Levi. Plaintiff asks this Court to accept Levi's claimed 50% net-profit margin while Plaintiff refuses to produce the basic financial records that would prove or disprove it.

This is not a situation where the missing proof would be difficult to produce. Plaintiff could have submitted a one-page QuickBooks Profit & Loss statement. Plaintiff could have submitted the relevant tax-return page or schedule showing gross receipts, deductions, and ordinary business income. Plaintiff could have submitted a general ledger, expense ledger, payroll summary, observer-payment ledger, bank summary, distribution ledger, Zariz ledger, DLA-related ledger, or sworn accountant's reconciliation. Those are ordinary business records. They do not require disclosure of confidential customer strategy. They would show the Court the only financial issue that matters for lost profits: revenue minus expenses equals net profit.

### Plaintiff chose not to submit them.

Instead, Plaintiff produced and relied on the one type of financial report that avoids the issue the Court must decide: a Sales by Customer Summary / Sales by Customer Detail report. That report may show selected gross receipts by customer. It does not show expenses. It does not show payroll. It does not show observer payments. It does not show overhead. It does not show taxes. It does not show distributions. It does not show Zariz payments. It does not show DLA-related outflows. It does not show net profit. It is not a lost-profit calculation.

That selective production is the tell. Plaintiff was able to generate and submit gross customer-sales reports, but did not submit the simpler and more probative QuickBooks P&L or tax-return income proof that would reveal WatchDog's actual margin. Plaintiff gave the Court hundreds of pages of gross-sales summaries when one ordinary P&L page could have tested the entire 50% theory.

Plaintiff had two easy ways to verify the claimed margin: produce the records or allow its owner and financial witness to answer questions. Plaintiff did neither.

The Court should draw the obvious conclusion. If WatchDog's books supported a 50% margin, Plaintiff would have submitted them. If WatchDog's tax returns supported the claimed lost profits, Plaintiff would have submitted them. If Zariz and DLA-related outflows were ordinary and legitimate business entries, Plaintiff would have produced the invoices, contracts, ownership records, payment records, bank records, ledgers, tax treatment, and proof of services — or, at the bare minimum, permitted Levi to answer deposition questions about them.

Plaintiff did neither. It withheld the records and blocked the examination.

The problem is not merely that **Levi has a federal financial-crime conviction**. The problem is that the same financial danger signs are present in this damages motion: unexplained money movement, missing supporting records, selective financial production, blocked financial questioning, and a demand that the Court accept Levi's financial characterization without the books.

That is exactly why the Court should require records, not trust.

Plaintiff's own deposition conduct confirms the problem. Levi admitted she controls WatchDog's finances, reviewed the sales numbers submitted to the Court, and has access to WatchDog accounting records, yet she repeatedly testified that she needed financial records to answer basic questions about WatchDog's historical revenue and net profit. Plaintiff's counsel confirmed the point, stating: "we can stipulate that she needs documents to answer all these questions." **Ex. 9, Levi Dep. Tr. 114:6–16, 115:11–21, 117:6–22, 118:11–25, 119:7–24, 120:1–11.**

Then, when Defendants asked what services Zariz provided, who owned or operated Zariz, whether invoices or contracts existed, and whether the payments were expenses, distributions, related-party transfers, or personal transfers, Plaintiff's counsel instructed Levi not to answer or Levi gave no meaningful answer. **Ex. 9, Levi Dep. Tr. 146:16–151:22.**

Those were not harassment questions. They were damages questions. Lost profits are net profits. Net profits require proof of revenue minus expenses, transfers, distributions, payroll, observer payments, Zariz payments, DLA-related outflows, and other financial entries. Plaintiff blocked Defendants from testing the exact financial entries Plaintiff now asks the Court to ignore.

Levi also testified that "98.3 percent of Companions's sales should've been IME WatchDog and those are my damages. Period. End of story," and that "how the finances of the company were handled is immaterial and irrelevant." **Ex. 9, Levi Dep. Tr. 126:21–25.** That testimony exposes Plaintiff's entire damages theory: Levi wants Defendants' gross sales treated as WatchDog's money while declaring WatchDog's own finances irrelevant. WatchDog's finances are not irrelevant. WatchDog's finances are the proof.

This is not confusion. This is not an inability to calculate damages. Plaintiff selected gross-sales reports, withheld net-profit records, blocked the financial examination, and now asks the Court to accept a 50% margin from Levi on trust. That is not proof. It is the absence of proof.

Plaintiff's counsel's own conduct underscores the point. In an unrelated default-damages case bearing the same case number mistakenly placed on Plaintiff's Notice of Motion here, counsel submitted plaintiff-side damages proof: a sworn representative declaration, documents maintained by the plaintiff, invoices, a rental-rate range, a formula tied to the plaintiff's claimed loss, and third-party contract evidence. **Ex. 31, Unrelated Default-Damages Submission in Case No. 1:23-cv-06186-NRM-JRC, Dkt. 41 at 1–3, PageID 149–151; Dkt. 41-1; Dkt. 41-2.** That contrast matters. Plaintiff's counsel knows what plaintiff-side damages proof looks like. Here, Plaintiff did not submit WatchDog's own P&Ls, tax returns, ledgers, payroll records, bank records, Zariz records, DLA-related records, distribution records, or accountant reconciliation. Instead, Plaintiff used Defendants' gross Sales by Customer Detail records and blocked the questions that would test WatchDog's actual profit.

The Court does not need to make any new criminal finding to deny damages. The Court only needs to apply Rule 55. Plaintiff's damages request depends on financial representations from Levi, a convicted federal criminal in a financial-crime case; Plaintiff withheld the records that would verify those representations; Plaintiff blocked questioning into the six-figure Zariz/DLA outflows that determine net profit; and Plaintiff asks the Court to accept a 50% margin without the books.

That record cannot support a multi-million-dollar damages award. It supports zero damages.

**IV. PLAINTIFF CANNOT USE PRIOR RETURN, DESTRUCTION, CONFIDENTIALITY, OR USE RESTRICTIONS AS BOTH A SWORD AND A SHIELD.**

Defendants do not attach restricted WatchDog P&Ls or internal operating records because prior Court directives restricted Defendants' retention and use of WatchDog materials. But those restrictions do not relieve Plaintiff of its damages burden.

Plaintiff owns the records. Plaintiff controls the records. Plaintiff has the P&Ls, tax returns, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, cash-flow records, Zariz records, DLA-related records, and distribution records.

If Plaintiff wants lost profits, Plaintiff must prove lost profits with its own books.

Plaintiff cannot restrict Defendants from attaching WatchDog financial records and then ask the Court to accept an unsupported 50% margin while refusing to submit those same records itself. The Court should not require Defendants to risk violating prior orders to disprove a damages theory Plaintiff failed to prove.

**If the historical P&Ls, March 2017 package, bank records, payroll records, cash-flow records, Zariz records, DLA-related records, or related financial materials are necessary to determine damages, Plaintiff should be ordered to submit its own copies under seal or for in camera review.**

Plaintiff cannot suppress the records that test its margin and then ask the Court to accept that margin on trust.

The primary relief should be denial of damages and entry of zero compensatory damages. Defendants do not request an inquest as their primary relief. Only if the Court is inclined to consider any damages award despite Plaintiff's failure of proof should the Court require complete WatchDog financial production, in camera review, and live testimony subject to cross-examination.

**V. PLAINTIFF'S SALES BY CUSTOMER SUMMARY AND ECL ARE CUSTOMER-LIST DOCUMENTS, NOT DAMAGES PROOF.**

Plaintiff's Sales by Customer Summary is not a lost-profit calculation. It is a gross-sales/customer-list document. It does not show expenses. It does not show net profit. It

does not show customer loss. It does not show why any customer paid or stopped paying WatchDog. It does not show whether customers used multiple vendors. It does not show that Defendants caused WatchDog to lose any specific net profit.

A gross-sales report is not a damages instrument.

A broad customer list is not a damages instrument either. Plaintiff's ECL/customer list does not prove actual paying customers, actual lost customers, actual serviced customers, customer-specific causation, or lost net profits. A list of names may identify contacts, prospects, or possible market participants. It does not prove damages.

Plaintiff used a broad customer list to obtain severe restrictions and now seeks to use the same broad customer universe to support damages and permanent injunctive relief. That is improper. Damages cannot be awarded from a marketing list.

**A. Wingate proves that Plaintiff's "lost customer" label is unreliable.**

Wingate proves the problem. Plaintiff's own records show that Wingate continued paying WatchDog and increased revenue over time: $70,068 in 2016, $93,988 in 2017, $106,447 in 2018, $143,200 in 2019, $154,294 in 2021, and $202,195 in 2022. **Ex. 12, Plaintiff's Sales by Customer Summary, 2016–2022, PDF pp. 20, 28, 36, 44, 60, 70.**

A customer whose WatchDog revenue increased is not proof of lost business. It is proof that Plaintiff's "lost customer" label is unreliable.

Levi's deposition confirms that Plaintiff's model does not actually require a customer to be lost. When asked whether a customer that still pays WatchDog is lost, Levi testified that if the customer also paid IME Companions, "whatever money was paid to IME Companion is part of my damages calculation." **Ex. 9, Levi Dep. Tr. 130:13–24.** She later testified that if some Wingate business went to Companions, that money "should've been IME WatchDog's income." **Ex. 9, Levi Dep. Tr. 153:20–154:6.**

That is not customer-loss proof. It is an ownership theory over customers.

Customers are not property. Customer revenue is not automatically Plaintiff's lost profit. Law firms may use multiple IME providers. Customers may leave because of service problems. Customers may split work. Customers may use different vendors for last-minute coverage. Customers may refuse to return to WatchDog because of dissatisfaction, confidentiality concerns, perceived conflicts, distrust, pricing, availability, relationships, or ordinary competition.

Plaintiff did not prove customer-specific causation. It assumed it.

**B. Plaintiff's damages materials included more than two dozen firms Defendants never serviced.**

Plaintiff's customer proof is even more unreliable because Plaintiff's damages materials included firms Defendants never serviced, never billed, and never received revenue from. Defendants previously identified more than two dozen such firms, including William Schwitzer & Associates, Cherny & Podolsky, Kahn Gordon Timko & Rodriguez, Gersowitz Libo & Korek, Cellino & Barnes, Miraglia Law, Blumen & Shayne PLLC, and the Rizzuto Law Firm. **Ex. 8, Aug. 16, 2025 Discovery Follow-Up Email to Judge Cho, PDF p. 1.**

Plaintiff cannot recover damages from Defendants for firms that never paid Defendants. If those firms stopped using WatchDog but did not move their business to IME Companions, that is not evidence of diversion by Defendants. It is evidence of ordinary customer movement in a competitive market. Customers may leave an incumbent provider for many reasons: dissatisfaction with service, price, availability, trust, use of multiple vendors, internal staffing, or the emergence of new IME-observation companies after WatchDog entered the market first.

That distinction matters. A customer lost by WatchDog is not automatically a customer diverted by Defendants. Plaintiff still had to prove that Defendants caused each specific loss, that the customer would have used WatchDog absent the alleged conduct, that the customer instead used Defendants, and that WatchDog lost a specific amount of net profit. Plaintiff did not do that.

A damages model that includes firms Defendants never serviced is not a lost-profit calculation. It is a customer-list shortcut that treats ordinary market loss as recoverable damages without proving causation.

**C. The 2022 Zemsky plug number confirms the unreliability of Plaintiff's customer-sales model.**

The 2022 Zemsky & Salomon adjustment illustrates the same unreliability. Plaintiff did not rely on a filed 2022 tax return, bank record, invoice, payment receipt, customer confirmation, or forensic accounting trace. Plaintiff used a Sales by Customer Detail figure, then admitted that the 2022 Zemsky & Salomon entry was blank and filled that blank by importing the 2021 Zemsky number into 2022. **Ex. 2, Plaintiff's Damages Memorandum, Dkt. 652 at 17, PageID 12496.**

That is not competent damages evidence. It is an unsupported plug number. A blank field in a gross-sales report cannot become default-judgment damages merely because Plaintiff inserted a prior-year amount.

Plaintiff's customer proof is defective at every level. It does not prove actual customer loss. It does not prove causation. It does not prove net profit. It does not prove incremental costs. It does not prove WatchDog's actual damages.

The Court should deny damages.

**VI. PLAINTIFF FAILED TO PROVE CUSTOMER-SPECIFIC CAUSATION.**

Plaintiff's causation theory collapses customer by customer.

Customers are not property. Customer overlap is not loss. Customer overlap is not causation. Customer overlap is not net profit. Plaintiff had to prove that Defendants caused WatchDog to lose specific customers and specific net profits. Plaintiff did not do that.

**A. Customer overlap was expected because WatchDog was the incumbent provider; overlap is not causation, damages, or net lost profit.**

Plaintiff's customer-causation theory rests on a premise that does not prove damages: because many IME Companions customers had previously used WatchDog, Plaintiff assumes those customers were diverted and that every dollar they paid Companions became WatchDog's lost profit. That assumption is not proof. It is the causation gap Plaintiff had to close.

WatchDog was the incumbent provider in this niche market. Levi herself marketed WatchDog as "the first and largest IME company in New York," "covering over 1,000 exams per month." **Ex. 17, Levi Marketing / Win-Back Email, PDF p. 1.** That matters for two reasons.

First, customer overlap with a later market participant is predictable. In a small specialty market where WatchDog entered first, held itself out as the largest provider, and claimed to cover hundreds and later over one thousand exams per month, many later IME Companions customers would naturally have encountered or used WatchDog first. That shows market sequence. It does not prove diversion.

Second, Plaintiff's own volume evidence undercuts its claimed loss. The March 2017 materials reflected that WatchDog handled 516 IMEs in a single month. **Ex.**

**15, Gelardi Decl. ¶ 4.** Yet on **January 24, 2023**, Levi marketed WatchDog as "the first and largest IME company in New York," "covering over 1,000 exams per month." **Ex. 17, Jan. 24, 2023 Levi Marketing / Win-Back Email, PDF p. 1.** If WatchDog's monthly volume approximately doubled from the March 2017 materials to Levi's January 2023 marketing representation, Plaintiff cannot simply assume that customer overlap caused lost business. A company claiming that its volume grew from hundreds of IMEs per month to over 1,000 IMEs per month must prove actual net lost profits with records, not ask the Court to infer loss from overlap.

That growth evidence does not prove damages for Plaintiff. It creates the opposite question: where is the actual loss? Plaintiff still had to prove which customers were lost, why they left, whether they would have used WatchDog absent the conduct at issue, what work WatchDog would have performed, what expenses WatchDog would have incurred, and what net profit WatchDog actually lost. Plaintiff did not do that.

Prior use of WatchDog does not mean a law firm belonged to WatchDog forever. Customers are not property. Law firms may use multiple vendors, split work, seek last-minute coverage, try a new provider, respond to pricing, follow relationships, use internal staff, move to other providers, or stop using a service because of dissatisfaction, availability, trust, or ordinary business judgment.

Customer overlap is not customer loss. Customer overlap is not causation. Customer overlap is not damages. Customer overlap is not net lost profit.

Plaintiff therefore had to prove damages customer by customer. It had to identify which customers were actually lost, why they left, whether they would have used WatchDog absent the conduct at issue, what work WatchDog would have performed, what expenses WatchDog would have incurred, and what net profit WatchDog actually lost. Plaintiff did not do any of that.

Plaintiff also did not separate customer overlap from ordinary market forces, including market growth, Defendants' independent paid marketing and business-development efforts, attorney-event outreach, third-party lead generation, price competition, service dissatisfaction, customer choice, use of multiple vendors, and substitution by other IME-observation providers. The record shows IME

Companions performed attorney-event outreach at NYSTLA/SITLA events, sent follow-up emails after those events, used marketing materials and sample reports, and marketed its own portal, services, languages, reports, professionalism, independent ownership, pricing, and reliability. **Ex. 15, Gelardi Decl. ¶ 8; Ex. 27-A, Marketing 360 Agreement, PDF pp. 1–2; Ex. 27-B, Madwire / Marketing 360 Invoices, Jan.–Mar. 2022, PDF pp. 1–6; Ex. 27-C, Giant Partners Marketing Contract, PDF p. 1; Ex. 28, IME Companions Marketing / Attorney-Event Outreach Emails, PDF pp. 1–24.**

Defendants also paid for professional marketing infrastructure during the damages period. In July 2020, IME Companions executed a Marketing 360 agreement that included CRM lead management, email and text marketing, business listings, reputation management, social media, content marketing and SEO tracking, digital-ad monitoring, call tracking, analytics, website tools, forms, and related services, with a monthly recurring total of $1,195. **Ex. 27-A, Marketing 360 Agreement, PDF pp. 1–2.** IME Companions also paid Madwire/Marketing 360 invoices in January, February, and March 2022, each showing a $1,034.07 invoice total and a $0 balance. **Ex. 27-B, Madwire / Marketing 360 Invoices, Jan.–Mar. 2022, PDF pp. 1–6.** In August 2022, Defendants paid for a Giant Partners digital marketing campaign for IME Companions brand and website buildout with a corresponding advertising campaign for $7,250, with recurring monthly terms. **Ex. 27-C, Giant Partners Marketing Contract, PDF p. 1.**

A damages model that cannot distinguish a lost customer from a shared customer, a retained customer, a never-serviced firm, a customer using another provider, or a customer generated by independent marketing is not a lost-profit calculation. It is aggregation. Plaintiff seeks more than $5 million but never proved WatchDog's actual net lost profits with WatchDog's own books and records. Customer overlap cannot fill that gap.

**B. The Elefterakis record demonstrates why individualized damages proof was required.**

Plaintiff's damages model also fails because it collapses multiple actors, customers, time periods, and market forces into one undifferentiated gross-sales

number. That is not a damages calculation. Even accepting the default posture, Plaintiff still had to prove damages defendant by defendant, customer by customer, and in a net amount supported by competent records.

The Elefterakis record shows why individualized proof was required. Gregory Elefterakis was not a peripheral actor. He was a founding business participant and former partner involved in starting IME Companions. Plaintiff's own record reflects that his role involved customer development. The Court's October 20, 2023 Order states that Elefterakis testified he joined Companions "to help [it] obtain customers," and that he conceded he introduced, at most, approximately ten to fifteen clients during his time with Companions. **Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 9, PageID 4925.**

Defendants do not raise this point to relitigate liability. This is a damages argument only. If Plaintiff's own record involved a founding participant and former partner whose role included helping obtain customers, Plaintiff could not simply aggregate every customer movement and every dollar of Companions' gross revenue into one global damages theory against the remaining Defendants.

Plaintiff had to prove which customers were allegedly diverted, which customers were introduced or developed by which actor, which customers actually left WatchDog, which customers would have used WatchDog absent the conduct at issue, what work WatchDog would have performed, what expenses WatchDog would have incurred, and what net profit WatchDog actually lost from each customer.

The Court's Order itself underscores the attribution problem. In discussing the 2018 customer evidence, the Court noted that no competent evidence had been adduced as to whether certain former WatchDog customers were also Elefterakis's clients. **Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 9 n.9, PageID 4925.** That gap matters for damages. It may not have prevented preliminary injunctive findings, but damages require a number; and a number requires causation, allocation, expenses, and net profit.

The proportionality problem is also apparent from Plaintiff's own treatment of the founding participants. IME Companions' 2018 Membership Interest Purchase Agreement reflects that Greg Elefterakis, Roman Pollak, and Anthony Bridda

collectively owned 50% of IME Companions before Safa purchased their interests for $115,000. Ex. 30, Membership Interest Purchase Agreement, PDF pp. 2–3. Plaintiff nevertheless now seeks more than $5 million from the remaining Defendants while its claims involving those founding participants were resolved for a nominal five-figure amount. Dkt. 592, Sealed Confidential Stipulation of Settlement.

Defendants do not rely on that resolution to prove liability or non-liability, and do not ask the Court to treat settlement posture as damages evidence. The point is narrower: Plaintiff's own litigation posture underscores why aggregated, group-based customer-overlap theories cannot support a multi-million-dollar damages award. Where multiple founders, owners, and business-development actors existed, Plaintiff had to prove damages by customer, actor, time period, causation, and net profit. See **Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 9–10, PageID 4925–4926; Ex. 30, Membership Interest Purchase Agreement, PDF pp. 2–3.** Plaintiff did not.

Plaintiff cannot avoid that burden by invoking broad group allegations. It cannot treat every customer who ever used WatchDog as a permanently lost WatchDog customer. It cannot treat every customer who later used Companions as diverted by the same actor for the same reason. It cannot treat a founding participant's documented customer-development role as irrelevant while demanding millions from the remaining Defendants based on aggregated customer overlap. **See Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 9, PageID 4925.** And it cannot convert Companions' gross sales into WatchDog's lost profits without identifying the customers, the cause of the loss, and the net profit actually lost.

Rule 55 does not permit that. Default does not establish the amount of damages. It does not eliminate customer-specific causation. It does not prove WatchDog's net lost profits. It does not allow Plaintiff to collapse multiple actors, customers, causes, and time periods into one gross-revenue number.

Because Plaintiff seeks more than $5 million but never proved WatchDog's actual net lost profits with WatchDog's own books and records, Plaintiff's lost-profit request should be denied.

**C. Subin and Zemsky show ordinary customer choice, not automatic diversion.**

Subin and Zemsky illustrate the defect. Those firms were not simply "stolen" from WatchDog. The record shows ordinary business reasons, including service dissatisfaction, use of other IME-observation vendors, and independent customer choice.

Subin's Chief Operating Officer stated that Subin was unhappy with WatchDog's service before using Companions. **Ex. 32, Arnold Baum Affidavit, Dkt. 27 at 1, PageID 380.** That is ordinary customer dissatisfaction, not proof that Defendants caused WatchDog's loss through misappropriation.

Zemsky stated that WatchDog was the first IME service his firm used, that he was unhappy with WatchDog's service because it could not cover last-minute requests, that he then began using IME Guards in or about February 2019, and that he was unhappy with IME Guards because it did not have enough coverage. **Ex. 33, Jason Zemsky Affidavit, Dkt. 28 at 1, PageID 381.** That timeline shows a customer moving through ordinary market alternatives before using Companions.

Maura Diaz, the paralegal in charge of Zemsky & Salomon's IME calendar, later declared that Zemsky had used IME Companions since 2019 and that Carlos Roa contacted the firm, spoke in Spanish, disparaged Safa and Companions, warned the firm to stay away, said the FBI was involved, and said Safa would go to jail. **Ex. 34, Maura Diaz Decl., Dkt. 166 at 2, PageID 3480.** Then Zemsky later confirmed that the firm was no longer working with IME Companions as of March 10, 2023. **Ex. 23, Zemsky Apr. 10, 2023 Letter, PDF p. 1.**

That timeline defeats Plaintiff's automatic-causation theory. It shows service dissatisfaction with WatchDog, an intervening provider, customer choice, Plaintiff-side pressure, and later customer movement away from Companions itself. The point is confirmed by Jason Zemsky's April 10, 2023 letter stating that Zemsky & Salomon was "no longer working with IME Companions as of March 10th, 2023." **Ex. 23, Zemsky Apr. 10, 2023 Letter, PDF p. 1.**

That fact is highly significant. Plaintiff's damages theory assumes that customers who once used Companions represent continuing losses to WatchDog. But Zemsky demonstrates that customer movement is not linear. Customers may move from WatchDog, to another provider, to Companions, and away from Companions again. Without proof showing where the customer ultimately went, why the customer moved, whether the customer would have used WatchDog absent the alleged conduct, and what net profit WatchDog actually lost, Plaintiff cannot convert customer overlap into damages.

That is ordinary market conduct. It is not proof that Defendants permanently diverted WatchDog customers.

**D. Oresky and the other-provider evidence show that customers used multiple vendors.**

Oresky also contradicts Plaintiff's exclusive-customer theory. The record reflects that Oresky & Associates emailed both Companions and WatchDog seeking IME coverage, and Safa replied to all, including WatchDog. **Ex. 24, Oresky Jan. 18, 2023 Email re Percy Perez, PDF p. 1.** That is ordinary customer behavior. It shows firms

used multiple vendors and requested coverage from more than one provider. Plaintiff's damages model does not account for that.

Other evidence shows the same market reality. Defendants previously submitted NYSCEF-filed IME reports showing law firms associated with Plaintiff's alleged customer universe using other legal representatives and IME-observation providers after the TRO, including matters involving Khavinson & Associates, Zaremba Brown, Liakas Law, and Client Liaison Services, and identifying legal representatives such as Gerard Losquadro, John Schreiber, Salvador Mateo/Matteo, and Danny Cai. **Ex. 25, NYSCEF-Filed IME Reports Showing Other Legal Representatives / IME Providers, PDF pp. 4–13.**

If firms stopped using Companions but did not return to WatchDog, Plaintiff cannot blame Defendants without customer-specific proof.

Plaintiff did not provide that proof.

**E. Levi's own win-back email confirms ordinary market competition.**

Levi's own marketing email confirms the market reality Plaintiff ignores. She wrote that she was "hoping to win your business back" and offered reduced pricing of $165 for the first hour and $45 for each additional half hour "in an effort to win back your business." **Ex. 17, Jan. 24, 2023 Levi Marketing / Win-Back Email, PDF p. 1.**

That is ordinary market competition.

Customers move for service, price, availability, relationships, and trust. Plaintiff cannot assume that every customer who used Companions was lost because of the conduct at issue. Plaintiff had to prove customer-specific causation. It did not.

Because Plaintiff failed to prove customer-specific causation, its lost-profit request must be denied.

**VII. CASE-ENDING SANCTIONS DO NOT PROVE DAMAGES, AND PLAINTIFF CANNOT RECEIVE MILLIONS FROM AN UNTESTED PAPER RECORD.**

Plaintiff did not obtain a merits-tested damages finding. Plaintiff obtained case-ending sanctions and default posture. That posture does not decide the amount of damages.

Even accepting the default posture for purposes of this motion, damages remain separate. Case-ending sanctions do not prove WatchDog's net lost profits, a 50% margin, customer-by-customer loss, customer-specific causation, Companions' net unjust enrichment, a reasonable royalty, punitive damages, prejudgment interest, or a permanent occupational ban.

Plaintiff still had to prove the amount. It did not.

Plaintiff's own March 3, 2026 request underscores the same defect. Plaintiff represented at the March 3, 2026 hearing that it needed additional time to complete its default-judgment damages submission because it needed further financial records from Defendants. The Court granted a 90-day extension and leave to file a motion to compel those records. **Ex. 6, Mar. 3, 2026 Minute Entry granting 90-day extension and leave to move to compel.** Plaintiff then filed its damages motion weeks later without filing the contemplated motion to compel and without obtaining the supposedly necessary records. Plaintiff cannot represent that further records are needed, then seek millions on the same incomplete paper record.

The problem is broader than a missing exhibit. Plaintiff seeks final monetary and equitable relief from summaries, assumptions, declarations, and attribution narratives that were not meaningfully tested through live damages testimony. The missing proof is not collateral; it is the proof needed to determine net profit, causation, margin, attribution, and the scope of any injunction.

Defendants sought to test central witnesses and source records. Defendants requested depositions of Levi, Roa, and Rosenblatt. **Ex. 35, Deposition Notices for Daniella Levi, Carlos Roa, and Adam Rosenblatt.** Levi's deposition confirms the problem. When asked why Rosenblatt did not appear for deposition, Levi said she was not aware of a deposition notice for Adam. **Ex. 9, Levi Dep. Tr. 105:2–10.** She later admitted she did not know whether Warner requested Rosenblatt's

deposition. E**x. 9, Levi Dep. Tr. 110:13–22.** When shown notices for Levi, Roa, and Rosenblatt, she said she had no knowledge of what the documents were, who sent them, or when, and speculated that if a notice was sent it was "probably an improper notice." **Ex. 9, Levi Dep. Tr. 111:2–21.**

Roa's role is relevant to reliability, not liability. Levi admitted that Plaintiff identified Roa as a whistleblower in the complaint and appointed him President of Operations the very next day. **Ex. 9-B, Levi Dep. Tr. 43:5–18.** Plaintiff's materials identify Roa as President of Operations, an operational role one would expect to know who was retained, assigned, confirmed, or appeared for assignments. **Ex. 36, IME WatchDog Carlos Roa Webpage, PDF p. 1.** At Levi's deposition, Plaintiff's counsel stated that Roa was part of Plaintiff's legal team and an officer of WatchDog, had participated in every deposition, and would be called as a witness if the case went to trial. Judge Cho allowed him to remain because he "may be a witness." **Ex. 9-B, Levi Dep. Tr. 9:3–12, 11:8–15, 12:6–25.**

This matters because Plaintiff's damages and injunction theories depend on accurate customer-level and assignment-level attribution. Default does not admit the amount of damages. It does not permit the Court to award millions or impose a permanent occupational ban based on untested attribution narratives when the underlying source records were not produced.

The June 13, 2025 Jeannie Tam / Morgan & Morgan issue illustrates the point. It is not offered as a separate damages claim. It is a reliability example. Plaintiff used the Tam IME to support emergency relief, active-concert theories, and contempt-related exposure. Plaintiff attributed the June 13, 2025 Tam IME to Mark Purificati and Defendants. Defendants dispute that attribution and sought a narrow subpoena to Morgan & Morgan to test who was requested, retained, assigned, confirmed, invoiced, paid, or expected to appear for that one IME. **Ex. 37, Mar. 29, 2026 Letter Motion for Limited Rule 45 Subpoena to Morgan & Morgan, PDF pp. 1–3.**

Defendants contend that Morgan & Morgan requested WatchDog coverage for the Tam IME; that WatchDog responded confirming a WatchDog representative, Paula/Paola; that a WatchDog report was generated; and that WatchDog invoiced Morgan & Morgan for that IME. Defendants were denied the subpoena that would

have obtained the neutral third-party records needed to prove or disprove those facts. Ex. 37, Mar. 29, 2026 Letter Motion for Limited Rule 45 Subpoena to Morgan & Morgan, PDF pp. 1–3; Apr. 10, 2026 Dkt. Order denying Dkt. 654 as unnecessary; Ex. 38, Apr. 21, 2026 Dkt. Order Denying Reconsideration of Morgan & Morgan Subpoena Denial. Plaintiff, for its part, did not submit an affidavit from Morgan & Morgan, or an affidavit from a WatchDog scheduler or representative.

The point is not that the Court must accept Defendants' account on this paper record. The point is that the Court should not accept Plaintiff's attribution narrative on trust either. Where a disputed assignment can be proven or disproven by ordinary source documents, and Plaintiff does not provide those documents, the narrative cannot support final monetary or equitable relief.

Rule 55 permits the Court to require proof before entering damages. Plaintiff should not receive millions of dollars or a permanent occupational ban based on an untested paper record, selected gross sales, unsupported margin assumptions, blocked financial discovery, disputed assignment narratives, and Plaintiff's refusal to produce the records that would verify or disprove its own damages theory.

### VIII. PUNITIVE DAMAGES, PREJUDGMENT INTEREST, ATTORNEYS' FEES, AND COSTS CANNOT STAND ON AN UNPROVEN COMPENSATORY BASE.

Plaintiff's requests for punitive damages, prejudgment interest, attorneys' fees, and costs all depend on a damages foundation Plaintiff failed to prove.

Under the DTSA, exemplary damages are tied to damages awarded under § 1836(b)(3)(B). If Plaintiff has not proven actual loss, non-duplicative unjust enrichment, or a reasonable royalty, there is no reliable compensatory award to double.

The same is true for prejudgment interest. Interest cannot be awarded on an unproven damages number. Plaintiff cannot obtain interest on a speculative award built from gross sales, an unsupported 50% margin, and a 98.3% attribution figure that was never a damages formula.

Attorneys' fees and costs also should not be awarded as a substitute for damages proof. Plaintiff cannot use fee requests to cure its failure to prove actual loss, net unjust enrichment, reasonable royalty, causation, or net profits. To the extent Plaintiff seeks fees or costs tied to its defective damages model, those requests should be denied or, at minimum, subjected to strict documentation, apportionment, and reduction.

Because Plaintiff failed to prove compensatory damages with reasonable certainty, the Court should deny punitive damages, prejudgment interest, attorneys' fees tied to the defective damages request, and costs unsupported by competent proof.

## IX. PLAINTIFF'S REQUESTED PERMANENT TRI-STATE OCCUPATIONAL BAN IS OVERBROAD AND SHOULD BE DENIED OR NARROWED.

Plaintiff also seeks a permanent ban covering New York, New Jersey, and Connecticut. That request is overbroad.

A permanent injunction is not automatic. Plaintiff must prove irreparable injury, inadequate legal remedies, that the balance of hardships favors equitable relief, and that the public interest would not be disserved. Plaintiff also must satisfy the DTSA's limits on injunctive relief. The DTSA does not authorize a permanent occupational ban based merely on information a person knows, and it does not permit restraints that conflict with state-law limits on lawful work.

Plaintiff has not proven a basis for a tri-state occupational ban.

WatchDog's March 2017 operational information, previously transmitted and discussed in this litigation, reflected 516 IMEs in March 2017, with only two New Jersey IMEs listed and no Connecticut IMEs listed. **Ex. 15, Gelardi Decl. ¶¶ 4–5.** Plaintiff cannot justify a permanent tri-state occupational ban through a broad marketing list when its own operating record reflects a materially narrower geographic footprint.

Any injunction, if entered at all, should be limited to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets. It should not prohibit lawful IME-observation work across three states.

The requested ban is not narrow tailoring; it is a permanent work restriction dressed as trade-secret relief. A broad occupational/customer-list ban would create an indefinite contempt-monitoring regime over lawful IME-observation work, rather than a targeted injunction against use, disclosure, or retention of specifically identified trade secrets. The DTSA and eBay do not authorize that result on this record.

Plaintiff's damages failure matters here too. Plaintiff has not proven actual lost net profits, customer-specific causation, ongoing misuse, or threatened misappropriation sufficient to justify the sweeping restraint it seeks.

The Court should deny the requested permanent tri-state occupational ban. If any injunction is entered, it should be limited to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets, and should not prohibit lawful IME-observation work or impose an indefinite supervision regime over ordinary competitive activity.

## X. PLAINTIFF'S ANTICIPATED REPLY DOES NOT CURE THE MISSING PROOF.

Plaintiff's reply cannot cure the missing proof. The likely arguments are predictable, but none supplies WatchDog's books, a net-profit calculation, customer-specific causation, or a recognized DTSA damages measure.

First, Plaintiff may argue that Defendants are relitigating liability. They are not. Defendants accept the default posture for this motion and challenge only the amount of damages, the evidentiary sufficiency of Plaintiff's proof, causation, margin, and the scope of permanent equitable relief. Rule 55 preserves that distinction.

Second, Plaintiff may argue that the 98.3% figure is law of the case. It is not law of the case on damages. It was a gross-revenue attribution assertion. It did not deduct expenses, prove WatchDog's net profits, prove WatchDog's margin, establish customer-by-customer causation, prove Companions' net gain, or establish a reasonable royalty. The October 20, 2023 Order required further proof of actual damages; it did not award damages.

Third, Plaintiff may argue that the 50% margin is reasonable. A margin is not reasonable because Levi says so. It must be proven with WatchDog's books. Plaintiff did not submit complete WatchDog P&Ls, tax returns, ledgers, payroll records, bank records, observer-payment records, cash-flow records, Zariz records, DLA-related records, accountant analysis, or expert proof. The historical evidence points the other way.

Fourth, Plaintiff may argue that Companions' gross sales are a fair proxy. They are not. Lost profits are net profits. Unjust enrichment is net gain. A proxy cannot erase expenses, deductions, payroll, observer payments, overhead, taxes, related-party outflows, causation, and apportionment. Customer overlap cannot establish

damages where Plaintiff simultaneously represented that WatchDog was covering more than 1,000 IMEs per month. Plaintiff still had to prove actual net lost profits.

Fifth, Plaintiff may argue that Levi's financial-crime conviction is irrelevant. Defendants do not rely on it as a standalone character attack. The point is financial proof. Plaintiff asks the Court to accept Levi's financial assertions while withholding WatchDog's books and blocking questions into Zariz/DLA outflows. In that context, the Court should require records, not trust.

Sixth, Plaintiff may argue that customer overlap establishes causation. It does not. The Zemsky evidence independently disproves any gross-sales proxy theory. Jason Zemsky later confirmed that Zemsky & Salomon was no longer working with IME Companions as of March 10, 2023. **Ex. 23, Zemsky Apr. 10, 2023 Letter, PDF p. 1.** That fact alone demonstrates why customer overlap cannot be treated as continuing diversion and why gross-sales figures cannot substitute for proof of customer-specific causation, customer retention, or actual net lost profits.

Seventh, Plaintiff may argue that Zariz and DLA are speculative. They are not offered as independent claims. They are financial entries that affect net profit. If Plaintiff wants lost profits, it must explain the outflows that determine profit. Plaintiff controls those records and did not submit them.

Eighth, Plaintiff may argue that no inquest is necessary. That argument proves too much. If Plaintiff's papers were sufficient, they would contain WatchDog's books and a net-profit calculation. They do not. Plaintiff's own March 3, 2026 request confirms the proof problem: Plaintiff represented that further financial records were needed, obtained additional time and leave to move to compel, and then sought millions without obtaining those records or filing the contemplated motion. **Ex. 6, Mar. 3, 2026 Minute Entry granting 90-day extension and leave to move to compel.** The Court should enter zero damages. At minimum, no damages should be entered without complete WatchDog financial production, in camera review where necessary, and live testimony.

Ninth, Plaintiff may argue that a permanent tri-state injunction follows from default. It does not. Permanent injunctive relief requires proof of irreparable injury, inadequacy of legal remedies, balance of hardships, public interest, statutory tailoring, and a lawful scope. The DTSA does not authorize a permanent

occupational ban based on a broad customer list and an unsupported damages model.

Plaintiff's reply may repeat liability findings, but liability findings do not fill the damages record. The missing proof remains missing. The legally supported award remains zero.

## XI. THE ONLY SUPPORTABLE RESULT IS ZERO DAMAGES.

Plaintiff had the burden. Plaintiff did not meet it.

To award lost profits on this record, the Court would have to find that Plaintiff proved WatchDog's actual lost net profits, a reliable WatchDog profit margin, customer-specific causation, and the expenses WatchDog would have incurred to perform the allegedly diverted work. The current record does not support those findings.

To award DTSA unjust-enrichment damages, the Court would have to find Companions' net gain attributable to misappropriation, after deductions, expenses, apportionment, and causation. Plaintiff did not prove that either. To award a reasonable royalty, the Court would need a royalty analysis. Plaintiff offered none.

To award punitive damages or prejudgment interest, the Court would need a proven compensatory base. Plaintiff has not proven one. To impose a permanent tri-state occupational ban, the Court would need proof of irreparable injury, inadequacy of legal remedies, threatened misuse, narrow tailoring, and a lawful scope. Plaintiff has not made that showing.

This is not a case where damages were difficult but proven. It is a case where damages were never proven. Plaintiff asks for more than $5 million, but it did not submit WatchDog's own books and records showing actual net lost profits. It submitted gross customer-sales records from Defendants and asked the Court to convert them into WatchDog's money judgment. The Court can deny damages without disturbing the default because default establishes liability allegations, not the amount of damages.

Plaintiff's own materials further underscore the problem. The March 2017 records reflected 516 IMEs in a single month, while Levi later, on January 24, 2023, marketed WatchDog as covering "**over 1,000 exams per month." Ex. 15, Gelardi Decl. ¶ 4; Ex. 17, Jan. 24, 2023 Levi Marketing / Win-Back Email, PDF p. 1.** If WatchDog's own representations reflect substantial volume and growth, the Court should require actual financial proof of loss rather than infer lost profits from customer overlap, gross-sales reports, or attribution percentages. The question is not whether WatchDog performed IMEs. The question is whether Plaintiff proved actual net lost profits. It did not.

The law does not permit that shortcut.

This is especially true where Plaintiff's damages presentation depends on financial assertions from Levi, a convicted federal criminal in a financial-crime context, while Plaintiff withholds WatchDog's books, blocks examination into the Zariz/DLA outflows that determine net profit, and asks the Court to accept a 50% margin that WatchDog's own historical financial reality does not support.

The only supportable award on this record is zero damages. Any other damages award would require findings the current record does not support: a proven net-profit loss, a reliable margin, customer-specific causation, net unjust enrichment, a reasonable royalty, or a narrowly tailored equitable basis for a permanent occupational ban.

The Court should deny Plaintiff's damages request in full, enter zero compensatory damages, deny punitive damages and prejudgment interest, deny the requested permanent tri-state occupational ban, and limit any injunction, if entered at all, to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets.

Defendants do not request an inquest as their primary relief. Only if the Court is inclined to consider any damages award despite Plaintiff's failure of proof, Defendants respectfully request that no award be entered unless and until Plaintiff first produces complete WatchDog financial records, submits any restricted materials for in camera review, and presents live testimony subject to cross-examination.

**RELIEF REQUESTED**

For the foregoing reasons, Defendants respectfully request that the Court:

1. deny Plaintiff's request for lost-profit damages in full and award zero damages;

2. deny Plaintiff's request for punitive damages because there is no proven damages base to double;

3. deny Plaintiff's request for prejudgment interest tied to unproven lost profits;

4. deny or substantially reduce any attorneys' fees and costs dependent on Plaintiff's defective damages model;

5. deny Plaintiff's request for a permanent tri-state occupational ban;

6. limit any injunctive relief, if entered, to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets; and

7. alternatively, only if the Court is not prepared to deny damages outright, require Plaintiff to produce complete financial records, including P&Ls, tax returns, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, distribution records, Zariz invoices/contracts/ownership records, and cash-flow records, permit in camera review, and require live testimony subject to cross-examination before any damages are awarded.

Dated: June 1, 2026
Respectfully submitted,

Safa Gelardi
Pro Se Defendant
Vito Gelardi
Pro Se Defendant

# EXHIBIT LIST / TABLE OF EXHIBITS

The following exhibits are submitted in support of Defendants' Opposition to Plaintiff's Motion for Default Judgment Damages and Permanent Injunctive Relief. Exhibit numbers correspond to the citations used in the opposition. Exhibits marked by subpart are separated by divider pages in the combined PDF package.

| Exhibit | Title | Short Description | Key Point Supported |
| --- | --- | --- | --- |
| 1 | Plaintiff's Notice of Motion for Default Judgment Damages and Permanent Injunctive Relief | Dkt. 651, notice of motion requesting damages, punitive damages, interest, fees, costs, and permanent injunctive relief. | Shows the scope of Plaintiff's requested monetary and equitable relief. |
| 2 | Plaintiff's Damages Memorandum Excerpt | Dkt. 652 pages 15-17, including Plaintiff's DTSA damages model, 98.3% reliance, 50% margin, and Zemsky adjustment. | Shows Plaintiff's damages model is built on gross sales, attribution, and an assumed margin. |
| 3 | Levi Declaration in Support of Default Judgment Damages | Dkt. 653 and attachments submitted by Plaintiff in support of damages. | Shows Plaintiff's own damages evidence and sales-detail materials. |
| 4 | Levi March 22, 2023 Declaration | Dkt. 172 excerpt identifying the origin of the 98.3% figure and partial/incomplete 2022 data. | Shows 98.3% was a gross-revenue attribution assertion, not a damages formula. |
| 5 | October 20, 2023 Order Excerpt - Damages Pages | Excerpt of Dkt. 254 pages 32-34. | Included as damages-proof excerpt; the full order is Exhibit 29. |
| 6 | March 3, 2026 Minute Entry | Minute entry granting Plaintiff a 90-day extension and leave to move to compel records. | Shows Plaintiff represented additional records were needed before seeking damages. |
| 7 | August 13, 2025 Felsen Email | Plaintiff's demand for Companions Sales by Customer Detail records and threatened extrapolation. | Shows Plaintiff's model was built from Companions gross sales records. |
| 8 | August 16, 2025 Discovery Follow-Up Email to Judge Cho | Defendants' damages-discovery follow-up identifying never-serviced firms and gross-sales proof issues. | Shows firms included in Plaintiff's customer universe were never serviced by Defendants. |
| 9 | Selected Excerpts of Daniella Levi Deposition Transcript | Levi transcript excerpts regarding 98.3%, WatchDog finances, Zariz questions, and damages based on Companions records. | Shows Plaintiff's owner admitted the damages calculation was based on Companions records, not WatchDog records. |
| 9-B | Additional Excerpts of Daniella Levi Deposition Transcript | Pages 9, 11, 12, 43, 105, 110, and 111. | Supports Roa role, deposition-notice issues, and witness reliability points. |
| 10 | IME Companions Form 1065 Tax Return Excerpts, 2018-2021 | Companions gross receipts and ordinary business income figures. | Shows gross receipts are not profits and actual margins were below Plaintiff's 50% assumption. |

| | | | |
|---|---|---|---|
| 11 | March 27, 2023 Hearing Transcript Excerpts - Roman Pollak | Dkt. 199 excerpts regarding WatchDog historical P&Ls and profitability. | Shows WatchDog historical net income was modest and inconsistent with a 50% margin. |
| 12 | Plaintiff's Sales by Customer Summary / Customer Materials, 2016-2022 | Plaintiff customer-sales summary materials. | Supports Wingate revenue increase and unreliability of "lost customer" assumptions. |
| 13-A | Rosenblatt April 28, 2017 Email re March 2017 WatchDog Materials | Email stating March 2017 package included monthly P&L, client list, IME list, invoices, and pay-versus-billed breakdown. | Shows WatchDog maintained the records needed to prove or disprove lost profits. |
| 13-B | Rosenblatt April 28, 2017 Email re WatchDog P&Ls | Email stating WatchDog P&Ls for the last three years were attached. | Shows historical P&L proof existed and was central to profitability. |
| 15 | Declaration of Safa Gelardi | Declaration addressing historical WatchDog financial data, March 2017 materials, Zariz/DLA outflows, volume, geography, marketing, and market behavior. | Provides sworn basis for historical margin, 516 IMEs, Zariz/DLA issues, and geographic tailoring. |
| 16 | IME Companions Volume Reports, February-April 2022 | Combined volume reports listing IME entries by date, doctor, location, and other details. | Supports monthly-volume comparison and volume/revenue context. |
| 17 | January 24, 2023 Levi Marketing / Win-Back Email | Levi email identifying finance degree, Founder/CEO role, "over 1,000 exams per month," and win-back pricing. | Shows WatchDog's claimed scale/growth and ordinary market competition. |
| 18 | Levi Criminal Conviction Packet | Indictment, plea agreement, warrant/arrest materials, and judgment in federal financial-crime case. | Supports financial credibility challenge tied to missing records and trust-based damages proof. |
| 23 | Zemsky April 10, 2023 Letter | Letter stating Zemsky & Salomon was no longer working with IME Companions as of March 10, 2023. | Shows customer movement and defeats continuing-diversion assumptions. |
| 24 | Oresky January 18, 2023 Email re Percy Perez | Email sent to both IME Companions and WatchDog/Adam requesting IME coverage. | Shows firms used multiple vendors and overlap is not causation. |
| 25 | NYSCEF-Filed IME Reports Showing Other Legal Representatives / IME Providers | Court-filed IME reports identifying other legal representatives/providers. | Shows market alternatives and substitution by non-Companions providers. |
| 26 | WatchDog "Clients that Never Returned" Summary | Summary listing firms and total $0.00. | Shows some firms in Plaintiff's customer universe generated no revenue for Defendants. |
| 27-A | Marketing 360 Agreement | July 2020 agreement for CRM, email/text marketing, listings, reputation, SEO, ads, analytics, website tools, and forms. | Shows independent paid marketing infrastructure. |
| 27-B | Madwire / Marketing 360 Invoices | January-March 2022 invoices showing $1,034.07 monthly | Shows paid marketing expenditures during the damages |

| | | totals and $0 balances. | period. |
|---|---|---|---|
| 27-C | Giant Partners Marketing Contract | August 2022 digital marketing / brand and advertising campaign for IME Companions. | Shows independent paid marketing and brand development. |
| 28 | IME Companions Marketing / Attorney-Event Outreach Emails | NYSTLA/SITLA follow-up and marketing emails with sample reports, portal, services, pricing, and languages. | Shows independent business-development and ordinary market forces. |
| 29 | October 20, 2023 Memorandum & Order and Second Amended Preliminary Injunction | Full Dkt. 254 order and injunction. | Supports Elefterakis attribution issues and the Court's requirement of actual damages proof. |
| 30 | 2018 Membership Interest Purchase Agreement | Agreement showing Safa purchased 50% interests from Elefterakis, Pollak, and Bridda for $115,000. | Supports multi-actor/customer-development and proportionality arguments. |
| 31 | Unrelated Default-Damages Submission With Wrong Case Number | Supplemental declaration and exhibits in Espada / Arthur Kill Properties default-damages matter. | Shows Plaintiff's counsel knew what plaintiff-side damages proof looks like. |
| 32 | Arnold Baum Affidavit | Subin affidavit stating Subin was unhappy with WatchDog and was introduced to Companions through Greg Elefterakis. | Supports ordinary customer dissatisfaction and independent causation issues. |
| 33 | Jason Zemsky Affidavit | Affidavit stating Zemsky was unhappy with WatchDog, used IME Guards, and then used Companions. | Shows intervening provider, service dissatisfaction, and ordinary customer choice. |
| 34 | Maura Diaz Declaration | Declaration regarding Zemsky's IME calendar, use of Companions, and Roa call. | Supports customer movement and reliability issues. |
| 35 | May 10, 2023 Deposition Notices for Levi, Roa, and Rosenblatt | Notices of deposition served for central witnesses. | Shows Defendants sought to test source witnesses and records. |
| 36 | IME WatchDog Carlos Roa Webpage | WatchDog webpage identifying Roa as President, Operations. | Supports Roa's operational role and expected knowledge of assignments. |
| 37 | March 29, 2026 Letter Motion for Limited Rule 45 Subpoena to Morgan & Morgan | Tam/Morgan & Morgan subpoena request and supporting materials. | Reliability example showing Defendants sought neutral third-party records. |
| 38 | April 21, 2026 Docket Order Denying Reconsideration of Morgan & Morgan Subpoena Denial | Order denying reconsideration of subpoena denial as unnecessary after contempt was decided in Defendants' favor. | Confirms subpoena request was denied because contempt had already been decided, not because the records were irrelevant in the abstract. |

# EXHIBIT 1

**Plaintiff's Notice of Motion for Default Judgment Damages
and Permanent Injunctive Relief**

Defendants' Exhibit Package

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
IME WATCHDOG, INC.,

               Plaintiff,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, IME COMPANIONS LLC,
CLIENT EXAM SERVICES LLC,
and IME MANAGEMENT & CONSULTING LLC,

               Defendants.

----------------------------------------------------------------X

**Case No.: 23-cv-6186 (NRM)(JRC)**

**NOTICE OF MOTION FOR
DEFAULT JUDGMENT**

**PLEASE TAKE NOTICE** that, upon the reading and filing of Plaintiff IME WatchDog, Inc,'s ("Plaintiff") Memorandum of Law in Support of its Motion for Default Judgment and the Declaration of Daniella Levi, Esq., Plaintiff, by and through its undersigned counsel, will move this Court before the Hon. Pamela K. Chen, U.S.D.J. as soon as counsel may be heard, for an Order entering judgment by default in favor of Plaintiff and against Defendants Safa Gelardi, Vito Gelardi, and IME Companions LLC (collectively hereinafter the "Defendants") for (i) $1,414,800.00 for lost profit together with pre-judgment interest and post-judgment interest; (ii) punitive damages in the amount of $2,829,600 pursuant to 18 U.S.C. § 1836(b)(3)(C); (iii) attorneys' fees in the amount of $299,256.59; (iv) pre-judgment interest in the amount of $525,032,00; (iv) post-judgment interest in accordance with 28 U.S.C. § 1961; (v) a permanent injunction prohibiting Defendants from conducting any independent medical examination observations directly or indirectly in the tri-state area of New York, New Jersey, and Connecticut; and (vi) such other and further relief as the Court deems just, proper, and equitable.

**PLEASE TAKE FURTHER NOTICE,** that pursuant to the Court's February 9, 2026 Order and amended order issued on the record at the March 3, 2026 hearing, Defendants' opposition papers, if any, are due within thirty (30) days hereof, and pursuant to pursuant to Rule 6 and Local Civil Rule 6.1, Plaintiff's reply papers in further support are due seven (7) days after Defendants serve their opposition.

Dated:    Lake Success, New York
March 28, 2026

Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

By:    /s/ Jamie S. Felsen
3000 Marcus Ave., Suite 3W8
Lake Success, NY 11042
(516) 328-8899

**SAGE LEGAL LLC**

By:    /s/ Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421

*Attorneys for Plaintiff*
*IME WatchDog, Inc.*

# EXHIBIT 2

**Plaintiff's Damages Memorandum Excerpt**

**POINT II**

**PLAINTIFF SHOULD BE AWARDED $1,414.80.00 PLUS INTEREST AS DAMAGES ON ITS UNDERLYING CLAIMS IN ADDITION TO $2,781,074 IN PUNITIVE DAMAGES AND $299,256.59 IN ATTORNEYS' FEES AND A PERMANENT INJUNCTION**

Because the DTSA provides the largest damages of all of Plaintiff's claims, Plaintiff will analyze damages only under the DTSA. Remedies available under the DTSA include both equitable relief and monetary damages. In addition, the DTSA permits the granting of an injunction to prevent actual or threatened misappropriation of trade secrets. See 18 U.S.C. § 1836(b)(3)(A)(i); see also IME Watchdog, Inc. v. Gelardi, 732 F.Supp.3d 224 (E.D.N.Y. 2024); Zurich Am, Life Ins. Co. v. Nagel, 538 F.Supp.3d 396 (S.D.N.Y. 2021).

As to monetary damages, the DTSA permits the recovery of compensatory damages, punitive damages, and attorneys' fees. 18 U.S.C. §§ 1836(b)(3)(B)–(D). The DTSA's broad compensatory damages provision permits an award for: (1) "damages for actual loss caused by the misappropriation;" and (2) "damages for any unjust enrichment caused by the misappropriation ... that is not addressed in computing damages for actual loss;" or (3) "in lieu of damages measured by any other methods ... a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B).

The DTSA authorizes the court to award punitive damages in an amount not more than 2 times the amount of the damages and reasonable attorneys' fees where "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(C)&(D).

Plaintiff alleges Defendants' willfully and maliciously misappropriated Plaintiff's trade secrets. See SAC ¶ 99. Accordingly, Plaintiff is entitled to (i) damages; (ii) punitive damages of two times the damages; and (iii) attorneys' fees.

### A. Damages

Between 2018 and 2022, through their theft of Plaintiff's trade secrets, Defendants stole at least sixty-seven (67) customers from Plaintiff. See Declaration of Daniella Levi, Esq. ("Levi Decl.") ¶ 5; see also IME Watchdog, Inc. v. Gelardi, 2022 U.S. Dist. LEXIS 86997, at *17 (E.D.N.Y. May 13, 2022) ("[T]here is no doubt that Companions' existence and growth is based almost entirely on Watchdog's misappropriated trade secrets, customers, and business opportunities"); IME Watchdog, Inc. v. Gelardi, 732 F. Supp. 3d 224, 242 (E.D.N.Y. 2024) ("Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction").

Indeed, this Court has already found that 98.3% of the total revenue Defendants generated since Companions' inception was obtained through sales to Plaintiff's former customers. Ime Watchdog, Inc. v. Gelardi, 2023 U.S. Dist. LEXIS 189054, at *12 (E.D.N.Y. Oct. 20, 2023).

Plaintiff's damages calculation in this motion is limited to Defendants' sales figures and Plaintiff's resulting lost profits for the period 2018 through 2022.  Plaintiff is not seeking damages 'through any extrapolated figures for later years, or any revenue attributed to IME Legal Reps or any other post-2022 entity.   Applying the court's prior determination that 98.3 percent of Companions' total revenue was derived from the theft of Plaintiff's customers, Plaintiff's damages for the period of 2018 through 2022 are $1,414.80.00 plus pre-judgment and post-judgment interest.  As set forth in the Levi Declaration, based on Companions' annual Sales by Customer Detail that Companions produced during discovery, Companions' sales for the period 2018 through 2022 totaled $2,625,787 (consisting of $72,847.00 in 2018; $411,215.00 in 2019; $435,316 in 2020; $823,345 in 2021; and $883,0646 in 2022. (Levi Decl. ¶ 7).

12

The 2022 sales figure had to be adjusted because it omitted the revenue associated with Zemsky & Salomon, a customer appearing in Companions' 2022 sales records which is on the Enjoined Customers List for whom the dollar amount was left blank. (Id. ¶ 8). Zemsky & Salomon paid Companions $54,015.00 in 2021; using that amount for 2022 yields a total 2022 Companions sales of $937,061.00. (Id. ¶ 9). Therefore, Companions' total adjusted sales for the period 2018 through 2022 is $2,679,802. (Id.)

Applying Plaintiff's typical fifty percent (50%) profit margin results in lost profits for the period 2018-2022 of $1,339,901. (Id. ¶¶ 10-11).

In addition, because Companions charged $179.00 per independent medical examination while Plaintiff charged $189, Plaintiff's equivalent revenue would have been 5.59% higher, or $1,414,800.00 for that same time period. (Id. ¶ 12). Plaintiff respectfully submits that this amount represents the lost-profits damages to be awarded on the present motion.

Moreover, not only has Plaintiff pled that its trade secrets were willfully and maliciously misappropriated, which allegation must be deemed admitted, but this Court, on several occasions, has actually found that Defendants misappropriated Plaintiff's trade secrets. See *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224 (E.D.N.Y. March 13, 2024); *Ime Watchdog, Inc. v. Safa Abdulrahim Gelardi*, 2022 U.S. Dist. LEXIS 86997 (E.D.N.Y. May 13, 2022); *IME Watchdog, Inc. v. Gelardi*, 2023 U.S. Dist. LEXIS 189054 (E.D.N.Y. Oct. 20, 2023).

Accordingly, Plaintiff is entitled under the DTSA to an award of punitive damages of two (2) times the amount of its $1,414,800.00 in damages. See 18 U.S.C. § 1836(b)(3)(C). Therefore, Plaintiff is entitled to punitive damages of $2,829,600, for a total of $4,244,400 in lost profits and punitive damages. Plaintiff is also entitled to pre- and post-judgment interest on the $1,414,800 for lost profits as provided by 28 U.S.C. § 1961.

13

# EXHIBIT 3

**Levi Declaration in Support of Default Judgment Damages**

Defendants' Exhibit Package

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

IME WATCHDOG, INC.,

                       Plaintiff,

           -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, IME COMPANIONS LLC,
CLIENT EXAM SERVICES LLC, and
IME MANAGEMENT & CONSULTING LLC,

                       Defendants.
-------------------------------------------------------------------X

**Case No.: 1:22-cv-1032 (PKC) (JRC)**

**DECLARATION OF DANIELLA LEVI
IN SUPPORT OF PLAINTIFF'S
MOTION FOR DEFAULT JUDGMENT**

I, Daniella Levi, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am the Chief Executive Officer of IME WatchDog, Inc. (hereinafter "Plaintiff"), the plaintiff in the above-referenced case.

2.     I submit this declaration in support of Plaintiff's motion for default judgment which the Court directed Plaintiff to file in its February 9, 2026 Memorandum & Order.

3.     A default judgment should be entered in favor of Plaintiff against Defendants Safa Gelardi ("Safa"), Vito ("Vito") Gelardi, and IME Companions LLC ("Companions") (Safa, Vito, and Companions collectively hereinafter the "Defendants") as follows: (i) $1,414,800.00 for lost profit together with pre-judgment interest and post-judgment interest, (ii) punitive damages in the amount of $2,829,600; (iii) attorneys' fees in the amount of $299,256.59; and (iv) a permanent injunction prohibiting Defendants from conducting any independent medical examination observations directly or indirectly in the tri-state area.

4.     As this Court previously concluded, between 2018 and 2022, through their theft of Plaintiff's trade secrets, Defendants stole at least sixty-seven (67) customers from Plaintiff. IME

1

Watchdog, Inc. v. Gelardi, 2022 U.S. Dist. LEXIS 86997, at *17 (E.D.N.Y. May 13, 2022); IME Watchdog, Inc. v. Gelardi, 732 F. Supp. 3d 224, 242 (E.D.N.Y. 2024).

5. This Court also previously concluded that 98.3% of the total revenue Defendants generated since Companions' inception was obtained through sales to Plaintiff's former customers. Ime Watchdog, Inc. v. Gelardi, 2023 U.S. Dist. LEXIS 189054, at *12 (E.D.N.Y. Oct. 20, 2023).

6. Applying the court's prior determination that 98.3 percent of Companions' total revenue was derived from the theft of Plaintiff's customers, Plaintiff's damages for the period 2018-2022 are $1,414.80.00 as discussed in further detail below, plus pre-judgment and post-judgment interest.

7. During discovery, Companions produced its annual Sales by Customer Detail for the period 2018 through 2022 which totals $2,625,787 ($72,847.00 in 2018; $411,215.00 in 2019; $435,316 in 2020; $823,345 in 2021; and $883,0646 in 2022. (A copy of Companions' annual Sales by Customer Detail for 2018 through 2022 is annexed hereto as **Exhibit "A"**.)

8. The 2022 sales figure has to be adjusted because it omitted the revenue associated with Zemsky & Salomon, a customer appearing in Companions' 2022 sales records for whom the dollar amount was left blank.

9. Zemsky & Salomon paid Companions $54,015.00 in 2021. See Exhibit A. Using that amount for 2022 yields total sales for 2022 for Companions of $937,061.00. Therefore, Companions' total adjusted sales for the period 2018 through 2022 is $2,679,802.

10. Plaintiff's profit margin during the relevant period was fifty percent (50%). Annexed hereto as **Exhibit "B"** is a sample of documents kept in Plaintiff's ordinary course of business identifying the amount Plaintiff billed its customers and payments to its observers (with the identities of the observers redacted) establishing an estimated 50% profit margin.

11. Applying Plaintiff's typical fifty percent (50%) profit margin results in lost profits for the period 2018-2022 of $1,339,901.

12. In addition, because Companions charged $179 per independent medical examination while Plaintiff charged $189. Plaintiff's equivalent revenue would have been 5.59% higher, or $1,414,800.00 for that same time period. Plaintiff respectfully submits that $1,414,800.00 represents the lost-profits damages to be awarded to Plaintiff.

13. Plaintiff also incurred $452,460.00 in attorneys' fees throughout the duration of this litigation for which Plaintiff seeks a judgment less the $153,203.41 in attorneys' fees which were previously awarded to Plaintiff, for a total of $299,256.59.

14. Milman Labuda Law Group PLLC ("MLLG") billed Plaintiff at rates of $450 for Jamie Felsen and $300 for Emanuel Kataev for a total of $402,090.00. A summary of MLLG's billing descriptions provided in the invoices Plaintiff received from MLLG is annexed hereto as **Exhibit "C"**.

15. Sage Legal LLC ("Sage") billed Plaintiff $300 per hour for a total of $50,370.00. Sage's invoices issued to Plaintiff are annexed hereto as **Exhibit "D"**.

16. Accordingly, Plaintiff seeks entry of a default judgment as follows: (i) $1,414,800 for lost profit together with pre-judgment interest and post-judgment interest, (ii) punitive damages in the amount of $2,829,600; (iii) attorneys' fees in the amount of $299,256.59; and (iv) a permanent injunction prohibiting Defendants from conducting any independent medical examination observations directly or indirectly in the tri-state area.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2026.

_____
Daniella Levi

3

# EXHIBIT A

Case 1:22-cv-10832-PKC-JRC Document 6753-1 Filed 06/02/26 Page 65 of 331 PageID #: 12586

# IME Companions

Sales by Customer Detail

January - December 2018

| DATE | TRANSACTION TYPE | NUM | PRODUCT/SERVICE | MEMO/DESCRIPTION | QTY | SALES PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| Alan Blumen (deleted) | | | | | | | $0.00 | |
| Cellino & Barnes (deleted) | | | | | | | $220.00 | |
| Cherny & Podolsky | | | | | | | $18,780.00 | |
| Khavinson & Associates, P.C. | | | | | | | $3,965.00 | |
| Kleblan Law Group, P.C. | | | | | | | $1,635.00 | |
| Law Office of Michael A. Forzano | | | | | | | $651.00 | |
| Silbowitz, Garafola, Silbowitz, Schatz, & Frederick, LLP | | | | | | | $597.00 | |
| Spektor Law | | | | | | | $5,075.00 | |
| Subin (deleted) | | | | | | | $32,091.00 | |
| The Battiloro Law Group (deleted) | | | | | | | $6,720.00 | |
| The Hamel Law Firm | | | | | | | $1,840.00 | |
| William Schwitzer & Associates | | | | | | | $0.00 | |
| Yadgarov Law | | | | | | | $913.00 | |
| **TOTAL** | | | | | | | **$72,487.00** | |

Accrual Basis  Monday, December 19, 2022 06:07 PM GMT-05:00

# IME Companions

Sales by  Customer Detail

January 1 - December 19, 2019

| DATE | TRANSACTION TYPE | NUM | PRODUCT/SERVICE | MEMO/DESCRIPTION | QTY | SALES PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| Alan Ripka & Associates | | | | | | | $6,365.00 | |
| Bergman Bergman Goldberg Fields Lam | | | | | | | $790.00 | |
| Cellino & Barnes (deleted) | | | | | | | $0.00 | |
| Cherny & Podolsky | | | | | | | $6,539.00 | |
| Daniel  Brown | | | | | | | $265.00 | |
| Elefterakis, Elefterakis & Panek | | | | | | | $93,455.00 | |
| Forzano Law | | | | | | | $1,218.00 | |
| Georgaklis & Mallas, Pllc | | | | | | | $440.00 | |
| Khavinson & Associates, P.C. | | | | | | | $5,930.00 | |
| Kleblan Law Group, P.C. | | | | | | | $1,450.00 | |
| Law Office of Michael A. Forzano | | | | | | | $2,420.00 | |
| Lever & Ecker, PLLC | | | | | | | $4,210.00 | |
| Liakas Law, P.C. | | | | | | | $32,295.00 | |
| Mushiyev & Associates | | | | | | | $2,365.00 | |
| Pirrotti & Glatt Law Firm | | | | | | | $250.00 | |
| Raskin & Kremins, LLP | | | | | | | $355.00 | |
| Silberstein Awad & Miklos PC | | | | | | | $2,850.00 | |
| Silbowitz, Garafola, Silbowitz, Schatz, & Frederick, LLP | | | | | | | $6,511.00 | |
| Spektor Law | | | | | | | $14,285.00 | |
| Subin (deleted) | | | | | | | $40,145.00 | |
| Subin Associates, LLP | | | | | | | $164,238.00 | |
| The Battiloro Law Group (deleted) | | | | | | | $700.00 | |
| The Hamel Law Firm | | | | | | | $590.00 | |
| Yadgarov Law | | | | | | | $10,754.00 | |
| Zaremba Brown PLLC | | | | | | | $9,750.00 | |
| Zemsky & Salomon | | | | | | | $3,045.00 | |
| **TOTAL** | | | | | | | **$411,215.00** | |

# IME Companions

Sales by  Customer Detail

January - December 2020

| DATE | TRANSACTION TYPE | NUM | PRODUCT/SERVICE | MEMO/DESCRIPTION | QTY | SALES PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| Alan Ripka & Associates | | | | | | | $9,655.73 | |
| Aminov Law Group | | | | | | | | |
| 11/03/2020 | Invoice | 1938 | IME Companion | Sonia Rodriguez - 2 Hours<br>Thomas McLaughlin<br>1040 Hempstead Tpke. Franklin, Square, NY 11010<br>Outside NYC | 1.00 | 315.00 | 315.00 | 315.00 |
| **Total for Aminov Law Group** | | | | | | | **$315.00** | |
| Bergman Bergman Goldberg Fields Lam | | | | | | | $13,770.00 | |
| Bisogno & Meyerson | | | | | | | $4,520.00 | |
| Bogoraz Law Group | | | | | | | | |
| 10/13/2020 | Invoice | 1877 | IME Companion | Kim Davis - 1 Hour<br>2044 Ocean Ave Brooklyn, NY 11229 | 1.00 | 175.00 | 175.00 | 175.00 |
| **Total for Bogoraz Law Group** | | | | | | | **$175.00** | |
| Boris H. Linares, P.C. | | | | | | | $1,575.00 | |
| Buttafuoco & Associates | | | | | | | $1,090.00 | |
| Caesar and Napoli, PC | | | | | | | $0.00 | |
| Cherny & Podolsky | | | | | | | $2,408.00 | |
| Chopra & Nocerino, LLP | | | | | | | $175.00 | |
| Christopher Caputo PC | | | | | | | $310.00 | |
| Clay M. Evall, Esq. | | | | | | | $5,440.00 | |
| Elefterakis, Elefterakis & Panek | | | | | | | $41,465.00 | |
| Feld Law Firm, PC | | | | | | | $880.00 | |
| Forzano Law | | | | | | | $1,218.00 | |
| Georgaklis & Mallas, Pllc | | | | | | | $5,970.00 | |
| Ginarte Gallardo Gonzalez Winograd, LLP | | | | | | | $18,090.00 | |
| Herschel  Kulefsky | | | | | | | $160.00 | |
| Jeff esq (deleted) | | | | | | | $0.00 | |
| Kahn Gordon Timko & Rodriques | | | | | | | $175.00 | |
| Khavinson & Associates, P.C. | | | | | | | $3,875.00 | |
| Law Firm of Nonna Shikh | | | | | | | $265.00 | |
| Law office of Ali Najmi | | | | | | | $375.00 | |
| Law Office of Jason Greenberg | | | | | | | $850.00 | |
| Law Office of Michael A. Forzano | | | | | | | $378.00 | |
| Law Offices of Frank Guzman | | | | | | | $175.00 | |
| Lever & Ecker, PLLC | | | | | | | $3,520.00 | |
| Liakas Law, P.C. | | | | | | | $51,465.00 | |
| Marder Eskesen & Nass | | | | | | | $400.00 | |
| Mushiyev & Associates | | | | | | | $6,405.00 | |
| Perecman and Assoc. | | | | | | | $1,930.00 | |
| Pinkhasov & Associates Pllc | | | | | | | $295.00 | |
| Raskin & Kremins, LLP | | | | | | | $10,225.00 | |
| Sheryl R Menkes | | | | | | | $295.00 | |
| Silberstein Awad & Miklos PC | | | | | | | $18,710.00 | |
| Silbowitz, Garafola, Silbowitz, Schatz, & Frederick, LLP | | | | | | | $7,353.00 | |
| Spektor Law | | | | | | | $9,895.00 | |
| Subin Associates, LLP | | | | | | | $168,834.00 | |
| The Battiloro Law Group (deleted) | | | | | | | $ -7,420.00 | |
| The Hamel Law Firm | | | | | | | $590.00 | |
| Vladimir & Associates | | | | | | | $220.00 | |
| Weitz & Pascale | | | | | | | $225.00 | |
| Wickman, Victoria | | | | | | | $175.00 | |
| Wilson Grochow & Drucker | | | | | | | $965.00 | |
| Yadgarov Law | | | | | | | $12,370.00 | |
| Yankowitz Law Firm | | | | | | | $1,050.00 | |
| Zaremba Brown PLLC | | | | | | | $8,985.00 | |
| Zemsky & Salomon | | | | | | | $25,520.00 | |
| **TOTAL** | | | | | | | **$435,316.73** | |

# IME Companions

### Sales by  Customer Detail

January - December 2021

| DATE | TRANSACTION TYPE | NUM | PRODUCT/SERVICE | MEMO/DESCRIPTION | QTY | SALES PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| Alan Ripka & Associates | | | | | | | $18,855.00 | |
| Andrews, Bernstein, Maranto, & Nicotra PLLC | | | | | | | $585.00 | |
| Appell & Parrinelli | | | | | | | $3,915.00 | |
| Arcia & Associates, PC | | | | | | | $1,055.00 | |
| Bergman Bergman Goldberg Fields Lam | | | | | | | $24,755.00 | |
| Bisogno & Meyerson | | | | | | | $350.00 | |
| Block O'Toole & Murphy, LLP | | | | | | | $15,410.00 | |
| Bogoraz Law Group | | | | | | | $4,895.00 | |
| Boris H. Linares P.C (deleted) | | | | | | | $925.00 | |
| Boris H. Linares, P.C. | | | | | | | $5,830.00 | |
| Bornstein & Emanuel, P.C. | | | | | | | $1,145.00 | |
| Brian J. Levy & Associates, PC | | | | | | | $4,175.00 | |
| Brittany  Weiner | | | | | | | $350.00 | |
| Buttafuoco & Associates | | | | | | | $485.00 | |
| Caesar and Napoli, PC | | | | | | | $440.00 | |
| Chopra & Nocerino, LLP | | | | | | | $2,305.00 | |
| Clay M. Evall, Esq. | | | | | | | $1,925.00 | |
| Costas Eliades | | | | | | | $1,810.00 | |
| Curan & Ahlers, LLP | | | | | | | $840.00 | |
| Dell & Schaefer Chartered | | | | | | | $310.00 | |
| Domina Law | | | | | | | $175.00 | |
| Elefterakis, Elefterakis & Panek | | | | | | | $56,845.00 | |
| Elliot  Weinreb | | | | | | | $450.00 | |
| Feld Law Firm, PC | | | | | | | $265.00 | |
| Forzano Law | | | | | | | $1,470.00 | |
| Georgaklis & Mallas, Pllc | | | | | | | $12,965.00 | |
| Geroulakis Law, PC | | | | | | | $350.00 | |
| Gersowitz Libo & Korek P.C | | | | | | | $260.00 | |
| Ginarte Gallardo Gonzalez Winograd, LLP | | | | | | | $110,715.00 | |
| Gold Benes LLP | | | | | | | $335.00 | |
| Greenberg Law P.C | | | | | | | $175.00 | |
| Gucciardo Law Firm, PLLC | | | | | | | $5,200.00 | |
| Hill & Moin LLP | | | | | | | $615.00 | |
| Joudeh & Kuller, LLP | | | | | | | $885.00 | |
| Khavinson & Associates, P.C. | | | | | | | $19,005.00 | |
| Kleblan Law Group, P.C. | | | | | | | $5,685.00 | |
| Kohan Law Group | | | | | | | $1,315.00 | |
| Kramer, Dunleavy & Ratchik, PLLC. | | | | | | | $225.00 | |
| Krinsky & Musumeci, ESQS. PLLC | | | | | | | $225.00 | |
| Law office of Ali Najmi | | | | | | | $525.00 | |
| Law Office of Jason Greenberg | | | | | | | $935.00 | |
| Law Office of Joshua Brian Irwin P.C | | | | | | | $175.00 | |
| Law Office of Joshua Brian Irwin, P.C. | | | | | | | $175.00 | |
| Law Office of Rohit J. Kumar, P.C. | | | | | | | $175.00 | |
| Law Office of Ronald Ramirez | | | | | | | $1,305.00 | |
| Law Offices of Ian M. Sack | | | | | | | $495.00 | |
| Law Offices of Randi B. Siegel | | | | | | | $225.00 | |
| Lever & Ecker, PLLC | | | | | | | $6,070.00 | |
| Liakas Law, P.C. | | | | | | | $77,660.00 | |
| Magendzo Law P.C | | | | | | | $3,895.00 | |
| Matthew  Salimbene | | | | | | | $695.00 | |
| McClendon-Smith Barrantes-Isibor PC | | | | | | | $225.00 | |
| Michael Redenburg Esq. PC | | | | | | | $355.00 | |
| Mushiyev & Associates | | | | | | | $8,160.00 | |
| Neil Borg Law | | | | | | | $525.00 | |
| Newman, Anzalone & Newman | | | | | | | $525.00 | |
| Pascale Law | | | | | | | $175.00 | |
| Peknic, Peknic & Schaefer, LLC | | | | | | | $95.00 | |
| Perecman and Assoc. | | | | | | | $875.00 | |
| Raskin & Kremins, LLP | | | | | | | $10,535.00 | |
| Robert  Miraglia | | | | | | | $220.00 | |
| Rosenberg & Rodriguez PLLC | | | | | | | $135.00 | |
| Sanocki Newman & Turret, LLP | | | | | | | $175.00 | |
| Selvin Law Firm PLLC | | | | | | | $1,525.00 | |
| Silberstein Awad & Miklos PC | | | | | | | $45,620.00 | |
| Silbowitz, Garafola, Silbowitz, Schatz, & Frederick, LLP | | | | | | | $11,220.00 | |

# IME Companions

Sales by Customer Detail

January - December 2021

| DATE | TRANSACTION TYPE | NUM | PRODUCT/SERVICE | MEMO/DESCRIPTION | QTY | SALES PRICE | AMOUNT | BALANCE |
|------|------------------|-----|-----------------|------------------|-----|-------------|--------|---------|
| Spektor Law | | | | | | | **$10,320.00** | |
| Steve Cohen | | | | | | | **$355.00** | |
| Subin Associates, LLP | | | | | | | **$174,810.00** | |
| The Barnes Firm | | | | | | | **$6,765.00** | |
| The Hamel Law Firm | | | | | | | **$485.00** | |
| Vishnick McGovern Milizio LLP | | | | | | | **$175.00** | |
| Vladimir & Associates | | | | | | | **$850.00** | |
| Weitz & Pascale | | | | | | | **$1,915.00** | |
| Wickman, Victoria | | | | | | | **$1,465.00** | |
| Wilson Grochow & Drucker | | | | | | | **$535.00** | |
| Wingate, Russotti, Shapiro & Halperin LLP | | | | | | | **$21,240.00** | |
| Yadgarov Law | | | | | | | **$17,575.00** | |
| Yankowitz Law Firm | | | | | | | **$2,755.00** | |
| Zaremba Brown PLLC | | | | | | | **$49,870.00** | |
| Zemsky & Salomon | | | | | | | **$54,015.00** | |
| **TOTAL** | | | | | | | **$823,345.00** | |

# IME Companions

Sales by Customer Detail

January 1 - December 19, 2022

| DATE | TRANSACTION TYPE | NUM | PRODUCT/SERVICE | MEMO/DESCRIPTION | QTY | SALES PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| Alan Ripka & Associates | | | | | | | $18,525.00 | |
| Appell & Parrinelli | | | | | | | $3,610.00 | |
| Arcia & Associates, PC | | | | | | | $1,090.00 | |
| Bergman Bergman Goldberg Fields Lam | | | | | | | $15,270.00 | |
| Block O'Toole & Murphy, LLP | | | | | | | $21,200.00 | |
| Bogoraz Law Group | | | | | | | $25,215.00 | |
| Boris H. Linares, P.C. | | | | | | | $2,265.00 | |
| Brian J. Levy & Associates, PC | | | | | | | $3,205.00 | |
| Caesar and Napoli, PC | | | | | | | $1,720.00 | |
| Chopra & Nocerino, LLP | | | | | | | $315.00 | |
| Christopher Caputo PC | | | | | | | $1,325.00 | |
| Clay M. Evall, Esq. | | | | | | | $1,700.00 | |
| Costas Eliades | | | | | | | $890.00 | |
| Dan Danzi Law | | | | | | | $150.00 | |
| Davidoff & Associates | | | | | | | $1,020.00 | |
| Digianni Law | | | | | | | $440.00 | |
| Douglas And London | | | | | | | $48,715.00 | |
| Elefterakis, Elefterakis & Panek | | | | | | | $22,005.00 | |
| Evan Goldberg | | | | | | | $225.00 | |
| Feld Law Firm, PC | | | | | | | $1,585.00 | |
| Georgaklis & Mallas, Pllc | | | | | | | $7,590.00 | |
| Ginarte Gallardo Gonzalez Winograd, LLP | | | | | | | $126,940.00 | |
| Gold Benes LLP | | | | | | | $275.00 | |
| Greenberg Law P.C | | | | | | | $175.00 | |
| Gropper&Nejat | | | | | | | $525.00 | |
| Gucciardo Law Firm, PLLC | | | | | | | $13,065.00 | |
| Haggerty & Silverman | | | | | | | $565.00 | |
| Hill & Moin LLP | | | | | | | $1,235.00 | |
| Jay Hernandez  / Transportation | | | | | | | $14,010.00 | |
| Joudeh & Kuller, LLP | | | | | | | $6,675.00 | |
| Khavinson & Associates, P.C. | | | | | | | $27,156.00 | |
| Kleblan Law Group, P.C. | | | | | | | $4,225.00 | |
| Kohan Law Group | | | | | | | $1,200.00 | |
| Law Office of Jason Greenberg | | | | | | | $225.00 | |
| Lever & Ecker, PLLC | | | | | | | $4,750.00 | |
| Liakas Law, P.C. | | | | | | | $86,085.00 | |
| Magendzo Law P.C | | | | | | | $5,110.00 | |
| Martin Ginsberg | | | | | | | $1,095.00 | |
| Michael J Brown P.C | | | | | | | $450.00 | |
| Morris Downing & Sherred LLP | | | | | | | $1,535.00 | |
| Mushiyev & Associates | | | | | | | $8,370.00 | |
| Neil Borg Law | | | | | | | $175.00 | |
| O'Donovan | | | | | | | $250.00 | |
| Oleg Smolyar Esq. | | | | | | | $350.00 | |
| Oresky & Associates | | | | | | | $215.00 | |
| Pascale Law | | | | | | | $1,170.00 | |
| Perecman and Assoc. | | | | | | | $1,300.00 | |
| Pinkhasov & Associates Pllc | | | | | | | $4,700.00 | |
| Raskin & Kremins, LLP | | | | | | | $5,130.00 | |
| Rosenberg & Rodriguez PLLC | | | | | | | $3,130.00 | |
| Silberstein Awad & Miklos PC | | | | | | | $39,300.00 | |
| Silbowitz, Garafola, Silbowitz, Schatz, & Frederick, LLP | | | | | | | $10,150.00 | |
| Spektor Law | | | | | | | $7,360.00 | |
| Subin Associates, LLP | | | | | | | $234,305.00 | |
| Sutton & Smyth | | | | | | | $620.00 | |
| The Barnes Firm | | | | | | | $4,555.00 | |
| Vangeles Skartsiaris | | | | | | | $490.00 | |
| Vladimir & Associates | | | | | | | $1,545.00 | |
| Weitz & Pascale | | | | | | | $1,040.00 | |
| Wickman, Victoria | | | | | | | $350.00 | |
| Wilson Grochow & Drucker | | | | | | | $1,840.00 | |
| Wingate, Russotti, Shapiro & Halperin LLP | | | | | | | $14,225.00 | |
| Wiss Law | | | | | | | $225.00 | |
| Yadgarov Law | | | | | | | $16,520.00 | |
| Yankowitz Law Firm | | | | | | | $2,805.00 | |
| Zaremba Brown PLLC | | | | | | | $49,570.00 | |

# IME Companions

Sales by  Customer Detail

January 1 - December 19, 2022

| DATE | TRANSACTION TYPE | NUM | PRODUCT/SERVICE | MEMO/DESCRIPTION | QTY | SALES PRICE | AMOUNT | BALANCE |
|------|------------------|-----|-----------------|------------------|-----|-------------|--------|---------|
| Zemsky & Salomon | | | | | | | | |

# EXHIBIT 4

**Levi March 22, 2023 Declaration**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

IME WATCHDOG, INC.,

                          Plaintiff,

           -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS,
NICHOLAS LIAKIS, and IME COMPANIONS LLC,

                          Defendants.

---------------------------------------------------------------X

SAFA GELARDI and IME COMPANIONS, LLC,

                  Third-Party Plaintiffs,

           -against-

CARLOS ROA,

                  Third-Party Defendant.

---------------------------------------------------------------X

CARLOS ROA,

                  Third-Party Counter-Claimant,

           -against-

SAFA ABUDLRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS, LLC,

                  Third-Party Counter-Defendants.

---------------------------------------------------------------X

**Case No.: 1:22-cv-1032 (PKC) (JRC)**

**REPLY DECLARATION OF DANIELLA LEVI, ESQ. IN FURTHER SUPPORT OF ITS ORDER TO SHOW CAUSE FOR CONTEMPT, FOR AN ORDER OF ATTACHMENT PURSUANT TO RULE 64 OF THE FEDERAL RULES OF CIVIL PROCEDURE & ARTICLE 62 OF THE NEW YORK CIVIL PRACTICE LAW & RULES, AND IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION DIRECTING DEFENDANTS TO CEASE OPERATING IME COMPANIONS LLC AND ANY OTHER ENTITIES THAT <u>COMPETE WITH PLAINTIFF</u>**

    Daniella Levi, Esq. declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.      I am the sole shareholder and Chief Operating Officer of the Plaintiff IME WatchDog, Inc. ("IME WatchDog").

2.      I respectfully submit this reply declaration in further support of Plaintiff's renewed motion for a preliminary injunction directing Defendants to cease operating IME Companions LLC and any other entities that compete with Plaintiff, in further support of its order to show cause for contempt, and for an order of attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure (hereinafter "Rules" or "Rule") & Article 62 of the New York Civil Practice Law & Rules (hereinafter "CPLR").

3.      I respectfully ask that my prior declarations dated February 25, 2022, the accompanying declaration under seal dated February 25, 2022, my April 8, 2022 supplemental declaration, and my March 10, 2023 declaration in support of the instant motion be incorporated by reference herein.  See Docket Entries 8, 15 (filed under seal), and 45-2 (filed under seal), and 155, respectively.

4.      I have compared the "Sales by Customer Summary" lists of IME WatchDog (which was misappropriated by the Defendants) with those of the Defendants, IME Companions LLC, which were obtained through discovery.

5.      A summary of the revenue Defendants earned from IME WatchDog's customers compared to sales earned from other customers are as follows:

| Year | Companions Sales for Plaintiff's Customers | Companions' "Independent" Sales |
|---|---|---|
| 2018 | $64,392.00 | $8,335.00 |
| 2019 | $408,800.00 | $2,415.00 |
| 2020 | $432,491.00 | $2,825.00 |
| 2021 | $810,780.00 | $12,565.00 |
| 2022[1] | $863,111.00 | $19,935.00 |
| TOTAL | $2,579,574.00 | $46,075.00 |

---

[1] This was a partial and incomplete list provided by the Defendants.

2

# EXHIBIT 5

**October 20, 2023 Order Excerpt - Damages Pages**

6786338, at \*33 ("[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm.").[14]

Thus, if Defendants had exercised any amount of diligence, they would not have let a family friend "take over" Companions' business after the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating [Companions] or any other business that unfairly competes with Plaintiff" (Dkt. 156, at 3), because it was a clear violation of the Court's TRO. (*See* March 2023 Tr. 114:16–18 (Beibin testifying that "[w]hen IME Companions was closed, [he] was made to believe that all of the business was now going to be taken over by Fari Gutierrez[.]").) Even defense counsel conceded during the March 27, 2023 hearing that "[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [Client Exam Services] leads back to [Safa]." (*Id.* 126:3–5.)

Thus, the Court is prepared to hold Safa in civil contempt for violating the Court's March 2023 TRO.

### C. The Court Requires Further Briefing Regarding the Compensatory Damages Sought

As discussed, in order to hold Safa in civil contempt, Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages. *See* Local Rule 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be*

---

[14] During the March 27, 2023 hearing, Defendants' counsel argued that giving Plaintiff's client lists to Gutierrez did not qualify as "use" of Plaintiff's trade secrets if Safa was "not profiting from it" and "not operating" the new business. (March 2023 Tr. 127:2–5.) However, New York trade secrets law clearly refutes this argument. Furthermore, this self-serving, post-hoc argument ignores the plain language of the Amended Injunction and the Court's written decisions and oral pronouncements in this matter.

*available to the moving party*.  A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353  (explaining that "compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)).  Thus, Plaintiff is directed to submit further briefing setting forth the actual damages it has incurred due to (1) Safa's "contact" with Roa, and (2) the creation of Client Exam Services, within 60 days of this Order.

## III.    Plaintiff's Other Requested Relief

In addition to the issues addressed above, Plaintiff is also seeking the following relief: (1) imposing upon Defendants a daily fine of $10,000 payable to Plaintiff for each day the Court finds Defendants in violation of the previous Injunctions; (2) attaching Defendants' real property or directing that all proceeds from the sale of any real property be held in escrow pending final disposition of this case; and (3) directing Defendants to submit to another forensic examination at their sole cost.  The Court denied these requests for the reasons stated on the record at the March 27, 2023 hearing and does not find there is need to further supplement its reasoning at this time. (*See generally* March 2023 Tr.)

<div align="center">

**CONCLUSION**

</div>

For the reasons stated above, the Court grants in part and denies in part Plaintiff's request for a second preliminary injunction.  The Court attaches the Second Amended Preliminary Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order.  Moreover, although the Court is prepared to find Safa in civil contempt of the Amended Injunction and the March 2023 TRO, the Court reserves on making a final ruling and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees for the March 27, 2023 contempt proceedings.  Plaintiff's supplemental

brief setting forth the specific amounts of attorneys' fees and compensatory damages they believe they are owed as a result of Defendants' contact with Roa and the creation of Client Exam Services is due 60 days from the date of this Order.  Defendants will be permitted 30 days to respond, if they choose.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
        Brooklyn, New York

34

# EXHIBIT 6

**March 3, 2026 Minute Entry**

 Safa Gelardi <safagelardi@gmail.com>

## Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion for Preliminary Injunction

1 message

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov>                           Tue, Mar 3, 2026 at 8:11 PM
To: nobody@nyed.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mailbox is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of New York

### Notice of Electronic Filing

The following transaction was entered on 3/3/2026 at 9:11 PM EST and filed on 3/3/2026
**Case Name:**        IME WatchDog, Inc. v. Gelardi et al
**Case Number:**     1:22-cv-01032-PKC-JRC
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Minute Entry for proceedings held before Judge Pamela K. Chen: Evidentiary and Show-Cause Hearing held on 3/3/2026. Appearances by Emanuel Kataev for Plaintiff; Jared Lefkowitz for Direct IME Services LLC ("Direct"), Interested Party; Defendants Safa Gelardi and Vito Gelardi, appearing *pro se*. Case called. Hearing held. The following witnesses were sworn and testified: Safa Gelardi and Mark Purificati. For the reasons stated on the record, the [623] Temporary Restraining Order is lifted, the [620] Motion for Preliminary Injunction is denied, and decision on the [620] Motion for Contempt is reserved. Oral motion for extension of time to file motion for default judgment made by Plaintiff; Court granted 90-day extension and granted Plaintiff leave to submit a motion to compel production of records. Oral motion for attorney's fees made by Mr. Lefkowitz on behalf of Direct. Mr. Lefkowitz to submit his billing records for in camera review. Plaintiff to respond by 3/17/2026; Direct to reply by 3/31/2026. Neither the response nor reply shall exceed 5 pages. (Court Reporter Avery Armstrong.) (JEC)**

**1:22-cv-01032-PKC-JRC Notice has been electronically mailed to:**

Anthony Joseph Genovesi    agenovesi@abramslaw.com, anthony@genovesi.us

Jared M. Lefkowitz    jmleflaw@gmail.com

Jamie Scott Felsen    jamiefelsen@mmmlaborlaw.com

Melanie I. Wiener    mwiener@abramslaw.com

Michael Joseph Alber    mja@alberlegal.com, malber@alberlegal.com

# EXHIBIT 7

**August 13, 2025 Felsen Email**

Defendants' Exhibit Package

 Gmail

**Safa Gelardi <safagelardi@gmail.com>**

## IME Watchdog v. Gelardi

**Jamie Felsen** <jamiefelsen@mllaborlaw.com>                                Wed, Aug 13, 2025 at 3:55 PM
To: Safa Gelardi <safagelardi@gmail.com>, vito gelardi <vitogelardi@gmail.com>, "brent.chapman1@gmail.com"
<brent.chapman1@gmail.com>
Cc: Emanuel Kataev <emanuel@sagelegal.nyc>

Safa,

As noted several times, Companions has not produced its Sales by Customer Details since 2022.  Please
produce for 2023 through the present immediately.  If you fail to produce, we will be forced to extrapolate
damages using Companions' Sales by Customer Details for 2022.  These documents were also required to
be produced pursuant to the July 21, 2025 Order.

[Quoted text hidden]

# EXHIBIT 8

**August 16, 2025 Discovery Follow-Up Email to Judge Cho**



# Discovery Follow-Up re Plaintiffs' "Sales by Customer Summary

**Safa Gelardi** <safagelardi@gmail.com>                                      Sat, Aug 16, 2025 at 6:21 PM
To: Vito <vitogelardi@gmail.com>, NYED_Cho Chambers <cho_chambers@nyed.uscourts.gov>, Jamie Felsen <jamiefelsen@mllaborlaw.com>, Emanuel Kataev <emanuel@sagelegal.nyc>

Dear Judge Cho,

Thank you for your attention to the damages discovery issue. Plaintiffs have produced a document titled **"Sales by Customer Summary (2011–2022)"**, which they claim demonstrates their alleged damages. Respectfully, that document does not establish damages under the law.

**1. Clients I never serviced.**
The Summary includes many firms that I never worked with at all, including **William Schwitzer & Associates**, Brown & Gropper, Cherny & Podolsky, Law Office of Sheryl Menkes, Newman, Anzalone & Newman, Kahn Gordon Timko & Rodriguez, Law Office of Joshua Brian Irwin, Law Office of Stephen Frankel, Law Office of Bradley Hames, Alan Blueman, Bornstein & Emanuel, Buttafuoco & Associates, The Forzano Law Firm, Bern & Ripka, Gersowitz Libo & Korek, Krinsky & Musumeci, Pirrotti Law Firm, The Selvin Law Firm, Cellino & Barnes (Melville), Geroulakis Law, Michael Forzano, JAG Law, Mikhail Ilyaich & Associates, Matthew J. Salimbene, The Traver Law Firm, Ariel Aminov, Miraglia Law, Blumen & Shayne PLLC, and the Rizzuto Law Firm.

These clients cannot be attributed to me. For example:

- **Mr. Cherny passed away in 2019.** His firm's attrition cannot be laid at my feet.

- **William Schwitzer & Associates** generated only $493 in 2017 for Plaintiffs, never appeared on their lists again, and in practice relied on their own paralegals to accompany clients at IMEs. I was the **first companion** when building my business, and I personally encountered Schwitzer's paralegals. His decision to use internal staff had nothing to do with me.

The presence of these names on Plaintiffs' list does not prove damages.

**2. The Wingate example – the opposite of a loss.**
Plaintiffs include Wingate as though it were a "lost" client. Yet their own Summary shows **Wingate's revenue increasing every year**: $70,068 in 2016 → $93,988 in 2017 → $106,447 in 2018 → $143,200 in 2019 → $154,294 in 2021 → $202,195 in 2022, with only a dip in 2020 during the pandemic.

A client whose revenue **goes up is the very opposite of a lost client.** I covered only a few overflow matters for Wingate when Plaintiffs could not staff them; they were never my client.

**3. Timing clarification.**
For the Court's clarity: IME Companions LLC was incorporated in October 2017, but operations did not begin until January 2018 due to the holiday season and the time needed to establish accounts and staffing. Incorporation is not the same as operating, and no damages can be attributed to me for any period before January 2018.

**4. My business versus theirs – the fraction theory collapses.**
In 2021, my peak year, I reported $333,329 in ordinary business income on 67 clients **(Exhibit C, 2021 Form 1065, line 22)** . Plaintiffs told the Court they had **476 clients**, and the TRO was entered based on that number. By their own theory that I "stole a fraction," Plaintiffs' profits should **dwarf** mine. Yet they have not produced any records showing that. The numbers simply do not line up with their damages story.

**5. The 98.3% ruling does not replace proof of damages.**
Plaintiffs frequently cite the figure of 98.3% as though it were a judicial damages determination. That percentage was their assertion at the TRO stage, not language from Judge Chen's Preliminary Injunction Order (Exhibit D, May 13, 2022 Preliminary Injunction Order). The Order itself never adopted that figure; it simply granted interim relief. A preliminary injunction does not substitute for proof of damages.

Case law is clear: damages must be proven with reasonable certainty, measured as **net lost profits**, and based on Plaintiffs' own financials — not by assuming my income equals their loss. See *Schonfeld v. Hilliard*, 218 F.3d 164, 172–75

(2d Cir. 2000); *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 110–12 (2d Cir. 2007); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495–96 (2d Cir. 1995); *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261–62 (1986).

A ruling does not replace the requirement to prove damages. Plaintiffs still bear that burden.

### 6. Plaintiffs' burden of proof — not mine.

Plaintiffs' counsel has openly admitted in writing that they cannot calculate damages without my records. In an August 13, 2025 email, Mr. Felsen wrote (Exhibit A, Felsen email to me dated August 13, 2025):

> "Companions has not produced its Sales by Customer Details since 2022. Please produce for 2023 through the present immediately. If you fail to produce, we will be forced to extrapolate damages using Companions' Sales by Customer Details for 2022."

This statement confirms that Plaintiffs are attempting to use my records as their damages model. Respectfully, that is backwards. Under well-established law, it is Plaintiffs' burden to prove their damages from their own books, not to rely on mine. See *E.J. Brooks Co. v. Cambridge Security Seals*, 31 N.Y.3d 441, 448–49 (2018) (plaintiff must prove its own loss; cannot substitute defendant's costs or profits); *Hertz Corp. v. Avis, Inc.*, 106 A.D.2d 246, 248 (1st Dep't 1985) (plaintiff not entitled to use defendant's profits as damages); *Schonfeld v. Hilliard*, 218 F.3d 164, 172–75 (2d Cir. 2000).

If the Court were to accept Plaintiffs' approach — that they may extrapolate damages from my 2022 records because they cannot prove their own — this would set a dangerous precedent. In effect, any plaintiff could sue first and then rummage through a defendant's records to construct damages later. That is not the law, and it would open the door to speculative civil suits.

### 7. Why the "Sales by Customer Summary" proves nothing.

The Summary is simply a list of gross receipts (Exhibit B, Plaintiffs' "Sales by Customer Summary, 2011–2022"). It does not show net profits, expenses, transfers, or distributions. It even contains red flags such as negative entries and duplicate client names. Standing alone, it cannot establish damages under any standard.

### 8. Request.

Accordingly, I respectfully ask that when Plaintiffs submit the affidavit swearing their income exceeds mine, they also be required to produce their **Profit and Loss Statements (accrual basis, redacted if necessary) from January 2018 through the present (YTD 2025).**

This is only fair. The affidavit must be corroborated by their own books. Redaction is acceptable, but profit and loss numbers must be shown. Without this, their affidavit cannot be meaningfully tested, and damages remain unproven.

**Respectfully,**
Safa Gelardi
Pro Se Defendant

- **Exhibit A:** Aug. 13, 2025 Felsen email.

- **Exhibit B:** Plaintiffs' "Sales by Customer Summary (2011–2022)" (under seal, client names highlighted).

- **Exhibit C:** Excerpt from IME Companions LLC 2021 Tax Return (Form 1065, line 22).

- **Exhibit D:** Judge Chen's Preliminary Injunction Order (May 13, 2022).

---

**4 attachments**

**Final Order on Prelim Inj.pdf**
171K

**Gmail - IME Watchdog v. Gelardi.pdf**
87K

**2025-08-08 2011 - 2022 All Customers Stolen by Defendants (1).pdf**
1884K

**2021 ime companions tax returns pg 5.pdf**
81K

# EXHIBIT 9

**Selected Excerpts of Daniella Levi Deposition Transcript**

D. LEVI

expenses.  I'm getting to a gross and net point here.  So you don't have to answer.  I'm just going to state the questions.

Q.   Those payments appear year after year, correct?

A.   I have to look at the financial records.

Q.   You agree those payments are not to any IME observers?

MR. KATAEV:  Objection.  Vague.

Q.   The payments, the hundreds of thousands of dollars made to an equity named Zariz?

MR. FELSEN:  What records are you referring to?

MS. GELARDI:  I'm just asking.

MR. FELSEN:  I want to know what records you're referring.

MS. GELARDI:  I'm asking a question.

MR. FELSEN:  What records are you referring to that this question is based on?  It sounds like you're in possession of Plaintiff's confidential information

D. LEVI

in violation of a court order based on these questions.

MS. GELARDI:  I'm not in possession. If I were in possession of them, I would show them to you.  So I'm asking questions based on what Adam sent in the past, okay.

MR. FELSEN:  And you still have that in your possession?

MS. GELARDI:  I don't.  I'm asking questions about the P&Ls and other financials that Adam sent in 2017, okay, so we're just asking questions.  We're not pointing to any documents here.

MR. FELSEN:  Right, but you have information that you had at one point. I don't know if you still have it or not.  And you're using information from those trade secrets to derive questions at this deposition and that's in violation of a court order.

MS. GELARDI:  I don't have the documents.  I'm not violating the court order.  It goes directly to the damages

D. LEVI

claim of expenses, grosses versus net. I'm just going to ask the questions, Mr. Felsen.

MR. FELSEN:  You have the information that was on the dockets and trade secrets and we're not going to answer questions about information that you have that you're not supposed to have.

MS. GELARDI:  I don't have the information.  I am asking questions about the information.  I'm just going to continue asking questions, you don't have to answer them.

Q.    These payments they're not made to any IME physician, they're not made to any IME observer, they're not made to any law firm, correct, Ms. Levi?

MR. FELSEN:  Objection.

Q.    So these payments are not for IME WatchDog's core services, correct?

MR. FELSEN:  Objection.

A.    (No verbal response.)

Q.    What services does Zariz provide to

150

D. LEVI

IME WatchDog?

MR. FELSEN:  Objection.

A.    (No verbal response.)

Q.    You have never identified who owns or operates Zariz, do you own or operate that entity?

MR. KATAEV:  Objection.  I instruct the witness not to answer.

MR. FELSEN:  Objection.

Q.    You have not provided any invoices or contracts showing what services Zariz supposedly provided you, correct?

MR. FELSEN:  Objection.

A.    (No verbal response.)

Q.    And you have not explained whether Zariz payments were business expenses, profit distributions or personal transfers, correct?

MR. FELSEN:  Objection.

A.    (No verbal response.)

Q.    Your records also show distributions to Daniella Levi & Associates?

MR. FELSEN:  Objection.

MR. KATAEV:  Same instruction.  Not to answer.

151

                    D. LEVI

Q.   You also show distributions to Daniella Levi outside of Daniella Levi & Associates, correct?

          MR. FELSEN:  Objection.

          MR. KATAEV:  Same instruction not to answer.

Q.   You have not shown how those distributions were treated in your damages calculation, correct?

          MR. FELSEN:  Objection.

A.   (No verbal response.)

Q.   You're asking the court to award you millions of dollars without accounting for these large recurring payments and distributions, correct?

          MR. FELSEN:  Objection.

          MS. GELARDI:  It's just a yes or no on that.  I'm not invading privacy in that question.

          MR. FELSEN:  Objection.

A.   (No verbal response.)

Q.   You've been in business since 2011 yes or no?

A.   Yes.

D. LEVI

The Witness:  So if you want to ask me a question at a deposition and you want me to provide you with an answer, you need me to let me complete answering the question and then you can ask another question.  You keep interjecting, interrupting and it's impossible to conduct a deposition in this way.

MS. GELARDI:  I apologize.  I'll repeat the question, okay.  Actually I'll move on to the next one.

MR. FELSEN:  Let her finish her answer.

THE WITNESS:  Can you read me back my answer, what I started to say, please.

(Whereupon, the referred to answer was read back by the Reporter.)

THE WITNESS:  The damages are 98.3 of your sales.

MS. GELARDI:  I'm sorry, Ms. Levi, I didn't ask you about the damages.  That wasn't the question.

D. LEVI

very derived from misappropriated clients.  And therefore 98.3 percent of every dollar that was earned by IME Companions belong to IME WatchDog. Those are my damages.

In addition, my damages are the loss of my reputation that you tarnished, as well as the loss of the reputation of IME WatchDog, which you also tarnished thanks to the way you instructed Adam to sabotage relationships and screw up relationships or as you say "fuck it up."

Q.  Let me ask the question that I asked, Ms. Levi.  You were sent multiple deposition and damage production requests, your attorneys were sent multiple deposition damages requests, both verbally during conferences and formally in writing by my prior attorney Jonathon Warner, correct?

A.  I don't know.  I don't have the record in front of me.  I have to look at documents in order to give you a comprehensive answer.

D. LEVI

finances.

MR. FELSEN:  She doesn't memorize her finances.  All these documents you're referring to, show it to us.

MS. GELARDI:  All I'm asking is, you know, you know your finances.  If you ask me how much I make, people know how much they make.

Q.  My question is in your damages model, you claim you lost a million and change, correct, but not in any year have you made anything near that, correct, in profit?

A.  You misunderstand.

Q.  I'm just asking.

A.  You do not understand the way that damages are calculated and I'm going to repeat it.

Q.  Ms. Levi, with all respect --

A.  Let me finish answering. 98.3 percent of Companions's sales should've been IME WatchDog and those are my damages. Period.  End of story.  How much money I made, how the money, how the finances of the company were handled is immaterial and irrelevant.

152

D. LEVI

Q.    You never produced a document showing you made a million dollars in profit, yes or no?

MR. KATAEV:  Objection.  You can answer.

A.    (No verbal response.)

Q.    Your top clients stayed with you, correct, Ms. Levi?

MR. FELSEN:  Objection.

A.    That's actually incorrect because Subin was our top client and they left and never came back.

Q.    Your revenue increased for some of them, correct?

MR. KATAEV:  Objection.  Vague.  You can answer the question.

Q.    Of your top clients?

A.    I have to look at financial records in order to ascertain and give you answers. However, the damages calculation is not based on IME WatchDog's records.  It's based on Companions's records.

Q.    Given all that information, your damages claim is not supported by a complete and

D. LEVI

since 2011, correct?

A.    I started it in 2011.

Q.    In 2011?

A.    Correct.

Q.    Are you the sole owner?

A.    Yes, I am.

Q.    As a sole owner, you control its finances, correct?

A.    Yes.

Q.    On August 8th, you submitted a sales by customer summary to the court, correct?

A.    Yes.

Q.    You reviewed those numbers before submitting, correct?

A.    Yes.

Q.    So as you're here today you have recent detailed knowledge of your company's revenue history, correct?

A.    I don't have things committed to memory, if that's what you're asking.

Q.    The court directed you to produce an up-to-date sales by customer summary, correct?

A.    Correct.  And we complied with the court's directive.

D. LEVI

Q.    You only provided the summary through the end of 2022, correct?

A.    Correct.

Q.    Yesterday the court gave you one more week to produce the remainder, correct?

A.    What is the point of this question?

Q.    I'm getting to the point, Ms. Levi.

A.    Okay.  Whatever the court ordered is whatever the court ordered.

Q.    Generating a sales by customer summary is a standard report from your accounting system, correct, it's just a yes or no, it's a simple question?

MR. FELSEN:  Objection.

A.    It's a report.  You're calling it a simple report.  I don't know.  It's a report that can be generated, correct.

Q.    But you do have full access to those records, correct?

A.    Of course.

Q.    So there's no reason you could not produce the complete sales by customer summary through its all of 2023, all of 2024 and up to date for 2025, is there?

D. LEVI

talking about that document or are you talking about total revenue?

Q.   I'm just asking a question.  You can say yes or no.

A.   I have to look at the financial records to give an accurate answer.

Q.   Not a problem.  I'm going to continue asking.  You don't have to know, you can say I don't know.  It doesn't matter.  I'm just going to ask the question.  Your net profit that year was under $10,000, correct?

A.   Again, I have to refer to documents in order to be able to answer questions.

Q.   In 2015, your revenue was in the higher 800,000 range, correct?

A.   My answer remains the same.  I have to look at documents in order to answer the question.

Q.   Your net profit for 2015 was about 70 to $80,000 correct?

A.   Again, my answer remains the same.

Q.   In 2016, your revenue remained roughly in the 800 to $900,000 range; yes or no?

A.   What's clear to me is that you

118

D. LEVI

still, despite that the court ordered you to return all of WatchDog's information and destroy anything that's on your system, you clearly still failed to make that court order and you still are in possession of those documents.

Q.    I'm just asking a question, Ms. Levi.  You can say I don't know, you can say yes or no.

A.    I gave you my answer.

Q.    In 2016, the revenue remained roughly in the 800 to $900,000 range, yes or no?

A.    Again, I have to look at documents to be able to answer.

Q.    And the profit in 2016 was, again, I would say between 60 to 70,000, correct?

A.    My answer is the same.  I have to look at documents in order to be able to answer the question.

Q.    In 2017, your revenue succeeded 900,000, yes or no?

A.    My answer is the same.

MR. FELSEN:  Ms. Gelardi, we can stipulate that she needs documents to answer all these questions.

119

D. LEVI

MS. GELARDI:  That's fine.  I can ask them, though.

MR. FELSEN:  You're wasting your time.

MS. GELARDI:  That's fine.  Okay.

Q.  In 2017, your profit was still well under 100,000, yes or no, you need to look at your documents, ma'am?

A.  My answer remains the same as it was to all the prior questions.

Q.  In 2018, your revenue crossed a million dollars, correct?

A.  I need to look at documents.

Q.  Your profit was still in the very low six figures, correct?

A.  My answer remains the same.  I have to look at documents in order to be able to answer the question.

Q.  In 2019, your revenue stayed hovered above a million dollars, correct?

A.  I have to look at documents.  And I don't know how you have access to my financial records.

Q.  And your profit for 2019 was nowhere

D. LEVI

near a million dollars, correct?

A.    My answer is the same.

Q.    Remains the same, okay.  In 2020, even during the pandemic, you billed hundreds of thousands of dollars to top clients, correct?

A.    Again, I'm going to (crosstalk) --

Q.    That's it.

A.    I'm going to respond by saying that I have to look at documents in order to be able to answer your questions.

Q.    So these are the documents you provided the court which show 2019, just a few days ago you provided these.  My question again was in 2020, even during the pandemic you billed hundreds of thousands to top clients, correct, I'll point you to some of them in 2020.

MR. KATAEV:  Can we mark this, please.

A.    The numbers are what they are.  Whatever the documents that we presented are, those are the numbers.

(Whereupon, Sales by Customer List 2011 to 2022 was marked as Defendants' Exhibit D1 for identification as of this

D. LEVI

irrelevant because it cannot point to clients?

A.    Correct.

Q.    But now you're telling me the case is not about clients because I'm showing that over 40 percent of my clients were never your clients from 2011 to 2022 they're nowhere in your records.

A.    We can agree to disagree.

Q.    Okay, let's agree to disagree.  We at least agree that these are, all the highlighted in green are not lost accounts?

A.    I have no idea.  I have to review it based on our clients.  I cannot do it just taking a look at it in a deposition.

Q.    Okay.  Ms. Levi, your financial records reflect repeated launch payments, hundreds of thousands of dollars to an entity called Zariz, correct?

MR. KATAEV:  Objection.  This is in violation of Rule 26 which is designed to harass.  We instruct the witness not to answer the question.

MS. GELARDI:  For the record, I'm only asking in regards to damages and

D. LEVI

reliable financial picture, correct?

MR. FELSEN:  Objection.

A.    Absolutely incorrect.

MS. GELARDI:  I just want to ask a couple of questions about Wingate and then we're going to move away from the financial part.

THE WITNESS:  It's your deposition.

MS. GELARDI:  I'm really trying not to make you uncomfortable.  That's the only reason I'm saying that.

THE WITNESS:  I'm very comfortable. I'm enjoying this.

Q.    When you cease of a lost client on your damages claim that means.  I asked you this already that customers stop doing business with you.

A.    And I already responded.

Q.    With respect to Wingate, they continued booking with you after the date you claimed they were lost; is that fair to say?

A.    Again.

Q.    It's in your records, Ms. Levi.

A.    Again, as I said, to the extent that

D. LEVI

some of Wingate's business went to IME Companions, whatever money was generated through Wingate for IME Companions should've been IME WatchDog's income.  So that is the basis for the damages calculation.

Q.    The 98.3 percent claim that came from your damages claim, right, it was generated, it came from an Excel sheet that you provided to the court, correct?

A.    Again, I have to refer back to, this was a filing that was done, I believe over two years ago.  So I would have to look at that time to tell you exactly how things were calculated.

Q.    You represented that spreadsheet as your actual customer list and said names were misappropriated from you by me; is that fair to say?

A.    Whatever I submitted is what I submitted.  The documents speak for themselves.

Q.    Your own verified customer revenue record, your sales by summary list proved that many of the companies on the Excel spreadsheet including at Wingate never appeared at all; is that correct, these are your documents that you

D. LEVI

A.    My affidavit explains very clearly how the damages calculation were arrived at.

Q.    Ms. Levi, you used gross revenue numbers in your damages model, correct?

A.    Again, I have to look at the affidavit I presented.  You want to show me the affidavit, I am happy to explain it to you.

MR. FELSEN:  I'll make a statement that your questions mischaracterizes what her affidavit says.

MR. KATAEV:  Objection.

Q.    A lost customer is one that stops paying you entirely, correct, Ms. Levi?

A.    No.

Q.    If a customer is still paying you, then they are not lost, correct?

MR. KATAEV:  Objection. Argumentative.

A.    Well, if a customer is paying me a certain amount, but paying IME Companions a certain amount, so whatever money was paid to IME Companion is part of my damages calculation. I don't know how many more times I have to explain it to you.

# EXHIBIT 9-B

**Additional Excerpts of Daniella Levi Deposition Transcript**

D. LEVI

JUDGE CHO:  All right, go ahead.

MS. GELARDI:  Your Honor, I just, I just don't think it's proper or right that Carlos Roa, since they considered him a witness, they rely on his affidavit, they cite his affidavit, that he's available and present in every single proceeding.  I don't think it's proper that he's here.  Either he's part of the legal team or he's a witness, which one is it.

MR. FELSEN:  Your Honor, he's a (crosstalk) --

JUDGE CHO:  What is your concern with having Mr. Roa there, Ms. Levi? I'm sorry, Ms. Gelardi?

MS. GELARDI:  My concern is he cannot, he's, with him being available at every single proceedings totally dismantles the fact that he's a fact witness, your Honor.  We can't, we can't, he's in settlement conferences, your Honor.

JUDGE CHO:  But what is your

11

D. LEVI

this question frankly.  Are you okay with excusing Mr. Roa from the deposition today?

MR. KATAEV:  No, your Honor.

JUDGE CHO:  All right.  Why does he need to be there?

MR. KATAEV:  Well, first of all, your Honor, this is the last deposition in this case so he will not be testifying and he has not been deposed. Second, he's part of our legal team and he's an officer of IME WatchDog.  He's participated in every deposition to date.  There's no basis to exclude him.

MS. GELARDI:  Your Honor.

MR. KATAEV:  He's here as a corporate officer.

JUDGE CHO:  Ms. Gelardi, Mr. Gelardi let me explain something to you.  So under our Local Rule 30.3 entitled persons attending depositions.  Here's what the rules says:  A person who is a party in the action may attend a deposition of a party or a witness.  A

12

D. LEVI

witness or a potential witness in the action may attend the deposition of a party or witness unless or ordered otherwise by the court.

So Mr. Kataev, Mr. Felsen, let me ask you this question: Do you expect Mr. Roa to be a witness in this case?

MR. KATAEV: If the case goes to trial, which we don't expect it to.

JUDGE CHO: I'm sorry. I didn't hear that. Yes or no?

MR. KATAEV: If the case goes to trial, he will be called as a witness at trial. We are not expecting him to be deposed and we don't expect a trial to occur in this case because we're going to be moving to summary judgments. And Judge Chen repeatedly issued orders.

JUDGE CHO: All right, I heard enough. I heard enough. So Ms. Gelardi, Mr. Gelardi, I am allowing him to be there pursuant to our Local Rule, okay, because he may be a witness in this case. He's allowed to be there.

43

                        D. LEVI

complaint, correct?

        A.   I don't know when you terminated him
but yeah.

        Q.   Well, in that complaint you
identified Mr. Roa as a whistleblower against
me, right?

        A.   Yes.

        Q.   And the very next day, you appointed
him as president of operations at IME WatchDog,
correct?

            MR. KATAEV:  Objection.  You can
        answer.

        A.   Yes.

        Q.   So you rewarded him with a senior
executive position immediately after he appeared
in your complaint as a witness, correct?

        A.   Yes.

        Q.   You understand that makes him far
from an independent whistleblower.  He was a
disgruntled former employee of mine whom you
brought into your company and elevated the day
after you sued me, correct?

            MR. KATAEV:   Objection.
        Argumentative.

D. LEVI

Q.    Ms. Levi, why didn't Adam Rosenblatt appear for a deposition in this case given that he is the main accuser and your entire case relies heavily on his affidavit?

MR. FELSEN:    Objection.

A.    Again, I'm not aware of a deposition notice that was served with respect to Adam. And Judge Cho already ordered that discovery in this case is closed after my deposition.

Q.    Understood.    Why would the main accuser whose testimony you're relying on to support your claim even need a formal deposition request from the opposing party?

MR. FELSEN:    Objection.

MR. KATAEV:    Objection.

MR. FELSEN:    You can answer if you understand.

A.    No, I don't.    Can you ask the question again.

Q.    My question is, why would the main accuser whose testimony you are relying on to support your claims even need a formal deposition request from the opposing party?

A.    I'm not here to do the work of your

D. LEVI

despite repeated requests, Ms. Levi?

MR. KATAEV:  Objection.  You can answer.

A.  You're assuming facts not in evidence that he was repeatedly noticed for a deposition.

Q.  You do know Mr. Rosenblatt was subpoenaed for deposition, right, Ms. Levi?

MR. FELSEN:  Objection.  Asked and answered.

A.  Again (crosstalk) --

Q.  You don't know, okay.  My former attorney, Mr. Jonathon Warner, requested him many times verbally during conferences, do you have any recollection of any of that?

A.  No.

Q.  So to your knowledge then you don't know if Mr. Warner ever sent a formal written communication that a date be provided for Mr. Rosenblatt's deposition?

A.  No.

MR. FELSEN:  Objection.  Asked and answered.

MS. GELARDI:  Okay.

D. LEVI

Q.    I'm going to just show you the deposition request.  These here are three subpoenas with requests for depositions for June 1st, June 8th and June 15th for you, Mr. Roa and Mr. Rosenblatt.  You want to take a look at them?

MR. KATAEV:  Can we mark them, please.

MR. FELSEN:  I want to state on the record that we be provided the exhibits.

Q.    These subpoenas directly contradict what your attorneys told Judge Cho on the call, correct?

A.    First of all, I have no knowledge what these documents are and who sent them.  But I don't know who drafted them, who sent them and to who and when; number one.  And number two, if there was a notice sent, it was probably an improper notice which is why my attorneys probably ignored it.

MS. GELARDI:  Those notices were sent on May 10, 2023.  I have an e-mail from my attorney stating "I served these upon plaintiff's attorney today."

# EXHIBIT 10

**IME Companions Form 1065 Tax Return Excerpts, 2018-2021**

# Form **1065**

Department of the Treasury
Internal Revenue Service

## U.S. Return of Partnership Income

For calendar year 2018, or tax year beginning  01/01 , 2018, ending  12/31, 20  18  .

▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

| | |
|---|---|
| **A** Principal business activity<br>OTHER LEGAL S | **D** Employer identification number<br>82-3148364 |
| **B** Principal product or service | **E** Date business started<br>10/17/2017 |
| **C** Business code number<br>541190 | **F** Total assets (see instructions)<br>$ |

Type or Print

Name of partnership
IME COMPANIONS LLC

Number, street, and room or suite no. If a P.O. box, see instructions.
9207 245TH ST

City or town, state or province, country, and ZIP or foreign postal code
FLORAL PARK, NY 11001

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ▶ ------------------

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ 4

**J** Check if Schedules C and M-3 are attached . ▶ ☐

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

### Income

| | | | |
|---|---|---|---|
| **1a** | Gross receipts or sales . | **1a** 358183 | |
| **b** | Returns and allowances . | **1b** | |
| **c** | Balance. Subtract line 1b from line 1a . | **1c** | 358183 |
| **2** | Cost of goods sold (attach Form 1125-A) . | **2** | |
| **3** | Gross profit. Subtract line 2 from line 1c . | **3** | 358183 |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) . . | **4** | |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040)) . | **5** | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . | **6** | |
| **7** | Other income (loss) (attach statement) . | **7** | |
| **8** | **Total income (loss).** Combine lines 3 through 7 . | **8** | 358183 |

### Deductions

*(see instructions for limitations)*

| | | | |
|---|---|---|---|
| **9** | Salaries and wages (other than to partners) (less employment credits) . | **9** | 21500 |
| **10** | Guaranteed payments to partners . | **10** | |
| **11** | Repairs and maintenance . | **11** | |
| **12** | Bad debts . | **12** | |
| **13** | Rent . | **13** | 12000 |
| **14** | Taxes and licenses . | **14** | |
| **15** | Interest (see instructions) . | **15** | |
| **16a** | Depreciation (if required, attach Form 4562) . | **16a** 12000 | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | **16c** 12000 |
| **17** | Depletion **(Do not deduct oil and gas depletion.)** . | **17** | |
| **18** | Retirement plans, etc. . | **18** | |
| **19** | Employee benefit programs . | **19** | |
| **20** | Other deductions (attach statement) . | **20** | 192530 |
| **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . | **21** | 238030 |
| **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 . | **22** | 120153 |

### Tax and Payment

| | | | |
|---|---|---|---|
| **23** | Interest due under the look-back method—completed long-term contracts (attach Form 8697) | **23** | |
| **24** | Interest due under the look-back method—income forecast method (attach Form 8866) . | **24** | |
| **25** | BBA AAR imputed underpayment (see instructions) . | **25** | |
| **26** | Other taxes (see instructions) . | **26** | |
| **27** | **Total balance due.** Add lines 23 through 27 . | **27** | |
| **28** | Payment (see instructions) . | **28** | |
| **29** | **Amount owed.** If line 28 is smaller than line 27, enter amount owed . | **29** | |
| **30** | **Overpayment.** If line 28 is larger than line 27, enter overpayment . | **30** | |

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____
Signature of partner or limited liability company member

▶ _____
Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

### Paid Preparer Use Only

| Print/Type preparer's name<br>YEHAD ABDELAZIZ | Preparer's signature | Date<br>04/01/2019 | Check ☐ if self-employed | PTIN<br>P01210216 |
|---|---|---|---|---|

Firm's name ▶ THE FIVE PILLARS FINANCIAL SERVICES — Firm's EIN ▶ 27-3392017

Firm's address ▶ 508 72ND ST BROOKLYN NY 11209- — Phone no. 718-833-5202

**For Paperwork Reduction Act Notice, see separate instructions.**

QNA

Form **1065** (2018)

**Form 1065**

Department of the Treasury
Internal Revenue Service

## U.S. Return of Partnership Income

For calendar year 2019, or tax year beginning _____ , 2019, ending _____ , 20 ____ .

▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2019**

| | |
|---|---|
| **A** Principal business activity | **D** Employer identification no. |
| OTHER LEGAL | 82-3148364 |
| **B** Principal product or service | **E** Date business started |
| SERVICE | 10/17/2017 |
| **C** Business code number | **F** Total assets (see instructions) |
| 541190 | $ 38,583. |

Type or Print

IME COMPANIONS LLC
9207 245TH ST
FLORAL PARK, NY 11001

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☒ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

**J** Check if Schedules C and M-3 are attached ............................................ ▶ ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution**: Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

### INCOME

| | | | |
|---|---|---|---:|
| **1a** | Gross receipts or sales | **1a** 505,825. | |
| **b** | Returns and allowances | **1b** | |
| **c** | Balance. Subtract line 1b from line 1a | **1c** | 505,825. |
| **2** | Cost of goods sold (attach Form 1125-A) | **2** | |
| **3** | Gross profit. Subtract line 2 from line 1c | **3** | 505,825. |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | **4** | |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) | **5** | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | **6** | |
| **7** | Other income (loss) (attach statement) | **7** | |
| **8** | **Total income (loss).** Combine lines 3 through 7 | **8** | 505,825. |

### DEDUCTIONS FOR LIMITATIONS (SEE INSTRS)

| | | | |
|---|---|---|---:|
| **9** | Salaries and wages (other than to partners) (less employment credits) | **9** | 66,500. |
| **10** | Guaranteed payments to partners | **10** | |
| **11** | Repairs and maintenance | **11** | |
| **12** | Bad debts | **12** | |
| **13** | Rent | **13** | 12,200. |
| **14** | Taxes and licenses | **14** | 5,954. |
| **15** | Interest (see instructions) | **15** | 5,953. |
| **16a** | Depreciation (if required, attach Form 4562) | **16a** | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | **16c** |
| **17** | Depletion **(Do not deduct oil and gas depletion.)** | **17** | |
| **18** | Retirement plans, etc. | **18** | |
| **19** | Employee benefit programs | **19** | |
| **20** | Other deductions (att stmt) SEE STATEMENT 1 | **20** | 289,859. |
| **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | **21** | 380,466. |
| **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 | **22** | 125,359. |

### TAX AND PAYMENT

| | | | |
|---|---|---|---:|
| **23** | Interest due under the look-back method — completed long-term contracts (attach Form 8697) | **23** | |
| **24** | Interest due under the look-back method — income forecast method (attach Form 8866) | **24** | |
| **25** | BBA AAR imputed underpayment (see instructions) | **25** | |
| **26** | Other taxes (see instructions) | **26** | |
| **27** | **Total balance due.** Add lines 23 through 26 | **27** | |
| **28** | Payment (see instructions) | **28** | |
| **29** | **Amount owed.** If line 28 is smaller than line 27, enter amount owed | **29** | |
| **30** | **Overpayment.** If line 28 is larger than line 27, enter overpayment | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____
Signature of partner or limited liability company member

▶ _____ Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| PETER A. MANISCALCO CPA MBA | PETER A. MANISCALCO CPA MBA | | | P00309874 |

Firm's name ▶ MANISCALCO & PICONE, CPAS, P.C.    Firm's EIN ▶ 204440952

Firm's address ▶ 2493 RICHMOND RD
STATEN ISLAND, NY 10306-1936    Phone no. 718-668-2901

**BAA For Paperwork Reduction Act Notice, see separate instructions.**    PTPA0105 10/02/19    Form **1065** (2019)

| Form **1065** | | **U.S. Return of Partnership Income** | | OMB No. 1545-0123 |
|---|---|---|---|---|

**U.S. Return of Partnership Income**

For calendar year 2020, or tax year beginning _____ , 2020,
ending _____ , 20 _____ .

► Go to *www.irs.gov/Form1065* for instructions and the latest information.

Form **1065**

Department of the Treasury
Internal Revenue Service

**2020**

| **A** Principal business activity | | **D** Employer identification no. |
|---|---|---|
| Other Legal | | 82-3148364 |
| **B** Principal product or service | **Type or Print** | **E** Date business started |
| Service | IME Companions LLC | 10/17/2017 |
| **C** Business code number | 9207 245th Street | **F** Total assets (see instructions) |
| 541190 | Floral Park, NY 11001 | $ 196,279. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☒ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ► _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ► _____ 2

**J** Check if Schedules C and M-3 are attached ............................................................... ► ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution**: Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

**INCOME**

| | | | | |
|---|---|---|---|---|
| **1a** | Gross receipts or sales ........................................... | **1a** | 638,175. | |
| **b** | Returns and allowances .......................................... | **1b** | | |
| **c** | Balance. Subtract line 1b from line 1a .......................... | | **1c** | 638,175. |
| **2** | Cost of goods sold (attach Form 1125-A) ........................ | | **2** | |
| **3** | Gross profit. Subtract line 2 from line 1c ....................... | | **3** | 638,175. |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) ............................................ | | **4** | |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040)) .......... | | **5** | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | **6** | |
| **7** | Other income (loss) (attach statement) .......................... | | **7** | |
| **8** | **Total income (loss).** Combine lines 3 through 7 ............... | | **8** | 638,175. |

**DEDUCTIONS FOR LIMITATIONS** (SEE INSTRS FOR LIMITATIONS)

| | | | | |
|---|---|---|---|---|
| **9** | Salaries and wages (other than to partners) (less employment credits) .... | | **9** | |
| **10** | Guaranteed payments to partners ............................... | | **10** | 97,065. |
| **11** | Repairs and maintenance ....................................... | | **11** | 1,813. |
| **12** | Bad debts .................................................... | | **12** | |
| **13** | Rent ........................................................ | | **13** | 27,500. |
| **14** | Taxes and licenses ........................................... | | **14** | 175. |
| **15** | Interest (see instructions) .................................... | | **15** | |
| **16a** | Depreciation (if required, attach Form 4562) ..... | **16a** | | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return ... | **16b** | **16c** | |
| **17** | Depletion **(Do not deduct oil and gas depletion.)** ............ | | **17** | |
| **18** | Retirement plans, etc. ........................................ | | **18** | |
| **19** | Employee benefit programs .................................... | | **19** | |
| **20** | Other deductions (att stmt) .................. See Statement 1 | | **20** | 329,815. |
| **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 ............ | | **21** | 456,368. |
| **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 ... | | **22** | 181,807. |

**TAX AND PAYMENT**

| | | | |
|---|---|---|---|
| **23** | Interest due under the look-back method — completed long-term contracts (attach Form 8697) ...... | **23** | |
| **24** | Interest due under the look-back method — income forecast method (attach Form 8866) ............ | **24** | |
| **25** | BBA AAR imputed underpayment (see instructions) ................ | **25** | |
| **26** | Other taxes (see instructions) .................................. | **26** | |
| **27** | **Total balance due.** Add lines 23 through 26 .................... | **27** | |
| **28** | Payment (see instructions) ..................................... | **28** | |
| **29** | **Amount owed.** If line 28 is smaller than line 27, enter amount owed ... | **29** | |
| **30** | **Overpayment.** If line 28 is larger than line 27, enter overpayment ... | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

► _____
Signature of partner or limited liability company member

► _____
Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☒ if self-employed | PTIN |
|---|---|---|---|---|
| Gregg T. Iliceto CPA | | | | P00729565 |
| Firm's name ► Gregg T. Iliceto CPA LLC | | | Firm's EIN ► 27-4150557 | |
| Firm's address ► 3041 Veterans Rd W STATEN ISLAND, NY 10309 | | | Phone no. (718) 227-3354 | |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**    PTPA0105  09/03/20    Form **1065** (2020)

| Form **1065** | | U.S. Return of Partnership Income | | OMB No. 1545-0123 |
|---|---|---|---|---|

**U.S. Return of Partnership Income**

For calendar year 2021, or tax year beginning _____ , 2021,
ending _____ , 20 _____ .

► Go to *www.irs.gov/Form1065* for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

**2021**

| **A** Principal business activity |
|---|
| Other Legal |

| **B** Principal product or service |
|---|
| Service |

| **C** Business code number |
|---|
| 541190 |

**Type or Print**

IME Companions LLC
9207 245th Street
Floral Park, NY 11001

| **D** Employer identification no. |
|---|
| 82-3148364 |

| **E** Date business started |
|---|
| 10/17/2017 |

| **F** Total assets (see instructions) |
|---|
| $ 193,542. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☒ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ► _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ► 2

**J** Check if Schedules C and M-3 are attached .................................................................. ► ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution**: Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

**INCOME**

| | | | | |
|---|---|---|---|---|
| **1a** | Gross receipts or sales ........................................... | **1a** | 822,103. | |
| **b** | Returns and allowances ........................................... | **1b** | | |
| **c** | Balance. Subtract line 1b from line 1a ........................................... | | **1c** | 822,103. |
| **2** | Cost of goods sold (attach Form 1125-A) ........................................... | | **2** | |
| **3** | Gross profit. Subtract line 2 from line 1c ........................................... | | **3** | 822,103. |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | | **4** | |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040)) ........................................... | | **5** | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) ........................................... | | **6** | |
| **7** | Other income (loss) (attach statement) | | **7** | |
| **8** | **Total income (loss).** Combine lines 3 through 7 ........................................... | | **8** | 822,103. |

**DEDUCTIONS FOR LIMITATIONS** (SEE INSTRS)

| | | | |
|---|---|---|---|
| **9** | Salaries and wages (other than to partners) (less employment credits) ........................................... | **9** | |
| **10** | Guaranteed payments to partners ........................................... | **10** | |
| **11** | Repairs and maintenance ........................................... | **11** | 2,158. |
| **12** | Bad debts ........................................... | **12** | |
| **13** | Rent ........................................... | **13** | |
| **14** | Taxes and licenses ........................................... | **14** | |
| **15** | Interest (see instructions) ........................................... | **15** | 9,484. |
| **16a** | Depreciation (if required, attach Form 4562) ........ **16a** | | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return ... **16b** | **16c** | |
| **17** | Depletion **(Do not deduct oil and gas depletion.)** ........................................... | **17** | |
| **18** | Retirement plans, etc. ........................................... | **18** | |
| **19** | Employee benefit programs ........................................... | **19** | |
| **20** | Other deductions (att stmt) ........................... See Statement 1 | **20** | 477,132. |
| **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 ........... | **21** | 488,774. |
| **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 ........................................... | **22** | 333,329. |

**TAX AND PAYMENT**

| | | | |
|---|---|---|---|
| **23** | Interest due under the look-back method — completed long-term contracts (attach Form 8697) ...... | **23** | |
| **24** | Interest due under the look-back method — income forecast method (attach Form 8866) ........... | **24** | |
| **25** | BBA AAR imputed underpayment (see instructions) ........................................... | **25** | |
| **26** | Other taxes (see instructions) ........................................... | **26** | |
| **27** | **Total balance due.** Add lines 23 through 26 ........................................... | **27** | |
| **28** | Payment (see instructions) ........................................... | **28** | |
| **29** | **Amount owed.** If line 28 is smaller than line 27, enter amount owed ........................................... | **29** | |
| **30** | **Overpayment.** If line 28 is larger than line 27, enter overpayment ........................................... | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

► _____ Signature of partner or limited liability company member    ► _____ Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☒ if self-employed | PTIN |
|---|---|---|---|---|
| Gregg T. Iliceto CPA | | | | P00729565 |

| Firm's name | ► Gregg T. Iliceto CPA LLC | Firm's EIN ► 27-4150557 |
|---|---|---|
| Firm's address | ► 3041 Veterans Rd W STATEN ISLAND, NY 10309 | Phone no. (718) 227-3354 |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**    PTPA0105 10/04/21    Form **1065** (2021)

# EXHIBIT 11

**March 27, 2023 Hearing Transcript Excerpts - Roman Pollak**

correct?

A    No.

Q    Let's look at Plaintiff's 37.  This is an October 3rd, 2017 email from you to Safa Gelardi.

You sent this email, correct?

A    Yes.

Q    And in this email you are analyzing profit and loss statements, correct?

A    Yes.

Q    And the reason why you're analyzing these profit and loss statements is to determine whether you also, with Greg and Anthony, want to get into a similar business, correct?

A    I analyzed it because Safa asked me to.

Q    And the reason why you fulfilled her request is to determine whether you wished to use this information to start a competing business, correct?

A    No.

Q    Well, isn't it true that this email that you're analyzing the insurance expense to determine how much money is spent on insurance, for example?

A    Yes.

Q    And you're stating in here that you will not have similar expensing related to utilities, correct?

A    Correct.

Q    And you have questions about items such as the

POLLAK - DIRECT - MR. KATAEV                    72

commissioner of labor expense and lawyer expense, correct?

A    Yes.

Q    And you've analyzed that and used that information to determine whether you wanted to open a competing business, correct?

A    No.

Q    Let's go to Plaintiff's 38.

THE COURT:  So can I ask you, what was the purpose of your email back to her with these responses?

THE WITNESS:  Well, yeah, Safa asked me to analyze the P&L and give her my thoughts, and these were the items that stuck out to me.

THE COURT:  But for what purpose?  In other words, what -- did she say why she wanted you to do that?

THE WITNESS:  Well, she was trying to -- I guess see if the business was profitable.

THE COURT:  Okay.  But why come to you and say, can you analyze this?

THE WITNESS:  Well, she was trying to get me to present it to Greg --

THE COURT:  Okay.

THE COURT REPORTER:  Present it to who?

THE WITNESS:  To Greg as a business opportunity.

THE COURT:  Okay.  So is it accurate that you were doing this analysis, in part, because you were trying to

POLLAK - DIRECT - MR. KATAEV                    73

decide if you should pitch it to Greg as a business he should get involved in?

THE WITNESS:  In part.

THE COURT:  Okay.  All right.

Go ahead.

BY MR. KATAEV:

Q    Now, you knew from your discussions with Safa that she had Adam on the inside of the IME Watchdog, correct?

A    No, not at this time.

Q    But in this email, you ended with -- with respect to travel expenses, I, quote:  I will assume that is mostly the dock or Adam.

Do you see that?

THE COURT:  Hang on.  So hang on.

For the court reporter, you got to go slower.

MR. KATAEV:  All right.

THE COURT:  It says, I assume that is mostly the dock, slash, Adam.  None of that capitalized.

Okay.  Go ahead.

THE WITNESS:  Correct.  Can you repeat that?

Q    You stated in this email, with respect to travel expenses, that you assume that is mostly the dock or Adam, correct?

A    Yes.

Q    And when you refer to "Adam," you're referring to Adam

POLLAK - DIRECT - MR. KATAEV                84

A    I don't recall doing that.

Q    And you recommended to Greg to get involved in this business, correct?

A    Yes.

Q    Based on the profitability of IME Watchdog, correct?

A    No, based on all the attorneys that we deal with and the potential of the business with them.

            THE COURT:  With who?

            THE WITNESS:  Our attorneys.

            THE COURT:  I'm sorry, I don't really understand.

            You mean that you would get income from the attorneys you were already working with --

            THE WITNESS:  Correct.

            THE COURT:  -- if you also got involved in this IME --

            THE WITNESS:  -- yes.

            THE COURT:  -- Companion business?

            THE WITNESS:  Yes, (indiscernible).

BY MR. KATAEV:

Q    And in the course of the time that you worked with Safa at IME Companions, you received distributions, correct?

A    Yes.

Q    And you profited from the information that Safa found, correct?

            MR. GENOVESI:  Objection.

POLLAK - CROSS - MR. WARNER                    90

A     Okay.

Q     What were the gross profits over three years for the Watchdogs?

         MR. KATAEV:  Objection, Your Honor, relevance.

         THE COURT:  Well, I can look at the document.  You don't need to have him answer that question, unless it leads to another question --

         MR. WARNER:  It does.

         THE COURT:  Okay.  Of this witness?

         MR. WARNER:  Yes.

         THE COURT:  Okay.  Go ahead.

         So looking at that exhibit.

Q     2014, they lost $42,000, correct?  Is that correct?

A     It's a $42,000 loss in 2014.

Q     And 2015, how did they do?

A     Almost 70,000 of net income.

Q     And in 2016?

A     Almost 75,000 of income.

Q     So what would be the approximate average income that they made annually?

A     With the loss?

Q     Yes.

A     Maybe 30,000.

Q     Were you interested in this business because it made about $30,000 a year, or for some other reason?

MR. KATAEV:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  Can I answer?

THE COURT:  Yes, go ahead.

THE WITNESS:  No, no.

Q    Why were you interested in the business?

A    Just a potential that Greg saw in the amount of IMEs that occurred, and the amount of attorneys that we deal with that they used that type of service.

Q    And did ultimately you and Greg supply various names to Ms. Gelardi to try and prospect, as that term was used?

A    Yes.

Q    And as far as you're aware, did she prospect them successfully?

A    Yes.

Q    And the document that Your Honor had you look at, Exhibit 18, where you said you recognized 13 out of the 20 names on that list.

Were these some of the major advertising firms -- excuse me, I'll rephrase that.

Were these personal injury firms that had substantial advertising in the community during that period of time?

MR. KATAEV:  Objection.

THE COURT:  Overruled.

PROCEEDINGS                    92

THE WITNESS:  I don't recall the advertising.

Q    Were these some of the most successful personal injury firms in the city of New York?

MR. KATAEV:  Objection.

THE COURT:  Sustained.  Sustained.  He just said he doesn't know.

MR. WARNER:  I asked about advertisement, Judge.  I didn't ask him about success.

Q    Would these be some of the high reputation personal injury firms in the city?

MR. KATAEV:  Same objection.

THE COURT:  Overruled.

Did you know of these firms?

THE WITNESS:  I know that at least two of these firms are very large, as far as the amount of funding that Case Cash does with them.

MR. WARNER:  I have no further questions, Judge.

THE COURT:  I have one follow up.

You said that at some point Mr. Elefterakis or you, or through you, provided names of the attorneys you work with; is that right?

THE WITNESS:  Yes.

THE COURT:  When?  In relation to when you got involved with the business or a date, if you remember one?

THE WITNESS:  I would say it was late summer of

POLLAK - REDIRECT - MR. KATAEV                93

2017.  I couldn't give you an exact date.

THE COURT:  But after you received this July email that we're talking about, which is Exhibit Number 35?

THE WITNESS:  Yeah.  Yeah.

THE COURT:  And did you provide names that went beyond the names that are on this list, if you recall?

THE WITNESS:  I believe so.

THE COURT:  Did you send that via email, or how did you do that?

THE WITNESS:  I don't recall.  Email.  Probably text.  Phone call.

THE COURT:  All right.

MR. KATAEV:  I just have one question on redirect.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. KATAEV:

Q    You testified that Safa would call you with names that you would then call Greg with, correct?

A    No.

Q    Earlier today Greg Elefterakis testified that he would get phone calls from you asking whether Greg is familiar with those firms, correct?

A    Yes.

Q    And you did that because Safa provided you those names, correct?

PROCEEDINGS                                94

A     No.  I did that upon learning of this possible business, as I would come across names during, you know, Case Cash operating hours, I would ask him about those attorneys.

Q     And that's something you remembered today, correct?

A     Yes.

MR. KATAEV:  Okay.  No further questions.

THE COURT:  Okay.  All right.

Thank you very much.  You may step down.

(The witness steps down.)

THE COURT:  All right.  So let's go back -- I think, Mr. Warner, you wanted to address a couple of points.

MR. WARNER:  I did, Your Honor.  Thank you.

THE COURTROOM DEPUTY:  Mr. Warner, would you please use the microphone.

MR. WARNER:  I'm sorry.

THE COURT:  And let me just say this for Mr. Beibin's sake.

I do actually want to hear from you at some point.  So, you know, maybe in fairness to the witnesses here, we should maybe hear from them first, and then I can hear argument.

So, Mr. Beibin -- is it Beibin?  Yeah, Mr. Beibin, if you'll come up and take the stand, I'd appreciate that.

MR. GENOVESI:  Judge, is it going to --

THE COURT:  You folks can sit down.  He's your

# EXHIBIT 12

**Plaintiff's Sales by Customer Summary / Customer
Materials, 2016-2022**

**10:10 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
### January through December 2016

|  | Jan - Dec 16 |
|---|---|
| **Silbowitz, Garafola, Silbowitz, Schatz** | 8,620.00 |
| **Subin Associates, LLP** | 131,645.00 |
| **The Perecman Firm, PLLC** | 1,211.00 |
| **The Selvin Law Firm, PLLC** | 2,116.00 |
| **Wilson Grochow Druker** | 269.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 70,068.00 |
| **Zaremba Brown, PLLC** | 16,226.00 |

10:12 AM
04/04/25
Accrual Basis

**IME Watchdog, Inc**
**Sales by Customer Summary**
January through December 2017

|  | Jan - Dec 17 |
|---|---|
| ██████████████ |  |
| **The Forzano Law Firm** | 3,052.00 |
| ██████████████ |  |
| **The Law Firm of Davidoff & Associates** | 672.00 |
| ██████████████ |  |
| **The Perecman Firm, PLLC** | 13,111.00 |
| ██████████████ |  |
| **The Selvin Law Firm, PLLC** | 1,807.00 |
| ██████████████ |  |
| **William Schwitzer & Associates** | 493.00 |
| **Wilson Grochow Druker** | 224.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 93,988.00 |
| ██████████████ |  |
| **Yakov Mushiyev & Associates** | 453.00 |
| ██████████████ |  |
| **Zaremba Brown, PLLC** | 19,069.00 |
| **Zemsky & Salomon** | 6,541.00 |
| **TOTAL** | ████████ |

10:12 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2018**

|  | Jan - Dec 18 |
|---|---|
| **The Forzano Law Firm** | 1,266.00 |
| **The Perecman Firm, PLLC** | 10,055.00 |
| **The Selvin Law Firm, PLLC** | 5,326.00 |
| **The Tarver Law Firm** | 179.00 |
| **Wilson Grochow Druker** | 862.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 106,447.00 |
| **Yakov Mushiyev & Associates** | 1,173.00 |
| **Zaremba Brown, PLLC** | 20,835.00 |
| **Zemsky & Salomon** | 10,068.00 |
| **TOTAL** | |

10:13 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
## Sales by Customer Summary
**January through December 2019**

|  | Jan - Dec 19 |
|---|---:|
| **The Forzano Law Firm** | 1,779.00 |
| **The Law Firm of Davidoff & Associates** | 358.00 |
| **The Perecman Firm, PLLC** | 15,207.00 |
| **The Selvin Law Firm, PLLC** | 4,855.00 |
| **Weitz Pascale** | 4,006.00 |
| **Wilson Grochow Druker** | 1,039.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 143,200.00 |
| **Yakov Mushiyev & Associates** | 1,594.00 |
| **Zaremba Brown, PLLC** | 8,748.00 |
| **Zemsky & Salomon** | 636.00 |
| **TOTAL** |  |

**10:13 AM**
**04/04/25**
**Accrual Basis**

# IME Watchdog, Inc.
# Sales by Customer Summary
### January through December 2020

|  | Jan - Dec 20 |
|---|---:|
| ███████████ |  |
| **The Perecman Firm, PLLC** | 7,922.00 |
| ███████████ |  |
| **The Selvin Law Firm, PLLC** | 2,240.00 |
| ███████████ |  |
| **Weitz Pascale** | 1,671.00 |
| ███████████ |  |
| **Wilson Grochow Druker** | 2,227.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 85,830.00 |
| ███████████ |  |
| **Zemsky & Salomon** | 229.00 |
| **TOTAL** | ████████ |

10:14 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2021**

|  | Jan - Dec 21 |
|---|---|
| **The Law Firm of Davidoff & Associates** | 2,655.00 |
| **The Perecman Firm, PLLC** | 6,847.00 |
| **The Selvin Law Firm, PLLC** | 4,861.00 |
| **Wilson Grochow Druker** | 4,337.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 154,294.00 |
| **TOTAL** |  |

Case 1:22-cv-01032-PKC-JRC     Document 670     Filed 06/02/26     Page 136 of 331 PageID #: 12957

**IME Watchdog, Inc**
## Sales by Customer Summary
### January through December 2022

|  | Jan - Dec 22 |
|---|---|
|  |  |
| **Wilson Grochow Druker** | 2,269.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 202,195.00 |
|  |  |
| **Yakov Mushiyev & Associates** | 869.00 |
|  |  |
| **Zaremba Brown, PLLC** | 2,778.00 |
|  |  |
| **TOTAL** |  |

# EXHIBIT 13-A

**Rosenblatt April 28, 2017 Email re March 2017 WatchDog Materials**

 **Gmail**                                    **Safa Gelardi <safagelardi@gmail.com>**

---

## IME Watchdog for March 2017

3 messages

---

**Adam Rosenblatt** <adammrosenblatt@gmail.com>                    Fri, Apr 28, 2017 at 3:48 PM
To: safagelardi@gmail.com

Hi Safa,

Attached please find a breakdown of March 2017. Including the monthly P&L,  list of  clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs what we billed, etc.

Thank you

Adam M. Rosenblatt

---

Safa Gelardi <safagelardi@gmail.com> To: Steven Siegler <steven@kilegal.com>>                    Fri, Mar 11, 2022 at 2:55 PM

Steve,

Take a look at this. Adam sent this to me when he was trying to convince me to go into business with him.

There seems to be a lot of financial and operational information in here. I think it may become important, let's review it and talk about it tomorrow.

Safa

---

Sent from my iPhone

Begin forwarded message:

From: Adam Rosenblatt <adammrosenblatt@gmail.com>
Date: April 28, 2017 at 4:48:17 PM EDT
To: safagelardi@gmail.com
Subject: IME Watchdog for March 2017

# EXHIBIT 13-B

**Rosenblatt April 28, 2017 Email re WatchDog P&Ls**



**Safa Gelardi <safagelardi@gmail.com>**

---

## IME Watchdog P&L Last 3 years

6 messages

---

**Adam Rosenblatt** <adammrosenblatt@gmail.com>                                    Fri, Apr 28, 2017 at 3:15 PM
To: safagelardi@gmail.com

Good evening Safa,

As per our discussion attached please find the P&L for IME Watchdog for the last three years.

I would like for you to really understand that this company could have achieved an even greater success had any reinvestment been made or if a serious marketing strategy been established.

Thank you,

Adam M. Rosenblatt

---

**3 attachments**

---

Safa Gelardi <safagelardi@gmail.com> To: Steven Siegler <steven@kilegal.com>>                                    Fri, Mar 11, 2022 at 3:35 PM

Steve, please look at these also, talk to you tomorrow

Sent from my iPhone

Begin forwarded message:

> **From:** Adam Rosenblatt <adammrosenblatt@gmail.com>
> **Date:** April 28, 2017 at 4:15:59 PM EDT
> **To:** safagelardi@gmail.com
> **Subject: IME Watchdog P&L Last 3 years**
>
> Good evening Safa,
>
> As per our discussion attached please find the P&L for IME Watchdog for the last three years.
>
> I would like for you to really understand that this company could have achieved an even greater success had any reinvestment been made or if a serious marketing strategy been established.
>
> Thank you,
>
> Adam M. Rosenblatt

# EXHIBIT 15

**Declaration of Safa Gelardi**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**IME WATCHDOG, INC.,**
**Plaintiff,**

**-against-**

**SAFA GELARDI, VITO GELARDI, and IME COMPANIONS LLC,**
**Defendants.**

**Case No. 1:22-cv-01032-PKC-JRC**

**DECLARATION OF SAFA GELARDI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT DAMAGES AND PERMANENT INJUNCTIVE RELIEF**

I, Safa Gelardi, declare as follows:

1. I am a Defendant in this action. I submit this declaration in support of Defendants' opposition to Plaintiff IME WatchDog, Inc.'s motion for default judgment damages and permanent injunctive relief. I have personal knowledge of the matters stated in this declaration unless otherwise indicated.

2. I understand that, because of prior Court directives concerning return, destruction, confidentiality, and use of WatchDog materials, Defendants are not attaching restricted internal WatchDog financial materials such as WatchDog P&Ls, internal operating records, payroll/IME breakdowns, bank records, cash-flow records, and related financial records. I am not attempting to use or attach restricted WatchDog materials in violation of any Court order. My purpose is to explain what was reviewed with counsel and why Plaintiff's own records are necessary to test Plaintiff's claimed damages.

3. Based on materials reviewed with former counsel before compliance with the Court's directives, WatchDog's historical financial information reflected the following figures for 2014 through 2016:

a. 2014 sales income of approximately $525,199.40 and a net loss of approximately $42,539.82;

b. 2015 sales income of approximately $835,016.90 and net income of approximately $69,800.66;

c. 2016 sales income of approximately $969,699.84 and net income of approximately $74,557.42.

Those figures reflected total sales income of approximately $2,330,916.14 and total net income of approximately $101,818.26 for 2014 through 2016, which is an approximate aggregate net margin of 4.4%.

4. Based on my review with former counsel of the March 2017 materials transmitted by Adam Rosenblatt before compliance with the Court's directives, those materials reflected that WatchDog handled approximately 516 IMEs in March 2017. The materials also reflected that Zariz received approximately $25,000 in March 2017 and was already at approximately $75,000 year-to-date. The March 2017 materials also included or referenced records such as the monthly P&L, client list, list of IMEs covered, WatchDog invoices, bank/account materials, payroll or IME-payment information, projected cash-flow materials, and a pay-versus-billed breakdown.

5. Based on the same review with former counsel, WatchDog's historical records reflected significant outflows, including approximately $183,314.13 in distributions to DLA in 2014, approximately $165,000 in distributions to DLA and approximately $90,000 to Zariz in 2015, and approximately $220,000 to Zariz in 2016. I do not have the ability to attach the restricted internal WatchDog records themselves, but those categories of records are the types of financial materials Plaintiff controls and could submit to the Court if they support Plaintiff's claimed 50% margin.

6. Based on my review with former counsel of the March 2017 materials, the operating materials reflected approximately 516 IMEs in March 2017, with only two New Jersey IMEs listed and no Connecticut IMEs listed. I offer this fact to address the scope of Plaintiff's requested tri-state work ban and the need for narrow tailoring.

7. Adam Rosenblatt sent me the March 2017 WatchDog materials before this lawsuit, when he was attempting to convince me to go into business with him. I later provided those materials to my former attorney, Jonathan Warner, so they could be reviewed for their relevance to this case, including Plaintiff's business operations, profitability, records, and any damages issues.

8. Based on my personal knowledge of IME Companions' operations, IME Companions performed independent business-development and marketing efforts, including attorney-event outreach, marketing materials, sample reports, website and portal promotion, and paid marketing campaigns. IME Companions also used paid marketing services, including Marketing 360/Madwire and Giant Partners, during the relevant period.

9. Based on my personal knowledge and records, IME Companions' highest-volume year generally averaged approximately 350 to 375 IMEs per month, with only approximately

two months reaching approximately 400 to 405 IMEs. Plaintiff has not shown through WatchDog's own books that WatchDog would have performed the allegedly diverted work, what expenses WatchDog would have incurred, or what net profit WatchDog actually lost.

10. Based on my personal knowledge and records, IME Companions did not service, bill, or receive revenue from many firms included in Plaintiff's broad customer materials. Those firms included, among others, William Schwitzer & Associates, Cherny & Podolsky, Kahn Gordon Timko & Rodriguez, Gersowitz Libo & Korek, Cellino & Barnes, Miraglia Law, Blumen & Shayne PLLC, and the Rizzuto Law Firm.

11. Based on my personal knowledge and the records submitted with Defendants' opposition, customers in the IME-observation market often used more than one provider, changed providers, used different vendors for last-minute coverage, or stopped using a provider for reasons unrelated to Defendants. Customer overlap does not show why a customer moved, whether the customer would have used WatchDog, or what net profit WatchDog lost.

12. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 1, 2026
Jersey Village, Texas

---

Safa Gelardi
Pro Se Defendant

# EXHIBIT 16

**IME Companions Volume Reports, February-April 2022**

Defendants' Exhibit Package

| Date of Exam | Client Name | Length of IME | Amount Paid | Attorney | Report Submitted | Report Sent | Length of IME | Invoice Number | Doctor |
|---|---|---|---|---|---|---|---|---|---|
| 12/21/2021 | | 1 hour | | | Y | | 1 hour | 4166 | Dr. Gregory Menio |
| 2/1/2022 | | 1 hour | # | | Y | | 1 hour | 3818 | Dr. Alexandra Carrer |
| 2/1/2022 | | 1 hour | # | | Y | sent | 1 hour | 4036 | Dr. Sean Lager |
| 2/1/2022 | | cancelled D/O | # | | | | | 4138 | Dr. Louis Romeo |
| 2/1/2022 | | 1 hour +15 | # | | Y | | 1 hour | 3969 | Dr. Brian Wolin |
| 2/1/2022 | | Dr. did not show | # | | Y | | 1 hour | 3970 | Dr. Anthony Spataro |
| 2/1/2022 | | 1 hour | # | | Y | | 1 hour | 4139 | Dr. Lourdes Esteban |
| 2/1/2022 | | 1.5 hours | # | | Y | attached | 1.5 hours | 4264 | Dr. Lourdes Esteban |
| 2/1/2022 | | cancelled D/O | # | | | | | 4232 | Dr. Marianna Golden |
| 2/1/2022 | | 1.25 hours | # | | Y | | 1.5 hours | 4267 | Dr. Charla Fischer |
| 2/1/2022 | | 1 hour | # | | Y | sent | 1 hour | 4037 | Dr. Sean Lager |
| 2/1/2022 | | 2 hours | # | | Y | sent | 2 hours | 4038 | Dr. Alain De Le Chapelle |
| 2/1/2022 | | 1 hour +30 | # | | Y | Y | 2 hour | 4155 | Dr. Alan Mechanic |
| 2/1/2022 | | 1.5 hours+30 | # | | Y | | 1.5 hours | 4158 | Dr. Tal Mednick |
| 2/2/2022 | | 1 hour | # | | Y | | 1 hour | 4246 | Dr. Allen Rubenstein |
| 2/2/2022 | | 1.25 hours | # | | Y | sent | 1.5 hours | 4039 | Dr. Jeffrey Knox |
| 2/2/2022 | | cancelled 2/1 | cancelled 2/1 | | Zaremba | | | | 4267 |
| 2/2/2022 | | 1.5 hours | # | | Y | sent | 1.5 hours | 4040 | Dr. Paul Lerner |
| 2/2/2022 | | 1 Hour | | | | | 1 Hour | 3902 | Dr. Paul Kuflik |
| 2/2/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 3902 | Peter Capotosto |
| 2/2/2022 | | 1 hour | # | | Y | | 1 hour | 4140 | Dr. Allen Rubenstein |
| 2/2/2022 | | 1 Hour | # | | NRN/int only | | | 4161 | Dr. Ronald Csillag |
| 2/2/2022 | | 2 hours | # | | Y | | 2 hours | 3942 | Dr. Warren Cohen |
| 2/2/2022 | | 1.5 Hours | # | | Y | | 1.5 hours | 4166 | Dr. Charles Totero |
| 2/3/2022 | | 1.75 hours | # | | Y | | 2 hours | 4247 | Dr. Ira Chernoff |
| 2/3/2022 | | | | | | | | 3971 | Dr. Franklin Porter |
| 2/3/2022 | | 1.25 hours+25 | # | | Y | | 1.5 hours | | Dr. Jeffrey Richmond |
| 2/3/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4266 | Jennifer Canter |
| 2/3/2022 | | 1 hour | # | | Y | | 1 hour | 3902 | Dr. Andrew Bazos |
| 2/3/2022 | | 1.75 hours +15 | # | | Y | Y | 2 hours | 3989 | Dr. Regina Hillsman |
| 2/3/2022 | | 1 hour | # | | Y | | 1 hour | | Dr. Andrew Bazos |
| 2/3/2022 | | 1 hour | # | | Y | | 1 hour | 3953 | Dr. Andrew Bazos |
| 2/3/2022 | | 1.5 Hours +15 | # | | | | | 4166 | Dr. Daniel Feuer |
| 2/3/2022 | | 2 hours | # | | Y | | 2 hours | 3902 | Dr. Neil Roth |
| 2/3/2022 | | | | | | | | 4166 | Dr. Daniel Feuer |
| 2/3/2022 | | 1 hour | # | | Y | sent | 1 hour | 4041 | Dr. Alexandra Carrer |

| Date | | | | | | | | | Doctor |
|---|---|---|---|---|---|---|---|---|---|
| 2/3/2022 | | | | | | | | | Dr. Vikas Agrawal |
| 2/3/2022 | | | | | | | | 4267 | Dr. Daniel Feuer |
| 2/3/2022 | | | | | | | | | Dr. Marc Chernoff |
| 2/3/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4159 | Dr. Howard Kiernan |
| 2/3/2022 | | 2.5 hours | # | | Y | attached | 2.5 hours | 4264 | Dr. Ira Chernoff |
| 2/3/2022 | | 1 hour+25 | # | | Y | | 1 hour | 4166 | Dr. Joseph Lopez |
| 2/3/2022 | | 1 Hour/cancelled last min | # | | | | 1 Hour | 4166 | Dr. Vikas Agrawal |
| 2/3/2022 | | 1 hour | # | | Y | | 1 hour | 4159 | Dr. Alexandra Carrer |
| 2/3/2022 | | 1 Hour | # | | | | 1 hour | 4264 | Dr. Pierce Ferriter |
| 2/3/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Andrew Bazos |
| 2/3/2022 | | TT NS/CANCELLED DO | 0 | | | | 1 Hour | 4248 | Dr. Dorothy Scarpinato |
| 2/4/2022 | | 1 hour | # | | Y | | 1 hour | 4159 | Dr. Bonnie Vader |
| 2/4/2022 | | | | | | | | | Dr. William Walsh |
| 2/4/2022 | | 4.25 hours+15 | # | | Y | | 4.5 hours | 4407 | Dr. David Masur |
| 2/4/2022 | | 1 hour | # | | Y | | 1 hour | 4267 | Dr. Yong Kim |
| 2/4/2022 | | 1 hour | | | Y | | 1 hour | 4042 | Dr. Jason Hochfelder |
| 2/4/2022 | | 2.5 hours | # | | Y | attached | 2.5 hours | 4264 | Dr. Charla Fischer |
| 2/5/2022 | | | | | | | DNB | | Dr. Santoshi Bilakota |
| 2/5/2022 | | | | | | | DNB | | Dr. Santoshi Bilakota |
| 2/7/2022 | | 1.25 hours+15 | # | | Y | sent | 1.5 hours | 4043 | Dr. Richard Semble |
| 2/7/2022 | | 1 hour+20 | # | | Y | sent | 1 hour | 4044 | Dr. Pierce Ferriter |
| 2/7/2022 | | 3.25 hours+15 | # | | Y | sent | 3.5 hours | 4045 | Dr. Alain De La Chapelle |
| 2/7/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Ramon Valderrama |
| 2/7/2022 | | Guillermo Antonio Rosado | | | | | | 4166 | Dr. Nicholas Post |
| 2/7/2022 | | 1 Hour | # | | | | 1 hour | 4264 | Dr. Eial Faierman |
| 2/7/2022 | | 1 hour | # | | Y | | 1 hour | 3902 | Dr. Andrew Hecht |
| 2/7/2022 | | 1 hour | # | | Y | | 1 hour | 4266 | Dr. Ramesh Gidumal |
| 2/7/2022 | | 1 hour+25 | # | | Y | | 1 hour | 4166 | Dr. Jonathan Glassman |
| 2/7/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4249 | Dr. Robert April |
| 2/7/2022 | | 1 hour+15 | # | | Y | sent | 1 hour | 4046 | Dr. Scott Bienenfeld |
| 2/7/2022 | | 1.25 hours | # | | Y | | 1.5 hours | 4267 | Dr. Konrad Grusson |
| 2/7/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Jeffrey Passick |
| 2/7/2022 | | 2 hours | # | | Y | attached | 2 hours | 4264 | Dr. Jeffrey Passick |
| 2/7/2022 | | 1.25 hours | # | | Y | sent | 1.5 hours | 4047 | Dr. J. Serge Parisian |
| 2/7/2022 | | 1 Hour +20 | # | | NRN/int only | | | 4162 | Dr. Isaiah Florence |

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2/7/2022 | ▓ | 1 hour see notes | # | ▓ | | | 1 Hour | 4250 | Dr. David Essig |
| 2/7/2022 | ▓ | 1.25 hours | # | ▓ | Y | attached | 1.5 hours | 4264 | Dr. Benjamin Rosenstadt |
| 2/7/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 4166 | Dr. Serge Paarisen |
| 2/7/2022 | ▓ | 1 hour +30 | # | ▓ | Y | | | 4166 | Dr. Louis Romeo |
| 2/7/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 4158 | Dr. William Kulak |
| 2/7/2022 | ▓ | 1 hour +20 | # | ▓ | Y | attached | 1 hour | 4264 | Dr. Mitchell Goldstein |
| 2/7/2022 | ▓ | 1.75 hours | # | ▓ | Y | | 2 hours | 4159 | Dr. Steven Goodman |
| 2/8/2022 | ▓ | 2 hours | # | ▓ | Y | attached | 2 hours | 4264 | Dr. Barbara Freeman |
| 2/8/2022 | ▓ | | | ▓ | | | | 4251 | Dr. Neil Roth |
| 2/8/2022 | ▓ | | | ▓ | | | | | Dr. Teresa Habacker |
| 2/8/2022 | ▓ | 1 hour+30 | # | ▓ | Y | | 1 hour | 4233 | Dr. Stuart Hershon |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 4267 | Dr. Ronald Grelsamer |
| 2/8/2022 | ▓ | 1.25 hours | # | ▓ | Y | | 1.5 hours | 3889 | Dr. Konrad Gruson |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 3974 | Dr. Jeffrey Dermksian |
| 2/8/2022 | ▓ | 2.25 hours | # | ▓ | Y | | 2.5 hours | 4166 | Dr. Mitchell Goldstein |
| 2/8/2022 | ▓ | 2 hours | # | ▓ | Y | sent | 2 hours | 4048 | Dr. Mitchell Goldstein |
| 2/8/2022 | ▓ | | | ▓ | | | | 4267 | Dr. Matthew Shatzer |
| 2/8/2022 | ▓ | 4.75 hours | # | ▓ | Y | | 5 hours | 4266 | Dr. Dustin Gordon |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 4267 | Dr. Neil Roth |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 4267 | Dr. Peter Capotosto |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | sent | 1 hour | 4049 | Dr. Mitchell Goldstein |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | | Dr. Willam Walsh |
| 2/8/2022 | ▓ | 1.25 hours | # | ▓ | Y | | 1.5 hours | 4158 | Dr. Willam Walsh |
| 2/8/2022 | ▓ | 1.5 hours | # | ▓ | Y | | 1.5 hours | 4158 | Dr. Willam Walsh |
| 2/8/2022 | ▓ | 2.25 hours+30 | # | ▓ | Y | | 2.5 hours | 4266 | Jane Mattson |
| 2/8/2022 | ▓ | | | ▓ | | | | 4267 | Dr. Ji Kim |
| 2/8/2022 | ▓ | 1.25 hours | # | ▓ | Y | | 1.5 hours | 4166 | Dr. Bo T. Headlam |
| 2/8/2022 | ▓ | | | ▓ | | | | 4166 | Dr. Eric Mittelmann |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 4267 | Dr. Peter Capotosto |
| 2/8/2022 | ▓ | 1 Hour | # | ▓ | | | 1 hour | 3966 | Dr. Daniel Feuer |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | | Dr. Thomas Nipper |
| 2/8/2022 | ▓ | | | ▓ | | | | 4252 | Dr. Jerry Ellstein |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | attached | 1 hour | 4264 | Dr. Amit Khaneja |
| 2/8/2022 | ▓ | | | ▓ | | | | 4159 | Dr. Alan Handlesman |
| 2/8/2022 | ▓ | 1 hour | # | ▓ | Y | attached | 1 hour | 4264 | Dr. Howard Kiernan |
| 2/9/2022 | ▓ | 1 hour | # | ▓ | Y | | 1 hour | 4141 | Dr. Howard Kiernan |

| Date | | | # | | | | | | Doctor |
|---|---|---|---|---|---|---|---|---|---|
| 2/9/2022 | ▮ | | | ▮ | | | | 4050 | Dr. Howard Kiernan |
| 2/9/2022 | | 1.5 Hours +30 | # | | | | | 4269 | Dr. Willam Walsh |
| 2/9/2022 | | 1.5 hours | # | | Y | Y | 1.5 hours | 4238 | Dr. Robert April |
| 2/9/2022 | | 1 hour see notes | # | | Y | | 1 hour | 4266 | Dr. Jeffrey Salkin |
| 2/9/2022 | | RS/to 2/17 | | | | | | | Dr. William Healy |
| 2/9/2022 | | 1 hour | # | | Y | | 1 jpur | 4267 | Dr. Kenneth Mroczek |
| 2/9/2022 | | 1.75 hours | # | | Y | sent | 2 hours | 4051 | Dr. Jeffrey Salkin |
| 2/9/2022 | | 1.75 hours | # | | Y | sent | 2 hours | 4052 | Dr. Jeffrey Salkin |
| 2/9/2022 | | 1 hour +30 | # | | Y | | 1 hour | 4159 | Dr. Vito Loguidoce |
| 2/9/2022 | | 1 hour | # | | Y | | 1 hour | 4159 | Dr. Jeffrey Knox |
| 2/9/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Roger Bonomo |
| 2/9/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Teresa Habacker |
| 2/10/2022 | | 2 hours | | | Y | attached | 2 hours | 4264 | Dr. Arnold Berman |
| 2/10/2022 | | 1 Hour +30 | # | | | | | 4245 | Dr. Jay Eneman |
| 2/10/2022 | | 1 hour +15 | # | | Y | | 1 hour | 3953 | Dr. Douglas Unis |
| 2/10/2022 | | 2.25 Hours | # | | Y | | 2.5 hours | 4267 | Dr. Malcolm Reid |
| 2/10/2022 | | | | | | | | 4166 | Dr. Joseph Dryer |
| 2/10/2022 | | | | | | | | | Dr. Lanny Schwartzfard |
| 2/10/2022 | | 1 hour | # | | Y | | 1 hour | 3975 | Dr. Joseph Yellin |
| 2/10/2022 | | 2.5 hours | # | | Y | sent | 2.5 hours | 4053 | Dr. Jeffrey Guttman |
| 2/10/2022 | | 1 Hour +30 | # | | | | | 4267 | Dr. Jay Eneman |
| 2/10/2022 | | | | | | | DNB | | Dr. Jeffrey Guttman |
| 2/10/2022 | | 1 hour +15 | # | | Y | | 1 hour | 4166 | Dr. Aruna Senevirante |
| 2/10/2022 | | " | | | Y | | | 4166 | Dr. Brian Wolin |
| 2/10/2022 | | 1.25 hours | # | | Y | sent | 1.5 hours | 4054 | Dr. Sean Lager |
| 2/10/2022 | | 1.25 hours+15 | # | | Y | | 1.5 hours | 4166 | Dr. Aruna Senevirante |
| 2/10/2022 | | 1 Hour | # | | NRN/int only | | | 4266 | Dr. Kincaid Wolstein |
| 2/10/2022 | | 1 Hour | # | | Y | sent | 1 hour | 4055 | Dr. Neil Roth |
| 2/10/2022 | | 1 hour | # | | Y | | 1 hour | 4142 | Dr. Sean Thompson |
| 2/10/2022 | | | | | | | | | Dr. Mark Weidenbaum |
| 2/10/2022 | | 1 hour +30 | # | | Y | | 1 hour | 4729 | Dr. Craig Ordway |
| 2/10/2022 | | Lurline McKenzie-Moses | | | | | | | Dr. Regina Hillsman |
| 2/10/2022 | | 1.25 hours +15 | # | | Y | sent | 1.5 hours | 4056 | Dr. Aruna Seneviratne |
| 2/10/2022 | | 1.75 hours | # | | Y | | 2 hours | 4253 | Dr. Saad Chaudhary |
| 2/10/2022 | | 2.5 hours | # | | Y | | 2.5 hours | 4166 | Dr. Jeffrey Guttman |
| 2/10/2022 | | 3.75 hours | # | | Y | | 4 hours | 4158 | Dr. Jeffrey |

| Date | | Hours | # | | Y | sent/attached | Hours | Number | Name |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Guttman |
| 2/10/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4158 | Dr. Arnold Berman |
| 2/10/2022 | | 1 hour | # | | Y | | 1 hour | 4267 | Dr. Paul Kuflik |
| 2/11/2022 | | 1 hour+40 | # | | Y | | 1 hour | 4271 | Dr. Marc Chernoff |
| 2/11/2022 | | 5 Hours | # | | | | 5 hours | 3943 | Dr. Richard Rise |
| 2/11/2022 | | 2.75 hours +15 | # | | Y | sent | 3 hours | 4057 | Dr. Jonathan Glassman |
| 2/11/2022 | | 1.25 hours | # | | Y | sent | 1.5 hours | 4058 | Dr. Mitchell Goldstein |
| 2/11/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4266 | Dr. Young |
| 2/11/2022 | | 5.75 Hours | # | | | | 6 hours | 3944 | Dr. Richard Rise |
| 2/11/2022 | | 1 Hour | # | | Y | attached | 1 hour | 4264 | Dr. Wesley Harris Bronson |
| 2/12/2022 | | 1.5 hours +15 | # | | Y | | 1.5 hours | 4254 | Dr. Arnold Berman |
| 2/14/2022 | | 2.5 hours | # | | Y | sent | 2.5 hours | 4059 | Dr. Sean Lager |
| 2/14/2022 | | 1 hour | # | | Y | | 1 hour | | Dr. Bradley Weiner |
| 2/14/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Yong Kim |
| 2/14/2022 | | 1.75 hours | # | | Y | | 2 hours | 4234 | Dr. Aruna Seneviratne |
| 2/14/2022 | | | | | | | DNB | | Dr. Howard Kiernan |
| 2/14/2022 | | 1 hour | # | | Y | | 1 hour | 3953 | Dr. Richard Semble |
| 2/14/2022 | | 2 hours | # | | Y | sent | 2 Hours | 4060 | Dr. Douglas Cohen |
| 2/14/2022 | | 3.75 Hours | # | | | | | 4267 | Dr. David Erlanger |
| 2/14/2022 | | 1 hour | # | | Y | | 1 hour | 4266 | Dr. Steven Gingseng |
| 2/14/2022 | | | | | | | | 4134 | Dr. Howard Kiernan |
| 2/14/2022 | | 1 hour +15 | # | | Y | sent | 1 hour | 4061 | Dr. Sean Lager |
| 2/14/2022 | | 1.25 hours +25 | # | | Y | attached | 1.5 hours | 4264 | Dr. Itzhak Haimovic |
| 2/14/2022 | | 2 hours | # | | Y | | 2 hours | 4158 | Dr. Santoshi Bilakota |
| 2/14/2022 | | 1.25 hours | # | | Y | attached | 1.5 hours | 4264 | Dr. Roger Bonomo |
| 2/14/2022 | | 1 Hour No show | # | | Y | attached | 1 hour | 4264 | Dr. William Kulak |
| END OF PAY PERIOD | | | | | | | | | |
| 2/15/2022 | | 2.5 hours | # | | Y | | 2.5 hours | 3945 | Dr. Richard Semble |
| 2/15/2022 | | 1.5 Hours see notes | # | | | | | 4160 | Dr. Eial Faierman |
| 2/15/2022 | | CANCELLED/LM | 0 | | | | 1 hour | 4255 | Dr. Howard Kiernan |
| 2/15/2022 | | 1 hour +15 | # | | Y | sent | 1 hour | 4062 | Dr. Jessica Gallina |
| 2/15/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Neil Ganz |
| 2/15/2022 | | 3.75 Hours | # | | Y | sent | 4 hours | 4063 | Dr. Sean Lager |
| 2/15/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Neil Ganz |
| 2/15/2022 | | 1 hour | | | Y | | 1 hour | 3902 | Dr. Jessica Gallina |
| 2/15/2022 | | 1 hour | # | | Y | Y | 1 hour | 4244 | Joseph Pessalano |
| 2/15/2022 | | 1.75 Hours | # | | Y | | 2 Hours | 3953 | Dr. Howard Kiernan |

| Date | | Hours | # | | Status | Note | Hours | ID | Doctor |
|---|---|---|---|---|---|---|---|---|---|
| 2/15/2022 | | 1.5 Hours | | | | | | 4266 | Dr. Adam Bender |
| 2/14/2022 | | 1 Hour sent wrong day | # | | DNB | | | | Dr. William Head |
| 2/15/2022 | | 6 hours | # | | Y | sent | 6 hours | 3901 | Dr. William Head |
| 2/15/2022 | | 1.25 Hours +20 | # | | | | | 4267 | Dr. Paul Kuflik |
| 2/15/2022 | | 1.75 hours | # | | Y | sent | 2 hours | 4064 | Dr. Eial Faierman |
| 2/15/2022 | | 1 hour | # | | Y | sent | 1 hour | 4065 | Dr. Paul Lerner |
| 2/15/2022 | | 1.5 hours | # | | Y | | 1.5 horus | | Dr. Edward Adler |
| 2/15/2022 | | | | | | | | 4066 | Dr. Alain De La Chapelle |
| 2/15/2022 | | 1 hour +15 | # | | Y | | | 4166 | Dr. Elizabeth Ortof |
| 2/15/2022 | | 1 hour +15 | # | | Y | | 1 hour | 4166 | Dr. Louis Romeo |
| 2/15/2022 | | 1 hour | # | | Y | | 1 hour | 4158 | Dr. Santoshi Billakota |
| 2/15/2022 | | 1 hour | # | | Y | | 1 hour | 4158 | Dr. Howard Levy |
| 2/15/2022 | | 1 Hour | paid | | Y | | 1 hour | 4158 | Dr. William Walash |
| 2/15/2022 | | 1.5 hours | # | | Y | attached | 1.5 hours | 4264 | Dr. Paul Lerner |
| 2/15/2022 | | 1.5 Hours | # | | Y | attached | 1.5 hours | 4264 | Dr. Howard Kiernan |
| 2/16/2022 | | 1.25 hours +90 | # | | Y | | 1.5 hours | 4166 | Dr. Joseph Dryer |
| 2/16/2022 | | | | | | | | 4067 | Dr. Elizabeth Ortof |
| 2/16/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4144 | Dr. Jerry Lubliner |
| 2/16/2022 | | 1 Hour +40 | # | | Y | | 1 hour | 3976 | Dr. Joseph Pessalano |
| 2/16/2022 | | 1 Hour | # | | NRN/int only | | 1 hour | | Dr. Howard Kiernan |
| 2/16/2022 | | 1.75 hours | # | | Y | | 2 hours | 4267 | Dr. Lourdes Esteban |
| 2/16/2022 | | 1.75 hours | # | | Y | | 2 hours | 4267 | Dr. Patricia Enriquez |
| 2/16/2022 | | 1 hour | # | | Y | | 1 hour | 4159 | Dr. Martin Locascio |
| 2/16/2022 | | 2 Hours +20 | # | | Y | | 2 hours | 4264 | Dr. Matthew Mendez |
| 2/16/2022 | | 1.75 Hours +20 | # | | Y | attached | 2 hours | 4264 | Dr. Matthew Mendez |
| 2/16/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Thomas Nipper |
| 2/16/2022 | | 2 hours +40 | # | | Y | | 2 hours | 4158 | Dr. Nicholas Post |
| 2/16/2022 | | 1.5 hours+40 | # | | Y | | 1.5 hours | 4158 | Dr. Jeffrey Guttman |
| 2/17/2022 | | 2.25 hours | # | | Y | sent | 2.5 hours | 4068 | Dr. Charles Demarco |
| 2/17/2022 | | 1.25 hours | # | | Y | | 1.5 hours | 3972 | Dr. Jeffrey Klein |
| 2/17/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Marshall Keilson |
| 2/17/2022 | | 1 hour+40 | # | | Y | | 1 hour | 4166 | Dr. Andrew Bazos |
| 2/17/2022 | | 1 hour | # | | Y | | 1 hour | 4145 | Dr. Hugh Selznick |
| 2/17/2022 | | 1 hour | # | | Y | Y | 1 hour | 4243 | Dr. Andrew Bazos |
| 2/17/2022 | | 1.5 hours+40 | # | | Y | | 1.5 hours | | Dr. Marc Chernoff |
| 2/17/2022 | | 1 hour | # | | Y | | 1 hour | 4266 | Dr. Andrew Bazos |

| Date | (redacted) | Hours | Note | (redacted) | Y | Status | Hours | ID | Doctor |
|---|---|---|---|---|---|---|---|---|---|
| 2/17/2022 | | 1 hour | # | | | | 1 hour | 3973 | Dr. Robert Pae |
| 2/17/2022 | | 1.25 hours +25 | # | | Y | | 1.5 horus | | Dr. William Walsh |
| 2/17/2022 | | Combined | 0 | | | | | | Dr. Ronald Csillag |
| 2/17/2022 | | 3 hours | # | | Y | | 3 hours | 4266 | Dr. David Masur |
| 2/17/2022 | | 1 Hour | # | | | | | 4256 | Dr. Jeffrey Klein |
| 2/17/2022 | | 1.5 hours+40 | # | | Y | | 1.5 hours | 4257 | Dr. Marc Chernoff |
| 2/17/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4730 | Dr. Dorothy Scarpinato |
| 2/17/2022 | | 1.25 hours | # | | Y | | 1.5 hours | 4731 | Dr. Alan Jacobs |
| 2/17/2022 | | 3.25 hours +90 | # | | Y | | 3.5 hours | 4166 | Dr. Katherine Murell |
| 2/17/2022 | | 1 hour | # | | Y | | 1 hour | 4258 | Dr. Dorothy Scarpinato |
| 2/17/2022 | | r/s from 2/9 | r/s from 2/9 | | | | | | Dr. William Healy |
| 2/17/2022 | | 1 Hour | Paid | | | | | 4163 | Dr. Pierce Ferriter |
| 2/17/2022 | | 1 Hour +15 | # | | Y | | 1 hour | 3946 | Dr. Louis McIntyre |
| 2/17/2022 | | 1.75 hours | # | | Y | | 2 hours | 4146 | Dr. Sean Thompson |
| 2/17/2022 | | 1 Hour +15 | # | | Y | | 1 hour | 3947 | Dr. Louis McIntyre |
| 2/17/2022 | | 1.25 hours +15 | # | | Y | | 1.5 hours | | Dr. Loius McIntyre |
| 2/17/2022 | | 1 Hour | # | | Y | sent | 1 hour | 4069 | Dr. Scott Bienenfeld |
| 2/17/2022 | | | | | Ginarte | Ginarte | | 4070 | |
| 2/17/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Andrew Bazos |
| 2/17/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Andrew Bazos |
| 2/17/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Andrew Bazos |
| 2/18/2022 | | 1 hour +40 | # | | | | | 4071 | Dr. Norman Weiss |
| 2/18/2022 | | 2.25 hours | # | | Y | | 2.5 hours | 4266 | Dr. Warren Cohen |
| 2/18/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4267 | Gary Young |
| 2/18/2022 | | 1 hour | # | | Y | sent | 1 hour | 4072 | Dr. Jason Hochfelder |
| 2/18/2022 | | 1.5 hours+40 | # | | Y | attached | 1.5 hours | 4264 | Dr. Surya Vishnubhakat |
| 2/18/2022 | | 1.5 hours | # | | Y | attached | 1.5 hours | 4264 | Dr. John Waller |
| 2/18/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Jared Brandoff |
| 2/18/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Warren Cohen |
| 2/18/2022 | | 1.25 hours | # | | Y | | 1.5 hours | | Dr. William Walsh |
| 2/18/2022 | | 3.25 Hours | # | | Y | | 3.5 Hours | 4147 | Dr. Louis Cornacchia |
| 2/18/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Kevin Portnoy |
| 2/19/2022 | | 1.25 Hours +25 | # | | Y | | 1.5 hour | 3948 | Dr. Santoshi Bilakota |
| 2/19/2022 | | 1 hour +25 | # | | Y | | 1 hour | | Dr. Carl Weiss |
| 2/19/2022 | | 1 Hour +25 | # | | Y | | 1 hour | 3949 | Dr. Santoshi Bilakota |
| 2/19/2022 | | 2.75 hours +25 | # | | Y | | 3 hours | 4159 | Dr. Carl Weiss |
| 2/21/2022 | | 1 hour | | | Y | sent | 1 hour | 4073 | Dr. Sean Lager |
| 2/21/2022 | | 1 hour+40 | # | | Y | | 1 hour | | Dr. Philip Cilio |

| Date | | Duration | Status | | Name/Y | Note | Hours | Number | Doctor |
|------|---|----------|--------|---|--------|------|-------|--------|--------|
| 2/21/2022 | | 1 hour | # | | | | 1 hour | 4259 | Dr. Ramesh Gidumal |
| 2/21/2022 | | 1 hour +15 | # | | Y | sent | 1 hour | 4074 | Dr. Sean Lager |
| 2/21/2022 | | R/S to 3/21 | | | | | | 4267 | Dr. Kenneth Perrine |
| 2/21/2022 | | 1 Hour +50 | # | | | | 1.5 Hours | 3902 | Dr. Alexandre Carrer |
| 2/21/2022 | | 1 hour | # | | NRN | | | 4267 | Dr. Konrad Gruson |
| 2/21/2022 | | 1 hour+15 | # | | Y | Y | 1 hour | 3990 | Dr. Eial Faierman |
| 2/21/2022 | | 1 Hour | # | | | | 1 hour | 4260 | Peter Capotosto |
| 2/21/2022 | | | | | | | 5 Hours | 3902 | Dr. William Head |
| 2/21/2022 | | | | | | | | | Dr. Jeffrey Klein |
| 2/21/2022 | | 1 hour See Notes | # | | Y | Y | 1 hour | 4156 | Dr. Marc Agulnick |
| 2/21/2022 | | 1 hour+20 | # | | Y | | 1 hour | 4166 | Dr. Govindall Bhanusali |
| 2/21/2022 | | 1 Hour | # | | Y | | 1 hour | 4166 | Dr. Stephen Flood |
| 2/21/2022 | | client showed | client showed | | Pinkhasov | | | | DNB |
| 2/22/2022 | | | | | | | | 4235 | Dr. Sammy Dean |
| 2/22/2022 | | 1 hour+30 see notes | # | | Y | sent | 1 hour | 4075 | Dr. Dana Mannor |
| 2/22/2022 | | 1 hour | # | | Y | | 1 hour | 4267 | Dr. John Bendo |
| 2/22/2022 | | 1.25 hours | # | | Y | | 1.5 hours | 3967 | Dr. Wei Shen |
| 2/22/2022 | | 1 Hour | # | | Y | sent | 1 hour | 4076 | Dr. Scott Bienenfeld |
| 2/22/2022 | | 1 hour | # | | Y | | 1 hour | 3953 | Dr. Ronald Grelsamer |
| 2/22/2022 | | 1.25 Hours | # | | Y | Y | 1.5 hours | 4241 | Dr. Paul Lerner |
| 2/22/2022 | | 1.25 hours | # | | Y | | 1.5 hours | 4266 | Dr. Jay Eneman |
| 2/22/2022 | | 1 hour | paid | | Yankowitz | | | | 4305 |
| 2/22/2022 | | 1 hour | # | | Y | | 1 hour | 4267 | Dr. Joel Grad |
| 2/22/2022 | | 1 hour | # | | Y | | 1 hour | 4261 | Dr. Adam Bender |
| 2/22/2022 | | 1 hour | # | | Y | | 1 hour | 4262 | Joseph Pessalano |
| 2/22/2022 | | 1.5 Hour | paid | | E & E | | | | 4159 |
| 2/22/2022 | | | | | | | | 4159 | Dr. Richard Semble |
| 2/22/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Neil Roth |
| 2/22/2022 | | 1 Hour | # | | | | 1 hour | 4264 | Dr. Alan Miller |
| 2/22/2022 | | 1 hour +20 | # | | Y | | 1 hour | 4264 | Dr. Daniel Wolstein |
| 2/23/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4267 | Dr. Alexander Merkler |
| 2/23/2022 | | 1.25 Hours | # | | Y | | 1.5 Hours | 4280 | Dr. Howard Levin |
| 2/23/2022 | | 1 hour | # | | Y | Y | 1 hour | 4242 | Dr. Lourdes Esteban |
| 2/23/2022 | | 1 hour +25 | # | | Y | | 1 hour | 4732 | Dr. Paul Lerner |
| 2/23/2022 | | 1.75 Hours +15 | # | | Y | | | 4267 | Dr. Chirag Shah |
| 2/23/2022 | | 3.25 Hours | # | | Y | | 3.5 hours | 3991 | Dr. Jeffrey Guttman |
| 2/23/2022 | | 1 hour | # | | Y | | 1 hour | 4266 | Dr. Robert Moriarty |

| Date | | Duration | # | | Y | Status | Duration | Number | Name |
|---|---|---|---|---|---|---|---|---|---|
| 2/23/2022 | | 1 hour | # | | Y | | 1 hour | 3992 | Dr. Lourdes Esteban |
| 2/23/2022 | | 1.25 Hours | # | | Y | | | 4266 | Dr. Arnold Berman |
| 2/23/2022 | | 1.25 Hours | # | | Y | | 1.5 Hour | 3953 | Dr. Arnold Berman |
| 2/23/2022 | | 1 hour | # | | Y | | 1 hour | 3968 | Dr. Lourdes Esteban |
| 2/23/2022 | | 1 Hour | # | | Y | attached | 1 hour | 4264 | Howard Levin |
| 2/23/2022 | | | | | | | | 4264 | Sheidellas Gomez |
| 2/24/2022 | | 1.5 hours | # | | Y | | 1.5 hours | | Dr. Lanny Schwartzfard |
| 2/24/2022 | | 1 Hour | # | | | | | 4164 | Dr. Pierce Ferriter |
| 2/24/2022 | | 1 Hour +20 | # | | | | 1 hour | 4165 | Dr. Surya Murthy Vishnubhakat |
| 2/24/2022 | | 2.5 hours | # | | Y | | 2.5 hours | 3902 | Dr. John Sidtis |
| 2/24/2022 | | 1 hour +30 | # | | Y | | 1 hour | | Dr. Dorothy Scarpinato |
| 2/24/2022 | | 1 Hour | # | | Y | | | 4267 | Joseph Pessalano |
| 2/24/2022 | | rescheduled to 3/14 | # | | | | | | Dr. Jeffrey Richmond |
| 2/24/2022 | | | | | | | | 4077 | Dr. Thomas Albus |
| 2/24/2022 | | 1 Hour +60 | # | | Y | | 1 hour | 4236 | Dr. Bonnie Corey |
| 2/24/2022 | | 1.25 Hours | # | | Y | sent | 1.5 hours | 4078 | Dr. Andrew Beharrie |
| 2/24/2022 | | 1 hour | # | | Y | sent | 1 hour | 4079 | Dr. Twee Do |
| 2/24/2022 | | 1.5 Hours | # | | Y | sent | 1.5 Hours | 4080 | Dr. Franklin Porter |
| 2/24/2022 | | 1 Hour | # | | Y | attached | 1 hour | 4264 | Dr. Ashok Anant |
| 2/24/2022 | | 1 hour+40 | # | | Y | attached | 1 hour | 4264 | Dr. Eric Freeman |
| 2/24/2022 | | 1 hour | # | | Y | | 1 hour | 4158 | Dr. Howard Kiernan |
| 2/24/2022 | | 1 hour | # | | Y | | 1 hour | 4166 | Dr. Thomas Albus |
| 2/24/2022 | | 1 Hour | # | | Y | | 1 hour | 4264 | Dr. Steven Fayer |
| 2/24/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Roy Kulick |
| 2/24/2022 | | 1.25 Hours | # | | Y | | 1.5 hours | 4166 | Dr. Andrew Beharrie |
| 2/24/2022 | | 1 hour +60 | # | | | | 1 horu | 4264 | Dr. Adam Soyer |
| 2/24/2022 | | 1 hour | # | | Y | attached | 1 hour | 4264 | Dr. Jason Baynes |
| 2/25/2022 | | 2 Hours +15 | # | | | | 2 Hours | 4081 | Dr. Jonathan Glassman |
| 2/25/2022 | | 2.75 hours | # | | Y | | 3 hours | 4266 | Dr. Barbara Zvi |
| 2/25/2022 | | 1.5 Hours | paid | | Silberstein | NRN/int only | | 4266 | |
| 2/25/2022 | | 1.25 Hours | # | | Y | | 1.5 hours | | Dr. Warren Cohen |
| 2/25/2022 | | 2 Hours | | | | | | 4266 | Dr. Christopher Gharibo |
| 2/25/2022 | | 1.5 hours | # | | Y | | 1.5 hours | 4166 | Dr. Malcolm Reid |
| 2/25/2022 | | 1.5 hours | # | | Y | | | 4237 | Dr. Dana Manor |
| 2/25/2022 | | 1.75 hours | # | | Y | | 2 hours | 4148 | Dr. Dana Manor |
| 2/25/2022 | | 1 Hour see notes | # | | NRN | | | 4159 | Dr. Kishore Ranade |
| 2/25/2022 | | 1 Hour | # | | Y | sent | 1 hour | 4082 | Dr. Kishore Ranade |

| Date | | Duration | # | | Y | Status | Duration | Number | Doctor |
|---|---|---|---|---|---|---|---|---|---|
| 2/25/2022 | ■ | 1 hour+40 | # | ■ | | | 1 hour | 4083 | Dr. Matthew Landfried |
| 2/25/2022 | ■ | 1 hour | # | ■ | Y | attached | 1 hour | 4264 | Dr. Frank Lombardo |
| 2/25/2022 | ■ | 1.5 Hours | # | ■ | Y | attached | 1.5 hours | 4264 | Dr. Dana Manor |
| 2/25/2022 | ■ | 1 Hour | # | ■ | Y | | 1 hour | 4166 | Dr. Scott Bienfeld |
| 2/25/2022 | ■ | 1.25 hours | # | ■ | Y | | 1.5 hours | 4166 | Dr. Jeffrey Knox |
| 2/26/2022 | ■ | 7 hours | # | ■ | Y | | 7 hours | 4166 | Dr. Thomas Myers |
| 2/28/2022 | ■ | 1 hour+30 | # | ■ | Y | sent | 1 hour | 4084 | Dr. Louis Romeo |
| 2/28/2022 | ■ | 2 Hours | # | ■ | | | 1 hour | | Dr. Steven Goodman |
| 2/28/2022 | ■ | 1.25 Hours | # | ■ | Y | | 1.5 hours | 4263 | Dr. Douglas S. Cohen |
| 2/28/2022 | ■ | 1.25 Hours | # | ■ | Y | | 1.5 hours | | Dr. Howard Kiernan |
| 2/28/2022 | ■ | 1.25 hours +15 | # | ■ | Y | | 1.5 hours | 4166 | Dr. Nicholas Post |
| 2/28/2022 | ■ | 2 hours | # | ■ | Y | | 2 hours | 4166 | Dr. Catherine Tortorella |
| 2/28/2022 | ■ | 1 hour+20 | # | ■ | Y | | 1 hour | | Dr. Jeffrey Beer |
| 2/28/2022 | ■ | Cancelled | | ■ | | | 1 hour | | Dr. Vijay Sidhwani |
| 2/28/2022 | ■ | Cancelled | | ■ | | | | | Dr. Vijay Sidhwani |
| 2/28/2022 | ■ | 4.5 Hours | # | ■ | Y | Y | 4.5 hours | 4239 | Dr. William Barr |
| 2/28/2022 | ■ | 1.5 hours | # | ■ | Y | attached | 1.5 hours | 4264 | Dr. Jeffrey Passick |
| 2/28/2022 | ■ | 1.25 hours | # | ■ | Y | | 1.5 hours | 4264 | Dr. William Kulak |
| 2/28/2022 | ■ | 1 hour | # | ■ | Y | attached | 1 hour | 4264 | Dr. Jeffrey Passick |
| 2/28/2022 | ■ | 2.5 Hours | # | ■ | | | 2.5 hours | 4166 | Dr. Steve Goodman |
| 2/28/2022 | ■ | 1 hour | # | ■ | Y | | 1 hour | 4158 | Dr. Jeffrey Passick |
| 2/28/2022 | ■ | 1.25 hours | # | ■ | Y | | 1.5 hours | 4158 | Dr. Jeffrey Passick |
| 2/28/2022 | ■ | 2.75 Hours | # | ■ | | | 2.75 Hours | 4281 | Dr. Stephen Goodman |
| 2/28/2022 | ■ | 1 hour+20 | # | ■ | Y | | 1 hour | | Dr. Jeffrey Richmond |
| 2/28/2022 | ■ | 1 hour | # | ■ | Y | | 1 hour | 4158 | Dr. Regina Hillsman |
| 2/28/2022 | ■ | 1 hour | # | ■ | Y | | 1 hour | 4158 | Dr. Regina Hillsman |
| 2/28/2022 | ■ | 1.5 hours | | ■ | Y | | 1.5 hours | 4264 | Dr. Willaim Kulak |
| 2/28/2022 | ■ | | | ■ | Maine | | | | |
| 2/28/2022 | ■ | | | ■ | Dallas | | | | |
| 2/28/2022 | ■ | | | ■ | Dallas | | | | |
| 2/28/2022 | ■ | | | ■ | Seatle | | | | |

| Date of Exam | Client Name | Length of IME | Length of IME | Doctor | Specialty | Location | Notes / Clients phone # |
|---|---|---|---|---|---|---|---|
| 3/1/2022 | | Penny | | Dr. David Erlanger | Ortho | 111 East 75th Street, New York, NY 10021 | # |
| 3/1/2022 | | 1.5 Hours | 1.5 hours | #Dr. Richard Kanoff | Neuro | 1300 Union Turnpike, New Hyde Park, NY 11040 | # |
| 3/1/2022 | | cancelled | Gabby | Dr. Jay Eneman | Ortho | 4 Weber Avenue, Malverne, NY 11565 | # |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Anthony Russo | Dentist | 4514 Parsons Blvd, Flushing, NY 11355 | # |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Pierce Ferriter | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Pierce Ferriter | Ortho | 713 East Tremont Avenue, Bronx, NY 10465 | |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Pierce Ferriter | Ortho | 713 East Tremont Avenue, Bronx, NY 10465 | # |
| 3/1/2022 | | 1.5 hours | 1.5 hours | #Dr. Henry Spinelli | Plastic Surg | 875 5th Avenue, New York, NY 10065 | # |
| 3/1/2022 | | 1 hour+20 | 1 hour | #Dr. Paul Kuflik | Ortho | 1122 Franklin Avenue, Garden City, NY 11530 | # |
| 3/1/2022 | | 2 hours +3 | 2 hours | #Dr. Daniel Rich | Ortho | 333 Earle Ovington Blvd, Uniondale, NY 11553 | # |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. John Bendo | Spinal Surgeo | 862 Park Avenue, New York, NY 10075 | # |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Knox | Ortho | 5 Columbus Circle, New York, NY, 10019 | # |
| 3/1/2022 | | 1.25 hours | 1.5 hours | #Dr. Jay Eneman | Ortho | 900 Walt Whitman Road, Malverne, NY 11747 | # |
| 3/1/2022 | | 1.5 hours | 1.5 hours | #Dr. Konrad Gruson | Ortho | 1250 Waters Place, Bronx, NY 10461 | # |
| 3/1/2022 | | 5.5 hours + | 5.5 hours | #Dr. Richard DeBenedetto | Neuro/Psych | 100 South Bedford Road, Mt. Kisco, NY 10549 | # |
| 3/1/2022 | | 1 hour +15 | 1 hour | #Dr. Marshall Keilson | Neuro | 1220 Avenue P, Brooklyn, NY 11229 | # |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Adam Bender | Neuro | 1150 Park Avenue, New York, NY 10128 | TT not seen due to forgetting vaccination card at home |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Adam Bender | Neuro | 1150 Park Avenue, New York, NY 10128 | |
| 3/1/2022 | | 1 hour+20 | 1 hour | #Dr. William Walsh | Ortho | 2545 Hempstead Turnpike, East Meadow, NY 11554 | |
| 3/1/2022 | | 1.5 hours | 1.5 hours | #Dr. Jerry Lubliner | Ortho | 215 East 77th Street, New York, NY 10021 | |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Joseph Pessalano | Voc Rehab | 1101 Stewart Ave. Garden City NY 11530 | AFFIDAVIT FILED |
| 3/1/2022 | | | Wilson | #Dr. Alexandra Carrer | Ortho | 30-01 Astoria Blvd. Astoria NY 11102 | |
| 3/1/2022 | | 1 hour | 1 hour | #Dr. Mitchell Goldstein | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | |
| 3/2/2022 | | 1.25 hours | 1.5 hours | #Dr. William Kulak | Ortho | 580 Park Ave, New York, NY 10065 | AFFIDAVIT FILED |
| 3/2/2022 | | 1 hour | 1 hour | #Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | TT No show |
| 3/2/2022 | | | Missed | #Dr. Gregory Montalbano | | 82 Lamberts Lane, Staten Island, NY 10314 | # |
| 3/2/2022 | | 2.5 hours | 2.5 hours | #Peter Capotosto | | 570 Lexington Avenue, New York, NY 10022 | # |
| 3/2/2022 | | no report | Diana | #Dr. Glenn Berman | Chiro | 3311 Shore Parkway, Brooklyn, NY 11235 | |
| 3/2/2022 | | Combined | Diana | #Dr. Martin Locasio | Acu | 3311 Shore Parkway, Brooklyn, NY 11235 | |
| 3/2/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Knox | | 43-31 Corporal Kennedy Street, Bayside, NY 11361 | |
| 3/2/2022 | | 1.5 hours | 1.5 hours | #Dr. Jeffrey Knox | | 43-31 Corporal Kennedy Street, Bayside, NY 11361 | # |
| 3/2/2022 | | 2.5 hours + | 2.5 hours | #Dr. Ernesto Seldman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/2/2022 | | Combined | 1 Hour | #Dr. Brian Wolin | Chiro | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/2/2022 | | 1.25 hours | 1.5 hours | #Dr. Thomas Nipper | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/2/2022 | | 1.25 hours | 1.5 hours | #Dr. Alex Greenberg | Oral Surgeon | 18 East 48th Street, New York, NY 10017 | # |
| 3/2/2022 | | 1.75 Hours | Jonathan | #Dr. Thomas Nipper | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |

| Date | | | | Name | Specialty | Address | Note |
|---|---|---|---|---|---|---|---|
| 3/2/2022 | | 1 hour +30 | 1 hour | #Dr. Richard Weinstein | Ortho | 1133 Westchester Avenue, White Plains, NY 10604 | # |
| 3/2/2022 | | 1 hour +15 | 1 hour | #Jospeph Pessalano | Voc Rehab | 40 Wall Street, New York, NY 10005 | |
| 3/2/2022 | | 1 Hour | Maura | #Jeffrey Knox | Ortho | 43-31 Corporal Kennedy St. Bayside NY 11361 | |
| 3/2/2022 | | 1 Hour +20Maura | | #John Killian | | 230 Hilton Avenue, Hempstead, NY 11550 | |
| 3/3/2022 | | 2.5 hours | 2.5 hours | #Dr. Joseph Yellin | Neuro | 130 Eaast 77th Street, NY, NY 10075 | AFFIDAVIT FILED |
| 3/3/2022 | | 1 hour | 1 hour | #Dr. Ira Chernoff | Ortho | 400 East 54th Street, New York, NY 10022 | |
| 3/3/2022 | | | Mark Russia#Dr. | Michael Goldstein | Ophthalmolo | 2114 Williambridge Road, Bronx, NY 10461 | # |
| 3/3/2022 | | C ancelled | Sara | Dr. Dana Manor | Ortho | 945 Huguenot Avenue, Staten Island, NY 10312 | # |
| 3/3/2022 | | 1.25 hours | 1.5 hours | #Dr. Dana Manor | Ortho | 945 Huguenot Avenue, Staten Island, NY 10312 | # |
| 3/3/2022 | | 1 hour+15 | 1 hour | #Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | # |
| 3/3/2022 | | 1 hour | 1 hour | #Dr. Marc Chernoff | Ortho | 800 Woodbury Road, Woodbury, NY 11797 | # |
| 3/3/2022 | | 1.25 hours | 1.5 hours | #Dr. Michael Goldstein | Ophthalmolo | 115 East 61st Street, New Yoek, NY 10065 | # |
| 3/3/2022 | | 1.5 hours | 1.5 hours | #Dr. John Sidtis | Psych | 845 3rd Avenue, New York, NY 10022 | # |
| 3/3/2022 | | 1 hour | 1 hour | #Dr. Vladimir Zlatnick | Neuro | 99-52 66th Road, Rego Park, NY 11374 | # |
| 3/3/2022 | | 1 hour | 1 hour | #Dr. Dorothy Sarpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | # |
| 3/3/2022 | | | Jonathan | #Dr. Franklin Porter | | 2932 Wilkinson Avenue, Bronx, NY 10461 | # |
| 3/3/2022 | | 1 hour | 1 hour | #Dr. Jay Eneman | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | |
| 3/3/2022 | | 1 Hour +15Maura | | #Dr. Daniel Feurer | | 910 Grand Concourse, Bronx, NY 10451 | # |
| 3/3/2022 | | 1 Hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY, USA 10019 | # |
| 3/3/2022 | | 2 hours +1 | 2 horurs | #Josiah Pearson | Voc Rehab | 40 Wall Street, New York, NY 10006 | # |
| 3/3/2022 | | 1 Hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY, USA 10019 | # |
| 3/3/2022 | | | Penny | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY, USA 10019 | |
| 3/3/2022 | | 1 hour | 1 hour | #Dr. Alexandra Carrer | Ortho | 1118 Avenue Y, Brooklyn, NY 11235 | |
| 3/3/2022 | | 2.25 hours | 2.5 hours | #Dr. Alexandra Carrer | Ortho | 1118 Avenue Y, Brooklyn, NY 11235 | # |
| 3/3/2022 | | | Mark Russia#Dr. | Mitchell Goldstein | | 2114 Williambridge Road, Bronx, NY 10461 | |
| 3/3/2022 | | 1 Hour | Penny | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY, USA 10019 | # |
| 3/3/2022 | | 2 hours +2 | 2 hours | #Dr. Itzhak Haimovic | Neuro | 170 Great Neck Road, Great Neck, NY 11021 | # |
| 3/3/2022 | | 2 hours | 2 hours | #Dr. Carl Friedman | | 100 Park Avenue, New York, NY 10028 1st floor | # |
| 3/3/2022 | | 1 Hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY, USA 10019 | # |
| 3/3/2022 | | cancelled s | Christian | Mark Ramnauth | Voc rehab | 745 5th Avenue, New York, NY 10151 | based on the report, TT told comp will not be going and unclear wh |
| 3/3/2022 | | 1.5 hours | 1.5 hours | #Dr. Jessica Gallina | Ortho | 240 Central Park South, New York, NY 10019 | AFFIDAVIT FILED |
| 3/3/2022 | | 1.25 hours | 1.5 hours | #Dr. Arnold Berman | Ortho | 30 Park Avenue, New York, NY 10016 | |
| 3/3/2022 | | 7 hours | 7 hours | #Dr. Richard DeBenedetto | Neuropsych | 118-35 Queens Blvd, Forest Hills, NY 11375 | AFFIDAVIT FILED |
| 3/3/2022 | | 1.25 Hours | 1.5 hours | #Dr. Solomon Miskin | | 107-05 Forest Hills NY 11375 | |
| 3/3/2022 | | 1 Hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY, USA 10019 | AFFIDAVIT FILED |
| 3/3/2022 | | 1 Hour can | 1 Hour | #Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | |
| 3/3/2022 | | 1 Hour can | 1 Hour | #Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY | AFFIDAVIT FILED |

| Date | | | | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | 10461 | |
| 3/3/2022 | | 1 hour | 1 hour | #Dr. Lawrence Altman | Chiro | 506 River Rd. New Milford NJ 07646 | |
| 3/4/2022 | | CANCELLEDCancelled | | #Dr. Jeffrey Salkin | Ortho | 100 Mamaroneck Avenue, White Plains, NY 10601 | # |
| 3/4/2022 | | 1 hour+40 | 1 hour | #Dr. Ira Chernoff | Ortho | 2500 Nesconet Highway, Stony Brook, NY 11790 | appt cancelled by the defense |
| 3/4/2022 | | 1.75 hours | 2 hours | #Dr. Vikas Agrawal | Neuro | 1665 Grand Concourse, Bronx, NY 10452 | Spanish Speaking |
| 3/4/2022 | | 1 hour | 1 hour | #Dr. William Walsh | Ortho | 86-11 Lefferts Blvd. Richmond Hill NY 11418 | # |
| 3/4/2022 | | 1 hour +30 | 1 hour | #Dr. Dorothy Sarpinato | Ortho | 760 North Wellwood Avenue, Lindenhurst, NY 1175# | |
| 3/4/2022 | | 1.5 hours | 1.5 hours | #Dr. Elizabeth Morrison | | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/4/2022 | | 1.25 hours | 1.5 hours | #Dr. Jeffrey Salkin | Ortho | 100 Mamaroneck Avenue, White Plains, NY 10601 | # |
| 3/5/2022 | | 1.75 hours | 2 hours | #Dr. Carl Weiss | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | # |
| 3/7/2022 | | 1 hour | 1 hour | #Dr. Howard Kiernan | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | |
| 3/7/2022 | | 1 hour | 1 hour | #Dr. Howard Kiernan | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | |
| 3/7/2022 | | 1.25 hours | 1.5 hours | #Dr. Matthew Mendez-Zfass | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/7/2022 | | 1.5 hours | 1.5 hours | #Dr. Edward Yang | Ortho | 25-20 30th Avenue, Astoria, NY 11102 | # |
| 3/7/2022 | | 1 hour +15 | 1 hour | #Dr. John Buckner | Ortho | 2010 Bruckner Blvd, Bronx, NY 10473 | # |
| 3/7/2022 | | 3 Hours +2 | 3 Hours | #Dr. Tal Mednick | Neuro | 601 Franklin Avenue, Garden City, NY 11530 | # |
| 3/7/2022 | | 1 hour +15 | 1 hour | #Dr. Nicholas Post | Neuro | 9020 5th Avenue, Brooklyn, NY 11209 | |
| 3/7/2022 | | 1 hour | 1 hour | #Dr. Ramesh Gudumal | | 20 East 46th Street, New York, NY 10017 | # |
| 3/7/2022 | | 1.75 Hours | 2 hours | #Dr. David Essig | Ortho | 717 Church Avenue, Brooklyn, NY 11218 | # |
| 3/7/2022 | | rescheduleDave | | #Dr. Nicholas Post | Neuro | 345 East 37th St. New York NY 10016 | AFFIDAVIT FILED |
| 3/7/2022 | | | Missed | #Dr. Calogero Gambino | Ortho | 6740 4th Ave. Brooklyn NY 11209 | |
| 3/7/2022 | | 1.25 Hours | 1.5 hours | #Dr. Ira Neustadt | Neuro | 30 Matthews St. Goshen NY 10924 | CASE SETTLED |
| 3/7/2022 | | 1.75 Hours | 2 hours | #Dr. Ira Neustadt | Neuro | 30 Matthews St. Goshen NY 10924 | |
| 3/8/2022 | | 1 hour +15 | 1 hour | #Dr. Houten | Neuro | 6010 Bay Parkway, Brooklyn, NY 11204 | |
| 3/8/2022 | | 1 hour +15 | 1 hour | #Dr. Kenneth Alleyne | | 2949 Middletown Road, Bronx, NY 10461 | |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. Neal Ezra | Oral Surgeon | 1301 Comaga Avenue, Far Rockaway, NY 11691 | # |
| 3/8/2022 | | 1.25 Hours | Mark | #Dr. Jeffrey Passick | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | # |
| 3/8/2022 | | 1.25 hours | 1.5 hours | #Dr. Howard Levy | Ortho | 1110 Pennsylvania Avenue, Brooklyn, NY 11207 | |
| 3/8/2022 | | 1 Hour | 1 hour | #Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | # |
| 3/8/2022 | | 2 hours +1 | 2 hours | #Dr. Kenneth Alleyne | | 2949 Middletown Road, Bronx, NY 10461 | # |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. Jay Eneman | Ortho | 112-47 Queens Blvd, Forest Hills, NY 11375 | # |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. Thomas Nipper | Chiro | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. Edward Toriello | Ortho | 70-02 Fresh Pond Road, Ridgewood, 11385 | # |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. John Bendo | Ortho | 863 Park Avenue, New York, NY 10075 | # |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. Bonnie Corey | Chiro | 2915 Avenue S, Brooklyn, NY 11229 | |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. Bonnie Corey | Chiro | 2915 Avenue S, Brooklyn, NY 11229 | # |
| 3/8/2022 | | RescheduleCancelled | | Dr. Daniel Rosenberrg | Physical Med | 34 Scotch Road, Ewing, NJ 08628 | # |
| 3/8/2022 | | 1 hour | 1 hour | #Dr. Jay Eneman | Ortho | 112-47 Queens Blvd, Forest Hills, NY | |

| Date | | | | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|---|---|
| 3/8/2022 | | | Jonathan | #Dr. Ronald Grelsamer | Ortho | 35 East 85th St. New York NY 10028 | AFFIDAVIT FILED |
| 3/8/2022 | | | Maria E | #Dr. Eric Roth | PMR | 110 W. 34th St. New York NY 10001 | |
| 3/8/2022 | | 1.5 Hours | 1.5 hours | #Dr. Ken Alleyne | | 2949 Middletown Road, Bronx, NY 10461 | |
| 3/8/2022 | | 1.25 Hours | Mark | #Dr. Jeffrey Passick | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | |
| 3/8/2022 | | 1.25 Hours | Maura | #Dr. Steven Weinstein | PMR | 595 Merrick Ave. East Meadow NY 11554 | |
| 3/8/2022 | | 2.5 hours | 2.5 hours | #Dr. Stefain Kieserman | | 61 East 86th St. New York NY 10028 | |
| 3/9/2022 | | 1 hour | 1 hour | #Dr. Harvey Manes | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | AFFIDAVIT FILED |
| 3/9/2022 | | 2.25 hours | 2.5 hours | #Dr. Ken Alleyne | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Record IME/Spanish Speaking |
| 3/9/2022 | | 1 hour | 1 hour | #Dr. Howard Kiernan | Ortho | 224 West 35th Street, New York, NY 10001 | |
| 3/9/2022 | | 1 Hour | Jonatnan | #Dr. Daniel Feurer | Neuro | 30-55 21st Street, Astoria, NY 11101 | # |
| 3/9/2022 | | 1 hour | 1 hour | #Dr. Matthew Shatzer | Psych | 570 Lexington Avenue, New York, NY 10022 | # |
| 3/9/2022 | | 1 hour | 1 hour | #Dr. Teresa Habacker | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/9/2022 | | 1 Hour | Mark | #Dr. Daniel Feurer | Neuro | 30-55 21st Street, Astoria, NY 11101 | # |
| 3/9/2022 | | 1.25 hours | 1.5 hours | #Dr. John Killian | Ortho | 230 Hilton Avenue, Hempstead, NY 11550 | # |
| 3/9/2022 | | 1 hour | 1 hour | #Dr. Bradley Weiner | Chiro | 636 Broadway, New York, NY 10012 | # |
| 3/9/2022 | | 1 hour | 1 hour | #Dr. Matthew Mendez-Zfass | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/9/2022 | | 1 hour | 1 hour | #Dr. Bradley Weiner | Ortho | 636 Broadway, New York, NY 10012 | |
| 3/9/2022 | | 1 Hour | Mark | #Dr. Roger Bonomo | Neuro | 47 East 77th St. New York NY 10075 | AFFIDAVIT FILED |
| 3/9/2022 | | 1.25 Hours | Mark | #Dr. Alexander Merkler | | 420 East 70th Street, New York, NY 10065 | # |
| 3/9/2022 | | 1 Hour | Christian | #Dr. Sanford Wert | | 3423 Guider Avenue, Brooklyn, NY 11235 | |
| 3/10/2022 | | 1 hour | 1 hour | #Twee Do | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | TT could not make it - new ppt requested |
| 3/10/2022 | | 2.5 hours | 2.5 hours | #Dr. Arnold Berman | Ortho | 910 Grand Concourse, Bronx, NY 10451 | |
| 3/10/2022 | | 1 hour +20 | 1 hour | #Dr. Eric Freeman | Ortho | 657 Central Avenue, Cedarhurst, NY 11516 | |
| 3/10/2022 | | 3 hours | 3 hours | #Dr. Kevin Kang | Ortho | 6010 Bay Parkway, Brooklyn, NY 11219 | # |
| 3/10/2022 | | 1.5 Hours | 2.5 Hours | #Dr. Thomas Nipper | Ortho | 75 East Gun Hill Road, Bronx, NY 10467 | # |
| 3/10/2022 | | 1.25 hours | 1.5 hours | #Dr. Neil Roth | Ortho | 210 East 64th Street, New York, NY 10065 | # |
| 3/10/2022 | | 1 hour | 1 hour | #Dr. Salvator Corso | Ortho | 501 5th Avenue, New York, NY 10017 | # |
| 3/10/2022 | | 1.5 hours | 1.5 hours | Dr. Jeffrey Klein | Ortho | 303 2nd Avenue, New York, NY 10003 | # |
| 3/10/2022 | | 1 hour | 1 hour | #Dr. Ahmed Saleh | | 6010 Bay Parkway, Brooklyn, NY 11204 | # |
| 3/10/2022 | | 1 hour | 1 hour | #Dr. Afshin Razi | Ortho | 6010 Bay Parkway, Brooklyn, NY 11219 | # |
| 3/10/2022 | | 1 hour | Christian | #Dr. Jeffrey Klein | Ortho | 303 2nd Avenue, New York, NY 10003 | # |
| 3/10/2022 | | 1 hour | 1 hour | #Dr. William Healy | Ortho | 196 East Main Street, Huntington, NY 11743 | # |
| 3/10/2022 | | 1.5 Hours | 2.5 Hours | #Dr. Thomas Nipper | Ortho | 75 East Gun Hill Road, Bronx, NY 10467 | Spanish Speaking |
| 3/10/2022 | | 1 hour | 1 hour | #Dr. Dorothy Sarpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | Russian Speaking |
| 3/10/2022 | | Cancelled | Cancelled | Dr. Saad Chaudhary | Ortho | 5 East 98th Street, New York, NY 10029 | # |
| 3/10/2022 | | 1 Hour +40 | 1 hour | #Dr. Robert Snitoff | Chiro | 601 Veterans Memorial Highway, Hauppage, NY 117# | |
| 3/10/2022 | | 1 hour+30 | 1 hour | #Dr. Ronald Mann | | 1888 Commerce Street, Yorktown Heights, NY 1059# | |

| Date | | Col3 | Col4 | Doctor | Specialty | Address | Status |
|---|---|---|---|---|---|---|---|
| 3/10/2022 | | 1 Hour +40 | 1 hour | #Dr. Anthony Spataro | Ortho | 601 Veterans Memorial Highway, Hauppage, NY 117# | |
| 3/10/2022 | | no report | Diana | #Dr. Lawrence Weisner | | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/10/2022 | | 1 hour | 1 hour | #Dr. Amit Khaneja | Neuro | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/10/2022 | | 2.5 hours + | 2.5 hours | #Dr. John Sidtis | Neuropsych | 68 South Service Road, Melville, NY 11747 | # |
| 3/10/2022 | | 1 Hour +40 | 1 hour | #Dr. Jordan Kerker | Ortho | 651 Old Country Road, Plainview, NY 11803 | # |
| 3/10/2022 | | 1.75 hours | 2 hours | #Dr. Saad Chaudhary | | 5 East 98th Street, New York, NY 10029 | # |
| 3/10/2022 | | 1.25 Hours | 2 Hours | #Dr. Mitchell Goldstein | | 2114 Williambridge Road, Bronx, NY 10461 | |
| 3/10/2022 | | 1.5 Hours + | 1.5 hours | #Dr. Arnold Berman | Ortho | 910 Grand Concourse, Bronx, NY 10451 | |
| 3/10/2022 | | 1.25 Hours | 1.5 hours | #Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | AFFIDAVIT FILED |
| 3/10/2022 | | 1.5 Hours | 2 Hours | #Dr. Thomas Nipper | Ortho | 75 East Gun Hill Road, Bronx, NY 10467 | |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. Kishore Ranade | Neuro | 80-02 Kew Gardens Road, Kew Gardens, NY 11415 | |
| 3/11/2022 | | 1 hour +20 | 1 hour | #Dr. Ignatius Roger | hand speciali | 370 Ninth St. Brooklyn NY 11215 | |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. Andrew Casden | Ortho | 210 East 64th Street, New York, NY 10021 | AFFIDAVIT FILED |
| 3/11/2022 | | int only | Jine/fari sis#Dr. | William Walsh | Ortho | 2545 Hempstead Turnpike, East Meadow, NY 11554# | |
| 3/11/2022 | | 1.75 hours | 2 hours | #Dr. John Iozzo | Chiro | 2114 Williamsbridge Road, Bronc, NY 10461 | # |
| 3/11/2022 | | 1 hour +15 | 1 hour | #Dr. Jason Hochfelder | | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. George Balazs | | 277 88th Street, Brooklyn, NY 11209 | # |
| 3/11/2022 | | 1.5 Hours +Jonathan | | #Dr. Omar Hussamy | | 2805 Veterans Memorial Highway, Ronkonkoma, NY# | |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. Andrew Casden | Ortho | 210 East 64th Street, New York, NY 10021 | |
| 3/11/2022 | | 1 Hour no | 1 hour | #Dr. Steven Zaretsky | Ortho | 910 Grand Concourse, Bronx, NY 10451 | # |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. Kishore Ranada | Neuro | 80-02 Kew Gardens Road, Kew Gardens, NY 11415 | # |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. Dana Manor | | 607 Park Avenue, New York, NY 10065 | # |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. John Xethalis | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. John Xethalis | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | |
| 3/11/2022 | | 1 Hour | 1 hour | #Dr. Kishore Ranade | Neuro | 80-02 Kew Gardens Road, Kew Gardens, NY 11415 | |
| 3/11/2022 | | 1 hour | Jeff | #Dr. John Xethalis | Neuro | 2044 Ocean Avenue, Brooklyn, NY 11230 | |
| 3/11/2022 | | 1 hour | 1 hour | #Dr. Sean Thompson | Ortho | 175-61 Hillside Ave. Jamiaca Estates NY 11432 | |
| 3/12/2022 | | 4 Hours NoDiana | | #Dr. Rimma Danov | Neuro | 95-11 Shore Road, Brooklyn, NY 11209 | # |
| 3/14/2022 | | 1 hour | 1 hour | #Dr. Daniel Feuer | Neuro | 30-55 21st Street, Astoria, NY 11102 | AFFIDAVIT FILED |
| 3/14/2022 | | 1 hour +40 | 1 hour | #Dr. Rene Elkin | Neuro | 140 Lockwood Avenue, New Rochelle, NY 10801 | TT requested Friday Appt |
| 3/14/2022 | | 1.5 hours+ | 1.5 hours | #Dr. Jonathan Glassman | Ortho | 1662 Route 300, Newburgh, NY 12550 | Upstate New York AFFIDAVIT FILED |
| 3/14/2022 | | CANCELLEDCANCELLED#Dr. | | Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | # |
| 3/14/2022 | | 1 hour | 1 hour | #Dr. Ramesh Gudumal | Ortho | 20 East 46th Street, New York, NY 10017 | # |
| 3/14/2022 | | 3.25 hours | 3.5 hours | #Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | # |
| 3/14/2022 | | 1 hour | 1 hour | #Dr. Regina Hillsman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/14/2022 | | 1 hour | 1 hour | #Dr. Regina Hillsman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |

| Date | | | | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|---|---|
| 3/14/2022 | | 1 hour +20 | 1 hour | #Dr. Jeffrey Richmond | Ortho | 600 Northern Blvd, Great Neck, NY 11021 | # |
| 3/14/2022 | | 1 Hour +30 | 1 hour | #Dr. Louis Romeo | Ortho | 2805 Veterans Memorial Highway, Ronkonkoma, NY# | |
| 3/14/2022 | | 1 hour | 1 hour | #Dr. Victor Sasson | Ortho | 1660 East 14th Street, Brooklyn, NY 11229 | # |
| 3/14/2022 | | 1.25 Hours | 1.5 hours | #Dr. Gary Young | | Via Zoom | Spanish Speaking |
| 3/14/2022 | | 1 hour | 1 hour | #Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | # |
| 3/14/2022 | | 1 Hour see | Maria E | #Dr. Thomas Nipper | Ortho | 99-76 Queens Blvd, Rego Park, NY 11374 | # |
| 3/14/2022 | | CANCELLEDCANCELLED | | Dr. Warren Cohen | Neuro | 2114 Williamsbridge Road, Bronc, NY 10461 | # |
| 3/14/2022 | | 1.75 hours | DNB | Dr. Yong Kim | Spine | 145 East 32nd Street, New York, NY 10016 | |
| 3/14/2022 | | | Jonathan | #Dr. Santoshi Billakota | | 112- 47 Queens Blvd. Forest Hills Forest Hills NY 11375 | |
| 3/14/2022 | | 3.5 hours | 3.5 hours | #Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | |
| 3/14/2022 | | 2 hours | 2 hours | #Dr. Aruna Seneviratne | Ortho | 717 Church Ave. Brooklyn NY 11218 | |
| 3/14/2022 | | 1.25+20 | 1.5 hours | #Dr. Yong Kim | Ortho | 145 East 32nd Street, New York, NY 10016 | AFFIDAVIT FILED |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. John Xethalis | Ortho | 42 Richmond Terrace, Staten Island, NY 10301 | # |
| 3/15/2022 | | 2.5 Hours | 3 Hours | #Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | # |
| 3/15/2022 | | 3 hours | 3 hours | #Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | # |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Daniel Arick | ENT | 450 Clinton Street, Brooklyn, NY 11231 | # |
| 3/15/2022 | | 1 hour+25 | 1 hour | #Dr. George Ackerman | Ortho | 4 Weber Avenue, Malverne, NY 11565 | # |
| 3/15/2022 | | 1 hour +15 | 1 hour | #Dr. Daniel Feuer | Neuro | 337 Court Street, Brooklyn, NY 11231 | |
| 3/15/2022 | | 1.5 hours | 1.5 hours | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/15/2022 | | 1 Hour +50Mark | | Dr. Eric Freeman | Ortho | 400 Montauk Highway, West Islip, NY 11795 | # |
| 3/15/2022 | | 1 Hour | 1 Hour | #Dr. John Xethalis | Ortho | 42 Richmond Terrace, Staten Island, NY 10301 | # |
| 3/15/2022 | | 2.5 hours | 2.5 hours | #Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | # |
| 3/15/2022 | | 1.25 hours | 1.5 hours | #Dr. Kevin Kang | | 6010 Bay Parkway, Brooklyn, NY 11219 | # |
| 3/15/2022 | | 2.75 hours | 3 Hours | #Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | |
| 3/15/2022 | | 1.5 hours | 1.5 hours | #Dr. Mitchell Goldstien | Ortho | 9207 Flatlands Ave. Brooklyn NY 11236 | |
| 3/15/2022 | | 1 Hour | Mark | #Dr. Edward Toriello | Ortho | 70-02 Fresh Pond Rd. Ridgewood NY 11385 | |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Nicholas Post | Neuro | 345 East 37th St. New York NY 10016 | |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Joseph Marguiles | Ortho | 110 W. 34th St. New York NY 10001 | aFFIDAVIT FILED |
| 3/15/2022 | | 1.5 Hours +Jonathan | | #Dr. Tal Mednick | | 601 Franklin Ave. Garden City NY 11530 | |
| 3/15/2022 | | 1.25 hours | 1.5 hours | #Dr. Nicholas Post | Neuro | 345 East 37th St. New York NY 10016 | |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Nicholas Post | Neuro | 345 East 37th St. New York NY 10016 | |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Rueben Burshtein | Neuro | 2044 Ocean Ave. Brooklyn NY 11230 | |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 3/15/2022 | | 1 hour | 1 hour | #Dr. Marshall Keilson | Neuro | 1220 Ave. P Brooklyn NY 11229 | |
| 3/15/2022 | | 2 Hours +3 | Jonathan | #Dr. Bradley White | Ortho | 220 North Central Ave. Hartsdale NY 10530 | |
| 3/15/2022 | | 1.5 hours | 1.5 hours | #Dr. John Xethalis | Ortho | 42 Richmond Terrace, Staten Island, NY 10301 | |

| Date | | | | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|---|---|
| 3/15/2022 | | out of count | 1 hour | #Dr. Jerry Lubliner | Ortho | 215 East 73rd. St. New York NY | |
| 3/16/2022 | | 1 hour+20 | 1 Hour | #Dr. William Healy | Ortho | 196 East Main Street, Huntington, NY 11743 | |
| 3/16/2022 | | 1 hour | 1 Hour | #Dr. Jeffrey Klein | Ortho | 303 2nd Avenue, New York, NY 10003 | |
| 3/16/2022 | | | Diana | #Dr. John Yang | | 85-11 Lefferts Blvd, Richmond Hills, NY 11418 | # |
| 3/16/2022 | | 2.25 hours | 2.5 hours | #Dr. Ernest Seldman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/16/2022 | | 1 hour | 1 hour | #Dr. Gary Young | Voc Rehab | Via Zoom | # |
| 3/16/2022 | | 3 hours | 3 hours | #Dr. Jay Eneman | Ortho | 3438 Bell Boulevarde Suite 401 Bayside NY | |
| 3/16/2022 | | 1.5 hours | 1.5 hours | #Dr. Jonathan Garay | Physical Med | 314 West 14th Street, New York, NY 10014 | # |
| 3/16/2022 | | 1 Hour | Tiff | #Dr. Louis McIntyre | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | # |
| 3/16/2022 | | | 1 hour | #Dr. Jeffrey Knox | | 43-31 Corporal Kennedy Street, Bayside, NY 11360 | # |
| 3/16/2022 | | 1 hour | 1 hour | #Dr. Christopher Gharibo | Neuro | 333 East 38th Street, New York, NY 10016 | # |
| 3/16/2022 | | 1 Hour | 1 hour | #Dr.Howard Kiernan | Ortho | 86-11 Lefferts Blvd LL Level Richmon Hill, NY 11418 | |
| 3/16/2022 | | 1 Hour +40 | 1 hour | #Dr. Matthew Skolnick | Ortho | 150 East Sunrise Highway, Suite L-22, Lindenhurst, NY | 11757 |
| 3/16/2022 | | 1.5 Hours | Mark | #Dr.Richard DeBendetto | neuro psych | 118-35 Queens Boulevard, Suite 400, Forest Hills, NY | 11375 |
| 3/16/2022 | | 1 hour | 1 hour | #Dr. Allen Rubenstein | Neuro | 885 Park Avenue, New York, NY 10075 | # |
| 3/17/2022 | | 1.5 hours | 1.5 hours | #Dr. Jeffrey Dermksoan | Ortho | 5 Columbus Circle, New York, NY 10019 | |
| 3/17/2022 | | 1.5 hours | 1.5 hours | #Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10017 | # |
| 3/17/2022 | | 1 hour | CANCELLED | Dr. David Erlanger | Neuropsych | 111 East 75th Street, New York, NY 10021 | # |
| 3/17/2022 | | 1.5 hours | 2 hours | #Dr. John Xethalis | Ortho | 224 West 35th Street, New York, NY 10001 | Maura was the name but, Dave sent the report on 5/4 |
| 3/17/2022 | | 2 Hours | 2 hours | #Dr. John Xethalis | Ortho | 224 West 35th Street, New York, NY 10001 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Dorothy Scarpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Elizabeth Ortof | Ortho | 173 West 78th Street, New York, NY 10024 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. John Xethalis | Ortho | 224 West 35th Street, New York, NY 10001 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Dorothy Scarpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/17/2022 | | 2 Hours | Maura | #Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/17/2022 | | 1 hour+20 | 1 hour | #Dr. Eric Freeman | Ortho | 657 Central Avenue, Cedarhurst, NY 11516 | # |
| 3/17/2022 | | 1.5 Hours | 1.5 Hours | Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Dorothy Scarpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/17/2022 | | 1 Hour +20 | 1 hour | #Dr. Eric Freeman | Ortho | 657 Central Avenue, Cedarhurst, NY 11516 | # |
| 3/17/2022 | | 2 hours | 2 hours | #Dr. Malcom Reid | Pain meddici | 1090 Amsterdam Avenue, New York, NY 10025 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Pierce Ferriter | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. John Xethalis | Ortho | 224 West 35th Street, New York, NY 10001 | # |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | # |
| 3/17/2022 | | 1 Hour | 1 hour | #Dr. Christopher Ferrante | Chiro | 2044 Ocean Ave. Brooklyn NY 11230 | # |

| Date | | | | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|---|---|
| 3/17/2022 | | Cancelled | | Dr. Ahmed Saleh | Ortho | 6010 Bay Parkway, Brooklyn, NY 11204 | # |
| 3/17/2022 | | 1.5 hours | 1.5 hours | #Dr. Serge Parisien | | 337 Court Street, Brooklyn, NY 11231 | # |
| 3/17/2022 | | 1.25 hours | 1.5 hours | Dr. Mark Weidenbaum | Ortho | 51 West 51st Street, New York, NY 10017 | Russian Speaking/ Req Jeff or Nick |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Mark Weidenbaum | Ortho | 51 West 51st Street, New York, NY 10017 | # |
| 3/17/2022 | | | Cancelled | Dr. Pierce Ferriter | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | # |
| 3/17/2022 | | 1 Hour | 1 hour | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/17/2022 | | 1.25 hours | 1.5 hours | #Dr. Ira Chernoff | Ortho | 400 East 54th Street, New York, NY 10022 | # |
| 3/17/2022 | | 2.5 hours | 2.5 hours | #Dr. Serge Parisien | | 337 Court Street, Brooklyn, NY 11231 | |
| 3/17/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Passik | Ortho | 421 Ocean Parkway, 1st Floor, Brooklyn, NY 11218 | |
| 3/17/2022 | | 2 hours | 2 hours | #Dr. Jay Eneman | | 94-24 58th Avenue, Elmhurst, NY 11373 | |
| 3/17/2022 | | | Diana | #Dr. Franklin Porter | | 2932 Wilkinson Avenue, Basement Level, Bronx, NY | 10461 |
| 3/17/2022 | | 2.5 hours+ | 2.5 hours | #Dr. Marc Chernoff | Ortho | 800 Woodbury Road, Woodbury, NY 11797 | |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. Ira Chernoff | Ortho | 2500 Route 347, Stony Brook, NY 11790 | |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. Yong Kim | Ortho | 145 East 32nd Street, New York, NY 10016 | |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. Charla Fischer | Ortho | 145 East 32nd Street, New York, NY 10016 | |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. John Xethalis | Ortho | 2044 Ocean Ave. Brooklyn NY 11230 | # |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. Salvatore Corso | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. Salvatore Corso | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | |
| 3/18/2022 | | 2 Hours | 2 hours | #Dr. Vikas Agrawal | Neuro | 1665 Grand Concourse, Bronx, NY 10452 | # |
| 3/18/2022 | | 2.5 hours | 2.5 hours | #Dr. Dana Manor | Ortho | 86-11 Lefferts Blvd, Richmond Hill, NY 11418 | # |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. Jennifer Canter | Voc Rehab | Via Zoom | # |
| 3/18/2022 | | 2 hours | 2 hours | #Dr. Mitchell Goldstein | | 188 Montague Street. Suite 502, Brooklyn, NY 11201 | |
| 3/18/2022 | | 1 hour | 1 hour | #Dr. Franklin Porter | | 5 West 86th Street, New York, NY 10024 | # |
| 3/19/2022 | | 1.5 hours | 1.5 hours | #Dr. Arnold Berman | | 910 Grand Concourse, Suite 1 B, Bronx, NY 10451 | |
| 3/19/2022 | | 1 Hour | Tiff | #Dr. Dontese Nicholson | Pain Manage | 30-55 21st Street, Astoria, NY 11102 | # |
| 3/21/2022 | | 1 Hour | 1 hour | #Dr. Steven Goodman | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | |
| 3/21/2022 | | 1.75 Hours | Jonathan | #Dr. Howard B. Yeon | | 335 Columbus Ave, Tuckahoe, NY 10707 | |
| 3/21/2022 | | 1 hour | 1 hour | #Dr. Anthony Spataro-ortho | Dr. Dennis M | 162-04 Jamaica Ave, 5th Floor, Jamaica, NY 11432 | |
| 3/21/2022 | | 1 Hour | SWO | #Dr. Joseph Yellin | | 1599 East 15th Street 3rd Floor, Brooklyn, NY 11230 | |
| 3/21/2022 | | 1.5 hours | 1.5 hours | #Dr. Arnold Goldman | Ortho | 76-05 Queens Blvd, Forest Hills, NY 11375 | # |
| 3/21/2022 | | 1.25 hours | 1.5 hours | #Dr. William Healy | Ortho | 196 East Main Street, Huntington, NY 11743 | # |
| 3/21/2022 | | 1.75 hours | 2 hours | #Dr. Howard Kiernan | Ortho | 2044 Ocean Ave. Brooklyn NY 11230 | Atty sent wrong claimant, Joanna Rodriguez |
| 3/21/2022 | | | 1 Hour | #Dr. Eric Kanter | Ophthalmolo | 349 East Northfield Road, Livingston, NJ 07039 | # |
| 3/21/2022 | | | Jackie | #Dr. Greenwald | | 33 Wood Avenue, Iselin, NJ 08830 | # |
| 3/21/2022 | | 1 Hour +20Maura | | #Dr. Pierce Ferriter | Ortho | 2545 Hempstead Turnpike, East Meadow, NY 11554# | |
| 3/21/2022 | | 1 hour | 1 hour | #Peter Capotosto | Voc Rehab | 420 Lexington Avenue, New York, NY 10170 | |

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3/22/2022 | | nt only | Tim | #Dr. King | | | Face time |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. Daniel Feuer | Neuro | 30-55 21st Street, Astoria, NY 11102 | # |
| 3/22/2022 | | 1 hour | 1 hour | #John Houten | Spine | 6010 Bay Parkway, Brooklyn, NY 11204 | # |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. Jerry Lubliner | Ortho | 215 East 73rd Street, New York, NY 10021 | # |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. Ronald Grelsamer | Ortho | 303 2nd Avenue, New York, NY 10003 | # |
| 3/22/2022 | | 1 hour+20 | 1 hour | #Dr. Matthew Shatzer | Physical Med | 1554 Northern Blvd, Manhasset, NY 11030 | # |
| 3/22/2022 | | 1 hour+30 | 1 hour | #Peter Capotosto | Voc Rehab | 101 Front Street, Mineola, NY 11501 | # |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. Daniel Feuer | Neuro | 30-55 21st Street, Astoria, NY 11102 | Def ordering an Albanian Interpreter |
| 3/22/2022 | | 3 Hours | 3 hours | Dr. Jay Eneman | Ortho | 112-47 Queens Blvd, Forest Hills, NY 11375 | # |
| 3/22/2022 | | 3.25 Hours | 3.5 hours | Dr. Jay Eneman | Ortho | 112-47 Queens Blvd, Forest Hills, NY 11375 | # |
| 3/22/2022 | | 1.25 hours | 1.5 hours | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/22/2022 | | | Diana | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/22/2022 | | | Diana | #Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | # |
| 3/22/2022 | | 1.75 Hours | 2 hours | Dr. Rene Elkin | Neuro | 1560 Grand Concourse, Bronx, NY 10457 | # |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. Ronald Grelsamer | Ortho | 303 2nd Avenue, New York, NY 10003 | # |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. Scott Bienenfeld | | 1115 Broadway, New York, NY 10010 | # |
| 3/22/2022 | | | Diana | #Dr.Amit Khaneja | neuro | 2572 East 15th Street, Brooklyn, NY 11235 | |
| 3/22/2022 | | 1.75 hours | 2 hours | #Dr. Alexandra Carrer | Ortho | 1118 Avenue Y, Brooklyn, NY 11235 | |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. John Bendo | Ortho | 862 Park Avenue, New York, NY 10075 | |
| 3/22/23/2022 | | 3 Hours | Mark | #Dr. Jaime Levey | Voc Rehab | 150 Broadway, 23rd Floor, New York, NY 10038 | |
| 3/22/2022 | | 1 hour+20 | 1 hour | #Dr. Teresa Habacker | Ortho | 414 Jericho Turnpike New Hyde Park, NY 11040 | |
| 3/22/2022 | | 2 hours | 2 hours | #Dr. Vikas Agrawal | | 1665 Grand Concourse, Suite A, Bronx, NY 10452 | |
| 3/22/2022 | | 1 hour | 1 hour | #Dr. Eial Faierman | Ortho | 37-47 77th Street, Jackson Heights, NY 11372 | |
| 3/22/2022 | | 1.5 hours+ | 1.5 hours | #Dr. Lourdes Esteban | Neuro | 9921 4th Avenue, Brooklyn, NY 11209 | # |
| 3/23/2022 | | 1 hour+15 | 1 hour | #Dr. Roger Bonomo | Neuro | 47 East 77th Street, New York, NY 10075 | # |
| 3/23/2022 | | 1 hour+15 | 1 hour | #Dr. Adam Bender | Neuro | 1150 Park Avenue, New York, NY 10128 | # |
| 3/23/2022 | | 1.5 Hours | 1.5 hours | #Dr. Dr. Jerry Lubliner | Ortho | 215 East 75th Street, New York, NY 10021 | # |
| 3/23/2022 | | 1 hour | 1 hour | #Dr. Dana Manor | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | |
| 3/23/2022 | | 1.25 hours | 1.5 hours | #Dr. Paul Kuflik | Ortho | 955 5th Avenue, New York, NY 10075 | # |
| 3/23/2022 | | 1.5 Hours | 1.5 hours | #Dr. Warren Cohen | Neuro | 2114 Williamsbridge Road, Bronx, NY 10461 | |
| 3/23/2022 | | 1.5 hours | 1.5 hours | Dr. Dana Manor | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | # |
| 3/23/2022 | | 2.25 hours | 2.5 hours | #Dr. Arnold Berman | Ortho | 30-55 21st Street, Astoria, NY 11102 | # |
| 3/23/2022 | | 1 hour | 1 hour | #Dr. Harvey Manes | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/23/2022 | | 2 hours | 2 hours | #Dr. Arnold Berman | Ortho | 30-55 21st Street, Astoria, NY 11102 | # |
| 3/23/2022 | | 1 hour | 1 hour | #Dr. Jeffrey Nudelmann | Acu | 717 Church Avenue, Brooklyn, NY 11218 | # |
| 3/23/2022 | | 1 Hour +40 | 1 hour | #Dr. Robert Hendler | | 78 Cypress Road, Goshen, NY 10924 | # |
| 3/23/2022 | | 1 hour | 1 hour | #Dr. Allan Rubenstein | Neuro | 885 Park Avenue, Suite 1B. New York, NY 10075 | |
| 3/23/2022 | | 2 hours | 2 hours | #Dr. Dana Mannor | Ortho | 2044 Ocean Ave, Level 1A, Brooklyn, | |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | NY 11229 | |
| 3/23/2022 | | Christian | #Dr. Adam Bender | Neuro | 1150 Park Avenue New York, NY 10128 | |
| 3/23/2022 | 1 hour | 1 hour | #Dr. Allan Rubenstein | Neurology | 885 Park Avenue, Suite 1B. New York, NY 10075 | |
| 3/23/2022 | CANCELLED1 | hour | #Dr. Sanford Wert | | 3423 Guider Avenue, Brooklyn, NY 11235 | # |
| 3/23/2022 | 1 hour | 1 hour | #Dr. Jeffrey Nudelmann | Acu | 717 Church Avenue, Brooklyn, NY 11218 | # |
| 3/23/2022 | 2 Hours | 1 hour | #Dr. Kevin Portnoy | Chiro | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/23/2022 | Combined | 1 hour | #Dr. Neil Watnik | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | # |
| 3/23/2022 | 1.75 Hours | 2 hours | #Dr. Teresa Habacker | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 3/23/2022 | 1.25 Hours | 1.5 hours | #Dr. William Walsh | Ortho | 2545 Hempstead Turnpike, East Meadow, NY 11554 | |
| 3/23/2022 | 1.25 hours | 1.5 hours | #Dr. Jeffrey Dermskian | Ortho | 1790 Broadway, New York, NY 10019 | # |
| 3/24/2022 | | 1 hour | #Dr. Salvatore Corso | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | # |
| 3/24/2022 | 1 Hour | Dave | #Dr. Jason Baynes | Ortho | 315 Madison Avenue, New York, NY 10017 | # |
| 3/24/2022 | | No One | Dr. Mark Ramnauth | Voc Rehab | 745 5th Avenue, New York, Ny 10151 | # |
| 3/24/2022 | | 1 hour | #Dr. Thomas Albas | Ortho | 30-55 21st Street, Astoria, NY 11102 | # |
| 3/24/course | 1 hour | 1 hour | #Dr. Daniel Feuer | Neuro | 910 Grand Concourse, Bronx, NY 10457 | # |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Mark Ramnauth | Voc Rehab | 745 5th Avenue, New York, Ny 10151 | # |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | # |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Jeffrey Richmond | Ortho | 600 Northern Blvd, Great Neck, NY 11021 | # |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 3/24/2022 | 1.5 hours | 1.5 hours | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | # |
| 3/24/2022 | 1.5 hours | 1.5 hours | #Dr. Roman Nowygrod | Vascular | 161 Fort Washington Avenue, New York, NY 10032 | # |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | # |
| 3/24/2022 | 1.25 Hours | 1.5 hours | #Dr. Franklin Porter | | 98-76 Queens Blvd, Rego Park, NY 11374 | # |
| 3/24/2022 | hour | 1 hour | #Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | # |
| 3/24/2022 | 1.75 hours | 2 hours | #Dr. Mark Ramnauth | Voc Rehab | 745 5th Avenue, New York, Ny 10151 | # |
| 3/24/2022 | 1.5 Hours | 1.5 hours | #Dr. Edwin Wolf | Podiatry | 1 West 85th Street, New York, NY 10024 | # |
| 3/24/2022 | 3 hours+20 | 3 hours | #Dr. Barbara Baer | | 1979 Marcus Avenue, New Hyde Park, NY 11040 | # |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Jay Eneman | Ortho | 4 Weber Avenue, Malverne, NY 11565 | # |
| 3/24/2022 | 3 Hours +4 | 3 hours | Dr. Victoria London | | 100 South Bedford Road, Mount Kisco, NY 10549 | |
| 3/24/2022 | cancelled | Cancelled | Dr. Jason Baynes | Ortho | 315 Madison Avenue, New York, NY 10017 | # |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Amit Khaneja | Neuro | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 3/24/2022 | 1 hour | 1 hour | #Dr. Howard Levin | Ortho | 2114 Williamsbridge Road, Bronx, NY | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | 10461 | |
| 3/24/2022 | ▉ | 1 Hour | Dave | Dr. Adam Bender | Neuro | 1150 Park Avenue, Suite 1E, New York, NY 10128 | |
| 3/25/2022 | | 1 hour | 1 hour | #Dr. Jared Brandoff | Ortho | 315 Madison Avenue, New York, NY 10017 | # |

| Date of Exam | Client Name | Invoice Number | Doctor | Specialty | Location | Notes / Clients phone # |
|---|---|---|---|---|---|---|
| 4/1/2022 | | 4437 | Dr. Howard Yeon | Ortho | 65 Broadway, New York, NY 10006 | Cancelled by vendor- Plaintiff Atty not notified |
| 4/1/2022 | | 4470 | Dr. Ira Chernoff | | 2500 Route 347 Stony Brook NY 11790 | |
| 4/1/2022 | | 4440 | Dr. Pierce Ferriter | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11229 | |
| 4/1/2022 | | | Dr. David Pereira | Ortho | 145 East 32nd Street New York NY 10016 | TT informed Companion night before, he is not a |
| 4/1/2022 | | 4437 | Dr. Nicholas Post | Neuro | 80-02 Kew Gardens Road, 2nd Floor, Suite 200, | Kew Gardens, NY 11415 |
| 4/1/2022 | | 4408 | Dr. Andrew Beharrie | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/1/2022 | | 4355 | Dr. Vikas Agrawal | | 1665 Grand Concourse, Bronx, NY, USA Ste. A NY | 10452 |
| 4/1/2022 | | 4439 | Dr. Dana Mannor | Ortho | 86-11 Lefferts Blvd- LL level Richmond Hill, NY | 11418 |
| 4/4/2022 | | 4409 | Dr. Philip Cilio | Acu/Chiro | 1118 Avenue Y, Brooklyn, NY 11235 | |
| 4/4/2022 | | 4440 | Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11229 | |
| 4/4/2022 | | 4440 | Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11229 | |
| 4/4/2022 | | 4437 | Dr. Steven Fayer | Psychiatrist | Via Zoom | |
| 4/4/2022 | | 4408 | Dr. Richard Semble | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | |
| 4/4/2022 | | 4440 | Dr. Richard Semble | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | |
| 4/4/2022 | | 4295 | Dr. Nicholas Post | Neuro | 9020 5th Avenue, Brookln, NY 11209 | |
| 4/4/2022 | | 4437 | Dr. Marshall Keilson | Neuro | 1220 Avenue P, Brooklyn, NY 11229 | |
| 4/4/2022 | | | Dr. Richard Semble | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | Spanish Speaking Spanish |
| 4/4/2022 | | 4356 | Dr. Michael Miller | | 220 North Central Avenue, Hartsdale, NY 10530 | Spanish |
| 4/4/2022 | | 4430 | Dr. Anthony Spataro | Ortho | 162-04 Jamaica Avenue, Queens, NY, Usa 5th Floor, | Jamaica NY 11432 |
| 4/4/2022 | | 4430 | Dr. Vijay Sidhwani | Pain Mgt | 2114 Williamsbridge Road, Bronx, NY, USA LL Room | 112 NY 10461 |
| 4/4/2022 | | 4357 | Dr. Jack Choueka | | 6010 Bay Parkway, Brooklyn, NY 11204 | Spanish |
| 4/4/2022 | | | Dr. Ali Sadr | Neuro | 42 Broadway, New York, NY 10006 | Spanish Speaking Spanish |
| 4/4/2022 | | | Peter Capotosto | Voc Rehab | 420 Lexington Avenue, New York, NY 10170 | |
| 4/4/2022 | | 4329 | Joseph Pessalano | Voc Rehab | 1101 Stewart Avenue, Garden City, NY 11530 | |
| 4/4/2022 | | 4465 | Joseph Pessalano | Voc Rehab | 1101 Stewart Avenue, Garden City, NY 11530 | |
| 4/4/2022 | | 4329 | Dr. Kenneth Perrine | | 150 West 70th Sr. New York NY 10023 | |
| 4/5/2022 | | 4329 | Dr. Adam Bender | Neuro | 1150 Park Avenue, New York, NY 10128 | |
| 4/5/2022 | | 4437 | Dr. Alan Miller | Ortho | 30-55 21st Street, Astoria, NY 11102 | |
| 4/5/2022 | | 4440 | Dr. Alan Miller | Ortho | 30-55 21st Street, Astoria, NY 11102 | |
| 4/5/2022 | | 4429 | Dr. Alan Miller | Ortho | 30-55 21st Street, Astoria, NY 11102 | |
| 4/5/2022 | | 4430 | Dr. Howard Kiernan | Ortho | 86-11 Lefferts Blvd, Richmond Hill, NY 11418 | |
| 4/5/2022 | | 4408 | Dr. Mictchell Goldstein | Ortho | 188 Montague Street, Brooklyn, NY 11201 | |
| 4/5/2022 | | 4409 | Dr. Marc Agulnick | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/5/2022 | | 4462 | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 4/5/2022 | | 4552 | Dr. Thomas Nipper | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/5/2022 | | 4553 | Dr. Thomas Nipper | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/5/2022 | | 4478 | Dr. Nicholas Post | Neuro | 345 East 37th Street, Suite 202 New York NY 10016 | |
| 4/5/2022 | | 4329 | Dr. Bonnie Corey | Chiro | 2915 Avenue S Brooklyn NY 11229 | |
| 4/5/2022 | | 4437 | Dr. Howard Levy | Ortho | 1110 Pennsylvania Avenue, Unit 1, Brooklyn, NY | 11207 |
| 4/5/2022 | | 4358 | Dr. Sean Lager | | 20 East 46th Street, New York, NY, USA ste 600 | NY 10176 |
| 4/5/2022 | | 4359 | Dr. Adam Raff | Psychiatry | 40 Park Avenue, New York, NY, USA Ste. 1K NY | 10016 |
| 4/5/2022 | | 4330 | Dr. Adam Bender | Neuro | 1150 Park Avenue, New York, NY 10128 | |
| 4/5/2022 | | 4466 | Dr. Ronald Grelsamer | Ortho | 303 2nd Avenue, Suite 19 New York NY 10003 | |

| Date | | | Doctor Name | Specialty | Address | |
|---|---|---|---|---|---|---|
| 4/5/2022 | | 4437 | | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 4/5/2022 | | 4437 | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 4/5/2022 | | 4479 | Dr. Thomas Mclaughlin | Acu/Chiro | 277 88th Street Brooklyn NY 11209 | |
| 4/5/2022 | | 4360 | Dr. William Head Jr | | 154 West 14th Street, New York, NY, USA 4th Floor | NY 10011 |
| 4/5/2022 | | 4437 | Dr. Charla Fischer | Ortho | 145 East 32nd Street New York NY 10016 | |
| 4/5/2022 | | 4437 | Dr. Marshall Keilson | Neuro | 1220 Avenue P, Brooklyn, NY 11229 | |
| 4/5/2022 | | 4566 | Dr. Jason Baynes | Ortho | 173 Huguenot Street, Suite 200 New Rochelle | NY 10801 |
| 4/5/2022 | | 4437 | Dr. Jessica Gallina | Ortho | 240 Central Park South, Suite 2-0, New York, NY | 10019 |
| 4/5/2022 | | 4361 | Dr. Elizabeth Ortof | Neuro | 173 West 78th Street, New York, NY USA Ste 1C | NY 10024 |
| 4/5/2022 | | 4362 | Dr. Alvin M. Bregman | | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/6/2022 | | 4408 | Dr. Jeffrey Knox | Ortho | 43-31 Corporal Kennedy Street, Bayside, NY 11361 | |
| 4/6/2022 | | 4437 | Dr. Jeffrey Klein | Ortho | 303 Second Avenue, Suite 19, New York, NY 10003 | |
| 4/6/2022 | | 4408 | Dr. Frank Hudak | Ortho | 200-12 44th avenue, Bayside, NY 11361 | |
| 4/6/2022 | | 4363 | Dr. Barbara Baer | | 547 Saw Mill River Road, Ardsley, NY USA Ste. | 2B NY 10502 |
| 4/6/2022 | | 4437 | Dr. Jeffrey Klein | Ortho | 303 Second Ave Suite 19, New York, NY 10003 | |
| 4/6/2022 | | 4364 | Dr. Sheldon Hersh | | 949 Central Avenue, Woodmere, NY, USA #201 | NY 11598 |
| 4/6/2022 | | 4470 | Dr. Jonathan Glassman | Chiro | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/6/2022 | | 4365 | Dr. Charles M. Totero | | 18 East 41st Street, New York, NY, USA Ste. 403 | NY 10017 |
| 4/6/2022 | | 4437 | Dr. Warren Cohen | Neuro | 110 West 34 Street, Room 400, New York, NY 10001 | |
| 4/6/2022 | | 4463 | Dr. Matthew Mendez | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 4/6/2022 | | 4480 | Dr. Franklin Porter | Psych | 3311 Shore Parkway Brooklyn NY 11235 | |
| 4/6/2022 | | 4329 | Dr. Eric Roth | Acu | 3311 Shore Parkway Brooklyn NY 11235 | |
| 4/6/2022 | | 4440 | Dr. Debra Pollack | Neuro | 2114 Williamsbridge Road, Ste. 112 Bronx NY 10461 | |
| 4/6/2022 | | 4366 | Dr. Jeffrey Klein | Ortho | 303 2nd Avenue New Yotk, NY USA Ste 19 NY 10003 | |
| 4/7/2022 | | 4329 | Dr. Marc Chernoff | Ortho | 800 Woodbury Road, Woodbury, NY 11797 | |
| 4/7/2022 | | 4481 | Dr. Brian Daly | Voc Rehab | Via Zoom | ,, |
| 4/7/2022 | | 4557 | Dr. Arnold Berman | Ortho | 30 Park Avenue New York NY 10016 | |
| 4/7/2022 | | 4367 | Dr. Scott Bienenfeld | | 115 Broadway, New York, NY USA Ste. 1260 NY | 10006 |
| 4/7/2022 | | 4482 | Dr. Steven Zaretsky | Ortho | 230 West 79th Street, suite 123 12th Fl New York | NY 10024 |
| 4/7/2022 | | 4368 | Dr. Salvatore Corso | Ortho | 501 5th Avenue, New York, NY, USA Ste.1203 NY | 10017 |
| 4/7/2022 | | 4369 | Dr. Salvatore Corso | Ortho | 501 5th Avenue, New York, NY, USA Ste.1203 NY | 10017 |
| 4/7/2022 | | 4470 | Dr. Salvatore Corso | Ortho | 501 5th Avenue, New York, NY, USA Ste.1203 NY | 10017 |
| 4/7/2022 | | 4470 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/7/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/5/2022 | | 4330 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/7/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/7/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/7/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/7/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/7/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street Floor 3 New York, NY 10019 | |
| 4/7/2022 | | 4370 | Dr. Vijay Sidhwani | | 595 Merrick Avenue, East Meadow, NY, USA NY | 11554 |
| 4/7/2022 | | 4437 | Dr. Sean Thompson | Ortho | 175-61 Hillside Avenue, Suite 400, Jamaica Estates, | NY 11432 |
| 4/7/2022 | | 4371 | Dr. Ronald Mann | | 550 Mamaroneck Avenue, Harrison, NY, USA #103 | NY 10528 |

| Date | Code | Name | Specialty | Address | Notes |
|---|---|---|---|---|---|
| 4/7/2022 | 4437 | Ocular Screening | Ortho | 2227 Williamsbridge Rd, Suite 110, Bronx, NY 10461 | |
| 4/7/2022 | 4430 | Dr. Jay Eneman | Ortho | 4 Weber Ave, Malverne, NY, USA NY 11565 | |
| 4/7/2022 | 4470 | Dr. Jay Eneman | Ortho | 4 Weber Ave, Malverne, NY, USA NY 11565 | |
| 4/7/2022 | 4570 | Dr. Marc Chernoff | Ortho | 800 Woodbury Road, Woodbury, NY 11797 | |
| 4/7/2022 | 4372 | Dr. Peter Spohn | | 998 Old Country Road, Plainview, NY, USA 2nd | Floor NY 11803 |
| 4/7/2022 | 4330 | Dr. Daniel Wolstein | Voc Rehab | Via Zoom | |
| 4/7/2022 | 4409 | Dr. Ronald Mann | Ortho | 1888 Commerce Street, 2nd Floor, Yorktown Heights, | NY 10598 |
| 4/7/2022 | 4426 | Dr. Ira Chernoff | Ortho | 400 East 54th Street, New York, NY, USA NY 10022 | |
| 4/7/2022 | 4567 | Dr. Daniel Feuer | Neuro | 910 Grand Concourse, Ste. 1-AB Bronx NY 10451 | |
| 4/7/2022 | 4329 | Dr. Joseph Pessalano | Voc Rehab | 40 Wall Street, 52nd Fl New York, NY 10005 | |
| 4/7/2022 | 4578 | Dr. Michael Gerling | Ortho | 110 Duane Street New York NY 10017 | |
| 4/7/2022 | 4437 | Dr. Jessica Gallina | Ortho | 240 Central Park South, Suite 2-0, New York, NY | 10019 |
| 4/7/2022 | 4440 | Dr. Dana Mannor | Ortho | 2044 Ocean Ave. Brooklyn NY 11229 | |
| 4/7/2022 | 4440 | Dr. Dana Mannor | Ortho | 2044 Ocean Ave. Brooklyn NY 11229 | |
| 4/7/2022 | 4437 | Dr. Alexander Carrer | Ortho | 1118 Avenue Y, Brooklyn, NY 11235 | |
| 4/8/2022 | 4296 | Dr. Pierce Ferriter | Ortho | 2545 Hempstead Turnpike, East Meadow, NY 11554 | Spanish speaking compan Spanish |
| 4/8/2022 | 4483 | Dr. Louis Cornacchia | Neuro | 626 Rex Corp Plaza, Uniondale, NY 11556 | English |
| 4/8/2022 | 4297 | Dr. Jeffrey Richmond | Chiro | 201 Portion Road, Ronkonkoma, NY 11779 | |
| 4/8/2022 | 4484 | Dr. Robert Meyerson | Ortho | 170 William Street, New York, NY 10038 | English |
| 4/8/2022 | 4470 | Dr. Jeffrey Guttman | Ortho | 2044 Ocean Ave. Brooklyn NY 11229 | |
| 4/8/2022 | 4437 | Diuglas Unis | Ortho | 300 Cadman Plaza West 18 Brooklyn NY 11201 | |
| 4/8/2022 | 4408 | Elizabeth Ortof | Neuro | 173 W. 78th St. New York NY 100324 | |
| 4/8/2022 | 4408 | Angeles Cheung | Neuro | 445 Park Ave. New York NY 10022 | |
| 4/8/2022 | 4467 | Yong Kim | Ortho | 145 East 32nd St. New York NY 10016 | |
| 4/8/2022 | 4373 | Ronald Mann | Ortho | 1888 Commerece St. Yorktown Heights NY 10598 | |
| 4/8/2022 | 4426 | Dr. Marshall Keilson | Neuro | 1220 Avenue P, Brooklyn, NY 11229 | English |
| 4/8/2022 | | | Neuro/ Psych | 3230 Bainbridge Avenue, Bronx, NY10467 | |
| 4/8/2022 | | Dr. Jeanette Wasserstein | Neuro/ Psych | 1160 5th Avenue, New York, NY 10029 | Spanish Speaking Spanish |
| 4/11/2022 | 4408 | Dr. Louis Romeo | Ortho | 2905 Veterans Highway, Ronkonkama, NY 11779 | |
| 4/11/2022 | 4437 | Dr. Eric Freeman | Ortho | 657 Central Avenue, Cedarhurst, NY 11516 | TT went in without Companion |
| 4/11/2022 | 4470 | Dr. Carl Friedman | Ortho | 123 Maple Street, Cedarhurst, NY 11516 | |
| 4/11/2022 | 4437 | Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11229 | |
| 4/11/2022 | 4468 | Dr. Allen Rubenstein | Neuro | 885 Park Avenue, New York, NY 10075 | |
| 4/11/2022 | 4328 | Dr. Regina Hillsman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Spanish Speaking Spanish |
| 4/11/2022 | 4440 | Dr. Regina Hillsman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/11/2022 | 4571 | Dr. Regina Hillsman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/11/2022 | 4330 | Dr. Yong Kim | Acu | 145 East 32nd Street New York NY 10016 | Def ordering Albanian Int Albanian |
| 4/11/2022 | 4580 | Dr. William Kulak | | 580 Park Avenue, New York, NY 10065 | Spanish speaking compan Spanish |
| 4/11/2022 | 4328 | Dr. Ramesh Gidumal | Ortho | 20 East 46th Street, New York, NY 10017 | English |
| 4/11/2022 | 4437 | Dr. Regina Hillsman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/11/2022 | 4506 | Dr. Ronald L. Mann | | 1888 Commerce Street, 2nd Floor, Yorktown Heights, | NY 10598 |
| 4/11/2022 | 4507 | Dr. Louis Romeo | | 2805 Veterans Memorial Highway, Ronkonkoma, | NY, USA Ste. 10 NY 11779 |
| 4/11/2022 | 4508 | Dr. Ramesh Gidumal | | 20 East 46th Street, New York, NY, USA ste 600 | NY 10176 |

| Date | | Ref | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|---|
| 4/11/2022 | | | | Neuro | 2114 Williams Bridge Rd Suite 115 Bronx, NY 10461 | |
| 4/11/2022 | | 4437 | Dr. Eial Faierman | Ortho | 2100 Bartow Avenue, Suite 227, Bronx, NY 10475 | |
| 4/11/2022 | | 4328 | Dr. Warren Cohen | Neuro | 2114 Williamsbridge Road, Bronx, NY 10461 | English |
| 4/12/2022 | | 4554 | Dr. Jay Eneman | Ortho | 900 Walt Witman Road, Melville, NY 11747 | Spanish speaking compan Spanish |
| 4/12/2022 | | 4509 | Dr. Howard Kiernan | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | Record IME Spanish |
| 4/12/2022 | | 4328 | Dr. Jeffrey Passick | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | Spanish Speaking Spanish |
| 4/12/2022 | | 4426 | Dr. Peter Spohn | Ortho | 3311 Shore Parkway Brooklyn NY 11235 | Client is in Wheelchair English |
| 4/12/2022 | | 4298 | Dr. Theresa Habacker | Ortho | 5954 Route 25A, Wading River, NY 11792 | |
| 4/12/2022 | | 4328 | Dr. Jeffrey Passick | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | English |
| 4/12/2022 | | 4328 | Dr. Jeffrey Passick | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | Punjabi Interpreter will b Punjabi |
| 4/12/2022 | | 4582 | Dr. Howard Kiernan | Ortho | 3713 East Tremont Avenu, Bronx, NY 10465 | Spanish Speaking Compa Spanish |
| 4/12/2022 | | 4408 | Dr. Howard Kiernan | Ortho | 3713 East Tremont Avenu, Bronx, NY 10465 | |
| 4/12/2022 | | 4440 | Dr. Daniel Feuer | Ortho | 337 Court Street, Brooklyn, NY 11231 | |
| 4/12/2022 | | 4299 | Dr. Neil Roth | Ortho | 210 East 64th Street, New York, NY 10065 | Requesting Mark |
| 4/12/2022 | | 4471 | Dr. Michael Rosenfeld | Psych | 585 Stewart Avenue, Garden City, NY 11530 | |
| 4/12/2022 | | 4470 | Dr. Jay Eneman | Ortho | 900 Walt Witman Road, Melville, NY 11747 | No show |
| 4/12/2022 | | 4437 | Dr. Daniel Arick | Otolaryngology | 450 Clinton Street, Entrance:33 First Place, Brooklyn | NY 11231 |
| 4/12/2022 | | 4510 | Dr. Adam Bender | Neuro | 1150 Park Avenue, New York, NY 10128 | |
| 4/12/2022 | | 4437 | Dr. Charla Fischer | Ortho | 145 East 32nd Street, 4th Floor, New York, NY | 10016 |
| 4/12/2022 | | 4437 | Dr. Robert S. April | Neuro | 120 East 86th Street, 2nd Floor, New York, NY | 10028 |
| 4/12/2022 | | | Dr. David Erlanger | Neuropsych | 111 East 75th Street, New York, NY 10021 | |
| 4/12/2022 | | 4583 | Dr. John Houten | Neurosurgeon | 6010 Bay Parkway, Brooklyn, NY 11210 | Spanish Speaking Compa Spanish |
| 4/13/2022 | | 4437 | Dr. Marshall Keilson | Neuro | 1220 Avenue P, Brooklyn, NY 11229 | |
| 4/13/2022 | | 4511 | Dr. Matthew Mendez | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | Record IME Portugese |
| 4/13/2022 | | 4430 | Dr. Jonathan Glassman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Speaks Spanish/English Spanish |
| 4/13/2022 | | 4439 | Dr. Teresa Habacker | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | English |
| 4/13/2022 | | 4440 | Dr. Lourdes Esteban | Neuro | 9921 4th Avenue, Brooklyn, NY 11209 | |
| 4/13/2022 | | 4408 | Dr. Jack Choueka | Ortho | 6010 Bay Parkway, Brooklyn, NY 11204 | |
| 4/13/2022 | | 4485 | Dr. Ronald Snyder | Ortho | 30-55 21st Street, Astoria, NY 11102 | English |
| 4/13/2022 | | 4472 | Dr. Paul Lerner | Neuro | 1575 Hillside Avenue, New Hyde Park, NY 11040 | English |
| 4/13/2022 | | 4512 | Dr. Jeffrey Knox | Ortho | 43-31 Corporal Kennedy Street, Bayside, NY 11360 | Record IME Spanish |
| 4/13/2022 | | 4437 | Dr. Edward Toriello | Ortho | 220A St. Nicholas Ave, Brooklyn NY 11237 | |
| 4/13/2022 | | 4329 | Dr. Rene Elkin | Neuro | 1560 Grand Concourse, Bronx, NY 10457 | |
| 4/14/2022 | | 4329 | Dr. Jessica Gallina | Ortho | 240 Central Park South, New York, NY 10019 | |
| 4/14/2022 | | 4426 | Dr. David Erlanger | Neuro | Via Zoom | |
| 4/14/2022 | | | Dr. Thomas Nipper | Ortho | 2114 Williamsbridge Road, Bronx, NY 10461 | Record IME / Felayne's m Spanish |
| 4/14/2015 | | 4486 | Dr. Dana Mannor | Ortho | 2044 Ocean Ave. Brooklyn NY 11229 | English |
| 4/14/2022 | | 4328 | Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | English |
| 4/14/2022 | | 4440 | Dr. Douglas Unis | Ortho | 2114 Williamsbridge Road, Bronx, NY 10461 | |
| 4/14/2022 | | 4487 | Dr. Daniel Arick | ENT | 450 Clinton Street, Brooklyn, NY 11231 | client is minor/spanish sp Spanish |
| 4/14/2022 | | 4426 | Dr. John Xethalis | Ortho | 224 West 35th Street, New York, NY 10001 | |
| 4/14/2022 | | 4426 | Dr. Dorothy Scarpinato | Ortho | 277 88th Street Brooklyn NY 11209 | |
| 4/14/2022 | | 4513 | Dr. Louis Romeo | | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Record IME Spanish |

| Date | Code | Doctor | Specialty | Address | Language |
|------|------|--------|-----------|---------|----------|
| 4/14/2022 | | Dr. ... | | ... Avenue, West Nyack, NY 10994 | Spanish |
| 4/14/2022 | 4515 | Dr. Jeffrey Klein | Ortho | 303 2nd Avenue, New York, NY 10003 | Spanish |
| 4/14/2022 | 4437 | Dr. Dennis Mann | Chiro | 2114 Williams Bridge Rd Lower Level Room 110 | Bronx, NY 10461 |
| 4/14/2022 | 4437 | Dr. Richard DeBenedetto | Neuro | 118-35 Queens Blvd, Regus Forest Hills Tower | Suite 400, Forest Hills, NY 11375 |
| 4/14/2022 | 4437 | Dr. Charla Fischer | Ortho | 145 East 32nd Street, 4th Floor, New York, NY | 10016 |
| 4/14/2022 | 4470 | Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | |
| 4/14/2022 | 4437 | Dr. Dana Mannor | Ortho | 2044 Ocean Ave, Brooklyn NY 11230 | |
| 4/14/2022 | 4437 | Dr. Nicholas Post | Neuro | 341 East 37th Street New York, NY 10016 | |
| 4/14/2022 | 4437 | Dr. Dana Mannor | Ortho | 2044 Ocean Ave, 1st Floor Suite A1, Brooklyn, | NY 11230 |
| 4/14/2022 | 4516 | Dr. Kai Ming Fu | | 525 East 68th Street, New York, NY 10065 | Spanish |
| 4/15/2022 | 4572 | Dr. Louis Cornacchia | Neuro | 17-52 Francis Lewis Blvd, Whitestone, NY 11357 | |
| 4/15/2022 | 4328 | Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Avenue, Jamaica NY 11432 | English |
| 4/15/2022 | 4408 | Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | Spanish Interpreter RequSpanish |
| 4/15/2022 | 4408 | Dr. Salvatore Corso | Ortho | 3713 East Tremont Avenu, Bronx, NY 10465 | |
| 4/15/2022 | 4579 | Dr. Angela Lastihenos | Physical Therapy | 3227 East Tremont Avenue, Bronx, NY 10461 | French Interpreter needeFrench |
| 4/15/2022 | 4558 | Dr. Salvatore Corso | Ortho | 3713 East Tremont Avenu, Bronx, NY 10465 | |
| 4/15/2022 | 4408 | Dr. Peter Spohn | | 2805 Veterans Memorial Highway, Ronkonkoma, | NY, USA Ste. 10 NY 11779 |
| 4/15/2022 | 4408 | Dr. Elizabeth Morrison | | 162-04 Jamaica Ave 5th Floor Jamaica NY 11432 | |
| 4/15/2022 | 4437 | Dr. Alok Sharan | Ortho | 800 Second Ave, 9th Floor, New York, NY 10017 | |
| 4/15/2022 | 4517 | Dr. Elizabeth Ortof | | 173 West 78th Street, New York, NY 10024 | Spanish |
| 4/15/2022 | 4408 | Dr. Peter Spohn | | 2805 Veterans Memorial Highway, Ronkonkoma, | NY, USA Ste. 10 NY 11779 |
| 4/15/2022 | | Dr. Salvatore Corso | Ortho | 3713 East Tremont Avenu, Bronx, NY 10465 | |
| 4/15/2022 | 4437 | Dr. Alok Sharan | Ortho | 800 Second Ave, 9th Floor, New York, NY 10017 | |
| 4/15/2022 | 4408 | Dr. Elizabeth Morrison | | 162-04 Jamaica Avenue 5th Floor Jamiaca NY 11432 | |
| 4/15/2022 | hours | Dr. | | 3227 East Tremont Avenue, Bronx, NY 10461 | |
| 4/15/2022 | 4408 | Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Avenue Jamaica NY 11432 | |
| 4/15/2022 | 4408 | Dr. Salvatore Corso | Ortho | 3713 East Tremont Avenu, Bronx, NY 10465 | |
| 4/15/2022 | 4470 | Dr. Jeffrey Guttman | Ortho | 162-04 Jamaica Ave. Jamaica NY 11432 | |
| 4/18/2022 | 4408 | Dr. Howard Kiernan | Ortho | 86-11 Lefferts Boulevard, Richmond Hill, NY 11418 | |
| 4/18/2022 | | Dr.Warren Cohen | Neuro | 825 Avenue W Brooklyn NY 11233 | |
| 4/18/2022 | | Dr. William Barr | Neuro | 724 2nd Ave New York NY 10016 | |
| 4/18/2022 | | Dr. Laith Jazrawi | Ortho | 333 East 38th Street, 4th Floor, New York, NY 10016 | |
| 4/18/2022 | 4437 | Dr. Roger Bonomo | Neuro | 47 East 77th Street, New York, NY 10075 | |
| 4/18/2022 | 4518 | Dr. David Abramson | | 42A East 74th Street, New York, NY 10021 | Spanish |
| 4/18/2022 | 4408 | Dr. Warren Cohen | Neuro | 825 Avenue W, Brooklyn, NY 11223 | Spanish Speaking Spanish |
| 4/18/2022 | 4426 | Dr. Yong Kim | Ortho | 145 East 32nd Street New York NY 10016 | |
| 4/18/2022 | 4488 | Dr. Warren Cohen | Neuro | 825 Avenue W, Brooklyn, NY 11223 | Spanish Speaking Spanish |
| 4/18/2022 | 4329 | Lenox Hill Radiology | MRI | 80-02 Kew Gardens Road, Kew Gardens, NY 11415 | Spanish Speaking Spanish |
| 4/18/2022 | 4409 | Dr. Joseph Lopez | Ortho | 10 Medical Plaza, Glen Cove, New York | |
| 4/18/2022 | 4519 | Dr. Stephen Flood | | 346 1st Street, Brooklyn, NY 11215 | Record IME Spanish |
| 4/18/2022 | | Dr. William Barr | Neuro | 724 2nd Avenue, New York, NY 10016 | |
| 4/19/2022 | 4437 | Dr. Kevin Kang | Ortho | 6010 Bay Parkway, Brooklyn, NY 11204 | |
| 4/19/2022 | 4437 | Dr. Salvatore Corso | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11229 | |

| Date | | Number | Provider | Specialty | Address | Notes |
|---|---|---|---|---|---|---|
| 4/19/2022 | | | | Spine | 8 East Av enue, New York, NY 10075 | |
| 4/19/2022 | | 4520 | Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10176 | Record IME Spanish |
| 4/19/2022 | | 4521 | Dr. Jason Bynes | Ortho | 173 Huguenot Street, New Rochelle, NY 10801 | need to review if video p Spanish |
| 4/19/2022 | | 4408 | William Dinenberg | Ortho | 2032 Hillview Street, Sarasota, FL 34239 | $275 1st hour |
| 4/19/2022 | | 4328 | Dr. King | | Via Phone | Spanish Translator Spanish |
| 4/19/2022 | | 4330 | Joseph Pessalano | Voc Rehad | 315 Madison Avenue, New York, NY 10017 | |
| 4/19/2022 | | 4332 | Dr. Edward Toriello | Ortho | 70-02 Fresh Pond Road, Ridgewood, NY 11385 | |
| 4/19/2022 | | 4426 | Dr. Ronald Grelsamer | Ortho | 303 2nd Avenue, New York, NY 10003 | English |
| 4/19/2022 | | 4502 | Dr. David Weissberg | Ortho | 379 Oakwood Road, Huntington Station, NY 11746 | Requesting a Female com |
| 4/19/2022 | | 4330 | Joseph Pessalano | Voc Rehad | 315 Madison Avenue, New York, NY 10017 | |
| 4/19/2022 | | 4426 | Dr. Jason Bynes | Ortho | 2949 Middletown Road, Bronx, NY 10461 | English |
| 4/19/2022 | | 4430 | Dr. Tal Mednick | Neuro | 601 Franklin Avenue, Garden City, NY 11530 | English |
| 4/19/2022 | | 4489 | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | Spanish Speaking Spanish |
| 4/19/2022 | | 4329 | Dr. Barbara Baer | Psych | 1979 Marcus Avenue, New Hyde Park, NY 11040 | |
| 4/19/2022 | | 4329 | Lenox Hill Radiology | MRI | 80-02 Kew Gardens Road, Kew Gardens, NY 11415 | Spanish Speaking Spanish |
| 4/19/2022 | | 4584 | Dr. Jay Eneman | Ortho | 585 Stewart Avenue, Garden City, NY 11530 | Spanish Speaking Spanish |
| 4/19/2022 | | 4490 | Dr. Marshall Keilson | Neuro | 1220 Avenue P, Brooklyn, NY 11229 | English |
| 4/19/2022 | | 4437 | Dr. Edward Toriello | Ortho | 70-02 Fresh Pond Road, Ridgewood, NY 11385 | |
| 4/19/2022 | | 4437 | Dr.Edward Toriello | Ortho | 70-02 Fresh Pond Road, Ridgewood, NY 11385 | |
| 4/19/2022 | | 4332 | Dr. Edward Toriello | Ortho | 70-02 Fresh Pond Road, Ridgewood, NY 11385 | |
| 4/19/2022 | | 4437 | Dr. Edward Toriello | Ortho | 70-02 Fresh Pond Road, Ridgewood, NY 11385 | |
| 4/19/2022 | | 4437 | Dr. Jason Baynes | Ortho | 2949 Middletown Road, Bronx, NY 10461 | |
| 4/19/2022 | | 4437 | Dr. David M. Erlanger | Neuro | 111 East 75th Street, Suite 1B, New York, NY 10021 | |
| 4/19/2022 | | 4437 | Dr. Charla Fischer | Ortho | 145 East 32nd Street New York NY 10016 | |
| 4/19/2022 | | 4328 | Dr. King | | Via Phone | |
| 4/19/2022 | | 4491 | Dr. Jeffrey Passick | Ortho | 421 Ocean Ave Brooklyn NY 11218 | |
| 4/19/2022 | | 4492 | Dr. Marshall Keilson | Neuro | 1220 Avenue P, Brooklyn, NY 11229 | |
| 4/19/2022 | | 4437 | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 4/19/2022 | | 4470 | Dr. Vikas Agrawal | Neuro | 1665 Grand Concourse Suite A Bronx, NY 10452 | |
| 4/19/2022 | | 4330 | Dr. Alan Winship | | 40 Gardenville Parkway, Cheetowaga, NY 14224 | |
| 4/20/2022 | | 4437 | Dr. Marianna Golden | Neuro | 162-04 Jamaica Avenue, Jamaica, NY 11432 | |
| 4/20/2022 | | 4437 | Dr. Ali Sadr | Neuro | 42 Broadway, New York, NY 10004 | |
| 4/20/2022 | | 4555 | Dr. Jeffrey Klein | Spine | 303 2nd Avenue, New York, NY 10003 | BILL 360 180 Each way foSpanish |
| 4/20/2022 | | 4330 | Dr. Michael Landi | Ortho | 400 International Drive, Williamsville, NY 14221 | |
| 4/20/2022 | | 4330 | Dr. Jane Mattson | Life Expert | 570 Lexington Avenue, New York, NY 10022 | Spanish Speaking Spanish |
| 4/20/2022 | | 4408 | Dr. Jerry Lubliner | Ortho | 215 East 73rd Street, New York, NY 10021 | Spanish Speaking Compa Spanish |
| 4/20/2022 | | 4473 | Dr. Richard Weinstein | | 1133 Westchester Avenue, White Plains, NY 10604 | Spanish Speaking Compa Spanish |
| 4/20/2022 | | 4559 | Dr. Howard Levin | Ortho | 2114 Williamsbridge Road, Bronx, NY 10461 | |
| 4/20/2022 | | 4408 | Dr. Peter Spohn | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Serbian speaking companSerbian |
| 4/20/2022 | | 4328 | Dr. Howard Kiernan | Ortho | 3713 East Tremont Avenue, Bronx, NY 10465 | English |
| 4/20/2022 | | 4565 | Dr. Rene Elkin | Neuro | 140 Lockwood Avenue, New Rochelle, NY 10801 | Spanish |
| 4/20/2022 | | 4408 | Dr. Charles Totero | Ortho | 18 East 41st Street New York NY 10017 | |
| 4/20/2022 | | 4408 | Dr. Michael Rosenfeld | Psych | 3510 Bainbridge Avenue Gun Hill Road Bromx | NY 10467 |

| Date | | Number | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|---|
| 4/21/2022 | | | | | 700 White Plains, Scarsdale, NY 10583 | Spanish Speaking Compa Spanish |
| 4/21/2022 | | 4573 | Dr. Mark Weidenbaum | | 51 West 51st Street, New York, NY | Spanish Speaking Compa Spanish |
| 4/21/2022 | | 4493 | Dr. Jordan Kerker | Ortho | 651 Old Country Road, Plainview, NY 11803 | English |
| 4/21/2022 | | hours | Dr. Debra Pollack | Ortho | 421 Ocean Avenue, Brooklyn, NY 11218 | |
| 4/21/2022 | | 4522 | Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | Spanish |
| 4/21/2022 | | 4469 | Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 4/21/2022 | | 4437 | Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11229 | |
| 4/21/2022 | | 4494 | Dr. Howard Kiernan | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11229 | Spanish Speaking Compa Spanish |
| 4/21/2022 | | 4426 | Dr. John Xethalis | Ortho | 224 West 35th Street, New York, NY 10001 | |
| 4/21/2022 | | 4523 | Dr. Franklin Porter | | 2932 Wilkinson Avenue, Bronx, NY 10461 | Record IME Spanish |
| 4/21/2022 | | 4440 | Dr. Aruna Seneviratne | Ortho | 2114 Williamsbridge Road, Bronx, NY 10461 | |
| 4/21/2022 | | 4524 | Dr. John Xethalis | Ortho | 224 West 35th Street, New York, NY 10001 | Record IME Spanish |
| 4/21/2022 | | 4568 | Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 4/21/2022 | | 4525 | Dr. Ronald Mann | Ortho | 1888 Commerce Street, Yorktown Heights, NY | 10598 Record IME Spanish |
| 4/21/2022 | | 4526 | Dr. Mukund Komanduri | Ortho | 910 Grand Concourse, Bronx, NY 10451 | Record IME Spanish |
| 4/21/2022 | | 4329 | Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 4/21/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 4/21/2022 | | 4470 | Dr. Dorothy Scarpinto | Ortho | 176 Hicksville Rd, Bethpage NY 11714 | |
| 4/21/2022 | | 4409 | Dr. Solomon Miskin | Psych | 107-05 70th Avenue Forest Hills NY 11375 | |
| 4/21/2022 | | 4437 | Dr. Joseph Yellin | | 130 East 77th Street 10th Floor Lenox Hill Hospital, | New York, NY 10075 |
| 4/21/2022 | | 4437 | Dr. Andrew Bazos | Ortho | 244 West 54th Street, New York, NY 10019 | |
| 4/22/2022 | | 4574 | Dr. Carl Weiss | | 94-24 58th Avenue, Elmhurst, NY 11373 | |
| 4/22/2022 | | 4495 | Dr. Alexandra Carrer | Ortho | 1118 Avenue Y, Brooklyn, NY 11235 | Spanish Speaking Compa Spanish |
| 4/22/2022 | | 4503 | Dr. Dorothy Scarpinato | Ortho | 760 N. Wellwood Avenue, Lindenhurts, NY 11757 | Female Comapnion |
| 4/22/2022 | | 4408 | Dr. Gary Florio | Pain Mngmt | 65 Broadway, New York, NY 10006 | Spanish Speaking Compa Spanish |
| 4/22/2022 | | 4409 | Dr. Vikas Agrawal | Neuro | 1665 Grand Concourse Suite A Bronx, NY 10452 | |
| 4/22/2022 | | 4586 | Dr. Howard Reiser | Neuro | 152 East Main Street Huntington NY 11743 | |
| 4/22/2022 | | 4437 | Dr. Yong Kim | Ortho | 145 East 32nd Street New York NY 10016 | |
| 4/22/2022 | | 4437 | Dr. John Xethalis | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | |
| 4/22/2022 | | 4437 | Dr. Jonathan Glassman | Ortho | 2114 Williamsbridge Road, Bronx, NY 10461 | |
| 4/22/2022 | | 4527 | Dr. Jason Hochfelder | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Record IME Spanish |
| 4/23/2022 | | 4464 | Dr. Arnold Berman | Ortho | 2572 East 15th Street, Brooklyn, NY 11235 | Sat Appt. |
| 4/23/2022 | | 4329 | Dr. Arnold Berman | Ortho | 2572 East 15th Street, Brooklyn, NY 11235 | English |
| 4/23/2022 | | 4428 | Dr. Carl Weiss | Ortho | 94-24 58th Avenue, Elmhurst, NY 11373 | Sat Appt. |
| 4/25/2022 | | 4470 | Dr. Ernesto Seldman | Ortho | 162-04 Jamaica Avenue, Jamaica NY 11432 | |
| 4/25/2022 | | 4437 | Dr. David Essig | Ortho | 717 Church Avenue, Brooklyn, NY 11218 | |
| 4/25/2022 | | 4409 | Dr. Pierce Ferriter | Ortho | 42 Richmond Terrace, Staten Island, NY 10301 | |
| 4/25/2022 | | 4437 | Dr. Eial Faierman | Ortho | 2100 Bartow Avenue, Bronx, NY 10475 | |
| 4/25/2022 | | 4437 | Dr. Eial Faierman | Ortho | 2100 Bartow Avenue, Bronx, NY 10475 | |
| 4/25/2022 | | 4575 | Dr. Regina Hillsman | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/25/2022 | | 4528 | Dr. Howard Yeon | | 256 Old Nyack Turnpike, Spring Valley, NY 10977 | Record IME Spanish |
| 4/25/2022 | | 4529 | Dr. Mitchell Goldstein | Ortho | 325 Merrick Avenue, East Meadow, NY 11554 | Record IME Spanish |
| 4/25/2022 | | 4496 | Dr. Jeffrey Nudelman | Acu | 717 Church Avenue, Brooklyn, NY 11218 | English |

| Date | Ref | Doctor | Specialty | Address | Notes |
|---|---|---|---|---|---|
| 4/25/2022 | | | Ortho | Avenue, East Meadow, NY 11554 | Spanish |
| 4/25/2022 | 4330 | Brian Daly | Voc Rehb | 575 Madison Avenue, New York, NY 10017 | Spanish Speaking Spanish |
| 4/25/2022 | 4504 | Dr. Matthew Chacko | Neuro | 319 Middle Country Road, Smithtown, NY 11787 | Female Companion |
| 4/25/2022 | 4430 | Dr. David Manevitz | Acu | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Client has daily seizures English |
| 4/25/2022 | 4475 | Dr. Scott Haig | Ortho | 700 White Plains, Scarsdale, NY 10583 | Spanish Speaking Compa Spanish |
| 4/25/2022 | 4576 | Dr. Saran Rosner | Neuro | 245 Saw Mill River Road, Hawthorne, NY 10532 | |
| 4/25/2022 | 4408 | Dr. Warren Cohen | Neuro | 825 Avenue W, Brooklyn, NY 11223 | Creole Speaking Compan Creole |
| 4/25/2022 | 4408 | Dr. Sean Lager | Ortho | 20 East 46th St. New York NY 10176 | |
| 4/26/2022 | 4437 | Dr. Eial Faierman | Ortho | 37-47 77th Street, Jackson Heights, NY 11372 | |
| 4/26/2022 | 4437 | Dr. Adam Bender | Neuro | 1050 Park Avenue, New York, NY 10128 | |
| 4/26/2022 | 4437 | Dr. Daniel Feuer | Neuro | 337 Court Street, Brooklyn, NY 11231 | |
| 4/26/2022 | 4408 | Dr. Annna Kroll | Pysical medicine | 150-28 Union Turnpike, Flushing, NY 11367 | Spanish Speaking Compa Spanish |
| 4/26/2022 | 4530 | Dr. Michael Miller | Ortho | 220 North Central Avenue, Hartsdale, NY 10530 | TT went in without CompSpanish |
| 4/26/2022 | 4328 | Dr. Alexander Merkler | Neuro | 420 East 70th Street, New York, NY& 10065 | Spanish Speaking Compa Spanish |
| 4/26/2022 | 4505 | Dr. Joseph Lopez | Ortho | 10 Medical Plaza, Glen Cove, NY 11542 | Req Female Companion |
| 4/26/2022 | 4531 | Dr. Jay Enemen | Ortho | 112-47 Queens Blvd, Forest Hills, NY 11373 | Spanish |
| 4/26/2022 | 4438 | Dr. Noah Finkel | Ortho | 205 East Main Street, Huntington, NY 11743 | |
| 4/26/2022 | 4532 | Dr. Thomas Nipper | Ortho | 3311 Shore Parkway, Brooklyn, NY 11235 | |
| 4/26/2022 | 4533 | Dr. Thomas Nipper | Ortho | 3311 Shore Parkway, Brooklyn, NY 11235 | Record IME Spanish |
| 4/26/2022 | 4560 | Dr. Jay Eneman | Ortho | 112-47 Queens Blvd, Forest Hills, NY 11373 | Russian Speaking / Little Russian |
| 4/26/2022 | 4439 | Dr. Catherine Tortorella | Chiro | 86-11 Leffters Blvd, Richmond Hill, NY 11418 | Spanish Speaking Compa Spanish |
| 4/26/2022 | 4476 | Dr. Matthew Chacko | Neuro | 1040 Hempstead Turnpike, Franklin Square, NY | 11010 |
| 4/26/2022 | | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | Spanish Speaking Compa Spanish |
| 4/26/2022 | | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | Spanish Speaking Compa Spanish |
| 4/26/2022 | 4534 | Dr. Sammy Dean | | 910 Grand Concourse, Bronx, NY 10451 | Spanish |
| 4/26/2022 | 4535 | Dr. Vikas Agrawal | | 1665 Grand Concourse Suite A Bronx, NY 10452 | Record IME Spanish |
| 4/26/2022 | 4408 | Dr. Mark Kramer | Ortho | 1075 Central Park Avenue, Scarsdale, NY 10583 | English |
| 4/26/2022 | 4577 | Dr. Salvatore Corso | Ortho | 162-04 Jamaica Avenue Jamaica NY 11432 | Spanish Speaking Compa Spanish |
| 4/26/2022 | | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | Client Speaks Albanian Albanian |
| 4/26/2022 | 4328 | Dr. Neil Roth | Ortho | 210 East 64th Street, New York, NY 10065 | Spanish Speaking Compa Spanish |
| 4/26/2022 | 4437 | Dr. Paul Lerner | Neuro | 30-80 31st Street, Astoria, NY 11102 | |
| 4/26/2022 | 4328 | Dr. Wei Shen | | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | Spanish Speaking Compa Spanish |
| 4/26/2022 | 4328 | Dr. Louis Romeo | Ortho | 2114 Williamsbridge Road, Bronx, NY 10461 | English |
| 4/26/2022 | | Dr. Wendell Scott | | 180 South Street, New Providence, NJ | |
| 4/26/2022 | 4439 | Dr. Howard Keirnan | Ortho | 86-11 Leffters Blvd, Richmond Hill, NY 11418 | English |
| 4/26/2022 | 4536 | Dr. Sean Lager | Ortho | 20 East 46th Street, New York, NY 10176 | Record IME Spanish |
| 4/26/2022 | 4329 | Dr. Jessica Gallina | Ortho | 240 Central Park Souuth, New York, NY 10019 | |
| 4/26/2022 | 4437 | Dr. Jeffrey Dermksian | Ortho | 5 Columbus Circle New York NY 10019 | |
| 4/26/2022 | 4437 | Dr. Howard Levy | Ortho | 1110 Pennsylvania Avenue, Unit 1, Brooklyn, NY | 11207 |
| 4/26/2022 | | Dr. Sean Lager | Ortho | 20 East 46th St. New York NY 10176 | |
| 4/26/2022 | | Dr. Sean Lager | Ortho | 20 East 46th St. New York NY 10176 | |
| 4/26/2022 | 4437 | Dr. Teresa Habacker | Ortho | 42-23 Francis Lewis Blvd, Bayside, NY 11361 | |
| 4/26/2022 | 4470 | Dr. Jay Eneman | Ortho | 112-47 Queens Blvd, Forest Hills, NY 11373 | |
| 4/26/2022 | 4470 | Dr. Jeffrey Passick | Ortho | 421 Ocean Parkway, Brooklyn, NY 11218 | |

| Date | | Number | Doctor Name | Specialty | Address | Notes |
|---|---|---|---|---|---|---|
| 4/27/2022 | | 4437 | Dr. Ernesto Seldman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | |
| 4/27/2022 | | 4437 | Dr. Michael Russ | PM&R | 162-04 Jamaica Avenue, Jamaica, NY 11432 | |
| 4/27/2022 | | 4437 | Dr. Ernesto Seldman | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | |
| 4/27/2022 | | 4437 | Dr. Robert Castracane | Oral surgeon | 595 Madison Avenue, New York, NY 10022 | |
| 4/27/2022 | | 4437 | Dr. Lourdes esteban | Neuro | 9921 4th Avenue, Brooklyn, NY 11209 | |
| 4/27/2022 | | 4556 | Dr. Arnold Berman | Ortho | 30-55 21st Street, Astoria, NY 11102 | |
| 4/27/2022 | | 4537 | Dr. Louis Nunez | | 982 Main Street, Fishkill, NY 12524 | Record IME Spanish |
| 4/27/2022 | | 4408 | Dr. Leon Sultan | Ortho | 112-41 Queens Blvd, Forest Hills, NY 11375 | No show |
| 4/27/2022 | | 4430 | Dr. John Killian | Ortho | 230 Hilton Avenue, Hempstead, NY 11550 | Speaks English & Russian |
| 4/27/2022 | | 4538 | Dr. Ken Alleyne | | 65 Broadway, New York, NY 10006 | Record IME Spanish |
| 4/27/2022 | | 4539 | Dr. Ronald Snyder | | 100 Mamaroneck Avenue, White Plains, NY 10601 | Record IME Spanish |
| 4/27/2022 | | 4569 | Dr. Barbara Baer | | 547 Saw Mill River Road, Ardsley, NY 10502 | |
| 4/27/2022 | | 4329 | Dr. Robert DeFalco | Ortho | 150 Morris Avenue, Springfield, NJ 07081 | |
| 4/27/2022 | | 4585 | Dr. Vito Loguidice | Ortho | 201 Dolson Avenue, Middletown, NY 10940 | English |
| 4/27/2022 | | 4437 | Dr. Matthew Mendez-ZfassOrtho | | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 4/27/2022 | | 4440 | Dr. Matthew Mendez-ZfassOrtho | | 421 Ocean Parkway, Brooklyn, NY 11218 | Russian Speaking Compa Russian |
| 4/27/2022 | | 4328 | Dr. Nicholas Post | Neuro | 80-02 Kew Gardens Road, Kew Gardens, NY 11415 | Spanish Speaking Compa Spanish |
| 4/27/2022 | | 4328 | Dr. Larry Shemen | ENT | 107-21 Queens Blvd, Forest Hills, NY 11375 | English |
| 4/27/2022 | | 4330 | Dr. Adam Bender | Neuro | 1150 Park Avenue, New York, NY 10128 | Spanish Speaking Spanish |
| 4/27/2022 | | 4581 | Dr. William Kulak | Ortho | 580 Park Avenue, New York, NY 10021 | Spanish Speaking Compa Spanish |
| 4/27/2022 | | 4329 | Dr. Sheeraz Qureshi | Spinal | 541 East 71st Street, New York, NY 10021 | Spanish Speaking Spanish |
| 4/27/2022 | | 4437 | Dr. Jessica Stoll | Voc rehab | Zoom | |
| 4/27/2022 | | 4408 | Dr. Matthew Mendez | | 421 Ocean Parkway, Brooklyn, NY 11218 | |
| 4/28/2022 | | 4477 | David Stein | voc rehab | Zoom | |
| 4/28/2022 | | 4409 | Dr. Rimma Danov | Neuropsych | 141-40 Union Turnpike, Flushing, NY 11367 | |
| 4/28/2022 | | 4470 | Dr. Dorothy Sacrpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | |
| 4/28/2022 | | 4470 | Dr. Dorothy Sacrpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | |
| 4/28/2022 | | 4437 | Dr. Dorothy Sacrpinato | Ortho | 277 88th Street, Brooklyn, NY 11209 | |
| 4/28/2022 | | 4408 | Dr. David Rubenfeld | Ortho | 1310 Broad Street, Bloomfield, NJ 07003 | |
| 4/28/2022 | | 4437 | Dr. Jeffrey Guttman | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | |
| 4/28/2022 | | 4564 | Dr. David Erlanger | | 111 East 75th Street, New York, NY 10021 | Spanish |
| 4/28/2022 | | 4540 | Dr. Louis McIntyre | Ortho | 162-04 Jamaica Avenue, Jamaica, NY 11432 | Record IME/TT went in wSpanish |
| 4/28/2022 | | 4541 | Dr. Franklin Porter | | 98-76 Queens Blvd, Rego Park, NY 11374 | Record IME Spanish |
| 4/28/2022 | | 4587 | Dr. Jeffrey Richmond | Ortho | 600 Northern Blvd, Great Neck, NY 11021 | |
| 4/28/2022 | | 4328 | Dr. Marc Ramnauth | Voc Rehab | 745 5th Avenue, New York, NY 10151 | Spanish Speaking Compa Spanish |
| 4/28/2022 | | 4542 | Dr. Adam Bender | | 1150 Park Avenue, New York, NY 10128 | Spanish |
| 4/28/2022 | | 4543 | Dr. Regina Hillsman | Ortho | 2949 Middletown Road, Bronx, NY 10461 | Spanish |
| 4/28/2022 | | 4329 | Dr. Daniel Feurer | Neuro | 910 Grand Concourse, Bronx, NY 10457 | mask & gloves required |
| 4/28/2022 | | 4329 | Mark Ramnauth | Voc Rehab | 745 5th Avenue, New York, NY 10151 | Spanish Speaking Compa Spanish |
| 4/28/2022 | | 4497 | Dr. Konrad Gruson | Ortho | 1250 Water Towers, Bronx, NY 10461 | Spanish Speaking Compa Spanish |
| 4/28/2022 | | 4328 | Dr. Kincaid | | Via Zoom | Spanish Speaking Compa Spanish |
| 4/28/2022 | | 4328 | Dr. Kincaid | | Via Zoom | Spanish Speaking Compa Spanish |
| 4/28/2022 | | 4330 | Dr. Rene Elkin | Neuro | 1560 Grand Concourse, Bronx, NY 10457 | |

| Date | Code | Provider | Specialty | Address | Notes |
|---|---|---|---|---|---|
| 4/28/2022 | 4328 | Dr. Mark Wheelhaus | Ortho | 5 East 51st Street, New York, NY 10019 | Spanish Speaking Compa Spanish |
| 4/28/2022 | 4440 | Dr. Jeffrey Guttman | Ortho | 2044 Ocean Avenue, Brooklyn, NY 11230 | |
| 4/28/2022 | 4328 | Dr. Jason Bynes | Ortho | 315 Madison Avenue, New York, NY 10017 | Spanish Speaking Compa Spanish |
| 4/28/2022 | 4408 | Dr. Daniel Downs | | 3001 Astoria Boulevard, Asrtoria, NY 11102 | |
| 4/28/2022 | 4437 | Dr. Rene Elkin | Neuro | 1560 Grand Concourse, Bronx, NY 10457 | |
| 4/28/2022 | 4437 | Dr. Joseph Kalangie | PM&R | 2114 Williamsbridge Bronx NY 10461 | |
| 4/28/2022 | 4437 | Dr. Manspeizer | Ortho | 75 East Gun Hill Rd. Bronx NY 10467 | |
| 4/28/2022 | 4437 | Dr. John Xethalis | Ortho | 3713 East Tremont Ave.Bronx NY 10465 | |
| 4/28/2022 | 4437 | Dr. Yong Kim | Ortho | 41-61 Kissena Blvd. Flushing NY 11355 | |
| 4/28/2022 | 4437 | Dr. Jeffrey Klein | Ortho | 303 2nd Ave. New York NY 10003 | |
| 4/28/2022 | 4437 | Dr. Jeffrey Klein | Ortho | 303 2nd Ave. New York NY 10003 | |
| 4/28/2022 | 4470 | Dr. Saran Rosner | Neuro | 3233 Westchester Ave. Bronx NY 10461 | |
| 4/29/2022 | 4330 | Dr. Jeff Brandoff | Ortho | 315 Madison Avenue, New York, NY 10017 | Spanish Speaking Spanish |
| 4/29/2022 | 4430 | Dr. Vijay Sidhwani | Pain Mngmt | 162-04 Jamaica Avenue, Jamaica, NY 11432 | English |
| 4/29/2022 | 4544 | Dr. Jason Hochfelder | | 3600 Fieldstone Road, Bronx, NY 10463 | Record IME Spanish |

# EXHIBIT 17

**January 24, 2023 Levi Marketing / Win-Back Email**

 Outlook

**Fwd: IME Watchdog**

██ ████████████████

██ ████████████

■ █████████████████

▐█████████████████████████████████████

████ █████ █████ █████

From: **Daniella Levi** <daniellalevi@levilawny.com>
Date: Tue, Jan 24, 2023 at 1:15 PM
Subject: IME Watchdog
To: karine@blglegal.com <karine@blglegal.com>
Cc: Daniella Levi <daniellalevi@levilawny.com>

Dear Ms. Bogoraz,

I hope you're doing well. As you may recall, my name is Daniella Levi and I am a personal injury attorney as well. I wanted to reach out to you because I noticed that we have much in common, attended Pace Law School, earned a degree in finance and started our own business in a male dominated industry. I respect and admire your success and dedication and was hoping to win your business back as I know you have used our services in the past.

I wanted to remind you of the high quality services offered by IME Watchdog. As the first and largest IME company in New York, covering over 1,000 exams per month, we have a proven track record of success. We have successfully changes the law in all four departments to allow plaintiffs to be represented during insurance medical exams by an non attorney advocate. Our team of personal injury lawyers, including myself train all of our watchdogs to provide the highest quality reports that meet the standards of the legal profession while zealously protecting the plaintiffs. In addition, our watchdogs make sure your clients do not waste time waiting around unnecessarily at the IME doctors' offices and are available to translate in multiple languages,

I would like to offer you our services at the reduced rate of $165 for the first hour and $45 for each additional half hour in an effort to win back your business. Our 100% satisfaction rate and 5 star google reviews from happy plaintiffs are a testament to our commitment to providing the highest quality service at the lowest possible rate. I would be honored to have the opportunity to work with you and ensure that your clients receive the best possible representation during their insurance medical exams, Please do not hesitate to reach out, I look forward to speaking with you.

Warm regards,

**Daniella Levi, Esq.**

Founder & CEO

IME Watchdog, Inc.

159-16 Union Turnpike, Suite 200

Fresh Meadows, New York 11366

Office: 718-463-2320

**Cell-646-660-2513**

Fax: 718-463-2324

email: daniella@imewatchdog.com

www.imewatchdog.com



**Daniella Levi, Esq.**



159-16 Union Turnpike, Suite 200

Fresh Meadows, New York 11366

daniellalevi@levilawny.com

Telephone: 718-380-1010

Facsimile: 718-380-1050

Cell: 646-660-2513

**www.levilawny.com**



# EXHIBIT 18

**Levi Criminal Conviction Packet**

FORM DBD-34
JUN. 85

No. _ _ _ _ _ _ _ _ _ _ _

# UNITED STATES DISTRICT COURT

_ _ _ _ _ _ _ _ _ _ District of _ Connecticut _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Division

## THE UNITED STATES OF AMERICA

vs.

DAVID VANOUNOU, aka JOSEPH BENNUN, RAYMOND CHOCHANA, aka RAYMOND SHASHANA, ADI TAL, MEIR OHAION, ALEX ADJMI, ALAN DAYON, DANIELLA LEVI, JACK ZEBEDE, ISSHAI DAVID VANOUNOU, aka ESHAY DAVID WANUNU, BENJAMIN HESSON, aka BENNY HASSAN, DINO TOSCANI, JACOB COHEN

# INDICTMENT
## 126 Counts

18 U.S.C. Sec. 371 (Conspiracy) — 1 Count
18 U.S.C. Sec. 1956(a)(1) (Money Laundering) — 109 Counts
18 U.S.C. Sec. 1956(a)(2) (Money Laundering) — 15 Counts
18 U.S.C. Sec. 982 (Forfeiture) — 1 Count

A true bill.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                                    Foreman

Filed in open court this _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ day

of _ _ _ _ _ _ _ _ _ _ _ A.D. 19 _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                                    Clerk

Bail, $ _ _ _ _ _ _ _ _ _ _ _ _ _ _

28

125        7/10/92              500,000          Tal, Vanounou, Hesson,
                                                 Isshai Vanounou

Each such transaction being a violation of Title 18, United States Code, Sections 1956(a)(2)(B) and 2.

COUNT ONE HUNDRED TWENTY-SIX

1.    As a result of the offenses alleged in Counts Two through One Hundred Twenty-Five, the defendants

DAVID VANOUNOU,
        aka JOSEPH BENNUN
RAYMOND CHOCHANA
        aka RAYMOND SHASHANA
ADI TAL
MEIR OHAION
ALEX ADJMI
ALAN DAYON
DANIELLA LEVI
JACK ZEBEDE
ISSHAI DAVID VANOUNOU
        aka ESHAY DAVID WANUNU
BENJAMIN HESSON
        aka BENNY HASSAN
DINO TOSCANI
JACOB COHEN

and each of them shall, pursuant to 18 U.S.C Section 982, upon conviction forfeit to the United States:

a.    $22,572,528 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property involved in the aforesaid offenses; and

b.    all property, real and personal, involved in the aforesaid offenses, and all property traceable to such property with all such interests, wherever located, and in whatever name held.

AO 442 (Rev. 12/85) Warrant for Arrest

#14

# United States District Court

### DISTRICT OF
### CONNECTICUT

UNITED STATES OF AMERICA

V.

DANIELLA LEVI

## WARRANT FOR ARREST

CASE NUMBER: 3:93CR000106 TFGD

To: The United States Marshal
   and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest   DANIELLA   LEVI

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

[X] Indictment   ☐ Information   ☐ Complaint   ☐ Order of court   ☐ Violation Notice   ☐ Probation Violation Petition

charging him or her with (brief description of offense)

Conspiracy

in violation of Title ___18___ United States Code, Section(s) ___371___

| | |
|---|---|
| KEVIN F. ROWE | CLERK |
| Name of Issuing Officer | Title of Issuing Officer |
| *Catherine Borozhey* Deputy Clerk | MAY 20, 1993   BRIDGEPORT, CT |
| Signature of Issuing Officer | Date and Location |

Bail fixed at $ _____ by_____

Name of Judicial Officer

| RETURN | | |
|---|---|---|

This warrant was received and executed with the arrest of the above-named defendant at _____

| DATE RECEIVED 5-20-93 | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST 5-25-93 | Agents of FBI | By: *[signature]* |

United States Code, Section 371, and money laundering, in violation of Title 18, United States Code, Section 1956.

3.   The FBI office in Bridgeport, Connecticut provided myself and other agents with the FBI office in New York with a copy of the warrant for the arrest of the defendants ALAN DAYON, DANIELLA LEVI, and BENJAMIN HESSON, a/k/a "Benny Hassan," a copy of which are attached hereto.

4.   The FBI office in Bridgeport, Connecticut also furnished myself and other agents with the FBI office in New York with information regarding the whereabouts of the defendants ALAN DAYON, DANIELLA LEVI, and BENJAMIN HESSON, a/k/a "Benny Hassan." The defendants whereabouts were thereafter corroborated by the FBI offices in New York and Miami, Florida, who conducted an independent investigation into these defendants whereabouts.

5.   On May 25, 1993 at the time I arrested the defendant DANIELLA LEVI, I asked her what her name was and she responded that she was "Daniella Levi."   After she was placed under arrest, the defendant, DANIELLA LEVI," was transported to the FBI office in New York, and was advised of her constitutional rights. The defendant, DANIELLA LEVI, was thereafter asked, among other things, for her date of birth and she told me that she was born on August 25, 1962. I have compared the date of birth which the defendant, DANIELLA LEVI, gave to me on May 25, 1993, with the date of birth on the documents I received from the Department of Motor Vehicles and the date of birth--August 25, 1962--is the same.

6.   On May 25, 1993, I have been advised that an agent with the FBI went to the home of the defendant, ALAN DAYON, at 1927 East First Street, Brooklyn, New York.   The agent placed a telephone call to a telephone number previously determined to be located inside that address.   A woman answered the telephone and the agent asked, in substance, whether Alan Dayon was there.   The woman responded, in substance, "yes, hold on."   A man came to the phone and the agent said "Alan," and the defendant, ALAN DAYON, responded "yes."   The agent advised the defendant, ALAN DAYON, in substance, that the agent had a warrant for his arrest, and asked the defendant, ALAN DAYON, to come to the front door of the building.   A few minutes later, the defendant, ALAN DAYON, came to the door, and asked, in substance, to see the warrant for his arrest.

7.   I have been further informed that after his arrest, the defendant, ALAN DAYON, was transported to the FBI office in New York, and was advised of his constitutional rights. The defendant, ALAN DAYON, was thereafter asked, among other things, for his date of birth and he told the agent that he was born on March 3, 1924. I have been informed that the agent compared the date of birth which the defendant gave to him on May 25, 1993, with the date of birth on the documents received from the FBI office in Bridgeport, Connecticut and the date of birth--March 3, 1924--is the same.

9

in Israel, directed the money laundering activities of co-conspirator Madar.

19.   In or about the spring of 1991, co-conspirator Madar asked defendant DANIELLA LEVI, who was a vice president of Bank Leumi in New York, to find a person who could launder money. Thereafter, defendant DANIELLA LEVI introduced co-conspirator Madar to defendant ALEX ADJMI for this purpose.

20.   During the summer of 1991, defendant DANIELLA LEVI received a fee for her role in introducing co-conspirator Madar to defendant ALEX ADJMI and initiating money laundering transactions.

21.   In or about the Spring of 1991, co-conspirator Madar explained the money laundering procedure to defendant ALEX ADJMI, who undertook the responsibility of finding a person or entity to launder the cash on behalf of co-conspirator Abenhaim and his co-conspirators.

22.   In or about April 1991, defendant ALEX ADJMI contacted defendant ALAN DAYON, and together they initiated discussions with Prism Financial Services regarding the laundering of cash.

23.   In or about late May, 1991, defendants DAVID VANOUNOU and RAYMOND CHOCHANA, through defendant MEIR OHAION, delivered approximately $100,000 in cash to co-conspirator Madar to be laundered. Co-conspirator Madar then delivered the cash to defendant ALEX ADJMI.

24.   On or about May 31, 1991, defendant ALEX ADJMI delivered approximately $100,000 in U.S. currency to Ezra Rishty, a co-

U.S. Department of Justice

United States Attorney
District of Connecticut

915 Lafayette Boulevard
Bridgeport, Connecticut 06604

(203) 579-5596

October 8, 1993

Richard Herman, Esq.
Blutrich, Herman & Miller
2 Park Avenue
Suite 1400
New York, N.Y. 10016

United States District Court
District of Connecticut
FILED AT     WATERBURY
Oct. 8        , 19 93
Kevin F. Rowe, Clerk
By

Re: United States v. Daniella Levi et. al.,
     Criminal No. 3:93CR00106(TFGD)

Dear Mr. Herman:

     This letter confirms the plea agreement entered into between your client, Daniella Levi (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal case.

The Plea and Offense

     Daniella Levi agrees to plead guilty to count one of an indictment charging her with conspiracy to knowingly evade the reporting requirements of Title 31 U.S.C. §5313(a), all in violation of Title 31 U.S.C §§ 5324(1) and 371.

The Penalties

     This offense carries a maximum penalty of 5 years' imprisonment and a $ 10,000 fine or both. In addition, under 31 U.S.C. § 3583, the Court may impose a term of supervised release of not more than 3 years, to begin at the expiration of any term of imprisonment imposed. The defendant understands that should she violate any condition of the supervised release during its term, she may be required to serve a further term of imprisonment equal to the period of the supervised release with no credit for the time already spent on supervised release.

     In addition, under U.S.S.G. §5E1.2(i) the Court may be required to impose an additional fine amount that is at least sufficient to pay the costs to the Government of any imprisonment, probation or supervised release ordered. If a sentence of imprisonment is imposed, the rate is $ 1,734.00 a month. If a sentence of probation or supervised release is imposed, the rate is $ 180.90 a month.

Richard Herman, Esq.
October 8, 1993
Page-6

<u>No Other Promises</u>

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agre ement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

CHRISTOPHER F. DRONEY
UNITED STATES ATTORNEY

JAMES I. GLASSER
ASSISTANT UNITED STATES ATTORNEY

JOSEPH W. MARTINI
ASSISTANT UNITED STATES ATTORNEY

The defendant Daniella Levi certifies that she has read this 6 page plea agreement letter and its attachment and that she fully understands and accepts the terms thereof.

DANIELLA LEVI                                          10/8/93
The Defendant                                          Date

I have read the above and explained it to my client, who advises me that she understands and accepts its terms.

RICHARD HERMAN, ESQ.                                   10/8/93
Attorney for the Defendant                             Date

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

### JUDGMENT IN A CRIMINAL CASE

**UNITED STATES OF AMERICA**

v.

**CASE NO. 3:93CR00106 TFGD**

**DANIELLA LEVI**
86-26 62nd Avenue
Rego Park, N.Y. 11374
SSN: 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          DOB: 08/25/62

**Richard B. Herman, Esq.**
Defendant's Attorney

The defendant **pleaded** guilty to count **one of an indictment** after a plea of not guilty.  Accordingly, the defendant is adjudged guilty of count **one**, which involves the following offense:

Title & Section: 31:5324(1) and 371                     Count: One
Nature of Offense: Conspiracy to knowingly evade reporting requirements of 31:5313(a)
Date Offense Concluded: 5/93

The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The defendant shall be placed on probation for a term of one year.

It is further Ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.   It is hereby Ordered that the general conditions of probation set out on the reverse side be imposed.

It is ordered that the defendant shall pay a Special Assessment of $50.00, for count **one** which shall be due immediately.

**May 27, 1994**
Date of Imposition of Sentence

/s/
T. F. Gilroy Daly / U.S.D.J.  Date:

*CERTIFIED AS A TRUE COPY*
*ON THIS DATE* _____
*BY:* _____
     *Deputy Clerk*

8

| | |
|---|---|
| DAVID VANOUNOU | "Joseph" |
| ADI TAL | "Samuel" |
| ALEX ADJMI | "Victor," "Alex Gomez," "007" |
| MEIR OHAION | "Arik" |
| ISSHAI DAVID VANOUNOU | "Ronnie" |
| BENJAMIN HESSON | "Michael" |
| JACK ZEBEDE | "Victor" |
| JACOB COHEN | "Yoav Ibem" |
| Szion Jacob Abenhaim | "Zero," "Paul" |
| Yehudah Madar | "Yuri," "Yubick,"  "Tony" |

Overt Acts

To further the unlawful agreement and accomplish its goals and purposes, the following overt acts, among others, were committed, in the District of Connecticut and elsewhere:

16.  In or about early 1991, defendant JACOB COHEN introduced defendant DAVID VANOUNOU (hereafter sometimes referred to as "VANOUNOU") to Yehudah Madar, a co-conspirator but not a defendant herein (hereafter "co-conspirator Madar").

17.  In or about the spring of 1991, defendant DAVID VANOUNOU recruited co-conspirator Madar to find a means to launder the cash proceeds of unlawful activity which co-conspirator Abenhaim would arrange to have delivered in New York.

18.  Beginning in or about the spring of 1991, defendant DAVID VANOUNOU, in New York, and his partner, defendant RAYMOND CHOCHANA,

9

in Israel, directed the money laundering activities of co-conspirator Madar.

19. In or about the spring of 1991, co-conspirator Madar asked defendant DANIELLA LEVI, who was a vice president of Bank Leumi in New York, to find a person who could launder money. Thereafter, defendant DANIELLA LEVI introduced co-conspirator Madar to defendant ALEX ADJMI for this purpose.

20. During the summer of 1991, defendant DANIELLA LEVI received a fee for her role in introducing co-conspirator Madar to defendant ALEX ADJMI and initiating money laundering transactions.

21. In or about the Spring of 1991, co-conspirator Madar explained the money laundering procedure to defendant ALEX ADJMI, who undertook the responsibility of finding a person or entity to launder the cash on behalf of co-conspirator Abenhaim and his co-conspirators.

22. In or about April 1991, defendant ALEX ADJMI contacted defendant ALAN DAYON, and together they initiated discussions with Prism Financial Services regarding the laundering of cash.

23. In or about late May, 1991, defendants DAVID VANOUNOU and RAYMOND CHOCHANA, through defendant MEIR OHAION, delivered approximately $100,000 in cash to co-conspirator Madar to be laundered. Co-conspirator Madar then delivered the cash to defendant ALEX ADJMI.

24. On or about May 31, 1991, defendant ALEX ADJMI delivered approximately $100,000 in U.S. currency to Ezra Rishty, a co-

4

property that was of a value greater than $10,000, and was derived from specified unlawful activity, that is, the importation and distribution of controlled substances in violation of 21 U.S.C. Sections 841 and 952, in violation of 18 U.S.C. Section 1957;

(d) to knowingly and for the purpose of evading the reporting requirements of 31 U.S.C. Section 5313(a), and the regulations promulgated thereunder, cause and attempt to cause a domestic financial institution to fail to file a report required under Section 5313(a), in violation of 31 U.S.C. Section 5324(1); and

(e) to knowingly travel and cause and aid and abet travel and the use of a facility in interstate and foreign commerce with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, violations of 18 U.S.C. Sections 1956 and 1957 and 31 U.S.C. Section 5324, in violation of 18 U.S.C. Section 1952(a)(3).

Manner and Means

2. It was a part of the conspiracy that co-conspirator Szion Jacob Abenhaim, a money broker from Cali, Colombia, would and did "buy" United States currency from drug traffickers in Colombia responsible for selling controlled substances, including cocaine, in the United States and elsewhere. This currency was generated as proceeds from the unlawful trafficking in controlled substances, including cocaine, illegally imported into and sold in the United States and elsewhere.

7

numbers for the wire transfer transactions conducted by Prism Financial Services so that they could confirm that the transactions had been completed according to co-conspirator Abenhaim's instructions.

12. It was a further part of the conspiracy that each level of the money laundering organization would and did receive a percentage commission for its services in laundering the cash delivered to Prism Financial Services.

13. It was a further part of the conspiracy that the defendants and their co-conspirators would and did discuss expanding the money laundering operation to Los Angeles, Dallas, Miami, Canada, Italy and France.

14. It was a further part of the conspiracy that approximately $22.5 million in cash was delivered to Prism Financial Services by individuals acting on the instructions of the defendants and their co-conspirators, which cash was wire transferred to accounts in the United States and abroad pursuant to instructions from co-conspirator Abenhaim.

15. It was a further part of the conspiracy that the defendants would and did conceal the money laundering organization and its activities from law enforcement scrutiny by, among other devices, the use of beepers, counter-surveillance techniques and code names for the participants. Among the code names used were:

Defendant or Co-conspirator    Code name

RAYMOND CHOCHANA                "Rafael," "Rafe"

# EXHIBIT 23

**Zemsky April 10, 2023 Letter**

LAW OFFICES OF
## ZEMSKY & SALOMON, P.C.
95 FRONT STREET • SUITE 2
HEMPSTEAD, NEW YORK 11550
TEL: (516) 485-3800
FAX: (516) 485-3280
WWW.ZEMSKYANDSALOMON.COM

\*DAVID E. ZEMSKY
MICHAEL L. SALOMON

MITCHELL B. KOVAL

\*N.Y. AND N.J. BAR

April 10, 2023

To whom it may concern:

Our firm is no longer working with IME Companions as of March 10ᵗʰ, 2023.

Sincerely yours

Jason M. Zemsky

# EXHIBIT 24

**Oresky January 18, 2023 Email re Percy Perez**

# EXHIBIT 24 - Oresky January 18, 2023 Email re Percy Perez

**From:** "Martinez, Tania"
**To:** IME Companions , "adam@imewatchdog.com"
**Cc:** "calendar@oreskylaw.com"
**Date:** Wed, 18 Jan 2023 21:44:20 +0000
**Subject:** Re: Percy Perez

**Email Body:**
Re: Percy Perez
102 East Oxford Street, Valley Stream, NY 11580
Phone #: (917) 968-1190
Date of Accident: April 13, 2019

Good Afternoon,

We need your services for the following Defendant Independent Medical Examination that has been scheduled for the following:

Date: 2/23/23
Time: 12:00 PM
Doctor: Jeffrey Klein
Location: 303 Second Avenue, Suite 19
New York, NY 10003

Date: 2/28/23
Time: 10:00 AM
Doctor: Daniel Feuer
Location: 337 Court Street, Ground Floor
Brooklyn, NY 11231

Client speaks spanish and please let me know the name of the companion who will accompany my client to note it in my calendar

Thanks,

-Tania Martinez

Calendar Coordinator

[cid:picture0]

149 East 149th Street

Bronx, New York 10451

TEL (718) 993-7832

FAX (718) 993-2279

Email: <mailto:Email: %20tmartinez@oreskylaw.com>
calendar@oreskylaw.com<mailto:Email:%C2%A0%20tmartinez@oreskylaw.com>

Website: www.oreskylaw.com<http://www.oreskylaw.com/>

The information contained in this email is information protected by the attorney-client and/or attorney work product privilege. It is intended for the use of the individual named above and the privileges are not waived by virtue of this being sent via email. If the person actually receiving this email or any other reader of this email is not the named recipient or the agent responsible to deliver it to the named recipient, any use, dissemination, distribution, or copying of this communication is strictly prohibited.

# EXHIBIT 25

**NYSCEF-Filed IME Reports Showing Other Legal Representatives / IME Providers**

Case 1:22-cv-01032-PKC-JRC    Document 670    Filed 06/02/26    Page 199 of 331 PageID #: 12920

:
:                    For Use of Clerk
:
: .. .. .. .. .. .. .. .. ..

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**

————————————————————————X,

SAURY NOVA VARGAS,                        Index No. 20390/2015E

                    Plaintiff,

                                          **<u>NOTE OF ISSUE</u>**

        -against-

3750-62 EAST TREMONT HOLDING CORP.,

                    Defendants,

————————————————————————X

3750- 62 EAST TREMONT HOLDING CORP.,

                    Third- Party Plaintiff,

        -against-

3758 E. TREMONT REST CORP. d/b/a
VAPOR LOUNGE,

                    Third-Party Defendant,

————————————————————————X

**NOTICE FOR TRIAL**

_X_ Jury trial demand
    _X Of all issues
    __ Of issues specified below or attached hereto
___ Trial without jury
Filed by attorneys for the Plaintiff
Date summons served: <u>January 22, 2015</u>
Date service completed:  <u>January 23, 2015</u>
Date issue joined: <u>April 29, 2015</u>

**NATURE OF ACTION OR SPECIAL PROCEEDING**

<u>X</u> Tort
        ___ Motor Vehicle Negligence
        ___ Medical Malpractice
    _X___ Other Tort
___ Contract

Case 1:22-cv-01032-PKC-JRC   Document 670   Filed 06/02/26   Page 200 of 331 PageID #: 12921

___ Contested Matrimonial
___ Uncontested Matrimonial
___ Tax Certiorari
___ Condemnation
___ Other (Not Itemized Above) _____
___ This action is brought as a class action

___ This is a medical malpractice action: panel procedures
___ Prescribed by the court rules pursuant to Judiciary Law section 148(a)
       ___ Have been completed    ___ Have not been completed
     _X_ Amount demanded - $5,000,000.00
         Other relief – COSTS AND DISBURSEMENTS
         Preference claimed under
         Insurance carrier(s), if known – Allstate Insurance Company

DATED:     Bronx, New York
          January 19, 2024

                           _____
                           Marina Tasevich, Esq.
                           **LAW OFFICE OF**
                           **ALEXANDER BESPECHNY**
                           Attorney for Plaintiff
                           **SAURY NOVA VARGAS**
                           2360 Westchester Avenue
                           Bronx, NY 10462
                           (718) 792-4800

TO:     **MARKS, O'NEILL, O'BRIEN**
       **DOHERTY & KELLY, P.C.**
       Attorneys for Defendant and Third-Party Plaintiff
       **3750- 62 EAST TREMONT HOLDING CORP.**
       600 Third Avenue, Suite 1501
       New York, NY 10016
       (212) 967-0080

Case 1:22-cv-01032-PKC-JRC    Document 670    Filed 06/02/26    Page 201 of 331 PageID #: 12922

1

*Jessica B. Gallina, M.D., PC*
_____

Orthopaedic Surgery                          240 Central Park South, Suite 2-O, New York, NY 10019
Foot and Ankle Surgery                       Tel: (212) 265-0255 — Fax: (212) 265 0233

                                             541 Cedar Hill Avenue, Wyckoff, NJ 07491
                                             Tel: (201) 904-2121 — Fax: (201) 904-2125

November 07, 2023
Marci Mitkoff, Esq.
Marks, O'Neill, O'Brien, Doherty & Kelly, PC
708, 3rd Avenue, Suite 2500
New York, NY 10017

**INDEPENDENT MEDICAL RE-EXAMINATION**

**CLAIMANT NAME:**     Nova Vargas, Saury
**DATE:**              11/07/2023
**DATE OF LOSS:**      01/04/2015
**CLAIM #:**           1279.104637
**FILE #:**            1279.104637

Dear Ms. Mitkoff,

I am a New York State Licensed and Board Certified Orthopedic Surgeon.  At your request, an Independent Orthopedic Re-examination was performed on November 07, 2023, in my Manhattan office at 240 Central Park South, Suite 2-0, New York, NY, 10019 in New York County.  The findings of that evaluation are presented as follows.

This is a follow-up to my independent medical evaluation performed on March 03, 2020.

The claimant, Saury Nova Vargas, was identified with a valid New York State Driver's License. Clara Vazquez, a legal representative was also present and identified with a valid New York State Driver's License.

Consent to evaluation was explained to Mr. Vargas.  I explained that you requested that I conduct an Independent Medical Evaluation.  I discussed the purpose of my evaluation and that I would not be providing any treatment.  I explained that doctor/patient confidentiality did not exist for the purpose of this evaluation and that I would submit a report of my findings.  I instructed him to let me know if he had pain during the examination and we would then stop the examination.  He stated that he understood and agreed to proceed with the examination.

Case 1:22-cv-01032-PKC-JRC    Document 670    Filed 06/02/26    Page 201 of 331 PageID #: 12922

Case 1:22-cv-01032-PKC-JRC   Document 670   Filed 06/02/26   Page 202 of 331 PageID #: 12923

action, which was served by Defendants CITY OF NEW YORK and HUNTS POINT

TERMINAL PRODUCE COOPERATIVE ASSOCIATION, INC., with Notice of Entry on or

about September 30, 2022, which denied Defendants/Appellants, HENRY HAAS, INC.,

INTERCONTINENTAL TRUCK BROKERAGE CORP. and JOEL ENCARNACION's motion,

pursuant to CPLR 3212 and granted Plaintiff/Respondent's motion pursuant to CPLR 3212

against Defendants/Appellants.  Defendants/Appellants appeal from each and every part of said

Decision and Order.

Dated:  White Plains, New York
         October 13, 2022

                               Yours, etc.

                               LAW OFFICE OF THOMAS K. MOORE

                               By: Mary E. Marzolla
                               Attorneys for Defendants
                               HENRY HAAS, INC., INTERCONTINENTAL
                               TRUCK BROKERAGE CORP. and JOEL
                               ENCARNACION
                               **Mailing Address**
                               P.O. Box 2903
                               Hartford, CT 06104-2903
                               (914) 285-8500

TO:    ZAREMBA BROWN PLLC
         Attorney(s) for Plaintiff
         40 Wall Street, 52nd Floor
         New York, NY 10005
         (212) 380-6700

Case 1:22-cv-01032-PKC-JRC    Document 670    Filed 06/02/26    Page 203 of 331 PageID
#: 12924

Paul L. Kuflik, MD
*Associate Professor*
*Mt. Sinai School of Medicine*
*Spine Surgery*
*www.Drpaulkuflik.com*
*516 739 9270*

**Office Address:** *955 Fifth Ave, New York, NY 10075*
*1122 Franklin Ave. Suite 106, Garden City, NY 11530*

**Mailing Address**: *Please send all correspondence to:*
*912 Harvard Ct. Woodmere, NY 11598*

May 12, 2023

Coffey, Modica, O'Meara, and Capowski, LLP
200 East Post Road, Suite 210
White Plains, NY  10601

**Re:  Nicholas Bucci**
**File #2020000842**
**Express #41-528**
**Date of Loss:  3/29/2019**

To Whom It May Concern:

I had the opportunity to examine Mr. Bucci at my office at 955 Fifth Avenue, New York City, New York, 10075, at approximately 8:45 AM on May 3, 2023.  He was accompanied by Mr. Salvador Mateo, a representative of his attorney's office.  Mr. Mateo was present throughout and took notes. Mr. Bucci's New York State commercial driver's license was used for identification.  Covid precautions were in place. Mr. Bucci acknowledged that he understood he was there to be examined and not treated.

The history as obtained from Mr. Bucci is that he is a 49-year-old, right-hand-dominant construction worker for Verizon injured on the job on 3/29/2019.  He claims he was hit by a 24-inch bolt that hit him in his right arm and then into the face with associated loss of consciousness for several minutes.  He reports that he was taken by ambulance to Lincoln Hospital where he was stitched and released.  He then went to Orange Regional Hospital and underwent surgery on his right arm.  He claims he injured his neck, head, face, teeth, right hand, right wrist, and lower back.

He reports that his neck pain began immediately.  He reports he was treated with physical therapy, injections and then underwent surgery.  He reports that he had a pinching pain in the right side of his neck radiating to the right shoulder to the right top of his chest, and to the right upper extremity.  He reports that he was treated with neck surgery by Dr. DeMoura. He reports the surgery was of no benefit to him. He claims that prior to the surgery his pain was a 9 on a scale of 0 to 10.  The pain

1

**Re:  Nicholas Bucci**
**File #2020000842**
**Express #41-528**
**Date of Loss:  3/29/2019**

FILED: RICHMOND COUNTY CLERK 06/10/2024 05:10 PM INDEX NO. 152138/2021
NYSCEF DOC. NO. 26 RECEIVED NYSCEF: 06/10/2024

# David M. Erlanger, Ph.D., ABPP

Psychological and Neuropsychological Assessment Services, P.C.
*Board Certified Clinical Neuropsychologist*
111 East 75th Street
Suite# 1B
New York, NY 10021

Clinical & Forensic
Children & Adults

Tel: (212) 396-2766
Fax: (212) 396-2762

July 13, 2023
Law Office of Eric D. Feldman-NY
485 Lexington Avenue
New York, NY 10017

## NEUROPSYCHOLOGICAL EVALUATION

Name: Victoria Targia
Date of Birth: September 29, 1980
Date of Incident: October 18, 2019
Date of Examination: July 6, 2023
Claim #: IIK8637

To Whom It May Concern:

Victoria Targia was evaluated to determine current neuropsychological status in regard to a 10/18/19 accident in which she reportedly fell and hit her head. Ms. Targia stated that she understood the general nature of the evaluation. She was advised of the limitations of an independent neuropsychological evaluation and agreed to proceed. She was advised that this evaluation did not establish a doctor-patient relationship and that there would be no treatment recommendations made by the examiner. Ms. Targia was informed that her level of effort would be assessed during the course of the examination. Approximately 10 minutes were used to review these issues, during which time she was provided with opportunities to ask questions and discuss all of these topics.

This evaluation was observed in its entirety by Danny Cai, who identified himself as an employee of Client Liaison Services. Mr. Cai instructed the examiner that he was not allowed to ask questions about Ms. Targia's routine activities, which is a standard component of any neuropsychological evaluation, limiting the conclusions and opinions expressed herein. When the examiner explained this limitation, Mr. Cai did not call his employer for guidance or clarification.

Case 1:22-cv-01032-PKC-JRC   Document 670   Filed 06/02/26   Page 205 of 331 PageID #: 12926

# David M. Erlanger, Ph.D., ABPP

Psychological and Neuropsychological Assessment Services, P.C .
*Board Certified Clinical Neuropsychologist*
111 East 75th Street
Suite# 1B
New York, NY 10021

Clinical & Forensic
Children & Adults

Tel: (212) 396-2766
Fax: (212) 396-2762

July 13, 2023
Law Office of Eric D. Feldman-NY
485 Lexington Avenue
New York, NY 10017

## NEUROPSYCHOLOGICAL EVALUATION

Name: Victoria Targia
Date of Birth: September 29, 1980
Date of Incident: October 18, 2019
Date of Examination: July 6, 2023
Claim #: IIK8637

To Whom It May Concern:

Victoria Targia was evaluated to determine current neuropsychological status in regard to a 10/18/19 accident in which she reportedly fell and hit her head. Ms. Targia stated that she understood the general nature of the evaluation. She was advised of the limitations of an independent neuropsychological evaluation and agreed to proceed. She was advised that this evaluation did not establish a doctor-patient relationship and that there would be no treatment recommendations made by the examiner. Ms. Targia was informed that her level of effort would be assessed during the course of the examination. Approximately 10 minutes were used to review these issues, during which time she was provided with opportunities to ask questions and discuss all of these topics.

This evaluation was observed in its entirety by Danny Cai, who identified himself as an employee of Client Liaison Services. Mr. Cai instructed the examiner that he was not allowed to ask questions about Ms. Targia's routine activities, which is a standard component of any neuropsychological evaluation, limiting the conclusions and opinions expressed herein. When the examiner explained this limitation, Mr. Cai did not call his employer for guidance or clarification.

Case 1:22-cv-01032-PKC-JRC    Document 670    Filed 06/02/26    Page 206 of 331 PageID #: 12927

**NEW YORK ORTHOPAEDIC SPINAL ASSOCIATES**
**IRA J. CHERNOFF, M.D.**
**MARC CHERNOFF, M.D.**
**897 Park Avenue**
**Suite E**
**New York, New York 10075**
**(631) 246-6100**

### INDEPENDENT MEDICAL EXAMINATION

January 10, 2024

Lewis Johs Avallone Aviles, L.L.P.
1377 Motor Parkway
Suite 400
Islandia, N.Y.  11749

Re:             **Miguel Ramos**
LJAA File No.:   0416.1016.0000
Date of Accident: 07/09/2020

To Whom It May Concern:

Miguel Ramos presented to my Manhattan office on January 10, 2024 for the purpose of an Independent Medical Examination. Mr. Ramos's New York State Driver's License was presented and photocopied for the purpose of picture identification. Carmen Dionico, an interpreter, was utilized via telephone speakerphone, who provided Spanish translation throughout this examination. He was accompanied by Salvador Matteo from Client Liaison Services, representing his attorney's office, who was present throughout this evaluation. A questionnaire that was provided to the claimant was not filled out, as the attorney representative stated, and the claimant confirmed that as per his attorney, he was not to fill out any forms in writing, and thus an oral history was obtained.

He is a 38-year-old right hand dominant male, who presents with a chief complaint of lower back and left foot pain. He has no other current complaints. He relates this to a work injury on July 9, 2020, when he was on a scaffold, carrying a bin on his right shoulder. He states that the scaffold went down, and that he hurt his right shoulder as the bin compressed into it. He notes that the scaffold did not collapse, and that he did not fall, but describes that when the scaffold lowered, the weight of the bin was on his right shoulder. He states that that afternoon, he went to a clinic. He was asked who referred him to the clinic, and who brought him to the clinic, but as per his attorney

Case 1:22-cv-01032-PKC-JRC    Document 670    Filed 06/02/26    Page 207 of 331 PageID #: 12928

# Debra A. Pollack, M.D.

### Diplomate of the American Board of Psychiatry and Neurology
*2114 Williamsbridge Rd, Bronx, NY, 10461*

Examination Date: June 14, 2023
Report Date: June 23, 2023

Ehrlich Gayner
150 Broadway
Suite 909
New York, NY 10038

Attn: Melina Quispe

Re:                          Almonte, Jose
Claim #:                     02330
EW/GC Case #:                22001175
DOI:                         3/19/20
Specialty Requested:         Neurology
Request Type:                Liability IME

To whom it may concern.

I performed an independent neurology examination of the claimant noted above, on 6/14/23 in my Bronx, New York office. The claimant did present with a valid photo identification which was witnessed and copied. The claimant drove to the examination today. The claimant was accompanied by Joel Lachapelle, a legal representative. Per his attorney's advice, the claimant did not fill out the intake forms.

The following are findings of the examination:

### WORK HISTORY
The claimant was working as a taxi driver when the 3/19/20 incident occurred. He states that he missed time from work following the accident. Mr. Almonte is currently working at the same job with the same duties.

### INJURY HISTORY
Mr. Almonte was involved in an accident on 3/19/20. He did not provide any information regarding how the accident occurred, injuries he sustained or any emergency treatment he may have received. (*Records indicate the claimant was involved in a motor vehicle accident on 3/19/20 in which he was a restrained driver of a taxi that as struck from the right side resulting in headaches, neck pain, and low back pain.*)

### PAST MEDICAL HISTORY
Mr. Almonte did not provide any information regarding his past medical history.

Case 1:22-cv-01032-PKC-JRC    Document 670    Filed 06/02/26    Page 208 of 331 PageID #: 12929

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**
-------------------------------------------------------------------------------X    Index No.: 25761/19E
ENOCH S. OTCHERE,

                                  **Plaintiff(s),**

             -against-

TERRENCE HOLDER, NEW YORK CITY TRANSIT
AUTHORITY, KHALIL LOUZ AND SEVERIN NONOSEE,,

                            **Defendant(s).**    File No.: 1064935
-------------------------------------------------------------------------------X

**NOTICE OF EXPERT WITNESS PURSUANT TO CPLR 3101(d)**

**PLEASE TAKE NOTICE**, of Defendant(s), **SEVERIN NONOSEE**, response to Plaintiff(s) request for expert disclosure pursuant to section 3101(d) of the Civil Practice Law and Rules.

Defendants expect to call **DR. J. SERGE PARISIEN, M.D.** as an expert witness at the trial in the above matter.

The subject matter upon which the examining physician is presently expected to testify is set forth in detail in report(s) dated **NOVEMBER 6, 2023**, attached hereto and incorporated by reference herein.

The facts and opinions upon which the examining physician is expected to testify are based on his/her physical examination of the plaintiff and/or his/her review of the plaintiff's medical records and upon all matters in evidence.

The grounds of the physician's opinion come from his/her physical examination of the plaintiff on the above date and/or his/her review of the plaintiff's medical records and is set forth in the attached report.

The Curriculum Vitae for the examining physician is annexed to the report.

Dated:  Freeport, New York
        June 3, 2024

                                 BAKER, MCEVOY & MOSKOVITS

  TO:    KHAVINSON & ASSOCIATES, P.C.
          45 BROADWAY
          NEW YORK, NY 10006
          (212) 785-5000

                               _____

                                BY: RONIT Z. MOSKOVITS, ESQ.
                                ATTORNEY FOR DEFENDANT(s)
                                5 BROADWAY, SUITE 3
                                FREEPORT, NY 11520
                                (212) 857-8230

Case 1:22-cv-01032-PKC-JRC   Document 670   Filed 06/02/26   Page 209 of 331 PageID #: 12930

# J. SERGE PARISIEN, M.D.

## Orthopedic Surgeon

337 Court Street
Brooklyn, NY 11231

November 6, 2023

Baker, McEvoy & Moskovits
c/o IME Services Inc.
960 Route 6
Suite 101
Mahopac, NY 10541

| | |
|---|---|
| **Claimant Name:** | **Enoch Otchere** |
| **Accident Date:** | **September 26, 2018** |
| **Claim #:** | **1064935-4** |
| **Date of Examination:** | **November 6, 2023** |
| **IME #:** | **AMTI-2023-9301** |

**TO WHOM IT MAY CONCERN:**

As per your request, the following report is being submitted on Mr. **Enoch Otchere**. This examination was performed on November 6, 2023 at my Bronx office. A valid NYS Driver's license was presented prior to examination. It is not disclosed how he arrived to the office.

He is accompanied by John Schreiber who identifies as the claimant's legal representative.

The claimant was the passenger of a vehicle involved in an accident causing him to sustain injury to the neck, left shoulder, low back and right ankle. He denies the loss of consciousness. There were no fractures or lacerations sustained. The same day he reportedly presented to St. Barnabas Hospital for emergency room treatment.

He states that he underwent left shoulder surgery on December 18, 2018.

**WORK HISTORY:** John instructed the claimant not to disclose any information regarding employment status.

Case 1:22-cv-01032-PKC-JRC Document 670 Filed 06/02/26 Page 210 of 331 PageID #: 12931

## JEFFREY PASSICK, M.D., F.A.A.O.S.
### DIPLOMATE AMERICAN BOARD OF ORTHOPEDIC SURGERY

**421 Ocean Parkway**          **Tel. #  718-339-8200**
**Brooklyn, NY  11218**          **Fax # 718-336-8200**


Examination Date:  9/19/23
Report Date:  9/29/23


James F. Butler & Associates
300 Jericho Quadrangle, Suite 260
P.O. Box 9040
Jericho, NY 11753


RE:            Deryck Gordon
Claim #:       37 08N3 44H
DOI:          6/4/2020
Request Type:    Liability IME


To Whom It May Concern:

As per your request, I performed an orthopedic examination on the above claimant on 9/19/23 in my Brooklyn, New York office.  The claimant presented valid photo identification which was witnessed and copied.

The claimant was accompanied by Gerard Losquadro, a legal representative.

The claimant was provided with intake forms but refused to complete them at the advice of his attorney.

My findings are as follows:

**HISTORY:**

Mr. Gordon was involved in a motor vehicle accident on 6/4/20.  The claimant verbalized that he was the driver of a car that was sideswiped.  He verbalized he went to the emergency department on his own after the accident.  He verbalized his car was totaled.

The claimant verbalized receiving injections (not specified).  He did not provide any information as to whether he received physical therapy, chiropractic care, or acupuncture subsequent to the accident of 6/4/20.

Case 1:22-cv-01032-PKC-JRC Document 670 Filed 06/02/26 Page 211 of 331 PageID #: 12932

**KHAVINSON & ASSOCIATES, P.C.**
Attorney(s) for Plaintiff(s)
Deryck M. Gordon
45 Broadway, Suite 720
New York, NY 10006
(718) 421-3815
tm@khavinson.com

3

# EXHIBIT 26

**WatchDog "Clients that Never Returned" Summary**

**IME Watchdog, Inc.**
**Clients that Never Returned**

| | |
|---|---|
| Bogoraz Law Group, P.C. | 0 |
| Elefterakis, Elefterakis & Panek | 0 |
| Liakas Law P.C. | 0 |
| Khavinson & Associates | 0 |
| Zaremba Brown | 0 |
| Subin Associates | 0 |
| **TOTAL** | **$0.00** |

# EXHIBIT 27-A

**Marketing 360 Agreement**



# Marketing 360® Standard Service Agreement.

## IME Companions

| Created For: Safa Gelardi | Created By: Hannah Newman |
|---|---|
| safagelardi@gmail.com | hannah.newman@marketing360.com |
| **Date Created:** | **Executed:** |
| Mon, Jul 20, 2020, 2:37 PM MDT | Mon, Jul 20, 2020, 2:51 PM MDT |

**Marketing 360® Base Platform Features (Customizable)**  $395.00/mo

| Feature | |
|---|---|
| CRM - Manage leads and contacts | ✓ |
| Nurture - Email and text message marketing | ✓ |
| Listings - Manage and monitor business listings | ✓ |
| Reputation - Monitor and request online reviews | ✓ |
| Social - Monitor social media and schedule posts | ✓ |
| Content - Track content marketing and SEO | ✓ |
| Ads - Monitor digital ad campaigns | ✓ |
| Intelligence - Call tracking, analytics and more | ✓ |
| Creative - Design tools and on-demand talent | ✓ |
| Call Tracking | ✓ |
| Files - Store files in the cloud | ✓ |
| Forms - Build and manage website forms | ✓ |



| | | |
|---|---|---|
| 📅 Calendar - Manage company calendar | | ✓ |
| 📈 Websites 360® - Small business website platform | | ✓ |
| Top Rated Local® - Small business review platform | | ✓ |
| 📞 Support - Online and phone support | | ✓ |

## Monthly Marketing Programs & Fuel (Added services include a dedicated team)

| | |
|---|---|
| Social Media Management | $300.00/mo |
| On-Demand Creative Services (Creative Credits) | $500.00/mo |

## Totals

| | |
|---|---|
| Monthly Recurring Total | **$1,195.00** |
| One Time Services Total | **$0.00** |
| Annual Recurring Total | **$0.00** |

# $1,195.00
### Total due today

This agreement (the "Service Agreement") between you (the "Client" or "you") and Madwire, LLC (the "Company"), located at 3405 S. Timberline Rd. Fort Collins, CO 80525, and together with Client the "Parties" or each individually a "Party") is effective on the date of Client's signature (the "Effective Date"), and is governed by the Company's Terms of Service located at www.marketing360.com/terms (the "Terms of Service"). If, at any time during the Term, you utilize Marketing 360 Payments you also agree to the terms located at www.marketing360.com/payment-terms (the "Payment Terms").  The Terms of Service and Payment Terms are incorporated in full by this reference. The Service Agreement together with the Terms of Service constitute the entire agreement (the "Agreement") between the Parties. By accepting this Agreement you agree that you have read, understand and agree to be bound by the Terms of Service, which contain, among other provisions, refund policies, dispute resolution provisions, and limitations of liability. The Company limits acceptance to this Service Agreement and the Terms of Service, and objects to any other additional or different terms in the Client's acceptance.

**Monthly Billing Commitment:**

In agreeing to this Service Agreement, you hereby agree to a six (6) month minimum commitment and authorize recurring monthly billing for such period (the "Initial Term"). The first payment will be taken on the Effective Date, and you will be billed for subsequent payments monthly. You may cancel services prior to completing the Initial Term by paying an Early Cancellation Fee equal to the lesser of either (a) your remaining monthly payments under the Initial Term or (b) $2,310. After the Initial Term, the Term will be automatically renewed for successive one (1) month periods (each a "Renewal Term" and together with the Initial Term the "Term") until terminated by either Party as provided in the Terms of Service. All cancellations require no less than 30 days' written notice.

* Client Name (typically your company's legal name - for example ABC, LLC)

IME Companions LLC

* Signer's Full Name

Safa Gelardi

* Signer's Corporate Title (President, CEO, etc)

CEO

**Signature:**

By signing below you certify that you, as the Client or as Client's Authorized Representative, have read and agree to the provisions set forth in this Service Agreement and to the Terms of Service, including the refund policy, and that together these agreements constitute a legal, valid and binding obligation of Client, enforceable against Client in accordance with their terms. You further certify and represent that you are authorized to provide the payment information you have provided or plan to provide to the Company in conjunction with this Service Agreement.

I authorize recurring billing on my account: ☑

I understand and agree to the terms of service: ☑



I am also the authorized card holder or ACH representative: ☑

## Billing Information

* Name of Authorized Credit Card Holder or Authorized ACH Representative (Not Company Name)

Safa Gelardi

* Billing Street Address

9207 245th St.

* City

Floral Park

* State

NY

* Zip

11101

* Last 4 digits of authorized credit card or ACH account number (Make sure this matches what you provided)

4276

* Phone

| 7187494732 |
| --- |

* Email

| safagelardi@gmail.com |
| --- |

Contract ID: df-b2nEtIGdNhDXGFa60G7OyToEHjC-R6gYAWxtcAqU | Mon, Jul 20, 2020, 2:51 PM MDT

Case 1:22-cv-01032-PKC-JRC     Document 670     Filed 06/02/26     Page 219 of 331 PageID #: 12940

* Phone

# EXHIBIT 27-B

**Madwire / Marketing 360 Invoices**

Defendants' Exhibit Package



**INV01785762**

Account Number **M30297**
Due Date **01/20/2022**

**Please remit payment to:**
Madwire, LLC
3405 S. Timberline Rd.
Fort Collins, CO 80525
(855) 773 - 8171

Invoice For

**IME Companions**
9207 245th St.

Floral Park, New York, 11101
United States

We appreciate your business!  All services governed by the Marketing 360 Terms of Service located at www.marketing360.com/terms

For assistance please contact your marketing executive **Paul Richardson** at (855) 773-8169.

| CHARGE SUMMARY | | | | |
|---|---|---|---|---|
| **Service Period** | **Rate Plan Name** | **Charge Detail** | **Subtotal** | **TOTAL** |
| 01/20/2022-02/19/2022 | Marketing 360 - Monthly (T) | Charge Name: Marketing 360 - Monthly<br>Quantity:  1<br>Unit Price:  $395.00<br>Description: | $395.00 | $429.07 |
| 01/20/2022-02/19/2022 | Marketing 360 Fuel- Monthly | Charge Name: Content Credits - Monthly<br>Quantity:  605<br>Unit Price:  $1.00<br>Description: | $605.00 | $605.00 |

**COMMENTS**

| | |
|---|---|
| **Discount:** | **$0.00** |
| **Subtotal:** | **$1,000.00** |
| **NY COUNTY TAX** | **$16.79** |
| **NY SPECIAL TAX** | **$1.48** |
| **NY STATE TAX** | **$15.80** |
| **Total:** | **$1,034.07** |
| **Invoice Balance:** | **$0.00** |

| TRANSACTIONS | | | |
|---|---|---|---|
| | | Invoice Total | $1,034.07 |
| Transaction Date | Transaction Number | Transaction Type | Applied Amount |
| 01/20/2022 | P-00728675 | Payment | ($1,034.07) |
| | | Invoice Balance | $0.00 |



**INV01796966**

Account Number **M30297**
Due Date **02/20/2022**

**Please remit payment to:**
Madwire, LLC
3405 S. Timberline Rd.
Fort Collins, CO 80525
(855) 773 - 8171

| Invoice For | **IME Companions**<br>9207 245th St.<br><br>Floral Park, New York, 11101<br>United States | We appreciate your business! All services governed by the Marketing 360 Terms of Service located at www.marketing360.com/terms<br><br>For assistance please contact your marketing executive **Paul Richardson** at (855) 773-8169. |
| --- | --- | --- |

| CHARGE SUMMARY | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Service Period** | **Rate Plan Name** | **Charge Detail** | **Subtotal** | **TOTAL** | |
| 02/20/2022-03/19/2022 | Marketing 360 - Monthly (T) | Charge Name: Marketing 360 - Monthly<br>Quantity: 1<br>Unit Price: $395.00<br>Description: | $395.00 | $429.07 | |
| 02/20/2022-03/19/2022 | Marketing 360 Fuel- Monthly | Charge Name: Content Credits - Monthly<br>Quantity: 605<br>Unit Price: $1.00<br>Description: | $605.00 | $605.00 | |

**COMMENTS**

| | |
| --- | --- |
| **Discount:** | **$0.00** |
| **Subtotal:** | **$1,000.00** |
| **NY COUNTY TAX** | **$16.79** |
| **NY SPECIAL TAX** | **$1.48** |
| **NY STATE TAX** | **$15.80** |
| **Total:** | **$1,034.07** |
| **Invoice Balance:** | **$0.00** |

| TRANSACTIONS | | | |
|---|---|---|---|
| | | Invoice Total | $1,034.07 |
| **Transaction Date** | **Transaction Number** | **Transaction Type** | **Applied Amount** |
| 02/20/2022 | P-00738158 | Payment | ($1,034.07) |
| | | Invoice Balance | $0.00 |



**INV01807649**

Account Number **M30297**
Due Date **03/20/2022**

**Please remit payment to:**

Madwire, LLC
3405 S. Timberline Rd.
Fort Collins, CO 80525
(855) 773 - 8171

| Invoice For | **IME Companions**<br>9207 245th St.<br><br>Floral Park, New York, 11101<br>United States | We appreciate your business! All services governed by the Marketing 360 Terms of Service located at www.marketing360.com/terms<br><br>For assistance please contact your marketing executive **Paul Richardson** at (855) 773-8169. |
|---|---|---|

| CHARGE SUMMARY | | | | | |
|---|---|---|---|---|---|
| **Service Period** | **Rate Plan Name** | **Charge Detail** | **Subtotal** | **TOTAL** | |
| 03/20/2022-04/19/2022 | Marketing 360 - Monthly (T) | Charge Name: Marketing 360 - Monthly<br>Quantity: 1<br>Unit Price: $395.00<br>Description: | $395.00 | $429.07 | |
| 03/20/2022-04/19/2022 | Marketing 360 Fuel- Monthly | Charge Name: Content Credits - Monthly<br>Quantity: 605<br>Unit Price: $1.00<br>Description: | $605.00 | $605.00 | |

**COMMENTS**

| | |
|---|---|
| **Discount:** | **$0.00** |
| **Subtotal:** | **$1,000.00** |
| **NY COUNTY TAX** | **$16.79** |
| **NY SPECIAL TAX** | **$1.48** |
| **NY STATE TAX** | **$15.80** |
| **Total:** | **$1,034.07** |
| **Invoice Balance:** | **$0.00** |

| TRANSACTIONS | | | |
|---|---|---|---|
| | | Invoice Total | $1,034.07 |
| Transaction Date | Transaction Number | Transaction Type | Applied Amount |
| 03/20/2022 | P-00747524 | Payment | ($1,034.07) |
| | | Invoice Balance | $0.00 |

# EXHIBIT 27-C

**Giant Partners Marketing Contract**

Defendants' Exhibit Package

# GIANTPARTNERS

1461 Lawrence Drive
Thousand Oaks, CA 91320
P: (805) 267-1575

Ship to

**IME Companions**
Safa Gelardi
148 Clay Pit Rd. Staten
Island NY 10309
P: (833) 463-7767

**IME Companions**
Safa Gelardi
148 Clay Pit Rd
Staten Island NY
10309

Term: Recurring Monthly

Date: August 11, 2022

## Line Item Description

| Item | Description | Amount |
|---|---|---|
| Digital Marketing Partnership (Starter) | IME Companions brand with corresponding advertising campaign | 7250 |

# EXHIBIT 28

**IME Companions Marketing / Attorney-Event Outreach Emails**

Outlook

---

## FW: NYSTLA Decisions Staten Island: IME Companions - always protecting Your clients

---

**From** Carlos Roa <croa@imecompanions.com>

**Date** Mon 10/21/2019 3:48 PM

**To** IME Companions <info@imecompanions.com>

📎 5 attachments (1 MB)

IME Companions Report Exam Conducted 2-19-19 [1].pdf; 10-04-19 IME Report Marcial Vasquez.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 7-1-19 IME Report Drupattie Singh.pdf; 2-27-19 IME Companions Report[2].pdf;

Best Regards,

Carlos D. Roa
President



Office: 833-463-7767
Direct: 718-749-4732
9207 245th St
Floral Park, New York 11001
Email: croa@imecompanions.com
www.Imecompanions.com



---

**From:** Carlos Roa <croa@imecompanions.com>
**Sent:** Monday, October 21, 2019 8:16:05 AM
**To:** anthony@pirrottilawfirm.com <anthony@pirrottilawfirm.com>
**Subject:** NYSTLA Decisions Staten Island: IME Companions - always protecting Your clients

Dear Mr. Anthony Pirrotti,

IME Companions had the pleasure of meeting you at last week's NYSTLA Decisions CLE in Staten Island. You advised me to reach out to you in regards to sending IME Companions to your client's IMEs.

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as

the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency  we work with the best. Our current clients include: Subin Associates, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

With our professional staff, robust reports, and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms.
Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 Outlook

---

## FW: NYSTLA Staten Island: IME Companions - always protecting Your clients

---

**From** Carlos Roa <croa@imecompanions.com>

**Date** Tue 10/22/2019 11:37 AM

**To** IME Companions <info@imecompanions.com>

📎 5 attachments (1 MB)

2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf;

Best Regards,

Carlos D. Roa
President



Office: 833-463-7767
Direct: 718-749-4732

9207 245th St
Floral Park, New York 11001
Email: croa@imecompanions.com
www.Imecompanions.com



---

**From:** Carlos Roa <croa@imecompanions.com>
**Sent:** Monday, October 21, 2019 8:10:30 AM
**To:** 718ABOGADO@GMAIL.COM <718ABOGADO@GMAIL.COM>
**Subject:** NYSTLA Staten Island: IME Companions - always protecting Your clients

Dear Charles DeStefano,

IME Companions had the pleasure of meeting you at last week's NYSTLA Decisions CLE in Staten Island. You advised me to reach out to you in regards to sending IME Companions to your client's IMEs.

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as

the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency  we work with the best. Our current clients include: Subin Associates, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

With our professional staff, robust reports, and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms.
Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

In addition, we look forward to sponsoring the SITLA dinner on November 13, 2019. Please do send us more information.

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 Outlook

## Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

**From** Carlos Roa <croa@imecompanions.com>

**Date** Tue 10/22/2019 4:59 PM

**To** Ronald Cerrachio <rcerrach@nycourts.gov>; Charles Destefano <718abogado@gmail.com>; patrick bisogno <p.bisogno@mac.com>; SITLA - JOE CANEPA <jcanepa@josephgcanepapllc.com>; Michael Kuharski <MKuharski@klglawyer.com>

**Cc** IME Companions <info@imecompanions.com>

Dear All,

Please advise of final details in regards to November 13 (should it be available for us to Sponsor). In addition we would like to thank you all for allowing IME Companions to sponsor the dinner and become part of a great organization.

We were fortunate to meet Charles last week, and we look forward meeting the rest of you very soon!

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284

9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

**From:** Ronald Cerrachio <rcerrach@nycourts.gov>
**Date:** Tuesday, October 22, 2019 at 3:08 PM
**To:** Charles Destefano <718abogado@gmail.com>, Carlos Roa <croa@imecompanions.com>, patrick bisogno <p.bisogno@mac.com>, SITLA - JOE CANEPA <jcanepa@josephgcanepapllc.com>, Michael

Kuharski <MKuharski@klglawyer.com>
**Subject:** Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

Dear Charlie and Carlos:
  Thanks so much for your proposal and assistance to the Staten Island Trial Lawyers.
Best
Ron Cerrachio

Get Outlook for iOS
_____

**From:** Charles Destefano <718abogado@gmail.com>
**Sent:** Tuesday, October 22, 2019 12:34 PM
**To:** Carlos Roa; patrick bisogno; SITLA - JOE CANEPA; Ronald Cerrachio; Michael Kuharski
**Subject:** Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

Dear Carlos
Thank you for your proposal to sponsor a dinner for the Staten Island Trial Lawyers Association on November 13th.  I am including our President, Mr PatBisogno, and our entire Executive Board in this email thread.  MrBisogno handles to calendar of events, so I need to be sure that the event is not superseded by a prior commitment.

We are an association that was formed over 50 years ago by Trial Lawyers who were  committed to support the rights of injuredpersons. We meet once per month atBocelli Restaurant located at 1250Hylan Boulevard, Staten Island, New York.  The meetings are generally attended by approximately 20 to 30 current members, the majority of whom are practicing Personal Injury attorneys.

As a sponsor, your contribution is limited to the cost percapita of each member that attends the meeting. In other words, if 22 members attend, your company will cover the cost of 22 members.

You are given 15 to 20 minutes to present your services to our members and may do so via Power Point presentation, video, live talk, or any other format that suits you. Additionally, all materials which explain your services may be distributed to members.  It is

recommended that you obtain a list of all members which includes their contact information (email, office address, etc).

It should be noted that each year we choose only one sponsor per area of legal services.  In other words, your competitors will not be able to present to our association during the one year following your sponsored dinner. You are welcome to announce that you are a "Proud Sponsor of the Staten Island Trial Lawyers 2019" in your website, literature, etc.

Once it is established that the night is clear for a new Sponsor, I will send an email to you.  (MrBisogno will check our calendar and hopefully that can be expedited ASAP).

Thanks again and it was a pleasure to meet you at theNYSTLA 2019 Decisions CLE.

Charles DeStefano, 1st Vice President

On Tue, Oct 22, 2019 at 6:03 AM Carlos Roa <croa@imecompanions.com> wrote:

Dear Charles,

Great thank you. We appreciate that, we know you will very satisfied with our work.
Can you send me information on Co-Sponsoring the event on November 13, or point me in the right direction.
Thank you talk with you soon!

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

---

**From:** "718abogado@gmail.com" <718abogado@gmail.com>
**Date:** Monday, October 21, 2019 at 12:56 PM
**To:** Carlos Roa <croa@imecompanions.com>
**Subject:** Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

Carlos, I spoke about your company this morning to my paralegal. We will be using your services. I also look forward to seeing you at the trial lawyers meeting next month.

Sincerely,

Charles

Sent from my iPhone

On Oct 21, 2019, at 8:10 AM, Carlos Roa <croa@imecompanions.com> wrote:

Dear Charles DeStefano,

IME Companions had the pleasure of meeting you at last week's NYSTLA Decisions CLE in Staten Island. You advised me to reach out to you in regards to sending IME Companions to your client's IMEs.

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency  we work with the best. Our current clients include: Subin Associates, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

With our professional staff, robust reports, and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms.
Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

In addition, we look forward to sponsoring the SITLA dinner on November 13, 2019. Please do send us more information.

Kind Regards,

Carlos D. Roa
President
<image001.png>
Office : 833 463 7767
Direct : 718 524 3284
9207 245<sup>th</sup> St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com
<image002.png>

**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

<2-27-19 IME Companions Report[2].pdf>
<7-1-19 IME Report Drupattie Singh.pdf>

&lt;7-18-19 IME Report Tyrell Hendricks .pdf&gt;
&lt;10-04-19 IME Report Marcial Vasquez.pdf&gt;
&lt;IME Companions Report Exam Conducted 2-19-19 [1].pdf&gt;

--
Charles C. DeStefano, Esq.
Law Offices of Charles C. DeStefano
1082 Victory Boulevard
Staten Island, New York  10301

CONFIDENTIALITY NOTICE: The information in this E-Mail may be confidential and may be legally privileged. It is intended solely for the addressee(s). If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on this e-mail, is prohibited and may be unlawful. If you have received this E-Mail message in error, notify the sender by reply E-Mail and delete the message.

Please be CAREFUL when clicking links or opening attachments from external senders.

 Outlook

---

## FW: NYSTLA CLE: IME Companions - Always Professional and Always Reliable (Better Pricing, Better Service)

---

**From** IME Companions <info@imecompanions.com>
**Date** Fri 3/6/2020 8:55 AM
**To** IME Companions <info@imecompanions.com>

📎 7 attachments (2 MB)
2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 1-14-20 IME Report Marcial Vasquez .pdf; affidavit christine guzman 11-21-19.pdf;

Kind Regards,

Safa Gelardi
Chief Executive Officer



Office: 833-463-7767
Direct: 718-749-4732
9207 245th St
Floral Park, New York 11001
Email: sgelardi@imecompanions.com
www.Imecompanions.com



---

**From:** IME Companions
**Sent:** Monday, February 24, 2020 4:50:55 PM
**To:** ngjelaj@maglawyers.com <ngjelaj@maglawyers.com>
**Subject:** NYSTLA CLE: IME Companions - Always Professional and Always Reliable (Better Pricing, Better Service)

**COMPETITOR TO IME WATCHDOG and IME Guards –**

**We are IME COMPANIONS**

**WWW.IMECOMPANIONS.COM**

Dear Nick,

It was a pleasure meeting you and speaking with you at the NYSTLA CLE meeting last month. I would like to introduce you to IME Companions.
We come highly recommended by some of the biggest firms in NYC.

I would like to introduce you to IME Companions. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company. We don't cap our time during the IME. If the Plaintiff our job is to make the plaintiff be seen. We wait until the IME is complete, however long that takes.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic,

**Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Gregory Spektor & Associates, Ginarte Gallardo Winograd, Bergman and Bergman, and many more.**

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client, in order to insure the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

First Hour - $125
Additional Half Hour – $45
Anywhere in Nassau County- Flat rate of $50
Anywhere in Suffolk – Flat Rate of $60
Anywhere in New City, Westchester, Putnam and Orange Counties – Flat rate of $75
Anywhere past Orange and Putnam County would have to be charged individually depending on distance.
Staten Island – Flat Rate of $40

No extra fees apply for anywhere in Brooklyn, Bronx, Manhattan and Queens.
No extra fees apply for bilingual Companions.

**(no mileage or tolls calculating, all is included in the additional flat fee)**

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

One of the great things about IME Companions is that we have a large staff and we will work around the clock to ensure each of your clients is well prepared for their IMEs. We not only do IMEs, we run IME Departments for large firms – we understand the importance of these IMEs and understand that they be completed as though you were present. We work with the best, because our service is the best. We truly want to bring great value to your firm. Our staff of 35 bilingual (many languages) Companions out on the field, and our in house office staff of 9 will ensure we can deliver and bring you value. Your clients are our clients, and we are there to protect them.

We can guarantee better pricing and better service than whomever you may be using.

We look forward to hearing from you.

Kind Regards,

Safa Gelardi
CEO



Office : 833 463 7767
Direct : 718 749 4732
9207 245<sup>th</sup> St.
Floral Park, NY 11001
Email: sgelardi@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 Outlook

---

## FW: IME Companions - Always Professional and Always Reliable

---

**From** IME Companions <info@imecompanions.com>

**Date** Mon 2/24/2020 3:43 PM

**To** IME Companions <info@imecompanions.com>

📎 7 attachments (2 MB)
2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 1-14-20 IME Report Marcial Vasquez .pdf; affidavit christine guzman 11-21-19.pdf;

Kind Regards,

Safa Gelardi
Chief Executive Officer



Office: 833-463-7767
Direct: 718-749-4732
9207 245<sup>th</sup> St
Floral Park, New York 11001
Email: sgelardi@imecompanions.com
www.Imecompanions.com



---

**From:** IME Companions
**Sent:** Monday, February 24, 2020 3:47 PM
**To:** jalexander@wrslaw.com
**Subject:** IME Companions - Always Professional and Always Reliable

**WWW.IMECOMPANIONS.COM**

Dear Ms. Joyce Alexander,

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, French, Creole, Arabic, Hindu, Punjabi, Urdu

**Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, Ginarte Gallardo Winograd, Napoli Shkolnik, and many more.**

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

I have attached some sample reports for your observation. We look forward to hearing from you, aiding protecting your clients during their IMEs. Please send all IME requests to this email address.

**You will be compensated per IME, please feel free to call Safa Gelardi at (718)749-4732 directly for more details. You will get a gift card at the end of every month.**

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 Outlook

---

## IME COMPANIONS - Always Professional and Always Reliable

---

**From** Omar A <omar@imecompanions.com>

**Date** Tue 2/11/2020 11:48 AM

**To** IME Companions <info@imecompanions.com>

📎 7 attachments (1 MB)

2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 11-21-19 IME Report Christine Guzman.pdf; affidavit christine guzman 11-21-19.pdf;

**COMPETETOR TO IME WATCH DOG  -**   [imecompoanions.com]IME Companions

Dear Yolanda,

IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by a personal injury attorney, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic.

Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Napoli & Shkolnik, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

**WE OFFER PERFERRED PRICING, WE WILL WORK WITH YOU AND WE DO NOT NEED A CREDIT CARD ON FILE, WE ACCEPT CHECKS**

Below is our standard Pricing.

Our Prices:

1st Hour is $175, with every following half hour at $45

Out of NYC Prices:

**Long island: Nassau 1st hour + $50 flat fee**

**Long island: Suffolk 1st hour + $60 flat fee**

**Westchester: 1st hour + $75 flat fee**

**New Jersey and Connecticut 1st Hour + $125 flat fee**

**(no mileage or tolls calculating, all is included in the additional flat fee)**

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

Kind Regards,

Omar A. Rahman
President



Office : 833 463 7767
Direct : 646 280 8596
9207 245th St.
Floral Park, NY 11001
Email: omar@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 Outlook

## FW: IME Companions - Always Professional and Always Reliable

**From** IME Companions <info@imecompanions.com>

**Date** Wed 1/29/2020 3:01 PM

**To** IME Companions <info@imecompanions.com>

7 attachments (1 MB)

2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 11-21-19 IME Report Christine Guzman.pdf; affidavit christine guzman 11-21-19.pdf;

**From:** IME Companions <info@imecompanions.com>
**Date:** Wednesday, December 4, 2019 at 1:16 PM
**To:** Omar A <omar@imecompanions.com>
**Subject:** FW: IME Companions - Always Professional and Always Reliable

Dear Ms. Davy,

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

Our Prices:

1st Hour is $175, with every following half hour at $45

Out of NYC Prices:

**Long island: 1st hour + $50 flat fee**, with every following half hour at $45

**Westchester: 1st hour + $75 flat fee**, with every following half hour at $45

**New Jersey: 1st Hour + $100 flat fee**, with every following half hour at $45

**(no mileage or tolls calculating, all is included in the additional flat fee)**

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

# EXHIBIT 29

**October 20, 2023 Memorandum & Order and Second Amended
Preliminary Injunction**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

                    Plaintiff,

        - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS, LLC, CLIENT EXAM
SERVICES, LLC, and IME MANAGEMENT
& CONSULTING, LLC,

                    Defendants.
-------------------------------------------------------x
SAFA GELARDI and IME COMPANIONS,
LLC,

               Third-Party
               Plaintiffs,

        - against -

CARLOS ROA,

               Third-Party
               Defendant.
-------------------------------------------------------x
CARLOS ROA,

               Third-Party
               Counter-Claimant,

        - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, and IME COMPANIONS, LLC,

               Third-Party Counter-
               Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

1

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") initiated this action on February 25, 2022, against Safa Abdulrahim Gelardi ("Safa") and Vito Gelardi (collectively "Individual Defendants"), and IME Companions, LLC ("Companions"), alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.[1]  (Compl., Dkt. 1.)  On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction").  (See Dkts. 6–14, 66; 3/29/2022 Docket Order; 4/5/2022 Docket Order.)  As part of the April 2022 Injunction, the Court ordered a forensic examination in which Defendants would "provide complete and unrestricted access to their records and electronic accounts to the forensic analyst" (Dkt. 66-1, at 3), so that the Court could determine whether "Companions is built entirely on misappropriated information and poached clients" (Dkt. 66, at 17).  On June 8, 2022, the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction").  (Dkt. 80; see also 6/8/2022 Docket Order.)

Discovery has proceeded over the past year and has included the forensic analysis of Defendants' records and depositions of Defendant Safa.  (See Dkts. 86, 105, 115; 2/2/2023 Minute Entry; 2/3/2023 Minute Entry.)  On March 10, 2023, Plaintiff filed (1) a second motion for a temporary restraining order ("TRO"), (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April

---

[1] Plaintiff filed an Amended Complaint on October 13, 2022, adding Gregory Elefterakis, Roman Pollak, Anthony Bridda, and Nicholas Liakis as additional Defendants. (Dkt. 114.) However, Plaintiff does not seek a preliminary injunction as to these Defendants. (See Dkt. 151, at 2 ("Let the defendants, Safa Abdulrahim Gelardi, Vito Gelardi, and IME Companions LLC (collectively the 'Defendants'), show cause . . . why an order should not be issued[.]").)

2

2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motion for preliminary injunction and contempt on March 27, 2023. (Dkt. 156; *see also* Dkt. 167.) Defendants filed their opposition to Plaintiff's motions on March 17, 2023. (Dkts. 160–66.) Plaintiff filed their reply on March 22, 2023. (Dkts. 171–73.) At the March 27, 2023 preliminary injunction hearing, the parties presented and examined witnesses and presented documentary evidence.

Based on the parties' papers, affidavits, and witness testimony, the Court now makes the below Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure Rules 52(a) and 65(d), with respect to Plaintiff's renewed motion for a preliminary injunction and request to hold Defendants in contempt for violating the Court's previous orders. *See Eyewonder, Inc. v. Abraham*, 293 F. App'x 818, 820 (2d Cir. 2008) (vacating preliminary injunction because district court did not "state the reasons why it issued"). For the reasons stated below, the Court expands the scope of the Amended Injunction against Defendants and moreover, finds Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO.[2]

---

[2] After the March 27th preliminary injunction hearing, on April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment. (*See* Dkts. 196–98.) The Court held a hearing on May 4, 2023, pursuant to that motion, and directed the parties to submit supplemental briefing. (*See* 5/4/2023 Minute Entry; Dkts. 218–20, 224–25.) The Court denied Plaintiff's renewed motion for contempt on July 13, 2023 and does not address that motion here. (Dkt. 231.)

**FINDINGS OF FACT**

## I.    Previous Findings of Fact[3]

Plaintiff Watchdog and Defendant Companions are competitors in the personal injury litigation business.  When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination ("IME") of the plaintiff to evaluate his or her alleged injuries. (*See* Levi Decl., Dkt. 8, ¶¶ 4–8.)  Both Watchdog and Companions provide third-party services to personal injury attorneys, which involves Watchdog and/or Companions associates accompanying plaintiffs to IMEs, where the associate observes, takes notes, and helps the plaintiffs fill out forms. (*Id.* ¶¶ 3, 6–18.)  The associates produce reports of the IMEs for the plaintiffs' counsel to use in the personal injury lawsuits.  (*Id.* ¶¶ 15–16, 27–28.)

Watchdog is a New York corporation (*see* Am. Compl., Dkt. 114, ¶ 4) established in May 2011 by Daniella Levi (*see* Levi Decl., Dkt. 8, ¶¶ 1, 14).  Levi is a personal injury attorney who saw a "need for a service" that could accompany personal injury clients to IMEs.  (Am. Compl., Dkt. 114, ¶¶ 18–22.)  She "developed forms and reports for the 'watch dogs' to complete relating to the different types of IMEs . . . , established price lists," and "built a customer database through her long-lasting relationships and friendships with other personal injury attorneys[.]"  (*Id.* ¶¶ 25–26.)  Watchdog developed information regarding its customers' preferences, "such as how soon each customer wants its reports, and whether the [associates] should have a conference with the customer in advance of the IME[.]"  (Levi Decl., Dkt. 8, ¶ 30.)

---

[3] The Court issued a Memorandum & Order in support of the April 2022 Injunction in which the Court made numerous Findings of Fact.  *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, (E.D.N.Y. May 13, 2022).  The relevant Findings of Fact to this latest Memorandum & Order are repeated here.

Adam Rosenblatt was Watchdog's President at all relevant times. (Am. Compl., Dkt. 114, ¶ 40.) Only he and Levi had access to "Watch[d]og's entire database, including the identity of all its customers and clients, their contact information, their preferences, pricing information, and all of the financial details of IME Watch[d]og." (*Id.* ¶¶ 41–43.) The confidential documents in the database were password protected, such that only Levi and Rosenblatt had access to them. (Levi Decl., Dkt. 8, ¶¶ 34–35.)

Companions is a New York company (Am. Compl., Dkt. 114, ¶ 5) established in November 2017 by Defendants Safa and Vito Gelardi, a married couple. (*See* Safa Gelardi Decl., Dkt. 26, ¶¶ 2, 33.) Safa did not have any previous experience in the personal injury or IME field when starting Companions—rather, she had worked at a bank in various positions. (*See* April 4, 2022 Hearing Tr. ("April 2022 Tr."), Dkt. 98, 24:21–25:10, 29:16–30:7.) However, through meetings with Rosenblatt and his father in early 2017, Safa learned about Watchdog's business, reviewed Plaintiff's confidential documents that Rosenblatt shared with her, and decided to open Companions. (*See* Safa Gelardi Decl., ¶¶ 16–18, 20–22, 28, 33; April 2022 Tr. 35:19–21, 84:10–85:1, 155:12–14.)[4]

---

[4] The Court also finds that Safa Gelardi has repeatedly perjured herself throughout this case and is thus wholly uncredible as a witness. For example, at the April 2022 hearing, Safa was asked "[y]ou instructed Adam [Rosenblatt] to sabotage the customer accounts of IME WatchDog?" and she responded: "[a]bsolutely untrue." (Apr. 2022 Tr., 42:15–17.) But the forensic evidence shows that Safa sent text messages to Rosenblatt from 2019 through 2022 directing him to sabotage Plaintiff's customer accounts in exchange for monetary payments—including in the very months preceding the April 2022 hearing. *See infra* Findings of Fact Section II.B. (*See also* Dkt. 154-2, at 250–251 (showing text messages between Safa and Rosenblatt on February 22, 2022, in which she asks Rosenblatt to "turn [Douglas and Londin] down the next time" they ask Plaintiff to observe an IME in New York); *id.* at 252 (showing text from Safa to Rosenblatt on February 22, 2022 stating "Listen[,] turn all Wingate [] down so you can take them back when y[o]u work for your[self]"); March 27, 2023 Hearing Tr. ("March 2023 Tr."), Dkt. 199, 29:14–24.) At the March 27, 2023 hearing, the Court warned Defendants' counsel of Safa's history of perjury, and counsel ultimately chose not to have Safa testify. (March 2023 Tr. 121:17–24, 125:20–23.)

5

## II. Plaintiff's Trade Secrets

### A. Defendant Safa Gelardi's Receipt and Use of Plaintiff's Confidential Customer Lists and Financial Documents

The forensic examination of Defendant Safa's emails reveals that she received troves of confidential information about Plaintiff's business in the Spring of 2017 that helped her start Companions. In late April of 2017, Plaintiff's employee, Adam Rosenblatt, began emailing copies of Plaintiff's confidential financial records and customer lists to Safa. (Pl.'s Br., Dkt. 152 (hereinafter, "Dkt. 152"), at 3; *see also* Dkt. 154-3, at ECF[5] 112 (Rosenblatt emailing Plaintiff's "Sales by Client 2016.pdf" to Safa Gelardi with the message "On day one I could bring in money"); *id.* at ECF 1–27 (Rosenblatt sending copies of Plaintiff's Profit and Loss statements from 2014 through 2016 and Watchdog's 2016 Quarterly Review to Safa Gelardi); *id.* at ECF 22 (slide summarizing Watchdog's top 10 clients in 2015 and 2016).) Safa immediately forwarded these emails containing Plaintiff's confidential information to others. (Dkt. 154-3, at ECF 8 (forwarding copy of Plaintiff's 2016 Quarterly Review to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 34 (forwarding copy of "IME Watchdog Clients Master List 2017.xlsx" to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 40 (forwarding Rosenblatt's email with "a breakdown of March 2017, [i]ncluding the monthly P&L, list of clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs[.] what we billed, etc." to "jay@fivepillarsgroup.com" on April 29, 2017).)

In the first week of May 2017, Rosenblatt emailed Safa explaining what materials she needed to buy to get a competing business started and sent her Plaintiff's invoices to use as models. (Dkt. 152, at 4; Dkt. 154-3, at ECF 118 (Rosenblatt email to Safa dated May 1, 2017, with subject

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

line "Needed" and listing items to buy including "Computer with 3 monitors" and "Quickbooks").) On May 4, 2017, Safa's accountants formed IME GuardDog Inc.—the name that Safa wanted to call her competing business at the time, although she ultimately settled on IME Companions LLC. (Dkt. 152, at 4.)   On the previous day, Rosenblatt had started an email thread with a website designer, Lumina, and Safa, explaining that "[a]s discussed, we need a website for IME Guard Dog with a significant amount of content to be taken from IME Watchdog." (Dkt. 154-3, at ECF 122.)

Safa used the financial information and customer lists from Rosenblatt to create her own "top revenue" customers, organized by customers who paid the most revenue to Plaintiff so that she could target them. (Dkt. 152, at 5; *see also* Dkt. 154-3, at 136 (forwarding "Attorney List Over 10,000 in Revenue.xlsx" to Defendant Roman Pollak on August 8, 2017).)   On September 29, 2017, Safa sent Watchdog's confidential financial records to Defendant Roman Pollak in the hopes that he would pitch the idea of IME observers as a business opportunity to Defendant Greg Elefterakis. (*See* Dkt. 152, at 4 (citing Dkt. 154-3, at ECF 141–47); March 2023 Tr. 72:8–73:3.)[6] Neither Defendant Pollak nor Defendant Elefterakis knew anything about the IME observer business before Safa contacted them. (March 2023 Tr. 81:6–9 (establishing that fact as to Pollak); *id.* 42:18–19 (establishing that fact as to Elefterakis).)   Pollak analyzed Watchdog's financial records to determine the business's profitability and asked Safa follow-up questions on October 3, 2017. (March 2023 Tr. 72:8–73:3; Dkt. 154-3, at ECF 148.) Pollak specifically mentioned in his October 3rd email to Safa, regarding "travel expenses.. [sic] I assume that is mostly the

---

[6] Plaintiff called Pollak and Elefterakis as witnesses at the March 27, 2023 hearing.  Their testimony established that, in 2017, Elefterakis owned a business called Case Cash Funding, which worked with personal injury law firms to provide non-recourse loans to prospective plaintiffs. (March 2023 Tr. 46:15–23.)   Pollak was the CFO of Case Cash Funding and reported to Elefterakis. (*Id.* 46:24–25, 61:3–12.)

doc/[A]dam." (Dkt. 154-3, at ECF 148.)  At the hearing, Pollak testified that it was likely he was referring to Adam Rosenblatt at the time of the email, but did not know whether Adam Rosenblatt was affiliated with Watchdog when he wrote the email.[7]  (March 2023 Tr. 74:8–75:10.)  On October 5, 2017, Pollak emailed Lumina and Safa, requesting to "have a functional version [of the website] by months [sic] end" and indicating that "90% of the [website's] content will come from the IME watchdog site and the brochure provided by Safa."  (Dkt. 154-3, at 149–50.)

Importantly, Defendants openly conceded during the March 2023 hearing that Safa took Plaintiff's confidential information from Rosenblatt. (March 2023 Tr. 29:8–13 (The Court: "[Safa] clearly took information via Mr. Rosenblatt and started her business.  Are you denying that?" Defendants' counsel: "No, Judge.  Mr. Rosenblatt sent her a customer list and[,] . . . I believe, gross revenue figures for 2016 on that list."); *see also id.* 31:1–3 (Defendants' counsel: "Mr. Rosenblatt sent the customer list with the general revenue provisions on it to Ms. Gelardi.  There's no dispute as to that.").)[8]  However, Defendants contend that it was of no consequence that Safa took Plaintiff's confidential information, because Plaintiff's customers—personal injury firms— are public knowledge and obtainable through daytime television advertisements (March 2023 Tr. 32:4–8), and moreover, that Defendant Gregory Elefterakis "was very well aware of the top personal injury firms, because he's in the cash provision business, and he knew all these firms

---

[7] The Court found Defendant Pollak to be evasive and untrustworthy throughout his examination.  Pollak admitted that he reviewed Watchdog's website during his analysis of Watchdog's profitability but did not recall seeing Adam Rosenblatt listed as an employee on the website. (March 2023 Tr. 75:12–17.)  At this time, the Court does not make a finding as to whether Pollak was lying during the hearing about his knowledge of Rosenblatt's employment with Watchdog because it is not necessary for resolving this motion.

[8] The Court notes that in light of these admissions, Safa perjured herself at the April 2022 hearing when she was asked "[Rosenblatt] gave you a Sales by Customer Summary for 2016 in or about April of [20]17, correct?" and she responded "No." (April 2022 Tr. 35:24–36:1.)

intimately" (*id.* 32:13–16).   Defendants therefore claim that Safa built her business "through introductions by Mr. Elefterakis, not through [] the Rosenblatt [documents]."   (*Id.* 32:16–20.) However, Defendant Elefterakis's testimony during the hearing flatly contradicted that argument.

At the hearing, Elefterakis testified that he joined Companions "to help [it] obtain customers[.]"   (March 2023 Tr. 54:6–9.)   But he also conceded that he introduced at most, 15 customers to Companions throughout his time at the company.   (*See id.* at 44:3–14 ("[The Court]: And how many clients did you recall approaching[?] . . . [Elefterakis]: Originally, it was within, probably, ten clients to get a good sampling of what the response would be[.] . . . [The Court]: And did you, at any point, approach any other clients besides these ten?   [Elefterakis]: No. [The Court]: And so this was at the beginning before Companions started; is that right? [Elefterakis]: Yes, correct."); *id.* 53:12–14 (Elefterakis testifying that he introduced "[b]etween ten and 15 clients that I obtained through my own, you know, personal contacts" to Companions).)

The documentary evidence shows that today, 90% of Defendants' customers are comprised of Plaintiff's former customers (Dkt. 152, at 5), with well over 400 of those customers being traceable to the customer lists and confidential information that Defendant wrongfully obtained from Rosenblatt (*see* Dkts. 180, 187; 4/3/2023 Docket Order).   Moreover, 98.3% of the total revenue Defendants have generated since Companions' inception was obtained through sales from Plaintiff's former customers.   (Levi Decl., Dkt. 172, at 2–3; March 2023 Tr. 10:24–11:10.)   Thus, Defendants' claim that Safa built her business primarily through client introductions by Mr. Elefterakis is thoroughly contradicted by the evidence in the record, and plainly false.[9]

---

[9] During the hearing, Plaintiff submitted that in 2018, Defendants had only 12 customers, with 10 of those customers being former clients of Plaintiff. (March 2023 Tr. 58:2–3.)   No competent evidence was adduced at the hearing as to whether these ten former Watchdog customers were also Elefterakis's clients.   (*See id.* 58:18–23.)   Furthermore, Defendant Pollak testified that he recalled providing customer names to Safa in the summer of 2017 beyond the ones

**B.    Defendant Safa Gelardi's Text Messages and Venmo Payments to Plaintiff's Employee Adam Rosenblatt**

Plaintiff has produced over 200 pages of text messages between Safa and Rosenblatt spanning from September 2019 through March 2022. (Dkt. 154-2.) These text messages establish that over the course of at least three years, Safa told Rosenblatt which of Plaintiff's customers she wanted and that she would pay Rosenblatt to sabotage Plaintiff's relationship with those customers so that they would use Companions instead. (*See, e.g.*, Dkt. 154-2, at ECF 85–86 (Safa: "Ignore them[,] fuck up a few times[,] and when they switch [to me] I will pay you big."  Rosenblatt: "Sounds good . . . Will have some more immediate clients for you tomorrow."  Safa: "Yes baby. Make that money."); *id.* at ECF 81 (Safa: "When am I gona [sic] get Parker Waichman.  Name your price I got you[.]"  Rosenblatt: "They pay 95[.]"  Safa: "I will give you half in advance and half after they start booking[.]"); Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.)  Moreover, Defendants conceded as much during the March 2023 hearing:

> THE COURT: Okay[—t]here's forensic evidence[—a]m I wrong that there actually are communications where [Safa]'s saying to Mr. Rosenblatt, send me this, or sabotage this?  I read something in the papers where it says, go and get them, baby, or something to that effect, where he's basically trying to delay things, or the services aren't as good from Watchdog or to do other things to sabotage those clients of Watchdog.  Is that not in evidence?

---

listed in Plaintiff's confidential customer lists.  (March 2023 Tr. 92:19–93:11; *see also id.* 94:1–3.)  Pollak could not recall the dates he provided such information and could not recall how he provided the information to Safa.  (*Id.* 92:19–93:11.)  To date, Defendants have not submitted any evidence of Pollak or Elefterakis providing Safa with any customer names.  The Court therefore cannot make a factual finding at this time regarding how many of Defendants' initial 12 customers were procured through the confidential information Defendants misappropriated from Plaintiff versus through Elefterakis's or Pollak's pre-existing client relationships.  However, the Court does not find this fact to be necessary or material to resolving the instant motion because of the plethora of other evidence showing that Safa Gelardi relied on Plaintiff's trade secrets to start her business and to continue building the business, which warrants an expanded preliminary injunction.

> MR. WARNER [(Defendants' counsel)]: There are text exchanges, Judge, that indicate what you are saying. But this was well after this business was set up and started. Well after.

(March 2023 Tr. 29:14–24.) Safa has pleaded the Fifth Amendment and invoked her right against self-incrimination with respect to her payments to Rosenblatt. (*See* Apr. 2022 Tr. 53:8–11; *id.* 61:14–62:16.)

## III.    Defendant Safa Gelardi's Contacts with Carlos Roa

On November 4, 2022, Defendant Safa Gelardi hired a private investigator, Steve Stanulis, to track and contact Third-Party Defendant and Plaintiff's employee, Carlos Roa ("Roa"). (Dkt. 153, at 4–5; *see also* Dkt. 153-5, at ECF 1.) Stanulis works for a company called Silver Shield. (Dkt. 153-5, at ECF 1.) Safa hired Stanulis to "investigate" Roa because she believed that he, as a former employee, was "soliciting clients and slandering her name." (*Id.*) Specifically, Safa directed Stanulis to "befriend" Roa (March 2023 Tr. 137:18–20) and "try to relate to him" with the goal of getting Roa "to defame [Defendants] very badly" (Dkt. 181-1, at ECF 1). Safa provided Stanulis with scripted things to say to Roa, including complimenting him because "he loves it" and asking him "how long have you been in the sports business?" (*Id.* at ECF 1.)[10]

---

[10] During the hearing, Defendants' counsel claimed that hiring a private investigator to befriend Roa did not violate the Court's Amended Injunction barring contact between the parties, because it "wouldn't be contact initiated by [Safa] or her [private investigator]. It was supposed to go the other way around, Judge." (March 2023 Tr. 137:22–24.) Specifically, Defendants' counsel argued that Safa hiring a private investigator to "accept contact" was distinguishable from Safa *initiating* contact. (*Id.* 138:3–6.) The Court finds this argument to be meritless and bordering on frivolous. Defendants' counsel is, again, cautioned not to make disingenuous representations and frivolous arguments to the Court in future proceedings. (*See also id.* 138:8–16 (The Court: "I don't care if Mr. Roa initiates [contact] if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. I don't care who initiated it. . . . Again, this is the kind of parsing that you and your client are doing that strikes me as troublesome and will only result in further restrictions.").)

11

Moreover, Safa paid Stanulis to place a GPS tracker on Roa's car.  (Dkt. 153-5.)  On November 11, 2022, Roa discovered the tracker because his security camera captured Stanulis placing the GPS tracker.  (Dkt. 153, at 3.)  Roa reported the incident to the police on November 12, 2022.  (*Id*. at 4.)  Defendant Safa claimed that the GPS tracker was placed without her knowledge.  (March 2023 Tr. 139:6–11.)  However, the documentary evidence once again shows that Safa was being untruthful; in fact, she knowingly paid for the use of a tracker by her private investigator, Stanulis, and actively monitored the tracker before it was found.  (Dkt. 153-5, at ECF 1, *id.* at ECF 11–16 (Safa texting Stanulis regarding whether GPS tracker is working).)

## IV.     Defendants' Circumvention of the Court's March 2023 Temporary Restraining Order

The Court enjoined Defendants on March 10, 2023, from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law."  (Dkt. 156, at 3; 3/10/2023 Docket Order.)  Six days later, Mayra Gomez, one of Plaintiff's independent contractors, saw Jeff Beibin ("Beibin"), a Companions employee, at an IME on March 16, 2023 in Commack, New York.  (Dkt. 173, ¶¶ 1, 9.)  Beibin filed a declaration conceding that he was at an IME on that date, but that he was there as "an agent of Client Exam Services, which is owned and operated by Fari Gutierrez."  (Dkt. 176, ¶ 3.)  Based on evidence presented at the March 27, 2023 hearing, the Court finds that Fari Gutierrez ("Gutierrez")—a friend of the Gelardi family (March 2023 Tr. 98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)— created Client Exam Services at Safa's direction specifically to continue operating Defendants' business in contravention of the Court's TRO.

Documentary evidence and witness testimony from the hearing establishes that after the TRO was issued, Safa Gelardi told Fari Gutierrez that "I have been shut down.  I cannot operate [Companions].  It's yours, if you want it."  (March 2023 Tr. 25:1–3.)  On March 11, 2023, Safa

12

told Beibin that Companions was shutting down until further notice and that Gutierrez had started a company and would contact Beibin. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business").) On March 12, 2023, Beibin received a call from "Sammy" on behalf of Client Exam Services, an IME observer business. Sammy explained "that everything would pretty much be operating the same way as they did" at Companions, and gave Beibin an IME assignment. (*Id.* 97:11–14, 100:21–24.) Sammy is Safa's nephew and his full name is Hesham Salameh. (*Id.* 107:2–110:15.) Client Exam Services was incorporated on March 16, 2023 (*id.* 6:23, 105:2–15), the same day that Beibin ran into Plaintiff's independent contractor, Gomez. Beibin's sole communication with Client Exam Services was with Sammy via phone and email. (*Id.* 104:16–20.) Beibin has never been to an office for Client Exam Services and is not aware of whether there is a physical office. (*Id.* 104:11–15.)

Since March 10, 2023, Beibin has attended approximately 12 IMEs on behalf of Client Exam Services, for the same clients he had been servicing when he worked at Companions. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.) There are no differences in operations between Client Exam Services and Companions. (*Id.* 113:25–114:11.) In fact, Beibin did not think to ask Sammy or Client Exam Services about his pay rate or frequency because "[w]hen IME Companions was closed[,]" Safa informed him "that all of the business was now going to be taken over by Fari Gutierrez . . . [a]nd everything would remain the same, except for the name of the company[.]" (*Id.* 114.)[11]

---

[11] The Court found Defendants' arguments and defense counsel's credibility troubling throughout the Court's probing of the Client Exam Services issue. Defense counsel opened the March 27, 2023 hearing by unequivocally asserting that "there's no connection" between Defendants and Client Exam Services, and boldly stated that "[Defendants] have nothing to do with Client Exam Services." (March 2023 Tr. 24:13–16.) However, Beibin's testimony during

## CONCLUSIONS OF LAW

### I.      Preliminary Injunction

#### A.      Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right. A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 64 F.4th 658, 666–67 (2d Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). "In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by showing a clear or substantial likelihood of success on the merits, and by making a strong showing of irreparable harm." *Id.* at 667 (cleaned up). "First, a plaintiff must meet that standard if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits . . . . Second, a plaintiff must meet that standard if he seeks a so-called 'mandatory injunction' – that is, an injunction that 'alter[s] the status quo,' which usually is done by commanding some positive act." *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34–35 (2d Cir. 1995)). "Under the heightened standard, [the party seeking a preliminary injunction] 'must show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm.'" *Id.* at 669 (quoting *New York ex rel. Schneiderman*

---

the hearing plainly revealed Safa's integral role in creating Client Exam Services, and her close—even familial—relationship with Client Exam Services' managers, Gutierrez and "Sammy." Thus, after Beibin's testimony, defense counsel conceded "[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [it] leads back to [Safa]." (*Id.* 126:3–5.) Defense counsel is again warned that future false, disingenuous, and/or irresponsible claims and arguments could result in sanctions and/or findings of contempt.

*v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole from Plaintiff.

### B.     Likelihood of Success on the Merits

####     1.     Legal Standard for Trade Secrets Claim

Plaintiff asserts, *inter alia*, causes of action under the Defend Trade Secrets Act ("DTSA") and misappropriation of trade secrets under New York common law. (*See* Am. Compl., Dkt. 114, at 2.) Section 1836 of the DTSA is a private cause of action for "[1] [a]n owner of a trade secret" which was "[2] misappropriated" and "[3] related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "The elements for a misappropriation claim under New York law are fundamentally the same [as under Section 1836] . . . [and] [d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (cleaned up). When a claimant proves "actual or threatened misappropriation," then "injunctive relief is authorized," but when "that there has been 'unjust enrichment' or 'actual loss caused by the misappropriation of the trade secret,' [then] damages are authorized." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403–04 (S.D.N.Y. 2021) (citing 18 U.S.C. § 1836.)

"Under New York law, a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (citing *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and

15

which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007). In general, the following factors must be considered to determine whether information is a trade secret:

> (1) The extent to which the information is known outside of the business;
>
> (2) the extent to which it is known by employees and others involved in the business;
>
> (3) the extent of measures taken by the business to guard the secrecy of the information;
>
> (4) the value of the information to the business and its competitors;
>
> (5) the amount of effort or money expended by the business in developing the information; and
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)).

Most relevant to this case, "[c]ustomer lists may constitute trade secrets under certain limited circumstances. Specifically, the identity of customers is protected if the list was developed through substantial effort and kept in confidence." *Id.* at 148 (citing *N. Atl. Instruments, Inc.*, 188 F.3d at 44). "[L]ists of customers will not be deemed protected trade secret information where customers are readily ascertainable as prospective users or consumers, of the product at issue." *Id.* at 149 (internal quotations and citation omitted). "The issue of whether and to what extent a customer list constitutes trade secret information is a question of fact for th[e] court. When determining the confidentiality of customer lists[,] . . . the court considers the trade secret criteria referred to above." *Id.* In particular, although lists of customers may be publicly available or back-trackable, "the *identities of individual contact people*" at customers' companies can be "protectable trade secrets." *N. Atl. Instruments, Inc.*, 188 F.3d at 45.

16

### 2.    Plaintiff's Customer Lists Constitute Trade Secrets

Here, the record shows that Plaintiff developed its customer list through Daniella Levi's experience in the personal injury field, and that Plaintiff took measures to keep Watchdog's customer lists secret, such as password-protecting the lists and limiting access to them to only company executives. (Levi Decl., Dkt. 8, ¶¶ 34–35, 41–43.)   The customer information was clearly valuable to individuals outside the business, as evidenced by Defendant Safa Gelardi's own text messages, and her willingness to pay Rosenblatt for the information. (Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.)   Moreover, although Defendants argue that the names of personal injury law firms are public information (March 2023 Tr. 32:4–8), Plaintiff's customer lists contained not only firm names, but the identities of individual contacts for the firms, and the revenue paid and services contracted for by Watchdog's customers (*see* Dkts. 180-1, 180-2).   In fact, Safa was able to use the details in Plaintiff's customer lists to create a spreadsheet of "top revenue" customers, organized by the firms who paid the most revenue to Plaintiff, so that Defendants could target them for poaching.   (Dkt. 152, at 5.)   Plaintiff's customer lists and information fall squarely within the definition of trade secrets, as found by the Second Circuit in *Heyman*:

> While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured. Moreover, the data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way. Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, but rather upon how he did in fact *actually* acquire it. "It matters not that defendants *could* have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. *The fact is that they did not.* Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."

17

*Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590–91 (2d Cir. 1963) (emphasis added) (quoting *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953)).  Here, there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants. *See supra* Findings of Fact Section II.  Thus, the Court finds that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants.

### C.    Irreparable Harm

#### 1.    Legal Standard for Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . . and plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC,* 62 F.4th at 672 (citations and quotation marks omitted).  "[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *Rex Med. L.P. v. Angiotech Pharm. (US) Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)).  Good will is defined as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976 (RJH), 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012) (summary order); *see also Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562 (ERK) (RML), 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 F. App'x 885 (2d Cir. 2008) (summary order).  "[G]ood will

18

constitutes the intangible qualities of a business that attracts customers . . . ." *Nat'l Elevator Cab & Door Corp.*, No. 07-CV-1562, at *5.

### 2. Plaintiff Has Shown Irreparable Harm

First and foremost, the Court notes that it already found evidence of irreparable harm to Plaintiff when the Court issued its April 2022 Injunction. *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, at *6 n.12 (E.D.N.Y. May 13, 2022) ("[I]n light of the overwhelming evidence of irreparable harm and clear likelihood of success, Plaintiff has met the heightened, mandatory injunction standard as well."). Thus, even prior to filing its renewed preliminary injunction motion and its contempt motion, Plaintiff had already met this standard. Now, the forensic examination and other discovery has laid bare the full extent of Defendants' theft of Plaintiff's trade secrets.

The forensic examination shows that beyond paying Rosenblatt to steal Watchdog's trade secrets to start Companions in 2017, Safa also paid Rosenblatt to intentionally sabotage Plaintiff's customer relationships and poach Plaintiff's clients over the course of almost three years. (*See, e.g.*, Dkt. 154-2, at ECF 83 (Safa asking Rosenblatt "[w]hat do I tell [Plaintiff's client] to get them to switch [to Companions?]"); *id.* at ECF 84–85 (Rosenblatt telling Safa to "be faster" when following up on clients he sends to Companions and advising her to "[m]ake them ready to switch [to Companions]" so that he "can just ignore them"); *id.* at ECF 92–93 (Safa offering "[$]400 paid semi[-]monthly on the 15th and the 1st" to Rosenblatt for "leads on [Plaintiff's] poachable clients" and marketing for Companions); *id.* at ECF 105 (Safa texting Rosenblatt to "[s]end me the attys [sic] that do last minute. Come on [Rosenblatt]. If you helped me out it won't put a dent in [W]atchdog. And you know I am willing to pay for them[.]").) Thus, notwithstanding Safa's self-serving and devious appeal to Rosenblatt about not "put[ting] a dent in [W]atchdog" (*id.*), Plaintiff has unquestionably lost good will, reputation, and business opportunities because of Defendants'

19

unlawful conduct and will continue to suffer irreparable harm absent an injunction. *See QBE Am., Inc. v. Allen*, Nos. 22-CV-756, 22-CV-757 (JSR), 2022 WL 889838, at \*15 (S.D.N.Y. Mar. 15, 2022) ("Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor."); *see also Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at \*3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x. 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal citation and quotation marks omitted)).  Notably, the evidence presented throughout the multiple proceedings in this matter suggests that the IME market is relatively small and finite, such that finding new customers to replace the ones poached by Defendants has not and will not be easy for Plaintiff.

Moreover, a defendant's dissemination of trade secrets can be sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *Intertek Testing Servs.*, 443 F. Supp. 3d at 331; *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever.").  Here, Defendants have conceded that they gave all of their customer information, including the information stolen from Plaintiff, to Fari Gutierrez to start Client Exam Services.  (March 2023 Tr. 126–127.)  Thus, Defendants not only wrongfully used Plaintiff's trade secrets to build Companions, Defendants further disseminated

Plaintiff's confidential information to outside parties in order to evade the Court's March 2023 TRO, resulting in further damage to Plaintiff's business, reputation, and good will.

Defendants argued during the March 2023 hearing that Safa "giving up" the misappropriated customer information to Gutierrez did not qualify as Safa "using" the information because "she's not profiting from it and she's not operating [Client Exam Services.]" (March 2023 Tr. 127:2–5.) However, Defendants misunderstand the plain text of both the Amended Injunction and trade secret law. The Amended Injunction states in relevant part: "Defendants . . . are preliminarily enjoined from . . . using *in any manner whatsoever* Plaintiff's trade secrets and confidential information" (Dkt. 80 (emphasis added)), and New York law is clear that the dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See, e.g.*, *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018) ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."); *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). Therefore, the Court finds that Plaintiff has shown they will be irreparably injured absent a preliminary injunction. Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction.

**D.      Narrowly Drawn Injunction**

In the context of loss of trade secrets, the Second Circuit instructs that: "where irreparable injury has been demonstrated, a 'narrowly drawn' preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be 'narrowly

21

tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)).  Here, the Court issues a narrowly tailored injunction, only enjoining Defendants from providing services to those customers who Plaintiff has shown were misappropriated from Plaintiff. (*See* Dkt. 180; 4/3/2023 Docket Order; 4/7/2023 Docket Order; 4/10/2023 Docket Order.)  The Court notes again that this strengthened injunction is necessitated by Defendants' violation of the previous injunction.

### E.      Balance of Equities

The Court finds that the balance of equities tips decidedly in Plaintiff's favor.  The Court has already found that Plaintiff has suffered and will continue to suffer irreparable harm if Defendants are not enjoined from using and disseminating Plaintiff's trade secrets.  As for Defendants' claims of hardship, the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity. *See, e.g.*, *Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.*, No. 18-CV-8333 (ALC), 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) ("Where a party knowingly copies and uses another party's trademark without its permission, that party assumes the associated risks, and any potential loss suffered by an injunction may be considered to be self-imposed."); *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 247–48 (E.D.N.Y. 2009) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) for the proposition that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding that there was no real hardship to the defendant resulting from the issuance of an injunction other than loss of money from activity "it probably should not have engaged in to begin

22

with"); *Pearson Educ., Inc. v. Labos*, 19-CV-487 (CM), 2019 WL 1949820, at *6 (S.D.N.Y. Apr. 23, 2019) ("[I]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." (internal quotation marks and citation omitted)). Thus, here, Defendants' claim of hardship falls flat given the mountain of irrefutable evidence that Defendants engaged in a multi-year campaign, from the formation of Companions to the initiation of this lawsuit, to steal Plaintiff's confidential information and customers knowingly, methodically, and persistently. That is, Defendants assumed the risks of losing these customers when Defendants intentionally engaged in illegal activity to obtain them, and cannot legitimately claim any harm when they are forced to relinquish their ill-gotten business.

## F.    Public Interest

Lastly, the Court finds that the public interest will be served by an injunction prohibiting Defendants from further using what the Court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets to poach clients from Plaintiff. As the Court stated in its previous Memorandum & Order issuing the April 2022 Injunction, "[i]t goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest." *IME Watchdog, Inc.*, 2022 WL 1525486, at *8.

## G.    Bond

As before, the Court waives the bond requirement imposed by Federal Rule of Civil Procedure 65(c). Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond,

23

*see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant, *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted). If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction." *Corning, Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (per curiam).

Here, Defendants have not requested a security bond and Plaintiff similarly has not raised the issue. Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case. The Court has concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants from a preliminary injunction, if any, would therefore be minimal. *Golden Krust*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm."). Accordingly, the Court finds that no bond is required.

## II.     Civil Contempt

### A.     Civil Contempt Legal Standard

"A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Regarding the first factor, "[a]n injunction is sufficiently

24

clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id*. (quoting *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir.1989)). As to the second factor, "[n]oncompliance [has] to be supported by clear and convincing evidence." *Id*. at 99. For the third factor, a party who diligently complies in a reasonable manner, "to ensure it remain[s] in compliance with the Injunction" "c[an] petition[] the District Court for a modification, clarification or construction of the order." *Id*. (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)). Importantly, a party's intent or state of mind does not matter for finding contempt. *See McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act."). Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id*. at 192. Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id*.

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id*. at 1353 (citation omitted). On the other hand, coercive sanctions are "left to the informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent

25

seriousness of the sanction's burden." *Id.* (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

**B. The Court Finds Defendants in Contempt of the Amended Injunction and March 2023 TRO**

Applying this standard, the Court is prepared to find Safa Gelardi in contempt of the Amended Injunction, upon a showing of compensatory damages incurred by Plaintiff, with respect to the provisions in the Amended Injunction: (1) barring Defendants from making contact with Carlos Roa; and (2) operating Defendants' business or any other business that unfairly and unlawfully competes with Plaintiff.

**1. Hiring a Private Investigator to "Befriend" Carlos Roa Constitutes "Contacting" Roa in Violation of the Amended Injunction**

**a. The Amended Injunction Clearly Prohibited Contact**

The Court's Amended Injunction enjoins "Defendants, *their agents*, officers and employees, *and all other persons and entities in active concert or participation with them*" from "contacting Plaintiff's current clients, employees, and agents[.]" (Dkt. 80, at 2 (emphasis added).) Safa's hired investigator, Stanulis, undoubtedly qualifies as her agent and/or a person acting in concert with her." *See CBS Broad. Inc.*, 814 F.3d at 98 ("An injunction is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" (quoting *Drywall Tapers & Pointers*, 889 F.2d at 395)). Thus, the Court finds that the Amended Injunction clearly and unambiguously prohibited Safa from hiring Stanulis to contact Roa.

26

b.     Evidence of Safa's Violation is Clear and Convincing

Despite the plain language of the Amended Injunction, Safa hired a private investigator to contact Plaintiff's current employee, Roa. (*See* Dkt. 153-4 (contract between Safa and private investigative agency dated "11/04/2022").) Safa directed the private investigator to "befriend" Roa, even providing the hired agent with scripted questions and conversation topics. (*See, e.g.*, Dkt. 181-1, at ECF 1 (email from Safa to the private investigator stating "Dear, Steve, this is my ex-employee [Carlos Roa], try to relate to him, he is a big mouth and will talk."); *id.* (Safa providing conversation material to the investigator including, "[Q]uestions to ask[:] how long have you been in the sports business? ([H]e claims to be a manager to runners[] and athletes[.] . . . Try to get him to talk shit about his current boss (Daniella Levi)[.] Try to get him to defame her badly and disparage her, and have him talk about starting his own IME Business[.]").) Moreover, Defendants "don't dispute" that Safa "had instructed the [private investigator] to befriend Mr. Roa." (March 2023 Tr. 137:18–20.)

In response, Defendants argue that Safa's plan of hiring a private investigator to *elicit* contact was not *initiating* contact. (*Id.* 137:22–138:6 (Safa's counsel arguing that "instruct[ing] the [private investigator] to befriend Mr. Roa" "wouldn't be a contact initiated by her or the [private investigator]" because it was "supposed to go the other way around"—that is—the investigator was hired to "accept contact, not to make contact.").) However, for the reasons stated on the record, the Court finds this argument wholly unavailing, if not disingenuous and cynical. (*Id.* 138:7–16 ("THE COURT: [W]hether [Stanulis] initiates it or not it's contact . . . if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. . . . She placed someone there to have contact with him.").) Moreover, whether Safa *willfully* violated the no-contact provision is irrelevant to the Court's finding of contempt, *see*

27

*McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve from civil contempt . . . it matters not with what intent the defendant did the prohibited act."), although, based on the evidence produced in connection with the hearing, as well her conduct throughout these proceedings, the Court would find Safa's conduct willful, if that were a requirement. Thus, the Court finds that there is clear and convincing evidence that Safa attempted to contact Roa through a hired investigator in violation of the Amended Injunction.[12]

c.        Safa Did Not Exercise Reasonable Diligence

Lastly, although the plain language of the Amended Injunction clearly prohibited any individual working "in concert" with Safa from contacting Plaintiff's employees, to the extent Safa had any concerns about what the provision entailed, she could have asked the Court for "a modification, clarification[,] or construction of the order[.]" *CBS Broad. Inc.*, 814 F.3d at 99. Instead, she "incorrectly took it upon [her]self to interpret" the no-contact provision as allowing her to hire an individual to "befriend" Roa and did not exercise reasonable diligence in complying with the Amended Injunction. *Id.*[13] Moreover, any argument that the Amended Injunction's no-contact provision was too general is unavailing. Where a party's "proclivity for unlawful conduct has been shown[,]" as has been overwhelmingly established as to Defendants here, "[d]ecrees of

---

[12] Plaintiff also submitted clear and convincing evidence that Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5, at ECF 1 (Stanulis declaring that Safa "requested 10 hours of surveillance and agreed to a 'tracker' on [Roa's] car as well"); *id.* at ECF 11–16 (Safa texting Stanulis regarding whether the GPS tracker is working).) For the reasons stated on the record, the Court declines to find that Safa's attempt to track Roa violated the Amended Injunction. (*See* March 2023 Tr. 20:5–21:4.) However, the Court's Second Amended Preliminary Injunction will expressly prohibit Defendants from surveilling and tracking Plaintiff and Plaintiff's employees in addition to the no-contact provision.

[13] Furthermore, as noted, the Court does not find that Safa misunderstood the language of the no-contact provision. Rather, she deliberately sought to end run the injunction by directing the private investigator to elicit contact and "befriend" Roa.

28

[] generality are often necessary to prevent further violations." *McComb*, 336 U.S. at 192; *see also id.* ("It does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined.").

Thus, the Court is prepared to hold Safa in civil contempt for violating the Amended Injunction. However, the Court cannot enter an order finding Safa in civil contempt at this time because Plaintiff has not submitted the required affidavit "set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party." *See* Local Rule 83.6(a); *see also* Local Rule 83.6(c) (requiring the Court to "set[] forth the amount of damages, if any, to which the complainant is entitled" and "fixing the fine, if any, imposed by the Court" in an order of civil contempt). For this reason, the parties are directed to further brief the issue of damages and attorneys' fees before the Court can hold Safa in contempt. *See infra* Conclusions of Law, Section II.C.

> ### 2. Defendants Violated the March 2023 TRO By Helping to Start Client Exam Services
>
> #### a. The March 2023 TRO Clearly Prohibited Defendants from Helping to Start Client Exam Services

On March 10, 2023, the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) This language is clear and unambiguous.

> #### b. Evidence of Defendants' Noncompliance is Clear and Convincing

The evidence presented during the March 27, 2023 hearing clearly and convincingly established that Safa directed Fari Gutierrez—a friend of the Gelardi family (March 2023 Tr.

98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—to create Client Exam Services and circumvent the Court's TRO. Defendants' own counsel explained that after the issuance of the TRO, Safa "called Fari and said, [']I have been shut down. I cannot operate the business [Companions]. It's yours, if you want it.[']" (*Id.* 25:1–3.) Safa's employee, Beibin, also testified that on March 11, 2023, the day after the Court issued the TRO, Safa told him that Companions was shutting down until further notice and that Gutierrez had started a company and would contact him. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business")).) On March 12, 2023, Beibin received a call from "Sammy," Safa's nephew, on behalf of Client Exam Services, who explained to Beibin "that everything would pretty much be operating the same way as they did" at Companions. (*Id.* 97:11–14, 100:21–24.) There were, in fact, no differences in operations between Client Exam Services and Companions:

THE COURT: Are you paid the same?

THE WITNESS: I haven't been paid yet.

THE COURT: But were you promised the same pay[?]

THE WITNESS: It would be the same, yeah.

THE COURT: But did you discuss that specifically?

THE WITNESS: No.

THE COURT: So why did you assume that?

THE WITNESS: Because I was told that everything would operate the way it had before.

THE COURT: . . . . Who told you that?

THE WITNESS: That's what Sammy told me.

THE COURT: As before what? The company didn't exist [until March 16th].

THE WITNESS: When IME Companions was closed, I was made to believe that all of the business was now going to be taken over by Fari Gutierrez and . . . Sammy would give me my assignments.

THE COURT: And everything would remain the same, except for the name of the company as far as you were told?

THE WITNESS: As far as I was told, yeah.

(*Id.* 113:25–114:23.) Beibin attended approximately 12 IMEs on behalf of Client Exam Services for the same clients he had been servicing when he worked at Companions after the March 2023 TRO was issued. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.)

Thus, the Court finds that there is overwhelming, undisputed evidence that "Defendants and any persons/entities acting in concert with them" have continued to operate a "business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.)

c.        Defendants Did Not Exercise Reasonable Diligence

Lastly, Defendants clearly did not exercise reasonable diligence in complying with the March 2023 TRO. Defendants argue that Safa provided Companions' clients and "outstanding assignments" to Gutierrez because she wanted to ensure they were "take[n] care of" after Companions was enjoined from servicing them. (March 2023 Tr. 26:16 – 27:4.) Therefore, it was not Safa who was operating the business or using the client information, but rather "she was letting someone else us[e] them." (*Id.* 27:5–15.) But Defendants ignore the fact that they were already enjoined by the Amended Injunction from "using *in any manner whatsoever* Plaintiff's trade secrets and confidential information." (Dkt. 80 (emphasis added).) Moreover, under New York law, dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See Capstone Logistics Holdings, Inc.*, 2018 WL

31

6786338, at *33 ("[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm.").[14]

Thus, if Defendants had exercised any amount of diligence, they would not have let a family friend "take over" Companions' business after the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating [Companions] or any other business that unfairly competes with Plaintiff" (Dkt. 156, at 3), because it was a clear violation of the Court's TRO. (*See* March 2023 Tr. 114:16–18 (Beibin testifying that "[w]hen IME Companions was closed, [he] was made to believe that all of the business was now going to be taken over by Fari Gutierrez[.]").) Even defense counsel conceded during the March 27, 2023 hearing that"[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [Client Exam Services] leads back to [Safa]." (*Id.* 126:3–5.)

Thus, the Court is prepared to hold Safa in civil contempt for violating the Court's March 2023 TRO.

## C. The Court Requires Further Briefing Regarding the Compensatory Damages Sought

As discussed, in order to hold Safa in civil contempt, Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages. *See* Local Rule 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be*

---

[14] During the March 27, 2023 hearing, Defendants' counsel argued that giving Plaintiff's client lists to Gutierrez did not qualify as "use" of Plaintiff's trade secrets if Safa was "not profiting from it" and "not operating" the new business. (March 2023 Tr. 127:2–5.) However, New York trade secrets law clearly refutes this argument. Furthermore, this self-serving, post-hoc argument ignores the plain language of the Amended Injunction and the Court's written decisions and oral pronouncements in this matter.

*available to the moving party.* A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353 (explaining that "compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)). Thus, Plaintiff is directed to submit further briefing setting forth the actual damages it has incurred due to (1) Safa's "contact" with Roa, and (2) the creation of Client Exam Services, within 60 days of this Order.

## III.      Plaintiff's Other Requested Relief

In addition to the issues addressed above, Plaintiff is also seeking the following relief: (1) imposing upon Defendants a daily fine of $10,000 payable to Plaintiff for each day the Court finds Defendants in violation of the previous Injunctions; (2) attaching Defendants' real property or directing that all proceeds from the sale of any real property be held in escrow pending final disposition of this case; and (3) directing Defendants to submit to another forensic examination at their sole cost. The Court denied these requests for the reasons stated on the record at the March 27, 2023 hearing and does not find there is need to further supplement its reasoning at this time. (*See generally* March 2023 Tr.)

<div align="center">

**CONCLUSION**

</div>

For the reasons stated above, the Court grants in part and denies in part Plaintiff's request for a second preliminary injunction. The Court attaches the Second Amended Preliminary Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order. Moreover, although the Court is prepared to find Safa in civil contempt of the Amended Injunction and the March 2023 TRO, the Court reserves on making a final ruling and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees for the March 27, 2023 contempt proceedings. Plaintiff's supplemental

<div align="center">

33

</div>

brief setting forth the specific amounts of attorneys' fees and compensatory damages they believe they are owed as a result of Defendants' contact with Roa and the creation of Client Exam Services is due 60 days from the date of this Order. Defendants will be permitted 30 days to respond, if they choose.

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
 Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

                    Plaintiff,

          - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS, LLC, CLIENT EXAM
SERVICES, LLC, and IME MANAGEMENT
& CONSULTING, LLC,

                    Defendants.
-------------------------------------------------------x
SAFA GELARDI and IME COMPANIONS,
LLC,

               Third-Party
               Plaintiffs,

          - against -

CARLOS ROA,

               Third-Party
               Defendant.
-------------------------------------------------------x
CARLOS ROA,

               Third-Party
               Counter-Claimant,

         - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, and IME COMPANIONS, LLC,

               Third-Party Counter-
               Defendants.
-------------------------------------------------------x

**SECOND AMENDED PRELIMINARY INJUNCTION**
22-CV-1032 (PKC) (JRC)

1

PAMELA K. CHEN, United States District Judge:

Upon consideration of Plaintiff's second application for a preliminary injunction, Plaintiff's memorandum of law and supplemental briefs filed in support thereof and the accompanying declarations, Defendants' memorandum of law and supplemental brief filed in opposition thereto and the accompanying declarations, and the evidence presented at the show-cause hearing held on March 27, 2023; and

Upon consideration of the Court's Findings of Fact and Conclusions of Law, set forth in the Court's Memorandum & Order dated October 20, 2023, that Plaintiff likely will succeed on the merits of this litigation, that Plaintiff will and has suffered irreparable harm if the requested relief is not granted in part, that the balance of hardships tips in Plaintiff's favor, and that it is in the public's interest for the Court to issue a preliminary injunction,

**IT IS THEREFORE ORDERED THAT:**

A. Plaintiff's application for a preliminary injunction is hereby GRANTED in part, and that Defendants, their agents, officers, and employees, and all other persons and entities in active concert or participation with them, are preliminarily enjoined from:

1. using in any manner, whatsoever—including but not limited to transferring, transmitting, selling, and/or giving to another individual or entity—Plaintiff's trade secrets, and confidential and proprietary information, in the nature of Plaintiff's: customer lists, customer information (including, but not limited to, customer names, contact information, whether customers paid the issued invoices—and if so—amounts paid, number of associate visits performed, nature of services performed and hours spent servicing the customer, and customer's preferences in connection with the independent medical examinations); invoices; website; training

2

handbooks; independent medical examination reports; monthly, quarterly, and/or annual reports; internal memoranda; financial information (including, but not limited to, information regarding payroll, banking, and profit and loss); and employees and agents (including which customers they service, which doctors' independent medical examinations they observed and how long such examinations lasted, and how much they earn);

2. providing any services to customers misappropriated from Plaintiff, including the customers identified on the Enjoined Customers List (attached as Exhibit A);

3. contacting (or eliciting contact from) and/or surveilling Plaintiff's current clients, employees, and agents;

4. franchising IME Companions LLC; and

5. destroying any documents, whether in hard copy and/or computerized and/or other electronic media format, that are presently in Defendants' personal or corporate possession relating to IME Companions LLC, IME Watchdog, Inc., or any other matter relevant to this case.

B. Defendants are directed to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets, and confidential and proprietary information, in the nature of Plaintiff's: invoices; website; training handbooks; independent medical examination reports; customer information (including, but not limited to, customer names, contact information, whether customers paid the issued invoices and if so, amounts paid, number of associate visits performed, nature of services performed and hours spent servicing the customer, and customer's preferences in connection with the independent

3

medical examinations); monthly, quarterly, and/or annual reports; internal memoranda; financial information (including information regarding payroll, banking, and profit and loss); and employees and agents (including, but not limited to, which customers they service, which doctors' independent medical examinations they observed and how long such examinations lasted, and how much they earn).

This preliminary injunction shall continue until a final judgment or order is issued in this matter, unless otherwise modified in writing by the Court. Failure to comply with the preliminary injunction will result in findings of contempt and in sanctions.

SO ORDERED.

_/s/ Pamela K. Chen_
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
Brooklyn, New York

4

# EXHIBIT 30

**2018 Membership Interest Purchase Agreement**

Defendants' Exhibit Package

SFO 7-25-18

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

**between**

**SAFA GELARDI, as Purchaser**

**and**

**GREG ELEFTERAKIS, ROMAN POLLAK AND**

**ANTHONY BRIDDA, as Sellers**

**and**

**IME COMPANIONS LLC, as Company**

**August \_\_\_, 2018**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement ("**Agreement**") is made as of August ___, 2018 ("**Effective Date**") by and among **SAFA GELARDI** ("**Purchaser**"), with an office located at c/o IME Companions, LLC, 9207 245th Street, Floral Park, NY 11001 and **GREG ELEFTERAKIS,** with an address at 100 Quentin Roosevelt Blvd., Garden City, NY 11530, **ROMAN POLLAK**, with an address at 111 Lake Shore Drive, Lake Hiawatha, NJ  07034 and **ANTHONY BRIDDA**, with an address at 180 Water Street, #6H, New York, NY  10038 (individually, "**Seller**" and collectively, "**Sellers**") and **IME COMPANIONS, LLC** (the "**Company**"), with an office located at 9207 245th Street, Floral Park, NY  11001.

## <u>RECITALS</u>

A.    The Purchaser and Sellers own all of the issued and outstanding membership interests ("**Membership Interests**") in the Company which was formed in New York on October 16, 2017 ("**Company**") as follows:

**Purchaser:**  Safa Gelardi 50%

**Sellers:**    Greg Elefterakis 25%
Roman Pollak 12.5%
Anthony Bridda 12.5%

B.    The Sellers desire to sell to Purchaser, and Purchaser desires to purchase from the Sellers, Membership Interests (the "**Purchased Interests**") in the Company constituting fifty (50%) percent of the Company's total issued and outstanding membership interests as follows:

Greg Elefterakis 25%
Roman Pollak 12.5%
Anthony Bridda 12.5%

NOW THEREFORE, the parties agree as follows:

## ARTICLE I

### SALE OF PURCHASED INTERESTS

1.1    <u>Purchase and Sale</u>.  Effective on the date hereof, the Sellers sell, transfer, convey, assign, and deliver to Purchaser, and Purchaser purchases and accepts from the Sellers, the Membership Interests owned by Sellers.

1.2     Purchase Price.   The aggregate purchase price for the Membership Interests is the sum of One Hundred Fifteen Thousand ($115,000.00) Dollars ("**Purchase Price**").

1.3     Payment of the Purchase Price.   The Purchase Price will be paid at the "**Closing**" through $25,000 by way of a certified check (the "Check") and the delivery of a secured promissory note in the principal amount of $90,000 due August __, 2020, payable in equal installments of $25,000 every six months (the "**Note**").   The Note and Check shall be issued proportionately to the Sellers in the percentage ownership interest as set forth in paragraph 2.2 Capitalization below.

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Purchaser that the following statements are true and correct in all immaterial respects on (and as of) the Closing Date:

2.1     Organization, Standing and Power.   The Company is a limited liability company, duly organized and validly existing in the State of New York.   The Company has all requisite power and authority to conduct its business as it is now being conducted; to enter into this Agreement; and to own, lease, and operate its assets and properties.   The Company is in good standing under the laws of the State of New York.

2.2     Capitalization.   Effective as of the Closing Date, all of the issued and outstanding ownership and Membership Interests of the Company are owned by its Members as follows:

| Name | Percentage Ownership Interest |
|---|---|
| Safa Gelardi | 50.0% |
| Greg Elefterakis | 25.0% |
| Roman Pollak | 12.5% |
| Anthony Bridda | 12.5% |

No other Membership Interests have been issued to, or reserved for, any other person or entity.   There are no outstanding subscriptions, options, warrants, conversion rights, convertible securities, pre-emptive rights, preferential rights, or other rights (contractual or otherwise) or agreements of any kind for the purchase or acquisition of any Membership Interests.

2.3     Authority; Binding Effect.   The Company has, by all necessary action of its Members, duly authorized the execution and delivery of this Agreement, the performance of its obligations under this Agreement, and the consummation of the

3

transactions contemplated hereby.  This Agreement constitutes a legally valid and binding agreement, enforceable against the Company, in accordance with its terms.

2.4    No Violations or Conflicts.  The execution and delivery of this Agreement by the Company, the performance of its obligations according to this Agreement, and the consummation of the transactions contemplated in this Agreement will not violate any law, rule, regulation, order, injunction, or decree applicable to the Company; or create default under any agreement to which the Company is a party.

2.5    Validity of Membership Interests.  The Membership Interests are validly authorized and issued Membership Interests of the Company, fully paid and non-assessable, and free and clear of all liens, encumbrances, restrictions, and commitments of any kind.

2.6    No Litigation.  There are no actions at law, suits in equity, proceedings, or claims pending or threatened against the Company or any of the assets or properties of any of them.

2.7    Compliance with Laws and Orders.  The Company is in full compliance with all laws, rules, regulations, and orders applicable to it and its assets and properties.

2.8    Tax Matters.  The Company has timely filed, or there have been timely filed on its behalf, all federal, state and local income, payroll, sales, and all other tax returns that are required to be filed by it.  All of the tax returns are complete and accurate.  The Company has paid timely all taxes (collectively, the "**Taxes**") due and payable by the Company.  There are no unpaid taxes due and payable by the Company.  There are no claims or assessments pending or proposed against the Company for any alleged deficiency in tax.  There are no threatened tax claims or assessments against the Company.  There are no current or pending or threatened audits, examinations, or other administrative or judicial proceedings (including, without limitation, any deficiency or refund litigation) with respect to taxes or tax returns the Company.  The Company has withheld and paid all taxes required to have been withheld and paid in connection with any amounts paid or owing any employee, independent contractor, creditor, or other third party.

2.9    Insurance.  All policies of fire, liability, casualty, and other forms of insurance in existence on the Closing Date with respect to the Company, its assets and properties, are in full force and effect and are valid and enforceable.

2.10   No Broker.  There are no claims (and there is not any basis for any claims) for brokerage commissions, finder's fees, or similar payments in connection with the transactions contemplated by this Agreement as a result of any action taken by the Company.

2.11   No Material Omissions.  No representation or warranty made by the Company in this Agreement contains any untrue statement of a material fact, or any omission of a material fact necessary to make the statements contained in this Agreement not misleading in light of the circumstances under which they are made.

4

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company that the following statements are true and correct in all respects, as of the Effective Date:

3.1    Authority and Binding Agreement.    The Purchaser has, by all necessary action, duly authorized the execution and delivery of this Agreement, the performance of its obligations under this Agreement, and the consummation of the transactions contemplated hereby. This Agreement constitutes a legally valid and binding agreement, enforceable against Purchaser in accordance with its terms.

3.2    No Broker.    There are no claims (and there is not any basis for any claims) for brokerage commissions, finder's fees, or similar payments in connection with the transactions contemplated by this Agreement resulting from any action taken by Purchaser.

3.3    Investment Representation.    Purchaser is acquiring the Membership Interests for its own account and investment, and not on behalf of any other person, or with a view to the resale or distribution of the Membership Interests.

3.4    No Material Omissions.    No representation or warranty made by the Purchaser in this Agreement contains any untrue statement of a material fact, or any omission of a material fact necessary to make the statements contained in this Agreement not misleading in light of the circumstances under which they are made.

## ARTICLE IV

## THE CLOSING

4.1    Closing.    The closing of the sale of the Membership Interests will take place on the effective date at 10:00 a.m. ("**Closing**") at the offices TBD, located at \_\_\_\_\_ _____, or at such other time or place that the parties will mutually agree.

4.2    Deliveries by the Purchaser and Company.    At the Closing, the Purchaser and Company will deliver the following documents and items to Sellers:

4.2.1.  This Agreement, duly executed by the Purchaser and Company;

4.2.2.  The $25,000, by certified check or in immediately available funds

by wire; and

5

4.2.3. The Note, duly executed by the Purchaser and guaranteed by the Company.

4.3    Delivery by Sellers.    At the Closing, Sellers will deliver the following documents and items to the Company:

4.3.1. This Agreement, duly executed by Sellers; and

4.3.2. Membership Interests constituting 50% of the outstanding Membership Interests in the Company as set forth in paragraph B above.

## ARTICLE V

## INDEMNIFICATION

5.1    Indemnity Obligation.  The Company and its Members, managers, agents, affiliates, successors, and assigns, and the members, managers, agents, affiliates, successors, heirs, legal representatives, and assigns of each of the foregoing (collectively, the "**Indemnitors**") each jointly and severally agree to indemnify and defend Sellers or Purchaser as the case may be (and its heirs, legal representatives, agents, assigns, and affiliates) (collectively, the "**Indemnitees**"), and hold each of the Indemnitees harmless from, any and all costs, losses, liabilities, judgments, amounts paid in settlement, and other expenses (including attorneys' fees) caused by (or in any way arising out of) any and all claims, suits, responsibilities, causes of action, litigation, proceedings, and other liabilities of any nature in any way arising (directly or indirectly) out of any of the following matters:

5.1.1. any of the representations and warranties contained in this Agreement or being false, inaccurate, or untrue;

5.1.2. any fraud or misconduct by the Company or any of its Members;

5.1.3. the operations or existence of the Company prior to the date of this Agreement;

5.1.4. the breach by the Company or any of its Members, or the default in the performance by any of them, of any covenant, agreement, or obligation to be performed by any of them under this Agreement or any of the Additional Agreements;

5.1.5. any claims by third parties; and

5.1.6. any and all Taxes imposed on or incurred by the Company attributable to any taxable period that includes period of time on or prior to the Effective Date.

6

5.2     *No Settlement without Consent*. No Indemnitor, in the defense of any such claim or litigation, will, except with the consent of each Indemnitee, consent to the entry of any judgment, or enter into any settlement, which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee of a release from all liability with respect to such claim or litigation.

5.3     *Benefits*.   The indemnification obligations of an Indemnitor under this Agreement will also benefit and protect any of the Indemnitee's present or future legal representatives, successors, heirs, and assigns.

## ARTICLE VII

## GENERAL PROVISIONS

This Agreement constitutes the complete understanding and agreement of the parties with respect to the subject matter hereof and supersedes all previous agreements between them, and which shall remain in full force and effect and shall survive the execution and termination of this Agreement. This Agreement may not be modified except by a writing signed by both parties. This Agreement and the performance hereunder will be governed by the laws of the State of New York (without giving effect to principles of conflict of laws).   This Agreement is intended to be performed by the parties in the State of New York.  The parties agree that the sole and exclusive jurisdiction and venue for any litigation arising from or relating to this Agreement or the subject matter hereof will be a federal or state court located in Nassau County in the State of New York. Each party knowingly and voluntarily submits to personal jurisdiction over it in New York, and to the exercise of jurisdiction over it by such court. This Agreement will be binding upon, and will inure to the benefit of, the parties.  Any notice provided pursuant to this Agreement, if specified to be in writing, will be in writing and will be deemed given (i) if by hand delivery, upon receipt thereof; (ii) if mailed three (3) days after deposit in the United States mail, postage prepaid, certified mail return receipt requested; and (iii) if by nationally recognized overnight courier, one (1) day after deposit with such courier.  All notices will be addressed to the parties at their addresses set forth in the preamble to this Agreement.  No waiver of any breach or default under this Agreement will be considered valid unless in writing and signed by the party giving such waiver, and no such waiver will be deemed a waiver of any subsequent breach or default of the same or similar nature. In the event of any litigation among the parties arising out of this Agreement, the successful parties will be entitled to recover their legal fees and expenses from the losing parties. The invalidity or unenforceability of any provision of the Agreement will not affect the validity or enforceability of any other provision. Nothing in this Agreement will be deemed or construed by the parties or any other entity to create an agency, partnership or joint venture between the parties. The rights and remedies of both parties set forth in this Agreement are not exclusive and are in addition to any other rights and remedies available to them at law or in equity.

7

**IN WITNESS WHEREOF**, the parties are signing this Agreement on the Effective Date.

<u>Purchaser</u>:

**SAFA GELARDI**


by:_____


<u>Sellers</u>:

**GREG ELEFTERAKIS**


by:_____


**ROMAN POLLAK**


by:_____


**ANTHONY BRIDDA**


by:_____


<u>Company</u>:

**IME COMPANIONS, LLC**


by:_____

# EXHIBIT 31

**Unrelated Default-Damages Submission With Wrong Case
Number**

Defendants' Exhibit Package

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

MILTON ESPADA, ARTHUR KILL PROPERTIES,
LLC, and PLAZA BODY SHOP, INC.

                               **Plaintiffs,**

             **- against -**

CITY OF NEW YORK, NEW YORK POLICE
DEPARTMENT CAPTAIN GLORISEL LEE, NEW
YORK POLICE DEPARTMENT LIEUTENANT
MIGUEL ESTEVEZ, BREEN BROS. TOWING,
INC., JOSEPH BREEN, and DEALER DIRECT
SERVICES, INC.

                               **Defendants.**

------------------------------------------------------------------------X

**Case No.: 23-cv-6186 (NRM)(JRC)**

**SUPPLEMENTAL
DECLARATION OF ADAM
ROSATTI IN SUPPORT OF
PLAINTIFF ARTHUR KILL
PROPERTIES, LLC'S MOTION
FOR DEFAULT**

Adam Rosatti declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.     I am an authorized representative of Plaintiff Arthur Kill Properties, LLC ("Plaintiff AKP").

2.     As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents maintained at Plaintiff AKP's office.

3.     I submit this supplemental affidavit in further support of the damages AKP seeks against Dealer Direct Services, Inc. ("Dealer Direct").

4.     There is an acute demand for empty surface lots throughout New York City that could serve as excess storage for all variety of vehicles, including, passenger and commercial vehicles.

5.     AKP purchased the property at issue for the purpose of renting it out to the general public for vehicle storage.

6.     AKP's storage rental price has ranged typically between $100 per day to $175 per day.

7.     For example, AKP has rented space to Plaza Automall.

8.     Plaza Automall has paid AKP storage fees within that range.  See Exhibit A.

9.     AKP would have been able to store 100 cars each day on the area of the lot that Dealer Direct improperly utilized.

10.     Dealer Direct's unauthorized use lasted for approximately six months.

11.     AKP applies the following formula to determine its lost storage fee damages: a blended rate of $125 per day per car x 100 cars equals $12,500.00 per day.  $12,500.00 per day for 180 days equals $2,250,000.00.

12.     Plaintiff AKP has also suffered damages because it was unable to conduct business with a third-party entity, Amazon.

13.     Specifically, Plaintiff AKP was unable to rent three acres of the Property to Amazon for seven (7) months.

14.     After mid-November 2022 when AKP was able to utilize the three acres Amazon amended its existing lease with AKP to include the previously unusable three acres. See Exhibit B Lease Amendment.

15.     As seen from the amendment, Amazon expanded the five acres it was already using to eight acres. Amazon agreed to pay AKP $240,000.00 per month for the eight acres – the equivalent of $30,000.00 per acre per month.

2

16.     Plaintiff AKP would have been able to rent out each acre to Amazon for $30,000.00 per acre. This resulted in a $630,000.00 loss of business with Amazon.

17.     In total, Plaintiff AKP has incurred $2,880,000.00 worth of damages against Defendant Dealer Direct for its interference with Plaintiff AKP's right to use, enjoy and manage the Property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2025

_____Adam Rosatti_____
Adam Rosatti

Case 4:23-cv-01186-KGB-MRTC Document 6741 Filed 06/03/2025 Page 306 of 431 PageID #: 13027

# EXHIBIT 32

**Arnold Baum Affidavit**

Defendants' Exhibit Package

AFFIDAVIT

STATE OF NEW YORK     )
                                ) SS.:

COUNTY OF NEW YORK )

I Arnold Baum, being duly sworn, deposes and says, under the penalty of perjury:

I am Chief Operating Officer of Subin Associates. On or about January 2018, the firm was introduced to Safa Gelardi through a contact named Greg Elefterakis. She introduced a new IME service to us called IME Companions. My firm was using IME Watchdog. We were unhappy with their service. We started using IME Companions and have been ever since. We are happy with the service from IME Companions.

_____
Arnold Baum

Sworn to before me this
15 day of March, 2022


Notary Public

Bonita Woods
Notary Public, State of New York
No. 01W06091142
Qualified in Bronx County
Commision Expires April 28, 2023

# EXHIBIT 33

**Jason Zemsky Affidavit**

## AFFIDAVIT

STATE OF NEW YORK)

                ) SS.:

COUNTY OF NEW YORK)

I Jason M. Zemsky, being duly sworn, deposes and says, under the penalty of perjury:

My firm Zemsky & Salomon used IME services from IME Watch Dog in the past. They were the first IME service we used. I was unhappy with their service; they could not cover last minute request. A representative from IME Guards came to my office on or about February 2019. I then started using IME Guards. I was unhappy with their service as they did not have enough coverage. On or about August 2019, two representatives from IME Companions came to my office to introduce a new IME service called IME Companions. The representatives identified themselves as Carlos Roa and Safa Gelardi. I then started using IME Companions and have been ever since. I am very satisfied with the service.

Jason M. Zemsky

Sworn to before me this
15 day of March, 2022

Notary Public

JOSEPH VUOZZO
Notary Public, State of New York
Registration #02VU6356293
Qualified in Nassau County
Commission Expires March 27, 2025

# EXHIBIT 34

**Maura Diaz Declaration**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

IME WATCHDOG, INC.,

                       Plaintiff,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS,
NICHOLAS LIAKIS, and IME COMPANIONS LLC,

                       Defendants.

------------------------------------------------------------------X

SAFA GELARDI and IME COMPANIONS, LLC,

                       Third-Party Plaintiffs,

        -against-

CARLOS ROA,

                       Third-Party Defendant.

------------------------------------------------------------------X

CARLOS ROA,

                       Third-Party Counter-Claimant,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS, LLC,

                       Third-Party Counter-Defendants.

------------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**DECLARATION OF**
**MAURA DIAZ**

       MAURA DIAZ, hereby declares and verifies the truth of the following, under penalty

of perjury under the laws of the United States of America, pursuant to Title 28, United States Code,

Section 1746:

1.      I am the paralegal in charge of the Independent Medical Examination ("IME") calendar at Zemsky & Salomon, P.C., and I am fully familiar with the facts set forth herein.  My employer has been using the services of IME Companions LLC ("Companions") since 2019.

2.      I have been informed that Carlos Roa ("Roa") has submitted an affidavit to this Court suggesting that I called plaintiff IME Watchdog, Inc. ("Watchdog") on behalf of Safa Gelardi ("Safa").  Roa is mistaken.

3.      The truth is that I called Watchdog at the request of my boss, Jason Zemsky, Esq., because Roa had been calling our firm.  Mr. Zemsky asked me to call him back and to find out what was going on.  I finally spoke with Roa on January 31, 2023.  At that time, Roa told me that he could speak to me because his colleague had left the office.  Roa spoke to me in Spanish.  He bashed and disparaged both Safa and Companions by warning us to stay away from Safa and Companions because the FBI was involved and Safa would be going to jail.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 17, 2023.

_____
Maura Diaz

Sworn to before me this
17th day of March, 2023

_____
NOTARY PUBLIC

JASON M. ZEMSKY
Notary Public, State of New York
Registration #02ZE6266222
Qualified in Nassau County
Commission Expires Jan. 30, 20 24

-2-

# EXHIBIT 35

**May 10, 2023 Deposition Notices for Levi, Roa, and Rosenblatt**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IME WATCHDOG, INC.,

                Plaintiff,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS,
NICHOLAS LIAKIS, and IME COMPANIONS LLC,

                Defendants.
-----------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

                Third-Party Plaintiffs,

        -against-

CARLOS ROA,

                Third-Party Defendant.
-----------------------------------------------------------------X
CARLOS ROA,

                Third-Party Counter-Claimant,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS, LLC,

                Third-Party Counter-Defendants.
-----------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

      **PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil

Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and

through its attorneys, Warner & Scheuerman, will take the deposition of plaintiff IME Watchdog,

Inc., by Daniella Levi, upon oral examination of any knowledge or information that is relevant to this

case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 15, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18th Street, 10th Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed.

Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

WARNER & SCHEUERMAN
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By:    /s/ Jonathon D. Warner
Jonathon D. Warner (5195)
6 West 18th Street, 10th Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To:    MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)


MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)


LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IME WATCHDOG, INC.,

                          Plaintiff,

            -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS,
NICHOLAS LIAKIS, and IME COMPANIONS LLC,

                          Defendants.
-----------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

                       Third-Party Plaintiffs,

            -against-

CARLOS ROA,

                       Third-Party Defendant.
-----------------------------------------------------------------X
CARLOS ROA,

                    Third-Party Counter-Claimant,

            -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS, LLC,

                    Third-Party Counter-Defendants.
-----------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

      **PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil

Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and

through its attorneys, Warner & Scheuerman, will take the deposition of third-party defendant/third-

party claimant Carlos Roa upon oral examination of any knowledge or information that is relevant

to this case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 8, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18<sup>th</sup> Street, 10<sup>th</sup> Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed.

Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
        May 10, 2023

**WARNER & SCHEUERMAN**
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By:    */s/ Jonathon D. Warner*
       Jonathon D. Warner (5195)
       6 West 18<sup>th</sup> Street, 10<sup>th</sup> Floor
       New York, New York 10011
       (212) 924-7111
       jdwarner@wslaw.nyc

To:    MILMAN LABUDA LAW GROUP PLLC
       Attorneys for Plaintiffs
       3000 Marcus Avenue, Suite 3W8
       Lake Success, New York 11042
       (516) 328-8899
       emanuel@mllaborlaw.com
       (VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)


MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)


LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
IME WATCHDOG, INC.,

                            Plaintiff,

            -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS,
NICHOLAS LIAKIS, and IME COMPANIONS LLC,

                          Defendants.
------------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

                          Third-Party Plaintiffs,

            -against-

CARLOS ROA,

                          Third-Party Defendant.
------------------------------------------------------------------X
CARLOS ROA,

                          Third-Party Counter-Claimant,

            -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS, LLC,

                          Third-Party Counter-Defendants.
------------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

      **PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil

Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and

through its attorneys, Warner & Scheuerman, will take the deposition of plaintiff IME Watchdog,

Inc., by Adam Rosenblatt, upon oral examination of any knowledge or information that is relevant

to this case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on

June 1, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner &

Scheuerman, 6 West 18<sup>th</sup> Street, 10<sup>th</sup> Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed.

Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

WARNER & SCHEUERMAN
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By:    /s/ Jonathon D. Warner
Jonathon D. Warner (5195)
6 West 18<sup>th</sup> Street, 10<sup>th</sup> Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To:    MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

-2-

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)


MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)


LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

# EXHIBIT 36

**IME WatchDog Carlos Roa Webpage**



(https://imewatchdog.com)

## *President, Operations*

📞 (718) 463-2320(tel:+17184632320)

✉ carlos@imewatchdog.com(mailto:carlos@imewatchdog.com)

☁ Download VCard

As the President of Operations, Carlos Roa brings a formidable blend of academic prowess and entrepreneurial acumen to the table. Armed with a Bachelor's in Health Science from Stony Brook University (2014), a Master's in Public Health from the same institution in 2016, and a Doctorate of Law specializing in Sports Law from Universidad Carlos III de Madrid in 2019, his academic achievements underscore his dedication to diverse fields. Carlos is a seasoned entrepreneur, renowned for founding a boutique international sports management firm. His firm boasts an impressive clientele comprising athletes in Soccer, Track and Field, and Tennis. Notably, he serves as the International Counsel to the Panamanian Olympic Committee and the Panamanian National Soccer Team, leveraging his expertise in negotiations involving athletes, sponsorships, and clothing brands. Before assuming his current role at IME Watchdog, Carlos honed his skills at one of New York City's largest Personal Injury Law firms, overseeing the IME Department. His

# EXHIBIT 37

**March 29, 2026 Letter Motion for Limited Rule 45 Subpoena
to Morgan & Morgan**

Defendants' Exhibit Package

March 29, 2026

Hon. Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

*Re: IME Watchdog, Inc. v. Safa Abdulrahim Gelardi, Vito Gelardi, et al., 22-CV-1032 (PKC) (JRC)*

**LETTER MOTION FOR LEAVE TO SERVE LIMITED RULE 45 SUBPOENA ON MORGAN & MORGAN**

Dear Judge Chen:

I respectfully request leave to serve a limited Rule 45 document subpoena on nonparty Morgan & Morgan, through Nicholas Gerschman, Esq., 199 Water Street, Suite 1500, New York, New York 10038, concerning the June 13, 2025 IME of Jeannie Tam.

This request arises from a specific factual dispute Plaintiff has used, and continues to use, to support a broader narrative of ongoing conduct, active concert, and contempt exposure. Plaintiff has asserted, in substance, that Defendants serviced the June 13, 2025 Jeannie Tam IME and that Mark Purificati appeared. Defendants deny that. Defendants did not receive any request for that IME, did not retain or assign Mark Purificati for that IME, and were not paid for that IME.

This request is not speculative. Exhibit A contains the relevant pages of the filed affirmation of Jared Lefkowitz, Esq. Mr. Lefkowitz states that, after the March 3, 2026 hearing, records were checked and Mark Purificati had not performed the June 13, 2025 observation and had never performed an observation for a Morgan & Morgan client. He further states that, on March 24, 2026, he called Nicholas Gerschman, explained the issue, and was told that Morgan & Morgan uses Plaintiff IME WatchDog for IME observations, although written confirmation identifying who was actually retained for the Tam IME was still not provided. He also explains how he located a separate NYSCEF-filed Morgan & Morgan matter in which IME WatchDog was expressly identified as the observer.

The Kelly matter sharpens the point because it supplies prior-course evidence involving the same Morgan & Morgan attorney. Exhibits F and G reflect that, in a separate Kelly matter handled by Nicholas Gerschman, an IME report dated April 4, 2024 expressly identified IME WatchDog as the observer present at the IME. That history tends to show that, as between Plaintiff and Mr. Purificati, Plaintiff IME WatchDog-not Mr. Purificati-was Morgan & Morgan's regular vendor for IME observation services.

Roa's role is central. Exhibit B is Plaintiff's March 23, 2026 supplemental declaration of Carlos Roa. Mr. Roa did not appear as a detached bystander. He declared, under penalty of perjury, that he was familiar with the relevant facts through personal knowledge and review of the file maintained at IME WatchDog, yet he still attributed the June 13, 2025 Tam IME to Mark Purificati and used that attribution to support Plaintiff's active-concert narrative. Exhibit C is Plaintiff's own public webpage identifying Mr. Roa as IME WatchDog's President, Operations. That title is not incidental. It is the very operational role one would expect to know who was retained, who was assigned, who was confirmed, and who appeared.

That means the disputed Tam attribution was not merely repeated from a third-party report by an outsider. Plaintiff, through its own operations chief, reviewed its own file and still placed that attribution before the Court while presenting Mr. Roa only as a judgment creditor. If the attribution is wrong, the problem is not just a clerical mismatch in a doctor's report. It is a potentially false operational attribution advanced by

Plaintiff itself. At minimum, it is serious gamesmanship, and it is exactly why neutral third-party verification from Morgan & Morgan is necessary before Plaintiff is permitted to continue relying on the Tam IME.

Exhibits D and E are the Jeannie Tam IME report and the D & D Associates rescheduling letter tying Morgan & Morgan to the June 13, 2025 Tam IME. Read together with Exhibits A through G, the present record shows a concrete, objective dispute about who Morgan & Morgan actually retained for that IME and who in fact appeared with the claimant.

This is not ancillary. Plaintiff used the June 13, 2025 Tam IME to support emergency TRO/PI relief, to press an active-concert theory, and to place Defendants under a continuing cloud of contempt-related exposure. Having chosen to wield that IME as part of its contempt and default narrative, Plaintiff should not be permitted to resist the short third-party subpoena that can conclusively determine whether Plaintiff's attribution is true.

The prejudice is concrete. Plaintiff used this disputed IME to help drive emergency proceedings, consume judicial resources, and then doubled down on March 23, 2026 through Mr. Roa's declaration instead of producing straightforward operational confirmation. If Morgan & Morgan's records show that Plaintiff IME WatchDog-or someone other than Defendants-was retained for the Tam IME, then Plaintiff advanced a materially false operational attribution to obtain leverage and to continue pressing for sweeping final relief. That would raise serious concerns about the accuracy of evidence presented to the Court. Fundamental fairness and due process require that this issue be resolved by documents, not accusation.

This request is also timely and proportional in light of Plaintiff's current posture. Plaintiff previously represented to the Court that it required additional financial information before default judgment and was granted time to pursue such material. Yet Plaintiff now seeks sweeping final relief-including substantial money damages and a permanent injunction-while still relying on unresolved factual assertions such as the June 13 Tam IME. Plaintiff cannot say the record needed more information for default judgment and then ask the Court to accept a disputed operational attribution that can be tested by a single narrow subpoena.

This is not a fishing expedition and not an attempt to reopen broad discovery. Defendants do not seek attorney mental impressions, legal strategy, or a wholesale review of counsel's file. Defendants seek only limited, nonprivileged records sufficient to show who Morgan & Morgan retained for that IME, who was assigned or confirmed, whether any reassignment occurred, whether any invoice or payment exists, and any attendance-related record identifying who was expected to appear or who did appear. The issue is verifiable in multiple narrow ways without invading privilege, including request and confirmation records, invoice or payment records, a redacted observer report identifying only the attorney, client, date, doctor, location, and observer, office sign-in or front-desk records from the examination location, or another nonprivileged attendance-related record sufficient to identify who was expected to appear or who did appear.

The proposed subpoena is narrow and proportional. It is confined to one IME, one client, one law firm, and one discrete operational question. If leave is granted, Defendants will serve the subpoena only after providing advance notice and a copy to the parties. The proposed document requests are attached as Attachment 1. For the Court's convenience, an exhibit index follows the attachment. Defendants respectfully request leave to serve the limited Rule 45 subpoena.

Respectfully submitted,

/s/ Safa Gelardi
/s/ Vito Gelardi
Safa Gelardi and Vito Gelardi
Pro Se Defendants

**ATTACHMENT 1**

**PROPOSED SCHEDULE A – DOCUMENTS REQUESTED**

Produce documents concerning the June 13, 2025 IME of Jeannie Tam sufficient to show:

1. whether Morgan & Morgan requested IME observer, companion, watchdog, or similar coverage for that IME;

2. the identity of any company or person contacted, retained, assigned, confirmed, cancelled, substituted, or replaced for such coverage;

3. the date of any such request, confirmation, cancellation, reassignment, substitution, or replacement;

4. whether any invoice was issued or payment was made for such coverage, including the identity of the payee;

5. any nonprivileged communication transmitting or confirming the assignment for such coverage; and

6. any nonprivileged document sufficient to identify the person expected to appear or who did appear with the client at that IME.

**Definitions**

"Records sufficient to show" means documents adequate to identify the fact, date, entity, and individual involved, without requiring production of entire files where narrower records will suffice.

"Nonprivileged communication" excludes attorney-client privileged communications and attorney work product, but includes nonprivileged business records reflecting retention, assignment, confirmation, invoice, payment, cancellation, substitution, or attendance.

# EXHIBIT 38

**April 21, 2026 Docket Order Denying Reconsideration of Morgan & Morgan Subpoena Denial**

**Full docket text:**

ORDER: The Court denies Defendants' [660] motion for reconsideration of the Court's order denying their motion seeking to file a Rule 45 subpoena on Morgan & Morgan, New York, (4/10/2026 Dkt. Order). The standard for granting a motion for reconsideration is "strict." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Cho v. Blackberry Ltd.*, 991 F.3d 155, 170 (2d Cir. 2021) (citation omitted). A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted).

Defendants' motion points to no controlling decisions or data that the Court overlooked and is properly denied on that basis alone. (*See generally* Mot. for Recons., Dkt. 660.) Nonetheless, the Court also rejects Defendants' argument on the merits. Their argument appears to be that, because the Court found that there was not "clear and convincing" evidence linking Defendants to the June 2025 examination that Mark Purificati allegedly performed for Morgan & Morgan, New York, (*see* 4/10/2026 Dkt. Order (denying Plaintiff's motion for contempt)), Defendants are entitled to additional discovery regarding that examination. (*See* Mot. for Recons., Dkt. 660, at 5 (arguing that once the Court found that Plaintiff had not met its burden of proving civil contempt, additional discovery became "more necessary, not less"); *id.* at 7 (arguing that Defendants should be allowed to "test" Plaintiff's "unproven" allegations of contempt so that the allegations do not "remain in the factual narrative").) However, Plaintiff's motion for civil contempt—the only motion to which the requested records would be relevant—has already been decided *in Defendants' favor*. (*See* 4/10/2026 Dkt. Order.) Defendants' request is therefore unnecessary and not relevant to any matter pending before this Court (or, for that matter, the Second Circuit, which is only now considering the Court's entry of judgment for sanctions related to Defendants' contumacious conduct described in the Court's March 2025 Memorandum & Order, (Dkt. 448); *see* Mem. & Order, Dkt. 616, at 40). *See* Fed. R. Civ. P. 26(b)(1) (limiting scope of discovery to matters that are "relevant to any party's claim or defense and proportional to the needs of the case"); *id.* R. 26(b)(2)(C)(iii) (requiring the Court to limit discovery if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)"). Ordered by Judge Pamela K. Chen on 4/21/2026. (JEC)

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/01/2026 23:25:31 | | |
| **PACER Login:** | Florida1994 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 1:22-cv-01032-PKC-JRC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |