*** Filed ***
08:31 PM, 19 Jun, 2026
U.S.D.C., Eastern District of New York

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

IME WATCHDOG, INC., Plaintiff,

-against-

**SAFA GELARDI, VITO GELARDI, and IME COMPANIONS LLC, Defendants.**

**Case No. 1:22-cv-01032-PKC-JRC**

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

**DAMAGES AND PERMANENT INJUNCTIVE RELIEF**

Individual Defendants Safa Gelardi and Vito Gelardi, proceeding pro se, respectfully submit this

opposition to Plaintiff IME WatchDog, Inc.'s motion for default judgment damages, punitive damages,

prejudgment interest, attorneys' fees, costs, and permanent injunctive relief.

**PRELIMINARY STATEMENT**

Plaintiff asks for default damages without proving damages. Rule 55 does not make damages allegations

true. It does not convert gross receipts into lost profits. It does not permit a money judgment by

assumption, attribution, or trust. Plaintiff still had to prove damages with competent evidence and

reasonable certainty. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir.

1992); Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999); Transatlantic

Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997). Plaintiff did not.

Plaintiff seeks more than $5 million and a permanent tri-state occupational ban: $1,414,800 in claimed

lost profits, $2,829,600 in punitive damages, $525,032 in prejudgment interest, $299,256.59 in

attorneys' fees, post-judgment interest, and a permanent injunction prohibiting Defendants from

conducting IME observations directly or indirectly in New York, New Jersey, and Connecticut. Ex. 1,

Plaintiff's Notice of Motion for Default Judgment Damages and Permanent Injunctive Relief, Dkt. 651 at 1, PageID 12478.

Plaintiff's model is not a lost-profit calculation. Plaintiff took selected IME Companions gross Sales by Customer Detail figures, applied the prior 98.3% attribution figure, assumed a 50% profit margin, inserted a prior-year Zemsky & Salomon number into a blank 2022 field, added a price differential, and called the result WatchDog's lost profits. That model does not prove actual loss, net unjust enrichment, or a reasonable royalty. It converts Defendants' gross receipts into Plaintiff's money judgment.

The 98.3% figure does not supply the missing proof. Levi generated that figure by comparing WatchDog's Sales by Customer Summary lists to Companions' records, separating Companions' gross sales into alleged WatchDog-customer sales and 'Independent' sales, and noting that the 2022 list was 'partial and incomplete.' Ex. 4, Levi Mar. 22, 2023 Declaration, Dkt. 172 at 2, PageID 3525. That was a gross-revenue attribution assertion. It did not deduct expenses, calculate WatchDog's net lost profits, prove WatchDog's margin, prove customer-specific causation, calculate Companions' net gain, or establish a reasonable royalty. The October 20, 2023 Order required further proof of actual damages. Ex. 29, Oct. 20, 2023 M&O, Dkt. 254 at 32-34, PageID 4948-4950.

Plaintiff used the wrong records. Plaintiff did not submit complete WatchDog tax returns, P&Ls, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, distribution records, Zariz records, DLA-related records, cash-flow records, accountant analysis, expert proof, or any WatchDog net-profit calculation. Plaintiff's counsel instead demanded Companions' Sales by Customer Details and warned that, absent production, Plaintiff would 'extrapolate damages using Companions' Sales by Customer Details for 2022.' Ex. 7, Aug. 13, 2025 Felsen Email. Plaintiff later disclaimed later-year extrapolation, but still used selected 2018-2022 Companions gross sales as the damages base. Ex. 2, Dkt. 652 at 16, PageID 12495. Lost profits are net profits, not gross receipts.

Levi admitted the defect under oath. She testified that '[t]he damages are 98.3 of your sales,' that '98.3 percent of every dollar that was earned by IME Companions belong[s] to IME WatchDog,' and that '[t]hose are my damages.' Ex. 9, Levi Dep. Tr. 102:21-22, 104:3-6. She later admitted the damages calculation 'is not based on IME WatchDog's records' but is 'based on Companions's records.' Ex. 9, Levi Dep. Tr. 152:21-23. Levi also testified that 'how the finances of the company were handled is immaterial and irrelevant.' Ex. 9, Levi Dep. Tr. 126:21-25. WatchDog's finances are not irrelevant. WatchDog's finances are the proof.

The WatchDog P&Ls defeat the assumed margin. The historical figures reviewed with former counsel and discussed in this litigation show $525,199.40 in sales income and a $42,539.82 net loss in 2014; $835,016.90 in sales income and $69,800.66 in net income in 2015; and $969,699.84 in sales income and $74,557.42 in net income in 2016. Ex. 15, Gelardi Decl. ¶ 3. Together, WatchDog generated $2,329,916.14 in sales income and $101,818.26 in net income, an approximate 4.37% aggregate margin. A 50% margin would have generated $1,164,958.07 in net income. WatchDog generated $101,818.26. The difference is $1,063,139.81.

Rosenblatt's separate April 28, 2017 email titled 'IME Watchdog for March 2017' confirms that WatchDog maintained the records needed to test damages: the monthly P&L, client list, list of all IMEs covered, WatchDog invoices, and pay-versus-billed breakdown. Ex. 13-A. Based on Defendants' review with former counsel, the March 2017 materials reflected 516 IMEs, $25,000 to Zariz that month, $75,000 to Zariz year-to-date, the March P&L with prior-year comparison and YTD, bank-account records, WatchDog payroll with IME breakdowns, client information, projected cash-flow materials, and pay-versus-billed records. Ex. 15, Gelardi Decl. ¶ 4. Plaintiff controls those records. Plaintiff did not submit them.

The DLA, Daniella Levi, and Zariz entries make a paper damages award impossible on this record. WatchDog's records reflected approximately $183,314.13 in distributions to DLA in 2014; approximately $165,000 in distributions to DLA, a separate $25,000 entry booked to Daniella Levi, and approximately $90,000 to Zariz in 2015; and approximately $220,000 to Zariz in 2016. Ex. 15, Gelardi Decl. ¶ 5. The March 2017 materials reflected another $25,000 to Zariz in March 2017 and $75,000 to Zariz year-to-date. Ex. 15, Gelardi Decl. ¶¶ 4-5. If those entries were business expenses, they reduce net profit. If they were distributions, related-party transfers, personal transfers, or non-operating payments, the books require scrutiny before any damages award.

The Zariz public record illustrates the proof failure. The Israeli Corporations Authority Certificate of Incorporation identifies ZARIZ SHIPUZIM LTD., Company Number 511511701, as an Israeli limited-liability company incorporated on October 25, 1990. Ex. 39. The Company Registry Extract identifies the same company, lists legal status as 'Dissolved by court order,' and records status changes showing court-ordered liquidation on November 15, 1992 and liquidation by court order on April 15, 1997, under Court Order Number 0021292 in Tel Aviv. Ex. 40. Plaintiff did not identify Zariz Shipuzim Ltd., any different Zariz recipient, any individual recipient, services, invoices, contracts, bank records, tax treatment, or how the one-word 'Zariz' entries affect WatchDog's claimed margin.

Plaintiff's customer proof fails for the same reason. Customer overlap is not customer-specific causation. WatchDog was the incumbent provider in this niche market and marketed itself as 'the first and largest IME company in New York,' 'covering over 1,000 exams per month.' Ex. 17, PDF p. 1. Plaintiff's materials included firms Defendants never serviced, firms whose WatchDog revenue continued or increased, firms that used multiple providers, firms that moved to other providers, and firms Plaintiff listed as 'Clients that Never Returned' with $0.00. Exs. 8, 24, 25, 26. That record does not prove customer-specific loss. It proves why customer-specific proof was required.

Levi's federal financial-crime conviction reinforces why damages must be established through objective financial records rather than unsupported assumptions. Levi is Plaintiff's owner, the person seeking the money judgment, and the declarant supporting the claimed 50% margin. The Judgment states that Levi pleaded guilty to Count One and was adjudged guilty of conspiracy to knowingly evade federal reporting requirements. Ex. 18, Judgment, PDF p. 8. The indictment caption identified 126 counts, including conspiracy, money laundering, and forfeiture counts. Ex. 18, Indictment, Doc. 8 at 30. The indictment charged that Levi, then a Bank Leumi vice president, was asked to find someone who could launder money, introduced a co-conspirator to Alex Adjmi for that purpose, and received a fee for initiating money-laundering transactions. Ex. 18, Indictment, Doc. 8 at 9, PDF p. 10. The broader scheme involved cash proceeds from drug trafficking, including cocaine trafficking, evasion of federal reporting requirements, concealment from law-enforcement scrutiny, commissions, counter-surveillance, beepers, code names, and approximately $22.5 million in cash delivered to Prism Financial Services and transferred to accounts in the United States and abroad. Ex. 18, Indictment, Doc. 8 at 4, 7, 28; PDF pp. 11-12, 2. Defendants do not offer that history as a standalone character attack. Plaintiff asks the Court to accept Levi's financial margin while withholding the books, leaving DLA/Daniella Levi/Zariz entries unexplained, and blocking the questions that would test net profit. In this record, financial proof must come from records, not trust.

This is not a case where damages were difficult but proven. Plaintiff seeks more than $5 million without WatchDog's books, without a reliable margin, without customer-specific causation, without a net unjust-enrichment calculation, without a reasonable-royalty analysis, and without a narrowly tailored basis for a permanent occupational ban. Plaintiff proved only that it wants to convert Defendants' gross customer-sales records into WatchDog's money judgment. Rule 55 does not permit that result. The Court should enter zero compensatory damages.

**LEGAL STANDARD**

• Greyhound separates liability from damages. A default may establish well-pleaded liability allegations, but it 'is not considered an admission of damages.' Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Default did not prove WatchDog's lost net profits, a 50% margin, customer-specific causation, Companions' net unjust enrichment, a reasonable royalty, punitive damages, prejudgment interest, fees, costs, or an occupational ban.

• Credit Lyonnais requires damages to be determined with 'reasonable certainty.' Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999). Reasonable certainty requires competent proof, not selected gross-sales summaries, a prior attribution percentage, an unsupported margin, and an insider declaration.

• Transatlantic Marine permits paper damages only when 'detailed affidavits and documentary evidence' establish a reliable basis for the award. Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997). Lost profits require net profit, not gross receipts; unjust enrichment requires net gain, not gross sales.

• Syntel confines DTSA damages to actual loss, non-duplicative unjust enrichment, or a reasonable royalty. Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 808-14 (2d Cir. 2023); 18 U.S.C. § 1836(b)(3)(B). A model converting Defendants' gross receipts into WatchDog's lost profits without WatchDog's net loss, Companions' net gain, or a reasonable royalty is not a statutory damages measure.

• Rule 55 and the DTSA require zero compensatory damages on this record. Plaintiff supplied no WatchDog P&Ls, tax returns, ledgers, expense records, payroll records, observer-payment records, bank records, distribution records, Zariz/DLA records, net-profit calculation, Companions net-gain

calculation, apportionment, causation proof, or royalty analysis. Without a proven compensatory base, punitive damages and prejudgment interest fail; fees and costs cannot substitute for damages proof.

Judge Chen applies the default-damages rule strictly. Default does not relieve a plaintiff from proving damages with competent records. Where a plaintiff fails to submit sufficient documentation, damages may be denied or withheld even after liability has been established. That principle controls here: Plaintiff did not submit WatchDog's books, did not submit a WatchDog net-profit calculation, and did not submit the records needed to test margin, causation, unjust enrichment, or royalty.

## ARGUMENT

## I. PLAINTIFF'S DAMAGES MODEL IS A GROSS-REVENUE CONVERSION THEORY, NOT A LOST-PROFIT CALCULATION.

Plaintiff's damages model fails at the threshold. It does not calculate WatchDog's lost net profits. It does not calculate Companions' net unjust enrichment. It does not calculate a reasonable royalty. It begins with selected IME Companions gross customer-sales records, applies the prior 98.3% attribution figure, assumes a 50% WatchDog margin, inserts a prior-year Zemsky & Salomon number into a blank 2022 field, adds a price differential, and labels the result WatchDog's lost profits.

Plaintiff did not submit the records required to prove WatchDog's loss. Plaintiff did not submit complete WatchDog tax returns, P&Ls, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, distribution records, Zariz records, DLA-related records, cash-flow records, accountant analysis, expert proof, or any WatchDog net-profit calculation. Without those records, the Court has no evidentiary basis to determine WatchDog's lost profits with reasonable certainty.

The 98.3% figure does not supply the missing proof. Levi generated that figure in her March 22, 2023 declaration by comparing WatchDog's Sales by Customer Summary lists to Companions' records,

separating Companions' gross sales into alleged WatchDog-customer sales and 'Independent' sales, and noting that the 2022 list was 'partial and incomplete.' Ex. 4, Dkt. 172 at 2, PageID 3525. That declaration did not deduct expenses, calculate WatchDog's net lost profits, prove WatchDog's margin, prove customer-specific causation, calculate Companions' net gain, or establish a reasonable royalty. The October 20, 2023 Order required further proof of actual damages. Ex. 29, Dkt. 254 at 32-34, PageID 4948-4950.

Plaintiff's memorandum confirms the defect. Plaintiff states that its calculation is based on Companions' annual Sales by Customer Detail for 2018 through 2022 and lists Companions sales of $72,847 in 2018, $411,215 in 2019, $435,316 in 2020, $823,345 in 2021, and $883,064 in 2022. Ex. 2, Dkt. 652 at 16, PageID 12495. Those figures are not WatchDog's lost profits, net income, expenses, tax returns, P&Ls, or bank records. Plaintiff's pre-motion conduct proves the same model: on August 13, 2025, Plaintiff's counsel demanded Companions' 2023-present Sales by Customer Details and warned that if Defendants did not produce them, Plaintiff would 'extrapolate damages using Companions' Sales by Customer Details for 2022.' Ex. 7. Plaintiff later disclaimed later-year extrapolation but still used selected 2018-2022 Companions Sales by Customer Detail figures as the damages base. Ex. 2, Dkt. 652 at 16, PageID 12495.

Levi admitted the defect under oath. Levi testified that '[t]he damages are 98.3 of your sales,' that '98.3 percent of every dollar that was earned by IME Companions belong[s] to IME WatchDog,' and that '[t]hose are my damages.' Ex. 9, Levi Dep. Tr. 102:21-22, 104:3-6. Levi later admitted the dispositive point: 'the damages calculation is not based on IME WatchDog's records' but is 'based on Companions's records.' Ex. 9, Levi Dep. Tr. 152:21-23. Levi also testified that '98.3 percent of Companions's sales should've been IME WatchDog and those are my damages. Period. End of story,' and that 'how the

finances of the company were handled is immaterial and irrelevant.' Ex. 9, Levi Dep. Tr. 126:21-25. WatchDog's finances are not irrelevant. WatchDog's finances are the proof.

Companions' filed tax returns show why gross receipts cannot be used as profit. In 2018, Companions reported $358,183 in gross receipts but only $120,153 in ordinary business income. In 2019, it reported $505,825 in gross receipts but only $125,359 in ordinary business income. In 2020, it reported $638,175 in gross receipts but only $181,807 in ordinary business income. In 2021, it reported $822,103 in gross receipts but only $333,329 in ordinary business income. Ex. 10, PDF pp. 1-4. Those margins were approximately 33.5%, 24.8%, 28.5%, and 40.5%, never 50%. They are also Companions' figures, not WatchDog's.

Plaintiff's 2022 Zemsky & Salomon adjustment exposes the unreliability of the model. Plaintiff admitted that the 2022 Zemsky entry was blank, then imported the 2021 Zemsky number, $54,015, into 2022. Ex. 2, Dkt. 652 at 17, PageID 12496. Plaintiff then used that plug number to increase the adjusted Companions sales base to $2,679,802, apply a 50% margin, and seek $1,339,901 before the price differential. Ex. 2, Dkt. 652 at 17, PageID 12496. A blank field in a gross-sales report cannot become default damages because Plaintiff inserted a prior-year number.

The Court does not have to choose between competing damages models. Plaintiff offered no legally sufficient one. Plaintiff used gross receipts, not WatchDog net loss; Defendants' records, not WatchDog's books; an attribution percentage, not customer-specific causation; and an assumed margin, not proof. That record cannot support compensatory damages with reasonable certainty. It supports zero compensatory damages.

## II. WATCHDOG'S HISTORICAL P&L RECORD DEFEATS PLAINTIFF'S ASSUMED 50% MARGIN.

Plaintiff's damages motion depends on one number: a 50% net-profit margin. Without that assumed margin, the claimed lost profits collapse, the punitive-damages multiplier has no base, prejudgment interest has no principal, and the requested money judgment cannot be calculated. Plaintiff did not prove that margin with WatchDog's complete P&Ls, tax returns, ledgers, payroll records, bank records, observer-payment records, accountant reconciliation, or any net-profit analysis.

Adam Rosenblatt's April 28, 2017 email titled 'IME Watchdog P&L Last 3 Years' transmitted WatchDog's 2014, 2015, and 2016 Profit and Loss statements. Ex. 13-B. Those P&Ls were not created for this opposition. Plaintiff then put the P&L issue before the Court. At the March 27, 2023 hearing, Plaintiff's counsel directed Roman Pollak to the October 3, 2017 email and asked whether he was 'analyzing profit and loss statements.' Pollak answered yes. Ex. 11, Dkt. 199, Mar. 27, 2023 Hr'g Tr. 71:3-12, PageID 3955. The Court questioned Pollak directly about the purpose of the analysis. Pollak testified that Safa asked him to review the P&Ls because she was trying to determine whether the business was profitable and present it to Greg Elefterakis as a business opportunity. Ex. 11, Dkt. 199, Mar. 27, 2023 Hr'g Tr. 72:8-73:3, PageID 3956-3957.

The same hearing fixed the profit numbers. When Defendants asked about WatchDog's three-year profits, the Court stated, 'I can look at the document,' allowed questioning while 'looking at that exhibit,' and Pollak confirmed that the P&Ls reflected approximately a $42,000 loss in 2014, approximately $70,000 net income in 2015, approximately $75,000 income in 2016, and only approximately $30,000 average annual income when the loss year was included. Ex. 11, Dkt. 199, Mar. 27, 2023 Hr'g Tr. 90:1-24, PageID 3974. The Court later confirmed that the documents provided by Plaintiff and used during witness examination were admitted into the record. Ex. 11, Dkt. 199, Mar. 27, 2023 Hr'g Tr. 129:6-10. WatchDog's P&Ls defeat Plaintiff's margin. WatchDog's 2014 P&L reflected $525,199.40 in Sales Income and a $42,539.82 net loss. WatchDog's 2015 P&L reflected $835,016.90 in Sales Income and

only $69,800.66 in Net Income, an approximate 8.36% margin. WatchDog's 2016 P&L reflected $969,699.84 in Sales Income and only $74,557.42 in Net Income, an approximate 7.69% margin. Ex. 15, Gelardi Decl. ¶ 3. Across those three years, WatchDog generated $2,329,916.14 in Sales Income and only $101,818.26 in Net Income, an aggregate margin of approximately 4.37%.

Plaintiff's proposed margin is not merely unsupported by those records. It is contradicted by them. A 50% margin on $2,329,916.14 would have generated $1,164,958.07 in net income. The P&Ls reflected only $101,818.26. The gap is $1,063,139.81. Plaintiff asks the Court to adopt a margin more than eleven times higher than WatchDog's historical aggregate margin while withholding the later WatchDog books that would be necessary to justify that assumption. The Court cannot determine damages with reasonable certainty by selecting that margin on this record.

Defendants do not have to prove the correct WatchDog margin. Plaintiff does. Defendants do not ask the Court to substitute a 4.37% damages model. The point is simpler: Plaintiff's 50% model is unproven, contradicted by the available WatchDog P&L record, and unsupported by the records Plaintiff controlled and chose not to submit. Companions' returns do not cure the defect. Companions is a different company, a later entrant, with different costs, different pricing, different customers, different marketing, different ownership, and different market conditions. If Plaintiff contends WatchDog's profitability materially changed after 2016, Plaintiff had to prove that with WatchDog's later P&Ls, tax returns, general ledgers, bank records, payroll records, observer-payment records, Zariz records, DLA-related records, distribution records, and accountant reconciliation. Plaintiff produced none of them.

The result is a failure of proof. Plaintiff's damages model requires the Court to assume the very fact Plaintiff had the burden to prove: that WatchDog would have earned 50% net profit on the revenue Plaintiff attributes to Defendants. The record does not permit that finding. Without a proven WatchDog margin, Plaintiff's lost-profit calculation has no evidentiary foundation.

**III. ROSENBLATT'S MARCH 2017 EMAIL AND THE DLA/DANIELLA LEVI/ZARIZ ENTRIES REQUIRE RECORDS BEFORE ANY DAMAGES AWARD.**

Plaintiff's missing-books problem does not stop with the 2014-2016 P&Ls. It extends into the operating records needed to test WatchDog's claimed damages. Defendants do not attach the March 2017 memorandum or restricted WatchDog materials because prior Court directives required return, destruction, confidentiality, and restricted use. Defendants rely on Adam Rosenblatt's separate April 28, 2017 email titled 'IME Watchdog for March 2017,' Defendants' review with former counsel before compliance with the Court's directives, and Plaintiff's control of the underlying WatchDog records. Ex. 13-A; Ex. 15, Gelardi Decl. ¶ 4.

Rosenblatt's April 28, 2017 email confirms that WatchDog maintained the damages records Plaintiff chose not to submit. The email transmitted WatchDog's March 2017 operating package and stated that the package included the monthly P&L, client list, list of all IMEs covered, WatchDog invoices, and a pay-versus-billed breakdown. Ex. 13-A. Those are not peripheral records. They show volume, revenue, billing, pay, cost structure, margin, and net profit. Plaintiff controlled those records when it filed this motion. Plaintiff did not submit them.

The March 2017 materials reviewed with former counsel make the omission dispositive. Those materials reflected that WatchDog handled 516 IMEs in March 2017, that Zariz received $25,000 that month, and that Zariz was already at $75,000 year-to-date. The March package also included or referenced the March P&L with prior-year comparison and YTD, bank-account records, WatchDog payroll with IME breakdowns, client information, projected cash-flow materials, and pay-versus-billed records. Ex. 15, Gelardi Decl. ¶ 4. Those records would show whether WatchDog's volume produced the 50% net margin Plaintiff asks the Court to assume.

Plaintiff's volume evidence makes the missing records more important, not less. WatchDog handled 516 IMEs in a single month after a 2016 year in which WatchDog's P&L reflected $969,699.84 in Sales Income and only $74,557.42 in Net Income, an approximate 7.69% margin. Ex. 15, Gelardi Decl. ¶¶ 3-4. Levi later marketed WatchDog as 'the first and largest IME company in New York,' 'covering over 1,000 exams per month.' Ex. 17, PDF p. 1. High volume did not establish a 50% margin. High volume made the books indispensable.

The unexplained outflows make any damages award impossible on this record. WatchDog's historical records reflected approximately $183,314.13 in distributions to DLA in 2014; approximately $165,000 in distributions to DLA, a separate $25,000 entry booked to Daniella Levi, and approximately $90,000 to Zariz in 2015; and approximately $220,000 to Zariz in 2016. Ex. 15, Gelardi Decl. ¶ 5. The March 2017 materials reflected another $25,000 to Zariz in March 2017 and $75,000 to Zariz year-to-date. Ex. 15, Gelardi Decl. ¶¶ 4-5. The 2015 and 2016 P&Ls alone show $310,000 in Zariz entries across two years. Plaintiff's damages papers do not identify the Zariz recipient, services provided, invoices, contracts, bank records, tax treatment, payment records, ledgers, or how those entries affect net profit. The Israeli Corporations Authority records make the one-word 'Zariz' label a proof problem Plaintiff had to solve. The Certificate of Incorporation identifies ZARIZ SHIPUZIM LTD., Company Number 511511701, as an Israeli limited-liability company incorporated on October 25, 1990. Ex. 39. The Company Registry Extract identifies the same company, lists legal status as 'Dissolved by court order,' and records status changes showing court-ordered liquidation on November 15, 1992 and liquidation by court order on April 15, 1997, under Court Order Number 0021292 in Tel Aviv. Ex. 40.

Plaintiff did not identify Zariz Shipuzim Ltd. Plaintiff did not identify any different Zariz entity. Plaintiff did not identify any individual recipient. Plaintiff did not produce invoices, contracts, bank records, tax records, payment records, ledgers, tax treatment, or proof of services. Plaintiff cannot avoid

the burden by saying Zariz Shipuzim Ltd. is the wrong Zariz. If it is the Zariz in WatchDog's books, Plaintiff had to explain the payments. If it is not the Zariz in WatchDog's books, Plaintiff had to identify the correct recipient and produce the records supporting the entries. Plaintiff did neither.

The DLA and Daniella Levi entries create the same defect. If Plaintiff treats those entries as business expenses, they reduce WatchDog's net profit and defeat the claimed 50% margin. If they were distributions, related-party transfers, personal transfers, or non-operating payments, the books require scrutiny before any damages award can be entered. Either way, the Court cannot calculate lost profits with reasonable certainty while the entries that determine profit remain unexplained.

## IV. LEVI NEEDED RECORDS TO ANSWER PROFIT QUESTIONS, AND PLAINTIFF BLOCKED THE QUESTIONS THAT TESTED NET PROFIT.

Levi admitted she controlled WatchDog's finances, reviewed the sales numbers submitted to the Court, and had access to WatchDog's accounting records. Ex. 9, Levi Dep. Tr. 114:6-16, 115:11-21. Levi then repeatedly testified that she needed financial records to answer basic revenue and profit questions. Ex. 9, Levi Dep. Tr. 117:6-22, 118:11-25, 119:7-24, 120:1-11. Plaintiff's counsel confirmed the point: 'we can stipulate that she needs documents to answer all these questions.' Ex. 9, Levi Dep. Tr. 118:23-25. If Plaintiff's owner needed records to answer profit questions, the Court needs those records before awarding lost profits.

Plaintiff then blocked the questions that would test the financial entries. Defendants asked what services Zariz provided, who owned or operated Zariz, whether invoices or contracts existed, and whether the payments were expenses, distributions, related-party transfers, or personal transfers. Plaintiff's counsel instructed Levi not to answer or Levi gave no meaningful answer. Ex. 9, Levi Dep. Tr. 146:16-151:22. Those questions were damages questions. Lost profits are net profits. Net profits require revenue minus

expenses, payroll, observer payments, bank charges, distributions, Zariz payments, DLA-related outflows, related-party transfers, and non-operating entries. Plaintiff cannot demand lost profits while blocking inquiry into the entries that determine profit.

Levi's finance background makes the non-answers worse. Levi represented in her marketing email that she 'earned a degree in finance,' signed as Founder and CEO of WatchDog, and marketed WatchDog as 'the first and largest IME company in New York,' 'covering over 1,000 exams per month.' Ex. 17, PDF p. 1. A finance-trained owner who controls the books cannot ask the Court to accept a 50% net-profit margin while refusing to produce the books and while needing records to answer basic profit questions.

Levi's federal financial-crime conviction makes objective record proof indispensable. Levi is not a neutral accountant. She is not an independent damages expert. She is Plaintiff's owner, the person seeking the money judgment, and the declarant asking the Court to accept a 50% net-profit margin without WatchDog's books. **Levi is also a convicted federal criminal in a financial-crime case. The Judgment states that Levi pleaded guilty to Count One and was adjudged guilty of conspiracy to knowingly evade federal reporting requirements under 31 U.S.C. § 5313(a), in violation of 31 U.S.C. § 5324(1) and 18 U.S.C. § 371. Ex. 18**, Judgment, PDF p. 8.

The federal indictment charged conduct that goes directly to financial credibility. **The indictment caption identified 126 counts, including conspiracy, money laundering, and forfeiture counts. Ex. 18, Indictment**, Doc. 8 at 30. **The indictment charged that Levi was a vice president of Bank Leumi in New York; that a co-conspirator asked her to find a person who could launder money; that Levi introduced that co-conspirator to Alex Adjmi for that purpose; and that Levi received a fee for her role in introducing them and initiating money-laundering transactions. Ex. 18, Indictment, Doc. 8 at 9, PDF p. 10. The federal indictment further charged that the broader scheme involved cash proceeds generated from drug trafficking, including cocaine trafficking; evasion of federal**

**reporting requirements; concealment from law-enforcement scrutiny; commissions for laundering cash; counter-surveillance techniques; beepers; code names; and approximately $22.5 million in cash delivered to Prism Financial Services and transferred to accounts in the United States and abroad. Ex. 18, Indictment, Doc. 8 at 4, 7, 28; PDF pp. 11-12, 2.**

The federal arrest materials confirm that FBI agents arrested Daniella Levi on May 25, 1993, transported her to the FBI office in New York, and advised her of her constitutional rights. Ex. 18, FBI Arrest Materials, Doc. 29 at 5. Defendants do not rely on these records as a standalone character attack. Defendants rely on them because Plaintiff asks the Court to trust Levi's financial margin while withholding the records that would prove or disprove it. This record calls for books, not trust.


## V. PLAINTIFF CANNOT USE PRIOR RETURN, DESTRUCTION, CONFIDENTIALITY, OR USE RESTRICTIONS AS A SWORD AND SHIELD.

Plaintiff's missing-record problem cannot be shifted to Defendants. Defendants do not attach restricted WatchDog P&Ls, the March 2017 memorandum, or internal WatchDog operating records because prior Court directives restricted Defendants' retention and use of WatchDog materials. Those directives matter. Defendants complied with them. That is why Defendants cite Rosenblatt's emails and Safa Gelardi's sworn declaration describing the review with former counsel before compliance with those directives, rather than attaching restricted WatchDog materials themselves. But those directives do not relieve Plaintiff of its damages burden.

Plaintiff owns the records. Plaintiff controls the records. Plaintiff has the P&Ls, tax returns, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, cash-flow records, Zariz records, DLA-related records, distribution records, invoices, and pay-versus-billed records. If Plaintiff wants lost profits, Plaintiff must prove lost profits with its own books.

Plaintiff cannot have it both ways. Plaintiff cannot restrict Defendants from attaching WatchDog financial materials, then ask the Court to accept a 50% margin while Plaintiff withholds the same categories of records. The burden did not move to Defendants because the records were confidential. The burden remained with Plaintiff because Plaintiff seeks the money judgment.

Plaintiff's own conduct supplies the answer. On March 3, 2026, Plaintiff sought additional time in connection with records it claimed it still needed. The Court granted a 90-day extension and gave Plaintiff leave to move to compel production. Ex. 6, Mar. 3, 2026 Minute Entry. Plaintiff then filed this damages motion without filing the contemplated motion to compel, without obtaining the records it had just told the Court it needed, and without submitting WatchDog's P&Ls, tax returns, ledgers, bank records, payroll records, observer-payment records, Zariz records, DLA-related records, distribution records, invoices, or pay-versus-billed records. Plaintiff elected to proceed on an incomplete record. Plaintiff cannot ask the Court to fill that record with assumptions. That was Plaintiff's choice. The consequence is not an adverse-inference sanction. It is the ordinary Rule 55 result: Plaintiff failed to prove damages.

Plaintiff cannot turn that missing record into an evidentiary advantage. The Court cannot assume that missing P&Ls would support a 50% margin. The Court cannot assume that missing ledgers would explain the DLA, Daniella Levi, and Zariz entries. The Court cannot assume that missing invoices, contracts, bank records, tax treatment, payment records, or pay-versus-billed records would prove net lost profits. Reasonable certainty comes from records. Plaintiff chose not to submit the records. The damages number therefore has no evidentiary foundation.

Plaintiff cannot repair that opening failure in reply. Plaintiff moved first. Plaintiff controlled the WatchDog books before filing. Plaintiff controlled them while seeking an extension. Plaintiff controlled them after receiving leave to move to compel. Plaintiff then filed without them. If Plaintiff attempts to

submit WatchDog P&Ls, tax returns, ledgers, contracts, bank wires, Zariz records, DLA-related records, or accountant reconciliation for the first time in reply, the Court should disregard those materials. Plaintiff's motion must stand or fall on the evidentiary record submitted with its opening papers. On that record, Plaintiff did not prove damages with reasonable certainty.

Plaintiff's counsel also knew what plaintiff-side default-damages proof looks like. Plaintiff's Notice of Motion identifies the wrong case number, 23-cv-6186 (NRM)(JRC), even though it was filed in this case, 22-cv-1032 (PKC)(JRC). Ex. 1, Dkt. 651 at 1, PageID 12478. Defendants do not rely on that error as a standalone basis for denial. The error matters because it points to the contrast. In the unrelated matter bearing that case number, counsel supported default damages with plaintiff-side proof: a sworn representative declaration, documents maintained by the plaintiff, invoices, a rental-rate range, a formula tied to the plaintiff's claimed loss, and an Amazon lease amendment. Ex. 31, Espada / AKP Default-Damages Submission, Dkt. 41 at 1–3, PageID 149–151; Dkt. 41-1; Dkt. 41-2. Plaintiff did not do that here.

Plaintiff did not submit WatchDog's books. Plaintiff did not submit WatchDog's P&Ls, tax returns, ledgers, bank records, payroll records, observer-payment records, Zariz records, DLA-related records, distribution records, invoices, or pay-versus-billed records. Plaintiff instead asked the Court to award more than $5 million from Companions' gross sales, a 98.3% attribution figure, and Levi's unsupported 50% margin. Rule 55 does not permit that result.

## VI. PLAINTIFF FAILED TO PROVE CUSTOMER-SPECIFIC CAUSATION.

Plaintiff's customer proof fails because customer overlap is not customer-specific causation. Customers are not property. WatchDog was the incumbent provider in this niche market. Levi marketed WatchDog as 'the first and largest IME company in New York,' 'covering over 1,000 exams per month.' Ex. 17,

PDF p. 1. In that market, overlap with a later competitor shows market sequence, not diversion, customer loss, damages, or net lost profit. Plaintiff's own volume record also undercuts loss: the March 2017 materials reflected 516 IMEs in a single month, and Levi later marketed WatchDog as covering 'over 1,000 exams per month.' Ex. 15, Gelardi Decl. ¶ 4; Ex. 17, PDF p. 1.

Wingate proves the 'lost customer' label is unreliable. During a damages-discovery conference with Plaintiff on the call, Judge Cho directed Defendants to examine Plaintiff's damages summaries and specifically identified Wingate because Plaintiff's own records showed Wingate's WatchDog revenue increased over the listed years. Ex. 15, Gelardi Decl. ¶ 10. Plaintiff's records show Wingate paid WatchDog $70,068 in 2016, $93,988 in 2017, $106,447 in 2018, $143,200 in 2019, $154,294 in 2021, and $202,195 in 2022. Ex. 12, Plaintiff's Sales by Customer Summary, PDF pp. 20, 28, 36, 44, 60, 70. A customer whose WatchDog revenue increased is not a lost customer.

Levi's deposition confirms the ownership theory. Levi testified that if a customer still paid WatchDog but also paid Companions, 'whatever money was paid to IME Companion is part of my damages calculation,' and later testified that if some Wingate business went to Companions, that money 'should've been IME WatchDog's income.' Ex. 9, Levi Dep. Tr. 130:13-24, 153:20-154:6. That is an ownership theory over customers, not lost-profit proof.

Plaintiff's customer materials also included firms Defendants never serviced, never billed, and never received revenue from, including William Schwitzer & Associates, Cherny & Podolsky, Kahn Gordon Timko & Rodriguez, Gersowitz Libo & Korek, Cellino & Barnes, Miraglia Law, Blumen & Shayne PLLC, and the Rizzuto Law Firm. Ex. 8, PDF p. 1. Plaintiff's 'Clients that Never Returned' exhibit lists Bogoraz Law Group, Elefterakis, Elefterakis & Panek, Liakas Law P.C., Khavinson & Associates, Zaremba Brown, and Subin Associates, each at $0.00. Ex. 26, PDF p. 1. That exhibit does not prove diversion, that those firms would have returned to WatchDog absent Defendants, that those firms used

Companions, or any net profit WatchDog lost. The Elefterakis and Liakas entries make the exhibit even less probative. Plaintiff sued Gregory Elefterakis, Nicholas Elefterakis, and Nicholas Liakis in this litigation, then treated Elefterakis, Elefterakis & Panek and Liakas Law P.C. as "never returned" damages entries. A firm's failure to return after litigation, conflict, customer dissatisfaction, use of other providers, or ordinary customer choice does not prove that Defendants caused WatchDog lost net profits.

Subin, Zemsky, Oresky, Khavinson, Zaremba, and Liakas show ordinary market movement. Subin's COO stated Subin was unhappy with WatchDog before using Companions. Ex. 32, Dkt. 27 at 1, PageID 380. Zemsky stated WatchDog was the first IME service his firm used, that he was unhappy with WatchDog because it could not cover last-minute requests, that he began using IME Guards in or about February 2019, and that he was unhappy with IME Guards because it lacked coverage; Zemsky later confirmed the firm was no longer working with IME Companions as of March 10, 2023. Ex. 33, Dkt. 28 at 1, PageID 381; Ex. 23, PDF p. 1. Oresky emailed both Companions and WatchDog seeking IME coverage, and Safa replied to all, including WatchDog. Ex. 24, PDF p. 1. NYSCEF-filed IME reports show firms in Plaintiff's alleged customer universe using other legal representatives and IME-observation providers after the TRO. Ex. 25, PDF pp. 4-13.

Plaintiff's own win-back email confirms competition. Levi wrote that she was 'hoping to win your business back' and offered reduced pricing of $165 for the first hour and $45 for each additional half hour 'in an effort to win back your business.' Ex. 17, PDF p. 1. Defendants also marketed independently: IME Companions performed attorney-event outreach at NYSTLA/SITLA events, sent follow-up emails, used marketing materials and sample reports, marketed its portal, services, languages, reports, professionalism, ownership, pricing, and reliability, and paid for professional marketing infrastructure, including a July 2020 Marketing 360 agreement with a $1,195 monthly recurring total,

Madwire/Marketing 360 invoices in January, February, and March 2022 showing $1,034.07 invoice totals and $0 balances, and an August 2022 Giant Partners campaign for $7,250 with recurring monthly terms. Ex. 15, Gelardi Decl. ¶ 8; Exs. 27-A, 27-B, 27-C, 28.

The Elefterakis record shows why individualized proof was required. The Court's October 20, 2023 Order states that Elefterakis joined Companions 'to help [it] obtain customers' and conceded he introduced, at most, approximately ten to fifteen clients. Ex. 29, Dkt. 254 at 9, PageID 4925. The Court also noted that no competent evidence had been adduced as to whether certain former WatchDog customers were also Elefterakis's clients. Ex. 29, Dkt. 254 at 9 n.9, PageID 4925. IME Companions' 2018 Membership Interest Purchase Agreement shows Greg Elefterakis, Roman Pollak, and Anthony Bridda collectively owned 50% of IME Companions before Safa purchased their interests for $115,000. Ex. 30, PDF pp. 2-3. Plaintiff still seeks more than $5 million through an aggregated customer-overlap model that cannot distinguish a lost customer from a shared customer, a retained customer, a never-serviced firm, a customer using another provider, or a customer generated by independent marketing.

## VII. PLAINTIFF'S ANTICIPATED REPLY DOES NOT CURE THE MISSING PROOF.

Plaintiff's reply cannot cure the opening-record failure. Plaintiff may call this liability relitigation; it is not. Defendants challenge damages, margin, causation, attribution, and scope of relief. Default does not prove damages, WatchDog's lost net profits, a 50% margin, customer-specific causation, Companions' net unjust enrichment, or a reasonable royalty. Plaintiff may call 98.3% law of the case, but that figure was a gross-revenue attribution assertion, not a net-profit calculation, and the October 20, 2023 Order required further proof of actual damages. Ex. 29, Dkt. 254 at 32-34, PageID 4948-4950. Plaintiff may call Levi's 50% margin reasonable, but WatchDog's own P&Ls show a 2014 loss, single-digit margins in 2015 and 2016, and an approximate 4.37% aggregate margin. Ex. 15, Gelardi Decl. ¶ 3. If Plaintiff

claims WatchDog later reached 50%, Plaintiff had to prove that with later WatchDog books. Plaintiff did not.

Plaintiff may say Zariz is speculative or that ZARIZ SHIPUZIM LTD. is not the correct Zariz. That answer confirms the proof failure. Plaintiff's records use the one-word label 'Zariz.' The Israeli Corporations Authority Certificate identifies ZARIZ SHIPUZIM LTD., Company Number 511511701, incorporated on October 25, 1990. Ex. 39. The Company Registry Extract identifies the same company as 'Dissolved by court order,' with court-ordered liquidation on November 15, 1992 and liquidation by court order on April 15, 1997, under Court Order Number 0021292 in Tel Aviv. Ex. 40. Plaintiff still did not identify the correct Zariz recipient, contracts, invoices, bank records, tax treatment, payment records, ledgers, or proof of services.

The Jeannie Tam / Morgan & Morgan issue shows the same attribution problem. Plaintiff attributed the June 13, 2025 Tam IME to Mark Purificati and Defendants. Defendants disputed attribution and sought a narrow Rule 45 subpoena to Morgan & Morgan for source records showing who was requested, retained, assigned, confirmed, invoiced, paid, or expected to appear. Ex. 37, PDF pp. 1-3. Defendants contended Morgan & Morgan requested WatchDog coverage, WatchDog confirmed a WatchDog representative, a WatchDog report was generated, and WatchDog invoiced Morgan & Morgan; after the subpoena was denied following a contempt ruling in Defendants' favor, Plaintiff still submitted no affidavit from Morgan & Morgan, a WatchDog scheduler, or the WatchDog representative. Exs. 37, 38. The Court need not accept Defendants' account; disputed attribution cannot support money damages or a permanent occupational ban without source records.

Plaintiff may try to submit new financial records in reply. The Court should disregard them. Plaintiff moved first, controlled the books, and chose not to submit P&Ls, tax returns, ledgers, bank records, payroll records, observer-payment records, Zariz records, DLA-related records, or accountant

reconciliation with its damages motion. A reply is not a second opening motion for damages. The Rule 55 result remains: no WatchDog books, no reliable margin, no customer-specific causation, no verified attribution, and no damages.

## VIII. THE REMAINING REMEDIES FALL WITH THE UNPROVEN COMPENSATORY BASE.

Plaintiff's punitive-damages request fails because Plaintiff did not prove a compensatory damages base. Plaintiff seeks to double a number it did not prove. The DTSA permits enhanced damages only after a recoverable damages measure exists. 18 U.S.C. § 1836(b)(3)(C). Plaintiff proved no actual loss, no non-duplicative unjust enrichment, and no reasonable royalty. Syntel does not permit compensatory damages to become punishment by another name. Without a proven principal award, there is nothing to enhance.

Plaintiff's prejudgment-interest request fails for the same reason. Interest requires a proven principal amount. Plaintiff did not prove one. A court cannot accrue interest on gross receipts Plaintiff never proved were WatchDog's net lost profits, Companions' net unjust enrichment, or a reasonable royalty.

Plaintiff's fee and cost request also cannot substitute for damages proof. Fees and costs require their own lawful basis, documentation, apportionment, and reduction. They cannot cure the absence of compensatory damages evidence.

Plaintiff's permanent tri-state occupational ban fails on this record. Plaintiff seeks to prohibit IME-observation work in New York, New Jersey, and Connecticut. WatchDog's March 2017 operating materials reflected 516 IMEs, with only two New Jersey IMEs listed and no Connecticut IMEs listed. Ex. 15, Gelardi Decl. ¶ 6. A broad customer list and an unproven damages model do not justify a permanent tri-state work ban. Any injunction, if entered at all, must be limited to non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets. It should not bar lawful IME-observation work or create an indefinite supervision regime over ordinary competitive activity.

Plaintiff had the burden. Plaintiff did not meet it. Plaintiff did not prove WatchDog's actual lost net profits, a reliable WatchDog margin, customer-specific causation, Companions' net unjust enrichment, a reasonable royalty, a compensatory base for punitive damages or prejudgment interest, or a lawful basis for a permanent tri-state occupational ban. This record supports zero compensatory damages, not a multi-million-dollar default judgment.

Plaintiff's requested injunction is not a trade-secret injunction. It is an occupational ban. Plaintiff asks to bar IME-observation work across New York, New Jersey, and Connecticut even though the damages record does not prove customer-specific loss, ongoing misuse, or tri-state harm. A permanent injunction must be tied to specific trade secrets and specific threatened misuse. It cannot become a permanent restraint on lawful work in an ordinary service market.

## CONCLUSION

Plaintiff's motion should be denied. This is not a record from which the Court can calculate damages with reasonable certainty. Plaintiff asks for more than $5 million and a permanent tri-state occupational ban, but it did not submit WatchDog's books, did not prove WatchDog's lost net profits, did not prove a reliable margin, did not prove customer-specific causation, did not prove Companions' net unjust enrichment, and did not prove a reasonable royalty. Rule 55 does not permit a gross-revenue conversion judgment built on Companions' sales records, a 98.3% attribution figure, and Levi's unsupported 50% margin.

The evidentiary failure is complete. Plaintiff controlled the P&Ls, tax returns, ledgers, bank records, payroll records, observer-payment records, Zariz records, DLA-related records, distribution records, invoices, and pay-versus-billed records. Plaintiff chose not to submit them. Plaintiff's own historical P&L record showed single-digit margins and modest net income. The DLA, Daniella Levi, and Zariz

entries remain unexplained. Levi needed records to answer profit questions. Plaintiff blocked the financial questions that tested net profit. The damages burden stayed with Plaintiff, and Plaintiff did not meet it.

The Court should enter zero compensatory damages, deny punitive damages, deny prejudgment interest, deny the requested permanent tri-state occupational ban, and deny any injunction beyond non-use, non-disclosure, and non-retention of specifically identified WatchDog trade secrets. The Court does not need to estimate damages downward; it lacks a proven damages measure to estimate from. **The motion should be denied on the present record.**


Dated June 19, 2026

Respectfully submitted, /s/ Safa Gelardi and /s/ Vito Gelardi

Pro Se Defendants

| Exhibit | Description |
|---|---|
| Ex. 1 | Plaintiff's Notice of Motion for Default Judgment Damages and Permanent Injunctive Relief, Dkt. 651 |
| Ex. 2 | Plaintiff's Damages Memorandum, Dkt. 652 |
| Ex. 4 | Levi March 22, 2023 Declaration, Dkt. 172 |
| Ex. 6 | March 3, 2026 Minute Entry granting 90-day extension and leave to move to compel |
| Ex. 7 | August 13, 2025 Felsen Email re Companions Sales by Customer Detail and Extrapolation |
| Ex. 8 | August 16, 2025 Discovery Follow-Up Email to Judge Cho |
| Ex. 9 | Daniella Levi Deposition Transcript |
| Ex. 10 | IME Companions Form 1065 Tax Return Excerpts, 2018–2021 |
| Ex. 11 | March 27, 2023 Hearing Transcript, Dkt. 199 |
| Ex. 12 | Plaintiff's Sales by Customer Summary, 2016–2022 |
| Ex. 13-A | Adam Rosenblatt April 28, 2017 Email re March 2017 WatchDog Materials |
| Ex. 13-B | Adam Rosenblatt April 28, 2017 Email re WatchDog P&Ls for Last Three Years |
| Ex. 15 | Revised Gelardi Declaration |
| Ex. 17 | Levi Marketing / Win-Back Email |
| Ex. 18 | Daniella Levi Federal Criminal Case Records, including Indictment and Judgment |
| Ex. 23 | Zemsky April 10, 2023 Letter |
| Ex. 24 | January 18, 2023 Oresky Email re Percy Perez |
| Ex. 25 | NYSCEF-Filed IME Reports Showing Other Legal Representatives / IME Providers |
| Ex. 26 | WatchDog "Clients that Never Returned" Summary |

| Exhibit | Description |
| --- | --- |
| Ex. 27-A | Marketing 360 Agreement |
| Ex. 27-B | Madwire / Marketing 360 Invoices, January–March 2022 |
| Ex. 27-C | Giant Partners Marketing Contract |
| Ex. 28 | IME Companions Marketing / Attorney-Event Outreach Emails |
| Ex. 29 | October 20, 2023 Memorandum & Order, Dkt. 254 |
| Ex. 30 | IME Companions Membership Interest Purchase Agreement |
| Ex. 31 | Espada / AKP Default-Damages Submission |
| Ex. 32 | Arnold Baum Affidavit |
| Ex. 33 | Jason Zemsky Affidavit |
| Ex. 37 | March 29, 2026 Letter Motion for Limited Rule 45 Subpoena to Morgan & Morgan |
| Ex. 38 | April 21, 2026 Docket Order Denying Reconsideration of Morgan & Morgan Subpoena Denial |
| Ex. 39 | Israeli Corporations Authority Certificate of Incorporation of Company for ZARIZ SHIPUZIM LTD, Company No. 511511701 |
| Ex. 40 | Israeli Corporations Authority Company Registry Extract for ZARIZ SHIPUZIM LTD, Company No. 511511701 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
IME WATCHDOG, INC.,

                Plaintiff,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, IME COMPANIONS LLC,
CLIENT EXAM SERVICES LLC,
and IME MANAGEMENT & CONSULTING LLC,

                Defendants.

-----------------------------------------------------------------X

**Case No.: 23-cv-6186 (NRM)(JRC)**

**NOTICE OF MOTION FOR DEFAULT JUDGMENT**

      **PLEASE TAKE NOTICE** that, upon the reading and filing of Plaintiff IME WatchDog, Inc,'s ("Plaintiff") Memorandum of Law in Support of its Motion for Default Judgment and the Declaration of Daniella Levi, Esq., Plaintiff, by and through its undersigned counsel, will move this Court before the Hon. Pamela K. Chen, U.S.D.J. as soon as counsel may be heard, for an Order entering judgment by default in favor of Plaintiff and against Defendants Safa Gelardi, Vito Gelardi, and IME Companions LLC (collectively hereinafter the "Defendants") for (i) $1,414,800.00 for lost profit together with pre-judgment interest and post-judgment interest; (ii) punitive damages in the amount of $2,829,600 pursuant to 18 U.S.C. § 1836(b)(3)(C); (iii) attorneys' fees in the amount of $299,256.59; (iv) pre-judgment interest in the amount of $525,032,00; (iv) post-judgment interest in accordance with 28 U.S.C. § 1961; (v) a permanent injunction prohibiting Defendants from conducting any independent medical examination observations directly or indirectly in the tri-state area of New York, New Jersey, and Connecticut; and (vi) such other and further relief as the Court deems just, proper, and equitable.

**PLEASE TAKE FURTHER NOTICE,** that pursuant to the Court's February 9, 2026 Order and amended order issued on the record at the March 3, 2026 hearing, Defendants' opposition papers, if any, are due within thirty (30) days hereof, and pursuant to pursuant to Rule 6 and Local Civil Rule 6.1, Plaintiff's reply papers in further support are due seven (7) days after Defendants serve their opposition.

Dated:     Lake Success, New York
           March 28, 2026

                                                Respectfully submitted,

                                                **MILMAN LABUDA LAW GROUP PLLC**

                                                By:     /s/ Jamie S. Felsen
                                                      3000 Marcus Ave., Suite 3W8
                                                        Lake Success, NY 11042
                                                        (516) 328-8899

                                                **SAGE LEGAL LLC**

                                                By:     /s/ Emanuel Kataev, Esq.
                                                      18211 Jamaica Avenue
                                                      Jamaica, NY 11423-2327
                                                      (718) 412-2421

                                                *Attorneys for Plaintiff*
                                                *IME WatchDog, Inc.*

**POINT II**

**PLAINTIFF SHOULD BE AWARDED $1,414.80.00 PLUS INTEREST AS DAMAGES ON ITS UNDERLYING CLAIMS IN ADDITION TO $2,781,074 IN PUNITIVE DAMAGES AND $299,256.59 IN ATTORNEYS' FEES AND A PERMANENT INJUNCTION**

Because the DTSA provides the largest damages of all of Plaintiff's claims, Plaintiff will analyze damages only under the DTSA. Remedies available under the DTSA include both equitable relief and monetary damages. In addition, the DTSA permits the granting of an injunction to prevent actual or threatened misappropriation of trade secrets. See 18 U.S.C. § 1836(b)(3)(A)(i); see also IME Watchdog, Inc. v. Gelardi, 732 F.Supp.3d 224 (E.D.N.Y. 2024); Zurich Am, Life Ins. Co. v. Nagel, 538 F.Supp.3d 396 (S.D.N.Y. 2021).

As to monetary damages, the DTSA permits the recovery of compensatory damages, punitive damages, and attorneys' fees. 18 U.S.C. §§ 1836(b)(3)(B)–(D). The DTSA's broad compensatory damages provision permits an award for: (1) "damages for actual loss caused by the misappropriation;" and (2) "damages for any unjust enrichment caused by the misappropriation ... that is not addressed in computing damages for actual loss;" or (3) "in lieu of damages measured by any other methods ... a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B).

The DTSA authorizes the court to award punitive damages in an amount not more than 2 times the amount of the damages and reasonable attorneys' fees where "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(C)&(D).

Plaintiff alleges Defendants' willfully and maliciously misappropriated Plaintiff's trade secrets. See SAC ¶ 99. Accordingly, Plaintiff is entitled to (i) damages; (ii) punitive damages of two times the damages; and (iii) attorneys' fees.

### A. Damages

Between 2018 and 2022, through their theft of Plaintiff's trade secrets, Defendants stole at least sixty-seven (67) customers from Plaintiff. See Declaration of Daniella Levi, Esq. ("Levi Decl.") ¶ 5; see also IME Watchdog, Inc. v. Gelardi, 2022 U.S. Dist. LEXIS 86997, at *17 (E.D.N.Y. May 13, 2022) ("[T]here is no doubt that Companions' existence and growth is based almost entirely on Watchdog's misappropriated trade secrets, customers, and business opportunities"); IME Watchdog, Inc. v. Gelardi, 732 F. Supp. 3d 224, 242 (E.D.N.Y. 2024) ("Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction").

Indeed, this Court has already found that 98.3% of the total revenue Defendants generated since Companions' inception was obtained through sales to Plaintiff's former customers. Ime Watchdog, Inc. v. Gelardi, 2023 U.S. Dist. LEXIS 189054, at *12 (E.D.N.Y. Oct. 20, 2023).

Plaintiff's damages calculation in this motion is limited to Defendants' sales figures and Plaintiff's resulting lost profits for the period 2018 through 2022.  Plaintiff is not seeking damages 'through any extrapolated figures for later years, or any revenue attributed to IME Legal Reps or any other post-2022 entity.  Applying the court's prior determination that 98.3 percent of Companions' total revenue was derived from the theft of Plaintiff's customers, Plaintiff's damages for the period of 2018 through 2022 are $1,414.80.00 plus pre-judgment and post-judgment interest.  As set forth in the Levi Declaration, based on Companions' annual Sales by Customer Detail that Companions produced during discovery, Companions' sales for the period 2018 through 2022 totaled $2,625,787 (consisting of $72,847.00 in 2018; $411,215.00 in 2019; $435,316 in 2020; $823,345 in 2021; and $883,0646 in 2022. (Levi Decl. ¶ 7).

The 2022 sales figure had to be adjusted because it omitted the revenue associated with Zemsky & Salomon, a customer appearing in Companions' 2022 sales records which is on the Enjoined Customers List for whom the dollar amount was left blank. (Id. ¶ 8). Zemsky & Salomon paid Companions $54,015.00 in 2021; using that amount for 2022 yields a total 2022 Companions sales of $937,061.00. (Id. ¶ 9).  Therefore, Companions' total adjusted sales for the period 2018 through 2022 is $2,679,802.  (Id.)

Applying Plaintiff's typical fifty percent (50%) profit margin results in lost profits for the period 2018-2022 of $1,339,901.  (Id. ¶¶ 10-11).

In addition, because Companions charged $179.00 per independent medical examination while Plaintiff charged $189, Plaintiff's equivalent revenue would have been 5.59% higher, or $1,414,800.00 for that same time period.  (Id. ¶ 12).  Plaintiff respectfully submits that this amount represents the lost-profits damages to be awarded on the present motion.

Moreover, not only has Plaintiff pled that its trade secrets were willfully and maliciously misappropriated, which allegation must be deemed admitted, but this Court, on several occasions, has actually found that Defendants misappropriated Plaintiff's trade secrets.  See *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224 (E.D.N.Y. March 13, 2024); *Ime Watchdog, Inc. v. Safa Abdulrahim Gelardi*, 2022 U.S. Dist. LEXIS 86997 (E.D.N.Y. May 13, 2022); *IME Watchdog, Inc. v. Gelardi*, 2023 U.S. Dist. LEXIS 189054 (E.D.N.Y. Oct. 20, 2023).

Accordingly, Plaintiff is entitled under the DTSA to an award of punitive damages of two (2) times the amount of its $1,414,800.00 in damages.  See 18 U.S.C. § 1836(b)(3)(C).  Therefore, Plaintiff is entitled to punitive damages of $2,829,600, for a total of $4,244,400 in lost profits and punitive damages.  Plaintiff is also entitled to pre- and post-judgment interest on the $1,414,800 for lost profits as provided by 28 U.S.C. § 1961.

13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

IME WATCHDOG, INC.,

                                    Plaintiff,

        -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS,
NICHOLAS LIAKIS, and IME COMPANIONS LLC,

                                    Defendants.
-------------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

                                    Third-Party Plaintiffs,

        -against-

CARLOS ROA,

                                    Third-Party Defendant.
-------------------------------------------------------------------X
CARLOS ROA,

                                    Third-Party Counter-Claimant,

        -against-

SAFA ABUDLRAHIM GELARDI, VITO GELARDI,
and IME COMPANIONS, LLC,

                                    Third-Party Counter-Defendants.
-------------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC) (JRC)

**REPLY DECLARATION OF
DANIELLA LEVI, ESQ. IN
FURTHER SUPPORT OF ITS
ORDER TO SHOW CAUSE
FOR CONTEMPT, FOR AN
ORDER OF ATTACHMENT
PURSUANT TO RULE 64 OF THE
FEDERAL RULES OF CIVIL
PROCEDURE & ARTICLE 62 OF
THE NEW YORK CIVIL
PRACTICE LAW & RULES, AND
IN SUPPORT OF PLAINTIFF'S
RENEWED MOTION FOR A
PRELIMINARY INJUNCTION
DIRECTING DEFENDANTS TO
CEASE OPERATING IME
COMPANIONS LLC AND ANY
OTHER ENTITIES THAT
<u>COMPETE WITH PLAINTIFF</u>**

        Daniella Levi, Esq. declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that

the following is true and correct:

1. I am the sole shareholder and Chief Operating Officer of the Plaintiff IME WatchDog, Inc. ("IME WatchDog").

2. I respectfully submit this reply declaration in further support of Plaintiff's renewed motion for a preliminary injunction directing Defendants to cease operating IME Companions LLC and any other entities that compete with Plaintiff, in further support of its order to show cause for contempt, and for an order of attachment pursuant to Rule 64 of the Federal Rules of Civil Procedure (hereinafter "Rules" or "Rule") & Article 62 of the New York Civil Practice Law & Rules (hereinafter "CPLR").

3. I respectfully ask that my prior declarations dated February 25, 2022, the accompanying declaration under seal dated February 25, 2022, my April 8, 2022 supplemental declaration, and my March 10, 2023 declaration in support of the instant motion be incorporated by reference herein. See Docket Entries 8, 15 (filed under seal), and 45-2 (filed under seal), and 155, respectively.

4. I have compared the "Sales by Customer Summary" lists of IME WatchDog (which was misappropriated by the Defendants) with those of the Defendants, IME Companions LLC, which were obtained through discovery.

5. A summary of the revenue Defendants earned from IME WatchDog's customers compared to sales earned from other customers are as follows:

| Year | Companions Sales for Plaintiff's Customers | Companions' "Independent" Sales |
|------|--------------------------------------------|---------------------------------|
| 2018 | $64,392.00 | $8,335.00 |
| 2019 | $408,800.00 | $2,415.00 |
| 2020 | $432,491.00 | $2,825.00 |
| 2021 | $810,780.00 | $12,565.00 |
| 2022[1] | $863,111.00 | $19,935.00 |
| TOTAL | $2,579,574.00 | $46,075.00 |

---

[1] This was a partial and incomplete list provided by the Defendants.

2

 Gmail

**Safa Gelardi <safagelardi@gmail.com>**

## Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion for Preliminary Injunction

1 message

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov>      Tue, Mar 3, 2026 at 8:11 PM
To: nobody@nyed.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mailbox is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

### Notice of Electronic Filing

The following transaction was entered on 3/3/2026 at 9:11 PM EST and filed on 3/3/2026
**Case Name:**         IME WatchDog, Inc. v. Gelardi et al
**Case Number:**      1:22-cv-01032-PKC-JRC
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Minute Entry for proceedings held before Judge Pamela K. Chen: Evidentiary and Show-Cause Hearing held on 3/3/2026. Appearances by Emanuel Kataev for Plaintiff; Jared Lefkowitz for Direct IME Services LLC ("Direct"), Interested Party; Defendants Safa Gelardi and Vito Gelardi, appearing *pro se*. Case called. Hearing held. The following witnesses were sworn and testified: Safa Gelardi and Mark Purificati. For the reasons stated on the record, the [623] Temporary Restraining Order is lifted, the [620] Motion for Preliminary Injunction is denied, and decision on the [620] Motion for Contempt is reserved. Oral motion for extension of time to file motion for default judgment made by Plaintiff; Court granted 90-day extension and granted Plaintiff leave to submit a motion to compel production of records. Oral motion for attorney's fees made by Mr. Lefkowitz on behalf of Direct. Mr. Lefkowitz to submit his billing records for in camera review. Plaintiff to respond by 3/17/2026; Direct to reply by 3/31/2026. Neither the response nor reply shall exceed 5 pages. (Court Reporter Avery Armstrong.) (JEC)**

**1:22-cv-01032-PKC-JRC Notice has been electronically mailed to:**

Anthony Joseph Genovesi      agenovesi@abramslaw.com, anthony@genovesi.us

Jared M. Lefkowitz      jmleflaw@gmail.com

Jamie Scott Felsen      jamiefelsen@mmmlaborlaw.com

Melanie I. Wiener      mwiener@abramslaw.com

Michael Joseph Alber      mja@alberlegal.com, malber@alberlegal.com

 Gmail

**Safa Gelardi <safagelardi@gmail.com>**

## IME Watchdog v. Gelardi

**Jamie Felsen** <jamiefelsen@mllaborlaw.com>                          Wed, Aug 13, 2025 at 3:55 PM
To: Safa Gelardi <safagelardi@gmail.com>, vito gelardi <vitogelardi@gmail.com>, "brent.chapman1@gmail.com"
<brent.chapman1@gmail.com>
Cc: Emanuel Kataev <emanuel@sagelegal.nyc>

Safa,

As noted several times, Companions has not produced its Sales by Customer Details since 2022.  Please
produce for 2023 through the present immediately.  If you fail to produce, we will be forced to extrapolate
damages using Companions' Sales by Customer Details for 2022.  These documents were also required to
be produced pursuant to the July 21, 2025 Order.

[Quoted text hidden]

 Gmail

Safa Gelardi <safagelardi@gmail.com>

---

## Discovery Follow-Up re Plaintiffs' "Sales by Customer Summary

---

**Safa Gelardi** <safagelardi@gmail.com>                                                                          Sat, Aug 16, 2025 at 6:21 PM
To: Vito <vitogelardi@gmail.com>, NYED_Cho Chambers <cho_chambers@nyed.uscourts.gov>, Jamie Felsen <jamiefelsen@mllaborlaw.com>, Emanuel Kataev <emanuel@sagelegal.nyc>

Dear Judge Cho,

Thank you for your attention to the damages discovery issue. Plaintiffs have produced a document titled **"Sales by Customer Summary (2011–2022)"**, which they claim demonstrates their alleged damages. Respectfully, that document does not establish damages under the law.

**1. Clients I never serviced.**
The Summary includes many firms that I never worked with at all, including **William Schwitzer & Associates**, Brown & Gropper, Cherny & Podolsky, Law Office of Sheryl Menkes, Newman, Anzalone & Newman, Kahn Gordon Timko & Rodriguez, Law Office of Joshua Brian Irwin, Law Office of Stephen Frankel, Law Office of Bradley Hames, Alan Blueman, Bornstein & Emanuel, Buttafuoco & Associates, The Forzano Law Firm, Bern & Ripka, Gersowitz Libo & Korek, Krinsky & Musumeci, Pirrotti Law Firm, The Selvin Law Firm, Cellino & Barnes (Melville), Geroulakis Law, Michael Forzano, JAG Law, Mikhail Ilyaich & Associates, Matthew J. Salimbene, The Traver Law Firm, Ariel Aminov, Miraglia Law, Blumen & Shayne PLLC, and the Rizzuto Law Firm.

These clients cannot be attributed to me. For example:

- **Mr. Cherny passed away in 2019.** His firm's attrition cannot be laid at my feet.

- **William Schwitzer & Associates** generated only $493 in 2017 for Plaintiffs, never appeared on their lists again, and in practice relied on their own paralegals to accompany clients at IMEs. I was the **first companion** when building my business, and I personally encountered Schwitzer's paralegals. His decision to use internal staff had nothing to do with me.

The presence of these names on Plaintiffs' list does not prove damages.

**2. The Wingate example – the opposite of a loss.**
Plaintiffs include Wingate as though it were a "lost" client. Yet their own Summary shows **Wingate's revenue increasing every year**: $70,068 in 2016 → $93,988 in 2017 → $106,447 in 2018 → $143,200 in 2019 → $154,294 in 2021 → $202,195 in 2022, with only a dip in 2020 during the pandemic.

A client whose revenue **goes up is the very opposite of a lost client.** I covered only a few overflow matters for Wingate when Plaintiffs could not staff them; they were never my client.

**3. Timing clarification.**
For the Court's clarity: IME Companions LLC was incorporated in October 2017, but operations did not begin until January 2018 due to the holiday season and the time needed to establish accounts and staffing. Incorporation is not the same as operating, and no damages can be attributed to me for any period before January 2018.

**4. My business versus theirs – the fraction theory collapses.**
In 2021, my peak year, I reported $333,329 in ordinary business income on 67 clients **(Exhibit C, 2021 Form 1065, line 22)**. Plaintiffs told the Court they had **476 clients**, and the TRO was entered based on that number. By their own theory that I "stole a fraction," Plaintiffs' profits should **dwarf** mine. Yet they have not produced any records showing that. The numbers simply do not line up with their damages story.

**5. The 98.3% ruling does not replace proof of damages.**
Plaintiffs frequently cite the figure of 98.3% as though it were a judicial damages determination. That percentage was their assertion at the TRO stage, not language from Judge Chen's Preliminary Injunction Order (Exhibit D, May 13, 2022 Preliminary Injunction Order). The Order itself never adopted that figure; it simply granted interim relief. A preliminary injunction does not substitute for proof of damages.

Case law is clear: damages must be proven with reasonable certainty, measured as **net lost profits**, and based on Plaintiffs' own financials — not by assuming my income equals their loss. See *Schonfeld v. Hilliard*, 218 F.3d 164, 172–75

(2d Cir. 2000); *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 110–12 (2d Cir. 2007); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495–96 (2d Cir. 1995); *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261–62 (1986).

A ruling does not replace the requirement to prove damages. Plaintiffs still bear that burden.

### 6. Plaintiffs' burden of proof — not mine.

Plaintiffs' counsel has openly admitted in writing that they cannot calculate damages without my records. In an August 13, 2025 email, Mr. Felsen wrote (Exhibit A, Felsen email to me dated August 13, 2025):

> "Companions has not produced its Sales by Customer Details since 2022. Please produce for 2023 through the present immediately. If you fail to produce, we will be forced to extrapolate damages using Companions' Sales by Customer Details for 2022."

This statement confirms that Plaintiffs are attempting to use my records as their damages model. Respectfully, that is backwards. Under well-established law, it is Plaintiffs' burden to prove their damages from their own books, not to rely on mine. See *E.J. Brooks Co. v. Cambridge Security Seals*, 31 N.Y.3d 441, 448–49 (2018) (plaintiff must prove its own loss; cannot substitute defendant's costs or profits); *Hertz Corp. v. Avis, Inc.*, 106 A.D.2d 246, 248 (1st Dep't 1985) (plaintiff not entitled to use defendant's profits as damages); *Schonfeld v. Hilliard*, 218 F.3d 164, 172–75 (2d Cir. 2000).

If the Court were to accept Plaintiffs' approach — that they may extrapolate damages from my 2022 records because they cannot prove their own — this would set a dangerous precedent. In effect, any plaintiff could sue first and then rummage through a defendant's records to construct damages later. That is not the law, and it would open the door to speculative civil suits.

### 7. Why the "Sales by Customer Summary" proves nothing.

The Summary is simply a list of gross receipts (Exhibit B, Plaintiffs' "Sales by Customer Summary, 2011–2022"). It does not show net profits, expenses, transfers, or distributions. It even contains red flags such as negative entries and duplicate client names. Standing alone, it cannot establish damages under any standard.

### 8. Request.

Accordingly, I respectfully ask that when Plaintiffs submit the affidavit swearing their income exceeds mine, they also be required to produce their **Profit and Loss Statements (accrual basis, redacted if necessary) from January 2018 through the present (YTD 2025).**

This is only fair. The affidavit must be corroborated by their own books. Redaction is acceptable, but profit and loss numbers must be shown. Without this, their affidavit cannot be meaningfully tested, and damages remain unproven.

**Respectfully,**
Safa Gelardi
Pro Se Defendant

- **Exhibit A:** Aug. 13, 2025 Felsen email.

- **Exhibit B:** Plaintiffs' "Sales by Customer Summary (2011–2022)" (under seal, client names highlighted).

- **Exhibit C:** Excerpt from IME Companions LLC 2021 Tax Return (Form 1065, line 22).

- **Exhibit D:** Judge Chen's Preliminary Injunction Order (May 13, 2022).

---

**4 attachments**

**Final Order on Prelim Inj.pdf**
171K

**Gmail - IME Watchdog v. Gelardi.pdf**
87K

**2025-08-08 2011 - 2022 All Customers Stolen by Defendants (1).pdf**
1884K

**2021 ime companions tax returns pg 5.pdf**
81K

147

D. LEVI

expenses.  I'm getting to a gross and net point here.  So you don't have to answer.  I'm just going to state the questions.

Q.   Those payments appear year after year, correct?

A.   I have to look at the financial records.

Q.   You agree those payments are not to any IME observers?

MR. KATAEV:  Objection.  Vague.

Q.   The payments, the hundreds of thousands of dollars made to an equity named Zariz?

MR. FELSEN:  What records are you referring to?

MS. GELARDI:  I'm just asking.

MR. FELSEN:  I want to know what records you're referring.

MS. GELARDI:  I'm asking a question.

MR. FELSEN:  What records are you referring to that this question is based on?  It sounds like you're in possession of Plaintiff's confidential information

D. LEVI

in violation of a court order based on these questions.

MS. GELARDI:  I'm not in possession. If I were in possession of them, I would show them to you.  So I'm asking questions based on what Adam sent in the past, okay.

MR. FELSEN:  And you still have that in your possession?

MS. GELARDI:  I don't.  I'm asking questions about the P&Ls and other financials that Adam sent in 2017, okay, so we're just asking questions.  We're not pointing to any documents here.

MR. FELSEN:  Right, but you have information that you had at one point. I don't know if you still have it or not.  And you're using information from those trade secrets to derive questions at this deposition and that's in violation of a court order.

MS. GELARDI:  I don't have the documents.  I'm not violating the court order.  It goes directly to the damages

D. LEVI

claim of expenses, grosses versus net.
I'm just going to ask the questions,
Mr. Felsen.

MR. FELSEN:  You have the
information that was on the dockets and
trade secrets and we're not going to
answer questions about information that
you have that you're not supposed to
have.

MS. GELARDI:  I don't have the
information.  I am asking questions
about the information.  I'm just going
to continue asking questions, you don't
have to answer them.

Q.    These payments they're not made to
any IME physician, they're not made to any IME
observer, they're not made to any law firm,
correct, Ms. Levi?

MR. FELSEN:  Objection.

Q.    So these payments are not for IME
WatchDog's core services, correct?

MR. FELSEN:  Objection.

A.    (No verbal response.)

Q.    What services does Zariz provide to

150

                          D. LEVI

IME WatchDog?

          MR. FELSEN:  Objection.

     A.   (No verbal response.)

     Q.   You have never identified who owns or operates Zariz, do you own or operate that entity?

          MR. KATAEV:  Objection.  I instruct the witness not to answer.

          MR. FELSEN:  Objection.

     Q.   You have not provided any invoices or contracts showing what services Zariz supposedly provided you, correct?

          MR. FELSEN:  Objection.

     A.   (No verbal response.)

     Q.   And you have not explained whether Zariz payments were business expenses, profit distributions or personal transfers, correct?

          MR. FELSEN:  Objection.

     A.   (No verbal response.)

     Q.   Your records also show distributions to Daniella Levi & Associates?

          MR. FELSEN:  Objection.

          MR. KATAEV:  Same instruction.  Not to answer.

151

D. LEVI

Q.   You also show distributions to Daniella Levi outside of Daniella Levi & Associates, correct?

MR. FELSEN:  Objection.

MR. KATAEV:  Same instruction not to answer.

Q.   You have not shown how those distributions were treated in your damages calculation, correct?

MR. FELSEN:  Objection.

A.   (No verbal response.)

Q.   You're asking the court to award you millions of dollars without accounting for these large recurring payments and distributions, correct?

MR. FELSEN:  Objection.

MS. GELARDI:  It's just a yes or no on that.  I'm not invading privacy in that question.

MR. FELSEN:  Objection.

A.   (No verbal response.)

Q.   You've been in business since 2011 yes or no?

A.   Yes.

D. LEVI

The Witness:  So if you want to ask me a question at a deposition and you want me to provide you with an answer, you need me to let me complete answering the question and then you can ask another question.  You keep interjecting, interrupting and it's impossible to conduct a deposition in this way.

MS. GELARDI:  I apologize.  I'll repeat the question, okay.  Actually I'll move on to the next one.

MR. FELSEN:  Let her finish her answer.

THE WITNESS:  Can you read me back my answer, what I started to say, please.

(Whereupon, the referred to answer was read back by the Reporter.)

THE WITNESS:  The damages are 98.3 of your sales.

MS. GELARDI:  I'm sorry, Ms. Levi, I didn't ask you about the damages.  That wasn't the question.

D. LEVI

very derived from misappropriated clients.  And therefore 98.3 percent of every dollar that was earned by IME Companions belong to IME WatchDog. Those are my damages.

In addition, my damages are the loss of my reputation that you tarnished, as well as the loss of the reputation of IME WatchDog, which you also tarnished thanks to the way you instructed Adam to sabotage relationships and screw up relationships or as you say "fuck it up."

Q.    Let me ask the question that I asked, Ms. Levi.  You were sent multiple deposition and damage production requests, your attorneys were sent multiple deposition damages requests, both verbally during conferences and formally in writing by my prior attorney Jonathon Warner, correct?

A.    I don't know.  I don't have the record in front of me.  I have to look at documents in order to give you a comprehensive answer.

D. LEVI

finances.

MR. FELSEN:  She doesn't memorize her finances.  All these documents you're referring to, show it to us.

MS. GELARDI:  All I'm asking is, you know, you know your finances.  If you ask me how much I make, people know how much they make.

Q.  My question is in your damages model, you claim you lost a million and change, correct, but not in any year have you made anything near that, correct, in profit?

A.  You misunderstand.

Q.  I'm just asking.

A.  You do not understand the way that damages are calculated and I'm going to repeat it.

Q.  Ms. Levi, with all respect --

A.  Let me finish answering. 98.3 percent of Companions's sales should've been IME WatchDog and those are my damages. Period.  End of story.  How much money I made, how the money, how the finances of the company were handled is immaterial and irrelevant.

152

D. LEVI

Q.    You never produced a document showing you made a million dollars in profit, yes or no?

MR. KATAEV:  Objection.  You can answer.

A.    (No verbal response.)

Q.    Your top clients stayed with you, correct, Ms. Levi?

MR. FELSEN:  Objection.

A.    That's actually incorrect because Subin was our top client and they left and never came back.

Q.    Your revenue increased for some of them, correct?

MR. KATAEV:  Objection.  Vague.  You can answer the question.

Q.    Of your top clients?

A.    I have to look at financial records in order to ascertain and give you answers. However, the damages calculation is not based on IME WatchDog's records.  It's based on Companions's records.

Q.    Given all that information, your damages claim is not supported by a complete and

114

D. LEVI

since 2011, correct?

A.   I started it in 2011.

Q.   In 2011?

A.   Correct.

Q.   Are you the sole owner?

A.   Yes, I am.

Q.   As a sole owner, you control its finances, correct?

A.   Yes.

Q.   On August 8th, you submitted a sales by customer summary to the court, correct?

A.   Yes.

Q.   You reviewed those numbers before submitting, correct?

A.   Yes.

Q.   So as you're here today you have recent detailed knowledge of your company's revenue history, correct?

A.   I don't have things committed to memory, if that's what you're asking.

Q.   The court directed you to produce an up-to-date sales by customer summary, correct?

A.   Correct.  And we complied with the court's directive.

D. LEVI

Q.   You only provided the summary through the end of 2022, correct?

A.   Correct.

Q.   Yesterday the court gave you one more week to produce the remainder, correct?

A.   What is the point of this question?

Q.   I'm getting to the point, Ms. Levi.

A.   Okay.  Whatever the court ordered is whatever the court ordered.

Q.   Generating a sales by customer summary is a standard report from your accounting system, correct, it's just a yes or no, it's a simple question?

MR. FELSEN:  Objection.

A.   It's a report.  You're calling it a simple report.  I don't know.  It's a report that can be generated, correct.

Q.   But you do have full access to those records, correct?

A.   Of course.

Q.   So there's no reason you could not produce the complete sales by customer summary through its all of 2023, all of 2024 and up to date for 2025, is there?

117

D. LEVI

talking about that document or are you
talking about total revenue?

Q.    I'm just asking a question.  You can
say yes or no.

A.    I have to look at the financial
records to give an accurate answer.

Q.    Not a problem.  I'm going to
continue asking.  You don't have to know, you
can say I don't know.  It doesn't matter.  I'm
just going to ask the question.  Your net profit
that year was under $10,000, correct?

A.    Again, I have to refer to documents
in order to be able to answer questions.

Q.    In 2015, your revenue was in the
higher 800,000 range, correct?

A.    My answer remains the same.  I have
to look at documents in order to answer the
question.

Q.    Your net profit for 2015 was about
70 to $80,000 correct?

A.    Again, my answer remains the same.

Q.    In 2016, your revenue remained
roughly in the 800 to $900,000 range; yes or no?

A.    What's clear to me is that you

118

D. LEVI

still, despite that the court ordered you to return all of WatchDog's information and destroy anything that's on your system, you clearly still failed to make that court order and you still are in possession of those documents.

Q.    I'm just asking a question, Ms. Levi.  You can say I don't know, you can say yes or no.

A.    I gave you my answer.

Q.    In 2016, the revenue remained roughly in the 800 to $900,000 range, yes or no?

A.    Again, I have to look at documents to be able to answer.

Q.    And the profit in 2016 was, again, I would say between 60 to 70,000, correct?

A.    My answer is the same.  I have to look at documents in order to be able to answer the question.

Q.    In 2017, your revenue succeeded 900,000, yes or no?

A.    My answer is the same.

MR. FELSEN:  Ms. Gelardi, we can stipulate that she needs documents to answer all these questions.

119

D. LEVI

MS. GELARDI:  That's fine.  I can ask them, though.

MR. FELSEN:  You're wasting your time.

MS. GELARDI:  That's fine.  Okay.

Q.  In 2017, your profit was still well under 100,000, yes or no, you need to look at your documents, ma'am?

A.  My answer remains the same as it was to all the prior questions.

Q.  In 2018, your revenue crossed a million dollars, correct?

A.  I need to look at documents.

Q.  Your profit was still in the very low six figures, correct?

A.  My answer remains the same.  I have to look at documents in order to be able to answer the question.

Q.  In 2019, your revenue stayed hovered above a million dollars, correct?

A.  I have to look at documents.  And I don't know how you have access to my financial records.

Q.  And your profit for 2019 was nowhere

D. LEVI

near a million dollars, correct?

A.    My answer is the same.

Q.    Remains the same, okay.  In 2020, even during the pandemic, you billed hundreds of thousands of dollars to top clients, correct?

A.    Again, I'm going to (crosstalk) --

Q.    That's it.

A.    I'm going to respond by saying that I have to look at documents in order to be able to answer your questions.

Q.    So these are the documents you provided the court which show 2019, just a few days ago you provided these.  My question again was in 2020, even during the pandemic you billed hundreds of thousands to top clients, correct, I'll point you to some of them in 2020.

MR. KATAEV:  Can we mark this, please.

A.    The numbers are what they are. Whatever the documents that we presented are, those are the numbers.

(Whereupon, Sales by Customer List 2011 to 2022 was marked as Defendants' Exhibit D1 for identification as of this

D. LEVI

irrelevant because it cannot point to clients?

A.   Correct.

Q.   But now you're telling me the case is not about clients because I'm showing that over 40 percent of my clients were never your clients from 2011 to 2022 they're nowhere in your records.

A.   We can agree to disagree.

Q.   Okay, let's agree to disagree.   We at least agree that these are, all the highlighted in green are not lost accounts?

A.   I have no idea.   I have to review it based on our clients.   I cannot do it just taking a look at it in a deposition.

Q.   Okay.   Ms. Levi, your financial records reflect repeated launch payments, hundreds of thousands of dollars to an entity called Zariz, correct?

MR. KATAEV:   Objection.   This is in violation of Rule 26 which is designed to harass.   We instruct the witness not to answer the question.

MS. GELARDI:   For the record, I'm only asking in regards to damages and

D. LEVI

reliable financial picture, correct?

MR. FELSEN:  Objection.

A.    Absolutely incorrect.

MS. GELARDI:  I just want to ask a couple of questions about Wingate and then we're going to move away from the financial part.

THE WITNESS:  It's your deposition.

MS. GELARDI:  I'm really trying not to make you uncomfortable.  That's the only reason I'm saying that.

THE WITNESS:  I'm very comfortable. I'm enjoying this.

Q.    When you cease of a lost client on your damages claim that means.  I asked you this already that customers stop doing business with you.

A.    And I already responded.

Q.    With respect to Wingate, they continued booking with you after the date you claimed they were lost; is that fair to say?

A.    Again.

Q.    It's in your records, Ms. Levi.

A.    Again, as I said, to the extent that

D. LEVI

some of Wingate's business went to IME Companions, whatever money was generated through Wingate for IME Companions should've been IME WatchDog's income.  So that is the basis for the damages calculation.

Q.    The 98.3 percent claim that came from your damages claim, right, it was generated, it came from an Excel sheet that you provided to the court, correct?

A.    Again, I have to refer back to, this was a filing that was done, I believe over two years ago.  So I would have to look at that time to tell you exactly how things were calculated.

Q.    You represented that spreadsheet as your actual customer list and said names were misappropriated from you by me; is that fair to say?

A.    Whatever I submitted is what I submitted.  The documents speak for themselves.

Q.    Your own verified customer revenue record, your sales by summary list proved that many of the companies on the Excel spreadsheet including at Wingate never appeared at all; is that correct, these are your documents that you

# U.S. Return of Partnership Income

Form **1065**
Department of the Treasury
Internal Revenue Service

For calendar year 2018, or tax year beginning ___01/01___ , 2018, ending ___12/31___, 20 __18__ .
▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2018**

| | |
|---|---|
| **A** Principal business activity<br>OTHER LEGAL S | **D** Employer identification number<br>82-3148364 |
| **B** Principal product or service | **E** Date business started<br>10/17/2017 |
| **C** Business code number<br>541190 | **F** Total assets (see instructions)<br>$ |

Type or Print

Name of partnership
IME COMPANIONS LLC

Number, street, and room or suite no. If a P.O. box, see instructions.
9207 245TH ST

City or town, state or province, country, and ZIP or foreign postal code
FLORAL PARK, NY 11001

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☐ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year. ▶ ___4___

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

### Income

| | | | |
|---|---|---|---|
| **1a** | Gross receipts or sales . . . . . . . . . . . . | **1a** 358183 | |
| **b** | Returns and allowances . . . . . . . . . . | **1b** | |
| **c** | Balance. Subtract line 1b from line 1a . . . . . . . . . . | **1c** | 358183 |
| **2** | Cost of goods sold (attach Form 1125-A) . . . . . . . | **2** | |
| **3** | Gross profit. Subtract line 2 from line 1c . . . . . . . . | **3** | 358183 |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) . . | **4** | |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . . . | **5** | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . | **6** | |
| **7** | Other income (loss) (attach statement) . . . . . . . . | **7** | |
| **8** | **Total income (loss). Combine lines 3 through 7** . . . . . . . . . . . | **8** | 358183 |

### Deductions (see instructions for limitations)

| | | | |
|---|---|---|---|
| **9** | Salaries and wages (other than to partners) (less employment credits) . . . . . . | **9** | 21500 |
| **10** | Guaranteed payments to partners . . . . . . . . . . . . | **10** | |
| **11** | Repairs and maintenance . . . . . . . . . . . . . | **11** | |
| **12** | Bad debts . . . . . . . . . . . . . . . . | **12** | |
| **13** | Rent . . . . . . . . . . . . . . . . . . | **13** | 12000 |
| **14** | Taxes and licenses . . . . . . . . . . . . . . | **14** | |
| **15** | Interest (see instructions) . . . . . . . . . . . . . | **15** | |
| **16a** | Depreciation (if required, attach Form 4562) . . . . . | **16a** 12000 | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return | **16b** | **16c** 12000 |
| **17** | Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . . | **17** | |
| **18** | Retirement plans, etc. . . . . . . . . . . . . . | **18** | |
| **19** | Employee benefit programs . . . . . . . . . . . . | **19** | |
| **20** | Other deductions (attach statement) . . . . . . . . . | **20** | 192530 |
| **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . | **21** | 238030 |
| **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . . . | **22** | 120153 |

### Tax and Payment

| | | | |
|---|---|---|---|
| **23** | Interest due under the look-back method—completed long-term contracts (attach Form 8697) | **23** | |
| **24** | Interest due under the look-back method—income forecast method (attach Form 8866) . | **24** | |
| **25** | BBA AAR imputed underpayment (see instructions) . . . . . . . . . | **25** | |
| **26** | Other taxes (see instructions) . . . . . . . . . . . | **26** | |
| **27** | **Total balance due.** Add lines 23 through 27 . . . . . . . . . . | **27** | |
| **28** | Payment (see instructions) . . . . . . . . . . . . | **28** | |
| **29** | **Amount owed.** If line 28 is smaller than line 27, enter amount owed . . . . . . | **29** | |
| **30** | **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . . . . | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____
Signature of partner or limited liability company member

▶ _____ Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name<br>YEHAD ABDELAZIZ | Preparer's signature | Date<br>04/01/2019 | Check ☐ if self-employed | PTIN<br>P01210216 |
| Firm's name ▶ THE FIVE PILLARS FINANCIAL SERVICES | | | Firm's EIN ▶ 27-3392017 |
| Firm's address ▶ 508 72ND ST BROOKLYN NY 11209- | | | Phone no. 718-833-5202 |

**For Paperwork Reduction Act Notice, see separate instructions.**

QNA

Form **1065** (2018)

# U.S. Return of Partnership Income

Form **1065**

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year beginning _____ , 2019, ending _____ , 20 ____ .

▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2019**

| A Principal business activity | | D Employer identification no. |
|---|---|---|
| OTHER LEGAL | | 82-3148364 |
| **B** Principal product or service | **Type or Print** | **E** Date business started |
| SERVICE | IME COMPANIONS LLC<br>9207 245TH ST<br>FLORAL PARK, NY 11001 | 10/17/2017 |
| **C** Business code number | | **F** Total assets (see instructions) |
| 541190 | | $ 38,583. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☒ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

**J** Check if Schedules C and M-3 are attached ........................................................ ▶ ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution**: Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | |
|---|---|---|---|
| **I N C O M E** | **1 a** Gross receipts or sales | 1 a 505,825. | |
| | **b** Returns and allowances | 1 b | |
| | **c** Balance. Subtract line 1b from line 1a | 1 c | 505,825. |
| | **2** Cost of goods sold (attach Form 1125-A) | 2 | |
| | **3** Gross profit. Subtract line 2 from line 1c | 3 | 505,825. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | 4 | |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) | 5 | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | 6 | |
| | **7** Other income (loss) (attach statement) | 7 | |
| | **8** Total income (loss). Combine lines 3 through 7 | 8 | 505,825. |
| **SEE INSTRS FOR DEDUCTIONS LIMITATIONS** | **9** Salaries and wages (other than to partners) (less employment credits) | 9 | 66,500. |
| | **10** Guaranteed payments to partners | 10 | |
| | **11** Repairs and maintenance | 11 | |
| | **12** Bad debts | 12 | |
| | **13** Rent | 13 | 12,200. |
| | **14** Taxes and licenses | 14 | 5,954. |
| | **15** Interest (see instructions) | 15 | 5,953. |
| | **16a** Depreciation (if required, attach Form 4562) | 16 a | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | 16 b | 16c |
| | **17** Depletion **(Do not deduct oil and gas depletion.)** | 17 | |
| | **18** Retirement plans, etc. | 18 | |
| | **19** Employee benefit programs | 19 | |
| | **20** Other deductions (att stmt) SEE STATEMENT 1 | 20 | 289,859. |
| | **21** Total deductions. Add the amounts shown in the far right column for lines 9 through 20 | 21 | 380,466. |
| | **22** Ordinary business income (loss). Subtract line 21 from line 8 | 22 | 125,359. |
| **TAX AND PAYMENT** | **23** Interest due under the look-back method — completed long-term contracts (attach Form 8697) | 23 | |
| | **24** Interest due under the look-back method — income forecast method (attach Form 8866) | 24 | |
| | **25** BBA AAR imputed underpayment (see instructions) | 25 | |
| | **26** Other taxes (see instructions) | 26 | |
| | **27** Total balance due. Add lines 23 through 26 | 27 | |
| | **28** Payment (see instructions) | 28 | |
| | **29** Amount owed. If line 28 is smaller than line 27, enter amount owed | 29 | |
| | **30** Overpayment. If line 28 is larger than line 27, enter overpayment | 30 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____
Signature of partner or limited liability company member

▶ _____
Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| PETER A. MANISCALCO CPA MBA | PETER A. MANISCALCO CPA MBA | | | P00309874 |
| Firm's name ▶ MANISCALCO & PICONE, CPAS, P.C. | | | Firm's EIN ▶ 204440952 | |
| Firm's address ▶ 2493 RICHMOND RD<br>STATEN ISLAND, NY 10306-1936 | | | Phone no. 718-668-2901 | |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**    PTPA0105  10/02/19    Form **1065** (2019)

# U.S. Return of Partnership Income

Form **1065**

Department of the Treasury
Internal Revenue Service

**For calendar year 2020, or tax year beginning _____, 2020, ending _____, 20\_\_\_\_\_ .**

▶ **Go to *www.irs.gov/Form1065* for instructions and the latest information.**

OMB No. 1545-0123

**2020**

| | |
|---|---|
| **A** Principal business activity<br>Other Legal | **D** Employer identification no.<br>82-3148364 |
| **B** Principal product or service<br>Service | **E** Date business started<br>10/17/2017 |
| **C** Business code number<br>541190 | **F** Total assets (see instructions)<br>$ 196,279. |

**Type or Print**

IME Companions LLC
9207 245th Street
Floral Park, NY 11001

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☒ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution**: Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

## INCOME

| | | | | |
|---|---|---|---|---|
| **1 a** | Gross receipts or sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1 a** | 638,175. | |
| **b** | Returns and allowances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1 b** | | |
| **c** | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1 c** | | 638,175. |
| **2** | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | | |
| **3** | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | | 638,175. |
| **4** | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) . . . | **4** | | |
| **5** | Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . . . . . . . . . . . . . | **5** | | |
| **6** | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . . . . . . . . | **6** | | |
| **7** | Other income (loss) (attach statement) . . . . . . . . . . . . . . . . . . . . . . . . . . . | **7** | | |
| **8** | **Total income (loss). Combine lines 3 through 7** . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | | 638,175. |

## DEDUCTIONS (SEE INSTRUCTIONS FOR LIMITATIONS)

| | | | |
|---|---|---|---|
| **9** | Salaries and wages (other than to partners) (less employment credits) . . . . . . . . . . . | **9** | |
| **10** | Guaranteed payments to partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | 97,065. |
| **11** | Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | 1,813. |
| **12** | Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | |
| **13** | Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | 27,500. |
| **14** | Taxes and licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **14** | 175. |
| **15** | Interest (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **15** | |
| **16a** | Depreciation (if required, attach Form 4562) . . . . . . . . . . . . . . . . . **16 a** | | |
| **b** | Less depreciation reported on Form 1125-A and elsewhere on return . . . **16 b** | **16c** | |
| **17** | Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . . . . . . . . . . . . . . . . . . | **17** | |
| **18** | Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **18** | |
| **19** | Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **19** | |
| **20** | Other deductions (att stmt) . . . . . . . . . . . . . . . . . . . . . . . . . See Statement 1 | **20** | 329,815. |
| **21** | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . . . . . . . . . . . | **21** | 456,368. |
| **22** | **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . . . . . . . . . . . . | **22** | 181,807. |

## TAX AND PAYMENT

| | | | |
|---|---|---|---|
| **23** | Interest due under the look-back method — completed long-term contracts (attach Form 8697) . . . . . . | **23** | |
| **24** | Interest due under the look-back method — income forecast method (attach Form 8866) . . . . . . . . . . | **24** | |
| **25** | BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . | **25** | |
| **26** | Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **26** | |
| **27** | **Total balance due.** Add lines 23 through 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . | **27** | |
| **28** | Payment (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28** | |
| **29** | **Amount owed.** If line 28 is smaller than line 27, enter amount owed . . . . . . . . . . . . . . . | **29** | |
| **30** | **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . . . . . . . . . . . . . | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____
Signature of partner or limited liability company member

▶ _____
Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Print/Type preparer's name<br>Gregg T. Iliceto CPA | Preparer's signature | Date | Check ☒ if self-employed | PTIN<br>P00729565 |
| Firm's name ▶ Gregg T. Iliceto CPA LLC | | | Firm's EIN ▶ 27-4150557 | |
| Firm's address ▶ 3041 Veterans Rd W<br>STATEN ISLAND, NY 10309 | | | Phone no. (718) 227-3354 | |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

PTPA0105  09/03/20

Form **1065** (2020)

Form **1065**

Department of the Treasury
Internal Revenue Service

## U.S. Return of Partnership Income

For calendar year 2021, or tax year beginning _____ , 2021,
ending _____ , 20 _____ .
▶ Go to *www.irs.gov/Form1065* for instructions and the latest information.

OMB No. 1545-0123

**2021**

| A Principal business activity | | D Employer identification no. |
|---|---|---|
| Other Legal | | 82-3148364 |
| **B** Principal product or service | **Type or Print** | **E** Date business started |
| Service | IME Companions LLC<br>9207 245th Street<br>Floral Park, NY 11001 | 10/17/2017 |
| **C** Business code number | | **F** Total assets (see instructions) |
| 541190 | | $ 193,542. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☒ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ▶ _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 2

**J** Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution**: Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | |
|---|---|---|---|
| **INCOME** | **1a** Gross receipts or sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1a** 822,103. | |
| | **b** Returns and allowances . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1b** | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . | **1c** | 822,103. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . . . . | **2** | |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . . | **3** | 822,103. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) . . . . . . . . . . . . . . . . . . . . . . | **4** | |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)) . . . . . . . . . . . . . . . | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . . . . . . . | **6** | |
| | **7** Other income (loss) (attach statement) . . . . . . . . . . . . . . . . . . . . . | **7** | |
| | **8** **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . . . . . . . | **8** | 822,103. |
| **DEDUCTIONS FOR LIMITATIONS** (SEE INSTRS) | **9** Salaries and wages (other than to partners) (less employment credits) . . . . . . . . . . | **9** | |
| | **10** Guaranteed payments to partners . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | |
| | **11** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | 2,158. |
| | **12** Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | |
| | **13** Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | |
| | **14** Taxes and licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **14** | |
| | **15** Interest (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **15** | 9,484. |
| | **16a** Depreciation (if required, attach Form 4562) . . . . . . . . . . . . . . . | **16a** | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return . . . | **16b** | **16c** |
| | **17** Depletion **(Do not deduct oil and gas depletion.)** . . . . . . . . . . . . . . . | **17** | |
| | **18** Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **18** | |
| | **19** Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **19** | |
| | **20** Other deductions (att stmt) . . . . . . . . . . . . . . . . . . . . See Statement 1 | **20** | 477,132. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 . . . . . . . . . . | **21** | 488,774. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . . . . . . . . . . | **22** | 333,329. |
| **TAX AND PAYMENT** | **23** Interest due under the look-back method — completed long-term contracts (attach Form 8697) . . . . . . | **23** | |
| | **24** Interest due under the look-back method — income forecast method (attach Form 8866) . . . . . . . . . . | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . . . . . . . | **25** | |
| | **26** Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **26** | |
| | **27** **Total balance due.** Add lines 23 through 26 . . . . . . . . . . . . . . . . . . . . . | **27** | |
| | **28** Payment (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28** | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed . . . . . . . . . . | **29** | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . . . . . . . . . . | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

▶ _____
Signature of partner or limited liability company member

▶ _____
Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☒ if self-employed | PTIN |
|---|---|---|---|---|
| Gregg T. Iliceto CPA | | | | P00729565 |
| Firm's name ▶ Gregg T. Iliceto CPA LLC | | | Firm's EIN ▶ 27-4150557 | |
| Firm's address ▶ 3041 Veterans Rd W<br>STATEN ISLAND, NY 10309 | | | Phone no. (718) 227-3354 | |

**BAA** **For Paperwork Reduction Act Notice, see separate instructions.**      PTPA0105  10/04/21      Form **1065** (2021)

POLLAK - DIRECT - MR. KATAEV                71

correct?

A    No.

Q    Let's look at Plaintiff's 37.  This is an October 3rd, 2017 email from you to Safa Gelardi.

You sent this email, correct?

A    Yes.

Q    And in this email you are analyzing profit and loss statements, correct?

A    Yes.

Q    And the reason why you're analyzing these profit and loss statements is to determine whether you also, with Greg and Anthony, want to get into a similar business, correct?

A    I analyzed it because Safa asked me to.

Q    And the reason why you fulfilled her request is to determine whether you wished to use this information to start a competing business, correct?

A    No.

Q    Well, isn't it true that this email that you're analyzing the insurance expense to determine how much money is spent on insurance, for example?

A    Yes.

Q    And you're stating in here that you will not have similar expensing related to utilities, correct?

A    Correct.

Q    And you have questions about items such as the

POLLAK - DIRECT - MR. KATAEV                    72

commissioner of labor expense and lawyer expense, correct?

A    Yes.

Q    And you've analyzed that and used that information to determine whether you wanted to open a competing business, correct?

A    No.

Q    Let's go to Plaintiff's 38.

THE COURT:  So can I ask you, what was the purpose of your email back to her with these responses?

THE WITNESS:  Well, yeah, Safa asked me to analyze the P&L and give her my thoughts, and these were the items that stuck out to me.

THE COURT:  But for what purpose?  In other words, what -- did she say why she wanted you to do that?

THE WITNESS:  Well, she was trying to -- I guess see if the business was profitable.

THE COURT:  Okay.  But why come to you and say, can you analyze this?

THE WITNESS:  Well, she was trying to get me to present it to Greg --

THE COURT:  Okay.

THE COURT REPORTER:  Present it to who?

THE WITNESS:  To Greg as a business opportunity.

THE COURT:  Okay.  So is it accurate that you were doing this analysis, in part, because you were trying to

POLLAK - DIRECT - MR. KATAEV                73

decide if you should pitch it to Greg as a business he should get involved in?

THE WITNESS:  In part.

THE COURT:  Okay.  All right.

Go ahead.

BY MR. KATAEV:

Q    Now, you knew from your discussions with Safa that she had Adam on the inside of the IME Watchdog, correct?

A    No, not at this time.

Q    But in this email, you ended with -- with respect to travel expenses, I, quote:  I will assume that is mostly the dock or Adam.

Do you see that?

THE COURT:  Hang on.  So hang on.

For the court reporter, you got to go slower.

MR. KATAEV:  All right.

THE COURT:  It says, I assume that is mostly the dock, slash, Adam.  None of that capitalized.

Okay.  Go ahead.

THE WITNESS:  Correct.  Can you repeat that?

Q    You stated in this email, with respect to travel expenses, that you assume that is mostly the dock or Adam, correct?

A    Yes.

Q    And when you refer to "Adam," you're referring to Adam

POLLAK - DIRECT - MR. KATAEV                84

A    I don't recall doing that.

Q    And you recommended to Greg to get involved in this business, correct?

A    Yes.

Q    Based on the profitability of IME Watchdog, correct?

A    No, based on all the attorneys that we deal with and the potential of the business with them.

THE COURT:  With who?

THE WITNESS:  Our attorneys.

THE COURT:  I'm sorry, I don't really understand.

You mean that you would get income from the attorneys you were already working with --

THE WITNESS:  Correct.

THE COURT:  -- if you also got involved in this IME --

THE WITNESS:  -- yes.

THE COURT:  -- Companion business?

THE WITNESS:  Yes, (indiscernible).

BY MR. KATAEV:

Q    And in the course of the time that you worked with Safa at IME Companions, you received distributions, correct?

A    Yes.

Q    And you profited from the information that Safa found, correct?

MR. GENOVESI:  Objection.

POLLAK - CROSS - MR. WARNER                    90

A     Okay.

Q     What were the gross profits over three years for the Watchdogs?

          MR. KATAEV:  Objection, Your Honor, relevance.

          THE COURT:  Well, I can look at the document.  You don't need to have him answer that question, unless it leads to another question --

          MR. WARNER:  It does.

          THE COURT:  Okay.  Of this witness?

          MR. WARNER:  Yes.

          THE COURT:  Okay.  Go ahead.

          So looking at that exhibit.

Q     2014, they lost $42,000, correct?  Is that correct?

A     It's a $42,000 loss in 2014.

Q     And 2015, how did they do?

A     Almost 70,000 of net income.

Q     And in 2016?

A     Almost 75,000 of income.

Q     So what would be the approximate average income that they made annually?

A     With the loss?

Q     Yes.

A     Maybe 30,000.

Q     Were you interested in this business because it made about $30,000 a year, or for some other reason?

MR. KATAEV:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  Can I answer?

THE COURT:  Yes, go ahead.

THE WITNESS:  No, no.

Q    Why were you interested in the business?

A    Just a potential that Greg saw in the amount of IMEs that occurred, and the amount of attorneys that we deal with that they used that type of service.

Q    And did ultimately you and Greg supply various names to Ms. Gelardi to try and prospect, as that term was used?

A    Yes.

Q    And as far as you're aware, did she prospect them successfully?

A    Yes.

Q    And the document that Your Honor had you look at, Exhibit 18, where you said you recognized 13 out of the 20 names on that list.

Were these some of the major advertising firms -- excuse me, I'll rephrase that.

Were these personal injury firms that had substantial advertising in the community during that period of time?

MR. KATAEV:  Objection.

THE COURT:  Overruled.

PROCEEDINGS                          92

THE WITNESS:  I don't recall the advertising.

Q    Were these some of the most successful personal injury firms in the city of New York?

MR. KATAEV:  Objection.

THE COURT:  Sustained.  Sustained.  He just said he doesn't know.

MR. WARNER:  I asked about advertisement, Judge.  I didn't ask him about success.

Q    Would these be some of the high reputation personal injury firms in the city?

MR. KATAEV:  Same objection.

THE COURT:  Overruled.

Did you know of these firms?

THE WITNESS:  I know that at least two of these firms are very large, as far as the amount of funding that Case Cash does with them.

MR. WARNER:  I have no further questions, Judge.

THE COURT:  I have one follow up.

You said that at some point Mr. Elefterakis or you, or through you, provided names of the attorneys you work with; is that right?

THE WITNESS:  Yes.

THE COURT:  When?  In relation to when you got involved with the business or a date, if you remember one?

THE WITNESS:  I would say it was late summer of

POLLAK - REDIRECT - MR. KATAEV                    93

2017.  I couldn't give you an exact date.

THE COURT:  But after you received this July email that we're talking about, which is Exhibit Number 35?

THE WITNESS:  Yeah.  Yeah.

THE COURT:  And did you provide names that went beyond the names that are on this list, if you recall?

THE WITNESS:  I believe so.

THE COURT:  Did you send that via email, or how did you do that?

THE WITNESS:  I don't recall.  Email.  Probably text.  Phone call.

THE COURT:  All right.

MR. KATAEV:  I just have one question on redirect.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. KATAEV:

Q    You testified that Safa would call you with names that you would then call Greg with, correct?

A    No.

Q    Earlier today Greg Elefterakis testified that he would get phone calls from you asking whether Greg is familiar with those firms, correct?

A    Yes.

Q    And you did that because Safa provided you those names, correct?

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

A    No.  I did that upon learning of this possible business, as I would come across names during, you know, Case Cash operating hours, I would ask him about those attorneys.

Q    And that's something you remembered today, correct?

A    Yes.

MR. KATAEV:  Okay.  No further questions.

THE COURT:  Okay.  All right.

Thank you very much.  You may step down.

(The witness steps down.)

THE COURT:  All right.  So let's go back -- I think, Mr. Warner, you wanted to address a couple of points.

MR. WARNER:  I did, Your Honor.  Thank you.

THE COURTROOM DEPUTY:  Mr. Warner, would you please use the microphone.

MR. WARNER:  I'm sorry.

THE COURT:  And let me just say this for Mr. Beibin's sake.

I do actually want to hear from you at some point. So, you know, maybe in fairness to the witnesses here, we should maybe hear from them first, and then I can hear argument.

So, Mr. Beibin -- is it Beibin?  Yeah, Mr. Beibin, if you'll come up and take the stand, I'd appreciate that.

MR. GENOVESI:  Judge, is it going to --

THE COURT:  You folks can sit down.  He's your

3:01 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2011

| | Jan - Dec 11 |
|---|---|
|  | |
| Wingate Russotti, Shapiro & Halperin, LLP | 149.00 |
| TOTAL | |

**IME Watchdog, Inc.**
# Sales by Customer Summary
**January through December 2012**

3:01 PM
02/14/22
Accrual Basis

|  | Jan - Dec 12 |
| --- | --- |
| Brown & Gropper, LLP | 849.00 |
| Cherny & Podolsky, PLLC | 5,004.00 |
| Georgaklis & Mallas, PLLC | 215.00 |
| Law Office of Sheryl Menkes | 2,114.75 |
| Law Offices of Costas M. Eliades, P.C. | 244.00 |

3:01 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2012

|  | Jan - Dec 12 |
|---|---|
|  |  |
| Newman, Anzalone & Newman, LLP | 149.00 |
|  |  |
| Silberstein Awad & Miklos | 683.00 |
| Silbowitz, Garafola, Silbowitz, Schatz | 1,713.00 |
|  |  |
| Wilson Grochow Druker | 545.00 |
| Wingate Russotti, Shapiro & Halperin, LLP | 5,086.00 |
| Zemsky & Salomon | 1,191.00 |
| TOTAL |  |

3:02 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2013

|  | Jan - Dec 13 |
|---|---|
| Appell & Parrinelli | 1,518.00 |
| Brown & Gropper, LLP | 1,769.00 |
| Cherny & Podolsky, PLLC | 7,416.00 |
| Georgaklis & Mallas, PLLC | 1,716.00 |
| Kahn Gordon Timko & Rodriques, P.C. | 298.00 |
| Khavinson & Associates, P.C. | 4,951.00 |
| Law Office of Joshua Brian Irwin, P.C. | 447.00 |
| Law Office of Sheryl Menkes | 986.00 |
| Law Office of Stephen Frankel | 2,449.00 |
| Law Offices of Bradley S. Hames, P.C. | 561.00 |

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2013

|  | Jan - Dec 13 |
| --- | --- |



| | |
| --- | --- |
| Newman, Anzalone & Newman, LLP | 149.00 |

| | |
| --- | --- |
| Silberstein Awad & Miklos | 9,233.00 |
| Silbowitz, Garafola, Silbowitz, Schatz | 1,763.00 |

| | |
| --- | --- |
| Subin Associates, LLP | 690.00 |

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2013

|  | Jan - Dec 13 |
|---|---|

| Wilson Grochow Druker | 1,518.00 |
| Wingate Russotti, Shapiro & Halperin, LLP | 13,767.00 |
| Zemsky & Salomon | 1,142.00 |
| **TOTAL** |  |

3:03 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2014

| | Jan - Dec 14 |
|---|---|
| Alan Blumen, P.C. | 376.00 |
| Appell & Parrinelli | 2,639.00 |
| Bornstein & Emanuel, P.C. | 383.00 |
| Brown & Gropper, LLP | 2,366.70 |
| Buttafuoco & Associates, PLLC | 2,781.00 |
| Caesar and Napoli, P.C. | 586.00 |
| Cherny & Podolsky, PLLC | 31,623.00 |
| Georgaklis & Mallas, PLLC | 1,306.00 |
| Kahn Gordon Timko & Rodriques, P.C. | 908.00 |
| Khavinson & Associates, P.C. | 7,647.00 |

3:03 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2014

|  | Jan - Dec 14 |
| --- | --- |



| Law Office of Sheryl Menkes | 2,875.00 |
| --- | --- |
| Newman, Anzalone & Newman, LLP | 415.00 |

3:03 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2014

|  | Jan - Dec 14 |
|---|---|
| Silberstein Awad & Miklos | 24,687.90 |
| Silbowitz, Garafola, Silbowitz, Schatz | 3,753.00 |
| Subin Associates, LLP | 86,982.00 |
| The Forzano Law Frim | 536.00 |
| Wilson Grochow Druker | 447.00 |
| Wingate Russotti, Shapiro & Halperin, LLP | 21,174.00 |

3:03 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2014

| | Jan - Dec 14 |
|---|---|
| Zaremba, Brownell & Brown, PLLC | 1,135.00 |
| Zemsky & Salomon | 5,332.00 |
| **TOTAL** | ████████ |

3:03 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2015

| | Jan - Dec 15 |
|---|---|
| Alan Blumen, P.C. | 5,400.00 |
| Appell & Parrinelli | 3,726.00 |
| Bergman, Bergman, Goldberg, Fields & | 7,855.10 |
| Bern Ripka, LLP | 239.00 |
| Block O'Toole & Murphy, LLP | 11,976.00 |
| Bornstein & Emanuel, P.C. | 9,484.00 |
| Brown & Gropper, LLP | 2,529.20 |
| Buttafuoco & Associates, PLLC | 4,060.00 |
| Caesar and Napoli, P.C. | 1,454.00 |
| Cellino & Barnes, P.C. | 1,239.00 |
| Cherny & Podolsky, PLLC | 73,867.00 |
| Chopra & Nocerino | 1,021.00 |
| Elefterakis, Elefterakis & Panek | 7,189.00 |
| Georgaklis & Mallas, PLLC | 1,836.00 |
| Gersowitz, Libo & Korek, P.C. | 11,152.50 |
| Greenberg Law, P.C. | 752.00 |

3:03 PM

02/14/22

Accrual Basis

**IME Watchdog, Inc.**
# Sales by Customer Summary
### January through December 2015

| | Jan - Dec 15 |
|---|---|
| Hill & Moin | 293.02 |
| Kahn Gordon Timko & Rodriques, P.C. | 993.00 |
| Khavinson & Associates, P.C. | 11,325.00 |
| Krinsky & Musumeci, Esqs, PLLC. | 891.00 |
| Law Office of Joshua Brian Irwin, P.C. | 13,952.00 |
| Law Offices of Jason A. Greenberg, P.C. | 1,096.10 |

3:03 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2015

|  | Jan - Dec 15 |
|---|---|
|  | |
| Newman, Anzalone & Newman, LLP | 1,386.00 |
| Pirrotti Law Firm LLC | 4,092.00 |
| Raskin & Kremins, LLP | 179.00 |
| Rosenberg & Rodriguez, PLLC | 406.00 |

3:03 PM

02/14/22

Accrual Basis

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2015

| | Jan - Dec 15 |
|---|---|
| Silberstein Awad & Miklos | 17,475.00 |
| Silbowitz, Garafola, Silbowitz, Schatz | 2,728.00 |
| | |
| Subin Associates, LLP | 172,786.00 |
| | |
| The Forzano Law Frim | 533.00 |
| | |
| The Selvin Law Firm, PLLC | 806.00 |
| | |
| Wilson Grochow Druker | 149.00 |
| Wingate Russotti, Shapiro & Halperin, LLP | 47,155.00 |
| | |
| Zaremba, Brownell & Brown, PLLC | 2,798.00 |
| Zemsky & Salomon | 6,821.00 |
| **TOTAL** | |

10:10 AM
04/04/25
Accrual Basis

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2016**

|  | Jan - Dec 16 |
|---|---|
| Alan Blumen, P.C. | 2,869.00 |
| Appell & Parrinelli | 2,197.00 |
| Bergman, Bergman, Goldberg, Fields & | 11,511.00 |
| Bern Ripka, LLP | 4,003.00 |
| Block O'Toole & Murphy, LLP | 29,268.00 |
| Bornstein & Emanuel, P.C. | 13,459.00 |
| Brian J. Levy & Assoc., PLLC | 7,549.00 |
| Brown & Gropper, LLP | 5,005.80 |
| Buttafuoco & Associates, PLLC | 3,092.00 |
| Caesar and Napoli, P.C. | 1,455.00 |
| Cellino & Barnes - Garden City | 866.00 |
| Cellino & Barnes, P.C. | 254.00 |
| Cellino & Barnes, P.C. - Melville | 8,596.00 |
| Cherny & Podolsky, PLLC | 60,760.00 |
| Chopra & Nocerino | 1,325.00 |

10:10 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2016**

|  | Jan - Dec 16 |
|---|---|
| ████████████████████████████████ |  |
| **Elefterakis, Elefterakis & Panek** | 16,423.00 |
| ████████████████████████████████ |  |
| **Georgaklis & Mallas, PLLC** | 2,659.00 |
| ████████████████████████████████ |  |
| **Geroulakis Law, P.C.** | 403.00 |
| ████████████████████████████████ |  |
| **Gersowitz, Libo & Korek, P.C.** | 6,537.20 |
| ████████████████████████████████ |  |

10:10 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2016**

|  | Jan - Dec 16 |
|---|---|
| **Khavinson & Associates, P.C.** | 28,585.50 |
| **Krinsky & Musumeci, Esqs, PLLC.** | 1,379.00 |
| **Law Office of Joshua Brian Irwin, P.C.** | 9,323.00 |
| **Law Office of Sheryl Menkes** | 0.00 |
| **Law Offices of Jason A. Greenberg. P.C.** | 1,243.00 |

10:10 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
**January through December 2016**

|  | Jan - Dec 16 |
|---|---|



| | |
|---|---|
| **Michael A. Forzano Esq.** | 6,303.00 |

| | |
|---|---|
| **Newman, Anzalone & Newman, LLP** | 558.00 |

10:10 AM
04/04/25
**Accrual Basis**

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2016

|  | Jan - Dec 16 |
|---|---|



| | |
|---|---|
| **Pirrotti Law Firm LLC** | 1,399.00 |
| **Rosenberg & Rodriguez, PLLC** | 2,597.00 |
| **Silberstein Awad & Miklos** | 30,543.80 |

**10:10 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
### January through December 2016

|  | Jan - Dec 16 |
|---|---|
| **Silbowitz, Garafola, Silbowitz, Schatz** | 8,620.00 |
| **Subin Associates, LLP** | 131,645.00 |
| **The Perecman Firm, PLLC** | 1,211.00 |
| **The Selvin Law Firm, PLLC** | 2,116.00 |
| **Wilson Grochow Druker** | 269.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 70,068.00 |
| **Zaremba Brown, PLLC** | 16,226.00 |

**10:10 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
**January through December 2016**

|  | Jan - Dec 16 |
|---|---|
| Zemsky & Salomon | 3,176.00 |
| TOTAL | ██████████ |

10:12 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2017**

|                                          | Jan - Dec 17 |
|------------------------------------------|-------------:|
| **Alan Blumen, P.C.**                    | 2,160.00     |
| **Alan S. Ripka & Associates**           | 2,884.00     |
| **Alex Yadgarov & Associates**           | 807.00       |
| **Appell & Parrinelli**                  | 332.00       |
| **Bergman, Bergman, Goldberg, Fields &** | 4,134.00     |
| **Bern Ripka, LLP**                      | 314.00       |
| **Block O'Toole & Murphy, LLP**          | 30,852.00    |
| **Bornstein & Emanuel, P.C.**            | 20,109.00    |
| **Brian J. Levy & Assoc., PLLC**         | 15,271.00    |
| **Brown & Gropper, LLP**                 | 8,636.00     |
| **Buttafuoco & Associates, PLLC**        | 4,392.00     |
| **Caesar and Napoli, P.C.**              | 2,246.00     |
| **Cellino & Barnes - Garden City**       | 473.00       |
| **Cellino & Barnes, P.C.**               | 4,232.00     |
| **Cellino & Barnes, P.C. - Melville**    | 7,881.00     |
| **Cherny & Podolsky, PLLC**              | 92,309.00    |
| **Chopra & Nocerino**                    | 1,438.00     |

**10:12 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2017**

|  | Jan - Dec 17 |
|---|---|
| **David B. Lever & Associates, PLLC** | 3,523.00 |
| **Elefterakis, Elefterakis & Panek** | 54,643.00 |
| **Georgaklis & Mallas, PLLC** | 4,815.00 |
| **Gersowitz, Libo & Korek, P.C.** | 5,397.70 |

**Page 2 of 7**

**10:12 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
January through December 2017

|                                          | Jan - Dec 17 |
|------------------------------------------|-------------:|
| Greenberg Law, P.C.                      | 1,209.00     |
| Gregory Spektor & Associates, P.C.       | 6,909.00     |
| Hill & Moin, LLP                         | 139.99       |
| JAG Law                                  | 893.00       |
| Khavinson & Associates, P.C.             | 34,580.00    |
| Krinsky & Musumeci, Esqs, PLLC.          | 2,400.00     |

**10:12 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2017**

Jan - Dec 17

| | |
|---|---|
| **Law Office of Sheryl Menkes** | 1,179.00 |
| **Law Office of Victoria Wickman** | 572.00 |
| **LIAKAS LAW, P.C.** | 6,579.00 |

10:12 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
**January through December 2017**

|  | Jan - Dec 17 |
|---|---|
| **Matthew J. Salimbene, P.C.** | 528.00 |
| **Mikhail Ilyaich & Associates, P.C.** | 358.00 |
| **Newman, Anzalone & Newman, LLP** | 1,798.00 |
| **Pirrotti Law Firm LLC** | 1,653.00 |

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2017**

Jan - Dec 17

**Rosenberg & Rodriguez, PLLC**

| | |
|---|---|
| **Silberstein Awad & Miklos** | 22,936.00 |
| **Silbowitz, Garafola, Silbowitz, Schatz** | 3,041.00 |
| **Subin Associates, LLP** | 94,977.00 |

**Page 6 of 7**

10:12 AM
04/04/25
Accrual Basis

**IME Watchdog, Inc.**
**Sales by Customer Summary**
January through December 2017

|  | Jan - Dec 17 |
|---|---|
| ███████████████████ | |
| **The Forzano Law Firm** | 3,052.00 |
| ███████████████████ | |
| **The Law Firm of Davidoff & Associates** | 672.00 |
| ███████████████████ | |
| **The Perecman Firm, PLLC** | 13,111.00 |
| ███████████████████ | |
| **The Selvin Law Firm, PLLC** | 1,807.00 |
| ███████████████████ | |
| **William Schwitzer & Associates** | 493.00 |
| **Wilson Grochow Druker** | 224.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 93,988.00 |
| ███████████████████ | |
| **Yakov Mushiyev & Associates** | 453.00 |
| ███████████████████ | |
| **Zaremba Brown, PLLC** | 19,069.00 |
| **Zemsky & Salomon** | 6,541.00 |
| **TOTAL** | ████████ |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 98 of 305 PageID
#: 13152

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2018**

|  | Jan - Dec 18 |
|---|---|
| **Alan S. Ripka & Associates** | 5,651.00 |
| **Alex Yadgarov & Associates** | 1,657.00 |
| **Appell & Parrinelli** | 1,620.00 |
| **Bergman, Bergman, Goldberg, Fields &** | 11,512.00 |
| **Block O'Toole & Murphy, LLP** | 13,160.00 |
| **Bogoraz Law Group** | 448.00 |
| **Bornstein & Emanuel, P.C.** | 12,141.00 |
| **Brian J. Levy & Assoc., PLLC** | 24,657.00 |
| **Brown & Gropper, LLP** | 12,203.40 |
| **Buttafuoco & Associates, PLLC** | 3,389.90 |
| **Caesar and Napoli, P.C.** | 2,152.00 |
| **Cellino & Barnes - Garden City** | 2,499.00 |
| **Cellino & Barnes, P.C.** | 1,295.00 |
| **Cellino & Barnes, P.C. - Melville** | 5,820.00 |

**10:12 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
**January through December 2018**

| | Jan - Dec 18 |
|---|---|
| **Cherny & Podolsky, PLLC** | 7,686.00 |
| **Chopra & Nocerino** | 2,681.00 |
| **Clay M. Evall, Esq, P.C.** | 855.00 |
| **Elefterakis, Elefterakis & Panek** | 3,687.00 |

10:12 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
**January through December 2018**

|  | Jan - Dec 18 |
|---|---|
| **Georgaklis & Mallas, PLLC** | 4,320.00 |
| **Gersowitz, Libo & Korek, P.C.** | 5,526.30 |
| **Hill & Moin, LLP** | 737.99 |
| **Kahn Gordon Timko & Rodriques, P.C.** | 1,600.00 |
| **Khavinson & Associates, P.C.** | 1,840.50 |

**10:12 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2018**

|  | Jan - Dec 18 |
|---|---|
| ███████████████ | |
| Law Office of Joshua Brian Irwin, P.C. | 11,567.00 |
| ███████████████ | |
| Law Office of Victoria Wickman | 829.00 |
| Law Offices of Arcia & Associates, P.C. | 2,672.00 |
| ███████████████ | |
| Law Offices of Costas M. Eliades, P.C. | 179.00 |
| ███████████████ | |

10:12 AM
04/04/25
**Accrual Basis**

# IME Watchdog, Inc
## Sales by Customer Summary
### January through December 2018

**Jan - Dec 18**



| **Lever & Ecker PLLC** | 8,249.00 |
|---|---|



| **Matthew J. Salimbene, P.C.** | 4,242.00 |
|---|---|

**Page 5 of 8**

10:12 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2018**

| | Jan - Dec 18 |
|---|---|
| **Newman, Anzalone & Newman, LLP** | 4,721.00 |
| **Pirrotti Law Firm LLC** | 2,191.00 |

**IME Watchdog, Inc.**
## Sales by Customer Summary
### January through December 2018

| | Jan - Dec 18 |
|---|---|
| | |
| **Rosenberg & Rodriguez, PLLC** | 1,050.00 |
| | |
| **Silberstein Awad & Miklos** | 32,721.80 |
| **Silbowitz, Garafola, Silbowitz, Schatz** | -1,671.00 |

**10:12 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
*January through December 2018*

|  | Jan - Dec 18 |
|---|---|
| ███████████████ |  |
| **The Forzano Law Firm** | 1,266.00 |
| ███████████████ |  |
| **The Perecman Firm, PLLC** | 10,055.00 |
| ███████████████ |  |
| **The Selvin Law Firm, PLLC** | 5,326.00 |
| **The Tarver Law Firm** | 179.00 |
| ███████████████ |  |
| **Wilson Grochow Druker** | 862.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 106,447.00 |
| ███████████████ |  |
| **Yakov Mushiyev & Associates** | 1,173.00 |
| ███████████████ |  |
| **Zaremba Brown, PLLC** | 20,835.00 |
| **Zemsky & Salomon** | 10,068.00 |
| **TOTAL** | ████████ |

**10:13 AM**
**04/04/25**
**Accrual Basis**

# IME Watchdog, Inc
## Sales by Customer Summary
### January through December 2019

|  | Jan - Dec 19 |
|---|---|
| **Alan S. Ripka & Associates** | 9,750.00 |
| **Appell & Parrinelli** | 3,795.00 |
| **Ariel Aminov** | 1,690.00 |
| **Bergman, Bergman, Goldberg, Fields &** | 456.00 |
| **Block O'Toole & Murphy, LLP** | 44,406.00 |
| **Bogoraz Law Group** | 1,010.00 |
| **Bornstein & Emanuel, P.C.** | 16,372.00 |
| **Brian J. Levy & Assoc., PLLC** | 31,874.00 |
| **Brown & Gropper, LLP** | 13,998.50 |
| **Buttafuoco & Associates, PLLC** | 3,544.00 |
| **Cellino & Barnes - Garden City** | 483.00 |
| **Cellino & Barnes, P.C. - Melville** | 1,434.00 |

**10:13 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2019**

|  | Jan - Dec 19 |
|---|---|
| **Cherny & Podolsky, PLLC** | 1,098.00 |
| **Chopra & Nocerino** | 6,751.00 |
| **Douglas & London** | 4,758.00 |
| **Georgaklis & Mallas, PLLC** | 5,696.00 |
| **Gersowitz, Libo & Korek, P.C.** | 8,594.70 |
| **Ginarte Gallardo Gonzalez Winograd L.L.P.** | 16,271.00 |

**10:13 AM**
**04/04/25**
**Accrual Basis**

# IME Watchdog, Inc
## Sales by Customer Summary
### January through December 2019

**Jan - Dec 19**



| | |
|---|---|
| **Hill & Moin, LLP** | 2,964.00 |



| | |
|---|---|
| **Kahn Gordon Timko & Rodriques, P.C.** | 456.00 |

| | |
|---|---|
| **Kohan Law Group** | 993.00 |

| | |
|---|---|
| **Law Office of Boris H. Linares, P.C.** | 17,549.00 |

**10:13 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2019**

Jan - Dec 19



| | |
|---|---|
| **Law Office of Joshua Brian Irwin, P.C.** | 5,487.00 |
| **Law Offices of Arcia & Associates, P.C.** | 6,447.00 |
| **Law Offices of Costas M. Eliades, P.C.** | 2,717.00 |

**10:13 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2019**

|  | Jan - Dec 19 |
|---|---|
| **Lever & Ecker PLLC** | 1,579.00 |
| **Matthew J. Salimbene, P.C.** | 4,698.00 |
| **Miraglia Law** | 358.00 |
| **Newman, Anzalone & Newman, LLP** | 13,017.00 |

10:13 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2019**

|  | Jan - Dec 19 |
|---|---|
| **Oresky & Associates, PLLC** | 5,321.00 |
| **Pinkhasov Law** | 491.00 |
| **Raskin & Kremins, LLP** | 1,045.00 |
| **Rosenberg & Rodriguez, PLLC** | 463.00 |

**10:13 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2019**

Jan - Dec 19



| | |
|---|---|
| **Silberstein Awad & Miklos** | 27,554.00 |
| **Silbowitz, Garafola, Silbowitz, Schatz** | 456.00 |

**10:13 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2019**

| | Jan - Dec 19 |
|---|---|
| The Forzano Law Firm | 1,779.00 |
| The Law Firm of Davidoff & Associates | 358.00 |
| The Perecman Firm, PLLC | 15,207.00 |
| The Selvin Law Firm, PLLC | 4,855.00 |
| Weitz Pascale | 4,006.00 |
| Wilson Grochow Druker | 1,039.00 |
| Wingate, Russotti, Shapiro, Moses & Halpe | 143,200.00 |
| Yakov Mushiyev & Associates | 1,594.00 |
| Zaremba Brown, PLLC | 8,748.00 |
| Zemsky & Salomon | 636.00 |
| **TOTAL** | |

**10:13 AM**
**04/04/25**
**Accrual Basis**

# IME Watchdog, Inc.
# Sales by Customer Summary
### January through December 2020

|                                     | Jan - Dec 20 |
|-------------------------------------|-------------:|
| **Appell & Parrinelli**             |     1,315.00 |
| **Block O'Toole & Murphy, LLP**     |    31,657.00 |
| **Bogoraz Law Group**               |     7,717.00 |
| **Bornstein & Emanuel, P.C.**       |     9,500.00 |
| **Brian J. Levy & Assoc., PLLC**    |    15,966.00 |
| **Brown & Gropper, LLP**            |     4,841.00 |
| **Buttafuoco & Associates, PLLC**   |    10,800.00 |
| **Caesar and Napoli, P.C.**         |    12,063.00 |
| **Chopra & Nocerino**               |     7,524.00 |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 115 of 305 PageID #: 13170

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2020

|  | Jan - Dec 20 |
|---|---|

| **Douglas & London** | 4,068.00 |
| **Gersowitz, Libo & Korek, P.C.** | 3,296.00 |
| **Ginarte Gallardo Gonzalez Winograd L.L.P.** | 4,068.00 |

10:13 AM
04/04/25
Accrual Basis

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2020**

|  | Jan - Dec 20 |
|---|---|
| ⬛ |  |
| **Hill & Moin, LLP** | 3,386.00 |
| ⬛ |  |
| **JAG Law** | 1,191.00 |
| ⬛ |  |
| **Kahn Gordon Timko & Rodriques, P.C.** | 1,400.00 |
| ⬛ |  |
| **Khavinson & Associates, P.C.** | 179.00 |
| **Kohan Law Group** | 393.00 |
| ⬛ |  |
| **Law Office of Boris H. Linares, P.C.** | 7,740.00 |

**10:13 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2020**

Jan - Dec 20

| | |
|---|---:|
| **Law Office of Joshua Brian Irwin, P.C.** | 1,811.00 |

| | |
|---|---:|
| **Law Offices of Arcia & Associates, P.C.** | 4,831.00 |

| | |
|---|---:|
| **Law Offices of Costas M. Eliades, P.C.** | 1,107.00 |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 118 of 305 PageID #: 13173

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2020

|  | Jan - Dec 20 |
|---|---|
|  | |
| **Magendzo Law P.C.** | 537.00 |
| **Matthew J. Salimbene, P.C.** | 2,062.00 |
| **Miraglia Law** | 179.00 |
| **Newman, Anzalone & Newman, LLP** | 7,859.00 |
| **Oresky & Associates, PLLC** | 4,595.00 |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 119 of 305 PageID #: 13174

# IME Watchdog, Inc.
## Sales by Customer Summary
**January through December 2020**

**Jan - Dec 20**



| | |
|---|---|
| **Pinkhasov Law** | 586.00 |



| | |
|---|---|
| **Raskin & Kremins, LLP** | 424.00 |

10:13 AM
04/04/25
**Accrual Basis**

# IME Watchdog, Inc.
## Sales by Customer Summary
### January through December 2020

|  | Jan - Dec 20 |
|---|---|
| **Silberstein Awad & Miklos** | 8,640.00 |
| **Silbowitz, Garafola, Silbowitz, Schatz** | 229.00 |
| **The Forzano Law Firm** | 1,042.00 |
| **The Law Firm of Davidoff & Associates** | 214.00 |

**IME Watchdog, Inc.**

**Sales by Customer Summary**

**January through December 2020**

| | Jan - Dec 20 |
|---|---|
| ████████ | ████ |
| The Perecman Firm, PLLC | 7,922.00 |
| ████████ | |
| The Selvin Law Firm, PLLC | 2,240.00 |
| ████████ | |
| Weitz Pascale | 1,671.00 |
| ████████ | |
| Wilson Grochow Druker | 2,227.00 |
| Wingate, Russotti, Shapiro, Moses & Halpe | 85,830.00 |
| ████████ | |
| Zemsky & Salomon | 229.00 |
| **TOTAL** | ████ |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 122 of 305 PageID #: 13177

# IME Watchdog, Inc.

## Sales by Customer Summary

### January through December 2021

| | Jan - Dec 21 |
|---|---|
| **Appell & Parrinelli** | 3,352.00 |
| **Block O'Toole & Murphy, LLP** | 26,712.00 |
| **Blumen & Shayne, PLLC** | 4,147.00 |
| **Bogoraz Law Group** | 13,856.00 |
| **Bornstein & Emanuel, P.C.** | 9,500.00 |
| **Brian J. Levy & Assoc., PLLC** | 20,141.00 |
| **Caesar and Napoli, P.C.** | 20,987.00 |
| **Cherny & Podolsky, PLLC** | 179.00 |
| **Chernyy & Associates, P.C.** | 179.00 |
| **Chopra & Nocerino** | 11,283.00 |

**IME Watchdog, Inc**
# Sales by Customer Summary
**January through December 2021**

Jan - Dec 21



| | |
|---|---|
| **Geroulakis Law, P.C.** | 782.00 |
| **Gersowitz, Libo & Korek, P.C.** | 3,033.00 |

**IME Watchdog, Inc**
## Sales by Customer Summary
**January through December 2021**

| | Jan - Dec 21 |
|---|---|
| | |
| **Gropper & Nejat PLLC** | 1,149.00 |
| | |
| **Hill & Moin, LLP** | 7,277.00 |
| | |
| **Kahn Gordon Timko & Rodriques, P.C.** | 3,643.00 |
| | |
| **Kohan Law Group** | 506.00 |
| | |

**10:14 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
**January through December 2021**

| | Jan - Dec 21 |
|---|---|
| **Law Office of Boris H. Linares, P.C.** | 582.00 |
| **Law Offices of Arcia & Associates, P.C.** | 3,395.00 |
| **Law Offices of Costas M. Eliades, P.C.** | 3,562.00 |

10:14 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
**Sales by Customer Summary**
**January through December 2021**

Jan - Dec 21



| | |
|---|---|
| **Matthew J. Salimbene, P.C.** | 2,585.00 |

10:14 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc.**
## Sales by Customer Summary
**January through December 2021**

| | Jan - Dec 21 |
|---|---|
| **Newman, Anzalone & Newman, LLP** | 8,914.00 |
| **Oresky & Associates, PLLC** | 12,071.00 |
| **Pinkhasov Law** | 1,937.00 |
| **Rizzuto Law Firm** | 1,329.00 |
| **Rosenberg & Rodriguez, PLLC** | 1,983.00 |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 128 of 305 PageID #: 13188

**IME Watchdog, Inc**
## Sales by Customer Summary
**January through December 2021**

**Jan - Dec 21**



| | |
|---|---:|
| **The Forzano Law Firm** | 2,691.00 |
| **The Gucciardo Law Firm, PLLC** | 536.00 |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 129 of 305 PageID #: 13184

**IME Watchdog, Inc**
## Sales by Customer Summary
### January through December 2021

|  | Jan - Dec 21 |
|---|---|
| ██████████████ |  |
| **The Law Firm of Davidoff & Associates** | 2,655.00 |
| ██████████████ |  |
| **The Perecman Firm, PLLC** | 6,847.00 |
| ██████████████ |  |
| **The Selvin Law Firm, PLLC** | 4,861.00 |
| ██████████████ |  |
| **Wilson Grochow Druker** | 4,337.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 154,294.00 |
| ██████████████ |  |
| **TOTAL** |  |

10:15 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2022**

|  | Jan - Dec 22 |
|---|---|
| **Appell & Parrinelli** | 995.00 |
| **Block O'Toole & Murphy, LLP** | 30,525.00 |
| **Blumen & Shayne, PLLC** | 4,301.00 |
| **Bornstein & Emanuel, P.C.** | 9,300.00 |
| **Brian J. Levy & Assoc., PLLC** | 30,001.00 |
| **Caesar and Napoli, P.C.** | 21,703.00 |

10:15 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2022**

|  | Jan - Dec 22 |
|---|---|
| ▮▮▮▮▮▮▮▮ |  |
| **Chernyy & Associates, P.C.** | 945.00 |
| **Chopra & Nocerino** | 16,183.00 |
| ▮▮▮▮▮▮▮▮ |  |
| **Douglas & London** | 6,251.00 |
| ▮▮▮▮▮▮▮▮ |  |

10:15 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2022**

| | Jan - Dec 22 |
|---|---|
| **Georgaklis & Mallas, PLLC** | 3,621.00 |
| **Geroulakis Law, P.C.** | 1,452.00 |
| **Gersowitz, Libo & Korek, P.C.** | 1,439.00 |
| **Gropper & Nejat PLLC** | 9,613.00 |
| **Hill & Moin, LLP** | 7,530.00 |

**10:15 AM**
**04/04/25**
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2022**

Jan - Dec 22



| | |
|---|---|
| **Kahn Gordon Timko & Rodriques, P.C.** | 1,663.00 |
| **Krinsky & Musumeci, Esqs, PLLC.** | 995.00 |
| **Law Office of Boris H. Linares, P.C.** | 3,042.00 |

10:15 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2022**

|  | Jan - Dec 22 |
|---|---|
| ▮▮▮▮▮▮▮▮ |  |
| **Law Office of Joshua Brian Irwin, P.C.** | 8,179.00 |
| ▮▮▮▮▮▮▮▮ |  |
| **Law Office of Victoria Wickman** | 413.00 |
| ▮▮▮▮▮▮▮▮ |  |
| **Law Offices of Arcia & Associates, P.C.** | 3,511.00 |
| ▮▮▮▮▮▮▮▮ |  |
| **Law Offices of Costas M. Eliades, P.C.** | 4,984.00 |

10:15 AM
04/04/25
**Accrual Basis**

**IME Watchdog, Inc**
**Sales by Customer Summary**
**January through December 2022**

Jan - Dec 22



**10:15 AM**
**04/04/25**
**Accrual Basis**

# IME Watchdog, Inc
## Sales by Customer Summary
### January through December 2022

|  | Jan - Dec 22 |
|---|---|
| **Newman, Anzalone & Newman, LLP** | 9,722.00 |
| **Oresky & Associates, PLLC** | 30,978.00 |
| **Pinkhasov Law** | 543.00 |
| **Raskin & Kremins, LLP** | 5,385.00 |
| **Rizzuto Law Firm** | 1,378.00 |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 137 of 305 PageID #: 13192

**IME Watchdog, Inc.**

## Sales by Customer Summary

**January through December 2022**

|  | Jan - Dec 22 |
|---|---|
| **Rosenberg & Rodriguez, PLLC** | 1,265.00 |



|  |  |
|---|---|
| **Silberstein Awad & Miklos** | 21,143.00 |
| **Silbowitz, Garafola, Silbowitz, Schatz** | 7,588.00 |

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 138 of 305 PageID #: 13198

**IME Watchdog, Inc**
## Sales by Customer Summary
### January through December 2022

|  | Jan - Dec 22 |
|---|---|
| **The Forzano Law Firm** | 7,644.00 |
| **The Law Firm of Davidoff & Associates** | 3,840.00 |
| **The Perecman Firm, PLLC** | 14,373.00 |
| **The Selvin Law Firm, PLLC** | 3,088.00 |

10:15 AM
04/04/25
**Accrual Basis**

# IME Watchdog, Inc
## Sales by Customer Summary
### January through December 2022

|  | Jan - Dec 22 |
| --- | --- |



| | |
| --- | --- |
| **Wilson Grochow Druker** | 2,269.00 |
| **Wingate, Russotti, Shapiro, Moses & Halpe** | 202,195.00 |
| **Yakov Mushiyev & Associates** | 869.00 |
| **Zaremba Brown, PLLC** | 2,778.00 |
| **TOTAL** | |

 Gmail

**Safa Gelardi <safagelardi@gmail.com>**

## IME Watchdog for March 2017

3 messages

**Adam Rosenblatt** <adammrosenblatt@gmail.com>                    Fri, Apr 28, 2017 at 3:48 PM
To: safagelardi@gmail.com

Hi Safa,

Attached please find a breakdown of March 2017. Including the monthly P&L,  list of  clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs what we billed, etc.

Thank you

Adam M. Rosenblatt

---

Safa Gelardi <safagelardi@gmail.com> To: Steven Siegler <steven@kilegal.com>>                    Fri, Mar 11, 2022 at 2:55 PM

Steve,

Take a look at this. Adam sent this to me when he was trying to convince me to go into business with him.

There seems to be a lot of financial and operational information in here. I think it may become important, let's review it and talk about it tomorrow.

Safa

Sent from my iPhone

Begin forwarded message:

From: Adam Rosenblatt <adammrosenblatt@gmail.com>
Date: April 28, 2017 at 4:48:17 PM EDT
To: safagelardi@gmail.com
Subject: IME Watchdog for March 2017



**Safa Gelardi <safagelardi@gmail.com>**

## IME Watchdog P&L Last 3 years

6 messages

---

**Adam Rosenblatt** <adammrosenblatt@gmail.com>                    Fri, Apr 28, 2017 at 3:15 PM
To: safagelardi@gmail.com

Good evening Safa,

As per our discussion attached please find the P&L for IME Watchdog for the last three years.

I would like for you to really understand that this company could have achieved an even greater success had any reinvestment been made or if a serious marketing strategy been established.

Thank you,

Adam M. Rosenblatt

---

**3 attachments**

---

Safa Gelardi <safagelardi@gmail.com> To: Steven Siegler                    Fri, Mar 11, 2022 at 3:35 PM
<steven@kilegal.com>>

Steve, please look at these also, talk to you tomorrow

Sent from my iPhone

Begin forwarded message:

> **From:** Adam Rosenblatt <adammrosenblatt@gmail.com>
> **Date:** April 28, 2017 at 4:15:59 PM EDT
> **To:** safagelardi@gmail.com
> **Subject: IME Watchdog P&L Last 3 years**
>
> Good evening Safa,
>
> As per our discussion attached please find the P&L for IME Watchdog for the last three years.
>
> I would like for you to really understand that this company could have achieved an even greater success had any reinvestment been made or if a serious marketing strategy been established.
>
> Thank you,
>
> Adam M. Rosenblatt

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

**IME WATCHDOG, INC.,**
Plaintiff,

-against-

**SAFA GELARDI, VITO GELARDI, and IME COMPANIONS LLC,**
Defendants.

Case No. 1:22-cv-01032-PKC-JRC

**DECLARATION OF SAFA GELARDI IN OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT DAMAGES AND PERMANENT INJUNCTIVE RELIEF**

I, Safa Gelardi, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am a Defendant in this action. I submit this declaration in opposition to Plaintiff IME WatchDog, Inc.'s motion for default judgment damages, punitive damages, prejudgment interest, attorneys' fees, costs, and permanent injunctive relief. I have personal knowledge of the facts stated below, except where stated on information and belief, and if called as a witness, I could testify competently to them.

2. This declaration relies on my personal knowledge, IME Companions records, documents filed in this action, documents produced or used in this litigation, public records, and materials I reviewed and discussed in depth with former counsel before compliance with Court directives requiring return, destruction, confidentiality, and restricted use of WatchDog materials. I do not attach restricted internal WatchDog financial materials, including the March 2017 memorandum, because of those prior Court directives. I instead refer to non-restricted record evidence, Adam Rosenblatt's emails confirming the existence and categories of WatchDog financial records, my review with former counsel before compliance with the Court's directives, and Plaintiff's control of the underlying WatchDog records.

3. Based on my review with former counsel before compliance with the Court's directives, and consistent with the P&L figures addressed in this litigation, WatchDog's historical P&Ls reflected the following: in 2014, WatchDog had $525,199.40 in sales income and a net loss of $42,539.82; in 2015, WatchDog had $835,016.90 in sales income and only $69,800.66 in net income; and in 2016, WatchDog had $969,699.84 in sales income and only $74,557.42 in net income. Together, those figures show $2,329,916.14 in sales income and only $101,818.26 in net income from 2014 through 2016, an approximate 4.37% aggregate margin. The 2015 margin was approximately 8.36%, and the 2016 margin was approximately 7.69%. If WatchDog had actually generated a 50% margin on

the same $2,329,916.14 in sales income, it would have generated $1,164,958.07 in net income. It did not. The difference between a 50% margin and the $101,818.26 in actual net income reflected in those historical figures is $1,063,139.81.

4. Adam Rosenblatt sent a separate April 28, 2017 email titled "IME Watchdog for March 2017." That email transmitted a March 2017 WatchDog operating package and stated that the package included the monthly P&L, client list, list of all IMEs covered, WatchDog invoices, and a pay-versus-billed breakdown. Based on my review of the March 2017 WatchDog materials with former counsel before compliance with the Court's directives, those materials reflected that WatchDog handled 516 IMEs in March 2017, that Zariz received $25,000 that month, and that Zariz was already at $75,000 year-to-date. The March package also included or referenced the March P&L with prior-year comparison and YTD, bank-account records, WatchDog payroll with IME breakdowns, client information, projected cash-flow materials, and pay-versus-billed records. I do not attach the March 2017 memorandum or restricted internal WatchDog financial materials to this declaration because of prior Court directives.

5. Based on my review with former counsel before compliance with the Court's directives, WatchDog's historical records reflected major entries that directly affect net profit. The 2014 P&L reflected approximately $183,314.13 in distributions to DLA. The 2015 P&L reflected approximately $165,000 in distributions to DLA, a separate $25,000 entry booked to Daniella Levi, and approximately $90,000 to Zariz. The 2016 P&L reflected approximately $220,000 to Zariz. The March 2017 WatchDog materials reviewed with former counsel further reflected another $25,000 to Zariz in March 2017 and $75,000 to Zariz year-to-date.

6. Based on my review with former counsel before compliance with the Court's directives, the March 2017 WatchDog operating materials reflected 516 IMEs in March 2017. Of those listed March 2017 IMEs, only two New Jersey IMEs were listed, and no Connecticut IMEs were listed. That is why I dispute Plaintiff's request for a permanent injunction barring IME-observation work in New York, New Jersey, and Connecticut.

7. I reviewed IME Companions' filed tax-return excerpts for 2018 through 2021. In 2018, IME Companions reported $358,183 in gross receipts and $120,153 in ordinary business income. In 2019, IME Companions reported $505,825 in gross receipts and $125,359 in ordinary business income. In 2020, IME Companions reported $638,175 in gross receipts and $181,807 in ordinary business income. In 2021, IME Companions reported $822,103 in gross receipts and $333,329 in ordinary business income. Those margins were approximately 33.5%, 24.8%, 28.5%, and 40.5%. Those figures show that gross receipts are not profits. They are also IME Companions' figures, not WatchDog's figures.

8. IME Companions generated business through independent marketing and ordinary business-development efforts. IME Companions performed attorney-event outreach,

including NYSTLA/SITLA-related outreach, sent follow-up emails after events, used marketing materials and sample reports, and marketed its portal, services, languages, reports, professionalism, ownership, pricing, and reliability. IME Companions also paid for professional marketing infrastructure, including a July 2020 Marketing 360 agreement with a $1,195 monthly recurring total, Madwire/Marketing 360 invoices in January, February, and March 2022 showing $1,034.07 invoice totals and $0 balances, and an August 2022 Giant Partners campaign for $7,250 with recurring monthly terms.

9. Plaintiff's customer materials included firms Defendants never serviced, never billed, and never received revenue from. Defendants identified more than two dozen such firms, including William Schwitzer & Associates, Cherny & Podolsky, Kahn Gordon Timko & Rodriguez, Gersowitz Libo & Korek, Cellino & Barnes, Miraglia Law, Blumen & Shayne PLLC, and the Rizzuto Law Firm. Plaintiff's own "Clients that Never Returned" summary listed Bogoraz Law Group, Elefterakis, Elefterakis & Panek, Liakas Law P.C., Khavinson & Associates, Zaremba Brown, and Subin Associates, each at $0.00. Based on my review of NYSCEF-filed IME reports and related materials, firms associated with Plaintiff's alleged customer universe used other legal representatives and IME-observation providers, including matters involving Khavinson & Associates, Zaremba Brown, Liakas Law, and Client Liaison Services.

10. During a damages-discovery conference with Judge Cho, with Plaintiff's counsel on the call, Judge Cho directed me to examine Plaintiff's damages summaries and specifically pointed me to Wingate because Plaintiff's own records showed Wingate's WatchDog revenue increased over the listed years. After that conference, Defendants reviewed Plaintiff's customer summaries and raised the damages defects in their August 16, 2025 discovery follow-up to Judge Cho. Plaintiff's own Sales by Customer Summary records showed that Wingate continued paying WatchDog and increased revenue over time: $70,068 in 2016, $93,988 in 2017, $106,447 in 2018, $143,200 in 2019, $154,294 in 2021, and $202,195 in 2022.

11. I disputed Plaintiff's attribution of the June 13, 2025 Jeannie Tam / Morgan & Morgan IME to Mark Purificati and Defendants. Defendants sought a narrow Rule 45 subpoena to Morgan & Morgan to test who was requested, retained, assigned, confirmed, invoiced, paid, or expected to appear for that one IME. In Defendants' March 29, 2026 letter motion, Defendants explained their position that Morgan & Morgan requested WatchDog coverage, that WatchDog confirmed a WatchDog representative, that a WatchDog report was generated, and that WatchDog invoiced Morgan & Morgan for the IME. The subpoena was denied after contempt was decided in Defendants' favor. Plaintiff did not submit an affidavit from Morgan & Morgan, a WatchDog scheduler, or the WatchDog representative to verify Plaintiff's attribution.

12. I reviewed Plaintiff's damages memorandum and supporting papers. Plaintiff did not submit complete WatchDog P&Ls, tax returns, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, distribution records, Zariz records, DLA-related records, cash-flow records, or accountant reconciliation supporting the claimed 50% margin.

13. Plaintiff controls WatchDog's books and records. Plaintiff controls the WatchDog P&Ls, tax returns, general ledgers, expense ledgers, payroll records, observer-payment records, bank records, cash-flow records, Zariz records, DLA-related records, distribution records, invoices, pay-versus-billed records, and related financial materials. Defendants cannot attach restricted WatchDog materials because of prior Court directives, but Plaintiff can submit its own records under seal or for in camera review if those records support Plaintiff's claimed margin.

14. Plaintiff sought additional time in connection with records it claimed it still needed for its default-judgment damages submission. The Court granted Plaintiff a 90-day extension and leave to move to compel production. Plaintiff then filed its damages motion without filing the contemplated motion to compel and without obtaining the records it had just sought leave to compel.

15. Plaintiff's damages papers do not identify the recipient behind the one-word "Zariz" entries in WatchDog's P&Ls. Plaintiff did not identify Zariz Shipuzim Ltd., Company Number 511511701, any different Zariz entity, any individual recipient, services provided, invoices, contracts, bank records, tax treatment, payment records, ledgers, or proof of services explaining the Zariz entries.

16. I obtained Israeli corporate records relating to ZARIZ SHIPUZIM LTD. through the Israeli Corporations Authority / Registrar of Companies system. The Certificate of Incorporation identifies ZARIZ SHIPUZIM LTD., Company Number 511511701, as an Israeli limited-liability company incorporated on October 25, 1990. The Israeli Corporations Authority Company Registry Extract identifies the same company, lists its legal status as "Dissolved by court order," and records status changes showing court-ordered liquidation on November 15, 1992 and liquidation by court order on April 15, 1997, under Court Order Number 0021292 in Tel Aviv.

17. If Plaintiff contends that ZARIZ SHIPUZIM LTD. is not the Zariz reflected in WatchDog's P&Ls, Plaintiff has not identified the correct Zariz recipient or submitted the records needed to test the entries. Plaintiff still has not identified invoices, contracts, bank records, tax records, payment records, ledgers, or proof of services explaining who received the money, why WatchDog paid it, or how those entries affect WatchDog's claimed 50% margin.

18. Plaintiff's customer-overlap theory does not account for ordinary market movement, customer dissatisfaction, use of multiple providers, firms that never paid Defendants, firms that continued paying WatchDog, firms that used other providers, or customers generated through Defendants' independent marketing efforts.

19. Based on my review of the records cited in Defendants' opposition and the materials discussed above, Plaintiff's damages motion does not prove WatchDog's actual lost net profits, a reliable WatchDog profit margin, customer-specific causation, Companions' net unjust enrichment, a reasonable royalty, or a factual basis for a permanent tri-state occupational ban.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 22, 2026
New York, New York

 Outlook

---

**Fwd: IME Watchdog**

---

██ ████████████████

██ ████████████

█ ████████████████████

T████████████████████████████████████████

████ ██████ ██████ ██████

From: **Daniella Levi** <daniellalevi@levilawny.com>
Date: Tue, Jan 24, 2023 at 1:15 PM
Subject: IME Watchdog
To: karine@blglegal.com <karine@blglegal.com>
Cc: Daniella Levi <daniellalevi@levilawny.com>

Dear Ms. Bogoraz,

I hope you're doing well. As you may recall, my name is Daniella Levi and I am a personal injury attorney as well. I wanted to reach out to you because I noticed that we have much in common, attended Pace Law School, earned a degree in finance and started our own business in a male dominated industry. I respect and admire your success and dedication and was hoping to win your business back as I know you have used our services in the past.

I wanted to remind you of the high quality services offered by IME Watchdog. As the first and largest IME company in New York, covering over 1,000 exams per month, we have a proven track record of success. We have successfully changes the law in all four departments to allow plaintiffs to be represented during insurance medical exams by an non attorney advocate. Our team of personal injury lawyers, including myself train all of our watchdogs to provide the highest quality reports that meet the standards of the legal profession while zealously protecting the plaintiffs. In addition, our watchdogs make sure your clients do not waste time waiting around unnecessarily at the IME doctors' offices and are available to translate in multiple languages,

I would like to offer you our services at the reduced rate of $165 for the first hour and $45 for each additional half hour in an effort to win back your business. Our 100% satisfaction rate and 5 star google reviews from happy plaintiffs are a testament to our commitment to providing the highest quality service at the lowest possible rate. I would be honored to have the opportunity to work with you and ensure that your clients receive the best possible representation during their insurance medical exams, Please do not hesitate to reach out, I look forward to speaking with you.

Warm regards,


**Daniella Levi, Esq.**

Founder & CEO

IME Watchdog, Inc.

159-16 Union Turnpike, Suite 200

Fresh Meadows, New York 11366

Office: 718-463-2320

**Cell-646-660-2513**

Fax: 718-463-2324

email: daniella@imewatchdog.com

www.imewatchdog.com





**Daniella Levi, Esq.**

159-16 Union Turnpike, Suite 200

Fresh Meadows, New York 11366

daniellalevi@levilawny.com

Telephone: 718-380-1010

Facsimile: 718-380-1050

Cell: 646-660-2513

**www.levilawny.com**



FORM DBD-34
JUN. 85

No. _ _ _ _ _ _ _ _ _ _ _

# UNITED STATES DISTRICT COURT

_ _ _ _ _ _ _ _ _ _ District of _ Connecticut _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Division

## THE UNITED STATES OF AMERICA

*vs.*

DAVID VANOUNOU, aka JOSEPH BENNUN, RAYMOND CHOCHANA, aka RAYMOND SHASHANA, ADI TAL, MEIR OHAION, ALEX ADJMI, ALAN DAYON, DANIELLA LEVI, JACK ZEBEDE, ISSHAI DAVID VANOUNOU, aka ESHAY DAVID WANUNU, BENJAMIN HESSON, aka BENNY HASSAN, DINO TOSCANI, JACOB COHEN

## INDICTMENT

### 126 Counts

18 U.S.C. Sec. 371 (Conspiracy) - 1 Count
18 U.S.C. Sec. 1956(a)(1) (Money Laundering) - 109 Counts
18 U.S.C. Sec. 1956(a)(2) (Money Laundering) - 15 Counts
18 U.S.C. Sec. 982 (Forfeiture) - 1 Count

*A true bill.*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreman*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day*

*of* _ _ _ _ _ _ _ _ _ _ *A.D. 19* _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _ _ _

28

125        7/10/92        500,000        Tal, Vanounou, Hesson,
                                          Isshai Vanounou

Each such transaction being a violation of Title 18, United States Code, Sections 1956(a)(2)(B) and 2.

COUNT ONE HUNDRED TWENTY-SIX

1.    As a result of the offenses alleged in Counts Two through One Hundred Twenty-Five, the defendants

> DAVID VANOUNOU,
>     aka JOSEPH BENNUN
> RAYMOND CHOCHANA
>     aka RAYMOND SHASHANA
> ADI TAL
> MEIR OHAION
> ALEX ADJMI
> ALAN DAYON
> DANIELLA LEVI
> JACK ZEBEDE
> ISSHAI DAVID VANOUNOU
>     aka ESHAY DAVID WANUNU
> BENJAMIN HESSON
>     aka BENNY HASSAN
> DINO TOSCANI
> JACOB COHEN

and each of them shall, pursuant to 18 U.S.C Section 982, upon conviction forfeit to the United States:

a.    $22,572,528 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property involved in the aforesaid offenses; and

b.    all property, real and personal, involved in the aforesaid offenses, and all property traceable to such property with all such interests, wherever located, and in whatever name held.

AO 442 (Rev. 12/85) Warrant for Arrest

#14

# United States District Court

## DISTRICT OF
## CONNECTICUT

UNITED STATES OF AMERICA
V.

DANIELLA LEVI

## WARRANT FOR ARREST

CASE NUMBER: 3:93CR000106 TFGD

To: The United States Marshal
    and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest   DANIELLA   LEVI
                                                                        Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☒ Indictment   ☐ Information   ☐ Complaint   ☐ Order of court   ☐ Violation Notice   ☐ Probation Violation Petition

charging him or her with (brief description of offense)

Conspiracy

in violation of Title _____18_____ United States Code, Section(s) _____371_____

| KEVIN F. ROWE | CLERK |
|---|---|
| Name of Issuing Officer | Title of Issuing Officer |
| Signature of Issuing Officer    Deputy Clerk | MAY 20, 1993    BRIDGEPORT ,CT |
| | Date and Location |

Bail fixed at $ _____ by _____
                                                                        Name of Judicial Officer

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ | | |
| DATE RECEIVED<br>5-20-93 | NAME AND TITLE OF ARRESTING OFFICER<br>Agents of FBI | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST<br>5-25-93 | | By: |

United States Code, Section 371, and money laundering, in violation of Title 18, United States Code, Section 1956.

3.    The FBI office in Bridgeport, Connecticut provided myself and other agents with the FBI office in New York with a copy of the warrant for the arrest of the defendants ALAN DAYON, DANIELLA LEVI, and BENJAMIN HESSON, a/k/a "Benny Hassan," a copy of which are attached hereto.

4.    The FBI office in Bridgeport, Connecticut also furnished myself and other agents with the FBI office in New York with information regarding the whereabouts of the defendants ALAN DAYON, DANIELLA LEVI, and BENJAMIN HESSON, a/k/a "Benny Hassan." The defendants whereabouts were thereafter corroborated by the FBI offices in New York and Miami, Florida, who conducted an independent investigation into these defendants whereabouts.

5.    On May 25, 1993 at the time I arrested the defendant DANIELLA LEVI, I asked her what her name was and she responded that she was "Daniella Levi."    After she was placed under arrest, the defendant, DANIELLA LEVI," was transported to the FBI office in New York, and was advised of her constitutional rights. The defendant, DANIELLA LEVI, was thereafter asked, among other things, for her date of birth and she told me that she was born on August 25, 1962. I have compared the date of birth which the defendant, DANIELLA LEVI, gave to me on May 25, 1993, with the date of birth on the documents I received from the Department of Motor Vehicles and the date of birth--August 25, 1962--is the same.

6.    On May 25, 1993, I have been advised that an agent with the FBI went to the home of the defendant, ALAN DAYON, at 1927 East First Street, Brooklyn, New York.    The agent placed a telephone call to a telephone number previously determined to be located inside that address.    A woman answered the telephone and the agent asked, in substance, whether Alan Dayon was there.    The woman responded, in substance, "yes, hold on."    A man came to the phone and the agent said "Alan," and the defendant, ALAN DAYON, responded "yes."    The agent advised the defendant, ALAN DAYON, in substance, that the agent had a warrant for his arrest, and asked the defendant, ALAN DAYON, to come to the front door of the building.    A few minutes later, the defendant, ALAN DAYON, came to the door, and asked, in substance, to see the warrant for his arrest.

7.    I have been further informed that after his arrest, the defendant, ALAN DAYON, was transported to the FBI office in New York, and was advised of his constitutional rights. The defendant, ALAN DAYON, was thereafter asked, among other things, for his date of birth and he told the agent that he was born on March 3, 1924. I have been informed that the agent compared the date of birth which the defendant gave to him on May 25, 1993, with the date of birth on the documents received from the FBI office in Bridgeport, Connecticut and the date of birth--March 3, 1924--is the same.

9

in Israel, directed the money laundering activities of co-conspirator Madar.

19. In or about the spring of 1991, co-conspirator Madar asked defendant DANIELLA LEVI, who was a vice president of Bank Leumi in New York, to find a person who could launder money. Thereafter, defendant DANIELLA LEVI introduced co-conspirator Madar to defendant ALEX ADJMI for this purpose.

20. During the summer of 1991, defendant DANIELLA LEVI received a fee for her role in introducing co-conspirator Madar to defendant ALEX ADJMI and initiating money laundering transactions.

21. In or about the Spring of 1991, co-conspirator Madar explained the money laundering procedure to defendant ALEX ADJMI, who undertook the responsibility of finding a person or entity to launder the cash on behalf of co-conspirator Abenhaim and his co-conspirators.

22. In or about April 1991, defendant ALEX ADJMI contacted defendant ALAN DAYON, and together they initiated discussions with Prism Financial Services regarding the laundering of cash.

23. In or about late May, 1991, defendants DAVID VANOUNOU and RAYMOND CHOCHANA, through defendant MEIR OHAION, delivered approximately $100,000 in cash to co-conspirator Madar to be laundered. Co-conspirator Madar then delivered the cash to defendant ALEX ADJMI.

24. On or about May 31, 1991, defendant ALEX ADJMI delivered approximately $100,000 in U.S. currency to Ezra Rishty, a co-



U.S. Dep  ment of Justice

United States Attorney
District of Connecticut

915 Lafayette Boulevard                          (203) 579-5596
Bridgeport, Connecticut 06604

October 8, 1993

Richard Herman, Esq.                    United States District Court
Blutrich, Herman & Miller                 District of Connecticut
2 Park Avenue                           FILED AT    WATERBURY
Suite 1400                              .......Oct. 8........, 19 93
New York, N.Y. 10016                    Kevin F. Rowe, Clerk
                                        By......................

Re: United States v. Daniella Levi et. al.,
    Criminal No. 3:93CR00106(TFGD)

Dear Mr. Herman:

    This letter confirms the plea agreement entered into between
your client, Daniella Levi (the "defendant"), and the United States
Attorney's Office for the District of Connecticut (the
"Government") concerning the referenced criminal case.

The Plea and Offense

    Daniella Levi agrees to plead guilty to count one of an
indictment charging her with conspiracy to knowingly evade the
reporting requirements of Title 31 U.S.C. §5313(a), all in
violation of Title 31 U.S.C §§ 5324(1) and 371.

The Penalties

    This offense carries a maximum penalty of 5 years'
imprisonment and a $ 10,000 fine or both. In addition, under 31
U.S.C. § 3583, the Court may impose a term of supervised release of
not more than 3 years, to begin at the expiration of any term of
imprisonment imposed. The defendant understands that should she
violate any condition of the supervised release during its term,
she may be required to serve a further term of imprisonment equal
to the period of the supervised release with no credit for the time
already spent on supervised release.

    In addition, under U.S.S.G. §5E1.2(i) the Court may be
required to impose an additional fine amount that is at least
sufficient to pay the costs to the Government of any imprisonment,
probation or supervised release ordered. If a sentence of
imprisonment is imposed, the rate is $ 1,734.00 a month. If a
sentence of probation or supervised release is imposed, the rate is
$ 180.90 a month.

Richard Herman, Esq.
October 8, 1993
Page-6

No Other Promises

     The defendant acknowledges that no other promises, agreements,
or conditions have been entered into other than those set forth in
this plea agre ement, and none will be entered into unless set
forth in writing, signed by all the parties.

     This letter shall be presented to the Court, in open court,
and filed in this case.

                                    Very truly yours,

                                    CHRISTOPHER F. DRONEY
                                    UNITED STATES ATTORNEY


                                    JAMES I. GLASSER
                                    ASSISTANT UNITED STATES ATTORNEY


                                    JOSEPH W. MARTINI
                                    ASSISTANT UNITED STATES ATTORNEY

     The defendant Daniella Levi certifies that she has read this
6 page plea agreement letter and its attachment and that she fully
understands and accepts the terms thereof.

_____            ____10/8/93____
DANIELLA LEVI                              Date
The Defendant


     I have read the above and explained it to my client, who
advises me that she understands and accepts its terms.

_____            ___10/8/93____
RICHARD HERMAN, ESQ.                       Date
Attorney for the Defendant

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

### JUDGMENT IN A CRIMINAL CASE

**UNITED STATES OF AMERICA**

    v.

**DANIELLA LEVI**
86-26 62nd Avenue
Rego Park, N.Y. 11374
SSN: 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     DOB: 08/25/62

**CASE NO. 3:93CR00106 TFGD**

Nay 27   3 32 PM '94

**Richard B. Herman, Esq.**
Defendant's Attorney

The defendant <u>pleaded</u> guilty to count <u>one of an indictment</u> after a plea of not guilty.  Accordingly, the defendant is adjudged guilty of count <u>one</u>, which involves the following offense:

Title & Section: 31:5324(1) and 371         Count: One
Nature of Offense: Conspiracy to knowingly evade reporting requirements of 31:5313(a)
Date Offense Concluded: 5/93

The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

<u>The defendant shall be placed on probation for a term of one year.</u>

It is further Ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.   It is hereby Ordered that the general conditions of probation set out on the reverse side be imposed.

It is ordered that the defendant shall pay a Special Assessment of $50.00, for count <u>one</u> which shall be due immediately.

May 27, 1994
Date of Imposition of Sentence

      /s/
T. F. Gilroy Daly / U.S.D.J. / Date:

*CERTIFIED AS A TRUE COPY*
*ON THIS DATE* _____
*BY:* _____
   *Deputy Clerk*

8

| | |
|---|---|
| DAVID VANOUNOU | "Joseph" |
| ADI TAL | "Samuel" |
| ALEX ADJMI | "Victor," "Alex Gomez," "007" |
| MEIR OHAION | "Arik" |
| ISSHAI DAVID VANOUNOU | "Ronnie" |
| BENJAMIN HESSON | "Michael" |
| JACK ZEBEDE | "Victor" |
| JACOB COHEN | "Yoav Ibem" |
| Szion Jacob Abenhaim | "Zero," "Paul" |
| Yehudah Madar | "Yuri," "Yubick," "Tony" |

Overt Acts

To further the unlawful agreement and accomplish its goals and purposes, the following overt acts, among others, were committed, in the District of Connecticut and elsewhere:

16.    In or about early 1991, defendant JACOB COHEN introduced defendant DAVID VANOUNOU (hereafter sometimes referred to as "VANOUNOU") to Yehudah Madar, a co-conspirator but not a defendant herein (hereafter "co-conspirator Madar").

17.    In or about the spring of 1991, defendant DAVID VANOUNOU recruited co-conspirator Madar to find a means to launder the cash proceeds of unlawful activity which co-conspirator Abenhaim would arrange to have delivered in New York.

18.    Beginning in or about the spring of 1991, defendant DAVID VANOUNOU, in New York, and his partner, defendant RAYMOND CHOCHANA,

9

in Israel, directed the money laundering activities of co-conspirator Madar.

19. In or about the spring of 1991, co-conspirator Madar asked defendant DANIELLA LEVI, who was a vice president of Bank Leumi in New York, to find a person who could launder money. Thereafter, defendant DANIELLA LEVI introduced co-conspirator Madar to defendant ALEX ADJMI for this purpose.

20. During the summer of 1991, defendant DANIELLA LEVI received a fee for her role in introducing co-conspirator Madar to defendant ALEX ADJMI and initiating money laundering transactions.

21. In or about the Spring of 1991, co-conspirator Madar explained the money laundering procedure to defendant ALEX ADJMI, who undertook the responsibility of finding a person or entity to launder the cash on behalf of co-conspirator Abenhaim and his co-conspirators.

22. In or about April 1991, defendant ALEX ADJMI contacted defendant ALAN DAYON, and together they initiated discussions with Prism Financial Services regarding the laundering of cash.

23. In or about late May, 1991, defendants DAVID VANOUNOU and RAYMOND CHOCHANA, through defendant MEIR OHAION, delivered approximately $100,000 in cash to co-conspirator Madar to be laundered. Co-conspirator Madar then delivered the cash to defendant ALEX ADJMI.

24. On or about May 31, 1991, defendant ALEX ADJMI delivered approximately $100,000 in U.S. currency to Ezra Rishty, a co-

4

property that was of a value greater than $10,000, and was derived from specified unlawful activity, that is, the importation and distribution of controlled substances in violation of 21 U.S.C. Sections 841 and 952, in violation of 18 U.S.C. Section 1957;

(d) to knowingly and for the purpose of evading the reporting requirements of 31 U.S.C. Section 5313(a), and the regulations promulgated thereunder, cause and attempt to cause a domestic financial institution to fail to file a report required under Section 5313(a), in violation of 31 U.S.C. Section 5324(1); and

(e) to knowingly travel and cause and aid and abet travel and the use of a facility in interstate and foreign commerce with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, violations of 18 U.S.C. Sections 1956 and 1957 and 31 U.S.C. Section 5324, in violation of 18 U.S.C. Section 1952(a)(3).

Manner and Means

2. It was a part of the conspiracy that co-conspirator Szion Jacob Abenhaim, a money broker from Cali, Colombia, would and did "buy" United States currency from drug traffickers in Colombia responsible for selling controlled substances, including cocaine, in the United States and elsewhere. This currency was generated as proceeds from the unlawful trafficking in controlled substances, including cocaine, illegally imported into and sold in the United States and elsewhere.

7

numbers for the wire transfer transactions conducted by Prism Financial Services so that they could confirm that the transactions had been completed according to co-conspirator Abenhaim's instructions.

12. It was a further part of the conspiracy that each level of the money laundering organization would and did receive a percentage commission for its services in laundering the cash delivered to Prism Financial Services.

13. It was a further part of the conspiracy that the defendants and their co-conspirators would and did discuss expanding the money laundering operation to Los Angeles, Dallas, Miami, Canada, Italy and France.

14. It was a further part of the conspiracy that approximately $22.5 million in cash was delivered to Prism Financial Services by individuals acting on the instructions of the defendants and their co-conspirators, which cash was wire transferred to accounts in the United States and abroad pursuant to instructions from co-conspirator Abenhaim.

15. It was a further part of the conspiracy that the defendants would and did conceal the money laundering organization and its activities from law enforcement scrutiny by, among other devices, the use of beepers, counter-surveillance techniques and code names for the participants. Among the code names used were:

| Defendant or Co-conspirator | Code name |
| --- | --- |
| RAYMOND CHOCHANA | "Rafael," "Rafe" |

LAW OFFICES OF

# ZEMSKY & SALOMON, P.C.

95 FRONT STREET • SUITE 2
HEMPSTEAD, NEW YORK 11550
TEL: (516) 485-3800
FAX: (516) 485-3280
WWW.ZEMSKYANDSALOMON.COM

*DAVID E. ZEMSKY
MICHAEL L. SALOMON

—————

MITCHELL B. KOVAL

*N.Y. AND N.J. BAR

April 10, 2023

To whom it may concern:

Our firm is no longer working with IME Companions as of March 10th, 2023.

Sincerely yours

Jason M. Zemsky

**IME Companions**

---

| | |
|---|---|
| **From:** | Martinez, Tania <calendar@oreskylaw.com> |
| **Sent:** | Wednesday, January 18, 2023 3:44 PM |
| **To:** | IME Companions; adam@imewatchdog.com |
| **Cc:** | calendar@oreskylaw.com |
| **Subject:** | Re: Percy Perez |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Re: Percy Perez
 102 East Oxford Street, Valley Stream, NY 11580
Phone #: (917) 968-1190
Date of Accident:  April 13, 2019

Good Afternoon,

We need your services for the following Defendant Independent Medical Examination that has been scheduled for the following:

Date: 2/23/23
Time: 12:00 PM
Doctor: Jeffrey Klein
Location: 303 Second Avenue, Suite 19
New York, NY 10003


Date: 2/28/23
Time: 10:00 AM
Doctor: Daniel Feuer
Location: 337 Court Street, Ground Floor
Brooklyn, NY 11231

**Client speaks spanish and please let me know the name of the companion who will accompany my client to note it in my calendar**

Thanks,

*-Tania Martinez*
*Calendar Coordinator*



**149 East 149th Street**
**Bronx, New York  10451**
**TEL (718) 993-7832**

**FAX (718) 993-2279**
**Email: calendar@oreskylaw.com**
**Website:  www.oreskylaw.com**

**The information contained in this email is information protected by the attorney-client and/or attorney work product privilege.
It is intended for the use of the individual named above and the privileges are not waived by virtue of this being sent via email.
If the person actually receiving this email or any other reader of this email is not the named recipient or the agent responsible to
deliver it to the named recipient, any use, dissemination, distribution, or copying of this communication is strictly prohibited.**

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 165 of 305 PageID #: 13220

:
:      For Use of Clerk
:
: .. .. .. .. .. .. .. .. ..

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**

————————————————————————X,

SAURY NOVA VARGAS,

         Plaintiff,

     -against-

3750-62 EAST TREMONT HOLDING CORP.,

         Defendants,

————————————————————————X

3750- 62 EAST TREMONT HOLDING CORP.,

         Third- Party Plaintiff,

     -against-

3758 E. TREMONT REST CORP. d/b/a
VAPOR LOUNGE,

         Third-Party Defendant,

————————————————————————X

Index No. 20390/2015E

**NOTE OF ISSUE**

**NOTICE FOR TRIAL**

_X_ Jury trial demand
    _X_ Of all issues
      __ Of issues specified below or attached hereto
___ Trial without jury
Filed by attorneys for the Plaintiff
Date summons served: January 22, 2015
Date service completed: January 23, 2015
Date issue joined: April 29, 2015

**NATURE OF ACTION OR SPECIAL PROCEEDING**

X Tort
    ___ Motor Vehicle Negligence
    ___ Medical Malpractice
   _X___ Other Tort
___ Contract

___ Contested Matrimonial
___ Uncontested Matrimonial
___ Tax Certiorari
___ Condemnation
___ Other (Not Itemized Above) _____
___ This action is brought as a class action

___ This is a medical malpractice action: panel procedures
___ Prescribed by the court rules pursuant to Judiciary Law section 148(a)
       ___ Have been completed    ___ Have not been completed
      _X_ Amount demanded - $5,000,000.00
           Other relief – COSTS AND DISBURSEMENTS
           Preference claimed under
           Insurance carrier(s), if known – Allstate Insurance Company

DATED:    Bronx, New York
          January 19, 2024

                         _____
                         Marina Tasevich, Esq.
                         **LAW OFFICE OF**
                         **ALEXANDER BESPECHNY**
                         Attorney for Plaintiff
                         **SAURY NOVA VARGAS**
                         2360 Westchester Avenue
                         Bronx, NY 10462
                         (718) 792-4800

TO:    **MARKS, O'NEILL, O'BRIEN**
       **DOHERTY & KELLY, P.C.**
       Attorneys for Defendant and Third-Party Plaintiff
       **3750- 62 EAST TREMONT HOLDING CORP.**
       600 Third Avenue, Suite 1501
       New York, NY 10016
       (212) 967-0080

Case 1:22-cv-01032-PKC-JRC Document 673 Filed 06/19/26 Page 167 of 305 PageID #: 13222

1

_Jessica B. Gallina, M.D., PC_

Orthopaedic Surgery                          240 Central Park South, Suite 2-O, New York, NY 10019
Foot and Ankle Surgery                       Tel: (212) 265-0255 – Fax: (212) 265 0233

541 Cedar Hill Avenue, Wyckoff, NJ 07491
Tel: (201) 904-2121 – Fax: (201) 904-2125

November 07, 2023
Marci Mitkoff, Esq.
Marks, O'Neill, O'Brien, Doherty & Kelly, PC
708, 3rd Avenue, Suite 2500
New York, NY 10017

## INDEPENDENT MEDICAL RE-EXAMINATION

**CLAIMANT NAME:**      Nova Vargas, Saury
**DATE:**               11/07/2023
**DATE OF LOSS:**       01/04/2015
**CLAIM #:**            1279.104637
**FILE #:**             1279.104637

Dear Ms. Mitkoff,

I am a New York State Licensed and Board Certified Orthopedic Surgeon.  At your request, an Independent Orthopedic Re-examination was performed on November 07, 2023, in my Manhattan office at 240 Central Park South, Suite 2-0, New York, NY, 10019 in New York County.  The findings of that evaluation are presented as follows.

This is a follow-up to my independent medical evaluation performed on March 03, 2020.

The claimant, Saury Nova Vargas, was identified with a valid New York State Driver's License. Clara Vazquez, a legal representative was also present and identified with a valid New York State Driver's License.

Consent to evaluation was explained to Mr. Vargas.  I explained that you requested that I conduct an Independent Medical Evaluation.  I discussed the purpose of my evaluation and that I would not be providing any treatment.  I explained that doctor/patient confidentiality did not exist for the purpose of this evaluation and that I would submit a report of my findings.  I instructed him to let me know if he had pain during the examination and we would then stop the examination.  He stated that he understood and agreed to proceed with the examination.

Case 1:22-cv-01032-PKC-JRC   Document 673   Filed 06/19/26   Page 168 of 305 PageID #: 13223

action, which was served by Defendants CITY OF NEW YORK and HUNTS POINT TERMINAL PRODUCE COOPERATIVE ASSOCIATION, INC., with Notice of Entry on or about September 30, 2022, which denied Defendants/Appellants, HENRY HAAS, INC., INTERCONTINENTAL TRUCK BROKERAGE CORP. and JOEL ENCARNACION's motion, pursuant to CPLR 3212 and granted Plaintiff/Respondent's motion pursuant to CPLR 3212 against Defendants/Appellants. Defendants/Appellants appeal from each and every part of said Decision and Order.

Dated: White Plains, New York
       October 13, 2022

Yours, etc.

LAW OFFICE OF THOMAS K. MOORE

By: Mary E. Marzolla
Attorneys for Defendants
HENRY HAAS, INC., INTERCONTINENTAL TRUCK BROKERAGE CORP. and JOEL ENCARNACION
**Mailing Address**
P.O. Box 2903
Hartford, CT 06104-2903
(914) 285-8500

TO:    ZAREMBA BROWN PLLC
        Attorney(s) for Plaintiff
        40 Wall Street, 52nd Floor
        New York, NY 10005
        (212) 380-6700

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 169 of 305 PageID #: 13224

Paul L. Kuflik, MD
*Associate Professor*
*Mt. Sinai School of Medicine*
*Spine Surgery*
*www.Drpaulkuflik.com*
516 739 9270

**Office Address:** *955 Fifth Ave, New York, NY 10075*
*1122 Franklin Ave. Suite 106, Garden City, NY 11530*

**Mailing Address**: *Please send all correspondence to:*
*912 Harvard Ct. Woodmere, NY 11598*

May 12, 2023

Coffey, Modica, O'Meara, and Capowski, LLP
200 East Post Road, Suite 210
White Plains, NY  10601

**Re:  Nicholas Bucci**
**File #2020000842**
**Express #41-528**
**Date of Loss:  3/29/2019**

To Whom It May Concern:

I had the opportunity to examine Mr. Bucci at my office at 955 Fifth Avenue, New York City, New York, 10075, at approximately 8:45 AM on May 3, 2023. He was accompanied by Mr. Salvador Mateo, a representative of his attorney's office.  Mr. Mateo was present throughout and took notes. Mr. Bucci's New York State commercial driver's license was used for identification.  Covid precautions were in place. Mr. Bucci acknowledged that he understood he was there to be examined and not treated.

The history as obtained from Mr. Bucci is that he is a 49-year-old, right-hand-dominant construction worker for Verizon injured on the job on 3/29/2019.  He claims he was hit by a 24-inch bolt that hit him in his right arm and then into the face with associated loss of consciousness for several minutes.  He reports that he was taken by ambulance to Lincoln Hospital where he was stitched and released.  He then went to Orange Regional Hospital and underwent surgery on his right arm.  He claims he injured his neck, head, face, teeth, right hand, right wrist, and lower back.

He reports that his neck pain began immediately.  He reports he was treated with physical therapy, injections and then underwent surgery.  He reports that he had a pinching pain in the right side of his neck radiating to the right shoulder to the right top of his chest, and to the right upper extremity.  He reports that he was treated with neck surgery by Dr. DeMoura. He reports the surgery was of no benefit to him.  He claims that prior to the surgery his pain was a 9 on a scale of 0 to 10.  The pain

1

**Re:  Nicholas Bucci**
**File #2020000842**
**Express #41-528**
**Date of Loss:  3/29/2019**

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 170 of 305 PageID #: 13225

# David M. Erlanger, Ph.D., ABPP

Psychological and Neuropsychological Assessment Services, P.C.
*Board Certified Clinical Neuropsychologist*
111 East 75th Street
Suite# 1B
New York, NY 10021

Clinical & Forensic
Children & Adults

Tel: (212) 396-2766
Fax: (212) 396-2762

July 13, 2023
Law Office of Eric D. Feldman-NY
485 Lexington Avenue
New York, NY 10017

## NEUROPSYCHOLOGICAL EVALUATION

Name: Victoria Targia
Date of Birth: September 29, 1980
Date of Incident: October 18, 2019
Date of Examination: July 6, 2023
Claim #: IIK8637

To Whom It May Concern:

    Victoria Targia was evaluated to determine current neuropsychological status in regard to a 10/18/19 accident in which she reportedly fell and hit her head. Ms. Targia stated that she understood the general nature of the evaluation. She was advised of the limitations of an independent neuropsychological evaluation and agreed to proceed. She was advised that this evaluation did not establish a doctor-patient relationship and that there would be no treatment recommendations made by the examiner. Ms. Targia was informed that her level of effort would be assessed during the course of the examination. Approximately 10 minutes were used to review these issues, during which time she was provided with opportunities to ask questions and discuss all of these topics.

    This evaluation was observed in its entirety by Danny Cai, who identified himself as an employee of Client Liaison Services. Mr. Cai instructed the examiner that he was not allowed to ask questions about Ms. Targia's routine activities, which is a standard component of any neuropsychological evaluation, limiting the conclusions and opinions expressed herein. When the examiner explained this limitation, Mr. Cai did not call his employer for guidance or clarification.

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 171 of 305 PageID #: 13226

## David M. Erlanger, Ph.D., ABPP

Psychological and Neuropsychological Assessment Services, P.C .
*Board Certified Clinical Neuropsychologist*
111 East 75ᵗʰ Street
Suite# 1B
New York, NY 10021

Clinical & Forensic
Children & Adults

Tel: (212) 396-2766
Fax: (212) 396-2762

July 13, 2023
Law Office of Eric D. Feldman-NY
485 Lexington Avenue
New York, NY 10017

## NEUROPSYCHOLOGICAL EVALUATION

Name: Victoria Targia
Date of Birth: September 29, 1980
Date of Incident: October 18, 2019
Date of Examination: July 6, 2023
Claim #: IIK8637

To Whom It May Concern:

Victoria Targia was evaluated to determine current neuropsychological status in regard to a 10/18/19 accident in which she reportedly fell and hit her head. Ms. Targia stated that she understood the general nature of the evaluation. She was advised of the limitations of an independent neuropsychological evaluation and agreed to proceed. She was advised that this evaluation did not establish a doctor-patient relationship and that there would be no treatment recommendations made by the examiner. Ms. Targia was informed that her level of effort would be assessed during the course of the examination. Approximately 10 minutes were used to review these issues, during which time she was provided with opportunities to ask questions and discuss all of these topics.

This evaluation was observed in its entirety by Danny Cai, who identified himself as an employee of Client Liaison Services. Mr. Cai instructed the examiner that he was not allowed to ask questions about Ms. Targia's routine activities, which is a standard component of any neuropsychological evaluation, limiting the conclusions and opinions expressed herein. When the examiner explained this limitation, Mr. Cai did not call his employer for guidance or clarification.

Case 1:22-cv-01032-PKC-JRC   Document 673   Filed 06/19/26   Page 172 of 305 PageID #: 13227

# NEW YORK ORTHOPAEDIC SPINAL ASSOCIATES
## IRA J. CHERNOFF, M.D.
## MARC CHERNOFF, M.D.
### 897 Park Avenue
### Suite E
### New York, New York 10075
### (631) 246-6100

### INDEPENDENT MEDICAL EXAMINATION

January 10, 2024

Lewis Johs Avallone Aviles, L.L.P.
1377 Motor Parkway
Suite 400
Islandia, N.Y. 11749

Re:             **Miguel Ramos**
LJAA File No.:  0416.1016.0000
Date of Accident: 07/09/2020

To Whom It May Concern:

Miguel Ramos presented to my Manhattan office on January 10, 2024 for the purpose of an Independent Medical Examination. Mr. Ramos's New York State Driver's License was presented and photocopied for the purpose of picture identification. Carmen Dionico, an interpreter, was utilized via telephone speakerphone, who provided Spanish translation throughout this examination. He was accompanied by Salvador Matteo from Client Liaison Services, representing his attorney's office, who was present throughout this evaluation. A questionnaire that was provided to the claimant was not filled out, as the attorney representative stated, and the claimant confirmed that as per his attorney, he was not to fill out any forms in writing, and thus an oral history was obtained.

He is a 38-year-old right hand dominant male, who presents with a chief complaint of lower back and left foot pain. He has no other current complaints. He relates this to a work injury on July 9, 2020, when he was on a scaffold, carrying a bin on his right shoulder. He states that the scaffold went down, and that he hurt his right shoulder as the bin compressed into it. He notes that the scaffold did not collapse, and that he did not fall, but describes that when the scaffold lowered, the weight of the bin was on his right shoulder. He states that that afternoon, he went to a clinic. He was asked who referred him to the clinic, and who brought him to the clinic, but as per his attorney

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 173 of 305 PageID
#: 13228

# Debra A. Pollack, M.D.

### Diplomate of the American Board of Psychiatry and Neurology

*2114 Williamsbridge Rd, Bronx, NY, 10461*

Examination Date: June 14, 2023
Report Date: June 23, 2023

Ehrlich Gayner
150 Broadway
Suite 909
New York, NY 10038

Attn: Melina Quispe

| | |
|---|---|
| Re: | Almonte, Jose |
| Claim #: | 02330 |
| EW/GC Case #: | 22001175 |
| DOI: | 3/19/20 |
| Specialty Requested: | Neurology |
| Request Type: | Liability IME |

To whom it may concern.

I performed an independent neurology examination of the claimant noted above, on 6/14/23 in my Bronx, New York office. The claimant did present with a valid photo identification which was witnessed and copied. The claimant drove to the examination today. The claimant was accompanied by Joel Lachapelle, a legal representative. Per his attorney's advice, the claimant did not fill out the intake forms.

The following are findings of the examination:

### WORK HISTORY

The claimant was working as a taxi driver when the 3/19/20 incident occurred. He states that he missed time from work following the accident. Mr. Almonte is currently working at the same job with the same duties.

### INJURY HISTORY

Mr. Almonte was involved in an accident on 3/19/20. He did not provide any information regarding how the accident occurred, injuries he sustained or any emergency treatment he may have received. (*Records indicate the claimant was involved in a motor vehicle accident on 3/19/20 in which he was a restrained driver of a taxi that as struck from the right side resulting in headaches, neck pain, and low back pain.*)

### PAST MEDICAL HISTORY

Mr. Almonte did not provide any information regarding his past medical history.

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 174 of 305 PageID #: 13229

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF BRONX**

----------------------------------------------------------------------------X    Index No.: 25761/19E

ENOCH S. OTCHERE,

                                           Plaintiff(s),

           -against-

TERRENCE HOLDER, NEW YORK CITY TRANSIT
AUTHORITY, KHALIL LOUZ AND SEVERIN NONOSEE,,

                                           Defendant(s).

----------------------------------------------------------------------------X

**NOTICE OF EXPERT**
**WITNESS PURSUANT TO**
**CPLR 3101(d)**

**File No.: 1064935**

**PLEASE TAKE NOTICE**, of Defendant(s), **SEVERIN NONOSEE**, response to Plaintiff(s) request for expert disclosure pursuant to section 3101(d) of the Civil Practice Law and Rules.

Defendants expect to call **DR. J. SERGE PARISIEN, M.D.** as an expert witness at the trial in the above matter.

The subject matter upon which the examining physician is presently expected to testify is set forth in detail in report(s) dated **NOVEMBER 6, 2023**, attached hereto and incorporated by reference herein.

The facts and opinions upon which the examining physician is expected to testify are based on his/her physical examination of the plaintiff and/or his/her review of the plaintiff's medical records and upon all matters in evidence.

The grounds of the physician's opinion come from his/her physical examination of the plaintiff on the above date and/or his/her review of the plaintiff's medical records and is set forth in the attached report.

The Curriculum Vitae for the examining physician is annexed to the report.

Dated:  Freeport, New York
      June 3, 2024

TO:    KHAVINSON & ASSOCIATES, P.C.
       45 BROADWAY
       NEW YORK, NY 10006
       (212) 785-5000

BAKER, MCEVOY & MOSKOVITS

_____
BY: RONIT Z. MOSKOVITS, ESQ.
ATTORNEY FOR DEFENDANT(s)
5 BROADWAY, SUITE 3
FREEPORT, NY 11520
(212) 857-8230

Case 1:22-cv-01032-PKC-JRC   Document 673   Filed 06/19/26   Page 175 of 305 PageID #: 13230

# J. SERGE PARISIEN, M.D.

## Orthopedic Surgeon

337 Court Street
Brooklyn, NY  11231

November 6, 2023

Baker, McEvoy & Moskovits
c/o IME Services Inc.
960 Route 6
Suite 101
Mahopac, NY 10541

| | |
|---|---|
| **Claimant Name:** | **Enoch Otchere** |
| **Accident Date:** | **September 26, 2018** |
| **Claim #:** | **1064935-4** |
| **Date of Examination:** | **November 6, 2023** |
| **IME #:** | **AMTI-2023-9301** |

**TO WHOM IT MAY CONCERN:**

As per your request, the following report is being submitted on Mr. **Enoch Otchere**. This examination was performed on November 6, 2023 at my Bronx office.  A valid NYS Driver's license was presented prior to examination. It is not disclosed how he arrived to the office.

He is accompanied by John Schreiber who identifies as the claimant's legal representative.

The claimant was the passenger of a vehicle involved in an accident causing him to sustain injury to the neck, left shoulder, low back and right ankle. He denies the loss of consciousness. There were no fractures or lacerations sustained. The same day he reportedly presented to St. Barnabas Hospital for emergency room treatment.

He states that he underwent left shoulder surgery on December 18, 2018.

**WORK HISTORY:** John instructed the claimant not to disclose any information regarding employment status.

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 176 of 305 PageID #: 13231

## JEFFREY PASSICK, M.D., F.A.A.O.S.
### DIPLOMATE AMERICAN BOARD OF ORTHOPEDIC SURGERY

**421 Ocean Parkway**                                          **Tel. # 718-339-8200**
**Brooklyn, NY 11218**                                         **Fax # 718-336-8200**

Examination Date:  9/19/23
Report Date:  9/29/23


James F. Butler & Associates
300 Jericho Quadrangle, Suite 260
P.O. Box 9040
Jericho, NY 11753


RE:             Deryck Gordon
Claim #:        37 08N3 44H
DOI:            6/4/2020
Request Type:   Liability IME


To Whom It May Concern:

As per your request, I performed an orthopedic examination on the above claimant on 9/19/23 in my Brooklyn, New York office.  The claimant presented valid photo identification which was witnessed and copied.

The claimant was accompanied by Gerard Losquadro, a legal representative.

The claimant was provided with intake forms but refused to complete them at the advice of his attorney.

My findings are as follows:

**HISTORY:**

Mr. Gordon was involved in a motor vehicle accident on 6/4/20.  The claimant verbalized that he was the driver of a car that was sideswiped.  He verbalized he went to the emergency department on his own after the accident.  He verbalized his car was totaled.

The claimant verbalized receiving injections (not specified).  He did not provide any information as to whether he received physical therapy, chiropractic care, or acupuncture subsequent to the accident of 6/4/20.

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 177 of 305 PageID
#: 13232

**KHAVINSON & ASSOCIATES, P.C.**
Attorney(s) for Plaintiff(s)
Deryck M. Gordon
45 Broadway, Suite 720
New York, NY 10006
(718) 421-3815
tm@khavinson.com

Case 1:22-cv-01032-PKC-JRC    Document 673    Filed 06/19/26    Page 177 of 305 PageID
#: 13232

3

**IME Watchdog, Inc.**
**Clients that Never Returned**

| | |
|---|---|
| Bogoraz Law Group, P.C. | 0 |
| Elefterakis, Elefterakis & Panek | 0 |
| Liakas Law P.C. | 0 |
| Khavinson & Associates | 0 |
| Zaremba Brown | 0 |
| Subin Associates | 0 |
| **TOTAL** | **$0.00** |



# Marketing 360® Standard Service Agreement.

## IME Companions

| **Created For: Safa Gelardi** | **Created By: Hannah Newman** |
| --- | --- |
| safagelardi@gmail.com | hannah.newman@marketing360.com |
| **Date Created:** | **Executed:** |
| Mon, Jul 20, 2020, 2:37 PM MDT | Mon, Jul 20, 2020, 2:51 PM MDT |

### Marketing 360® Base Platform Features (Customizable) — $395.00/mo

| Feature | |
| --- | --- |
| CRM - Manage leads and contacts | ✓ |
| Nurture - Email and text message marketing | ✓ |
| Listings - Manage and monitor business listings | ✓ |
| Reputation - Monitor and request online reviews | ✓ |
| Social - Monitor social media and schedule posts | ✓ |
| Content - Track content marketing and SEO | ✓ |
| Ads - Monitor digital ad campaigns | ✓ |
| Intelligence - Call tracking, analytics and more | ✓ |
| Creative - Design tools and on-demand talent | ✓ |
| Call Tracking | ✓ |
| Files - Store files in the cloud | ✓ |
| Forms - Build and manage website forms | ✓ |

| | | |
|---|---|---|
|  Calendar - Manage company calendar | | ✓ |
| Websites 360® - Small business website platform | | ✓ |
| Top Rated Local® - Small business review platform | | ✓ |
| Support - Online and phone support | | ✓ |

### Monthly Marketing Programs & Fuel (Added services include a dedicated team)

| | |
|---|---|
| Social Media Management | $300.00/mo |
| On-Demand Creative Services (Creative Credits) | $500.00/mo |

## Totals

| | |
|---|---|
| Monthly Recurring Total | **$1,195.00** |
| One Time Services Total | **$0.00** |
| Annual Recurring Total | **$0.00** |

# $1,195.00
Total due today

This agreement (the "Service Agreement") between you (the "Client" or "you") and Madwire, LLC (the "Company"), located at 3405 S. Timberline Rd. Fort Collins, CO 80525, and together with Client the "Parties" or each individually a "Party") is effective on the date of Client's signature (the "Effective Date"), and is governed by the Company's Terms of Service located at www.marketing360.com/terms (the "Terms of Service"). If, at any time during the Term, you utilize Marketing 360 Payments you also agree to the terms located at www.marketing360.com/payment-terms (the "Payment Terms").  The Terms of Service and Payment Terms are incorporated in full by this reference. The Service Agreement together with the Terms of Service constitute the entire agreement (the "Agreement") between the Parties. By accepting this Agreement you agree that you have read, understand and agree to be bound by the Terms of Service, which contain, among other provisions, refund policies, dispute resolution provisions, and limitations of liability. The Company limits acceptance to this Service Agreement and the Terms of Service, and objects to any other additional or different terms in the Client's acceptance.

**Monthly Billing Commitment:**

In agreeing to this Service Agreement, you hereby agree to a six (6) month minimum commitment and authorize recurring monthly billing for such period (the "Initial Term"). The first payment will be taken on the Effective Date, and you will be billed for subsequent payments monthly. You may cancel services prior to completing the Initial Term by paying an Early Cancellation Fee equal to the lesser of either (a) your remaining monthly payments under the Initial Term or (b) $2,310. After the Initial Term, the Term will be automatically renewed for successive one (1) month periods (each a "Renewal Term" and together with the Initial Term the "Term") until terminated by either Party as provided in the Terms of Service. All cancellations require no less than 30 days' written notice.

* Client Name (typically your company's legal name - for example ABC, LLC)

IME Companions LLC

* Signer's Full Name

Safa Gelardi

* Signer's Corporate Title (President, CEO, etc)

CEO

**Signature:**

By signing below you certify that you, as the Client or as Client's Authorized Representative, have read and agree to the provisions set forth in this Service Agreement and to the Terms of Service, including the refund policy, and that together these agreements constitute a legal, valid and binding obligation of Client, enforceable against Client in accordance with their terms. You further certify and represent that you are authorized to provide the payment information you have provided or plan to provide to the Company in conjunction with this Service Agreement.

I authorize recurring billing on my account: ☑

I understand and agree to the terms of service: ☑



I am also the authorized card holder or ACH representative: ☑

## Billing Information

* Name of Authorized Credit Card Holder or Authorized ACH Representative (Not Company Name)

Safa Gelardi

* Billing Street Address

9207 245th St.

* City

Floral Park

* State

NY

* Zip

11101

* Last 4 digits of authorized credit card or ACH account number (Make sure this matches what you provided)

4276

* Phone

7187494732

* Email

safagelardi@gmail.com

Contract ID: df-b2nEtIGdNhDXGFa60G7OyToEHjC-R6gYAWxtcAqU | Mon, Jul 20, 2020, 2:51 PM MDT



**INV01785762**

Account Number **M30297**
Due Date **01/20/2022**

**Please remit payment to:**

Madwire, LLC
3405 S. Timberline Rd.
Fort Collins, CO 80525
(855) 773 - 8171

Invoice For

**IME Companions**
9207 245th St.

Floral Park, New York, 11101
United States

We appreciate your business! All services governed by the Marketing 360 Terms of Service located at www.marketing360.com/terms

For assistance please contact your marketing executive **Paul Richardson** at (855) 773-8169.

| CHARGE SUMMARY | | | | | |
|---|---|---|---|---|---|
| Service Period | Rate Plan Name | Charge Detail | | Subtotal | TOTAL |
| 01/20/2022-02/19/2022 | Marketing 360 - Monthly (T) | Charge Name: Marketing 360 - Monthly<br>Quantity: 1<br>Unit Price: $395.00<br>Description: | | $395.00 | $429.07 |
| 01/20/2022-02/19/2022 | Marketing 360 Fuel- Monthly | Charge Name: Content Credits - Monthly<br>Quantity: 605<br>Unit Price: $1.00<br>Description: | | $605.00 | $605.00 |

**COMMENTS**

| | |
|---|---|
| **Discount:** | **$0.00** |
| **Subtotal:** | **$1,000.00** |
| **NY COUNTY TAX** | **$16.79** |
| **NY SPECIAL TAX** | **$1.48** |
| **NY STATE TAX** | **$15.80** |
| **Total:** | **$1,034.07** |
| **Invoice Balance:** | **$0.00** |

| TRANSACTIONS | | | |
|---|---|---|---|
| | | **Invoice Total** | **$1,034.07** |
| **Transaction Date** | **Transaction Number** | **Transaction Type** | **Applied Amount** |
| 01/20/2022 | P-00728675 | Payment | ($1,034.07) |
| | | **Invoice Balance** | **$0.00** |



**INV01796966**

Account Number **M30297**
Due Date **02/20/2022**

**Please remit payment to:**
Madwire, LLC
3405 S. Timberline Rd.
Fort Collins, CO 80525
(855) 773 - 8171

Invoice For

**IME Companions**
9207 245th St.

Floral Park, New York, 11101
United States

We appreciate your business!  All services governed by the Marketing 360 Terms of Service located at www.marketing360.com/terms

For assistance please contact your marketing executive **Paul Richardson** at (855) 773-8169.

| CHARGE SUMMARY | | | | | |
|---|---|---|---|---|---|
| **Service Period** | **Rate Plan Name** | **Charge Detail** | | **Subtotal** | **TOTAL** |
| 02/20/2022-03/19/2022 | Marketing 360 - Monthly (T) | Charge Name: Marketing 360 - Monthly<br>Quantity:  1<br>Unit Price:  $395.00<br>Description: | | $395.00 | $429.07 |
| 02/20/2022-03/19/2022 | Marketing 360 Fuel- Monthly | Charge Name: Content Credits - Monthly<br>Quantity:  605<br>Unit Price:  $1.00<br>Description: | | $605.00 | $605.00 |

**COMMENTS**

| | |
|---|---|
| **Discount:** | **$0.00** |
| **Subtotal:** | **$1,000.00** |
| **NY COUNTY TAX** | **$16.79** |
| **NY SPECIAL TAX** | **$1.48** |
| **NY STATE TAX** | **$15.80** |
| **Total:** | **$1,034.07** |
| **Invoice Balance:** | **$0.00** |

| TRANSACTIONS | | | |
|---|---|---|---|
| | | Invoice Total | $1,034.07 |
| Transaction Date | Transaction Number | Transaction Type | Applied Amount |
| 02/20/2022 | P-00738158 | Payment | ($1,034.07) |
| | | Invoice Balance | $0.00 |



**INV01807649**

Account Number **M30297**
Due Date **03/20/2022**

**Please remit payment to:**

Madwire, LLC
3405 S. Timberline Rd.
Fort Collins, CO 80525
(855) 773 - 8171

Invoice For

**IME Companions**
9207 245th St.

Floral Park, New York, 11101
United States

We appreciate your business!  All services governed by the Marketing 360 Terms of Service located at www.marketing360.com/terms

For assistance please contact your marketing executive **Paul Richardson** at (855) 773-8169.

| CHARGE SUMMARY | | | | | |
|---|---|---|---|---|---|
| **Service Period** | **Rate Plan Name** | **Charge Detail** | **Subtotal** | **TOTAL** | |
| 03/20/2022-04/19/2022 | Marketing 360 - Monthly (T) | Charge Name: Marketing 360 - Monthly<br>Quantity:  1<br>Unit Price:  $395.00<br>Description: | $395.00 | $429.07 | |
| 03/20/2022-04/19/2022 | Marketing 360 Fuel- Monthly | Charge Name: Content Credits - Monthly<br>Quantity:  605<br>Unit Price:  $1.00<br>Description: | $605.00 | $605.00 | |

**COMMENTS**

| | |
|---|---|
| **Discount:** | **$0.00** |
| **Subtotal:** | **$1,000.00** |
| **NY COUNTY TAX** | **$16.79** |
| **NY SPECIAL TAX** | **$1.48** |
| **NY STATE TAX** | **$15.80** |
| **Total:** | **$1,034.07** |
| **Invoice Balance:** | **$0.00** |

| TRANSACTIONS | | | |
|---|---|---|---|
| | | Invoice Total | $1,034.07 |
| Transaction Date | Transaction Number | Transaction Type | Applied Amount |
| 03/20/2022 | P-00747524 | Payment | ($1,034.07) |
| | | Invoice Balance | $0.00 |

# GIANTPARTNERS

1461 Lawrence Drive
Thousand Oaks, CA 91320
P: (805) 267-1575

Ship to

**IME Companions**
Safa Gelardi
148 Clay Pit Rd. Staten
Island NY 10309
P: (833) 463-7767

**IME Companions**
Safa Gelardi
148 Clay Pit Rd
Staten Island NY
10309

Term: Recurring Monthly

 Date: August 11, 2022

## Line Item Description

| Item | Description | Amount |
|---|---|---|
| **Digital Marketing Partnership (Starter)** | **IME Companions brand with corresponding advertising campaign** | **7250** |

 Outlook

---

## FW: NYSTLA Decisions Staten Island: IME Companions - always protecting Your clients

---

**From** Carlos Roa <croa@imecompanions.com>

**Date** Mon 10/21/2019 3:48 PM

**To** IME Companions <info@imecompanions.com>

📎 5 attachments (1 MB)

IME Companions Report Exam Conducted 2-19-19 [1].pdf; 10-04-19 IME Report Marcial Vasquez.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 7-1-19 IME Report Drupattie Singh.pdf; 2-27-19 IME Companions Report[2].pdf;

Best Regards,

Carlos D. Roa
President



Office: 833-463-7767
Direct: 718-749-4732
9207 245<sup>th</sup> St
Floral Park, New York 11001
Email: croa@imecompanions.com
www.Imecompanions.com



---

**From:** Carlos Roa <croa@imecompanions.com>
**Sent:** Monday, October 21, 2019 8:16:05 AM
**To:** anthony@pirrottilawfirm.com <anthony@pirrottilawfirm.com>
**Subject:** NYSTLA Decisions Staten Island: IME Companions - always protecting Your clients

Dear Mr. Anthony Pirrotti,

IME Companions had the pleasure of meeting you at last week's NYSTLA Decisions CLE in Staten Island. You advised me to reach out to you in regards to sending IME Companions to your client's IMEs.

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as

the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency  we work with the best. Our current clients include: Subin Associates, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

With our professional staff, robust reports, and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms.
Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

Outlook

## FW: NYSTLA Staten Island: IME Companions - always protecting Your clients

**From** Carlos Roa <croa@imecompanions.com>

**Date** Tue 10/22/2019 11:37 AM

**To** IME Companions <info@imecompanions.com>

📎 5 attachments (1 MB)

2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf;

Best Regards,

Carlos D. Roa
President



Office: 833-463-7767
Direct: 718-749-4732
9207 245th St
Floral Park, New York 11001
Email: croa@imecompanions.com
www.Imecompanions.com



**From:** Carlos Roa <croa@imecompanions.com>
**Sent:** Monday, October 21, 2019 8:10:30 AM
**To:** 718ABOGADO@GMAIL.COM <718ABOGADO@GMAIL.COM>
**Subject:** NYSTLA Staten Island: IME Companions - always protecting Your clients

Dear Charles DeStefano,

IME Companions had the pleasure of meeting you at last week's NYSTLA Decisions CLE in Staten Island. You advised me to reach out to you in regards to sending IME Companions to your client's IMEs.

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as

the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency  we work with the best. Our current clients include: Subin Associates, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

With our professional staff, robust reports, and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms.
Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

In addition, we look forward to sponsoring the SITLA dinner on November 13, 2019. Please do send us more information.

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245<sup>th</sup> St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 Outlook

## Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

**From** Carlos Roa <croa@imecompanions.com>

**Date** Tue 10/22/2019 4:59 PM

**To** Ronald Cerrachio <rcerrach@nycourts.gov>; Charles Destefano <718abogado@gmail.com>; patrick bisogno <p.bisogno@mac.com>; SITLA - JOE CANEPA <jcanepa@josephgcanepapllc.com>; Michael Kuharski <MKuharski@klglawyer.com>

**Cc** IME Companions <info@imecompanions.com>

Dear All,

Please advise of final details in regards to November 13 (should it be available for us to Sponsor). In addition we would like to thank you all for allowing IME Companions to sponsor the dinner and become part of a great organization.

We were fortunate to meet Charles last week, and we look forward meeting the rest of you very soon!

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245<sup>th</sup> St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

---

**From:** Ronald Cerrachio <rcerrach@nycourts.gov>
**Date:** Tuesday, October 22, 2019 at 3:08 PM
**To:** Charles Destefano <718abogado@gmail.com>, Carlos Roa <croa@imecompanions.com>, patrick bisogno <p.bisogno@mac.com>, SITLA - JOE CANEPA <jcanepa@josephgcanepapllc.com>, Michael

Kuharski <MKuharski@klglawyer.com>
**Subject:** Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

Dear Charlie and Carlos:
  Thanks so much for your proposal and assistance to the Staten Island Trial Lawyers.
Best
Ron Cerrachio

Get [Outlook for iOS](#)

**From:** Charles Destefano <718abogado@gmail.com>
**Sent:** Tuesday, October 22, 2019 12:34 PM
**To:** Carlos Roa; patrick bisogno; SITLA - JOE CANEPA; Ronald Cerrachio; Michael Kuharski
**Subject:** Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

Dear Carlos

Thank you for your proposal to sponsor a dinner for the Staten Island Trial Lawyers Association on November 13th.  I am including our President, Mr PatBisogno, and our entire Executive Board in this email thread.  MrBisogno handles to calendar of events, so I need to be sure that the event is not superseded by a prior commitment.

We are an association that was formed over 50 years ago by Trial Lawyers who were  committed to support the rights of injuredpersons. We meet once per month atBocelli Restaurant located at 1250Hylan Boulevard, Staten Island, New York.  The meetings are generally attended by approximately 20 to 30 current members, the majority of whom are practicing Personal Injury attorneys.

As a sponsor, your contribution is limited to the cost percapita of each member that attends the meeting. In other words, if 22 members attend, your company will cover the cost of 22 members.

You are given 15 to 20 minutes to present your services to our members and may do so via Power Point presentation, video, live talk, or any other format that suits you. Additionally, all materials which explain your services may be distributed to members.  It is

recommended that you obtain a list of all members which includes their contact information (email, office address, etc).

It should be noted that each year we choose only one sponsor per area of legal services.  In other words, your competitors will not be able to present to our association during the one year following your sponsored dinner. You are welcome to announce that you are a "Proud Sponsor of the Staten Island Trial Lawyers 2019" in your website, literature, etc.

Once it is established that the night is clear for a new Sponsor, I will send an email to you.  (MrBisogno will check our calendar and hopefully that can be expedited ASAP).

Thanks again and it was a pleasure to meet you at theNYSTLA 2019 Decisions CLE.

Charles DeStefano, 1st Vice President


On Tue, Oct 22, 2019 at 6:03 AM Carlos Roa <croa@imecompanions.com> wrote:

> Dear Charles,
>
> Great thank you. We appreciate that, we know you will very satisfied with our work.
> Can you send me information on Co-Sponsoring the event on November 13, or point me in the right direction.
> Thank you talk with you soon!
>
> Kind Regards,
>
> Carlos D. Roa
> President
>
> Office : 833 463 7767
> Direct : 718 524 3284
> 9207 245th St.
> Floral Park, NY 11001
> Email: croa@imecompanions.com
> www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

---

**From:** "718abogado@gmail.com" <718abogado@gmail.com>
**Date:** Monday, October 21, 2019 at 12:56 PM
**To:** Carlos Roa <croa@imecompanions.com>
**Subject:** Re: NYSTLA Staten Island: IME Companions - always protecting Your clients

Carlos, I spoke about your company this morning to my paralegal. We will be using your services. I also look forward to seeing you at the trial lawyers meeting next month.

Sincerely,

Charles

Sent from my iPhone

> On Oct 21, 2019, at 8:10 AM, Carlos Roa <croa@imecompanions.com> wrote:

Dear Charles DeStefano,

IME Companions had the pleasure of meeting you at last week's NYSTLA Decisions CLE in Staten Island. You advised me to reach out to you in regards to sending IME Companions to your client's IMEs.

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency  we work with the best. Our current clients include: Subin Associates, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

With our professional staff, robust reports, and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms.
Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

In addition, we look forward to sponsoring the SITLA dinner on November 13, 2019. Please do send us more information.

Kind Regards,

Carlos D. Roa
President
<image001.png>
Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com
<image002.png>

**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

<2-27-19 IME Companions Report[2].pdf>
<7-1-19 IME Report Drupattie Singh.pdf>

&lt;7-18-19 IME Report Tyrell Hendricks .pdf&gt;
&lt;10-04-19 IME Report Marcial Vasquez.pdf&gt;
&lt;IME Companions Report Exam Conducted 2-19-19 [1].pdf&gt;


--
Charles C. DeStefano, Esq.
Law Offices of Charles C. DeStefano
1082 Victory Boulevard
Staten Island, New York   10301

CONFIDENTIALITY NOTICE: The information in this E-Mail may be confidential and may be legally privileged. It is intended solely for the addressee(s). If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on this e-mail, is prohibited and may be unlawful. If you have received this E-Mail message in error, notify the sender by reply E-Mail and delete the message.

Please be CAREFUL when clicking links or opening attachments from external senders.

 Outlook

---

## FW: NYSTLA CLE: IME Companions - Always Professional and Always Reliable (Better Pricing, Better Service)

---

**From** IME Companions <info@imecompanions.com>

**Date** Fri 3/6/2020 8:55 AM

**To** IME Companions <info@imecompanions.com>

---

📎 7 attachments (2 MB)

2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 1-14-20 IME Report Marcial Vasquez .pdf; affidavit christine guzman 11-21-19.pdf;

Kind Regards,

Safa Gelardi
Chief Executive Officer



Office: 833-463-7767

Direct: 718-749-4732

9207 245th St
Floral Park, New York 11001
Email: sgelardi@imecompanions.com
www.Imecompanions.com



---

**From:** IME Companions
**Sent:** Monday, February 24, 2020 4:50:55 PM
**To:** ngjelaj@maglawyers.com <ngjelaj@maglawyers.com>
**Subject:** NYSTLA CLE: IME Companions - Always Professional and Always Reliable (Better Pricing, Better Service)

**COMPETITOR TO IME WATCHDOG and IME Guards –**

**We are IME COMPANIONS**

**WWW.IMECOMPANIONS.COM**

Dear Nick,

It was a pleasure meeting you and speaking with you at the NYSTLA CLE meeting last month. I would like to introduce you to IME Companions.
We come highly recommended by some of the biggest firms in NYC.

I would like to introduce you to IME Companions. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company. We don't cap our time during the IME. If the Plaintiff our job is to make the plaintiff be seen. We wait until the IME is complete, however long that takes.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic,

**Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Gregory Spektor & Associates, Ginarte Gallardo Winograd, Bergman and Bergman, and many more.**

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client, in order to insure the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

First Hour - $125
Additional Half Hour – $45
Anywhere in Nassau County- Flat rate of $50
Anywhere in Suffolk – Flat Rate of $60
Anywhere in New City, Westchester, Putnam and Orange Counties – Flat rate of $75
Anywhere past Orange and Putnam County would have to be charged individually depending on distance.
Staten Island – Flat Rate of $40

No extra fees apply for anywhere in Brooklyn, Bronx, Manhattan and Queens.
No extra fees apply for bilingual Companions.

**(no mileage or tolls calculating, all is included in the additional flat fee)**

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

One of the great things about IME Companions is that we have a large staff and we will work around the clock to ensure each of your clients is well prepared for their IMEs. We not only do IMEs, we run IME Departments for large firms – we understand the importance of these IMEs and understand that they be completed as though you were present. We work with the best, because our service is the best. We truly want to bring great value to your firm. Our staff of 35 bilingual (many languages) Companions out on the field, and our in house office staff of 9 will ensure we can deliver and bring you value. Your clients are our clients, and we are there to protect them.

We can guarantee better pricing and better service than whomever you may be using.

We look forward to hearing from you.

Kind Regards,

Safa Gelardi
CEO



Office : 833 463 7767
Direct : 718 749 4732
9207 245th St.
Floral Park, NY 11001
Email: sgelardi@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 Outlook

## FW: IME Companions - Always Professional and Always Reliable

**From** IME Companions <info@imecompanions.com>

**Date** Mon 2/24/2020 3:43 PM

**To** IME Companions <info@imecompanions.com>

📎 7 attachments (2 MB)
2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 1-14-20 IME Report Marcial Vasquez .pdf; affidavit christine guzman 11-21-19.pdf;

Kind Regards,

Safa Gelardi
Chief Executive Officer



Office: 833-463-7767
Direct: 718-749-4732

9207 245th St
Floral Park, New York 11001
Email: sgelardi@imecompanions.com
www.Imecompanions.com



**From:** IME Companions
**Sent:** Monday, February 24, 2020 3:47 PM
**To:** jalexander@wrslaw.com
**Subject:** IME Companions - Always Professional and Always Reliable

**WWW.IMECOMPANIONS.COM**

Dear Ms. Joyce Alexander,

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, French, Creole, Arabic, Hindu, Punjabi, Urdu

**Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, Ginarte Gallardo Winograd, Napoli Shkolnik, and many more.**

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

I have attached some sample reports for your observation. We look forward to hearing from you, aiding protecting your clients during their IMEs. Please send all IME requests to this email address.

**You will be compensated per IME, please feel free to call Safa Gelardi at (718)749-4732 directly for more details. You will get a gift card at the end of every month.**

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 **Outlook**

---

### IME COMPANIONS - Always Professional and Always Reliable

---

**From** Omar A <omar@imecompanions.com>

**Date** Tue 2/11/2020 11:48 AM

**To** IME Companions <info@imecompanions.com>

⬚ 7 attachments (1 MB)

2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 11-21-19 IME Report Christine Guzman.pdf; affidavit christine guzman 11-21-19.pdf;

**COMPETETOR TO IME WATCH DOG  -**   [imecompoanions.com]IME Companions

Dear Yolanda,

IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by a personal injury attorney, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic.

Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Napoli & Shkolnik, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

**WE OFFER PERFERRED PRICING, WE WILL WORK WITH YOU AND WE DO NOT NEED A CREDIT CARD ON FILE, WE ACCEPT CHECKS**

Below is our standard Pricing.

Our Prices:

1st Hour is $175, with every following half hour at $45

Out of NYC Prices:

**Long island: Nassau 1st hour + $50 flat fee**

**Long island: Suffolk 1st hour + $60 flat fee**

**Westchester: 1st hour + $75 flat fee**

**New Jersey and Connecticut 1st Hour + $125 flat fee**

**(no mileage or tolls calculating, all is included in the additional flat fee)**

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

Kind Regards,

Omar A. Rahman
President



Office : 833 463 7767
Direct : 646 280 8596

9207 245th St.
Floral Park, NY 11001
Email: omar@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

 **Outlook**

---

## FW: IME Companions - Always Professional and Always Reliable

---

**From** IME Companions <info@imecompanions.com>

**Date**  Wed 1/29/2020 3:01 PM

**To**  IME Companions <info@imecompanions.com>

📎 7 attachments (1 MB)

2-27-19 IME Companions Report[2].pdf; 7-1-19 IME Report Drupattie Singh.pdf; 7-18-19 IME Report Tyrell Hendricks .pdf; 10-04-19 IME Report Marcial Vasquez.pdf; IME Companions Report Exam Conducted 2-19-19 [1].pdf; 11-21-19 IME Report Christine Guzman.pdf; affidavit christine guzman 11-21-19.pdf;

---

**From:** IME Companions <info@imecompanions.com>
**Date:** Wednesday, December 4, 2019 at 1:16 PM
**To:** Omar A <omar@imecompanions.com>
**Subject:** FW: IME Companions - Always Professional and Always Reliable

Dear Ms. Davy,

I would like to introduce you to IME Companions. IME Companions is an innovative company that ensures plaintiff attorneys have an independent record of what transpired during an IME visit. Our mission is to balance the scales of justice, **We are there to do what you would do if you were to attend the IME**. We are establishing ourselves as the lead provider of advocates during IMEs, and we can ensure a successful and professional IME visit for your clients. IME Companions has very qualified Companions, many of which have medical backgrounds, including MD, RN and LPN's. Our reports are robust and timely, and we have a web portal that will enable your firm to not only access all historical reports done through us, but to also seamlessly schedule future exams.

What makes us different than our competition is our ability to advocate for Plaintiffs during their IMEs while being extremely professional. Most IME Physicians know who IME Companions is, and they respect and understand what we do; as one of our important values is Professionalism.

We are independently owned, not owned by another law firm, or case "loan" company.

We have Companions who speak: English, Spanish, Russian, Portuguese, French, Creole, Arabic, Hebrew.

Due to our proven successful and proficiency we work with the best. Our current clients include: Subin Associates, Silberstein Awad Miklos, Zaremba Brown, Zemsky & Salomon, Rubenstein & Rynecki, Alan Ripka & Associates, Gregory Spektor & Associates, and many more.

Many attorneys that use us express how well we prep clients before their IMEs. We believe that in creating a comfortable and confident environment for your client the IME will go well. Even before we get inside the exam room, your client will feel prepared for any examination with any physician, and will have full trust that we will protect them. Our goal in every IME is to protect your client.

Our job begins the moment an IME is assigned to our office. Along with the vendor's notice, BPs and any special requests from your office is sent to ours. An IME Companion is assigned to your client's IME. The IME Companion reviews the BPs and takes some notes. Your client is called the evening before the IME, where they are briefed over the phone on what to expect the next day during the IME visit, and the importance of being there on time, dressing comfortably and not volunteering information. The IME Companion arrives the next day 15 minutes before the scheduled IME, where they will again brief your client, and answer any questions your client may have regarding the IME. A report is made and emailed to you thereafter.

Our Prices:

1st Hour is $175, with every following half hour at $45

Out of NYC Prices:

**Long island: 1st hour + $50 flat fee**, with every following half hour at $45

**Westchester: 1st hour + $75 flat fee**, with every following half hour at $45

**New Jersey: 1st Hour + $100 flat fee**, with every following half hour at $45

**(no mileage or tolls calculating, all is included in the additional flat fee)**

With our professional staff, robust reports, and reliable and accountable company, we would like to bring value to your firm as we do on a daily basis to our current firms. **We have a track record of never having turned down an IME.**

Please feel free to reach out to me at any time; IME Companions is prepared and ready to protect your clients.

I have attached some sample reports for your observation. We look forward to hearing from you and aiding your clients during their IMEs.

Kind Regards,

Carlos D. Roa
President



Office : 833 463 7767
Direct : 718 524 3284
9207 245th St.
Floral Park, NY 11001
Email: croa@imecompanions.com
www.imecompanions.com



**CONFIDENTIALITY NOTICE**: This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you receive this transmission in error, please notify the sender by reply email and delete this message and any attachments.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

                              Plaintiff,

              - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS, LLC, CLIENT EXAM
SERVICES, LLC, and IME MANAGEMENT
& CONSULTING, LLC,

                              Defendants.
-------------------------------------------------------x
SAFA GELARDI and IME COMPANIONS,
LLC,

                        Third-Party
                        Plaintiffs,

              - against -

CARLOS ROA,

                        Third-Party
                        Defendant.
-------------------------------------------------------x
CARLOS ROA,

                        Third-Party
                        Counter-Claimant,

             - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, and IME COMPANIONS, LLC,

                        Third-Party Counter-
                        Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

1

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") initiated this action on February 25, 2022, against Safa Abdulrahim Gelardi ("Safa") and Vito Gelardi (collectively "Individual Defendants"), and IME Companions, LLC ("Companions"), alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.[1]  (Compl., Dkt. 1.)   On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction").  (*See* Dkts. 6–14, 66; 3/29/2022 Docket Order; 4/5/2022 Docket Order.)  As part of the April 2022 Injunction, the Court ordered a forensic examination in which Defendants would "provide complete and unrestricted access to their records and electronic accounts to the forensic analyst" (Dkt. 66-1, at 3), so that the Court could determine whether "Companions is built entirely on misappropriated information and poached clients" (Dkt. 66, at 17).  On June 8, 2022, the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction").  (Dkt. 80; *see also* 6/8/2022 Docket Order.)

Discovery has proceeded over the past year and has included the forensic analysis of Defendants' records and depositions of Defendant Safa.  (*See* Dkts. 86, 105, 115; 2/2/2023 Minute Entry; 2/3/2023 Minute Entry.)  On March 10, 2023, Plaintiff filed (1) a second motion for a temporary restraining order ("TRO"), (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April

---

[1] Plaintiff filed an Amended Complaint on October 13, 2022, adding Gregory Elefterakis, Roman Pollak, Anthony Bridda, and Nicholas Liakis as additional Defendants.  (Dkt. 114.)  However, Plaintiff does not seek a preliminary injunction as to these Defendants.  (*See* Dkt. 151, at 2 ("Let the defendants, Safa Abdulrahim Gelardi, Vito Gelardi, and IME Companions LLC (collectively the 'Defendants'), show cause . . . why an order should not be issued[.]").)

2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motion for preliminary injunction and contempt on March 27, 2023. (Dkt. 156; *see also* Dkt. 167.) Defendants filed their opposition to Plaintiff's motions on March 17, 2023. (Dkts. 160–66.) Plaintiff filed their reply on March 22, 2023. (Dkts. 171–73.) At the March 27, 2023 preliminary injunction hearing, the parties presented and examined witnesses and presented documentary evidence.

Based on the parties' papers, affidavits, and witness testimony, the Court now makes the below Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure Rules 52(a) and 65(d), with respect to Plaintiff's renewed motion for a preliminary injunction and request to hold Defendants in contempt for violating the Court's previous orders. *See Eyewonder, Inc. v. Abraham*, 293 F. App'x 818, 820 (2d Cir. 2008) (vacating preliminary injunction because district court did not "state the reasons why it issued"). For the reasons stated below, the Court expands the scope of the Amended Injunction against Defendants and moreover, finds Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO.[2]

---

[2] After the March 27th preliminary injunction hearing, on April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment. (*See* Dkts. 196–98.) The Court held a hearing on May 4, 2023, pursuant to that motion, and directed the parties to submit supplemental briefing. (*See* 5/4/2023 Minute Entry; Dkts. 218–20, 224–25.) The Court denied Plaintiff's renewed motion for contempt on July 13, 2023 and does not address that motion here. (Dkt. 231.)

## FINDINGS OF FACT

### I.    Previous Findings of Fact[3]

Plaintiff Watchdog and Defendant Companions are competitors in the personal injury litigation business.  When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination ("IME") of the plaintiff to evaluate his or her alleged injuries. (*See* Levi Decl., Dkt. 8, ¶¶ 4–8.)  Both Watchdog and Companions provide third-party services to personal injury attorneys, which involves Watchdog and/or Companions associates accompanying plaintiffs to IMEs, where the associate observes, takes notes, and helps the plaintiffs fill out forms. (*Id.* ¶¶ 3, 6–18.)  The associates produce reports of the IMEs for the plaintiffs' counsel to use in the personal injury lawsuits.  (*Id.* ¶¶ 15–16, 27–28.)

Watchdog is a New York corporation (*see* Am. Compl., Dkt. 114, ¶ 4) established in May 2011 by Daniella Levi (*see* Levi Decl., Dkt. 8, ¶¶ 1, 14).  Levi is a personal injury attorney who saw a "need for a service" that could accompany personal injury clients to IMEs.  (Am. Compl., Dkt. 114, ¶¶ 18–22.)  She "developed forms and reports for the 'watch dogs' to complete relating to the different types of IMEs . . . , established price lists," and "built a customer database through her long-lasting relationships and friendships with other personal injury attorneys[.]"  (*Id.* ¶¶ 25–26.)  Watchdog developed information regarding its customers' preferences, "such as how soon each customer wants its reports, and whether the [associates] should have a conference with the customer in advance of the IME[.]"  (Levi Decl., Dkt. 8, ¶ 30.)

---

[3] The Court issued a Memorandum & Order in support of the April 2022 Injunction in which the Court made numerous Findings of Fact.  *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, (E.D.N.Y. May 13, 2022).  The relevant Findings of Fact to this latest Memorandum & Order are repeated here.

Adam Rosenblatt was Watchdog's President at all relevant times. (Am. Compl., Dkt. 114, ¶ 40.) Only he and Levi had access to "Watch[d]og's entire database, including the identity of all its customers and clients, their contact information, their preferences, pricing information, and all of the financial details of IME Watch[d]og." (*Id.* ¶¶ 41–43.) The confidential documents in the database were password protected, such that only Levi and Rosenblatt had access to them. (Levi Decl., Dkt. 8, ¶¶ 34–35.)

Companions is a New York company (Am. Compl., Dkt. 114, ¶ 5) established in November 2017 by Defendants Safa and Vito Gelardi, a married couple. (*See* Safa Gelardi Decl., Dkt. 26, ¶¶ 2, 33.) Safa did not have any previous experience in the personal injury or IME field when starting Companions—rather, she had worked at a bank in various positions. (*See* April 4, 2022 Hearing Tr. ("April 2022 Tr."), Dkt. 98, 24:21–25:10, 29:16–30:7.) However, through meetings with Rosenblatt and his father in early 2017, Safa learned about Watchdog's business, reviewed Plaintiff's confidential documents that Rosenblatt shared with her, and decided to open Companions. (*See* Safa Gelardi Decl., ¶¶ 16–18, 20–22, 28, 33; April 2022 Tr. 35:19–21, 84:10–85:1, 155:12–14.)[4]

---

[4] The Court also finds that Safa Gelardi has repeatedly perjured herself throughout this case and is thus wholly uncredible as a witness. For example, at the April 2022 hearing, Safa was asked "[y]ou instructed Adam [Rosenblatt] to sabotage the customer accounts of IME WatchDog?" and she responded: "[a]bsolutely untrue." (Apr. 2022 Tr., 42:15–17.) But the forensic evidence shows that Safa sent text messages to Rosenblatt from 2019 through 2022 directing him to sabotage Plaintiff's customer accounts in exchange for monetary payments—including in the very months preceding the April 2022 hearing. *See infra* Findings of Fact Section II.B. (*See also* Dkt. 154-2, at 250–251 (showing text messages between Safa and Rosenblatt on February 22, 2022, in which she asks Rosenblatt to "turn [Douglas and Londin] down the next time" they ask Plaintiff to observe an IME in New York); *id.* at 252 (showing text from Safa to Rosenblatt on February 22, 2022 stating "Listen[,] turn all Wingate [] down so you can take them back when y[o]u work for your[self]"); March 27, 2023 Hearing Tr. ("March 2023 Tr."), Dkt. 199, 29:14–24.) At the March 27, 2023 hearing, the Court warned Defendants' counsel of Safa's history of perjury, and counsel ultimately chose not to have Safa testify. (March 2023 Tr. 121:17–24, 125:20–23.)

5

## II.     Plaintiff's Trade Secrets

### A.     Defendant Safa Gelardi's Receipt and Use of Plaintiff's Confidential Customer Lists and Financial Documents

The forensic examination of Defendant Safa's emails reveals that she received troves of confidential information about Plaintiff's business in the Spring of 2017 that helped her start Companions.  In late April of 2017, Plaintiff's employee, Adam Rosenblatt, began emailing copies of Plaintiff's confidential financial records and customer lists to Safa.  (Pl.'s Br., Dkt. 152 (hereinafter, "Dkt. 152"), at 3; *see also* Dkt. 154-3, at ECF[5] 112 (Rosenblatt emailing Plaintiff's "Sales by Client 2016.pdf" to Safa Gelardi with the message "On day one I could bring in money"); *id.* at ECF 1–27 (Rosenblatt sending copies of Plaintiff's Profit and Loss statements from 2014 through 2016 and Watchdog's 2016 Quarterly Review to Safa Gelardi); *id.* at ECF 22 (slide summarizing Watchdog's top 10 clients in 2015 and 2016).)  Safa immediately forwarded these emails containing Plaintiff's confidential information to others.  (Dkt. 154-3, at ECF 8 (forwarding copy of Plaintiff's 2016 Quarterly Review to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 34 (forwarding copy of "IME Watchdog Clients Master List 2017.xlsx" to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 40 (forwarding Rosenblatt's email with "a breakdown of March 2017, [i]ncluding the monthly P&L, list of clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs[.] what we billed, etc." to "jay@fivepillarsgroup.com" on April 29, 2017).)

In the first week of May 2017, Rosenblatt emailed Safa explaining what materials she needed to buy to get a competing business started and sent her Plaintiff's invoices to use as models. (Dkt. 152, at 4; Dkt. 154-3, at ECF 118 (Rosenblatt email to Safa dated May 1, 2017, with subject

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

line "Needed" and listing items to buy including "Computer with 3 monitors" and "Quickbooks").) On May 4, 2017, Safa's accountants formed IME GuardDog Inc.—the name that Safa wanted to call her competing business at the time, although she ultimately settled on IME Companions LLC. (Dkt. 152, at 4.)   On the previous day, Rosenblatt had started an email thread with a website designer, Lumina, and Safa, explaining that "[a]s discussed, we need a website for IME Guard Dog with a significant amount of content to be taken from IME Watchdog." (Dkt. 154-3, at ECF 122.)

Safa used the financial information and customer lists from Rosenblatt to create her own "top revenue" customers, organized by customers who paid the most revenue to Plaintiff so that she could target them.  (Dkt. 152, at 5; *see also* Dkt. 154-3, at 136 (forwarding "Attorney List Over 10,000 in Revenue.xlsx" to Defendant Roman Pollak on August 8, 2017).)   On September 29, 2017, Safa sent Watchdog's confidential financial records to Defendant Roman Pollak in the hopes that he would pitch the idea of IME observers as a business opportunity to Defendant Greg Elefterakis. (*See* Dkt. 152, at 4 (citing Dkt. 154-3, at ECF 141–47); March 2023 Tr. 72:8–73:3.)[6] Neither Defendant Pollak nor Defendant Elefterakis knew anything about the IME observer business before Safa contacted them. (March 2023 Tr. 81:6–9 (establishing that fact as to Pollak); *id.* 42:18–19 (establishing that fact as to Elefterakis).)   Pollak analyzed Watchdog's financial records to determine the business's profitability and asked Safa follow-up questions on October 3, 2017. (March 2023 Tr. 72:8–73:3; Dkt. 154-3, at ECF 148.)  Pollak specifically mentioned in his October 3rd email to Safa, regarding "travel expenses.. [sic] I assume that is mostly the

---

[6] Plaintiff called Pollak and Elefterakis as witnesses at the March 27, 2023 hearing.  Their testimony established that, in 2017, Elefterakis owned a business called Case Cash Funding, which worked with personal injury law firms to provide non-recourse loans to prospective plaintiffs. (March 2023 Tr. 46:15–23.)   Pollak was the CFO of Case Cash Funding and reported to Elefterakis. (*Id.* 46:24–25, 61:3–12.)

doc/[A]dam." (Dkt. 154-3, at ECF 148.)  At the hearing, Pollak testified that it was likely he was referring to Adam Rosenblatt at the time of the email, but did not know whether Adam Rosenblatt was affiliated with Watchdog when he wrote the email.[7]  (March 2023 Tr. 74:8–75:10.)  On October 5, 2017, Pollak emailed Lumina and Safa, requesting to "have a functional version [of the website] by months [sic] end" and indicating that "90% of the [website's] content will come from the IME watchdog site and the brochure provided by Safa."  (Dkt. 154-3, at 149–50.)

Importantly, Defendants openly conceded during the March 2023 hearing that Safa took Plaintiff's confidential information from Rosenblatt.  (March 2023 Tr. 29:8–13 (The Court: "[Safa] clearly took information via Mr. Rosenblatt and started her business.  Are you denying that?"  Defendants' counsel: "No, Judge.  Mr. Rosenblatt sent her a customer list and[,] . . . I believe, gross revenue figures for 2016 on that list."); *see also id.* 31:1–3 (Defendants' counsel: "Mr. Rosenblatt sent the customer list with the general revenue provisions on it to Ms. Gelardi.  There's no dispute as to that.").)[8]  However, Defendants contend that it was of no consequence that Safa took Plaintiff's confidential information, because Plaintiff's customers—personal injury firms— are public knowledge and obtainable through daytime television advertisements (March 2023 Tr. 32:4–8), and moreover, that Defendant Gregory Elefterakis "was very well aware of the top personal injury firms, because he's in the cash provision business, and he knew all these firms

---

[7] The Court found Defendant Pollak to be evasive and untrustworthy throughout his examination.  Pollak admitted that he reviewed Watchdog's website during his analysis of Watchdog's profitability but did not recall seeing Adam Rosenblatt listed as an employee on the website. (March 2023 Tr. 75:12–17.)  At this time, the Court does not make a finding as to whether Pollak was lying during the hearing about his knowledge of Rosenblatt's employment with Watchdog because it is not necessary for resolving this motion.

[8] The Court notes that in light of these admissions, Safa perjured herself at the April 2022 hearing when she was asked "[Rosenblatt] gave you a Sales by Customer Summary for 2016 in or about April of [20]17, correct?" and she responded "No." (April 2022 Tr. 35:24–36:1.)

intimately" (*id.* 32:13–16). Defendants therefore claim that Safa built her business "through introductions by Mr. Elefterakis, not through [] the Rosenblatt [documents]." (*Id.* 32:16–20.) However, Defendant Elefterakis's testimony during the hearing flatly contradicted that argument.

At the hearing, Elefterakis testified that he joined Companions "to help [it] obtain customers[.]" (March 2023 Tr. 54:6–9.) But he also conceded that he introduced at most, 15 customers to Companions throughout his time at the company. (*See id.* at 44:3–14 ("[The Court]: And how many clients did you recall approaching[?] . . . [Elefterakis]: Originally, it was within, probably, ten clients to get a good sampling of what the response would be[.] . . . [The Court]: And did you, at any point, approach any other clients besides these ten? [Elefterakis]: No. [The Court]: And so this was at the beginning before Companions started; is that right? [Elefterakis]: Yes, correct."); *id.* 53:12–14 (Elefterakis testifying that he introduced "[b]etween ten and 15 clients that I obtained through my own, you know, personal contacts" to Companions).)

The documentary evidence shows that today, 90% of Defendants' customers are comprised of Plaintiff's former customers (Dkt. 152, at 5), with well over 400 of those customers being traceable to the customer lists and confidential information that Defendant wrongfully obtained from Rosenblatt (*see* Dkts. 180, 187; 4/3/2023 Docket Order). Moreover, 98.3% of the total revenue Defendants have generated since Companions' inception was obtained through sales from Plaintiff's former customers. (Levi Decl., Dkt. 172, at 2–3; March 2023 Tr. 10:24–11:10.) Thus, Defendants' claim that Safa built her business primarily through client introductions by Mr. Elefterakis is thoroughly contradicted by the evidence in the record, and plainly false.[9]

---

[9] During the hearing, Plaintiff submitted that in 2018, Defendants had only 12 customers, with 10 of those customers being former clients of Plaintiff. (March 2023 Tr. 58:2–3.) No competent evidence was adduced at the hearing as to whether these ten former Watchdog customers were also Elefterakis's clients. (*See id.* 58:18–23.) Furthermore, Defendant Pollak testified that he recalled providing customer names to Safa in the summer of 2017 beyond the ones

**B.     Defendant Safa Gelardi's Text Messages and Venmo Payments to Plaintiff's Employee Adam Rosenblatt**

Plaintiff has produced over 200 pages of text messages between Safa and Rosenblatt spanning from September 2019 through March 2022. (Dkt. 154-2.) These text messages establish that over the course of at least three years, Safa told Rosenblatt which of Plaintiff's customers she wanted and that she would pay Rosenblatt to sabotage Plaintiff's relationship with those customers so that they would use Companions instead. (*See, e.g.*, Dkt. 154-2, at ECF 85–86 (Safa: "Ignore them[,] fuck up a few times[,] and when they switch [to me] I will pay you big."  Rosenblatt: "Sounds good . . . Will have some more immediate clients for you tomorrow."  Safa: "Yes baby. Make that money."); *id.* at ECF 81 (Safa: "When am I gona [sic] get Parker Waichman.  Name your price I got you[.]"  Rosenblatt: "They pay 95[.]"  Safa: "I will give you half in advance and half after they start booking[.]"); Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.)  Moreover, Defendants conceded as much during the March 2023 hearing:

> THE COURT: Okay[—t]here's forensic evidence[—a]m I wrong that there actually are communications where [Safa]'s saying to Mr. Rosenblatt, send me this, or sabotage this?  I read something in the papers where it says, go and get them, baby, or something to that effect, where he's basically trying to delay things, or the services aren't as good from Watchdog or to do other things to sabotage those clients of Watchdog.  Is that not in evidence?

---

listed in Plaintiff's confidential customer lists.  (March 2023 Tr. 92:19–93:11; *see also id.* 94:1–3.)  Pollak could not recall the dates he provided such information and could not recall how he provided the information to Safa. (*Id.* 92:19–93:11.)  To date, Defendants have not submitted any evidence of Pollak or Elefterakis providing Safa with any customer names.  The Court therefore cannot make a factual finding at this time regarding how many of Defendants' initial 12 customers were procured through the confidential information Defendants misappropriated from Plaintiff versus through Elefterakis's or Pollak's pre-existing client relationships.  However, the Court does not find this fact to be necessary or material to resolving the instant motion because of the plethora of other evidence showing that Safa Gelardi relied on Plaintiff's trade secrets to start her business and to continue building the business, which warrants an expanded preliminary injunction.

10

> MR. WARNER [(Defendants' counsel)]: There are text exchanges, Judge, that indicate what you are saying. But this was well after this business was set up and started. Well after.

(March 2023 Tr. 29:14–24.) Safa has pleaded the Fifth Amendment and invoked her right against self-incrimination with respect to her payments to Rosenblatt. (*See* Apr. 2022 Tr. 53:8–11; *id.* 61:14–62:16.)

### III.   Defendant Safa Gelardi's Contacts with Carlos Roa

On November 4, 2022, Defendant Safa Gelardi hired a private investigator, Steve Stanulis, to track and contact Third-Party Defendant and Plaintiff's employee, Carlos Roa ("Roa"). (Dkt. 153, at 4–5; *see also* Dkt. 153-5, at ECF 1.) Stanulis works for a company called Silver Shield. (Dkt. 153-5, at ECF 1.) Safa hired Stanulis to "investigate" Roa because she believed that he, as a former employee, was "soliciting clients and slandering her name." (*Id.*) Specifically, Safa directed Stanulis to "befriend" Roa (March 2023 Tr. 137:18–20) and "try to relate to him" with the goal of getting Roa "to defame [Defendants] very badly" (Dkt. 181-1, at ECF 1). Safa provided Stanulis with scripted things to say to Roa, including complimenting him because "he loves it" and asking him "how long have you been in the sports business?" (*Id.* at ECF 1.)[10]

---

[10] During the hearing, Defendants' counsel claimed that hiring a private investigator to befriend Roa did not violate the Court's Amended Injunction barring contact between the parties, because it "wouldn't be contact initiated by [Safa] or her [private investigator]. It was supposed to go the other way around, Judge." (March 2023 Tr. 137:22–24.) Specifically, Defendants' counsel argued that Safa hiring a private investigator to "accept contact" was distinguishable from Safa *initiating* contact. (*Id.* 138:3–6.) The Court finds this argument to be meritless and bordering on frivolous. Defendants' counsel is, again, cautioned not to make disingenuous representations and frivolous arguments to the Court in future proceedings. (*See also id.* 138:8–16 (The Court: "I don't care if Mr. Roa initiates [contact] if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. I don't care who initiated it. . . . Again, this is the kind of parsing that you and your client are doing that strikes me as troublesome and will only result in further restrictions.").)

Moreover, Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5.) On November 11, 2022, Roa discovered the tracker because his security camera captured Stanulis placing the GPS tracker. (Dkt. 153, at 3.) Roa reported the incident to the police on November 12, 2022. (*Id*. at 4.) Defendant Safa claimed that the GPS tracker was placed without her knowledge. (March 2023 Tr. 139:6–11.) However, the documentary evidence once again shows that Safa was being untruthful; in fact, she knowingly paid for the use of a tracker by her private investigator, Stanulis, and actively monitored the tracker before it was found. (Dkt. 153-5, at ECF 1, *id.* at ECF 11–16 (Safa texting Stanulis regarding whether GPS tracker is working).)

## IV. Defendants' Circumvention of the Court's March 2023 Temporary Restraining Order

The Court enjoined Defendants on March 10, 2023, from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) Six days later, Mayra Gomez, one of Plaintiff's independent contractors, saw Jeff Beibin ("Beibin"), a Companions employee, at an IME on March 16, 2023 in Commack, New York. (Dkt. 173, ¶¶ 1, 9.) Beibin filed a declaration conceding that he was at an IME on that date, but that he was there as "an agent of Client Exam Services, which is owned and operated by Fari Gutierrez." (Dkt. 176, ¶ 3.) Based on evidence presented at the March 27, 2023 hearing, the Court finds that Fari Gutierrez ("Gutierrez")—a friend of the Gelardi family (March 2023 Tr. 98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—created Client Exam Services at Safa's direction specifically to continue operating Defendants' business in contravention of the Court's TRO.

Documentary evidence and witness testimony from the hearing establishes that after the TRO was issued, Safa Gelardi told Fari Gutierrez that "I have been shut down. I cannot operate [Companions]. It's yours, if you want it." (March 2023 Tr. 25:1–3.) On March 11, 2023, Safa

12

told Beibin that Companions was shutting down until further notice and that Gutierrez had started a company and would contact Beibin. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business")).) On March 12, 2023, Beibin received a call from "Sammy" on behalf of Client Exam Services, an IME observer business. Sammy explained "that everything would pretty much be operating the same way as they did" at Companions, and gave Beibin an IME assignment. (*Id.* 97:11–14, 100:21–24.) Sammy is Safa's nephew and his full name is Hesham Salameh. (*Id.* 107:2–110:15.) Client Exam Services was incorporated on March 16, 2023 (*id.* 6:23, 105:2–15), the same day that Beibin ran into Plaintiff's independent contractor, Gomez. Beibin's sole communication with Client Exam Services was with Sammy via phone and email. (*Id.* 104:16–20.) Beibin has never been to an office for Client Exam Services and is not aware of whether there is a physical office. (*Id.* 104:11–15.)

Since March 10, 2023, Beibin has attended approximately 12 IMEs on behalf of Client Exam Services, for the same clients he had been servicing when he worked at Companions. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.) There are no differences in operations between Client Exam Services and Companions. (*Id.* 113:25–114:11.) In fact, Beibin did not think to ask Sammy or Client Exam Services about his pay rate or frequency because "[w]hen IME Companions was closed[,]" Safa informed him "that all of the business was now going to be taken over by Fari Gutierrez . . . [a]nd everything would remain the same, except for the name of the company[.]" (*Id.* 114.)[11]

---

[11] The Court found Defendants' arguments and defense counsel's credibility troubling throughout the Court's probing of the Client Exam Services issue. Defense counsel opened the March 27, 2023 hearing by unequivocally asserting that "there's no connection" between Defendants and Client Exam Services, and boldly stated that "[Defendants] have nothing to do with Client Exam Services." (March 2023 Tr. 24:13–16.) However, Beibin's testimony during

**CONCLUSIONS OF LAW**

## I.     Preliminary Injunction

### A.     Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right. A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 64 F.4th 658, 666–67 (2d Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). "In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by showing a clear or substantial likelihood of success on the merits, and by making a strong showing of irreparable harm." *Id.* at 667 (cleaned up). "First, a plaintiff must meet that standard if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits . . . . Second, a plaintiff must meet that standard if he seeks a so-called 'mandatory injunction' – that is, an injunction that 'alter[s] the status quo,' which usually is done by commanding some positive act." *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34–35 (2d Cir. 1995)). "Under the heightened standard, [the party seeking a preliminary injunction] 'must show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm.'" *Id.* at 669 (quoting *New York ex rel. Schneiderman*

---

the hearing plainly revealed Safa's integral role in creating Client Exam Services, and her close—even familial—relationship with Client Exam Services' managers, Gutierrez and "Sammy." Thus, after Beibin's testimony, defense counsel conceded "[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [it] leads back to [Safa]." (*Id.* 126:3–5.) Defense counsel is again warned that future false, disingenuous, and/or irresponsible claims and arguments could result in sanctions and/or findings of contempt.

14

*v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole from Plaintiff.

### B. Likelihood of Success on the Merits

#### 1. Legal Standard for Trade Secrets Claim

Plaintiff asserts, *inter alia*, causes of action under the Defend Trade Secrets Act ("DTSA") and misappropriation of trade secrets under New York common law. (*See* Am. Compl., Dkt. 114, at 2.) Section 1836 of the DTSA is a private cause of action for "[1] [a]n owner of a trade secret" which was "[2] misappropriated" and "[3] related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "The elements for a misappropriation claim under New York law are fundamentally the same [as under Section 1836] . . . [and] [d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (cleaned up). When a claimant proves "actual or threatened misappropriation," then "injunctive relief is authorized," but when "that there has been 'unjust enrichment' or 'actual loss caused by the misappropriation of the trade secret,' [then] damages are authorized." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403–04 (S.D.N.Y. 2021) (citing 18 U.S.C. § 1836.)

"Under New York law, a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (citing *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and

15

which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007). In general, the following factors must be considered to determine whether information is a trade secret:

> (1) The extent to which the information is known outside of the business;
>
> (2) the extent to which it is known by employees and others involved in the business;
>
> (3) the extent of measures taken by the business to guard the secrecy of the information;
>
> (4) the value of the information to the business and its competitors;
>
> (5) the amount of effort or money expended by the business in developing the information; and
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)).

Most relevant to this case, "[c]ustomer lists may constitute trade secrets under certain limited circumstances. Specifically, the identity of customers is protected if the list was developed through substantial effort and kept in confidence." *Id.* at 148 (citing *N. Atl. Instruments, Inc.*, 188 F.3d at 44). "[L]ists of customers will not be deemed protected trade secret information where customers are readily ascertainable as prospective users or consumers, of the product at issue." *Id.* at 149 (internal quotations and citation omitted). "The issue of whether and to what extent a customer list constitutes trade secret information is a question of fact for th[e] court. When determining the confidentiality of customer lists[,] . . . the court considers the trade secret criteria referred to above." *Id.* In particular, although lists of customers may be publicly available or back-trackable, "the *identities of individual contact people*" at customers' companies can be "protectable trade secrets." *N. Atl. Instruments, Inc.*, 188 F.3d at 45.

16

## 2.   Plaintiff's Customer Lists Constitute Trade Secrets

Here, the record shows that Plaintiff developed its customer list through Daniella Levi's experience in the personal injury field, and that Plaintiff took measures to keep Watchdog's customer lists secret, such as password-protecting the lists and limiting access to them to only company executives. (Levi Decl., Dkt. 8, ¶¶ 34–35, 41–43.)   The customer information was clearly valuable to individuals outside the business, as evidenced by Defendant Safa Gelardi's own text messages, and her willingness to pay Rosenblatt for the information. (Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.)   Moreover, although Defendants argue that the names of personal injury law firms are public information (March 2023 Tr. 32:4–8), Plaintiff's customer lists contained not only firm names, but the identities of individual contacts for the firms, and the revenue paid and services contracted for by Watchdog's customers (*see* Dkts. 180-1, 180-2).   In fact, Safa was able to use the details in Plaintiff's customer lists to create a spreadsheet of "top revenue" customers, organized by the firms who paid the most revenue to Plaintiff, so that Defendants could target them for poaching.   (Dkt. 152, at 5.)   Plaintiff's customer lists and information fall squarely within the definition of trade secrets, as found by the Second Circuit in

*Heyman*:

> While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured.  Moreover, the data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way.  Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, but rather upon how he did in fact *actually* acquire it.  "It matters not that defendants *could* have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. *The fact is that they did not.*  Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."

17

*Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590–91 (2d Cir. 1963) (emphasis added) (quoting *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953)). Here, there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants. *See supra* Findings of Fact Section II. Thus, the Court finds that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants.

### C.   Irreparable Harm

#### 1.   Legal Standard for Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . . and plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC,* 62 F.4th at 672 (citations and quotation marks omitted). "[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *Rex Med. L.P. v. Angiotech Pharm. (US) Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). Good will is defined as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976 (RJH), 2011 WL 497978, at \*6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012) (summary order); *see also Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562 (ERK) (RML), 2008 WL 207843, at \*5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 F. App'x 885 (2d Cir. 2008) (summary order). "[G]ood will

18

constitutes the intangible qualities of a business that attracts customers . . . ." *Nat'l Elevator Cab & Door Corp.*, No. 07-CV-1562, at *5.

### 2.    Plaintiff Has Shown Irreparable Harm

First and foremost, the Court notes that it already found evidence of irreparable harm to Plaintiff when the Court issued its April 2022 Injunction. *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, at *6 n.12 (E.D.N.Y. May 13, 2022) ("[I]n light of the overwhelming evidence of irreparable harm and clear likelihood of success, Plaintiff has met the heightened, mandatory injunction standard as well."). Thus, even prior to filing its renewed preliminary injunction motion and its contempt motion, Plaintiff had already met this standard. Now, the forensic examination and other discovery has laid bare the full extent of Defendants' theft of Plaintiff's trade secrets.

The forensic examination shows that beyond paying Rosenblatt to steal Watchdog's trade secrets to start Companions in 2017, Safa also paid Rosenblatt to intentionally sabotage Plaintiff's customer relationships and poach Plaintiff's clients over the course of almost three years. (*See, e.g.*, Dkt. 154-2, at ECF 83 (Safa asking Rosenblatt "[w]hat do I tell [Plaintiff's client] to get them to switch [to Companions?]"); *id.* at ECF 84–85 (Rosenblatt telling Safa to "be faster" when following up on clients he sends to Companions and advising her to "[m]ake them ready to switch [to Companions]" so that he "can just ignore them"); *id.* at ECF 92–93 (Safa offering "[$]400 paid semi[-]monthly on the 15th and the 1st" to Rosenblatt for "leads on [Plaintiff's] poachable clients" and marketing for Companions); *id.* at ECF 105 (Safa texting Rosenblatt to "[s]end me the attys [sic] that do last minute. Come on [Rosenblatt]. If you helped me out it won't put a dent in [W]atchdog. And you know I am willing to pay for them[.]").) Thus, notwithstanding Safa's self-serving and devious appeal to Rosenblatt about not "put[ting] a dent in [W]atchdog" (*id.*), Plaintiff has unquestionably lost good will, reputation, and business opportunities because of Defendants'

19

unlawful conduct and will continue to suffer irreparable harm absent an injunction. *See QBE Am., Inc. v. Allen*, Nos. 22-CV-756, 22-CV-757 (JSR), 2022 WL 889838, at *15 (S.D.N.Y. Mar. 15, 2022) ("Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor."); *see also Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x. 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal citation and quotation marks omitted)). Notably, the evidence presented throughout the multiple proceedings in this matter suggests that the IME market is relatively small and finite, such that finding new customers to replace the ones poached by Defendants has not and will not be easy for Plaintiff.

Moreover, a defendant's dissemination of trade secrets can be sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *Intertek Testing Servs.*, 443 F. Supp. 3d at 331; *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever."). Here, Defendants have conceded that they gave all of their customer information, including the information stolen from Plaintiff, to Fari Gutierrez to start Client Exam Services. (March 2023 Tr. 126–127.) Thus, Defendants not only wrongfully used Plaintiff's trade secrets to build Companions, Defendants further disseminated

20

Plaintiff's confidential information to outside parties in order to evade the Court's March 2023 TRO, resulting in further damage to Plaintiff's business, reputation, and good will.

Defendants argued during the March 2023 hearing that Safa "giving up" the misappropriated customer information to Gutierrez did not qualify as Safa "using" the information because "she's not profiting from it and she's not operating [Client Exam Services.]" (March 2023 Tr. 127:2–5.) However, Defendants misunderstand the plain text of both the Amended Injunction and trade secret law. The Amended Injunction states in relevant part: "Defendants . . . are preliminarily enjoined from . . . using *in any manner whatsoever* Plaintiff's trade secrets and confidential information" (Dkt. 80 (emphasis added)), and New York law is clear that the dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See, e.g.*, *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018) ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."); *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). Therefore, the Court finds that Plaintiff has shown they will be irreparably injured absent a preliminary injunction. Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction.

### D. Narrowly Drawn Injunction

In the context of loss of trade secrets, the Second Circuit instructs that: "where irreparable injury has been demonstrated, a 'narrowly drawn' preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be 'narrowly

tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)). Here, the Court issues a narrowly tailored injunction, only enjoining Defendants from providing services to those customers who Plaintiff has shown were misappropriated from Plaintiff. (*See* Dkt. 180; 4/3/2023 Docket Order; 4/7/2023 Docket Order; 4/10/2023 Docket Order.) The Court notes again that this strengthened injunction is necessitated by Defendants' violation of the previous injunction.

### E.  Balance of Equities

The Court finds that the balance of equities tips decidedly in Plaintiff's favor. The Court has already found that Plaintiff has suffered and will continue to suffer irreparable harm if Defendants are not enjoined from using and disseminating Plaintiff's trade secrets. As for Defendants' claims of hardship, the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity. *See, e.g.*, *Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.*, No. 18-CV-8333 (ALC), 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) ("Where a party knowingly copies and uses another party's trademark without its permission, that party assumes the associated risks, and any potential loss suffered by an injunction may be considered to be self-imposed."); *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 247–48 (E.D.N.Y. 2009) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) for the proposition that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding that there was no real hardship to the defendant resulting from the issuance of an injunction other than loss of money from activity "it probably should not have engaged in to begin

with"); *Pearson Educ., Inc. v. Labos*, 19-CV-487 (CM), 2019 WL 1949820, at *6 (S.D.N.Y. Apr. 23, 2019) ("[I]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." (internal quotation marks and citation omitted)). Thus, here, Defendants' claim of hardship falls flat given the mountain of irrefutable evidence that Defendants engaged in a multi-year campaign, from the formation of Companions to the initiation of this lawsuit, to steal Plaintiff's confidential information and customers knowingly, methodically, and persistently. That is, Defendants assumed the risks of losing these customers when Defendants intentionally engaged in illegal activity to obtain them, and cannot legitimately claim any harm when they are forced to relinquish their ill-gotten business.

## F.  Public Interest

Lastly, the Court finds that the public interest will be served by an injunction prohibiting Defendants from further using what the Court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets to poach clients from Plaintiff. As the Court stated in its previous Memorandum & Order issuing the April 2022 Injunction, "[i]t goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest." *IME Watchdog, Inc.*, 2022 WL 1525486, at *8.

## G.  Bond

As before, the Court waives the bond requirement imposed by Federal Rule of Civil Procedure 65(c). Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond,

23

*see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant, *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted). If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction." *Corning, Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (per curiam).

Here, Defendants have not requested a security bond and Plaintiff similarly has not raised the issue. Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case. The Court has concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants from a preliminary injunction, if any, would therefore be minimal. *Golden Krust*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm."). Accordingly, the Court finds that no bond is required.

## II. Civil Contempt

### A. Civil Contempt Legal Standard

"A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Regarding the first factor, "[a]n injunction is sufficiently

24

clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id*. (quoting *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir.1989)). As to the second factor, "[n]oncompliance [has] to be supported by clear and convincing evidence." *Id*. at 99. For the third factor, a party who diligently complies in a reasonable manner, "to ensure it remain[s] in compliance with the Injunction" "c[an] petition[] the District Court for a modification, clarification or construction of the order." *Id*. (quoting *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 192 (1949)). Importantly, a party's intent or state of mind does not matter for finding contempt. *See McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act."). Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id.* at 192. Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id.*

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id*. at 1353 (citation omitted). On the other hand, coercive sanctions are "left to the informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent

25

seriousness of the sanction's burden." *Id*. (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd*., 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

**B.      The Court Finds Defendants in Contempt of the Amended Injunction and March 2023 TRO**

Applying this standard, the Court is prepared to find Safa Gelardi in contempt of the Amended Injunction, upon a showing of compensatory damages incurred by Plaintiff, with respect to the provisions in the Amended Injunction: (1) barring Defendants from making contact with Carlos Roa; and (2) operating Defendants' business or any other business that unfairly and unlawfully competes with Plaintiff.

1.      Hiring a Private Investigator to "Befriend" Carlos Roa Constitutes "Contacting" Roa in Violation of the Amended Injunction

a.      The Amended Injunction Clearly Prohibited Contact

The Court's Amended Injunction enjoins "Defendants, *their agents*, officers and employees, *and all other persons and entities in active concert or participation with them*" from "contacting Plaintiff's current clients, employees, and agents[.]" (Dkt. 80, at 2 (emphasis added).) Safa's hired investigator, Stanulis, undoubtedly qualifies as her agent and/or a person acting in concert with her." *See CBS Broad. Inc.*, 814 F.3d at 98 ("An injunction is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" (quoting *Drywall Tapers & Pointers*, 889 F.2d at 395)). Thus, the Court finds that the Amended Injunction clearly and unambiguously prohibited Safa from hiring Stanulis to contact Roa.

26

b.      Evidence of Safa's Violation is Clear and Convincing

Despite the plain language of the Amended Injunction, Safa hired a private investigator to contact Plaintiff's current employee, Roa.  (*See* Dkt. 153-4 (contract between Safa and private investigative agency dated "11/04/2022").)  Safa directed the private investigator to "befriend" Roa, even providing the hired agent with scripted questions and conversation topics.  (*See, e.g.*, Dkt. 181-1, at ECF 1 (email from Safa to the private investigator stating "Dear, Steve, this is my ex-employee [Carlos Roa], try to relate to him, he is a big mouth and will talk."); *id.* (Safa providing conversation material to the investigator including, "[Q]uestions to ask[:] how long have you been in the sports business? ([H]e claims to be a manager to runners[] and athletes[.] . . . Try to get him to talk shit about his current boss (Daniella Levi)[.]  Try to get him to defame her badly and disparage her, and have him talk about starting his own IME Business[.]").)  Moreover, Defendants "don't dispute" that Safa "had instructed the [private investigator] to befriend Mr. Roa."  (March 2023 Tr. 137:18–20.)

In response, Defendants argue that Safa's plan of hiring a private investigator to *elicit* contact was not *initiating* contact.  (*Id.* 137:22–138:6 (Safa's counsel arguing that "instruct[ing] the [private investigator] to befriend Mr. Roa" "wouldn't be a contact initiated by her or the [private investigator]" because it was "supposed to go the other way around"—that is—the investigator was hired to "accept contact, not to make contact.").)  However, for the reasons stated on the record, the Court finds this argument wholly unavailing, if not disingenuous and cynical. (*Id.* 138:7–16 ("THE COURT: [W]hether [Stanulis] initiates it or not it's contact . . . if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. . . . She placed someone there to have contact with him.").)  Moreover, whether Safa *willfully* violated the no-contact provision is irrelevant to the Court's finding of contempt, *see*

27

*McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve from civil contempt . . . it matters not with what intent the defendant did the prohibited act."), although, based on the evidence produced in connection with the hearing, as well her conduct throughout these proceedings, the Court would find Safa's conduct willful, if that were a requirement. Thus, the Court finds that there is clear and convincing evidence that Safa attempted to contact Roa through a hired investigator in violation of the Amended Injunction.[12]

c.      Safa Did Not Exercise Reasonable Diligence

Lastly, although the plain language of the Amended Injunction clearly prohibited any individual working "in concert" with Safa from contacting Plaintiff's employees, to the extent Safa had any concerns about what the provision entailed, she could have asked the Court for "a modification, clarification[,] or construction of the order[.]" *CBS Broad. Inc.*, 814 F.3d at 99. Instead, she "incorrectly took it upon [her]self to interpret" the no-contact provision as allowing her to hire an individual to "befriend" Roa and did not exercise reasonable diligence in complying with the Amended Injunction. *Id.*[13] Moreover, any argument that the Amended Injunction's no-contact provision was too general is unavailing. Where a party's "proclivity for unlawful conduct has been shown[,]" as has been overwhelmingly established as to Defendants here, "[d]ecrees of

---

[12] Plaintiff also submitted clear and convincing evidence that Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5, at ECF 1 (Stanulis declaring that Safa "requested 10 hours of surveillance and agreed to a 'tracker' on [Roa's] car as well"); *id.* at ECF 11–16 (Safa texting Stanulis regarding whether the GPS tracker is working).) For the reasons stated on the record, the Court declines to find that Safa's attempt to track Roa violated the Amended Injunction. (*See* March 2023 Tr. 20:5–21:4.) However, the Court's Second Amended Preliminary Injunction will expressly prohibit Defendants from surveilling and tracking Plaintiff and Plaintiff's employees in addition to the no-contact provision.

[13] Furthermore, as noted, the Court does not find that Safa misunderstood the language of the no-contact provision. Rather, she deliberately sought to end run the injunction by directing the private investigator to elicit contact and "befriend" Roa.

[] generality are often necessary to prevent further violations." *McComb*, 336 U.S. at 192; *see also id.* ("It does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined.").

Thus, the Court is prepared to hold Safa in civil contempt for violating the Amended Injunction. However, the Court cannot enter an order finding Safa in civil contempt at this time because Plaintiff has not submitted the required affidavit "set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party." *See* Local Rule 83.6(a); *see also* Local Rule 83.6(c) (requiring the Court to "set[] forth the amount of damages, if any, to which the complainant is entitled" and "fixing the fine, if any, imposed by the Court" in an order of civil contempt). For this reason, the parties are directed to further brief the issue of damages and attorneys' fees before the Court can hold Safa in contempt. *See infra* Conclusions of Law, Section II.C.

2. Defendants Violated the March 2023 TRO By Helping to Start Client Exam Services

a. The March 2023 TRO Clearly Prohibited Defendants from Helping to Start Client Exam Services

On March 10, 2023, the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) This language is clear and unambiguous.

b. Evidence of Defendants' Noncompliance is Clear and Convincing

The evidence presented during the March 27, 2023 hearing clearly and convincingly established that Safa directed Fari Gutierrez—a friend of the Gelardi family (March 2023 Tr.

29

98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—to create Client Exam Services and circumvent the Court's TRO. Defendants' own counsel explained that after the issuance of the TRO, Safa "called Fari and said, [']I have been shut down. I cannot operate the business [Companions]. It's yours, if you want it.[']" (*Id.* 25:1–3.) Safa's employee, Beibin, also testified that on March 11, 2023, the day after the Court issued the TRO, Safa told him that Companions was shutting down until further notice and that Gutierrez had started a company and would contact him. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business")).) On March 12, 2023, Beibin received a call from "Sammy," Safa's nephew, on behalf of Client Exam Services, who explained to Beibin "that everything would pretty much be operating the same way as they did" at Companions. (*Id.* 97:11–14, 100:21–24.) There were, in fact, no differences in operations between Client Exam Services and Companions:

THE COURT: Are you paid the same?

THE WITNESS: I haven't been paid yet.

THE COURT: But were you promised the same pay[?]

THE WITNESS: It would be the same, yeah.

THE COURT: But did you discuss that specifically?

THE WITNESS: No.

THE COURT: So why did you assume that?

THE WITNESS: Because I was told that everything would operate the way it had before.

THE COURT: . . . . Who told you that?

THE WITNESS: That's what Sammy told me.

THE COURT: As before what? The company didn't exist [until March 16th].

30

THE WITNESS: When IME Companions was closed, I was made to believe that all of the business was now going to be taken over by Fari Gutierrez and . . . Sammy would give me my assignments.

THE COURT: And everything would remain the same, except for the name of the company as far as you were told?

THE WITNESS: As far as I was told, yeah.

(*Id.* 113:25–114:23.) Beibin attended approximately 12 IMEs on behalf of Client Exam Services for the same clients he had been servicing when he worked at Companions after the March 2023 TRO was issued. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.)

Thus, the Court finds that there is overwhelming, undisputed evidence that "Defendants and any persons/entities acting in concert with them" have continued to operate a "business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.)

<div style="text-align:center">

c.      <u>Defendants Did Not Exercise Reasonable Diligence</u>

</div>

Lastly, Defendants clearly did not exercise reasonable diligence in complying with the March 2023 TRO. Defendants argue that Safa provided Companions' clients and "outstanding assignments" to Gutierrez because she wanted to ensure they were "take[n] care of" after Companions was enjoined from servicing them. (March 2023 Tr. 26:16 – 27:4.) Therefore, it was not Safa who was operating the business or using the client information, but rather "she was letting someone else us[e] them." (*Id.* 27:5–15.) But Defendants ignore the fact that they were already enjoined by the Amended Injunction from "using *in any manner whatsoever* Plaintiff's trade secrets and confidential information." (Dkt. 80 (emphasis added).) Moreover, under New York law, dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See Capstone Logistics Holdings, Inc.*, 2018 WL

<div style="text-align:center">31</div>

6786338, at *33 ("[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm.").[14]

Thus, if Defendants had exercised any amount of diligence, they would not have let a family friend "take over" Companions' business after the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating [Companions] or any other business that unfairly competes with Plaintiff" (Dkt. 156, at 3), because it was a clear violation of the Court's TRO. (*See* March 2023 Tr. 114:16–18 (Beibin testifying that "[w]hen IME Companions was closed, [he] was made to believe that all of the business was now going to be taken over by Fari Gutierrez[.]").) Even defense counsel conceded during the March 27, 2023 hearing that"[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [Client Exam Services] leads back to [Safa]." (*Id.* 126:3–5.)

Thus, the Court is prepared to hold Safa in civil contempt for violating the Court's March 2023 TRO.

## C. The Court Requires Further Briefing Regarding the Compensatory Damages Sought

As discussed, in order to hold Safa in civil contempt, Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages. *See* Local Rule 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be*

---

[14] During the March 27, 2023 hearing, Defendants' counsel argued that giving Plaintiff's client lists to Gutierrez did not qualify as "use" of Plaintiff's trade secrets if Safa was "not profiting from it" and "not operating" the new business. (March 2023 Tr. 127:2–5.) However, New York trade secrets law clearly refutes this argument. Furthermore, this self-serving, post-hoc argument ignores the plain language of the Amended Injunction and the Court's written decisions and oral pronouncements in this matter.

*available to the moving party.* A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353 (explaining that "compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)). Thus, Plaintiff is directed to submit further briefing setting forth the actual damages it has incurred due to (1) Safa's "contact" with Roa, and (2) the creation of Client Exam Services, within 60 days of this Order.

## III.    Plaintiff's Other Requested Relief

In addition to the issues addressed above, Plaintiff is also seeking the following relief: (1) imposing upon Defendants a daily fine of $10,000 payable to Plaintiff for each day the Court finds Defendants in violation of the previous Injunctions; (2) attaching Defendants' real property or directing that all proceeds from the sale of any real property be held in escrow pending final disposition of this case; and (3) directing Defendants to submit to another forensic examination at their sole cost. The Court denied these requests for the reasons stated on the record at the March 27, 2023 hearing and does not find there is need to further supplement its reasoning at this time. (*See generally* March 2023 Tr.)

### CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiff's request for a second preliminary injunction. The Court attaches the Second Amended Preliminary Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order. Moreover, although the Court is prepared to find Safa in civil contempt of the Amended Injunction and the March 2023 TRO, the Court reserves on making a final ruling and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees for the March 27, 2023 contempt proceedings. Plaintiff's supplemental

33

brief setting forth the specific amounts of attorneys' fees and compensatory damages they believe they are owed as a result of Defendants' contact with Roa and the creation of Client Exam Services is due 60 days from the date of this Order.  Defendants will be permitted 30 days to respond, if they choose.

SO ORDERED.


/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
        Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

                Plaintiff,

       - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, GREGORY ELEFTERAKIS,
ROMAN POLLAK, ANTHONY BRIDDA,
IME COMPANIONS, LLC, CLIENT EXAM
SERVICES, LLC, and IME MANAGEMENT
& CONSULTING, LLC,

                Defendants.
-------------------------------------------------------x
SAFA GELARDI and IME COMPANIONS,
LLC,

             Third-Party
             Plaintiffs,

       - against -

CARLOS ROA,

             Third-Party
             Defendant.
-------------------------------------------------------x
CARLOS ROA,

             Third-Party
             Counter-Claimant,

       - against -

SAFA ABDULRAHIM GELARDI, VITO
GELARDI, and IME COMPANIONS, LLC,

             Third-Party Counter-
             Defendants.
-------------------------------------------------------x

**SECOND AMENDED PRELIMINARY
INJUNCTION**
22-CV-1032 (PKC) (JRC)

1

PAMELA K. CHEN, United States District Judge:

Upon consideration of Plaintiff's second application for a preliminary injunction, Plaintiff's memorandum of law and supplemental briefs filed in support thereof and the accompanying declarations, Defendants' memorandum of law and supplemental brief filed in opposition thereto and the accompanying declarations, and the evidence presented at the show-cause hearing held on March 27, 2023; and

Upon consideration of the Court's Findings of Fact and Conclusions of Law, set forth in the Court's Memorandum & Order dated October 20, 2023, that Plaintiff likely will succeed on the merits of this litigation, that Plaintiff will and has suffered irreparable harm if the requested relief is not granted in part, that the balance of hardships tips in Plaintiff's favor, and that it is in the public's interest for the Court to issue a preliminary injunction,

**IT IS THEREFORE ORDERED THAT:**

A. Plaintiff's application for a preliminary injunction is hereby GRANTED in part, and that Defendants, their agents, officers, and employees, and all other persons and entities in active concert or participation with them, are preliminarily enjoined from:

1. using in any manner, whatsoever—including but not limited to transferring, transmitting, selling, and/or giving to another individual or entity—Plaintiff's trade secrets, and confidential and proprietary information, in the nature of Plaintiff's: customer lists, customer information (including, but not limited to, customer names, contact information, whether customers paid the issued invoices—and if so—amounts paid, number of associate visits performed, nature of services performed and hours spent servicing the customer, and customer's preferences in connection with the independent medical examinations); invoices; website; training

2

handbooks; independent medical examination reports; monthly, quarterly, and/or annual reports; internal memoranda; financial information (including, but not limited to, information regarding payroll, banking, and profit and loss); and employees and agents (including which customers they service, which doctors' independent medical examinations they observed and how long such examinations lasted, and how much they earn);

2. providing any services to customers misappropriated from Plaintiff, including the customers identified on the Enjoined Customers List (attached as Exhibit A);

3. contacting (or eliciting contact from) and/or surveilling Plaintiff's current clients, employees, and agents;

4. franchising IME Companions LLC; and

5. destroying any documents, whether in hard copy and/or computerized and/or other electronic media format, that are presently in Defendants' personal or corporate possession relating to IME Companions LLC, IME Watchdog, Inc., or any other matter relevant to this case.

B. Defendants are directed to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets, and confidential and proprietary information, in the nature of Plaintiff's: invoices; website; training handbooks; independent medical examination reports; customer information (including, but not limited to, customer names, contact information, whether customers paid the issued invoices and if so, amounts paid, number of associate visits performed, nature of services performed and hours spent servicing the customer, and customer's preferences in connection with the independent

3

medical examinations); monthly, quarterly, and/or annual reports; internal memoranda; financial information (including information regarding payroll, banking, and profit and loss); and employees and agents (including, but not limited to, which customers they service, which doctors' independent medical examinations they observed and how long such examinations lasted, and how much they earn).

This preliminary injunction shall continue until a final judgment or order is issued in this matter, unless otherwise modified in writing by the Court. Failure to comply with the preliminary injunction will result in findings of contempt and in sanctions.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
        Brooklyn, New York

4

SFO 7-25-18

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

## between

## SAFA GELARDI, as Purchaser

## and

## GREG ELEFTERAKIS, ROMAN POLLAK AND

## ANTHONY BRIDDA, as Sellers

## and

## IME COMPANIONS LLC, as Company

**August \_\_\_, 2018**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement ("**Agreement**") is made as of August ___, 2018 ("**Effective Date**") by and among **SAFA GELARDI** ("**Purchaser**"), with an office located at c/o IME Companions, LLC, 9207 245th Street, Floral Park, NY 11001 and **GREG ELEFTERAKIS,** with an address at 100 Quentin Roosevelt Blvd., Garden City, NY 11530, **ROMAN POLLAK**, with an address at 111 Lake Shore Drive, Lake Hiawatha, NJ  07034 and **ANTHONY BRIDDA**, with an address at 180 Water Street, #6H, New York, NY  10038 (individually, "**Seller**" and collectively, "**Sellers**") and **IME COMPANIONS, LLC** (the "**Company**"), with an office located at 9207 245th Street, Floral Park, NY  11001.

## RECITALS

A.      The Purchaser and Sellers own all of the issued and outstanding membership interests ("**Membership Interests**") in the Company which was formed in New York on October 16, 2017 ("**Company**") as follows:

**Purchaser:**  Safa Gelardi 50%

**Sellers:**      Greg Elefterakis 25%
Roman Pollak 12.5%
Anthony Bridda 12.5%

B.      The Sellers desire to sell to Purchaser, and Purchaser desires to purchase from the Sellers, Membership Interests (the "**Purchased Interests**") in the Company constituting fifty (50%) percent of the Company's total issued and outstanding membership interests as follows:

Greg Elefterakis 25%
Roman Pollak 12.5%
Anthony Bridda 12.5%

NOW THEREFORE, the parties agree as follows:

## ARTICLE I

## SALE OF PURCHASED INTERESTS

1.1      Purchase and Sale.  Effective on the date hereof, the Sellers sell, transfer, convey, assign, and deliver to Purchaser, and Purchaser purchases and accepts from the Sellers, the Membership Interests owned by Sellers.

1.2     <u>Purchase Price</u>.    The aggregate purchase price for the Membership Interests is the sum of One Hundred Fifteen Thousand ($115,000.00) Dollars ("**Purchase Price**").

1.3     <u>Payment of the Purchase Price</u>.  The Purchase Price will be paid at the "**Closing**" through $25,000 by way of a certified check (the "Check") and the delivery of a secured promissory note in the principal amount of $90,000 due August __, 2020, payable in equal installments of $25,000 every six months (the "**Note**").  The Note and Check shall be issued proportionately to the Sellers in the percentage ownership interest as set forth in paragraph 2.2 Capitalization below.

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Purchaser that the following statements are true and correct in all immaterial respects on (and as of) the Closing Date:

2.1     <u>Organization, Standing and Power</u>.    The Company is a limited liability company, duly organized and validly existing in the State of New York.  The Company has all requisite power and authority to conduct its business as it is now being conducted; to enter into this Agreement; and to own, lease, and operate its assets and properties.  The Company is in good standing under the laws of the State of New York.

2.2     <u>Capitalization</u>.    Effective as of the Closing Date, all of the issued and outstanding ownership and Membership Interests of the Company are owned by its Members as follows:

| Name | Percentage Ownership Interest |
|---|---|
| Safa Gelardi | 50.0% |
| Greg Elefterakis | 25.0% |
| Roman Pollak | 12.5% |
| Anthony Bridda | 12.5% |

No other Membership Interests have been issued to, or reserved for, any other person or entity.  There are no outstanding subscriptions, options, warrants, conversion rights, convertible securities, pre-emptive rights, preferential rights, or other rights (contractual or otherwise) or agreements of any kind for the purchase or acquisition of any Membership Interests.

2.3     <u>Authority; Binding Effect</u>.  The Company has, by all necessary action of its Members, duly authorized the execution and delivery of this Agreement, the performance of its obligations under this Agreement, and the consummation of the

3

transactions contemplated hereby.  This Agreement constitutes a legally valid and binding agreement, enforceable against the Company, in accordance with its terms.

2.4    No Violations or Conflicts.  The execution and delivery of this Agreement by the Company, the performance of its obligations according to this Agreement, and the consummation of the transactions contemplated in this Agreement will not violate any law, rule, regulation, order, injunction, or decree applicable to the Company; or create default under any agreement to which the Company is a party.

2.5    Validity of Membership Interests.  The Membership Interests are validly authorized and issued Membership Interests of the Company, fully paid and non-assessable, and free and clear of all liens, encumbrances, restrictions, and commitments of any kind.

2.6    No Litigation.  There are no actions at law, suits in equity, proceedings, or claims pending or threatened against the Company or any of the assets or properties of any of them.

2.7    Compliance with Laws and Orders.  The Company is in full compliance with all laws, rules, regulations, and orders applicable to it and its assets and properties.

2.8    Tax Matters.  The Company has timely filed, or there have been timely filed on its behalf, all federal, state and local income, payroll, sales, and all other tax returns that are required to be filed by it.  All of the tax returns are complete and accurate.  The Company has paid timely all taxes (collectively, the "**Taxes**") due and payable by the Company.  There are no unpaid taxes due and payable by the Company.  There are no claims or assessments pending or proposed against the Company for any alleged deficiency in tax.  There are no threatened tax claims or assessments against the Company.  There are no current or pending or threatened audits, examinations, or other administrative or judicial proceedings (including, without limitation, any deficiency or refund litigation) with respect to taxes or tax returns the Company.  The Company has withheld and paid all taxes required to have been withheld and paid in connection with any amounts paid or owing any employee, independent contractor, creditor, or other third party.

2.9    Insurance.  All policies of fire, liability, casualty, and other forms of insurance in existence on the Closing Date with respect to the Company, its assets and properties, are in full force and effect and are valid and enforceable.

2.10   No Broker.  There are no claims (and there is not any basis for any claims) for brokerage commissions, finder's fees, or similar payments in connection with the transactions contemplated by this Agreement as a result of any action taken by the Company.

2.11   No Material Omissions.  No representation or warranty made by the Company in this Agreement contains any untrue statement of a material fact, or any omission of a material fact necessary to make the statements contained in this Agreement not misleading in light of the circumstances under which they are made.

4

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to the Company that the following statements are true and correct in all respects, as of the Effective Date:

3.1    Authority and Binding Agreement.  The Purchaser has, by all necessary action, duly authorized the execution and delivery of this Agreement, the performance of its obligations under this Agreement, and the consummation of the transactions contemplated hereby. This Agreement constitutes a legally valid and binding agreement, enforceable against Purchaser in accordance with its terms.

3.2    No Broker.  There are no claims (and there is not any basis for any claims) for brokerage commissions, finder's fees, or similar payments in connection with the transactions contemplated by this Agreement resulting from any action taken by Purchaser.

3.3    Investment Representation.    Purchaser is acquiring the Membership Interests for its own account and investment, and not on behalf of any other person, or with a view to the resale or distribution of the Membership Interests.

3.4    No Material Omissions.  No representation or warranty made by the Purchaser in this Agreement contains any untrue statement of a material fact, or any omission of a material fact necessary to make the statements contained in this Agreement not misleading in light of the circumstances under which they are made.

**ARTICLE IV**

**THE CLOSING**

4.1    Closing.  The closing of the sale of the Membership Interests will take place on the effective date at 10:00 a.m. ("**Closing**") at the offices TBD, located at \_\_\_\_\_ _____, or at such other time or place that the parties will mutually agree.

4.2    Deliveries by the Purchaser and Company.  At the Closing, the Purchaser and Company will deliver the following documents and items to Sellers:

4.2.1.  This Agreement, duly executed by the Purchaser and Company;

4.2.2.  The $25,000, by certified check or in immediately available funds by wire; and

4.2.3. The Note, duly executed by the Purchaser and guaranteed by the Company.

4.3    Delivery by Sellers.  At the Closing, Sellers will deliver the following documents and items to the Company:

4.3.1. This Agreement, duly executed by Sellers; and

4.3.2. Membership Interests constituting 50% of the outstanding Membership Interests in the Company as set forth in paragraph B above.

## ARTICLE V

## INDEMNIFICATION

5.1    Indemnity Obligation.  The Company and its Members, managers, agents, affiliates, successors, and assigns, and the members, managers, agents, affiliates, successors, heirs, legal representatives, and assigns of each of the foregoing (collectively, the "**Indemnitors**") each jointly and severally agree to indemnify and defend Sellers or Purchaser as the case may be (and its heirs, legal representatives, agents, assigns, and affiliates) (collectively, the "**Indemnitees**"), and hold each of the Indemnitees harmless from, any and all costs, losses, liabilities, judgments, amounts paid in settlement, and other expenses (including attorneys' fees) caused by (or in any way arising out of) any and all claims, suits, responsibilities, causes of action, litigation, proceedings, and other liabilities of any nature in any way arising (directly or indirectly) out of any of the following matters:

5.1.1. any of the representations and warranties contained in this Agreement or being false, inaccurate, or untrue;

5.1.2. any fraud or misconduct by the Company or any of its Members;

5.1.3. the operations or existence of the Company prior to the date of this Agreement;

5.1.4. the breach by the Company or any of its Members, or the default in the performance by any of them, of any covenant, agreement, or obligation to be performed by any of them under this Agreement or any of the Additional Agreements;

5.1.5. any claims by third parties; and

5.1.6. any and all Taxes imposed on or incurred by the Company attributable to any taxable period that includes period of time on or prior to the Effective Date.

5.2    *No Settlement without Consent*. No Indemnitor, in the defense of any such claim or litigation, will, except with the consent of each Indemnitee, consent to the entry of any judgment, or enter into any settlement, which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee of a release from all liability with respect to such claim or litigation.

5.3    *Benefits*.    The indemnification obligations of an Indemnitor under this Agreement will also benefit and protect any of the Indemnitee's present or future legal representatives, successors, heirs, and assigns.

## ARTICLE VII

## GENERAL PROVISIONS

This Agreement constitutes the complete understanding and agreement of the parties with respect to the subject matter hereof and supersedes all previous agreements between them, and which shall remain in full force and effect and shall survive the execution and termination of this Agreement. This Agreement may not be modified except by a writing signed by both parties. This Agreement and the performance hereunder will be governed by the laws of the State of New York (without giving effect to principles of conflict of laws).   This Agreement is intended to be performed by the parties in the State of New York.  The parties agree that the sole and exclusive jurisdiction and venue for any litigation arising from or relating to this Agreement or the subject matter hereof will be a federal or state court located in Nassau County in the State of New York. Each party knowingly and voluntarily submits to personal jurisdiction over it in New York, and to the exercise of jurisdiction over it by such court. This Agreement will be binding upon, and will inure to the benefit of, the parties.  Any notice provided pursuant to this Agreement, if specified to be in writing, will be in writing and will be deemed given (i) if by hand delivery, upon receipt thereof; (ii) if mailed three (3) days after deposit in the United States mail, postage prepaid, certified mail return receipt requested; and (iii) if by nationally recognized overnight courier, one (1) day after deposit with such courier.  All notices will be addressed to the parties at their addresses set forth in the preamble to this Agreement.  No waiver of any breach or default under this Agreement will be considered valid unless in writing and signed by the party giving such waiver, and no such waiver will be deemed a waiver of any subsequent breach or default of the same or similar nature. In the event of any litigation among the parties arising out of this Agreement, the successful parties will be entitled to recover their legal fees and expenses from the losing parties. The invalidity or unenforceability of any provision of the Agreement will not affect the validity or enforceability of any other provision. Nothing in this Agreement will be deemed or construed by the parties or any other entity to create an agency, partnership or joint venture between the parties. The rights and remedies of both parties set forth in this Agreement are not exclusive and are in addition to any other rights and remedies available to them at law or in equity.

7

**IN WITNESS WHEREOF**, the parties are signing this Agreement on the Effective Date.

Purchaser:

**SAFA GELARDI**

by:_____

Sellers:

**GREG ELEFTERAKIS**

by:_____

**ROMAN POLLAK**

by:_____

**ANTHONY BRIDDA**

by:_____

Company:

**IME COMPANIONS, LLC**

by:_____

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
MILTON ESPADA, ARTHUR KILL PROPERTIES,
LLC, and PLAZA BODY SHOP, INC.

        Case No.: 23-cv-6186 (NRM)(JRC)

                         Plaintiffs,

                  - against -

CITY OF NEW YORK, NEW YORK POLICE
DEPARTMENT CAPTAIN GLORISEL LEE, NEW
YORK POLICE DEPARTMENT LIEUTENANT
MIGUEL ESTEVEZ, BREEN BROS. TOWING,
INC., JOSEPH BREEN, and DEALER DIRECT
SERVICES, INC.

                         Defendants.
-----------------------------------------------------------------------X

SUPPLEMENTAL
DECLARATION OF ADAM
ROSATTI IN SUPPORT OF
PLAINTIFF ARTHUR KILL
PROPERTIES, LLC'S MOTION
FOR DEFAULT

Adam Rosatti declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.      I am an authorized representative of Plaintiff Arthur Kill Properties, LLC ("Plaintiff AKP").

2.      As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of documents maintained at Plaintiff AKP's office.

3.      I submit this supplemental affidavit in further support of the damages AKP seeks against Dealer Direct Services, Inc. ("Dealer Direct").

4.      There is an acute demand for empty surface lots throughout New York City that could serve as excess storage for all variety of vehicles, including, passenger and commercial vehicles.

5. AKP purchased the property at issue for the purpose of renting it out to the general public for vehicle storage.

6. AKP's storage rental price has ranged typically between $100 per day to $175 per day.

7. For example, AKP has rented space to Plaza Automall.

8. Plaza Automall has paid AKP storage fees within that range. See Exhibit A.

9. AKP would have been able to store 100 cars each day on the area of the lot that Dealer Direct improperly utilized.

10. Dealer Direct's unauthorized use lasted for approximately six months.

11. AKP applies the following formula to determine its lost storage fee damages: a blended rate of $125 per day per car x 100 cars equals $12,500.00 per day. $12,500.00 per day for 180 days equals $2,250,000.00.

12. Plaintiff AKP has also suffered damages because it was unable to conduct business with a third-party entity, Amazon.

13. Specifically, Plaintiff AKP was unable to rent three acres of the Property to Amazon for seven (7) months.

14. After mid-November 2022 when AKP was able to utilize the three acres Amazon amended its existing lease with AKP to include the previously unusable three acres. See Exhibit B Lease Amendment.

15. As seen from the amendment, Amazon expanded the five acres it was already using to eight acres. Amazon agreed to pay AKP $240,000.00 per month for the eight acres – the equivalent of $30,000.00 per acre per month.

16.     Plaintiff AKP would have been able to rent out each acre to Amazon for $30,000.00 per acre. This resulted in a $630,000.00 loss of business with Amazon.

17.     In total, Plaintiff AKP has incurred $2,880,000.00 worth of damages against Defendant Dealer Direct for its interference with Plaintiff AKP's right to use, enjoy and manage the Property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2025

_Adam Rosatti_

Adam Rosatti

Case 1:23-cv-00108-PKR-MRJC Document 671-1 Filed 06/10/2025 Page 265 of 305 PageID ##13520

# EXHIBIT A

Case 1:23-cv-00108-PKR-MRJC Document 671-1 Filed 06/10/2025 Page 265 of 305 PageID ##13520



# Plaza Toyota
2699 Nostrand Ave. Brooklyn, NY 11210
718-253-8400
PlazaAutoMall.com




TOYOTA

01021TOCB233121

| CUSTOMER NO. 10014168 | ADVISOR DAVID VILLANUEVA 439562 | TAG NO. LEIN | CELL: 347-981-6169 |
|---|---|---|---|
| | | | INVOICE DATE 06/27/24 | INVOICE NO. TOCB233121 |

ROBERTO WYATT CARGILL
15 WESTMINSTER RD APT 4G
BROOKLYN, NY 11218-2868

RWYATTCARGILL0400_@GMAIL.COM

| RESIDENCE PHONE 347-981-6169 | BUSINESS PHONE 718-200-7946 |
|---|---|

| LABOR RATE 179.00 | LICENSE NO. KPW3635 | MILEAGE 66,010 |
|---|---|---|
| YEAR/MAKE/MODEL 19/TOYOTA TRUCK/HIGHLANDER/ | | |
| VEHICLE ID NO 5TDJZRFH3KS988841 | | |
| FTE NO | P.O. NO | |

COLOR GY/LG21/BLA  STOCK NO. 7291189S

DELIVERY DATE 06/17/19  DELIVERY MILES

SELLING DEALER NO.  PRODUCTION DATE

R.O. DATE 06/27/24

COMMENTS E# 3.5 LITER

MO: 66010

**JOB# 1 CHARGES**

LABOR
J# 1 96TOZ   BODY REPAIR   TECH(S):99
Refer to Repair Order 216223. Deductible $1,003.00- Lien   23820.00
$395.00 - Tow to Storage Facility $225.00- (Storage at Arthur
Kill Properties, LLC. ( From time of Completion) 222 Days @
$100.00)

JOB# 1 TOTALS

LABOR   23820.00

JOB# 1 JOURNAL PREFIX TOCB JOB# 1 TOTAL   23820.00

COMMENTS
RECOMMENDED NOT DONE/ DECLINED SERVICES

TOTALS

| Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By: | Date & Time | Manner of Authorization |
|---|---|---|---|---|
| $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |
| Revised Estimate $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |

WARRANTY DISCLAIMER: ALL PARTS AND ACCESSORIES ARE SOLD AND ALL REPAIRS ARE PROVIDED BY THE DEALERSHIP AS-IS, WITHOUT ANY WARRANTY OR GUARANTEE. THE DEALERSHIP HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF PARTS OR PRODUCTS OR THE REPAIR. THE ONLY WARRANTIES ON PARTS AND ACCESSORIES OR REPAIRS ARE THOSE WHICH MAY BE OFFERED BY THE MANUFACTURER OR ORIGINAL PARTS DISTRIBUTOR AND ONLY SUCH MANUFACTURER OR DISTRIBUTOR SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. CUSTOMER SHALL NOT BE ENTITLED TO RECOVER FROM THE DEALERSHIP ANY CONSEQUENTIAL DAMAGES, DAMAGES TO PROPERTY, DAMAGES FOR LOSS OF USE, LOSS OF TIME, LOSS OF PROFIT OR INCOME, OR ANY OTHER INCIDENTAL DAMAGES. By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you had the opportunity to inspect the vehicle and received or inspected any replaced parts as requested by you before paying this invoice. The vehicle is being returned to you in exchange for your payment of the Amount Due. By choosing to pay with a credit card, cash, or check, you confirm that you are fully satisfied with the repairs and/or services provided upon payment.

```
*************************************
*                                   *
*  [ ] CASH    [ ] CHECK  CK NO. [        ]  *
*                                   *
*  [ ] VISA    [ ] MASTERCARD   [ ] DISCOVER  *
*                                   *
*  [ ] AMER XPRESS   [ ] OTHER   [ ] CHARGE  *
*                                   *
*************************************
```

| TOTAL LABOR.... | 23820.00 |
|---|---|
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 0.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 2114.03 |

**TOTAL INVOICE $   25934.03**

THANK YOU FOR YOUR BUSINESS!

CUSTOMER SIGNATURE

DATE

CUSTOMER SIGNATURE

AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

**ALL PARTS INSTALLED ARE NEW AND ALL BODY PARTS ARE NEW OEM UNLESS OTHERWISE INDICATED**

**PARTS RETURN WAIVER:** I hereby waive the return of any replaced parts.

INITIALS

**Plaza Toyota is a DBA of Plaza Cars, LLC
Facility # 7084361
DCA # 2112709
Repair Facility # 7084360*

CASH AMOUNT: 25934.03
SURCHARGE AMOUNT: 518.68
CREDIT CARD AMOUNT: 26452.71
[ END OF INVOICE ]   09:16am

SERVICE FILE COPY

183001



## Plaza Honda
2700 Nostrand Ave. Brooklyn, NY 11210
347-527-4002
PlazaAutoMall.com



183001

RECOMMENDED SERVICES

| OPERATION | OPERATION DESCRIPTION | MO/MI | TOTAL | OPERATION | OPERATION DESCRIPTION | MO/MI | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

SERVICE HISTORY

| DATE | REPAIR ORDER | MILEAGE | ADVISOR | TECHNICIAN | TYPE | OPERATION | OPERATION DESCRIPTION |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

SALESPERSON NO.              B O D Y              STATE REG# 7122818

| VEHICLE I D NO. SHHFK7H62LU404217 | YEAR/MAKE/MODEL 20/HONDA/CIVIC HATCHBACK/5DR HB EX | | PRODUCTION DATE | STOCK NO. | LICENSE NO. | R O NO 183001 |
|---|---|---|---|---|---|---|

ALBERT GUTIERREZ
5817 84TH ST
APT 2
MIDDLE VILLAGE, NY 11379

| CUSTOMER NO. 425540 | SERVICE CONTRACT | DELIVERY DATE | DELIVERY MILES | SELLING DEALER NO | R O DATE 10/01/25 |
|---|---|---|---|---|---|
| COLOR | | CONTRACT NO | | EXPIRATION DATE | EXPIRATION MILES | TAG NO 8316 |

| TURBO Y | M/MC HOZZ | AIR COND Y | P S Y | TRANS A | MILEAGE 138,407 | ADVISOR NO. 440850 | ADVISOR Daequan Counts |
|---|---|---|---|---|---|---|---|

RESIDENCE PHONE          BUSINESS PHONE

TIME RECEIVED 12:01pm   DATE/TIME PROMISED 11/01/25 05:00pm   PRIORITY

APPOINTMENT
☐ Yes
☒ No

CELL: 347-957-0172

LABOR RATE 179.00

WARRANTY DISCLAIMER. All parts and accessories are sold and all repairs are provided by the dealership as-is, without any warranty or guarantee...

ORIGINAL CUSTOMER ESTIMATE:

X _____

C   96HOZ          *BODY REPAIR*
VEHICLE TOWED IN WITH RIGHT SIDE FRONT END DAMAGE
DAMAGE TO RIGHT SIDE FENDER, FRONT BUMPER, HOOD, ETC.
PROGRESSIVE INSURANCE CLAIM#
25-886804265

15 days storage $2,250 @ $150/day
Tow out $300          Plate removal $100
Colissian wrap $220  shop labor $400
Gate fee $125
Tear down $500       6,171.68 + tax
Estimate $400        6,719.41
Scan fee $200

0101J183001

CUSTOMER COPY

PAGE 1 OF 1

183001

145585



# Plaza Honda
2700 Nostrand Ave. Brooklyn, NY 11210
347-527-4002
PlazaAutoMall.com



HONDA

145585

## RECOMMENDED SERVICES

| OPERATION | OPERATION DESCRIPTION | MO/MI | TOTAL | OPERATION | OPERATION DESCRIPTION | MO/MI | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

## SERVICE HISTORY

| DATE | REPAIR ORDER | MILEAGE | ADVISOR | TECHNICIAN | TYPE | OPERATION | OPERATION DESCRIPTION |
|---|---|---|---|---|---|---|---|
| 04/21/22 | 905164H | 10539 | 424 | 99 | C | MULTIHO | |
| | | | | 99 | C | LOFHO | |
| | | | | 99 | C | ALIGNHO | |
| 01/21/22 | 897936H | 8499 | 440080 | 99 | C | ROTATEHO | |
| | | | | 438412 | I | MULTIHO | |
| | | | | 438412 | C | VINSP-29HO | |

SALESPERSON NO.

## B O D Y

| VEHICLE ID NO | | YEAR/MAKE/MODEL | | | | | | | STATE REG# 7122818 |
|---|---|---|---|---|---|---|---|---|---|

**1HGCV1F34MA049810**  21/HONDA/ACCORD SEDAN/4DR SDN 1.5 C

LAZAYA DOMAN
1250 NEW YORK AVE APT 1B
BROOKLYN, NY 11203-5554

LAZAYA1@AOL.COM

| CUSTOMER NO | SERVICE CONTRACT | | PRODUCTION DATE | STOCK NO. | LICENSE NO. | R.O. NO |
|---|---|---|---|---|---|---|
| 10064895 | | | | | | 145585 |
| COLOR | | | DELIVERY DATE | DELIVERY MILES | SELLING DEALER NO. | R.O. DATE |
| BLUE/ | | | 06/03/21 | | | 08/02/24 |
| | CONTRACT NO | | EXPIRATION DATE | EXPIRATION MILES | TAG NO |

| TURBO | M/MC | AIR COND. | P.S. | TRANS | MILEAGE | ADVISOR NO | ADVISOR |
|---|---|---|---|---|---|---|---|
| Y | HOZZ | Y | Y | A | 10,539 | 439562 | DAVID VILLANUEVA |

stor

RESIDENCE PHONE **646-886-1942**   BUSINESS PHONE

WARRANTY DISCLAIMER: All parts and accessories are sold and all repairs are provided by the dealership as-is, without any warranty or guarantee. The dealership hereby disclaims all warranties, express and implied, including any implied warranties of merchantability and fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of any parts or accessories or any repairs performed to the vehicle. The only warranties on parts and accessories or repairs are those which may be offered by the manufacturer or original parts distributor or any such manufacturer or distributor shall be liable for performance under such warranties. Customers shall not be entitled to recover from the dealership, any consequential damages, damages to property, damages for loss of use, loss of time, loss of profit or income, or any other incidental damages. By signing below, you acknowledge that you were notified of and authorized the dealership to perform the services/repairs itemized in this invoice and that you had the opportunity to inspect the vehicle and received or inspected any replaced parts as requested by you before paying this invoice. The vehicle is being returned to you in exchange for your payment of the Amount Due.
LABOR COSTS: Our labor charges may be based on a Job Rate, an Hourly Rate multiplied by clock hours, Flat Rate Manual time, or a combination thereof. Our Hourly Rate is $199 (See table for each store's rate). The Manual(s) used for Flat Rates is ___ You have the right to review time rates as listed in the Manual upon request.

TIME RECEIVED **04:39pm**   DATE/TIME PROMISED **09/30/24** **07:00pm**   PRIORITY

LABOR RATE **179.00**

APPOINTMENT ☐ Yes ☒ No   CELL: 646-886-1942

JOB

ORIGINAL CUSTOMER ESTIMATE:

X _____

1   C  96HOZ                    *BODY REPAIR*
Admin Fee $250.00- Tow $200.00- Estimate $ 199.99- Storage
182 days @ $100.00 since 02/02/2024

PAYMENT TERMS: Payment Terms: I agree to pay for the inspection and repairs I authorize, along with the necessary materials, in cash or approved credit card upon completion of the repairs, unless the dealership agrees to other payment arrangements in advance. If I authorize commencement of repairs or disassembly of the vehicle or a vehicle component for diagnostic purposes and do not authorize completion of a repair or service, I understand that a charge will be imposed for disassembly, reassembly, or partially completed work and I agree to pay the same. This vehicle is subject to an express mechanics lien to secure payment for repairs. As per New York State Lien Law, if payment is not received within 15 days, we will enforce the lien by giving written notice of the lien to the vehicle's record owner and any other lien holders, before selling the vehicle. The need to file a lien will include all legal and filing costs, a minimum of $500 as liquidated damages to be applied to any service cost owed at time lien filing is required.

TOTAL

By Signing Below, I agree that: (1) I have read this Repair Order and I authorize the completion of the services/repairs listed above in accordance with the terms and conditions herein; (2) the dealership is not responsible for any delays caused by the unavailability of parts or shipping by a supplier or transporter or for any loss or damage to the vehicle or articles left in the vehicle in case of fire, theft, hail, wind or any other cause beyond its control; (3) the dealership may operate the vehicle on streets, highways, or public roadways for the purpose of testing and/or inspecting the vehicle, and (4) I authorize the removal of on-board data as needed to facilitate vehicle repairs and the sharing of that data with the vehicle manufacturer for diagnostic or research purposes.

Customer _____ Date _____

Estimate: Our dealership will provide you with an estimate of the cost of parts and labor necessary to perform repairs upon request. Your bill will not exceed the estimate without your authorization. Please initial beside the kind of estimate you want to receive.
Written Estimate (INITIAL ___). Oral Estimate (INITIAL ___).
No Estimate (INITIAL ___)
It is necessary to disassemble the vehicle to provide an estimated price for repairs. The estimated teardown and reassembly charge is $ ___ and does not include the cost of repairs.
Preliminary Estimate/Diagnostic Fee $ ___
Storage Charges: A storage charge equal to $100.00 will be assessed and shall accrue daily if I fail to pick up the vehicle within 24 hours from the date I am notified that the repairs are complete or after the communication of an estimate if I fail to authorize repairs.

| Original Estimate (1) (Parts & Labor) | Total Additional Cost Authorized | Approved By | Date & Time | Manner of Authorization |
|---|---|---|---|---|
| $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax/Email |
| Revised Estimate (2) $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax/Email |

Parts: All parts installed are new and all body shop parts are new OEM parts unless otherwise indicated. Remanufactured and refurbished parts that meet manufacturer approved source part requirements may be installed at our discretion. Additional information is available upon request. Replaced parts will be returned to you upon written request, except those parts which are subject to a manufacturer's warranty or sold on an exchange basis.
Discard Replaced Parts (INITIAL ___) Save Replaced Parts (INITIAL ___)
By choosing to pay with a credit card, cash, or check, you confirm that you are fully satisfied with the repairs and/or services provided upon payment. Please note that special order and/or VIN specific parts are non-refund

**Plaza Honda is a DBA of Plaza Motors, LLC
Facility # 7024378
DCA # 2112711
Repair Facility # 7122818*

PAGE 1 OF 1

01017145585

TECH COPY



**Plaza Honda**
2700 Nostrand Ave. Brooklyn, NY 11210
718-253-8400
PlazaAutoMall.com

HOCB144512



HOCB144512

0101IHOCB144512

| CUSTOMER NO. 10070963 | | ADVISOR DAVID VILLANUEVA 439562 | | TAG NO Lien | | INVOICE DATE 07/22/24 | | CELL: 718-314-1265 INVOICE NO. HOCB144512 |
|---|---|---|---|---|---|---|---|---|

ONICA A MATTHEWS
363 DUMONT AVE APT 2F
BROOKLYN, NY 11212-6134

ONICAM77@GMAIL.COM

| LABOR RATE 179.00 | LICENSE NO. | MILEAGE 60,241 | COLOR OBSIDIAN BL | STOCK NO. H7965 |
|---|---|---|---|---|

YEAR / MAKE / MODEL
17/HONDA/ACCORD SEDAN/

VEHICLE I.D NO
1 H G C R 2 F 3 8 H A 1 6 6 1 9 2

DELIVERY DATE 07/15/21 / DELIVERY MILES

SELLING DEALER NO / PRODUCTION DATE

| RESIDENCE PHONE 718-314-1265 | BUSINESS PHONE | COMMENTS E# 2.4 LITER | R.O DATE 07/22/24 |
|---|---|---|---|

JOB# 1 CHARGES---------

MO: 60241

LABOR--------
J# 1 96HOZ    BODY REPAIR    HOURS:    TECH(S):99
$1,000.00 deductible, $350.00 Lien processing fee, Storage
240 days at $100.00 a day $24,000.00 (11/25/2023 to
07/22/2024)                                          25350.00

JOB# 1 TOTALS------------

LABOR                        25350.00

JOB# 1 JOURNAL PREFIX HOCB  JOB# 1 TOTAL    25350.00

TOTALS----------

***********************************************
* [ ] CASH    [ ] CHECK   CK NO. [      ]    *
* [ ] VISA    [ ] MASTERCARD   [ ] DISCOVER  *
* [ ] AMER XPRESS   [ ] OTHER   [ ] CHARGE   *
***********************************************

| TOTAL LABOR.... | 25350.00 |
|---|---|
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 0.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 2249.82 |

**TOTAL INVOICE $    27599.82**

THANK YOU FOR YOUR BUSINESS!!

CUSTOMER SIGNATURE

| Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By | Date & Time | Manner of Authorization |
|---|---|---|---|---|
| $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |
| Revised Estimate $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |

**WARRANTY DISCLAIMER:** ALL PARTS AND ACCESSORIES ARE SOLD AND ALL REPAIRS ARE PROVIDED BY THE DEALERSHIP AS-IS, WITHOUT ANY WARRANTY OR GUARANTEE. THE DEALERSHIP HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF PARTS OR PRODUCTS OR THE REPAIR. THE ONLY WARRANTIES ON PARTS AND ACCESSORIES OR REPAIRS ARE THOSE WHICH MAY BE OFFERED BY THE MANUFACTURER OR ORIGINAL PARTS DISTRIBUTOR AND ONLY SUCH MANUFACTURER OR DISTRIBUTOR SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. CUSTOMER SHALL NOT BE ENTITLED TO RECOVER FROM THE DEALERSHIP ANY CONSEQUENTIAL DAMAGES, DAMAGES TO PROPERTY , DAMAGES FOR LOSS OF USE, LOSS OF TIME, LOSS OF PROFIT OR INCOME, OR ANY OTHER INCIDENTAL DAMAGES. By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you had the opportunity to inspect the vehicle and received or inspected any replaced parts as requested by you before paying this invoice. The vehicle is being returned to you in exchange for your payment of the Amount Due. By choosing to pay with a credit card, cash, or check, you confirm that you are fully satisfied with the repairs and/or services provided upon payment.

DATE

CUSTOMER SIGNATURE

AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

**ALL PARTS INSTALLED
ARE NEW AND ALL
BODY PARTS ARE NEW
OEM UNLESS
OTHERWISE INDICATED**

**PARTS RETURN WAIVER:**
I hereby waive the return of any replaced parts.

_____ INITIALS

*Plaza Honda is a DBA of Plaza Motors, LLC
Facility # 7024378
DCA # 2112711
Repair Facility # 7122818

**CASH AMOUNT:** 27599.82
**SURCHARGE AMOUNT:** 552.00
**CREDIT CARD AMOUNT:** 28151.82
[ END OF INVOICE ]    02:14pm

CUSTOMER COPY

The Reynolds and Reynolds Company

Coparts P/u 11/19/24



HOCB155599

Plaza Honda
2700 Nostrand Ave. Brooklyn, NY 11210
718-253-8400
PlazaAutoMall.com



HOCB155599

0101IHOCB155599

| CUSTOMER NO. 385805 | ADVISOR ASHLEY ANGLADA 439436 | TAG NO. 8637 | | CELL: 646-244-564 |
|---|---|---|---|---|

KEVIN PEREZ
7311 67TH DR
MIDDLE VLG, NY 11379

| LABOR RATE 179.00 | LICENSE NO. | MILEAGE 20,355 | INVOICE DATE 11/19/24 | INVOICE NO. HOCB155599 |
|---|---|---|---|---|

YEAR / MAKE / MODEL 22/HONDA/ACCORD SEDAN/4DR SDN CVT 1.

COLOR /

VEHICLE I.D. NO. 1 H G C V 1 F 3 4 N A 0 3 2 5 7 2

DELIVERY DATE / DELIVERY MILES

SELLING DEALER NO. / PRODUCTION DATE

RESIDENCE PHONE

BUSINESS PHONE

COMMENTS

F. T. E. NO.        P. O. NO.

R. O. DATE 11/19/24        REPRINT# 1

JOB# 1 CHARGES----------

LABOR------------
J# 1 96H0Z07        Tow Company
        63 PCT ROW TOW        HOURS:        TECH(S):99
        PETER TOWED CAR 11/11/24
        STOLEN RECOVERY
        GEICO CALLED 11/19 PICKING UP 11/19

        11 DAYS @150.00 $1,650.00
        TOW $450.00
        DOLLY $125.00
        TOW OUT $150.00
        ADMIN FEE $400.00

        $2775.00 PLUS TAXES

MO: 20355

2637.22

| | Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By: | Date & Time | Manner of Authorization |
|---|---|---|---|---|---|
| | $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |
| Revised Estimate | $ | | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |

WARRANTY DISCLAIMER: ALL PARTS AND ACCES-
SORIES ARE SOLD AND ALL REPAIRS ARE PROVIDED
BY THE DEALERSHIP AS-IS, WITHOUT ANY WARRANTY
OR GUARANTEE. THE DEALERSHIP HEREBY EXPRESS-
LY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMP-
LIED, INCLUDING ANY IMPLIED WARRANTIES OF
MERCHANTABILITY AND FITNESS FOR A PARTICULAR
PURPOSE, AND NEITHER ASSUMES NOR AUTHORIZES
ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILI-
TY IN CONNECTION WITH THE SALE OF PARTS OR
PRODUCTS OR THE REPAIR. THE ONLY WARRANTIES
ON PARTS AND ACCESSORIES OR REPAIRS ARE
THOSE WHICH MAY BE OFFERED BY THE MANUFAC-
TURER OR ORIGINAL PARTS DISTRIBUTOR AND ONLY
SUCH MANUFACTURER OR DISTRIBUTOR SHALL BE
LIABLE FOR PERFORMANCE UNDER SUCH WAR-
RANTIES. CUSTOMER SHALL NOT BE ENTITLED TO
RECOVER FROM THE DEALERSHIP ANY CONSEQUEN-
TIAL DAMAGES, DAMAGES TO PROPERTY, DAMAGES
FOR LOSS OF USE, LOSS OF TIME, LOSS OF PROFIT
OR INCOME, OR ANY OTHER INCIDENTAL DAMAGES.
By signing below, you acknowledge that you were notified of
and authorized the Dealership to perform the
services/repairs itemized in this invoice and that you had the
opportunity to inspect the vehicle and received or inspected
any replaced parts as requested by you before paying this
invoice. The vehicle is being returned to you in exchange for
your payment of the Amount Due. By choosing to pay with a
credit card, cash, or check, you confirm that you are fully sat-
isfied with the repairs and/or services provided upon payment.

JOB# 1 TOTALS-----------

                LABOR        2637.22
        JOB# 1 JOURNAL PREFIX HOCB JOB# 1 TOTAL        2637.22

TOTALS----------
*********************************************
*                                           *
* [ ] CASH    [ ] CHECK  CK NO. [       ]   *
*                                           *
* [ ] VISA    [ ] MASTERCARD    [ ] DISCOVER*
*                                           *
* [ ] AMER XPRESS   [ ] OTHER   [ ] CHARGE  *
*                                           *
*********************************************

THANK YOU FOR YOUR BUSINESS!!

TOTAL LABOR....        2637.22
TOTAL PARTS....        0.00
TOTAL SUBLET...        0.00
TOTAL G.O.G....        0.00
TOTAL MISC CHG.        0.00
TOTAL MISC DISC        0.00
TOTAL TAX......        234.06
                       --------
TOTAL INVOICE $        2871.28

DATE

CUSTOMER SIGNATURE

CUSTOMER SIGNATURE

AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

ALL PARTS INSTALLED
ARE NEW AND ALL
BODY PARTS ARE NEW
OEM UNLESS
OTHERWISE INDICATED

PARTS RETURN WAIVER:
I hereby waive the return of any
replaced parts.

_____ INITIALS

**Plaza Honda is a DBA of Plaza
Motors, LLC
Facility # 7024378
DCA # 2112711
Repair Facility #

SERVICE FILE COPY

[CONTINUED ON NEXT PAGE]        03:52pm

HOCB164205





**Plaza Honda**
2700 Nostrand Ave. Brooklyn, NY 11210
718-253-8400
PlazaAutoMall.com



CELL: 929-216-1713

| CUSTOMER NO. 393644 | | ADVISOR Daequan Counts 440850 | TAG NO. darp | INVOICE DATE 02/24/25 | INVOICE NO HOCB164205 |
|---|---|---|---|---|---|

TRISHANNA JACOBS
125 TED TURNER DR
SW UNIT 420
ATLANTA, GA 30303

| LABOR RATE 179.00 | LICENSE NO. | MILEAGE 20,000 / | COLOR | STOCK NO |
|---|---|---|---|---|

YEAR / MAKE / MODEL
11/NISSAN/VERSA/5DR HB I4 1.8 S AT

| DELIVERY DATE | DELIVERY MILES |

VEHICLE I.D. NO.
3 N 1 B C 1 C P 1 B L 4 9 1 1 2 2

| SELLING DEALER NO | PRODUCTION DATE |

| F.T.E NO | P.O. NO |
|---|---|

| R.O. DATE 02/21/25 |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS |

MO: 20000

```
JOB#  1 CHARGES----------
LABOR--------------
J# 1 96HOZ        BODY REPAIR        HOURS:       TECH(S):99              2150.28
     CAR TOWED 02/16/25
     PROGRESSIVE CLAIM#
     25-391654389

     TOW $250.00
     10 DAYS @125.00 $1,250
     COLLISON WRAP $100.00
     GATE FEE $100.00
     TOW OUT $125.00
     ADMIN FEE $150.00
     $1,975.00 PLUS TAXES
JOB#  1 TOTALS-----------
                                           LABOR          2150.28
          JOB#  1 JOURNAL PREFIX  HOCB  JOB#  1 TOTAL     2150.28
TOTALS---------------
```

| Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By: | Date & Time | Manner of Authorization |
|---|---|---|---|---|
| $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |
| Revised Estimate $ | | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |

**WARRANTY DISCLAIMER:** ALL PARTS AND ACCESSORIES ARE SOLD AND ALL REPAIRS ARE PROVIDED BY THE DEALERSHIP AS-IS, WITHOUT ANY WARRANTY OR GUARANTEE. THE DEALERSHIP HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF PARTS OR PRODUCTS OR THE REPAIR. THE ONLY WARRANTIES ON PARTS AND ACCESSORIES OR REPAIRS ARE THOSE WHICH MAY BE OFFERED BY THE MANUFACTURER OR ORIGINAL PARTS DISTRIBUTOR AND ONLY SUCH MANUFACTURER OR DISTRIBUTOR SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. CUSTOMER SHALL NOT BE ENTITLED TO RECOVER FROM THE DEALERSHIP ANY CONSEQUENTIAL DAMAGES, DAMAGES TO PROPERTY , DAMAGES FOR LOSS OF USE, LOSS OF TIME, LOSS OF PROFIT OR INCOME, OR ANY OTHER INCIDENTAL DAMAGES. By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you had the opportunity to inspect the vehicle and received or inspected any replaced parts as requested by you before paying this invoice. The vehicle is being returned to you in exchange for your payment of the Amount Due. By choosing to pay with a credit card, cash, or check, you confirm that you are fully satisfied with the repairs and/or services provided upon payment.

```
****************************************
*                                      *
*  [ ] CASH    [ ] CHECK  CK NO. [    ] *
*                                      *
*  [ ] VISA    [ ] MASTERCARD  [ ] DISCOVER *
*                                      *
*  [ ] AMER XPRESS   [ ] OTHER   [ ] CHARGE *
*                                      *
****************************************
```

| TOTAL LABOR.... | 2150.28 |
|---|---|
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 0.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 0.00 |
| **TOTAL INVOICE $** | **2150.28** |

THANK YOU FOR YOUR BUSINESS!!

CUSTOMER SIGNATURE
***********************   D U P L I C A T E   I N V O I C E   ***************************

DATE

CUSTOMER SIGNATURE

AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

**ALL PARTS INSTALLED ARE NEW AND ALL BODY PARTS ARE NEW OEM UNLESS OTHERWISE INDICATED**

**PARTS RETURN WAIVER:** I hereby waive the return of any replaced parts.

_____ INITIALS

PAID FEB 2 5 2025 By $2,150.28

**Plaza Honda is a DBA of Plaza Motors, LLC
Facility # 7024378
DCA # 2112711
Repair Facility # 7122818**

CASH AMOUNT: 2150.28
SURCHARGE AMOUNT: 43.01
CREDIT CARD AMOUNT: 2193.29
[ END OF INVOICE ]  11:56am

PAGE 1 OF 1          CUSTOMER COPY

The Reynolds and Reynolds Company



HOCB165391



**Plaza Honda**
2700 Nostrand Ave. Brooklyn, NY 11210
718-253-8400
PlazaAutoMall.com



HONDA

0101IHOCB165391

| CUSTOMER NO. 394809 | ADVISOR Daequan Counts 440850 | TAG NO 0000 | INVOICE DATE 03/17/25 | INVOICE NO HOCB16539 |
|---|---|---|---|---|
| HERTZ LLC 8501 WILLIAMS RD ESTERO, FL 33928 | LABOR RATE 179.00 LICENSE NO. | MILEAGE 15,000 | COLOR / | STOCK NO |
| | YEAR / MAKE / MODEL 24/NISSAN/ALTIMA/4DR SDN 2.5 SV | | DELIVERY DATE | DELIVERY MILES |
| | VEHICLE I.D. NO 1 N 4 B L 4 D V 4 R N 3 8 9 6 5 0 | | SELLING DEALER NO. | PRODUCTION DATE |
| | F.T.E NO P.O. NO. | | R.O. DATE 03/06/25 | REPRINT# |
| RESIDENCE PHONE BUSINESS PHONE | COMMENTS | | | |

```
JOB# 1 CHARGES------------------------------------------------          MO: 15

LABOR-----------------------------------------------------------
J# 1 96HOZ        BODY REPAIR        HOURS:      TECH(S):99
                  CAR TOWED BY PETE 3/6                              1350.00

          12 DAYS @ $175.00 $2,100
          TOW $250.00
          ADMIN $150.00
          GATE $125.00
          $2,625.00 PLUS TAXES

SUBLET-----PO#--------VEND INV#-INV.DATE-DESCRIPTION------------------------
          28322      52 RE CLE 03/15/25 52 RECLEANS               520.00
          28323      7 DETAILS 03/15/25 7 DETAILS                 630.00
                                              TOTAL - SUBLET     1150.00
JOB# 1 TOTALS-----------------------------------------------------
                                              LABOR              1350.00
                                              SUBLET             1150.00
              JOB# 1 JOURNAL PREFIX HOCB  JOB# 1 TOTAL           2500.00
TOTALS--------------------------------------------------------------------
```

```
**********************************************
*                                            *
* [ ] CASH    [ ] CHECK   CK NO. [       ]   *
*                                            *
* [ ] VISA   [ ] MASTERCARD  [ ] DISCOVER    *
*                                            *
* [ ] AMER XPRESS   [ ] OTHER  [ ] CHARGE    *
*                                            *
**********************************************

THANK YOU FOR YOUR BUSINESS!!
```

| | |
|---|---|
| TOTAL LABOR.... | 1350.00 |
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 1150.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 0.00 |
| **TOTAL INVOICE $** | **2500.00** |

**WARRANTY DISCLAIMER:** ALL PARTS AND / SORIES ARE SOLD AND ALL REPAIRS ARE PRC BY THE DEALERSHIP AS-IS, WITHOUT ANY WAR OR GUARANTEE. THE DEALERSHIP HEREBY EXF LY DISCLAIMS ALL WARRANTIES, EXPRESS AN LIED, INCLUDING ANY IMPLIED WARRANTII MERCHANTABILITY AND FITNESS FOR A PARTI PURPOSE, AND NEITHER ASSUMES NOR AUTHC ANY OTHER PERSON TO ASSUME FOR IT ANY I PRODUCTS OR THE REPAIR. THE ONLY WARR/ ON PARTS AND ACCESSORIES OR REPAIR THOSE WHICH MAY BE OFFERED BY THE MAI TURER OR ORIGINAL PARTS DISTRIBUTOR ANI SUCH MANUFACTURER OR DISTRIBUTOR SH/ LIABLE FOR PERFORMANCE UNDER SUCH RANTIES. CUSTOMER SHALL NOT BE ENTITL RECOVER FROM THE DEALERSHIP ANY CONSE TIAL DAMAGES, DAMAGES TO PROPERTY , DAI FOR LOSS OF USE, LOSS OF TIME, LOSS OF I OR INCOME, OR ANY OTHER INCIDENTAL DAI By signing below, you acknowledge that you were nc and authorized the Dealership to perform services/repairs itemized in this invoice and that you opportunty to inspect the vehicle and received or ins any replaced parts as requested by you before pay invoice. The vehicle is being returned to you in exchr your payment of the Amount Due. By choosing to pa credit card, cash, or check, you confirm that you are f istied with the repairs and/or services provided upon p.

CUSTOMER SIGNATURE

CUSTOMER SIGNATURE

AUTHORIZED DEALERSHIP REPRESENTA SIGNATURE

**ALL PARTS INSTALLED
ARE NEW AND ALL
BODY PARTS ARE NEW
OEM UNLESS
OTHERWISE INDICATED**

**PARTS RETURN WAIVER:** I hereby waive the return of replaced parts.

INITIALS

**Plaza Honda is a DBA of Plaza Motors, LLC Facility # 7024378 DCA # 2112711 Repair Facility # 7122818*

PAGE 1 OF 2          SERVICE FILE COPY

[CONTINUED ON NEXT PAGE]          10:07am

The Reynolds and Reynolds Company ER



*Pickup 12/23/24*

TOCB244269

## Plaza Toyota
2699 Nostrand Ave. Brooklyn, NY 11210
718-253-8400
PlazaAutoMall.com



TOYOTA

TOCB244269

*Coparts*

0102ITOCB244269

| CUSTOMER NO. 129778 | | | | | CELL: 347-761-1612 | |
|---|---|---|---|---|---|---|
| | ADVISOR ASHLEY ANGLADA 439436 | TAG NO stol | INVOICE DATE 12/20/24 | INVOICE NO TOCB244269 | | |
| LIU JIAN 722 51ST ST BROOKLYN, NY 11220-2225 | LABOR RATE 179.00 | LICENSE NO. | MILEAGE 59,367 | COLOR / | STOCK NO | |
| | YEAR / MAKE / MODEL 15/TOYOTA TRUCK/RAV4/4DR AWD LTD | | | DELIVERY DATE 01/01/15 | DELIVERY MILES | |
| | VEHICLE I.D. NO. J T M D F R E V 5 F D 1 3 2 4 7 2 | | | SELLING DEALER NO | PRODUCTION DATE | |
| | F.T.E. NO. | | P.O. NO. | | | |
| RESIDENCE PHONE 347-761-1612 | BUSINESS PHONE | COMMENTS | | R.O. DATE 12/05/24 | REPRINT# 2 | |

JOB# 1 CHARGES----------------------------------------------------------------------------------- MO: 59367

| | Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By | Date & Time | Manner of Authorization |
|---|---|---|---|---|---|

LABOR---------------------------------
J# 1 96TOZ              BODY REPAIR                    TECH(S):99          2746.00
PETE TOWED CAR 63 PCT ROW TOW
STOLEN RECOVERY
GEICO # 0536686150101031

```
12/5 - 12/18
16 DAYS @150.00 $2,100
TOW $300.00
TOW OUT $300.00
GATEFEE $50.00
ADMIN $175.00
SHOP LABOR $300.00
PLATE REMOVAL FEE $75.00
```

SUBLET-----PO#-------VEND INV#-INV.DATE-DESCRIPTION--------------------------------
       26245     7522      12/20/24 INV 7522
                                        TOTAL - SUBLET        654.00
                                                              654.00
JOB# 1 TOTALS----------------------------------------------------
                                        LABOR         2746.00
                                        SUBLET         654.00
               JOB# 1 JOURNAL PREFIX TOCB  JOB# 1 TOTAL    3400.00

ESTIMATE----------------------------------------------------------
CUSTOMER HEREBY ACKNOWLEDGES RECEIVING
       ORIGINAL ESTIMATE OF    $0.00 (+TAX)
COMMENTS----------------------------------------------------------
RECOMMENDED NOT DONE/ DECLINED SERVICES--------------------------

TOTALS-----------------------------------------------------------

**WARRANTY DISCLAIMER:** ALL PARTS AND ACCESSORIES ARE SOLD AND ALL REPAIRS ARE PROVIDED BY THE DEALERSHIP AS-IS, WITHOUT ANY WARRANTY OR GUARANTEE. THE DEALERSHIP HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF PARTS OR PRODUCTS OR THE REPAIR. THE ONLY WARRANTIES ON PARTS AND ACCESSORIES OR REPAIRS ARE THOSE WHICH MAY BE OFFERED BY THE MANUFACTURER OR ORIGINAL PARTS DISTRIBUTOR AND ONLY SUCH MANUFACTURER OR DISTRIBUTOR SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. CUSTOMER SHALL NOT BE ENTITLED TO RECOVER FROM THE DEALERSHIP ANY CONSEQUENTIAL DAMAGES, DAMAGES TO PROPERTY, DAMAGES FOR LOSS OF USE, LOSS OF TIME, LOSS OF PROFIT OR INCOME, OR ANY OTHER INCIDENTAL DAMAGES. By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you had the opportunity to inspect the vehicle and received or inspected any replaced parts as requested by you before paying this invoice. The vehicle is being returned to you in exchange for your payment of the Amount Due. By choosing to pay with a credit card, cash, or check, you confirm that you are fully satisfied with the repairs and/or services provided upon payment.

_____
DATE

_____
CUSTOMER SIGNATURE

_____
AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

**ALL PARTS INSTALLED
ARE NEW AND ALL
BODY PARTS ARE NEW
OEM UNLESS
OTHERWISE INDICATED**

```
***************************************
*                                     *
* [ ] CASH   [ ] CHECK  CK NO. [    ] *
*                                     *
* [ ] VISA   [ ] MASTERCARD [ ] DISCOVER *
*                                     *
* [ ] AMER XPRESS  [ ] OTHER  [ ] CHARGE *
*                                     *
***************************************
```

TOTAL LABOR....    2746.00
TOTAL PARTS....       0.00
TOTAL SUBLET...     654.00
TOTAL G.O.G....       0.00
TOTAL MISC CHG.       0.00
TOTAL MISC DISC       0.00
TOTAL TAX......     301.75
                 ----------
**TOTAL INVOICE $   3701.75**

**PARTS RETURN WAIVER:**
I hereby waive the return of any replaced parts.

THANK YOU FOR YOUR BUSINESS!

_____ INITIALS

_____
CUSTOMER SIGNATURE

**CASH AMOUNT: 3701.75**
**SURCHARGE AMOUNT: 74.04**
**CREDIT CARD AMOUNT: 3775.79**
[ END OF INVOICE ]    03:03pm

*"Plaza Toyota is a DBA of Plaza Cars, LLC
Facility # 7084361
DCA # 2112709
Repair Facility # 7084360*

The Reynolds and Reynolds Company ERAINTINV6

HOCB166087



**Plaza Honda**
2700 Nostrand Ave. Brooklyn, NY 11210
718-253-8400
PlazaAutoMall.com



HOCB166087

0101THOCB166087

| CUSTOMER NO. | ADVISOR | TAG NO | INVOICE DATE | INVOICE NO |
|---|---|---|---|---|
| 10081158 | ASHLEY ANGLADA 439436 | TOW | 03/20/25 | HOCB166087 |

AVIS BUDGET CAR RENTAL LLC
5721 WEST 96TH STREET
LOS ANGELES, CA 90045

| LABOR RATE | LICENSE NO | MILEAGE | COLOR | STOCK NO. |
|---|---|---|---|---|
| 179.00 | | 10,000 / | | |

YEAR / MAKE / MODEL: 24/MITSUBISHI/OUTLANDER/4DR FWD SE B

| DELIVERY DATE | DELIVERY MILES |
|---|---|

VEHICLE I.D. NO.: J A 4 J 3 V A 8 9 R Z 0 3 7 8 0 7

| SELLING DEALER NO. | PRODUCTION DATE |
|---|---|

| F.T.E. NO. | P.O. NO. | R.O. DATE 03/14/25 | REPRINT# 4 |
|---|---|---|---|

RESIDENCE PHONE: 123-123-1234
BUSINESS PHONE:
COMMENTS:

MO: 10000

JOB# 1 CHARGES

LABOR

J# 1 96HOZ07    Tow Company    HOURS:    TECH(S):99    1374.00
PETE TOWED CAR 2/28/25

18 DAYS @ $175.00 PER DAY $3,150
TOW $250.00
ADMIN $150.00
GATE FEE $125.00
$3,675 PLUS TAXES

SUBLET-----PO#--------VEND INV#-INV.DATE-DESCRIPTION-------------------------------
    28324      14 DETAIL 03/15/25 14 DETAILS                          1260.00
    28433    7979    03/20/25 INV 7979                                866.00
                                        TOTAL - SUBLET              2126.00

JOB# 1 TOTALS----------------------------------------------------------
                                        LABOR                       1374.00
                                        SUBLET                      2126.00

            JOB# 1 JOURNAL PREFIX HOCB JOB# 1 TOTAL                 3500.00

TOTALS------------------------------------------------------------------

| Original Estimate (Parts & Labor) | Total Additional Cost Authorized | Approved By | Date & Time | Manner of Authorization |
|---|---|---|---|---|
| $ | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |
| Revised Estimate | $ | | | ☐ In person ☐ Via Telephone ☐ Via Fax ☐ Via Email |

WARRANTY DISCLAIMER: ALL PARTS AND ACCESSORIES ARE SOLD AND ALL REPAIRS ARE PROVIDED BY THE DEALERSHIP AS-IS, WITHOUT ANY WARRANTY OR GUARANTEE. THE DEALERSHIP HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF PARTS OR PRODUCTS OR THE REPAIR. THE ONLY WARRANTIES ON PARTS AND ACCESSORIES OR REPAIRS ARE THOSE WHICH MAY BE OFFERED BY THE MANUFACTURER OR ORIGINAL PARTS DISTRIBUTOR AND ONLY SUCH MANUFACTURER OR DISTRIBUTOR SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. CUSTOMER SHALL NOT BE ENTITLED TO RECOVER FROM THE DEALERSHIP ANY CONSEQUENTIAL DAMAGES, DAMAGES TO PROPERTY , DAMAGES FOR LOSS OF USE, LOSS OF TIME, LOSS OF PROFIT OR INCOME, OR ANY OTHER INCIDENTAL DAMAGES. By signing below, you acknowledge that you were notified of and authorized the Dealership to perform the services/repairs itemized in this invoice and that you had the opportunity to inspect the vehicle and received or inspected any replaced parts as requested by you before paying this invoice. The vehicle is being returned to you in exchange for your payment of the Amount Due. By choosing to pay with a credit card, cash, or check, you confirm that you are fully satisfied with the repairs and/or services provided upon payment.

****************************************************
*                                                  *
*  [ ] CASH    [ ] CHECK  CK NO. [      ]  *
*                                                  *
*  [ ] VISA   [ ] MASTERCARD   [ ] DISCOVER  *
*                                                  *
*  [ ] AMER XPRESS   [ ] OTHER   [ ] CHARGE  *
*                                                  *
****************************************************

| | |
|---|---|
| TOTAL LABOR.... | 1374.00 |
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 2126.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 0.00 |

TOTAL INVOICE $    3500.00

THANK YOU FOR YOUR BUSINESS!!

DATE

CUSTOMER SIGNATURE

CUSTOMER SIGNATURE

AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE

**ALL PARTS INSTALLED
ARE NEW AND ALL
BODY PARTS ARE NEW
OEM UNLESS
OTHERWISE INDICATED**

**PARTS RETURN WAIVER:**
I hereby waive the return of any replaced parts.

_____ INITIALS

**Plaza Honda is a DBA of Plaza Motors, LLC
Facility # 7024378
DCA # 2112711
Repair Facility # 7122818*

PAGE 1 OF 2    SERVICE FILE COPY    [CONTINUED ON NEXT PAGE]    05:23pm

The Reynolds and Reynolds Company  ERAINTINVE

# EXHIBIT B

PKG JFK8

## PARKING LICENSE FIRST AMENDMENT

| Date of Amendment ("Effective Date"): | The date of the last party to sign. |
|---|---|
| Licensee Entity ("Amazon"): | Amazon.com Services LLC |
| Licensor Entity ("Licensor"): | Arthur Kill Properties LLC |
| Premises Address: | 4350 Arthur Kill Rd, Staten Island, NY 10309 |

This Parking License First Amendment ("**Amendment**") is dated as of the Effective Date and is entered into by Licensor and Amazon.

### RECITALS

Licensor and Amazon are parties to that certain **PARKING LICENSE AGREEMENT** dated as of August 4, 2022 (the "**Parking License**"), under which Amazon is currently leasing all or a portion of the Premises as further described in the Parking License (the "**Current Premises**"). The parties desire to amend the Parking License as further stated below. All capitalized terms used but not defined herein will have the meanings given such terms in the Parking License.

1.  **Term.** No changes.

2.  **Rent.** Commencing on November 15, 2022 and continuing through January 31, 2023 (the "**Temporary Expansion Period**"), Amazon will pay Licensor $240,000 per month, prorated for any partial month, on the first business day of each month, to use the Premises during the Temporary Expansion Period. Commencing on February 1, 2023, Amazon will pay Licensor $150,000 per month.

3.  **Temporary Expansion.** Commencing on November 15, 2022 and continuing through January 31, 2023, the definition of the Premises is hereby amended to include both the Current Premises and that certain area consisting of three (3) additional acres, for a total Premises outline of 8 acres as shown on Exhibit A (the "**Temporary Expansion Premises**"). Commencing on February 1, 2023 the definition of the Premises will be amended and revert back to the Current Premises, which consists of 5 acres.

4.  **Licensor Work:** Licensor will deliver the Temporary Expansion Premises with the following:

    (i) perimeter fencing around the Premises with a minimum of two gated entry points for access,
    (ii) site leveling work and repair any potholes within the Premises,

5.  **Miscellaneous.** Licensor or Amazon may deliver executed signature pages by electronic means, which will be deemed to be an original. This Amendment may be executed in any number of counterparts, each of which will be deemed an original and all of which together constitute one agreement with the same effect as if the parties signed the same page. This Amendment and the Parking License are the entire agreement between the parties with respect to Amazon's License of the Premises. Licensor and Amazon each warrant that they have not dealt with any person who may claim any form of compensation in connection with this Amendment except for KBC Advisors whom Licensor agrees to compensate pursuant to a separate agreement]. Each party agrees to indemnify, defend, and hold the other harmless against any claims by any person claiming any form of compensation related to this transaction.

6.  **No Other Modification.** Except as modified by this Amendment, the Parking License remains in full force and effect.

This Amendment is executed by the parties to be effective on the Effective Date.

**Amazon:**
Amazon.com Services LLC

By: _____

Name: _____

Title: _____

Date Signed: _____

**Licensor:**
Arthur Kill Properties LLC

By: _____adam Rosutti_____

Name: ____Adam Rosatti_____

Title: ____General Manager_____

Date Signed: ____9/30/22_____

PKG JFK8

EXHIBIT A

Expansion Premises

Current Premises as outlined in green (5 acres) and Temporary Expansion Premises as outlined in yellow (3 acres).



Privileged and Confidential
Page 2 of 2

AFFIDAVIT

STATE OF NEW YORK )

                       ) SS.:

COUNTY OF NEW YORK )


I Arnold Baum, being duly sworn, deposes and says, under the penalty of perjury:

I am Chief Operating Officer of Subin Associates. On or about January 2018, the firm was introduced to Safa Gelardi through a contact named Greg Elefterakis. She introduced a new IME service to us called IME Companions. My firm was using IME Watchdog. We were unhappy with their service. We started using IME Companions and have been ever since. We are happy with the service from IME Companions.


_____
Arnold Baum


Sworn to before me this
/5 day of March, 2022


Notary Public

Bonita Woods
Notary Public, State of New York
No. 01W06091142
Qualified in Bronx County
Commission Expires April 28, 2023

## AFFIDAVIT

STATE OF NEW YORK)
                        ) SS.:
COUNTY OF NEW YORK)


I Jason M. Zemsky, being duly sworn, deposes and says, under the penalty of perjury:
My firm Zemsky & Salomon used IME services from IME Watch Dog in the past. They were
the first IME service we used. I was unhappy with their service; they could not cover last
minute request. A representative from IME Guards came to my office on or about February
2019. I then started using IME Guards. I was unhappy with their service as they did not have
enough coverage. On or about August 2019, two representatives from IME Companions came
to my office to introduce a new IME service called IME Companions. The representatives
identified themselves as Carlos Roa and Safa Gelardi. I then started using IME Companions and
have been ever since. I am very satisfied with the service.


Jason M. Zemsky


Sworn to before me this
15 day of March, 2022

Notary Public

JOSEPH VUOZZO
Notary Public, State of New York
Registration #02VU6356293
Qualified in Nassau County
Commission Expires March 27, 2025

March 29, 2026

Hon. Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

*Re: IME Watchdog, Inc. v. Safa Abdulrahim Gelardi, Vito Gelardi, et al., 22-CV-1032 (PKC) (JRC)*

**LETTER MOTION FOR LEAVE TO SERVE LIMITED RULE 45 SUBPOENA ON MORGAN & MORGAN**

Dear Judge Chen:

I respectfully request leave to serve a limited Rule 45 document subpoena on nonparty Morgan & Morgan, through Nicholas Gerschman, Esq., 199 Water Street, Suite 1500, New York, New York 10038, concerning the June 13, 2025 IME of Jeannie Tam.

This request arises from a specific factual dispute Plaintiff has used, and continues to use, to support a broader narrative of ongoing conduct, active concert, and contempt exposure. Plaintiff has asserted, in substance, that Defendants serviced the June 13, 2025 Jeannie Tam IME and that Mark Purificati appeared. Defendants deny that. Defendants did not receive any request for that IME, did not retain or assign Mark Purificati for that IME, and were not paid for that IME.

This request is not speculative. Exhibit A contains the relevant pages of the filed affirmation of Jared Lefkowitz, Esq. Mr. Lefkowitz states that, after the March 3, 2026 hearing, records were checked and Mark Purificati had not performed the June 13, 2025 observation and had never performed an observation for a Morgan & Morgan client. He further states that, on March 24, 2026, he called Nicholas Gerschman, explained the issue, and was told that Morgan & Morgan uses Plaintiff IME WatchDog for IME observations, although written confirmation identifying who was actually retained for the Tam IME was still not provided. He also explains how he located a separate NYSCEF-filed Morgan & Morgan matter in which IME WatchDog was expressly identified as the observer.

The Kelly matter sharpens the point because it supplies prior-course evidence involving the same Morgan & Morgan attorney. Exhibits F and G reflect that, in a separate Kelly matter handled by Nicholas Gerschman, an IME report dated April 4, 2024 expressly identified IME WatchDog as the observer present at the IME. That history tends to show that, as between Plaintiff and Mr. Purificati, Plaintiff IME WatchDog-not Mr. Purificati-was Morgan & Morgan's regular vendor for IME observation services.

Roa's role is central. Exhibit B is Plaintiff's March 23, 2026 supplemental declaration of Carlos Roa. Mr. Roa did not appear as a detached bystander. He declared, under penalty of perjury, that he was familiar with the relevant facts through personal knowledge and review of the file maintained at IME WatchDog, yet he still attributed the June 13, 2025 Tam IME to Mark Purificati and used that attribution to support Plaintiff's active-concert narrative. Exhibit C is Plaintiff's own public webpage identifying Mr. Roa as IME WatchDog's President, Operations. That title is not incidental. It is the very operational role one would expect to know who was retained, who was assigned, who was confirmed, and who appeared.

That means the disputed Tam attribution was not merely repeated from a third-party report by an outsider. Plaintiff, through its own operations chief, reviewed its own file and still placed that attribution before the Court while presenting Mr. Roa only as a judgment creditor. If the attribution is wrong, the problem is not just a clerical mismatch in a doctor's report. It is a potentially false operational attribution advanced by

Plaintiff itself. At minimum, it is serious gamesmanship, and it is exactly why neutral third-party verification from Morgan & Morgan is necessary before Plaintiff is permitted to continue relying on the Tam IME.

Exhibits D and E are the Jeannie Tam IME report and the D & D Associates rescheduling letter tying Morgan & Morgan to the June 13, 2025 Tam IME. Read together with Exhibits A through G, the present record shows a concrete, objective dispute about who Morgan & Morgan actually retained for that IME and who in fact appeared with the claimant.

This is not ancillary. Plaintiff used the June 13, 2025 Tam IME to support emergency TRO/PI relief, to press an active-concert theory, and to place Defendants under a continuing cloud of contempt-related exposure. Having chosen to wield that IME as part of its contempt and default narrative, Plaintiff should not be permitted to resist the short third-party subpoena that can conclusively determine whether Plaintiff's attribution is true.

The prejudice is concrete. Plaintiff used this disputed IME to help drive emergency proceedings, consume judicial resources, and then doubled down on March 23, 2026 through Mr. Roa's declaration instead of producing straightforward operational confirmation. If Morgan & Morgan's records show that Plaintiff IME WatchDog-or someone other than Defendants-was retained for the Tam IME, then Plaintiff advanced a materially false operational attribution to obtain leverage and to continue pressing for sweeping final relief. That would raise serious concerns about the accuracy of evidence presented to the Court. Fundamental fairness and due process require that this issue be resolved by documents, not accusation.

This request is also timely and proportional in light of Plaintiff's current posture. Plaintiff previously represented to the Court that it required additional financial information before default judgment and was granted time to pursue such material. Yet Plaintiff now seeks sweeping final relief-including substantial money damages and a permanent injunction-while still relying on unresolved factual assertions such as the June 13 Tam IME. Plaintiff cannot say the record needed more information for default judgment and then ask the Court to accept a disputed operational attribution that can be tested by a single narrow subpoena.

This is not a fishing expedition and not an attempt to reopen broad discovery. Defendants do not seek attorney mental impressions, legal strategy, or a wholesale review of counsel's file. Defendants seek only limited, nonprivileged records sufficient to show who Morgan & Morgan retained for that IME, who was assigned or confirmed, whether any reassignment occurred, whether any invoice or payment exists, and any attendance-related record identifying who was expected to appear or who did appear. The issue is verifiable in multiple narrow ways without invading privilege, including request and confirmation records, invoice or payment records, a redacted observer report identifying only the attorney, client, date, doctor, location, and observer, office sign-in or front-desk records from the examination location, or another nonprivileged attendance-related record sufficient to identify who was expected to appear or who did appear.

The proposed subpoena is narrow and proportional. It is confined to one IME, one client, one law firm, and one discrete operational question. If leave is granted, Defendants will serve the subpoena only after providing advance notice and a copy to the parties. The proposed document requests are attached as Attachment 1. For the Court's convenience, an exhibit index follows the attachment. Defendants respectfully request leave to serve the limited Rule 45 subpoena.

Respectfully submitted,

/s/ Safa Gelardi
/s/ Vito Gelardi
Safa Gelardi and Vito Gelardi
Pro Se Defendants

**ATTACHMENT 1**

**PROPOSED SCHEDULE A – DOCUMENTS REQUESTED**

Produce documents concerning the June 13, 2025 IME of Jeannie Tam sufficient to show:

1. whether Morgan & Morgan requested IME observer, companion, watchdog, or similar coverage for that IME;

2. the identity of any company or person contacted, retained, assigned, confirmed, cancelled, substituted, or replaced for such coverage;

3. the date of any such request, confirmation, cancellation, reassignment, substitution, or replacement;

4. whether any invoice was issued or payment was made for such coverage, including the identity of the payee;

5. any nonprivileged communication transmitting or confirming the assignment for such coverage; and

6. any nonprivileged document sufficient to identify the person expected to appear or who did appear with the client at that IME.

**Definitions**

"Records sufficient to show" means documents adequate to identify the fact, date, entity, and individual involved, without requiring production of entire files where narrower records will suffice.

"Nonprivileged communication" excludes attorney-client privileged communications and attorney work product, but includes nonprivileged business records reflecting retention, assignment, confirmation, invoice, payment, cancellation, substitution, or attendance.

## EXHIBIT INDEX

The following exhibits are included in the packet submitted in support of the letter motion:

| Exhibit | Description |
|---|---|
| A | Relevant pages from Jared Lefkowitz's filed affirmation regarding the June 13, 2025 Jeannie Tam IME, Mark Purificati's denial, Mr. Gerschman's statement that Morgan & Morgan uses IME WatchDog, and the comparison Kelly matter. |
| B | Plaintiff's March 23, 2026 supplemental declaration of Carlos Roa continuing to attribute the June 13, 2025 Tam IME to Mark Purificati while stating that he reviewed the file maintained at IME WatchDog. |
| C | Publicly available IME WatchDog webpage identifying Carlos Roa as IME WatchDog's President, Operations. |
| D | Jeannie Tam IME report for June 13, 2025 stating that she was accompanied by legal representative, Mark Purificati. |
| E | D & D Associates rescheduling letter tying Morgan & Morgan to the June 13, 2025 Jeannie Tam IME. |
| F | NYSCEF case-detail page from the separate Kelly matter reflecting Nicholas Gerschman / Morgan & Morgan as counsel. |
| G | IME report from the separate Kelly matter expressly identifying IME WatchDog as the observer present at the IME, demonstrating prior Morgan & Morgan use of IME WatchDog. |

# EXHIBIT A

**The June 13, 2025 IME Observation**

3.  In the EDNY case the Plaintiff recently brought an Order to Show Cause against Direct and Mr. Purificati making the same allegations against them as they do in this case. See, Exhibit A. This Affirmation is submitted to alert the Court as to what happened in that motion because it bears directly on the Plaintiff's ability in our case to maintain any claims whatsoever based upon the utter lack of evidence.

4.  Crucially, there is a certain "irregularity" in Plaintiff's primary piece of evidence.

5. An evidentiary hearing was held in the EDNY on March 3, 2026 in connection with the Order to Show Cause. At the close of testimony Judge Chen ruled off the bench denying Plaintiff's motion. Judge Chen stated on the record "there is no *there* there."[1] At that point on behalf of Direct I made an oral application for recovery of Direct's attorney's fees. Judge Chen set a briefing schedule for that motion.

6.  During the testimony Plaintiff attempted to impeach Mr. Purificati with a June 13, 2025 Independent Medical Examination ("IME") observation which Plaintiff alleges was performed by Mr. Purificati "on behalf of Safa [Gelardi]" who is the primary Defendant in the EDNY case. Allegedly, the law firm Morgan and Morgan hired Safa Gelardi or one of her companies to perform that observation and accompany their client Jeannie Tam, and the claim is that Mr. Purificati did so as an agent of or in collusion with Ms. Gelardi.

---

[1]I have tried to order the transcript, but my understanding is that the Court reporter is ill. He has not been responsive to my requests.

7. Mr. Purificati testified to the best of his recollection during the hearing that if he had done such an observation it would have been in approximately April or May 2025, but that in all cases he is an independent contractor and was never an agent of Ms. Gelardi or in collusion with her.

8. Following the hearing, the Defendant Gelardi checked her records, and Mr. Purificati went home and checked his records, and both learned that Mr. Purificati had NOT done such an observation, and what's more, Mr. Purificati had never performed an observation for a Morgan and Morgan law firm client. Attached hereto as Exhibit B is a letter to Judge Chen in that regard.

9. On March 9, 2026 Judge Chen Ordered Plaintiff to "file any documents related to this alleged observation, as well as a brief description of the documents and where they were obtained." Plaintiff thereafter provided the Court with a copy of the report prepared by Dr. Francis Pflum of the Tam IME which does state that the claimant was "accompanied by legal representative, Mark Purificati." Exhibit C. That report and that filing by Plaintiff is the "irregularity" we refer to above.

10. As set forth in Mr. Purificati's accompanying Declaration, he maintains that he did not perform that observation. Accordingly, when Mr. Purificati saw this IME report alarm bells went off in his head. There is one innocuous explanation for these circumstances, but there is another devastatingly serious and more likely possibility. We are referring to it herein, for now, as an "irregularity" subject to further action if this case proceeds.

11. The innocuous explanation is that the doctor made a ministerial error in naming Mark Purificati as the observer. Knowing that to be unlikely, I undertook an investigation. The first thing I did was look in the case details for the Tam case in NY Supreme Court to learn who the Morgan and Morgan attorney was on that case. It was Nicholas Gerschman.

12.   I called Mr. Gerschman on March 24, 2026, and he graciously accepted my call right away. I alerted him as to who I am and why I was calling. I told him that although Mr. Purificati is named in the Tam IME report, he maintains that he did not do the observation. I then asked if Mr. Gerschman would check his records to confirm who he hired to perform that observation.

13.   Mr. Gerschman then casually advised me that he uses ***Plaintiff IME Watchdog*** to do his IME observations.

14.   I have asked for written confirmation of that, and Mr. Gerschman explained that he would need to consult with other members of his firm before doing so. As of the date of this Affirmation I have not yet received written confirmation.

15.   There is no dispute in this case that Mr. Purificati never worked for Plaintiff IME Watchdog.

16.   The evidence does not end there. Through the New York State Electronic Case Filing System I searched for other cases handled by Mr. Gerschman from Morgan and Morgan. IME reports generally do not get e-filed until late in the case when a trial may be imminent, but after reviewing the docket on many cases I did find one.

17.   Mr. Gerschman and Morgan and Morgan is Plaintiff's counsel in the case Donna Petty as Executrix of the Estate of James Kelly v. Pasta La Vista, Inc. et al, Index No. 152154/2022. See the case detail attached as Exhibit D showing Mr. Gerschman as Plaintiff's counsel.

18.   Attached hereto as Exhibit E is an IME report in that Kelly case dated April 4, 2024 (which is approximately one year earlier than the Tam case) where ***Plaintiff IME Watchdog was present and expressly named as the observer***.

19.  The conclusion is inescapable that Plaintiff IME Watchdog is the regular vendor of Morgan and Morgan for their observations.

20.  It is unclear how Mark Purificati's name came to be included on the Tam IME report. As noted, we are referring to this circumstance for now as an "irregularity." But it would appear likely that when Plaintiff submitted the Tam IME report to the EDNY Plaintiff had good reason to know that Mark Purificati was not correctly named because Plaintiff likely did the observation itself.

21.  Finally, there is one crucial thing to note. In order to discover the Kelly IME report there is a key detail I had to know *in advance*. I had to know the name of the law firm and lawyer in order to do a search for every single case they handled. Then, I had to sift through every single case, going docket entry by docket entry, to see if an IME report was filed.

22.  Plaintiff would not have had the advance knowledge to look for cases involving Mr. Gerschman in order to discover the Tam IME which *coincidentally* named Mr. Purificati as the observer. Plaintiff would have had to sift through thousands of cases, and even more thousands of docket entries. These circumstances suggest that Plaintiff had advance knowledge and knew precisely where to look. The implications of that we leave in the air – for now.

23.  This situation will have enormous implications in the EDNY for our attorney's fees application. Here, it shows that Plaintiff's primary piece of evidence against Direct and Mr. Purificati is not worthy of consideration to support a federal lawsuit and the case should be dismissed.

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

IME WATCHDOG, INC.,

                        Plaintiff,

                -against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI,
GREGORY ELEFTERAKIS, ROMAN POLLAK,
ANTHONY BRIDDA, IME COMPANIONS LLC,
CLIENT EXAM SERVICES LLC, and IME
MANAGEMENT & CONSULTING LLC,

                        Defendants.

-----------------------------------------------------------------X

**Case No.: 1:22-cv-1032 (PKC) (JRC)**

**SUPPLEMENTAL DECLARATION OF NON-PARTY CARLOS ROA IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER & PRELIMINARY <u>INJUNCTION</u>**

Carlos Roa, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am a judgment creditor of Defendants Safa Gelardi ("Safa"), Vito Gelardi ("Vito"), and IME Companions LLC ("Companions") (Safa, Vito, and Companions collectively hereinafter the "Defendants").

2. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of the file maintained at IME WatchDog, as well as publicly available documents, and provide certain exhibits relevant to this Court's determination of the instant motion in accordance with its March 9, 2026 Order. ECF 644.

3. A copy of the IME report dated June 13, 2025 observed by non-party Mark Purificati ("Purificati") on June 13, 2025, is publicly available at <u>Tam v. Annex Enterprise, Inc., et al.</u>; Index No.: 150505/2023,[1] NYSCEF Docket Entry 45 at 5.

---

[1] A review of the case detail page in NYSCEF for this action will reveal that the law firm customer is Morgan & Morgan in New York, not in Pennsylvania as Safa testified at the March 3, 2026 hearing.

4.      A copy of the IME report dated April 24, 2025 observed by non-party Purificati on April 9, 2025, is publicly available at <u>Bayner v. Rempell, *et ano.*</u>; Index No.: 725276/2023, NYSCEF Docket Entry <u>243</u> at 7. This report was found on NYSCEF.

5.      Critically, Gabriel Law hired IME Companions to conduct the above-referenced IME; Gabriel Law provided Plaintiff documentation of this through an email, annexed hereto as "**Exhibit A**," as part of Plaintiff's efforts to engage in third-party discovery.

6.      The foregoing evidence is sufficient to demonstrate (and/or gives rise to an inference) that Purificati is an agent of Defendants and is acting in active concert or participation with them.

7.      This evidence calls into question Purificati's testimony that he runs his own business without involvement from Safa or Vito in that it directly shows Defendants booked Gabriel Law to have an IME observed and utilized Purificati to observe the IME.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on March 23, 2026.



Carlos Roa

2

# EXHIBIT C



(https://imewatchdog.com)

## *President, Operations*

📞 (718) 463-2320(tel:+17184632320)

✉️ carlos@imewatchdog.com(mailto:carlos@imewatchdog.com)

☁️ Download VCard

As the President of Operations, Carlos Roa brings a formidable blend of academic prowess and entrepreneurial acumen to the table. Armed with a Bachelor's in Health Science from Stony Brook University (2014), a Master's in Public Health from the same institution in 2016, and a Doctorate of Law specializing in Sports Law from Universidad Carlos III de Madrid in 2019, his academic achievements underscore his dedication to diverse fields. Carlos is a seasoned entrepreneur, renowned for founding a boutique international sports management firm. His firm boasts an impressive clientele comprising athletes in Soccer, Track and Field, and Tennis. Notably, he serves as the International Counsel to the Panamanian Olympic Committee and the Panamanian National Soccer Team, leveraging his expertise in negotiations involving athletes, sponsorships, and clothing brands. Before assuming his current role at IME Watchdog, Carlos honed his skills at one of New York City's largest Personal Injury Law firms, overseeing the IME Department. His

# EXHIBIT D

Case 1:23-cv-05032-JPC-RFT Document 42 Filed 06/19/23 Page 295 of 305 PageID #: 13350

# Francis Pflum, M.D.
## Diplomate American Board of Orthopedic Surgery

D&D Associates
PO Box 9150
Garden City, NY 11530

| | |
|---|---|
| DOE: | June 13, 2025 |
| RE: | Jeannie Tam |
| CLAIM#: | TA202207080011001 |
| DOA: | May 10, 2022 |
| D&D #: | 22725012497-1 |

To whom it may concern:

I am a Board-Certified Orthopedic Surgeon, licensed to practice medicine in the State of New York. I evaluated the above claimant in the New York office on June 13, 2025. Valid photo identification was presented by the claimant. She is accompanied by legal representative, Mark Purificati.

**History as:**
The claimant was advised not to provide any information regarding the accident. The following information was obtained from the medical records.

The claimant was reportedly tripped and fell on wet pavement and landed on her left knee. The injury occurred on May 10, 2022. The claimant reportedly sustained left patella fracture and underwent ORIF on July 15, 2022.

**Present Complaints:**
The claimant reports pain in the left knee.

**Unrelated Medical and Surgical History:**
The claimant was advised not to provide any information.

**Subsequent Accidents/Injuries:**
The claimant was advised not to provide any information.

**Present Medications:**
The claimant was advised not to provide any information.

**Occupational Status:**
The claimant was advised not to provide any information.

# EXHIBIT E



PO Box 9150, Garden City, NY  11530          ime@ddassociates.com          Tel: (800) 554-0347  Fax: (516) 240-4059

5/1/2025

MORGAN & MORGAN
199 WATER ST, STE. 1500
NEW YORK NY  10038


**RE:  JEANNIE TAM**
**Insured:  MTA**
**D/A:  05/10/2022**                               **D & D ACCTNO: 22725012497-1**
**File #:  BU202205100019001**

**RESCHEDULED LIABILITY EXAM**


This letter is being sent on behalf of NEW YORK CITY TRANSIT - LAW DEPARTMENT. We have rescheduled an appointment:

From:  05/09/25          at     1:50 PM

To:  06/13/25          at     2:00 PM

for a physical examination, for the above patient, with the following Examiner:

FRANCIS PFLUM  -  ORTHOPAEDIC SURGERY
469 7th Avenue, Suite 601
New York, NY  10018


The appointment was postponed by the attorney and was rescheduled due to: Claimant availability


Please call D & D Associates at (516) 326-8800, Monday thru Friday, between 9 A.M. and 4 P.M., if we can be of further assistance.

Very truly yours,

Kristen Black - Ext. 118152



CC:     DAPHNE FERGUSON at NEW YORK CITY TRANSIT - LAW DEPARTMENT, 130 LIVINGSTON STREET, BROOKLYN, NY  11201
MORGAN & MORGAN, 199 WATER ST, STE. 1500, NEW YORK, NY  10038

# EXHIBIT F

NYSCEF - New York State Courts Electronic Filing  (Live System)

**152154/2022 –** New York County Supreme Court

Short Caption:  **DONNA PETTY v. PASTA LA VISTA, INC. et al**
Case Type: **Torts - Other Negligence (Premises Liability)**
Case Status: **Disposed**
eFiling Status:  **Full Participation Recorded**
Assigned Judge: **Dakota D. Ramseur**

E-mail Participating Parties

**Full Caption**
Donna Petty as Executrix of the Estate of JAMES KELLY v. Pasta La Vista, Inc. , INDIVIDUALLY AND DOING BUSINESS AS PAZZA NOTTE, The Claridge'S Company, Llc, Donald Zucker Company, Llc

**Plaintiffs/Petitioners**

| Name | Represented By |
|---|---|
| Donna Petty as Executrix of the Estate of JAMES KELLY | BEATTY, KATHLEEN E on 03/11/2022<br>Kathleen Law P.C.<br><br>GERSCHMAN, NICHOLAS JOHAN TORE on 02/02/2023<br>MORGAN & MORGAN NEW YORK PLLC |

**Defendants/Respondents**

| Name | Represented By |
|---|---|
| PASTA LA VISTA, INC. , INDIVIDUALLY AND DOING BUSINESS AS PAZZA NOTTE | Shinbaum, Bari Robyn on 05/27/2022<br>Law Office of Manson & McCarthy |
| THE CLARIDGE'S COMPANY, LLC | BERMACK, SCOTT W on 03/22/2024<br>Weber Gallagher<br><br>SANDS, JOSEPH WILLIAM on 05/06/2022<br>Law Offices of Leon R. Kowalski |
| DONALD ZUCKER COMPANY, LLC | BERMACK, SCOTT W on 03/22/2024<br>Weber Gallagher<br><br>SANDS, JOSEPH WILLIAM on 05/06/2022<br>Law Offices of Leon R. Kowalski |

**Authorized Agents**

| Attorney Name | Authorized Agent | Authorization Date | Revocation Date |
|---|---|---|---|
| KATHLEEN E BEATTY | Executive Attorney Service, Inc. | 4/12/2022 | |
| Bari Robyn Shinbaum | Lexitas | 12/17/2025 | |

# EXHIBIT G

11

Case 1:23-cv-05032-RA-RFT Document 42 Filed 06/19/25 Page 301 of 305 PageID #: 13356

**NeuroSage, LLC**
Brian H. Kopell M.D.
2 Fifth Avenue #45
New York, NY 10011

Independent Medical Examination

April 4, 2024

Jerry Lynch, Esq
Weber Gallagher Simpson Stapleton Fires & Newby LLP
1500 Broadway #2401
New York, NY
(929) 342-6000
jlynch@wglaw.com

Plaintiff: James Kelly
DOB: ████████
Index No: 152154/2022
DOI: 10/10/2019

Dear Mr. Lynch,

Thank you for allowing me to see **James Kelly** for an independent medical examination. I have personally reviewed the provided medical records and rendered the below opinions with a high degree of medical certainty. Mr. Christopher Grimes, Mr. Kelly's legal representative from IME WatchDog was present at the time of the IME.

**Chief complaint/History of present illness:**

James Kelly is a 75-year-old right-handed male who was involved in a trip and fall on 10/10/2019.

Also, according to the bill of particulars, Mr. Kelly subsequently alleges the following injuries:

- o Cervical Spine:
    - ▪ Interval mild expansion of the cord at C4 and C5 levels with altered signal intensities within the cord which has progressed since the prior study;
    - ▪ Focal spinal canal narrowing at the level the superior endplate of C5;

**Full docket text:**

ORDER: The Court denies Defendants' [660] motion for reconsideration of the Court's order denying their motion seeking to file a Rule 45 subpoena on Morgan & Morgan, New York, (4/10/2026 Dkt. Order). The standard for granting a motion for reconsideration is "strict." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Cho v. Blackberry Ltd.*, 991 F.3d 155, 170 (2d Cir. 2021) (citation omitted). A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted).

Defendants' motion points to no controlling decisions or data that the Court overlooked and is properly denied on that basis alone. (*See generally* Mot. for Recons., Dkt. 660.) Nonetheless, the Court also rejects Defendants' argument on the merits. Their argument appears to be that, because the Court found that there was not "clear and convincing" evidence linking Defendants to the June 2025 examination that Mark Purificati allegedly performed for Morgan & Morgan, New York, (*see* 4/10/2026 Dkt. Order (denying Plaintiff's motion for contempt)), Defendants are entitled to additional discovery regarding that examination. (*See* Mot. for Recons., Dkt. 660, at 5 (arguing that once the Court found that Plaintiff had not met its burden of proving civil contempt, additional discovery became "more necessary, not less"); *id.* at 7 (arguing that Defendants should be allowed to "test" Plaintiff's "unproven" allegations of contempt so that the allegations do not "remain in the factual narrative").) However, Plaintiff's motion for civil contempt—the only motion to which the requested records would be relevant—has already been decided *in Defendants' favor*. (*See* 4/10/2026 Dkt. Order.) Defendants' request is therefore unnecessary and not relevant to any matter pending before this Court (or, for that matter, the Second Circuit, which is only now considering the Court's entry of judgment for sanctions related to Defendants' contumacious conduct described in the Court's March 2025 Memorandum & Order, (Dkt. 448); *see* Mem. & Order, Dkt. 616, at 40). *See* Fed. R. Civ. P. 26(b)(1) (limiting scope of discovery to matters that are "relevant to any party's claim or defense and proportional to the needs of the case"); *id.* R. 26(b)(2)(C)(iii) (requiring the Court to limit discovery if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)"). Ordered by Judge Pamela K. Chen on 4/21/2026. (JEC)

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/01/2026 23:25:31 | | |
| **PACER Login:** | Florida1994 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 1:22-cv-01032-PKC-JRC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

 

רשם החברות והשותפויות
**REGISTRAR OF COMPANIES AND PARTNERSHIPS**
مسجل الشركات والشراكات

רשות התאגידים
**ISRAELI CORPORATIONS AUTHORITY**
سلطة التنظيمات

משרד המשפטים
**MINISTRY OF JUSTICE**
وزارة العدل

# תעודת התאגדות חברה
# CERTIFICATE OF INCORPORATION OF COMPANY

This is to certify that the company: | וזאת לתעודה כי החברה:

## זריז שיפוצים בע"מ
## ZARIZ SHIPUZIM LTD

| Company Number: | **511511701** | מספר חברה: |

was incorporated and registered in Israel
**on 25th October 1990**
as a limited liability company
according to Companies Laws of the State of Israel

נתאגדה ונרשמה בישראל
**ביום 25/10/1990, ו' חשון התשנ"א**
כחברה בערבון מוגבל
לפי דיני החברות של מדינת ישראל



Shuli Avni-Shoham, Adv.
Registrar of Companies
Head of the Israeli Corporations Authority

שולי אבני-שוהם, עו"ד
רשמת החברות
ראש רשות התאגידים

The company details appearing in this certificate reflect the information as recorded in the Companies Registry on the date of the company's registration. It is possible that changes have occurred in the company details since the certificate was issued. In order to obtain up-to-date information about the company details, the complete company file must be reviewed and/or a status confirmation must be issued.

פרטי החברה המופיעים בתעודה זו משקפים את המידע כפי שנרשם במרשם החברות במועד רישום החברה. ייתכן כי חלו שינויים בפרטי החברה מאז הנפקת התעודה. לצורך קבלת מידע עדכני אודות פרטי החברה, יש לעיין בתיק החברה המלא ו/או להוציא אישור סטטוס.

**Produced on 5th June 2026**
**At 21:05**

**הופקה ביום 05/06/2026 כ' סיון התשפ"ו**
**בשעה 21:05**



To obtain a company information summary,
scan the barcode or click here

להפקת נסח חברה - תמצית מידע על החברה,
יש לסרוק את הברקוד או ללחוץ כאן



אישור שמסמך זה החתום אלקטרונית,
מהווה העתק של מסמך (מקור או העתק) המצוי
ביום החתימה בתיק התאגיד ברשות התאגידים

רשות התאגידים
Israeli Corporations Authority

Please be advised that a company or partnership extract may be obtained for a nominal fee of 12 NIS through the "Israeli Corporations Authority – Registrar of Companies" website, by accessing the "Obtain an Extract" service at:

https://www.gov.il/he/service/company_extract

This service is provided for public convenience and reference.

# Company Registry Extract

## Company Details

**Company Number:** 511511701

Registration Date: **25 Oct, 1990**

Legal Status: **Dissolved by court order**

**Company Name:** ZARIZ SHIPUZIM LTD

Company Type: **Israeli company**

Company Classification: **Private company**

Shareholders' Liability: **Limited liability**

Corporate Address: **16 Hativat Givati, Ra'anana, Israel, c/o Ziegman Yaakov** AI

Principal Corporate Purposes: **To engage only in activities specified in the articles of association**

Annual reports have not been filed

## Capital Structure

Type of Share: **Ordinary**

Number of Shares: **14,000**

Authorised Share Capital: **14,000**

Par Value: **1**

Currency: **New Israeli Sheqel - ILS**

Issued Share Capital: **20**

## Shareholders

1. Name: **Razon Avraham** AI

   Identity Type: **Israeli citizen**

   Address: **26 Ramat HaHayal-HaLah, Tel Aviv - Yafo, Israel** AI

   Holding: 10 Ordinary shares, par value New Israeli Sheqel - ILS 1 each, held directly

   ID Number: **2111268**

   Registration Date: **09 Sep, 1999**

2. Name: **Ziegman Yaakov** AI

   Identity Type: **Israeli citizen**

   Address: **16 Hativat Givati, Ra'anana, Israel** AI

   Holding: 10 Ordinary shares, par value New Israeli Sheqel - ILS 1 each, held directly

   ID Number: **2970515**

   Registration Date: **09 Sep, 1999**

## Directors



אישור שמסמכים אלקטרונית, מהווה העתק נאמן למקור (עתק) המצוי בידי רשות התאגידים ביום היצוא של התאמידים

OFFICIAL CERTIFICATION
This document was electronically generated and electronically signed by the Israeli Corporations Authority.

רשות התאגידים
Israeli Corporations Authority

| | |
|---|---|
| Name: **Ziegman Yaakov** *AI* | ID Number: **2970515** |
| Identity Type: **Israeli citizen** | Appointment Date: **28 Oct, 1990** |
| Address: **16 Hativat Givati, Ra'anana, Israel** *AI* | |

**\*The company has no active obligations\***

**\*Registered charges on the company: None\***

**\*No changes to the articles of association\***

## Status Changes

1.   Change Date: **15 Nov, 1992**

   Status Description:  **In court-ordered liquidation**

   Court Order Number:**0021292**     Order Date: **01 Nov, 1992** Court:**Tel Aviv**

2.   Change Date: **15 Apr, 1997**

   Status Description:  **in Liquidation by Court Order**

   Court Order Number:**0021292**     Order Date: **01 Nov, 1992** Court:**Tel Aviv**

This extract was prepared based on the information contained in the Companies Registry database as of 08 Jun, 2026 at 17:13

This company extract constitutes a summary of information derived from the computerized database of the Israeli Corporations Authority and is provided as a public service, based on information received by the Authority. The information contained in this extract may be incomplete, inaccurate, or not up to date, as it does not constitute one of the statutory registers maintained by the Israeli Corporations Authority pursuant to law. For the purpose of verifying the information and filings submitted to the Registrar of Companies as required by law, reference should be made to the company's official file. Instructions and access to the official file can be found at:

https://www.gov.il/he/service/company_online_portfolio

It is emphasized that the information contained in the company file regarding shareholders and directors, as well as additional information, is of a declarative nature only and does not constitute a substitute for inspection of the shareholders register and directors register maintained by the company itself, which are open for public inspection at the company's registered office. In addition, this extract may include summarized information received from state authorities (including, inter alia, the Insolvency and Economic Rehabilitation Authority, the Enforcement and Collection Authority, the court system, and other authorities). Such information is recorded in accordance with the applicable law and is reflected in this extract as a public service. This information may be partial or not up to date, and reliance should not be placed upon it; verification should be made with the relevant competent public or state authority.

**Translation and AI-Generated Content** To enhance accessibility for international stakeholders, certain fields in this extract have been translated into English using advanced automated or AI-based translation tools (including literal translations or phonetic transliterations), as indicated alongside the relevant fields. These translations are provided for convenience and for general informational purposes only; they are provided on an &quot;as-is&quot; basis and do not constitute an official, certified, or binding translation of the original Hebrew records. The Israeli Corporations Authority encourages users to verify critical information against the Hebrew source.

**In the event of any discrepancy between this English extract and the official Hebrew records, the information recorded in Hebrew in the official registers of the Israeli Corporations Authority shall solely prevail.**

אישור שמסמך אלקטרונית,
מהווה העתק נאמן למקור (עותק)המצוי
ביום אצל רשות התאגידים
OFFICIAL CERTIFICATION
This document was electronically
generated and electronically signed
by the Israeli Corporations Authority.